## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | Case No. 16-11501 (CSS) |
| Debtors.[1] | (Jointly Administered) |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | Adversary Proceeding No. 18-50489 (CSS)  Re:  Docket No. **50** |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS ADVERSARY COMPLAINT

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................7

    The YPF Defendants............................................................................................................7

    Maxus's Legacy Liabilities..................................................................................................8

    OCC Acquires Diamond Shamrock's Chemicals Business (1986) ....................................8

    YPF Aquires Maxus (1995) ..............................................................................................11

    First Set of Transfers—YPF's Alleged Asset "Stripping" Transfers (1996-1997) ...........12

    Second Set of Transfers—Repsol's Alleged Asset "Stripping" (1999-2005) ...................15

    Third Set of Transfers—Repsol's Alleged Intercompany Transfers (2007-2009) ............17

    Public Disclosures of the Alleged Transfers (1996-2009)................................................20

    Repsol is Replaced as YPF's Majority Shareholder (2012) .............................................21

    Passaic River Litigation Regarding Legacy Environmental Liabilities (2005-2016)........22

    The Maxus Bankruptcy (2016) ........................................................................................25

ARGUMENT.....................................................................................................................25

    I.    Standard ....................................................................................................25

    II.    Each of the Trust's Fraudulent Transfer Claims Fails as a Matter of Law............27

        A.    The Trust's Fraudulent Transfer Claims (Counts II-XXI) Are Time-Barred ........................................................................................32

        B.    The Alleged Fraudulent Transfers at Issue in the Passaic River Litigation (Counts IV-XIII) Should Be Dismissed as Barred by the Doctrine of Collateral Estoppel or, in the Alternative, Dismissed Under the Law of the Case Doctrine........................................................35

        C.    Collapsing Cannot Be Used to Save the Trust's Untimely Fraudulent Transfer Claims (Counts II-XXI) ...........................................41

            i.    The Collapsing Doctrine Only Applies to Interdependent Transactions ......................................................................42

            ii.    As a Matter of Law, the Factual Allegations Made in the Complaint Do Not Support Application of the Collapsing Doctrine...........................................................................44

            iii.    The *Tronox* Decision Does Not Save the Trust's Claims..............48

        D.    Avoidance and Recovery of the YPFI Transfers (Counts XIV-XV) Would Be an Impermissible Extraterritorial Application of the Bankruptcy Code, and for that Independent Reason, the Claims Should Be Dismissed ...............................................................................50

E.      The Trust Cannot Avoid Transfers Not Made by a Debtor, and for this Independent Reason, Counts X-XV of the Complaint Should Be Dismissed .................................................................................54

F.      Counts II and III also Must Be Dismissed Because They Fail to Meet the Pleading Requirements of Fed. R. Civ. P. 8(a) and 9(b) ............56

III.    The Trust's Unjust Enrichment Claim (Count XXII) Fails as a Matter of Law .....................................................................................................59

A.      The Trust's Claim for Unjust Enrichment is Time-Barred ........................61

B.      The Trust Cannot Assert a Claim for Unjust Enrichment that Belongs to the Debtors' Creditors..................................................................62

IV.     The Trust's Civil Conspiracy Claim (Count XXIII) Fails as a Matter of Law .....................................................................................................64

A.      Delaware Does Not Recognize a Cause of Action for Civil Conspiracy to Commit Fraudulent Transfer ...............................................66

B.      The Trust Cannot Assert a Cause of Action for Civil Conspiracy to Commit Fraudulent Transfer........................................................................67

C.      Even if a Civil Conspiracy Claim Could Otherwise Be Stated by the Trust, It Cannot Survive Because It Is Time-Barred ...........................69

V.      The Trust's Veil Piercing/Alter Ego Independent Cause of Action (Count I) Fails as a Matter of Law.........................................................................70

A.      The Trust's Veil Piercing/Alter Ego Cause of Action Fails Because Alter Ego Is Not an Independent Cause of Action ....................................71

B.      The Trust's Alter Ego Claim Must Also Be Dismissed Because It Impermissibly Seeks to Hold the YPF Defendants Liable for Harm Not Caused by the YPF Defendants' Alleged Misuse of the Corporate Form .........................................................................................75

NO CONSENT TO ENTRY OF FINAL ORDER OR JUDGMENT ...........................................79

NOTICE.........................................................................................................................................79

CONCLUSION..............................................................................................................................80

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*,
    512 B.R. 447 (Bankr. S.D.N.Y. 2014) ............................................................43, 46

*Am. Metrocomm Corp. v. Duane Morris & Heckscher LLP (In re Am. Metrocomm Corp.)*,
    274 B.R. 641 (Bankr. D. Del. 2002) .................................................................29

*In re Amarin Corp. PLC Sec. Litig.*,
    689 F. App'x 124 (3d Cir. 2017) .....................................................................26

*ASARCO LLC v. Ams. Mining Corp.*,
    382 B.R. 49 (S.D. Tex. 2007) ..........................................................................30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................25, 26

*Atlantis Plastics Corp. v. Sammons*,
    558 A.2d 1062. (Del. Ch. 1989) .......................................................................69

*Bamigbade v. State Farm Mut. Auto. Ins. Co.*,
    391 F. App'x 131 (3d Cir. 2010) .................................................................26, 32

*Banco Popular N. Am. v. Gandi*,
    184 N.J. 161 (2005) .........................................................................................65

*Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch. Inc.)*,
    347 B.R. 708 (Bankr. C.D. Cal. 2006) ........................................................52, 53

*Begier v. Price Waterhouse*,
    81 B.R. 303 (E.D. Pa. 1987) ............................................................................63

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................25

*Beskrone v. OpenGate Capital Group (In re PennySaver USA Publishing, LLC)*,
    587 B.R. 445 (Bankr. D. Del. 2018) .................................................................59

*Blair v. Infineon Techs. AG*,
    720 F. Supp. 2d 462 (D. Del. 2010) ............................................................71, 72

*In re Bracket Holding Corp. Litig.*,
    No. N15C-02-233 WCC, 2017 WL 3283169 (Del. Super. July 31, 2017) ..............31

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
    366 B.R. 318 (Bankr. D. Del. 2007) ................................................................................55, 56

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.
    Fabrikant & Sons, Inc.)*,
    480 B.R. 480 (S.D.N.Y. 2012)........................................................................................44, 48

*Caplin v. Marine Midland Grace Trust Co.*,
    406 U.S. 416 (1972)........................................................................................................62, 73

*Case Fin., Inc. v. Alden*,
    No. 1184-VCP, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009) ................................................71

*Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999)............................................................................................71

*Christianson v. Colt Indus. Op. Co.*,
    486 U.S. 800 (1988)..............................................................................................................39

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)..............................................................................................26, 34

*Connolly v. Labowitz*,
    519 A.2d 138 (Del. Super. 1986) .......................................................................................64, 68

*Crystallex Int'l Corp. v. Petróleos de Venez., S.A.*,
    213 F. Supp. 3d 683 (D. Del. 2016).......................................................................................42

*Crystallex Int'l Corp. v. Petróleos de Venez. S.A.*,
    879 F.3d 79 (3d Cir. 2018)...........................................................................................55, 56, 66

*Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*,
    No. 3601-VCS, 2010 WL 720150 (Del. Ch. Mar. 3, 2010)............................................65, 67

*EiserAmper LLP v. Morgan (In re SRC Liquid. LLC)*,
    581 B.R. 78 (D. Del. 2017).....................................................................................................57

*Emerald Capital Advisors Corp. v. Bayerische Moteren Werke AG (In re FAH
    Liquid. Corp.)*,
    572 B.R. 117 (Bankr. D. Del. 2017) ........................................................................27, 29, 54

*Endo Pharms. Inc. v. Mylan Pharms. Inc.*,
    No. 11-CV-717 (RMB/KW), 2014 WL 2532179 (D. Del. Apr. 8, 2014) ..............................28

*In re Estate of Dawson*,
    641 A.2d 10126 (N.J. 1994)....................................................................................................36

*FDIC v. Hirsch (In re Colonial Realty Corp.),*
 980 F.2d 125 (2d Cir. 1992) ..........................................................53, 54

*Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.),*
 108 B.R. 384 (Bankr. D. Mass. 1989) ...............................................32

*Gavin v. Club Holdings, LLC,*
 No. 15-175-RGA, 2016 WL 1298964 (D. Del. Mar. 31, 2016) ............33, 35, 62, 63

*Glassberg v. Boyd,*
 116 A.2d 711, 717 (Del. Ch. 1955) ....................................................69

*Glob. Link Logistics Inc. v. Olympus Growth Fund III L.P.,*
 No. 4444-VCP 2010 WL 338214 (Del. Ch. Jan. 29, 2010) ...................72

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP),*
 453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...............................................46

*Hamilton Partners, L.P. v. England,*
 11 A.3d 1180 (Del. Ch. 2010) ............................................................66

*Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings
 Corp.),*
 166 B.R. 461 (Bankr. M.D. Fla.) ........................................................76

*Ieradi v. Mylan Labs., Inc.,*
 230 F.3d 594 (3d Cir. 2000) ...............................................................26

*Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.,*
 No. 16-1343, 2016 WL 8256412 (E.D. Pa. Sept. 16, 2016) .................42

*Irwin & Leighton, Inc. v. W.M. Anderson Co.,*
 532 A.2d 983 (Del. Ch. 1987)............................................................76

*JMB Mfg., Inc. v. Child Craft, LLC,*
 939 F. Supp. 2d 909 (S.D. Ind. 2013) ................................................76

*Kleven v. Stewart (In re Myers),*
 320 B.R. 667 (Bankr. N.D. Ind. 2005)................................................68

*Kuroda v. SPJS Holdings, L.L.C.,*
 971 A.2d 872 (Del. Ch. 2009)........................................................64, 68

*LaMonica v. CEVA Grp. PLC (In re CIL Ltd.),*
 582 B.R. 46 (Bankr. S.D.N.Y. 2018) ...........................................52, 53, 54

*Landis v. Sci. Mgmt. Corp.,*
 No. 7483, 1991 WL 19848 (Del. Ch. Feb. 15, 1991) .........................60

*LaSalle Nat'l Bank v. Perelman*,
    82 F. Supp. 2d 279 (D. Del. 2000) .................................................................................. 70, 76

*In re Lee Way Holding Co.*,
    120 B.R. 881 (Bankr. S.D. Ohio 1990) ............................................................................. 76

*Local 322, Allied Indus. Workers v. Johnson Controls, Inc.*,
    921 F.2d 732 (7th Cir. 1991) ........................................................................................... 38

*Marion v. TDI Inc.*,
    591 F.3d 137 (3d Cir. 2010) ......................................................................................... 63, 73

*Marnavi S.p.A. v. Keehan*,
    900 F. Supp. 2d 377 (D. Del. 2012) ........................................................................... 33, 35, 70

*Martin v. Old W. Cowboy Boots Corp. (In re Old W. Cowboy Boots Corp.)*,
    Adv. No. 5-06-50096, 2009 WL 3182998 (Bankr. M.D. Pa. Sept. 30, 2009) ........................ 72

*Medtronic Vascular, Inc. v. Adv. Cardiovascular Sys., Inc.*,
    No. 98-80-SLR, 2005 WL 46553 (D. Del. Jan. 5, 2005) ........................................................ 62

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
    426 B.R. 96 (Bankr. D. Del. 2010) ................................................................................. 43, 44

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
    426 B.R. 488 (Bankr. D. Del. 2010) ........................................................................... 27, 28, 29

*Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools)*,
    368 B.R. 394 (Bankr. D. Del. 2007) .............................................................................. 32, 33

*Mills v. Everest Reins. Co.*,
    410 F. Supp. 2d 243 (S.D.N.Y. 2006) ................................................................................ 43

*Mobil Oil Corp. v. Linear Films, Inc.*,
    718 F. Supp. 260 (D. Del. 1989) ................................................................................... 72, 76

*Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) ................................................................................. 7, 21

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ...................................................................................................... 51

*In re Motors Liquid. Co.*,
    No. 15-CV-8432 (JMF), 2018 WL 2416567, --- B.R. --- (S.D.N.Y. May 29,
    2018) ............................................................................................................................ 40

*Mukamal v. Nat'l Christian Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*,
    Adv. No. 11-2940, 2014 WL 12498025 (Bankr. S.D. Fla. Dec. 10, 2014) ............................ 32

*N.J. Dep't of Env't Prot. v. Occidental Chem. Corp.*,
   No. ESX-L-9868-05, 2015 N.J. Super. LEXIS 229 (N.J. Super. Ct. Law Div.
   Jan. 29, 2015) ...........................................................................................................22, 37, 38

*N.J. Dep't of Env't Prot. v. Occidental Chem. Corp.*,
   No. ESX-L-9868-05, 2015 N.J. Super. LEXIS 230 (N.J. Super. Ct. Law Div.
   Jan. 13, 2015) .................................................................................................... *passim*

*N.L.R.B. v. Greater Kansas City Roofing*,
   2 F.3d 1047 (10th Cir. 1993) ...........................................................................................76

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
   766 F.3d 212 (2d Cir. 2014)........................................................................................76, 77

*In re New Century TRS Holdings, Inc.*,
   No. 07-10416 (KJC), 2014 WL 1466444 (Bankr. D. Del. Apr. 10, 2014) .............................66

*Next Millennium Realty, L.L.C. v. Adchem Corp.*,
   No. 03-5985 (ARL), 2015 WL 11090419 (E.D.N.Y. Mar. 31, 2015) ....................................77

*NML Capital, Ltd. v. Rep. of Arg.*,
   No. 03-Civ.-8845 (TPG), 2011 WL 1533072 (S.D.N.Y. Apr. 22, 2011) ...............................22

*O'Boyle v. Braverman*,
   337 F. App'x 162 (3d Cir. 2009) .....................................................................................26

*Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
   Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
   405 B.R. 527 (Bankr. D. Del. 2009) ...........................................................................67, 68

*Off. Comm. of Unsecured Creditors of HH Liquid., LLC v. Comvest Grp.
   Holdings, LLC (In re HH Liquid., LLC)*,
   Adv. No. 16-51204 (KG), 2018 WL 4191580, --- B.R. --- (Bankr. D. Del. Jan.
   26, 2018) ......................................................................................................................63

*Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.,
   Inc. (In re Sunbeam Corp.)*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..............................................................................46

*OHC Liquid. Tr. v. Nucor Corp. (In re Oakwood Homes Corp.)*,
   325 B.R. 696 (Bankr. D. Del. 2005) .................................................................................57

*PAH Litig. Trust v. Water Street Healthcare Partners, L.P. (In re Physiotherapy
   Holdings, Inc.)*,
   Adv. No. 15-51238 (KG), 2017 WL 5163515 (Bankr. D. Del. Nov. 6, 2017)............27, 30, 31

*Phoenix Can. Oil Co. v. Texaco, Inc.*,
   560 F. Supp. 1372 (D. Del. 1983)....................................................................................62

*In re Pilgrim's Pride Corp.,*
    442 B.R. 522 (Bankr. N.D. Tex. 2010)................................................................40

*Podvey Meanor Catenacci Hildner Cocziello & Chattman, P.C. v. Stanziale (In re*
    *Rabinowitz),*
    Adv. No. 10-02435 (DHS), 2011 WL 6749068 (Bankr. D.N.J. Dec. 21, 2011) ....................36

*Portes v. Tan,*
    No. A-3940-11T3, 2014 WL 463140 (N.J. App. Div. Feb. 6, 2014) ........................................64

*Precision Brand Prods., Inc. v. Downers Grove Sanitary Distr.,*
    No. 08-cv-5549, 2011 WL 3489844 (N.D. Ill. Aug. 8, 2011) .................................................77

*Pulieri v. Boardwalk Prop., LLC,*
    No. 9886-CB, 2015 WL 691449 (Del. Ch. Feb. 18, 2015)................................................61, 62

*Quadrant Structured Prods. Co. v. Vertin,*
    102 A.3d 155 (Del. Ch. 2014)................................................................................................66

*Ramunno v. Cawley,*
    705 A.2d 1029 (Del. 1998) ......................................................................................................64

*Richardson v. Monaco (In re Summit Metals, Inc.),*
    477 B.R. 484 (Bankr. D. Del. 2012) ........................................................................................26

*Rieser v. Hayslip (In re Canyon Sys. Corp.),*
    343 B.R. 615 (Bankr. S.D. Ohio 2006)....................................................................................68

*Roberts v. Balasco (In re Ernie Haire Ford, Inc.),*
    459 B.R. 824 (Bankr. M.D. Fla. 2011) ..............................................................................63, 67

*Ross v. Ross,*
    705 A.2d 784 (N.J. Super. Ct. App. Div. 1998)......................................................................38

*Round Rock Research LLC v. ASUSTeK Computer Inc.,*
    967 F. Supp. 2d 969 (D. Del. 2013)........................................................................................70

*Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.),*
    307 B.R. 744 (Bankr. S.D.N.Y. 2004).....................................................................................63

*SB Liquid. Trust v. Preferred Bank (In re Syntax-Brillian Corp.),*
    Adv. No. 10-51389, 2011 WL 3101809 (Bankr. D. Del. July 25, 2011) ..........................44, 48

*Scott v. NG U.S. 1, Inc.,*
    450 Mass. 760 (Mass. 2008) ..................................................................................................77

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.),*
 513 B.R. 222 (S.D.N.Y. 2014)..................................................................................51, 52, 53, 54

*Secs. Investor Prot. Corp. v. Murphy (In re Selheimer & Co.),*
 319 B.R. 395 (Bankr. E.D. Pa. 2005) ......................................................................................40

*Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. (In re Sherwood Invs. Overseas Ltd.),*
 Adv. No. 6:10-00158-KSJ, 2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) ........................................................................................................................................52, 53

*Smiley v. Daimler Chrysler,*
 538 F. Supp. 2d 711 (D. Del. 2008) .........................................................................................68

*Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.),*
 562 B.R. 601 (Bankr. S.D.N.Y. 2017).................................................................................52, 53

*Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC),*
 571 B.R. 241 (Bankr. E.D. Ky. 2017) ......................................................................................28

*Spring Real Estate, LLC v. Echo/RT Holdings, LLC,*
 No. 7994-VCN, 2016 WL 769586 (Del. Ch. Feb. 18, 2016).....................................................55

*Springel v. Prosser (In re Innovative Commc'n Corp.),*
 Adv. No. 08-03004, 2011 WL 3439291 (Bankr. D.V.I. Aug. 5, 2011)...................................32

*Stillwater Liquid. LLC v. Net Five at Palm Pointe, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.),*
 559 B.R. 563 (Bankr. S.D.N.Y. 2016).......................................................................................46

*Superior Contracting Grp. Inc. v. Rachmale (In re LTC Holdings, Inc.),*
 587 B.R. 25 (Bankr. D. Del. 2018) ...........................................................................................71

*Sutton v. JP Morgan Chase Bank, N.A. (In re Wa. Mut., Inc.),*
 575 B.R. 609 (Bankr. D. Del. 2017) .........................................................................................70

*Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P.,*
 906 A.2d 168 (Del. Ch. 2006)...................................................................................................67

*Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.),*
 429 B.R. 73 (Bankr. S.D.N.Y. 2010) .......................................................................................49

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),*
 503 B.R. 239 (Bankr. S.D.N.Y. 2013)............................................................................. *passim*

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
　Adv. No. 09-1198 (ALG), 2014 WL 5819821 (Bankr. S.D.N.Y. July 22,
　2014) ...................................................................................................................41

*TrustCo Bank v. Mathews*,
　No. 8374-VCP, 2015 WL 295373 (Del. Ch. Jan. 22, 2015)...................................29

*Turner v. Crawford Square Apartments III, L.P.*,
　449 F.3d 542 (3d Cir. 2006).........................................................................27, 35

*U.S. Bank Nat'l Assn. v. Verizon Commc'ns, Inc.*,
　761 F.3d 409 (5th Cir. 2014) ................................................................72, 73, 74

*United States. v. Rocky Mountain Holdings, Inc.*,
　782 F. Supp. 2d 106 (E.D. Pa. 2011) ...................................................................28

*U.S. Virgin Islands v. Goldman, Sachs & Co.*,
　937 A.2d 760 (Del. Ch. 2007)..............................................................................62

*VTB Bank v. Navitron Projects Corp.*,
　No. 8514-VCN, 2014 WL 1691250 (Del. Ch. Apr. 28, 2014) ................................29

*Walker v. Sonafi Pasteur (In re Aphton Corp.)*,
　423 B.R. 76 (Bankr. D. Del. 2010) .......................................................................57

*Wavedivision Holdings, LLC v. Highland Capital Mgmt. L.P.*,
　No. 08C-11-132-JOH, 2011 WL 13175837 (Del. Super. Oct. 31, 2011, *as
　corrected*, Aug. 7, 2012).....................................................................................65

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
　543 B.R. 127 (Bankr. S.D.N.Y. 2016)...................................................................54

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
　567 B.R. 55 (Bankr. S.D.N.Y. 2017).....................................................................42

*Winstar Holdings, LLC v. Blackstone Group, LP (In re Winstar Commc'ns, Inc.)*,
　435 B.R. 33 (Bankr. D. Del. 2010) ...........................................................39, 61, 69

*Yaquinto v. Ward (In re Ward)*,
　558 B.R. 771 (Bankr. N.D. Tex. 2016)..................................................................73

*Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*,
　418 B.R. 107 (Bankr. D. Del. 2009) ....................................................................70

*Zirger v. Gen. Accident Ins. Co.*,
　676 A.2d 1065 (N.J. 1996)...................................................................................36

**Statutes**

11 U.S.C. § 541 ................................................................................................54

11 U.S.C. § 544 ........................................................................................ *passim*

28 U.S.C. § 1450 ...............................................................................................40

6 Del. C. § 1309 ..........................................................................................33, 37

10 Del. C. § 8106 ........................................................................................61, 69

N.J.S.A. § 25:2-31 (1988) .................................................................................37

**Other Authorities**

Fed. R. Bankr. P. 7008 .................................................................................59, 79

Fed. R. Bankr. P. 7009 .....................................................................................57

Fed. R. Bankr. P. 7012 .....................................................................................26

Fed. R. Bankr. P. 9027 .....................................................................................40

Fed. R. Civ. P. 8 .........................................................................................56, 59

Fed. R. Civ. P. 9 .........................................................................................56, 57

Fed. R. Civ. P. 12 .......................................................................................26, 32

Del. Bankr. L.R. 7008-1 ....................................................................................79

Restatement (Second) of Conflict of Laws § 6 (1971) .................................30, 31

Restatement (Second) of Conflict of Laws § 145 (1971) .............................29, 65

Restatement (Second) of Conflict of Laws § 221 (1971) .............................30, 60

## PRELIMINARY STATEMENT

All of the claims against the YPF Defendants[2] asserted by the Trust must be dismissed. The Trust seeks to impose liability on the YPF Defendants based on alleged fraudulent transfers and common law unjust enrichment and civil conspiracy claims, all of which were time-barred long ago. In its Complaint, the Trust also goes far beyond the boundaries of well-established law by seeking to impose unprecedented liability on the YPF Defendants for *all* claims in the Debtors' Chapter 11 cases based on a theory that the YPF Defendants were the alter egos of the Debtors. It likewise seeks unspecified liability through two counts seeking avoidance of fraudulent transfers, which capture all of the purportedly fraudulent transfers targeted by the Trust's other claims, *plus* other amorphous and unenumerated transfers, which as alleged implicate every single payment by the Debtors from 1995 to the Petition Date.

