## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | )  Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | ) |
|  | )  Case No. 16-11501 (CSS) |
| Debtors. | ) |
|  | )  Jointly Administered |
|  | ) |
|  | ) |
| MAXUS LIQUIDATING TRUST, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )  Adversary Proceeding |
|  | ) |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | )  Case No. 18-50489 (CSS) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) |
| REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., | ) |
| REPSOL USA HOLDINGS CORP., REPSOL | ) |
| E&P USA, INC., REPSOL OFFSHORE E&P | ) |
| USA, INC., REPSOL E&P T&T LIMITED, and | ) |
| REPSOL SERVICES CO., | ) |
|  | ) |
| Defendants. | ) |

## REPSOL DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Robert J. Dehney
Curtis S. Miller
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 351-9412
Facsimile:  (302) 425-3080

WEIL, GOTSHAL & MANGES LLP
Edward Soto
Robert Lemons
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Counsel for Repsol Defendants*

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ...................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ................................................4

ARGUMENT ...........................................................................................................6

I.     The MLT's Claims Are Barred Under Applicable Principles of *Res Judicata*, Collateral Estoppel, and the Entire Controversy Doctrine...................................6

    A.     New Jersey *Res Judicata* and Collateral Estoppel Rules Apply..............................6

    B.     The MLT's Claims Are Barred by *Res Judicata* Because All Three Elements for Claim Preclusion Under New Jersey Law Are Met ........................................7

        i.     The MLT's Claims Arise out of the Same Transactions and Occurrences as the Claims Asserted in the New Jersey Court ...............................................8

        ii.    Because the MLT Is a Party to the New Jersey Litigation, Both the Identical Party and/or Privity Requirement for Res Judicata Is Satisfied.......11

        iii.   The Superior Court of New Jersey's November 22, 2017 Order Constitutes a Valid and Final Judgment on the Merits ......................................................16

    C.     Barring the MLT's Claims as Precluded Comports with Principles of Comity, Judicial Efficiency, and Repose That Underlie Preclusion Law...........................17

    D.     Collateral Estoppel Also Bars the MLT's Attempted Re-litigation of Issues .......19

    E.     The MLT, as Successor-in-Interest of Maxus, Is Barred by the Entire Controversy Doctrine from Bringing Claims That Maxus Could Have Asserted in the New Jersey Court ........................................................................23

II.    Motion to Dismiss Standard of Review ...........................................................27

III.   The MLT Fails to State a Claim for Alter Ego Liability (Count I)...................................28

    A.     Delaware Law Applies to the MLT's Alter Ego Declaratory Judgment Claim ....28

    B.     Alter Ego Is Not an Independent Cause of Action, But Merely a Remedy...........29

    C.     Delaware Law Applies a Two-Pronged Test to Establish Alter Ego Liability......29

    D.     The MLT Has Not Pled Allegations Sufficient to Pierce the Corporate Veil at Each Level of the Corporate Chain, as Is Required to Reach Its Great-Grandparent.........................................................................................................31

    E.     The MLT Cannot Establish the Second Prong of Alter Ego Liability—a Fraud or Injustice Sufficient to Pierce the Corporate Veil.............................................35

        i.     The MLT Failed to Plead That the Intermediate Entities Are Insolvent or Incapable of Satisfying Any Judgment ..........................................................35

ii. The MLT Has Not Pled that Repsol Caused a Fraud or Injustice Because It Alleges that Such Fraud or Injustice Occurred Years Before Repsol Arrived on the Scene ........................................................................................37

**F.** The MLT Has Not Sufficiently Pled the First Prong of Alter Ego Liability—That Repsol Exerted Complete Domination and Control Over Maxus and Tierra ..................................................................................................................40

**IV.** The MLT's Fraudulent Transfer Claims Must be Dismissed ............................................46

**A.** Each Fraudulent Transfer Claim Is Time-Barred ..................................................46

**B.** Counts XIV–XV Fail Because Those Transactions Do Not Involve Property of the Debtors and UFTA Does Not Apply to Subsequent Transfers Between Foreign Entities ..................................................................................................51

**C.** The MLT Fails to Meet the Pleading Standards for Actual and Constructive Fraudulent Transfer ..............................................................................................56

i. Counts II–III Are Duplicative and Do Not Identify the Date, Amount, or Source of the Fraudulent Transfers ................................................................57

ii. Counts XVI–XXI, Related to the Settlement Agreements, Fail to Plausibly Plead a Fraudulent Transfer Claim Against Repsol ........................................59

iii. Counts XII-XIII, Regarding the Crescendo Asset, Fail Because They Do Not Meet the Plausibility Test ........................................................................63

**V.** Civil Conspiracy Based on Allegedly Fraudulent Transfers Is Not a Cause of Action Under Delaware Law and Is Time-Barred Anyway ........................................................66

**VI.** Unjust Enrichment Claim is Time-Barred (Count XXII) ................................................68

**STATEMENT REGARDING LOCAL RULE 7012-1** ............................................................69

**CONCLUSION** ..........................................................................................................................69

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 865 Centennial Ave. Assocs. Ltd. P'ship*,
  200 B.R. 800 (Bankr. D.N.J. 1996) ...................................................................24, 26

*Akande v. Transamerica Airlines, Inc. (In re Transamerica Airlines, Inc.)*,
  No. CIV.A. 1039-N, 2006 WL 587846 (Del. Ch. Feb. 28, 2006) ....................................66, 67

*Akzona Inc. v. E.I. Du Pont De Nemours & Co.*,
  607 F. Supp. 227 (D. Del. 1984) ........................................................................43

*Alaska v. Andrus*,
  429 F. Supp. 958 (D. Alaska 1977) .....................................................................12

*Albright v. Attorney's Title Ins. Fund*,
  504 F. Supp. 2d 1187 (D. Utah 2007) ..............................................................42, 45

*Allen v. McCurry*,
  449 U.S. 90 (1980) .....................................................................................18

*Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*,
  963 A.2d 746 (Del. Ch. 2009) ..........................................................................31

*Angell v. Ber Care Inc. (In re Caremerica, Inc.)*,
  409 B.R. 737 (Bank. E.D.N.C. 2009) ..............................................................57, 63

*Apex Mar. Co. v. OHM Enterprises, Inc*,
  No. 10 CIV. 8119 SAS, 2011 WL 1226377 (S.D.N.Y. Mar. 31, 2011) .................................41

*Aragon Partners LP v. HDOX Bioinformatics, Inc.*,
  No. A-2937-15T2, 2018 WL 1370661 (N.J. Super. Ct. App. Div. Mar. 19,
  2018) ..............................................................................................8, 19

*Matter of Armstrong*,
  201 B.R. 526 (Bankr. D. Neb. 1996) ...................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................27

*Bailey v. Ness*,
  733 F.2d 279 (3d Cir. 1984) .............................................................................7

*Bank of Belton v. Bogar Farms*,
  154 S.W.3d 518 (Mo. Ct. App. 2005) ...................................................................39

*Barclay v. Swiss Fin. Corp. (In re Bankr. Estate of Midland Euro Exchange, Inc.)*,
    347 B.R. 708 (Bankr. C.D. Cal. 2006) ...................................................................................55

*Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Caliber
Auto Transfer, Inc.*,
    No. CIV.09-6447 (DRD), 2010 WL 2521091 (D.N.J. June 11, 2010) ..................................24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................................... *passim*

*Blair v. Infineon Techs. AG*,
    720 F. Supp. 2d 462 (D. Del. 2010) ....................................................................................29

*In re BMT-NW Acquisition, LLC*,
    582 B.R. 846 (Bankr. D. Del. 2018) ..............................................................................57, 58

*Bondi v. Citigroup, Inc.*,
    32 A.3d 1158 (N.J. App. Div. 2011) ...............................................................................8, 17

*Bressner v. Ambroziak*,
    379 F.3d 478 (7th Cir. 2004) ...............................................................................................58

*In re Brown*,
    951 F.2d 564 (3d Cir. 1991) ...................................................................................................7

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ...............................................................................................59

*Burtch v. Huston (In re USDigital, Inc.)*,
    443 B.R. 22 (Bankr. D. Del. 2011) ........................................................................27, 56, 61

*Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*,
    466 B.R. 626 (Bankr. D. Del. 2012) ....................................................................................65

*Cadle Co. v. Wilson*,
    136 S.W.3d 345 (Tex. Ct. App. 2004) .................................................................................49

*Canter v. Lakewood of Voorhees*,
    22 A.3d 68 (N.J. App. Div. 2011) ..................................................................................35, 42

*Carpenters & Joiners Welfare Fund v. Wayne*,
    No. CIV. 02-779 JNEJGL, 2003 WL 21730105 (D. Minn. July 21, 2003) ..........................37

*Case Fin., Inc. v. Alden*,
    No. CIV. A. 1184-VCP, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009) .................................45

*Casini v. Graustein (In re Casini)*,
    307 B.R. 800 (Bankr. D.N.J. 2004) ....................................................................................39

iv

*Catalina Mktg. Int'l, Inc. v. Coolsavings.Com, Inc.*,
    No. 00C2447, 2003 WL 21542491 (N.D. Ill. July 3, 2003) ....................................................45

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999)......................................................................................29, 30

*In re Circle Y of Yoakum, Tx.*,
    354 B.R. 349 (Bankr. D. Del. 2006) ..................................................................................28, 56

*Cornell Glasgow, LLC v. LaGrange Props., LLC*,
    No. N11C-07-160, 2012 WL 3157124 (Del. Sup. Ct. 2012)...................................................66

*Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd*,
    No. 05-60055-CIV, 2011 WL 1232986 (S.D. Fla. Mar. 30, 2011) ........................................59

*Covey v. Peoria Speakeasy, Inc. (In re Duckworth)*,
    No. 10-83603, 2013 WL 1397456 (Bankr. C.D. Ill. Apr. 5, 2013) ........................................54

*Crispino v. Chemical Bank N.J., N.A. (In re Crispino)*,
    160 B.R. 749 (Bankr. D.N.J. Nov. 17, 1993)........................................................................26

*Culver v. Ins. Co. of N. Am.*,
    559 A.2d 400 (N.J. 1989)........................................................................................................24

*D.R. Horton Inc.–N.J. v. Dynastar Dev., L.L.C.*,
    No. MER-L-1808-00, 2005 WL 1939778 (N.J. Super. Ct. Law Div. Aug. 10,
    2005) ........................................................................................................................................39

*Del. River Port Auth. v. Fraternal Order of Police*,
    290 F.3d 567 (3d Cir. 2002).....................................................................................................8

*DermaFocus LLC v. Ulthera, Inc.*,
    201 F. Supp. 3d 465 (D. Del. 2016).........................................................................................62

*Covery v. Casey's General Stores, Inc. (In re Duckworth*,
    No. 10-83603, 2012 WL 4434681 (Bankr. C.D. Ill. Sept. 24, 2012) ................................53, 54

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
    No. 3184-VCP, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008) ..................................................38

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
    No. CV 7471-VCP, 2013 WL 5621678 (Del. Ch. Sept. 30, 2013)..........................................44

*Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*,
    No. CIV.A. 3601-VCS, 2010 WL 720150 (Del. Ch. Mar. 3, 2010).........................................68

*Edleman v. McMullin Orchards (In re Silver Mill Frozen Foods, Inc.)*,
    32 B.R. 783 (Bankr. W.D. Mich. 1983)...................................................................................14

*EiserAmper LLP v. Morgan (In re SRC Liquidation LLC)*,
    581 B.R. 78 (Bankr. D. Del. 2017) ...................................................................61

*Energy Coal v. CITGO Petroleum Corp.*,
    836 F.3d 457 (5th Cir. 2016) ..........................................................................31

*Energy Marine Servs., Inc. v. DB Mobility Logistics AG*,
    No. CV 15-24-GMS, 2016 WL 284432 (D. Del. Jan. 22, 2016)...........................41

*Eugenia VI Venture Holdings, Ltd. v. Maplewood Holdings LLC (In re AMC Investors, LLC)*,
    524 B.R. 62 (Bankr. D. Del. 2015) ...........................................................9, 11, 15

*F.D.I.C. v. White*,
    No. 3:96-CV-0560, 1998 WL 120298 (N.D. Tex. Mar. 5, 1998)...........................68

*Fantazia Int'l Corp. v. CPL Furs New York, Inc.*,
    67 A.D.3d 511 (N.Y. App. Div. 2009) ...............................................................39

*Faulkner v. Kornman (In re The Heritage Org., L.L.C.)*,
    413 B.R. 438 (Bankr. N.D. Tex. 2009)........................................................ *passim*

*Favors v. Aughtry*,
    No. CV 16-8347-(RBK/KMW), 2017 WL 3228122 (D.N.J. July 31, 2017) .........................16

*Ferguson v. Travelers Indem. Co.*,
    No. A-0028-15T1, 2017 WL 957732 (N.J. Super. Ct. App. Div. Mar. 10, 2017) ...................................................................................................15

*First Union Nat. Bank v. Penn Salem Marina, Inc.*,
    921 A.2d 417 (N.J. 2007)..................................................................................9

*Fletcher v. Atex, Inc.*,
    861 F. Supp. 242 (S.D.N.Y. 1994), *aff'd*, 68 F.3d 1451 (2d Cir. 1995) ...........................44, 45

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009).............................................................................27

*In re G-I Holdings, Inc.*,
    313 B.R. 612 (Bankr. D.N.J. 2004) ..................................................................50

*Gibbons v. First Fid. Bank, N.A. (In re Princeton–New York Investors, Inc.)*,
    199 B.R. 285 (Bankr. D.N.J. 1996) ..................................................................49

*Gierum v. Glick (In re Glick)*,
    568 B.R. 634 (Bankr. N.D. Ill. 2017) ................................................................52

vi

*In re Good Time Charley's Inc.*,
    54 B.R. 157 (Bankr. D.N.J. 1984) ....................................................................13

*Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*,
    491 B.R. 747 (Bankr. W.D. La. 2013) ..............................................................28

*Grasty v. Michail*,
    No. 02C-05-89 CLS, 2004 WL 396388 (Del. Super. Ct. Feb. 24, 2004) ..............................29

*Harthman v. Texaco Inc. (In re Tutu Wells Contamination Litig.)*,
    909 F. Supp. 1005 (D.V.I. 1995) ....................................................................32

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
    498 F.Supp.2d 25 (D.D.C. 2007) ....................................................................32

*Hudgins v. Davidson*,
    127 B.R. 6 (E.D. Va. 1991)....................................................................14

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*,
    136 F.3d 537 (7th Cir. 1998) ....................................................................42

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*,
    532 A.2d 983 (Del. Ch. 1987)....................................................................38

*Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*,
    456 F. Supp. 831 (D. Del. 1978)....................................................................45

*Johnson v. Diamond Shine, Inc.*,
    890 F. Supp. 2d 763 (W.D. Ky. 2012)....................................................................36

*Joiner v. Ryder System Inc.*,
    966 F. Supp. 1478 (C.D. Ill. 1996) ............................................................35, 36, 42, 43

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
    529 F.3d 371 (7th Cir. 2008) ....................................................................32

*Kapila v. Bible Baptist College of Penn. (In re ATM Fin. Servs., LLC)*,
    No. 6:08-bk-969, 2011 WL 2604247 (Bankr. M.D. Fla. June 21, 2011) ..............................63

*Katiroll Co. v. Kati Roll & Platters Inc.*,
    No. 10-3620 JAP, 2012 WL 3061152 (D.N.J. July 26, 2012)................................................31

*Kramer Motors, Inc. v. British Leyland, Ltd.*,
    628 F.2d 1175 (9th Cir. 1980) ....................................................................43

*Lawler v. RepublicBank Dallas (In re Lawler)*,
    53 B.R. 166 (Bankr. N.D. Tex. 1985)....................................................................53

WEIL:\96695690\7\69508.0003

*In re Lewison Bros.*,
  162 B.R. 974 (Bankr. D.N.J. 1993) ...................................................................24

*Local 322, Allied Indus. Workers of Am., AFL-CIO v. Johnson Controls, Inc.,*
  *Globe Battery Div.,*
  921 F.2d 732 (7th Cir. 1991) ...........................................................................12

*Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*,
  No. CIV.A.04-1256-JJF, 2007 WL 129003 (D. Del. Jan. 12, 2007).......................65

*In re Mahkovic*,
  No. BR 12-70612-JAD, 2014 WL 4345962 (Bankr. W.D. Pa. Aug. 28, 2014) ...................18

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
  470 U.S. 373 (1985)..........................................................................................19

*Mason v. Network of Wilmington, Inc.*,
  No. CIV.A. 19434-NC, 2005 WL 1653954 (Del. Ch. July 1, 2005) .......................30

*McNeil v. Legislative Apportionment Comm'n of State*,
  828 A.2d 840 (N.J. 2003)...................................................................................8

*MicroStrategy Inc. v. Acacia Research Corp.*,
  No. 5735, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010)........................................29

*Miller v. Barenberg (In re Bernard Techs., Inc.)*,
  398 B.R. 526 (Bankr. D. Del. 2008) ..................................................................51

*Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools)*,
  386 B.R. 37 (D. Del. 2008)................................................................................59

*Milner v. TPAC LLC (In re Ticketplanet.com)*,
  313 B.R. 46 (Bankr. S.D.N.Y. 2004)..................................................................43

*Mobil Oil Corp. v. Linear Films, Inc.*,
  718 F. Supp. 260 (D. Del. 1989)........................................................................30

*In re Montgomery Ward, LLC*,
  634 F.3d 732 (3d Cir. 2011)..............................................................................25

*Montoya v. Tobey (In re Ewbank)*,
  359 B.R. 807 (Bankr. D.N.M. 2007) ..................................................................49

*Morris v. Zimmer*,
  No. 10 CIV. 4146 VB LMS, 2014 WL 7474770 (S.D.N.Y. Feb. 11, 2014) ...................39

*Morrison v. National Australia Bank Limited*,
  561 U.S. 247, 255 (2010)..................................................................................55

viii

*In re Mullarkey*,
    536 F.3d 215 (3d Cir. 2008)...............................................................................8

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
    766 F.3d 212 (2d Cir. 2014)..............................................................................38

*Nelson v. Frana Companies, Inc.*,
    No. 13-CV-2219 PJS/SER, 2013 WL 6500165 (D. Minn. Dec. 11, 2013) ...........................57

*New Jersey Div. of Child Prot. & Permanency v. J.H.*,
    No. A-1322-12T3, 2014 WL 1464469 (N.J. Super. Ct. App. Div. Apr. 16,
    2014) ...................................................................................................17

*Noto v. Cia Secula di Armanento*,
    310 F. Supp. 639 (S.D.N.Y. 1970) ..............................................................35, 36

*Nugent v. Bus. Cards Tomorrow, Inc. (In re Nugent)*,
    254 B.R. 14 (Bankr. D.N.J. 1998) ..................................................................18

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re
    Cybergenics Corp.)*,
    226 F.3d 237 (3d Cir. 2000)............................................................................47

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S
    & B Holdings LLC)*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) .........................................................42, 43

*In re Old CarCo LLC*,
    454 B.R. 38 (Bankr. S.D.N.Y. 2011).............................................................63, 65

*In re Old Carco LLC*,
    No. 11 Civ. 5039, 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011) .........................................27

*Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*,
    685 A.2d 724 (Del. Super. Ct. 1996) ................................................................32

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)............................................................................34

*Pace v. Kuchinksy*,
    789 A.2d 162 (N.J. Super. Ct. App. Div. 2002)......................................................20

*Paterson v. Scherer (In re Hudsar Inc.)*,
    199 B.R. 266 (Bankr. D.N.J. 1996) ..................................................................23

*In re Pensignorkay, Inc.*,
    204 B.R. 676 (Bankr. E.D. Pa. 1997) ................................................................17

*Perry v. Unum Life Ins. Co. of Am.*,
    353 F. Supp. 2d 1237 (N.D. Ga. 2005) ...............................................................35

