

March 30, 2020

**VIA ECF**
The Honorable Christopher Sontchi
United States Bankruptcy Court for the District of Delaware
824 Market Street
Wilmington, Delaware 19801

Re:   *Maxus Liquidating Trust v. YPF S.A., et al. (In re Maxus Energy Corp., et al.),*
      Adv. No. 18-50489-CSS

Dear Judge Sontchi:

      We write on behalf of the Maxus Liquidating Trust (the "Trust") regarding several outstanding discovery disputes with the Defendants.

      At the outset, we all must acknowledge that the human and economic toll of the Covid-19 coronavirus demands from all parties involved even greater flexibility, efficiency and mutual consideration than that with which they already discharge their respective obligations. In light of the logistical complications caused by the pandemic, the Parties have been making and should continue to make every effort to streamline and simplify both the remaining period of discovery (fact and expert) as well as the evidentiary presentations to the Court (including at the dispositive motions phase), so as to avoid using more of the time, energy and resources of the Parties and the Court than is necessary, and reduce the travel time of witnesses, experts and counsel as much as possible. This correspondence is designed to lead, without burdening the Court too excessively, to a common framework for the completion of document production in the near term so that, once the current restrictions lift and business gets back to whatever "usual" may become, the Parties will be able to proceed promptly with the deposition phase of this proceeding.

      While various satellite litigations have rolled off,[1] discovery in this action has proceeded and, in accordance with the Federal Rules of Civil Procedures, the parties have met and conferred and exchanged correspondence repeatedly over the past ten months to resolve various discovery issues. The Parties have largely resolved these issues consensually in the ordinary course. As a result, with some limited exceptions, each of the Parties believes that it has now concluded its production of documents. To date, the Trust has produced over 730,000 documents,[2] YPF has produced nearly 30,000 documents, and Repsol has produced only 437 documents.

      Not all issues have been resolved. At the conclusion of the most recent meet and confer on March 17, 2020, the Parties determined that they could not resolve four issues, as to which each would seek intervention by the Court. Those issues are (1) the extent of discovery into the facts

---

[1] By way of an update, the United States District Court for the District of Delaware denied a week ago the Defendants' motions to withdraw the reference without prejudice because "the litigation is continuing on in essentially the same manner as it would if the litigation were in this Court." *See Order on Reference Motions,* March 23, 2020, No. 19-1073-RGA [D.I. 10]. Further, the Parties still await a ruling from the Appellate Division of the Superior Court of New Jersey on the Trust's appeal against the Superior Court's order to dismiss the alter ego cross-claims against Repsol.

[2] The Parties agreed that they could use, but would not be required to reproduce in this action, documents previously produced in the New Jersey Action.

underlying the claims allowed in the Debtors' bankruptcy process, (2) the validity of certain apparent privilege claims, (3) the number of deponents each side will be permitted to take, and (4) certain production deficiencies in the Defendants' productions to date.

The Trust's position as to each open issue is set forth below. The Parties have agreed that they will submit letters in response to their initial letters on April 10, 2020, and respectfully request that the Court thereafter convene a telephonic discovery conference as may be practicable.

**1.    Scope of Discovery**

As this Court knows, the causes of action in the Complaint principally revolve around (1) fraudulent conveyance claims and (2) alter ego/veil-piercing claims. With respect to fraudulent transfer claims, the Parties have agreed to bifurcate any discovery issues relating to triggering creditors and to meet and confer regarding a separate track of discovery and depositions protocol. The Trust expects that the Parties can resolve those issues without need for the Court to intervene.

However, with respect to the alter ego claims, the Parties have a fundamental disagreement as to the need for, and propriety of, discovery and depositions regarding veil piercing damages. The Court will recall that, in their chapter 11 proceedings, the Debtors were faced with a limited pool of assets and a massive number of proofs of claims (over 19,000 proofs of claims were filed exceeding over $46 billion in total claims). As the Court observed in its Confirmation Order, the Debtors' Plan provided for the settlement and allowance of the most significant claims against the Debtors' estates, which settlement and allowance was "the culmination of extensive good faith, arms' length negotiations between and among the Debtors and various case constituencies." *See Confirmation Order* [Case No. 16-11501, D.I. 1460, at Finding H]; *see also* Plan at Article XI.F, Compromises and Settlements of Certain Claims. Those Plan-related claims comprise approximately $700 million of the total allowed Class 4 environmental claims, which were liquidated and non-contingent. The Trust and the Debtors further settled or allowed additional claims after the Effective Date, in accordance with Article X.C of the Plan, with a total Class 4 claims pool of around $708 million as of today (plus disputed claims).

