

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
+1 212 839 5300
+1 212 839 5599 FAX

+1 212 839 7336
JKUSTER@SIDLEY.COM

AMERICA • ASIA PACIFIC • EUROPE

March 30, 2020

**By ECF**

The Honorable Christopher S. Sontchi
United States Bankruptcy Court for the District of Delaware
824 North Market Street
5th Floor
Wilmington, DE 19801

    Re:    <u>*Maxus Liquidating Trust v. YPF S.A., et al.*</u>, Adv. Pro. 18-50489 (Bankr. D. Del.)

Dear Judge Sontchi:

    We represent Defendants YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings, Inc. (collectively, the "YPF Defendants") in the above-referenced proceedings. We write pursuant to Rule 7026-1 of the Local Rules of this Court and FED. R. CIV. P. 30 and 37, made applicable by Rules 7030 and 7037 of the Federal Rules of Bankruptcy Procedure, to request the Court's ruling on certain discovery disputes with the Maxus Liquidating Trust (the "Trust"). The parties have met and conferred multiple times and have exchanged position letters in an attempt to resolve their disputes consensually, but there are several issues remaining that require the Court's intervention, which are addressed below.

    **<u>Number of Depositions</u>**. Pursuant to FED. R. CIV. P. 30(a)(2), the YPF Defendants respectfully request that the Court grant leave to the YPF and Repsol Defendants to take 25 depositions in addition to the 10 provided for in that rule, for a total of 35. Defendants' requested number of depositions is clearly proportionate to the complexity and expansiveness of the Trust's 130-page, 485-paragraph Complaint. The Trust's allegations literally span decades, covering three separate periods of corporate ownership of Debtors, starting at least in 1995 when YPF acquired Maxus, through 1999 when Repsol acquired control of YPF, through 2012 when YPF's controlling shares were reacquired by the Argentine government, and through the Debtors' decision to file for bankruptcy protection in 2016. The Trust asserts claims for alter ego liability against two separate corporate parent groups of defendants, fraudulent transfer, unjust enrichment and civil conspiracy and seeks damages that the Trust alleges could be as high as $14 billion. There are 23 counts of fraudulent transfers in the Trust's complaint, with independent, varied histories and factual records, requiring evidence from different decision makers and witnesses involved in each of those transfers. The Trust also alleges the existence of a grand "strategy" pursuant to which scores of people purportedly conspired to coordinate and execute a plan to avoid evolving environmental liabilities for more than 20 years. Over those

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 2

two decades, employees and officers of the Debtors and Defendants, as well as third parties with substantial involvement at various points during the alleged decades-long scheme, came and went. The parties' Initial Disclosures list nearly 120 unique names of fact witnesses with potentially relevant information. Simply put, this case is massive and complex, and 35 depositions is eminently reasonable given this scope.

The YPF and Repsol Defendants initially sought to save the parties substantial time, money and effort by utilizing the depositions taken in the New Jersey Action as if taken in this case, given the unquestionable overlapping subject matter involving alleged alter ego misconduct and asset stripping. The Trust objected, and the Court denied Defendants' request to do so. *See* Adv. D.I. 165, 193. In light of this, Defendants carefully scrutinized the deposition testimony and other relevant evidence in the case thus far, and agreed to reduce their request to use prior deposition testimony from over 50 witnesses to 20, none of whom are Defendant-party witnesses. Given the much smaller and specific list of previously deposed witnesses, Defendants renewed their request that the Trust consent to use just those depositions as if taken in this action. The Trust again refused. As a result, Defendants have no choice but to seek leave from the Court so that they could obtain critically important and necessary testimony from 20 witnesses previously deposed about the same subject matter in the New Jersey Action. The remaining 11 deponents on Defendants' list were not previously deposed.

Defendants and the Trust exchanged Deposition Witness Lists, which are attached hereto as Exhibit A and B. The Trust's List includes 20 witnesses, none of which overlap with witnesses on Defendants' List. The Trust, however, refuses to consent to more than 15 depositions per side, offering no legitimate basis for imposing such an arbitrary limit. Pretending the subject matter of its claims are narrow, the Trust informed Defendants that it does not believe that "the circumstances of this case warrant the excessive cost and delay of 35 depositions." (*See* Letter from Matt Nicholson to Marissa Alter-Nelson, *et al.* at 1 (Mar. 4, 2020) (attached hereto as Exhibit C).) That claim is disingenuous. The Trust refused to agree to use any of the depositions taken in the New Jersey Action, which would have obviated the need to force those witnesses to sit for another deposition covering the exact same subject matter. Moreover, Defendants are seeking to depose far *fewer* witnesses than were deposed in the New Jersey Action, which was more limited in time and scope than this case, and where the damages claims were a mere fraction of the $14 billion being sought by the Trust in this case. In fact, Your Honor already held that that the Trust is asserting claims that are significantly "expanded" from what was litigated in New Jersey. (Adv. D.I. 193 at 7.) Defendants have made a particularized showing of the anticipated relevant testimony and need for each of the deponents they seek to depose in this case, based on their review of the record to date in the chart hereto as Exhibit D.

