

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
+1 212 839 5300
+1 212 839 5599 FAX

+1 212 839 7336
JKUSTER@SIDLEY.COM

AMERICA • ASIA PACIFIC • EUROPE

April 10, 2020

**By ECF**

The Honorable Christopher S. Sontchi
United States Bankruptcy Court for the District of Delaware
824 North Market Street
5th Floor
Wilmington, DE 19801

Re:    *Maxus Liquidating Trust v. YPF S.A., et al.*, Adv. Pro. 18-50489 (Bankr. D. Del.)

Dear Judge Sontchi:

The YPF Defendants respectfully submit this letter in response to the March 30, 2020 discovery letter filed by the Trust (the "Trust Mar. 30 Letter" [Adv. D.I. 216].)  The YPF Defendants are keenly aware of the impact that the Covid-19 pandemic is having not only here in the United States, but also in Argentina and Spain.  We are pleased to see that the Trust has acknowledged the impact of this crisis and the need for "greater flexibility, efficiency and mutual consideration" in managing this matter going forward.  (Trust Mar. 30 Letter at 1.)  Indeed, the pandemic has not only taken an immense human toll, but also an economic one that has yet to play out fully.  We also are cognizant of this Court's recent order delaying any non-essential hearings until after May 1.  *In re Amended Order Governing the Conduct of Hearings Due to Coronavirus Disease 2019 (COVID-19)* (Bankr. D. Del. Mar. 31, 2020).  The unprecedented financial challenges energy companies like the YPF Defendants (and creditors like OCC) are now facing cannot be ignored as the parties move forward in litigating this case.[1]  The "greater flexibility" the parties must exercise must recognize this new reality, and allow them to focus on doing everything they can to manage their way through this worldwide pandemic first and foremost in the near term.  After the Court resolves their discovery disputes, the parties must negotiate a schedule that takes into account the far-reaching effects of this unprecedented crisis.

All of that, however, does not mean that the Trust can seek to prejudice the YPF Defendants by precluding them from obtaining documents and testimony necessary to defend

---

[1] *See, e.g.*, Shreyansi Singh & David Goodman, *Coronavirus Crisis a 'Game Changer' for Oil Sector:  Goldman Sachs*, Reuters, Mar. 30, 2020, *available at* https://www.reuters.com/article/us-global-oil-research-goldman/coronavirus-crisis-a-game-changer-for-oil-sector-goldman-sachs-idUSKBN21H197?rpc=401& (last accessed Apr. 9, 2020) ("Oil has been hit disproportionately by the 'coronacrisis', sending landlocked crude prices into negative territory, Goldman said. . . . The bank also said that demand from commuters and airlines, which account for about 16 million barrels per day of global consumption, may never return to their previous levels.").

The Honorable Christopher S. Sontchi
April 10, 2020
Page 2

themselves.  As we explained in our March 30 Letter (the "YPF Mar. 30 Letter" [Adv. D.I. 217]), the YPF Defendants already were exercising flexibility and efficiency with respect to discovery in this case before the Covid-19 crisis.  The YPF and Repsol Defendants together considerably narrowed the number of depositions from the New Jersey Action they need to re-take in this case.  But fundamental fairness and due process mandate that the YPF Defendants be allowed to obtain the critically necessary evidence required to defend themselves from all of the Trust's allegations, which span over two decades, implicate numerous individual transfers at significantly different times, with different witnesses with separate knowledge as to each alleged alter-ego conduct spanning different eras of ownership, and liability for what the Trust claims could amount to $14 billion in damages.  (*See* YPF Mar. 30 Letter at 2; *id.* Ex. D.)[2]

**Scope of Discovery**.  The Trust takes the erroneous position that the "Court's claims allowance and settlement approvals – and its related findings – sufficiently establish the existence of valid prepetition claims against the Debtors' estates that provide *prima facie* proof of damages on the alter ego counts," and that Defendants are therefore prohibited from seeking discovery in connection with the alter ego counts.  (Trust Mar. 30 Letter at 2.)  The Trust is wrong.  Nothing in the Confirmation Order or the Plan limits the ability of the YPF Defendants to fully defend themselves, including with respect to the underlying environmental liability, which the Trust seeks to impose on the YPF Defendants via its alter-ego theory.[3]

The Trust spends considerable effort describing the process through which the Debtors settled, or allowed, Class 4 claims with various creditors for a pool asserting $700 million in damages, along with the creation of the ERRT to address unliquidated portions of underlying environmental claims which the Trust contends could run as high as $14 billion.  The Trust then declares that the Debtors settled those claims to "avoid the prospect of interminable litigation" that comes with having to litigate complex environmental claims, and OCC's indemnity claim.  (Trust Mar. 30 Letter at 2-3.)  But nothing in the Plan or under the law allows the Trust to use the allowance of those claims against the YPF Defendants here.  To be clear, the YPF Defendants are *not* challenging the legitimacy of the process by which Debtors may have settled or allowed claims ***against the Debtors and their estates***; rather, they are challenging the Trust's attempt to use those allowed claims as proof of the existence of the underlying liability and damages associated with those claims ***against the YPF Defendants***.

