

October 14, 2020

Via E-Filing
The Honorable Christopher Sontchi
United States Bankruptcy Court for the District of Delaware
824 Market Street
Wilmington, Delaware 19801

**Re:** *Maxus Liquidating Trust v. YPF S.A., et al.*, Adv. No. 18-50489 (*In re Maxus Energy Corp., et al.*, No. 16-11501)

Dear Judge Sontchi:

We write on behalf of the Maxus Liquidating Trust to address the YPF Defendants' non-compliance with this Court's June 23, 2020 Opinion and Order resolving certain prior discovery disputes in this proceeding.[1]

Those disputes were first brought to this Court's attention in the Trust's letter to the Court dated March 30, 2020. [D.I. 216] In that letter, among other issues, the Trust challenged the YPF Defendants' assertion of privilege over documents that their privilege log reflected had been disclosed to individuals who held dual roles at a YPF Entity and a Debtor (the so-called "two-hat" individuals, hereinafter "Two-Hatters"). By its submission, the Trust requested that the Court "rule that YPF's attorney-client privilege has been waived with respect to any communications directly with employees, directors, officers or agents of the Debtors – notwithstanding that those individuals may have had a nominal affiliation" with YPF. [D.I. 216 at 8] The Trust did not purport to draw a distinction between directors, employees, officers or agents; nor did the YPF Defendants in their response. [D.I. 220]

Following a lengthy telephonic hearing, on June 23, 2020, the Court issued the Opinion and Order and granted the relief sought by the Trust. Among other rulings, the Court directed that "[t]he 'two-hat' basis for withholding production of documents and communications claimed by YPF is DENIED and production of the purportedly privileged documents is required." Order ¶ 3. Without explanation, however, the YPF Defendants did not begin producing documents that were the subject of the Order until August 11, 2020, and did not finish until September 4, 2020, more than two and a half months after the Court's ruling. In total, the YPF Defendants produced 6,985 documents in response to the Opinion and Order.

During the Trust's review of the YPF Defendants' productions, and as expected, numerous documents appeared which reflected that personnel on both the YPF side and the Maxus side (including directors, officers and employees of each, as well as outside counsel of each) in fact frequently communicated with each other regarding "Project Jazz." To remind the Court, Project Jazz was the legal and operational "Strategy" adopted by YPF that involved installation of

---

[1] *See* Order [Case No. 16-11501-CSS, D.I. 2338]; Opinion [Adv. Pro. 18-50489, D.I. 227]. Capitalized terms not otherwise defined herein are used as defined in the Opinion.

"independent directors" at Maxus, which ultimately led to the filing of the Maxus bankruptcy cases and proposed first-day settlement with YPF. Among those documents was an executive summary of a much more extensive memorandum that had been prepared by Chadbourne & Park LLP (YPF's outside counsel) and shared via email with a director of Maxus while he was a director of Maxus. When the Trust requested that the YPF Defendants produce a copy of the complete memorandum, the YPF Defendants not only refused to produce it but also sought to claw back the executive summary as having been "inadvertently" produced. The next day, and just hours before the first deposition in this proceeding had been scheduled to commence, the YPF Defendants sent a second claw back request seeking an additional 427 documents. And, on October 13, the YPF Defendants sent a third claw back request seeking an additional 1,673 documents on the basis of the same "inadvertent" production (the "Third Clawback Notice," Exhibit D hereto).

All three claw back requests are based on the same remarkable theory of inadvertent production. Based on the discussions with the YPF Defendants' counsel, it appears that the YPF Defendants initially read the Opinion and Order as requiring the production of documents disclosed to Two-Hatter directors even if they were not simultaneously also officers or employees. Thus, based on this initial understanding of the Opinion and Order, they "unintentionally identified" more than 2,000 for production. Now, however, the YPF Defendants take the position that the Opinion and Order does not require the production of documents that YPF disclosed to a Two-Hatter *director* of a Debtor if the *director* was not simultaneously also an officer or employee of a Debtor, even if the Two-Hatter director (as here) later became an officer or employee of a Debtor.

