**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, | Case No. 16-11501 (CSS) |
| Debtor. | (Jointly Administered) |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | |
| -against- | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | Adv. Proc. No. 18-50489 (CSS) |
| Defendant. | |

**YPF DEFENDANTS' MOTION TO DISQUALIFY WHITE & CASE LLP
AS COUNSEL FOR THE MAXUS LIQUIDATING TRUST**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

   I.   MS. BOELTER PITCHES HER FIRM TO YPF AND SERVES AS KEY COUNSEL AND STRATEGIST FOR THE COMPANY ...................................................................... 4

   II.   WHITE & CASE'S ROLE OPPOSITE YPF ................................................................... 8

   III.   MS. BOELTER LEAVES SIDLEY AND YPF, AND SHE SWITCHES SIDES ......... 9

   IV.   WHITE & CASE ESTABLISHES AN INADEQUATE SCREEN AND THEN RESISTS YPF'S EFFORTS TO OBTAIN INFORMATION ABOUT IT. ........................... 11

ARGUMENT ........................................................................................................................... 14

   I.   NO SCREEN COULD SUFFICIENTLY PROTECT YPF'S CONFIDENCES AND ENSURE THE FAIRNESS OF THESE PROCEEDINGS. ..................................................... 15

     A.   Ms. Boelter had a substantial relationship with YPF as one of its key legal advisers.. 17

     B.   Ms. Boelter switched sides in the midst of an ongoing case. ...................................... 19

     C.   Ms. Boelter's work in the New York Restructuring and Financial Insolvency group creates a substantial risk YPF's confidences will spread through that small group. ............ 20

     D.   Ms. Boelter was intimately involved with the most important parts of this case. ........ 22

   II.   EVEN IF AN ETHICAL SCREEN COULD BE SUFFICIENT GIVEN THE CIRCUMSTANCES OF MS. BOELTER'S PRIOR REPRESENTATION OF YPF, THE SCREEN WHITE & CASE IMPLEMENTED IS DEFICIENT. ............................................. 24

   III.   DISQUALIFICATION IS THE ONLY ADEQUATE MEASURE TO PROTECT YPF AND PRESERVE THE INTEGRITY OF THE LITIGATION ............................................... 25

     A.   Disqualification will promote the policies of protecting client confidences, maintaining public confidence in the bar, and ensuring attorney loyalty. ................................................ 25

     B.   Disqualifying a firm for hiring its opponents' lead counsel does not unreasonably hamper attorney mobility. ....................................................................................................... 28

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apeldyn Corp. v. Samsung Elecs. Co.*,
693 F. Supp. 2d 399 (D. Del. 2010)................................................................... 25

*Cheng v. GAF Corp.*,
631 F.2d 1052 (2d Cir. 1980)............................................................................. 20

*Decora Inc. v. DW Wallcovering, Inc.*,
899 F. Supp. 132 (S.D.N.Y. 1995)........................................................... 20, 21, 25

*Enzo Life Scis. Inc. v. Adipogen Corp.*,
Case No. 11-cv-00088 (RGA), 2013 WL 6138791 (D. Del. Nov. 20, 2013).................... *passim*

*In re Corn Derivatives Antitrust Litig.*,
748 F.2d 157 (3d Cir. 1984)........................................................................... 26, 30

*Int'l Longshoreman's Ass'n Local 1332 v. Int'l Longshoreman's Ass'n*,
909 F. Supp. 287 (E.D. Pa. 1995) ...................................................................... 15

*Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd*,
Case No. 10-cv-01067 (LPS), 2011 WL 2692968 (D. Del. June 22, 2011)....................... *passim*

*James v. Teleflex, Inc.*,
Case No. 97-cv-01206 (LR), 1999 WL 98559 (E.D. Pa. Feb. 24, 1999) ..................... 16, 17, 29

*Madukwe v. Del. State. Univ.*,
552 F. Supp. 2d 452 (D. Del. 2008)................................................................. 23, 26

*Norfolk S. Ry. v. Reading Blue Mountain & N. R.R.*,
397 F. Supp. 2d 551 (E.D. Pa. 2005) ................................................................ *passim*

*United States v. Miller*,
624 F.2d 1198 (3d Cir. 1980)............................................................................. 25

## Rules and Statutes

Bankr. D. Del. L.R. 9010-1(f)............................................................................. 15

## <u>Other Authorities</u>

Model Rule of Professional Conduct 1.10 ........................................................................... 3, 15, 16

Model Rule of Professional Conduct 1.9 ..................................................................    15, 28

Restatement (Third) of the Law Governing Lawyers § 124(2)(a) (Am. L. Inst. 2000) .........  16, 23

Defendants YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings, Inc., (collectively, "YPF" or the "YPF Defendants") respectfully submit this Memorandum of Law in support of their motion to disqualify White & Case LLP ("White & Case") as counsel for the Maxus Liquidating Trust in connection with this proceeding.

## PRELIMINARY STATEMENT

Until recently, Jessica Boelter was a partner at Sidley Austin LLP ("Sidley") and one of the lead attorneys representing YPF in this litigation.  From the outset of the case, Ms. Boelter was an architect of YPF's strategy, a trusted advisor to YPF's senior management, and a recipient of sensitive confidential information that YPF provided to her pertaining to this multi-year, multi-billion dollar case.  Then, on Saturday, September 12, 2020, YPF learned from another Sidley lawyer, John Kuster, that Ms. Boelter planned to join White & Case LLP ("White & Case"), counsel to YPF's adversary, the Maxus Liquidating Trust ("Trust").  YPF learned at the same time that Ms. Boelter had been romantically involved with, and indeed was engaged to be married to, Thomas Lauria, the head of White & Case's bankruptcy and restructuring practice.  On October 1, without a word to YPF concerning any of these developments, Ms. Boelter formally joined White & Case.  The bankruptcy practice she joined at White & Case includes the same lawyers, in the same New York office, who have spent the past two years litigating against Ms. Boelter's former client YPF.  Under these extraordinary circumstances, and for the reasons stated below and in the expert opinion of Professor W. Bradley Wendel of Cornell Law School, YPF respectfully submits that no ethical screen, no matter how extensive, could adequately assure YPF that its confidential information has not and will not be leaked to its adversary and used to prejudice YPF's interests in this litigation.  Disqualification is the only remedy that will preserve the integrity of these proceedings going forward.

YPF does not seek this relief lightly.  YPF retains global law firms for litigation and understands well the practical realities of potential conflicts and lawyers changing firms over the course of their careers, and appreciates that in some circumstances a protective screen at the new firm can be sufficient for this and other conflicts.  But this is not the usual case.  This is not simply a case of a lawyer moving laterally to a new firm whose clients may have interests potentially adverse to those of a former client or an instance in which a protective screen is a practical safeguard.  Here, White & Case recruited and hired as a partner the very attorney, Ms. Boelter, who established the initial lawyer-client relationship between Sidley and YPF, including negotiating Sidley's engagement; developed YPF's strategy; provided legal advice to YPF regarding nearly every aspect of this litigation; and regularly discussed the case with senior YPF management, including its CEO and general counsel.  Ms. Boelter not only received YPF's confidential information; she created confidential information by formulating and then conveying strategic and legal advice to YPF.  And Ms. Boelter has not simply joined White & Case; she has joined the very practice group—headed by her now-husband—in the very office that has been litigating against YPF in this high-stakes matter.  While YPF acknowledges that protective screens are appropriate for many circumstances, that is not the case here and this situation may well be *sui generis.*  It is no wonder that Professor Wendel concludes as follows:

> This case is one of the most egregious instances I have seen of a moving lawyer possessing sensitive confidential client information switching over to the law firm representing the litigation adversary of a former client.  Under these circumstances, the screen procedures established by White & Case are insufficient to cure the conflict imputed to the firm when it hired Ms. Boelter. Disqualification of the firm is the only remedy that will adequately protect the interests of YPF in preventing the disclosure or misuse of its confidential information.

