**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11501 (CSS)<br>(Jointly Administered) |
| MAXUS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>-against-<br><br>YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO.,<br><br>Defendants. | Adv. Proc. No. 18-50489 (CSS) |

**DECLARATION OF W. BRADLEY WENDEL**

I, W. Bradley Wendel, pursuant to 28 U.S.C. § 1746, declare as follows:

<u>Introduction</u>

1.      I have been retained by counsel for YPF, S.A., YPF Holdings, Inc., YPF International S.A., and CLH Holdings, Inc. ("YPF"), to render an opinion regarding the compliance with professional ethical duties of attorney Jessica C.K. Boelter and the law firm White & Case LLP ("White & Case").  The conduct relates primarily to the lateral move by Ms. Boelter from Sidley Austin LLP ("Sidley"), counsel for YPF in the matter of *The Maxus Liquidating Trust v. YPF S.A. et al*, Case No. 18-ap-50489 (CSS) (Bankr. D. Del.) ("Maxus

1

Litigation"), to White & Case, counsel for the Maxus Liquidating Trust (the "Trust") in the same matter. *See* Ex. B, Letter from J. Paradise to J. Kuster (Oct. 1, 2020).[1]  In my opinion, the screening procedures established by White & Case, and described in the October 1, 2020 letter from the firm's general counsel, are insufficient to remove the imputation of Ms. Boelter's conflict of interest from the firm.  Ms. Boelter possesses such highly sensitive confidential information of her former client, YPF, which is likely to be significant in the representation of the Trust, that a screening mechanism at White & Case is inadequate to protect the legitimate interests of YPF.  *See* Restatement (Third) of the Law Governing Lawyers ("Restatement") § 124(2)(a), cmt. d(i) (Am. L. Inst. 2000).  The only remedy that will mitigate the resulting prejudice to YPF is the disqualification of White & Case from the representation of the Trust.

2.      This opinion is based on the correspondence between Sidley, White & Case, and Cleary Gottlieb Steen & Hamilton LLP, including in particular the November 25, 2020 letter from Jennifer Paradise to Howard Zelbo and Victor Hou, with the firm's screening procedures and notification as Exhibits;  the Declaration of John J. Kuster ("JK Decl."); the Declaration of Daniel González Casartelli ("DG Decl."); the Declaration of Germán Fernández Lahore ("GFL Decl."); and the Declaration of Rebecca Michaud ("RM Decl."); as well as my experience, knowledge and expertise in the topics described in the opinions given.

Qualifications

3.      I am the Edwin H. Woodruff Professor of Law at Cornell Law School in Ithaca, New York.  Prior to joining the Cornell faculty I was an Assistant and then Associate Professor of Law at Washington and Lee University, a law clerk to the Honorable Andrew J. Kleinfeld on the U.S. Court of Appeals for the Ninth Circuit in Fairbanks, Alaska, and a products liability

---

[1]      Unless otherwise specified, the exhibits are those to the Declaration of Rebecca M. Michaud.

litigator at Bogle & Gates in Seattle, Washington.  I am admitted to practice in New York and

am on inactive status in Washington State, where I was initially admitted in 1994.  I received a

B.A. from Rice University, a J.D. from Duke Law School, and an LL.M. and J.S.D. from

Columbia Law School.  My qualifications are set out more fully in my CV, which is attached as

Exhibit A to this Declaration.

4. My primary areas of teaching and research specialization are legal ethics,

professional responsibility, and the law governing lawyers.  I am a co-editor of a widely adopted

law school casebook, Hazard, Koniak, Cramton, Cohen & Wendel, *The Law and Ethics of

Lawyering*, now in its Sixth Edition with Foundation Press; the sole author of a textbook,

Wendel, *Professional Responsibility: Examples and Explanations*, Sixth Edition, with Wolters

Kluwer; and co-editor of a rules supplement, Martyn, Fox & Wendel, *The Law Governing

Lawyers: National Rules, Standards, Statutes, and State Lawyer Codes*, also with Wolters

Kluwer.  In addition, I have published numerous law review articles on these topics.  I have

regularly taught law school courses on legal ethics and professional responsibility for 20 years,

frequently teach CLE programs on legal ethics for practicing lawyers throughout the country,

and serve as a consultant or expert witness regarding legal ethics and professional responsibility

nationwide.  Since 2007, I have been a member of the drafting committee for the Multistate

Professional Responsibility Examination (MPRE).  From 2011 to 2012, I served as a Reporter to

a working group within the ABA Commission on Ethics 20/20, which considered amendments to

the ABA Model Rules of Professional Conduct.  In 2012, I was the recipient of the Sanford D.

Levy Memorial Award from the New York State Bar Committee on Professional Ethics.

