## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11501 (CSS)<br>(Jointly Administered) |
| MAXUS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACION, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO.,<br><br>Defendants. | Adversary Proceeding No. 18-50489 (CSS) |

### PLAINTIFF'S OPPOSITION TO YPF DEFENDANTS' MOTION TO DISQUALIFY WHITE & CASE LLP

Date:  January 29, 2020


J. Christopher Shore (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
matthew.nicholson@whitecase.com

Brian E. Farnan (Bar No. 4098)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com


*Attorneys for the Liquidating Trust*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................ii

PRELIMINARY STATEMENT ....................................................................................1

COUNTER STATEMENT OF FACTS ..........................................................................5

   I.  PRIOR PROCEEDINGS ...................................................................................5

   II.  MS. BOELTER'S KNOWLEDGE OF YPF "CLIENT CONFIDENCES" .......................7

   III.  MS. BOELTER'S KNOWLEDGE OF YPF'S "LITIGATION STRATEGY" .................8

   IV.  MS. BOELTER BEGINS HER RELATIONSHIP WITH THOMAS LAURIA IN 2018.............................................................................................................10

   V.  MS. BOELTER MOVES TO WHITE & CASE ..............................................10

   VI.  YPF BRINGS IN CLEARY TO SEEK DISQUALIFICATION OF WHITE & CASE ...12

ARGUMENT ...........................................................................................................15

   I.  MS. BOELTER'S LATERAL MOVE IS PERMISSIBLE AND DOES NOT IMPERIL YPF CONFIDENCES OR THE CONDUCT OF THIS PROCEEDING...15

      A.   White & Case Abided By The Model Rules On Lateral Hires, And Provided All Appropriate Information On The Screen ...........................................16

      B.   The White & Case Screen Is Reasonably Adequate Under The Circumstances ...19

         1.   Ms. Boelter's "substantial relationship" with YPF does not render the White & Case screen less effective.............................................. 23

         2.   The Timing of Ms. Boelter's departure does not render the screen less effective............................................................................................. 25

         3.   White & Case's Size Weighs Against Finding the Screen Ineffective ..... 26

         4.   Ms. Boelter's alleged "intimate involvement" with the "most important parts of this case" does not render the screen ineffective ........................ 29

   II.  MS. BOELTER'S CONDUCT PRIOR TO JOINING WHITE & CASE, INCLUDING HER RELATIONSHIP, DOES NOT CREATE AN IMPUTABLE CONFLICT THAT WOULD WARRANT DISQUALIFICATION ...............................................31

   III.  THE TRUST WOULD BE SUBSTANTIALLY PREJUDICED, AND YPF WOULD OBTAIN A TACTICAL BENEFIT, IF WHITE & CASE WERE DISQUALIFIED 33

   IV.  THERE IS NO BASIS FOR THE COURT TO STAY THESE PROCEEDINGS PENDING RESOLUTION OF THE MOTION TO DISQUALIFY..........................39

CONCLUSION........................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

Alamo Group, LLC v A&G Realty Partners, LLC In re OSH 1 Liquidating Corp.,
2015 Bankr LEXIS 467 (Bankr D Del Feb. 2, 2015,
Nos. 13-11565 (CSS), 14-50103 (CSS)) ...................................................................15, 23, 36

*Alexander v. Primerica Holdings, Inc.*,
822 F. Supp. 1099 (D.N.J. 1993) ...................................................................................36, 37

*Apeldyn Corp. v. Samsung Elec. Co.*,
693 F. Supp. 2d 399 (D. Del. 2010)........................................................................................33

*Blumenfeld v. Borenstein*,
276 S.E.2d 607 (Ga. 1981)........................................................................................................38

*Boston Sci. Corp. v. Johnson & Johnson, Inc.*,
647 F. Supp. 2d 369 (D. Del. 2009)........................................................................................22

*Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.*,
573 F.2d 988 (8th Cir. 1978) ...................................................................................................37

*Conley v. Chaffinch*,
431 F. Supp. 2d 494 (D. Del. 2006)........................................................................................32

*Decora, Inc. v. DW Wallcovering, Inc.*,
899 F. Supp. 132 (S.D.N.Y. 1995)........................................................................................27

*Dworkin v. General Motors Corp.*,
906 F. Supp. 273 (E.D. Pa. 1995) ..........................................................................................21

*Enzo Life Scis. Inc. v. Adipogen Corp.*,
No. 11:-cv-00088 (RGA) (D. Del. Sept. 20, 2013)........................................................ passim

*Hartford Steam Boiler Inspection & Ins. Co. v. Int'l Glass Prods., LLC*, No.
2:08cv1564, 2017 U.S. Dist.
LEXIS 77102 (W.D. Pa. May 22, 2017) .................................................................................35

*Holcombe v. Quest Diagnostics, Inc.*,
675 F. Supp. 2d 515 (E.D. Pa. 2009) .....................................................................................21

*In re Marvel Ent. Grp.*,
140 F.3d 463 (3d Cir. 1998)....................................................................................................24

*In re Muma Servs., Inc.*,
286 B.R. 583 (Bankr. D. Del. 2002) .......................................................................................32

*In re Rite Aid Corp. Securities Litigation*,
   139 F. Supp.2d 649 (E.D. Pa. 2001) ...................................................................32

*Intellectual Ventures I LLC v. Checkpoint Software Techs., Inc.*, No. 10-1067-
   LPS, 2011 U.S. Dist.
   LEXIS 154921 (D. Del. June 22, 2011) .......................................................15, 35

*James v. Teleflex, Inc.*,
   No. 97-1206, 1999 U.S. Dist.
   LEXIS 1961 (E.D. Pa. Feb. 24, 1999) ...............................................................21

*Kaiser Grp. Int'l, Inc. v. Nova Hut a.s. (In re Kaiser Grp. Int'l, Inc.)*,
   272 B.R. 846 (Bankr. D. Del. 2002) ...........................................................33, 35

*Liberate Techs. LLC v. Worldgate Communs., Inc.*,
   133 F. Supp. 2d 357 (D. Del. 2001)...................................................................35

*Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*,
   529 Pa. 241 (Pa. 1992)......................................................................................21

*Modanlo v. Ahan (In re Modanlo)*,
   342 B.R. 230 (D. Md. 2006) ..............................................................................36

*Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*,
   632 F. Supp. 418 (D. Del. 1986)...................................................24, 35, 36, 38

*New Jersey Dep't of Envtl. Prot. v Occidental Chem. Corp.*
   *In re Maxus Energy Corp., 560 BR 111 (Bankr D Del 2016)* ..................................6

*Norfolk S. Ry. Co. v. Reading Blue Mt. & N. R.R. Co.*,
   397 F. Supp. 2d 551 (M.D. Pa. 2005) ......................................................21, 25, 26

*Rohm & Haas Co. v. Dow Chem. Co.*,
   No. 4309-CC 2009 Del. Ch. LEXIS 249 (Del. Ch. Feb. 12 2009) .........................30

*Sonos, Inc. v. D&M Holdings, Inc.*, No. 14-cv-1330 (RGA), 2015 U.S. Dist.
   LEXIS 119718 (D. Del. Sept. 9, 2015)...............................................................32

*T. Levy Assocs. v. Kaplan*,
   No. 16-4929, 2016 U.S. Dist. LEXIS 177187 (E.D. Pa. Dec. 22, 2016)................30

*Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*,
   491 F. Supp. 2d 510 (D. Del. 2007)...................................................................15

*TQ Delta, LLC v. 2Wire, Inc.*, C.A. No. 13-1835-RGA, 2016 U.S. Dist.
   LEXIS 130982 (D. Del. Sep. 26, 2016)...............................................................34

AMERICAS 105730538

*United States v. Dong*, No. 2:11-cr-00511-DCN, 2015 U.S. Dist.
LEXIS 163995 (D.S.C. Dec. 8, 2015) ..................................................................32

*Voicenet Communs., Inc. v. Pappert*, No. 04-1318, 2004 U.S. Dist.
LEXIS 6429 (E.D. Pa. Apr. 5, 2004) ..................................................................30

*Volterra Semiconductor LLC v. Monolithic Power Sys.*,
No. 19-cv-2240 (CFC), 2020 U.S. Dist.
LEXIS 154875 (D. Del. Aug. 26, 2020) ..............................................................15

# FEDERAL RULES

Federal Rule of Evidence, Rule 408 ..........................................................................18

Indiana Rules of Professional Conduct, Rule 1.10 ...................................................23

Local Bankruptcy Rule 9010-1(f) ...............................................................2, 16, 20

Nevada Rules of Professional Conduct, Rule 1.10 ...................................................23

New Jersey Rules of Professional Conduct, Rule 1.10(c) ........................................23

Rule 1.0 .....................................................................................................................19

Rule 1.7 .........................................................................................................31, 32, 33

Rule 1.9 ............................................................................................................. passim

Rule 1.10 ........................................................................................................... passim

Rule 1.18 ...................................................................................................................23

Rule 10 .....................................................................................................................17

# MISCELLANEOUS

*ABA Comm. On Ethics & Pro. Resp.*, Formal Op. 494 (2020) ...............................31

Flamm, Richard E., LAWYER DISQUALIFICATION: DISQUALIFICATION OF
ATTORNEYS AND LAW FIRMS, § 14.2 (2d ed. 2014 and 2020 Supp.)......................24

Geoffrey C. Hazard, Jr., W. William Hodes, and Peter J. Jarvis, *The Law of
Lawyering* § 15.11 (4th ed. 2020)............................................................................25

§ 124(2)(a) ................................................................................................................20

iv

Joseph J. Farnan, Jr., the Liquidating Trustee for the Maxus Liquidating Trust ("Trust"), by and through his undersigned counsel, respectfully submits this brief in opposition to the *YPF Defendants' Motion to Disqualify White & Case LLP as Counsel for the Maxus Liquidating Trust*, dated December 19, 2020 [D.I. 306] ("Motion" or "Mot."). As set forth in greater detail herein, the Court should deny the Motion.

**PRELIMINARY STATEMENT**

This Motion presents, in actuality, only one issue for the Court to decide: are the screening procedures established by White & Case when Ms. Jessica Boelter (now Lauria) joined the firm "reasonably adequate under the circumstances" to protect any of YPF's confidences that Ms. Boelter may have obtained while at Sidley Austin. As set forth below and as will be established at an evidentiary hearing if the Court finds that one is necessary, the White & Case screen is a state-of-the-art set of physical, electronic and behavioral controls that are far beyond "reasonably adequate" here and ensure, to the fullest extent practicable, that whatever Ms. Boelter may have learned from YPF while she was at Sidley will never be revealed to the Trust. In the 157 pages that YPF has submitted in support of its Motion, and indeed in the months of correspondence leading up to its tactical filing, YPF has not identified a single flaw in the White & Case screening procedures, has not suggested any modifications to address any legitimate concerns about disclosure, and has even failed to submit what it contends would be a "reasonably adequate" (as opposed to "impenetrable") screen.

