**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, | Case No. 16-11501 (CSS) (Jointly Administered) |
| Debtor. | |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | |
| -against- | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | Adv. Proc. No. 18-50489 (CSS) |
| Defendant. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF YPF
DEFENDANTS' MOTION TO DISQUALIFY WHITE & CASE LLP AS
<u>COUNSEL FOR THE MAXUS LIQUIDATING TRUST</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................. ii

PRELIMINARY STATEMENT .........................................................................................1

REPLY STATEMENT OF FACTS.....................................................................................2

    I.   MS. BOELTER WAS A KEY MEMBER OF THE YPF TEAM WHILE SHE WAS A PARTNER AT SIDLEY AND COUNSEL TO YPF.......................................................3

    II.   MS. BOELTER FAILED TO INFORM YPF OF HER RELATIONSHIP WITH THE HEAD OF WHITE & CASE'S RESTRUCTURING GROUP .........................................6

    III.  YPF HAS NOT DELAYED OR PROLONGED THIS LITIGATION ...........................10

ARGUMENT .....................................................................................................................13

    I.   THE COURT NEEDS TO CONSIDER THE FACTS SURROUNDING MS. BOELTER'S PRIOR REPRESENTATION OF YPF TO DECIDE WHETHER SCREENING COULD CLEANSE WHITE & CASE'S IMPUTED CONFLICT..........13

    II.   MS. BOELTER'S REPRESENTATION OF YPF MAKES THE SCREEN INEFFECTIVE TO AVOID IMPUTING HER CONFLICT TO HER FIRM................16

        A.  Ms. Boelter's Substantial Relationship with YPF as Key Advisor and Counsel of Record Weighs in Favor of Disqualification............................................................16

        B.  Ms. Boelter's Side-Switching in the Middle of Litigation Favors Disqualification ...17

        C.  Ms. Boelter's Work in the Same Group as the Lawyers Suing Her Former Client Favors Disqualification.............................................................................................18

        D.  Ms. Boelter's Possession of Critical Client Confidences Favors Disqualification .....19

    III.  MS. BOELTER'S CONDUCT BEFORE MOVING TO WHITE & CASE RAISES CONCERNS ABOUT HER ADHERENCE TO HER DUTIES TO YPF.......................20

    IV.  THE COURT SHOULD NOT REWARD WHITE & CASE'S ETHICAL GAMBLE BY PROTECTING IT FROM DISQUALIFICATION .......................................................23

CONCLUSION..................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Alamo Grp. v. A&G Realty Partners LLC*,
No. 13-11565 (CSS), 2015 Bankr. LEXIS 467 (Bankr. D. Del. Feb. 2, 2015) .................. 15

*Alexander v. Primerica Holdings, Inc.*,
822 F. Supp. 1099 (D.N.J. 1993) ..................................................................................... 24

*Apeldyn Corp. v. Samsung Elecs. Co.*,
693 F. Supp. 2d 399 (D. Del. 2010) ................................................................................. 17

*Cent. Milk Producers Co-op v. Sentry Food Stores, Inc.*,
573 F.2d 988 (8th Cir. 1978) ............................................................................................ 24

*Commonwealth v. Croken*,
733 N.E.2d 1005 (Mass. 2000) ......................................................................................... 21

*Decora, Inc. v. DW Wallcovering, Inc.*,
899 F. Supp. 132 (S.D.N.Y. 1995) ................................................................................... 20

*Enzo Life Scis., Inc. v. Adipogen Corp.*,
No. 11-cv-00088 (RGA), 2013 WL 6138791 (D. Del. Nov. 20, 2013) ........................... *passim*

*In re Corn Derivatives Antitrust Litig..*,
748 F.2d 157 (3d Cir. 1984) ....................................................................................... 17, 25

*In re IH 1, Inc.*,
441 B.R. 742 (Bankr. D. Del. 2011) ................................................................................. 24

*In re Kaiser Grp. Int'l*,
272 B.R. 846 (Bankr. D. Del. 2002) ................................................................................. 24

*In re Meridian Auto. Sys.-Composite Ops.*,
340 B.R. 740 (Bankr. D. Del. 2006) ................................................................................. 24

*In re Modanlo*,
342 B.R. 230 (D. Md. 2006) ............................................................................................. 24

*Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*,
No. 10-cv-01067 (LPS), 2011 WL 2692968 (D. Del. June 22, 2011) ..................... 16-17, 18, 23

*James v. Teleflex, Inc.*,
No. 97-cv-01206 (LR), 1999 WL 98559 (E.D. Pa. Feb. 24, 1999) ......................... 13, 15-16, 23

*Liberate Techs. LLC v. Worldgate Comm'cns, Inc.*,
133 F. Supp. 2d 357 (D. Del. 2001) ..................................................................... 24

*Madukwe v. Del. State Univ.*,
552 F. Supp. 2d 452 (D. Del. 2008) ................................................................... 17-18

*Nemours Foundation v. Gilbane, Aetna, Federal Insurance Co.*,
632 F. Supp. 418 (D. Del. 1986) ..................................................................... *passim*

*Norfolk S. Ry. Co. v. Reading Blue Mtn. & N. R.R. Co.*,
397 F. Supp. 2d 551 (M.D. Pa. 2005) ..................................................... 13, 16, 17, 25

*TQ Delta, LLC v. 2Wire, Inc.*,
No. 13-cv-1835, 2016 U.S. Dist. LEXIS 130982 (D. Del. Sept. 26, 2016) .............    23-24, 25

*Voicenet Comm'cns, Inc. v. Pappert*,
No. 04-cv-1318, 2004 WL 870790 (E.D. Pa. Apr. 5, 2004) ............................................ 20

## Rules and Statutes

Local Bankruptcy Rule 9010-1(f) ..................................................................... 15

Model Rule of Professional Conduct, Preamble .................................................. 25

Model Rule of Professional Conduct Rule 1.0, cmt. 6 .......................................... 22

Model Rule of Professional Conduct Rule 1.7 ................................................... 6, 21

Model Rule of Professional Conduct Rule 1.9(a) ................................................. 17

Model Rule of Professional Conduct Rule 1.10, cmt. 7 ......................................... 14

## Other Authorities

Restatement (Third) of the Law Governing Lawyers § 124(2)(a) (Am. L. Inst. 2000) ......    13-14

Laws. Man. on Prof. Conduct (ABA/BLAW) (Feb. 17, 2020) ......................................... 14

ABA Comm. on Ethics & Pro. Resp., Formal Op. 494 (2020) ........................................ 21

N.C. Bar, Formal Ethics Op. 3 (2019) ............................................................... 21

## PRELIMINARY STATEMENT

The Trust[1] attempts to reframe the Motion as a referendum on the personal integrity of the Trust's lawyers or Ms. Boelter.[2]  In doing so, the Trust misconstrues the objective analysis called for by the conflicts rules and precedents which focus on the degree of risk posed by a lead lawyer who switches sides during litigation, not on the supposed probity of that lead lawyer. Instead of following established precedents in this Circuit, the Trust asks the Court to hold that any lawyer, no matter how significant their role in a case or how critical the confidential information they possess, can switch sides in the middle of an ongoing litigation without consent of the lawyer's client.  According to the Trust, provided the new firm implements a typical lateral screen, the lawyer's former client can be forced to accept this move, and just hope that no information ever slips out as that lawyer works with its adversaries, and, worse, in this case is married to the head of the group that counts this litigation as one of its most important cases.

