# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11501 (CSS)<br>(Jointly Administered) |
| MAXUS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>-against-<br><br>YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO.,<br><br>Defendants. | Adv. Proc. No. 18-50489 (CSS) |

## DECLARATION OF W. BRADLEY WENDEL

I, W. Bradley Wendel, pursuant to 28 U.S.C. § 1746, declare as follows:

Introduction

1. I, W. Bradley Wendel, submit this Reply Declaration in response to the Maxus Liquidating Trust's Opposition to the YPF Defendants' Motion to Disqualify White & Case LLP (the "Opposition").[1]

2. In addition to the materials that I identified in my first Declaration ("First Declaration"), I have reviewed the Opposition as well as the Declaration of Lucian T. Pera

---

[1] Unless otherwise defined, capitalized terms have the same meaning as in my First Declaration.

1

("Pera Declaration"), the Declaration of Jessica C. Lauria (formerly Boelter), the Declaration of Debra Kobrin Levy ("Levy Declaration"), and the Declaration of Matthew L. Nicholson.

3.  After reviewing these materials, and based on my experience, knowledge, and expertise in the topics described in my First Declaration and below, I remain of the opinion stated in my First Declaration: that under the circumstances described, a screening mechanism is not adequate to cleanse the imputed conflict created by Ms. Boelter's association with White & Case.

4.  In addition, the Opposition contains at least two key misstatements of the law governing lawyers: First, the Opposition mistakes the source of and law applicable to the Court's inherent authority to disqualify counsel appearing before it. Second, the Opposition focuses on what the Trust views as the minimal chance that Ms. Boelter has or will disclose confidential YPF information to YPF's adversaries. But the law on screening and imputed conflicts does not focus on evaluating an individual lawyer's propensity to disclose client confidences. Instead, it focuses on the magnitude of the risk, given the nature of the confidences involved, faced by a client whose former lawyer is now associated with an adversary firm. The following discussions of these issues, in combination with my First Declaration, may be of assistance to the Court in evaluating the factors relevant to the question whether to disqualify White & Case from representing the Trust.

Relevance of Amendment to Model Rule 1.10(a)(2)

5.  The Opposition relies heavily on the 2009 amendment to ABA Model Rule 1.10(a)(2), which *for disciplinary purposes* permits screening to remove the imputation of a conflict of interest brought to a law firm by an incoming lateral lawyer. *See* Opp'n 17, 21, 23. It is very important to keep in mind, however, the distinction between (a) the disciplinary function

of the rules and (b) the inherent power of this Court to regulate the practice of lawyers appearing before it. Paragraph 20 of the Scope section of the Model Rules states: "[V]iolation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation." By the same logic, *compliance* with a rule does not necessarily warrant a court withholding a remedy, such as disqualification, in an appropriate case.

6.  Disqualification is a remedy employed by a tribunal to safeguard against prejudice to a party to litigation before that tribunal; the inherent authority of a tribunal to regulate the conduct of lawyers appearing before it is independent of the attorney disciplinary process of a state. As the leading treatise on the law of lawyering states, "[t]he Model Rules of Professional Conduct . . . are enforced primarily through disciplinary proceedings held under the aegis of the highest courts in each state. The rules governing conflicts of interest, on the other hand, are most often enforced as 'other' law, via disqualification motions in litigation, in federal or state court, even though they are also subject to the rules of professional ethics." 1 Geoffrey C. Hazard, et al., *The Law of Lawyering* § 1.5, at 1-9 (3d ed. 2012); Restatement (Third) of the Law Governing Lawyers § 6, cmt. I (2000).

7.  The disciplinary rules may *inform* courts' consideration of whether to disqualify counsel in order to protect a party from prejudice. They are not, however, strictly speaking, following or applying the disciplinary rules. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 234-35 (2d Cir. 1977) (reviewing several foundational cases on disqualification for conflicts); *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 269 (D. Del. 1979) (distinguishing rigid application of the disciplinary rules from their usefulness as "general guidelines against which proposed and actual conduct can be evaluated"). "When ruling on disqualification motions, courts tend to be influenced by the rules governing lawyer conduct; however, they

ultimately follow standards developed in judicial decisions, which may not be the same as those in the rules." ABA/BNA *Lawyers' Manual on Prof'l Conduct* ¶ 51:1904.