The Trust concocts an incredible story of a grand "Strategy" allegedly hatched by the YPF Defendants in 1995, immediately after YPF's leveraged buyout of Maxus, purportedly to steal away with Maxus's valuable assets in order to avoid its legacy environmental liabilities. But this alleged "Strategy" is implausible on its face: it purportedly spans over 20 years, involves multiple discrete and unrelated transactions and assets, allegedly benefited two completely different corporate owners at different times and in entirely different ways, and allegedly culminated with the Debtors' bankruptcy filings *years* after the applicable statute of limitations had already run, and after the YPF Defendants had provided hundreds of millions of dollars in financial support to the Debtors. The notion that the YPF Defendants had a plan in 1995 (before any transaction had occurred) to be the target of a tender offer and be owned by Repsol four years later, and then to

---

[2] All capitalized terms not otherwise defined in the Preliminary Statement are used as defined below.

have assets removed *from the YPF entities* and transferred to the Repsol entities, simply is not plausible as a matter of law.

The Trust also goes far beyond any cognizable claims by seeking to recover massive damages against the YPF Defendants for *all* of the Debtors' environmental liabilities even though the Trust's own Complaint makes unequivocally clear that the pollution which caused the underlying environmental liabilities occurred *decades* or more before the YPF Defendants even had any ownership interest in the Debtors. More specifically, the environmental liabilities were caused by various predecessors and successors of Diamond Alkali Company—including the Debtors—and emanated primarily from pollution discharged into the Passaic River from their Lister Site, which has been inactive since 1977. (Compl. ¶ 41.) The Trust also acknowledges that at the time the Lister Site became inactive, the Debtors had two lines of business: an oil and gas exploration business (which had nothing to do with creating the legacy environmental liabilities) and a chemical business (which had everything to do with creating those liabilities). The Debtors' chemical business was subsequently purchased by Occidental Chemical Corporation ("OCC"), which in 1986 became the legal successor to the legacy polluter that caused the entirety of underlying environmental problems referenced in the Complaint. (*Id.* ¶ 44.) In the parties' Stock Purchase Agreement ("SPA") there was an indemnity from Maxus, requiring it to hold OCC harmless with respect to legacy environmental liabilities. (*Id.*) None of the YPF Defendants was a party to the SPA, for the obvious reason that OCC purchased the Debtors' chemical business nine years before YPF's acquisition of Maxus.

The Debtors' ability to pay ongoing legacy environmental liabilities in 1986 depended on their ongoing operating revenue that was not otherwise required to run the oil and gas exploration business, or on their sale of assets to generate the capital to make such payments. But the Trust

2

also alleges that Maxus was inadequately capitalized (and that it was potentially insolvent and unable to pay its debts) before YPF even acquired it. (*Id.* ¶¶ 71, 102). Had the Debtors continued to operate as an independent company, they never would have been able to provide a "warm safe bed" to pay for the purported billions of dollars in legacy environmental liabilities. (*Id.* ¶ 17.) In its Complaint, however, the Trust seeks to put OCC and the other creditors in a massively *better* position than they ever would have occupied if the YPF Defendants had never entered the picture. Pre-YPF Maxus, by the Trust's own admission, could never have paid the environmental liabilities in the amount that the Trust is now alleging, or anything close to it. Nothing in the Bankruptcy Code, any applicable state law, or any notion of equity or fairness ever would countenance now imposing those liabilities on the YPF Defendants.

The YPF Defendants acquired the Debtors' remaining oil and gas exploration business through a leveraged buyout in 1995 (which occurred after several post-OCC sale dispositions of assets). The Trust claims that the YPF Defendants had a sudden revelation immediately thereafter that they faced increasing legacy environmental liabilities via Maxus's indemnity obligation (*Id.* ¶¶ 8, 73) and then embarked on a two-decade long journey, scheming to insulate the Debtors' assets from being used to pay for the Debtors' legacy environmental liabilities.

The first alleged step taken to "strip" the Debtors of their assets, according to the Trust, occurred in 1996 and 1997, when foreign subsidiaries of the Debtors (in Bolivia, Venezuela, Ecuador, and Indonesia) were subject to a tax restructuring. There are of course countless examples of international companies moving subsidiaries within their corporate structure in order to take advantage of substantial tax efficiencies. The precursor to this tax restructuring, according to the Trust, was that the Debtors had $1.4 billion in third party debt retired by the YPF Defendants. (*Id.* ¶¶ 10, 65, 78.) Although the YPF Defendants take issue with the gross mischaracterization of

the retirement of that massive secured debt and tax restructuring (which the record will show *benefited* the Debtors), it does not matter for purposes of this motion because these ancient 20-year-old transactions are not viable actual or constructive fraudulent transfer claims for an entirely different reason: they are time-barred.

Each of these four alleged fraudulent transfers that occurred in the 1990s is subject to Delaware's four-year statute of limitations, which means the Trust is at least 15 years too late in asserting these claims. Tellingly, the New Jersey Court—which adjudicated these very same fraudulent transfer claims brought against the YPF Defendants by OCC—already declared them time-barred. That Court also found that because these transactions were conspicuously featured in the YPF Defendants' SEC filings (which also covered the Debtors), no reasonable creditor of the Debtors would have failed to discover them. It should not be lost on this Court that OCC is the party that controls three of the five seats on the Liquidating Trust Oversight Committee (Disclosure Statement Art. V.E.7, D.I. 1258, Ex. A) and the party that loaned $16 million in seed money to fund the Trust and this Adversary Proceeding (*id.* Art. V.E.5), no doubt in an attempt to get a second bite of the apple to avoid the New Jersey Court's decision.

The remainder of the Trust's fraudulent transfer claims meet the same fate. In 1999, a new, completely independent set of related companies—the Repsol Defendants—purchased sufficient shares through a tender offer to gain a majority stake in the YPF Defendants. Once the Repsol Defendants took ownership of the YPF Defendants, the Trust contends they too engaged in a series of alleged fraudulent transfers: (1) selling Debtors' interests in a joint venture by January 2000 (the "Crescendo" transfer); (2) causing YPFI to sell the same Venezuelan, Ecuadorian, and Indonesian subsidiaries to other Repsol entities or other third parties in 2001 and 2002—some of which are extraterritorial and beyond this Court's reach in any event and/or were not made by any

4

of the Debtors; and (3) engaging in a series of inter-company settlements from 2007 to 2009. None

of these alleged fraudulent transfers are within the four-year statute of limitations either, and the

Trust does not allege, nor could it, that these transfers were unknown or concealed. Similarly, the

Trust's common-law unjust enrichment (Count XXII) and civil conspiracy claims (Count XXIII)

are time-barred, as are the Trust's omnibus fraudulent transfer claims (Counts II-III)—all of which

also fail for other substantive reasons explained below.

There is no legitimate way for the Trust to circumvent the inescapable conclusion that all

of these claims are untimely. It is obvious that the Trust is fully aware of its statute of limitations

problems, given its mistaken reliance on the New York Bankruptcy Court's opinion in *Tronox Inc.*

*v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), in the body of its

Complaint. (Compl. ¶¶ 1-12.) The Trust no doubt intends to rely upon the *Tronox* court's holding

that pursuant to the "collapsing doctrine," a series of interdependent transactions which are part of

an overall scheme, occurring over four years, could be "collapsed" such that, as long as the last

transfer was within the statute of limitations, the trustee would not be barred from seeking to avoid

all of them.

However, nothing in *Tronox* is so revolutionary that it could remotely support the Trust's

attempt to deploy the collapsing doctrine here. In order to collapse multiple transactions into one,

the law requires that the defendants must have known at the outset about all of the transactions to

follow, and that each was interdependent with the others. Collapsing most commonly occurs in the

leveraged buy-out context, but the alleged "Strategy" at issue here is nothing like an LBO.

Collapsing may not be used to move all prior transactions, whenever they occurred, up to the

Petition Date, which the Trust seeks to do here. Similarly, no court has ever collapsed 20-year-old

separate, independent transactions undertaken by completely different parties. Unlike the

"Strategy" alleged in the Complaint, *Tronox* involved interdependent steps of a single corporate spin-off transaction that occurred well within the applicable four-year statute of limitations period, not separate and independent transactions that were concluded between 7 and 20 years prior to the bankruptcy filing and directed by different owners at different times, with certain of the transfers benefiting different parties, and certain transactions actually harming the party being sued (here, the YPF Defendants). *Tronox* simply cannot save the Trust's time-barred claims.

That leaves the Trust's alter ego cause of action (Count I), in which it seeks a declaration that the YPF Defendants are the alter egos of the Debtors such that the YPF Defendants are jointly and severally liable for each of the claims that have been asserted by the Debtors' creditors in these Chapter 11 cases. But the Trust's alter ego claim must also be dismissed. First, veil piercing/alter ego liability is only a remedy; it is not an independent cause of action. As such, the Trust cannot pursue an alter ego remedy unless it is tied to a substantive claim against the underlying corporate entity. Because the Trust has no viable claims, it cannot pursue a stand-alone alter ego remedy. The New Jersey Court made this point perfectly clear when it refused to allow OCC to circumvent the dismissal of its fraudulent transfer claims on statute of limitations grounds via a catchall alter ego theory, precisely because the latter is merely a remedy, not a separate claim. Other courts also have held that the underlying individual creditor claims in a Chapter 11 case cannot serve as a substitute to a substantive general claim the Trust itself must be able to bring in its Complaint in order to pursue an alter ego remedy. That is particularly true in this case, where the Trust possesses the sole and unilateral ability to defend and settle the very liabilities and proofs of claim for which it now claims the YPF Defendants and the Repsol Defendants are somehow liable.

Separately, even if an untethered alter ego remedy could be pursued in the absence of any underlying claim (and it cannot be), as a matter of law the Trust may not seek to recover more than

6

the harm allegedly caused by the alter ego "defendant," and the YPF Defendants could never have caused any environmental liability, as all of the activity relating to that liability long predated their involvement. Yet the Trust seeks to use an alter ego theory to impose joint and several liability on the YPF Defendants for all environmental liabilities of the Debtors based on conduct that occurred decades or more before the YPF Defendants had any affiliation with the Debtors. Such a disconnect is not lost on courts. Case upon case holds that a creditor-plaintiff may recover from a parent only those damages proximately caused by the parent's alleged abuse of the corporate form. Here, that is not the underlying environmental liability but, at most, the purported fraudulent transfers (*i.e.*, the moving of assets allegedly to avoid having them available to be used to satisfy the Debtors' environmental liability obligations) that resulted from the YPF Defendants' claimed adverse dominion and control of the Debtors—transfers which are now time-barred, and cannot be revived through the mere invocation of "alter ego" liability.

## BACKGROUND[3]

### The YPF Defendants

YPF, S.A. ("YPF") is a corporation (*sociedad anónima*) formed under the laws of Argentina with its principal place of business in Buenos Aires, Argentina. (Compl. ¶ 25.)[4] YPF Holdings, Inc. ("YPFH") is a Delaware corporation that is wholly-owned by YPF. (*Id.* ¶ 24.) YPF International S.A. ("YPFI") is a Bolivian company that is wholly-owned by YPF. (*Id.* ¶¶ 26, 86.)

---

[3] For the purposes of the Motion, the YPF Defendants rely on factual allegations in the Complaint without conceding their veracity or any of the Trust's inferences drawn therefrom. The YPF Defendants also rely on facts of which this Court may take judicial notice or materials incorporated by reference into the Complaint.

[4] A true and correct copy of the Complaint is attached as Exhibit 1 to the Declaration of John J. Kuster in Support of the YPF Defendants' Motion to Dismiss Adversary Complaint, dated October 19, 2018 ("Kuster Decl.").

CLH Holdings, Inc. ("CLH Holdings" and collectively, the "YPF Defendants") is a Delaware corporation[5] that is wholly-owned by YPFH. (*Id.* ¶ 27.)

## Maxus's Legacy Liabilities

The vast majority of the Debtors' alleged liabilities are unliquidated and contingent environmental liabilities that arose from commercial operations of the Debtors' predecessors several decades prior to YPF's acquisition of Maxus Energy Corporation ("Maxus") in 1995. More specifically, Maxus's predecessor Diamond Alkali Company (together with various predecessors and successors, "Diamond Alkali") was founded in 1910. (*Id.* ¶ 41.) In the late 1960s, Diamond Alkali became a wholly-owned subsidiary of Diamond Shamrock Corporation ("Diamond Shamrock"). (*Id.* ¶¶ 4, 41.) The Debtors, through Diamond Alkali, Diamond Shamrock, and other corporate predecessors, allegedly engaged in conduct that has resulted, or will result, in substantial environmental liabilities. (*Id.* ¶¶ 42-58.) Indeed, in the 1950s through the 1970s, Diamond Alkali and Diamond Shamrock owned and/or operated chemical plants in at least 148 locations nationwide, including a plant in Newark, New Jersey (the "Lister Site"). (*Id.* ¶¶ 3, 4, 41, 48-58.) The Maxus Liquidating Trust (the "Trust") does not allege, nor could it, that any YPF Defendants caused or participated in any of the alleged pollution at any of these sites, including the Lister Site, that gave rise to the environmental liabilities asserted against the Debtors in these Chapter 11 cases.

## OCC Acquires Diamond Shamrock's Chemicals Business (1986)

In September 1986, nearly a decade before YPF acquired Maxus, Diamond Shamrock sold its active, ongoing chemicals business through a stock sale to an affiliate of OCC. (*Id.* ¶ 44.)[6] Diamond Shamrock retained ownership of the Lister Site and other sites with environmental

---

[5] *See* Kuster Decl., Ex. 2 at 1 (Contribution Agreement).

[6] The chemical business, known as Occidental Electrochemicals Corporation, was merged into OCC on November 30, 1987. Kuster Decl., Ex. 3 ¶ 29 (Fourth Amended Complaint in Passaic River Litigation).

issues, and agreed to defend, indemnify, and hold harmless OCC for environmental liabilities related to Diamond Shamrock's chemicals business, including certain remediation obligations at the Lister Site. (*Id.*)

In 1987, the following year, Diamond Shamrock was renamed Maxus Energy Corporation. (*Id.* ¶ 45.) At this time, according to the Complaint, Maxus was no longer a chemicals business, but instead was an independent oil and gas exploration and production company. (*Id.* ¶ 6.) The chemicals business, as an asset, had been stripped away for OCC's benefit, leaving the much smaller Maxus oil and gas exploration business with a remaining indemnification obligation to OCC for certain historical environmental liabilities associated with the chemicals business. (*Id.* ¶ 44.) During this period, Maxus also used $147 million from the stock sale of the chemicals business to fund shareholder dividends[7] and continued its contraction by, among other things, spinning off a number of other segments of its business, including Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Coal Company, and Transworld Petroleum (U.K.) Limited (which held substantially all of Maxus's oil and gas interests in the British North Sea).[8] The Trust does not allege that any creditor ever objected to these transfers. Thus, as a result of commercial operations of the legacy chemicals business stretching back a half-century before YPF entered the scene in 1995, as well as a string of spinoffs in the prior decade, Maxus was already saddled with "significant environmental liabilities" and, according to the Complaint, was "inadequately capitalized." (*See id.* ¶¶ 48-58, 71.)[9]

---

[7] Kuster Decl., Ex. 4 at 21 (Maxus Form 10-K for fiscal year ended December 31, 1987 (Mar. 11, 1988)).

[8] *Id.* at 2-3, 21-22. The spin-off of the refining and marketing business alone eliminated $799.3 million in physical assets ($521.7 million, net of accumulated amortization of $277.6 million) and reduced paid-in capital by approximately $258.1 million. (*Id.* at 41, 50-51.)

[9] At the time Maxus agreed to the indemnity provisions in the SPA, it had recorded a $75 million reserve for environmental liabilities. (*See* Kuster Decl., Ex. 4 at 3.) Neither OCC nor any other creditor objected to the size of those reserves at the time.

***Environmental Liabilities at the Lister Site.*** In 1977, almost a decade before Diamond Shamrock sold its active, ongoing chemicals business to an affiliate of OCC, the Lister Site— where Diamond Alkali manufactured various pesticides and herbicides—became inactive. (*Id.* ¶ 41.)[10] Five years later, in 1982, the United States Environmental Protection Agency (the "EPA") discovered dioxin contamination at the Lister Site. (*Id.* ¶ 42.) The following year, the New Jersey Department of Environmental Protection (the "NJDEP") issued an administrative order requiring Diamond Shamrock to implement stabilization measures to prevent off-site migration of dioxin and other contaminants. (*Id.* ¶ 43.) In 1984, the Lister Site was added to the Superfund National Priority List. (*Id.* ¶ 43.)

***Other Environmental Liabilities.*** The Complaint lists other environmental liabilities for which Maxus is purportedly responsible, as a successor to Diamond Alkali, Diamond Shamrock and/or other companies that formerly owned or operated chemical plants and which occurred decades before YPF acquired Maxus in 1995:

- A site in Kearny, New Jersey, where *Diamond Alkali* operated a ferrous chromate processing plant *until the 1970s*. (*Id.* ¶ 49.)

- Another site in Kearny, where *Diamond Alkali* processed chromium ore (the "Kearny Plant Site"). (*Id.* ¶ 50.) The Kearny Plant Site is adjacent to a site in Kearny at which various heavy industrial activities occurred between *1916 and 1993*. (*Id.*)

- A site in Painesville, Ohio, at which *Diamond Alkali* operated a ferrous chromate processing plant *until 1976*. (*Id.* ¶ 51.)

- A facility in Greens Bayou, Texas, at which *Diamond Alkali and then Diamond Shamrock* manufactured DDT and other chemicals from *1951 until 1983*. (*Id.* ¶ 52; Kuster Decl., Ex. 5 at 17 of 107 (Final Damage Assessment and Restoration Plan/Environmental Assessment for Greens Bayou, Harris County, Houston, Texas, filed in *U.S., et al. v. GB Biosciences Corp., et al.*, No. 4:13-cv-151 (S.D. Tex.) [D.I. 2-2].)

---

[10] The "Lister Site" appears to be a portion or all of the "Diamond Alkali Site" as defined in the Plan (as defined below), although the Complaint is not precise in its definition or usage of the term.

- A site in Milwaukee, Wisconsin, owned or operated by certain of the Debtors' predecessors for processing coke and gas *between 1966 and 1973* (the "<u>Milwaukee Solvay Site</u>"). (Compl. ¶ 53.)[11]

- A site in Louisville, Kentucky, that was operated to produce pesticides and insecticides in the *1950s*. (*Id.* ¶ 54.)

- The Malone Services Company Superfund site in Galveston County, Texas, where *Diamond Shamrock sent waste products prior to OCC's acquisition in 1986.* (*Id.* ¶ 56.)

The contingent environmental liabilities related to the chemicals business from these sites are allegedly as much as $12 billion based on governmental proofs of claim filed, approximately 96% of which is attributable to the Lister Site. (Disclosure Statement Arts. I.C.1, I.N, & II.E.1.)[12] The Trust does not allege (nor could it) that the YPF Defendants had any involvement in the Debtors' or their predecessors' operations or ownership of any of their properties or assets when any of the pollution occurred that gave rise to these environmental liabilities.

**<u>YPF Aquires Maxus (1995)</u>**

In 1995, decades after the operations that gave rise to the environmental liabilities had ceased and nearly a decade after Maxus sold its chemicals business to an affiliate of OCC, YPF acquired Maxus through a leveraged buyout ("<u>LBO</u>"). (Compl. ¶¶ 63, 72.) As part of the acquisition, YPF agreed to include a "Keepwell Covenant" in the merger agreement under which YPF provided financial support to Maxus up to the amount of the $425 million acquisition debt. (*Id.* ¶ 65.) After the LBO, Maxus was able to retire $1.4 billion in commercial debt to third-party

---

[11] In its first amended complaint in its adversary proceeding pending against Honeywell International Inc. in this Court, Maxus alleged that the Milwaukee Solvay Site "is comprised of a number of adjacent lots where various industrial activities have occurred *since at least 1873.*" *Maxus Energy Corp. v. Honeywell Int'l Inc. (In re Maxus Energy Corp.)*, Adv. No. 17-50054 (CSS), D.I. 17 ¶ 11 (Bankr. D. Del. filed May 5, 2017) (emphasis added).

[12] The YPF Defendants believe that this amount is grossly inflated, and that the final amount (including after contribution or other recovery from other potentially responsible parties) should be a small fraction of this number.

secured creditors that was coming due shortly with an approximately equal amount of intercompany debt. (*See id.* ¶¶ 77-78.)

As is common after an acquisition, YPF performed a tax restructuring, in which it reorganized the legal structure of its and Maxus's corporate groups to minimize the groups' tax burden. (*Id.* ¶ 75.) In particular, the Maxus corporate group's key international entities were moved from Debtor Maxus International Energy Company ("MIEC") and non-Debtor Maxus Indonesia, Inc. (both U.S. entities) to YPFI, a newly created non-U.S. holding company subsidiary of MIEC. (*Id.* ¶¶ 80, 86, 90, 93.) This restructuring was completed in 1997, nearly two decades before the Debtors filed their voluntary petitions on June 17, 2016 (the "Petition Date"). None of the Debtors' creditors, including OCC, are alleged to have objected to the LBO or the tax restructuring, or indeed to *any* of the transfers alleged to have occurred, at or near the time they occurred.

**First Set of Transfers—YPF's Alleged Asset "Stripping" Transfers (1996-1997)**

The Trust alleges that in 1996 and 1997, the YPF Defendants caused the Debtors to engage in various transactions whereby certain Maxus foreign subsidiaries were transferred to YPF entities. Each of these transfers (giving rise to Counts IV-XI of the Complaint) was fully disclosed in publicly available SEC filings.

***Transfer 1—Bolivian Transfer (Counts IV-V)***: Effective July 1, 1996 (and contemporaneously disclosed through SEC filings), MIEC transferred its shares of Maxus Bolivia, Inc. to YPFI (the "Bolivian Transfer"). (*Id.* ¶ 86; Kuster Decl., Ex. 6 at 1 (Maxus Form 8-K (July 11, 1996)); *see also* Kuster Decl., Ex. 7 (Maxus Bolivia Share Transfer Authorization (effective June 28, 1996).) On July 1, 1996, MIEC also entered into the Stock Purchase and Sale Agreement with YPF, pursuant to which MIEC sold its holdings in its then-subsidiary YPFI to YPF for

approximately $266 million. (Compl. ¶ 86; Kuster Decl., Ex. 6 at 2 & Ex. 2.1; *see also id.* Ex. 8

(YPFI Stock Purchase and Sale Agreement).)