*In re Platte River Bottom, LLC*,
    No. 13-13098 HRT, 2015 WL 3897453 (Bankr. D. Colo. June 23, 2015).............48

*Possession v. Cooper Bussmann, Inc. (In re Hechinger Inv. Co. of Delaware, Inc.)*,
    297 B.R. 390 (Bankr. D. Del. 2003) ...................................................................33

*Premio Foods, Inc. v. Purdue Farms, Inc.*,
    No. 11-cv-4968, 2012 WL 3133791 (D.N.J. July 30, 2012) ..................................67

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006).................................................................32

*Pulieri v. Boardwalk Props., LLC*,
    No. CV 9886-CB, 2015 WL 691449 (Del. Ch. Feb. 18, 2015) .............................68

*Quadrant Structured Prods. Co. v. Vertin*,
    102 A.3d 155 (Del. Ch. 2014)...........................................................................66

*R.S. v. S.C.*,
    No. A-1185-13T1, 2017 WL 919053 (N.J. Super. Ct. App. Div. Mar. 8, 2017)....................20

*In re Rabinowitz*,
    10-12538 DHS, 2011 WL 6749068 (Bankr. D.N.J. Dec. 21, 2011).......................25

*Radovich v. L.P. YA Global Invs., L.P.*,
    570 F. App'x 203 (3d Cir. 2014) .........................................................................8

*Radovich v. YA Global Invs., L.P.*,
    No. CIV.A. 12-CV-6723, 2013 WL 4012042 (D.N.J. Aug. 5, 2013)......................18

*Rafool v. Propack Sys., LLC (In re Fleming Packaging Corp.)*,
    No. 03-82408, 2007 WL 1021884 (Bankr. C.D. Ill. Mar. 30, 2007)......................52

*Ravin v. Morris Truman, L.L.C. (In re Popular Club Plan, Inc.)*,
    395 B.R. 587 (Bankr. D.N.J. 2008) .........................................................26, 32, 33

*In re Raytrans Holding, Inc.*,
    573 B.R. 121 (Bankr. D. Del. 2017) ........................................................7, 15, 28

*Ricketti v. Barry*,
    775 F.3d 611 (3d Cir. 2015)...............................................................................24

*Rodsan v. Borough of Tenafly*,
    No. CIV.A. 10-1923 MAS, 2011 WL 2621016 (D.N.J. June 30, 2011) ......................8, 24, 25

WEIL:\96695690\7\69508.0003

*Ross v. Ross*,
    705 A.2d 784 (N.J. Super. Ct. App. Div. 1998)....................................................................12

*Round Rock Research LLC v. ASUSTeK Computer Inc.*,
    967 F. Supp. 2d 969 (D. Del. 2013)....................................................................30

*Sandone v. Diana*,
    No. 6-2928-09, 2012 WL 5869580 (N.J. Sup. Ct. App. Div. Nov. 21, 2012).......................66

*Scott v. NG U.S. 1, Inc.*,
    881 N.E.2d 1125 (Mass. 2008) ....................................................................38

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    513 B.R. 222 (S.D.N.Y. 2014)....................................................................55

*Seidel v. Byron*,
    405 B.R. 277 (N.D. Ill. 2009) ....................................................................59

*Seiko Epson Corp. v. Print–Rite Holdings, Ltd.*,
    No. 2002 WL 32513403 (D. Or. Apr. 30, 2002) ....................................................................43

*In re SemCrude, L.P.*,
    407 B.R. 112 (Bankr. D. Del. 2009) ....................................................................28

*In re Sherwood Inv. Overseas Ltd., Inc.*,
    No. 6:10-bk-584, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ..........................................55

*Shibles v. Bank of Am., N.A.*,
    730 F. App'x 103 (3d Cir. 2018) ....................................................................23

*Smith v. Am. Founders Fin., Corp.*,
    365 B.R. 647 (S.D. Tex. 2007) ....................................................................48, 50

*Smith v. Nicholas/Earth Printing, L.L.C. (In re Bob Nicholas Enter., Inc.)*,
    358 B.R. 693 (Bankr. S.D. Tex. 2007) ....................................................................58

*Soroof Trading Dev. Co. v. GE Microgen, Inc.*,
    283 F.R.D. 142 (S.D.N.Y. 2012) ....................................................................32

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ....................................................................31, 41

*Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*,
    516 B.R. 163 (Bankr. E.D. Ky. 2014)....................................................................52, 53, 54

*Suarez v. Camden Cty. Bd. of Chosen Freeholders*,
    972 F. Supp. 269 (D.N.J. 1997) ....................................................................16

xi

*Sugartown Worldwide LLC v. Shanks*,
  No. CIV.A. 14-5063, 2015 WL 1312572 (E.D. Pa. Mar. 24, 2015)........................29

*SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*,
  No. 12 CIV. 7280 ALC DCF, 2013 WL 5366373 (S.D.N.Y. Sept. 25, 2013) .......................35

*Taylor v. Sturgell*,
  553 U.S. 880 (2008)........................................................................13

*Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*,
  493 F.3d 345 (3d Cir. 2007)................................................................34

*In re Topcor, Inc.*,
  132 B.R. 119 (Bankr. N.D. Tex. 1991).......................................................47

*Trevino v. Merscorp, Inc.*,
  583 F. Supp. 2d 521 (D. Del. 2008)........................................................30

*Tronox, Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
  503 B.R. 239 (S.D.N.Y. 2013)..............................................................50

*Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*,
  855 F.3d 84, 88 (2d Cir. 2017)............................................................33

*U.S. Coal Corp. v. Pryor Cashman LLP, Defendant (In re Licking River Mining, LLC)*,
  565 B.R. 794 (Bankr. E.D. Ky. 2017).......................................................57

*United States v. Bestfoods*,
  524 U.S. 51 (1998).........................................................................42

*United States v. Pisani*,
  646 F.2d 83 (3d. Cir. 1981)................................................................29

*United States v. Rocky Mountain Holdings Inc.*,
  782 F. Supp. 2d 106 (E.D. Penn. 2011) ....................................................46

*Untracht v. W. Jersey Health Sys.*,
  803 F. Supp. 978 (D.N.J. 1992) ...........................................................22

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
  871 A.2d 1108 (Del. 2005) ................................................................28

*Velasquez v. Franz*,
  123 N.J. 498 (1991) .......................................................................7

*W.R. Gace & Co. v. Sealed Air Corp. (In re W.R. Grace & Co.)*,
  281 B.R. 852 (Bankr. D. Del. 2002) .......................................................46

WEIL:\96695690\7\69508.0003

*Walker v. Choudhary*,
    40 A.3d 63 (N.J. Super. Ct. App. Div. 2012)........................................................22

*Watkins v. Resorts Int'l Hotel & Casino, Inc.*,
    591 A.2d 592 (N.J. 1991)........................................................................................24

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................................................................55

*Williams v. Marlar (In re Marlar)*,
    267 F.3d 749 (8th Cir. 2001) ...........................................................................14, 15

*In re Winstar Commc'ns, Inc.*,
    348 B.R. 234 (Bankr. D. Del. 2005) ......................................................................64

*WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. (In re WRT Energy Corp.)*,
    282 B.R. 343 (Bankr. W.D. La. 2001) ...................................................................64

*Yaquinto v. Ward (In re Ward)*,
    558 B.R. 771 (Bankr. N.D. Tex. 2016)..................................................................29

*Zazzali v. Swenson (In re DBSI, Inc.)*,
    No. 08-12687 PJW, 2011 WL 607442 (Bankr. D. Del. Feb. 11, 2011) ..................47

*Zazzali v. Wavetronix LLC (In re DBSI, Inc.)*,
    445 B.R. 351 (Bankr. D. Del. 2011) ......................................................................59

*Zirger v. Gen. Acc. Ins. Co.*,
    676 A.2d 1065 (N.J. 1996).............................................................................13, 14

**Statutes**

6 Del. Code Ann. § 1304(a) ...........................................................................................56

6 Del. Code Ann. § 1309 ...............................................................................................47

10 Del. Code Ann. § 8106 .......................................................................................67, 68

11 U.S.C. § 544.................................................................................................... *passim*

28 U.S.C. § 1738........................................................................................................1, 7

Ky. Rev. Stat. Ann. § 378A.090 ...................................................................................47

N.J. Stat. Ann. § 25:2–31 .......................................................................................47, 49

N.J. Stat. Ann. § 2A:14-1..............................................................................................67

Ohio Rev. Code Ann. § 1336.09....................................................................................47

WEIL:\96695690\7\69508.0003

Tex. Bus. & Comm. Code § 24.010 .............................................................................47

Wis. Stat. Ann. § 893.425 .........................................................................................47

**Other Authorities**

46 Am. Jur. 2d Judgments § 561 ................................................................................12

Federal Rule of Bankruptcy Procedure 7012(b) ....................................................1, 27

Federal Rule of Civil Procedure 8 ...........................................................41, 56, 57, 63

Federal Rule of Civil Procedure 9 .......................................................................56, 57

Federal Rule of Civil Procedure 12(b)(6) ................................................1, 27, 55, 63

New Jersey Rule 4:30A .............................................................................................23

New Jersey Rule 4:33-1 .............................................................................................11

Restatement (Second) Judgments § 13, cmt f. (1982) ................................................17

Restatement (Second) of Judgments § 27 (1982) ......................................................20

Restatement (Second) of Judgments § 86 (1982) ........................................................7

WEIL:\96695690\7\69508.0003

1.      Pursuant to 28 U.S.C. § 1738 and Federal Rule of Civil Procedure 12(b)(6), made applicable to the Court under Federal Rules of Bankruptcy Procedure 7012(b), Defendants Repsol, S.A., Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Company (collectively "**Repsol**") respectfully move this Court to dismiss the claims asserted by the Maxus Liquidating Trust ("**MLT**") against Repsol in its complaint ("**Complaint**") [Adv. D.I. 1].

## SUMMARY OF THE ARGUMENT

2.      This is the situation in which Repsol finds itself:  perpetually facing claims brought by Occidental Chemical Corporation ("**OCC**") over a decade ago in New Jersey, removed to federal court and transferred to this Court before being abstained from and remanded back to the New Jersey Superior Court ("**New Jersey Court**"), and finally raised in this Court again. OCC hopes that this Court will prefer the "new" plaintiff, the MLT, in its unrelenting quest to re-litigate its "new" claims against Repsol. But the plaintiff is not new:  the MLT is just OCC in disguise, as OCC funded the MLT's litigation warchest and wields controlling power over the MLT. And the claims are not new:  the allegations and causes of action the MLT makes against Repsol are the very same claims that a court of competent jurisdiction already dismissed.

3.      The substantial similarity between the MLT and OCC and the claims they brought against Repsol highlights the egregious forum-shopping and litigation gamesmanship employed by the MLT and OCC. First, the MLT, while bringing these claims again in this Court, is concurrently pursuing an appeal of them in the New Jersey appellate court after intervening and taking over OCC's dismissed claims there. Second, the MLT raises the same untrue facts and the same flawed claims that OCC did despite having access to, and the benefit of, nearly a decades' worth of information including documents, depositions, expert reports, briefs, orders, and judgments. The MLT's regurgitation of the same allegations and claims that OCC asserted is

1

inexcusable (but unsurprising) given: (1) the MLT knows its allegations are contradicted by the underlying documents and deposition testimony, including from Maxus's own witnesses; and (2) the MLT was apprised of the legal hurdles it had to address to survive dismissal. That the MLT was unable to allege anything new, or overcome those legal hurdles, is yet further evidence of what the New Jersey Court already found: the fraudulent transfer claims are long time-barred and the alter ego claim faces an insurmountable hurdle in the form of a solvent corporate barrier between Maxus and Repsol. The Complaint should be dismissed because it represents impermissible forum-shopping and an attempt to get a second bite at the apple, and because the claims fail as a matter of law for the same reason that they did when OCC asserted them.

4.      The MLT's obvious forum-shopping, attempt to re-litigate claims, and desire to turn this Court into a state appellate court, is precluded by principles of *res judicata*, collateral estoppel, and New Jersey's entire controversy doctrine. These doctrines and principles embody a number of policies that are all at play here:  (1) judicial efficiency, namely saving this Court and the New Jersey Court from wasting time and resources adjudicating claims multiple times; (2) protection of parties—like Repsol—from vexatious litigation; (3) principles of comity; and (4) avoidance of inconsistent rulings.

5.      Moreover, dismissal of the claims is appropriate, not only because they are the same, but because they once again fail to state a claim for relief. The MLT attempts to hold Repsol liable for *every single debt that Maxus ever incurred*—which the MLT estimates is $14 billion in claims—based on every single transaction Maxus ever undertook (many times not even involving Maxus or Repsol). The MLT does so by simply regurgitating the same causes of action OCC pursued in the New Jersey Court, *i.e.*, claims for alter ego, fraudulent transfers, unjust enrichment and civil conspiracy (the "**Claims**"). The Claims fare no better in this Court.

6.      The MLT's overarching theory is ludicrous. According to the MLT, YPF S.A. ("**YPF**") concocted a "Strategy" in 1995 to fraudulently strip Maxus's assets, and carried it out for over *twenty years*, with Repsol allegedly joining in 1999, culminating in Maxus's 2016 bankruptcy filing (which occurred years after Repsol's relationship with those entities had ended). But alter ego parents strip assets surreptitiously; they do not disclose them in public filings. Alter ego parents ignore fair value; they do not allegedly slightly underpay and get fairness opinions. Alter ego parents disregard subsidiary complaints; they do not enter into settlements to compensate them, allowing them to retain independent counsel in the process. The MLT's theory fails to meet the plausibility test.

7.      In particular, the MLT fails to state a claim for alter ego because alter ego is a remedy, not an independent cause of action, and the MLT pleads no underlying substantive liability to which Repsol's alleged alter ego liability could attach. Beyond that, the Complaint contains no allegations sufficient to pierce Maxus's corporate veil through several intermediate entities to reach Repsol. The MLT does not even plead that YPF, the last entity between Repsol and Maxus in the corporate chain, is insolvent and therefore incapable of satisfying a judgment (if any). The MLT also admits that Repsol could not have *caused* the alleged harm because it pleads that Maxus was insolvent by 1999, prior to the date in which Repsol acquired a majority interest of YPF. And the MLT fails to plead facts sufficient to make a claim that Repsol dominated and controlled Maxus. Instead, the MLT cites actions by Repsol that are routine and consistent with proper, and typical, subsidiary-grandparent relationships.

8.      The MLT further ignores that its fraudulent transfer claims (which undergird the MLT's civil conspiracy and unjust enrichment claims) are plainly time-barred. They were time-barred when OCC attempted to bring them in the New Jersey Court over 10 years ago and are

WEIL:\96695690\7\69508.0003

even more so today.  Moreover, many of the MLT's attempts to state a fraudulent transfer claim fail because they are mere recitals of the elements of the cause of action or are self-refuting and therefore implausible. The MLT then piles on duplicative and equally meritless causes of action for unjust enrichment and civil conspiracy based on the same insufficiently pled and time-barred fraudulent transfer claims.

9.      At bottom, the MLT's Complaint amounts to an unsubstantiated effort to reach as many pockets as possible, regardless of whether the law allows it. Accordingly, as described in detail below, the MLT's Complaint should be dismissed in its entirety.

## NATURE AND STAGE OF THE PROCEEDINGS

10.      The Debtors commenced these Chapter 11 cases on June 17, 2016. [D.I. 1]. The Debtors' Amended Chapter 11 Plan of Liquidation ("**Plan**") was confirmed by this Court on May 22, 2017 ("**Confirmation Order**") [D.I. 1460]. Under the Plan, the Liquidating Trust was to be "managed by the Liquidating Trustee, under the direction of the Liquidating Trust Oversight Committee, which shall have five members. Three of the members of the Liquidating Trust Oversight Committee shall be appointed by OCC." Plan at Art. VI, § G. Upon the effective date of the Plan, the MLT became vested with the authority to pursue causes of action, subject to the prior written approval of the Liquidating Trust Oversight Committee. *See* Plan at Art. I, § A; *id.* at Art. IV, § H; Liquidating Trust Agreement at § 3.02(b) [D.I. 1453-1].

11.      The MLT filed this Complaint on June 14, 2018, asserting twenty-three causes of action against YPF, YPFI International S.A. ("**YPFI**"), YPF Holdings Inc. ("**YPFH**"), CLH Holdings, Inc. ("**CLHH**"), and Repsol (collectively, "**Defendants**") in order to hold Defendants jointly and severally liable for all claims and liabilities asserted by the Debtors' creditors, amounting to a purported $14 billion. Compl. pp. 1–2. Pursuant to the Liquidating Trust

4

Agreement, the MLT could not have filed this Complaint without the approval of and direction from OCC. *See* Liquidating Trust Agreement at § 3.02(b).

12.      Count I seeks a declaratory judgment that the "Defendants are the alter egos of Maxus and Tierra." Compl. ¶¶ 212–232. Counts II and III are claims for actual and constructive fraudulent transfers under 11 U.S.C. § 544 against the Defendants for non-specific fraudulent transfers based apparently on every transaction Maxus ever undertook. *Id.* ¶¶ 233–263. Counts IV through XI are claims asserted only against YPF entities and *not* Repsol. *Id.* ¶¶ 264–355. Counts XII and XIII are claims for actual and constructive fraudulent transfers under 11 U.S.C. § 544 against Defendants regarding the sale of an asset known as Crescendo ("**Crescendo Asset**"). *Id.* ¶¶ 356–378. Counts XIV and XV are claims for actual and constructive fraudulent transfers under 11 U.S.C. § 544 against Defendants regarding the sale of assets from YPFI to Repsol-related entities or third parties ("**YPFI Transactions**"). *Id.* ¶¶ 379–401. Counts XVI and XVII are claims for actual and constructive fraudulent transfers under 11 U.S.C. § 544 against Defendants regarding 2007 settlement agreements entered into between Maxus and Repsol for services ("**2007 Settlements**"). *Id.* ¶¶ 402–426. Counts XVIII and XIX are claims for actual and constructive fraudulent transfers under 11 U.S.C. § 544 against Defendants regarding the settlement of the Contribution Agreement between Maxus and YPF ("**2007/2008 Settlement Agreement**"). *Id.* ¶¶ 427–449. Counts XX and XXI are claims for actual and constructive fraudulent transfers under 11 U.S.C. § 544 against Defendants regarding a 2009 settlement between Maxus and Repsol E&P USA, Inc., Repsol Services Company, and Repsol Offshore E&P USA Inc. for certain disputes between Maxus and Repsol ("**2009 Settlement**"). *Id.* ¶¶ 450–472. Count XXII is a claim for unjust enrichment against Defendants based on these

same alleged fraudulent transfers. *Id. ¶¶* 473–476. Count XXIII is a claim for civil conspiracy against the Defendants based on these same alleged fraudulent transfers. *Id.* ¶¶ 477–485.

13.    At the same time, the MLT is pursuing an appeal of the final judgment entered in the New Jersey Court in favor of Repsol on the very same claims. In 2008, OCC filed cross-claims against the Defendants for alter ego, fraudulent transfer, civil conspiracy, and unjust enrichment, among others (the "**OCC Cross-Claims**"). *See* OCC Cross-Claims (as amended) (attached hereto as Ex. A). The fraudulent transfer, civil conspiracy, and unjust enrichment claims were dismissed as time-barred. *See* Jan. 29, 2015 Dismissal Order (attached hereto as Ex. B) and Jan. 13, 2015 Dismissal Op. (attached hereto as Ex. C). The alter ego-based claims were subsequently dismissed on summary judgment. *See* Jan. 14, 2016 Summary Judgment Op. (attached hereto as Ex. D) and Apr. 5, 2016 Summary Judgment Order (attached hereto as Ex. E). On September 14, 2018, the MLT filed a brief with the New Jersey appellate court arguing that the New Jersey Court erred in granting summary judgment on the alter ego-based claims and that the fraudulent transfer claim was rendered moot as a result of its filing this Complaint. *See* Brief of Intervenor/Appellant Joseph J. Farnan, Jr. as Liquidating Trustee for the Maxus Liquidating Trust ("**MLT Appellate Br.**") (attached hereto as Ex. F). Neither the MLT nor OCC appealed the New Jersey Court's dismissal of the civil conspiracy and unjust enrichment claims. *See generally id.*; Brief of Appellant OCC (attached hereto as Ex. G).