It is the Trust's view that this Court's claims allowance and settlement approvals – and its related findings – sufficiently establish the existence of valid prepetition claims against the Debtors' estates that provide *prima facie* proof of damages on the alter ego counts. Repsol, on the other hand,[3] seeks a blanket authorization to take discovery on, and challenge, the underlying allowed creditor claims, on the assumption that the Trust must prove the validity of every allowed claim of every creditor. *See* Repsol's February 18, 2020 letter, at 5 (the "Repsol February Letter"). Thus, in the Defendants' view, this litigation would entail having this Court re-litigate the validity and scope of, *inter alia*, (i) the Debtors' contractual liability towards OCC under the 1986 SPA (when this liability has been established in three state court proceedings),[4] (ii) the environmental liability claims asserted since 1995 by governmental agencies and potentially responsible parties against the Debtors with respect to dozens of environmental sites across the country, or (iii) the

---

[3] The YPF Defendants did not address this issue in their February 18 or March 4 letters, but the Trust understands that they generally share the Repsol Defendants' views in this dispute.

[4] *See Occidental Chem. Corp. v. Maxus Energy Corp.*, No. 02-09156, 2006 WL 6040766 (Tex. Dist. Ct. June 27, 2006); *Occidental Chem. Corp. v. Maxus Energy Corp.*, No. 2002-A-0012, 2004 WL 2861025 (Ohio Ct. App. Dec. 10, 2004); *Maxus Energy Corp. v. Occidental Chem. Corp.*, No. 05-96-01101-CV, 1998 WL 269994, at *1 (Tex. Ct. App. May 28, 1998).

hundreds of employment benefit claims filed against the Debtors for obligations going back several decades.

The Trust believes that such an expansion of this litigation would be both improper and unnecessary and that, in the absence of a compelling reason to do so, the Court should not permit the Defendants to re-litigate the allowances and settlements of the environmental, labor, trade and other claims asserted against the Debtors in the chapter 11 cases. To do so would substantially increase the discovery burden on the Trust and further delay the resolution of the merits of this case for no good reason.

Further, such an outcome would be unwarranted given that Repsol has thus-far failed to articulate how the additional discovery sought would be relevant or proportional in the context of this action, as the Federal Rules of Civil Procedure clearly require. *See* Fed. R. Civ. Pr. 26(b)(1). Repsol has taken the position that the Defendants require such discovery to show that that, even if they dominated and controlled the Debtors, they did not use that domination and control to visit a fraud or injustice on particular creditors. Repsol February Letter. But, contrary to Repsol's characterization, the Trust's claims do not hinge on the allowance of a particular claim. This litigation is about the harm all creditors suffered derivatively by virtue of the Defendants' abuse of the Debtors' corporate form and their siphoning of the Debtors' assets. Thus, the Trust alleges that the Defendants followed a deliberate Strategy (as defined in the Complaint), designed to remove the Debtors' assets from their books, isolate those assets from the Debtors' environmental liabilities during the limitations period, and ultimately file the Debtors for chapter 11, leaving the creditors with all of the Debtors' environmental obligations and none of their assets. The Trust simply disputes that the allowance (or the process leading to allowance) of any particular claim is relevant to the alter ego claims asserted in the Complaint: The value of the assets that could have been—but because of the Defendants' conduct was not—applied to creditor claims was fungible as between particular claims. In short, the Defendants' professed need to take searching discovery on particular claims seems diversionary.

As for proportionality, the Defendants' intention to peer into the Debtors' decades-long relationships with its trade creditors, potentially responsible parties and employees would exponentially expand the scope of discovery and impose a significant additional burden on the Trust. As an indication, the Defendants have advised the Trust that they intend to serve Rule 30(b)(6) notices on OCC, the CPG, the EPA, the DOI and NOAA, presumably to inquire into their environmental or contractual claims against the Debtors. Each of these parties has over three decades of history with the Debtors which would, under Repsol's theory of the case, be open to document discovery. This is entirely unnecessary when the Debtors' independent directors, with the support of experienced environmental counsel and decades of institutional knowledge at the Debtors, already negotiated in good faith the liquidated amount of each of the claims at issue, which settlement and allowance the Court already approved, as noted above. The cost of re-litigating each of the claims settled in the bankruptcy case would undoubtedly be prohibitive.