It is well established that under FED. R. CIV. P 30(a)(2), courts "*must* grant leave [to conduct more than ten depositions] to the extent consistent with Rule 26(b)(1) and (2)." FED. R.

**SIDLEY**

The Honorable Christopher S. Sontchi
March 30, 2020
Page 3

CIV. P. 30(a)(2) (emphasis added).[1]  In evaluating whether to grant leave to conduct more than ten depositions, courts are to consider "the needs of the case, the amount in controversy, other methods of obtaining the information, the importance of the issues to the litigation, and the importance of this particular discovery tool is in resolving the issues." *CFTC v. Commodity Inv. Grp., Inc.*, No. 05 Civ. 5741 (HB), 2005 WL 3030816, at *1 (S.D.N.Y. Nov. 10, 2005); *see also* Advisory Comm. Notes to FED. R. CIV. P. 26 (2015).  Where, as here, the litigation presents complex and substantial factual and legal issues, courts will permit parties to take numerous additional depositions beyond the 10 deposition default.[2]  *See generally Pacitti v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999) (District Court erred in limiting discovery and emphasizing that "[i]t is well recognized that the federal rules allow broad and liberal discovery")).

*Former Witnesses Deposed in the New Jersey Action Spanning the YPF and Repsol Eras set forth in the Complaint.*  The Defendants are seeking to depose only 20 of the witnesses who already deposed in the New Jersey Action, the vast majority of whom had significant roles at Maxus as employees, officers or advisors.  No witnesses controlled by Defendants are included.[3]  Defendants also only seek a Rule 30(b)(6) witness to depose from OCC.  (*See* Ex. D.)  The vast majority of the previously deposed witnesses Defendants seek to re-depose in this case are ones the Trust admits have potentially relevant testimony.  (*See* Trust's Opp. to Dep. Mot., Ex. A [Adv. D.I. 166]; *see also* Ex. D, Nos. 1-20.)  In fact, in opposing the Defendants' Deposition Motions [Adv. D.I. 154, 156], the Trust informed the Court that it intended to depose three specific Maxus witnesses (Slater, Smith and Wadsworth), and "twenty witnesses whose prior testimony could be sufficiently relevant to this action to require any deposition (which the Trust

---

[1] Rule 26 provides that a court should only limit additional discovery if it determines that: (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"; (2) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or (3) "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." FED. R. CIV. P. 26(b)(2)(C)(i)-(iii).

[2] *See, e.g., L.W. v. Lackawanna County*, Civ. A. No. 3:14-CV-0610, 2015 WL 2384229, at *1 (M.D. Pa. May 19, 2015) (granting leave to take 22 additional depositions of various employees, caseworkers, and record custodians with respect to allegations that "span[ned] a lengthy period" of time); *Scott v. City of Sioux City, Iowa*, 298 F.R.D. 400, (N.D. Iowa 2014) (granting plaintiff leave to take 21 depositions where plaintiff demonstrated each proposed deponent was likely to possess relevant information and plaintiff could not feasibly obtain that information from another source); *RxUSA Wholesale, Inc. v. McKesson Corp.*, No. CV 06-4343 (DRH) (AKT), 2007 WL 1827335, at *2-6 (E.D.N.Y. June 25, 2007) (granting plaintiff leave to take 17 additional depositions where damages were alleged to be over $50 million, discovery had already begun, case involved complex legal issues, and plaintiff had identified proposed deponents and likely testimony in sufficient detail); *Del Campo v. Am. Corrective Counseling Servs., Inc.*, No. C-01-21151 JW (PVT), 2007 WL 3306496, at *5 (N.D. Cal. Nov. 6, 2007) (granting leave to take 23 depositions in putative class action against 11 defendants alleging violations of the Fair Debt Collection Practices Act for conduct occurring as far back as 1997 and where the sale of the defendant corporation required "discovery of both the old and new owners" as well as "discovery as to the alter ego liability of the various entities [the defendant] split itself into").