Nothing in the Confirmation Order or the Plan prevents the YPF Defendants from discovering relevant evidence to demonstrate the liability arising out of the underlying claims was not caused by any of the alleged alter-ego conduct, nor allows the Trust to use the settlement or allowance of any creditors' claims as "prima facie proof" of damages.  Finding H of the Confirmation Order quoted by the Trust (Trust Mar. 30 Letter at 4) makes that plain:  the Court noted the "Plan Proponents proposed the Plan with the purpose of providing for the creation of a mechanism to resolve all Claims asserted *against the Debtors*" (*id.* (emphasis added);

---

[2] All capitalized terms herein are the same as those in the YPF March 30 Letter, unless indicated otherwise.

[3] The Trust claims the YPF Defendants did not expressly raise issues regarding the scope of discovery during the meet and confer negotiations (Trust Mar. 30 Letter at 2 n.3), but that is factually wrong, as they did so in their February 18, 2020 letter to the Trust (*see* Ex. A hereto).

The Honorable Christopher S. Sontchi
April 10, 2020
Page 3

Confirmation Order [Case No. 16-11501, D.I. 1460, at finding H].)  Neither Finding H nor anything else in the Plan suggests in any way that the YPF Defendants, which were neither Debtors nor Plan Proponents, were waiving rights or compromising their ability to defend themselves against any claims that may be asserted by the Trustee at a later time.

To the contrary, as we explained in our March 30 Letter, the Plan did exactly the opposite:  Art. XV.P of the Plan plainly and unambiguously provides that "[n]either the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan . . . ."  (Plan, art. XV.P [D.I. 1451].)  Article XV.P could not be clearer that the allowance of *any* Claim—including any Class 4 or 5 Claims—shall have no effect whatsoever on the YPF Defendants, either as to liability (since under the Plan, the allowance of those claims has no "precedential, preclusive or other effect"), or serve as prima facie evidence of damages on the alter ego counts (since under the Plan the allowance of claims cannot be used "as a purported measure of any valuation or damages.").  *Id.*  Nor can the Trust rely upon an absence of an objection by the YPF Defendants to the allowance of those claims (Trust Mar. 30 Letter at 2-4), because the YPF Defendants specifically negotiated for the inclusion of that provision to make clear that the allowance of claims against any Debtor in the Plan would have zero effect on any claims against them.  In light of Article XV.P, the YPF Defendants had no reason to oppose the Plan based on the allowance of any claims.[4]  (*See* Ex. B hereto.)

The Trust contends that Article XV.P was merely a "reservation[] of rights" provision that precluded "*res judicata* application of the allowance of claims," and that the settlements reached in the Plan were the result of good faith negotiations between the Debtors and creditors.  (Trust Mar. 30 Letter at 4.)  Tellingly, however, the Trust never quotes from the unambiguous language of Article XV.P, nor provides any explanation of why, if it was meant to allow the Trust to establish a "prima facie" case for damages against the YPF Defendants, the Plan provides the opposite.  Moreover, far from limiting the provision to preclusive effect (i.e. *res judicata*) alone, Art. XV.P goes beyond that concept to eliminate any precedential or other effect from the allowance of any Claims.  In other words, Article XV.P made sure the YPF Defendants' rights to fully defend themselves against all claims of liability and damages would not be hamstrung in any way by the allowance of any Claims in the Plan.  That includes challenging

---

[4] *See In re Lason, Inc.*, 300 B.R. 227, 231 (Bankr. D. Del. 2003) (concluding that where confirmation order reserved for secured lender "all claims, rights remedies, causes of action and defenses under the Credit Facility loan documents and related agreements . . . and otherwise with respect to the sale proceeds," secured lender was permitted to challenge valuation of its collateral that had been set by the plan) (alterations incorporated); *see also Stanziale v. Cayre (In re Dwek)*, Adv. No. 08-1201, 2012 WL 6011625, at *4 (Bankr. D.N.J. Dec. 3, 2012) (finding that where order approving settlement provided that it "shall in no way be deemed of preclusive effect with respect to D & D Trust's litigation against third parties, including but not limited to Kenneth Cayre, KLCC Investments, LLC and/or the KLC Foundation set forth in the D & D New York Litigation," the order "ma[de] clear that D & D was not abandoning its interest in the Securities as the consideration for the settlement" and therefore *res judicata* and judicial estoppel did not preclude D & D from litigating its interests in the Securities), *aff'd*, No. 07-11757 KCF, 2013 WL 6199259 (D.N.J. Nov. 27, 2013).

The Honorable Christopher S. Sontchi
April 10, 2020
Page 4

any causation and damages issues associated with the underlying environmental liabilities.  (*See* YPF Mar. 30 Letter at 4-5; *id.* Ex. D.)