The parties held a meet and confer on October 8, 2020 to discuss these issues, during which the Trust asked the YPF Defendants to explain the nature of the inadvertency that led to their production of the documents at issue. The YPF Defendants, however, refused to answer any of the Trust's questions as to the allegedly inadvertent production (taking the position that this information is also privileged). At the end of the October 8 meet and confer, the parties agreed to submit this dispute to the Court by having the Trust file a letter on October 14 and the YPF Defendants reply by letter by October 21.

By this submission, the Trust now requests that the Court now enter an order (1) denying the YPF Defendants' three claw-back requests, (2) directing the YPF Defendants to produce all purportedly clawed-back documents as well as the complete Chadbourne memorandum within five days of entry of the order, and (3) grant such other and further relief as the Court deems just.

\*       \*       \*

## I.    THE INITIAL PRIVILEGE DISPUTE

The present dispute has a long procedural history. Document production in this proceeding commenced in October 2019. Following the respective initial productions of documents, the parties exchanged categorical privilege logs on January 20, 2020, in accordance with the *Amended Case Management Plan and Scheduling Order* [D.I. 213]. For reasons not relevant to this dispute,

YPF served an amended privilege log on February 16, 2020 ("Pre-Order Log").[2] That Pre-Order Log designated 19 individuals who served as directors, officers, employees or seconded employees of Maxus as "affiliated" with the YPF Defendants, and reflected that the YPF Defendants had withheld certain communications to which these individuals were party on the basis of privilege. Trust February 18, 2020 Letter [D.I. 217-6]. The Trust objected to this designation and requested that such communications be produced. *Id.* The YPF Defendants refused, arguing that, because each of the nineteen individuals identified by the Trust "was also ***a director, officer and/or employee*** of a YPF Defendant and/or an affiliate of YPF that is not a Debtor at the relevant time," the documents in question were privileged "to the extent such individual was acting in its [sic] YPF-related capacity." YPF March 4, 2020 Letter [D.I. 220-5 at 4] (emphasis added).

The parties met and conferred in March 2020 but were unable to resolve this dispute, and agreed that the parties would address the Two-Hatter privilege issue (among other disputes) in letter submissions to the Court. [D.I. 216 at 1] In its submission, the Trust argued that the YPF Defendants had not met their burden of establishing the Two-Hatter privilege because they had not established that any privileged information had been disclosed to Two-Hatters in their YPF capacity and not their Debtor capacity.[3] Trust March 30, 2020 Letter [D.I. 216 at 5-6]. The Trust therefore asked that the Court "rule that YPF's attorney-client privilege has been waived with respect to any communications directly with employees, directors, officers or agents of the Debtors – notwithstanding that those individuals may have had a nominal affiliation YPFH or CLHH." *Id.* at 8.

In response, the YPF Defendants argued that "it does not break confidence to share an attorney-parent communication with an officer of the parent in her capacity as officer of the parent, even though she is also a director or officer of a subsidiary." YPF April 10 Letter [D.I. 220 at 9] (citing *In re Teleglobe*, 493 F.3d at 372). The YPF Defendants' submission incorporated by reference the list of 19 directors, officers or employees of Maxus who also had postings at YPF or an affiliate from their March 4 Letter (*id.* at 9), reiterating that "where these individuals sent or received YPF-privileged information in their YPF capacities, the applicable privilege is not waived." *Id.* Finally, the YPF Defendants urged the Court not to review the documents at issue *in camera*, proposing instead that "the parties should proceed with depositions and get resolution only for those privileged documents (and related testimony about them) that ever become an issue." *Id.* at 11.

## II.    THE JUNE 23, 2020 OPINION AND ORDER

The Court rendered an opinion on June 23, 2020 resolving, *inter alia*, the Two-Hatter privilege dispute (the "Opinion"). [D.I. 227] The Opinion acknowledged the YPF Defendants' contentions:

---

[2] By February 17, 2020, YPF had produced approximately 30,000 documents in this matter pursuant to the Trusts requests for production. As reflected on the Pre-Order Log, YPF withheld 19,568 documents.