Declaration of W. Bradley Wendel ("Wendel Decl.") ¶ 33.  Even if an ethical screen could have been erected that could protect YPF—and YPF does not concede that on these unique

facts it would have been possible—the screen White & Case unilaterally foisted on YPF is deficient. As an initial matter, Ms. Boelter and White & Case failed to seek YPF's consent or prior input on the screen they devised, and then failed to comply with their basic obligation under the Model Rules of Professional Conduct to "promptly" provide information about the screen they foisted unilaterally upon YPF. Model Rules of Pro. Conduct ("MRPC") r. 1.10(a)(2)(ii). Instead White & Case delayed, and initially sought to ensure the information they provided would not be submitted to the Court. Once White & Case did provide some partial responses to YPF's inquiries, the inadequacy of its purported screen became clear. White & Case's screen directs Ms. Boelter not to work in close physical proximity with the lawyers also representing the Trust. But such a requirement is simply not sustainable or practicable, given that Ms. Boelter has joined a New York bankruptcy group a substantial number of whose lawyers are working for the Trust. Screens are only viable to the extent it is reasonable to ask the former client to trust the measures the new firm has implemented, and it is unreasonable to expect YPF to trust that Ms. Boelter will not attend meetings with, visit the offices of, or have her office visited by both her fellow bankruptcy partners and the bankruptcy associates in the New York office. That White & Case saw the need to implement this facially impracticable proximity screen highlights the fact that no screen could be effective to cure the conflict it created when it hired Ms. Boelter as a partner.

YPF is of course aware that lawyers move laterally between firms. But it is one thing for one of YPF's counsel to move laterally to another firm with no role in these proceedings. It is quite another for Ms. Boelter to join (out of all the law firms in the country) the very law firm, office, and practice group that has been litigating against one of Ms. Boelter's most significant clients in one of the most significant matters for the Sidley bankruptcy group which she used to

lead.  For its part, in recruiting and hiring Ms. Boelter mid-litigation, White & Case assumed the

risk that YPF would have legitimate concerns with and object to the adequacy of an ethical wall

under the extraordinary circumstances here.  Yet neither White & Case nor Ms. Boelter ever

sought YPF's consent or even notified YPF in advance of Ms. Boelter's move.  This was despite

White & Case's acute awareness of the importance YPF placed on the sensitivity of information

related to this bet-the-company litigation: earlier in 2020, White & Case repeatedly sought YPF's

consent to the hiring of an associate who had briefly worked for YPF as part of another firm

representing YPF in the underlying bankruptcy.  After YPF declined to consent, White & Case

decided not to hire the associate.  White & Case was therefore well aware of the high value YPF

placed on confidences related to this case.  Nonetheless, White & Case forged ahead with the

recruitment and hiring of YPF's senior advisor and counsel on this matter, without giving any

advance notice to YPF.  White & Case now must bear the consequences of that decision.

  For the reasons set forth below, YPF respectfully submits that, in this unique case, no

ethical screen could cure the ethical conflict that White & Case has created and, therefore, White

& Case must be disqualified from representing the Trust in its litigation against YPF.

## STATEMENT OF FACTS[1]

### I. MS. BOELTER PITCHES HER FIRM TO YPF AND SERVES AS KEY COUNSEL AND STRATEGIST FOR THE COMPANY

  Soon after the Trust brought suit against YPF in June 2018, YPF interviewed various

outside law firms to represent it.  Among them was Sidley, and the two attorneys who led

Sidley's efforts at pitching to work for YPF were James Conlan and Ms. Boelter.  Decl. of

---

[1] The below statement of facts includes several facts about general topics discussed or kinds of work done by YPF's counsel, including Ms. Boelter.  By providing this general description of legal work done, YPF does not waive, and on the contrary intends to preserve, all applicable privileges under all applicable law, including but not limited to the attorney-client privilege and the protection of the work product doctrine.

Daniel González Casartelli ("DG Decl.") ¶ 3; Decl. of Germán Fernández Lahore ("GFL Decl.") ¶¶ 3-4.  Ms. Boelter, alongside Mr. Conlan, provided YPF's senior management with the initial assessment of YPF's case and proposed an initial litigation strategy.  GFL Decl. ¶ 3.  Ms. Boelter was involved in negotiating the terms of Sidley's eventual engagement with the company.  *Id.* ¶ 4.  The engagement letter was signed on July 20, 2018.  *Id.*  The senior bankruptcy partner on the case, Mr. Conlan, signed for Sidley, and the only other Sidley partner named was Jessica Boelter. *Id.*  Thereafter, the very first document YPF filed in this case was a motion to admit Ms. Boelter *pro hac vice*, and she remained counsel of record for YPF until October 1, 2020.  Mot. and Order for Admis. Pro Hac Vice, D.I. 4; Notice of Withdrawal of Appearance, D.I. 261.

Once Sidley's work on the case began, Ms. Boelter received even more sensitive information and became YPF's initial day-to-day contact, and remained a key advisor for the litigation.  DG Decl. ¶ 4; GFL Decl. ¶¶ 5-8, 11.  YPF's senior executives, including its CEO, regarded Ms. Boelter as one of YPF's lead lawyers.  DG Decl. ¶ 4; GFL Decl. ¶ 11.  She was active in formulating YPF's original litigation strategy, and she provided advice and counsel to YPF on key issues.  GFL Decl. ¶¶ 5-6; Decl. of John Kuster ("JK Decl.") ¶¶ 4-5.  Ms. Boelter was actively involved in formulating or at least privy to the legal advice Sidley provided to YPF on a wide range of highly sensitive topics, including:

- the motion to dismiss and litigation strategy following denial of the motion;
- document review and related privilege determinations;
- the possibility of a motion to withdraw the reference, and the merits of litigating the case in another forum;
- consideration of White & Case's litigation tactics;
- the possibility of settlement or other out-of-court resolution of the litigation;
- YPF's disclosures pursuant to securities laws;
- YPF's engagement of local counsel; and
- corporate law considerations related to this litigation.

GFL Decl. ¶¶ 6-8; JK Decl. ¶ 5; DG Decl. ¶ 7.  In addition to advising YPF about the conduct of this litigation, Ms. Boelter was privy to communications regarding YPF's efforts to obtain third-party discovery from Occidental Chemical Corp. ("Occidental"), as well as other strategic issues related to Occidental.  GFL Decl. ¶ 6.

In keeping with her importance as YPF's counsel, Ms. Boelter met with senior YPF management in person.  During these meetings, YPF executives discussed with Ms. Boelter litigation strategy, as well as other confidential and sensitive issues one would normally expect a client and its lead lawyers to discuss in a litigation of this importance and magnitude, such as settlement prospects and strategies, as well as the impact of this litigation on YPF's overall business and corporate objectives.

For example, on September 20, 2018, Mr. Fernández Lahore, YPF's general counsel, and Diego Pando, YPF's Controller, traveled from Argentina to New York to meet with Ms. Boelter and other Sidley lawyers to discuss litigation strategy and associated financial and business considerations.  GFL Decl. ¶ 7.  On February 21, 2019, Mr. Fernández Lahore traveled to New York to meet with Ms. Boelter and other Sidley partners to discuss the Court's denial of the YPF Defendants' Motion to Dismiss.  GFL Decl. ¶ 8.  Ms. Boelter actively participated in the discussion, which covered highly sensitive topics relating to this litigation.  *Id.*  And on May 15, 2019, Mr. González, YPF's CEO, himself traveled to New York to meet with Ms. Boelter and other members of the Sidley team to discuss this case.  DG Decl. ¶ 7.