5. Within the last four years I have testified by deposition or in court in the

following matters:

- *Sunridge Corp. v. Howard & Howard PLLC*, Clark County, Nevada, Superior Court, Case No. A-19-788603-B. Deposition January 24, 2020. (Testimony for defendant law firm in malpractice action alleging negligence in advising clients regarding settlement of breach of contract and unjust enrichment action arising out of development deal.)

- *Arkansas Teacher Retirement System v. State Street Bank and Trust*, U.S. District Court, D. Mass., Case No. 11-cv-10230 (MLW). Deposition April 3, 2018. (Testimony for plaintiffs' securities class action law firm in fee proceedings.)

- *Verano Land Group, LP v. VTLM Texas, LP*, Clark County, Nevada, District Court, Case No. A-12-655514-B. Deposition June 15, 2018. (Testimony for plaintiffs in legal malpractice and breach of fiduciary duty action against large law firm.)

- *Wadler v. Bio-Rad Laboratories, Inc.*, U.S. District Court, N.D. Cal., Case No. 3:15-cv-2356. Deposition November 17, 2016. (Testimony for former general counsel of corporation in wrongful termination action, alleging he was terminated for blowing the whistle on Foreign Corrupt Practices Act violations.)

My compensation is at the rate of $700 per hour.

<u>Facts</u>[2]

6.      Jessica Boelter was one of two partners, along with James Conlan, at Sidley who negotiated the firm's engagement by YPF in July 2018. *See* DG Decl. ¶ 3. Once the professional relationship commenced, YPF regarded Ms. Boelter as one of the primary lawyers and contact points at the firm and continued to share sensitive, confidential information to enable Ms. Boelter to provide strategic advice about the conduct of the case. *See* GFL Decl. ¶¶ 5-7. It appears that, after a short time, Ms. Boelter had become a close and trusted YPF advisor. In fact, at a New York Stock Exchange event commemorating YPF's 25 years as a publicly traded company, the only two lawyers invited to the reception were Ms. Boelter and Mr. Conlan, the two Sidley partners who had negotiated the firm's engagement and were actively involved in defending YPF in this high-stakes litigation. *See* DG Decl. ¶ 5.

---

[2]      For purposes of my opinion, I am assuming the facts outlined in the documents referenced herein as true.

7.    During her representation of the company, Ms. Boelter had, *inter alia*, extensive ongoing discussions about material aspects of the representation with YPF's CEO, Daniel González Casartelli, and YPF's Vice-President of Legal Affairs, Germán Fernández Lahore, about the Maxus Litigation.  She continued to be intimately involved with the representation of YPF as recently as May 15, 2019, when she met in person in New York City with CEO González, *see id.* ¶ 7, and as late as August 5, 2020, Mr. Fernández Lahore received a strategic planning presentation of the Maxus Litigation matter in which she was listed among the Sidley partners working on the case, *see* GFL Decl. ¶ 9.  She billed over 300 hours to YPF in connection with the matter.  *See* JK Decl. ¶ 3.  After the departure from Sidley of James Conlan in June 2020, Ms. Boelter was the senior restructuring partner at the firm representing YPF.  *See id.* ¶ 6.

8.    While she was a partner at Sidley, Ms. Boelter's responsibilities in connection with the representation of YPF included:

- Planning and preparing YPF's motion to dismiss the Adversary Complaint, including attending oral argument in Delaware on the motion;

- Discussing options with the client following the denial of YPF's motion to dismiss, including the possibility of a motion to withdraw the reference and consideration of the merits of seeking another forum;

- Consideration of the tactics of White & Case in this litigation;

- Participating in discussions within the firm regarding YPF's initial disclosures and discovery responses, including reviewing confidential documents, making privilege determinations, and other discovery matters;

- Developing the overall litigation strategy for YPF, including consideration of the possibility of settlement;

- Providing candid assessments of the likelihood of success of various options under consideration for resolution of the case;

- Communicating with YPF executives about developments in the case, by phone, email, and occasional in-person meetings;

- Advising on other legal issues such as corporate law matters and YPF's disclosures pursuant to U.S. securities laws, as well as obtaining third-party discovery from Occidental; and

- Discussing the engagement of local counsel.

*See, e.g.*, GFL Decl. ¶ 6; JK Decl. ¶ 5.

9.     In the course of her representation of YPF, Ms. Boelter became privy to extensive confidential information of YPF. Some of these matters were of the utmost sensitivity and importance to the client. For example, YPF executives discussed the legal and business considerations involved in various options for resolving the case, by settlement or otherwise. These discussions necessarily resulted in Ms. Boelter learning, as CEO González states, "the larger business and corporate dimensions of the litigation." DG Decl. ¶ 7. Given the magnitude and stakes of this litigation, one can readily infer the sensitivity of the information YPF shared with Ms. Boelter in the course of these communications.