Instead, YPF seeks to dodge the central question by positing that "no ethical screen, no matter how extensive, could adequately assure YPF that its confidential information has not and will not be leaked to its adversary." Mot. at 1. In advancing that self-centered position, YPF essentially advocates that this Court should set out to modify American Bar Association ("ABA")

Model Rule 1.10 (made applicable by Local Bankruptcy Rule 9010-1(f)) by adopting for its benefit a "key party" or "lead lawyer" exception in this one case.  That suggested type of modification, however, was specifically debated in the ABA's deliberation over Model Rule 1.10 more than a decade ago, and was rejected by the ABA in favor of a rule that intentionally does not distinguish between the importance or seniority of the attorney being screened.  After all, why should one presume that the bar's senior most lawyers are more likely to violate their ethical obligations than their more junior colleagues?  To the extent there were any doubt as to the ABA's position, the Trust submits herewith the declaration of Lucian Pera, who personally participated in the ABA's deliberations over Model Rule 1.10 and who can testify from experience as to the various policy considerations that came into play in its promulgation.  Suffice it to say, the Model Rule does not, as YPF suggests, prohibit a senior lawyer from joining a firm against whom her client is litigating, but rather attempts to balance a host of competing concerns that YPF simply ignores in its Motion, such as the interest of the new firm's client (here, the Trust) in maintaining its counsel of choice and in the ability of an attorney (here, Ms. Boelter) to join a new firm and leave behind her existing partnership without penalty.  In short, when this Court focuses on the *actual* Model Rule it has chosen to adopt and the *actual* screen put in place by White & Case to comply with it, this dispute can readily be resolved on the papers and in favor of the Trust.

The rest of the Motion (perhaps because there is so little for YPF to say on the Rule and the screen) is, unfortunately, loaded with factually questionable distractions that are largely irrelevant, at times tawdry, and, worse still, seemingly designed to attack the ethics and reputation of attorneys who have been appearing before this Court for decades.  To be clear,

- The Motion is *not* about protecting YPF's secrets as to its long history with its U.S. subsidiaries.  Since the mid-90's, YPF has employed no fewer than six sets of legal counsel representing it on matters concerning the Passaic River environmental cleanup.  This revolving door of counsel has set loose scores of lawyers who have

2

been privy to YPF confidences, including many other "key strategists" who now work for a diverse set of firms not employed by YPF. None of these former YPF attorneys is conceptually any different from Ms. Boelter (all have an ethical obligation to remain silent), except that Ms. Boelter alone is now subject to an affirmative, enforceable screen with severe sanctions for even inadvertent transgressions. If YPF can live with the risk that any of its scores of former lawyers might inadvertently disclose its secrets at a work or social gathering, they should be able to tolerate the significantly diminished risk that Ms. Boelter will.

- The Motion is also *not* about protecting YPF's "secret strategy" in this adversary proceeding—indeed, there is nothing particularly "secret" about it. As this Court has witnessed firsthand, YPF has held and pursued a simple goal here: avail itself of every opportunity to delay a trial and require the Trust to spend oftentimes hundreds of thousands of dollars on matters that should be resolved consensually or at least with minimal judicial involvement. The present gambit seems to be just one more play from that playbook.

- The Motion is also *not* about YPF maintaining access to one of its key lawyers in the pending litigation. Clients cannot block attorney career moves. Moreoover, though nowhere disclosed in the Motion's lengthy recitation of Ms. Boelter's history of participation in the matter, the fact is that Ms. Boelter last billed on the matter in 2019. Boelter Decl. ¶ 5. This is simply not a situation in which a key lawyer "switched sides" leaving a hole in the adverse party's litigation team. Indeed, no "side switching" occurred at all – Ms. Boelter has had nothing to do with and will not be involved in any manner in the ongoing litigation.

- The Motion is *not* about the relationship between, and now marriage of, Ms. Boelter to Mr. Thomas Lauria. Sidley has known about that relationship since 2018, and Ms. Boelter understood that YPF became aware of the relationship in 2019. Boelter Decl. ¶ 6. Whatever business rift Sidley's failure to inform YPF (assuming that, in fact, YPF did not know) might have caused is for Sidley and YPF to work out. Because the Motion is brought solely under Model Rules 1.9 and 1.10, if any breaches of ethics did occur prior to Ms. Boelter's joining White & Case (and, to be clear, the Trust is aware of and the Motion identifies none), that conduct is irrelevant to the present issues of imputation and screening.

- The Motion is not even about the adequacy of screening or White & Case's conduct in bringing Ms. Boelter on board. While the Motion goes to great lengths to try to impugn White & Case and its screening procedures with innuendo, the *facts* here are incontrovertible. White & Case relied on the Model Rules made applicable to this proceeding. It established a screen effective immediately upon Ms. Boelter's joining the firm. It notified YPF immediately of Ms. Boelter's joining, as required by the Model Rules. It repeatedly offered to discuss the extent of the screen, and solicited direct input from YPF as to any modification to the White & Case screen. The fact is that YPF rebuffed any discussions that would address ethical issues and instead insisted on preserving purported litigation rights. More to the point, YPF never requested any modification of the White & Case screen. Instead, counsel simply repeated their mantra that no screen would be adequate, begging the

AMERICAS 105730538

question of why they did not move months ago.  The proper conclusion from these facts is that YPF has not focused on ethics and protecting confidences but has rather seized on a perceived opportunity to interfere with the Trust's counsel and to cause more delay and more expense in this litigation.

In the end, the Motion is about *tactics* not *ethics*.  From the day that Ms. Boelter and Mr. Lauria began their relationship, this action has proceeded through motions to dismiss, motions to abstain and withdraw the reference, discovery and scheduling conferences, multiple discovery motions and extensive document productions.  Sidley and YPF did nothing.  Even just focusing on the period after Ms. Boelter gave notice in August 2020, the Trust has, in addition to continuing its internal trial preparation, taken depositions, argued discovery motions, argued an appeal and exchanged dozens of extensive communications with YPF's counsel of record on various procedural and substantive matters.  Still, YPF did not seek to oust White & Case.  And, while YPF purportedly deliberated over that choice, it never asked White & Case to withdraw, never asked to halt the proceedings, and never genuinely engaged in an effort to implement additional screening measures on a consensual basis.  Instead, it waited until the first day of the Christmas break to have its new counsel to file the most inflammatory of motions with a specific request that all proceedings in this action be stayed pending a determination of the Motion.  By adopting that course, YPF and its counsel forced the Trust to choose between granting its professionals a much-needed break from an obviously difficult year and acceding to an indeterminate delay in a proceeding that, due directly to YPF's prior conduct, has already dragged on too long, at too great expense.  If this dispute were about ethics, not tactics, one would have expected YPF and counsel to take a far more timely, measured, streamlined and tempered approach.

In short, the Court should deny the Motion and order such other relief it deems just.

4

## COUNTER STATEMENT OF FACTS

As set forth herein, the Trust believes that the Court may be able resolve the Motion without the need for a lengthy contested evidentiary hearing. To that end, the Trust has specifically requested that YPF consent, at least in the first instance, to proceed without extensive discovery (which could, ironically, create a risk of White & Case breaching its own screening policies). *See* Nicholson Decl. Ex. A at 12-13 (Dec. 24, 2020 email from C. Shore to V. Hou, "I believe we should be able to agree on a range of stipulated facts to present to the Court without having to engage in broad discovery . . . ."); *id.* at 3 (Jan. 8, 2021 email from C. Shore to V. Hou, requesting YPF agree to have the Motion heard on the papers). YPF has refused to consider the issue unless and until it has reviewed these opposition papers. *See id.* at 3 (Jan. 8, 2021 email from V. Hou to C. Shore). As such, the Trust respectfully submits the following counterstatement of facts to preserve its rights to create a detailed, contested evidentiary record without prejudice to its seeking to limit, at least in the first instance, the scope of this matter.

## I.    PRIOR PROCEEDINGS

The Motion plunges *in medias res* with events that unfolded after the Trust filed the Complaint that initiated this matter in June 2018. However, a brief discussion of the more distant past provides important context for the Court to assess YPF's present protest to Ms. Boelter's lateral move and the protections implemented by White & Case to accommodate it.

As the Court is well aware, this proceeding is not written on a blank slate, but is rather the final chapter in a series of proceedings that have transpired over the course of more than two-decades relating to environmental contaminations at multiple sites across the United States and YPF's attempts to avoid liability related thereto. *See, e.g.*, *YPF Defendants' Memorandum of Law In Support of Motion to Dismiss Adversary Complaint*, dated October 10, 2018 [D.I. 51], at 1-7. Most pertinent, in 2005, the State of New Jersey Environmental Protection Agency ("NJDEP")

AMERICAS 105730538

initiated an action in the Superior Court of New Jersey, Law Division—captioned *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corporation, et al.*, No. ESX-L-9868-05 (the "New Jersey Litigation"), in which (i) YPF S.A. and several of its affiliates— including YPF's holding-company subsidiary YPF Holdings, Inc., (ii) Repsol S.A. and its affiliates (also defendants in this action), Repsol YPF S.A. (the entity formed during the period of 1999-2012 when Repsol owned YPF S.A.), and (iii) Maxus Energy Corporation and its Debtor affiliates (collectively, "Maxus"), which were at all relevant times wholly-owned indirect subsidiaries of YPF—were all named defendants. *See, e.g.*, *Declaration of Javier J. Gonzalez in Support of First Day Motions*, dated June 18, 2016 [Case No. 16-11501, D.I. 2] at ¶¶ 32-42. There, the NJDEP sought to impose liability derivatively on the YPF, Repsol and Maxus entities for environmental liabilities related to contamination in the Passaic River in New Jersey. The New Jersey Litigation also came to comprise cross-claims brought against Maxus for indemnification, and against the YPF and Repsol entities derivatively as alleged alter-egos of Maxus. *Id.*

During the New Jersey Litigation, several national law firms represented YPF and/or Repsol YPF, including DLA Piper LLP, Kirkland & Ellis LLP, King & Spalding LLP, and Chadbourne & Parke LLP. Further, pursuant to various alleged joint defense agreements, those law firms coordinated on strategy extensively with the several major law firms that represented Maxus, including Andrews & Kurth LLP,[1] Drinker Biddle & Reath LLP, Haynes & Boone LLP, Vinson & Elkins and Jones Day LLP. YPF gave all of those firms access, to more or less of a degree, to its confidential information relating to the transactions at issue in the New Jersey

---

[1] Andrews & Kurth had previously represented YPF in connection with its acquisition of Maxus in 1995.

AMERICAS 105730538

Litigation and its attempts to use litigation to limit its liability.[2]

As this Court witnessed, on the eve of trial of alter-ego claims brought against YPF, Maxus filed the petitions that initiated the above-captioned Chapter 11 Cases.  In connection with these Cases, and the separate adversary proceeding to which OCC's cross-claims against YPF were removed [No. 16-51025], YPF continued to rely on Chadbourne & Parke as its litigation counsel. During the bankruptcy Cases, YPF publically disclosed its settlement position in a filed Settlement Agreement.  [No. 16-11501, D.I. 3 at Ex. A]  Only on the eve of confirmation of Maxus's plan of reorganization did YPF end its relationship with Chadbourne and hire Cravath, Swaine & Moore LLP, which appeared as its counsel of record at confirmation and indicated it would remain as counsel in this litigation.  *See* Amended Notice of Appearance and Request for Service of Papers of the YPF Entities, dated April 11, 2017 [No. 16-11501, D.I. 1145]; *see also* April 18, 2017 Hr'g Tr. [No. 16-11501] at 36:25-37:1 (Mr. Zumbro: "We are also fully prepared to litigate all of the YPF [C]auses of [A]ction.").  After the Trust filed its Complaint on June 14, 2018, Cravath exited and YPF brought in Sidley Austin LLP ("Sidley") to defend this action.