The Trust does not identify a single court that has adopted this position.  On the contrary, courts "look to several factors" concerning the nature of a prior representation and the lawyer's move to decide "whether a screen is adequate" to cleanse a conflict.  *Enzo Life Scis., Inc. v. Adipogen Corp.*, 2013 WL 6138791, at *3 (D. Del. Nov. 20, 2013).

An analysis of the relevant factors plainly calls for disqualification, as Ms. Boelter's recruitment to White & Case is an unprecedented instance of side-switching by a lead lawyer intimately involved in the matter in which her new colleagues are currently litigating against her former client.  The Trust cannot meaningfully dispute (i) the nature of Ms. Boelter's years of sensitive work for YPF and access to YPF's most critical confidences, (ii) the fact that Ms.

---

[1]        Capitalized terms and abbreviations not otherwise defined have the same meanings as in YPF's Motion to Disqualify White & Case LLP as Counsel, D.I. 306 ( the "Motion").

[2]        Jessica C.K. Boelter is now referred to as Jessica C. Lauria.  *See* Decl. of Jessica C. Lauria (Formerly Boelter), D.I. 331 ("Boelter Decl.").  For the sake of consistency, Ms. Lauria is referred to herein as "Ms. Boelter."

Boelter failed to apprise YPF, while she was its counsel, of her relationship (now marriage) to Mr. Lauria, head of the group that is part of the team litigating against YPF in this case, or (iii) her decision to interview with her adversary's law firm without notice to, much less consent of, YPF.  Under these extreme facts, White & Case's representation untenably increases the risk that YPF's confidences will be leaked and threatens to undermine the integrity of these proceedings: the Trust has already positioned itself to attempt to use such confidential information to its benefit "for any and all purposes" when an inadvertent disclosure occurs.[3]

The Trust blames the victim for seeking to vindicate its rights, and accuses YPF of bringing this Motion as a "tactic."  This is baseless.  Leading ethics expert Professor Wendel has opined that the facts here are the "most egregious" he has seen in his 30-year career.  The Trust's charge of delay is also misdirected, as it was the Trust's lawyers who resisted providing information about its supposed screen, even though Model Rule 1.10(a)(2)(ii) required White & Case to provide YPF this information.  Although as YPF has acknowledged, motions to disqualify are (and should be) rare, this Motion is necessary and warranted, on these extraordinary facts, in order to disqualify the firm that brazenly recruited one of its adversary's key lawyers midstream during litigation, knowing that this day of reckoning might come.

**REPLY STATEMENT OF FACTS**[4]

While the Opposition is long on misdirection and blame, it does not dispute the key facts relating to the nature of Ms. Boelter's recent work for YPF on this very litigation, which render ineffective White & Case's proposed screen.  Nor does the Opposition dispute key facts about

---

[3]     The Trust purports to claim that if confidential or privileged information is disclosed, it "reserves all rights to use the information so disclosed in this matter for any and all purposes."  Reply Decl. of Rebecca M. Michaud ("Reply RM Decl."), Ex. M ¶ 16, Trust's Resps. & Objs. To YPF's RFPs (Feb. 19, 2021).

[4]     The below statement of facts includes several facts about general topics discussed or kinds of work done by YPF's counsel, including Ms. Boelter.  As before, by providing this general description of legal work done, YPF does not waive, and on the contrary intends to preserve, all applicable privileges.

Ms. Boelter's prior failures to abide by her duties to YPF, which—though not prerequisites for disqualification—reinforce the unreasonableness of the Trust's position that YPF and this Court should just trust Ms. Boelter and the Trust's counsel on the screen's efficacy. Moreover, the information that the Trust and its counsel begrudgingly provided to date about the screen has been conflicting, further undermining YPF's faith that its confidences will remain safeguarded.

## I.    MS. BOELTER WAS A KEY MEMBER OF THE YPF TEAM WHILE SHE WAS A PARTNER AT SIDLEY AND COUNSEL TO YPF

The Trust does not dispute that Ms. Boelter was, along with former Sidley partner James Conlan, one of only two Sidley attorneys who pitched to work for YPF shortly after the Trust filed its Adversary Complaint in 2018, and who appeared on YPF's engagement letter with Sidley. DG Decl. ¶ 3, D.I. 308; GFL Decl. ¶¶ 3-4, D.I. 307. Despite Ms. Boelter's undisputed role in securing the mandate to represent YPF, the Trust seeks to minimize Ms. Boelter's lead strategic advisory role and attempts to relegate the former co-head of Sidley's restructuring practice to nothing more than a bit player. The Trust asserts that only "Mr. Conlan served as the lead attorney on the engagement" until he left Sidley in 2020, and thereafter "John J. Kuster assumed the role of lead attorney for YPF." Pl.'s Opp. to YPF's Mot. to Disqualify 7, 11, D.I. 327 ("Opposition"). Notwithstanding the fact that more than one lawyer can be a "lead attorney" on a matter, the Trust fails to acknowledge that *YPF* indisputably regarded Ms. Boelter as a key advisor throughout her time at Sidley.[5] The Trust's efforts to downplay Ms. Boelter's role are also inconsistent with how Ms. Boelter publicly described her relationship with YPF. The very first document that YPF filed in this case was a motion to admit Ms. Boelter *pro hac vice*, and she did not cease to be counsel of record until October 1, 2020—the same day she began at

---

[5]        DG Decl. ¶¶ 4, 8 (former YPF CEO "regarded Ms. Boelter as one of YPF's primary contact points with Sidley"); GFL Decl. ¶ 11 (YPF General Counsel "regarded Ms. Boelter as one of YPF's key legal advisers").

White & Case.  *See* Mot. 18.  Ms. Boelter listed her name among the authors of YPF's Motion to

Dismiss, and news articles identified her as counsel to YPF.  *Id.* 18 n.6.  A 2020 trade

advertisement additionally touted Ms. Boulter as the co-head of Sidley's restructuring practice

and YPF as one of the group's main clients, listed first among a roster of "[s]elect recent global

engagements."  RM Decl., Ex. K at 2, D.I. 310-1.

There can be no doubt that during the two years in which Ms. Boelter was (and publicly

represented herself to be) one of YPF's lead lawyers, Ms. Boelter was acting as YPF's counsel,

was entrusted with YPF's confidences and sensitive business information, and formulated legal

advice for YPF, including strategy that continues to be critical to this case.  The Trust

nonetheless baselessly suggests that the work performed by Ms. Boelter while at Sidley "largely

pertain[ed] to aspects of this adversary proceeding that are now concluded."  Opp'n 8.  First, this

ignores the fact that Ms. Boelter not only knew and helped devise YPF's litigation strategy, but

also learned significant confidential information about YPF itself, which remains pertinent.

Second, the Trust's speculation about the aspects of YPF's strategy to which Ms. Boelter was

privy is flatly contradicted by YPF's declarants, who describe Ms. Boelter's contributions to, and

involvement in, this case on topics that will remain sensitive until the end of the case, such as

YPF's strategy following this Court's denial of the motion to dismiss, document review and

related privilege determinations, consideration of White & Case's litigation tactics, and the

possibility of settlement or other out-of-court resolution.  *See* JK Decl. ¶ 5, D.I. 309; GFL Decl.

¶¶ 6-8; DG Decl. ¶ 7.  Ms. Boelter regularly consulted with YPF and the Sidley team, even

participating in a May 2019 meeting with YPF's CEO regarding strategy and next steps

following the denial of its motion to dismiss—in other words, strategy for the current and future

phases of this case.  DG Decl. ¶ 7.  It is difficult to imagine a more "clear" indication that Ms.