8. Comment [7] to Model Rule 1.10 clearly cautions lawyers that a lateral hire that may not subject lawyers to discipline may nevertheless result in disqualification of the law firm from a matter: "Lawyers should be aware, however, that even where screening mechanisms have been adopted, tribunals may consider additional factors in ruling upon motions to disqualify a lawyer from pending litigation." What Mr. Pera characterizes as an "advocacy position" in the Restatement of the Law Governing Lawyers, Pera Decl. ¶ 70, is nothing more than a reflection of the additional factors that courts have relied upon in ruling on disqualification motions.

9. If there is any advocacy in the Restatement's position, it was actually in being *ahead* of the Model Rules in permitting screening in cases involving moving private-sector lawyers. The Restatement drafters arrived at that position through consideration of numerous cases involving judicially created exceptions to the imputed disqualification established by Rule 1.10.

10. The Restatement drafters also recognized, however, that screening was not a blank check permitting all lateral moves, and that some lawyers may have access to such sensitive information of their former clients that their association with a law firm representing a litigation adversary of the former client should lead to the disqualification of that law firm. The balance of policy factors, as reflected in Section 124 of the Restatement, provides protection for the sensitive confidential information of clients, while not unduly hampering lawyer mobility.

11. The balance of policy considerations underlying a rule for lawyer discipline may differ from those a court should consider when requested by a party to protect it from prejudice in litigation pending before the court. Disciplinary authorities are often not well equipped to

handle the voluminous factual records generated in complex litigation. It is understandable that the ABA may not have wanted to task disciplinary authorities with determining the importance of confidential information to a party in a particular proceeding. Thus, the blanket screening provision in Model Rule 1.10(a)(2) may be reasonable from that policy perspective, as it pertains to lawyer regulation and discipline.

12. The policies at issue may be different where the court's inherent authority to supervise litigation is concerned. The court is already familiar with the record and can appreciate the significance of confidential information to the parties. It also has direct responsibility for the integrity of its proceedings, in contrast with the indirect responsibility vested in state attorney disciplinary and grievance authorities. The distinction between the disciplinary function of the rules, on the one hand, and their function as non-mandatory guidance for courts in the exercise of their inherent power, on the other, allows for a different balance of policies to be struck in different contexts. A court is in a better position than state disciplinary authorities to protect the interests of the former client in an ongoing litigation before that court.

13. White & Case apparently treated Model Rule 1.10(a)(2) as a kind of safe harbor, relying on screening to avoid disqualification regardless of how much sensitive confidential information Ms. Boelter possessed about her former client. In my opinion, a reasonable attorney with responsibility for ensuring the firm's compliance with all applicable standards – including those governing disqualification for conflicts of interest – should have perceived that hiring Ms. Boelter posed a significant risk of disqualification in any proceeding in which the YPF confidential information she possessed could be used to the disadvantage of her former client.

14. To emphasize, this is *not* to impugn the integrity of Ms. Boelter in any way. The practice of lawyers referring to the rules of professional conduct as "ethics rules" may create the

mistaken impression that an inquiry into the character or integrity of lawyers is part of the analysis of the law governing lawyers. In fact, the law governing disqualification for conflicts of interest employs legal standards and criteria that consider the magnitude of the risk to the client, and the policy considerations on the other side of the balance, in an objective manner, without inquiring into the moral character of the lawyers involved.

15. To summarize, where YPF's interests have been jeopardized by one of its lead lawyer's association with an adversary firm, Rule 1.10(a)(2) does not preclude this court from exercising its inherent authority to craft a remedy to protect these interests.

Objectivity of Imputed Conflicts Analysis

16. The Trust's brief states that "Ms. Boelter takes her ethical obligations to her former client very seriously. Boelter Decl. ¶ 11. Ms. Boelter has not revealed, either directly or indirectly, any confidential information (or substantive information of any sort) that she learned during her work for YPF, including during the conflicts screening process, to anyone at White & Case." Opp'n 11. This argument reflects a misunderstanding of the objective analysis of conflicts of interest rules. Ms. Boelter's testimony, even if it is truthful, would be relevant only if disqualification required a showing of actual disclosure of confidential information. But it is in fact the objective *risk* of disclosure of confidential information that justifies disqualification.