*Transfer 2—Venezuelan Transfers (Counts VI-VII)*: In June and July 1996, MIEC

transferred its shares of Maxus Venezuela S.A. and Maxus Venezuela (C.I.) Ltd. to YPFI (the

"Venezuelan Transfers"). (Compl. ¶ 86; *see also* Kuster Decl., Ex. 6 at 1.) As noted above, on July

1, 1996 (and contemporaneously disclosed through SEC filings), MIEC sold its holdings in its

then-subsidiary YPFI to YPF for approximately $266 million. (Compl. ¶ 86; *see also* Kuster Decl.,

Ex. 6 at 2 & Ex. 2.1.) As alleged in the Complaint, "YPF caused Maxus to transfer to YPFI the

stock of Maxus's Bolivian and Venezuelan affiliates . . . and then to sell the stock of YPFI to YPF

for book value ($266 million) as determined by Credit Suisse First Boston." (Compl. ¶ 86.)

*Transfer 3—Ecuadorian Transfer (Counts VIII-IX)*: More than a year later (and

contemporaneously disclosed through SEC filings), pursuant to a stock purchase and sale

agreement, dated as of December 31, 1997, MIEC sold its holdings in YPF Ecuador, Inc. to YPFI

for approximately $185 million (the "Ecuadorian Transfer"). (*Id.* ¶ 90; Kuster Decl., Ex. 9 (YPF

Ecuador Stock Purchase and Sale Agreement); *id.* Ex. 10 at 79 (YPF Form 20-F (Mar. 27, 1998).)

*Transfer 4—Indonesian Transfers (Counts X-XI)*: During the same time period (and

contemporaneously disclosed through SEC filings), pursuant to a purchase and sale agreement,

dated as of December 31, 1997, non-Debtor Maxus Indonesia, Inc. sold all of its interests in YPF

Java Baratlaut B.V. and Maxus Southeast Sumatra LLC to YPFI for approximately $505 million,

later adjusted to approximately $575.4 million (the "Indonesian Transfers"). (Compl. ¶¶ 93-94;

Kuster Decl., Ex. 11 (YPF Java Baratlaut/Maxus Southeast Sumatra Purchase and Sale

Agreement); *id.* Ex. 10 at 79.)

The Maxus corporate group used the proceeds of the Ecuadorian Transfer and the Indonesian Transfer to reduce its ongoing liabilities through, in part, (i) paying $165 million to redeem outstanding preferred stock owned by third parties, and (ii) repaying approximately $700 million of the $1.4 billion in loans provided by YPF to enable the Maxus corporate group to pay down its third-party debt. (Compl. ¶¶ 87, 92, 95).

### *Operations Prior to Repsol's Acquisition of YPF*

The Maxus corporate group transferred title to certain real estate properties to Chemical Land Holdings, Inc. (later renamed "Tierra"), which is a subsidiary of Defendant CLH Holdings focused on managing environmental liabilities. (*Id.* ¶¶ 20, 80-81.) Consistent with Tierra's corporate focus on environmental liability management, Tierra and Maxus entered into an Assumption Agreement, dated as of August 14, 1996, under which, among other things, Tierra assumed certain of Maxus's indemnification obligations to OCC for future environmental liabilities. (*Id.* ¶ 81; Kuster Decl., Ex. 12 (Assumption Agreement).) Notwithstanding this assumption, Maxus remained directly responsible to OCC for the indemnification. (Compl. ¶ 81.) The Debtors' management reserved $109 million for environmental contingencies that it believed were reasonably estimable at that time. (Kuster Decl., Ex. 13 at 15 (Maxus Form 10-Q (Aug. 8, 1996).) Further, pursuant to a Contribution Agreement, dated as of August 14, 1996 (the "Contribution Agreement"), YPF committed to support Tierra through (i) contributions totaling up to $111.5 million to pay management's contemporaneous estimates for environmental remediation and other costs, and (ii) annual financial contributions, with no cap on the total, for Tierra's ongoing general, administrative, and legal expenses. (*Id.* ¶ 82; Kuster Decl., Ex. 14 at 25 (Maxus Form 10-K405 (Mar. 20, 1997)); *id.* Ex. 2.)

**Second Set of Transfers—Repsol's Alleged Asset "Stripping" (1999-2005)**

In 1999—four years after YPF acquired Maxus—Repsol, S.A. ("Repsol")[13] acquired majority ownership of YPF (and therefore Maxus) through a series of stock purchases. (Compl. ¶¶ 11, 110.)[14] Soon after the acquisition, Repsol allegedly used its ownership of the Maxus and YPF corporate groups to implement its separate restructuring of both corporate groups by having non-Debtor Midgard Energy Company ("Midgard"), YPF and/or YPFI sell their respective interests in particular assets to the Repsol corporate group or third parties, not to YPF entities. (*Id.* ¶¶ 113-114). The Trust makes no allegation (nor could it) that the YPF Defendants knew or could have known in 1995 that Repsol would acquire 99% of the shares of YPF, or that Repsol would later transfer YPF group assets to Repsol affiliates or to unrelated third parties.

*Transfer 5—Crescendo Transfer (Counts XII-XIII)*: In December 1999 and January 2000—sixteen years before the Petition Date—"Repsol caused YPF to cause Maxus [*sic*] to sell part of its Crescendo interests," which included its exploration and production ("E&P") assets in Texas and Oklahoma (the "Crescendo Transfer"). (*Id.* ¶¶ 110, 113.) These E&P assets were stakes in Crescendo Resources LP ("Crescendo"), a joint venture between Midgard and BP Amoco. (*Id.* ¶ 113.) Non-Debtor Midgard sold a portion of its interest in Crescendo to BP Amoco, an unrelated third party, in December 1999 for $405.5 million, and in January 2000, Midgard sold the remainder of its interest in Crescendo to Apache Resources, another unrelated third party, for $219 million. (*Id.* ¶ 114; Kuster Decl., Ex. 16 at 9, 55, F-32 (YPF Form 20-F (June 2, 2000).) The proceeds were used in part to repay intercompany debt guaranteed by YPF and in part to extend a loan to Repsol

---

[13] Repsol's affiliates that are defendants in this adversary proceeding are referred to as the "Repsol Defendants".

[14] By December 31, 2000, Repsol owned 99.0% of the outstanding capital stock of YPF, having acquired a 14.99% equity stake from the Argentine government on January 20, 1999, an additional 82.47% stake through a tender offer on June 23, 1999, and the remainder in smaller acquisitions in 1999-2000. (Kuster Decl., Ex. 15 (Repsol Form 20-F (Mar. 9, 2001)).)

International Finance ("RIF"). (Compl. ¶ 116.) Repsol agreed to fund Maxus's continuing operations on its monthly cash needs. (*Id.*)

*Transfer 6—YPFI Transfers (Counts XIV-XV):* In 2001, at Repsol's direction, Repsol and YPF caused certain of the Ecuadorian and Venezuelan assets that had previously been transferred by the Debtors to YPFI to be sold to Repsol's affiliates. In addition, at Repsol's direction, certain of the Indonesian assets that had previously been transferred from the Debtors to YPFI were sold to the China National Offshore Corporation ("CNOOC") (collectively referred to as the "YPFI Transfers"). (*Id.* ¶¶ 119-121.) In other words, assets previously transferred to YPFI in 1995-1997 were transferred out of YPFI in 2001, for what the Trust contends was "less than fair market value or reasonably equivalent value." (*Id.* ¶¶ 122, 380, 392.)

More specifically, in January 2001, the YPF Defendants sold their Ecuadorian assets to Repsol YPF Ecuador S.A. for $307 million. (Kuster Decl., Ex. 17 at 39 (YPF Form 6-K (Nov. 20, 2002)); Compl. ¶¶ 118-119.) YPF also disclosed in an SEC filing that, at Repsol's direction, "[i]n July 2001, [YPFI] sold its 100% interest in Repsol YPF Venezuela S.A. to Repsol Exploración S.A." and "on September 2001, [YPFI] sold its 100% interest in Maxus Venezuela (C.I.) Ltd. and Maxus Guarapiche Ltd. to Repsol Exploración Venezuela B.V." (Kuster Decl., Ex. 17 at 40; Compl. ¶ 120) The Complaint alleges that total consideration for the sale of these assets was approximately $313 million. (Compl. ¶ 120.) Additionally, on January 22, 2002, Repsol announced via an SEC filing that it had reached an agreement to sell YPFI's Indonesian assets to CNOOC for approximately $585 million, subject to adjustment. (Kuster Decl., Ex. 18 at 3 (Repsol Form 6-K (Jan. 22, 2002)); Comp. ¶ 121.) Like the prior transfers, each alleged fraudulent transfer was publicly disclosed in contemporaneous SEC filings.

These transfers purportedly concluded the alleged asset stripping phase of the so-called "Strategy," and by late 2005, "Maxus had already been stripped of nearly all of its assets and had virtually no revenue stream." (Compl. ¶ 135.) The Complaint does not allege, nor could it, that the YPF Defendants knew that Repsol would transfer the Ecuadorian, Venezuelan, and Indonesian assets away from the YPF Defendants and to Repsol affiliates or to CNOOC at the time they were initially transferred to YPFI in 1996 and 1997, or that these initial transfers to YPFI in 1996 and 1997 were somehow dependent on the subsequent transfers in 2001 and 2002 to Repsol affiliates and to CNOOC.

**Third Set of Transfers—Repsol's Alleged Intercompany Transfers (2007-2009)**

*Corporate Restructuring of the Maxus Group:* The Trust alleges that in 2005 Repsol devised a new round of corporate reorganizations intended to "cause[] Maxus to sell certain of its remaining E&P assets to a Repsol subsidiary and remove[] the assets from the YPF and YPFH ownership chain." (*Id.* ¶ 133.) To implement this new "separation plan," Repsol allegedly created a new holding company for the Maxus corporate group, Repsol E&P USA, Inc. ("Repsol E&P USA"), which was a direct subsidiary of Repsol Exploración, S.A. (*Id.* ¶ 132.) Thereafter, from 2007 through 2009, with the asset transfers and corporate reorganizations completed, Repsol allegedly embarked on a new corporate objective of "eliminating intercompany receivables" through a series of settlement agreements. (*Id.* ¶ 151.) The Trust does not allege (nor could it) that the entry into these settlement agreements was part of any YPF "Strategy" formulated in 1996, as the settlement agreements were not entered into before YPF had been purchased by Repsol and addressed liabilities Repsol owed to Maxus after Repsol's acquisition of YPF.

*Transfer 7—2007 Repsol Settlement Agreements (Counts XVI-XVII):* Maxus employees had continued to provide services to various segments of the Repsol, YPF, and/or Maxus corporate

17

families, even though not all entities to which services were being provided were parties to a service agreement with Maxus. (*Id.* ¶ 136.) In order to compensate Maxus for its employees' services to Repsol in 2006 and 2007, in April and July 2007, Repsol entities entered into three settlement agreements (the "2007 Repsol Settlement Agreements") with Maxus for (1) marketing and distribution services provided to Repsol Services Company, (2) services provided to one or more Repsol entities in connection with exploration activities in the Gulf of Mexico, and (3) uncompensated technical services provided to one or more Repsol entities related to operations in Trinidad and Tobago. (*Id.* ¶ 139 404, 417.) Repsol paid at least $2.9 million in cash to Maxus under the 2007 Repsol Settlement Agreements. (*Id.* ¶¶ 139, 150.) None of the YPF Defendants is a party to the 2007 Repsol Settlement Agreements, and none of the 2007 Repsol Settlement Agreements concerned services provided to any YPF entity.

*Transfer 8—2007 YPF Settlement Agreement Transfers (Counts XVIII-XIX)*: On October 8, 2007—with Repsol still holding 99% of YPF's shares—the YPF Defendants entered into a settlement agreement with Maxus, Tierra, and Maxus (U.S.) Exploration Company ("MUSE") (the "2007 YPF Settlement Agreement"). (Kuster Decl., Ex. 19 (2007 YPF Settlement Agreement); Compl. ¶ 140.) The 2007 YPF Settlement Agreement (1) released Tierra from the Assumption Agreement, (2) provided for Maxus's funding of Tierra's future expenses related to indemnification obligations for 20 years, and (3) terminated the Contribution Agreement and provided for indemnification of YPF by Maxus and Tierra for any future claims for payment under the Contribution Agreement. (Compl. ¶ 140.) Under the 2007 YPF Settlement Agreement, allegedly in return for the termination of the Contribution Agreement, the YPF Defendants provided over $420 million to Maxus and Tierra, by (1) forgiving $363 million in intercompany debt owed by Maxus, (2) contributing $43 million to Maxus to meet its pension plan obligations,

18

and (3) advancing $14.4 million to Tierra. (*Id.* ¶ 141.) The 2007 YPF Settlement Agreement, including the termination of the Contribution Agreement, was publicly disclosed in SEC filings in 2008. (Kuster Decl., Ex. 20 at F-22 (YPF Form 20-F (Apr. 14, 2008)); *id.* Ex. 21 at 45 (YPF Form 6-K (May 19, 2008)).)

*Transfer 9—2009 Settlement Agreement Transfers (Counts XX-XXI)*: On July 8, 2009, Maxus entered into another settlement agreement with Repsol E&P USA, Repsol Services Company, and Repsol Offshore E&P USA (the "2009 Settlement Agreement" and collectively with the 2007 Repsol Settlement Agreements and the 2007 YPF Settlement Agreement, the "Settlement Agreements"). The 2009 Settlement Agreement related to the following: (1) the Repsol Defendants' use of Maxus-licensed seismic data, condensed seismic data, and software, (2) consideration for Maxus in connection with the exchange of certain of its prospects in the Gulf of Mexico, (3) unpaid invoices for services provided by Maxus to Repsol or other non-YPF subsidiaries, and (4) performance corroboration related to other of Maxus's Gulf of Mexico assets. (Compl. ¶ 148.) Maxus released its claims with regard to these matters in exchange for $50 million paid by the Repsol entities. (*Id.* ¶ 149.) As with the 2007 Repsol Settlement Agreements, none of the YPF Defendants was party to the 2009 Settlement Agreement.

Of the Settlement Agreements, the only one involving any of the YPF Defendants was the 2007 YPF Settlement Agreement. Under the 2007 YPF Settlement Agreement, YPF provided at least $420.4 million in consideration, through debt forgiveness or affirmative payments (including contributions for pension obligations that, if YPF had paid directly, would have given rise to a claim against Maxus under a theory of subrogation), and received only a release from any remaining obligations under the Contribution Agreement.

**Public Disclosures of the Alleged Transfers (1996-2009)**

As shown in the chart below, each of the allegedly fraudulent transfers was publicly disclosed, with each transfer involving the YPF Defendants being disclosed at or near the time:

| Transfer | Date | Disclosures |
|---|---|---|
| MIEC transfers Maxus Bolivia, Inc. to YPFI (Counts II-V) | July 1, 1996 | • Maxus Form 8-K (July 11, 1996) (Kuster Decl., Ex. 6)<br>• Maxus Form 10-Q (Nov. 12, 1996) (Ex. 22)<br>• Maxus Form 10-K405 (Mar. 20, 1997) (Ex. 14)<br>• Maxus Form 10-Q (May 13, 1997) (Ex. 23)<br>• YPF Form 20-F (Mar. 27, 1998) (Ex. 10) |
| MIEC transfers Maxus Venezuela S.A. and Maxus Venezuela (C.I.) to YPFI (Counts II-III, VI-VII) | July 1, 1996 | • Maxus Form 8-K (July 11, 1996) (Ex. 6)<br>• Maxus Form 10-Q (Nov. 12, 1996) (Ex. 22)<br>• Maxus Form 10-K405 (Mar. 20, 1997) (Ex. 14)<br>• Maxus Form 10-Q (May 13, 1997) (Ex. 23)<br>• YPF Form 20-F (Mar. 27, 1998) (Ex. 10) |
| MIEC transfers YPF Ecuador, Inc. to YPFI (Counts II-III, VIII-IX) | December 31, 1997 | • YPF Form 20-F (Mar. 27, 1998) (Ex. 10) |
| MIEC transfers shares in YPF Java Baratlaut B.V. and Maxus Southeast Sumatra LLC to YPFI (Counts II-III, X-XI) | December 31, 1997 | • YPF Form 20-F (Mar. 27, 1998) (Ex. 10) |
| Non-Debtor Midgard transfers interests in Crescendo to non-parties BP Amoco and Apache Resources (Counts II-III, XII-XIII) | 1999-2000 | • YPF Form 20-F (June 2, 2000) (Ex. 16) |

| Transfer | Date | Disclosures |
|---|---|---|
| YPF and YPFI transfer Ecuador investments to Repsol YPF Ecuador S.A. (Counts II-III, XIV-XV) | January 2001 | • YPF Form 6-K (Nov. 20, 2002) (Ex. 17) |
| YPFI transfers Repsol YPF Venezuela S.A. to Repsol Exploración S.A., and Maxus Venezuela (C.I.) Ltd. and Maxus Guarapiche Ltd. to Repsol Exploración Venezuela B.V. (Counts II-III, XIV-XV) | July 2001, September 2001 | • YPF Form 6-K (Nov. 20, 2002) (Ex. 17) |
| YPFI transfers Indonesian assets to CNOOC Ltd. (Counts II-III, XIV-XV) | January 2002 | • Repsol Form 6-K (Jan. 22, 2002) (Ex. 18) |
| 2007 YPF Settlement Agreement Transfers (Counts II-III, XVIII-XIX) | October 8, 2007; March 31, 2008 | • YPF Form 20-F (Apr. 14, 2008) (Ex. 20)<br>• YPF Form 6-K (May 19, 2008) (Ex. 21) |
| 2007 and 2009 Repsol Settlement Agreement Transfers (Counts II-III, XVI-XVII, XX-XXI) | April/July 2007; July 8, 2009 | • NJDEP Fourth Amended Complaint ¶¶ 88-89 (Sept. 28, 2012) (Ex. 3) |

**Repsol is Replaced as YPF's Majority Shareholder (2012)**

Years after the Settlement Agreements, the government of Argentina became critical of Repsol's management of YPF (including its appropriation of YPF's and Maxus's assets) and displaced Repsol as the majority owner of YPF's shares in May 2012. (Compl. ¶¶ 171-172.) After the Argentine government obtained a 51% stake of YPF in May 2012, management of YPF and Maxus was allegedly replaced. (*See id.* ¶¶ 176-177.) In connection with regaining ownership of YPF from Repsol, the Argentine comptroller, Julio de Vido, publicly released the "Mosconi Report," which disclosed his findings from an investigation into Repsol's management of YPF. (*Id.* ¶ 172.)[15] In the Complaint, the Trust asserts that the Mosconi Report "accused Repsol's management of being responsible for the looting and depredation of YPF" and contained "*the same*

---

[15] The Mosconi Report was released on June 1, 2012. *Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 344 (S.D.N.Y. 2014).

*asset siphoning allegations set forth in this complaint against the Defendants and put the blame squarely on Repsol.*" (*Id.* ¶ 172 (emphasis added).)

YPF subsequently took actions to ensure current payment of Maxus's creditors, including (1) making capital contributions for such payments (Compl. ¶ 179), (2) protecting funds (intended for Maxus's payment in connection with the Passaic River remediation) from certain holders of Argentinian bonds that were aggressively taking actions around the globe to impound assets that arguably could belong to the Argentine government (*Id.* ¶ 180),[16] and (3) causing foreign subsidiaries to issue loans to Maxus to continue funding its operations when YPF itself was temporarily prohibited from making additional capital infusions. (*Id.* ¶ 180.)

## Passaic River Litigation Regarding Legacy Environmental Liabilities (2005-2016)

In December 2005, prior to Repsol's being displaced as the majority shareholder of YPF in 2012, the State of New Jersey (on behalf of the NJDEP and other entities) initiated the Passaic River Litigation in the New Jersey Superior Court, Law Division, Essex County (the "New Jersey Court") against OCC and various corporate entities in the Maxus corporate group regarding the Lister Site. (*Id.* ¶¶ 13, 127.) In June 2007, OCC sought leave to amend its answer to bring cross-claims against certain of the YPF Defendants, certain of the Repsol Defendants, Maxus, and Tierra. *N.J. Dep't of Env't Prot. v. Occidental Chem. Corp.* ("*NJDEP v. OCC*"), No. ESX-L-9868-05 (PASR), 2015 N.J. Super. LEXIS 230, at *5 (N.J. Super. Ct. Law Div. Jan. 13, 2015), *adopted*, 2015 N.J. Super. LEXIS 229 (Jan. 29, 2015) (Kuster Decl., Ex. 24). After being granted leave to amend, on October 6, 2008, OCC formally asserted cross-claims against those defendants for, among other things, fraudulent transfer of Maxus's assets and unjust enrichment. (*Id.* ¶ 188; Kuster

---

[16] *See, e.g., NML Capital, Ltd. v. Rep. of Arg.,* No. 03-Civ.-8845 (TPG), 2011 WL 1533072, at *1 (S.D.N.Y. Apr. 22, 2011) (describing bondholder's obtaining order of attachment of Argentine assets in 2011 to satisfy judgments of $1.6 billion).

Decl., Ex. 25 ¶¶ 1, 76-83 (OCC's Answer, Affirmative Defenses and Crossclaims).) Over the next four years, OCC amended its cross-claims to add YPFI as a cross-claim defendant, to assert a claim that certain of the YPF and Repsol entities should be treated as alter egos of Maxus, and to assert, among others, a claim for civil conspiracy against the YPF and Repsol entities. (Kuster Decl., Ex. 26 (OCC's Second Amended Cross-Claims).)

Notably, and unsurprisingly given OCC's role in both cases, the allegations in the Passaic River Litigation are substantially identical to those asserted by the Trust with respect to the alleged asset stripping transfers. More specifically, in the Passaic River Litigation, the YPF Defendants were alleged to have "engaged in a scheme to enrich YPF, and later Repsol, by transferring substantially all of Maxus' assets to YPF affiliates, and subsequently to Repsol affiliates, for less than fair market value and by isolating the environmental liabilities associated with the Lister Site in companies wholly unable to fulfill obligations owed to Occidental under the SPA." (*Id.* Ex. 25 at 48-49, ¶ 78.) Additionally, "in 2001, Repsol furthered the scheme by directing that the Ecuadorian Assets and Indonesian Assets be transferred from YPF's international subsidiaries to Repsol's international subsidiaries that are not within YPF's corporate structure. YPF thereafter did so." (*Id.* at 49, ¶ 79.) The allegations in the Passaic River Litigation also state that the YPF Defendants conspired with Repsol, Maxus and MIEC to transfer Maxus's assets to YPF affiliates and later to Repsol affiliates. (*Id.* Ex. 26 ¶ 116.)