## ARGUMENT

I.    **The MLT's Claims Are Barred Under Applicable Principles of *Res Judicata*, Collateral Estoppel, and the Entire Controversy Doctrine**

### A.    New Jersey *Res Judicata* and Collateral Estoppel Rules Apply

14.    Federal law requires that judicial proceedings be given "the same full faith and credit in every court within the United States and its Territories and Possessions as they have by

law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738. Therefore, when there is a final judgment in a state court, federal courts look to that state's rules of *res judicata* (i.e., claim preclusion) to determine the preclusive effect of the state-court judgment in federal court. *In re Brown*, 951 F.2d 564, 568–69 (3d Cir. 1991) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."); Restatement (Second) of Judgments § 86 (1982) ("A valid and final judgment of a state court has the same effects under the rules of *res judicata* in a subsequent action in a federal court that the judgment has by the law of the state in which the judgment was rendered."); *accord In re Raytrans Holding, Inc.*, 573 B.R. 121, 129 (Bankr. D. Del. 2017). The same choice-of-law analysis applies to collateral estoppel (i.e., issue preclusion). *See Bailey v. Ness*, 733 F.2d 279, 281 (3d Cir. 1984) ("[I]n cases where a party seeks to rely on a state court judgment to preclude relitigation of the same issues in federal court, a federal court must look to state law and its assessment of the collateral estoppel doctrine to determine the extent to which the state would give its own judgment collateral estoppel effect."); *accord In re Raytrans Holding*, 573 B.R. at 129.

15.     Here, the relevant final judgment comes from the New Jersey Court. *See* Nov. 22, 2017 Order ("**Final Judgment Order**") (attached hereto as <u>Ex. H</u>). Therefore, this Court must apply New Jersey law on *res judicata* and collateral estoppel to evaluate the preclusive effect of that judgment here.

### B.     The MLT's Claims Are Barred by *Res Judicata* Because All Three Elements for Claim Preclusion Under New Jersey Law Are Met

16.     Under New Jersey law, the rule of *res judicata* dictates that a "cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be re-litigated by those parties or their privies in a new proceeding." *Velasquez v. Franz*,

7

123 N.J. 498, 505 (1991). There are three requirements for a claim to be barred by *res judicata*: (1) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the judgment in the prior action must be valid, final, and on the merits. *Bondi v. Citigroup, Inc.*, 32 A.3d 1158, 1185 (N.J. App. Div. 2011).[1]

       i.     *The MLT's Claims Arise out of the Same Transactions and Occurrences as the Claims Asserted in the New Jersey Court*

17.     For purposes of *res judicata*, causes of action are deemed part of a single "claim" if they arise out of the same transaction or occurrence. *McNeil v. Legislative Apportionment Comm'n of State*, 828 A.2d 840, 859 (N.J. 2003). Whether two actions arise out of the same transactions or occurrence depends on: (1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the material facts alleged are the same. *See Aragon Partners LP v. HDOX Bioinformatics, Inc.*, No. A-2937-15T2, 2018 WL 1370661, at *3 (N.J. Super. Ct. App. Div. Mar. 19, 2018); *see also Rodsan v. Borough of Tenafly*, No. CIV.A. 10-1923 MAS, 2011 WL 2621016, at *6 (D.N.J. June 30, 2011) ("[T]he determination of whether a subsequent suit is based on the same overall transaction that was the basis for a prior proceeding, turns on the essential similarity of the

---

[1] As a practical matter, where New Jersey law on *res judicata* and collateral estoppel applies, courts have also analyzed the issues under federal preclusion law, as New Jersey and federal law generally yield the same result. *See Radovich v. L.P. YA Global Invs., L.P.*, 570 F. App'x 203, 208 (3d Cir. 2014) (though district court relied on New Jersey preclusion law to determine preclusive effect of bankruptcy court judgment, the circuit court analyzed under both federal and New Jersey law, and affirmed district court's holding); *see also In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008); *Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 573 n.10 (3d Cir. 2002) (noting that New Jersey and federal standards for collateral estoppel "are almost identical"). Federal law applies the same three requirements as New Jersey law. *See In re Mullarkey*, 536 F.3d at 225.

underlying events giving rise to the various legal claims." (internal citation and quotations omitted)); *accord First Union Nat. Bank v. Penn Salem Marina, Inc.*, 921 A.2d 417, 424 (N.J. 2007). Where the same conduct is pled in two different actions—regardless of whether the later action contains more specificity—courts have held that the claims were related for *res judicata* purposes. *Eugenia VI Venture Holdings, Ltd. v. Maplewood Holdings LLC (In re AMC Investors, LLC)*, 524 B.R. 62, 74–76 (Bankr. D. Del. 2015) (finding the actions arose out of the same transaction where plaintiff pled the same conduct and same harm).

18.    Here, both OCC's Cross-Claims and the MLT's Complaint arise out of the same transactions and occurrences. Both the MLT and OCC allege that: (1) YPF and Repsol dominated and controlled Maxus by placing directors on its board that were controlled by and loyal to YPF and Repsol to ensure Maxus would enter into transactions benefitting YPF and Repsol at the expense of Maxus and its creditors (*compare* Compl. ¶ 217 *with* OCC Cross-Claims ¶ 135); (2) Maxus, YPF, Repsol, and their affiliates are alter egos of each other and operated as a "single economic entity"—or a "Cohesive Economic Unit"—for the benefit of YPF and Repsol (*compare* Compl. ¶ 216 *with* OCC Cross-Claims ¶ 64); (3) YPF and Repsol formulated and implemented a "Strategy" to systematically strip Maxus of its assets and cause those assets to be held by YPF and Repsol-controlled companies (*compare* Compl. ¶ 238 *with* OCC Cross-Claims ¶ 96); (4) YPF and Repsol received a benefit through their strategy of transferring Maxus's valuable assets, and it would be unjust to allow them to retain the benefit without undertaking Maxus's environmental obligations (*compare* Compl. ¶ 475 *with* OCC Cross-Claims ¶ 104); (5) YPF and Repsol acted together and knowingly participated in the strategy of transferring Maxus's valuable assets including the Crescendo Asset and YPFI Transactions (*compare* Compl. ¶ 481 *with* OCC Cross-Claims ¶ 116); (6) YPF and Repsol paid

9

less than fair market value for the assets transferred (*compare* Compl. ¶¶ 277, 300, 346, 357 *with* 4th Am. Compl.[2] ¶¶ 58–59, 63, 73); (7) Repsol caused Maxus to enter into a 2009 settlement agreement for less than reasonably equivalent value (*compare* Compl. ¶ 463 *with* 4th Am. Compl. ¶ 88); (8) Repsol siphoned Maxus personnel without providing Maxus fair consideration (*compare* Compl. ¶ 224 *with* OCC Cross-Claims ¶ 40); and (9) YPF and Repsol caused Maxus to be financially dependent on YPF and Repsol and left it without assets sufficient to fund its own operations and liabilities (*compare* Compl. ¶ 221 *with* 4th Am. Compl. ¶ 80). *See also* chart comparing claims (attached hereto as Ex. J).

19.     Indeed, in the parallel proceeding currently before the New Jersey appellate court, the MLT admits that the claims arise out of the same transaction and occurrence. There, the MLT argues its Complaint "subsume[s] and supersede[s] that fraudulent-transfer cross-claim that OCC filed" as it "is based on a decades-long history of fraudulent transactions, including the transactions that form the basis of OCC's fraudulent-transfer claim." MLT Appellate Br. at 33. The MLT further argues that the New Jersey appellate court should stay the appeal or vacate the New Jersey Court's ruling because the MLT's Complaint mooted OCC's claim. *Id.* at 34–37. Obviously, the appeal would not be moot if the claims were not based on the same conduct.

20.     Beyond basing their claims on the same transactions and occurrences, the MLT and OCC both demand the same relief: a finding that YPF and Repsol are alter egos of Maxus and its affiliates and, therefore, liable for Maxus's environmental liabilities. *Compare* Compl. pp. 1–2 *with* OCC Cross-Claims pp. 23–25. Both cases also employ the exact same theories of recovery—declaratory judgment, fraudulent transfers, unjust enrichment, and civil conspiracy— to obtain the demanded relief, which will necessarily result in substantial overlap in this case of

---

[2] OCC's Cross-Claims incorporate the "corporate misconduct allegations against the Repsol Group asserted in Plaintiff's Fourth Amended Complaint" ("**4th Am. Compl.**," attached hereto as Ex. I). *See* OCC Cross-Claims ¶ 36.

the legal arguments made before the New Jersey Court, and will require application of much of the same law already addressed by the New Jersey Court. Further, because the material facts and arguments are nearly identical, the witnesses and discovery in the New Jersey Court litigation— including over 9 million pages of documents and over 60 fact depositions—will entirely overlap with discovery in this case. The first requirement for *res judicata* is clearly satisfied. *See In re AMC Investors*, 524 B.R. at 76 (finding prior and present actions clearly arose out of same transaction because both cases focused on same alleged bad acts, most of relevant factual allegations took place during same time period, and same conduct pled in later case as in earlier case).

            ii.    *Because the MLT Is a Party to the New Jersey Litigation, Both the Identical Party and/or Privity Requirement for Res Judicata Is Satisfied*

21.    As this Court has held, OCC's alter ego-based claims are property of the Maxus bankruptcy estate. *See* Nov. 15, 2016 Op. at 17–18 ("**Abstention Op.**") [D.I. 42, Adv. No. 16-51025]; *see also* Aug. 2, 2017 Order at 8 ("**Clarification Op.**") [D.I. 65, Adv. No. 16-51025]). Under the Plan, the MLT became vested with "(i) the authority to file, withdraw, or litigate to judgment, objections to Claims or Equity Interests and (ii) the exclusive authority to settle or compromise (or decline to do any of the foregoing) any Disputed Claim or Cause of Action without any further notice to or action, order, or approval by the Bankruptcy Court." *See* Confirmation Order at ¶ 26.

22.    On November 1, 2017, before the New Jersey Court entered final judgment in Repsol's favor on all of OCC's Cross-Claims, the MLT moved to intervene in the New Jersey case as a matter of right under New Jersey Rule 4:33-1. *See* Brief in Support of Mot. to Intervene (the "**MLT Motion to Intervene**") (attached hereto as Ex. K). The New Jersey Court granted the MLT's motion to intervene, treating the MLT "as a party for *all purposes*." *See* Order Granting

Mot. to Intervene (attached hereto as Ex. L). Once the New Jersey Court entered the Final Judgment Order, the MLT appealed that order and is actively litigating the appeal in the New Jersey Court appellate court. *See* MLT Notice of Appeal (attached hereto as Ex. M) (stating that the MLT was appealing the orders comprising the Final Judgment Order "to the extent those orders concern claims which are now property of the Liquidating Trust and have not been permanently removed to the U.S. Bankruptcy Court."); *see generally* MLT Appellate Br. (arguing that the New Jersey Court erred in dismissing the fraudulent transfer claim and granting summary judgment on the alter ego-based claims).

23.     Courts have held that where an intervenor takes over on appeal—even though the intervenor did not have the opportunity to conduct discovery or develop a record below—the final judgment in the lower court is binding on the intervenor in other forums for purposes of claim and issue preclusion. *See Ross v. Ross*, 705 A.2d 784, 792 (N.J. Super. Ct. App. Div. 1998) ("[R]egardless of the proceedings below, Chiloro effectively intervened by appealing the June 4, 1996 order . . . Because Chiloro chose to submit a brief and argue the merits of her case, both at oral argument and on appeal, this court's judgment will be binding on her. That she was not entitled to conduct her own discovery, as mentioned, is irrelevant to the outcome of this case."); *Local 322, Allied Indus. Workers of Am., AFL-CIO v. Johnson Controls, Inc., Globe Battery Div.*, 921 F.2d 732, 734 (7th Cir. 1991) (union was a "party" to earlier action even though it did not intervene at the district court level, as the union was allowed to fully participate in the appeal); *Alaska v. Andrus*, 429 F. Supp. 958, 964 (D. Alaska 1977) ("[I]t is only due to the fact that the intervenors requested to be allowed into this action that this judgment may be binding on them in the other case."); *see also* 46 Am. Jur. 2d Judgments § 561 ("[G]enerally, intervenors in a suit are parties for *res judicata* purposes [and] even though a party is not allowed to intervene

at the trial court level, it may still be bound by the judgment when it is allowed to fully participate at the appellate court level, including supplementing the record on appeal.").

24.     Here, the MLT intervened and is fully participating in the New Jersey appellate court "as a party in [the] matter for all purposes." *See* Order Granting Mot. to Intervene. Therefore, the New Jersey Court decision is fully binding on the MLT in other forums, including this one. The MLT cannot litigate against Repsol on the appeal in the New Jersey appellate court and simultaneously renew those very claims and allegations in federal court. Allowing the MLT to pursue its claims here would not give full faith and credit to the New Jersey Court judgment, as this Court is required to do.

25.     In addition to being a party in both courts, the MLT is also in "privity" with OCC for purposes of *res judicata* and collateral estoppel. That is, the parties have a sufficient legal relationship to render the final judgment in the New Jersey Court binding on the MLT. Privity for purposes of *res judicata* is not a rigid doctrine, but a judicial concept "used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor v. Sturgell*, 553 U.S. 880, 894 and n.8 (2008) (providing non-exhaustive list of qualifying relationships including preceding and succeeding owners of property, bailee and bailor, and assignee and assignor (citing 18A Wright & Miller § 4449, at 351-353)); *see also Zirger v. Gen. Acc. Ins. Co.*, 676 A.2d 1065, 1071 (N.J. 1996) ("The concept of privity, as well as its parameters, are necessarily imprecise . . . It is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the *res judicata*." (internal citation and quotations omitted)). Substance, rather than form, governs the parties' identities in a particular case. *In re Good Time Charley's Inc.*, 54 B.R. 157,

13

160 (Bankr. D.N.J. 1984) (citing *L.M. Ericsson Telecommunications, Inc. v. Teltronics Services, Inc. (In re Teltronics Services Inc.)*, 18 B.R. 705, 706 (E.D.N.Y. 1982)).

26.     "Generally, one person is in privity with another and is bound by and entitled to the benefits of a judgment as though he was a party when there is such an identification of interest between the two as to represent the same legal right." *Zirger*, 676 A.2d at 1071 (quoting *Moore v. Hafeeza*, 515 A.2d 271 (N.J. Ch. Div. 1986)); *accord Edleman v. McMullin Orchards (In re Silver Mill Frozen Foods, Inc.)*, 32 B.R. 783, 785 (Bankr. W.D. Mich. 1983).  While "[u]nder the traditional common-law rule, *res judicata* only worked against those who were parties to an earlier suit…this rule has been liberalized and [] the focus of the *res judicata* inquiry has shifted from whether the party itself participated in prior litigation, to whether that party's interests were fully represented in the earlier case." *Matter of Armstrong*, 201 B.R. 526, 531 (Bankr. D. Neb. 1996). "Thus, the focus of some courts has shifted from the nature of the relationship between the parties, to the identity of their interests in the first litigation." *Id*.

27.     Whether a trustee is in privity with a creditor depends on the facts of the given case. While in some cases a trustee is not in privity with an unsecured creditor,[3] courts have explained that "privity exists for purposes of *res judicata* where two parties represent the interests of the same entity, and *this relationship may exist between a creditor and a trustee in some cases*." *Hudgins v. Davidson*, 127 B.R. 6, 8 (E.D. Va. 1991) (emphasis added). Here, both

---

[3] For example, in *Williams v. Marlar (In re Marlar)*, 267 F.3d 749 (8th Cir. 2001), a case identified by the MLT in its Objection to the Repsol Defendants' Motion for Abstention [Adv. D.I. 42 at 6], the Eighth Circuit found that a bankruptcy trustee seeking to avoid an allegedly fraudulent transfer under section 544(b)(1) was not in privity with the debtor's creditor who had similarly pursued a fraudulent transfer claim in state court pre-petition and lost. 267 F.3d at 754. *Marlar* is distinguishable because the state court creditor (an ex-wife) had actual notice of the transfer and the bankruptcy creditors' claims emanated from different transactions. *See id.* By contrast, here: (1) OCC lost in the New Jersey Court for reasons that would be equally applicable to any Maxus creditor—it did not act as a reasonable creditor would have and failed to bring its fraudulent transfer claim within the limitations period and also could not pierce the veil to Repsol, *see infra* Sec. I(D), and (2) the vast majority of Maxus's creditors have claims based on the same transaction—i.e., the indemnity Maxus owed OCC.

WEIL:\96695690\7\69508.0003

the MLT and OCC have the *exact same* interest in pursuing these same claims against Repsol—that is to impose liability on and win a money judgment from Repsol to satisfy environmental creditors. Critically, under the Liquidating Trust Agreement, OCC has majority control with the right to appoint three out of the five Liquidating Trust Oversight Committee members. Plan at Art. VI, § G. Further, OCC is entirely funding the MLT—to the tune of $16 million—out of a transparent desire to assert these claims for a second time against Repsol.[4] Plan at Art. VI, § E. And the Liquidating Trust Oversight Committee has the ability to remove the Trustee. *See* Liquidating Trust Agreement at § 4.02. Accordingly, the MLT and OCC have no divergence of interest that would make *res judicata* improper in these circumstances. *See In re Raytrans Holding, Inc.*, 573 B.R. 121 (finding collateral estoppel applied to case in which trustee joined the fraudulent transfer action previously commenced by the creditor in state court). Instead, it is clear that OCC is using the MLT as a vehicle to re-litigate claims that it previously lost.

28.    For the MLT to be bound by *res judicata* as a party in "privity" with OCC (beyond sharing an identical interest), the MLT's interests must have been "adequately represented" by OCC. *See Ferguson v. Travelers Indem. Co.*, No. A-0028-15T1, 2017 WL 957732, at *6 (N.J. Super. Ct. App. Div. Mar. 10, 2017). The MLT's interests were surely represented as OCC, potentially Maxus's single largest creditor, vigorously pursued the exact same claims with competent counsel[5] over the course of more than a decade. Now, that same

---

[4] Certainly, as the court held in *Marlar*, OCC should be prohibited from satisfying its bankruptcy claim, directly or indirectly, from any asset that becomes part of Maxus's bankruptcy estate by reason of this adversary proceeding. 267 F.3d at 756 (holding the ex-wife state court loser could not recover from the successful adversary proceeding because "the result would be contrary both to principles of res judicata under Arkansas law, and to principles of comity reflected in the federal *Rooker/Feldman* doctrine").

[5] Not only did OCC retain competent counsel in the New Jersey Court litigation—at one point having retained at least three law firms at the same time—but OCC's counsel from the main Maxus bankruptcy case is now counsel for the MLT. *See In re AMC Investors*, 524 B.R. at 76 (citing cases in which fact that two actions were prosecuted by same attorneys and same attorneys were directed and controlled by same people in both cases counseled in favor of finding privity for *res judicata* purposes ) (citations omitted).

creditor, OCC, is bankrolling the litigation activities of the MLT and is in a position to control the MLT by virtue of its membership on the Liquidating Trust Oversight Committee. Whatever distinction can be made between a single creditor and a bankruptcy trustee in the typical case is clearly not present here when the single creditor: (1) is the most significant creditor, (2) lost in state court, (3) never once undertook to file an involuntary petition for the debtor all the while maintaining it had been insolvent since 1999, and (4) is now effectively re-litigating its state court loss in federal bankruptcy court.