In fact, it was precisely to avoid the prospect of interminable litigation that the Debtors, with the approval of the Court, resolved the environmental creditor claims in the Chapter 11 Cases by allowing or settling the liquidated portion of the claims filed against the Debtors and setting up an environmental trust (the ERRT) to deal with the unliquidated portions. The Court found in the

Confirmation Order that "[t]he Plan Proponents proposed the Plan with the purpose of providing for the creation of a mechanism to resolve all Claims asserted against the Debtors, realizing upon various litigation claims, and distributing value to creditors." [D.I. 1460, at finding H]  Repsol's view of how this matter will proceed—*i.e.*, the Trust as a nominal plaintiff must essentially prosecute an independent litigation on behalf of every creditor—would be a radical departure from the collective proceeding envisioned by all participants at the Plan creation and approval phase. As the Court has observed, "it would be inequitable to have a collective proceeding and not to allow the creditors to proceed collectively." [D.I. 107 at 3]

The Parties' disagreement on the scope of discovery also bears on their opposing views as to the effect of the Plan's reservations of rights regarding allowed claims.  The Repsol Defendants stress that the Plan "specifically reserved Repsol's and other parties' rights to challenge these claims [*i.e.*, the underlying creditor claims]," to the extent the Trust relies on those claims to prove "a causal connection between the unpaid claims and the purported alter ego conduct the Repsol Defendants engaged in vis-à-vis Maxus."[5]  Repsol February Letter.  The Repsol Defendants have, however, overstated the import of the reservations of rights in the Plan.  While the Plan's reservation prevents a *res judicata* application of the allowance of claims, the facts remain that those claims were acknowledged, approved (or not objected to, including by the Defendants), and settled by the Debtors' Special Independent Committee composed of two independent directors selected by YPF.  That is why, in the Confirmation Order, the Court found that "[t]he Plan is the culmination of extensive good faith, arms' length negotiations between and among the Debtors and various case constituencies," and that "[i]n crafting and negotiating the terms of the Plan, and at all times during the Chapter 11 Cases, the Plan Proponents (a) conducted themselves honestly, with good intentions, and (b) upheld their fiduciary duties to stakeholders." [D.I. 1460, at Finding H]  The Defendants did not challenge, nor does the Plan reserve them the right to challenge, the finding that the Debtors, in good faith, admitted to owing specific creditors specific debts.  Thus, there is no call for discovery into settlement negotiations between the Debtors and their various creditor constituencies or question the resulting good faith acknowledgment of claims by the Debtors.  The time to challenge that process has come and gone.

## 2. Privilege Claims

In accordance with the *Amended Case Management Plan and Scheduling Order* [D.I. 213], the Parties exchanged categorical privilege logs on January 20, 2020.  After further discussions between the Parties, the YPF Defendants and the Trust provided amended categorical privilege logs.[6]  Notwithstanding those further clarifications, the Parties still have issues with each other's privilege designations.  It may well be that the resolution of the open issues described below necessitates an *in camera* review by the Court.[7]  The Trust proposes to discuss on the telephonic

---

[5] Repsol cites Confirmation Order ¶ 72 ("Notwithstanding anything to the contrary set forth in the Plan, the Plan Supplement or this Order, nothing contained therein or herein . . . shall have any precedential, preclusive or other effect against any of the Repsol Entities in any litigation, including with respect to any Cause of Action preserved under the Plan."), and Plan § XV.P ("Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan.").

[6] YPF circulated its amended log on February 16, 2020.  The Trust circulated its amended log on February 18, 2020.

[7] The Trust cites in this letter to various documents produced by the Trust to the Defendants in this action (all with the bates prefix MLT-).  Because the YPF Defendants have objected to the use and disclosure by the Trust of any documents on which the YPF Defendants may assert a privilege – even documents found in the Trust's databases – the Trust refrained from filing any

status conference how to accommodate such a process in the most efficient way under the present circumstances.

A. YPF Defendants' Privilege Designations

The Trust has two issues with the YPF Defendants' privilege designations in their amended privilege log. First, the YPF Defendants purport to rely on privilege applicable to YPF Holdings Inc. ("YPFH") or CLH Holdings, Inc. ("CLHH") as a basis to withhold from production documents and communications that were prepared by or sent to directors, officers or employees of the Debtors and to prevent the Trust from using those documents and communications in this matter.[8] Second, the YPF Defendants seek to vindicate a "common interest privilege" over specific documents that the Trust believes are not privileged.