[3] Several witnesses—Linda Engelbrecht, Walter Forwood, Mike Mills, David Rabbe, Jon Slater, Harvey Smith, and David Wadsworth—held positions with the Debtors and with one or more of the Defendants.  None are employed or controlled by Defendants.

**SIDLEY**

The Honorable Christopher S. Sontchi
March 30, 2020
Page 4

is already intending to take)". (*See* Trust's Opp. to Dep. Mot. at 2, 7, 17, 22 [Adv. D.I. 165].) As Exhibit D shows, each of the witnesses Defendants' seek to depose has critical non-cumulative evidence concerning relevant transfers and Maxus' corporate history and management during the distinct YPF (1995-95) and Repsol Eras (1999-2012), as well as information concerning Defendants' defenses. (*See* Ex. D, Nos. 1-20.). The Trust, however, has conveniently changed its mind as none of those prior witnesses (except for one Repsol witness, Pablo Blanco Perez) now appear on the Trust's Deposition Witness List. Moreover, the Trust previously argued that it can affirmatively use the testimony of previously deposed Maxus witnesses as "admissions" against Defendants, (*see* Adv. D.I. 158-3 at 9), yet it now seeks to restrict Defendants' ability to obtain deposition testimony from these very same witnesses. That position violates fundamental Due Process and would preclude Defendants from a level playing field in which all parties can rely upon and use prior deposition testimony.

*Witnesses With Relevant Testimony Concerning Debtors' Post-Repsol Era (2012-16) and Decision to File for Bankruptcy.* The Complaint asserts that the Debtors did not independently decide to file for bankruptcy protection in 2016, but that they did so merely based on the YPF Defendants' alleged domination and control and that the bankruptcy filing "was the ultimate and critical phase of the Strategy adopted as early as 1995." (Compl. ¶ 207; *see generally id.* ¶¶ 201-211.) These witnesses include the two Maxus independent directors, and Rule 30(b)(6) depositions of their lawyers (Morrison & Foerster LLP) and financial advisors (Zolfo Cooper, LLC). Both of these advisors are also referenced in the Complaint, (*e.g. id.* ¶¶ 202-205), and will provide evidence directly related to whether they acted independently, exercising professionalism and good faith without undue influence from the YPF Defendants. These are highly relevant and necessary witnesses, who also were identified by Defendants and the Trust in their written discovery. (*See* Ex. D.)

*Witnesses With Relevant Testimony Concerning Alleged Alter-Ego Liability, Damages and Other Issues.* Defendants also seek to depose, via Rule 30(b)(6) depositions, four creditors with whom the Debtors settled and allowed environmental liability claims involving massive damages. The Trust now seeks to impose 100% of the responsibility for these claims on Defendants via its alter-ego theory. The YPF Defendants must be able to depose these witnesses (as well as others) regarding such environmental liability to defend themselves, by among other things (i) challenging whatever evidence the Trust provides regarding causation and damages, and (ii) asserting amounts that should have been subject to a contribution action on behalf of the Debtors' estates. For example, the Trust continues to press that Defendants are liable for the entirety of the environmental liabilities, rather than only for damages directly caused by Defendants' purported alter ego liability.[4] Defendants thus have the right to obtain critical

---

[4] *See, e.g.*, *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 295 (D. Del. 2000) ("[i]n order to prevail on a claim to pierce the corporate veil and hold the corporation's shareholders liable, a plaintiff must prove that the corporate form causes fraud or similar injustice"); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 229-30 (2d Cir. 2014) (holding that defendant could not be liable for the environmental liabilities of its subsidiaries that

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 5

information relevant to establishing the lack of any causal link between actions which caused environmental liability and any alleged alter ego activity, *i.e.*, Defendants' purported stripping of assets from Debtors. (*E.g.*, Compl. ¶¶ 9-10, 74, 127, 220.)  In addition, likely subject areas of testimony also include such topics as the reasonableness and propriety of amounts purportedly expended; the remedial design leading to these expenses; Tierra's amount of culpability relative to other potentially responsible parties ("PRPs") and the Debtors' and Trust's failure to mitigate;[5] Tierra's taking ownership of the site for remediation purposes; Tierra's taking active measures to remove materials and prevent further contamination from the site; state of remediation at the time YPF acquired Maxus; and Tierra's historic cooperation with the EPA on removal and remediation during the relevant time periods. (*See* Ex. D; *see also* 42 U.S.C. § 9613(f)(1) (authorizing allocation of CERCLA liability among PRPs); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204 (3d Cir. 2010) (CERCLA liability properly allocated among PRPs).)