The Trust also contends that Defendants should not be permitted to engage in any discovery regarding the underlying environmental claims, or any other creditor claims, because "[t]his litigation is about the harm all creditors suffered derivatively by virtue of the Defendants' abuse of the Debtors' corporate form and their siphoning of the Debtors' assets."  (Trust Mar. 30 Letter at 3.)  If this Court takes that as true, and determines that this litigation of the Trust's alter-ego claims is only about asset-stripping, then by the Trust's own concession, the Trust must be limited to fraudulent transfer damages.  It could not seek to impose 100% liability for all of Debtors' creditors' claims on the YPF Defendants via its alter-ego claim, especially when the lion's share of the liability arises from pollution admittedly caused by Maxus's predecessor (now part of OCC) for decades before YPF acquired Maxus in 1995.[5]  Indeed, imposing the alter-ego liability on Defendants for the entirety of Debtors' purported $14 billion in damages is patently improper, because Maxus *never* had the assets to satisfy such a quantum of damages before YPF's acquisition, especially when Maxus at that time was carrying close to $1 billion in debt.  Under no circumstances is the Trustee entitled to that kind of windfall.

The Trust further relies on this Court's observation that it would be "inequitable to have a collective proceeding and not to allow the creditors to proceed collectively."  (Trust Mar. 30 Letter at 4.)  But that principle underscores exactly why the Trust should ***not*** be allowed to seek to collect on each of the individual creditors' alleged damages via its alter-ego claim.  The only *collective* harm common to all creditors allegedly caused by the alleged misconduct is that assets were purportedly "siphoned" away from Debtors to avoid environmental (and other) liabilities.  Accordingly, the collective damages from the alter-ego action should be limited to the amount necessary to make them whole, *i.e.*, where they would have been had the assets not been purportedly removed from Debtors for less than fair value.  Whatever that amount may be, it certainly is not equivalent to 100% of the damage generated by pollution released by Debtors' predecessor (now part of OCC) long before the YPF Defendants acquired Maxus in 1995.[6]  To the extent to which the Trust continues to suggest the YPF Defendants must pay the sum of all of the damages sought by each and every single one of the Debtors' creditors, however, each of the Debtors' creditors' individual claims is an input to the total amount of damages the Trust seeks for its alter ego claim.  The only way in which the YPF Defendants could possibly defend themselves against such claims is to engage in discovery that will lead to admissible evidence concerning issues of liability, causation and the calculation of each individual creditor's claim for damages, all of which add up to the total amount of damages sought by the Trust.

**Number of Depositions**.  In their March 30 Letter, the YPF Defendants demonstrated that pursuant to FED. R. CIV. P 30(a)(2) and 26(b)(1), this Court should grant the Defendants

---

[5] To be clear, the YPF Defendants still require certain discovery from witnesses relating to environmental liabilities and potential remedies.  For example, those topics will be covered in depositions since they relate to what the YPF Defendants knew about them in 1995 and thereafter, how remediation options evolved, communications and planning of the EPA, and other similar topics.  Such evidence goes to their knowledge and intent relating to the Trust's actual fraudulent transfer claims, as well as to the alleged alter ego claim.

[6] *See also* YPF Mar. 30 Letter at 4-5 & n. 4 and cases cited therein.

The Honorable Christopher S. Sontchi
April 10, 2020
Page 5

leave to take the 25 additional depositions they need to defend themselves against the Trust's expansive Complaint, for a total of 35 depositions. That number is both proportionate and measured in light of the fact that the Complaint spans more than two decades, involves numerous transfers and alter ego allegations over multiple ownership regimes, involving well over 100 potential witnesses, and seeks up to $14 billion in damages. (YPF Mar. 30 Letter at 1-6.) Defendants also initially sought to save the parties substantial time, money and effort by utilizing the depositions taken in the New Jersey Action as if taken in this case, but the Trust objected, and the Court denied Defendants' request to do so. (*See* Adv. D.I. 165, 193.) Thereafter, Defendants carefully scrutinized the record in the case thus far, and limited their request to use deposition testimony to only 20 of the more than 50 witnesses who were deposed in the New Jersey Action, provided the Trust with a list of those deponents, and renewed their request that the Trust consent to use just those depositions as if taken in this action. The Trust again refused and told the Defendants to take their request to the Court, which they did.