[3] The Trust also noted that record documents in this matter clearly reflect that both the Defendants and the Debtors were aware that potential disclosure of "privileged" communications between the Debtors and the Defendants was one of the risks of the Strategy. [D.I. 216 at 8]

> YPF Defendants purport to rely on privilege applicable to [YPFH] or [CLHH] as a basis to withhold producing ***documents and communications that were prepared by or sent to directors, officers, or employees of the Debtors*** to prevent the Trust from using those documents and communications in this matter. ***These "shared" employees include*** the Debtors' management, including their ex-Chief Executive Officers, Chief Financial Officers, treasurer, comptroller, Human Resources director, and Debtors' successive general counsels. YPF asserts that because these individuals simultaneously worked for YPFH or CLHH, the holding companies that held all of the Debtors' equity, [] they were working in their capacity as YPF employees and not for the Debtors.

Opinion at 17 (emphasis added). Likewise, the Court acknowledged the YPF Defendants' argument that if Two-Hatters "sent or received YPF-privileged information in their YPF capacities, the applicable privilege is not waived." Opinion at 18.

In rejecting that argument, the Court held that "[i]t is YPF's burden to show that those individuals were not wearing their 'subsidiary hat,'" and found that the YPF Defendants had not satisfied this burden on the record before the Court:

> The only argument in Court was that there should not be a blanket waiver of privilege because these employees wore "two hats," however, YPF did not produce any information to show that these individuals were not working in their capacity for the Debtors at the time of the e-mails and YPF is required to carry that burden. The Court presumes that these shared employees were acting on behalf of Maxus, as YPF has not met its burden. As a result, the documents must be produced. To be clear, YPF has not met its burden to those shared employees regardless of whether they were using a "Maxus" email.

Opinion at 18. The accompanying Order directed that "[t]he 'two-hat' basis for withholding production of documents and communications claimed by YPF is DENIED and production of the purportedly privileged documents is required." Order at 2. None of the YPF Defendants sought to appeal the Opinion and Order.

### III. THE PRESENT DISPUTE

Because each of the documents subject to the Opinion and order was already logged on the YPF Defendants' Pre-Order Log, production of the documents at issue should have been prompt. The YPF Defendants' Production, however, did not begin until August 11, 2020, and was not completed until September 4, 2020. The YPF Defendants ultimately produced 6,985 documents pursuant to the Order.[4] Included in the first production were two Spanish-language memoranda

---

[4] Specifically, the YPF Defendants made productions pursuant to the order on August 11, 21 and 28 and on September 4, 2020. The post-Order documents were produced with a new "YPF_MAXUS_PRIV" Bates prefix. Each page of each document in the YPF_MAXUS_PRIV range bears a legend denoting that "[t]his document is being produced pursuant to the June 23, 2020 Order of the Court and the YPF Defendants reserve all rights and objections to such

prepared by Chadbourne & Park, LLP ("Chadbourne"): (1) an executive summary of a memorandum dated September 4, 2012 prepared by attorneys from Chadbourne and addressed to Rodrigo Cuesta, Eduardo Pigretti and Mariano José Oteiza of YPF, ("Executive Summary") [YPF_MAXUS_PRIV_0000002149]; and (2) a memorandum dated February 24, 2013 prepared by the same Chadbourne lawyers and addressed to the same three YPF recipients shown on the Executive Summary, but adding as well as Francisco García Tobar ("Jazz 2013 Memo," and, with the September 2012 Memo, the "Memos") [YPF_MAXUS_PRIV_0000002141]. Mr. Tobar became a director of Maxus on December 14, 2012, and the cover correspondence of the copies of the Memos the YPF Defendants produced reflects that Mr. Tobar received the Memos from Chadbourne on February 24, 2013, and forwarded them to Fernando Giliberti (then YPF's director of strategy and business development) on February 26, 2013. YPF_MAXUS_PRIV_0000002140. Mr. Tobar thereafter became Maxus's CFO on August 1, 2013, and continued to receive transmissions of Chadbourne's Project Jazz related legal advice after that date.[5]

Upon uncovering these two Memos in the YPF Defendants' productions, the Trust commissioned certified translations. Unless the YPF Defendants object, the Trust believes it would be fruitful for the Court to review the translated Memos, and is willing to provide the Court with copies of the certified translations (with copies to counsel for the YPF Defendants) in accordance with the *Confidentiality and Discovery Agreement and Protective Order* entered by the Court on November 7, 2019 [D.I. 209] (the "Protective Order"), which provides that a party challenging a claw-back request may attach copies of the recalled documents for *in camera* review. Protective Order ¶ 19(f). As the Court will see should it conduct an *in camera* review, the Memos are highly pertinent to the matters framed in the Complaint.