As further evidence of the relationship of trust that Ms. Boelter established with YPF, Ms. Boelter even socialized with YPF's top executives.  On October 26, 2018, YPF management rang the closing bell at the New York Stock Exchange as part of a ceremony commemorating the twenty-fifth anniversary of YPF's listing as a public company.  *Id.* ¶ 5.  That evening, YPF held

a reception and invited key business partners and financial advisors. *Id.* They invited only two of their lawyers, Ms. Boelter and Mr. Conlan, and Ms. Boelter ultimately attended as Sidley's sole representative. *Id.* At the reception, she met with then-CEO Mr. González and discussed the case with him. *Id.*

Ms. Boelter was not only a key advisor for YPF; within Sidley, she naturally played a major role in managing and strategizing the conduct of the case. She billed over 300 hours to YPF in connection with this matter. JK Decl. ¶ 3. She worked extensively on the YPF Defendants' motion to dismiss. *Id.* ¶ 4. She reviewed YPF's answer; strategized about discovery issues; participated in internal discussions about a potential motion to withdraw the reference; and frequently discussed case strategy with the other Sidley partners working on the case. *Id.* ¶ 5. She was counsel of record for YPF and traveled to Delaware to attend the oral argument before this Court on the YPF Defendants' motion to dismiss. *Id.* ¶ 4. She also traveled to Delaware for this Court's hearing on May 28, 2019 concerning motions to treat depositions from prior actions as if taken in this case. *Id.*

While Ms. Boelter's day-to-day involvement in the litigation ebbed and flowed over time, particularly after the onset of discovery as the case transitioned to more traditional civil litigation, at all times YPF regarded her as their strategic bankruptcy advisor and a repository of their most sensitive confidences regarding this matter. GFL Decl. ¶ 11; DG Decl. ¶¶ 6-8. Moreover, when Mr. Conlan left Sidley in June of 2020, this left Ms. Boelter as the senior Sidley restructuring partner on the case. JK Decl. ¶ 6. On August 5, 2020—when Ms. Boelter might already have made the decision to move to White & Case—Sidley sent a privileged strategy document to YPF, providing a status update on this litigation and outlining strategic options; Ms. Boelter's photo and biography appeared among the partners listed in the presentation. GFL

Decl. ¶ 9.  Ms. Boelter continued to be identified as YPF's counsel of record up until the day she

left Sidley and started at White & Case.  *See* Notice of Withdrawal of Appearance, D.I. 261.

## II.    WHITE & CASE'S ROLE OPPOSITE YPF

White & Case has represented the Trust in its action against YPF from the outset, in what

can only be described as a bet-the-company litigation:  The Trust's claimed damages amount to

$14 billion.  *See* Compl. ¶ 2, D.I. 1.  The Trust has pursued its case aggressively, and YPF has

tried to defend itself against this existential threat.  The parties have litigated numerous motions

and engaged in extensive discovery.  With expert discovery, summary judgment motion practice,

and a potential trial on the horizon, the case will doubtless only increase in intensity.

The filing of the Adversary Complaint in 2018 was not the first time White & Case

represented a party adverse to YPF in connection with these matters.  White & Case is counsel to

Occidental in the bankruptcy proceeding underlying this case, *In re Maxus Energy Corp.*, Case

No. 16-11501 (CSS) (Bankr. D. Del) ("Maxus Bankruptcy").  The plan this Court approved

provided Occidental with beneficial interests in the Trust and control of a majority of the seats on

its Oversight Committee.  Am. Ch. 11 Plan of Liquidation at 29-31, 42-45, *In re Maxus Energy*

*Corp.*, Case No. 16-11501 (CSS) (Bankr. D. Del. May 20, 2017), D.I. 1451.  That committee

supervises the Trustee and determines whether the Trust should settle any causes of action,

including those against the YPF Defendants.  *Id.* at 45.  White & Case has since represented that

their work for Occidental in connection with the Maxus Bankruptcy "concluded in July 2017,"

and that Mr. Lauria, although he was counsel of record, never actually billed time to that case.

Ex. A at 1, Letter from J. Paradise to V. Hou (Dec. 4, 2020).[2]  However, it does not appear that

either White & Case or Mr. Lauria have withdrawn their appearances for Occidental, and the risk

---

[2]    Unless otherwise specified, citations to exhibits are to the exhibits to the Declaration of Rebecca M.
Michaud ("RM Decl.").

remains that Occidental could seek advice from its counsel of record at White & Case on issues related directly to YPF.

### III.    MS. BOELTER LEAVES SIDLEY AND YPF, AND SHE SWITCHES SIDES

Ms. Boelter left Sidley without saying anything about her departure to her then-client YPF, either before or since.  GFL Decl. ¶ 9; DG Decl. ¶¶ 9-10.  On September 12, 2020, Mr. Kuster told Mr. Fernández Lahore, to his shock, that this key senior member of the YPF team planned to leave for White & Case.  JK Decl. ¶ 8; GFL Decl. ¶ 10.  On October 1, by letter, White & Case informed YPF that Ms. Boelter had joined the firm as a partner and claimed to have implemented an ethical screen that supposedly cured the patent conflict created by Ms. Boelter's joining White & Case.  Ex. B, Letter from J. Paradise to J. Kuster (Oct. 1, 2020).  In its letter, White & Case described in vague terms the screen they had purportedly implemented.  *See id.*  White & Case did not provide YPF with the actual instructions or policies that had been provided to White & Case's attorneys concerning the supposed screen.  On the same day, October 1, Ms. Boelter was joined at White & Case by Bojan Guzina, co-head of Sidley's bankruptcy practice, as well as bankruptcy litigator Michael Andolina.  JK Decl. ¶ 9.  Shortly after, bankruptcy partner Andrew O'Neill, counsel Lauren Baccash, and associates Michael Linder and Blair Warner also left Sidley for White & Case.  JK Decl. ¶ 9.

On September 12, YPF also learned that Ms. Boelter was engaged to marry White & Case partner Thomas Lauria, head of the Financial Restructuring and Insolvency Practice ("Restructuring Group") at White & Case, where he is counsel of record to Occidental in the Maxus Bankruptcy.  GFL Decl. ¶ 10; JK Decl. ¶ 8.  White & Case has since revealed that the relationship between Ms. Boelter and Mr. Lauria dates back to late 2018.  Ex. C at 1, Letter from J. Paradise to H. Zelbo (Oct. 27, 2020).  Ms. Boelter had never disclosed this relationship to

YPF, and YPF was unaware of it until mid-September 2020.  GFL Decl. ¶ 10; DG Decl. ¶ 9.
White & Case has now confirmed that Ms. Boelter and Mr. Lauria married in November.

White & Case surely must have recognized the conflict created by their decision to bring
Ms. Boelter into the firm while White & Case still represented the Trust.  YPF of course
understands that potential conflicts may arise at times in litigation and has itself, for example,
faced a recent concern raised by an adversary about potential conflicts in the entirely different
context of substituting counsel who, unbeknownst to YPF, may have previously pitched to
represent YPF's adversary.[3]  But here, White & Case knew full well Ms. Boelter's role as a lead
lawyer for its adversary in this litigation, and nonetheless recruited her in the middle of the
litigation.  Moreover, despite possessing this knowledge, White & Case never asked YPF to
waive the obvious and substantial conflict of interest created by Ms. Boelter's association with
the firm.  GFL Decl. ¶ 12.  This omission is remarkable not only because of Ms. Boelter's high-
profile involvement in this case, but also because White & Case had previously sought a waiver
from YPF in order to hire a much more junior lawyer who worked briefly on the Maxus
Bankruptcy.  On April 8, 2020, White & Case asked YPF to waive the conflict that would be
created by their employment of a former Norton Rose Fulbright LLP ("Norton") associate,
because while at Norton this junior associate had done some work for YPF in connection with
the Maxus Bankruptcy.  *Id.* ¶ 13.  After repeated requests from White & Case, YPF ultimately
declined to consent to the conflict due to its concerns about protecting its confidential
information from being leaked and used against it in this litigation.  *Id.*  In turn, White & Case
eventually decided not to hire the associate.  Ex. C at 1.