10.     As the litigation progressed, Ms. Boelter handed over much of the responsibility for the day-to-day representation of YPF to litigators in the firm. However, she continued to participate in the management of the case and communicate about the case with other firm attorneys. She never formally withdrew from the representation of YPF, *see* JK Decl. ¶ 7, or notified YPF executives that she was ceasing work on the matter.

11.     On September 12, 2020, YPF learned two critical facts for the first time. First, Ms. Boelter intended to leave Sidley and become a partner at White & Case, counsel for the Trust in the Maxus Litigation. *See* JK Decl. ¶ 8. Second, Ms. Boelter had been in a romantic relationship with, and was engaged to be married to, Thomas Lauria, the Global Head of the Financial Restructuring and Insolvency Practice at White & Case and a frequent collaborator of

Christopher Shore, lead counsel for the Trust in this case.  *See id.*; RM Decl. ¶ 14.  Before that

date, no one at YPF had any knowledge of the relationship between Ms. Boelter and Mr. Lauria,

nor of any negotiations between Ms. Boelter and White & Case pertaining to a possible lateral

move.  *See* GFL Decl. ¶ 10; DG Decl. ¶ 10.

12.     White & Case notified YPF on October 1, 2020, that Ms. Boelter had joined the

firm as a partner, and that it was establishing a screening mechanism to isolate her from the

firm's work for the Trust.  The screening procedure is described in that letter, as well as in two

exhibits to the November 25, 2020, letter from Jennifer Paradise to Howard Zelbo and Victor

Hou.  The screens treat Ms. Boelter as conventional lateral hire, without any recognition of the

extent and sensitivity of the information she possessed pertaining to YPF.  Earlier in the year, the

firm had asked YPF to waive the conflict created by the possible lateral hire of an associate who

had formerly represented YPF; YPF declined.  *See* GFL Decl. ¶ 13.

Opinion

**Applicable Law**

13.     Local Rule 9010-1(f) of the United States Bankruptcy Court for the District of

Delaware provides:

> Subject to such modifications as may be required or permitted by federal statute, court
> rule, or decision, all attorneys admitted or authorized to practice before this Court,
> including attorneys admitted on motion or otherwise, shall also be governed by the Model
> Rules of Professional Conduct of the American Bar Association, as amended from time
> to time.

However, the engagement letter from Sidley to YPF includes a choice-of-law provision

specifying that New York law, including New York rules of professional conduct, govern the

relationship between Sidley and YPF.  *See* Ex. D, Letter from H. Zelbo to J. Paradise (Oct. 14,

2020).

14.     The apparent significance of the choice-of-law issue pertains to the difference between the rule on imputed conflicts in New York and the version of that rule in the Model Rules, each of which is designated Rule 1.10(a).  It is important to emphasize at the outset that the facial dissimilarity between the rules is not dispositive.  The key underlying issue—i.e. whether Ms. Boelter's access at Sidley to highly significant confidential information of YPF requires the disqualification of White & Case—is _not_ resolved conclusively by Rule 1.10(a). The law on conflicts of interest, moving lawyer conflicts, and screening is remarkably uniform nationwide, despite superficial differences in how state rules of professional conduct are worded. Because White & Case places great importance on the application of the Model Rules (*see* Ex. C, Letter from J. Paradise to H. Zelbo (Oct. 27, 2020)), however, it is useful to compare the two provisions:

> Model Rule 1.10(a): While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless [. . .]
>
> (2) the prohibition is based upon Rule 1.9(a) or (b) and arises out of the disqualified lawyer's association with a prior firm, and
>
> > (i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom;
> >
> > (ii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures; and
> >
> > (iii) certifications of compliance with these Rules and with the screening procedures are provided to the former client by the screened lawyer and by a partner of the firm, at reasonable intervals upon the former client's written request and upon termination of the screening procedures.

New York Rule 1.10(a): While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9, except as otherwise provided therein.

On its face, the New York imputation rule does not provide the option of screening a moving lawyer to prevent that lawyer's conflict from being imputed to other lawyers in the firm. However, the substantive law on attorney mobility, imputed conflicts, and screening is actually the same in New York and under the Model Rules (and, hence, in the District of Delaware), as explained here.

15.     First, screening is in fact recognized in New York as a way to avoid imputed disqualification.  *See Kassis v. Teacher's Ins. & Annuity Ass'n*, 717 N.E.2d 674, 678 (N.Y. 1999).  *Kassis* arose out of a motion to disqualify the firm hiring a lawyer who had previously represented the adversary in a litigated matter.  There, the New York Court of Appeals held that there was a presumption that the hiring firm should be disqualified, but that the presumption may be rebutted if the hiring law firm can (i) "prove that any information acquired by the disqualified lawyer is unlikely to be significant or material in the litigation" and (ii) establish "a 'Chinese Wall' around the disqualified lawyer." *Id.* at 678 (internal citation omitted).