## II.    MS. BOELTER'S KNOWLEDGE OF YPF "CLIENT CONFIDENCES"

While the Motion does not disclose how many firms pitched to replace Cravath, there is no dispute that Sidley did.  Ms. Boelter personally participated in a meeting with James Conlan in which Sidley pitched for the engagement to defend YPF in this action.  Boelter Decl. ¶ 4.  The Motion seeks to create the impression that Ms. Boelter served as YPF's lead counsel on this matter from Sidley's engagement until her very departure; however, Mr. Conlan served as the lead

---

[2] Separately before the Court is the Trust's motion to compel YPF to disclose a memorandum prepared by YPF's former counsel, Chadbourne & Parke, in 2012 relating to a potential bankruptcy filing by Maxus, on the grounds that the substance of that memorandum was disclosed to Maxus and its counsel as part of a broad effort to coordinate their defense.  [D.I. 275] ("Chadbourne Memo Motion").

7

attorney on the engagement until his departure from Sidley in June 2020.  Boelter Decl. ¶ 3.
Following the pitch, there seems to be no dispute that Ms. Boelter attended client meetings in 2018
and 2019 and worked with Sidley litigation attorneys on the motions YPF filed during that time.
Boelter Decl. ¶ 4.  But, to the best of her recollection, Ms. Boelter billed only approximately 200
hours to the matter in 2018, 100 hours in 2019, and none in 2020.[3]  Boelter Decl. ¶ 5.

### III.    MS. BOELTER'S KNOWLEDGE OF YPF'S "LITIGATION STRATEGY"

The Motion contends that Ms. Boelter was "[a]ctive in formulating YPF's original
litigation strategy." Mot. at 5.  However, some of Ms. Boelter's work on this matter as described
in the bullet points on page five of the Motion, such as YPF's securities law disclosures and
engagement of Delaware counsel seems tangential to this proceeding.  The remaining categories
of work largely pertain to aspects of this adversary proceeding that are now concluded.  For
example, the Motion touts that Ms. Boelter worked on YPF's Motion to Dismiss the Complaint.
Mot. at 5.  That motion was filed on October 19, 2018 [D.I. 50]; proceeded to oral argument on
January 22, 2019 [D.I. 98], and was denied on February 15, 2019 [D.I. 108].  YPF sought leave to
take interlocutory appeal on March 1, 2019 [D.I. 121], which Judge Richard G. Andrews denied
on September 12, 2019 [D.I. 11 in Case No. 19-mc-51-RGA].  The Motion also contends that Ms.
Boelter reviewed the Answer to the Complaint, which was filed on April 1, 2019, but that pleading
contains general denials of fact and asserts various garden-variety affirmative defenses with no
specificity that would indicate that any confidences were acted upon [D.I. 140].  Mot. at 7.  And,
while Ms. Boelter allegedly "participated in internal discussions about a potential motion to
withdraw the reference" (Mot. at 7), Judge Andrews denied that motion on March 23, 2020 [D.I.

---

[3] Although YPF makes several detailed accounts of how and why Ms. Boelter worked on the
matter, they have refused to disclose *when* she did so, even though YPF is in possession of her
time records and the Trust asked for that detail on December 22, 2020.

AMERICAS 105730538

215].

As to each of these filings, YPF has already, in effect, publically revealed its strategy to drag this litigation out as long as possible and cause the Trust, a limited-purpose, limited-funding entity, to spend as much money as possible as quickly as possible. That strategy is confirmed in other pleadings and proceedings as well. For example:

- YPF started this action by challenging the Trust's ability to effect valid service of its Complaint on Cravath [D.I. 9 at ¶ 5], as part of a motion for an extension of time to move to dismiss the Trust's Complaint up to six months after the filing of the Complaint [*id.* at ¶ 8].

- YPF filed a lengthy and unprecedented motion for leave to "correct the record," seeking to strike portions of a hearing transcript on the grounds that counsel for the Trust had allegedly "mischaracterized" a single court opinion during oral argument on its motion to dismiss [D.I. 101].

- After the Court denied the Defendants' motions to dismiss, YPF sought to negotiate for more than 50 depositions per side and a nine-month fact discovery period, and would only agree to a more expedited schedule on the condition that the Trust agree that any and all depositions from the New Jersey Litigation could be used for any and all purposes.

- When the Trust would not so stipulate, YPF filed what was in essence a pre-trial motion requesting that the Court impose their desired treatment of prior depositions or else expand the deposition period provided for in the then-current scheduling order by six months to allow the Defendants to retake dozens of unnecessary depositions [D.I. 156, 157].

- YPF interposed a baseless claim of attorney-client privilege so as to withhold from the Trust—a successor to Maxus' privileges—thousands of documents that had been openly shared with directors, officers and employees of Maxus. When the Trust moved to compel [D.I. 216], YPF sought to expand the scope of discovery to include claims of hundreds of environmental creditors that were settled in the Plan (to which YPF elected not to object during confirmation proceedings) [D.I. 217, 220].

- Then, after the Court granted the Trust's motion to compel [D.I. 227], YPF produced documents pursuant to the Court's order, only to seek to claw them back months later on the basis that they had "inadvertently" read the order "incorrectly" as requiring them to produce the documents that they had produced, prompting yet more motion practice [D.I. 275, 283].

The rational conclusion from these (and even other actions) is that YPF is willing to trade both

money and credibility in exchange for delay.  In any event, given YPF's concession that "Ms. Boelter's day-to-day involvement in the litigation ebbed and flowed over time, particularly after the onset of discovery as the case transitioned to more traditional civil litigation" (Mot. at 7),[4] it is not clear that Ms. Boelter presently has any pertinent, non-stale knowledge of YPF's strategy for litigating the remainder of this action.  *See infra* at 30.

## IV. MS. BOELTER BEGINS HER RELATIONSHIP WITH THOMAS LAURIA IN 2018

In or around 2018, Ms. Boelter and Mr. Lauria began a romantic relationship.  Boelter Decl. ¶ 6.  When Sidley undertook its representation, Ms. Boelter (correctly) believed that Mr. Lauria had never entered an appearance on behalf of the Trust in this matter.  *Id.*  Ms. Boelter disclosed her relationship with Mr. Lauria to colleagues at Sidley in 2018.  *Id.*  Ms. Boelter believes that YPF became aware of the relationship in 2019.  *Id.*

The two ultimately married on November 6, 2020.  *Id.*  By this time, Ms. Boelter was no longer working on the matter.  Boelter Decl. ¶ 5.  There is no allegation in the Motion that, at any time during the progression of their relationship, Ms. Boelter disclosed any of YPF's confidences to Mr. Lauria.

## V. MS. BOELTER MOVES TO WHITE & CASE

As noted above, James Conlan, then the global head of Sidley's restructuring group, left Sidley (along with Patrick Corr, then-head of Sidley's European restructuring and insolvency practice) to join Faegre, Drinker, Biddle & Reath LLP in June 2020.[5]  Mot. at 7.  Upon Mr.

---

[4] *See also* Wendel Decl.  ¶ 7 ("She continued to be intimately involved with the representation of YPF *as recently as May 15, 2019*.") (emphasis added); *id.* at ¶ 10 ("As the litigation progressed, Ms. Boelter handed over much of the responsibility for the day-to-day representation of YPF to litigators in the firm.").

[5] Faegre, Drinker, Biddle & Reath LLP resulted from the merger of Faegre, Baker, Daniels LLP with Drinker, Biddle & Reath LLP.  As noted above, the latter firm served as counsel to Maxus in the New Jersey Litigation, including on Project Jazz.

AMERICAS 105730538

Conlan's departure, John J. Kuster assumed the role of lead attorney for YPF on this matter. Boelter Decl. ¶ 3.  This matter, and Ms. Boelter's work for YPF in connection therewith, played no role in her decision to explore lateral moves or to leave Sidley.  Boelter Decl. ¶ 7.

In connection with her ultimate relocation to White & Case, Ms. Boelter went through a standard conflicts screening process.  Boelter Decl. ¶ 8.  During that process, Ms. Boelter did not discuss this matter other than to identify it as a matter on which she had worked, for purposes of conflict identification.  *Id.*  Also, during that process, Ms. Boelter understood that she was not being recruited because of her prior work for YPF, nor because of her relationship with Mr. Lauria. Boelter Decl. ¶ 9.

From the beginning of her recruitment, Ms. Boelter understood that, because of her prior work for YPF on this matter, a screen would be necessary.  Boelter Decl. ¶ 9.  A screen was implemented as of the day Ms. Boelter joined the firm (*see* Levy Declaration;[6] *see also* Motion Exhibits A through I), and Ms. Boelter was promptly informed of, and acknowledged that she would comply with, the screen.  Boelter Decl. ¶¶ 9-10; Levy Decl. ¶ 41.  Ms. Boelter has never seen any of the Trust's documents pertaining to this matter, whether hard copy or electronic, in White & Case's possession.  Boelter Decl. ¶ 11.

Ms. Boelter takes her ethical obligations to her former client very seriously.  Boelter Decl. ¶ 11.  Ms. Boelter has not revealed, either directly or indirectly, *any* confidential information (or substantive information of any sort) that she learned during her work for YPF, including during the conflicts screening process, to *anyone* at White & Case.  *Id.*  Other than the limited necessary disclosures during the conflicts screening process, Ms. Boelter has not discussed this matter with

---

[6] "Levy Declaration" or "Levy Decl." refers to the Declaration of Debra Kobrin Levy, Associate General Counsel and Senior Manager of Compliance at White & Case, filed herewith.

AMERICAS 105730538

anyone at White & Case, including Mr. Lauria, and has not set foot in White & Case's New York office since she joined the firm. *Id.* Ms. Boelter understands that White & Case policy dictates that any disclosure of a YPF confidence, even inadvertent, will be punished as a disciplinary violation. *Id.* Finally, Ms. Boelter has agreed to certify compliance with the White & Case screen periodically, even though YPF has not requested such updates. *Id.*

## VI.    YPF BRINGS IN CLEARY TO SEEK DISQUALIFICATION OF WHITE & CASE

On October 1, 2020, the day Ms. Boelter joined White & Case as a partner, White & Case sent a letter to Sidley to provide notice to YPF of Ms. Boelter's move and to inform YPF of the screening measures White & Case had in place. Mot. Ex. B. The letter made clear that all relevant personnel (*i.e.*, Ms. Boelter and lawyers and staff on working on this matter) had been instructed that: (1) Ms. Boelter would not have access to electronic or hard copy files relating to this matter; (2) Ms. Boelter may not discuss this matter with anyone at White & Case; (3) Ms. Boelter would not receive any part of the fee from this matter.[7] *Id.* White & Case also made clear that it would treat any breach of the screening procedures, inadvertent or otherwise, as a serious disciplinary offense. Mot. Ex. C at 1.