Boelter has "pertinent, non-stale knowledge of YPF's strategy for litigating the remainder of this action."  Opp'n 10.

The Trust's claim that Ms. Boelter billed "only" approximately "200 hours to the matter in 2018, 100 hours in 2019, and none in 2020" misses the point.  Opp'n 8; Boelter Decl. ¶ 5.  The record shows that Ms. Boelter advised on key aspects of the case that continue to be relevant today.  *See Enzo*, 2013 WL 6138791, at *1, *4 (only 10 hours of work warranted disqualification because it involved critical confidential information).  Ms. Boelter also continued to act as the billing partner and communicate directly with YPF through at least May 2020, transmitting bills and time summaries.  *See* Reply Decl. of Germán Fernández Lahore, Ex. A.

Moreover, Ms. Boelter's claim to have only "consulted" with other Sidley lawyers "in 2018 and early 2019," Boelter Decl. ¶ 4, is false.  Based on the time other Sidley attorneys recorded to this matter, Ms. Boelter continued to advise and have conversations with them regarding this matter in 2020.  For example, in July 2020 Ms. Boelter spoke with Mr. Kuster regarding expert discovery, which will not occur in this litigation until later this year.  *See* Decl. of Daniel J. Neppl ("DN Decl."), Ex. B at 10.  Further, as recently as August 2020, ███████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████  Ms. Boelter's Sidley colleagues included her in a presentation about ongoing litigation strategy.  *See* GFL Decl. ¶ 9.

In addition, Ms. Boelter continued to receive confidential communications about YPF relating to sensitive issues in this case up until her departure from Sidley, and was copied on client communications until September 11, *see id.* ¶ 5, ██████████████████████ ████████████████████████████████████████████████████████████████████

Even during the time in which Ms. Boelter claims to have scaled back her role, she apparently never removed herself from any internal mailing lists (thereby continuing to receive YPF's confidential information), and was identified as YPF's counsel of record up until the day she started at White & Case.  *See* Mot. 5.  Thus, it is not remotely accurate that Ms. Boelter only received sensitive and pertinent information "years ago."  Opp'n 30.

## II.     MS. BOELTER FAILED TO INFORM YPF OF HER RELATIONSHIP WITH THE HEAD OF WHITE & CASE'S RESTRUCTURING GROUP

During the time in which Ms. Boelter was acting as one of YPF's lead attorneys, she was in a romantic relationship with Thomas Lauria, head of the Restructuring Group at White & Case, where he is counsel of record to Occidental in the Maxus Bankruptcy.[6]  Although the Model Rules of Professional Conduct ("Model Rules") *require* that an attorney with a personal conflict of interest *must* consult with the affected client and obtain its written, informed consent, *see* Model Rules 1.7, Ms. Boelter admits by omission that she failed to do so.  Ms. Boelter states that it was her "understanding that YPF was aware of [her] relationship with Mr. Lauria in 2019," Boelter Decl. ¶ 6, but conspicuously fails to affirm that she informed YPF or obtained its consent, or explains how she reached an understanding that YPF "was aware."

To be clear, YPF was *not* informed of Ms. Boelter's romantic relationship with Mr. Lauria.  DG Decl. ¶ 9; GFL Decl. ¶ 10.  The first time that anyone at YPF was informed of Ms. Boelter's relationship with Mr. Lauria was on September 12, 2020, the same day that YPF learned of Ms. Boelter's intention to join White & Case.  GFL Decl. ¶ 10; JK Decl. ¶ 8.

While the Trust has described any discussion of Ms. Boelter's and Mr. Lauria's relationship as "tawdry," Opp'n 2, 38, the relationship is obviously relevant because it heightens

---

[6]     Occidental is directly adverse to YPF, as the Trust's "largest unsecured creditor."  Op. at 9, D.I. 111. Occidental has previously litigated against YPF and controls a majority of Trust Oversight Committee seats.  Mot. 8.

the risk of inadvertent disclosure of YPF's confidential information.[7]  Although the Trust

represents to the Court that Mr. Lauria has no "day-to-day involvement" in this litigation, White

& Case previously acknowledged that this case is "just one" of the many that he oversees as head

of the Restructuring Group.  RM Decl., Ex. C at 1.  On top of this, Mr. Lauria is counsel of

record to Occidental—publicly recognized as a "longtime YPF adversary" whose interests are

closely aligned, if not identical, with the Trust's.[8]  And Mr. Lauria has an extensive track record

of close collaboration with Mr. Shore, lead counsel in this litigation.  *See* Mot. 21; RM Decl. ¶

14; *see also* Reply RM Decl., Ex. O, Legal 500 Website (identifying Mr. Lauria and Mr. Shore

as Restructuring Group members and touting White & Case's representation of the Trust as one

of its most significant matters).  Troublingly, White & Case noticeably avoids asserting that a

formal screen has been or is in place with respect to Mr. Lauria other than noting that he has

been "instructed not to discuss" the case.  Decl. of Debra Kobrin Levy ¶¶ 48-49, D.I. 328 ("Levy

Decl."). ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

        The Trust and Ms. Boelter try to bolster their "trust us" defense by claiming that a proper

degree of separation between Ms. Boelter and the White & Case attorneys litigating this case

against YPF is possible, in part because Ms. Boelter has "not physically been to the firm's New

York office."  Boelter Decl. ¶ 11; *see also* Opp'n 12 (Ms. Boelter "has not set foot in White &

---

[7]        The Trust devotes two paragraphs to the subject without answering when their relationship began, which is relevant to how long the ethical breach has been ongoing.  Although White & Case previously claimed that Ms. Boelter's and Mr. Lauria's romantic relationship dates back to late 2018, RM Decl., Ex. C at 1, the Trust now evasively states that "*[i]n or around 2018*, Ms. Boelter and Mr. Lauria began a romantic relationship."  Opp'n 10 (emphasis added). ████████████████████

[8]        Jeff Montgomery, *Maxus Retains Del. Ch. 11 Control In Blow To YPF Strategy*, Law360 (Apr. 6, 2017), https://www.law360.com/articles/910582/maxus-retains-del-ch-11-control-in-blow-to-ypf-strategy.

Case's New York office since she joined the firm"), 29 (same).  In addition to the fact that this

obviously would not preclude her from working closely with the New York office, Ms. Boelter

*has* been to White & Case's Miami office a number of times in the past year, notwithstanding the

global pandemic.  *See infra.*  White & Case has previously stated that out of the "13 lawyers

from [the Restructuring Group who] have recorded time" to this litigation, one "is an employee

of our Miami office,"  RM Decl., Ex. A at 1, ██████████████████████████████

████████████████████████████████████████████████████████████

███████████████▌  More troubling still, Sidley's records demonstrate that Ms. Boelter logged

on to the Sidley network to, presumably, access client documents, respond to emails, and

otherwise conduct business on behalf of her clients, while physically located in White & Case's

Miami office on at least six occasions in 2020, including while she still represented YPF.  DN

Decl., Ex. A (noting that Ms. Boelter accessed Sidley's network from White & Case offices six

times in 2020 for a cumulative total of over 32 hours).[10]  Logging onto Sidley's network from

inside the Trust's counsel's offices obviously posed a risk to YPF's confidential information.