17. Again, the Hazard treatise states this principle in a helpful way: "In the modern view, a conflict of interest exists whenever the attorney-client relationship or the quality of the representation is 'at risk,' *even if no substantive impropriety – such as a breach of confidentiality or less than zealous representation – in fact eventuates*." Hazard, *The Law of Lawyering* at § 10.4 (emphasis in original). The party seeking disqualification – that is, the party whose confidential information is at risk from an attorney's lateral move – need not prove actual

disclosure of confidential information. That would be a highly ironic procedure to employ in the application of a rule intended to protect a party's confidences. Instead, courts should rely on "inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together." Model Rule 1.9, cmt. [6].[2]

18. These presumptions include the free flow of information within a firm about all of the matters on which firm lawyers have worked. Indeed, this presumption underlies the imputation of conflicts of interest by Model Rule 1.10. That rule recognizes that one of the benefits of associating with other lawyers is the sharing of knowledge and experience that colleagues can provide. Screening therefore contemplates a highly unusual situation, in which this free flow of information is restricted to protect the interests of a former client of a newly hired lawyer. In many cases a screen is adequate protection, in light of the relatively insignificant confidential information possessed by the moving lawyer. In this case, however, it is unrealistic to leave the protection of YPF to nothing more than trust.

19. The screening procedures described by White & Case Associate General Counsel Debra Kobrin Levy do not get at the underlying risk that a moving lawyer, such as Ms. Boelter, will reveal sensitive confidential information of her former client. As described in Ms. Levy's declaration, these procedures regulate the access by a newly hired lawyer to files pertaining to a matter in which the firm's client is adverse to a former client of the moving lawyer. In this case, that means Ms. Boelter has no access to files concerning the Trust. However, protection of the Trust's confidences is not the issue here. It is YPF's confidential information, known to Ms.

---

[2] As stated in one of the most important early conflicts cases: "To compel the client to show . . . the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule." *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F. Supp. 265, 269 (S.D.N.Y. 1953).

Boelter, that must be protected. That is why the court in *Nemours Found. v. Gilbane, Inc.*, 632 F. Supp. 418, 428 (D. Del. 1986), used the image of a "cone of silence" rather than a wall or screen. This is not merely an amusing reference to a 1960s television show, but a serious point about which client's interests are at stake when a lawyer changes law firms.

20. The only acknowledgement of the importance of a "cone of silence" is in Paragraph 22 of Ms. Levy's declaration: "In accordance with Firm policies, no lateral partner who has been screened from a matter may discuss any aspect of the matter with any person associated or affiliated with the Firm." This procedure amounts to no more than trusting Ms. Boelter's undertaking not to divulge confidential information of YPF. In some instances the risk to the client is insignificant enough that relying on trust is sufficient protection for the former client's interests. In this case, however, the stakes are too high to leave the protection of YPF to the discretion of its former lawyer.

21. This objective "risk rules" analysis is grounded in the highly fiduciary nature of the lawyer-client relationship and the duty of undivided loyalty that is owed to the client. *See*, *e.g.*, *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976). In some instances, it is too much to ask a former client to take it on trust that its former lawyer will not disclose, even inadvertently, its confidential information. Recognizing the importance of fiduciary duties and the objective analysis of the risk to the client is not an attack on the integrity of any particular lawyer. It is, instead, a recognition of the stringency of the fiduciary duties that lawyers accept when representing a client. Conflicts of interest rules are designed so that a client has more to rely on than trust. The client's interests are protected by prophylactic rules, governed by objective standards, that apply regardless of a lawyer's stated undertaking to act in good faith

with regard to the former client. In short, some interests are too important to leave to the client's trust in its former lawyer.

22. To conclude, determining the availability of screening requires an objective analysis of the risk posed to YPF, focusing on the nature of the confidential information to which Ms. Boelter had access while at Sidley and the adequacy of the procedures employed by White & Case to ensure that the confidential information of her former client is not compromised. While I agree that screens are a sufficient response in many cases, in my opinion employing a screen in this extreme case is a bridge too far: It is unfair to force YPF to accept a situation in which only good faith and carefulness protect such significant confidences from exposure to YPF's direct adversaries.

I hereby declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this matter.

Dated: February 25, 2020
Ithaca, Tompkins County, New York

*s/ W. Bradley Wendel*
W. Bradley Wendel