On December 12, 2013, the New Jersey Court approved a settlement between the State of New Jersey and the non-OCC defendants, resulting in the dismissal of the claims against the Repsol corporate group defendants, the YPF corporate group defendants, and the Maxus corporate group defendants (and some claims against OCC) in exchange for $130 million. (Compl. ¶ 190.) After the settlement, the only claims remaining in the Passaic River Litigation were OCC's cross-

claims, which included claims against the Repsol Defendants and the YPF Defendants for fraudulent transfers, unjust enrichment, civil conspiracy and alter ego. (*Id.* ¶ 191; *see* Kuster Decl., Ex. 26 ¶¶ 63-68, 94-105, 115-120.)

The YPF corporate group entities, the Maxus corporate group entities, and the Repsol corporate group entities separately moved to dismiss OCC's claims against them.[17] The New Jersey Court granted the YPF Defendants' and Repsol Defendants' motions to dismiss all of OCC's cross-claims for fraudulent transfer, unjust enrichment and civil conspiracy on the ground that the claims are time barred under New Jersey's codification of the Uniform Fraudulent Transfer Act ("NJUFTA"). The New Jersey Court's orders dismissed OCC's fraudulent transfer claims, its unjust enrichment and civil conspiracy claims, and its claim for a declaratory judgment regarding its alter ego liability remedy to the extent that any alter ego liability was predicated on the dismissed causes of action.[18] As the New Jersey Court explained, "[a]lter-ego liability is not a separate cause of action; it is a remedy."[19] As such, a plaintiff invoking the doctrine must "first establish an independent basis to hold the corporation liable,"[20] and without such an "independent basis" for liability, there is no ground for imposing alter ego liability.

The YPF Defendants and the Repsol Defendants later moved for summary judgment as to the remaining cross claims, all of which were asserted on alter ego liability theories: (i) breach of the SPA (both YPF and Repsol Defendants), (ii) contractual indemnification (both YPF and Repsol Defendants), (iii) contribution liability under the Spill Act (YPF Defendants only), and (iv) environmental contribution liability under other New Jersey statutes (YPF Defendants only). The

---

[17] *See NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230, at *75.

[18] *See id.* at *24-25 ("[T]o the extent each of the[] claims are barred, so is alter-ego liability based on them.").)

[19] *See id.* at *25.

[20] *See id.* at *25 (quoting *Casini v. Graustein (In re Casini)*, 307 B.R. 800, 811-12 (Bankr. D.N.J. 2004)).

New Jersey Court granted the Repsol Defendants' motion for summary judgment. (Compl. ¶ 192.) The New Jersey Court, however, denied the YPF Defendants' motion, and a bench trial was scheduled to start on June 18, 2016. (*Id.* ¶ 195.)

## The Maxus Bankruptcy (2016)

The Debtors filed their voluntary petitions on June 17, 2016, staying the Passaic River Litigation.[21] (*Id.* ¶¶ 95, 206.) The Debtors sought confirmation of a plan anchored on the prosecution of claims against YPF corporate group entities and Repsol corporate group entities and funded by OCC (the "Plan").[22] (*Id.* ¶¶ 209-210.) The Plan was confirmed on May 22, 2017, and went effective on July 14, 2017 (the "Effective Date"). (*Id.* ¶¶ 210-211.) The Trust was established on the Effective Date and commenced this action on June 14, 2018. (*Id.* ¶ 211.) By the time this action started, counsel to OCC had become counsel to the Trust, which is attempting to relitigate the same claims that were already dismissed in the New Jersey state court action.

## ARGUMENT

### I.    Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In short, a complaint must include "factual

---

[21] The Passaic River Litigation was removed to the federal district court in New Jersey by OCC and later transferred to this Court. The claims against the YPF Defendants remain pending before this Court as an adversary proceeding. (*See N.J. Dep't of Env't Prot. v. Occidental Chemical Corp.*, Adv. No. 16-51025 (CSS) (Bankr. D. Del.))

[22] The Plan was confirmed after the Debtors withdrew their motion [D.I. 300] for approval of a settlement with the YPF Defendants pursuant to which the YPF Defendants would have paid the Debtors $130 million to settle, among other things, the claims asserted in the Complaint. The first plan of liquidation to be proposed [D.I. 697] incorporated the proposed settlement.

content that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged." *Id.* (emphasis added).

"A complaint may properly be dismissed for failure to state a claim," pursuant to Fed. R. Civ. P. 12(b)(6),[23] "on statute of limitations grounds if the untimeliness of the complaint is apparent on its face." *Bamigbade v. State Farm Mut. Auto. Ins. Co.*, 391 F. App'x 131, 133 (3d Cir. 2010) (affirming dismissal of complaint filed in 2009 based on a 2005 accident where the statute of limitations for personal injury claims was two years) (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)).

In addressing a motion to dismiss, "in addition to the complaint itself," the Court may consider "documents incorporated by reference" by the complaint, the authenticity of which is not in dispute. *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 128 n.6 (3d Cir. 2017). Additionally, the Court "may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000). Such additional materials include, but are not limited to, court documents from state court proceedings, *O'Boyle v. Braverman*, 337 F. App'x 162, 164-65 (3d Cir. 2009), filings with the U.S. Securities and Exchange Commission, *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 162 n.3 (3d Cir. 2014), and a court's own docket, *Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 488 n.1 (Bankr. D. Del. 2012).

---

[23] Pursuant to Federal Rule of Bankruptcy Procedure 7012(b), Federal Rule of Civil Procedure 12(b)(6) applies in this adversary proceeding.

## II.    Each of the Trust's Fraudulent Transfer Claims Fails as a Matter of Law

Section 544 of the Bankruptcy Code permits a trustee to apply non-bankruptcy avoidance laws under certain circumstances:

> the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor *that is voidable under applicable law* by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1) (emphasis added). The Trust avers that its fraudulent transfer claims are brought under "applicable law, including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin." (*See* Counts II–XXI.) However, case law demonstrates that only one set of state laws can govern whether a transaction constitutes a fraudulent transfer. Indeed, the courts in this district do not apply the laws of multiple states when analyzing a Section 544(b)(1) fraudulent transfer claim, but rather engage in a conflict of law analysis to determine which law applies to a given claim. *See, e.g., PAH Litig. Trust v. Water Street Healthcare Partners, L.P. (In re Physiotherapy Holdings, Inc.)*, Adv. No. 15-51238 (KG), 2017 WL 5163515 (Bankr. D. Del. Nov. 6, 2017) (conducting conflict of laws analysis to determine sole "applicable law" in connection with section 544 fraudulent transfer claim); *Emerald Capital Advisors Corp. v. Bayerische Moteren Werke AG (In re FAH Liquid. Corp.)*, 572 B.R. 117, 129 (Bankr. D. Del. 2017) (same), *leave to appeal denied*, No. 17-160 (GMS), 2018 WL 2793944 (D. Del. June 11, 2018); *cf. Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)* ("*Mervyn's II*"), 426 B.R. 488, 496 n.6 (Bankr. D. Del. 2010) ("[T]he Court should . . . determine which state law applies to the fraudulent transfer claim.").

Here, it is apparent that Delaware law should govern the Trust's fraudulent transfer claims.[24] First, federal courts in Delaware apply Delaware law absent a true conflict of law. *See, e.g., Endo Pharms. Inc. v. Mylan Pharms. Inc.*, No. 11-CV-717 (RMB/KW), 2014 WL 2532179, at *7 (D. Del. Apr. 8, 2014) ("The Court need only conduct a choice-of-law analysis where the proposed states' laws actually conflict. Because the Court does not find that Delaware and Pennsylvania law conflict, it need not analyze which law should apply but will apply the law of the forum state, Delaware." (internal citations omitted)). Although the Trust provides a laundry list of states whose laws might apply, the Trust contends that each follows the "Uniform Fraudulent Transfer Act" ("UFTA"). (*See, e.g.*, Compl. ¶ 247 (listing Delaware, Kentucky, New Jersey, Ohio, Texas, and Wisconsin).) As various courts have found, "no choice of law conflict exists where both states have adopted the same relevant portions of the [Uniform Fraudulent Transfer Act.]" *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 113-14 (E.D. Pa. 2011); *see also, e.g., Mervyn's II*, 426 B.R. at 496 n.6 ("[Delaware, California, and Minnesota] have similarly adopted the UFTA, and therefore the result is the same regardless of the choice of law issue.").[25]

Even were a conflict to exist, however, Delaware law still should apply to the Trust's fraudulent transfer claims. While "[t]here is substantial disagreement among the courts as to whether or not a federal court exercising bankruptcy jurisdiction must follow the choice-of-law

---

[24] As discussed below, *infra* 50-54, the YPFI Transfers (Counts XIV and XV) were extraterritorial, and Section 544(b) does not provide a means for this Court to avoid them. However, to the extent that this Court determines (and it should not) that the YPFI Transfers were domestic or that Section 544(b) applies extraterritorially, of the *states* providing potentially applicable law, Delaware still had the most significant relationship to the transfers of any U.S. jurisdiction and should be the "applicable law" regarding those transfers as well. However, because the transactions are extraterritorial, any avoidance should be governed by foreign law, and the Trust has not pleaded any such law.

[25] While the Trust asserts that Kentucky's UFTA could be applicable law, Kentucky never enacted the UFTA, and its own idiosyncratic fraudulent transfer law (now-repealed chapter 378 of the Kentucky Revised Statutes) would apply if Kentucky law were applicable. *See Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, 571 B.R. 241, 245 n.3 (Bankr. E.D. Ky. 2017). Even if there is a conflict between the UFTA and Kentucky's now-repealed statutory regime, for the reasons set forth below, Delaware, not Kentucky, has the most significant relationship to the Trust's fraudulent transfer claims such that Delaware law must apply to the Trust's fraudulent transfer claims.

rules of the state in which it sits or the federal common law choice-of-law rules," such an analysis is irrelevant here "because both Delaware and the federal common law apply the Restatement's 'most significant relationship test' to decide choice of law issues." *Am. Metrocomm Corp. v. Duane Morris & Heckscher LLP (In re Am. Metrocomm Corp.)*, 274 B.R. 641, 659 n.16 (Bankr. D. Del. 2002) (internal quotations omitted); *see also Mervyn's II*, 426 B.R. at 496 n.6 ("Since the Delaware bankruptcy court has jurisdiction over this matter, the Court should apply the 'most significant relationship' choice of law standard to determine which state law applies to the fraudulent transfer claim." (citing *Travelers Indemn. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991)).

The Restatement (Second) of Conflict of Law, which Delaware has adopted, does not provide a specific standard for applying the most significant relationship test for fraudulent conveyance actions. Nevertheless, Delaware courts look to the Restatement's framework for tort and restitution actions to determine the most significant relationship for fraudulent conveyance actions. *See In re FAH Liquid. Corp.*, 572 B.R. at 129 (applying the Restatement's torts and restitution provisions to determine jurisdiction with most significant relationship to fraudulent transfer claim); *VTB Bank v. Navitron Projects Corp.*, No. 8514-VCN, 2014 WL 1691250, at *9-10 (Del. Ch. Apr. 28, 2014) (same); *cf. TrustCo Bank v. Mathews*, No. 8374-VCP, 2015 WL 295373, at *9-11 (Del. Ch. Jan. 22, 2015) (applying the Restatement's torts and *contracts* provisions to determine state with most significant relationship to fraudulent transfer claim).

For torts, the relevant factors under the Restatement are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2) (1971). For restitution claims, the relevant factors are:

> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship, (b) the place where the benefit or enrichment was received, (c) the place where the act conferring the benefit or enrichment was done, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

*Id.* § 221(2).

After completing this analysis, courts consider the aforementioned factors in relation to the

policy considerations outlined in Section 6 of the Restatement:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* § 6(2) (1971).

The holding in *Physiotherapy Holdings* is instructive. In that case, Judge Gross engaged in

a choice-of-law analysis to determine which law should apply to a litigation trust's fraudulent

transfer claims. Applying the "most significant relationship" test, the court applied Delaware law

based upon its conclusion that Delaware had the most significant relationship to the claim and the

parties even though there were numerous contacts with Pennsylvania—for example, the Debtors

were located in Pennsylvania, the persons alleged to have engaged in the underlying fraud were in

Pennsylvania, and the litigation trust filed its claims under Pennsylvania law. 2017 WL 5163515,

at *3. In deciding that Delaware law applied, the court noted that (i) the majority of the debtors

were Delaware corporations, (ii) the debtors filed for bankruptcy in Delaware, and (iii) the

litigation trust was formed in Delaware. *Id.*; *accord ASARCO LLC v. Ams. Mining Corp.*, 382 B.R.

49, 64 (S.D. Tex. 2007) (Delaware law applied for purposes of section 544(b) claim because, *inter*

*alia*, the defendant, one of the plaintiffs, the entity whose stock was transferred, and the current holder of such stock all were incorporated in Delaware).

The same considerations apply equally here because Delaware has the most significant relationship to the claims and the parties based on the allegations in the Complaint. First, all of the Debtors are incorporated in Delaware. (Compl. ¶¶ 19-23.) Second, five of the eleven Defendants are (or were at the time of the relevant transfers) incorporated in Delaware.[26] (*Id.* ¶¶ 24, 27, 31, 33-34.) Third, the Debtors filed for bankruptcy in Delaware. Fourth, the Trust was formed in Delaware (Liquidating Tr. Agmt. § 1.01(a), D.I. 1453-1). Finally, each of the alleged transfers has independent connections to Delaware,[27] which supports finding that the Section 6 policy considerations also point to applying Delaware law.[28]

Given these facts—all taken from the Complaint, documents cited therein, and/or SEC filings—the Court should apply Delaware law to the substance of the Trust's fraudulent transfer

[26] These are YPFH, CLH Holdings, Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and Repsol Services Company. The remaining six Defendants are incorporated in disparate locations: Argentina, Bolivia, Spain (two Defendants), Trinidad & Tobago, and Texas. (Compl. ¶¶ 25, 26, 28, 29, 30, and 32.)

[27] *See, e.g.,* Kuster Decl., Ex. 27 at 2 (Maxus Form 10-K (Mar. 22, 1996)) (Maxus Bolivia, Inc., was a Delaware corporation before transfer from MIEC to YPFI); *id.* Ex. 28 (Maxus Response to IRS Form 4564 (May 23, 2002)) (YPF Ecuador Inc. was a Delaware corporation before reincorporation in the Cayman Islands and transfer from MIEC to YPFI); *id.* Ex. 11 at 3 (Maxus Southeast Sumatra LLC was a Delaware limited liability company at time of transfer by Maxus Indonesia, Inc., also a Delaware entity, to YPFI); *id.* Ex. 29 (Midgard Stock Purchase Agreement (Jan. 24, 2000)) (purchaser was a Delaware corporation); *id.* Ex. 30 at 1 (Apr. 27, 2007 Repsol Settlement Agreement) (parties to 2007 Repsol Settlement Agreements were Delaware corporations); *id.* Ex. 19 at 1, 6 (parties to the 2007 YPF Settlement Agreement were Delaware, Argentine, and Bolivian entities, and included contributions by Delaware corporation YPFH to its Delaware subsidiaries Maxus and Tierra); *id.* Ex. 31 at 1 (parties to the 2009 Settlement Agreement were all Delaware entities). In addition, in connection with the YPFI Transfers (Counts II, III, XIV, and XV), one of the Indonesian entities transferred to CNOOC and the owner of the Ecuadorian assets transferred to Repsol YPF Ecuador S.A. were formerly Delaware entities, and the Trust implies that (on an alter ego theory) these assets belonged to Maxus, a Delaware corporation. (Compl. ¶¶ 383, 395.)

[28] Delaware has a high interest in resolving disputes between Delaware parties. *See, e.g., In re Bracket Holding Corp. Litig.,* No. N15C-02-233 WCC CCLD, 2017 WL 3283169, at *19 (Del. Super. July 31, 2017) (Delaware had greater interest in dispute between Delaware corporations). The expectation that fraudulent transfers between Delaware corporations, or transfers otherwise connected to Delaware, would be subject to Delaware law is justified. *See, e.g., id.; In re Physiotherapy Holdings, Inc.,* 2017 WL 5163515, at *3 (applying Delaware law to fraudulent transfer claim in light of the parties' and transfers' contacts with Delaware). Further, the application to Delaware law under such circumstances would promote certainty, predictability and uniformity of result. Finally, Delaware law on fraudulent transfers is well-developed, making it easy to determine and apply.

31

claims because Delaware has the most significant relationship to the claims and issues concerning corporate transactions and transfers raised by the allegations in the Complaint.[29] Accordingly, Delaware's statute of limitations applies to the Trust's fraudulent transfer claims.

### A. The Trust's Fraudulent Transfer Claims (Counts II-XXI) Are Time-Barred

The Trust's claims for fraudulent transfer all are barred by the four-year statute of limitations period because each allegedly fraudulent transfer occurred significantly more than four years prior to the Petition Date and significantly more than one year after the public disclosure of each transfer. A defendant may seek "dismiss[al] for failure to state a claim on statute of limitations grounds if the untimeliness of the complaint is apparent on its face." *Bamigbade*, 391 F. App'x at 133. "[T]o the extent that the transfer dates are outside the applicable statute of limitations period, [the claims] will be subject to dismissal under Rule 12(b)(6)." *Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools)*, 368 B.R. 394, 407 (Bankr. D. Del. 2007) (citing 11 U.S.C. § 544 and 6 Del. C. § 1309).

---

[29] The Complaint contains no factual allegations showing another jurisdiction has a more significant relationship with the fraudulent transfer claims than Delaware. First, the large body of claims arising from the cleanup of the Lister Site does not militate against the application of Delaware law. *See, e.g., Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 108 B.R. 384 (Bankr. D. Mass. 1989) ("[T]he focus [of the choice of law analysis] should be not so much on the debt to which the fraudulent conveyance action is ancillary as on the fraudulent conveyance action itself."). In fact, the widespread nature of the Debtors' creditor body as a whole favors applying a predictable choice of law. *Mukamal v. Nat'l Christian Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, Adv. No. 11-2940, 2014 WL 12498025, at *6 (Bankr. S.D. Fla. Dec. 10, 2014) (applying Georgia law where creditors were not predominantly located in any state, defendant was incorporated and had its principal place of business in Georgia, and Georgia had stronger interest in applying its laws than other choices); *Springel v. Prosser (In re Innovative Commc'n Corp.)*, Adv. No. 08-03004, 2011 WL 3439291, at *40 (Bankr. D.V.I. Aug. 5, 2011) (applying Virgin Islands law even though creditors were located in various places, including New York and Minnesota). Second, the only jurisdiction possibly in conflict with Delaware, Kentucky, is not home to any of the Debtors, any of the Defendants, or the Trust; Kentucky is not alleged to have any connection to any of the transferred assets; Kentucky is not the jurisdiction in which these Chapter 11 cases are pending; and Kentucky's statute in effect at the time of the transfers has been repealed and replaced with the Uniform Voidable Transactions Act, the successor to the UFTA.

Section 1309 of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1301 *et seq.*

("DUFTA") provides the statute of limitations for actions for the avoidance of a fraudulent transfer

under Delaware law:

> A cause of action with respect to a fraudulent transfer or obligation under this
> chapter is extinguished unless action is brought:
>
>> (1) Under § 1304(a)(1) of this title [actual fraudulent transfers], within 4
>> years after the transfer was made or the obligation was incurred or, if later,
>> within 1 year after the transfer or obligation was or could reasonably have
>> been discovered by the claimant;
>>
>> (2) Under § 1304(a)(2) or § 1305(a) of this title [constructive fraudulent
>> transfers], within 4 years after the transfer was made or the obligation was
>> incurred; or
>>
>> (3) Under § 1305(b) of this title [certain preferential transfers to insiders],
>> within 1 year after the transfer was made or the obligation was incurred.

6 Del. C. § 1309.

Thus, the fraudulent transfer claims must be asserted within four years of the subject

transfers (subject to possible enlargement by a one-year discovery period for actual fraudulent

transfers). *See In re The Brown Schools*, 368 B.R. at 407 (6 Del. C. § 1309 "limit[s] the avoidance

period to four years after transfer was made or within one year after the transfer could have

reasonably been discovered."); *see also Gavin v. Club Holdings, LLC*, No. 15-175-RGA, 2016 WL

1298964, at *8 (D. Del. Mar. 31, 2016) ("The statute of limitations under Delaware's fraudulent

transfer statute is four years."); *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 395 (D. Del. 2012)

(same).

Here, the Petition Date was June 17, 2016. Thus, any claims arising from transfers prior to

June 17, 2012, are time-barred. However, all of the alleged transfers occurred no later than 2009:

| Date | Transfer | Counts |
|------|----------|--------|
| July 1996 | Bolivian Assets | II, III, IV, V |
| July 1996 | Venezuelan Assets | II, III, VI, VII |
| December 1997 | Ecuadorian Assets | II, III, VIII, IX |
| December 1997 | Indonesian Assets | II, III, X, XI |
| December 1999-January 2000 | Crescendo Transfer | II, III, XII, XIII |
| 2001-2002 | YPFI Transfers | II, III, XIV, XV |
| April 2007-July 2007 | 2007 Repsol Settlement Agreements | II, III, XVI, XVII |
| October 8, 2007 | 2007 YPF Settlement Agreement | II, III, XVIII, XIX |
| July 8, 2009 | 2009 Settlement Agreement | II, III, XX, XXI |

Not only are all of these alleged transfers significantly outside of the limitations period, but also the Debtors did nothing to conceal any of the transfers, and any creditor could have reasonably discovered the transfers at or about the time that those transfers were made. Nowhere in the Complaint does the Trust allege otherwise. Indeed, in the Passaic River Litigation, the New Jersey Court specifically found that the transfers alleged to have occurred in the 1996-2000 time period had been contemporaneously disclosed through the SEC filings by Maxus and its subsidiaries, such that a reasonable creditor of Maxus Energy Corporation would have "learned about the transfers at issue when they were announced in SEC filings" and filed actions against those transfers within one year thereafter.[30] As such, the SEC filings disclosing these transfers were reasonably discoverable by all of Debtors' creditors more than a decade before the Petition Date.[31] The later transfers also were disclosed in SEC filings no later than May 19, 2008 (as well as other publicly available sources), meaning that actions to avoid the last such transfers would have to have been brought no later than the later of March 31, 2012 (four years after the last such transfer) or May 19, 2009 (one year after the last such transfer became discoverable).

---

[30] *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230 at *21.

[31] *Id.* at *19-20. The New Jersey Court applied New Jersey law, but the outcome under Delaware law based upon the New Jersey Court's factual findings is the same because Delaware has also adopted the Uniform Fraudulent Transfer Act. In addition, as noted above, this Court may consider SEC filings on a motion to dismiss. *City of Edinburgh Council v. Pfizer, Inc.* 754 F.3d at 163 n.3.

Therefore, the Trust's causes of action for avoidance of all of the alleged fraudulent transfers against the YPF Defendants are time-barred, and Counts II through XXI must be dismissed. *See, e.g., Gavin*, 2016 WL 1298964, at *8 (dismissing DUFTA claims brought in connection with agreement entered into in 2010, where action was commenced in 2015); *Marnavi*, 900 F. Supp. 2d at 398 (finding DUFTA claims time-barred where transfers occurred in 2001 and complaint was filed on June 25, 2008).