29.    While this Court need only find that the MLT is a party to the New Jersey Court litigation *or* in privity with OCC for purposes of *res judicata*, both are true here:  the MLT is (i) a party to the New Jersey Court litigation by virtue of its decision to intervene in that litigation and become "a party in [the] matter for all purposes;" and (ii) in privity with OCC because both the MLT and OCC share interests and represent the same legal right, and because the MLT is effectively controlled by OCC.

          iii.     *The Superior Court of New Jersey's November 22, 2017 Order Constitutes a Valid and Final Judgment on the Merits*

30.    The New Jersey Court judgment is a valid and final judgment on the merits. Orders granting motions to dismiss and summary judgment dismissals constitute final judgments. *See Favors v. Aughtry*, No. CV 16-8347-(RBK/KMW), 2017 WL 3228122, at *4 (D.N.J. July 31, 2017) (applying federal preclusion law and finding that order granting a motion to dismiss a complaint constituted a final judgment); *Suarez v. Camden Cty. Bd. of Chosen Freeholders*, 972 F. Supp. 269, 273–74 (D.N.J. 1997) ("[S]ummary judgment is a final judgment on the merits— sufficient to raise the defense of *res judicata* in a subsequent action between the parties." (quoting *Hubicki v. ACF Indus., Inc.*, 484 F.2d 519, 524 (3d Cir. 1973))).

31.     On January 29, 2015, the New Jersey Court dismissed OCC's non-alter-ego based claims (fraudulent transfer, unjust enrichment, and civil conspiracy, among others) against Repsol finding that these same claims were time-barred even when brought in 2008. *See* Jan. 29, 2015 Dismissal Order; Jan. 13, 2015 Dismissal Op. On April 5, 2016, the same court granted summary judgment in Repsol's favor on OCC's remaining claims (i.e., OCC's alter ego-based claims). *See* Apr. 5, 2016 Summary Judgment Order; Jan. 14, 2016 Summary Judgment Op. On November 22, 2017, the New Jersey Court entered final judgment on the "Repsol Orders," including the dismissal of all of OCC's claims against Repsol. *See* Nov. 22, 2018 Final Judgment Order.

32.     The Final Judgment Order is a valid and final judgment on the merits for purposes of preclusion law, even as it is pending on appeal. *Bondi*, 32 A.3d at 1187 ("New Jersey courts hold that a judgment is final even pending an appeal."); *accord New Jersey Div. of Child Prot. & Permanency v. J.H.*, No. A-1322-12T3, 2014 WL 1464469, at *5 n.3 (N.J. Super. Ct. App. Div. Apr. 16, 2014); *see also In re Pensignorkay, Inc.*, 204 B.R. 676, 678 (Bankr. E.D. Pa. 1997) ("[P]rior legal and factual determinations made by the District Court in that litigation are binding in this proceeding under the principles of *res judicata* and collateral estoppel despite the filing of an appeal by the debtor, unless and until such findings are overturned."); Restatement (Second) Judgments § 13, cmt f. (1982); *id.* § 16 cmt. a.

### C.     Barring the MLT's Claims as Precluded Comports with Principles of Comity, Judicial Efficiency, and Repose That Underlie Preclusion Law

33.     By pursuing its Claims in this Court, the MLT improperly asks this Court to disregard the final and binding judgment of the New Jersey Court. And yet, at the same time, the MLT continues to litigate that final and binding order—dismissing the very same claims predicated on the same allegations and seeking the same recovery—in the New Jersey appellate

17

court. Such duplicitous litigation is a waste of judicial resources. *See Radovich v. YA Global Invs., L.P.*, No. CIV.A. 12-CV-6723, 2013 WL 4012042, at *6 (D.N.J. Aug. 5, 2013), *aff'd sub nom. Radovich v. L.P. YA Glob. Investments, L.P.*, 570 F. App'x 203 (3d Cir. 2014) ("*res judicata* 'has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation'" and refusing to "entertain" complaint where it is merely "another bite at the apple") (citation omitted); *In re Mahkovic*, No. BR 12-70612-JAD, 2014 WL 4345962, at *4 (Bankr. W.D. Pa. Aug. 28, 2014) ("The purpose of *res judicata* is to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'").

34.    The MLT's attempt to re-litigate is particularly egregious when the Court considers the decade-long history of complicated and expensive litigation that Repsol endured and eventually won in the New Jersey Court. Beyond the significant costs and waste of resources that would be incurred if the MLT is allowed to retry claims already lost against Repsol, such a course of action would flagrantly violate the principles of federalism and comity that underlie *res judicata*. *See Allen v. McCurry*, 449 U.S. 90, 95–96 (1980) ("*res judicata* and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system.") (citations omitted). These concerns are also addressed by application of the *Rooker-Feldman* doctrine, which is likewise appropriate here as set forth in the Repsol Defendants' Memorandum of Law in Support of Abstention. *See* [Adv. D.I. 36] at 36–39; *see also Nugent v. Bus. Cards Tomorrow, Inc. (In re Nugent)*, 254 B.R. 14, 31 (Bankr. D.N.J. 1998) (finding "*Rooker-Feldman* doctrine impose[d] an additional barrier to relitigation of the State Court

Action in [Bankruptcy] Court," where state court had entered valid final judgment against debtors on issue that debtors sought to raise again in bankruptcy court, and noting debtors were free to re-litigate state court judgment in Florida Court of Appeal where they had already filed appeal of judgment).

35.     Allowing the MLT's re-tread claims to go forward also creates perverse incentives and bad policy. Defendants in the position of Repsol, facing serious allegations in state courts involving insolvent parties (as OCC maintained Maxus was since 1999), would have to invest resources to defend against the state claims, knowing that they may be forced to start all over again and re-litigate in bankruptcy court. Plaintiffs only have to win once; defendants have to win twice. That unfairness and vexatious litigation are precisely the ills that the doctrines of *res judicata*, comity, and *Rooker-Feldman*, and their animating principle of full faith and credit, were intended to address.

36.     Accordingly, under federal law and based on principles of comity, this court must afford the New Jersey Court judgment the full faith and credit that it is entitled to by dismissing the MLT's Complaint because it is barred by *res judicata* under New Jersey law.  *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) ("Section 1738 embodies concerns of comity and federalism that allow the States to determine, subject to the requirements of the statute and the Due Process Clause, the preclusive effect of judgments in their own courts.").

### D.     Collateral Estoppel Also Bars the MLT's Attempted Re-litigation of Issues

37.     While *res judicata* bars the MLT from re-litigating the claims at issue in the New Jersey Court, collateral estoppel also bars the MLT from re-litigating the central issues underlying the Final Judgment Order. *See Aragon Partners*, 2018 WL 1370661, at *4 (collateral estoppel applies when a party attempts to re-litigate facts necessary to a prior judgment; it is

distinguishable from *res judicata* in "that it alone bars re-litigation of issues in suits that arise from different causes of action") (citation omitted). Specifically, because the New Jersey Court already resolved certain factual issues in Repsol's favor, collateral estoppel bars the MLT from re-litigating, among other issues: (1) whether Repsol was Maxus's alter ego; (2) whether YPF was a solvent intermediary that prevents piercing the corporate veil from Maxus/Tierra to reach Repsol; and (3) the date upon which reasonable creditors knew or could have known about the allegedly fraudulent transfers.

38.     Under New Jersey law, collateral estoppel requires that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding. *R.S. v. S.C.*, No. A-1185-13T1, 2017 WL 919053, at *3 (N.J. Super. Ct. App. Div. Mar. 8, 2017); *Pace v. Kuchinsky*, 789 A.2d 162, 171 (N.J. Super. Ct. App. Div. 2002).

39.     ***Identical Issue.***   To determine whether issues are identical for purposes of collateral estoppel, courts generally examine: (1) whether there is a substantial overlap between the evidence or argument to be advanced in the second proceeding as compared to that advanced in the first; (2) whether new evidence or arguments involve application of the same rule of law as that involved in the prior proceeding; (3) whether pretrial preparation and discovery relating to the matter presented in the first action could reasonably be expected to have embraced the matter sought to be presented in the second; and (4) how closely related are the claims involved in the two proceedings. *See* Restatement (Second) of Judgments § 27 (1982).

WEIL:\96695690\7\69508.0003

40.    First, both the Complaint and the OCC Cross-Claims contend that Repsol was Maxus's alter ego based on Repsol's alleged: (1) failing to observe corporate formalities by selecting and controlling Maxus board members; (2) commingling of corporate funds; and (3) ensuring that Maxus had inadequate capital by siphoning Maxus's assets and rendering it dependent on Repsol and/or YPF. *See* Ex. J (chart comparing Complaint and OCC Cross-Claims). On these bases, both the MLT and OCC asserted claims for alter ego, fraudulent transfer, civil conspiracy, and unjust enrichment. *See id.* Thus, in contending that Repsol is Maxus's alter ego, the MLT makes the very same allegations that OCC made in the New Jersey Court. The evidence relied upon by OCC is the same evidence that the MLT will rely upon in this case. Indeed, the MLT already has access to all of the documents produced in the New Jersey Court and cherry-picked certain discovery in its Complaint. *See, e.g.*, Compl. ¶ 129 (referencing document produced in the New Jersey Court). Moreover, the legal arguments likely to be made by the MLT will be substantially similar, if not identical, to the arguments made by OCC in the New Jersey Court, because it is pursuing the very same theories of recovery. *See, e.g.*, MLT Appellate Br. at 33 ("The Delaware action…is based on a decades-long history of fraudulent transactions, including the transactions that form the basis of OCC's fraudulent-transfer claim.").

41.    Second, critical to the determination of whether Repsol is Maxus's alter ego, among other things, is the determination as to whether YPF stands as a solvent intermediary between Maxus and Repsol. *See infra* Sec. III(E)(i). That issue was thoroughly litigated as part of Repsol's successful summary judgment motion in the New Jersey Court, and the New Jersey Court held that there is "no evidence that YPF is insolvent or that it would not be in a position to pay Maxus's indemnity obligations." Jan. 14, 2016 Summary Judgment Op. at 10–11 (Delaware

law does not allow a party "seeking to pierce the corporate veil to skip over a solvent corporation in the corporate chain, or for that matter, that Delaware law would condone veil piercing on a global basis.").

42.     Accordingly, the issues of whether (1) Repsol was Maxus's alter ego; (2) whether YPF was a solvent intermediary that prevents piercing the corporate veil from Maxus/Tierra to reach Repsol; and (3) whether creditors knew or should have known about the alleged fraudulent transfers, are "identical issues" for purposes of collateral estoppel.

43.     ***Actually Litigated to Final Judgment***.  An issue is "actually litigated" if it has been submitted and determined on a motion to dismiss for failure to state a claim or a motion for summary judgment. *Walker v. Choudhary*, 40 A.3d 63, 74 (N.J. Super. Ct. App. Div. 2012) (citing Restatement (Second) Judgements § 27 (1982)).  Again, there can be no doubt that the issues of whether Repsol was Maxus's alter ego, whether YPF was a solvent intermediary preventing piercing of the corporate veil from Maxus/Tierra to Repsol, and whether creditors knew or should have known about the alleged fraudulent transfers were already raised in the pleadings, litigated fully, and determined on the merits in a final summary judgment. *See* Apr. 5, 2016 Summary Judgment Order (New Jersey Court determining that OCC "ask[ed] the court to ignore corporate separateness"—*i.e.*, raised the issue of alter ego—but failed to provide evidence Repsol was Maxus's alter ego or that YPF was insolvent); Jan. 13, 2015 Dismissal Op. at 14, 16 (fraudulent transfer claims are time-barred); *see also Untracht v. W. Jersey Health Sys.*, 803 F. Supp. 978, 984 (D.N.J. 1992), *aff'd*, 998 F.2d 1006 (3d Cir. 1993).

44.     ***Identical Party and/or Privity***. As explained *supra* Sec. I(B)(ii), the MLT is an identical party in both actions because it is currently litigating the New Jersey claims originated by OCC now in the New Jersey appellate court, as well as the duplicative claims at issue here.

Alternatively, the MLT and OCC are in privity for purposes of collateral estoppel (and *res judicata*).

### E.    The MLT, as Successor-in-Interest of Maxus, Is Barred by the Entire Controversy Doctrine from Bringing Claims That Maxus Could Have Asserted in the New Jersey Court

45.    The MLT, as the successor-in-interest to Maxus (the Debtors), is also barred from bringing its Claims under New Jersey's entire controversy doctrine, a unique subspecies of preclusion law. This doctrine is set forth in New Jersey Court Rule 4:30A and provides: "Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided[.]"  N.J. Ct. R. 4:30A; *see also Shibles v. Bank of Am., N.A.*, 730 F. App'x 103, 106 (3d Cir. 2018) ("We have characterized the doctrine as 'New Jersey's specific, and idiosyncratic, application of traditional *res judicata* principles.'") (quoting *Ricketti v. Barry*, 775 F.3d 611, 613 (3d Cir. 2015) (citation omitted)).

46.    "New Jersey's entire controversy doctrine 'embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.'" *Shibles*, 730 F. App'x at 106 (quoting *Wadeer v. N.J. Mfrs. Ins. Co.*, 110 A.3d 19, 27 (N.J. 2015) (citation omitted)); *see also Paterson v. Scherer (In re Hudsar Inc.)*, 199 B.R. 266, 277 (Bankr. D.N.J. 1996) ("Accordingly, all claims which arise out of the same common nucleus of operative facts must be resolved in a single action.") (citing *Bennun v. Rutgers State Univ.,* 941 F.2d 154, 165 (3d Cir. 1991)). "The entire controversy doctrine requires the raising in the first proceeding of all affirmative claims that a party might have against another party, including counter-claims and cross-claims as well as joinder of all parties with a material interest in the controversy (i.e. those who can effect or be

23

effected by the judicial outcome of the controversy). At the time of the original action, if the claim was known had arisen or accrued, the doctrine bars the claim." *In re 865 Centennial Ave. Assocs. Ltd. P'ship*, 200 B.R. 800, 814–15 (Bankr. D.N.J. 1996) (citation omitted).

47.     The entire controversy doctrine "applies in federal courts 'when there was a previous state-court action involving the same transaction[.]'" *Ricketti*, 775 F.3d at 613 (citation omitted). "This doctrine reaches more broadly than the same cause of action requirement of traditional *res judicata* doctrine and has a broader preclusive effect than both the Restatement and the traditional rule. The objectives behind the entire controversy doctrine are: (1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, No. CIV.09-6447 (DRD), 2010 WL 2521091, at *20 (D.N.J. June 11, 2010) (internal citations omitted).

48.     Given the doctrine's wide breadth, parties to a litigation may not subsequently bring claims that were actually litigated previously and are likewise barred from litigating "all relevant issues that *could have been so presented*." *Culver v. Ins. Co. of N. Am.*, 559 A.2d 400, 406 (N.J. 1989) (emphasis supplied); *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 591 A.2d 592, 599 (N.J. 1991) ("Claim preclusion applies not only to matters actually determined in an earlier action, but to all relevant matters that could have been so determined."). This doctrine requires that "the court [] dismiss a claim that was or could have been raised previously as precluded." *Rodsan*, 2011 WL 2621016, at *7 (citation omitted); *see also In re Lewison Bros.*, 162 B.R. 974, 985–86 (Bankr. D.N.J. 1993) ("The consequence of failure to join a related claim in the original action is forfeiture of the claim….Dismissal is appropriate even though the claim

was omitted from the original complaint through inadvertence rather than for tactical reasons.")
(citation omitted).

49.      Bankruptcy courts have applied the entire controversy doctrine to bar claims that
the debtor could have raised in state court prior to bankruptcy.  For example, in *In re Rabinowitz*,
No. 10-12538 DHS, 2011 WL 6749068 (Bankr. D.N.J. Dec. 21, 2011), the court applied the
entire controversy doctrine to bar the trustee's attempt to assert a breach of contract claim
because that cause of action could have been raised in the state court, but the debtor declined to
assert its rights in the state court. *Id.* at *9. The court further rejected the trustee's argument that
the doctrine did not apply because it was not in privity, as "[p]rivity between parties can exist if
the interests of the party against whom claim preclusion is asserted were represented in prior
litigation." *Id.* (citation omitted) ("Privity can exist where there is substantial identity between
the incentives of the earlier party and those of the party whom preclusion is asserted against.");
*In re Montgomery Ward, LLC*, 634 F.3d 732, 737–38 (3d Cir. 2011) (trustee may be a privy of
debtor for purposes of *res judicata*). Because the "remedy sought by the Trustee is more or less
equivalent to the remedy forgone by the Debtor at the state level," the court held that the entire
controversy doctrine barred the trustee's claim. *Id.* (noting that to allow the debtor to re-litigate
the issue at his convenience would be "grossly unfair").

50.      In this case, the MLT has the exclusive authority to prosecute "any and all Causes
of Action of the Debtors' or the Estates," including the "Repsol Causes of Action." Plan at 35.[6]
As held by this Court, claims for alter ego are property of the Debtors' estates, *see* Clarification
Op. at 3, and the MLT is therefore raising this claim on their behalf. Similarly, the MLT did not

---

[6] The "Repsol Causes of Action," are defined as "any and all Causes of Action held by the Debtors and the Estates against any of the Repsol Entities." Plan at 19.

WEIL:\96695690\7\69508.0003

purport to bring the unjust enrichment and civil conspiracy claims under its section 544 avoidance powers; thus, those claims are also debtor claims.

51.     These potential debtor claims were well known to Maxus during the entirety of the New Jersey Court litigation. *See* Compl. ¶ 199 (MLT conceding that Maxus was aware that it allegedly "had viable fraudulent transfer and alter ego claims against YPF and Repsol"). Both the New Jersey Department of Environmental Protection and OCC brought those claims against Repsol in the New Jersey Court litigation. Maxus did not. Nor did Maxus attempt to bring those claims *after* the government of Argentina expropriated Repsol's interest in it.[7] Thus, the entire controversy doctrine bars the MLT's attempt to bring those debtor-claims in this Court because they arise "from the same core set of facts" in the New Jersey Litigation and plainly could have been raised but were not. *See In re 865 Centennial Ave.*, 200 B.R. at 814–15 (holding claim was barred by entire controversy doctrine because claim arose from same core set of facts as prior state court action and, if successful, would require re-litigation of entire matter); *Ravin v. Morris Truman, L.L.C., (In re Popular Club Plan, Inc.)*, 395 B.R. 587, 593 (Bankr. D.N.J. 2008) (describing situation in which doctrine is applied in bankruptcy court); *Crispino v. Chemical Bank N.J., N.A. (In re Crispino)*, 160 B.R. 749 (Bankr. D.N.J. Nov. 17, 1993). Allowing the MLT the opportunity to revive these claims at its convenience would violate the entire controversy doctrine's rationale, waste judicial resources, promote fragmented litigation, render the New Jersey Court's decade-long involvement and adjudication of those claims a nullity and a fruitless exercise, and would not afford the New Jersey Court's judgment the full faith and credit that is required.

---

[7] The Argentine government expropriated YPF (and thereby Maxus) in May 2012 (*see* Compl. ¶ 171), severing any relationship between Maxus and Repsol.

## II.    Motion to Dismiss Standard of Review

52.    Federal Rule of Civil Procedure 12(b)(6), made applicable to this case under Federal Rules of Bankruptcy Procedure 7012(b), permits the Court to dismiss an action when there are insufficient facts alleged on the face of the complaint to support a cause of action. Fed. R. Civ. P. 12(b)(6); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While the facts pled in the complaint must be accepted as true, a plaintiff must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. *Id.* Plaintiff must allege sufficient facts "to raise a right to relief above the speculative level [] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555–56 (citations omitted). "Determining whether a complaint is 'facially plausible' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not shown—that the pleader is entitled to relief.'" *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 34–35 (Bankr. D. Del. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

53.    Following *Twombly* and *Iqbal*, the Third Circuit articulated a two-part analysis to apply in evaluating complaints on a motion to dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* (citation omitted). Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* A complaint has to "show" an entitlement to the requested relief with facts. *Id.*; *see also In re Old Carco LLC*, No. 11 Civ. 5039, 2011 WL 5865193, at *6 (S.D.N.Y. Nov. 22, 2011) ("Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements,

and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." (citation omitted)). As this Court has recognized, "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less." *In re Raytrans Holding, Inc.*, 573 B.R. at 128–29.