*1) YPFH Privilege Designations*

During the Parties' communications following the exchange of categorical privilege logs, the Trust observed that, based on the sender/recipient/copyee field on their log, the YPF Defendants apparently intended to assert privilege over a wide set of communications to which the Debtors' management—including their ex-CEOs, CFOs, treasurer, comptroller, HR director, and even the Debtors' successive general counsels—were party.[9] When the Trust sought clarification regarding the basis for withholding such documents, the YPF Defendants stated that, because all those individuals simultaneously worked for YPFH or CLHH,[10] the holding companies that held all of the Debtors' equity, the YPF Defendants could withhold from the Trust (a successor to the Debtors' privileges) communications between YPF and the relevant directors, officers or employees of the Debtors on the basis of attorney-client privilege or the work product doctrine, "to the extent [the relevant] individual was acting in [his or her] YPF-related capacity." *See* YPF March Letter ("In circumstances of 'two-hat' directors and officers, 'disclosure occurs when the parent shares an otherwise confidential attorney-parent communication with an officer, director, or agent of a subsidiary in that capacity,' and vice-versa.") (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 372 (3d Cir. 2007)). Other than to list the concurrent YPFH and CLHH positions held by the relevant Debtor personnel, the YPF Defendants have not explained how they determined that specific communications were made in a YPF (or YPFH/CLHH) capacity rather than a Debtor capacity.

Under the circumstances, the YPF Defendants have not carried their burden of establishing an applicable privilege that warrants withholding from the Trust communications to which Debtor personnel were party. *See U.S. v. Boffa*, 513 F. Supp. 517, 526 (D. Del. 1981) ("Because application of the privilege often results in the inadmissibility of probative evidence, the burden

---

[8] In their March 4, 2020 letter (the "YPF March Letter"), and again during the March 17, 2020 meet and confer, the YPF Defendants reserved their right to object to use by the Trust of documents purportedly reflecting YPFH-privileged documents as those documents came to the fore during the taking of depositions.

[9] When the Parties initially met and conferred regarding document discovery, they agreed that they would not withhold documents from production solely on the basis that an individual associated with an opposing party was included on correspondence.

[10] Only one individual, Mr. David Rabbe, had a role at CLHH and a Debtor (Tierra) without having an identical role at YPFH. Everything in this section applies with equal force to CLHH, which, upon information and belief, had no function other than to hold equity in Debtor Tierra.

of proof placed on the defendants [asserting the privilege] must be strictly observed. This burden cannot be discharged by mere conclusory or *ipse dixit* allegations."). It is not sufficient for the YPF Defendants merely to note that the Debtors and YPFH or CLHH had overlapping personnel. *See, e.g.*, *U.S. v. Bestfoods*, 524 U.S. 51, 70 n.13 (1998) ("[I]t is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.").

Nor could the YPF Defendants possibly carry their burden of proof in this respect. Indeed, the YPF Defendants' contention that personnel serving the Debtors and YPFH or CLHH simultaneously can be said to have acted in a "YPF-related capacity" on some occasions but not on others is directly contradicted by the facts in the record, which clearly establish that neither YPFH nor CLHH ever had a corporate identity independent of the Debtors and both were merely empty holding companies for the Debtors' equity. The organizational chart below reflects the relationships among the Debtors and the YPF Defendants as of the Petition Date.



*First Day Declaration of Javier Gonzalez*, Case No. 16-11501, D.I. 2, Exhibit 1.

To the Trust's knowledge, YPFH and CLHH never had any independent operations or assets, and had no independent directors, officers or employees, and no offices or bank accounts of their own (at least not until the Petition Date). Accordingly, the corporate actions of those two entities pertained exclusively to management of the Debtors' affairs, as YPFH board materials reflect. In fact, while several board meeting minutes are drafted as minutes of the meeting of the board of YPFH, meeting notices and agendas were sent out regarding the meeting of the board of Maxus and/or Tierra, two Debtors. Accordingly, there is no evidence that the dual personnel of the Debtors and YPFH ever understood themselves to be serving in a YPFH capacity, let alone a YPF capacity as the YPF Defendants contend. Further, each of the individuals that the YPF Defendants now allege were dual personnel acting in their capacity as YPFH personnel used its Maxus email address in professional correspondence, including in the communications with YPF. *See, e.g.*, *Asousa P'ship v. Smithfield Foods, Inc. (In re Asousa P'ship)*, 2005 Bankr. LEXIS 2373, at *14-15, 33-34 (Bankr. E. D. Penn. Nov. 17, 2005) (finding that the defendant failed to establish in what capacity its privileged documents were received because the defendant's CFO did not use

an email affiliated with the defendant or co-defendant and that the defendant failed to allege facts showing the CFO's capacity).