The Trust denies that Defendants have the ability to challenge the merits of these creditors' claims because the Court found the Chapter 11 Plan was the culmination of good faith, arm's-length negotiation, and thus should not be able to take any discovery on these issues. (Ex. C at 2.)  The Trust is wrong.  Art. XV.P of the Chapter 11 Plan clearly and unambiguously provides that "[n]either the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan . . . ." [D.I. 1451].  *See, e.g.*, *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362, 363 (E.D. Pa. 1996) ("Confirmed bankruptcy plans are binding contracts that must be interpreted in accordance with applicable contract law. . . . The paramount consideration of the court is to ascertain and give effect to the contracting parties' objective manifested intent.").  Moreover, at the confirmation hearing, the YPF Defendants' counsel specifically reiterated the importance of this very provision to the YPF Defendants in resolving differences with the Debtor regarding the Plan. (Hr'g Tr. 84:13-21, 84:23-85:2 (May 22, 2017) [D.I. 1475]).  This carve-out means what it says, and expressly preserved the rights of the YPF and Repsol Defendants to litigate these issues in any action brought against them.  Moreover, the amounts in those proofs of claim were admittedly the result of a settlement, not proven damages. (Ex. C at 2.)  Such discovery is clearly relevant and essential to Defendants' ability to defend themselves. (*See* Ex. D.)

---

arose prior to its control over them because "there is nothing in the record to suggest [predecessor] was directing the creation of coal tar at the subsidiaries prior to purchasing them").

[5] The Chapter 11 Plan for the Debtors specifically provided the Trust with the ability to pursue contribution claims against more than 25 PRPs (*see* Amended Chapter 11 Plan, Art. IV.H [D.I. 1451]), and Defendants have the right to obtain evidence regarding the Trust's failure to properly mitigate damages in that regard.  Indeed, the EPA's last Record of Decision in March 2016 noted that there were at least 8 contaminants requiring dredging to remediate the Passaic River, only two of which (Dioxin and an herbicide, DDT) were manufactured at the Lister Site by Debtors or their predecessors in interest.  *See* EPA March 2016 ROD (https://semspub.epa.gov/work/02/396055.pdf, at § 5.2); Compl. ¶¶ 42-47.  The remaining contaminants were manufactured, transported and/or used by other PRPs.

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 6

*Additional Depositions and Triggering Creditors*. Defendants and Trust reserved the right to depose additional witnesses as discovery continues and the parties identify trial witnesses who may not have been deposed. (*See* Ex. A, B.) For judicial efficiency's sake, Defendants proposed adding 4 additional placeholder slots for additional depositions to avoid having to return to the Court with another application for additional depositions to the extent possible. In addition, the total number of depositions above does not include the 60 potential triggering creditors identified by the Trust in its interrogatory responses. The parties have agreed to put depositions of triggering creditors on a separate track, wherein the Trust will identify relevant triggering creditors during the fact discovery period and with sufficient time to allow the Defendants to depose such creditors, which the Trust agreed do not count toward the total number of depositions Defendants are seeking in this letter. (*See* Email from M. Nicholson to S. Choi, *et al.* (Mar. 30, 2020) [attached hereto as Exhibit J].) However, the Defendants also seek a Rule 30(b)(6) deposition of the IRS, which has relevant information regarding the fair market value of certain transfers (*see* Compl. ¶ 91), and from whom facts are required as to whether its purported 10-year look-back period for fraudulent transfers applies in this case. (*See* Ex. D, No. 31.) In sum, the Defendants respectfully submit the Court should grant the Defendants leave to take an additional 25 depositions pursuant to FED. R. CIV. P. 30(a)(2), for a total of 35.[6]

**The MoFo Report**. In its Complaint, the Trust cites to and relies on a 196-page report prepared by Morrison & Foerster and Zolfo Cooper, dated May 16, 2016, called the "MoFo Report." (Compl. ¶ 204). Given this reliance, which is a clear and unequivocal waiver of any privilege that may have attached to the MoFo Report, the YPF Defendants requested that the Trust produce "all drafts as well as the final copy of the MoFo Report." (*See* YPF Defendants' First Set of Requests for the Production of Documents to Maxus Liquidating Trust, Request No. 36 (May 20, 2019) [attached hereto as Exhibit E].) The Trust has improperly refused to produce the MoFo Report, arguing that its reliance on it in the Complaint "does not constitute 'heavy' use of the Report" and that "the content of the MoFo Report does not relate to the Trust's claims, nor has the Trust attempted to use the contents of the Report to establish any element of any claim or defense" such that it did not waive privilege. (Ex. C at 5.)