Despite its pre-letter positions, the Trust now appears to propose that the parties should deal with the 20 previously deposed witnesses "on a witness-by-witness basis, for instance by agreeing to designate and counter-designate the relevant transcripts and thereby narrow the number of witnesses as to whom re-deposition would be needed or desirable." (Trust Mar. 30 Letter at 12.) The Trust further appears to concede that there is no reason to re-create the record "from scratch," and that witnesses' recollections are better preserved in those transcripts than they would be if deposed anew. *Id.* The Trust notably does not contest, because it cannot, that the depositions of these 20 witnesses contain relevant testimony. (*See* YPF Mar. 30 Letter, Ex. D.) And while it is trying to appear magnanimous by suggesting that the New Jersey depositions be available for summary judgment purposes (Trust Mar. 30 Letter at 11-12), it critically still refuses to allow Defendants the ability to use that testimony at trial. Frankly, it is astounding to see the Trust's about-face when it comes to the use of the New Jersey deposition transcripts in this action and their misrepresentation to the Court that "the Defendants have not once tried to engage with the Trust . . . on a witness-by-witness basis." *Id.* at 12. The Defendants offered to exchange proposed designations for the New Jersey depositions they sought to use in September 2019 (*see* Ex. C hereto (attachments omitted)), and during subsequent meet and confer conference calls, but the Trust flatly refused.[7] The YPF Defendants have always sought to avoid the time, money and expense of retaking the depositions from New Jersey, and the Trust could have simply sent an email or picked up the phone to tell us about their new-found willingness to exchange designations and avoid the need to re-take those 20 depositions.

---

[7] The Trust also suggests that the Defendants are continuing to ask for a "blanket rule" about the admissibility of that testimony at trial. (Trust Mar. 30 Letter at 12.) That is simply wrong. The Defendants always have limited their request for the New Jersey Depositions to be considered as if taken in this proceeding, preserving all parties' other objections to admissibility. (*See* Adv. D.I. 165, 193.) Moreover, the Trust's reliance on the Defendants' position in the original Deposition Motions is wrong and entirely misleading, as the Defendants have made numerous attempts to address both the number of depositions and other deposition protocol issues with the Trust, to no avail. And as the record shows, Defendants are not seeking to re-depose 50 witnesses from the New Jersey Action; they are seeking to depose only 20 of those witnesses. (YPF Mar. 30 Letter at 3-4.)

The Honorable Christopher S. Sontchi
April 10, 2020
Page 6

In any event, in light of the Trust's new-found position, Defendants recently provided the Trust with four of the relevant deposition transcripts as exemplars to see whether an agreement could be reached. The Trust indicated it was willing to meet and confer early next week regarding deposition designations, and Defendants suggested postponing their letter responses until first having done so, but the Trust refused notwithstanding this Court's May 1 Order and the waste of judicial resources. (*See* Ex. D hereto.) To the extent the parties can reach an agreement on the use of deposition transcripts, it will reduce the number of depositions that Defendants will require. However, it is important to re-emphasize that the YPF Defendants cannot be boxed into either waiving their ability to obtain evidence needed to defend themselves, or rolling the dice on calls about whether those depositions can be used in this case after the close of discovery, when it will be too late to obtain that evidence. The YPF Defendants respectfully submit that the Court should grant Defendants' request to take 25 additional depositions (for a total of 35), and if the parties reach agreement on the use of any of the New Jersey deposition transcripts, that number will be reduced accordingly. Defendants clearly demonstrated their need for these depositions in this case, and there is no need to return to the Court for more guidance later. Accordingly, the YPF Defendants submit that the Court should grant them leave to take up to an additional 25 depositions necessary for their defense, to be reduced only if the parties reach an agreement on the use of the 20 New Jersey depositions in this action.

**Communications Withheld from Production by the Trust**. The YPF Defendants demonstrated that the Trust improperly withheld documents based on a common interest privilege with respect to (i) communications in 2016 between the Debtors and counsel and advisors for the Chapter 11 Creditors' Committee (Category 7 of the Trust's Amended Log) and (ii) communications between the Petition Date and April 28, 2017, among the Debtors, MoFo, Zolfo, OCC and White & Case (Category 9 of the Trust's Amended Log). (YPF Mar. 30 Letter at 7-11.) In its Letter, the Trust ignores the clear law on common interest, arguing that the communications are privileged because "they relate to the preservation and maximization of the estate's main asset—the causes of action against the Defendants." (Trust Mar. 30 Letter at 9.) The Trust's argument is this regard is legally and factually flawed. The law requires that the parties share a "substantially similar legal interest," *In re Leslie Controls, Inc.*, 437 B.R. 496, 497 (Bankr. D. Del. 2010), and the record demonstrates that they did not. As the YPF Defendants showed, during the time periods identified for the relevant categories of the Trust's Amended Log, the Debtors, on the one hand, and the Creditors' Committee and OCC, on the other hand, were ***directly adverse***, with the Creditors' Committee and OCC challenging the YPF Settlement Agreement and the Initial Plan, which the Debtors had favored and negotiated. (*See* YPF Mar. 30 Letter at 10.)