By letter dated September 30, 2020, the Trust requested that the YPF Defendants produce the complete Chadbourne memorandum and exhibits referred to in Memos (the "Complete Memo"). The Trust contended that the initial disclosure of the Memos to Mr. Tobar waived privilege as to the subject matter of the Complete Memo. Trust September 30, 2020 Letter at 1-2. Hearing no response, the Trust emailed the YPF Defendants on Monday October 5, 2020 to solicit a response to its letter and to propose an adjournment of the deposition of YPF's former deputy general counsel, Mr. Eduardo Pigretti—scheduled for October 8, 2020—pending resolution of the Trust's request for the Complete Memo. Counsel for the YPF Defendants responded by email that the YPF Defendants would not produce the Complete Memo, that Mr. Pigretti would not consent to an adjournment of his deposition, and that a formal response to the Trust's letter would follow on October 6. Email correspondence between Martin B. Jackson and Matthew Nicholson, dated October 5, 2020, attached as Exhibit A hereto, at 6. The Trust proposed that the parties meet and confer on Wednesday, October 7 regarding the YPF Defendants' anticipated letter response, and to give notice that the Trust would reserve the right to recall Mr. Pigretti for further testimony on

---

production on the basis that the document is privileged." Per the post-Order privilege log provided on August 28, 2020, the YPF Defendants ultimately withheld 15,193 documents.

[5] The non-privileged Project Jazz documents generally reflect that Mr. Tobar (and other Two-Hatters) were party to routine, in-depth discussion of various issues under the Project Jazz umbrella, both before and after Mr. Tobar's appointment as CFO of Maxus. The Trust is willing to provide copies of these documents for *in camera* review, although not all are subject to pending claw-back requests (some having been in fact produced by the Trust from the Debtors' records).

the Complete Memo if the Trust obtained a copy after the deposition. *Id.* at 5. Counsel for YPF replied to reiterate that Mr. Pigretti's deposition would not be adjourned and that he would not be permitted to testify as to privileged matters. *Id.* at 4.

Counsel for YPF eventually provided a formal reply by letter on October 7, 2020 (the "First Clawback Notice," attached as Exhibit B hereto). In the First Clawback Notice, the YPF Defendants contended, for the first time, that the Opinion and Order "w[ere] limited to the issue presented to the Court concerning 'shared employees,'" and thus "[n]either the [Opinion nor Order] require the production of documents that were not exchanged with a 'two-hat' or 'shared' employee of the Debtors during the term of his or her employment with the Debtors." First Clawback Notice at 3. The YPF Defendants stated that they had "unintentionally identified the [Memos] as documents exchanged with Mr. Garcia Tobar during the course of his employment with the Debtors," even though he was only a director and not yet an officer or employee of Maxus. *Id.* at 2-3. Therefore, "by the [Opinion and Order], [the Memos] [] were inadvertently produced, and [] are hereby clawed back." *Id.* at 3. The First Clawback Notice also averred that "upon learning of the production, the YPF Defendants have promptly taken steps to claw-back the [Memos] and to prevent further disclosure upon learning of the inadvertent disclosure." *Id.* at 5.

Thereafter, the parties agreed to adjourn Mr. Pigretti's deposition and to meet and confer further regarding the Memos on October 8.[6] During that meet and confer, the YPF Defendants explained the link between the Opinion and Order and the inadvertent production in greater length. As the Trust understands it, their present position is that the Court either did not have before it and therefore did not reach, or held in favor of the YPF Defendants on, two issues bearing on whether the Memos need be produced: (1) whether an individual must be a "shared employee" as opposed to a "shared director" to qualify as a Two-Hatter under the Opinion and Order, and (2) whether disclosure only waives privilege if disclosure is made at a moment in time when the Two-Hatter is a "shared employee."