---

[3]      *See* Letter to Hon. Loretta A. Preska, *Petersen Energía Inversora S.A.U. v. Argentine Republic*, No. 15-cv-02739 (S.D.N.Y. Dec. 18, 2020), D.I. 243.

By contrast, White & Case and Ms. Boelter simply presented YPF with a *fait accompli*, unilaterally informing YPF that the company's top bankruptcy lawyer had switched sides.  White & Case sought to distinguish this situation from the prior conflict by noting that the associate had not been admitted *pro hac vice* in Delaware in connection with this litigation.  Ex. C at 1.  While that fact was arguably germane to the question what ethical rules were applicable to each attorney's conduct, Ms. Boelter's position as counsel of record also makes clear that her role was far more significant to YPF than was the junior associate's, making the conflict, and the infeasibility of an ethical screen to cure that conflict, all the more apparent.

## IV.    WHITE & CASE ESTABLISHES AN INADEQUATE SCREEN AND THEN RESISTS YPF'S EFFORTS TO OBTAIN INFORMATION ABOUT IT

White & Case claims to have established an ethical screen to separate Ms. Boelter from YPF-related matters.  Ex. B.  On October 14, counsel for YPF sent a letter to White & Case objecting to the conflict created by Ms. Boelter having joined the firm.  Ex. D, Letter from H. Zelbo to J. Paradise (Oct. 14, 2020).  On October 27, White & Case responded that it was satisfied with the adequacy of its own screen, asserting that an ethical screen could cleanse a conflict regardless of how senior or involved with a conflicted matter the conflicted lawyer had been.  Ex. C at 1.  On November 6, in order to evaluate the full extent of the risks White & Case's conduct posed to its confidential information, YPF exercised its right under Model Rule of Professional Conduct 1.10(a)(2)(ii) to seek additional information about White & Case's purported screen, and provided White & Case with a list of questions and requests for certain related documents.  Ex. E, Letter from V. Hou to J. Paradise (Nov. 6, 2020).[4]

---

[4]    YPF recognizes that this Court applies the Model Rules to attorneys appearing before it.  However, YPF reserves all rights to pursue in other fora any claims that it may have under other rules and laws applicable to White & Case's and Ms. Boelter's conduct.

Instead of responding promptly to YPF's request, as required, White & Case delayed. Almost a week later, on November 12, White & Case sent a brief email accusing YPF of improperly seeking "discovery" in anticipation of litigation concerning White & Case's screen, Ex. F, Email from J. Paradise to V. Hou (Nov. 12, 2020), in spite of the fact that White & Case was obligated to respond to YPF's written queries about their screening efforts under Model Rule of Professional Conduct 1.10(a)(2)(ii).  White & Case offered to orally discuss YPF's questions, but only on the condition that such discussions would be privileged under Federal Rule of Evidence 408.  Ex. F.  YPF responded on November 18, noting its entitlement to this information under Model Rule 1.10 and objecting to White & Case's apparent desire to keep information about its screen from submission to this Court in the event the Court was called upon to review the screen.  Ex. G, Letter from V. Hou to J. Paradise (Nov. 18, 2020).

White & Case eventually relented, agreeing to provide the written responses mandated by Model Rule 1.10(a)(2)(ii) on November 25, nearly three weeks after YPF's original request.  Ex. H at 1, Email from J. Paradise to V. Hou (Nov. 23, 2020).  In its letter, sent only 90 minutes before the parties' scheduled meet and confer, White & Case provided a partial and unsatisfactory response to YPF's queries.  RM Decl. ¶ 10; Ex. I, Letter from J. Paradise to V. Hou (Nov. 25, 2020).

Leaving aside the fact that **no** screen could adequately protect YPF's confidences given the extraordinary circumstances of Ms. Boelter's move to White & Case, *see infra* pp. 14-23, the information White & Case provided establishes an inadequate screen.  The "lateral screen" purportedly applied to Ms. Boelter contains several of the features used by screens in typical lateral hire situations.  Ex. I at 5-6.  It directs Ms. Boelter not to work on this litigation or to discuss it with any other personnel at the firm, and directs team personnel not to discuss the

matter with her.  *Id.*  It also restricts Ms. Boelter's access to Maxus-related files, provides that

Ms. Boelter will not receive a portion of the related fee, and provides for disciplinary sanctions

against those who breach the screen.  *Id.*

However, the screen does not ultimately address the fact that Ms. Boelter will necessarily

be working in the same department, in the same office, and likely with the same lawyers that

represent the Trust, and that she now lives with the head of the group litigating against her

former client.  The screen White & Case implemented purportedly directs Ms. Boelter not to

"work in an office location in close proximity to any of the attorneys working on the Maxus

Matter" ("Maxus Team").  *Id.* at 8  It also supposedly requires that Ms. Boelter not "share

secretarial coverage" with those assigned to the Maxus case.  *Id.* at 6.  But White & Case did not

explain how Ms. Boelter is expected to avoid "close proximity" with the Maxus Team lawyers

with whom she works on other cases, and with whom she doubtless has other regular interactions

outside of client matters as they work together in the same group and the same office.  White &

Case declined to provide any information about the extent to which the teams on which Ms.

Boelter is working or may work at White & Case overlap with the Maxus Team.  White & Case

eventually did disclose that four New York restructuring partners, and a total of 11 New York

restructuring lawyers, are currently working for the Trust.  Ex. A at 1.  According to White &

Case's website, a total of 85 lawyers are members of the firm's New York Restructuring Group.

Ex. J, White & Case LLP Website (Dec. 18, 2020).[5]  This means that Ms. Boelter is expected to

physically avoid about one in seven of her colleagues.

---

[5]      This number was arrived at using the "People Search" tool on White & Case's website and by applying the
Financial Restructuring and Insolvency and New York filters from the "Service" and "Location" menus.  The
website lists a total of 47 partners, and 85 lawyers of any seniority, under Financial Restructuring in New York, and
lists a total of 282 Financial Restructuring attorneys around the world.

**ARGUMENT**

The rare remedy of disqualification is warranted in this case and, indeed, is the only way to ensure that YPF's confidential information and the integrity of this litigation can be protected. There can be no question that Ms. Boelter possesses highly sensitive confidential information about YPF, including the strategies she helped to formulate during the course of her representation in this hard-fought litigation.  These sorts of client confidences are considered so sensitive that Professor W. Bradley Wendel, a leading ethics expert at Cornell Law School, describes them in his expert report as "radioactive," such that no ethical screen can cleanse the conflict.  Wendel Decl. ¶ 29.  This is particularly the case given that Ms. Boelter was YPF's counsel of record in this litigation until October 1, that YPF entrusted her with the most highly sensitive information regarding this litigation (much of which information Ms. Boelter helped to generate), and that Ms. Boelter joined the very department, headed by Ms. Boelter's now-husband, in the very office at White & Case that is spearheading the litigation in which she previously defended YPF.  As Professor Wendel notes, the rules on ethical screens were designed to allow lawyers with purely theoretical access to client information, or little actual information, to move to a new firm.  They were never intended to force a former client into the untenable position White & Case and Ms. Boelter have foisted upon YPF, where one of its lead counsel in a high-stakes matter switches sides, creating an unacceptable risk that its confidential and vital information will end up in the hands of its adversaries.  Moreover, even if a screen could be sufficient (and it could not be on these remarkable facts), the measures White & Case claims to have instituted are insufficient on their face and have already irreparably endangered the security of YPF's confidential information.  White & Case's subsequent stonewalling has only exacerbated YPF's concerns about the screening process and the vindication of its

legitimate expectations regarding the protection of its information.  And any additional measures imposed by White & Case would not address disclosures that may have already occurred. Accordingly, disqualifying White & Case is the only remedy that can protect YPF's confidences and begin to restore the integrity of this litigation and the public's perception of its fairness, whether in this country or, given the international dimension of this case, abroad.