16.     Second, strictly speaking, the rules of professional conduct of any state govern only the disciplinary process in which a lawyer may be subject to *license-related* sanctions such as reprimand, suspension, or disbarment.  *See* Model Rules, Scope, ¶ 19 ("Failure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process."); Restatement § 5(1).  Non-disciplinary remedies, including disqualification, are grounded in the inherent authority of the tribunal to regulate the conduct of lawyers appearing before it.  *See* Restatement § 6 cmt. i; ABA/BNA *Lawyers' Manual on Prof'l Conduct* § 51:1901.  Several

decisions from the District of Delaware set out the basis for the court's authority to disqualify a

law firm; the leading case summarizes the law as follows:

> The Court has the inherent authority to supervise the professional conduct of attorneys
> appearing before it, including the power to disqualify an attorney from a representation.
> *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).  Motions to disqualify
> are "generally disfavored" and, therefore, require the moving party to show clearly that
> "continued representation would be impermissible." *Talecris Biotherapeutics, Inc. v.
> Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007) (internal quotation marks and
> citations omitted); *see also Conley v. Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006)
> (same) (internal quotation marks and citations omitted).  Because "[t]he maintenance of
> public confidence in the propriety of the conduct of those associated with the
> administration of justice is so important," however, a court may disqualify an attorney
> "for failing to avoid even the appearance of impropriety." *Kabi Pharmacia AB v. Alcon
> Surgical, Inc.*, 803 F. Supp. 957, 960 (D. Del. 1992) (internal citation omitted).
>
> Attorney conduct is governed by the ethical standards of the court before which the
> attorney appears.  *See In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.
> 1984).  The District of Delaware has adopted the Model Rules of Professional Conduct
> ("M.R.P.C.").  *See* D. Del. LR 83.6(d)(2).

*Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*, Case No. 10-cv-1067 (LPS), 2011 WL

2692968, at *4-5 (D. Del. June 22, 2011); *see also Princeton Digital Image Corp. v. Office

Depot Inc.*, Case No. 13-cv-00239 (LPS), 2017 WL 3573812, at *1 (D. Del. Aug. 17, 2017);

*Regalo Int'l, LLC v. Munchkin, Inc.*, 211 F. Supp. 3d 682, 686 (D. Del. 2016).

17.    The comments to Model Rule 1.10 recognize the difference between the rules

governing professional discipline and the inherent power of tribunals to protect the legitimate

expectation of loyalty and confidentiality of the parties represented by law firms appearing

before the tribunal.  Comment 7 to Model Rule 1.10 makes this explicit:

> Rule 1.10(a)(2) similarly removes the imputation otherwise required by Rule 1.10(a), but
> unlike section (c), it does so without requiring that there be informed consent by the
> former client.  Instead, it requires that the procedures laid out in sections (a)(2)(i)-(iii) be
> followed.  A description of effective screening mechanisms appears in Rule 1.0(k).
> *Lawyers should be aware, however, that, even where screening mechanisms have been
> adopted, tribunals may consider additional factors in ruling upon motions to disqualify a
> lawyer from pending litigation.*

Model Rule 1.10 cmt. 7 (emphasis added).  In other words, the screening provisions in Model

Rule 1.10(a)(2) are not a safe harbor, permitting the hiring of any lawyer who formerly

represented the adverse party in litigation.  Rather, a court can determine, based on "additional

factors," that disqualification is required in order to protect the interests of the moving lawyer's

former client and the integrity of the proceedings at issue.

18.     There is a remarkably uniform nationwide body of law on the disqualification of

moving lawyers and hiring law firms.  I have served as an expert witness in disqualification

matters in states that have adopted the Model Rules with few changes, as well as in states such as

California or New York, with quite idiosyncratic versions of the rules.  In all of these states, the

analysis of the disqualification of moving lawyers and their new law firms is substantively

identical.  The analysis set out in Section 124 of the Restatement, including the comments and

illustrations, is a fair and accurate summary of the law that has developed from important early

cases such as *Silver Chrysler Plymouth v. Chrysler Motors Corp.*, 518 F.2d 751 (2d Cir. 1975).

The explanation in the following section is in line with the way I have taught this issue in

Professional Responsibility courses for 20 years, and summarized it in Chapter 16 of my

textbook, *Professional Responsibility: Examples and Explanations* (Wolters Kluwer, 6th ed.,

2019).  *See also* Geoffrey C. Hazard, Jr., W. William Hodes & Peter R. Jarvis, *The Law of

Lawyering* § 14.9 (3d ed. & Supp. 2010) (setting out this analysis).