The Motion attaches the parties' ensuing written correspondence in response to the above letter as Exhibits A and C through I, which the Trust respectfully submits the Court can assess without the need for additional color commentary. However, the Motion fails to apprise the Court of three key facts concerning the period following Ms. Boelter's departure from Sidley.

*First*, from the first notice and throughout the lead up to the filing of the Motion, White &

---

[7] The Motion concedes that these are "features used by screens in typical lateral hire situations." Mot. at 13. A fulsome description of the screening measures put in place by White & Case is set forth in the Levy Declaration. Further, in the accompanying Declaration of Lucian T. Pera ("Pera Declaration" or "Pera Decl."), Mr. Pera opines that such measures are, at the very least, reasonably adequate under the circumstances. *See* Pera Decl. at ¶¶ 49-57. To the extent that an evidentiary hearing is held, the Trust reserves the right to call other witnesses to establish its record.

12

Case repeatedly solicited orally and in writing YPF's views on how White & Case could augment the screening measures to alleviate any legitimate client concerns. Mot. Exs. B, C, F and H. Based upon YPF's contention that it has agreed to screens in other representations (Mot. at 2), it was obviously familiar with the concept and practice in U.S. jurisdictions. All the while, Cleary refused to suggest any areas in which the screen could be improved, ultimately taking the position that no screening measures could ever purge the imputed conflict. *See* Mot. Ex. G at 2 ("We do not concede that a screen would ever be sufficient.").

*Second*, the Motion fails to note that, at no point after receiving the White & Case's October 1, 2020 letter up to the filing of the Motion, did YPF request that White & Case withdraw from the matter, curtail its involvement in the proceeding, or agree to halt any proceedings. On the contrary:

- YPF sat by as White & Case prosecuted the Chadbourne Memo Motion, as discussed above.

- YPF did not object when White & Case appeared as counsel for the Trust at the deposition of Mr. David O. Smith on October 21, 2020, and the deposition of Fernando Segovia, currently a director of subsidiary YPF E&P Bolivia S.A. (and Maxus's former CFO and acting CEO during the Chapter 11 Cases), on October 23, 2020.[8]

- YPF did not object when, on October 27, 2020, the Trust moved to compel Mr. Segovia to answer certain deposition questions pertaining to his deposition preparation with Martin Jackson of Sidley where such preparatory discussions touched on issues pertaining to Maxus (as opposed to YPF). [D.I. 288]

- YPF did not object when White & Case appeared on behalf of the Trust at the November 4, 2020 oral argument on the aforementioned discovery disputes. [D.I. 296]

- In the meet-and-confers relating to the scheduling of briefing on the Motion, YPF's counsel took the position that the Christmas-week filing was purely coincidental, and that the Trust could have as long as needed to file its opposition. Then, after the Court

---

[8] Upon information and belief, YPF expected Messrs. Smith and Segovia to give largely exculpatory deposition testimony advancing its defenses. As it happened (and as the Trust will demonstrate in greater detail at the appropriate juncture), White & Case secured testimony from both witnesses undermining key portions of the YPF defense and supporting important allegations raised in the Trust's Complaint. This development may well have informed YPF's decision to file the Motion only *after* those depositions were taken.

calendared a two-day evidentiary hearing in late April, YPF initially sought to condition any delay in the Trust's opposition on the Trust's agreement to stay all further proceedings in the adversary action until resolution of the Motion. *See* Nicholson Decl. Ex. A at 5 (Jan. 8, 2021 email from V. Hou to M. Nicholson).

*Third*, the Motion is silent as to why Cleary is appearing for YPF and not Sidley. Only after the briefing schedule was agreed upon did the Trust learn through public statements that YPF is itself launching a restructuring of billions of dollars of its loans in distressed exchanges. *See, e.g.*, YPF S.A. Letter to Buenos Aires Stock Exchange, dated January 8, 2021 (attached to Form-6k for the month of January 2021).[9] As part of that restructuring process, Cleary is representing YPF in discussions with various groups of bondholders regarding the terms of bond exchanges. Given that a judgment by this Court could establish the Trust as YPF's largest single creditor, delay of this proceeding and entry of a money judgment at its conclusion is exactly what Cleary would want to facilitate a restructuring process. To that end, after the filing of the Motion, Cleary noticed five depositions (including of White & Case's general counsel and Chris Shore), and have propounded broad interrogatories and document requests that by their terms seek disclosures going back to June 1, 2016. While YPF may view discovery of that type as an opportunity to increase costs and cause delay, the Trust believes that discovery of that scope is not necessary or appropriate in the context of this Motion, particularly where collecting documents from Ms. Boelter could result in inadvertent disclosure to White & Case of some of the very confidences the Motion nominally seeks to protect. The Trust hopes to avoid the need for a fishing expedition by stipulating to facts, and reserves the right to curtail anything other than confirmatory diligence until the Court has an opportunity to determine the proper ambit of the dispute.

---

[9]    Available    at    https://www.ypf.com/english/investors/Lists/HechosRelevantes/SEC-Announcement-of-Exchange-Offers-and-Consent-Solicitation.pdf).

AMERICAS 105730538

## ARGUMENT

Turning to the law, as the Motion concedes, disqualification of counsel is rare.  Courts "approach[] motions to disqualify counsel with cautious scrutiny, mindful of a litigant's right to the counsel of its choice." *Volterra Semiconductor LLC v. Monolithic Power Sys.*, No. 19-cv-2240 (CFC), 2020 U.S. Dist. LEXIS 154875, at *7 (D. Del) (quoting *Intellectual Ventures I LLC v. Checkpoint Software Techs., Inc.*, No. 10-1067-LPS, 2011 U.S. Dist. LEXIS 154921, at *17 (D. Del. June 22, 2011)).  "A party's choice of counsel is entitled to substantial deference and the court should not quickly deprive parties of their freedom to choose the advocate who will represent their claims, particularly due to the risk that motions to disqualify may be motivated by an attempt to achieve a tactical advantage in the litigation." *Alamo Grp., LLC v. A&G Realty Partners, LLC* (*In re OSH 1 Liquidating Corp.*), Nos. 13-11565 (CSS), 14-50103 (CSS), 2015 Bankr. LEXIS 467, at *20 (Bankr. D. Del. Feb. 2, 2015) (Sontchi, J.).  Whether disqualification is appropriate depends on an analysis of the circumstances of the particular case at bar, and is "never automatic." *Intellectual Ventures*, 2011 U.S. Dist. LEXIS 154921, at *16 (collecting cases).  As motions to disqualify are generally disfavored, the moving party must "clearly demonstrate that continued representation would be impermissible." *See Volterra*, 2020 U.S. Dist. LEXIS 154875, at *6 (citing *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007)). Vague and unsupported allegations are not sufficient to meet this standard. *Alamo Grp.*, 2015 Bankr. LEXIS 467, at *21.

**I.    MS. BOELTER'S LATERAL MOVE IS PERMISSIBLE AND DOES NOT IMPERIL YPF CONFIDENCES OR THE CONDUCT OF THIS PROCEEDING**

At the outset, the Motion attempts to create some confusion as to what rules apply to the instant dispute. *See* Mot. at 11; Mot. Ex. C at 1.  YPF does appear to have abandoned the initial contention that the New York Rules of Professional Conduct apply to Ms. Boelter's conduct (*see*

AMERICAS 105730538

Mot. Ex. D at 1), and rightly acknowledge that, by virtue of this Court's local rules, the ABA Model Rules of Professional Conduct apply. *See* Mot. at 15 ("This Court applies the ABA Model Rules of Professional Conduct to questions of attorney misconduct. Bankr. D. Del. L.R. 9010-1(f)."). Yet, throughout the Motion, YPF's counsel cites to decisions of other jurisdictions, including New York, which take markedly different approaches to rules of screening and imputation, perhaps creating the impression that some law other than the ABA's Model Rules, as written, controls.

For the avoidance of any doubt that might be engendered by the Motion's use of the phrase "attorney misconduct" in relation to Ms. Boelter (a New York licensed attorney), the Trust clarifies that *New York's own ethical rules* establish that the Model Rules apply here. *See* New York R. Prof. Cond. ("RPC") 8.5(b)(1) ("For conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice (*either generally or for purposes of that proceeding*), the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise") (emphasis added); *see also* Pera Decl. at ¶ 22. In short, this dispute is governed *entirely* by the Model Rules, as written.

### A.    White & Case Abided By The Model Rules On Lateral Hires, And Provided All Appropriate Information On The Screen

The Model Rules provide that a lawyer may not undertake a representation of a new client in a matter "in which a firm with which the lawyer formerly was associated had previously represented a client whose interests are materially adverse to [the new client]; and about whom the lawyer had acquired information protected by [the Model Rules] that is material to the matter." MRPC Rule 1.9(b). Neither the Trust nor White & Case have ever contended that Ms. Boelter may properly represent the Trust in its litigation against YPF. The Model Rules also provide that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when

16

any one of them practicing alone would be prohibited from doing so by [Rule 1.9 ("Duties to Former Clients")]."  MPRC Rule 1.10 ("Imputation of Conflicts of Interest: General Rule").  Thus, if the Model Rules stopped there, Ms. Boelter's conflict *would* be imputed to White & Case, and both she and the firm might well be out of this proceeding.

However, Model Rule 1.10 explicitly provides that, if the conflict to be imputed "is based upon [Rule 1.9(b)][10] and arises out of the disqualified lawyer's association with a prior firm," then the conflict is *not* imputed for purposes of Rule 1.10(a) as long as the lawyer's association with the new firm meets three requirements in subsection 10(a)(2).  MRPC Rule 1.10(a)(2).  Specifically, "Rule 1.10(a)(2) . . . *removes the imputation* otherwise required by Rule 1.10(a), . . . *without requiring that there be informed consent by the former client*.  Instead, it requires that the procedures in sections (a)(2)(i)-(iii) be followed."  Rule 1.10, cmt. 7 (emphasis added).  As set forth below, the White & Case screen fully satisfies each of these three requirements.

*First*, the disqualified lawyer must be "timely screened from any participation in the [new firm's conduct of the adverse] matter" and must not receive any part of the fee therefrom.  Rule 1.10(a)(2)(i).  As White & Case informed YPF in its first notice, White & Case implemented its screen effective as of Ms. Boelter's first day with the firm.  Mot. Ex. B.  Further, as White & Case informed YPF at the time, the screen "[e]nsur[es] that [Ms.] Boelter will not be apportioned any part of the fee from [this matter] pursuant to ABA Model Rule 1.10(a)(2)."  *Id.* at 2.

*Second*, the new firm must promptly give written notice of the lawyer's association with the new firm "to any affected former client" (*i.e.*, of the prior firm).  Rule 1.10(a)(2)(ii).  Such notice must be sufficient "to enable the former client to ascertain compliance with the provisions

---

[10] Rule 1.10(a)(2) refers to disqualification under "Rule 1.9(a) or (b)," but "[w]hen a lawyer moves from one firm to another, the situation is governed by Rules 1.9(b) and 1.10(a)(2) and 1.10(b)."  Rule 1.10, cmt. 2.