Whether Ms. Boelter remains in Miami or eventually works from New York, the threat of

disclosure of YPF's confidential information has already materialized, continues to be present,

and is exacerbated by Ms. Boelter's recklessness of her duties to YPF.

Ms. Boelter also failed to notify YPF or seek its consent regarding her decision to

interview with White & Case, as required by Comment 10 to Model Rule 1.7, and neither Ms.

---

[9]  ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

[10]  Sidley's record is from December 2019 until Ms. Boelter's departure in October 1, 2020.  It is unknown
how many additional times Ms. Boelter accessed the Sidley network from a White & Case office, whether in Miami
or elsewhere, during Ms. Boelter's and Mr. Lauria's relationship in 2018 and 2019, when Ms. Boelter was—by her
own admission—most active in this litigation.  *See* Boelter Decl. ¶¶ 4-5.

Boelter nor White & Case asked YPF to waive the conflict that would be, and ultimately has been, created by Ms. Boelter's new position. This is contrary to the approach that the Trust's counsel had taken before with a Norton Rose Fulbright LLP associate who had done some work for YPF on the bankruptcy. GFL Decl. ¶ 13. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

White & Case merely sent a letter to YPF on October 1, 2020, notifying YPF of the *fait accompli* that Ms. Boelter had joined the firm and would be subject to a screen. In response, YPF promptly made inquiries of White & Case pursuant to its Model Rule 1.10(a)(2)(ii) rights, reserving its right to pursue disqualification while giving White & Case the opportunity to persuade YPF not to do so. *See* RM Decl., Ex. D. Based on the documented communications between the parties as YPF sought more information regarding the purported screen, *see* Mot. 11-12, the Trust's contention that YPF somehow slept on its rights, *see* Opp'n 13, 19, is unfounded. From the very first communication on October 14, 2020, YPF raised concerns, and White & Case's refusal to provide responses to YPF's inquiries only confirmed its concern that screening—particularly insofar as it relied upon Ms. Boelter to adhere to the ethical duties she breached while at Sidley—was inadequate to protect YPF's confidences.

That this conclusion is supported by one of the country's leading ethics experts, Professor Wendel, should resolve any concern that this Motion is about make-work in an already hard-fought litigation with $14 billion at stake, as opposed to "one of the most egregious" conflicts of interest ever reviewed in Professor Wendel's nearly 30-year career. Wendel Decl. ¶ 33, D.I. 311. Yet, the Trust claims that YPF should have suggested improvements (which would not make an

un-screenable situation any less tenable), or asked White & Case to withdraw (which, evidently, White & Case will not do unless and until ordered by this Court).

### III.    YPF HAS NOT DELAYED OR PROLONGED THIS LITIGATION

The Trust attempts to deflect attention away from the significant ethical issues raised in the Motion by calling it a "delay tactic," and then tries to shoehorn this characterization into the Trust's broader conspiracy theory of this case as a 20-year "scheme" that ran from YPF, to Repsol, and back to YPF again. The theory and the characterization are baseless. Although the Trust protests perhaps too much that this Motion constitutes a "tactic" to cause delay and increase costs, *see, e.g.*, Opp'n 1, 4, 15, YPF filed this Motion because White & Case's disqualification is the only way to ensure YPF's confidences and the integrity of this proceeding are maintained. Any inconvenience that the Trust decries is a problem of its counsel's making.

The Trust emphasizes the "ten weeks" that passed between White & Case's notice to YPF on October 1, 2020 and the filing of the Motion on December 19, 2020. Opp'n 19. During the majority of this time, discovery in the main litigation was effectively stayed at the Trust's insistence and pending resolution of a discovery dispute that was just recently addressed by this Court's February 8 opinion. Op., D.I. 333 (Feb. 8, 2021). YPF did not take its decision to bring the Motion lightly. It proceeded with due dispatch: YPF promptly sought and hired new counsel;[11] YPF promptly put the Trust and its counsel on notice that it may seek disqualification, RM Decl., Ex. D, and engaged with White & Case in the meet and confer required by the Local Rules, during which White & Case initially offered to speak only under the shield of Federal Rule of Evidence 408 and otherwise failed to promptly and adequately answer YPF's questions;

---

[11]    Given that this Motion is about conflicts, it is troubling that the Opposition professes confusion concerning "why Cleary is appearing for YPF and not Sidley." Opp'n 14. YPF engaged Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") as counsel because, among other reasons, Sidley lawyers are fact witnesses as to Ms. Boelter's work for YPF and these same Sidley lawyers had a previous partnership relationship with Ms. Boelter.

YPF carefully investigated the law; and YPF obtained declarations from an ethics expert and two senior managers.  Under these circumstances, the ten-week period of time was not only reasonable, the allegation of "delay" is nonsensical since essentially nothing was happening in the case and there was no prejudice to the Trust.  Moreover, the measured adjudication of this Motion will not meaningfully delay the litigation and is necessary to secure the integrity of the proceedings against White & Case's brazen conduct.[12]

Indeed, any delay has been caused by the Trust.  YPF filed its Motion when it was ready and not to gain some advantage.  Immediately after filing, YPF counsel made clear to the Trust's counsel that YPF did not intend to inconvenience counsel during the holidays and indicated its willingness to adjourn any response date so that all counsel could enjoy some respite.  The Trust requested three extensions to its response deadline and YPF agreed to each. *See* Decl. of Matthew L. Nicholson ("MN Decl."), Ex. A at 6, 7, 11, D.I. 329.[13]  And when the Trust requested additional pages in its response, YPF agreed to that too.

Further, the Trust's assertion that YPF has unduly sought discovery on the Motion "to increase costs and cause delay," Opp'n 14, is false, and is entirely at odds with the Trust's previous insistence on extensive discovery.  It was the Trust that first declared its intention (subsequently memorialized in an email by its own counsel) to initiate a "discovery land war." MN Decl., Ex. A at 13.  Whether the threat of extensive discovery was solely a tactic to try to dissuade YPF from seeking discovery of its own, or the Trust has come to recognize that a review of White & Case's practices and Ms. Boelter's decision to join White & Case without

---

[12]  The Trust alleges that because YPF has engaged different law firms in connection with this litigation and other matters, it does not care "about protecting [its] secrets." Opp'n 2-3, 6-7.  Unlike White & Case, those law firms are not representing YPF's adversaries in related matters, and thus YPF can trust that its confidences are safe. In any event, at all times, YPF expects that its law firms, and particularly, the lawyers it engages, will maintain YPF's confidences and uphold their professional responsibilities.

[13]  As a result, YPF does not understand White & Case's claimed hardship in submitting its own response. *See* Opp'n 4 (accusing YPF of depriving White & Case of "a much-needed break"); *see also id.* at 13, 35 (same).

seeking a waiver from YPF[14] would further diminish the Trust's chances of success, it is clear

that the Trust has now changed tack.  *See, e.g.*, Opp'n 5 ("[T]he Court may be able to resolve the

Motion without the need for a lengthy contested evidentiary hearing.").

The Trust's charge of delay is all the more galling given its own approach in this

litigation.  The Trust initiated this action *nearly two years* after the Maxus bankruptcy, even

though it basically rehashes the allegations previously made in the related New Jersey litigation.