### B. The Alleged Fraudulent Transfers at Issue in the Passaic River Litigation (Counts IV-XIII) Should Be Dismissed as Barred by the Doctrine of Collateral Estoppel or, in the Alternative, Dismissed Under the Law of the Case Doctrine

The New Jersey Court already dismissed fraudulent transfer claims asserted against the YPF Defendants and the Repsol Defendants relating to most of the transfers at issue. *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230, at *21-22. Therefore, this Court need not (and should not) make another determination as to the same transfers. Instead, the Court should dismiss Counts IV-XIII of the Complaint on the ground that the Trust is collaterally estopped from asserting claims against the YPF Defendants that were previously dismissed as time-barred by the New Jersey Court or, alternatively, based on the law of the case doctrine.

Under New Jersey law,[32] collateral estoppel applies where: "(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceedings; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment, and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." *In re*

---

[32] To determine the preclusive effect of a state court judgment, federal courts must "give the same preclusive effect to the judgment" that a court from "the state in which the judgment was entered[] would." *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006). As such, the Court must look to New Jersey law to determine the preclusive effect of the New Jersey Court's decision.

35

*Estate of Dawson*, 641 A.2d 10126, 1034-35 (N.J. 1994) (internal citations omitted). New Jersey applies a "pragmatic, case-by-case approach" for determining privity. *Zirger v. Gen. Accident Ins. Co.*, 676 A.2d 1065, 1071 (N.J. 1996). As the New Jersey Supreme Court has explained, the "concept of privity, as well as its parameters, are necessarily imprecise . . . . 'It is merely a word used to say that the relationship between the one who is a party on the record and another is *close enough* to include that other within the res judicata.'" *Id.* (quoting *Bruszewski v. United States*, 181 F.2d 419, 423 (3d Cir. 1950) (Goodrich, J., concurring)). As such, "[p]rivity can exist where there is *substantial identity between the incentives of the earlier party and those of the party whom preclusion is asserted against.*" *Podvey Meanor Catenacci Hildner Cocziello & Chattman, P.C. v. Stanziale (In re Rabinowitz)*, Adv. No. 10-02435 (DHS), 2011 WL 6749068, at \*9 (Bankr. D.N.J. Dec. 21, 2011) (citation omitted) (emphasis added).

The requirements for collateral estoppel are satisfied here. First, the issue to be precluded—whether the fraudulent transfer claims are time-barred—is identical. As discussed above, in the Passaic River Litigation, OCC filed against the YPF and Repsol Defendants a fraudulent transfer cross-claim predicated on several of the very same transactions at issue here: (i) MIEC's 1996 transfer of Maxus Bolivia to YPFI (Complaint Counts IV-V), (ii) MIEC's 1996 transfer of Maxus Venezuela S.A. and Maxus Venezuela (C.I.) Ltd. to YPFI (Complaint Counts VI-VII), (iii) MIEC's 1997 transfer of YPF Ecuador, Inc. to YPFI (Complaint Counts VIII-IX), (iv) non-debtor Maxus Indonesia, Inc.'s 1997 transfer of YPF Java Baratlaut and Maxus Southeast Sumatra LLC to YPFI (Complaint Counts X-XI), and (v) non-debtor Midgard's 1999-2000 transfer of its interests in Crescendo (Complaint Counts XII-XIII). Importantly, each of the transfers challenged in the Passaic River Litigation was publicly announced shortly after the occurrence of each transfer in filings with the SEC; the last one was announced publicly in a June 2, 2000 filing. Further, aside

from immaterial numbering differences, the Delaware limitations period applicable to these fraudulent transfer claims is identical to the limitations period the New Jersey Court applied.[33]

Second, the issue was actually litigated as it was fully briefed by the parties on motions to dismiss. Third, on November 22, 2017, the New Jersey Court entered final judgment in favor of the Repsol Defendants. (Kuster Decl., Ex. 32 (Order entering final judgment in Passaic River Litigation).) Fourth, the New Jersey Court's determination of the statute of limitations issue was essential to the November 22, 2017, final judgment, and that legal determination is equally applicable to the YPF Defendants. Indeed, following full briefing on the YPF and Repsol Defendants' motions to dismiss, the New Jersey Court held that OCC's actual and constructive fraudulent transfer claims against both sets of defendants were time-barred under New Jersey's applicable four-year statute of limitations (N.J.S.A. § 25:2-31 (1988)), noting that the challenged transfers occurred between 1996 and 2000 and OCC did not bring a fraudulent transfer cross-claim until it sought leave to amend its answer in June 2007. *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230 at *19-20. The New Jersey Court concluded that OCC could not take advantage of the alternative one-year period from discovery of the transfer for its actual fraudulent transfer claims, because each of the challenged transfers had been publicly disclosed in YPF's or Maxus's SEC filings at or around the time of the respective transactions, the last report having been filed on June 2, 2000. *Id.* As a result, on January 29, 2015, the New Jersey Court dismissed the fraudulent transfer claims asserted against the YPF Defendants and the accompanying alter ego liability claims associated with those fraudulent transfer claims. *N.J. Dep't of Env't Prot. v. Occidental*

---

[33] The New Jersey and Delaware limitations periods applicable to these claims are the same. *Compare* N.J.S.A. § 25:2-31 (1988) ("Under subsection a. of R.S. 25:2-25 [actual fraudulent transfers], within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.") *with* 6 Del. C. § 1309(1) ("Under § 1304(a)(1) of this title [actual fraudulent transfers], within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.").

*Chem. Corp.*, 2015 N.J. Super. LEXIS 229, at *1-2. The New Jersey Court also dismissed the fraudulent transfer claims and alter ego claims against the Repsol Defendants for the Crescendo Transfer for the same reasons. *Id.*; *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230 at *19-20.

Finally, the Trust is a party to the New Jersey case. The Trust intervened in the Passaic River Litigation and filed a brief on appeal from the trial court's decision.[34] Indeed, in granting the Trustee's application to intervene on November 17, 2017, the New Jersey Court ordered that the Trustee "shall be treated as a party in this matter for *all purposes*." (Kuster Decl., Ex. 33 (Order granting the Trust's motion to intervene in Passaic River Litigation) (emphasis added).) By intervening, the Trust has thereby subjected itself to the decisions and rulings by the New Jersey Court, including that court's November 22, 2017 final judgment, which incorporated the dismissal of the fraudulent transfer claims as time-barred. *See Ross v. Ross*, 705 A.2d 784, 792 (N.J. Super. Ct. App. Div. 1998) (intervenor bound by trial court's decision because, *inter alia*, intervenor participated in appeal of that decision); *see also Local 322, Allied Indus. Workers v. Johnson Controls, Inc.*, 921 F.2d 732, 735 (7th Cir. 1991) (barring plaintiff which intervened only on appeal from relitigating its claim in subsequent action under doctrine of *res judicata*).

Further, it is also evident that OCC and the Trust are "close enough" to be deemed to be in privity for the purposes of collateral estoppel. The Complaint's repeated invocations of Maxus' indemnification obligations to OCC make clear that OCC had a substantial interest in challenging the transfers in question. (*See, e.g.*, Compl. ¶¶ 5, 8, 45, 49, 50, 54, 56, 57, 235.) As such, OCC vigorously prosecuted fraudulent transfer cross-claims against the YPF Defendants and the Repsol Defendants concerning each of the transactions referenced above, and the Trust has since picked

---

[34] *See Repsol Defendants' Reply Memorandum of Law in Support of Abstention* [D.I. 46], ¶¶ 2, 33 (discussing Liquidating Trust's brief filed in the Passaic River Litigation appeal).

up that mantle in asserting identical claims. The Trust's decision to pursue the same claims demonstrates the "substantial identity" between OCC's and the Trust's incentives vis-à-vis the YPF Defendants, particularly where OCC controls the Liquidating Trust Oversight Committee, loaned $16 million to fund the Trust and this proceeding (Disclosure Statement Arts. V.E.5 & V.E.7) and counsel to OCC has become counsel to the Trust. In short, the Trust and OCC are more than "close enough" to be deemed to be in privity under New Jersey law. Therefore, pursuant to the doctrine of collateral estoppel, the Court should hold that the New Jersey Court's prior decision to dismiss OCC's fraudulent transfer claims precludes the Trust from asserting Counts IV-XIII, and dismiss those claims accordingly.

Alternatively, the Court should dismiss Counts IV-XIII because the New Jersey Court's rulings at the very least constitute law of the case. The law of the case doctrine provides that "when a court decides upon a rule of law, [such] decision should continue to govern the same issues in subsequent stages in the same case." *Winstar Holdings, LLC v. Blackstone Group, LP (In re Winstar Commc'ns, Inc.)*, 435 B.R. 33, 39 (Bankr. D. Del. 2010) (quoting *Christianson v. Colt Indus. Op. Co.*, 486 U.S. 800, 816 (1988)), *aff'd sub nom. Winstar Holdings, LLC v. Blackstone Advisory Partners LP (In re Winstar Commc'ns, Inc.)*, 591 F. App'x 58 (3d Cir. 2015). Although a court may "revisit prior decisions of its own or of a coordinate court in any circumstance," it should be "loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson*, 486 U.S. at 817 (internal quotation omitted). "Extraordinary circumstances" may exist where "new evidence is available" or "a supervening law has been announced." *In re Winstar Commc'ns, Inc.*, 435 B.R. at 39 (citing *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116-17 (3d Cir. 1997)). The doctrine applies with equal force in cases removed from state court.

39

Indeed, "[a]ll injunctions issued, orders entered and other proceedings had prior to removal shall remain in full force and effect until dissolved or modified by the court." Fed. R. Bankr. P. 9027(i); *see also* 28 U.S.C. § 1450 ("All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.").

With respect to bankruptcy proceedings, courts recognize that a decision in one adversary proceeding is law of the case in other adversary proceedings in the same plenary bankruptcy case because "[a]dversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case." *Secs. Investor Prot. Corp. v. Murphy (In re Selheimer & Co.)*, 319 B.R. 395, 405 (Bankr. E.D. Pa. 2005) (quoting *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990)); *accord In re Motors Liquid. Co.*, No. 15-CV-8432 (JMF), 2018 WL 2416567, at *14, --- B.R. --- (S.D.N.Y. May 29, 2018) ("[C]ourts have held that the law-of-the-case doctrine applies to different adversary proceedings filed within the same bankruptcy case." (internal quotation marks and citation omitted)); *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010) ("The law of the case doctrine applies in adversary proceedings in a bankruptcy case, and even between separate adversary proceedings in the same bankruptcy case.").

As discussed above, in the Passaic River Litigation, which remains pending before this Court as an adversary proceeding against the YPF Defendants, the New Jersey Court held that OCC's fraudulent transfer claims against the YPF Defendants, which were based on several of the same transfers challenged in this adversary proceeding, were time-barred. Therefore, pursuant to the law of the case doctrine, *this* Court should likewise dismiss Counts IV-XIII. Based upon the findings and holdings of the New Jersey Court, it already is established that the transfers in Counts IV-XIII occurred more than 15 years before the Petition Date, well outside the statutory period for

fraudulent transfer actions, and that each of those transfers was publicly announced in SEC filings. *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230 at *20. There is no need for this Court to revisit those fully litigated findings again in this case.

### C. Collapsing Cannot Be Used to Save the Trust's Untimely Fraudulent Transfer Claims (Counts II-XXI)

The Trust itself is highly aware of its obvious statute of limitations problems. That is no doubt why the Trust in the very first paragraphs of its Complaint tries to rely on the New York Bankruptcy Court's *Tronox* decision. The Trust touts that decision as a roadmap for this Court to follow in the Trust's effort to avoid the statute of limitation. (*See, e.g.*, Compl. ¶¶ 1-2, 9-15.) The Trust asks this Court to do what no court has ever done: use the collapsing doctrine to move alleged fraudulent transfers purportedly constituting a "Strategy" dating back more than 20 years, including the last such transfer, forward in time all the way to the Petition Date to circumvent any statute of limitations defenses. As discussed below, nothing in the *Tronox* case remotely supports doing such a thing. Even if the Court does not apply the law of the case doctrine to dismiss Counts IV-XIII against the YPF Defendants as time-barred (and it should), the collapsing doctrine still does not save the Trust's fraudulent transfer claims.

The *Tronox* decision is no panacea for the Trust, and furnishes no basis to conclude that any of the claims asserted against the YPF Defendants are timely. For starters, the *Tronox* holding, and the dicta in it upon which the Trust so heavily relies, is not controlling authority or a radical "game changer" on statute of limitations issues.[35] On the contrary, the criteria courts apply to allow the collapsing of transactions to avoid statutes of limitations is nothing new, and the *Tronox*

---

[35] The dicta in *Tronox* has not been adopted by any court in this District or in the Third Circuit. Nor was that case affirmed by the district court or the Second Circuit, as the parties settled after the bankruptcy court decision had been issued, but before any appeal to the district court could occur. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, Adv. No. 09-1198 (ALG), 2014 WL 5819821 (Bankr. S.D.N.Y. July 22, 2014).

decision does not remotely support revival of the Trust's time-barred fraudulent transfer claims. As discussed below, the factual record in *Tronox* is most certainly not "strikingly similar" (Compl. ¶ 2) to this case. The fraudulent transfer claims at issue here involve nine separate and distinct sets of transactions, spanning over 13 years, implicating separate assets and different corporate owners of the Debtors. Far from a single, admittedly unitary interdependent scheme like that at issue in *Tronox* and the cases upon which it relies, the Complaint on its face pleads separate, *independent* transactions that cannot, as a matter of law, be saved by generic allegations of a fanciful two-decades long "Strategy" that is otherwise contradicted by the facts as alleged. (Compl. ¶ 207.)

Indeed, courts have refused to collapse transactions in cases where, as here, the requested application of the collapsing doctrine would be "unorthodox" or "unprecedented." *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55, 147 (Bankr. S.D.N.Y. 2017) (rejecting trustee's "unorthodox" and "unprecedented expansion" of the collapsing doctrine to impute intent of purchaser to seller); *cf. Crystallex Int'l Corp. v. Petróleos de Venez., S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016) (rejecting, on a motion to dismiss, the application of collapsing doctrine and concluding that "the collapsing doctrine does not cleanly fit this case" because collapsing was sought to hold entity liable for transfer that occurred after such entity no longer had interests in property transferred), *rev'd on other grounds*, 879 F.3d 79 (3d Cir. 2018).

i. The Collapsing Doctrine Only Applies to Interdependent Transactions

The Trust cannot circumvent statutes of limitations by seeking to collapse separate, independent transactions together merely on implausible allegations that such transactions were part of a generic, overall strategy or scheme. *See Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, No. 16-1343, 2016 WL 8256412, at *13 (E.D. Pa. Sept. 16, 2016) (dismissing fraudulent transfer claims and refusing to collapse series of distributions to shareholder in three month period beyond the statute of limitations because each transfer "was its own

42

'transfer' under the PUFTA"); *Mills v. Everest Reins. Co.*, 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006) (stating, on a motion to dismiss, that "because a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitations was triggered").

Decisions assessing the collapsing doctrine also make clear that the doctrine only applies when multiple component transfers or steps of a transfer of assets can be plausibly part of a single, integrated transaction, like an LBO. *See, e.g., Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 104 (Bankr. D. Del. 2010) ("*Mervyn's I*") (recognizing that "where a series of transactions were 'part of one integrated transaction,' then courts may look 'beyond the exchange of funds' and 'collapse' the individual transactions of a leveraged buyout" but ultimately refusing to collapse the transactions) (*citing United States. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986)); *Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*, 512 B.R. 447, 490 (Bankr. S.D.N.Y. 2014) (finding no basis to collapse stock repurchase and equity redemption transactions occurring eight months apart where transactions were two separate transactions that did not rely upon one another), *aff'd* No. 14-CV-5532 (VEC), 2015 WL 1208588 (S.D.N.Y. Mar. 17, 2015), *aff'd* 652 F. App'x 19 (2d Cir. 2016). This limitation was recognized by the court in *Tronox. See* 503 B.R. at 269 ("'In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to knowledge of the defendants of the structure of the entire transaction and whether its components were part of a single scheme.'" (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995))).

Similarly, Delaware courts considering whether to collapse steps of a transaction consider the following factors: (i) whether all of the parties involved had knowledge at the outset of the multiple transactions to follow, (ii) whether each transaction would not have occurred on its own; and (iii) whether each transaction was dependent or conditioned on other transactions. *Mervyn's I*, 426 B.R. at 104-05 (refusing to collapse where bank had no knowledge of entire transaction); *SB Liquid. Trust v. Preferred Bank (In re Syntax-Brillian Corp.)*, Adv. No. 10-51389, 2011 WL 3101809, at *11-12 (Bankr. D. Del. July 25, 2011) (same), *aff'd in part, vacated in part on other grounds*, 573 F. App'x 154 (3d Cir. 2014).

       ii.   <u>As a Matter of Law, the Factual Allegations Made in the Complaint Do Not Support Application of the Collapsing Doctrine</u>

As a threshold matter, the Complaint fails to allege *facts* that plausibly could tie the separate alleged fraudulent transfers together as one, interdependent cohesive plan that all the Defendants knew would occur from the outset. There simply is no plausible basis upon which this Court could conclude that the parties knew about each component transfer at the time the alleged "Strategy" was initiated in 1996, that each transaction would not have occurred and been completed on its own, or that each transaction was dependent or conditioned upon the occurrence of each of the subsequent transactions. *See, e.g., Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 480 B.R. 480, 485-89 (S.D.N.Y. 2012) (affirming dismissal where allegations in complaint did not plausibly establish a basis to collapse transactions since bank defendants not alleged to have "actual or constructive knowledge of the entire scheme"), *aff'd*, 541 F. App'x 55 (2d Cir. 2013).

Nor is it plausible that in 1996 YPF and Maxus knew that Repsol would acquire YPF in a tender offer and take steps to transfer assets away from YPF entities to Repsol subsidiaries and third parties. (Compl. ¶¶ 118-121.) Repsol acquired 99% ownership of YPF in 1999 and, according

to the Complaint, "dominat[ed] the Maxus Board" after that time. (*Id.* ¶¶ 110-112).[36] If the intent

of the "Strategy" had been to isolate Maxus's valuable assets from its liabilities, then the 1996-

1997 transfers of certain of Maxus's international affiliates to YPFI were entirely superfluous

given the later transfers of those same entities in 1999 to Repsol affiliates and unrelated third

parties.

The Complaint goes on to allege that in 2005, following the Passaic River Litigation,

"Repsol began exploring options . . . to manufacture a new corporate separateness among Repsol,

YPF and the Maxus entities." (*Id.* ¶ 128.) In addition to these allegations, the Complaint describes

Repsol as deciding *in 2005* "to paper over Maxus's corporation separation issues." (*Id.* ¶ 152.)

These allegations contradict any argument that the alleged asset-stripping transactions occurred

before 2005, or were made with the knowledge of any future transaction occurring after 2005,

including the Settlement Agreements executed between 2007 and 2009.

While the Trust does not challenge any transactions occurring after 2009, in May 2012,

Repsol was displaced as the majority holder of YPF's shares, and the Complaint alleges that YPF

created and developed a new business plan for Maxus in August 2012. (*Id.* ¶¶ 171, 175.) To the

extent that the Trust seeks to collapse the challenged transfers with any business decisions made

by YPF after May 2012, it is similarly implausible that the business decisions made by YPF after

May 2012 (such as commencing these Chapter 11 cases) were known by YPF or Repsol at the

time any of the allegedly fraudulent transfers occurred between 1996 and 2009. If the plan in 1996

---

[36] *See* Compl. ¶¶ 113-116 (alleging subsidiary of Maxus, in turn subsidiary of YPF, transferred assets to Repsol affiliate, with $325 million of purchase price being on-lent to RIF); ¶¶ 118-124 (alleging YPFI transferred its stakes in Venezuelan, Ecuadorean, and Indonesian subsidiaries to Repsol affiliates and CNOOC, with Repsol receiving and controlling the cash proceeds); ¶¶ 139, 150 (alleging Maxus, a subsidiary of YPF, entered into the 2007 Repsol Settlement Agreements with Repsol subsidiaries under which Maxus gave up services it performed on behalf of Repsol and any claims related thereto); ¶¶ 148-150 (alleging Maxus, a subsidiary of YPF, entered into the 2009 Settlement Agreement with Repsol affiliates, giving up all claims related to the Ra prospect and earn-out rights, as well as claims related to uncompensated services and unpaid invoices).

had been to file bankruptcy as soon as the statute of limitations expired, the YPF Defendants never would have caused Maxus to wait 20 years to do so.

Therefore, because the Complaint does not, and could not, allege that at the time of any challenged transfer, the parties knew that each of the subsequent transfers would take place, its conclusory allegations about the existence of a 20-year Strategy cannot support the application of the collapsing doctrine as a matter of law. *See, e.g., Stillwater Liquid. LLC v. Net Five at Palm Pointe, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.)*, 559 B.R. 563, 596 (Bankr. S.D.N.Y. 2016) (finding, on a motion to dismiss, that no allegations could support collapsing two transactions where complaint alleges that the idea for the second transaction did not arise until after the first transaction had occurred); *Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370-73 (Bankr. S.D.N.Y. 2002) (rejecting, on motion to dismiss, application of collapsing doctrine where transferees did not have prior knowledge of future transactions).

Similarly, the Complaint does not, and could not, make any allegations that each transfer would not have occurred on its own or that each of the transfers was dependent or conditioned both on the occurrence of each of the later transfers and the filing of the Chapter 11 petitions. *See Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 509 (Bankr. S.D.N.Y. 2011) (granting a motion to dismiss and observing that "[a] court must focus on the interdependence of the multiple transactions and whether the participants knew of should have known that no transaction would occur unless all of the other transactions occurred."); *see also In re Adelphia Commc'ns Corp.*, 512 B.R. at 493-94 (rejecting collapsing where court could not find that the parties "intended to execute the two transactions as a single *integrated* one" because there was no indication that the transactions were interdependent or intended to rely upon one another, even

though the court believed the transactions, eight months apart, furthered a common goal). Here, the Complaint does not and cannot allege that (i) the YPF 1996 and 1997 asset transfers would not have occurred without, and were dependent or conditioned upon, the Repsol asset transfers which removed those very assets from YPFI after Repsol's 1999 acquisition of YPF; (ii) the alleged asset-stripping transfers that concluded by 2002 would not have occurred without, and were dependent or conditioned upon, the various Settlement Agreements being entered into between 2007 and 2009 or any other transaction occurring after Repsol devised a "new plan" in 2005 following the commencement of the Passaic River Litigation; or (iii) the Settlement Agreements would not have occurred without, and were dependent or conditioned upon, future transactions or business decisions made after YPF regained independence from Repsol in 2012.