### III. The MLT Fails to State a Claim for Alter Ego Liability (Count I)

#### A. Delaware Law Applies to the MLT's Alter Ego Declaratory Judgment Claim

54.    Bankruptcy courts apply "the choice of law rules of the forum state" in which they sit. *In re SemCrude, L.P.*, 407 B.R. 112, 133 (Bankr. D. Del. 2009). Pursuant to Delaware choice-of-law principles, this Court should apply the "the law of the state of incorporation to issues involving corporate internal affairs" to determine the alter ego claim. *In re Circle Y of Yoakum, Tx.*, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (citation omitted). "The internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs-the state of incorporation." *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("[O]nly the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs."). In veil-piercing cases, the relevant inquiry is the state of incorporation of [the] subsidiary whose veil was sought to be pierced. *See Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747, 788 (Bankr. W.D. La. 2013) (looking to law of state of incorporation of entities whose veils trustee sought to pierce, and applying Delaware veil-piercing law). Applying this choice-of-law principle, Delaware law applies to the MLT's attempt to pierce the corporate veil of Maxus and Tierra because, as pled in the Complaint, both Tierra and Maxus are incorporated in Delaware. Compl. ¶ 19 ("Maxus [] is a Delaware corporation"); *id.* ¶ 20 ("Tierra [] is a Delaware corporation").

### B. Alter Ego Is Not an Independent Cause of Action, But Merely a Remedy

55.    As a threshold matter, Count I should be dismissed because "[p]iercing the corporate veil is not itself an independent [] cause of action, but rather a means of imposing liability on an underlying cause of action." *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 n.10 (D. Del. 2010) (citation omitted); *Sugartown Worldwide LLC v. Shanks*, No. CIV.A. 14-5063, 2015 WL 1312572, at *9 (E.D. Pa. Mar. 24, 2015) (same and dismissing alter ego claim on this basis); *see also Yaquinto v. Ward (In re Ward)*, 558 B.R. 771, 786–87 (Bankr. N.D. Tex. 2016) ("alter ego is a remedy and not an independent cause of action"). The MLT cannot impose liability on Repsol based on an alter ego theory because, as discussed in more detail *infra* Sections IV–VI, the MLT has no viable underlying causes of action to attach the alter ego remedy.

### C. Delaware Law Applies a Two-Pronged Test to Establish Alter Ego Liability

56.    To establish alter ego liability under Delaware law, the MLT must prove *both* that: (1) the parent and subsidiary operated as a single economic entity as shown by domination and control; *and* (2) that the parent misused the corporate form to cause a fraud or injustice. *See Faulkner v. Kornman (In re The Heritage Org., L.L.C.)*, 413 B.R. 438, 512 (Bankr. N.D. Tex. 2009) (applying Delaware law); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999); *MicroStrategy Inc. v. Acacia Research Corp.*, No. 5735, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010); *Grasty v. Michail*, No. 02C-05-89 CLS, 2004 WL 396388, at *1 (Del. Super. Ct. Feb. 24, 2004).

57.    As to the first prong, courts in the Third Circuit apply the *Pisani* multi-factor test to determine whether a "single economic entity" exists. The *Pisani* factors include: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds

29

by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528–29 (D. Del. 2008) (citing *United States v. Pisani*, 646 F.2d 83, 88 (3d. Cir. 1981)). "'While no single factor justifies a decision to disregard the corporate entity', some combination of the above is required, and 'an overall element of injustice or unfairness must always be present, as well.'" *Trevino*, 583 F. Supp. 2d at 529 (citing *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)).

58.    As to the second prong, the "fraud or injustice . . . [must] be found in the *defendants' use of the corporate form*." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 (D. Del. 1989) (emphasis added). In effect, the "fraud or injustice prong" requires both a showing of a fraud or injustice *and* a showing that such fraud or injustice was *caused* by the corporate structure. *See Wallace*, 752 A.2d at 1184 ("Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.'") (citation omitted). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud" by the defendant. *Id.*; *see also Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) (same).

59.    Delaware courts routinely hold that piercing the corporate veil "is an extraordinary remedy," *Round Rock Research LLC v. ASUSTeK Computer Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013) (internal citation omitted), and "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace*, 752 A.2d at 1183 (internal citation omitted). This is because "Delaware has more steadfast policies on whether a corporation can be liable for its affiliate's conduct. It 'respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities

30

would be stymied if it did otherwise.'" *Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 461–62 (5th Cir. 2016) (citation omitted) ("Delaware courts only disregard the corporate form in the 'exceptional case'" (citation omitted)); *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009) ("This allows parents to engage in risky endeavors precisely because the parents can cabin the amount of risk they are undertaking by using distinct entities to carry out certain activities."). Thus, in order to prove alter ego liability, a plaintiff must meet a "notoriously difficult" burden, by clear and convincing evidence, to overcome the presumption that two separate entities exist. *Katiroll Co. v. Kati Roll & Platters Inc.*, No. 10-3620 JAP, 2012 WL 3061152, at *5 (D.N.J. July 26, 2012) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001), *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994)); *see also In re The Heritage Org., L.L.C.*, 413 B.R. at 513 ("Delaware law requires a 'strong case to induce a court of equity to consider two corporations as one.'" (citation omitted)). The MLT's Complaint fails to plausibly allege facts to meet this notoriously difficult burden and should be dismissed. *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 86 (S.D.N.Y. 2010) ("courts routinely consider, and grant, motions to dismiss for failure adequately to allege facts sufficient to support the imputation of liability on an alleged alter-ego").

### D.    The MLT Has Not Pled Allegations Sufficient to Pierce the Corporate Veil at Each Level of the Corporate Chain, as Is Required to Reach Its Great-Grandparent

60.    The Complaint is deficient because the MLT pleads alter ego globally and does not plead an alter ego relationship between every entity in the corporate chain between Repsol and Maxus. Various courts across the country, including Delaware, agree that "[w]hen a plaintiff attempts to hold a parent liable for the acts of a subsidiary separated by one or more intermediate companies, the plaintiff must justify the piercing of the corporate veil of each separate

31

corporation." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 689 (S.D.N.Y. 2006), *aff'd*, 582 F.3d 244 (2d Cir. 2009); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 381 (7th Cir. 2008) (similar); *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996) (requiring plaintiff to pierce corporate veils of two intermediaries to reach ultimate parent); *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 151 n. 9 (S.D.N.Y. 2012); *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 61 (D.D.C. 2007) ("For [defendant] to be liable, it would have to be the case that the veil between each layer could be pierced."); *Harthman v. Texaco Inc. (In re Tutu Wells Contamination Litig.)*, 909 F. Supp. 1005, 1009 n.4 (D.V.I. 1995) ("[T]he analysis appears more complicated here because as outlined above, there could potentially be several levels of corporations that must be pierced before Exxon could be held liable as a shareholder," noting that Plaintiffs would "at a minimum, have to pierce the corporate veils" of two intermediary subsidiaries "before this court could extend liability to" ultimate parent).

61.    To illustrate, the bankruptcy court in *In re The Heritage Organization, L.L.C.*, addressed a similar situation in which a trustee sought to hold a group of defendants in a corporate chain liable as the alter ego of the debtor. 413 B.R. 438.  There, the court applied the Delaware two-pronged test for alter ego liability and found that it "reveal[ed] various problems with the Trustee's veil piercing claims. Significantly, the first problems are conceptual in nature." *Id.* at 513. The conceptual problem was that the trustee sought to hold not only the debtor's shareholders or members liable for its debts, but also to pierce the veils of those shareholders and members to hold their respective owners liable for the debtor's debts. *Id.* at 514. To assert a "proper veil piercing claim," the plaintiff was required to pierce the veils of both

32

layers of shareholders or entities. *Id.* "In other words … the Delaware two-pronged test must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure." *Id.*

62.     The court's ruling in *In re Heritage Organization, L.L.C.* is not an anomaly. As the Second Circuit also held in *Tronox Inc. v. Kerr-McGee Corp (In re Tronox Inc.)*, a plaintiff must pierce the corporate veil and demonstrate a fraud at each level of the corporate chain. 855 F.3d 84, 88 (2d Cir. 2017).  There, the Second Circuit held that:

> Proving these [alter ego] claims against New Kerr-McGee requires establishing a chain of liability from the original tortfeasors to New Kerr-McGee. The Avoca Plaintiffs would first need a finding that the operator of the Avoca Plant, Tronox LLC (f/k/a Kerr-McGee Chemical) was liable for the underlying torts. Then they would need two veil-piercings or findings of alter-ego liability—the first to get to Tronox Worldwide LLC (f/k/a Old Kerr-McGee), the former direct parent of Tronox LLC, and the second to get to New Kerr-McGee as the non-debtor ultimate parent. ***At each level of piercing, the Avoca Plaintiffs would have to show that "there is fraud" or the entity whose veil they seek to pierce was "a mere instrumentality or alter ego of its owner."***

*Id.* at 106 n.27 (emphasis added) (citations omitted).

63.     Thus, the MLT is required to plead and demonstrate that each intermediate entity dominated and controlled the subsidiary below it to the point that those companies had no separate existence.  *See Possession v. Cooper Bussmann, Inc. (In re Hechinger Inv. Co. of Delaware, Inc.)*, 297 B.R. 390, 393 n.3 (Bankr. D. Del. 2003) ("Technically, in order to pierce the corporate veil to reach Cooper, Plaintiff would need to show that Bussmann was a mere instrumentality of its parent, McGraw–Edison, and that McGraw–Edison was a mere instrumentality of its parent, Cooper.").  But it has not done so.  Instead, the MLT loosely refers to all of the Defendants as alter egos of one another in an apparent attempt to collapse the entire corporate structure. *See, e.g.*, Compl. ¶ 229 ("The Defendants' domination, control and operation as a single economic entity caused an overall element of injustice and unfairness to Maxus,

33

Tierra, and the other Debtors and their respective creditors"); *id.* ¶¶ 217–26 (alleging various supposed alter ego acts that "The Defendants" did vis-à-vis "Maxus and Tierra").

64.    The "alter ego theory relied upon by the Trustee does not work on such a global basis." *In re Heritage Org., L.L.C.*, 413 B.R. at 515. The MLT cannot gloss over the details and "simply seek[] the global application of alter ego to all of the [Defendants] so as to collapse the [Repsol]-controlled empire," thereby "making all of those entities [liable] for [the debtor's] debts." *Id.* Here, the MLT has ignored that there are multiple separate corporate entities between Maxus and Repsol:[8]



And the MLT has not even attempted to allege facts sufficient to support a showing that YPF and Repsol are alter egos of one another, much less all of the other intermediate entities that exist between Maxus and Repsol. Absent such allegations, the MLT cannot pierce the veil of these intermediate entities and therefore cannot impose alter ego liability on Repsol. *See, e.g.*, *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 371 (3d Cir. 2007) ("[i]t is a bedrock principle of corporate law in Delaware and elsewhere that courts must respect entity separateness unless doing so would work inordinate inequity"); *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (holding that courts must "respect entity separateness

---

[8] *See* MLT Br. at 4. The pictured corporate organizational chart represents the corporate structure of Repsol YPF after December 2001. Prior to December 2001, YPFI wholly owned YPFH and was therefore above it in the corporate chain.

34

absent compelling circumstances calling equity ... into play"). Accordingly, as a threshold matter, the MLT cannot justify the extraordinary remedy of piercing the veil to reach Repsol when it has not pled facts that would allow this Court to pierce any of the entities' veils between Maxus and Repsol.

### E.    The MLT Cannot Establish the Second Prong of Alter Ego Liability—a Fraud or Injustice Sufficient to Pierce the Corporate Veil

#### i.    *The MLT Failed to Plead That the Intermediate Entities Are Insolvent or Incapable of Satisfying Any Judgment*

65.    Beginning with the second prong—a fraud or injustice that warrants piercing the corporate veil from a subsidiary through to an ultimate parent—the MLT must plead that the intermediate entities are insolvent or incapable of satisfying a potential judgment in order to justify piercing the veil. *See, e.g.*, *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12 CIV. 7280 ALC DCF, 2013 WL 5366373, at *5–6 (S.D.N.Y. Sept. 25, 2013) ("precondition" to piercing corporate veil is allegation of "insolvency on the part of the corporation in the sense that there are insufficient corporate assets to satisfy the plaintiff's claim.") (quoting *Johnson v. Lipton*, 328 S.E.2d 533 (Ga. 1985)); *see also Perry v. Unum Life Ins. Co. of Am.*, 353 F. Supp. 2d 1237, 1240 (N.D. Ga. 2005) (dismissing complaint premised on alter ego theory because plaintiff failed to plead corporation was insolvent); *Joiner v. Ryder System Inc.*, 966 F. Supp. 1478 (C.D. Ill. 1996).

66.    The solvency of the intermediate entities is critical because there is no fraud or injustice necessitating this Court's use of the extraordinary veil-piercing remedy unless the intermediate entities are insolvent and, therefore, incapable of meeting the subsidiary's obligations to its creditors. *See Canter v. Lakewood of Voorhees*, 22 A.3d 68, 76–77 (N.J. App. Div. 2011) (refusing to pierce corporate veil where entity was solvent because there would be no fraud or injustice); *Noto v. Cia Secula di Armanento*, 310 F. Supp. 639, 647 (S.D.N.Y. 1970)

("Where, as here, the solvency of the subsidiaries is unquestioned, where the outward indicia of the corporate form have been carefully maintained, and where the corporate form has not been used to defraud, there is no equitable reason whatsoever to pierce the corporate veil.");[9] *Johnson v. Diamond Shine, Inc.*, 890 F. Supp. 2d 763, 774 (W.D. Ky. 2012) (refusing to pierce corporate veil because plaintiff failed to allege that corporation was "without assets or insolvent" or that corporation "cannot pay any judgment which may be entered against it in Plaintiff's favor").

67.    The necessity of an insolvent intermediary is required regardless of whether the parent allegedly dominated and controlled the subsidiary. For example, in *Joiner v. Ryder System Inc.*, 966 F. Supp. 1478 (C.D. Ill. 1996), plaintiff sought to recover damages for injuries he sustained against the ultimate parent of a trailer manufacturer on an alter ego theory. The *Joiner* court assumed the "domination and control" prong of the alter ego test was satisfied and still found that the plaintiff could not satisfy the second prong—the "fraud or injustice" prong—because other subsidiaries within the corporate chain could satisfy any potential judgment. *See id.* at 1488. In particular, the court stated:

> [P]laintiffs generally initiate claims against the parent corporation because of the prospect that the subsidiary will be unable to satisfy a judgment. But, that is not the case here. Indeed, the subsidiaries within [the corporate structure] are very profitable-each could easily satisfy a large judgment against it. Although the undercapitalization of a subsidiary alone is not enough to establish the second requirement [] it is generally considered a prerequisite. Thus, considering that each subsidiary within [the corporate chain] is very profitable and could readily satisfy a large judgment, why should the Court pierce [the ultimate parent']s veil? What fraud or injustice would ensue?

*Id.*

---

[9] The Southern District of New York went on to note that: "in New York creditors of a subsidiary can generally not recover from a parent corporation or its stockholders until they have exhausted their remedies against the subsidiary itself." *Noto*, 310 F. Supp. at 647 n.22 (citing *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 266 F. Supp. 79, 82–83 (S.D.N.Y. 1967)). Here, OCC has not even attempted to exhaust its remedies against the two intervening subsidiaries between Maxus and Repsol: YPFI and YPF.

68.     Here, the MLT did not plead—because it cannot—that intermediate entity YPF (or any other intermediate entity) is insolvent. This is fatal to its alter ego claim because YPF is a solvent entity that stands between Repsol and Maxus in the corporate chain. Without this, the MLT cannot "explain why injustice or fundamental unfairness would occur if [YPFI's or YPF's] corporate veil[s] remain[] intact." *Carpenters & Joiners Welfare Fund v. Wayne*, No. CIV. 02-779 JNEJGL, 2003 WL 21730105, at *4 (D. Minn. July 21, 2003). The MLT's pleading failure is even more striking given that the New Jersey Court dismissed nearly identical alter ego-based claims raised by OCC in the New Jersey Court, in part, for this very reason. *See* Jan. 14, 2016 Summary Judgment Op. at 11 ("OCC asks the Court to ignore corporate separateness without providing any equitable basis for doing so. Nor does it provide an equitable basis for departing from the traditional rule, which requires veil piercing at each level. For example, OCC provides no evidence that YPF is insolvent or that it would not be in a position to pay Maxus's indemnity obligations.").

69.     Accordingly, the MLT's alter ego claim fails as a matter of law because the MLT has not pled that YPF or YPFI—which at all times were intermediate entities between Repsol and Maxus—were insolvent or unable to pay Maxus's debts if found liable.

> ii.     *The MLT Has Not Pled that Repsol Caused a Fraud or Injustice Because It Alleges that Such Fraud or Injustice Occurred Years Before Repsol Arrived on the Scene*

70.     The MLT further fails to state an alter ego claim because the alleged harm—i.e., Maxus's insolvency and its inability to satisfy its obligations to its creditors—is alleged to have been caused by YPF, *before* Repsol's acquisition of YPF in 1999. *See, e.g.*, Compl. ¶ 170 ("the Debtors were already insolvent when Repsol acquired YPF in 1999…"); *id.* ¶ 244 ("Specifically, Maxus and Tierra were rendered insolvent…as a result of the 1996–1997 Transfers."); *id.* ¶ 10 ("These initial transfers [by YPF] resulted in Maxus's total assets decreasing from $2.9 billion to

37

less than $1 billion and in a near total elimination of Maxus's revenue streams."); *id.* ¶ 107

("Within four years after the acquisition, YPF had effectively liquidated Maxus for YPF's own

benefit."); *id.* ¶ 108 ("The stripping of Maxus's international E&P assets largely eliminated

Maxus's ability to conduct business in a manner such that it could fund its ongoing obligations

out of its own revenue. By the end of 1998, Maxus was 'solvent' only insofar as it received YPF

capital contributions."). Thus, Repsol's subsequent acquisition of YPF and later transactions

(most not even involving Maxus) could not have also ***caused*** the same fraud or injustice that had

allegedly already happened.

71.     The MLT simply cannot impose liability on Repsol for conduct that predated

Repsol's ownership of YPF (and thereby Maxus). *See, e.g.*, *EBG Holdings LLC v. Vredezicht's

Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at \*12 (Del. Ch. Sept. 2, 2008)

(finding no fraud or inequity in use of corporate form by parent since wholly-owned subsidiary's

existence predated subsidiary's relationship with parent); *Irwin & Leighton, Inc. v. W.M.

Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987) (no basis to conclude entity so controlled other

at "any relevant" time to justify disregarding corporate status); *N.Y. State Elec. & Gas Corp. v.

FirstEnergy Corp.*, 766 F.3d 212, 229 (2d Cir. 2014) (affirming district court's refusal to pierce

corporate veil to hold parent responsible for acts occurring prior to parent's ownership); *Scott v.

NG U.S. 1, Inc.*, 881 N.E.2d 1125, 1133 (Mass. 2008) (veil-piercing cannot be used to "impose

liability for actions taken (or not taken) by another entity long before the formation of a

corporate relationship").