Even when navigating issues pertaining to privilege, the distinction between YPFH or CLHH and the Debtors appears to have been a matter of expediency. For example, Drinker Biddle at one point prepared a memorandum for the Debtors (which they represented) and had to explain to the Debtors' assistant general counsel, Derrick Vallance, who concurrently served in the same position at YPFH and CLHH, that Drinker Biddle did not represent YPFH and CLHH and could not prepare a similar memorandum for those two entities. And yet, in the end, Drinker Biddle addressed the exact same memorandum to YPFH and CLHH, simply changing the addressee block at the top.

The YPF Defendants' present insistence on a privilege applicable to YPFH and CLHH that warrants withholding from, or prohibition against use by, the Trust is a function of YPF's strategy in the present action, not of the on-the-ground understanding at the time of how privilege applied to exchanges of information amongst YPFH, CLHH, the other YPF Defendants and the Debtors. *See, e.g.*, *In re Grand Jury Subpoena Dated November 9, 1979*, 484 F. Supp. 1099, 1106 (S.D.N.Y. 1980) ("[A]fter-the-fact assertions that an attorney-client relationship or privilege existed are insufficient to carry the [plaintiff's burden] of establishing the existence of an attorney-client relationship.") (citations omitted).

Such a retroactive determination of where the privilege applies is not only not impermissible, it is also impossible to effectuate in practice. This was demonstrated when the Trust provided the YPF Defendants with a randomized sample of 30 documents from the Trust's own productions that pertain to a variety of subjects and timeframes relevant to the allegations in the Complaint, all of which (i) hit on the agreed-upon search terms, (ii) had a YPF agreed-upon custodian in the to/from/cc field, and (iii) were sent during the agreed-upon time-frame, and (iv) were absent from the YPF Defendants' own production. In response, the YPF Defendants conceded that eight documents should have been, but still have not been, produced and two documents could not be located in their custodial collections. However, the YPF Defendants stated that the remaining 20 documents identified by the Trust (and their attachments) were either "appropriately catalogued and withheld from production as privileged," or could not be located in the YPF Defendants' custodial collections but were still privileged as to the YPF Defendants. At the subsequent meet and confer on March 17, the YPF Defendants clarified that they viewed those 20 documents (out of a sample of 30) as all being subject to YPFH's privilege, notwithstanding the inclusion of Debtor personnel on the correspondence at issue. Looking at each of these 20 documents, the Trust is unable to discern a coherent guiding principle for the YPF Defendants' assertion of privilege. Some documents refer to YPFH by name and some do not mention (or even seem to relate to) YPFH or the YPF Defendants; some documents contain a "joint privilege" disclaimer and some do not; all are sent by or to Maxus employees or directors using their Maxus email addresses, whose signature blocks identify them as employees of the Debtors; several do not seem to contain any legal advice at all; and dozens of documents covering the same or similar topics have been produced by the YPF Defendants in this action.[11]

---

[11] The Trust has compiled those documents and translated them from Spanish where applicable. Due to the present circumstances, the Trust has been delayed in obtaining a certification of the translations. All of the documents can be made available to the Court if it believes a review if necessary.

Faced with YPFH's sweeping, inconsistent and impracticable privilege assertions, this Court should rule that YPF's attorney-client privilege has been waived with respect to any communications directly with employees, directors, officers or agents of the Debtors – notwithstanding that those individuals may have had a nominal affiliation YPFH or CLHH. Particularly where the YPF Defendants intend to defend the transactions at issue in the Complaint on the basis that they were taken in conjunction with and for the benefit of the Debtors, it would be inequitable to exclude part of, but not all, the Debtors' and YPFH's communications regarding the disposition of the Debtors' assets, the satisfaction of the Debtors' liabilities, and the steps leading up to the Debtors' chapter 11 filing – at the YPF Defendants' discretion. *See Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 513 (D. Del. 2005) ("The attorney client privilege should not be used as both a sword and a shield. The rationale behind this rule is one of fairness.") (citations omitted). Indeed, several documents produced in this action seem to indicate that the Defendants and the Debtors were aware that potential disclosure of "privileged" communications between the Debtors and the Defendants was one of the risks of the Strategy. [*E.g*., MLT00219697]

        *2) Common Interest Privilege Designations*

The Trust has requested that YPF clarify the nature of and parties to the common interest in respect of which the YPF Defendants included "common interest privilege" as a withholding rationale for 24 of the 28 categories of documents on their amended privilege log dated February 16, 2020. The YPF Defendants have indicated that they would provide such clarification, but as of this submission they have yet to do so. The Trust is hopeful that the Parties can resolve this issue without the Court's assistance.