Under applicable law, "the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992); *accord, e.g.*, *Net2Phone, Inc. v. Ebay, Inc.*, 2008 WL 8183817, at *11-12 (D.N.J. June 26, 2008) (privilege waiver found where plaintiff disclosed and disseminated conclusions of report); *In re Intel Corp. Microprocessor Antitrust Litig.*, 2008 WL 11233766 (D. Del. Mar. 6, 2008), *adopted*, 2008 WL 11233766 (D. Del. Mar. 20, 2008). Indeed,

---

[6] The parties agreed to meet and confer regarding the schedule once the Court resolves the discovery matters raised in their respective letter briefs. We do note, however, that in light of the worldwide Covid-19 pandemic, and various shelter in place orders and restrictions on travel in the U.S., Argentina and Spain, an appropriate amount of additional time will need to be added to the schedule for this reason as well.

# SIDLEY

where a party has injected potentially privileged information into litigation, it is not permitted to assert privilege and prevent the opposing party from obtaining discovery into such information; the party may not use privilege as both a sword and a shield. *See Smith v. Alyeska Pipline Serv. Co.*, 538 F. Supp. 977, 979 (D. Del. 1982) (privilege may be waived where advice of counsel is deliberately injected into the case); *see generally Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259-60 (Del. 1995). The rationale for finding a waiver in such circumstances is even greater where "the partial disclosure place[s] the party seeking discovery at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information." *Tackett*, 653 A.2d at 260; *cf. Gtech Corp. v. Scientific Games Int'l, Inc.*, No. 04-138, 2005 WL 8170733, at *1-2 (D. Del. July 11, 2005) (finding privilege waiver where party disclosed and relied on the content of the opinion of counsel and ordering production of counsel's opinion).

Here, the Trust has disclosed certain content of the MoFo Report in the Complaint and used it to bolster its claims concerning the YPF Defendants' alleged conduct. The Trust alleges that the MoFo Report concluded that "if a court were to look at the overall history and pattern of parent corporation conduct from YPF's acquisition of Maxus and Tierra in 1995 through 2016, there [is] a reasonable likelihood that the court would find alter ego liability." (Compl. ¶ 204.) Then, in criticizing the proposed settlement of the Debtors' claims against the YPF Defendants (which was ultimately rejected) as "far below the reasonably equivalent of the claims" and in describing the "'settlement' . . . [as] the centerpiece of the YPF-sponsored Chapter 11 Cases and the final piece of YPF and Repsol's Strategy to walk away from the Debtors' enormous environmental liabilities without having to face any legal consequences," the Trust *again* invokes the MoFo Report and relies on its conclusion that there is a "reasonable likelihood" that YPF could be found liable under an alter ego theory. (Compl. ¶ 205.) The Trust goes even further in the Complaint and describes the preparation of the MoFo Report. (Compl. ¶ 202; *see also* Amended Disclosure Stmt. for the Amended Chapter 11 Plan, at 38-39 (Apr. 24, 2017) (discussing scope of investigation underlying MoFo Report) [D.I. 1258-1].) Without seeing these documents, the YPF Defendants have no ability to determine the veracity of or defend themselves against the Trust's allegations.

The Trust affirmatively used the MoFo Report, and it cannot walk away from the words in its own Complaint. Otherwise, it would be improperly allowed to use the MoFo Report as a sword to bolster its claims, while simultaneously refusing to produce drafts and a final copy of the MoFo Report to shield itself from scrutiny. The Court should not allow such an unfair and legally impermissible posture, and therefore order that the Trust produce the requested drafts and final MoFo Report to the YPF Defendants.

**Communications Withheld from Production on Common Interest Grounds**. The YPF Defendants respectfully request that the Court order the Trust to produce certain responsive

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 8

documents and communications—with the Chapter 11 Creditors' Committee and OCC—that it has improperly withheld on the basis of a common interest privilege.

Under applicable law, the party invoking the common interest doctrine bears the burden of establishing that the "(1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived." *In re Leslie Controls, Inc.*, 437 B.R. 493, 497 (Bankr. D. Del. 2010). The common interest of the parties must be "at least a substantially similar legal interest," and "[w]hen the interests of the parties diverge to some extent the common interest doctrine applies 'only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests ... lose any privilege.'" *Id.* at 496-97 (citations omitted). As such, where, as here, parties negotiate a settlement and plan in the context of bankruptcy proceedings, a common legal interest may not arise until they have "agreed upon material terms" of said agreement. *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *5 (Bankr. D. Del. Feb. 3, 2011) ("Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan."). Additionally, where parties that have shared privileged communication later memorialize their "common legal interest" in a written agreement, "the lack of an agreement" for prior periods may serve as "evidence of the lack of a shared interest" during that earlier period. *TC Tech. LLC v. Sprint Corp.*, No. 16-cv-153-RGA, 2018 WL 6584122, at *5 (D. Del. Dec. 13, 2018).