The Trust does not and cannot dispute these facts, and its reliance on this Court's decision in *In re Leslie Controls* is clearly misplaced. (*See* Trust Mar. 30 Letter at 9-10.) In that case, Your Honor found the parties' alignment *against an insurer* created a common interest. *In re Leslie Controls*, 437 B.R. at 502. Here, however, the Creditors' Committee and OCC were adverse to the Debtors and affirmatively opposed any settlement with the YPF Defendants

The Honorable Christopher S. Sontchi
April 10, 2020
Page 7

during the relevant time period.[8]  As Your Honor made clear, "[w]hen the interests of the parties diverge to some extent the common interest doctrine applies 'only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests . . . lose any privilege.'"  *Id.* at 497.  Given that the Debtors, the Creditors' Committee and OCC did not share a sufficiently similar legal interest for the "preservation and maximization of . . . the causes of action against the Defendants," *id.* at 496-97, during the relevant time periods, they cannot establish the basis for a common interest privilege.[9]

Accordingly, with respect to **Category 7** of the Trust's amended privilege log, the common interest privilege is inapplicable to communications between Debtors and the Creditors' Committee regarding "the adminsitration [sic] of the Chapter 11 Cases, plan modifications, and corporate governance issues" between August 19, 2016 and December 15, 2016.  Indeed, as discussed in the YPF March 30 Letter, these documents were created more than four months before the Debtors withdrew the 9019 Motion on April 24, 2017, and during a period in which the Creditors' Committee (i) actively objected to the progress of the Chapter 11 Cases, (ii) demanded plan modifications wholly at odds with the Initial Plan favored by the Debtors, and (iii) believed that the Debtors lacked appropriate governance notwithstanding the installation of two independent directors.  (YPF Mar. 30 Letter at 9.)

For similar reasons, the Trust's claim in **Category 9** of its amended log that a common interest existed between the Debtors and OCC in connection with "environmental liabilities shared by Debtors and OCC, related remediation obligations and expenditures, and/or Site Transition Agreement" between June 19, 2016 and March 27, 2017 (one day before the Site Transition Agreement was executed, and one month before the withdrawal of the 9019 Motion), is unfounded; not only were the Debtors and OCC opposing each other with respect to the conduct and progress of the Chapter 11 proceedings, but OCC had been actively suing the Debtors in the New Jersey Action for years regarding environmental liabilities and remediation

---

[8] *See, e.g.*, Amended Disclosure Stmt. at 44, 52 (stating that the Creditors' Committee (comprised of OCC and other PRPs) took the position that "the YPF Settlement Agreement was grossly inadequate and fell well below the range of reasonableness."); *id.* at 54, 55 (noting that the Creditors' Committee "vigorously opposed" and made its objections to a settlement with the YPF Defendants "clear"); *id.* at 52 (stating that OCC objected to the Debtors' potential settlement with the YPF Defendants and "criticized the neutrality and integrity of the process that produced the YPF Settlement Agreement and expressed dissatisfaction with the adequacy of the $130 million to be contributed by YPF to the Estates.").

[9] *See also In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *5 (Bankr. D. Del. Feb. 3, 2011) ("Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan.").  The Trust's reliance on *In re Cherokee Simeon Venture I, LLC*, No. 12-12913 (KG), 2012 Bankr. LEXIS 6194 (Bankr. D. Del. May 31, 2012) (Trust Mar. 30 Letter at 9) for the proposition that "a formal joint defense agreement is not a prerequisite to a valid claim of common interest privilege" is irrelevant here.  That Court's actual holding makes the YPF Defendants' point:  the common interest privilege is "[d]esigned to protect the free flow of information where parties have ***undertaken a joint strategy or defense***." *Id.* at *2 (emphasis added).  This is not a scenario where the parties did not have a joint-defense agreement at all—they entered into one ***after*** they became aligned.  In that scenario, the law is clear that where parties that have shared privileged communications later memorialize their "common legal interest" in a written agreement, "the lack of an agreement" for prior periods may serve as "evidence of the lack of a shared interest" during that earlier period.  *TC Tech. LLC v. Sprint Corp.*, No. 16-cv-153-RGA, 2018 WL 6584122, at *5 (D. Del. Dec. 13, 2018).

The Honorable Christopher S. Sontchi
April 10, 2020
Page 8

obligations (*see, e.g.*, Compl. ¶¶ 191-192 (discussing OCC's cross-claims against Maxus in New Jersey Action regarding environmental liabilities and obligations); YPF Mar. 30 Letter at 10-12).

**The MoFo Report**. As the YPF Defendants demonstrated in their March 30 Letter, the Trust waived privilege with respect to the MoFo Report when it cited to and relied upon it in its Complaint.  (YPF Mar. 30 Letter at 6-7.)  Despite the clear waiver, the Trust contends that it is entitled to withhold production of the MoFo Report because its use of the report in the Complaint was not "heavy," its disclosure of "the contents and conclusions in the MoFo Report" was "minimal," and the YPF Defendants will not suffer "a 'distinct disadvantage'" due to the Trust's selective disclosure of it.  (Trust Mar. 30 Letter at 8-9.)  The Trust is wrong on all counts.

*First*, the law does not require "heavy" use of a privileged document to find a waiver of privilege.  To the contrary, "the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992); *accord, e.g.*, *Net2Phone, Inc. v. Ebay, Inc.*, 2008 WL 8183817, at *11-12 (D.N.J. June 26, 2008) (privilege waiver found where plaintiff disclosed and disseminated conclusions of report); *In re Intel Corp. Microprocessor Antitrust Litig.*, 2008 WL 11233766 (D. Del. Mar. 6, 2008), *adopted*, 2008 WL 11233766 (D. Del. Mar. 20, 2008).  Here, the Trust admits – as it must – that it disclosed portions of an otherwise privileged document by identifying "the contents and conclusion in the MoFo Report."  (Trust Mar. 30 Letter at 9.)