In an attempt to give counsel the benefit of the doubt, counsel for the Trust repeatedly asked the YPF Defendants to describe the nature of the inadvertent production of the Memos, noting that under Delaware law analysis of claw-back requests includes an analysis of measures taken to prevent inadvertent disclosure. Counsel for the YPF Defendants unequivocally responded that any information about the review undertaken to identify documents responsive to the Order, including how the Memos came to be designated for production, was privileged and would not be disclosed. The YPF Defendants also generally declined to describe any safeguards in place at the time of the disclosure of the Memos to Mr. Tobar to prevent disclosures of YPF-privileged

---

[6] Fewer than two hours before the meet and confer was to commence, the YPF Defendants sent a second clawback notice (the "Second Clawback Notice," attached as Exhibit C hereto). The Second Clawback Notice purported to retract an additional 427 documents on the ground that the documents were "sent or received by Mr. Garcia Tobar, contain information protected by the attorney-client privilege and/or work product doctrine and were not exchanged with a 'two-hat' or 'shared' employee of the Debtors during the term of his or her employment with the Debtors, and were inadvertently produced." Second Clawback Notice at 1.

6

information, or whether any steps were taken to restore confidentiality over the Memos once Mr. Tobar was appointed CFO of Maxus in August 2013.[7]

## ARGUMENT

### I. THE CLAWBACK REQUEST VIOLATES THE COURT'S ORDER

As addressed above, the clear text of the Opinion and Order requires production of the Memos and like documents that the YPF Defendants disclosed to Mr. Tobar, whether he was an officer *or* director, that the YPF Defendants had scheduled on their privilege log. Further, by attempting to claw back those documents and other materials the YPF Defendants have now placed themselves in violation of the Order.

First, the Opinion does not use "shared employees" as an independently defined term of art. On the contrary, where the phrase "these shared employees" first appears, it refers back to the "***directors***, officers, or employees of the Debtors" described in the preceding sentence. Opinion at 17 (emphasis added). Were there any doubt on the employee/officer/director issue, the decretal paragraph of the Order clearly provides that "[t]he 'two-hat' basis for withholding production of documents and communications claimed by YPF is DENIED and production of the purportedly privileged documents is required." Order at 2. That should end the matter.

Second, the YPF Defendants cannot salvage the "shared employees" theory by contending that the Opinion and Order was "limited to the issue presented to the Court concerning 'shared employees.'" First Clawback Notice at 2. The prior letter submissions reflect that neither side made any arguments relying on a purported distinction between a director and an officer or employee. In fact, YPF affirmatively cited cases holding the opposite during the parties' prior dispute: "In circumstances of ***'two-hat' directors and officers***, 'disclosure occurs when the parent shares an otherwise confidential attorney-parent communication with ***an officer, director, or agent*** of a subsidiary in that capacity,' and viceversa." YPF March 4, 2020 Letter [D.I. 220-5 at 4] (citing *In re Teleglobe Comm'ns Corp.*, 493 F.3d 345, 372 (3d Cir. 2007). In any event, the Trust is not aware of any binding legal authority that would create a safe-harbor for disclosures of parent-privileged materials to dual-role individuals who are directors, but not officers or employees, at a subsidiary. To the extent the YPF Defendants ever had an opportunity to interpose this principle as basis to avoid a finding of waiver, that time has come and gone. *See, e.g.*, *Gen. Elec. Co. v. Johnson*, No. 00-2855, 2007 U.S. Dist. LEXIS 8275, *16 (D.D.C. Feb. 5, 2007) (finding that "fresh privilege claims follow[ing] on the heels of a legal ruling rejecting [] other bases for withholding [] requested documents . . . smack[ed] of an attempt [] to get a second bite at the apple by 're-engineering' [a] privilege log to advance legal arguments [not raised] at earlier stages of the litigation").