## I.      NO SCREEN COULD SUFFICIENTLY PROTECT YPF'S CONFIDENCES AND ENSURE THE FAIRNESS OF THESE PROCEEDINGS

This Court applies the ABA Model Rules of Professional Conduct to questions of attorney misconduct.  Bankr. D. Del. L.R. 9010-1(f).  Under Model Rule 1.9, absent the consent of a former client, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same . . . matter in which that person's interests are materially adverse to the interests of the former client."  MRPC r. 1.9(a).  Under Rule 1.10, such conflicts are imputed to a lawyer's entire firm.  As a result, a firm cannot represent a client if one of its lawyers would be unable to do so under Rule 1.9.  MRPC r. 1.10(a).

There is no doubt that the interests of Ms. Boelter's former client, YPF, are materially adverse to the interests of its opponent and Ms. Boelter's firm's current client, the Trust.  *See Int'l Longshoreman's Ass'n Local 1332 v. Int'l Longshoreman's Ass'n*, 909 F. Supp. 287, 291 (E.D. Pa. 1995).  Accordingly, once White & Case accepted Ms. Boelter into its partnership, the firm presumptively disqualified itself from representing the Trust in this litigation.  This rule is based on the presumption that information easily spreads through the attorneys working together in a law firm.  *See* Wendel Decl. ¶ 21.  It acknowledges the risk that lawyers may inadvertently let slip information about past matters they have worked on, and a client should not have to fear

that the lawyer in whom it has reposed its confidences might move to an opposing party's firm

and leak that sensitive information to its litigation adversaries.  *Id.* ¶ 32.

Although imputed conflicts can in some circumstances be avoided if "the disqualified

lawyer is screened from any participation in the [conflicted] matter," MRPC r. 1.10(a)(2)(i), even

a "facially sufficient" screen will not prevent disqualification when "other factors weigh against

the sufficiency of the screen."  *James v. Teleflex, Inc.*, Case No. 97-cv-01206 (LR), 1999 WL

98559, at *5-6 (E.D. Pa. Feb. 24, 1999); *see also Intell. Ventures I LLC v. Checkpoint Software*

*Techs. Ltd*, Case No. 10-cv-01067 (LPS), 2011 WL 2692968, at *13 (D. Del. June 22, 2011)

(rejecting argument that "a screening mechanism cures every imputed conflict"); MRPC r. 1.10

cmt. 7 ("Lawyers should be aware . . . that, even where screening mechanisms have been

adopted, tribunals may consider additional factors in ruling upon motions to disqualify a lawyer

from pending litigation.").

In order to determine whether screening is available to cleanse the conflict created by a

moving lawyer's former client, a court considers "(1) [t]he substantiality of the relationship

between the [disqualified] attorney and the former client, (2) [t]he time lapse between the matters

in dispute, (3) [t]he size of the firm and the number of disqualified attorneys, (4) [t]he nature of

the disqualified attorney's involvement, and (5) [t]he timing of the wall."  *Enzo Life Scis. Inc. v.*

*Adipogen Corp.*, Case No. 11-cv-00088 (RGA), 2013 WL 6138791, at *3 (D. Del. Nov. 20,

2013).  The Restatement of the Law Governing Lawyers puts particular emphasis on the fourth

factor, stating that an imputed conflict can be cleansed with a screen only where "any

confidential client information communicated to the personally prohibited lawyer is unlikely to

be significant in the subsequent matter."  Restatement (Third) of the Law Governing Lawyers §

124(2)(a) (Am. L. Inst. 2000).

Thus, while White & Case may proclaim by fiat that its screen is sufficient regardless of how significant a lawyer's work was on the conflicted matter, that is not the law.  *See* Ex. C at 1 (contending erroneously that "[t]he applicability of the Model Rules' screening procedures are not dependent on the seniority of the lawyer involved or the type of work he or she performed."). Instead, as Professor Wendel and the case law make clear, courts evaluating a disqualifying conflict screened under the Model Rules or other codes of professional conduct consider the nature of the attorney's work on the case and the importance of the attorney's relationship with the client.  *See* Wendel Decl. ¶ 23.  Here, as addressed below, an analysis of the relevant factors weighs heavily against the adequacy of any screen.  Therefore, only White & Case's disqualification will adequately protect YPF's confidences, and in turn ensure the integrity and fairness of this litigation.

**A.  Ms. Boelter had a substantial relationship with YPF as one of its key legal advisers.**

Where the relationship between client and disqualified lawyer is particularly substantial—for example, when the disqualified lawyer served as counsel of record for the client—the effectiveness of a screen is undermined.  *See Teleflex*, 1999 WL 98559, at *6 (finding that conflicted lawyer's role as "lead counsel" and "counsel of record" for former client weighed against effectiveness of screen); *Norfolk S. Ry. v. Reading Blue Mountain & N. R.R.*, 397 F. Supp. 2d 551, 555 (E.D. Pa. 2005) (finding screen ineffective in part because conflicted lawyer was "lead counsel" and filed motions on behalf of client).  Here, Ms. Boelter was both counsel of record and one of the lead partners representing YPF in this multibillion dollar litigation.  Thus, this factor weighs heavily against the adequacy of an ethical screen.

Indeed, Ms. Boelter took a lead role in Sidley's relationship with YPF and with the case itself from the outset of the litigation.  She was one of the two lawyers negotiating the terms of

Sidley's engagement letter with YPF, and she was one of the two Sidley partners whose names

are listed on the engagement letter.  Ms. Boelter was publicly identified as YPF's counsel,

including by entering an appearance *pro hac vice* as counsel to the YPF Defendants, Motion and

Order for Admission Pro Hac Vice, D.I. 4, and listing her name among the authors of the YPF

Defendants' Motion to Dismiss,  YPF Defs.' Mot. to Dismiss the Adversary Compl. at 80, D.I.

50.  News articles about this case have repeatedly identified Ms. Boelter as counsel to YPF.[6]  In

an advertisement in a trade publication, published in 2020, where Ms. Boelter was listed as the

co-head of the Sidley restructuring practice along with Mr. Guzina (who also departed Sidley for

White & Case), the group touted its representation of YPF "in a US$14 billion law suit brought

by its former subsidiary in the Delaware bankruptcy court."  Ex. K at 2, Ass'n of Bus. Recovery

Pros. Directory.  And Ms. Boelter continued to represent YPF right up until she left Sidley.

     Ms. Boelter's role as shown in public was consistent with her role in private.  She

repeatedly met with senior YPF management in person, regularly spoke with them over the

phone, and corresponded with them with great frequency regarding this case, exchanging highly

confidential and sensitive information with YPF.  YPF regarded Ms. Boelter as the partner with

day-to-day responsibility for Sidley's relationship with YPF.  Ms. Boelter even discussed this

case with YPF's CEO at the commemoration of the 25th anniversary of YPF's public listing.