**Moving Lawyers, Imputed Conflicts, and Screening**

19.     Policy of protecting confidential information.  The policy underlying conflict of

interest rules in moving-lawyer cases is the protection of the confidential information of the

clients of the moving lawyer's former firm.  *See, e.g.*, *Dynamic 3D Geosolutions LLC v.*

11

*Schlumberger Ltd.*, 837 F.3d 1280, 1286 (Fed. Cir. 2016) ("[T]he obligation to protect a client's confidential information exists as part of the larger duty of loyalty owed to clients to maintain the integrity of the attorney-client relationship"); *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F. Supp. 725 (D. Del. 1985).  In this case, the former client and firm are YPF and Sidley.  YPF has a right to be protected from the possible disclosure (*see* Model Rule 1.6(a)) or adverse use (*see* Model Rule 1.9(c)) of its confidential information by a lawyer formerly associated with Sidley. Protection of the former client's confidential information occurs through the disqualification of the moving lawyer and the new firm (or the hiring firm)—in this case, White & Case. Disqualification is a prophylactic remedy used to ensure that the former client's confidences will not be abused in the litigation.  This abuse can occur through disclosure to other lawyers representing adversaries of the former client.  For this reason, the scope of disqualification can extend from the moving lawyer to the hiring firm.  The crucial issue is whether the moving lawyer (Ms. Boelter) had access, at the former firm (Sidley), to material confidential information of the former client (YPF).

    20.    "Risk Rules" Analysis.  Before getting into the details of moving-lawyer conflicts analysis, it is important to make a foundational point about conflicts of interest rules in general. Conflicts of interest rules regulate the *risk* that a lawyer or law firm may compromise its duties of undivided loyalty owed to a client due to the interests of another client, a third party, or the lawyer's own interests.  It is emphatically not the case that a conflict exists only when there is some actual harm to the client (or when the party seeking disqualification is able to prove some actual harm to the client).  Rather, a conflict of interest exists when there is a significant risk of disclosure or adverse use of the confidential information of a former client.  For this reason, the term "potential conflict" is misleading and should be avoided; there is a conflict, requiring full

disclosure and informed consent, when there is a significant risk of use or disclosure of the

confidential information of a former client. Conversely, it is not a defense in any way that the

moving lawyer has not disclosed or used confidential information of the former client. A

conflict exists because of, and at the moment there is, a *risk* to the former client of disclosure or

adverse use. This is a basic point in the law governing lawyers and has been clearly established

in the law for several decades. *See, e.g.*, Kevin C. McMunigal, "Conflict of Interest as Risk

Analysis," in Michael Davis & Andrew Stark, eds., *Conflict of Interest in the Professions*

(Oxford University Press 2001). In the recent and noteworthy breach of fiduciary duty litigation

against Kirkland & Ellis arising out of a mismanaged conflict of interest, the district court had

this to say:

> The Court does not accept Defendant's attempt to cabin the ethical rule's prohibition of a
> "representation ... directly adverse" to a client's showing of detrimental outcome. The
> plain language of Rule 1.7 looks to the lawyer's representation – his *advocacy against* his
> client – not merely the potential detrimental effect on the client. The Rule on its face
> refers to a *representation* which *is* "adverse" (versus one which *results* in "adversity"). It
> concerns a lawyer's duty of loyalty to a current client, and a corresponding prohibition
> against his concurrent undertaking to work in opposition to the clients' wishes and
> interests toward an objective to which the client is opposed. The client who confides in
> his counsel this afternoon is entitled to rest tonight knowing that s/he will not face that
> counsel on the opposite side of the table tomorrow.

*Mylan, Inc. v. Kirkland & Ellis LLP*, Case No. 15-cv-00581 (JFC) (LPL), 2015 WL 12733414, at

*13 (W.D. Pa., June 9, 2015). The conflict in *Mylan* was a concurrent conflict under Rule 1.7,

while this is a successive conflict under Rule 1.9. However, the principle that conflicts rules are

risk rules, not requiring a showing by the lawyer's former client of actual harm, or actual

disclosure or adverse use of confidential information, applies with equal force to successive-

representation conflicts. *See, e.g., Western Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F.

Supp. 3d 1074, 1090-091 (C.D. Cal. 2015).