AMERICAS 105730538

of this Rule," and must include: (A) "a description of the screening procedures employed;" (B) "a statement of the firm's and of the screened lawyer's compliance with these Rules;" (C) "a statement that review may be available before a tribunal;" and (D) "an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures."[11]  *Id.*  There can be no reasonable disagreement that White & Case complied with this section as well.  It sent a letter informing YPF of Ms. Boelter's move to White & Case and the related screening measures that White & Case implemented.  Mot. Ex. B at 1.  There can also be no real dispute that White & Case did "respond" to each of YPF's inquiries regarding the screen, though YPF does contend that White & Case's November 25, 2020 response to the November 6, 2020 letter was not "prompt."  Mot. at 12.  However, four business days after it received Cleary's letter, White & Case offered to engage openly with Cleary regarding the efficacy of its screening provisions under the auspices of Federal Rule of Evidence, Rule 408.  Mot. Ex. F.  Cleary declined, claiming that the proposal to discuss pursuant to Rule 408 was somehow "improper."  Mot. at 12; Mot. Ex. G at 2.  Nothing, however, prevented Cleary from having an initial discussion under Rule 408 and, if not satisfied with any answer, convening an on-the-record meet and confer between the litigators.  There is nothing in Model Rule 1.10 or any case law which the Trust has encountered which requires a new firm to abandon attempts to resolve screening issues consensually and instead proceed to litigation mode immediately.

*Third*, under Model Rule 1.10(a)(2), at reasonable intervals and upon the former client's

---

[11] "The notice required by paragraph (a)(2)(ii) generally should include a description of the screened lawyer's prior representation and be given as soon as practicable after the need for screening becomes apparent.  It also should include a statement by the screened lawyer and the firm that the client's material confidential information has not been disclosed or used in violation of the Rules.  The notice is intended to enable the former client to evaluate and comment upon the effectiveness of the screening procedures."  Rule 1.10, cmt. 9.

18

written request, the screened lawyer must provide "certifications of compliance with these Rules and with the screening procedures."[12]   Rule 1.10(a)(2)(iii).   Although YPF has not made any written request that White & Case certify compliance with the Rules and with the screening procedures, Ms. Boelter has indicated that she is willing to provide periodic compliance updates, and White & Case is willing to do so as well, should the Court so require.

### B.    The White & Case Screen Is Reasonably Adequate Under The Circumstances

While Rule 1.10 imposes a screening requirement, it does not prescribe any explicit steps that must be adopted in any situation to negate imputation of a former-client conflict to a new firm association.   Instead, the official comment to Rule 1.10 cross references Rule 1.0(k), which makes clear that "'[s]creened' denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are *reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect* under these Rules or other law."   *See* Model Rule 1.0(k) (emphasis added).   In the more than ten weeks between receipt of White & Case's letter giving notice of Ms. Boelter's joining and the filing of the Motion, YPF failed (or refused) to identify any area in which the White & Case screen could be made more reasonable, or even describe what is "reasonably adequate under the circumstances."   Importantly, each of the alleged "proximity deficiencies" in the screen listed in the Motion on page 13 was known to YPF no later than September 2020.

Rather, the Motion chiefly contends that the White & Case screen, while it may be facially sufficient for other types of lateral moves, is legally impermissible here.   In advancing this

---

[12] "The certifications required by paragraph (a)(2)(iii) give the former client assurance that the client's material confidential information has not been disclosed or used inappropriately, either prior to timely implementation of a screen or thereafter.   If compliance cannot be certified, the certificate must describe the failure to comply."   Rule 1.10, cmt. 10.

AMERICAS 105730538

contention, the Motion cites to no cases applying Local Bankruptcy Rule 9010-1(f), but starts with a multi-factor test from a 2013 opinion from the District Court for the District of Delaware.  *See Enzo Life Scis., Inc. v. Adipogen Corp.*, No. 11-cv-00088-RGA, 2013 U.S. Dist. LEXIS 164939, at *9-10 (D. Del. Nov. 20, 2013).  According to the Motion, *Enzo* requires that an effective screen must satisfy four requirements: (1) prohibit discussion of sensitive matters; (2) restrict circulation of sensitive documents; (3) restrict access to files; and (4) create a "strong firm policy against breach, *including* sanctions, physical *and/or* geographic separation."[13]  *Id.* (emphasis added).  The Motion then concedes that Ms. Boelter cannot work on or access files related to this matter, cannot discuss this matter with anyone at White & Case, and cannot receive a portion of the fee.  Mot. at 12-13.  The Motion also does not second-guess that anyone who breaches the screen will be subject to disciplinary sanction, including termination.  *Id.*; *see also* Levy Decl. ¶ 41; Boelter Decl. ¶ 11; Mot. Ex. I at Exhibit A thereto ("The Firm will treat any breach, inadvertent or otherwise, of an ethical screen as a serious disciplinary offense.").

Rather than stop there, the Motion next seeks to impose a different five-factor analysis to contend that the White & Case screen, while facially meeting the four *Enzo* requirements, will be insufficient to protect YPF-confidential information.  These factors are: (1) the substantiality of the relationship between the attorney and the former client; (2) the time lapse between the matters in dispute; (3) the size of the firm and the number of disqualified attorneys; (4) the nature of the disqualified attorney's involvement; (5) and the timing of the wall.  *Id.*  In particular, YPF urges

---

[13] The Motion seeks to add, as a fifth requirement, that an attorney cannot be screened effectively unless "any confidential client information communicated to the personally prohibited lawyer is unlikely to be significant in the subsequent matter."  Mot. at 16 (quoting Restatement (Third) of the Law Governing Lawyers § 124(2)(a)).  However, the Restatement provision, which is not the law in Delaware, would materially modify the Model Rules which this Court expressly adopted. Bankr. D. Del. L.R. 9010-1(f); *see also* Pera Decl. ¶¶ 61-64.

that this Court find that White & Case's screen is inadequate because (1) "Ms. Boelter had a substantial relationship with YPF as one of its key legal advisers," (Mot. at 17-20); (2) "Ms. Boelter switched sides in the midst of an ongoing case," (Mot. at 19-20); (3) "Ms. Boelter's work in [White & Case's] New York Restructuring and Financial Insolvency group creates a substantial risk YPF's confidences will spread through that small group," (Mot. at 20-22) and (4) "Ms. Boelter was intimately involved with the most important parts of this case." (Mot. at 22-23).

At the outset, the Trust respectfully submits that this five-factor framework is outdated and does not bind this Court regarding the application of this Court's Local Rule.  The *Enzo* decision itself was rendered after the ABA made material changes to the screening and imputation rules, as discussed by Mr. Pera in his Declaration (Pera Decl. ¶¶ 26-36).  Yet, its analysis derives solely from dicta in the dissent of an opinion addressing the Pennsylvania Rules of Professional Conduct—*see Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241 (Pa. 1992) (Nix, J., dissenting)—which was followed by a line of cases that mostly pre-date the 2009 changes to the Model Rules on screening.  *See, e.g.*, *Dworkin v. General Motors Corp.*, 906 F. Supp. 273 (E.D. Pa. 1995) (also addressing Pennsylvania Rules); *James v. Teleflex, Inc.*, No. 97-1206, 1999 U.S. Dist. LEXIS 1961, at *16 (E.D. Pa. Feb. 24, 1999) (same); *Norfolk S. Ry. Co. v. Reading Blue Mt. & N. R.R. Co.*, 397 F. Supp. 2d 551, 554 (M.D. Pa. 2005) (same); *Holcombe v. Quest Diagnostics, Inc.*, 675 F. Supp. 2d 515 (E.D. Pa. 2009) (post-dating the Model Rule changes, but addressing Pennsylvania rules only).

The question here is not what Pennsylvania might have permitted prior to or after the promulgation of Model Rule 1.10, but rather what this Court will now permit pursuant to the Local Rules it has adopted.  In considering that question, the Court should assess the effectiveness of the White & Case screen in light of all relevant factual considerations, but respectfully that inquiry

21

should not rewrite the Rule to reopen the debate as to whether a screen is permissible for "key participants." *See* Model Rule 1.10, cmt. 7 ("[E]ven where screening mechanisms have been adopted, tribunals may consider additional factors in ruling upon motions to disqualify *a lawyer* from pending litigation.") (emphasis added). And, even if this Court were to defer to how the *Enzo* court interpreted its local rule, it bears noting that *Enzo* itself arose in a unique fact pattern in which (1) the conflicted lawyer moved to a small firm (CCB) of which he was a founding name partner, (2) the firm thereafter attempted to substitute as counsel for plaintiff in a matter in which the lawyer had previously worked for defendant, and (3) there was a significant gap in time when the conflicted lawyer was not screened from his colleagues at CCB. *Enzo Life Scis.*, 2013 U.S. Dist. LEXIS 164939, at *3 (observing that the conflicted attorney had been a name partner at the firm appearing as substitute counsel to the adverse client prior to implementation of a screen). Indeed, the movant noted in a letter to Judge Andrews just how extreme the problem was there:

> the factual scenario here is unique and has not previously been addressed by this [c]ourt. . . . *[T]his is not the typical situation where an associate or partner leaves a firm and moves to a firm that is representing a client adverse to a prior representation of a newcomer.* . . . While Mr. Brown has been characterized as a side-switching attorney, CCB can just as easily be categorized as a side-switching firm. . . . The imputed conflict caused CCB, as a firm, to switch sides during the same litigation once it was retained by Enzo. Because the circumstances are akin to a side-switching firm and cannot be adequately screened, CCB must be disqualified.

*Enzo Life Scis. Inc. v. Adipogen Corp.*, No. 11:-cv-00088 (RGA) [Dkt. No. 136] (D. Del. Sept. 20, 2013) (emphasis added). That is certainly not what is happening here.

Further, even if this Court were inclined to adopt five-factor overlay and add material glosses to Rule 1.10 not found in its express text, YPF still fails to meet its burden of proof to show facts supporting its supposition about potential infirmities with the screen. *See, e.g.*, *Boston Sci. Corp. v. Johnson & Johnson, Inc.*, 647 F. Supp. 2d 369, 374 n.7 (D. Del. 2009) ("Whether disqualification is appropriate depends on the facts of the case and is never automatic."); *Alamo*

AMERICAS 105730538

*Group*, 2015 Bankr. LEXIS 467, at *21 (vague and unsupported allegations not sufficient grounds to disqualify).