Then, the Trust refused to agree to use prior deposition testimony from the New Jersey litigation,

insisting upon re-deposing witnesses and thereby increasing the time and cost associated with

discovery.  Op., D.I. 193 (June 22, 2019).  Worse yet, even though the Trust was aware for seven

months that Sidley was representing the so-called dual-hat witnesses, the Trust waited until

Sidley was in the midst of defending a deposition to object to the assertion of privilege.  And

while the Trust's motion on the dual-hat issue was pending, the Trust declined YPF's invitation

to continue deposing witnesses not affected by the issue, and discovery halted.[15]

The Trust additionally makes an inflammatory—but baseless—suggestion that this

Motion stems from Cleary Gottlieb's representation of YPF in a bond exchange offer.  Opp'n 14.

This accusation strains credulity, particularly because this case is in the discovery phase and is

likely some time away from final resolution, whereas the exchange offer concluded on February

11, 2021, just over a month after it was announced (which was weeks after YPF filed its

Motion).  *See* Reply RM Decl., Ex. P, YPF S.A. Press Release (Feb. 11, 2021).[16]

---

[14]    The Trust suggests that any discovery in this case is ill-advised because "collecting documents from Ms. Boelter could result in inadvertent disclosure to White & Case."  Opp'n 14.  White & Case has represented to YPF's counsel that Ms. Boelter has retained independent counsel, who presumably can perform any review.  In any event, YPF expects the Trust and its counsel will take all necessary precautions to mitigate the risk of disclosure.
[15]    The suggestion that the depositions of Messrs. Smith and Segovia "informed YPF's decision to file the Motion," Opp'n 13 n.8, is baseless chest-pounding.  This issue is a problem of White & Case's own making.
[16]    The Trust's counsel was well aware of the timing of the exchange offer.  *See* Reply RM Decl., Ex. Q, White & Case LLP Press Release (Jan. 17, 2021).

## ARGUMENT

I.  **THE COURT NEEDS TO CONSIDER THE FACTS SURROUNDING MS. BOELTER'S PRIOR REPRESENTATION OF YPF TO DECIDE WHETHER SCREENING COULD CLEANSE WHITE & CASE'S IMPUTED CONFLICT**

In extolling the supposed virtues of the screen that White & Case implemented (the deficiencies of which are addressed below), the Trust forgoes the requisite consideration of whether screening is available at all to cure the conflict created by White & Case's decision to hire Ms. Boelter.  In evaluating this question, courts in this district and in the Third Circuit apply a multifactor test that "looks to . . . '(1) [t]he substantiality of the relationship between the attorney and the former client, (2) [t]he time lapse between the matters in dispute, (3) [t]he size of the firm and the number of disqualified attorneys, (4) [t]he nature of the disqualified attorney's involvement, and (5) [t]he timing of the wall.'"  *Enzo*, 2013 WL 6138791, at *3.[17] These factors are in line with those considered by *Nemours Foundation v. Gilbane, Aetna, Federal Insurance Co.*, 632 F. Supp. 418, 429 (D. Del. 1986), in which then-Judge Farnan noted that "[t]he attorney's degree of prior involvement, whether he controlled strategy, whether he was an associate or partner, and whether he shared legal fees from his firm's representation are all important factors in evaluating the effectiveness of a [screen]."  This inquiry is separate from and in addition to the analysis of whether the screen itself has the requisite features of an adequate screen.  *Enzo*, 2013 WL 6138791, at *3-4 ("*Furthermore*, the screen must . . . [listing required screen features]" (emphasis added)); *James v. Teleflex, Inc.*, 1999 WL 98559, at *6 (E.D. Pa. Feb. 24, 1999) (even "facially sufficient" screen does not cleanse imputed conflict when factors weigh in favor of disqualification).  This is consistent with the Third Restatement of the Law Governing Lawyers § 124, cmt. d(i), which considers, *inter alia*, "the duration and

---

[17]      *See also Norfolk S. Ry. Co. v. Reading Blue Mtn. & N. R.R. Co.*, 397 F. Supp. 2d 551, 554 (M.D. Pa. 2005); *Teleflex*, 1999 WL 98559, at *5.

degree of responsibility of the personally prohibited lawyer." *See also* Wendel Decl. ¶¶ 23, 29.

The Trust nevertheless asks the Court to reject the "functional analysis" that courts in this Circuit have regularly applied for decades, *Nemours Found.*, 632 F. Supp. at 427, in favor of a finding that a law firm can cleanse any conflict created by any lawyer, no matter the facts of the prior representation or the circumstances of the move to an adversary firm, by implementing a lateral screen.[18]  *See* Opp'n 19-20.  The Trust cannot cite a single case in this Circuit in support of this position.  It relies on the opinion of Memphis practitioner Lucian Pera, stating that the factors taken from precedent should not be considered because they do not explicitly appear in Model Rule 1.10.  Pera Decl. ¶¶ 28-29.  This argument fails.

*First*, the Model Rules make clear that courts look to factors other than the facial sufficiency of a screen.  Mr. Pera ignores Comment 7 to Model Rule 1.10, which warns that "[l]awyers should be aware, however, that, even where screening mechanisms have been adopted, tribunals may consider additional factors in ruling upon motions to disqualify a lawyer from pending litigation."  This oversight is notable, given the ABA/BNA Lawyers' Manual on Professional Conduct—on whose editorial board Mr. Pera serves—urges "[f]irms [to] keep in mind" that "compliance with a screening provision in a state's version of [Model] Rule 1.10 may protect a lawyer from professional discipline, but does not guarantee that the firm can defeat a motion for disqualification."  § 51:2015 (Feb. 17, 2010).  Accordingly, as Professor Wendel opines, "the screening provisions in Rule 1.10(a)(2) are not a safe harbor, permitting the hiring of any lawyer who formerly represented the adverse party in litigation."  Wendel Decl. ¶ 17.  The Model Rules expressly contemplate that courts will engage in the multifactor inquiry conducted

---

[18]    The Trust repeatedly mischaracterizes the standard applied in YPF's opening brief as the "bright-line rule." Opp'n 30; *see also* Decl. of Lucian T. Pera ¶ 28, D.I. 350 ("Pera Decl.").  But the test set out in the case law is a balancing test, which applied here tips overwhelmingly towards disqualification.

in *Enzo* and other precedents.[19]

*Second*, Local Bankruptcy Rule 9010-1(f) explicitly adopts the Model Rules "*[s]ubject to such modifications as may be required or permitted* by federal statute, court rule or *decision*" (emphasis added). In so doing, the rule expressly directs that the Model Rules be interpreted and applied taking due account of the case law. This is in keeping with the basic precept that the power to disqualify arises from a court's "inherent power to supervise the professional conduct of attorneys appearing before it," not from the ABA. *Alamo Grp. v. A&G Realty Partners LLC*, 2015 Bankr. LEXIS 467, *20 (Bankr. D. Del. Feb. 2, 2015) (Sontchi, J.); *see also* Reply Decl. of W. Bradley Wendel ("Reply Wendel Decl.") ¶¶ 6-7.

The Trust and Mr. Pera's recitation of the "legislative history" of the amendments to Rule 1.10 is similarly misguided because it fails to account for Comment 7. *See* Pera Decl. ¶ 67. Mr. Pera states that the ABA House of Delegates rejected two amendments to the Ethics Committee's screening proposal: one that would make screening *per se* unavailable to lawyers with a "substantial role" in the conflicted matter, and one that would make it unavailable to lawyers with "material" confidential information about the conflicted matter. Pera Decl. ¶¶ 41-42. But the case law exemplified by *Enzo* and cited by YPF does not impose any *per se* bar to screening; it carefully weighs five factors to determine whether a screen is effective to resolve a particular conflict, just as YPF has done in the Motion and this Reply. There is no evidence that the ABA rejected this kind of balancing test, and on the contrary, Comment 7 expressly contemplates the continuing viability of such a test.[20]

---

[19]      The Trust cites Comment 7 to argue that the Court "should not rewrite the Rule to reopen the debate as to whether a screen is permissible for 'key participants.'" Opp'n 22 (citing Model Rule 1.10, cmt. 7). But Comment 7 stands for the *opposite* proposition: "even where screening mechanisms have been adopted," courts may disqualify lawyers if "additional factors" weigh against the effectiveness of a screen.