The Trust's conclusory allegations of a single, 20-year "Strategy" by all Defendants to avoid Debtors' environmental liabilities cannot support application of the collapsing doctrine in light of the Trust's more specific allegations identifying four very different and distinct sets of transactions: (i) YPF's initial acquisition of the Maxus corporate group and the initial debt, asset and environmental restructuring between 1996 and 1997 (Compl. §§ III-IV), (ii) Repsol's acquisition of YPF and the completely separate Repsol-initiated corporate reorganization and asset transfers between 1999 and 2002 (*id.* § VI), (iii) Repsol's corporate separateness plan, resulting in the Settlement Agreements between 2007 and 2009 (*id.* §§ VII-VIII), and (iv) Argentina's regaining an indirect majority ownership in May 2012 after Repsol was displaced as the majority holder of YPF's shares (*id.* § X). Indeed, it would be hard to imagine a more disjointed and inherently contradictory set of transactions that demonstrate, on their faces, a changed strategy and direction with each change in corporate management and ownership. For example, the Trust's own Complaint acknowledges that the Argentine government strongly criticized Repsol's management

47

of YPF in the Mosconi Report and the transactions Repsol made between 1999 and 2002 initiated by Repsol. (*Id.* ¶ 172). The alleged YPF asset-stripping transfers in 1996 and 1997 cannot be plausibly tied to the alleged Repsol asset-stripping transfers occurring between 1999 and 2002.

Thus, there simply is no solitary, unified approach or interdependent series of transactions, all contemplated by the same persons close in time, that could support collapsing all of the transfers at issue here to avoid the statute of limitations. *See, e.g., In re M. Fabrikant & Sons, Inc.*, 480 B.R. at 485-489 (granting motion to dismiss fraudulent transfer claims because there were no plausible allegations in the complaint to establish that there would be a basis to collapse transactions for fraudulent transfer purposes, including no "pairs of transactions that actually amounted to integrated, fraudulent transfers—as caselaw requires"); *In re Syntax-Brillian Corp.*, 2011 WL 3101809, at *11-12 (dismissing fraudulent transfer claims because related transactions could not be collapsed where no set of facts could show defendant was aware of transferor's scheme).

### iii. The *Tronox* Decision Does Not Save the Trust's Claims

Finally, *Tronox* simply does not save the Trust's otherwise time-barred claims. In *Tronox*, as part of a spin-off of the old company with legacy environmental liabilities, a single board of directors approved 11 transactions on the *same day* in 2002, which was outside of the statute of limitations period. 503 B.R. at 252. While the defendants in *Tronox* argued that the relevant asset transfers occurred in 2002, the court concluded that the actual split of the businesses took three years (until 2005) and several transfers to accomplish, with all of the transfers occurring with the knowledge of defendants, and therefore the statute of limitations did not bar the action. *Id.* at 267-70. The court based its decision in large part on three related conclusions: (1) The transfer of the assets was not completed until 2005, as evidenced by assignment agreements that were executed in 2005, but backdated to 2002 (even though the terms of the separation were not finalized until 2005), *id.* at 267; (2) the asset transfers in 2002 "were part of a single integrated scheme, *known*

48

*to Defendants*, that culminated only in the years 2005-06," which was well within the statute of limitations, *id.* at 270 (emphasis added); and (3) the defendants had made inadequate public disclosures about the transfers at issue. *Id.* at 271.

In stark contrast to *Tronox*, each of the alleged separate fraudulent transfers at issue here occurred over a *thirteen-year* period (1996 to 2009) and the Trust seeks to collapse them forward to when the Chapter 11 cases were filed in 2016.[37] Also, in stark contrast to *Tronox*, the Complaint here does not allege, nor could it, (i) that any of the sets of transactions were incomplete when the transfers were concluded, (ii) that any of the relevant nine transfers of the Debtors' assets at issue were wholly dependent on subsequent transactions made within the statute of limitations, (iii) that public disclosures or the transfers were inadequate, or (iv) that any transaction documents were backdated, or information was concealed, to create an illusion that the transfers occurred earlier than they actually had.

Finally, the Trust places heavy emphasis on dicta in the *Tronox* decision that an "unscrupulous enterprise [could] divest itself of substantially all of its assets," leaving behind environmental liabilities it continues to service until the statute of limitations runs out. (Compl. ¶ 1; *Tronox*, 503 B.R. at 271 (internal quotation omitted)). However, that dicta is not applicable here because there is simply no set of factual allegations remotely sufficient to support the notion that there was a single, interdependent scheme to accomplish such a thing.

To be sure, the Trust alleges a two-decade long "Strategy" that Debtors' owners implemented to try to protect their assets and minimize exposure to environmental liabilities. In

---

[37] Significantly, the plaintiffs in *Tronox* challenged the spin-off transaction as a whole, rather than treating the component transfers as separate, individually-actionable transfers, as the Trust does in the Complaint. *Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.)*, 429 B.R. 73, 100 (Bankr. S.D.N.Y. 2010) ("[T]he Complaint is fundamentally based on the assertion that the actionable transfer was the spin-off ... [which] took place... when New Kerr-McGee was finally spun out of the group . . . .").

so doing, the Trust is trying to fit a square peg in a round hole. The Complaint does not allege any facts that could plausibly be viewed as a unified, interdependent series of transactions as there is in a typical LBO where the collapsing doctrine is sometimes employed, or in a spin-off context like the one at issue in *Tronox*. The timing of the alleged "Strategy" also makes no sense. Far from putting Debtors on an "I.V. drip" to wait out paying for substantial environmental liabilities before the statute of limitations ran a few years later (*see* Compl. ¶¶ 1, 170, 179), this alleged "Strategy" apparently took over *two decades*, during which Debtors (a) paid all environmental liabilities and (b) did not file for bankruptcy protection until 2016, *seven years* after the last transfer being challenged had occurred, and long after the applicable four-year statute of limitations had expired.

Collapsing 20 years of distinct corporate transactions here would be unprecedented and an improper expansion of the collapsing doctrine as a matter of law. To the extent that the Trust contends *Tronox* pioneers new law in this regard for statute of limitations purposes, it is clearly wrong.[38] *Tronox* simply does not and cannot save the Trust's time-barred claims.

### D. Avoidance and Recovery of the YPFI Transfers (Counts XIV-XV) Would Be an Impermissible Extraterritorial Application of the Bankruptcy Code, and for that Independent Reason, the Claims Should Be Dismissed

The YPFI Transfers involving the Repsol Defendants' transfer of the Debtors' former foreign subsidiaries (Counts XIV-XV) were overseas transactions that the Trust cannot avoid, because doing so would be an impermissible extraterritorial application of the Bankruptcy Code.

---

[38] All of the cases relied upon by the court in *Tronox* concerning the collapsing doctrine involved leveraged-buy outs, or similar transactions that were clearly related and all known to the defendants as being part of the alleged scheme at the outset. In fact, most of those cases were not even in the statute of limitations context, and none extended the statute of limitations in as many unrelated transactions or over a two-decade period as is at issue here. *See Tronox*, 503 B.R. at 268-69 (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) (collapsing where conveyance of property and subsequent distribution of shares "were elements of a single restructuring plan adopted by Kinderhill's board of directors" occurring over approximately 13 months); *HBE Leasing Corp. v. Frank*, 48 F.3d at 635 (observing collapsing doctrine most commonly used in LBO context, involving related transactions where one transferee gives fair value to debtor in exchange for the debtor's property and the debtor then transfers proceeds to a second transferee (no statute of limitations defense at issue)); *In re Best Prods.*, 168 B.R. 35, 56-57 (Bankr. S.D.N.Y. 1994) (applying collapsing in LBO context (no statute of limitations defense at issue))).

Federal courts presume that Congress intended that a federal statute not be applied extraterritorially "unless a contrary intent appears." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). "In determining whether the presumption against extraterritoriality applies, the Court must determine, first, whether the factual circumstances at issue require an extraterritorial application of the relevant statutory provision; and second, if so, whether Congress intended for the statute to apply extraterritorially." *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.)* ("*Madoff*"), 513 B.R. 222, 226 (S.D.N.Y. 2014) (citing *Morrison*, 561 U.S. at 255-57; *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 816 (S.D.N.Y. 1995)).

To determine whether a transaction was foreign or domestic, a court "'considers the location of the transfers as well as the component events of those transactions.'" *Madoff*, 513 B.R. at 227 (quoting *In re Maxwell Commc'n Corp.*, 186 B.R. at 817). The YPFI Transfers were predominantly foreign, as were the transfers in *Madoff*. 513 B.R. at 227 ("Here, the relevant transfers and transferees are predominantly foreign: foreign feeder funds transferring assets abroad to their foreign customers and other foreign transferees.") The YPFI Transfers allegedly involved the transfer by YPFI, a Bolivian entity with its principal place of business in Bolivia, to (1) a Chinese company CNOOC (YPFI's Indonesian assets), (2) "a subsidiary of Repsol"—Repsol Exploración, S.A., a Spanish entity[39] (YPFI's Ecuadorian assets), (3) "a Repsol subsidiary"—Repsol Exploración Venezuela, B.V., a Dutch company[40] (portion of YPFI's Venezuelan assets), and (4) "Repsol"—Repsol Exploración, S.A., a Spanish entity[41] (portion of YPFI's Venezuelan

---

[39] Kuster Decl., Ex. 34 at F-166 (Repsol Form 20-F (Mar. 28, 2002)).

[40] *Id.*

[41] *Id.*

assets). (Compl. ¶¶ 119-121.) Each of these transfers involved the change in ownership of going-concern businesses with their operations and assets in foreign jurisdictions: Indonesia, Ecuador, and Venezuela.

Neither the alleged transferor (YPFI) nor the transferee (CNOOC or a Repsol entity) was a domestic entity, rendering each YPFI Transfer a paradigmatic foreign transaction. *See Madoff*, 513 B.R. at 227 ("Here, the relevant transfers and transferees are predominantly foreign: foreign feeder funds transferring assets abroad to their foreign customers and other foreign transferees."); *see also LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, 582 B.R. 46, 95 (Bankr. S.D.N.Y. 2018) (determining the issuance of shares of an English entity, in London, to be a foreign transaction), *amended by* Adv. No. 14-02442-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018); *Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. (In re Sherwood Invs. Overseas Ltd.)*, Adv. No. 6:10-00158-KSJ, 2015 WL 4486470, at *20 (Bankr. M.D. Fla. July 22, 2015) (dismissing claims where transferee and transferor were foreign entities and transfers were made between foreign banks); *Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch. Inc.)*, 347 B.R. 708, 715 (Bankr. C.D. Cal. 2006) (dismissing claims where transferor and transferee were foreign entities and transfers were made between foreign banks, even though funds passed through a New York account); *cf. Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.)*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (dismissing claim where U.S. entity headquartered in Israel paid Israeli transferee through bank accounts at a Tel Aviv bank). Beyond its reference to values in United States Dollars, the Trust has alleged no facts that suggest that the YPFI Transfers are domestic.[42] The use of American currency—if that is even what was done here—is not "sufficient

---

[42] In fact, in the Form 6-K disclosing the sale of the Indonesian assets, the purchase price is described as "662 million euros (US$ 585 million) subject to adjustment." *See id.* Ex. 18 at 3.

to make these foreign transfers domestic." *Madoff*, 513 B.R. at 228 n.1 (citing *Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010)).

Many courts have held that the avoidance and/or the recovery provisions of chapter 5 of the Bankruptcy Code do not apply extraterritorially. *See, e.g., Madoff*, 513 B.R. at 232 (dismissing fraudulent transfer claims "to the extent that they seek to recover purely foreign transfers"); *In re CIL Ltd.*, 582 B.R. at 92-93 ("Congress has not 'clearly expressed' that sections 548 and 550 apply extraterritorially and the Court finds that they do not."); *id.* at 97 ("The Court is not persuaded that the inclusion of the phrase 'voidable under applicable law' gives section 544(b) *de facto* extraterritorial application. The Court finds that it does not."); *In re Ampal-Am. Isr. Corp.*, 562 B.R. at 612 (concluding that Section 547 does not apply extraterritorially); *In re Sherwood Invs. Overseas Ltd.*, 2015 WL 4486470, at *21-22 (Section 548 contains "no clear indication of extraterritorial application," and the court should not "impart [Section] 541's extraterritorial provision into the largely unrelated [Sections] 548 and 550."); *In re Midland Euro Exch. Inc.*, 347 B.R. at 720 (dismissing complaint seeking extraterritorial application of sections 548 and 550 to recover transfers in furtherance of Ponzi scheme because Congress did not intend for section 548 to apply extraterritorially).

The reasoning of these courts is based on the Second Circuit's holding in *Colonial Realty* that transferred property does not become property of the estate until after it is recovered. *See FDIC v. Hirsch (In re Colonial Realty Corp.)*, 980 F.2d 125, 131 (2d Cir. 1992). At the point of recovery, and only at that point, recovered property "wherever located and by whomever held" becomes property of the estate. *See Madoff*, 513 B.R. at 229 ("[W]hether 'property of the estate' includes property 'wherever located' is irrelevant to the instant inquiry: fraudulently transferred property becomes property of the estate only after it has been recovered by the Trustee, so section

541 cannot supply any extraterritorial authority that the avoidance and recovery provisions lack on their own.") (citing *In re Colonial Realty Corp.*, 980 F.2d at 131; *In re Maxwell Commc'n Corp.*, 186 B.R. at 820).

Even though Section 544(b) imports "applicable law", Congress did not intend that section to apply extraterritorially any more than any other avoidance provision of the Bankruptcy Code. *See In re CIL Ltd.*, 582 B.R. at 96-97. In *CIL*, the court determined that just as the phrase "interests of the debtor in property" in Section 548 does not "manifest a clear intention by Congress that such provision has extraterritorial application," "'broad, boilerplate language such as the term ["applicable law"] is insufficient to overcome the presumption against extraterritoriality.'" *Id.* (concluding that the trustee could not use foreign law pursuant to Section 544(b) to avoid extraterritorial transfers) (quoting *In re Maxwell Commc'n Corp.*, 186 B.R. at 819).[43]

Thus, because the YPFI Transfers were extraterritorial or foreign in nature, and Section 544(b) cannot be applied extraterritorially to avoid such transfers, Counts XIV and XV should be dismissed.

### E. The Trust Cannot Avoid Transfers Not Made by a Debtor, and for this Independent Reason, Counts X-XV of the Complaint Should Be Dismissed

The Trust's fraudulent transfer claims asserted in Counts X-XV (involving the Indonesian

---

[43] The only case in this district or the Third Circuit to consider this question is *Emerald Capital Advisors Corp. v. Bayerische Moteren Werke AG (In re FAH Liquidating Corp.)*, 572 B.R. 117, 125-26 (Bankr. D. Del. 2017), which does not compel a different result. Both *FAH* and the primary case on which it relies circularly hold that because property recovered *after avoidance* becomes property of the estate, 11 U.S.C. § 541(a)(3), Congress intended for the avoidance and recovery provisions *enabling* the recovery of such property to have effect on transferred property, wherever located and by whomever held. *See In re FAH Liquid. Corp.*, 572 B.R. at 125-26; *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 154-55 (Bankr. S.D.N.Y. 2016) (citing *French v. Liebmann (In re French)*, 440 F.3d 145 (4th Cir. 2006)). Because the Bankruptcy Code is clear that transferred property becomes property of the estate *once it is recovered* by the trustee, *In re Colonial Realty Corp.*, 980 F.2d at 131, any arguable extraterritorial reach imparted by Section 541(a)(1)'s "wherever located and by whomever held" language cannot extend the avoidance provisions extraterritorially. This Court should follow *Madoff* and other cases prohibiting the extraterritorial application of the avoidance provisions. Even if this Court were to accept the reasoning of the *FAH* Court as to the extraterritorial application of section 544 (and it should not), that court determined that foreign law governed any avoidance of the transfers at issue. 572 B.R. at 130. The same result should obtain here. The Trust has not pleaded that any foreign law governs the avoidance of any of the alleged transfers, and Counts XIV-XV should be dismissed.

Transfers, the Crescendo Transfer, and the YPFI Transfers) must also be dismissed because they were not transfers made by the Debtors. Under applicable Delaware law, in order to state a claim for fraudulent transfer, the Trust must allege that, among other things, the *debtor* made a transfer. *See Crystallex Int'l Corp. v. Petróleos de Venez. S.A.*, 879 F.3d 79, 88-89 (3d Cir. 2018) (finding that a transfer must "be made 'by a debtor' in order to be cognizable under [DUFTA]."); *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 325 (Bankr. D. Del. 2007) ("[I]n order to state a claim under section 1304[(a)(2)] and 1305, the Trust must allege that (i) the debtor made a transfer (ii) for less than reasonably equivalent value and (iii) the debtor was, or was rendered, insolvent thereby."); *see also, e.g.*, *Spring Real Estate, LLC v. Echo/RT Holdings, LLC*, No. 7994-VCN, 2016 WL 769586, at *3 (Del. Ch. Feb. 18, 2016) (finding chapter 7 trustee has no standing to sue for avoidance of debtor's non-debtor subsidiary's transfer of its own assets because such assets did not implicate "an interest of the debtor in property"), *aff'd sub nom. Klauder v. Echo/RT Holdings, LLC*, No. 133, 2016 WL 7189917 (Del. Dec. 12, 2016).

Here, the Trust has defined "Maxus" as "Maxus Energy Corporation." (Compl. ¶ 19.) However, the Trust appears to also use the term "Maxus" to refer to any combination of (1) Maxus Energy Corporation, (2) the other Debtors, and (3) any of the Debtors' non-Debtor subsidiaries. *Compare, e.g.*, Compl. ¶ 10 (After the 1995 acquisition, "YPF first eliminated Maxus's commercial debt and replaced it with $1.4 billion in loans held by YPF") *with* ¶ 77 (YPF "caused Maxus to borrow funds from YPF to prepay the existing public and private debt . . . (including the Midgard Facility [defined in n.8 as 'Credit Agreement between *Midgard Energy Company*, Lenders and Chase Manhattan Bank (National Association) dated as of June 8, 1995'], the Indonesian Facility [defined in n.9 as 'Credit Agreement between *Maxus Indonesia, Inc., Maxus Northwest Java, Inc. and Maxus Southeast Sumatra, Inc.*, dated as of June 16, 1995'] . . . .").

The Trust uses imprecise and inconsistent drafting to allege transfers of assets of the Debtors when such transfers did not involve the Debtors and were not transfers of any assets of the Debtors. The Indonesian Transfers (Counts X-XI), involving the sale of certain subsidiaries to YPFI, were transfers of wholly-owned subsidiaries of Maxus Indonesia, Inc. (a non-Debtor), and could not have been transferred by Maxus or any other Debtor. (Compl. ¶¶ 93-94; Kuster Decl., Ex. 11.) Similarly, the Crescendo Transfer (Counts XII-XIII) involved transfers by "a joint venture between Midgard (a [non-Debtor] Maxus subsidiary) and BP Amoco." (Compl. ¶ 113.) The Trust never alleges that Maxus or any other Debtor had any direct ownership interest in Crescendo. Finally, the 2001 "YPFI Transfers" (Counts XIV-XV) are defined in the Complaint as a "subsequent transfer by YPF of YPFI's assets (the 'Maxus legacy E&P assets') to Repsol entities in 2001 and 2002," and do not include any transfer by the Debtors. (*Id.* ¶ 219.)

The Trust's use of "Maxus" to encompass multiple entities in the Debtors' corporate family is contradicted by its more specific allegations of ownership with regard to the Crescendo Transfer and by SEC filings (including of the Indonesian Facility the Complaint cites at ¶ 77, n.9). The Indonesian Transfers, the Crescendo Transfer, and the YPFI Transfers were all transfers by non-Debtor entities and a fraudulent transfer claim by the Trust against Defendants with respect to those transfers may not proceed. Therefore, Counts X-XV should be dismissed. *See, e.g., Crystallex Int'l Corp.*, 879 F.3d at 86 (determining that statutory definition of "transfer" excludes a transfer by a non-debtor); *In re Plassein Int'l Corp.*, 366 B.R. at 326 ("Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim.").

### F. Counts II and III also Must Be Dismissed Because They Fail to Meet the Pleading Requirements of Fed. R. Civ. P. 8(a) and 9(b)

The Trust's omnibus claims for fraudulent transfer in Counts II and III, which seek avoidance of "Fraudulent Transfers," defined as "transfers of Maxus's assets [which] include, but

are not limited to, the individual 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and the underlying transfers of Maxus's personnel, data, technical resources, and wells and other offshore interests which lead to the Settlement Agreements" (Compl. ¶ 239; *see also id.* ¶ 253), must be dismissed. In addition to the reasons stated above, they lack the particularity required by the Federal Rules of Civil Procedure for claims involving fraud, and (to the extent that they *are* specific) they are purely duplicative of the claims for fraudulent transfer in Counts IV-XXI.

Rule 9(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rule 7009, provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Courts in this district (including this Court) have determined that Rule 9(b) "applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud." *OHC Liquid. Tr. v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) (citing cases); *see also, e.g., EiserAmper LLP v. Morgan (In re SRC Liquid. LLC)*, 581 B.R. 78, 87 n.6 (D. Del. 2017) ("The Bankruptcy Court has held that the Rule 9(b) pleading standard applies to a fraudulent transfer claim under § 548, regardless of whether it is based on actual or constructive fraud." (citing *In re Oakwood Homes Corp.*, 325 B.R. at 698)); *Walker v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 85 n.12 (Bankr. D. Del. 2010) (Sontchi, J.) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud." (quoting *In re Oakwood Homes Corp.*, 325 B.R. at 698-99)).

The "purpose of Rule 9(b)'s particularity requirements" is "'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'" *In re Aphton Corp.*, 423 B.R. at 85

(quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984),
*cert. denied*, 469 U.S. 1211 (1985)).

Here, while Counts II and III are duplicative of the fraudulent transfers alleged by the Trust
with respect to the nine specific alleged transfers comprising Counts IV-XXI of the Complaint for
actual and constructive fraud, the Complaint fails to put the YPF Defendants "on notice of the
precise misconduct" at issue with respect to these blunderbuss fraudulent transfer counts, which
define "Fraudulent Transfers" as "transfers of Maxus's assets *includ[ing], but . . . not limited to*,"
the enumerated transfers (those comprising Counts IV-XXI) and certain categories of transfers
("the underlying transfers of Maxus's personnel, data, technical resources, and wells and other
offshore interests which lead to the Settlement Agreement"). (Compl. ¶ 239 (emphasis added); *see
also id.* ¶ 253.)

While the Complaint does identify certain examples of "Fraudulent Transfers" (*id.* ¶¶ 239,
253), the Trust otherwise leaves its Complaint open to capture one or more other purported
"transfers" that it does not identify or specify with particularity.[44] The YPF Defendants are not "on
notice of the precise misconduct" with regard to any additional unspecified "transfers" the Trust
intends to be captured within the meaning of "Fraudulent Transfers," which could include every
payment or other transfer by any of the Debtors since 1995—transfers that would no doubt be
time-barred or subject to dismissal for other reasons if they had been identified.