72.     Nor can the MLT hold Repsol liable for Maxus's alleged insolvency when it

pleads that such insolvency was caused by YPF prior to Repsol's involvement. The MLT has

"offered no evidence whatsoever…that [Maxus] was put in that position by [Repsol's]

domination"; rather, it pleads that YPF caused the insolvency. *Fantazia Int'l Corp. v. CPL Furs New York, Inc.*, 67 A.D.3d 511, 513 (N.Y. App. Div. 2009) ("While it is true that one corporation's exercise of domination and control which left the subservient corporation nothing more than a judgment-proof empty shell would constitute a wrong against a creditor, plaintiff has offered no evidence whatsoever that [subsidiary] is either judgment-proof, or that *it was put in that position by [parent]'s domination*.") (emphasis added); *Bank of Belton v. Bogar Farms*, 154 S.W.3d 518, 521 (Mo. Ct. App. 2005) (although facts were sufficient to show plaintiff was injured by subsidiary's inability to pay judgment, no facts proved parent company "exercised such control and domination over [subsidiary] as to cause the insolvency").

73.        The MLT's contention that the YPFI Transactions rendered Maxus and Repsol alter egos is undermined by its allegation that Maxus was already insolvent and unable to comply with its obligations to its creditors *before* Repsol acquired its interest in YPF because those very same assets had previously been removed from Maxus. *See, e.g.*, Compl. ¶¶ 107, 170. "There's an old saying, 'you can't commit murder on a corpse.' That applies to insolvent business entities." *See Casini v. Graustein (In re Casini)*, 307 B.R. 800, 819 (Bankr. D.N.J. 2004); *see also D.R. Horton Inc.–N.J. v. Dynastar Dev., L.L.C.*, No. MER-L-1808-00, 2005 WL 1939778, at *28 (N.J. Super. Ct. Law Div. Aug. 10, 2005); *Morris v. Zimmer*, No. 10 CIV. 4146 VB LMS, 2014 WL 7474770, at *9 (S.D.N.Y. Feb. 11, 2014) (refusing to pierce corporate veil because causation was lacking where company whose veil plaintiff sought to pierce had already committed injurious torts prior to engaging in transaction plaintiff attacked, such that plaintiffs' injury was caused by antecedent act and not any subsequent act of other defendants); *Bank of Belton*, 154 S.W. 3d at 521 (holding that there was "no evidence to indicate the [plaintiff] was injured as a result of any financial transactions [between alleged alter egos]," because "[n]one of

39

the stipulated facts provide a causal link between the monies exchanged by the corporations and the insolvency or undercapitalization of [subsidiary]"). Thus, Maxus's creditors necessarily could not have suffered the harm of Maxus's insolvency and loss of the assets *both* when YPF initially transferred Maxus's assets (before Repsol's acquisition of YPF) *and then again* when Repsol became Maxus's great-grandparent.

74.     The MLT attempts to sidestep its fatal allegation that Maxus was rendered insolvent at the hands of YPF (not Repsol) by alleging that "even though the Debtors were already insolvent when Repsol acquired YPF in 1999, the Debtors' creditors likely could have recovered some of their claims in the ensuing years if Repsol or YPF had permitted the Debtors to manage their own affairs." Compl. ¶ 170. The MLT is asking this Court to take the extraordinary step of piercing the corporate veil through a multitude of entities all the way up to Repsol and to hold Repsol liable for upwards of $14 billion based on its speculation that Maxus "likely *could* have" somehow overcome its drastic insolvency in 1999. Such speculation is patently insufficient to survive a motion to dismiss under the *Twomby-Iqbal* plausibility standard. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.") (internal citations omitted).[10] Accordingly, the MLT's alter ego claim against Repsol should be dismissed because the MLT cannot show that Repsol's alleged abuse of Maxus's corporate form caused any fraud or injustice.

**F.     The MLT Has Not Sufficiently Pled the First Prong of Alter Ego Liability—That Repsol Exerted Complete Domination and Control Over Maxus and Tierra**

75.     Turning to the first element of an alter ego claim—that the parent and subsidiary operated as a single economic entity as shown by domination and control—the MLT's alter ego

---

[10] It is also highly unlikely given the U.S. oil and gas industry's recent tumult and spate of bankruptcies. *See, e.g.,* Christopher Helman, *The 15 Biggest Oil Bankrtupcy (So Far),* Forbes (May 9, 2016), *available at* https://www.forbes.com/sites/christopherhelman/2016/05/09/the-15-biggest-oil-bankruptcies-so-far/#5855b2047ff9.

allegations consist of conclusory, internally inconsistent, self-refuting statements that are insufficient to pierce the veil all the way up to Maxus's great-grandparent Repsol.

76.     To survive a motion to dismiss, "[p]laintiffs must plead sufficient allegations to make their claim of alter-ego liability plausible and more than the 'mere possibility of misconduct.'" *Spagnola*, 264 F.R.D. at 87 (S.D.N.Y. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950)) ("overlap between the operations of Chubb and its subsidiaries…is not unusual and Plaintiffs' allegations do not rise to the level that indicates the kind of complete domination and control that is required under the first prong of the alter-ego analysis"); *Energy Marine Servs., Inc. v. DB Mobility Logistics AG*, No. CV 15-24-GMS, 2016 WL 284432, at *3 (D. Del. Jan. 22, 2016) ("The alleged multilevel alter-ego relationship amounts to "naked assertion[s] devoid of further factual enhancement" and is therefore insufficient to meet the minimum pleading requirements.") (citation omitted); *Apex Mar. Co. v. OHM Enterprises, Inc*, No. 10 CIV. 8119 SAS, 2011 WL 1226377, at *4 (S.D.N.Y. Mar. 31, 2011) ("Although the domination and control prong of the alter ego theory need only comply with Rule 8(a)'s liberal pleading standard, conclusory statements are insufficient…The unadorned invocation of dominion and control is simply not enough.") (citations and quotation marks omitted).  The MLT's alter ego theory simply does not pass the plausibility test as its allegations regarding an alter ego relationship between Repsol and Maxus show nothing more than the normal, everyday, uncontroversial dealings between a parent company and its indirect subsidiary.

77.     For example, the MLT alleges that individuals with management positions at YPF and Repsol held seats on Maxus and Tierra's boards, as well as held executive positions at unnamed "Debtor entities," and that Maxus's and YPFH's boards had overlapping directors. *See* Compl. ¶ 154. Overlapping officers and directors, however, does not constitute a claim for alter

41

ego; in fact, this is a "common business practice and exist[s] in most parent subsidiary relationships." *Joiner*, 966 F. Supp. at 1484 (that the corporations have common officers and directors is "common business practice and exist in most parent and subsidiary relationships.") (citation omitted); *see also, e.g.*, *Albright v. Attorney's Title Ins. Fund*, 504 F. Supp. 2d 1187, 1210 (D. Utah 2007) ("Majority stock ownership and control of the board is not a basis for piercing the corporate veil as a matter of law. [] Courts have routinely determined that "[n]either ownership of all of the stock of a subsidiary, nor identity of officers and directors, nor both combined are sufficient to justify 'piercing the corporate veil.'") (citation omitted); *Canter*, 22 A.3d at 76 (finding "nothing wrong" with person serving as subsidiary's officer or director while at the same time being or serving as parent's officer, director, or shareholder) (citing *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super 160, 199–200 (N.J. Super. Ct. App. Div. 2006) (observing that "'[a] parent's domination or control of its subsidiary cannot be established by overlapping boards of directors'") (citation omitted)).

78.     Indeed, the Supreme Court has provided that it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (internal quotation and citations omitted); *see also IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (it would be expected that shared board members would be involved in decisions affecting the subsidiary); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) ("It is well-established that wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent and without requiring the court to conclude that those officers and

42

directors were not functioning properly."); *Milner v. TPAC LLC (In re Ticketplanet.com)*, 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (dismissing piercing corporate veil claim, because "[a]n overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible"). "In fact, a complete overlap of directors and officers does not necessarily indicate improper control or undue influence." *Seiko Epson Corp. v. Print–Rite Holdings, Ltd.*, No. 2002 WL 32513403, at *15 (D. Or. Apr. 30, 2002).

79.    Similarly, the MLT's allegation that Repsol exercised control over its indirect, wholly-owned subsidiary Maxus by, for example, requiring Maxus management to seek approval from the Maxus board for expenditures over $300,000 is also a conventional practice between parent and subsidiary companies. *See* Compl. ¶ 157. Putting aside the fact that the MLT oddly complains that *Maxus* had to get *Maxus board approval* for significant expenditures—a board that was allegedly Repsol-controlled[11]—that too is not sufficient to establish alter ego liability. *See, e.g.*, *In re BH S & B Holdings LLC*, 420 B.R. at 138 (parents' retention of decision-making authority insufficient to pierce corporate veil "[s]ince courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary … it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility") (citations omitted); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.,* 607 F. Supp. 227, 238 (D. Del. 1984) (holding that evidence of 100% ownership of subsidiaries, the requirement that parent approve capital expenditures greater than $850,000, parent arranging financing for the subsidiary, and some overlap in the boards did not support veil-piercing); *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th

---

[11] The fact that Repsol, as the indirect grandparent of a wholly-owned subsidiary allegedly "dominated" the Maxus board by appointing directors is also not sufficient to pierce the veil. *See, e.g.*, *Joiner*, 966 F. Supp. at 1484 (no finding of alter ego where "RSI elects the officers of the ACD" because "many parent/subsidiary relationships have common officers, i.e., they serve as officers of both the parent and subsidiary" and sole shareholders have the power to elect the board of its wholly owned subsidiaries).

43

Cir. 1980) (refusing to infer subsidiary was alter ego of parent, even though parent had "general executive responsibility" for operations of subsidiary, approved major policy decisions, guaranteed subsidiary's bank loans, worked closely with the subsidiary on approving decisions, and some directors of the parent served as directors of the subsidiary while the president of the subsidiary had served as a director of the parent).

80.     Moreover, Repsol's alleged requirement that Maxus management consult with Repsol for significant decisions like "pursuing new investments and corporate opportunities," shows nothing more than that Maxus was a wholly-owned indirect subsidiary (Compl. ¶ 162); in no way does it evidence that Maxus was so completely dominated and controlled as to have no separate existence of its own. *See, e.g.*, *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *28 (Del. Ch. Sept. 30, 2013) (allegations of "common central management alone is not a proper basis for disregarding separate corporate existence."). Under Delaware law, "it is entirely appropriate for a parent corporation to approve major expenditures and policies involving the subsidiary." *Fletcher v. Atex, Inc.*, 861 F. Supp. 242, 245 (S.D.N.Y. 1994), *aff'd*, 68 F.3d 1451 (2d Cir. 1995) (citing *Akzona*, 607 F. Supp. at 238 (upholding veil even though "the parent had 'general executive responsibilities' for the operations of the subsidiary, approved major policy decisions, guaranteed [its] bank loans and worked closely with [it] on approving decisions"). Parent approval and involvement in the sale of a subsidiary's assets—such as Repsol's involvement in Maxus's sale of its Crescendo Asset to a third party (*see* Compl. ¶ 114)—similarly is commonplace amongst parent and subsidiary companies, and insufficient to pierce the corporate veil. *See, e.g.*¸ *Fletcher*, 68 F.3d at 1459–60 (finding that district court did not err in finding no domination by parent simply because parent's approval was required for real estate leases, major capital expenditures, negotiations for a sale of

44

minority stock ownership, or the fact that the parent played a significant role in the ultimate sale of subsidiary's assets to a third party).

81.     The MLT's allegation of consolidated treasury and financial functions at the Repsol level (*see* Compl. ¶ 158) fares no better in showing an alter ego relationship between Maxus and Repsol.  *See, e.g.*, *Fletcher*, 861 F. Supp. at 244 ("Atex's participation in Kodak's cash management system is consistent with sound business practice and does not show undue domination or control."); *see also Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F. Supp. 831, 843 (D. Del. 1978) (upholding corporate veil despite cash management program for subsidiary); *Albright*, 504 F. Supp. 2d at 1210 ("the filing of consolidated financial reports is insufficient to impose liability under the alter ego doctrine" and "coordinated banking arrangements between parent corporations and their subsidiaries are also common and do not justify piercing the corporate veil.").

82.     Repsol's alleged control of the New Jersey Court strategy (*see* Compl. ¶ 168) is also common for wholly-owned subsidiaries, and does not serve as evidence of alter ego. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.Com, Inc.*, No. 00C2447, 2003 WL 21542491, at *5 (N.D. Ill. July 3, 2003) ("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family. Such shared functions are insufficient to pierce the corporate veil.").

83.     Maxus's board making decisions through unanimous written consents and telephonic hearings (*see* Compl. ¶ 112) also does not move the needle on alter ego. *See, e.g.*, *Case Fin., Inc. v. Alden*, No. CIV. A. 1184-VCP, 2009 WL 2581873, at *5 (Del. Ch. Aug. 21, 2009) (finding no basis for disregarding subsidiary's separate corporate existence and treating it

as simply alter ego of parent based on, among other things, admission that subsidiary's board had "some formal meetings or acted by written consent in lieu of such meetings").

84.    In short, the MLT's allegations (i.e., overlapping directors and managers, a Repsol requirement that Maxus managers seek Maxus board approval for expenditures crossing a certain monetary threshold, consolidated treasury and financial functions, etc.) show no more than routine parent subsidiary dealings that courts across the country have held is insufficient to pierce the corporate veil. The MLT utterly fails to state a plausible claim that Repsol dominated and controlled Maxus to the point where it had no separate existence.

85.    Accordingly, the MLT fails to state a claim for alter ego declaratory judgment because it has not pled: (i) alter ego liability at each level of the corporate chain, (ii) that any of the intermediate entities are insolvent and therefore incapable of satisfying a judgment, (iii) that Repsol *caused* any fraud or injustice as it pled that Maxus was rendered insolvent prior to Repsol's ownership of it, and (iv) sufficient domination and control.

## IV.    The MLT's Fraudulent Transfer Claims Must be Dismissed

### A.    Each Fraudulent Transfer Claim Is Time-Barred

86.    The MLT asserts 12 claims for fraudulent transfer under 11 U.S.C. § 544 based on the laws of six different states: Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin. *See* Compl. Counts II–III, XII–XXI. A choice-of-law analysis is unnecessary, however, because the statute of limitations is the same under each state's version of the Uniform Fraudulent Transfer Act ("**UFTA**"). *See W.R. Gace & Co. v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 855 (Bankr. D. Del. 2002) ("Because there is no true conflict of laws, the Court will rely on the UFTA and treat as persuasive authorities from each of the UFTA jurisdictions."); *United States v. Rocky Mountain Holdings Inc.*, 782 F. Supp. 2d 106, 114 (E.D. Penn. 2011) (if

46

there is no conflict between two states' laws, then the court need not engage in a choice-of-law analysis). All of these alleged transfers are time–barred under UFTA and should be dismissed.

87.    Under UFTA, a cause of action for actual fraudulent transfer is extinguished unless the action is brought "within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant."[12] A cause of action for constructive fraudulent transfer is extinguished under the UFTA unless the action is brought "within 4 years after the transfer was made or the obligation was incurred."[13]

88.    Courts agree that "if the creditor is deemed estopped to recover upon his claim, or is barred from recovery because of the running of a statute of limitations *prior to the commencement of the case*, the trustee is likewise rendered impotent." *In re Topcor, Inc.*, 132 B.R. 119, 123–24 (Bankr. N.D. Tex. 1991) (citing 4 Collier on Bankruptcy ¶ 544.03[2] at 544–21 to –22) (emphasis added). This is because section 544(b) "authorizes the avoidance of 'any transfer of an interest of the debtor in property or any obligation incurred by the *debtor that is voidable under applicable law by a creditor* holding an [allowable] unsecured claim.'" *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000) (quoting 11 U.S.C. § 544(b) (emphasis added)); *see also Zazzali v. Swenson (In re DBSI, Inc.)*, No. 08-12687 PJW, 2011 WL 607442, at *2 (Bankr. D. Del. Feb. 11, 2011) ("A trustee can use his power under § 544(b)(1) 'only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action.'") (quoting *In re*

---

[12] 6 Del. Code Ann. § 1309(1); *see also* Ky. Rev. Stat. Ann. § 378A.090(1) (same); N.J. Stat. Ann. § 25:2-31(a) (similar; in 2002, the statute was amended to remove "or could reasonably have been"); Ohio Rev. Code Ann. § 1336.09(A) (same); Tex. Bus. & Comm. Code § 24.010(1) (same); Wis. Stat. Ann. § 893.425(1) (same).

[13] 6 Del. Code Ann. § 1309(2); *see also* Ky. Rev. Stat. Ann. § 378A.090(2) (same); N.J. Stat. Ann. § 25:2-31(b) (same); Ohio Rev. Code Ann. § 1336.09(B) (same); Tex. Bus. & Comm. Code § 24.010(2) (same); Wis. Stat. Ann. § 893.425(2) (same).

*Cybergenics*, 226 F.3d at 243)); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 658–59 (S.D. Tex. 2007) ("Section 544(b) gives the trustee the power to avoid the debtor's transfers or obligations that are avoidable by an actual, existing unsecured creditor under authority outside the bankruptcy law." (citing *In re Radcliffe's Warehouse Sales, Inc.*, 31 B.R. 827, 832 (Bankr. W.D. Wash. 1983) ("Like Prometheus bound, the trustee is chained to the rights of creditors in the case under title 11. If there are not creditors within the terms of section 544(b) against whom the transfer is voidable under applicable law, the trustee is powerless to act as far as 544(b) is concerned.")))). Section 544 "allows a trustee or debtor-in-possession to step into the shoes of an existing unsecured creditor to exercise lien avoidance rights on behalf of the estate." *In re Platte River Bottom, LLC*, No. 13-13098 HRT, 2015 WL 3897453, at *6 (Bankr. D. Colo. June 23, 2015). By doing so, the trustee's rights are derivative of an unsecured creditor's rights; thus, "if the creditor is estopped or barred from recovery, so is the trustee." *Smith*, 365 B.R. at 659.

89.      Here, all of the fraudulent transfer claims were extinguished years prior to the Petition Date. Indeed, the latest allegedly fraudulent transaction—related to the 2009 Settlement Agreement—occurred *seven* years prior to the commencement of the bankruptcy. *See* Compl., Count XXI. The MLT could only have had a non-time-barred fraudulent transfer claim if the relevant transaction occurred within *four* years of Maxus's petition for bankruptcy—i.e., no earlier than June 17, 2012. The MLT does not allege a single such transaction in the Complaint. *See generally* Compl.

90.      As the New Jersey Court already ruled, all of the allegedly constructive fraudulent transfers that took place prior to 2000 "are patently stale under both New Jersey and Texas law." Jan. 13, 2015 Dismissal Op. at 14, n.2. Similarly, the allegedly intentional fraudulent transfers were time-barred because a reasonable creditor "would have learned about the transfers at issue

when they were announced in SEC filings, and it would have brought its claims within one year. It did not." *Id.* at 16.

91.    Any attempt by the MLT to extend the statute of limitations[14] by claiming that any individual Maxus creditor could not have discovered these transfers is patently absurd as *all* of the alleged transactions were litigated at length in the New Jersey Court. *See, e.g.*, *See* Jan. 14, 2016 Summary Judgment Op. at 4–7 (discussing transactions alleged in Counts II–III, XII–XVII, XX–XXI); OCC Cross-Claims ¶ 40 (discussing Counts II–III, XIV–XV); Pl.'s 4th Am. Compl. ¶¶ 51–52, 73–79, 88, 90–91 (discussing Counts II–III, XII–XV, XVIII–XIX, XX–XXI). The allegedly fraudulent transactions, and the litigation based on them, were further disclosed in public filings dating back to 1996.[15]    Given that these transfers were publicly alleged for years and disclosed in various public documents, unsecured creditors could have, and should have, asserted claims for fraudulent transfer within the limitations period. They failed to do so.  Thus, the "four-year statute of limitations under the []UFTA expired well before the Debtor[s] filed [their] bankruptcy petition." *Montoya v. Tobey* (*In re Ewbank*), 359 B.R. 807, 810 (Bankr. D.N.M. 2007) (trustee's "action based on the NMUFTA fails regardless of whether reasonably equivalent value was given because the action is time-barred"). And the MLT's fraudulent transfer claims, premised on stepping into the shoes of Maxus's unsecured creditors, were

---

[14] Courts have held that UFTA statutes are not merely statutes of limitations, but statutes of repose, incapable of tolling. *See, e.g.*, *Gibbons v. First Fid. Bank, N.A. (In re Princeton–New York Investors, Inc.)*, 199 B.R. 285, 293 n. 4 (Bankr. D.N.J. 1996) (finding N.J. Stat. Ann. § 25:2–31 is a statute of repose because it bars the right to bring the action and not the remedy); *Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex. Ct. App. 2004) ("TUFTA is intended to be strictly construed and that section 24.010 is technically a statute of repose, rather than a statute of limitations").