        B.  The Trust's Privilege Designations

The YPF Defendants object to two privilege claims by the Trust. First, the YPF Defendants dispute that the Trust can withhold the report authored by Morrison & Foerster LLP (as counsel to the Debtors) regarding the Debtors' potential litigation claims against YPF in anticipation of the chapter 11 process and related attempt at settling these claims (the "MoFo Report"). The YPF Defendants claim that the Trust waived any privilege applicable to the MoFo Report by referring to the MoFo Report, and the conclusions therein, in the Complaint. Second, the YPF Defendants dispute the propriety of certain categories of common interest privilege pursuant to which the Trust has withheld documents.

        *1) The MoFo Report*

The YPF Defendants have objected to the Trust's withholding of the MoFo Report, contending that "the Trust heavily relies on [the MoFo Report] in its Complaint," and has used the conclusions of the Report as a "sword to bolster its claims." YPF Defendants' February 18, 2020 Letter (the "YPF February Letter"). Both statements are incorrect, and the YPF Defendants' argument in favor of disclosure is without merit.

First, the Trust referred to the MoFo Report in two paragraphs of its 485-paragraph Complaint. This does not constitute "heavy" use of the Report. The Complaint does not refer to the MoFo Report in any of the Trust's causes of action, let alone "rely" on the MoFo Report to

"bolster" such causes of action.  Indeed, the Trust has never suggested that the MoFo Report (its existence or its contents) gives rise to any element of any claim or defense being met or not being met.  Nor can the Complaint be read to create the impression that the Trust referred to the MoFo Report so as to introduce admissible evidence to support any of its claims – whether Morrison & Foerster believed the Debtors' alter-ego claims against YPF were reasonably likely to succeed is not "evidence" of anything.

        Second, the minimal "disclosure" in the Complaint of the contents and conclusions in the MoFo Report does not warrant the disclosure of the full MoFo Report in the interests of fairness. Read in context, the reference to the MoFo Report in the Complaint was clearly intended to demonstrate the conflict of interest that YPF imposed on the Debtors' special independent directors by depriving them of authority to prosecute (as opposed to merely settle) any of the estate claims against YPF.  The YPF Defendants knew that the Debtors understood themselves to have potential/viable claims against them.  Indeed, YPF initiated the process whereby disinterested directors vetted the Debtors' potential claims against YPF and reached a YPF-sponsored settlement of such claims.  Further, it is a matter of public record that the independent directors lacked authority to prosecute those claims until the Debtors' creditors and that the Court had to insist during the chapter 11 cases on governance reforms sufficient to allow those directors to serve as *bona fide* fiduciaries to the estates.

        Third, to date, the YPF Defendants have not even attempted to identify a "distinct disadvantage" at which YPF would be placed if it cannot examine the MoFo Report.  Nor could it.  The Complaint's reference to the MoFo Report does not make a factual allegation giving rise to an inference that the YPF Defendants would be unable to challenge without disclosure of the full MoFo Report.

        In light of the foregoing, the YPF Defendants have not established that the Trust waived the privilege applicable to the MoFo Report and, to date, have not articulated any other privilege defects or bases to compel the Trust to produce the MoFo Report.

        *2)  The Trust's Common Interest Withholdings*

        During the Parties' February 7, 2020 meet and confer, the Defendants requested more information regarding entries on the Trust's initial privilege log, dated January 27, 2020, corresponding to communications between the Debtors and their chapter 11 professionals and the Official Committee of Unsecured Creditors ("UCC") and its counsel, and financial advisor (the "Committee Communications"), as well as communications between the Debtors and their professionals and OCC and its professionals (the "OCC Communications"), on the basis of common interest privilege.  In their February Letters, the Defendants reiterated the request for additional information and generally disputed the Trust's right to withhold such communications.

        In the Trust February Letter, the Trust disagreed with the contention that communications between the Debtors and UCC (or its chairman, OCC) would not be privileged.  For evident policy reasons, it is essential that such communications remain privileged, particularly when they relate to the preservation and maximization of the estate's main asset – the causes of action against the Defendants.  As this Court found in *In re Leslie Controls*, a shared interest in maximizing the asset pool and creditor recoveries is a valid common interest shared by debtors and creditors, even when

they may be at odds on other facets of a reorganization.  437 B.R. 493, 500 (Bankr. D. Del. 2010) ("As representatives of the ultimate beneficiaries of at least a portion of the proceeds they were directly involved in the effort to maximize insurance coverage.  They were working with the Debtor to maximize the size of the pie.").