*Category 7 – Communications in 2016 between the Debtor and counsel and advisors for the Chapter 11 Creditors' Committee*. Category 7 of the Trust's amended categorical privilege log, dated February 18, 2020 (the "Trust's Amended Log") (*see* Letter from Matt Nicholson to Marissa Alter-Nelson, *et al.*, Ex. B (Feb. 18, 2020) [attached hereto as Exhibit F]), contains "[c]ommunications between, or documents prepared jointly among, Debtors and/or the Special Independent Directors and counsel and advisors for the Official Committee of Unsecured Creditors relating to administration of the Chapter 11 Cases, plan modification, and corporate governance issues" between August 19, 2016, and December 15, 2016. (Ex. F at 11.) Both as a matter of law and fact, there is no basis for the Trust to withhold these materials from production, as the Debtors and/or the Special Independent Directors, on the one hand, and counsel and advisors to the Creditors' Committee, on the other hand, did not share a common interest in 2016. Accordingly, the Trust should be ordered to produce these materials.[7]

---

[7] The documents reflected in Category 7 are responsive to a number of the YPF Defendants' requests for production. Indeed, the Trust does not dispute that the documents are responsive to one or more of the YPF Defendants' requests; the very fact that the Trust logged these documents demonstrates that these documents are, in fact, responsive and should have been produced but for the Trust's (unsupported) privilege assertion.

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 9

Between August 19, 2016, and December 15, 2016, the Debtors and the Creditors' Committee did not share "substantially similar legal interest[s]" as required for invoking the common interest privilege. To the contrary, the Debtors and the Creditors' Committee were adverse to one another in these proceedings during that time. Following an extensive investigation of potential claims the Debtors may have against the YPF Defendants, on June 15, 2016, the Debtors and the YPF Defendants "reached a settlement of all the Debtors' claims against the YPF Defendants [for $130 million] and executed a settlement agreement on June 17, 2016" (the "YPF Settlement Agreement"). (Amended Disclosure Stmt. at 39 [D.I. 1258-1]. In approving the YPF Settlement Agreement, the Debtors' independent directors stated that they "believed the [$130 million] settlement represented reasonable value for contingent and unliquidated claims and would eliminate burdens, expense, uncertainty, and delay of litigation." (Amended Disclosure Stmt. at 55.) On August 29, 2016, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking an order approving the settlement with YPF (the "9019 Motion"). [*See* D.I. 300]. On December 29, 2016, the Debtors filed a plan for liquidation, which incorporated the YPF Settlement Agreement. (Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, *et al.* [D.I. 697] (the "Initial Plan").)

The Creditors' Committee vociferously objected and moved to oppose the YPF Settlement Agreement and the Initial Plan. Based on its own, separate investigation of the Debtors' potential claims against the YPF Defendants, the Creditors' Committee (comprised of OCC, and other PRPs) took the position that "the YPF Settlement Agreement was grossly inadequate and fell well below the range of reasonableness." (*See* Amended Disclosure Stmt. at 44, 52.) The Creditors' Committee made its objections in this regard "clear" and "vigorously opposed" the proposed YPF settlement and the Initial Plan. (*See* Amended Disclosure Stmt. at 54, 55.) In light of these and other objections, on April 24, 2017—more than four months after the December 15, 2016 end date for Category 7 documents of the Trust's Amended Log—the Debtors withdrew the 9019 Motion [*see* D.I. 1260] and abandoned the Initial Plan. Up and until that point, there can be no argument that Debtors and Creditors' Committee shared a common interest—they were in fact adverse*,* a fact confirmed by a March 1, 2017 letter confirming their opposition to Debtors' plan. (*See* Letter from Adam C. Harris to Bradley I. Dietz and Theodore P. Nikolis (Mar. 1, 2017) [attached hereto as Exhibit G].)