*Second*, the disclosure of "the contents and conclusions in the MoFo Report" was more than "minimal."  While the Trust claims the MoFo Report was only used to "demonstrate the conflict of interest" vis-à-vis the Debtors' special independent directors – which in and of itself is reliance on the Report – it pretends that its use ends there.  It does not.  In its Complaint, the Trust expressly describes the preparation of the MoFo Report (Compl. ¶ 202), and alleges that the MoFo Report concluded there was a "reasonable likelihood" that a court would find alter ego liability, (*id.* ¶ 204).  The Trust further alleges that the MoFo Report was evidence that the Debtors' proposed settlement with the YPF Defendants was "far below the reasonably equivalent value of the claims" and was the "final piece" of a grand "Strategy" the YPF Defendants purportedly hatched 21 years earlier (*id.* ¶ 205)—thereby making it far more than a "minimal" piece of evidence.

*Third*, the law is clear that a party may not use privilege as both a sword and a shield. *See Smith v. Alyeska Pipeline Serv. Co.*, 538 F. Supp. 977, 979 (D. Del. 1982) (privilege may be waived where advice of counsel is deliberately injected into the case); *see generally Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259-60 (Del. 1995).  Here, that is exactly what the Trust's selective disclosure of "the contents and conclusions in the MoFo Report" has done, which has the YPF Defendants at a distinct disadvantage because they will be unable to verify the conclusions of the MoFo Report or place them in the proper context.  Indeed, the YPF Defendants believe that the MoFo Report will prove that the proposed settlement was fair and reasonable under the circumstances.

**Privileged Materials Exchanged with Employees, Officers, and Directors of the YPF Defendants.**  There are at least 19 employees, officers and directors of YPFH and/or CLHH who simultaneously held similar positions at one or more of the Debtors.  This is not abnormal, and

The Honorable Christopher S. Sontchi
April 10, 2020
Page 9

under applicable law, to the extent such individuals were acting in their YPF-related capacity, privileged communications involving those individuals are properly withheld as privileged. The Trust asks the Court to vitiate the sanctity of these privileges and, without a document-by-document fact-based analysis, "rule that YPF's attorney-client privilege has been waived with respect to any communications directly with employees, directors, officers or agents of the Debtors." (Trust Mar. 30 Letter at 8.) The Trust's request for such a blanket ruling ignores applicable law, and is an impermissible way of addressing this "dual-hat" privilege issue.

The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure," including where a corporate client's agents help facilitate an attorneys' legal representation of that client. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (internal quotation marks and citation omitted). Moreover, it is "well established" that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)). In light of this corporate reality, a subsidiary's ability to invade a corporate parent's privileged communications is limited. As the Third Circuit held, "it does not break confidence to share an attorney-parent communication with an officer of the parent in her capacity as officer of the parent, even though she is also a director or officer of a subsidiary." *In re Teleglobe*, 493 F.3d at 372.[10] Here, the Trust does not dispute (because it cannot) that each of the persons it had identified as an employee, officer or director of the Debtors also held positions with one or more of the YPF Defendants. (*See* Ex. E hereto at 3-7.) As such, each of these individuals wore "two-hats." As a result, where these individuals sent or received YPF-privileged information in their YPF capacities, the applicable privilege is not waived.[11] None of the Trust's arguments to the contrary have merit.

*First*, the Trust erroneously contends that YPFH and CLHH could never assert a privilege independent of any privilege that may have belonged to the Debtors because YPFH and CLHH were "merely empty holding companies." (Trust Mar. 30 Letter at 6.) There is no support for its position that holding companies have diminished privilege protections, and the Trust cites to no law to support that argument. That is not surprising, because it is not the law. *See, e.g., In re Fundamental Long Term Care, Inc.*, 515 B.R. 874, 879 (Bankr. M.D. Fla. 2014) (rejecting argument that privilege did not attach to holding company, and refusing to order production of memo shared by persons wearing "two hats" of holding company and operating subsidiary).

---

[10] *See also Estate of Juanita Jackson v. Gen. Elec. Cap. Corp. (In re Fundamental Long Term Care, Inc.)*, 515 B,R, 874, 878-79 (Bankr. M.D. Fla. 2014) (subsidiary failed to prove waiver where a parent's privileged document was shared with persons who held positions at both the parent and subsidiary, because the document was sent to those persons in their capacity as employees of the parent); *API, Inc. v. Home Ins. Co.*, Civ. No. 09-975 (JRT/JJG), 2010 WL 11537460, at *2 (D. Minn. Dec. 17, 2010) ("privilege is not destroyed when a communication is shared with an officer or director of a company, even though the person is also an officer or director of an affiliated company.").