Third, even if there were a "shared employee" requirement implicit in the Opinion and Order, the Memos would still have to be produced. There is no dispute that Mr. Tobar qualified

---

[7] In yet another act of gamesmanship, at 5:30 p.m. this evening (the agreed day for the Trust to file this letter), the YPF Defendants sent an email to rehabilitate their prior refusal to engage by means of a materially inaccurate recounting of the October 8 meet and confer. Rather than delay this dispute further, the Trust reserves the right to address their revisionist history at any hearing on this application.

as an "officer or employee" as of his appointment as CFO of Maxus on August 1, 2013, at which time he carried with him all knowledge learned in his capacity as director. First Clawback Notice at 2. Given this transition of roles, the YPF Defendants would bear the burden of establishing that Mr. Tobar did not have access to the Memos in his Maxus capacity thereafter, because a valid privilege claim requires that the parties to a privileged communication or document strive to maintain confidentiality of that communication or document. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In Re Hechinger Inv. Co. of Del., Inc.)*, 285 B.R. 601, 609 (D. Del. 2002) ("[E]ssential to any claim of privilege is not only that the communications were made in confidence, but that they were also maintained in confidence."); *see also United States v. Fisher*, 500 F.2d 683, 692 (3d Cir. 1974) (same); Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in Delaware Court of Chancery, Second Edition § 7.02(b)(4) (Matthew Bender & Co., 2019), § 7.02(b)(4) ("As a practical matter, . . . in order to preserve the privilege on an ongoing basis, access to initially confidential communications should be placed on a strict need-to-know basis."). Here, there has been no showing that the YPF Defendants ever sought to restrict Mr. Tobar's access to the Memos after he became Maxus's CFO, and as noted above numerous other documents in the parties' productions reflect that he continued to receive Project Jazz-related communications and documents thereafter.

## II.   PRODUCTION OF THE MEMOS WAS NOT "INADVERTENT"

Whether the Memos are or ever were privileged as against Maxus (which is denied), the YPF Defendants in fact produced the Memos to the Trust.[8] Thus, another question for the Court to address is whether the YPF Defendants waived privilege when they produced the Memos in this action, or whether they can now retract the documents they produced. The Protective Order permits a producing party to request the return of "inadvertently produced" material (Protective Order ¶ 19(a-b)), and also permits a receiving party to argue that production was not inadvertent and therefore constituted a waiver of privilege (*id.* ¶19(i)). That order, however, does not itself separately define the term "inadvertent." Delaware courts generally analyze four factors to determine whether production is, in fact, inadvertent: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of discovery and extent of disclosure, and (4) overall fairness, judged against the care or negligence with which the privilege is guarded. *Monsanto Co. v. Aetna Cas. & Sur. Co.*, No. 88C-JA-118, 1994 Del. Super. LEXIS 261, at *17 (Super. Ct. May 31, 1994). However, these factors all inform one key question: "whether or not the release of the documents was a knowing waiver or simply a mistake, immediately recognized and rectified." *Id.* Neither approach warrants grant of a claw-back request here.

First, YPF has not yet contended that the production of the Memos was "simply a mistake" of an over-eager or inattentive attorney. Rather, the YPF Defendants have contended that, although they understand the Opinion and Order differently now, at the time of production they believed the Opinion and Order required them to produce the Memos. Thus, in their own words, the YPF Defendants "unintentionally identified" the Memos as subject to the Opinion and Order.

---

[8] "Taking or failing to take precautions to keep a communication confidential may be considered as bearing on intent that the communication be confidential." Alexander C. Black, Annotation, *What persons or entities may assert or waive corporation's attorney-client privilege -- modern cases*, 28 A.L.R.5th 1, 3 (1995).

8

First Clawback Notice at 1. While the Trust still has no clear understanding of the chain of cause and effect that resulted in this "unintentional identification"—until tonight, the YPF Defendants withheld this information as privileged—the Trust notes that it took seven weeks for the YPF Defendants to make their first production of documents pursuant to the Opinion and Order, and the Trust did not request the Complete Memo for another seven weeks.[9] It does not seem plausible that the Memos were just produced and then simply and mistakenly forgotten for 14 weeks. The only inference that can be drawn here is that the "inadvertent compliance" theory had not yet occurred to the YPF Defendants as of September 30. In response, the Trust submits that an attorney's production of documents based on an understanding that a court has required it is not inadvertent, it is advisable.