     After serving in so public a role as YPF's counsel of record, Ms. Boelter's defection to

the opposing team was equally well-publicized.  *See* Dan Roe, *Hire Up: Big Firms Hire Groups*

*of Laterals*, Law.com (Oct. 2, 2020),  https://www.law.com/americanlawyer/2020/10/02/hire-up-

---

[6]     These articles include Rose Krebs, *Depositions Barred in $14B Maxus Bankruptcy Suit*, Law360 (June 24, 2019), https://www.law360.com/articles/1172332/depositions-barred-in-14b-maxus-bankruptcy-suit; Jeff Montgomery, *2 Energy Cos. Must Face $14B Suit from Del. Ch. 11 Trustee*, Law360 (Feb. 15,  2019), https://www.law360.com/articles/1130044/2-energy-cos-must-face-14b-suit-from-del-ch-11-trustee; and Vince Sullivan, *Ex-Maxus Owners Say $14B Suit Covers Well-Worn Ground*, Law360 (Jan. 22, 2019). https://www.law360.com/articles/1120597/ex-maxus-owners-say-14b-suit-covers-well-worn-ground.

big-firms-hire-groups-of-laterals/?slreturn=20201011124701; Roy Strom, *White & Case Hires Co-Leaders of Sidley Bankruptcy Practice*, Bloomberg Law (Oct. 1, 2020), https://news.bloomberglaw.com/business-and-practice/white-case-hires-co-leaders-of-sidleys-bankruptcy-practice. White & Case itself has broadcasted Ms. Boelter's association with the firm: she is now one of the six key bankruptcy partners touted by White & Case's advertisement on the Chambers website. Ex. L, Chambers & Partners Website. Under these circumstances, the mere appearance of impropriety created by Ms. Boelter's very public shift in loyalties weighs in favor of disqualification. *See Enzo Life Scis.*, 2013 WL 6138791, at *4 (finding that "appearance of a continuing imputed conflict" created by former counsel's public association with adversary firm favored disqualification); *Intell. Ventures*, 2011 WL 2692968, at *4  ("[A] court may disqualify an attorney for failing to avoid even the appearance of impropriety.").

**B. Ms. Boelter switched sides in the midst of an ongoing case.**

Another factor weighing against the sufficiency of a screen is the timing of Ms. Boelter's move to White & Case, in the midst of ongoing litigation. *See Norfolk*, 397 F. Supp. 2d at 554 (finding disqualification warranted where there was "no time lapse whatsoever" separating former representation from employment by adversary firm). In *Enzo Life Sciences*, the disqualified attorney last worked on the litigation in December 2011, withdrew as counsel in January 2012, and later moved to another firm; this new firm was retained by his former adversaries in May 2013. 2013 WL 6138791, at *1.[7] The court did not find that this lapse of time undermined the case for disqualification. *Id.* at *4. Here, by contrast, Ms. Boelter was YPF's counsel of record until the day before she moved to White & Case. Ms. Boelter's mid-

---

[7]    The court's opinion in *Enzo Life Sciences* contains a clerical error, listing May 3, 2011 as the date the disqualified attorney's firm entered its appearance. *See* 2013 WL 6138791, at *1. The docket entry the court cites is in fact from May 3, 2013; in context, it is clear the court intended to refer to this date. *See* Notice of Substitution of Counsel, *Enzo Life Scis. v. Adipogen Corp.*, Case No. 11-cv-00088 (RGA) (D. Del. May 3, 2013), D.I. 111.

litigation shift in loyalties strongly weighs in favor of finding a screen ineffective. *See Norfolk*, 397 F. Supp. 2d at 554.

### C. Ms. Boelter's work in the New York Restructuring and Financial Insolvency group creates a substantial risk YPF's confidences will spread through that small group.

When Ms. Boelter moved to White & Case, she joined the same small group of bankruptcy partners in White & Case's New York office that is actively litigating against her former client, making it extremely likely that YPF's confidential information and strategies will spread to the Trust's lawyers. Even if no confidence is ever actually disclosed—and to be clear, there is a substantial risk of actual disclosure—YPF's and the public's knowledge of this risk will color the proceedings with an "appearance of impropriety," which favors finding a screen ineffective and disqualifying White & Case. *Intell. Ventures*, 2011 WL 2692968, at *4; *see also* Wendel Decl. ¶ 16.

When lawyers work together, "there exists a continuing danger that [the disqualified lawyer] may unintentionally transmit information he gained through his prior association," even where the lawyer exerts "sincere efforts to disassociate himself from the [conflicted matter]." *Cheng v. GAF Corp.*, 631 F.2d 1052, 1058 (2d Cir. 1980), *vacated on other grounds*, 450 U.S. 903 (1981). This danger is even greater here, where the disqualified lawyer works in the same department that handles the conflicted matter and where lawyers in that group "regularly work[] with [the disqualified lawyer]." *Decora Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 140 (S.D.N.Y. 1995). Moreover, this risk is exacerbated because six other Sidley lawyers, including Ms. Boelter's former co-head of the Sidley bankruptcy practice, a senior litigation partner, a bankruptcy counsel, and two associates also left to join her at White & Case.

To be sure, White & Case is a large, global law firm. But the confidential information Ms. Boelter possesses does not need to go across the globe in order to make its disclosure highly

consequential for YPF.  It only needs to go across the hall, to the office of one of Ms. Boelter's

colleagues in the Restructuring Group, or be exchanged across the dinner table with her husband,

the head of that group.  Accordingly, the Court should look to the size of the group Ms. Boelter

actually works in and her current relationship with its senior attorneys to evaluate the

effectiveness of any screen.  White & Case's website lists 47 New York partners as involved

with its Financial Restructuring and Insolvency Practice.  *See* Ex. J.  Ms. Boelter may already be

working with those partners on various matters, including partners who also work on the Maxus

Team.  Moreover, Ms. Boelter has been involved in a romantic relationship with the group's

head, Mr. Lauria, since 2018, and the two married in early November.  This close personal

relationship substantially enhances the risk that YPF's confidential information has already

filtered through to White & Case lawyers working on this litigation, or that it will do so in the

future.  This is doubly so because Mr. Lauria and Christopher Shore, the Trust's lead counsel in

this case, are frequent collaborators: based on public records alone, they appear to have been

joint counsel of record in more than 25 cases since 2001.  RM Decl. ¶ 14.

Under these circumstances, there are simply too many points of contact between Ms.

Boelter and the Maxus Team for a screen to be effective.  It is almost inevitable that Ms. Boelter

eventually inadvertently makes a comment, suggests a strategy, or lets slip a detail that could tip

off an attorney working on the YPF litigation.  Accordingly, "the relatively small size of [the

New York Restructuring Group] and the close working relationship between [Ms. Boelter] and

those who are otherwise working on this case against [Ms. Boelter's] former client indicate that

screening mechanisms cannot be effective in this case," because it is almost inevitable that

confidential information percolates through the group to the lawyers litigating against YPF.

*Decora*, 899 F. Supp. at 141.

Moreover, this risk of leaked confidences taints the litigation even if no confidences are ever actually disclosed.  As Professor Wendel explains, the ethical rules are not harm-based, they are risk-based.  Wendel Decl. ¶¶ 20, 33.  An aggrieved client in these extraordinary circumstances, like YPF here, does not have to prove any confidences were actually leaked for there to be a conflict of interest for which no screen would suffice.  As long as that risk is present, YPF is unacceptably harmed: YPF is forced to worry whether every narrowly tailored discovery request or strategic motion from the Trust reflects some confidence about YPF or its litigation strategy that may already have been leaked or may be leaked in the future.  *See id.* ¶ 20. The knowledge that the Trust's litigation choices might reflect the disclosure of one of these critical confidences creates at a bare minimum an "appearance of impropriety" that favors disqualification.  *Intell. Ventures*, 2011 WL 2692968, at *4.