21.    <u>Two-Presumptions Analysis</u>.  The analysis of the disqualification of the moving

lawyer and the hiring firm employs two presumptions.  This analysis is developed in a line of

cases beginning with *Silver Chrysler*, and is based on Model Rules 1.9(b) (personal

disqualification of the moving lawyer) and 1.10(a) (imputed disqualification to the hiring law

firm).  To summarize, the analysis relies on presumptions concerning (a) the moving lawyer's

access to the confidential information of the client of the former firm and (b) sharing of the

confidential information of the former client with other lawyers at the hiring firm.  The

presumptions are rebuttable, but in different ways, as follows:

(a)    The moving lawyer is presumed to have acquired confidential information of all
clients of the former firm. However, the lawyer may rebut that presumption by showing
that she did not acquire actual knowledge of protected confidential information. This
analysis is fact-specific and can be "aided by inferences, deductions or working
presumptions that reasonably may be made about the way in which lawyers work
together." Model Rule 1.9 cmt. 6. However, a lawyer who regularly participates in
discussions of a client's matter should be presumed to be privy to all confidential
information pertaining to that client. *Id.*

(b)    The "taint" created by the moving lawyer's knowledge of the former client's
confidential information is ordinarily imputed to all lawyers in the hiring law firm.
Model Rule 1.10(a).  Imputation of the conflict reflects the presumption that the
incoming lawyer will freely share information learned in prior representations.  The
hiring law firm may rebut the presumption of shared confidential information only if (i)
the confidential information possessed by the moving lawyer is "unlikely to be significant
in the subsequent matter" – i.e. the representation by the hiring firm of the adversary of
the client of the former firm – *see* Restatement § 124(2)(a); (ii) adequate screening
measures are implemented in a timely manner, *Id.* § 124(2)(b); and (iii) timely and
adequate notice of the screening mechanism is provided to all affected clients, *Id.* §
124(2)(c).

22.    The burden of rebutting the presumption of shared confidential information is on

the law firm whose disqualification is sought – in this case, on White & Case.  *See* Model Rule

1.9 cmt. 6.

23.    Analysis of whether the presumptions are rebutted does not require the court to

examine the client's confidential information to determine whether it was protected.  Requiring

the client to disclose such sensitive information would be unfair, and almost perverse, given the

policy objective of the conflicts of interest rules.  Accordingly, courts should consider the extent

and nature of the work a lawyer performed for the client.  *See* Model Rule 1.9 cmt. 6 (giving the

example of a lawyer who had general access to all files of a client, and participated in general

discussions of the client's affairs as a situation which the lawyer cannot rebut the presumption of

access to that client's confidential information).

24.    Given the extent of her involvement in the litigation, it is unthinkable that Ms.

Boelter could rebut the presumption of having acquired confidential information of YPF.

25.    <u>Proof of Actual Sharing of Confidences</u>.  Use of rebuttable presumptions is not

the only way to establish that a moving lawyer has a personal "taint" that may be imputed to the

hiring law firm.  The moving party may directly prove access to material confidential

information of the former client, rather than relying on a presumption.  In a well-known District

of Delaware case, which was reproduced in previous editions of the Hazard, Koniak, Cramton,

Cohen & Wendel casebook, a lawyer switched sides in the middle of a litigated matter.  *See*

*Nemours Found. v. Gilbane*, 632 F. Supp. 418 (D. Del. 1986).  The moving lawyer did not have

a prior attorney-client relationship with the party seeking disqualification.  However, that party

proved that the moving lawyer was privy to its confidential information, having participated in

strategy sessions with a co-defendant.  *Id.* at 422.  The court concluded that, although there was

no express attorney-client relationship between the moving lawyer and the party seeking

disqualification (and, hence, no presumption of access to client confidences would have arisen),

there was a fiduciary obligation on the part of the moving lawyer not to misuse the confidential

information of the co-defendant.  *Id.* at 424.  Note that in this case, the party seeking

disqualification was required only to show the participation of the moving lawyer in strategy

sessions at which sensitive confidential information was likely to have been discussed.  This is in line with the observation in Rule 1.9 cmt. 6, that courts analyze access to confidential information with the assistance of "inferences, deductions or working presumptions" about the way lawyers work together.  *See also Dynamic 3D Geosolutions LLC*, 837 F.3d at 1286-287 (concluding that moving lawyer had access to sensitive confidential information of former client, based on lawyer's attendance at meetings where the relevant topics were discussed). Generally the method of proving actual sharing of confidential information is used only in the disqualification of co-counsel, where there is no presumption of sharing client confidences. However, a client is not required to rely on presumptions, but could opt to prove directly that its former lawyer acquired confidential information.

26.    Based upon the Declarations of John J. Kuster, Daniel González Casartelli, and Germán Fernández Lahore, it appears that there is extensive evidence that Ms. Boelter acquired extensive, specific and highly confidential information of YPF as a partner at Sidley and on the basis of this record, it would appear that that this presumption of access to confidential sensitive information is unrebuttable.