### 1.    Ms. Boelter's "substantial relationship" with YPF does not render the White & Case screen less effective

The Motion and the supporting declaration of Professor Wendel first take the position that, even if Rule 1.10 contemplates that proper ethical screening can cleanse the imputation of a former-firm conflict, a screen cannot cleanse an imputed conflict if the knowledge of the new lawyer rises above a certain threshold of "substantiality." *See* Mot. at 17-19, 22-23, 26-28; Wendel Decl. ¶ 17.  Notably, neither the Motion nor the Wendel Declaration cite authority from this Court finding an otherwise reasonably adequate ethics screen ineffective and therefore insufficient as a matter of law because the lawyer to be screened "knew too much."  Rule 1.10 contains no such proviso, though it could have.  *See* Rule 1.18; *see also* Pera Decl. ¶¶ 43-44.  When the ABA Ethics Committee adopted the current version of Rule 1.10 in 2009, the Committee expressly considered and rejected a proposal by the ABA Section of Litigation that would have prohibited lateral screening where the moving lawyer possessed confidential client information material to, or substantial involvement in, the screened matter.  Pera Decl. ¶¶ 28-36.  Indeed, certain States have subsequently refused to adopt Model Rule 1.10 wholesale and have created specific qualifications on who may be screened and who may not.  *See, e.g.*, Pera Decl. at fns. 7 and 13 (discussing Tennessee Rules of Professional Conduct); *see also* New Jersey Rules of Professional Conduct, Rule 1.10(c) (screening unavailable where potentially disqualified lawyer had "primary responsibility" in prior proceeding); Indiana Rules of Professional Conduct, Rule 1.10 (same); Nevada Rules of Professional Conduct, Rule 1.10 (same).  By adopting the Model Rules without qualification, this Court has not put any similar limitations on who can, and who cannot, avail themselves of the screening rules.

AMERICAS 105730538

Ultimately, the Motion's focus on substantiality seems aimed to the proposition that disqualification is appropriate here because Ms. Boelter's high-profile former representation of YPF gives rise to the "mere appearance of impropriety." Mot. at 19. To that end, the Motion cites two cases for the proposition that "a court may disqualify an attorney for failing to avoid even the appearance of impropriety." Mot. at 19 (citing *Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*, No. 10-cv-1067, 2011 U.S. Dist. LEXIS 154921, at *12 (D. Del. June 30, 2011) ("[A] court may disqualify an attorney for failing to avoid even the appearance of impropriety."); *Enzo Life Scis.*, 2013 U.S. Dist. LEXIS 164939, at *11-12)). Both cases are out of step on this point; the Model Rules do not include any reference to the appearances standard which existed in prior ethical Canons. Specifically, following the promulgation of amended Rule 1.9 of the Model Rules in 1983,[14] the ABA intentionally removed all references to appearances of impropriety because the standard was vague, subjective, and unpredictable of application. *See* Pera Decl. ¶¶ 81-82. Looking at Section 327(a) of the Bankruptcy Code, the Third Circuit has held that, because that statute makes no reference to the appearance of impropriety, that alone is not sufficient grounds to disqualify a lawyer or firm. *See In re Marvel Ent. Grp.*, 140 F.3d 463, 477 (3d Cir. 1998).

Even were "appearances" still a relevant consideration, the Trust respectfully submits that there is nothing "apparently" inappropriate in Ms. Boelter's or White & Case having facially and faithfully complied with the active ethical rule applicable to the proceeding. Rather, the Trust respectfully submits that "emphasis on the ethical rules themselves, rather than a presumption that they will be circumvented, should more effectively promote public respect for the bar." *Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 428 (D. Del. 1986); *see also* Pera Decl.

---

[14] *See* Flamm, Richard E., LAWYER DISQUALIFICATION: DISQUALIFICATION OF ATTORNEYS AND LAW FIRMS, § 14.2 (2d ed. 2014 and 2020 Supp.).

¶ 83 (quoting Geoffrey C. Hazard, Jr., W. William Hodes, and Peter R. Jarvis, *The Law of Lawyering* §15.11, at 15-37 (4th ed. 2020).).

### 2.    The Timing of Ms. Boelter's departure does not render the screen less effective

The Motion next asserts that "the timing" of Ms. Boelter's lateral move weighs in favor of finding the screen ineffective, because Ms. Boelter left Sidley "in the midst of ongoing litigation." Mot. at 19-20.  That contention seems odd – disqualifications from a litigation always occur in the midst of a litigation, as do screens implemented pursuant to Model Rule 1.10 when a laterally-moving lawyer has a former-firm conflict.  YPF's focus on September 2020 obfuscates that Ms. Boelter stopped any work for YPF in 2019, at least ten months prior.  Further, in lieu of analyzing how or why the timing of Ms. Boelter's move actually impacts the matter, the Motion simply cites to two cases, both of which are inapposite.

*First*, the Motion cites *Enzo*, in which there was a 16-month gap between the attorney's work at the old firm and the new firm's engagement on the screened matter.  The Motion contends that, there, "[t]he court did not find that this lapse of time undermined the case for disqualification." Mot. at 19.  Actually, the court in *Enzo* did not discuss time lapse at all, focusing on the facts that the destination firm had only eight attorneys and that the screen had no disciplinary provisions. 2013 U.S. Dist. LEXIS 164939, at *12-14.  In any event, the lawyer in *Enzo* had been at the new firm for more than a year before the plaintiff sought to retain the firm as substitute counsel, during which time the lawyer, who previously worked for the defendant, *had not been screened at all. Id.* Here, Ms. Boelter's joining and the screen's implementation were simultaneous. *See* Mot. Ex. B; *see also* Levy Decl. ¶¶ 13-14.  *Second*, the Motion relies on *Norfolk*, in which the lawyer at issue went to a new firm after the court had granted his client partial summary judgment—which he argued—and immediately before the trial he presumably would have conducted.  397 F. Supp. 2d

AMERICAS 105730538

at 554.[15]  Here, Ms. Boelter had no expected ongoing role in the matter – Sidley has conceded that it had already transitioned the matter to its litigation attorneys and away from its restructuring attorneys more than a year ago.  Mot. at 7.  There is no evidence from which the Court can conclude that Ms. Boelter's departure prejudiced YPF in any way.

### 3.    White & Case's Size Weighs Against Finding the Screen Ineffective

The Motion next contends that, based on various factors, it is "extremely likely that YPF's confidential information and strategies will spread to the Trust's lawyers," (Mot. at 20), and "almost inevitable that Ms. Boelter eventually inadvertently makes a comment, suggests a strategy, or lets slip a detail that could tip off an attorney working on the YPF litigation."[16]  Mot. at 21.  In other words, while cases such as *Enzo* and *Norfolk* might question the effectiveness of a screen in a small firm, the Motion seems to contend that it is the enormity of White & Case that makes it harder for White & Case to enforce the screen.  Mot. at 13, 24.  YPF's novel concern is misplaced.

*First*, the accusation that Ms. Boelter will simply violate her duties and the White & Case ethical screen is baseless.  Reputable attorneys do not "let slip" material information that they are required to maintain as confidential.  *Second*, the Motion cites the *Decora* case for the proposition that the Court can and should focus solely on the size of White & Case's financial restructuring group because the risk of inadvertent transmission of client confidence is greater when the screened

---

[15] Further, the screen in *Norfolk* was impaired due to other factors, including that (i) the destination firm had "only ten attorneys in a single office, [where] the close working environment presents the distinct possibility that [the screened lawyer] could be nearby and overhear a sensitive discussion," (ii) there was no provision on fee apportionment, and (iii) the screen had *no* disciplinary provisions. *Id.* at 555.

[16] The Motion asserts that "this risk is exacerbated because six other Sidley lawyers, including Ms. Boelter's former co-head of the Sidley bankruptcy practice, a senior litigation partner, a bankruptcy counsel, and two associates also left to join [Ms. Boelter] at White & Case."  Mot. at 20.  However, the Motion does not explain why this is so.  In fact, none of the other Sidley joiners are even alleged to have worked for YPF.

26

lawyer works in the same group handling the conflict matter.  Mot. at 20.  But, in *Decora*, the concern was that the screened lawyer regularly worked with the senior lawyer *on the screened matter* and was not actually screened until after the filing of a motion for disqualification.  899 F. Supp. at 140-41.  In fact, Ms. Boelter's joining the insolvency group is a red herring -- White & Case's Commercial Litigation practice handles this matter, not the restructuring group.  Even so, none of the 47 partners in the restructuring group has billed time on this litigation since before 2020, nor has any attorney in the firm's Miami office billed to this litigation during that time.[17] Levy Decl. ¶¶ 43-44.  Only *two* associates in the restructuring group billed any time to the litigation in the last year.[18]  *Id.*

Third, even if one were to focus just on White & Case's financial restructuring group, that group has 85 attorneys in New York alone, and 47 partners worldwide.  Mot. at 13 n.5.  While the Motion describes that group as "relatively small" (Mot. at 21), these numbers are still far larger than the firms in which courts have found the size of the firm to weigh against effective screening. *See, e.g.*, *Enzo* (eight attorneys); *Norfolk* (ten attorneys); *Decora, Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 140 (S.D.N.Y. 1995) (44 lawyers); *see also* Pera Decl. ¶ 54.

Fourth, the Motion overstates the requirement for "physical separation" between Ms.

---

[17] No doubt, Mr. Shore is a partner in the Commercial Litigation group, but does work frequently with the restructuring group.  But YPF should not have it both ways.  Either the Court should focus on the 85 lawyers assigned to the same group (as YPF does – *see* Mot. at 13), or the hundreds of White & Case attorneys assigned to tax, securities, real estate, debt finance, mergers & acquisitions, and other corporate groups who routinely interact with their restructuring colleagues.

[18] In its December 4, 2020 letter, White & Case noted that 13 restructuring lawyers had billed time to this matter "since the date Ms. Boelter joined the Firm."  Mot. Ex. A.  That tally of lawyers in the restructuring group as stated in the letter comprised *all* lawyers who *ever* billed *any* work for the Trust since White & Case was engaged, as long as they received notice of the screen when Ms. Boelter joined (which any current White & Case lawyer who worked for the Trust as of October 1, 2020 did).  However, only two members of the group have billed time to the Trust on this matter since Ms. Boelter joined (or, in fact, within the last year), both of whom work in the New York office.  Levy Decl. ¶ 44.

AMERICAS 105730538

Boelter and the New York lawyers working on this matter, both in terms of what the law requires and what White & Case has undertaken to provide. Mot. at 24. The Rule requires that the screened lawyer not discuss "the matter" from which they have been screened with lawyers working on that matter – in other words, the Rule focuses on the work, not the workers. There is no dispute that White & Case's screen complies with this requirement. Levy Decl. ¶¶ 24-27. The Rule does not require a strict physical separation of screened attorneys—*i.e.*, a guarantee that Ms. Boelter will never work or fraternize with Trust team lawyers on other matters, or, in YPF's even more draconian vision, speak with them at all about anything. Certainly, the Motion adduces no authority for the proposition that Ms. Boelter and Maxus team lawyers cannot ever meet or interact.[19] *See* Pera Decl. ¶ 55. The Motion instead points to language from the *Enzo* opinion addressing the requirement that the screen include a "strong firm policy against breach, *including* sanctions, physical *and/or* geographic separation." *Enzo Life Scis.*, 2013 U.S. Dist. LEXIS 164939 at *9 (emphasis added). To the extent that non-exclusive language creates a bona fide requirement for strict segregation—which, as discussed above, is not the case—the White & Case screening requirement that Ms. Boelter not "work in an office location in close proximity to any of the attorneys working on the Maxus matter" is an eminently reasonable measure that will prevent Ms. Boelter and the Trust team lawyers from overhearing each other inadvertently. *See* Ex. I at Exhibit B; *see also* Pera Decl. ¶ 56. While the Motion feigns bafflement that White & Case could ever ensure that Ms. Boelter, when in New York, will not work in close proximity with any Trust team lawyers, each floor in White & Case's New York office contains at least 70 separate offices (with 15 or more partners' offices), and it is perfectly feasible for Ms. Boelter to be seated (if and when

---

[19] Such a requirement would undermine the applicability of Rule 1.10 at small to mid-size firms. Yet, the drafters of the Model Rules expressly envisioned that imputed conflicts can be cleansed by screens even at small firms. *See* Pera Decl. ¶ 56.