[20]      The Trust also tries to undermine YPF's authority by noting that several cases applied the Pennsylvania ethical rules rather than the Model Rules. Opp'n 21. But this is not surprising: Pennsylvania rules expressly permitted screening over a decade before the Model Rules were amended to allow screening. *Teleflex*, 1999 WL

## II.   MS. BOELTER'S REPRESENTATION OF YPF MAKES THE SCREEN INEFFECTIVE TO AVOID IMPUTING HER CONFLICT TO HER FIRM

Analysis of the required factors shows that the screen erected by White & Case does not cleanse the conflict created by Ms. Boelter's move.  Indeed, as Professor Wendel opines, the specific circumstances of this case constitute almost the paradigmatic example of a moving lawyer whose conflicts cannot be screened away.  Wendel Decl. ¶¶ 29, 31.

### A.  Ms. Boelter's Substantial Relationship with YPF as Key Advisor and Counsel of Record Weighs in Favor of Disqualification

The Trust concedes that Ms. Boelter had a "high-profile" role as YPF's counsel of record, Opp'n 24, and the Trust does not dispute that Ms. Boelter was a key strategic advisor and recipient of YPF's most sensitive information.  *See supra* at 3-6; Mot. 7.  The Trust nonetheless rejects the application of this factor because it supposedly only concerns the "appearance of impropriety," which, the Trust claims, is no longer relevant under the Model Rules.  Opp'n 24. Again, the Trust's position finds no support in the case law—courts consider whether the side-switching lawyer was counsel of record, lead counsel, and otherwise publicly associated with the case when evaluating a screen.  *See*, *e.g.*, *Enzo*, 2013 WL 6138791, at *3; *Norfolk S. Ry.*, 397 F. Supp. 2d at 555; *Nemours Found.*, 632 F. Supp. at 429.  This is in part because the rules and case law addressing disqualification for imputed conflicts are focused on managing the risk that confidential information may leak.  *See* Wendel Decl. ¶ 19.  Obviously, the risk and consequences of leakage are far greater with lead counsel, who is the repository of the client's most guarded secrets, than with a more peripheral legal advisor.

Moreover, it is in any event "settled case law [in] the Third Circuit . . . that the maintenance of public confidence in the propriety of the conduct of those associated with the . . .

---

98559, at *5 (citing Penn. R. of Pro. Conduct 1.10(b)).  Pennsylvania Rule 1.10 was and is materially identical to Model Rule 1.10 as far as screening is concerned, and thus the *Enzo* test is equally applicable here.

administration of justice is so important, a court may disqualify an attorney for failing to avoid even the appearance of impropriety." *Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 2011 WL 2692968, at *13 n.10 (D. Del. June 22, 2011) (internal quotation marks omitted); *see also Apeldyn Corp. v. Samsung Elecs. Co.*, 693 F. Supp. 2d 399, 404 (D. Del. 2010) (collecting cases). Here, as in *Enzo*, the "appearance of a continuing imputed conflict" created when high-profile counsel makes a high-profile move to an adversary firm "weighs in favor of disqualification." *Enzo*, 2013 WL 6138791, at *4.

## B.  Ms. Boelter's Side-Switching in the Middle of Litigation Favors Disqualification

There is no dispute that Ms. Boelter switched sides in the middle of this litigation, nor is there any dispute that the case law deems this a relevant fact.  The Trust's jab that "disqualifications from a litigation always occur in the midst of a litigation," Opp'n 25, misses the target.  Model Rule 1.9(a) bars a lawyer from representing a former client's adversary "in the same *or a substantially related matter*" (emphasis added).  Where, as here, the lawyer switches sides in the middle of the same matter, it is much more likely that "a former client's confidences and secrets may be used against him."  *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984).  That is why courts consider the "time lapse between the matters in dispute" when evaluating the effectiveness of a screen.  *Norfolk S. Ry.*, 397 F. Supp. 2d at 554.

The Trust's assertion that the confidential information in Ms. Boelter's possession is "stale" is perplexing, since the Trust also contends that it has no idea what confidential information Ms. Boelter holds in her head.  Opp'n 10.  In any event, the Trust is wrong:  Ms. Boelter participated in discussions concerning YPF's path forward after the motion to dismiss stage.  *See supra* at 4-5.  Critically, these discussions included analyses about settlement strategies.  *See Madukwe v. Del. State Univ.*, 552 F. Supp. 2d 452, 462 (D. Del. 2008)

-17-

(knowledge of settlement strategy "is a basis for disqualification") (citation omitted). And—despite Ms. Boelter's failure, or decision not to, record time to YPF matters in 2020—she continued to discuss and hear about the case directly from her colleagues and client. *Supra* at 5-6. On this record, there is no doubt that Ms. Boelter is in possession of material confidential information about her former client. *See* Wendel Decl. ¶¶ 24, 30.

### C. Ms. Boelter's Work in the Same Group as the Lawyers Suing Her Former Client Favors Disqualification

Ms. Boelter is working with the same compact group of bankruptcy lawyers who are also litigating against her former client. *See* Mot. 20-21. Thus, although White & Case is a large firm, Ms. Boelter is more like an attorney moving to a smaller firm where a screen is less likely to be effective, especially since she is living with her husband who is head of the Restructuring Group and who oversees this case, among others. *Cf. Intell. Ventures*, 2011 WL 2692968, at *13 (screen less likely to be effective because lawyers were "in the same office").

The Trust insists that Ms. Boelter's work with other restructuring lawyers is not relevant because "White & Case's Commercial Litigation practice handles this matter," Mr. Shore is not a restructuring partner, and "none of the 47 partners in the restructuring group has billed time on this litigation since before 2020." Opp'n 27. While the Trust concedes Mr. Shore "work[s] frequently with the restructuring group," *id.*, White & Case's public statements show that Mr. Shore *is* a member of that group. *See supra* at 7; *see also* Reply RM Decl., Ex. R, White & Case LLP Website (Feb. 11, 2021) (identifying Mr. Shore as a Restructuring Group partner).

While the Trust insists that YPF should just trust it and its counsel about the efficacy of its screen, White & Case has been unable to provide consistent answers to basic factual questions regarding who is even subject to the screen. For instance, on the question of who has billed time to the matter (and therefore who would be subject to the screen at a minimum), the Trust has

provided alarmingly inconsistent information about the number and workplace of the lawyers who have billed time to this litigation.  In December, it stated that 13 restructuring lawyers, one of whom worked in White & Case's Miami office, had billed time to the YPF matter since Ms. Boelter joined the firm on October 1, 2020.  RM Decl., Ex. A at 1.  In its Opposition, however, the Trust claims that only two restructuring lawyers have billed to the case since October.  Opp'n 27 n.18.  Remarkably, this changed position is in tension with the Trust's claim in the very same Opposition that the original 13 restructuring lawyers "received notice of the screen," which was given to "any current White & Case lawyer *who worked for the Trust as of October 1, 2020*."  *Id.* (emphasis added).  These contradictory representations reflect either gamesmanship or White & Case's inability to keep track of who is working on this case and may be subject to the screen.