Therefore, because there is no specificity with respect to any unidentified transfers that are
not alleged as fraudulent transfers in Counts IV-XXI of the Complaint, and because Counts II and
III are entirely duplicative of the later counts that had been pleaded with greater particularity

---

[44] *See* Compl. ¶¶ 239, 253 ("These transfers of Maxus's assets include, but are not limited to, the individual 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and the underlying transfers of Maxus's personnel, data, technical resources, and wells and other offshore interests which lead to the Settlement Agreements.").

(Counts IV-XXI), Counts II (actual fraudulent transfer) and III (constructively fraudulent transfer) should be dismissed as duplicative or altogether insufficient in alleging any transfers beyond those set forth in Counts IV-XXI of the Complaint.

With respect to actions to avoid constructively fraudulent transfers, some courts (including this Court in a recent decision, *see Beskrone v. OpenGate Capital Group (In re PennySaver USA Publishing, LLC)*, 587 B.R. 445, 455-56 (Bankr. D. Del. 2018)), have applied Rule 8(a)(2) (incorporated by Bankruptcy Rule 7008) as the pleading standard for claims for the avoidance of a constructive fraudulent transfer claim. Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as "to state facts with sufficient particularity to provide the defendant with fair notice of the charges against him." *In re PennySaver USA Publ. LLC*, 587 B.R. at 456. "[C]omplaints that identify the dates, amounts, source, and transferee of each of the alleged transfers successfully support claims of constructive fraudulent transfer under Fed. R. Civ. Pro. 8(a)(2)'s pleading standard." *Id.* Count III fails to "identify the dates, amounts, source, and transferee of each of the alleged transfers" and therefore fails to satisfy Rule 8(a)(2) as to any "Fraudulent Transfer" that is not reflected in Counts IV-XXI. Therefore, even if this Court applies Rule 8(a)(2) to Count III, that count must be dismissed because it fails to provide fair notice to the YPF Defendants of the claims being asserted.

### III.    The Trust's Unjust Enrichment Claim (Count XXII) Fails as a Matter of Law

The Trust's claim for "damages to the Liquidating Trust" (Count XXII) based on a theory of unjust enrichment must be dismissed because it also is time-barred, and because the Trust lacks standing to assert a claim for unjust enrichment.

As a threshold matter, Delaware law applies to the Trust's unjust enrichment claim for the same reasons it does to the Trust's fraudulent transfer claims. "Delaware follows the 'most

significant relationship' test of the Restatement (Second) of Conflict of Laws § 221 (1971) to determine the law applicable to unjust enrichment claims." *Landis v. Sci. Mgmt. Corp.*, No. 7483, 1991 WL 19848, at *3 (Del. Ch. Feb. 15, 1991). Section 221 of the Restatement provides that contacts that should be taken into account include such things as the place where the relationship was centered, where the benefit or enrichment was received, where the act conferring the benefit or enrichment was done, the domicile and place of incorporation of the parties, and where a physical thing, such as land or chattel, was situated at the time of the enrichment. Restatement (Second) of Conflict of Laws § 221(2) (1971).

These factors weigh in favor of the application of Delaware law. The Complaint alleges that YPF was unjustly enriched through the purported "Strategy" relating to its alleged control of Maxus, a *Delaware* corporation. (*See, e.g.*, Compl. ¶ 474). In addition, all of the Debtors and two of the four YPF Defendants are incorporated in Delaware. (*See id.* ¶¶ 19-22, 24, 27; *see also* Kuster Decl., Ex. 2 at 1 (CLH Holdings identified as a Delaware corporation).) Further, the alleged benefit was received and/or conferred by YPFH (in Delaware), YPF (in Argentina), or YPFI (in Bolivia), and the physical assets substantially related to the alleged unjust enrichment are located in various states and countries across the globe. (*See, e.g.*, Compl. ¶¶ 86, 90, 93, 113 (discussing transfers relating to interests and assets in Bolivia, Venezuela, Ecuador, Indonesia, Texas and Oklahoma).) In light of the foregoing, the Court should find that the Trust's unjust enrichment claim against the YPF Defendants is governed by Delaware law.[45]

---

[45] The YPF Defendants do not concede that the common law of Delaware (or any other state) would apply extraterritorially to the Trust's purported unjust enrichment, conspiracy, or alter ego claims.

### A.  The Trust's Claim for Unjust Enrichment is Time-Barred

Under Delaware law, an unjust enrichment claim must be brought within three years of the accrual of the claim. 10 Del. C. § 8106(a); *Pulieri v. Boardwalk Prop., LLC*, No. 9886-CB, 2015 WL 691449, at *13 (Del. Ch. Feb. 18, 2015) (An unjust enrichment claim brought outside the three years specified by 10 Del. C. § 8106 "is presumptively untimely and subject to dismissal on laches grounds absent unusual or extraordinary circumstances that warrant deviating from the analogous limitations period." (citing *In re Sirius XM S'holder Litig.*, No. 7800-CS, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013) (courts generally apply the analogous statute of limitations to an equitable claim technically governed by the equitable doctrine of laches)).

"[A]n unjust enrichment claim accrues when the wrongful act causing the enrichment and impoverishment occurred." *Id.* (citing *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 42-43 (Del. Ch. 2012) ("A cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of that cause of action.")). Although Delaware recognizes certain limited tolling exceptions, if any such exception applies, the statute begins to run "'upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of the injury.'" *In re Winstar Commc'ns, Inc.*, 435 B.R. at 43 n.11 (quoting *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778-79 (Del. Ch. 2006) (identifying three exceptions—fraudulent concealment, inherent unknowable injury, and equitable tolling—and holding none applied)).

Any "enrichment and impoverishment" must have occurred no earlier than June 17, 2013 (three years prior to the Petition Date) for it to be actionable. The last act of alleged "enrichment and impoverishment" occurred no later than 2009. (*See* Compl. ¶ 11 ("The asset stripping phase . . . came to a close around 2009."); *id.* ¶ 148 (alleging entry into 2009 Settlement Agreement on July 8, 2009).) Indeed, most of the acts are alleged to have occurred more than 15 years prior to

the Petition Date.[46] The Trust's claim for unjust enrichment therefore is time-barred, and Count

XXII should be dismissed.[47] *See, e.g., Gavin*, 2016 WL 1298964, at *7-8 (granting motion to

dismiss trustee's unjust enrichment claim as time-barred under Delaware's three year statute of

limitations); *Medtronic Vascular, Inc. v. Adv. Cardiovascular Sys., Inc.*, No. 98-80-SLR, 2005 WL

46553, at *5 (D. Del. Jan. 5, 2005) (granting summary judgment for defendant where unjust

enrichment claim accrued in 1993, action should have been filed by 1996, and action was not

commenced until 1998); *Pulieri*, 2015 WL 691449, at *14 (granting motion to dismiss unjust

enrichment claim brought more than three years after accrual); *U.S. Virgin Islands v. Goldman,

Sachs & Co.*, 937 A.2d 760, 807 (Del. Ch. 2007) (dismissing unjust enrichment claims when

brought outside analogous three year statute of limitations).[48]

### B. The Trust Cannot Assert a Claim for Unjust Enrichment that Belongs to the Debtors' Creditors

In its unjust enrichment claim, the Trust improperly seeks to vindicate harms to the

Debtors' creditors rather than to the Debtors.[49] Accordingly, this claim also must be dismissed

because a trustee has no standing to assert such a claim. *See Caplin v. Marine Midland Grace Trust*

---

[46] It should not go without notice that the Trust's claim for unjust enrichment is based on the exact same conduct, and the exact same harm, as the Trust's claims for fraudulent transfer. (*See* Compl. ¶ 474 ("The Defendants have received a benefit through their scheme of transferring Maxus's assets to other entities . . . in an attempt to prevent those assets from being used to satisfy the claims owed by Maxus . . . .").)

[47] Delaware does *not* apply the collapsing doctrine to Delaware state law claims. As such, the doctrine is inapplicable to the Trust's unjust enrichment claim. *See, e.g., Phoenix Can. Oil Co. v. Texaco, Inc.*, 560 F. Supp. 1372, 1389 & n.48 (D. Del. 1983) ("New York courts have specifically addressed the question of accrual of continuing torts and have concluded that the statute of limitations runs with respect to *each act when it occurs*. Delaware courts apply the same rule." (emphasis added) (citing *Glassberg v. Boyd*, 116 A.2d 711, 717 (Del. Ch. 1955) for Delaware law)).

[48] Further, as with the fraudulent transfer claims asserted in the Passaic River Litigation, the New Jersey Court dismissed the related unjust enrichment claims on the basis that they were time-barred, having been knowable no later than June 2, 2000. *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230, at *22-23. Therefore, the Trust's unjust enrichment claim, at least to the extent based upon conduct prior to June 2, 2000, also should be dismissed pursuant to the doctrines of collateral estoppel and/or law of the case.

[49] *See* Compl. ¶ 474 (alleging that the Defendants received a benefit by transferring Debtors' assets "to prevent those assets from being used to satisfy the claims owed by Maxus *to its creditors*, including *the OCC Indemnification Obligations* to which Maxus is subject under the SPA, as well as Maxus's legacy environmental liabilities *to other creditors*.") (Emphasis added).

*Co.*, 406 U.S. 416, 428-34 (1972) (concluding trustee has no standing to sue on behalf of debenture

holders); *Marion v. TDI Inc.*, 591 F.3d 137, 148 n.15 (3d Cir. 2010) ("A bankruptcy trustee lacks

authority to bring a claim directly on behalf of the debtor's creditors." (citing *Caplin*, 406 U.S. at

421-34)); *Begier v. Price Waterhouse*, 81 B.R. 303, 306 (E.D. Pa. 1987) (concluding trustee cannot

maintain cause of action for claims personal to creditors).

　　　　The Trust may argue that Section 544(b) provides such standing; however, that section

"does not . . . clothe the trustee with *all* of the rights held by the creditors prior to bankruptcy.

Instead, it reflects a narrow exception to the well-settled rule that a bankruptcy trustee lacks

standing to assert general causes of action against third parties that belong to a debtor's creditors."

*Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*, 307 B.R. 744, 749 (Bankr.

S.D.N.Y. 2004) (citing *Caplin*, 406 U.S. at 428; *Shearson Lehman Hutton, Inc. v. Wagoner*, 944

F.2d 114, 118 (2d Cir. 1991); *Mixon v. Anderson (In re Ozark Rest. Equip. Co., Inc.)*, 816 F.2d

1222, 1226-28 (8th Cir. 1987)). Section 544(b) "'does not extend beyond avoidance actions, and

does not permit [the Representative] to assert the personal, direct claims of creditors for the benefit

of the estate or a particular class of creditors.'" *Id.* (quoting *Goldin v. Primavera Familienstifung*

*(In re Granite Partners, L.P.)*, 194 B.R. 318, 324 (Bankr. S.D.N.Y. 1996)); *see also Roberts v.*

*Balasco (In re Ernie Haire Ford, Inc.)*, 459 B.R. 824, 839-40 (Bankr. M.D. Fla. 2011) (dismissing

claims for unjust enrichment and conspiracy to commit fraudulent transfer asserted under section

544(b) because section 544(b) "cannot be used as a catchall provision by trustees to assert non-

avoidance causes of action"). Thus, because the Trust purports to assert the claim for unjust

enrichment to vindicate the Debtors' creditors' injuries, Count XXII should be dismissed.[50]

---

[50] Even if this Court determines that the Complaint is not time-barred (and it is) *and* that the Trust is asserting the Debtors' claim for unjust enrichment (and it is not), this Court should still dismiss Count XXII for another fundamental reason: the Trust cannot assert a claim for unjust enrichment "'in the face of an express contract.'" *Off. Comm. of Unsecured Creditors of HH Liquid., LLC v. Comvest Grp. Holdings, LLC (In re HH Liquid., LLC)*, Adv. No. 16-

IV.    **The Trust's Civil Conspiracy Claim (Count XXIII) Fails as a Matter of Law**

Count XXIII seeks to impose liability on the YPF Defendants for "civil conspiracy" under either Delaware or New Jersey law, notwithstanding that "[c]ivil conspiracy is not an independent cause of action in Delaware." *Connolly v. Labowitz*, 519 A.2d 138, 143 (Del. Super. 1986) (citing *Phoenix Can. Oil Co.*, 560 F. Supp. at 1388 ("Delaware courts do not recognize independent actions for civil conspiracies.")); *see also Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998) (same) (citing *Connolly*, 519 A.2d at 143).

Further, although "a civil conspiracy must embody an underlying wrong which would be actionable in the absence of the conspiracy," *Connolly*, 519 A.2d at 143, the Trust does not explicitly identify what the actionable underlying wrong is, leaving it to the Defendants and the Court to guess.[51] The Trust's allegations specific to the civil conspiracy claim focus on the alleged fraudulent transfers. (Compl. ¶ 481 ("transferring substantially all of the Debtors' valuable assets"), ¶ 482 ("the relevant Debtors . . . were functionally insolvent"), ¶ 483 (listing numerous actions "all of which constitute fraudulent transfers or attempted fraudulent transfers").) The prayer for relief on the civil conspiracy claim also seeks recovery of damages "in an amount equal to the dollar value of the property transferred and claims released pursuant to each Fraudulent

---

51204 (KG), 2018 WL 4191580, at *58, --- B.R. --- (Bankr. D. Del. Jan. 26, 2018) (quoting 66 Am. Jur. 2d Restitution & Implied Contracts § 22); *see also Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) (dismissing unjust enrichment claim where purported enrichment occurred through performance under a contract) (citing cases). Here, the alleged enrichments are governed by contracts to which the Debtors were party. *See, e.g.*, Kuster Decl., Ex. 8 (transfer of Bolivian and Venezuelan assets); *id.* Ex. 9 (transfer of Ecuadorean assets); *id.* Ex. 11 (transfer of Indonesian assets); Compl. ¶¶ 10, 78 (incurrence of intercompany debt); *id.* ¶ 116 and Kuster Decl., Ex. 16 at F-17 (use of Crescendo proceeds to pay down $236 million credit facility); *id.* Ex. 35 (Jan. 3, 2001 agreement regarding sale of Ecuadorean assets); *id.* Exs. 36, 37 (Aug. 20, 2001 agreements regarding sale of Venezuelan assets); *id.* Ex. 38 (Jan. 18, 2002 agreement regarding YPFI sale of Indonesian assets) *id.* Ex. 19 (2007 YPF Settlement Agreement). The Trust cannot avoid any of these contracts for a multitude of reasons, *supra* 27-59, and it has not sought to rescind them. Count XXII should be dismissed.

[51] Similarly, under New Jersey law, "[c]ivil conspiracy is not a cause of action by itself, but rather an additional claim that requires an underlying 'overt act' that caused the harm in question." *Portes v. Tan*, No. A-3940-11T3, 2014 WL 463140, at *10 (N.J. App. Div. Feb. 6, 2014) (affirming dismissal of conspiracy count where underlying fraud and consumer fraud claims were inadequately pleaded).

Transfer as of the date of such Fraudulent Transfer." (Compl. at 129.) Thus, the only allegations supporting the Trust's claim for civil conspiracy are that it is one to commit fraudulent transfer. Given the nature of the civil conspiracy claim, the Court still must resolve whether Delaware or New Jersey law applies to it. Although the Trust contends that either Delaware or New Jersey law applies to this claim (Compl. ¶ 478), the Court must resolve which of those states' law applies because a true conflict exists: as explained below, Delaware does not recognize a cause of action for civil conspiracy to commit fraudulent transfer, while New Jersey does.[52]

As civil conspiracy is a claim sounding in tort, the Court should look to the factors of section 145 of the Restatement (Second) of Conflict of Laws to determine which state has the "most significant relationship" to the claim: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2) (1971).

These factors support applying Delaware law, rather than New Jersey law. The alleged injury occurred in Delaware, where all of the Debtors are incorporated. *See Wavedivision Holdings, LLC v. Highland Capital Mgmt. L.P.*, No. 08C-11-132-JOH, 2011 WL 13175837, at *8 (Del. Super. Oct. 31, 2011, *as corrected*, Aug. 7, 2012) ("[W]hen a Delaware corporation is injured, the court may view the plaintiff corporation's injury as having taken place in Delaware, its chosen place of legal residence." (internal quotation marks omitted)). In addition, five of the

---

[52] *Compare Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*, No. 3601-VCS, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010) ("[T]he Delaware Fraudulent Transfer Act does not create a cause of action for aiding and abetting, or conspiring to commit, a fraudulent transfer.") *with Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 178 (2005) ("Following the *Morgan* definition, a creditor in New Jersey may bring a claim against one who assists another in executing a fraudulent transfer." (citing *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (N.J. App. Div. 1993))).

eleven Defendants also are, or at the time were, incorporated in Delaware[53] (and the remaining six Defendants are incorporated in five different jurisdictions). Further, the relationship between the YPF Defendants and the Debtors is based on YPF's acquisition of Maxus, a *Delaware* corporation. Each of these factors weighs in favor of applying Delaware law.[54] By contrast, none of the Debtors or the Defendants is incorporated in New Jersey; none of those parties is alleged to maintain its principal place of business in New Jersey; and none of the underlying fraudulent transfers is alleged to have occurred in New Jersey. In light of Delaware's far more significant relationship, the Court should apply Delaware law to the Trust's civil conspiracy claim.

### A. Delaware Does Not Recognize a Cause of Action for Civil Conspiracy to Commit Fraudulent Transfer

It is well-established that Delaware does not recognize a cause of action for civil conspiracy to commit fraudulent transfer (or indeed any cause of action based on a theory of fraudulent transfer other than one for avoidance). Earlier this year, the Third Circuit determined that "a DUFTA claim based on a theory of non-principal liability is not cognizable under the statute," foreclosing causes of action for both aiding and abetting fraudulent transfer and conspiracy to commit fraudulent transfer. *Crystallex Int'l Corp.*, 879 F.3d at 89. The Third Circuit's decision relied upon three Delaware Chancery Court decisions, including two specifically stating that a "conspiracy cannot be predicated on fraudulent transfer." *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) (quotation omitted) (dismissing claim for civil

---

[53] These are YPFH, CLH Holdings, Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and Repsol Services Company.

[54] The selection of Delaware law for this claim is additionally supported by other decisions analyzing Delaware's choice of law rules and applying the law of the underlying wrong to the civil conspiracy claim as well. *See, e.g., Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1211-12 (Del. Ch. 2010) (Delaware law applies to claims for underlying wrong and therefore the civil conspiracy); *see also In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2014 WL 1466444, at *7 n.17, *8 (Bankr. D. Del. Apr. 10, 2014) (Massachusetts law applies to claims for civil conspiracy and underlying wrong).

conspiracy to commit fraudulent transfers); *see also Edgewater Growth*, 2010 WL 720150, at \*2

("[T]he Delaware Fraudulent Transfer Act does not create a cause of action for aiding and abetting,

or conspiring to commit, a fraudulent transfer."); *Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P.*,

906 A.2d 168, 203 (Del. Ch. 2006) ("Despite the breadth of remedies available under state and

federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of

action for 'aiding and abetting.'").[55] Thus, Count XXIII for civil conspiracy must be dismissed.

### B. The Trust Cannot Assert a Cause of Action for Civil Conspiracy to Commit Fraudulent Transfer

Even if Delaware did recognize conspiracy to commit fraudulent transfer as a cause of

action (it does not), the Trust could not pursue it because the Trust cannot assert a claim for

conspiracy to commit fraudulent transfer. "Whether any state law recognizes such a claim [for

conspiracy to commit fraudulent transfer], even the law of a controlling state such as New Jersey

or Delaware here, is irrelevant in bankruptcy proceedings." *In re Fedders N. Am., Inc.*, 405 B.R.

at 548. "[B]ankruptcy courts have refused to permit trustees to use section 544(b) to pursue" a

claim for conspiracy to commit fraudulent transfer. *Id.; see also In re Ernie Haire Ford, Inc.*, 459

B.R. at 839-40 (dismissing claims for conspiracy to commit fraudulent transfer and unjust

enrichment where trustee asserted such claims under section 544(b)).

In *Fedders*, Judge Shannon noted that "[t]he trustee's only authority to assert a creditor's

state law causes of action related to fraudulent conveyances is found in section 544(b) of the

Code," which "only permits the trustee to *avoid* a fraudulent transfer." 405 B.R. at 548 (citing

*Wyle v. Howard, Weil, Labouisse, Friedrichs Inc. (In re Hamilton Taft & Co.)*, 176 B.R. 895, 902

---

[55] Non-transferee liability also is not recognized under Section 548. *See Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 549 (Bankr. D. Del. 2009) ("[T]he authorities are also clear that there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of *federal* law under the Code." (emphasis added) (citing cases)).

(Bankr. N.D. Cal. 1995) (section 544(b) does not enable a trustee to bring an action for aiding and abetting a fraudulent transfer); *see also Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 656 (Bankr. S.D. Ohio 2006) (holding that trustee could use section 544(b) and Ohio Pyramid Sales Act to avoid contracts, but section 544(b) did not permit pursuit of damages); *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 669 (Bankr. N.D. Ind. 2005) ("If the trustee seeks to do something other than avoid a particular transaction, the power to do so must come from somewhere other than § 544(b)."). Furthermore, section 550, which specifies the remedies after avoidance of a transfer under section 544(b), "only allows the trustee to recover up to the amount of the transfer from a transferee, or a party for whose benefit the transfer was made. [T]o allow any other recovery 'could lead to a result that expands remedies beyond § 550' [and] 'the court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer.'" *In re Fedders N. Am., Inc.*, 405 B.R. at 548-49 (quoting *Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners LLC)*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003) (refusing to consider a fraudulent transfer under a civil conspiracy claim)). Therefore, the claim for civil conspiracy to commit fraudulent transfer may not be pursued by the Trust, and Count XXIII must be dismissed.[56]

---

[56] Even assuming the Court were to construe this claim as something other than a claim to commit fraudulent transfer (which it should not), the claim must still be dismissed because no potential underlying claim is actionable. "Civil conspiracy is not an independent cause of action" and it "must embody an underlying wrong which would be actionable in the absence of the conspiracy." *Connolly*, 519 A.2d at 143; *see also, e.g., Kuroda*, 971 A.2d at 892 (same). In the absence of an actionable underlying wrong, a claim for civil conspiracy should be dismissed. *See, e.g., Smiley v. Daimler Chrysler*, 538 F. Supp. 2d 711, 718-19 (D. Del. 2008) (denying motion to amend complaint by adding civil conspiracy count because "proposed amendments fail to state claims for defamation and, further, are barred by the limitations period"). Because all of the Trust's substantive claims should be dismissed, there is no "underlying wrong which would be actionable in the absence of the conspiracy," and Count XXII must accordingly be dismissed.