[15] *See, e.g.*, excerpts of Maxus Energy Corporation Form 8-K (filed July 11, 1996) at 1-2 (disclosing Bolivian and Venezuelan sales); Maxus Energy Corporation Form 10-K (filed March 20, 1997) at 2-3 (disclosing Venezuelan sale); YPF S.A. Form 20-F (filed Mar. 27, 1998) at 75 (disclosing Indonesian and Ecuadorian sales); YPF S.A., Form 20-F (filed June 2, 2000) at 9, 55, F-32 (disclosing Crescendo Asset sale); YPF, S.A. Form 20-F (filed June 27, 2003) at F-27–F-29 (disclosing YPFI sales of assets in Bolivia, Ecuador, Indonesia, and Venezuela); YPF Form 20-F (filed June, 30, 2009) at F-22, F-30-32 (disclosing settlement of YPF's Contribution Agreement and the continuing New Jersey Court litigation) (attached hereto as Exs. N–S, respectively).

similarly extinguished long ago. *See Smith*, 365 B.R. at 659 ("the burden is on the trustee seeking to avoid the transfer to demonstrate the existence of an actual creditor with a viable cause of action against the debtor, which is not time-barred or otherwise invalid."); *In re G-I Holdings, Inc.*, 313 B.R. 612, 633 (Bankr. D.N.J. 2004) ("Significantly, to invoke § 544(b), the trustee or debtor-in-possession must show that at least one of the present unsecured creditors holds an allowable claim against whom the transfer or obligation was invalid.").

92.    Finally, the MLT's heavy reliance on *In re Tronox* is entirely misplaced. Compl. ¶ 1 (citing *Tronox, Inc. v. Kerr McGee Corp. (In re Tronox)*, 503 B.R. 239, 271 (S.D.N.Y. 2013)). Presumably, the MLT asserted allegations regarding a scheme dating back to 1995 in order fit into the *Tronox* rubric and collapse a series of transactions into a single, integrated transaction. Compl. ¶¶ 1–2. But in *Tronox*, the scheme involved approval to transfer various assets on the same day which concluded three years later; whereas here, the MLT's alleged scheme encompasses over twenty years of transactions, involving dozens of different entities and third parties that were never involved in the supposed conception of the "Strategy." In reality, there was no scheme, but even if there was one, the MLT alleges that it was created, carried out, and accomplished prior to 1999, and thus prior to Repsol's acquisition of YPF. *See, e.g.*, Compl. ¶ 8 ("YPF's scheme dates back to 1995"); *id*. ¶ 10 (alleging transfers between 1996 and 1997 of "Maxus's most valuable international E&P assets" to "YPF subsidiaries" resulted in a "near total elimination of Maxus's revenue streams"); *id*. ¶¶ 107–109 (alleging that "[w]ithin four years after the acquisition, YPF had effectively liquidated Maxus for YPF's own benefit," that YPF's alleged "stripping of Maxus's international E&P assets largely eliminated Maxus's ability to conduct business" and that Maxus was "functionally insolvent"); *id. ¶* 170 ("[T]he Debtors were already insolvent when Repsol acquired YPF in 1999"). Further, Repsol had zero involvement in

the scheme's purported conclusion—i.e. Maxus's decision to file for bankruptcy or enter into a settlement with YPF—as those actions were taken *after* YPF was expropriated from Repsol. The MLT does not plead otherwise and cannot toll the statute of limitations on this theory.

93.     Accordingly, Counts II–III and XI–XXI are time-barred and should be dismissed on this basis alone.

**B.    Counts XIV–XV Fail Because Those Transactions Do Not Involve Property of the Debtors and UFTA Does Not Apply to Subsequent Transfers Between Foreign Entities**

94.     Even if the claims were not time-barred, Counts XIV–XV related to the YPFI Transactions from YPFI to various Repsol entities fail because (i) those transactions did not involve the debtors or a transfer of the debtors' property, and (ii) UFTA does not allow the trustee to recover subsequent transfers between solely foreign entities.

95.     Plainly, by the MLT's allegations, the YPFI transfers took place between YPFI and Repsol international subsidiaries or other third parties; Maxus (the debtor) was not a party to those transactions, nor were its assets. *See, e.g.*, Compl. ¶ 380 ("In 2001 and 2002, Repsol caused *YPFI* to transfer to Repsol affiliates or third parties…").[16] None of these transactions were transfers of assets from the *debtor*, as required to bring a claim under Section 544. *See* 11 U.S.C. § 544 ("the trustee…may avoid any transfer of property of the debtor"); *Miller v. Barenberg (In re Bernard Techs., Inc.)*, 398 B.R. 526, 529 (Bankr. D. Del. 2008) (dismissing trustee's fraudulent transfer claims involving debtor's non-debtor subsidiary because the

---

[16] *See also* Compl. ¶ 119 ("YPF approved the sale of YPFI of what had been Maxus's Ecuadorian Assets to a subsidiary of Repsol for $307.5 million."); *id.* ¶ 120 ("In August and September of 2001, YPF approved the sale to a Repsol subsidiary of Maxus Venezuela for a total consideration of $109.7 million and Maxus Guarapiche to Repsol for $203.3 million—together, those entities held what were previously Maxus's Venezuelan Assets."); *id.* ¶ 121 ("On January 18, 2002, YPF's Indonesian assets were sold to the China National Offshore Corporation ("CNOOC"), the Chinese national oil company, for $585 million, less assumed debt"). Notably, the MLT does not allege that the Bolivian Asset sale from YPFI to a third-party Repsol subsidiary, which was sold for $883 million, was a fraudulent transfer. This is further evidence that the MLT's theory that Repsol stripped Maxus's most valuable assets is nonsensical. Repsol could not have both been stripping Maxus's assets as part of a "Strategy" while at the same time paying fair value for nearly $1 billion worth of assets.

transferred assets were not property of the debtor). Thus, the MLT cannot hold Repsol liable for allegedly fraudulent transfers of non-debtor property between non-debtors. *See, e.g.*, *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 671 (Bankr. N.D. Ill. 2017) (to assert a fraudulent transfer claim under section 544, the transfer must involve an interest of the debtor). In any case, critically absent is any allegation that these specific transfers were for less than reasonably equivalent value. *See* Compl. ¶¶ 118–122.

96.      Nor can the MLT use an alter ego theory to pretend as though the YPFI Transactions involved debtor property. *See, e.g.*, Compl. ¶ 238 ("the YPF and Repsol Defendants caused Debtors to transfer substantially all of Maxus's assets to YPF affiliates, then subsequently to Repsol affiliates"). As several courts have held, the MLT cannot use veil-piercing to treat property transferred by non-debtors (who are supposed alter egos) as debtor property. *See, e.g.*, *In re Glick*, 568 B.R. at 672 n.35 (noting "there is a real question whether [trustee] would be able to use [reverse piercing theories] to undo past transfers, deeming business entities to have been [a debtor']s alter egos not only on the petition date but pre-petition when each transfer occurred" and that several courts had rejected "attempts by trustees to use veil-piercing this way"); *Rafool v. Propack Sys., LLC (In re Fleming Packaging Corp.)*, No. 03-82408, 2007 WL 1021884, at *3 n.1 (Bankr. C.D. Ill. Mar. 30, 2007) ("The TRUSTEE cites no case where a court used the alter ego doctrine to transfer ownership of assets from one entity to another to facilitate a fraudulent transfer claim."); *Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*, 516 B.R. 163, 169–70 (Bankr. E.D. Ky. 2014).

97.      For example, in *Spradlin*, the trustee argued that disregarding the corporate form of a parent company meant that a pre-petition transfer would be treated as if it were made by the debtors directly, such that "the assets and liabilities of both parties are treated as merged both

prospectively and retroactively." *See Spradlin*, 516 B.R. at 169–70. The court rejected that argument, stating that the "logic is not consistent with veil piercing as a remedy." *Id*. Rather than "rewrite history," a finding of alter ego makes a dominating and controlling parent or shareholder's assets available to the debtor's creditors to satisfy their claims; this is a prospective remedy. Thus, alter ego or veil-piercing "allow[s] the injured party to recover from the corporation's assets" but it does not "go one step further and treat the business entity and its insiders as one in the same," including in the past. *See id*.; *see also Lawler v. RepublicBank Dallas (In re Lawler)*, 53 B.R. 166, 168–69 (Bankr. N.D. Tex. 1985) (noting "the inequities" of giving alter ego decree "retroactive effect" because, accepting such an argument would allow avoidance of any business transaction or conveyance to which alleged alter ego parent was party, which "would be a travesty").

98.     Likewise, the court in *Covery v. Casey's General Stores, Inc. (In re Duckworth)* rejected a trustee's "creative attempt to use the alter ego doctrine to entirely reconfigure the factual landscape." No. 10-83603, 2012 WL 4434681, at *5 (Bankr. C.D. Ill. Sept. 24, 2012). There, like the MLT here, the trustee contended that "the effect of the alter ego doctrine is that transfers" to parents pre-petition "may be ignored and the transfers treated as if they had been direct payments from the Debtor" to the party which ultimately ended up with the assets. *Id*. The *Duckworth* court declined to allow the trustee to use the alter ego doctrine to create a counter-factual transfer of debtor property, noting that the trustee cited no precedent in which the alter ego doctrine had been used for such a purpose nor was the court aware of any such precedent such that the trustee's "proposed use of the alter ego doctrine to change facts of ownership and collapse a chain of multiple transfers appears to be unprecedented." *Id*. at *5–6. The court specifically relied on the fact, equally true here, that "[a]t the time of the transfers, a separate

corporate entity existed and that is the entity that made the transfers" to the ultimate recipient of an allegedly fraudulent transfer (here Repsol subsidiaries) and "[e]ven a shell corporation can be an 'initial transferee.'" *Id.* at *8 (citation omitted).[17] The *Duckworth* court issued a warning against using the alter ego doctrine in non-extraordinary situations, like the MLT requests here, because:

> Piercing the corporate veil is a state common law equitable remedy that has nothing to do with federal bankruptcy law and, it goes without saying, is never applied by state courts in a bankruptcy context. As such, extreme caution is warranted when a bankruptcy court is asked to apply the remedy in the context of a bankruptcy cause of action such as that created by section 549. The doctrine is used by state courts to impose a result (usually personal liability), for reasons of equity, where the result would not otherwise be available under the facts of the transaction. The doctrine alters the legal effect of a transaction in spite of the facts. Here, the TRUSTEE contends that the alter ego doctrine may be used to recreate a different set of facts, to rewrite history so to speak, for a purpose cognizable only under bankruptcy law, with no state law corollary: to deprive a defendant of the statutory good faith transferee defense provided by section 550(b)(1). In this Court's view, adopting the TRUSTEE'S theory would constitute a gross overextension of the alter ego doctrine far beyond its identifiable state law parameters and purposes.

*Id.* Like the trustee in *Duckworth* and *Spradlin*, the MLT cannot use the alter ego remedy to recharacterize the YPFI Transactions as involving transfers of assets from Maxus to Repsol-related entities—even assuming those assets were fraudulently transferred from Maxus to YPFI, rendering them alter egos—because Repsol international subsidiaries plainly received the assets from the then-existing, separate legal entity (YPFI).

99.    The MLT's claim further fails because the YPFI transfers involved purely international parties and section 544 does not apply extraterritorially. As the Supreme Court stated in *Morrison v. National Australia Bank Limited*, "[w]hen a statute gives no clear

---

[17] Further, the trustee's position was "contrary to the majority rule that transferred property subject to recovery in an avoidance action is not property of the estate until it is ***actually recovered by the trustee***." *In re Duckworth*, 2012 WL 4434681, at *5 (emphasis added); *see also Covey v. Peoria Speakeasy, Inc. (In re Duckworth)*, No. 10-83603, 2013 WL 1397456, at *6 (Bankr. C.D. Ill. Apr. 5, 2013) ("fraudulently transferred property is not property of the estate until and unless the transfer is avoided and the property itself is recovered") (citing cases across jurisdictions).

indication of an extraterritorial application, it has none." 561 U.S. 247, 255 (2010); *see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232 (S.D.N.Y. 2014) (Bankruptcy Code does not apply extraterritorially "to allow for the recovery of subsequent transfers received abroad by a foreign transferee from a foreign transferor"); *Barclay v. Swiss Fin. Corp. (In re Bankr. Estate of Midland Euro Exchange, Inc.)*, 347 B.R. 708, 719 (Bankr. C.D. Cal. 2006) (trustee could not pursue fraudulent transfer claims where there was no evidence of congressional intent to extend the application of the fraudulent transfer statute extraterritorially); *In re Sherwood Inv. Overseas Ltd., Inc.*, No. 6:10-bk-584, 2016 WL 5719450, *11 (M.D. Fla. Sept. 30, 2016) ("nothing in the statutory language or legislative history of §§ 548 or 550 indicate that Congress intended these provisions to apply to conduct outside the United States").

100.    Here, the MLT alleges that between 1996–1997, YPF caused Maxus to transfer its Bolivian, Venezuelan, Ecuadorian, and Indonesian E&P Assets to YPFI. *See, e.g.*, Compl. ¶¶ 10, 86, 90, 93. In 2001–2002, several years later, the MLT alleges that YPFI subsequently transferred those assets to Repsol affiliates or third parties. *Id.* ¶¶ 119–121, 380. The MLT does not identify which Repsol entities were involved in the transfers. But the Court can take judicial notice of SEC filings,[18] which demonstrate that these assets were transferred to foreign entities, none of which are a party to this case.[19] Accordingly, the MLT cannot impose fraudulent transfer liability on Repsol based on the YPFI Transactions.

---

[18] *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) ("when considering a Rule 12(b)(6) or Rule 12(c) motion, the Court may take judicial notice of certain matters of public record" such as "documents publicly filed with the SEC").

[19] *See* YPF SEC 20-F (filed June 27, 2003) at 17 (attached hereto as Ex. R) (YPF and YPFI sold Ecuador assets sold to "Repsol YPF Ecuador"); *id.* at 18 (YPFI sold Maxus Venezuela (C.I.) Ltd. and Maxus Guaripiche Ltd. to "Repsol Exploracion Venezuela B.V."), *id.* (YPFI sold Indonesian assets to "Cnooc Southeast Asia Limited").

### C.    The MLT Fails to Meet the Pleading Standards for Actual and Constructive Fraudulent Transfer

101.    Beyond the expiration of the limitations period, the MLT failed to plead certain claims for relief with "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 547. To state a claim for actual fraud under UFTA, the MLT must show that the debtor made the transfer "with actual intent to hinder, delay or defraud any creditor of the debtor." *See* 6 Del. Code Ann. § 1304(a)(1). Claims for actual fraudulent transfer must meet the heightened pleading requirements under Rule 9(b). *See, e.g.*, *In re Circle Y of Yoakum*, 354 B.R. at 356 (granting motion to dismiss actual fraudulent transfer claims brought under section 544 pursuant to Rule 9(b) due to trustee's "mere[] recit[al] [of] the statutory elements").

102.    To state a claim for constructive fraud under UFTA, the MLT must show that "(1) the debtor made the transfer without receiving reasonably equivalent value, and (2) the debtor was either: a) insolvent or became insolvent as a result of the transfer; b) engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due." *In re USDigital, Inc.*, 443 B.R. at 38; 6 Del. C. § 1304(a)(2). Claims for constructive fraud must meet the pleading standard under Rule 8. *See In re USDigital,* 443 B.R. at 38 ("Courts in this district have held that Rule 8(a) governs constructive fraud claims."). The Third Circuit requires a two-step test when evaluating reasonably equivalent value. *Id.* (citing *In re RML, Inc.*, 92 F.3d 139, 149 (3d Cir. 1996)). First, the court must determine whether the debtor received any value from the transaction. *Id.* Then, it must decide if the value received was "roughly the value it gave." *Id.* (citing *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212–13 (3d Cir. 2006)). Courts have found that this includes pleading "an identification of the consideration received by each transferor,

information as to why the value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the time of the transfer." *See Angell v. Ber Care Inc. (In re Caremerica, Inc.)*, 409 B.R. 737, 756 (Bank. E.D.N.C. 2009).

       i.      *Counts II–III Are Duplicative and Do Not Identify the Date, Amount, or Source of the Fraudulent Transfers*

103.      Counts II and III—which appear to be an amalgamation of the remainder of the fraudulent transfer counts (Counts XII–XX) and any other transaction Maxus undertook—fail because they are non-specific and duplicative of other claims asserted in the Complaint. *See* Compl. ¶¶ 356–461. The MLT lumps all of the allegedly fraudulent transfers together (Compl. ¶¶ 239, 253), many of which did not even involve Repsol, and then recites the statutory requirements. It is particularly problematic that these counts appear to include alleged fraudulent transfers that did not involve Repsol in any capacity because they occurred *before* Repsol acquired YPF. Further, the MLT does not identify the transfer dates, amounts, sources, transferors or transferees of the alleged fraudulent transfers that support these counts, making it unclear which transactions comprise these counts. *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 857 (Bankr. D. Del. 2018) (trustee must "identif[y] the transfer by date and face amount" that is alleged "was for no consideration").

104.      Such broad allegations are plainly insufficient to meet the requirements of Rule 8(a), and certainly fall far short of the heightened pleading required under Rule 9(b). *See Nelson v. Frana Companies, Inc*., No. 13-CV-2219 PJS/SER, 2013 WL 6500165, at *3 (D. Minn. Dec. 11, 2013) (dismissing UFTA claim that did not "identify any particular fraudulent transfer, but rather allege[d] that each and every penny paid…since the day that Diamond was founded was transferred with actual intent to defraud… and without receiving reasonably equivalent value in exchange."); *U.S. Coal Corp. v. Pryor Cashman LLP, Defendant (In re Licking River Mining,*

*LLC)*, 565 B.R. 794, 808 (Bankr. E.D. Ky. 2017) (dismissing actual fraudulent transfer claims because complaint "does not identify any specific challenged transfer, and instead lumps all transfers from U.S. Coal to PC together via total dollar amount," which did not give answering party notice of misconduct being challenged).