The Trust also provided the Defendants in its February Letter with an amended privilege log that responded to the Defendants' request that the Trust separately categorize Committee Communications predating and post-dating the April 28, 2017 effective date of a certain Joint and Common Interest Agreement between the Trust, the Official Unsecured Creditors' Committee, the Maxus Debtors, OCC and Glenn Springs Holdings, Inc., dated July 14, 2017, and that the Trust separately categorize the OCC Communications predating and post-dating the Petition Date.  The amended privilege log also addressed the Defendants' requests that the Trust list all senders, recipients and copyees on all withheld correspondence, and include separate tallies for parents and attachments (rather than provide an aggregate total of documents withheld) and the Trust gave a category-by-category description of the scope and rationale for each common interest privilege in the Trust March Letter.

Notwithstanding those explanations, the Trust understands that the Defendants intend to ask the Court to intervene with respect to the Trust's claims of privilege in these categories.  The Trust will address any contentions the Defendants raise in their submissions in its letter in response, but notes in advance that a formal joint defense agreement is not a prerequisite to a valid claim of common interest privilege.  *See, e.g.*, *In re Cherokee Simeon Venture I, LLC*, No. 12-12913 (KG), 2012 Bankr. LEXIS 6194, at *8 (Bankr. D. Del. May 31, 2013) ("[T]he privilege does not require a formal agreement reduced to writing.  Rather, a 'meeting of the minds' is sufficient provided communications were given confident and the clients reasonably understood them to be so given.") (citations omitted).

### 3.  Production Deficiencies

The Trust and the Repsol Defendants continue to have an unresolved dispute over whether and to what extent, the Repsol Defendants must review and produce documents pre-dating the New Jersey Action discovery cutoff date.  Because Repsol's equity in the YPF Defendants and the Debtors was nationalized by the Republic of Argentina around the time of the New Jersey discovery cutoff date, the Repsol Defendants have, to date, produced few documents.  The Trust is hopeful that the Parties will come shortly to a mutually acceptable set of search terms to be run on non-produced documents in the Repsol Defendants' possession that pre-date the New Jersey Action discovery cutoff date.

While the YPF Defendants have represented to the Trust that their productions were now substantially complete (with a few items still outstanding), the Trust has not received a satisfactory answer at the March 18, 2020 meet and confer as to why documents similar to the sample of 30 representative documents attached as Exhibit C to the Trust February Letter cannot be found in the YPF productions.  As a reminder, in Exhibit B to the YPF March Letter, the YPF Defendants responded that eight documents (more than 25% of the sample) should have been produced but were not.[12]  The Trust is in no position to assess whether there is a similar 25% deficiency across

---

[12] The YPF Defendants said on March 4, 2020 that they would produce those missing documents but have yet to do so.

the YPF Defendants' entire production effort – leaving aside the issue of whether the privilege designations over the remaining 22 documents are appropriate.  It is worrisome to see the YPF Defendants acknowledge (without any form of justification) that over 25% of a representative sample of communications with the Debtors was incorrectly withheld for privilege, or never even collected and reviewed.  This is especially the case when the Parties expressly agreed to produce documents that had been shared with the other Parties in the first place, in part because the Trust was not able to assess how reliable the Debtors' document collection and archival practices had been in the past.

Faced with a fundamental uncertainty with respect to the scope of the YPF Defendants' productions, and no clear answers, the Trust requests that the YPF Defendants explain to the Court why their productions can indeed be considered to be "substantially complete."

### 4. Number of Depositions of Fact Witnesses

Looking forward to a time when travel and human interaction will once again be feasible, the Trust also seeks the Court's early intervention on one issue regarding depositions: the number of depositions that each side will be permitted to take in this action.  When the Parties exchanged initial lists of intended deponents in January of this year, the Defendants identified 31 individual or Rule 30(b)(6) depositions they intend to take, while the Trust identified 13 depositions.  In the meet and confer process, the Trust proposed that each side be permitted to take up to 15 depositions of fact witnesses.  The Defendants have taken the position that they cannot agree to any fewer than 35 depositions per side, to take place over the course of up to six months.