It was only after the withdrawal of the motion that the Debtors and the Creditors' Committee became aligned, and pursued a different plan, favored by the Creditors' Committee, that would not include a settlement of the Debtors' potential claims against the YPF Defendants. In recognition of the Debtors' changed strategy and realignment of legal interests, the Trust, the Debtors, the Creditors' Committee, and OCC entered into a joint defense and common interest agreement, entered into on July 14, 2017 (the "JDA"), a copy of which is attached hereto as Exhibit H. Notably, Paragraph 15 of the JDA reads: "Each of the Parties agrees that, to the extent its attorneys have already been in communication or had any discussions with attorneys for any of the other Parties, *dating back to April 28, 2017*, about matters related to the Claims

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 10

their communications, discussions, and work product have been and are subject to the attorney-client privilege, joint defense privilege, common interest doctrine, and business strategies doctrine and are specifically incorporated herein." (Emphasis added).

In light of the history between the Debtors and the Creditors' Committee in 2016, it can hardly be argued that they shared a similar legal interest as required for the common interest privilege during the period of August 19, 2016, and December 15, 2016 (the time period at issue). Instead, the Debtors and the Creditors' Committee were directly adverse to each other until at least April 24, 2017, when the Debtors abandoned the YPF Settlement Agreement and the Initial Plan in favor of an amended plan of liquidation supported by the Creditors' Committee. To the extent there could be any question as to the adversity between the Debtors and the Creditors' Committee between August 19, 2016 and December 15, 2016, the April 28, 2017 effective date of the JDA—just four days after the Debtors withdrew their 9019 Motion for approval of the YPF Settlement Agreement—serves as additional evidence of the absence of a prior common interest. *See TC Tech. LLC v. Sprint Corp.*, No. 16-cv-153-RGA, 2018 WL 6584122, at *5 (D. Del. Dec. 13, 2018). Indeed, unlike the parties in *In re Leslie Controls, Inc.*, where the Court found the parties' alignment against an insurer created a common interest, here, Debtors and the Creditors Committee were not aligned against YPF prior to April 24, 2017. 437 B.R. at 502. Instead, as evidenced by the YPF Settlement Agreement, Debtors were aligned with the YPF Defendants with whom they were negotiating a settlement during that period—not the Creditors Committee, who opposed any settlement with YPF. As such, the Court should order the Trust to produce the documents withheld in Category 7.

*Communications between the Petition Date and April 28, 2017, Among the Debtors, MoFo, Zolfo, OCC, and White & Case*. For similar reasons, the YPF Defendants respectfully request that the Court compel the Trust to produce the documents recorded in Category 9 of the Trust's Amended Log. Category 9 of the Trust's Amended Log concerns "[c]ommunications and/or documents relating to environmental liabilities shared by Debtors and OCC, related remediation obligations and expenditures, and/or Site Transition Agreement" for the period June 19, 2016, through March 27, 2017 among the Debtors, MoFo, Zolfo, OCC, and White & Case. (Ex. F at 12.) The Trust's claim that that the communications in Category 9 among these separate parties are protected from disclosure by a common interest privilege is erroneous.

First, prior to at least the Debtors' withdrawal of their 9019 Motion on April 24, 2017, OCC's legal interests were adverse to the Debtors' legal interests. Much like the Creditors' Committee, OCC strenuously objected to the Initial Plan and the YPF Settlement Agreement by "criticiz[ing] the neutrality and integrity of the process that produced the YPF Settlement Agreement and express[ing] dissatisfaction with the adequacy of the $130 million to be contributed by YPF to the Estates." (Amended Disclosure Stmt. at 52.) Indeed, OCC claimed that the YPF Settlement Agreement was the result of a "YPF-crafted and managed process," and demanded that "the Debtors [] stop their incessant pressing of the YPF agenda." (OCC

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 11

Objection to Debtor's Proposed Discovery Protocol, ¶ 6 [D.I. 537].)  OCC also suggested that "the $130 million settlement amount falls substantially below the lowest range of reasonableness under any analysis of the value of the claims against the YPF Entities."  (OCC Objection to Debtors' Request for Approval of the Disclosure Statement, at 10 n.7 [D.I. 844]; *see also id.* at 7-8 (criticizing the YPF Settlement Agreement for "purport[ing] to settle all of the Estates' causes of action against the YPF Entities—by far the Debtors' most valuable asset—for <u>less than one percent</u> of the total asserted amount of the Debtors' claim pool. . . . [T]he $130 million settlement amount is not even close to the lowest reasonable amount to settle those claims." (internal footnote omitted).)  In such circumstances of diametrically opposed legal interests, it can hardly be argued that the Debtors and OCC had a similar legal interest as required to establish a common interest privilege.