[11] The Trust's citation to *U.S. v. Boffa*, 513 F. Supp. 517 (D. Del. 1981), and *Bestfoods*, 524 U.S. at 70 n.13, does not compel a different result. Here, the YPF Defendants have not just "merely . . . note[d] that the Debtors and YPFH or CLHH had overlapping personnel." (Trust Mar. 30 Letter at 6.) Rather, the YPF Defendants amply demonstrated on an individual-by-individual basis that the relevant persons had overlapping roles.

The Honorable Christopher S. Sontchi
April 10, 2020
Page 10

*Second*, the separateness of YPFH and CLHH from the Debtors was not "a matter of expediency." (Trust Mar. 30 Letter at 7.)  Corporate formalities among YPFH, CLHH and the Debtors were observed in good faith and the ordinary course.  For example, in the New Jersey Action the Debtors and the YPF Defendants (including YPFH) were represented by separate counsel.  (*See, e.g.*, Joint Defense Agreement Among Repsol YPF, S.A., YPF, S.A., YPFH, CLHH, Maxus, and Tierra, effective as of Dec. 13, 2005 [D.I. 1988-1].)  Moreover, each of these entities maintained separate officers and boards of directors, which further undermines the Trust's claims that the separateness was "a matter of expediency."  (*See, e.g.*, Ex. E at 4-6 (noting the numerous different positions at YPFH, CLHH, or the Debtors).)

*Third*, the Trust erroneously claims that the YPF Defendants' assertion of privilege with respect to YPFH and CLHH is a "function of YPF's strategy in the present action."  (Trust Mar. 30 Letter at 7.)  The Trust's position is belied by the facts.  As the Trust itself notes, certain of the 30 "Exhibit C" documents it raised with the YPF Defendants "contain a 'joint privilege' disclaimer."  *Id.*[12]  This evidences a genuine, contemporaneous understanding by the relevant persons that the Debtors, on the one hand, and YPFH or CLHH, on the other hand, were separate entities and were differently situated for the purposes of claiming such a privilege.[13]

The Trust's related claims that employees, officers and directors of YPFH and CLHH did not believe YPFH and CLHH could make separate privilege claims also fail.  (Trust Mar. 30 Letter at 7.)  For example, whether a document directly refers to YPFH by name is not dispositive in a privilege inquiry; it is the nature and content of the communication that is dispositive.  The Trust also argues that "all [of the documents in question] are sent by or to Maxus employees or directors using their Maxus email addresses," *id.*, yet in so doing the Trust ignores the "well established" principle that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."  *Bestfoods*, 524 U.S. at 69 (citation omitted).[14]  In addition,

---

[12] The 30 documents referenced by the Trust are documents it cherry-picked from its productions that were not in the YPF Defendants' productions, which were identified in Exhibit C to its February 18, 2020 Letter.  The YPF Defendants reviewed these documents at the Trust's request, and determined that 17 were in fact privileged and appropriately withheld, 8 were withheld from production, and upon re-consideration, would be produced, and 5 could not be located in their custodial collections (they were not in the YPF Defendants' possession at the time of collection, likely because they were not saved by the relevant custodian at the time).  (Ex. E at 22-25.)  As explained herein, nothing about this process or the de-designation of a handful of documents was improper.

[13] *In re Grand Jury Subpoena Dated November 9, 1979*, 484 F. Supp. 1099, 1105 (S.D.N.Y. 1980), does not compel a different result.  Unlike the YPF Defendants here, the party invoking privilege in that case left the record devoid of indicia of privilege.

[14] The fact that YPFH and CLHH dual-hat employees, officers, and directors used Maxus email addresses in their communications is not dispositive.  Rather, even as indicated in the case cited by the Trust, *Asousa P'Ship v. Smithfield Foods, Inc., (In re Asousa P'ship)*, Adv. No. 04-1012, 2005 WL 3299823 (Bankr. E.D. Pa. Nov. 17, 2005), while an email address is a factor that may be considered, courts should take into account other factors, such as the contents and contexts of such communications, in making any determination of whether privilege has been correctly asserted.  *Id.* at *4; *see also Sowrtwood v. Empresas*, No. 13-cv-362 BTM (BLM), 2014 WL 12026069, at *2 (S.D. Cal. Apr. 18, 2014) (no waiver when privileged emails of a dual-hat employee concerning one company were sent to the dual-hat employee's email address with the other company, because the use of a particular email

The Honorable Christopher S. Sontchi
April 10, 2020
Page 11

the fact that "documents covering the same or similar topics" were allegedly produced by the YPF Defendants, (Trust Mar. 30 Letter at 7), is not dispositive of whether a document is protected from disclosure by privilege. It is entirely possible and, indeed, expected, that parties may exchange privileged and non-privileged communications and documents regarding a particular topic. And given the sheer volume of documents exchanged in this case, to the extent that the YPF Defendants inadvertently produce a privileged document, the Protective Order contains a clawback provision to ensure there was no waiver if that occurred.