Second, during the parties' actual meet and confer the YPF Defendants refused to establish that any precautions were taken to ensure that the initial production met with their current interpretation of the Opinion and Order. As noted, counsel for the YPF Defendants declined to respond to the Trust's questions on this topic on the ground that such information is privileged. In fairness, the YPF Defendants should not be heard to argue inadvertence when they refused during the meet and confer to have any discussion regarding the steps they took in connection with producing the Memos.

Third, the Protective Order calls for a party to seek to claw back "inadvertently" produced privileged material within 10 business days of discovery of the inadvertent production. Assuming that the YPF Defendants did not discover the allegedly inadvertent production until they received the Trust's September 30 letter, the First Clawback Notice was served on the last permissible day (*i.e.*, October 7, ten business days later) under the Protective Order.[10] The Second and Third Clawback Notices, however, are facially untimely; both requests rely on the same "unintentional identification" rationale as the First Clawback Notice, but they were served on October 8 and October 13, *i.e.*, on the eleventh and fourteenth business day respectively after the Trust's September 30 letter.

### III. DISCLOSURE OF THE MEMOS TO MR. TOBAR (AND OTHER DISCLOSURES TO TWO-HATTERS) EFFECTED A SUBJECT MATTER WAIVER AND THE COMPLETE MEMO MUST BE PRODUCED

The last question before the Court is whether disclosure of the Memos to Mr. Tobar during his tenure as a director and CFO of Maxus requires disclosure of additional documents, including but not limited to the Complete Memo. Generally, a deliberate disclosure of key portions of privileged information effects a waiver of privilege as to the entire subject matter of the disclosed information. *See, e.g.*, *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992) (under the "rule of partial disclosure," privilege is waived as to "the subject matter of [a] disclosed communication"); *E. Commer. Realty Corp. v. Fusco*, C.A. No. 85C-OC-92, 1987 Del. Super. LEXIS 1110, at *7 (Del. Super. Ct. Apr. 13, 1987) ("It is the rule that where a client discloses a

---

[9] The Memos were in the first production, released on August 11, 2020.

[10] Of course, if the YPF Defendants learned of the "inadvertency" only from the Trust's letter, this would mean that they did not genuinely understand the Opinion and Order to contain the "shared employee" requirement at any time prior to that date. On the other hand, if they did have that understanding prior to September 30, then the First Clawback Notice was also untimely.

communication protected by the attorney/client privilege, he waives the privilege with respect to matters that directly relate to the subject matter encompassed by the disclosed communication.").

More to the point, several courts have held that disclosure of the conclusions or executive summary of a longer document waives privilege as to the entire document. *Doe v. Baylor Univ.*, 320 F.R.D. 430, 437 (W.D. Tex. 2017) (disclosure of executive summary of privileged report "encompasses the entire scope of the investigation, and all materials, communications, and information provided to [counsel] as part of the investigation"); *Net2Phone, Inc. v. Ebay, Inc.*, No. 06-cv-2469, 2008 U.S. Dist. LEXIS 50451, at *40-46 (D.N.J. June 26, 2008) (privilege waiver found where plaintiff disclosed and disseminated conclusions of report); *Ryan v. Gifford*, 2007 Del. Ch. LEXIS 168, at *12 (Del. Ch. Nov. 30, 2007) (presentation by counsel for special committee to complete board effected waiver as to all communications between counsel and special committee).

As such, the Trust respectfully requests that the Court find that disclosure of the Memos to Mr. Tobar gave rise to a waiver of privilege as to the Complete Memo and all exhibits thereto, and order their immediate production, reserving for a later date whether the Defendants may have effected an even more broad subject matter waiver as to Project Jazz.[11]

Respectfully submitted,

/s/ Michael J. Farnan

Michael J. Farnan

cc: Counsel of Record (Via E-Filing)

---

[11] By the Trust's current estimate and understanding, Project Jazz is addressed in more than 400 documents produced by the parties, *excluding* the documents sought back in the First and Second Clawback Notices. As noted above, the most significant of these documents reflect a pattern of in-depth disclosure between YPF and other Two-Hatters regarding Project Jazz and related matters.