**D. Ms. Boelter was intimately involved with the most important parts of this case.**

The fact that White & Case hired Ms. Boelter while she was in possession of the most sensitive and significant of YPF's confidences likewise strongly favors finding a screen per se ineffective.  *Enzo Life Scis.*, 2013 WL 6138791, at *4.  As Professor Wendel explains, the policy underpinning the ethical rules on imputed conflicts is the protection of clients' confidential information.  Wendel Decl. ¶ 19.  Surveying the academic and legal authorities, Professor Wendel emphasizes that the level of assurance offered by a screen can depend on the seniority and importance of the conflicted lawyer to the matter.  *See id.* ¶ 29.  Senior lawyers are more likely to be in possession of significant confidences whose disclosure presents a much greater danger to the client than would those possessed by a more junior attorney.  *See id.*  At a certain point, the possible disclosure of those confidences is so consequential to the former client that a court cannot reasonably ask a former client to rest easy: some attorneys' information is too

"radioactive" to be safe behind an ethical screen. *Id.* ¶¶ 27, 29. This is reflected in the Third

Restatement, which makes the significance of the former client's confidences a dispositive factor

in determining whether screening will cure an imputed conflict. Restatement (3rd) of the Law

Governing Lawyers § 124(2)(a) (Am. L. Inst. 2000); *see also* Wendel Decl. ¶¶ 27, 29.

Disqualification is particularly warranted where the conflicted attorney's involvement

with the prior case included a candid evaluation of the strengths and weakness of the client's

case, as well as knowledge of the client's "defense strategies." *Enzo Life Scis.*, 2013 WL

6138791, at *4. Under these circumstances, even a "facially sufficient" screen would be

inadequate and disqualification is necessary. *Norfolk*, 397 F. Supp. 2d at 555-56. Here, in

addition to all her other work on the case, Ms. Boelter attended key strategy meetings where she

discussed litigation tactics and other strategic questions with YPF's CEO and top legal officer.

Again, as set forth above, *supra* pp. 5-8, Ms. Boelter's role as a key and trusted advisor

and strategist to YPF was far more extensive than that of the disqualified attorney in *Enzo Life

Sciences*, who had billed fewer than ten hours to the conflicting case and whose work was

limited to assisting with a mediation statement and the associated hearing, as well as signing a

few filings. 2013 WL 6138791, at *1. Here, Ms. Boelter billed over 300 hours to this case and

was one of the principal architects of YPF's litigation strategy. *See supra* pp. 5-8. There is no

doubt that this work put Ms. Boelter in possession of YPF's most sensitive confidences. *See

Madukwe v. Del. State. Univ.*, 552 F. Supp. 2d 452, 461 (D. Del. 2008) (noting that court should

draw conclusions about the confidences disclosed based on the nature of the attorney's work for

the prior client); *see also* Wendel Decl. ¶¶ 8, 33. Given the nature of those confidences, an

ethical screen could never be sufficient to protect YPF or the integrity of these proceedings.

**II.    EVEN IF AN ETHICAL SCREEN COULD BE SUFFICIENT GIVEN THE CIRCUMSTANCES OF MS. BOELTER'S PRIOR REPRESENTATION OF YPF, THE SCREEN WHITE & CASE IMPLEMENTED IS DEFICIENT**

As discussed above, given Ms. Boelter's strategic and factual knowledge about YPF and its case, an ethical screen cannot be trusted to ensure information is not inadvertently disclosed to its adversary.  Disqualification of White & Case is the only way to protect YPF's confidential information and its reasonable expectations, as well as to preserve the integrity and fairness of this proceeding.  Even assuming for the sake of argument, however, that some ethical screen could be sufficient here, White & Case's screen is defective because it depends on the entirely unlikely premise that Ms. Boelter will not work in "close proximity" with other members of her office's Restructuring Group who are also working on the Maxus Team.  Ex. I at 8.

At a minimum, any ethical screen must meet four requirements: (1) it must "[p]rohibit discussions of sensitive matters;" (2) it must "[r]estrict circulation of sensitive documents," (3) it must "[r]estrict access to [sensitive] files," and (4) it must establish a "strong policy against breach, including sanctions, physical [separation] and/or geographical separation" of conflicted lawyers from those working on conflicted matters.  *Enzo Life Scis.*, 2013 WL 6138791, at *4.

Here, the "physical . . . separation" White & Case has purported to impose is simply implausible.  About one in seven of White & Case's New York restructuring lawyers work on the Maxus Team.  Ms. Boelter may have already, and will surely in the future, work on matters, pitches, and internal firm business—not to mention have regular opportunities to speak—with the other New York Restructuring Group partners who are litigating against YPF, not to mention associates, or attorneys from *other* practice groups working on the Maxus Team.  It is unclear how White & Case expects to ensure Ms. Boelter does not work in close proximity with any of

-24-

them.  Accordingly, White & Case's screen does not credibly limit the danger that Ms. Boelter inadvertently discloses YPF's confidences to her colleagues.  *See Decora*, 899 F. Supp. at 140.

Even if White & Case took additional steps to strengthen its screen now—and to be clear, no realistic such steps could adequately strengthen the screen—it is too late.  An adequate screen must be imposed before the conflict arises, not after.  *See id.* at 141 (collecting cases).  Once the conflict arises, the former client is already exposed to the risk that its confidences and strategies will be disclosed.  White & Case chose to hire Ms. Boelter without ever seeking YPF's consent or even discussing possible screening measures with YPF.  In forging ahead unilaterally, White & Case chose to ask for forgiveness instead of permission.  The time to strengthen the screen was before Ms. Boelter was hired, not after, and White & Case made a calculated choice to forgo this opportunity.  Thus, the only appropriate remedy for their deficient screen is disqualification.

## III.    DISQUALIFICATION IS THE ONLY ADEQUATE MEASURE TO PROTECT YPF AND PRESERVE THE INTEGRITY OF THE LITIGATION

By inviting their opposing counsel, Ms. Boelter, to join the firm in the midst of litigation with Ms. Boelter's client, White & Case created an imputed conflict under Rule 1.10 that cannot be adequately addressed by a screen, as shown above.  Under these circumstances, White & Case must be disqualified from representing the Trust in this litigation.  "[D]isqualification ordinarily is the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case," *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980), and "any doubt as to the propriety of the representation should be resolved in favor of disqualification."  *Apeldyn Corp. v. Samsung Elecs. Co.*, 693 F. Supp. 2d 399, 404 (D. Del. 2010).

### A.  Disqualification will promote the policies of protecting client confidences, maintaining public confidence in the bar, and ensuring attorney loyalty.

The rule against representing adversaries of former clients, as embodied by Model Rule 1.9, serves at least three purposes:  (1) preventing "even the potential that a former client's confidences and secrets may be used against him;" (2) "maint[aining] public confidence in the integrity of the bar;" and (3) vindicating a client's "right to expect the loyalty of his attorney in the matter for which he is retained." *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984).  All of these purposes are served by disqualification on this case.

*First*, YPF faces more than the "potential that a former client's confidences and secrets may be used against" it.  *Id.*  Given Ms. Boelter's lead role representing YPF in this case until just weeks ago, she possesses exactly the vital confidences and secrets an adversary would want to use, and she is married to a lawyer who supervises the group that she works daily with, and which is litigating the case against YPF.  The risk is not simply that Ms. Boelter might disclose factual information about YPF.  Just as concerning to YPF is Ms. Boelter's deep knowledge of YPF's litigation and settlement strategy, much of which she helped to formulate.  Courts have disqualified attorneys simply because they had knowledge of a party's general "playbook" or "philosophy" for litigating a particular class of case, such as employment discrimination cases. *Madukwe*, 552 F. Supp. 2d at 462 (collecting cases).  This kind of "playbook information—for example, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject—is a basis for disqualification" even when these are all-purpose strategies applicable to many cases.  *Id.* (citation and internal quotation marks omitted).  Here, Ms. Boelter has more than YPF's playbook—she helped to write the game plan.  Disclosure of this information could have grave consequences for YPF.  The risk that Ms. Boelter might let slip a suggestion or a detail that betrays those confidences to her colleagues in the restructuring department, including her husband, is impermissibly great.  *See* Wendel Decl. ¶ 32.