27.    <u>Significance of Confidential Information and Permissibility of Screening</u>.  The *Silver Chrysler* analysis described in ¶ 21 is the basis of Illustrations 3-5 in Restatement § 124 cmt. d(i); *see also* W. Bradley Wendel, *Professional Responsibility: Examples and Explanations* 418 (Wolters Kluwer, 6th ed., 2019).  The Restatement Illustrations show that there are three levels of confidential information that play a role in moving-lawyer conflicts:

i.    The moving lawyer did not learn confidential information of a client of the former firm.  In terms of the presumptions analysis, the moving lawyer successfully rebutted the presumption of having acquired confidential information of all clients of the former firm.  A client about whom the moving lawyer acquired no confidential information is therefore not regarded as a former client of the moving lawyer for conflicts purposes.  *See* Restatement § 124 cmt. d(i), illus. 3.

ii. The moving lawyer did acquire confidential information of a client of the former firm (or was unable to rebut the presumption). However, the information the lawyer did acquire is unlikely to be significant in the new matter. The moving lawyer is personally disqualified from representing a new client whose interests are materially adverse to those of the client of the former firm. However, because the information is not likely to be significant, screening at the hiring firm, if timely implemented, will prevent the disqualification of the hiring firm. *Id.*, illus. 4. This is the most common scenario when a lawyer changes firms. The lawyer may have some passing exposure to confidential information, but it is unlikely to be significant in the representation of a party adverse to a client of the former firm. Thus, screening at the hiring firm will be sufficient to prevent the imputation of the conflict to the new firm.

iii. The moving lawyer acquired confidential information that will be highly relevant and significant in the matter and could be used against the interests of the former client. In this case, screening will not be sufficient to permit the hiring firm to represent a party whose interests are materially adverse to those of the client of the former firm. *Id.*, illus. 5. This is a relatively unusual category of highly sensitive (when I teach this concept, I refer to it as "radioactive") confidential information that makes a moving lawyer un-screenable. The reason is that non-consensual screens require a certain amount of trust on the part of the former client. We might expect the former client to trust the screening mechanism to protect relatively routine confidences, but when it comes to highly sensitive, "radioactive" secrets, it is asking too much to require the former client to take on trust that the new firm will protect this information. Thus, the conflict of the moving lawyer is imputed to the hiring law firm under Model Rule 1.10(a).

28. Non-consensual screens[3] have a bit of a checkered history in legal ethics. Many lawyers and scholars were skeptical that screens could provide sufficient protection for the confidential information of a former client. My co-editor Larry Fox is a dogged opponent of screening to cure imputed conflicts. He has always considered screening a fundamental betrayal of the fiduciary relationship between lawyers and their clients. Larry's argument is nicely summarized here:

---

[3]    I use this term to distinguish a screen that was mutually agreed upon by the former client and the hiring law firm as part of a process of obtaining informed consent. All former-client conflicts under Rule 1.9 are consentable. If the former client is willing to give consent conditioned upon the adoption of a screening procedure, it may do so. The difficult ethical issue arises when the client refuses consent, or was not given the opportunity to waive the conflict. Then a screen operates to cram the conflict down on an unwilling client. That is something that is much more threatening to the fiduciary relationship between the lawyer and the former client.

Frankly, a screen is implemented through a series of measures – locked file cabinets, limited computer access, memos to all – that are theater, not unlike taking your shoes off to go through airport security. While those measures certainly should be put in place, what really matters is whether the transferring lawyer maintains his or her silence about all the confidential information that lawyer knows from the prior employment. When it would be of great advantage to this lawyer's new firm and its client to know what the side-switcher knows, and, if they found out, no one would ever know. *Asking a client to accept the impregnability of the so-called screen is asking way too much, given client anxiety and the fallibility of lawyers.*

Lawrence J. Fox, *The Assault on Client Loyalty: A Dialogue about Prospective Waivers, Screening, and Suing Your Client's Parent*, 37 Litig. 41, 47 (2011) (emphasis added).  For many years he and others persuaded the ABA not to permit screening in the Model Rules.  However, as some states began to go their own way and adopt screens, either by rule amendment or by judicial decision, as in New York, the ABA's resistance to screening softened and Rule 1.10(a)(2) was adopted.

29.     Understanding this history is essential to appreciate the structure set forth in ¶ 27 above.  Screening can be sufficient protection for the confidential information of the former client where the moving lawyer(s) had access to only relatively inconsequential information.  A typical screening situation involves a moving associate who had done some work on a case, and therefore would not be able to rebut the presumption of shared confidences, but had not learned anything so significant that the former client would not trust that the hiring law firm's screening mechanism would protect it.  Larry Fox is correct that screens really do require the former client to trust the moving lawyer not to betray the client's confidences.  Where the confidences are not all that significant, the risk to the client of relying on trust are not that great.

However, where the information is highly sensitive—as I call it, radioactive confidential information—it is asking way too much to say to the former client, "trust me – your information is safe."  That is the reason behind the principle stated in Restatement § 124(2)(a), that screens

are permitted only when "any confidential client information communicated to the personally prohibited lawyer [here, Ms. Boelter] is unlikely to be significant in the subsequent matter."  A non-consensual screen, imposed without the informed consent of the client, is too much to ask the former client to accept based solely on the say-so of the moving lawyer.  *See also* 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 14.8, at 14-25 (3d ed. & Supp. 2010) ("if the incoming lawyer had *personally* represented a particular client in a matter . . . the 'taint' that determines the status of the incoming lawyer will presumptively be imputed to all members of the new firm").