28

she is actually assigned an office in New York) to a floor where on which no Trust team lawyers work.

*Finally*, YPF contends that White & Case's purported failure to strengthen the screen by increasing the physical distance between the offices of Ms. Boelter and the lawyers on the Trust team cannot be remediated now, and that White & Case must therefore be disqualified.  Mot. at 25.  As an initial matter, this argument smacks of gamesmanship.  Having sat by and said nothing while Ms. Boelter joined and integrated into the firm, YPF should not now be heard to argue that "it's too late" to adopt different screening mechanisms.  Nor is it too late when nothing confidential has been revealed, nor will be revealed.  In any event, due to the pandemic, White & Case attorneys have generally not been working in the New York office since March 2020 and, as a result, YPF confidential information has never been at risk from loose "water-cooler talk."  Ms. Boelter herself has not yet set foot in White & Case's New York office.  Boelter Decl. ¶ 11.  Thus, to the extent the Court has concerns about the proximity of Ms. Boelter's eventually-assigned office to the New York office of any other Trust team lawyer in New York, there is, unfortunately, ample time to deal with that proactively.[20]

### 4.    Ms. Boelter's alleged "intimate involvement" with the "most important parts of this case" does not render the screen ineffective

YPF next contends that "the fact that White & Case hired Ms. Boelter while she was in possession of the most sensitive and significant of YPF's confidences . . . strongly favors finding a screen per se ineffective."  Mot. at 22.  In essence, YPF simply assumes, contrary to any fact, that senior lawyers with important information should be deemed less capable of honoring their ethical obligations.  Preliminarily, and as discussed in Section I.B.1, *supra*, and in the Pera

---

[20] White & Case lawyers are not expected to return to the New York office before April 2021 at the earliest.

AMERICAS 105730538

Declaration, the drafters of the Model Rules emphatically rejected the concept of a "lead lawyer" exception to Rule 1.10(a).  In addition, and as discussed in the foregoing, Ms. Boelter was not in fact the "lead lawyer" before or at the time she left Sidley (Boelter Decl. ¶ 3), and it is an open question as to whether the information that Ms. Boelter may have learned years ago remains as sensitive and significant today.  *See Voicenet Communs., Inc. v. Pappert*, No. 04-1318, 2004 U.S. Dist. LEXIS 6429, at *7-8 (E.D. Pa. Apr. 5, 2004) (denying disqualification motion in part because lawyer's knowledge was "outdated"); *Rohm & Haas Co. v. Dow Chem. Co.*, No. 4309-CC 2009 Del. Ch. LEXIS 249, at *6-7 (Del. Ch. Feb. 12 2009) ("Dow has failed to convince me that the information Wachtell had access to regarding Dow's strategies and asset values in 2006 and 2007 will substantially advance the interest of Rohm and Haas in this litigation."); *T. Levy Assocs. v. Kaplan*, No. 16-4929, 2016 U.S. Dist. LEXIS 177187, at *6 (E.D. Pa. Dec. 22, 2016) (disqualification inappropriate where "information acquired in a prior representation may have been rendered obsolete by the passage of time").

Nevertheless, the Motion asks this Court to impose, on a post-hoc basis, a bright-line rule that "[d]isqualification is particularly warranted where the conflicted attorney's involvement with the prior case included a candid evaluation of the strengths and weakness of the client's case, as well as knowledge of the client's 'defense strategies.'"  Mot. at 23.  The only case the Motion cites for that proposition—*Enzo*—says nothing of the sort.  There, the court referred to evidence that the conflicted attorney became aware of defense strategies in connection with preparing mediation statements and document requests to contradict a denial that the conflicted attorney had a substantive role in the case.  *Enzo Life Scis.*, 2013 U.S. Dist. LEXIS 164939, at *10-11.  Even so, the *Enzo* court did not find "particularly" that the conflicted attorney could not be screened as a matter of law; rather this was just one factor among several.  *Id.* at *11.  Again, the *Enzo* court also

30

emphasized that the destination firm had only eight lawyers, that the screen failed to prohibit other lawyers from discussing the screened matter in the conflicted attorney's presence, and that it did not have an enforcement mechanism.  *Id.* at *12-13.  None of those infirmities are present here.

## II.    MS. BOELTER'S CONDUCT PRIOR TO JOINING WHITE & CASE, INCLUDING HER RELATIONSHIP, DOES NOT CREATE AN IMPUTABLE CONFLICT THAT WOULD WARRANT DISQUALIFICATION

Moving even further away from the central issue of screening adequacy, the Motion makes repeated reference to the relationship between Ms. Boelter and Mr. Lauria as if that had key importance to the dispute.  It does not.  The only conflict the Motion alleges is a conflict under Rule 1.9, to which Ms. Boelter is subject by virtue of her work for YPF while at Sidley.  The Motion does *not* seek to disqualify White & Case due to Ms. Boelter's relationship with and eventual marriage to Mr. Lauria under Model Rule 1.7.  Nor could it.

*First*, as to the period before Ms. Boelter joined White & Case, her relationship with Mr. Lauria did not create an actionable conflict, even under Model Rule 1.7, which applies to personal-interest conflicts including relationships between lawyers at firms with adverse clients.  That Rule only applies to lawyers representing adverse clients *in the same matter.  See* Rule 1.7, cmt. 11 ("*When lawyers representing different clients in the same matter or in substantially related matters* are closely related by blood or marriage, there may be a significant risk that client confidences will be revealed and that the . . . relationship will interfere with both loyalty and independent profession judgment.") (emphasis added); *see also ABA Comm. On Ethics & Pro. Resp.*, Formal Op. 494 (2020) ("Conflicts Arising Out of a Lawyer's Personal Relationship with Opposing Counsel") (observing that a lawyer with "a tangential role . . . where that lawyer has little or no direct decision-making authority in the matter and minimal contact with the opposing counsel" is less likely to create a conflict than where the lawyer is sole or lead counsel).  Here, Mr. Lauria has not worked at all on the Trust representation or the underlying Maxus bankruptcy.  Levy Decl. ¶ 42.

AMERICAS 105730538

*Second*, even if, during her pre-joining period, the relationship between Ms. Boelter and Mr. Lauria had created a conflict under Model Rule 1.7, the remedy would not have been to disqualify Sidley or White & Case. Rather, it would have been for one of the two individuals to withdraw from the representation. *See* Rule 1.7, cmts. 4 & 7. "The disqualification arising from a close family relationship is personal and ordinarily is not imputed to members of firms with whom the lawyers are associated." Rule 1.7, cmt 11; *see also United States v. Dong*, No. 2:11-cr-00511-DCN, 2015 U.S. Dist. LEXIS 163995, at *14 (D.S.C. Dec. 8, 2015) ("Although Dong's attorney would have an actual conflict if her husband were opposing counsel, that conflict is not imputed to other lawyers with whom her husband is associated." ). Because Mr. Lauria has never worked on this matter and Ms. Boelter no longer represents YPF, there is no representation from which they can now withdraw. *Cf. Sonos, Inc. v. D&M Holdings, Inc.*, No. 14-cv-1330 (RGA), 2015 U.S. Dist. LEXIS 119718, at *11 (D. Del. Sept. 9, 2015) ("[I]mputed disqualification does not follow [lawyers] to their new firm.").

*Third*, the conduct of YPF's counsel regarding the relationship between Ms. Boelter and Mr. Lauria plainly constitutes a waiver of any right YPF would have ever had to compel White & Case to withdraw on that basis. *See Conley v. Chaffinch*, 431 F. Supp. 2d 494, 498-99 (D. Del. 2006) ("In determining whether the moving party has waived its right to object to the opposing party's counsel the court should consider the length of [and reason for] the delay in bringing a motion to disqualify, when the movant learned of the conflict, whether the movant was represented by counsel."). Ms. Boelter informed Sidley of the relationship in 2018, and Sidley took no action. *See* Boelter Decl. ¶ 6; *see also In re Rite Aid Corp. Securities Litigation*, 139 F. Supp.2d 649, 661 (E.D. Pa. 2001) (finding waiver where movant waited nine months after discovering the potential conflict and movant "was represented by highly sophisticated counsel for that entire period"); *In*

*re Muma Servs., Inc.*, 286 B.R. 583, 589 (Bankr. D. Del. 2002) (one-year delay was unreasonable and gave rise to waiver). Indeed, there are grounds here for the Court to find a waiver on the post-joining imputation as well. Cleary was fully aware of the relationship between Ms. Boelter and Mr. Lauria from the very beginning of its involvement in this dispute, but did not then take the position that the relationship was grounds for disqualification of White & Case under Model Rule 1.7. *See Kaiser Grp. Int'l, Inc. v. Nova Hut a.s. (In re Kaiser Grp. Int'l, Inc.)*, 272 B.R. 846, 852 (Bankr. D. Del. 2002) (finding no reason for a four-month delay in moving to disqualify and concluding that the motion was "a strategic ploy" where movant had engaged with non-movant regarding an ethical screen).

*Finally*, YPF contends that "the confidential information Ms. Boelter possesses . . . only needs to . . . be exchanged across the dinner table with her husband, the head of [the Restructuring Group]" to make its disclosure "highly consequential." Mot. at 20-21. This salacious argument is simply counterfactual. *Both* Mr. and Mrs. Lauria are prohibited from discussing any YPF confidence with counsel working for the Trust (Levy Decl. ¶¶ 26-27, 46-49), so whatever dinner conversation they might share (in violation of their own screening commitments), there would still have to be a further transgression in which they disregarded the screen to talk to the Trust's attorneys who then used the information. There is simply no basis for this Court to presume multiple ethical violations by multiple attorneys appearing before it.

## III.    THE TRUST WOULD BE SUBSTANTIALLY PREJUDICED, AND YPF WOULD OBTAIN A TACTICAL BENEFIT, IF WHITE & CASE WERE DISQUALIFIED

The Motion finally contend that "any doubt as to the propriety of the representation should be resolved in favor of disqualification." Mot. at 25 (quoting *Apeldyn Corp. v. Samsung Elec. Co.*,

693 F. Supp. 2d 399, 404 (D. Del. 2010).[21]  As set forth in Sections I and II, *supra*, the Motion has identified no genuine deficiency with the screen that White & Case has implemented to prevent advertent or inadvertent disclosure by Ms. Boelter.  Further, as set forth above in Section I.B.1, the Motion fails to establish that "lead lawyers" or lawyers with "substantial knowledge" are to be excluded from the screening protections of Rule 1.10.  There is thus no doubt about the "propriety" of White & Case's continued representation of the Trust – rule following *is* proper; what is not proper is advocating for a Court to change a black-letter rule *after* one side has relied upon it.