In any event, a significant percentage of the lawyers White & Case's website identifies as part of the Restructuring Group work on this case and can be expected to work with Ms. Boelter.  Ms. Boelter's work, regardless of office location, will involve conversations with her colleagues, including interchanges about experiences from old cases in strategizing about new ones.  These create a ripe environment for Ms. Boelter to inadvertently mention confidential details from her representation of YPF,[21] which should not have to bear this risk.  Wendel Reply Decl. ¶ 22.

### D.  Ms. Boelter's Possession of Critical Client Confidences Favors Disqualification

While the Trust raises a semantic quibble that Ms. Boelter was not "*the* 'lead lawyer'" for YPF, Opp'n 30 (emphasis added), she was indisputably *a* lead lawyer—indeed, she was one of just two lawyers on the YPF engagement letter.  *See supra* at 3.  And in that role, Ms. Boelter

---

[21]    White & Case contends that "[r]eputable attorneys do not 'let slip' material information that they are required to maintain as confidential."  Opp'n 26.  Of course, if this were true, there would be no need for the entire apparatus of screening—a lawyer's obligations under Model Rule 1.6 to keep information confidential would suffice.  Screens are imperfect because they rely on people to abide by them, but mistakes happen.  Wendel Reply Decl. ¶ 21.  Indeed, in this case, White & Case itself served its Opposition on Ms. Boelter at Sidley, *as counsel to YPF*; this Court's February 8 opinion, D.I. 333, also lists Ms. Boelter as counsel to YPF.

came into possession of sensitive information about, among other things, strategy and settlement. As a result, the nature of Ms. Boelter's role strongly favors disqualification. *See Enzo*, 2013 WL 6138791, at *4 (rejecting argument that the conflicted lawyer's "less than [] pivotal role" should prevent disqualification, because conflicted lawyer "was aware of the defense strategies").

The Trust's only response is speculation that Ms. Boelter's information may not be "as sensitive and significant today." Opp'n 30. However, the Trust's cases regarding "outdated" information all concern whether a former representation was "substantially related" to a new matter. *See, e.g.*, *Voicenet Comm'cns, Inc. v. Pappert*, 2004 WL 870790, at *7 (E.D. Pa. Apr. 5, 2004). The Trust has not identified a single case where the court presumes that highly sensitive knowledge gained earlier in a litigation becomes "outdated" later in the exact same litigation.

## III.    MS. BOELTER'S CONDUCT BEFORE MOVING TO WHITE & CASE RAISES CONCERNS ABOUT HER ADHERENCE TO HER DUTIES TO YPF

The law of screening is not a referendum on the character of the individual lawyer being screened. Wendel Reply Decl. ¶ 21. Courts start with the assumption that there is free information-sharing within law firms and that even conscientious lawyers sometimes make mistakes in such a setting. *See Decora, Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 139-40 (S.D.N.Y. 1995); Wendel Reply Decl. ¶ 18. Moreover, the factors courts consider in evaluating the effectiveness of a screen all concern the nature of the prior representation and the corresponding risk to the client posed by their former lawyer's move; none of them concerns the probity of the screened lawyer. Therefore, although the Trust and Mr. Pera try to put Ms. Boelter's "reputatab[ility]" at issue, Opp'n 11, 26, 38, that does not change the facts and circumstances that make screening unavailable here.

Further, far from bolstering White & Case's defense of its screen, Ms. Boelter's approach towards her ethical duties to her then-client YPF unfortunately raises concerns about her respect

for her ongoing obligations now that she is YPF's former counsel.  Model Rule 1.7 requires that

a lawyer with an adverse "personal interest" in a matter obtain the written, informed consent of

her client in order to continue the representation.  ████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████  Ms. Boelter's "discussions concerning

possible employment . . . with a law firm representing [her client's] opponent" created an

adverse personal interest.  Model Rules 1.7, cmt. 10.  Yet Ms. Boelter never informed YPF of

these discussions, much less obtained YPF's consent to continue the representation.

Furthermore, the ABA and others have recognized that a serious romantic relationship

such as that between Ms. Boelter and Mr. Lauria likely creates the same kind of conflicting

personal interest as would be created if a lawyer were married to a lawyer on the opposing side.

*See* ABA Comm. on Ethics & Pro. Resp., Formal Op. 494 (2020); N.C. Bar, Formal Ethics Op. 3

(2019).  The question is whether there is a "significant risk" that the lawyer's representation of

the opposing client would be "materially limited" due to the relationship.  Model Rules 1.7(a)(2).

Ms. Boelter's relationship with the head of White & Case's Restructuring Group undoubtedly

posed a significant risk to Ms. Boelter's vigorous representation of YPF.  The Trust previously

acknowledged that Mr. Lauria "oversee[s]" this case among others, *supra* at 7, and remaining

and prevailing in the case would necessarily be of financial and professional importance to him,

as head of the Restructuring Group.  Ms. Boelter would have an "ordinary human" investment in

her husband's professional success.  *Commonwealth v. Croken*, 733 N.E.2d 1005, 1012 (Mass.

2000) (relationship with colleague of opposing counsel created conflict necessitating client

consent).  Further, although White & Case avers that Ms. Boelter cannot directly profit from

White & Case's representation of the Trust, Levy Decl., Ex. A ██████████████████████████

██████████████████████████████████████████

While Ms. Boelter claims a vague (and incorrect) "understanding" that YPF became aware of her relationship with Mr. Lauria in 2019, she fails to mention any effort that she made to disclose her personal conflict to YPF, despite her personal duty to do so, much less obtain its written consent. *See* Model Rules 1.0, cmt. 6 ("lawyer who does not personally inform the client . . . assumes the risk that the client . . . is inadequately informed and the consent is invalid").[22]

The Court need not, nor is it being asked to, decide whether Ms. Boelter's apparent violations of Model Rule 1.7 while she was associated with Sidley merit some sanction or should have required her to withdraw from representing YPF. The Trust therefore misses the point when it contends that these personal conflicts cannot be imputed to White & Case. Opp'n 32-33. Screening ultimately relies on the screened lawyer's undertaking not to reveal, inadvertently or otherwise, any client confidences. Wendel Decl. ¶ 30. As discussed above, YPF would have more than ample cause to be anxious about the protection of its confidential information even if Ms. Boelter's conduct with respect to her client before leaving Sidley had been exemplary. *Id.* ¶ 29. But here, even if Ms. Boelter had only skirted the edge of her duties while YPF's lawyer, her conduct raises additional serious concerns about her compliance with those duties now. *See* Pera, *Practical Advice for Documenting Conflict Waivers* ("[T]he rules form only a minimum standard . . . good lawyers strive to exceed that floor whenever possible.").

---

[22]    The Trust implies that some other Sidley lawyer should have informed YPF about this relationship. *See* Opp'n 32. The person with full knowledge about the conflict was Ms. Boelter; only she could provide YPF with the facts necessary for informed consent, and because personal conflicts are not imputed to the firm, it was Ms. Boelter's duty alone to make this disclosure. And it was her duty to obtain YPF's informed written consent, which Ms. Boelter indisputably did not obtain. Lucian T. Pera, *Practical Advice for Documenting Conflict Waivers*, Law360 (Nov. 17, 2014), https://www.law360.com/articles/586931/practical-advice-for-documenting-conflict-waivers (consent discussions "should be accompanied—or quickly followed—by appropriate documentation.").