### C.  Even if a Civil Conspiracy Claim Could Otherwise Be Stated by the Trust, It Cannot Survive Because It Is Time-Barred

Under Delaware law, a civil conspiracy claim must be brought within three years of the

accrual of the claim. 10 Del. C. § 8106; *In re Winstar Commc'ns, Inc.*, 435 B.R. at 43 & nn.10, 11

(stating that 10 Del. C. § 8106 applies to civil conspiracy claims and that "[a] cause of action

accrues under § 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause

of action"); *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064. (Del. Ch. 1989) (applying

three year period in 10 Del. C. § 8106 to claim for civil conspiracy); *Glassberg*, 116 A.2d at 717

(same)). Although Delaware recognizes certain limited tolling exceptions, if any such exception

applies, the statute begins to run "'upon the discovery of facts constituting the basis of the cause

of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence

on inquiry which, if pursued, would lead to the discovery of the injury.'" *In re Winstar Commc'ns,*

*Inc.*, 435 B.R. at 43 n.11 (quoting *Krahmer*, 903 A.2d at 778 (setting out three exceptions—

fraudulent concealment, inherent unknowable injury, and equitable tolling—and determining that

none applied)).

The Trust alleges a litany of "wrongful, overt acts" that apparently formed the alleged civil

conspiracy to commit fraudulent transfer by being "fraudulent transfers or attempted fraudulent

transfers." (Compl. ¶ 483.) Such acts explicitly include some (but not all) of the transfers itemized

in the definition of "Fraudulent Transfers." (*Id.* ¶ 239.) As shown above, each of the transfers as

to which the Trust has made any allegations as to the YPF Defendants was disclosed at or near the

time of the transaction. Similarly, each of the remaining "wrongful, overt acts" which the Trust

has alleged involved the YPF Defendants also was subject to disclosure at or near the time of the

transaction.[57] Each of the actions alleged by the Trust involving the pre-petition Debtors and the

YPFI Defendants was thus known or knowable more than three years before the Petition Date due

to public disclosures (not to mention the long-running Passaic River Litigation). Even if the Trust

could assert a claim for civil conspiracy to commit fraudulent transfer, these acts having been

known or knowable more than three years prior to the Petition Date, Count XXIII must be

dismissed as time-barred as to the YPF Defendants.[58]

### V.    The Trust's Veil Piercing/Alter Ego Independent Cause of Action (Count I) Fails as a Matter of Law

In addition to the dismissal of the underlying claims for fraudulent transfer, unjust

enrichment, and civil conspiracy, the Court should also dismiss the Trust's invalid and residual

cause of action for veil piercing/alter ego liability (Count I).

Under applicable Delaware law,[59] "piercing the corporate veil is an 'extraordinary

remedy.'" *Round Rock Research LLC v. ASUSTeK Computer Inc.*, 967 F. Supp. 2d 969, 978 (D.

Del. 2013) (quoting *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.*, 147 F. Supp. 2d

268, 274 (D. Del. 2001)); *see also Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d at 392 ("Under

Delaware law, '[d]isregard of the corporate entity is appropriate only in exceptional

---

[57] *See, e.g.*, Kuster Decl., Ex. 13 at 24 (repayment of short-term debt); *id.* Ex. 14 at 24, 25 (repurchase of outstanding preferred stock); *id.* at 26-27 ($175 million borrowed from YPFI to prepay Indonesian loan facility and incurring a loss as a result)); *id.* Ex. 9 (sale of Ecuadorian affiliate to YPFI); *id.* Ex. 35 (sale of Ecuadorian affiliate to Repsol).

[58] Further, as with the fraudulent transfer claims asserted in the Passaic River Litigation, the New Jersey Court dismissed the related civil conspiracy claims under New Jersey law on the basis that they were time-barred, having been knowable no later than June 2, 2000. *NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230, at *23. Therefore, the Trust's civil conspiracy claim, at least to the extent based upon conduct prior to June 2, 2000, should be dismissed pursuant to the doctrines of collateral estoppel and/or law of the case.

[59] There can be no dispute that Delaware law applies to the Trust's veil piercing/alter ego claim, because the Debtors are incorporated in Delaware and courts in Delaware "look to the state of incorporation of a company to determine whether the relationship between the corporate entity and its stockholders can give rise to liability of the stockholders for the conduct of the corporate entity." *Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*, 418 B.R. 107, 113 (Bankr. D. Del. 2009) (citing *Rosenmiller v. Bordes*, 607 A.2d 465, 468 (Del. Ch. 1991)); *see also, e.g., Sutton v. JP Morgan Chase Bank, N.A. (In re Wa. Mut., Inc.)*, 575 B.R. 609, 615 (Bankr. D. Del. 2017) (law of state of incorporation applied to veil piercing claim); *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 295 (D. Del. 2000) (law of state of incorporation applied to all claims, including alter ego claims).

circumstances.'") (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989)); *Case Fin., Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009) ("Delaware courts take the corporate form and corporate formalities very seriously . . . [and] will disregard the corporate form only in the 'exceptional case.'").

"Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.' Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175 (Del. Ch. 1999) (quoting *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996)).

Here, the Trust's veil piercing/alter ego independent cause of action must be dismissed because (i) veil piercing/alter ego is not an independent cause of action and a trustee may not rely on the proofs of claim asserted against the Debtors by their creditors as a basis for recovery under an alter ego theory, and (ii) even if veil piercing/alter ego could be asserted as an independent cause of action against the YPF Defendants (and it cannot), recovery must be limited to the harm caused by the alleged misuse of the corporate form and does not encompass all liabilities of the Debtors.

### A. The Trust's Veil Piercing/Alter Ego Cause of Action Fails Because Alter Ego Is Not an Independent Cause of Action

As this Court has held, "[a]n 'attempt to pierce the corporate veil [i]s not itself a cause of action but rather a means of imposing liability on an underlying cause of action, such as a tort or a breach of contract . . .' against the underlying corporate entity." *Superior Contracting Grp. Inc. v. Rachmale (In re LTC Holdings, Inc.)*, 587 B.R. 25, 39 (Bankr. D. Del. 2018) (Sontchi, J.) (quoting 1 William Meade Fletcher, *Fletcher Cyclopedia of Corporations* § 41.28, at 166-67 (rev. ed. 2006)); *see also Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 n.10 (D. Del. 2010)

71

(However, 'piercing the corporate veil is not itself an independent cause of action, but rather is a means of imposing liability on an underlying cause of action.'") (alterations incorporated) (quoting *Peacock v. Thomas*, 516 U.S. 349, 354 (1996)).[60]

Here, because all of the Trust's other claims asserted in its Complaint for fraudulent transfer, unjust enrichment and civil conspiracy fail as a matter of law, the veil piercing remedy must also be dismissed. *See, e.g., Glob. Link Logistics Inc. v. Olympus Growth Fund III L.P.*, No. 4444-VCP 2010 WL 338214, at \*7 (Del. Ch. Jan. 29, 2010) (dismissing veil piercing claim based upon the "same reason" for dismissal of the underlying contribution claim); *see also, e.g., U.S. Bank Nat'l Assn. v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 442 (5th Cir. 2014) (affirming dismissal of alter ego claims where judgment in favor of defendants on underlying substantive claims was affirmed), *cert. denied*, 135 S. Ct. 1430 (2015); *Martin v. Old W. Cowboy Boots Corp. (In re Old W. Cowboy Boots Corp.)*, Adv. No. 5-06-50096, 2009 WL 3182998, at \*4 (Bankr. M.D. Pa. Sept. 30, 2009) ("With a determination that the statute of limitations had expired for other Counts of this Complaint, the Court sees no reason to permit Count VII [piercing the corporate veil] to go forward, and therefore, that Count will also be dismissed.").[61]

This Court, like the New Jersey Court in the Passaic River Litigation, should not permit the Trust to circumvent the applicable statutes of limitations by improperly dressing up the veil piercing/alter ego *remedy* in cause of action clothing. As held by the New Jersey Court:

---

[60] While Delaware law governs the Trust's veil piercing/alter ego claim, courts recognize that Delaware law and federal common law are consistent. *See, e.g., Blair*, 720 F. Supp. 2d at 470 n.11 ("The alter ego analysis is in fact the same under state or federal law . . . ."); *Mobil Oil Corp.*, 718 F. Supp. at 268 ("[R]egardless of which law is applied to the alter ego question—whether federal, Delaware or Oklahoma common law—the outcome is the same.").

[61] To the extent that any of the Trust's underlying causes of action against the YPF Defendants were to survive this Motion, and none of them should, only the alter ego remedy attached to such surviving causes of action should remain. *See, e.g., NJDEP v. OCC*, 2015 N.J. Super. LEXIS 230, at \*24-28 (dismissing alter ego claims tied to underlying claims to the extent that the underlying claims were barred by applicable limitations period); *Glob. Link Logistics Inc.*, 2010 WL 338214, at \*7 (dismissing veil piercing claim where underlying claims were dismissed).

[T]o the extent each of these claims are barred, so is alter-ego liability based on them. Alter-ego is not a separate cause of action; it is a remedy.

\* \* \*

To reiterate: OCC fails to meet the applicable statute of limitations for its claims against the defendants for tortious interference (Count Four), for fraudulent transfers (Count Five), for unjust enrichment (Count Six), [and] for civil conspiracy . . . . In addition, to the extent these claims are barred by the applicable limitation period, all claims for alter-ego tied to them in Count Two are similarly precluded. Therefore, these claims should be dismissed as a matter of law with prejudice.

\* \* \*

The alter-ego claims in Count Two should also be dismissed in their entirety. This is true because, based on the facts of this case, a declaratory judgment is an inappropriate vehicle for deciding whether this remedy is appropriate.[62]

The Trust's assertion that the YPF Defendants "should be jointly and severally liable to the Liquidating Trust for all claims and liabilities asserted by Debtors' creditors in the Chapter 11 Cases" (Compl. at 74) does not save its veil piercing/alter ego cause of action, because the trustee cannot assert a cause of action for alter ego based upon each creditor's individual claims against the Debtors. See, e.g., Verizon Commc'ns, Inc., 761 F.3d at 442 (applying Texas law and affirming dismissal of trustee's claim for alter ego based upon the debtor's creditors' claims because the underlying claims asserted were properly dismissed); Yaquinto v. Ward (In re Ward), 558 B.R. 771, 788-89 (Bankr. N.D. Tex. 2016) (dismissing trustee's claim for alter ego based upon creditors' claims against debtor because "a bankruptcy trustee may not rely on the claims of creditors as a basis for recovery under an alter ego theory"); cf. Caplin, 406 U.S. at 434 (holding that a trustee has no standing to sue on behalf of individual creditors); Marion, 591 F.3d at 148

---

[62] NJDEP v. OCC, 2015 N.J. Super. LEXIS 230, at \*24-26. The New Jersey Court's determination that "declaratory judgment is an inappropriate vehicle" was two-fold: (1) the underlying claims were time-barred, so a declaratory judgment relating to those claims was time-barred, and (2) the relief requested—holding the YPF Defendants and the Repsol Defendants liable on an alter ego theory—could "more adequately be addressed in the context of the counts in the cross claims that survive [the] motions to dismiss." Id. at \*28.

n.15 ("A bankruptcy trustee lacks authority to bring a claim directly on behalf of the debtor's creditors." (citing *Caplin*, 406 U.S. at 421-34)).

The decision in *Verizon Communications* is instructive. In that case, the Fifth Circuit held that the district "court necessarily found that the alter ego claim failed since the Trustee had not prevailed on any of the other claims." 761 F.3d at 442. On appeal, the trustee argued that regardless of whether alter ego is a claim or a remedy, the district court's dismissal was improper in the bankruptcy context because the trustee is empowered to sue for alter ego based on the underlying claims of the creditors. *Id.* In rejecting the trustee's argument, the Fifth Circuit affirmed the dismissal of the alter ego claim on the basis that "while alter ego theory is a means to pierce the corporate veil, it still relies on an underlying claim." *Id.* (citing *Grothues v. IRS (In re Grothues)*, 226 F.3d 334, 337-38 (5th Cir. 2000)).

Even if the Trust could assert an alter ego claim based on the claims filed by the Debtors' creditors (and it cannot), the relief the Trust requests is incredibly broad: it requests "a judgment declaring that the Defendants . . . should be jointly and severally liable to the Liquidating Trust *for all claims and liabilities asserted by Debtors' creditors* in the Chapter 11 Cases." (Compl. at 74 (emphasis added).) Coupled with the provisions in the Plan that give the Trust "the *exclusive* authority to . . . settle or compromise . . . any Disputed Claim . . . without any further notice to or action, order, or approval by the Bankruptcy Court," (Plan § X(C)(b)), the Trust would have the unilateral power to settle any and all pending claims for any amount it determines appropriate (with or without any investigation, approval by this Court, or notice to the YPF Defendants) and pass the entirety of such amount to the YPF Defendants. The YPF Defendants would have no opportunity to defend the amount, much less the validity, of the claims settled by the Trust. Granting the Trust the ability to saddle the YPF Defendants with liability in any amount it wants

through a stand-alone alter ego claim would work an extreme injustice and is not permissible as a matter of law.

Therefore, because the Trust's veil piercing/alter ego claim is not an independent cause of action and the Trust cannot assert a veil piercing/alter ego claim against Defendants based upon individual creditor claims (in an amount to be determined by the Trust and the Trust alone), untethered to the direct claims asserted against the Defendants in the Complaint, Count I must be dismissed.

### B. The Trust's Alter Ego Claim Must Also Be Dismissed Because It Impermissibly Seeks to Hold the YPF Defendants Liable for Harm Not Caused by the YPF Defendants' Alleged Misuse of the Corporate Form

Regardless of whether the Trust's veil piercing/alter ego claim could proceed as a separate cause of action under Delaware law (and it most certainly cannot), it must also be dismissed because it impermissibly seeks to use veil piercing to impose liability on the YPF Defendants for "all claims and liabilities asserted by Debtors' creditors" (Compl. ¶ 232), rather than liability for the harm caused by the alleged misuse of their dominion and control over the Debtors—*i.e.*, the alleged harm caused by the fraudulent transfers that the Trust implies caused the Debtors to be unable to satisfy claims asserted by the Debtors' creditors.[63]

Alleged misuse of a corporate form and independent torts or breaches of contract do not alone justify imposition of alter ego liability. Rather, "[i]n order to prevail on a claim to pierce the corporate veil and hold the corporation's shareholders liable, a plaintiff must prove that the

---

[63] More specifically, the Trust requests "(a) a judgment declaring that the Defendants are the alter egos of Maxus and Tierra and should be jointly and severally liable to the Liquidating Trust for all claims and liabilities asserted by Debtors' creditors in the Chapter 11 Cases; (b) a judgment requiring the Defendants to pay and to reimburse the Liquidating Trust for all damages . . . that Debtors' creditors have sustained; (c) judgment declaring that the Defendants are jointly and severally liable for all losses . . . that the creditors of the Debtors may incur or that may be imposed on such creditors in the future and (d) an award to the Liquidating Trust of reimbursement of counsel fees . . . ." (Compl. ¶ 232.)

corporate form *causes* fraud or similar injustice." *LaSalle Nat'l Bank*, 82 F. Supp. 2d at 295

(emphasis added) (citing *Wallace v. Wood*, 752 A.2d at 1183-84 and *Skouras v. Admiralty Enters.*,

386 A.2d 674, 681 (Del. Ch. 1978)); *see also Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532

A.2d 983, 987 (Del. Ch. 1987) ("[T]he dominant corporation must have proximately caused

plaintiff harm through misuse of this control" (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers

& Chem. Corp.*, 483 F.2d 1098, 1103 (5th Cir. 1973)); *Hillsborough Holdings Corp. v. Celotex

Corp. (In re Hillsborough Holdings Corp.)*, 166 B.R. 461, 468-69 (Bankr. M.D. Fla.) (alter ego

liability requires that "the fraudulent or improper use of the corporate form caused injury to the

claimant" (applying Delaware and Florida law)), *aff'd*, 176 B.R. 223 (M.D. Fla. 1994).

In requiring that the misuse of the corporate form *cause* the injury, Delaware law is

consistent with the laws of other jurisdictions, including the federal common law. *See, e.g.*,

*N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1053 (10th Cir. 1993) ("It is only when the

shareholders disregard the separateness of the corporate identity *and when that act of disregard

causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced."

(emphasis in original) (applying federal law)); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,

766 F.3d 212, 229 (2d Cir. 2014) (Plaintiff must show "both domination of the corporation and

that such domination was used to commit a fraud or wrong against the plaintiff which resulted in

plaintiff's injury." (internal quotation omitted) (applying New York law)); *JMB Mfg., Inc. v. Child

Craft, LLC*, 939 F. Supp. 2d 909, 921 (S.D. Ind. 2013) ("[I]n the absence of a causal connection

between the alleged misuse of the corporate form and harm suffered, an *alter ego* claim cannot be

sustained." (applying Indiana law)); *Mobil Oil Corp.*, 718 F. Supp. at 269 ("The law requires that

fraud or injustice be found in the defendants' use of the corporate form." (applying both federal

and state law)); *In re Lee Way Holding Co.*, 120 B.R. 881, 895 (Bankr. S.D. Ohio 1990) ("Although

there have been cases where a parent corporation has been held liable for all of its subsidiaries' debts, . . . the fact remains that, to prevail . . . the Trustee must show [the alleged alter ego's] domination or control was used to commit fraud or wrong or other dishonest or unjust act, and that injury or unjust loss resulted . . . from such control and wrong." (internal citations omitted and quotation incorporated) (applying Ohio law)).

Even in the context of CERCLA liability, courts apply this proximate cause requirement prior to enforcing the veil-piercing remedy for environmental liabilities and will only hold the alleged alter ego liable for those injuries its misuse of the corporate form caused. *See, e.g., FirstEnergy Corp.,* 766 F.3d at 229-30 (holding that defendant could not be liable for the environmental liabilities of its subsidiaries that arose prior to its control over them because "there is nothing in the record to suggest [predecessor] was directing the creation of coal tar at the subsidiaries *prior* to purchasing them" (applying New York law)); *Next Millennium Realty, L.L.C. v. Adchem Corp.,* No. 03-5985 (ARL), 2015 WL 11090419, at \*21-22 (E.D.N.Y. Mar. 31, 2015) (dismissing alter ego claim because "in CERCLA cases, the complaining party must . . . demonstrate that the corporate domination caused the contamination at the [s]ite" (applying New York law)); *Precision Brand Prods., Inc. v. Downers Grove Sanitary Distr.,* No. 08-cv-5549, 2011 WL 3489844, at \*3 (N.D. Ill. Aug. 8, 2011) (holding that where the defendant's subsidiary had ceased owning the contaminated property "over 25 years" before the defendant acquired ownership of its subsidiary, the defendant could not be liable on an alter ego theory for the prior contamination (no choice of law analysis)); *Scott v. NG U.S. 1, Inc.,* 450 Mass. 760, 771-72 (Mass. 2008) (holding that where "the environmental releases occurred—and the contaminated property was sold—more than thirty years before" a series of corporate acquisitions culminating in the defendant's ownership began, even though the corporate form may have been disregarded at

periods during that time, the defendant would not be subject to alter ego liability (applying Massachusetts law)).

Here, the vast bulk of the claims of the Debtors' creditors arise from the operation of chemical facilities decades prior to the YPF Defendants' involvement with the Debtors. Indeed, the claim filed by the United States on behalf of the EPA and other agencies for the costs of cleanup and other remediation of contamination that the YPF Defendants had nothing to do with was asserted in an amount of as much as $11.9 billion; together with other environmental claims relating to the Debtors' pre-YPF operations, environmental claims total approximately 99% of the claims against the Debtors. Moreover, the Trust has alleged that in 1995, prior to any alleged alter ego activities, "Maxus was undercapitalized and in the zone of insolvency as a result of the LBO." (Compl. ¶ 70.)[64] Thus, by seeking to hold the YPF Defendants liable for "up to $14 billion" in damages" (*id.* ¶ 17)[65] for all claims asserted by the Debtors' creditors—not for harm caused by the YPF Defendants' alleged alter ego actions—the Trust seeks to turn alter ego on its head and abuse the Bankruptcy Code to radically improve the creditors' rights as a result of the commencement of these Chapter 11 cases and to work an injustice, rather than prevent one.

The *most* that the YPF Defendants allegedly did wrong is receive fraudulent transfers, which are now time-barred. The Trust does not allege, nor could it, that the YPF Defendants' actions caused any of the environmental liabilities, whether at the Lister Site or at any other

---

[64] In fact, the NJDEP alleged that OCC was *directly* responsible for pollution at the Lister Site. (Kuster Decl., Ex. 3 ¶ 26.) Moreover, the EPA likewise asserted direct claims against OCC and over 100 other potentially responsible parties—none of which were the YPF Defendants. (*Id.* Ex. 39 (EPA list of Potentially Responsible Parties for Passaic River remediation).) Accordingly, even were the Court to dismiss the Complaint against the YPF Defendants, there are many other parties, including OCC, from which the EPA can seek compensation for cleaning up the Passaic River.

[65] It should be noted that although the New Jersey State plaintiffs sought over $2 billion in damages from the YPF Defendants with respect to their Lister Site environmental claims, they settled for a payment of $65 million from each of the YPF group and the Repsol group. (Compl. ¶ 190; Kuster Decl., Ex. 40 ¶ 21 (Passaic River Litigation Settlement).)

location—and the Trust has alleged that, *even absent the YPF Defendants' actions*, it is unlikely that the Debtors would have been able to pay their liabilities. (*See, e.g.*, Compl. ¶ 102 ("Maxus was already insolvent by virtue of its environmental liabilities at the Lister Site alone" at the time of the acquisition by YPF).) The Trust should not be permitted to repackage its long time-barred fraudulent transfer claims as a general alter ego claim exposing the YPF Defendants to liability that is potentially unlimited, but is in any event asserted in an amount that is many times the value of the allegedly fraudulent transfers.

For all of the foregoing reasons, the Trust's veil piercing/alter ego cause of action must be dismissed in its entirety, including its request for a declaration that the YPF Defendants are jointly and severally liable for all claims and liabilities asserted by the Debtors' creditors in the Chapter 11 cases.

### NO CONSENT TO ENTRY OF FINAL ORDER OR JUDGMENT

Pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1, none of the YPF Defendants consent to the entry of final orders or judgments by the Court.

### NOTICE

Notice of this Motion shall be given to the Trust, the Repsol Defendants, and the United States of America (on behalf of the EPA, Department of Interior, and National Oceanic and Atmospheric Administration). The YPF Defendants respectfully submit that no further notice of this Motion is required.

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed in its entirety with

prejudice.

Dated: October 19, 2018
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com

-and-

**SIDLEY AUSTIN LLP**
James F. Conlan (*pro hac vice*)
Jessica C. Knowles Boelter (*pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Fax:  (312) 853-7036

**SIDLEY AUSTIN LLP**
John G. Hutchinson (*pro hac vice*)
John J. Kuster (*pro hac vice*)
Martin B. Jackson (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599

*Counsel for the YPF Defendants*