105.     Lumping all purportedly fraudulent transfers together fails to meet the pleading standard because it does not put Repsol on notice of the specific charges asserted. *In re BMT-NW Acquisition*, 582 B.R. at 856 (trustee must "state facts with sufficient particularity to provide the defendant fair notice of the charges against him."). The MLT alleges that "[t]hese transfers of Maxus's assets ***include, but are not limited to***, the individual 1996–1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and the underlying transfers of Maxus's personnel, data, technical resources, and wells and other offshore interests which leads to the Settlement Agreements." Compl. ¶¶ 239, 253 (emphasis added). "Including, but not limited to," is patently insufficient to identify the specific transfer. Further, although the MLT complains about the 2007 Stormy Monday and Tiger North Bronto asset sales (Compl. ¶ 135), it is unclear whether those asset sales are included in these counts. To the extent the alleged "transfer" of employees is included as a purported fraudulent transfer (*see* Compl. ¶¶ 136–137), people are not property or assets subject to UFTA. *See, e.g.*, *Smith v. Nicholas/Earth Printing, L.L.C. (In re Bob Nicholas Enter., Inc.)*, 358 B.R. 693, 701-02 (Bankr. S.D. Tex. 2007) ("A property interest consists of more than a unilateral expectation or abstract need, there must be a legitimate claim of entitlement."); *Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir. 2004) ("[T]his court has found [no authority], for the conclusion that Illinois law (or any other jurisdiction) regards the *value* of services provided as an asset subject to transfer under the UFTA."). Accordingly, Counts II–III fail to meet the basic pleading requirements.

ii.     *Counts XVI–XXI, Related to the Settlement Agreements, Fail to Plausibly Plead a Fraudulent Transfer Claim Against Repsol*

106.    The fraudulent transfer claims based on the 2007/2008 Settlement Agreement fail as that settlement plainly did not involve or benefit Repsol. *See* Counts XIII–XIX. As the MLT acknowledges, that agreement was between YPF and Maxus, and related to certain obligations YPF undertook under the 1996 Contribution Agreement, after acquiring Maxus in 1995. *See* 2007/2008 Settlement Agreement (attached hereto as Ex. T).[20] Repsol was not involved when YPF entered into the Contribution Agreement, never guaranteed YPF's obligations thereunder, and was not a party to the 2007/2008 Settlement Agreement. Therefore, the 2007/2008 Settlement Agreement terminating ***YPF's*** Contribution Agreement obligations did not result in ***Repsol*** receiving any property or assets from Maxus as an initial transferee, and did not make Repsol an entity for whose benefit such transfer was made. *See, e.g.*, *Zazzali v. Wavetronix LLC (In re DBSI, Inc.)*, 445 B.R. 351, 356 (Bankr. D. Del. 2011) (granting motion to dismiss trustee's fraudulent transfer action because trustee had no factual allegations in complaint supporting theory that transfers were for owner's benefit based merely on owner's control over entity that did allegedly receive transfer, and rest of trustee's complaint refuted the benefit theory); *Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd*, No. 05-60055-CIV, 2011 WL 1232986, at *2 (S.D. Fla. Mar. 30, 2011) (insufficient to simply presume that parent company received benefit from payments made to subsidiaries on fraudulent transfer claim); *Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools)*, 386 B.R. 37, 52 (D. Del. 2008) ("It is insufficient to state a claim for constructive fraud against a party by alleging that the party is an affiliate of the recipient of the transfer; such a claim ignores the separateness of corporate entities."); *Seidel v. Byron*, 405 B.R. 277, 291–92 (N.D. Ill. 2009) ("The term 'entity for whose

---

[20] This Court may consider documents "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).

benefit such transfer was made" has a particular meaning under the Bankruptcy Code; it refers to a guarantor or debtor of the transferee—'someone who receives the benefit but not the money.'") (citations omitted). The only connection the MLT draws between Repsol and the 2007/2008 Settlement Agreement is the baseless allegation that "Repsol, through its domination and control of Maxus, caused Maxus" to enter into it. Compl. ¶¶ 428, 440. Beyond being untrue, this allegation is directly refuted by the MLT's earlier allegation that it was "YPF [who] caused Maxus and Tierra to sign yet another Settlement Agreement." *Id*. ¶ 140. Such internal inconsistency highlights the deficiencies in the MLT's allegations.

107.    Further, with respect to each allegedly fraudulent transfer, and particularly with respect to the various settlement agreements, there are no allegations as to *how or why* the consideration received was less than the amount transferred. *See, e.g.*, *id*. ¶ 150 (recognizing Maxus received $2.9 million in the 2007 Settlement Agreement, but failing to allege how or why the consideration was less than reasonably equivalent value); *id.* (recognizing Maxus received $50 million in the 2009 Settlement Agreement, but failing to allege how or why the consideration was less than reasonably equivalent value).

108.    Not only does the MLT fail to plead sufficient facts for this Court to infer that the various settlement agreements were for less than reasonably equivalent value, but the agreements themselves refute the notion. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ *See* Counts XVI–XVII; Apr. 5, 2007 Settlement Agreement (attached hereto as <u>Ex. U</u>). ████████████████████████

60

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████ *See id.*

§ 2.02.  By definition, then, Maxus received the exact value of the services it would have earned under Agency Agreement. Accordingly, the underlying agreement belies the MLT's assertion that Maxus received less than reasonably equivalent value; and no creditor could have been rendered worse off as a result of this settlement.

109.    Likewise, Maxus received the exact value it claimed it was owed in the April 27, 2007 Settlement Agreement and July 1, 2007 Settlement Agreement. *See* Counts XVI–XVII. In both settlements, Maxus invoiced Repsol for certain services it provided, at the applicable hourly rate, and Repsol paid those invoices. *See* Apr. 27, 2007 Settlement Agreement between Maxus and RSC at §§ 1.02, 1.03 (attached hereto as Ex. V); July 1, 2007 Settlement Agreement between Maxus and Repsol E&P T&T Limited at § 2.1 (attached hereto as Ex. W). Nowhere in the Complaint does the MLT allege that Repsol failed to make payment or that Maxus under-invoiced Repsol for its services. Despite the MLT's conclusory allegation that "Repsol's purpose was decidedly not to fully compensate Maxus" (Compl. ¶ 151), the plain terms of the settlement agreements contradict this allegation. Accordingly, the MLT has failed to *plausibly* plead that Maxus did not receive reasonably equivalent value in the 2007 Settlements. *Twombly*, 550 U.S. at 555–56 (plaintiff must allege sufficient facts "to raise a right to relief above the speculative level"); *In re USDigital*, 443 B.R. at 39 (dismissing constructive fraudulent transfer claims because "[t]rustee has failed to set out sufficient factual matter to show that the claim is facially plausible"); *EiserAmper LLP v. Morgan*, *(In re SRC Liquidation LLC)*, 581 B.R. 78, 97–98

(Bankr. D. Del. 2017) (dismissing fraudulent transfer claims that failed to sufficiently allege that the company received less than reasonably equivalent value for the bonuses it paid).

110.    As to the 2009 Settlement Agreement, the MLT also fails to state a plausible claim for fraudulent transfer. *See* Counts XX–XXI. In the 2009 Settlement Agreement, Repsol and Maxus resolved certain disputes ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████. Compl. ¶ 150; 2009 Settlement Agreement (attached hereto as <u>Ex. X</u>). Based on the MLT's allegations, it is clear that the MLT is using this settlement as a mechanism to complain about Repsol's alleged failure to provide "any consideration for the damage caused to the Debtors by the lack of corporate independence over the prior decade." *Id*. ¶ 149.[21] But the MLT cannot rely on this settlement to convert its equally implausible alter ego claim into one for fraudulent transfer.

111.    Finally, as to Counts XVI, XVIII, and XX (alleging actual fraud related to the Settlement Agreements), the MLT's allegations cannot be predicated "upon information and belief." *See* Compl. ¶ 138 ("Upon information and belief, these settlements, described below, were not for fair consideration."); *id.* ¶ 149 ("Upon information and belief, the payments made in exchange for these releases were not for fair market value"). The Third Circuit has recognized that pleading upon information and belief may be permissible "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control." *DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465, 468 (D. Del. 2016) (citing *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267–68 (3d Cir. 2016)). But here, the factual

---

[21] Even giving full credit to the MLT's allegation that these claims were worth approximately $66 to $100 million, the value Maxus received in settling and releasing those claims looks not like Repsol plundering Maxus's assets, but more like the application of an appropriate litigation risk factor to disputed claims. *See* Compl. ¶ 150. It is further implausible that Repsol, in the midst of active litigation in the New Jersey Court for allegedly fraudulently transferring Maxus's assets as its alter ego, would then engage in yet another allegedly fraudulent transfer involving Maxus.

information—over 9 million pages of discovery—is in the hands of the MLT. Thus, this pleading failure is inexcusable given the MLT has access to voluminous discovery from the state court action regarding these very same transactions. *See, e.g.*, *In re Old CarCo LLC*, 454 B.R. 38, 60 (Bankr. S.D.N.Y. 2011) (dismissing fraudulent transfer claims and noting "this is a case where full 2004 discovery powers were available to the Trust and to its predecessor in interest, the Creditors' Committee. Substantial investigation took place and there was a full and fair opportunity to attempt to present a sustainable complaint.").

112.    Accordingly, the MLT failed to adequately plead actual and constructive fraudulent transfer related to the Settlement Agreements. *See Twombly*, 550 U.S. at 570 (2007) (requiring, to survive Rule 12(b)(6) challenge, "enough facts to state a claim that is plausible on its face"). In the absence of such allegations, the MLT's claims fail to meet the Rule 8 (much less the 9(b)) pleading standard. *See, e.g.*, *In re Caremerica, Inc.*, 409 B.R. at 756 (constructively fraudulent transfer claim failed to meet Rule 8 pleading standard as it was missing "an identification of the consideration received by each transferor, information as to why the value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the time of the transfer"); *Kapila v. Bible Baptist College of Penn. (In re ATM Fin. Servs., LLC)*, No. 6:08-bk-969, 2011 WL 2604247 at *4 (Bankr. M.D. Fla. June 21, 2011) ("The Court can imagine a number of ways in which the transfer of $400,000 *could have been* for less than reasonably equivalent value in exchange, but the scant factual matter presented by the amended complaint makes none of these hypothetical scenarios *plausible*." (emphasis original)).

iii.    *Counts XII-XIII, Regarding the Crescendo Asset, Fail Because They Do Not Meet the Plausibility Test*

113.    The MLT's allegations regarding the Crescendo Asset are self-refuting and, therefore, implausible under *Twombly/Iqbal*. The MLT alleges that Maxus's sale of its interest in

63

Crescendo was a fraudulent transfer because the $624.5 million sale price was less than Maxus's internal valuation and/or book value of the assets. *See* Compl. ¶¶ 113-14, 357 (alleging Maxus's Crescendo interests was internally valued at "$800 million to $1 billion" and had a "book value of $745 million).[22] The MLT further alleges that "Repsol cause[d] YPF to cause Maxus … to sell its Crescendo interests to BP Amoco for less than fair market value or reasonably equivalent value." *Id.* ¶ 357. The reason that the sale was for less than reasonably equivalent value, according to the MLT, is that "BP Amoco did not want its counterparty in the Crescendo joint venture [Maxus] to sell its interests to a third party, nor did it want Repsol to release data about Crescendo assets to third parties. At the same time, Repsol was solely interested in a quick divestiture in furtherance of the Strategy." *Id*. ¶ 114. According to the MLT, these sale conditions made it such that "neither Maxus nor BP Amoco was negotiating for a fair market value purchase price." *Id*.

114.    The MLT has it backwards. First, to the extent that BP Amoco did not want third parties to access the technical data of the assets, that suggests BP Amoco would pay more for the assets than a reasonable buyer—not less—because BP Amoco had a unique interest that the rest of the market did not share. Second, even assuming Repsol and YPF forced Maxus to sell its interests and then used the proceeds for themselves (they did not), this would also suggest a desire to obtain the highest possible value for that interest. *Id*. ¶¶ 117, 360, 372. Both sale conditions identified by the MLT as depressing the sale prices actually would be expected to

---

[22] *See In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 276-77 (Bankr. D. Del. 2005) ("Book value is not the same as fair value"); *WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. (In re WRT Energy Corp.)*, 282 B.R. 343, 369 (Bankr. W.D. La. 2001) (citing *Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddox Contractor, Inc.),* 40 F.3d 118, 121 (5th Cir. 1994) ("stating that 'fair value of property is ... determined [not by arbitrary book values of assets but rather] by ... 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions''; equating fair value with fair market value at the time of the transfer").

WEIL:\96695690\7\69508.0003

increase the sale price, rendering the MLT's theory implausible. *See, e.g.*, *In re Old CarCo LLC*, 454 B.R. at 53–54 (dismissing fraudulent transfer claims brought by liquidating trust because allegations regarding reasonably equivalent value of assets and benefits received by debtor were implausible).

115.    Moreover, the MLT cannot impose liability on Repsol when it did not receive the asset in question. *Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*, No. CIV.A.04-1256-JJF, 2007 WL 129003, at *2–3 (D. Del. Jan. 12, 2007) ("The majority of courts interpreting the Bankruptcy Code have declined to impose liability for fraudulent transfers on third parties who did not receive the assets in question."). Repsol was not the transferee as the Crescendo Asset was sold to third parties. Compl. ¶ 114 ("Repsol caused YPF to cause Maxus to sell part of its Crescendo interests to [] ***BP Amoco*** for just $405.5 million, and the balance of the interests to ***Apache Resources*** for $219 million—a total cash price of $624.5 million.").

116.    The proceeds were allegedly used to pay down debt owed to YPF and some loaned to a Repsol entity. *Id.* ¶ 116. Even if this were true, it does not support a fraudulent transfer. First, a "transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value." *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.*), 466 B.R. 626, 660 (Bankr. D. Del. 2012). In any event, Repsol did not receive or benefit from the transfer of proceeds paying down debt owed to YPF. Second, the MLT does not allege (because it cannot) that the loan (made to a Repsol affiliate) was not repaid in full. And allegations that the loan was "generally below LIBOR," even if true (it is not), is not the basis for a fraudulent transfer.

WEIL:\96695690\7\69508.0003

## V.    Civil Conspiracy Based on Allegedly Fraudulent Transfers Is Not a Cause of Action Under Delaware Law and Is Time-Barred Anyway

117.    As an initial matter, the MLT brings its civil conspiracy claim based on fraudulent transfers under both Delaware and New Jersey law, *see* Compl. ¶¶ 478, 480–81, but Delaware law does not recognize a cause of action for conspiring to commit a fraudulent transfer. *See Cornell Glasgow, LLC v. LaGrange Props., LLC*, No. N11C-07-160, 2012 WL 3157124, at *5 (Del. Sup. Ct. 2012) (dismissing civil conspiracy claim because "conspiracy cannot be predicated on fraudulent transfer"); *see also Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("Under Delaware law, a 'conspiracy cannot be predicated on fraudulent transfer....'") (citation omitted). Thus, the civil conspiracy claim should be dismissed on this basis alone.

118.    Nonetheless, under both Delaware and New Jersey law, "[c]ivil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong." *Cornell*, 2012 WL 3157124 at *5; *see also Sandone v. Diana*, No. 6-2928-09, 2012 WL 5869580, at *3 (N.J. Sup. Ct. App. Div. Nov. 21, 2012) (affirming dismissal of civil conspiracy claim after dismissing UFTA claim "because there is no independent cause of action against the [] defendants"). Since the fraudulent transfer claims are time-barred and fail to meet the pleading standards, the civil conspiracy necessarily fails.

119.    Further, the MLT cannot circumvent its failure to plead an actionable fraudulent transfer claim against Repsol and create a greater recovery for itself by attempting to plead a civil conspiracy claim. Repsol had no involvement or affiliation with Maxus or YPF prior to its 1999 acquisition, and therefore clearly did not conspire with those companies to accomplish any unlawful acts prior to 1999. *See Akande v. Transamerica Airlines, Inc. (In re Transamerica Airlines, Inc.)*, No. CIV.A. 1039-N, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006) ("A civil

66

conspiracy requires a plaintiff to establish that two or more persons combined or *agreed with the intent* to do an unlawful act or to do an otherwise lawful act by unlawful means") (emphasis added). Nor can the MLT rely on the YPFI Transactions as a basis to hold Repsol liable as a purported conspirator in transferring "substantially all of the *Debtors'* valuable assets" when the YPFI Transactions did not even involve Debtor assets. *See, e.g.*, Compl. ¶ 382 ("Repsol caused YPF and YPFI to effect the YPFI Transfers," not the debtors); *see also supra* Sec. IV(B).

120.    Moreover, when Repsol supposedly joined the "Strategy, in order to enrich YPF and its affiliates, and subsequently Repsol and its affiliates," Compl. ¶ 481, the only other parties to the "Strategy" were entities that Repsol directly or indirectly owned (including, e.g., YPFI and Maxus). The MLT's theory is thus barred by the intracorporate conspiracy doctrine, which provides that parent and subsidiary corporations cannot "conspire" with each other as a matter of law since they are not expected to operate independently or compete with each other. *See In re Transamerica Airlines*, 2006 WL 587846, at *6 ("[A] corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents.").[23]

121.    In any event, Delaware law requires that conspiracy claims be brought within *three* years of the date that the cause of action accrues, *see* 10 Del. Code Ann. § 8106, and New Jersey law applies a *six* year statute of limitations. *See* N.J. Stat. Ann. 2A:14-1. But the MLT does not allege any fraudulent transfer within three (or six) years of the petition date. *See supra* Sec. IV(A).

---

[23] The same is true in New Jersey. *See, e.g.*, *Premio Foods, Inc. v. Purdue Farms, Inc.*, No. 11-cv-4968, 2012 WL 3133791, at *5 (D.N.J. July 30, 2012) ("recent case law suggests that a parent corporation and its subsidiaries are 'legally incapable of forming a conspiracy with one another.'") (citation omitted).

122.    Finally, the MLT seeks "all damages resulting from the Strategy," Compl. p. 129, but it cannot use a conspiracy theory to seek greater relief against Repsol than is afforded under the UFTA. Instead, the law is clear that the UFTA:

> **do[es] not create personal liability on the part of a co-conspirator for fraudulent conveyances to an extent or in an amount beyond property which a co-conspirator actually receives or in which he acquires an interest**. . . . Nowhere does the statute imply that recovery could exceed the fraudulently transferred property. Nor should the Court assume that recovery could be had from anyone not in receipt of such property given both the nature of the relief afforded thereby and the statute's silence as to liability of transferors or transferees beyond recovery of the property in question.

*F.D.I.C. v. White*, No. 3:96-CV-0560, 1998 WL 120298, at *2 (N.D. Tex. Mar. 5, 1998) (emphasis added); *Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc*., No. CIV.A. 3601-VCS, 2010 WL 720150, at *2 n.17 (Del. Ch. Mar. 3, 2010) (citing *F.D.I.C.* with approval). Thus, even if the MLT's conspiracy claim against Repsol could survive a motion to dismiss (which it cannot), the MLT's recovery nevertheless would be limited to the value of the assets that the MLT proves that Repsol received fraudulently as a transferee and not, as the MLT seeks, limitless liability for "all damages."

## VI.    Unjust Enrichment Claim is Time-Barred (Count XXII)

123.    The MLT's unjust enrichment claim is time-barred by the relevant statute of limitations. Delaware law requires that an unjust enrichment claim be brought within three years of the events giving rise to such a claim. *See* 10 Del. Code Ann. § 8106; *see also Pulieri v. Boardwalk Props., LLC*, No. CV 9886-CB, 2015 WL 691449, at *13 (Del. Ch. Feb. 18, 2015) (under Delaware law, the "statute of limitations of a claim of unjust enrichment is three years").

124.    A cause of action accrues "when the wrongful act causing the enrichment and impoverishment occurred." *Id.* By its own admission, the events giving rise to the MLT's unjust enrichment claim are the alleged fraudulent transfers, *see* Compl. ¶¶ 473–476, which, as

discussed *supra* Sec. IV(A), all occurred more than three years before Maxus filed for bankruptcy. Accordingly, the MLT's unjust enrichment claim is time-barred.

## STATEMENT REGARDING LOCAL RULE 7012-1

125.    Pursuant to Local Rule 7012-1, Repsol states that it does not consent to the entry of final orders or judgments by the Court.

## CONCLUSION

126.    For the reasons set forth above, Repsol requests that the Court dismiss the MLT's Complaint.

Dated:    October 19, 2018
          Wilmington, Delaware

/s/ Daniel B. Butz
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

- *and* -

WEIL, GOTSHAL & MANGES LLP
Robert Lemons
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Edward Soto
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159

*Attorneys for Repsol Defendants*