Pursuant to Rule 30(a)(2)(A) of the Federal Rules of Civil Procedure ("FRCP"), the Parties must obtain leave from the Court to conduct more than ten depositions unless they stipulate otherwise.  For the reasons that follow, the Court should not grant leave for the Defendants to take more than 15 depositions in this action.

Of the 35 individuals or Rule 30(b)(6) representatives the Defendants intend to depose, 20 were previously deposed in the New Jersey Action.  The Defendants have indicated they will not budge on the number of these re-depositions unless the Trust agrees to allow the Defendants to use any portion of the depositions taken in the New Jersey Action without restriction—a concession they already sought from the Court by way of motion practice.[13]  As the Court will recall, the Trust offered several concessions regarding the use of depositions in the New Jersey Action during that motion cycle—including that "depositions could be used by any party in connection with any summary judgment motion" (Trust Opposition [D.I. 165] at 7)—but could not accede

---

[13] In April 2019, both groups of Defendants submitted motions that sought either (1) a blanket ruling that the depositions taken in the New Jersey Action could be used for all purposes as if taken in this action, or, in the alternative (2) a modification of the then-operative scheduling order to expand the time for depositions in this action sufficiently to allow for the re-deposition of "a significant number of the nearly 50 fact witnesses who were deposed during the wide-ranging discovery taken in the New Jersey Action."  *See Memorandum of Law in Support of the YPF Defendants' Motion for Entry of an Order Providing for the Use of Deposition Testimony from a Prior Action in This Action or, in the Alternative, for the Entry of an Amended Scheduling Order*, dated April 22, 2019 [D.I. 157] ("YPF Deposition Motion"), at 18; *see also Repsol Defendants' Motion to Modify the Scheduling Order to Include a Provision Treating Depositions Taken in the New Jersey Action as if They were Taken in This Action, or in the Alternative, to Amend the Scheduling Order*, dated April 22, 2019 [D.I. 153] ("Repsol Deposition Motion" and, together with the YPF Deposition Motion, the "Deposition Motions").

(preemptively) to the request that all testimony would be admissible at trial without additional safeguards of the Parties' respective rights.

The Court denied the Deposition Motions and held that it "cannot create a blanket rule regarding the use of the New Jersey Action deposition at this time" (Opinion on Deposition Motions, dated June 24, 2019 [D.I. 193]). Since then, the Defendants have not once tried to engage with the Trust to solve their problem on a witness-by-witness basis, for instance by agreeing to designate and counter-designate the relevant transcripts and thereby narrow the number of witnesses as to whom re-deposition would be needed or desirable.

To be sure, disagreements may arise as to whether specific testimony would be admissible (and as to whether specific testimony could be deemed an admission and, if so, by whom); indeed, it is inevitable that such disagreements will arise at the pre-trial phase of this matter. However, that the Parties disagree as to how the depositions from the New Jersey Action can be used at trial in this action does not mean the Parties should be authorized to recreate that record from scratch and at a great expense. Further, the Defendants have never suggested why retaking depositions would be the most efficient way to constitute a comprehensive factual record at this late date. As they previously stated to this Court: "[g]iven the amount of time that has passed since the depositions in the New Jersey Action . . . the deponents' memories and recollection of the events in question will only have decreased since they were last deposed." YPF Deposition Motion at 15. Under the circumstances, then, the Defendants' insistence on retaking all of the New Jersey depositions seems calculated to require the Trust to choose between agreeing to the Defendants' preferred treatment of the depositions or agreeing to a significantly more costly and time-consuming deposition protocol.[14] The Court should therefore refuse to grant the Defendants' request to conduct 35 depositions. Fifteen depositions per side should be sufficient for now, and the Parties will have to engage – or turn to the Court – in the pre-trial phase to determine the admissibility of the extensive deposition transcripts collected at great cost in the New Jersey Action.

We thank the Court in advance for its consideration of each of the foregoing issues, particularly in light of the circumstances in which the court and their staff are currently operating.

Respectfully submitted,

/s/ Michael J. Farnan

Michael J. Farnan

Cc:    Counsel for the Repsol Defendants
       Counsel for the YPF Defendants

---

[14] In light of the uncertainty regarding travel and other logistics to which the Covid-19 coronavirus outbreak has given rise, it seems inevitable that depositions will be more expensive and time-consuming. Before that additional challenge, the YPF Defendants already indicated they estimated their deposition schedule to have to take up to six months. YPF February Letter, at 4. While we can work with Defendants to come to technical solutions to accommodate depositions in light of the existing travel restrictions, taking a sober look at what is actually needed to bring this case to trial should be the first reflex of all the Parties.