      Second, the lack of a shared common interest between the Debtors and OCC is also evidenced by the Site Transition Agreement, by and between the Debtors and Glenn Springs Holdings, Inc. (acting for the benefit of OCC), and executed on March 28, 2017.  On March 28 2017—just one day after the last date of the Category 9 date range—the Debtors filed a motion for entry of an order approving the Site Transition Agreement.  (Debtors' Motion for Entry of an Order Approving A Site Transition Agreement [D.I. 1069] (the "Site Transition Agreement Motion").)  Importantly, the Site Transition Agreement Motion states that the Debtors and OCC "spent the past two months negotiating the terms" of the Site Transition Agreement.  (Site Transition Agrmt. Mot. ¶ 12.)  Given that the Site Transition Agreement was not executed until March 28, 2017, and in light of the fact that the parties did not begin negotiations for the agreement until January 2017, the Trust cannot credibly claim that the Debtors and OCC shared a common interest with respect to the Site Transition Agreement and any related matters for the throughout the Trust's claimed period of June 19, 2016, to March 27, 2017.

      Third, the adverse interest between OCC and the Debtors during this period is further illustrated by the fact that OCC filed four identical proofs of claim in the amount of $579 million, plus contingent and/or unliquidated amounts, against Tierra [Claim ##316 and 408] and Maxus [Claim ##320 and 413].  Indeed, courts have stated that a proof of claim is akin to a complaint, *see, e.g.*, *Glenn v. Cavalry Investments LLC (In re Glenn)*, 542 B.R. 833, 841 (Bankr. N.D. Ill. 2016) ("The filing of a proof of claim is often likened to the filing of a complaint."); *In re Franchi*, 451 B.R. 604, 607 (Bankr. S.D. Fla. 2011) ("Courts routinely recognize that the filing of a proof of claim is analogous to the filing of a complaint . . . ."); *In re Cerrato*, 504 B.R. 23, 38 (Bankr. E.D.N.Y. 2014) ("The filing of a proof of claim is equivalent to the filing of a complaint in a civil action . . . ."), therefore, OCC and the Debtors, in effect, became a plaintiff and defendants, respectively.  As such, until the proof of claim is resolved, OCC and the Debtors remained adverse to each other and did not share a common legal interest until at least OCC's proof of claim against the Debtors was allowed.

# SIDLEY

The Honorable Christopher S. Sontchi
March 30, 2020
Page 12

      Finally, the absence of a common interest sufficient to give rise to a legal privilege among the Debtors and OCC during this period is further underscored by the JDA. As noted above, the effective date of the JDA is April 28, 2017—approximately one month prior to the March 27, 2017 end date for Category 9. The facts that (i) the parties did not have a prior joint defense agreement and (ii) the parties deliberately chose to make the JDA effective as of April 28, 2017, strongly suggest that OCC and the Debtors did not share a common legal interest before April 28, 2017. *TC Tech. LLC v. Sprint Corp.*, No. 16-cv-153-RGA, 2018 WL 6584122, at *5 (D. Del. Dec. 13, 2018). Accordingly, as OCC and the Debtors had "opposing interests" during this time period, and Debtors cannot establish a sufficiently common legal interest to assert a privilege over their communications during the relevant time period, the YPF Defendants request that the Court order the Trust to produce the documents in Category 9 of the Trust's Amended Log.

      **Return of Laptops**. The YPF Defendants request that the Trust be directed to return to YPF at least 9 laptops that are the property of YPF. The Trust concedes the laptops belong to YPF in its Complaint. (Compl. ¶ 178 n.12 ("At least three of those laptops are now in the Liquidating Trust's possession. The Liquidating Trust also has email traffic sent by Maxus employees to their *personal YPF email address*.") (emphasis added); *id.* ¶ 178 ("*YPF-specific laptops*" were used "to connect to the *YPF server* and communicate with *YPF headquarters*.").) In its February 18, 2020 letter to the YPF Defendants, the Trust further confirmed that the laptops in question are "YPF Laptops" and do not belong to the Debtors. (Ex. F at 2.) YPF previously demanded the return of the YPF laptops after the Trust had sufficient time to image them (*see* Email from Rachel M. Fritzler to Laurent Lantonnois van Rode, *et al.* (Feb. 7, 2018) [attached hereto as Exhibit I]), which the Trust clearly has done. There is no legitimate reason why YPF's property should not be returned to it.

      *    *    *

      We thank the Court for its attention to these matters, and are prepared to address these and any other matters if the Court wishes to receive oral argument.

      Respectfully submitted,

      */s/ John J. Kuster*

      John J. Kuster