Fourth, the Trust's claim that the YPF Defendants are using the attorney-client privilege as a sword and a shield is erroneous. The Trust has not demonstrated that the YPF Defendants have **used** any privileged materials to advance their defenses in this action, nor do the YPF Defendants intend to do so. *See, e.g.*, *U.S. Fire Ins. Co. v. Asbestospray, Inc*., 182 F.3d 201, 212 (3d Cir. 1999) (reversing district court order declaring that plaintiff had waived the attorney-client and work product privileges because plaintiff "did not assert any claim or take any affirmative step that placed the advice of counsel at issue"). To the extent that the YPF Defendants have produced communications or documents that were sent to individuals with overlapping roles, the YPF Defendants did so on the grounds that such materials were either not privileged at all or that any such privileged material was shared with the Debtors and/or their separate counsel.

Finally, the Trust's request that the Court find a blanket waiver of privilege here is inappropriate. Such a wholesale waiver approach is disfavored, and may only be used when there has been a finding of "bad faith, willfulness, or fault," none of which is present here. *In re Teleglobe*, 493 F.3d at 386 (citation omitted); *see also Wartluft v. Milton Hershey School & School Trust*, No. 1:16-CV-2145, 2018 WL 3995697, at *6 (M.D. Pa. Aug. 21, 2018) (rejecting request for a blanket ruling, holding "we are cautioned to eschew any categorical approach which cloaks or rejects the privilege in a wholesale fashion without regard to the specific content of particular documents." (citing *U.S. v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990))).

Rather than burden the Court with having to review voluminous documents to resolve this privilege issue, the YPF Defendants respectfully submit that the most prudent course is for the parties to address these issues as they arise, on a document-by-document basis, through the continuing course of discovery. As the Trust admits, it already has all of the Debtors' emails and files, including the documents the YPF Defendants claim are privileged. Thus, to conserve judicial resources and to minimize (or eliminate) any need for in-camera review by the Court, the parties should proceed with depositions and get resolution only for those privileged documents (and related testimony about them) that ever become an issue at the close of discovery, at summary judgment or before trial, should the case proceed to trial.[15]

---

address did not mean that the recipient shared the privileged documents, and there was no reason to find that the dual-hat employee "did not have control of his email account or that others were viewing his emails at will.").

[15] The Trust also complains about certain common interest designations, but states it "is hopeful that the Parties can resolve [them] without the Court's assistance." (Trust Mar. 30 Letter at 8.) We agree, but must clarify the record. The Trust asked whether documents in certain categories of the YPF Defendants' privilege log were withheld from production based on "a common interest between the Debtors, YPF and/or Repsol," asserting that the Trust was

The Honorable Christopher S. Sontchi
April 10, 2020
Page 12

**Alleged Deficiencies in the YPF Defendants' Productions**.  Without first raising with the YPF Defendants, and without any legitimate basis, the Trust calls into question the YPF Defendants' representation that document production is "substantially complete."  Amazingly, it makes this specious allegation based on a subset of a sample of 30 documents that it hand-picked – i.e., 8 documents – out of the nearly 50,000 produced or logged by the YPF Defendants (approximately 0.02%).  As the YPF Defendants explained, the 8 documents at issue were originally withheld on the basis of a good faith and reasonable determination that they were privileged.  Upon further review at the request of the Trust, the YPF Defendants agreed to de-designate and produce those documents.  Such an exercise is routine in the document discovery and meet and confer process.[16]  For the Trust to now assert that the de-designation of 8 documents – each of which does in fact have attorneys present on the face of the document, and each of which the Trust already has (and the YPF Defendants already said they will produce) – translates to a "similar 25% deficiency across the YPF Defendants' entire production effort," (Trust Mar. 30 Letter at 10 (emphasis omitted)) is disingenuous and unfounded speculation.  To the extent the Trust identifies any additional documents it has questions on, the YPF Defendants are happy to review any such document(s).  The Trust has not done so as of the date of this letter.

\*        \*        \*

We thank the Court for its attention to these matters, and are prepared to address these and any other matters if the Court wishes to receive oral argument.

Respectfully submitted,

*/s/ John J. Kuster*

John J. Kuster

---

entitled to those documents.  *Id.* at 4.  The YPF Defendants responded that they would produce any documents in those categories that involved the Debtors.  (Ex. E at 7.)  The YPF Defendants further agreed to provide the Trust with the number of documents at issue (and for which it would be re-reviewing) and nothing more.

[16] The Trust disingenuously claims that it did "not receive[] a satisfactory answer at the March 18, 2020 meet and confer as to why documents similar to the sample of 30 representative documents attached as Exhibit C to the Trust February Letter cannot be found in the YPF productions." (Trust Mar. 30 Letter at 10.)  Not so.  As highlighted above, the YPF Defendants expressly provided the Trust, on meet and confer calls and in their March 4 letter, a document-by-document analysis for each of the documents listed in the Trust's Exhibit C.