*Second*, switching sides in the midst of ongoing litigation creates an appearance of impropriety that undermines the public's faith in their attorneys.  *See Enzo Life Scis.*, 2013 WL 6138791, at *4 (noting "constant appearance of a continuing imputed conflict" created by partner's public association with firm litigating against former clients).  This appearance of impropriety threatens the "integrity of the judicial system," because "clients must feel confident that they can divulge all relevant information to their attorneys, without fear that such confidences will eventually be used against them."  *Intell. Ventures*, 2011 WL 2692968, at *14.

Faced with a materially identical situation, the "hopefully rare" one in which one party's lead counsel abandoned his client for the opposing side's law firm, the court in *Norfolk Southern Railway* noted that such side-switching "severely undermines the integrity of the attorney-client relationship."  *Norfolk*, 397 F. Supp. 2d. at 556.  "If a client believes his attorney is free to abandon him . . . for employment with opposing counsel without fear of disqualification of opposing counsel, the client would have no reason to be assured that his attorney would be loyal, and the candor between the client and attorney would be severely compromised."  *Id.*  Clients would be encouraged "to provide as little information as possible to their attorneys for fear that the next day they would work for the opposition."  *Id.*  Disqualification is necessary here to "promot[e] public confidence" in the judicial system by assuring litigants—both YPF and others—that their trusted lawyers will not be permitted to turn against them in the middle of a lawsuit.  *Intell. Ventures*, 2011 WL 2692968, at *14.

This appearance of impropriety taints the litigation even if no confidences are ever actually disclosed.  YPF and other parties have no way of knowing whether confidences have already been disclosed or may be disclosed in the future, and would certainly have great difficulty proving as much.  So absent disqualification, YPF will always be on guard about this

very real risk.  This is, in part, why the law against representing former adversaries focuses on preventing the *risk* that confidences will be disclosed.  Wendel Decl. ¶¶ 20, 33.  Every time White & Case makes a targeted discovery request or poses an effective question during a deposition, YPF and the public will be forced to wonder whether that effective tactic was borne of a leaked confidence.  This threat to the integrity and fairness of these proceedings mandates White & Case's disqualification.

*Third*, YPF's legitimate interest in the loyalty of its attorneys weighs in favor of disqualification.  White & Case refused to disclose when they began recruiting Ms. Boelter.  But it is clear that Ms. Boelter was planning her move for at least some of the time she represented YPF and while she was involved in a personal relationship with the leader of the White & Case group litigating against YPF and personally representing Occidental in the underlying bankruptcy.  She never withdrew as YPF's counsel, nor did she tell YPF she was terminating her involvement in the case.  As soon as she decided to move to White & Case, Ms. Boelter's loyalties switched to her new firm's clients and her future partners, and these interests were in direct conflict with those of her client YPF.  White & Case must be disqualified in order to avoid this kind of compromise of an attorney's duty of undivided loyalty.  *See* Wendel Decl. ¶ 20.

### B. Disqualifying a firm for hiring its opponents' lead counsel does not unreasonably hamper attorney mobility.

The Comments to the Model Rules recognize two "competing considerations" to the protection of client confidences and loyalties: ensuring that the rules do not "preclude other persons from having reasonable choice of legal counsel," and not "unreasonably hamper[ing] lawyers from forming new associations and taking on new clients after having left a previous association."  MRPC r. 1.9 cmt. 4.  Here, it is entirely reasonable to disqualify a firm that resorts

to the extraordinary practice of hiring away one of its opponents' lead counsel in a pending, multibillion dollar litigation.

_First_, disqualifying White & Case would have no undue impact on the Trust's reasonable choice of counsel.  It is "hopefully rare" that "[i]n the middle of a pending litigation, the law firm representing the plaintiff hire[s] the defendant's lead counsel." _Norfolk_, 397 F. Supp. 2d at 556. Few clients would ever be negatively affected by this application of Model Rule 1.10.  And here, the Trust is already represented by able Delaware counsel, and would be free to retain additional out-of-state counsel after White & Case is disqualified.  YPF has no objection to the Trust taking a reasonable period of time to retain additional counsel and bring them up to speed on the case. While the Trust may wish to continue working with White & Case, under the circumstances of this case—where its agent White & Case deliberately created the conflict in question—the Trust's wish "must yield . . . to considerations of ethics which run to the very integrity of our judicial process." _Teleflex_, 1999 WL 98559, at *7 (internal quotation marks omitted).

_Second_, disqualification here would have no impact on lawyers' reasonable formation of new associations or retention of new clients.  White & Case could have kept the Trust as its client in this litigation had it not chosen to recruit its direct adversary.  White & Case knowingly created the conflict that must result in their loss of the Trust as a client.  Similarly, Ms. Boelter was "free to work for any other firm" in the world without creating this insurmountable conflict, and Ms. Boelter of course remains free to continue working with White & Case on the many other matters in which they have been engaged.  _Norfolk_, 397 F. Supp. 2d at 556.

\*       \*       \*

YPF does not take this action lightly, but it has filed this motion because it must.  So many of its confidences have been shared with Ms. Boelter and she has been a key advisor to the

-29-

company, privy to every critical aspect of the litigation and its ongoing strategy. Knowing this, White & Case hired Ms. Boelter as a partner in the very practice group, headed by her now husband, in the very office, leading the litigation against YPF. Neither White & Case nor Ms. Boelter provided any warning to YPF while White & Case was recruiting Ms. Boelter, and they never sought YPF's consent to Ms. Boelter switching sides. They presented a *fait accompli* to YPF and asked it to simply trust that the screen White & Case claims to have put into place will be sufficient to protect YPF's confidences. Ms. Boelter's information is too important for this trust to suffice, and in any event, that trust has been irrevocably destroyed by Ms. Boelter's own actions, aided by White & Case. YPF understands that protective screens may address many kinds of conflicts, but this is far from the usual case. Disqualifying White & Case is therefore necessary to vindicate not only YPF's but all clients' "right to expect the loyalty of [their] attorney in the matter for which he is retained." *In re Corn Derivatives*, 748 F.2d at 162. Even more important, disqualification is necessary because it is the only way to adequately ensure YPF's confidential information is not disclosed to its litigation adversaries, to protect YPF's legitimate expectations regarding the conduct of its counsel, and to ensure the fairness of this litigation cannot be questioned.

## CONCLUSION

For the foregoing reasons, YPF respectfully asks the Court to disqualify White & Case from representing the Trust in the above-captioned proceedings, to stay proceedings pending White & Case's withdrawal, and to order such other relief as the Court deems just and proper.[8]

---

[8]    Pursuant to D. Del. L. R. 7.1.1., YPF states that it met and conferred with the Trust prior to filing this motion. YPF was not able to reach an agreement with counsel to the Trust concerning a resolution of the issues addressed in this motion.

Dated: December 19, 2020
      Wilmington, Delaware

Respectfully submitted,

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware
T: 302-467-4400
F: 302-467-4450
landis@lrclaw.com
mcguire@lrclaw.com

-and-

Howard Zelbo (*pro hac vice* pending)
Victor L. Hou (*pro hac vice* pending)
Ari D. MacKinnon (*pro hac vice* pending)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999

*Attorneys for the YPF Defendants*