30.    The White & Case screening procedure, described in Exhibit A to the November 25, 2020, letter from Jennifer Paradise, is exactly as described by Larry Fox in ¶ 28—"a lot of theater," with notifications, restricted access to files, physical separation of personnel, and so on—while the essence of the problem remains assuring the former client, YPF, that its confidential information has not and will not be disclosed or misused.  The totality of measures aimed at this risk is stated under "Additional Procedures Relevant to Lateral Screens" as follows:

> No individual who has been screened from a matter may discuss any aspect of the matter which occasioned the implementation of the screen with any person associated or affiliated with the Firm.

*See* Ex. I, Letter from J. Paradise to V. Hou (Nov. 25, 2020), at 2.

In other words, Ms. Boelter agrees to keep mum about everything she learned over the course of at least 18 months while working as one of the lead lawyers representing YPF in this matter.  There is nothing other than Ms. Boelter's undertaking that protects YPF's confidential information.  Telling Ms. Boelter not to access documents related to the Maxus Litigation, moreover, misses the point that it is YPF's confidences at risk.  *See Nemours Found.,* 632 F. Supp. at 428 (noting that screens should not aim at protecting the confidential information of

clients of the hiring law firm, because the interests to be protected are the clients of the former law firm). This is too much to ask YPF to take on trust. This is particularly true when Ms. Boelter is married to the head of the department representing YPF's litigation adversary. Notably, Ms. Boelter and Mr. Lauria had been dating for some time before Ms. Boelter's move to White & Case. That relationship created a substantial risk that YPF's confidential information would be shared with its litigation adversary, particularly given Mr. Lauria's leadership role within the department and his close relationship with the lead counsel for the Trust in this matter. Now that Ms. Boelter has joined the very same department, the risk to YPF has only increased. That risk is exacerbated by the small size of the department, which occasions frequent interactions among lawyers representing various clients. It is straining credibility to suggest that any screening mechanism will be adequate to protect YPF's highly sensitive confidential information.

31.    The non-consensual nature of the screen is particularly troubling in this case, because White & Case had previously asked YPF for a waiver of the conflict created by a moving lawyer. *See* GFL Decl. ¶ 13. A former associate at Norton Rose Fulbright LLP, who had performed some work for YPF and its affiliates in the Maxus Energy Corporation bankruptcy, sought to join White & Case. In that instance, White & Case requested that YPF waive the conflict. YPF declined to do so, for precisely the concerns underlying this motion – i.e. that its confidential information could be compromised by the lateral move of one of its former lawyers. Here, where the moving lawyer is not an associate but a partner—indeed, the former engagement partner in the matter—White & Case is seeking to cram down a screen on the former client of the incoming lawyer. While the law may permit screens to avoid the imputation of the imputed conflict of a moving lawyer in cases where the lawyer had access to

only relatively insignificant information of the former client, it stretches the concept of screening far beyond its intended bounds to permit a moving lawyer and a hiring law firm to tell a former client that they have no opportunity to decline to waive such a glaring conflict of interest.

32.      People do not always act in conformity with their best intentions.  Sometimes, they let things slip that they did not mean to, especially where, as here, they have highly sensitive information of the type detailed in the categories above.  *See, e.g.*, *supra* ¶ 8.  Given the highly sensitive nature of the information acquired by Ms. Boelter about YPF, and the governing rules of professional responsibility, it is impermissible to tell YPF that it has no choice but to trust Ms. Boelter and White & Case not to inadvertently disclose or use this information.

Conclusion

33.      Conflicts rules are risk rules.  That means YPF does not have to show that Ms. Boelter disclosed or misused its confidential information.  There is a conflict of interest if there is a significant risk of disclosure or misuse of confidential information.  If the risk of disclosure is not significant, or if the information is not of particular importance to the former client, screens can mitigate this risk to the former client and cure what would otherwise be a conflict of interest imputed from a newly-hired lawyer.  Where the information is highly sensitive, however, a screen will not be effective to cure the conflict.  This case is one of the most egregious instances I have seen of a moving lawyer possessing sensitive confidential client information switching over to the law firm representing the litigation adversary of a former client.  Under these circumstances, the screen procedures established by White & Case are insufficient to cure the conflict imputed to the firm when it hired Ms. Boelter.  Disqualification of the firm is the only remedy that will adequately protect the interests of YPF in preventing the disclosure or misuse of its confidential information.

I hereby declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this matter.

Dated December 18, 2020
Ithaca, Tompkins County, New York

W. Bradley Wendel