But YPF's self-serving interest in "propriety" and its subjective peace of mind is not the only issue for the Court to assess here.[22]  Even those courts which have identified actual, unscreened conflicts and/or transgressions of Model Rule 1.9 take an all-facts-and-circumstances approach to determining whether disqualification of the attorney would be an appropriate remedy. Those factors include the timing of the disqualification motion, delay in bringing the motion, the stage of proceedings, whether confidential information from the prior representation had passed to the client, the cost to obtain new counsel, the complexity of the case, and whether there was any ulterior motive for filing the motion to disqualify.[23]  *See TQ Delta, LLC v. 2Wire, Inc.*, C.A. No.

---

[21] This is wrong as a matter of law; the *Apeldyn* court distilled this principle from the same cases that held that an attorney or firm can be disqualified for failing to cure "the mere appearance of impropriety" (*id.*), which the Third Circuit has rejected.  *See* Section I.B.1, supra.  The case is also factually distinguishable because there, the law firm representing the plaintiff hired a lawyer who had previously billed more than 4,000 hours on the matter while working for the firm representing the defendant.  *Id.* at 401.  Citing earlier precedent, the court granted the motion to disqualify but expressly noted that the problem could have been avoided by using "'an appropriate screening mechanism.'"  *Id.* at 404.

[22] Professor Wendell likewise adopts the same myopic view of the issue, going so far as to contend that "[d]isqualification of the firm is the only remedy that will adequately protect the interests of YPF . . . ."  Wendell Decl. ¶ 33.  As discussed, the Rule is not simply focused on the interests of the former client.

[23] Neither the District Courts nor the Bankruptcy Court have considered how these or other factors would apply in the context of a motion to disqualify a firm on the grounds that a conflict arising

34

13-1835-RGA, 2016 U.S. Dist. LEXIS 130982, at *18-19 (D. Del. Sep. 26, 2016); *Intell. Ventures*, 2011 U.S. Dist. LEXIS 154921, at *12-16.  The Motion addresses none of these factors, and all cut in favor of denying disqualification.

*First*, on the facts of this dispute, there can be little doubt the Motion was brought for tactical purposes.  *Nemours Found.*, 632 F. Supp. at 431 ("Courts have been extremely reluctant to disqualify attorneys when there is a possibility that a motion was made primarily for strategic purposes in a litigation.  Even when made in the best of faith, such motions inevitably cause delay.").  While YPF takes the position that no screen could *ever* provide adequate assurances that their confidential communications would be safe despite Ms. Boelter's move to White & Case, they delayed the filing of the Motion until Christmas week despite having found out that Ms. Boelter would be joining White & Case (and marrying Mr. Lauria) on September 12.[24]

Rather than move immediately (or even suggest any additional proactive protections) YPF's counsel engaged in an unproductive and doomed letter-writing campaign, which in hindsight seems calculated solely to generate grist for the mill of a motion to disqualify that it knew would be filed no matter how White & Case responded to its multiple, broad inquiries.  *See e.g.*, *Kaiser Grp. Int'l, Inc. v. Nova Hut a.s. (In re Kaiser Grp. Int'l, Inc.)*, 272 B.R. 846, 852 (Bankr. D. Del. 2002) (concluding that the motion was "a strategic ploy" where movant had

---

under Rule 1.10 was inadequately screened.  The Trust respectfully submits that, as no authority requires disqualification in all cases, the Court can take the factors identified in the *TQ Delta* opinion—which Judge Andrews issued after the opinion in *Enzo*—into consideration when evaluating the Motion, to the extent the Court does not find that the plain language of Model Rule 1.10 as adopted in the Local Rules requires that it be denied.

[24] *See also Hartford Steam Boiler Inspection & Ins. Co. v. Int'l Glass Prods., LLC*, No. 2:08cv1564, 2017 U.S. Dist. LEXIS 77102, at *11 (W.D. Pa. May 22, 2017) ("Courts within this jurisdiction consistently have recognized that *any meaningful delay* between the understanding of the substance of the basis to disqualify and the filing of a motion to do so raises the specter of tactical use and provides a proper basis for a finding of waiver.") (emphasis added).

AMERICAS 105730538

explicitly requested a "Chinese Wall"). Most important, as noted *supra* at 9, YPF allowed White & Case to continue with the representation of the Trust through multiple, very expensive fact-discovery processes, perhaps hoping that the lapse in time would amplify the insinuation that Ms. Boelter has already let slip some key morsel to her new husband. *Liberate Techs. LLC v. Worldgate Communs., Inc.*, 133 F. Supp. 2d 357, 360 n.2 (D. Del. 2001) (where movant "waited several months to bring this [conflict] to the court's attention despite ongoing settlement talks, the court deems any conflict in this instance to be waived"). Simply, this is not the conduct of a party who genuinely believes its most important secrets are likely to be divulged imminently to an adversary, but rather one intent on causing further delay and expense in these proceedings.[25]

*Second*, disqualification of White & Case would in fact severely prejudice the Trust. Courts considering motions to disqualify give the non-movant's choice of counsel substantial deference, and must be on guard that such motions are brought tactically. *See, e.g.*, *Alamo Group*, 2015 Bankr. LEXIS 467, *21. Here, White & Case has already achieved several important victories in dispositive and highly complicated motion practice. That work required White & Case to absorb a record that, as YPF has repeatedly observed, spans more than 25 years of transactions and related litigations and proceedings. *See, e.g.*, *Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 430-31 (D. Del. 1986) (finding that disqualification of out-of-state counsel would prejudice the client given the complexity of the case and the excellent working relationship with local counsel); *In re Modanlo*, 342 B.R. at 237 ("[Non-movant] would be prejudiced by the

---

[25] Given YPF's recent efforts to streamline its capital structure by means of distressed bond exchanges, it is not unimaginable that it may eventually have to seek some form of bankruptcy protection themselves. To the extent the timing of the Motion implicates a desire to have this action paused to facilitate restructurings of debts other than to the Trust, the delay in bringing the Motion may be additionally improper. *See, e.g.*, *Modanlo v. Ahan (In re Modanlo)*, 342 B.R. 230, 237 (D. Md. 2006) (finding waiver in part because timing of motion to disqualify suggested attempt to obtain tactical advantage vis-à-vis other filings in chapter 11 case).

AMERICAS 105730538

disqualification . . . particularly because of the long and complex history of litigation."); *see also Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1119 (D.N.J. 1993) ("[I]t has not escaped attention that this motion to disqualify . . . follows upon recent discovery which appears to significantly damage [movant's] case."). The breadth and depth of that institutional knowledge would take months, if not years, for the Trust to replicate.

Moreover, this matter has already proceeded into the fact deposition phase, with intensive phases of expert discovery and summary judgment to follow in short order. *See* Amended Case Management Plan and Scheduling Order, dated July 22, 2020 [D.I. 230]. Simply put, the Trust cannot easily or quickly switch horses now and still take this litigation to completion in anything close to the timeframe contemplated by the current scheduling order. *Id.*; *see also Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978) ("This court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed."). Nor can one simply presume that replacement counsel is readily at hand here. As noted, YPF has already employed a substantial portion of the waterfront, and has already demonstrated that they have no intent in acting reasonably and/or cooperatively with its former lawyers. Indeed, YPF affirmatively touts its refusal to grant White & Case a formal written waiver to hire a young associate who worked for Chadbourne during the Chapter 11 Cases. Mot. at 4, 10. As an initial matter, it is incomprehensible as to how YPF can view interfering with the career of a junior lawyer by repeatedly refusing to permit a screen might be a helpful fact for them. (Such conduct certainly cuts against YPF's protestations that it understands and appreciates the "practical realities of potential conflicts and lawyers changing firms . . . ." Mot. at 2.) But, this obvious lack of corporate self-awareness raises the specter that YPF would seek to disqualify any replacement

AMERICAS 105730538

counsel with even tangential involvement with any one of the many law firms and lawyers that have handled YPF confidences in the past.

*Third*, disqualifying White & Case on the basis of Ms. Boelter's former association with Sidley and work for YPF would actively thwart the very purpose of the screening rules which permit and promote lateral moves. While the Motion suggests that "Ms. Boelter was free to work for any other firm in the world" (Mot. at 29), this is simply not the case. Following Mr. Conlan's departure, she needed to find a firm in the appropriate geographical market with a comparable presence in the restructuring bar where she could continue her career. The list of appropriate potential homes was already short, and the web of potential challenges to disinterestedness to which seasoned debtor's counsel such as Ms. Boelter are subject truncates it even further.[26] Screening under Rule 1.10 exists precisely so that lawyers in Ms. Boelter's position can associate with new firms and continue their careers unabated, provided that they behave ethically. In other words, the Model Rules strive to make clear that moving from a firm is not, in and of itself, unethical, even when the new firm is adverse on an active representation. The notion that someone in Ms. Boelter's situation may never encounter another lawyer either professionally or socially sets an impossibly high standard for lateral hires, which would in turn severely hamper attorney mobility. *See, e.g.*, *Nemours Found.*, 632 F. Supp. at 431 ("Attorney mobility . . . would be severely restricted if a per se rule against a 'cone of silence' were adopted."); *see also* Pera Decl. ¶¶ 27-36.

Finally, disqualification based solely on the tawdry insinuation that Ms. Boelter could not keep herself from spilling a YPF confidence to her husband (who incidentally does not work on

---

[26] Ms. Boelter's active role as debtors' counsel for the Boy Scouts of America alone may have removed more than a dozen firms from her prospective roster of potential new firms.

38

this matter), would enact a per se rule imputing conflicts from spouse to spouse, in direct contravention of the policies inherent in the Model Rules. *See Blumenfeld v. Borenstein*, 276 S.E.2d 607, 609 (Ga. 1981) ("A per se rule of disqualification on the sole ground that an attorney's spouse is a member of a firm representing an opposing party would . . . effectively create a category of legal 'Typhoid Marys,' chilling both professional opportunities and personal choices.").

## IV.  THERE IS NO BASIS FOR THE COURT TO STAY THESE PROCEEDINGS PENDING RESOLUTION OF THE MOTION TO DISQUALIFY

The Motion concludes with a request that the Court "stay proceedings pending White & Case's withdrawal." Mot. at 30.  This request, which the Motion does not support with argument or citation to any authority, is unclear.  YPF has not made a separate application for the Court to stay discovery in this matter pending resolution of the Motion, and absent such an application the proceedings will continue.  In short, the Court can and should deny the stay relief requested.

## <u>CONCLUSION</u>

For the foregoing reasons, the Trust respectfully requests that the Court deny the Motion and grant such other and further relief that the Court deems appropriate and necessary.

Date:  January 29, 2020

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4098)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas

39

New York, NY 10020
(212) 819-8200
cshore@whitecase.com
matthew.nicholson@whitecase.com

*Attorneys for the Liquidating Trust*

AMERICAS 105730538