## IV.    THE COURT SHOULD NOT REWARD WHITE & CASE'S ETHICAL GAMBLE BY PROTECTING IT FROM DISQUALIFICATION

The supposed prejudice that the Trust argues should protect White & Case from disqualification is not compelling.  This conflict arose as a result of White & Case's "knowing and intentional decision" to hire Ms. Boelter, which White & Case and the Trust knew could result in disqualification.  *Intell. Ventures*, 2011 WL 2692968, at *13.  The Trust's protestations that White & Case was an innocent "rule follow[er]" are belied by two facts.  *First*, the applicable rules expressly warned White & Case to consider the case law.  *Second*, White & Case was much less confident that it could just "follow the rules" and escape disqualification when it declined to hire a Norton Rose associate whose hiring YPF did not consent to in April 2020.  Mot. 10.  Accordingly, White & Case clearly understood that Model Rule 1.10(a)(2) is not a safe harbor from disqualification, yet decided to take an ethical gamble when it hired Ms. Boelter.  It cannot now complain of the consequences of that gamble.

While the Trust complains that any new counsel would need to take some time to get up to speed, Opp'n 36-37, this was the risk that the Trust's counsel consciously assumed by hiring Ms. Boelter.  And the Trust could have avoided this consequence by instructing White & Case (i) to follow the same approach it had taken with the Norton Rose associate and seek consent from YPF, or (ii) not to gamble on hiring Ms. Boelter.[23]  It is well-settled that a party's "right to counsel of [its] choice . . . must yield . . . to considerations of ethics which run to the very integrity of our judicial process."  *Teleflex*, 1999 WL 98559, at *7 (citation omitted).

Indeed, to the extent courts give any weight to the burden of obtaining new counsel, it is where the confidential information at risk is *not* "of such pertinence that [the] continued

---

[23]    Even if relevant, the Trust has not asserted, by declaration or otherwise, that it was unaware of, or did not consent to, White & Case's hiring of Ms. Boelter.

representation of [the adversary] would unfairly harm [the former client]." *TQ Delta, LLC v. 2Wire, Inc.*, 2016 U.S. Dist. LEXIS 130982, at *21 (D. Del. Sept. 26, 2016) (citation omitted).[24] That is not the case here, where Ms. Boelter possesses highly sensitive information regarding YPF's litigation and settlement strategy. Nor is this a case of an unknown imputed conflict, where courts have been more willing to consider prejudice arguments. *See Nemours Found.*, 632 F. Supp. at 421. Moreover, any supposed burden here is lightened because the Trust is also represented by the Farnan firm, which is familiar with the case and could assist new counsel.

The Trust has also failed to identify any prejudice because of YPF's supposed "delay" in filing this Motion. *See supra* at 10-12. The Trust's suggestion that YPF waived its right to seek disqualification is likewise groundless. Courts have found no waiver even where the moving party spent as long as eight *months* discussing the conflict with the adverse party. *See In re Meridian Auto. Sys.-Composite Ops.*, 340 B.R. 740, 750 (Bankr. D. Del. 2006); *In re IH 1, Inc.*, 441 B.R. 742, 748 (Bankr. D. Del. 2011) (no waiver when movant "alerted [law firm] to the disqualification issue in August 2010," filed its answer in October, and filed its motion to disqualify in November). By contrast, the few cases of waiver cited by the Trust involved scenarios—unlike here—where the movant was aware of a conflict and delayed in *objecting*, thus allowing its opponent to proceed in ignorance.[25] Here, the Trust knew about YPF's objection shortly after it informed YPF of its law firm's hiring of Ms. Boelter, and if the Trust

---

[24]     *TQ Delta* denied disqualification in part because the former client was only a nonparty subpoena target and not a direct adversary. 2016 U.S. Dist. LEXIS 130982, at *22. The Trust's other cases are also distinguishable. *See Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1117 (D.N.J. 1993) (declining to excuse three-year delay in objecting given advanced stage of case); *In re Modanlo*, 342 B.R. 230, 235-36 (D. Md. 2006) (questioning whether movant had ever been prospective client); *Cent. Milk Producers Co-op v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992-93 (8th Cir. 1978) (movant expressly consented to screen for identically situated lawyer).

[25]     *See In re Kaiser Grp. Int'l*, 272 B.R. 846, 852 (Bankr. D. Del. 2002) (waiver where movant requested ethical screen and made "no further objection" until raising matter with court); *Liberate Techs. LLC v. Worldgate Comm'cns, Inc.*, 133 F. Supp. 2d 357, 359 n.2 (D. Del. 2001) (relevant factor was "delay in objecting to a conflict"); *Cent. Milk*, 573 F.2d at 992 (movant "waited more than two years . . . to formally raise the issue").

had desired certainty sooner, it could have filed its own motion. *See TQ Delta*, 2016 U.S. Dist. LEXIS 130982, at *7 (counsel "request[ed] an order that it was entitled to represent" adverse party). Instead, it delayed answering YPF's legitimate inquiries regarding the screen.

Finally, in arguing that it would be unfair to Ms. Boelter to disqualify White & Case, the Trust misconstrues the purposes of the professional conduct rules. Opp'n 38 ("the very purpose of the screening rules [is to] permit and promote lateral moves"). The rules serve to protect clients and the bar, not the interests of individual lawyers. *See* Model Rules, Preamble ¶ 12. Although the rules should be interpreted so as not to "*unreasonably* hamper lawyers from forming new associations," *Norfolk S. Ry.*, 397 F. Supp. 2d at 556 (emphasis added), lawyers are fiduciaries and therefore will sometimes be prevented from taking new jobs because of conflicts of interest. Finding that disqualification is warranted on such extraordinary facts as those present here would represent a rare and reasonable restriction on attorney mobility. Not only would the restriction on attorney mobility be minimal, but disqualifying White & Case is critical to assuring litigants in this hub for international bankruptcy proceedings that they will be treated fairly and protected from "even the potential that [their] confidences and secrets may be used against [them]." *In re Corn*, 748 F.2d at 162. This is all the more true because the Trust has unabashedly announced its intention to weaponize any confidential information Ms. Boelter lets slip during these proceedings. *See* Reply RM Decl., Ex. M ¶ 16. Disqualifying White & Case is accordingly necessary to preserve the integrity of this litigation and "public confidence in the integrity of the bar." *In re Corn*, 748 F.2d at 162 (citation omitted).

## CONCLUSION

YPF respectfully asks the Court to disqualify White & Case from representing the Trust in the above-captioned proceedings.

Dated:    February 26, 2021
          Wilmington, Delaware

                                    Respectfully submitted,


                                    /s/ Matthew B. McGuire
                                    Adam G. Landis (No. 3407)
                                    Matthew B. McGuire (No. 4366)
                                    LANDIS RATH & COBB LLP
                                    919 Market Street, Suite 1800
                                    Wilmington, Delaware
                                    T: 302-467-4400
                                    F: 302-467-4450
                                    landis@lrclaw.com
                                    mcguire@lrclaw.com


                                    -and-

                                    Victor L. Hou (*pro hac vice*)
                                    Ari D. MacKinnon (*pro hac vice*)
                                    CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                    One Liberty Plaza
                                    New York, New York  10006
                                    T: 212-225-2000
                                    F: 212-225-3999

                                    *Attorneys for the YPF Defendants*

# **Appendix I**

# **[FILED UNDER SEAL]**