# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 16-11501 (CSS) |
| MAXUS ENERGY CORPORATION, | ) | |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 18-50489 (CSS) |
| | ) | |
| YPF S.A., YPF INTERNATIONAL S.A., | ) | |
| YPF HOLDINGS, INC., CLH | ) | |
| HOLDINGS, INC., REPSOL, S.A., | ) | |
| REPSOL EXPLORATION, S.A, REPSOL | ) | |
| E&P USA, INC., REPSOL OFFSHORE | ) | |
| E&P USA, INC., REPSOL E&P T&T | ) | |
| LIMITED AND REPSOL SERVICES | ) | |
| COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>OPINION</u>[1]

LANDIS RATH & COBB LLP
Adam G. Landis
Matthew B. McGuire
919 Market Street
Suite 1800
Wilmington, DE  19801

    -and-

FARNAN LLP
Brian E Farnan
Michael J. Farnan
919 North Market Street
12th Floor
Wilmington, DE  19801

    -and-

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

CLEARY GOTTLIEB STEEN
 & HAMILTON LLP
Victor L. Hou (Argued)
Ari D. MacKinnon
One Liberty Plaza
New York, New York 10006

WHITE & CASE LLP
J. Christopher Shore (Argued)
Matthew L. Nicholson
1221 Avenue of the Americas
New York, New York 10020

Counsel for the YPF Defendants

Counsel for the Liquidating Trust

Dated: April 6, 2021

Sontchi, C.J.‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Before the Court is the YPF defendants' motion to disqualify plaintiff's lead law

firm.  The Court will deny the motion.

## A. Findings of Fact[2]

This adversary proceeding has been pending since 2018 and grew out of the 2016

Chapter 11 case of Maxus Energy Corporation ("Maxus").  The plaintiff is the Maxus

Liquidating Trust (the "Trust"), which was formed under Maxus's confirmed plan of

reorganization to pursue litigation, including this adversary proceeding.  The relevant

defendants are YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings,

Inc. (collectively, "YPF").  At all relevant times, YPF was Maxus's parent.  The causes of

---

[2] The Court conducted an evidentiary hearing on April 1, 2021.  At the hearing, 49 exhibits were presented, including 12 declarations.  All exhibits were admitted other than Exhibits 14, 16, 32 and 40, which were excluded.  The Court took the admission of Exhibits 17, 24 and 30 under advisement at the hearing.  Those exhibits are excluded for the reasons set forth in n. 62 below.  Pursuant to the parties' agreement, no live testimony was presented.

action in the complaint principally revolve around fraudulent conveyance, and alter ego/veil-piercing claims.[3]

Since the Trust's formation, it has been represented by White & Case LLP ("White & Case") as lead counsel, including in this adversary proceeding.[4]  Similarly, since shortly after the inception of this adversary proceeding, YPF has been represented by Sidley Austin LLP ("Sidley") as lead counsel.  YPF is now also represented in this adversary proceeding by Cleary Gottlieb Steen & Hamilton LLP ("Cleary").  Indeed, it is Cleary that has presented to the Court YPF Defendants' Motion to Disqualify White & Case LLP as Counsel for the Maxus Liquidating Trust, D.I. 306 ("Motion to Disqualify") as lead counsel rather than Sidley.  Cleary is the fourth major law firm to represent YPF in connection with the Maxus Chapter 11 case and this adversary proceeding.[5]

---

[3] For a more complete recitation of the factual background and legal issues please consult the numerous decisions issued by the Court in this case. *See Maxus Liquidating Trust v. YPF S.A., et al.*, Adv. Pro. No. 18-50489, 2021 WL 924302 (Bankr. D. Del. Mar. 11, 2021) (discovery dispute); *Maxus Liquidating Trust v. YPF S.A., et al.*, Adv. Pro. No. 18-50489, 2021 WL 856040 (Bankr. D. Del. Mar. 8, 2021) (discovery dispute); *Maxus Liquidating Trust v. YPF S.A., et al.*, 617 B.R. 806 (Bankr. D. Del. 2020) (discovery dispute); *Maxus Liquidating Trust v. YPF S.A., et al.*, Adv. Pro. No. 18-50489, 2019 WL 2581609 (Bankr. D. Del. June 24, 2019) (discovery dispute); *Maxus Liquidating Trust v. YPF S.A., et al.*, 597 B.R. 235 (Bankr. D. Del. 2019) (abstention); and *Maxus Liquidating Trust v. YPF S.A., et al.*, Adv. Pro. No. 18-50489, 2019 WL 647027 (Bankr. D. Del. Feb. 15, 2019) (motion to dismiss).

[4] White & Case represented Occidental Chemical Corp. ("Occidental") in Maxus's Chapter 11 case.  White & Case's work on behalf of Occidental in the Maxus Chapter 11 case concluded in July 2017.

[5] YPF's counsel in the Maxus Chapter 11 case and this adversary proceeding have been Chadbourne & Park, Cravath Swaine & Moore LLP, Sidley, and Landis Rath & Cobb LLP.  In addition, in the New Jersey environmental litigation that preceded and ultimately led to the Maxus Chapter 11 case, YPF and its former affiliate, Repsol, were represented by several firms, including DLA Piper LLP, Kirkland & Ellis LLP, King & Spaulding LLP and Chadbourne & Parke LLP.

The facts and issues relevant to the Motion to Disqualify center on Ms. Jessica Lauria neé Boelter.[6]  Ms. Boelter is a well-regarded restructuring attorney.  She has received numerous recognitions, including being named by Global Restructuring Review to its "40 Under 40 2016" list, which featured 40 of the world's leading restructuring specialists, aged 40 and under.  Turnarounds & Workouts selected her as one of the Outstanding Young Restructuring Lawyers for 2015, and Law360 named her a Rising Star as one of the country's top eight bankruptcy lawyers under the age of 40. In addition, she has been ranked as Up and Coming in Chambers USA.[7]

Ms. Boelter was formerly a partner in the restructuring group of Sidley before she joined White & Case on October 1, 2020.[8]  She started at Sidley in their Chicago office in 2002 after graduating from law school and became a partner at Sidley in 2010.[9]  She transferred to Sidley's New York office in 2017.[10]

Along with other lawyers, Ms. Boelter participated in the initial Sidley pitch to YPF in the summer of 2018.[11]  She was involved in negotiating the engagement letter between Sidley and YPF.[12]  She also consulted with other members of the Sidley team on

---

[6] As Ms. Lauria was known as Ms. Boelter at the time relevant to the Motion to Disqualify, with respect, the Court shall refer to her as Ms. Boelter for clarity's sake.

[7] https://www.whitecase.com/people/jessica-lauria (last visited April 6, 2021).

[8] Exh. 27, Declaration of Jessica C. Lauria (formerly Boelter) ("Boelter Declaration") at ¶2.

[9] *Id.* at ¶3.

[10] *Id.*

[11] *Id.* at ¶4. Exh. 2, Declaration of German Fernandez Lahore ("Lahore Declaration") at ¶3.

[12] Boelter Declaration at ¶4.  Lahore Declaration at ¶3.  Exh. 3, Declaration of John J. Kuster ("Kuster Declaration") at ¶4.

certain motions, including the motion to dismiss, and related analysis and was admitted *pro hac vice* in the adversary proceeding.[13]  In addition, she participated in or was copied on email correspondence with the client.[14]  She also attended several in-person meetings with the client.[15]  Executives at YPF considered Ms. Boelter to be "an integral part of YPF's outside legal team and depended on her advice, counsel and discretion on a wide range of highly sensitive topics."[16]

James Conlan led the Sidley engagement from the outset until his departure from Sidley in June 2020.[17]  Although Ms. Boelter was the senior remaining restructuring partner on the engagement, John Kuster assumed lead responsibility for the engagement after Mr. Conlan left the firm.[18]

Ms. Boelter's participation in this adversary proceeding varied over time.[19]  In total, she billed 300 hours to the engagement between 2018 and 2020.[20]  To the best of Ms. Boelter's recollection, approximately 200 of these hours were billed in 2018, approximately 100 hours were billed in 2019 (with the majority billed during the first half

---

[13] Boelter Declaration at ¶4. Order Approving Motion for Admission *pro hac vice* of Jessica C. Knowles Boelter, Esq.

[14] Lahore Declaration at ¶5.

[15] *Id.* at ¶¶5 and 7.  Exh. 1, Declaration of Daniel Gonzalez Casartelli ("Casartelli Declaration") at ¶¶5 and 7.

[16] Casartelli Declaration at ¶6.  *See also* Lahore Declaration at ¶11.

[17] Boelter Declaration at ¶3.  Kuster Declaration at ¶6.

[18] Boelter Declaration at ¶3; Kuster Declaration at ¶6.

[19] Kuster Declaration at ¶5.

[20] *Id.* at 3.

of the year), and no hours were billed in 2020.[21]  Ms. Boelter attended at least part of the

6-hour oral argument on the motion to dismiss and recalls making one appearance on the

record during a discovery hearing.[22]  The Court has no recollection of Ms. Boelter

appearing in the case.  Nonetheless, according to Mr. Kuster, Ms. Boelter worked on,

supervised work on, and/or was privy to internal discussions concerning:

      a.     drafting the motion to dismiss the complaint and preparing YPF's initial disclosure;

      b.     document collection, document review, privilege determinations, and other discovery matters;

      c.     the motion to withdraw the reference and consideration of the merits of seeking another forum;

      d.     the tactics of White & Case in the litigation;

      e.     developing YPF's overall litigation strategy;

      f.     YPF's disclosure pursuant to U.S. securities laws;

      g.     the engagement of local counsel;

      h.     corporate law considerations related to the case;

      i.     the possibility of settlement or other out-of-court resolution of the case;

      j.     discussions concerning litigation status; and

      k.     potential expert issues.[23]

As noted above, Mr. Conlan, then the global head of Sidley's restructuring group,

left Sidley to join Faegre Drinker Biddle & Reath LLP in June 2020.   As is often the case

in these matters, Mr. Conlan's departure led to the departure of other attorneys in his

---

[21] Boelter Declaration at ¶5.  Like any responsible senior attorney, Ms. Boelter did not bill all her time spent consulting with her colleagues.  Those consultations occurred throughout her time at Sidley, including in 2020.  *See* Exh. 33, Declaration of Daniel J. Neppl, Exhibit B.

[22] Boelter Declaration at ¶5; Kuster Declaration at ¶4.

[23] Kuster Declaration at ¶5.  *See also* Lahore Declaration at ¶6.

group.  Ms. Boelter began exploring other opportunities and avers that her work for YPF played no role in her decision to explore lateral moves or to leave Sidley.[24]

In connection with her ultimate relocation to White & Case, Ms. Boelter went through a standard conflict screening process.[25]  During that process, Ms. Boelter did not discuss the YPF case other than to identify it as a matter on which she had worked, for purposes of conflict identification.[26]  Also, during that process, Ms. Boelter understood that she was not being recruited because of her prior work for YPF.[27]

From the beginning of her recruitment, Ms. Boelter understood that, because of her prior work for YPF on this case, a screen would be necessary.[28]  A screen was implemented as of the day Ms. Boelter joined the firm;[29] and Ms. Boelter was promptly informed of, and acknowledged that she would comply with, the screen.[30]  Ms. Boelter avers that she has never seen any of the Trust's documents pertaining to this matter, whether hard copy or electronic, in White & Case's possession.[31]

---

[24] Boelter Declaration at ¶7.  Ms. Boelter began discussions with White & Case in August 2020. *See* Exh. 41, Maxus Liquidating Trust's Supplemental Responses & Objections to YPF's Interrogatories, dated March 12, 2021 ("Interrogatory Responses") at p. 9 and p. 12 ("Ms. Boelter made no representations concerning her work with YPF to anyone employed by White & Case other than as set forth in her declaration.").

[25] Boelter Declaration at ¶8.

[26] *Id.*

[27] *Id.* at ¶9.

[28] *Id.*

[29] Exh. 19, Declaration of Debra Kobrin Levy ("Levy Declaration") at ¶¶16, 25-28.

[30] Boelter Declaration at ¶¶ 9-10; Levy Declaration at ¶ 41.

[31] Boelter Declaration at ¶11.

Ms. Boelter avers that she has not revealed, either directly or indirectly, any confidential information (or substantive information of any sort) that she learned during her work for YPF, including during the conflicts screening process, to anyone at White & Case and there is no evidence to the contrary. [32]  Other than the limited necessary disclosures during the conflicts screening process, Ms. Boelter has not discussed this matter with anyone at White & Case and has not set foot in White & Case's New York office since she joined the firm (perhaps not surprising given the existing pandemic).[33] Ms. Boelter understands that White & Case policy dictates that any disclosure of a YPF confidence, even inadvertent, will be punished as a disciplinary violation.[34]  Finally, Ms. Boelter has agreed to certify compliance with the White & Case screen periodically.[35]

YPF executives first learned that Ms. Boelter was leaving Sidley and joining White & Case on September 12, 2020.[36]  Ms. Boelter joined White & Case on October 1, 2020, and sent a letter to Sidley to provide notice to YPF on the same date.[37]  The letter stated, among other things, that all relevant personnel (*i.e.*, Ms. Boelter and lawyers and staff working on the matter at White & Case) had been instructed that: (1) Ms. Boelter would not have access to electronic or hard copy files relating to the matter; (2) Ms. Boelter may not

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Kuster Declaration at ¶8. Lahore Declaration at ¶10.  Ms. Boelter was offered a partnership position at White & Case on September 8, 2020, which she accepted on the same day. Interrogatory Responses at p. 10.

[37] Motion to Disqualify at Exhibit B.

discuss this matter with anyone at White & Case; and (3) Ms. Boelter would not receive any part of the fee from this matter.[38]

Shortly thereafter, YPF's attorneys began a lengthy dialogue with White & Case over Ms. Boelter's departure.[39]  White & Case provided extensive information to YPF as to the screen that had been implemented and related information.[40]  YPF's lawyers never provided any comment as to the screen even though they were invited to do so.[41]  Rather, they took the position that due to Ms. Boelter's extensive involvement in the adversary proceeding on behalf of YPF no screen would be adequate.[42]

After almost two months of, ultimately, fruitless discussions, YPF filed the Motion to Disqualify on December 19, 2020.  Briefing was completed on February 26, 2021 and a hearing was held on April 1, 2021.[43]

### B.  Legal Standard

The Court "has the power . . . to discipline attorneys who have been admitted to practice before it," "including the power to disqualify an attorney from a

---

[38] *Id.*

[39] *See generally* Exhs. 4-16, Declaration of Rebecca M. Michaud and exhibits thereto; and Exhs. 22-23, Declaration of Matthew L. Nicholson and exhibit thereto.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] The Court issued a letter on March 12, 2021, D.I. 367, in which it established certain rules governing the preparation for and conduct of the evidentiary hearing, subject to the parties' right to agree otherwise.  In addition, the Court held a status conference on March 26, 2021 in preparation for the evidentiary hearing, at which time the parties announced that no live testimony would be presented unless the Court preferred otherwise.  The Court did not request live testimony.

representation."[44]  As such, "attorney conduct is governed by the ethical standards of the court before which the attorney appears."[45]  This Court, under Local Rule 9010-1(f), has adopted the American Bar Association's Model Rules of Professional Conduct (the "Model Rules") to govern the conduct of the attorneys appearing before it.

While reviewing motions to disqualify, courts consider "the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice."[46]  And "while there can be no hesitation to disqualify where impropriety *has occurred*, . . . judges must exercise caution not to paint with a broad brush under the misguided belief that coming down on the side of disqualification raises the standard of legal ethics and the publics' respect. The opposite effects are just as likely — encouragement of vexacious (sic) tactics and increased cynicism by the public."[47]

Consequently, motions to disqualify "must be viewed with extreme caution to avoid its misuse as an instrument of harassment" and "should not be imposed unless absolutely necessary."[48]  And where substantial preparation of the case for trial has occurred or granting the motion would impose "substantial prejudice and additional

---

[44] *EON Corp. IP Holdings LLC v. Flo TV Inc.*, No. C.A. 10-cv-812-RGA, 2012 WL 4364244, at *2 (D. Del. Sept. 24, 2012) (citing *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980)).

[45] *Madukwe v. Del. State Univ.*, 552 F. Supp. 2d (D. Del. 2008) (citing *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984)).

[46] *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988).

[47] *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1576–77 (Fed. Cir. 1984) (emphasis in original), *overruled on other grounds by Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985) (holding that orders denying a motion to disqualify in civil cases are not collateral orders subject to appeal as "final judgments" within the meaning of 28 U.S.C. § 1291) and (sharing the concern about the "tactical use of disqualification motions" to harass opposing counsel).

[48] *Flo-Con Sys., Inc. v. Servsteel, Inc.*, 759 F. Supp. 456, 458 (N.D. Ind. 1990).

legal expenses" on the nonmoving party, courts are reluctant to grant a motion to disqualify as a potential "tool to deprive opponents of the counsel of [their] choice" and "the balance of the parties' interests tips sharply in favor of the nonmoving party."[49] In sum, motions to disqualify are to be used as a protection against exceptional cases.

Prior to 2009, courts adopted different views on how client confidences are to be protected while recognizing the potential abuse of a motion to disqualify. Model Rule 1.10(a)(2) answers the question of *how* client confidences are to be protected—as they "*must* be protected"—by providing screening as "a mechanism to give effect to the duty of confidentiality, not a tool to undermine it" while also allowing courts the discretion to disqualify attorneys where it is reasonable under the circumstances of the case before them.[50] "Consequently, it should rarely be necessary to impute the transferring lawyer's disqualification to all of her new lawyer colleagues in order to meet the former client's concerns."[51]

Model Rule 1.10(a)(2)'s screening requirements together with the "extreme caution" standard under which courts review motions to disqualify support the idea that where a motion seeks to disqualify a firm complying with 1.10(a)(2), courts will likely find an "exceptional case" only where the circumstances show that no screening measures could adequately protect a client's confidential information. An example of

---

[49] *U.S. for Use & Benefit of Lord Elec. Co. v. Titan Pac. Const. Corp.*, 637 F. Supp. 1556, 1563 (W.D. Wash. 1986).

[50] ABA Standing Comm. on Ethics and Pro. Resp., *Resolution 109*, A.B.A., p.10–11, (A.B.A. Final Report Adopted Feb. 16, 2009), https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility1/final_report_adopted109.pdf (last visited April 6, 2021) (emphasis in original).

[51] *Id.* at p. 10.

just such an "exceptional case" is provided in the ABA Report recommending Model Rule

1.10(a)(2)'s adoption:

> For example, if a substantial number of lawyers on one side of a litigation move to the law firm representing the other side, a tribunal might disqualify the other side's law firm, because it would be reasonable to doubt the efficacy of screens established for so many lawyers who possess so much material confidential information.[52]

In determining whether an "exceptional case" exists where an ethical screen that

is compliant with Model Rule 1.10(a)(2) may be inadequate courts have applied a test that

looks to several factors, including:

> (1) The substantiality of the relationship between the attorney and the former client,
>
> (2) The time lapse between the matters in dispute,
>
> (3) The size of the firm and the number of disqualified attorneys,
>
> (4) The nature of the disqualified attorney's involvement, and
>
> (5) The timing of the wall.[53]

## C.  Analysis

The parties agree that Model Rule 1.9 prohibits Ms. Boelter from representing the

Trust at White & Case and do not contend she has attempted to do so.  Instead, YPF

argues that Ms. Boelter's move to White & Case is so exceptional and of such magnitude

as to render any possible ethical screen imposed by White & Case inadequate for the

protection of YPF's confidential information.  Thus, YPF argues, Ms. Boelter's conflict

---

[52] *Id*. at p. 12.

[53] *Enzo Life Sciences, Inc. v. Adipogen Corp.*, C.A. No. 11-cv-00088 -RGA, 2013 WL 6138791, at *3 (D. Del. Nov. 20, 2013).

should be imputed to White & Case and the firm should be disqualified from representing the Trust.

Rule 1.10(a)(2) imputes Ms. Boelter's conflict upon White & Case and acts to prohibit White & Case from representing the Trust *unless* (1) Ms. Boelter is timely screened from any participation in White & Case's representation of the Trust and is not apportioned a part of the fee therefrom; and (2) written notice is promptly given to YPF, which will include (a) the screening procedures White & Case has employed, and (b) a statement that (i) White & Case and Ms. Boelter will comply with the screening procedures, (ii) review may be appropriate before a tribunal, and (iii) contains White & Case's agreement to respond promptly to any of YPF's written inquiries about the screening procedures.  Under the Model Rules, screening "denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law."[54]

Comments [9] and [10] of Rule 1.0 of the Model Rules add that "[a]dditional screening measures that are appropriate for the particular matter will depend on the circumstances" and are only effective if they are "implemented as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening."

---

[54] Model Rule 1.0(k).

But, even after screening measures are adopted, "tribunals *may* consider additional factors in ruling upon motions to disqualify a lawyer from pending litigation."[55]

There can be no serious question that White & Case has faithfully adhered to the requirements of Model Rule 1.10(a)(2).  White & Case implemented a thorough, robust ethical screen between Ms. Boelter and the YPF adversary proceeding and all related issues immediately upon Ms. Boelter joining the firm.  Moreover, Ms. Boelter will not be apportioned a part of the fee from the YPF adversary proceeding and related issues.[56] Starting on October 1, 2020, and continuing through March 2021, White & Case provided YPF (through its attorneys) prompt and exhaustive notice of the screening procedures, as well as repeated statements that White & Case and Ms. Boelter would comply with the screening procedures.[57]  In addition, White & Case responded promptly to YPF's inquiries about the screening procedures, even repeatedly inviting YPF to provide

---

[55] Model Rule 1.10, cmt. 7 (emphasis added).

[56] YPF complains that the screen is inadequate because Ms. Boelter's husband, Mr. Thomas Lauria, who is the head of White & Case's restructuring group, may receive a part of the fee earned by White & Case from this litigation.  Ms. Boelter's relationship with Mr. Lauria is discussed more fully below but, in response to this argument, it is sufficient to point out that, under Model Rule 1.10, it is Ms. Boelter and not Mr. Lauria who is prevented from receiving fees arising from this adversary proceeding.

[57] YPF argues that notice of the screening procedures was inadequate because the disclosure of the identity of the lawyers subject to the screen evolved in the weeks after Ms. Boelter joined White & Case. Nonetheless, there can be no question that White & Case was acting in good faith.  The lack of precision in identifying the screened lawyers was unfortunate but does not justify disqualification.  *See Maxell, Ltd. v. Apple Inc.*, C.A. No. 5:19-CV-00036, 2021 WL 1100098 at *13 (E.D. Tex. Mar. 2, 2021) (Delay of 48 days in providing written notice compliant with Model Rule 1.10(a)(2)(ii) does not justify disqualification because, on balance, the prejudice to the movant from the opposing firm's failure to provide prompt written notice is not so great as to outweigh the significant prejudice to the opposing party if the court were to disqualify its counsel).  While this case is not on the eve of trial, it is in its third year and document discovery is complete.  It would be highly prejudicial to the Trust, which is an entity of limited means, to require it to find new counsel.

comments or changes to the procedures – an invitation YPF either ignored or declined. *In sum, White & Case and Ms. Boelter complied to the letter with the applicable ethical rule*.

As such, the question turns to whether an "exceptional case" exists such that no screening measures could adequately protect YPF's confidential information.  This is not such a case.  There is no doubt that Ms. Boelter was one of the senior attorneys in the YPF adversary proceeding.  As such, she was privy to client confidences, and YPF's strategy and tactics in defending the suit.  However, her involvement was largely diminished after the Court's denial of the motion to dismiss in 2019.  Her billed hours were cut in half from 2018 to 2019 with most of those hours accruing early in the year, and she did not bill a single hour to the file in 2020.  This is not particularly surprising, as Mr. Conlan was the lead restructuring attorney on the matter until just a few months before Ms. Boelter left Sidley,[58] and the matter was turned over to the litigators after denial of the motion to dismiss and the beginning of discovery.[59]

Moreover, Ms. Boelter's interactions with YPF executives were not sufficient to turn this matter into an "exceptional" case.  The declarations attempt to establish that Ms. Boelter was a key strategic advisor who was privy to the deepest and darkest YPF secrets. The declarations are artfully drafted but they exaggerate every interaction to an implausible degree.  The Court was particularly struck by the declaration of YPF's CEO, Mr. Casartelli, who averred that Ms. Boelter was a trusted and critical confidante because

---

[58] Significantly, Ms. Boelter did not bill any time to the matter even after Mr. Conlan left Sidley.

[59] Restructuring attorneys *can* do litigation, but the answer to the question of whether they *should* do litigation is, more often than not, "no."

he had a conversation with her at a cocktail party where they discussed the case. The example is incongruous for several reasons, not the least of which is (1) they discussed the case – what else would they discuss, they barely knew each other, and it was all they had in common, and (2) it was a cocktail party – if Mr. Casartelli believes that sharing critical confidences over drinks at a crowded cocktail party is appropriate, he needs to reexamine his thinking. In addition, the Court finds it disingenuous that a firm such as YPF, which changes law firms with striking frequency, is shocked that one (or more) of its lawyers may leave its employ, even by moving to a firm representing a legal opponent.

Remember, an ethical screen is only required to prevent a lawyer that leaves a firm from being adverse to her former client in the same or a substantially related matter. Lawyers subject to a screen are universally privy to client confidences and litigation strategy. That is not the question. The question is whether Ms. Boelter knows so much and was so involved as to make this an "exceptional case" where an ethical screen would be inadequate. If that were the case then the Court would expect such a lawyer to have billed more than 300 hours over more than two years in defending an extremely hard fought, $14 billion lawsuit.

An examination of the *Enzo Life Sciences* factors does not change the conclusion. Recall that those factors are:

> (1) The substantiality of the relationship between the attorney and the former client,
>
> (2) The time lapse between the matters in dispute,
>
> (3) The size of the firm and the number of disqualified attorneys,
>
> (4) The nature of the disqualified attorney's involvement, and

(5) The timing of the wall.[60]

As to the first factor, as discussed at length above, the relationship between Ms. Boelter and YPF was significant but not substantial.  Second, the time lapse between the matters in dispute, however, was short.  Indeed, it was immediate.  Third, the firms involved are extremely large.  Sidley and White & Case are sophisticated, global mega-firms.  YPF argues that the Court should not focus on the firms but, rather, the smaller departments or groups in the firms.  That is unavailing.  The legal industry is evolving towards becoming location agnostic (accelerated by the pandemic) -- especially in practice areas such as restructuring where cross-departmental legal expertise and collaboration in areas such as litigation, mergers and acquisitions, capital markets, etc., is routine.  White & Case has 2,293 attorneys worldwide with 456 of them located at its New York office and, even within the confines of restructuring, White & Case has 256 attorneys worldwide with 85 of them located in New York.[61]  Assuming, arguendo, the Court should consider the size of White & Case's (i) worldwide restructuring practice (256 attorneys), (ii) New York office (456 attorneys), or (iii) New York restructuring practice (85 attorneys), in each instance the Court would find that the screening procedures are sufficient.  But that is not the test – courts look at the firm as a whole and these firms are about as large as they get.  Moreover, the only attorney at issue is Ms. Boelter.  This is not

---

[60] *Enzo Life Sciences, Inc.*, 2013 WL 6138791 at *3.

[61] https://www.whitecase.com/people (last visited April 6, 2021).  The total number of attorneys was calculated by filtering by Role for Partner, Counsel, and Associate and adding the results; the same method for calculating attorneys was used to calculate the remaining numbers adding filters for Service: Financial Restructuring and Insolvency or Office: New York, or both. (2,293 total attorneys; 456 New York attorneys; 256 globally located restructuring attorneys; and 85 New York based restructuring attorneys).

a case where an entire trial team switched sides.  Fourth, again, as discussed above, Ms. Boelter's involvement in the YPF adversary was significant but not substantial.  Indeed, the Court has no memory of Ms. Boelter's involvement at all, and attendance at part of a lengthy oral argument certainly does not qualify as substantial involvement.  Ms. Boelter was a restructuring attorney involved at a high level in a litigation arising out of a bankruptcy that is focused on non-bankruptcy factual and legal issues.  She was not the lead trial lawyer billing thousands of hours to the matter.  Fifth, as to the timing of the wall, it was erected immediately upon Ms. Boelter joining the firm.

Thus, examining the *Enzo Life Sciences* factors, only one of the five factors would support concluding that the ethical wall established by White & Case and the firm's adherence to the requirements of Model Rule 1.10(a)(2) is inadequate.  That is clearly insufficient to require disqualification of the entire firm.[62]

---

[62] In support of the Motion to Disqualify, YPF submitted two Declarations of W. Bradley Wendel, Exhs. 17 and 30 (together the "Wendel Declarations").  Professor Wendel is the Edwin H. Woodruff Professor of Law at Cornell Law School.  Professor Wendel opines in his first declaration that "[t]his case is one of the most egregious instances I have seen of a moving lawyer possessing sensitive confidential client information switching over to the law firm representing the litigation adversary of a former client."  As discussed above, the Court respectfully disagrees.  Importantly, however, the Court finds that Professor Wendel's declarations consist entirely of a recitation of the law and legal conclusions.  While thorough and informative in the general sense, this is not the proper role of expert testimony.  The Court need not apply expert testimony to reach its own conclusions as to the law.  Indeed, it should not.  *Kansas v. Colorado*, No. 105, ORIGINAL, 1994 WL 16189353, at *155 (U.S. Oct. 3, 1994) (special master report) ("Opinion testimony providing legal conclusions is not admissible.").  *See also* Note, *Expert Legal Testimony*, 97 Harv. L. Rev. 797 ("Thus, conflicting expert legal testimony or any legal testimony not in conformity with the judge's formulation of the law fails to meet the helpfulness standard and should be excluded."); 31A Am. Jur. 2d *Expert and Opinion Evidence* § 96 ("Although a witness may be permitted, in a proper case, to give an opinion on an ultimate *fact* involved in a case, the witness may not give an opinion on a question of domestic law or on matters that involve questions of law.") (citations omitted); and 32 C.J.S. *Evidence* § 838 ("As a general rule, an expert witness may not give their opinion on a question of domestic law or on matters that involve questions of law, and an expert witness cannot instruct the court with respect to the applicable law of the case.").  Thus, the Court will not consider the Wendel Declarations nor Exh. 24, Declaration of Lucian T. Pera, submitted by White & Case in opposition to the Wendel Declarations.

Lastly, YPF repeatedly suggests that White & Case must be disqualified because of Ms. Boelter's marriage to Mr. Lauria, the head of White & Case's restructuring group. This argument is based on the proposition that married attorneys cannot help themselves from revealing client confidences over the dinner table or elsewhere. The Court refuses to presume that well-regarded married attorneys act in such a manner. It is unlikely that Ms. Boelter and Mr. Lauria spend the precious few hours that they can find together sharing client confidences, and the Court finds no reason to speculate that they do so. Indeed, the Court refuses to inquire into Ms. Boelter's and Mr. Lauria's marriage in any manner whatsoever as their relationship is not relevant. It is neither a basis for the relief requested by YPF in the Motion to Disqualify nor would it require disqualification of the firm in any event – just disqualification of Mr. Lauria who has never even worked on the adversary proceeding nor the underlying Maxus Chapter 11 case.[63]   Moreover, even if Ms. Boelter were to reveal YPF confidential information to her spouse (and there is no reason to believe she would), no harm would arise unless Mr. Lauria were, in turn, to betray his wife's confidences. There is no reason whatsoever to conclude or even to speculate that Mr. Lauria would reveal YPF information that he learned from his wife

---

[63] The Motion to Disqualify seeks relief related to the lateral movement of attorneys between firms. Model Rule 1.7, which is not a basis for the relief requested in the Motion to Disqualify, governs when there is a "personal interest of the lawyer" that may interfere with representation of a client. A conflict under Model Rule 1.7 is usually personal and is not imputed to the firm. *See* Model Rule 1.10(a)(1) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9 unless (1) the prohibition is based on a personal interest of the disqualified lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.").

with any other person, including his partner and frequent collaborator, Mr. Christopher

Shore, lead counsel for the Trust.

YPF attempts to justify an inquiry into Ms. Boelter's relationship with Mr. Lauria

on the basis that it is somehow probative of the likelihood that she will honor the ethical

screen.   Ms. Boelter and Mr. Lauria began dating intermittently in early 2017, the

relationship became "exclusive" in or around the fall of 2018, and they began to

cohabitate in July 2019.[64]  Ms. Boelter disclosed her relationship with Mr. Lauria to Sidley

in 2018 and believes persons at YPF were aware of the relationship in 2019.[65]  Mr. Lahore,

however, avers that he was not personally aware of the relationship until September 12,

2020.[66]  YPF argues that Ms. Boelter did not comply with the requirements of Model Rule

1.7 in connection with Ms. Boelter's relationship with Mr. Lauria.  This is less than clear.[67]

---

[64] Interrogatory Responses at p. 17.

[65] Boelter Declaration at ¶6.

[66] Lahore Declaration at ¶10.

[67] Ms. Boelter and Mr. Lauria were married on November 6, 2020 - after Ms. Boelter had left Sidley and joined White & Case. Boelter Declaration at ¶6.  The Model Rules provide that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which exists "if there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer." Model Rule 1.7(a)(2).  The comments explain that, with regard to romantic relationships, the above prohibition applies when the lawyer is married to a lawyer in an adverse firm. Model Rule 1.7, cmt. 11 ("When lawyers representing different clients in the same matter or in substantially related matters *are closely related by blood or marriage*, there may be a significant risk that client confidences will be revealed, and that the lawyer's family relationship will interfere with both loyalty and independent professional judgment.") (emphasis added).  *Compare* Conflicts Arising Out of a Lawyer's Personal Relationship with Opposing Counsel, ABA Comm. on Ethics & Pro. Resp., Formal Op. 494 (July 9, 2020) ("Lawyers who cohabit in an intimate relationship should be treated similarly to married couples for conflicts purposes. The same is true for couples who are engaged to be married or in exclusive intimate relationships.").

Note, however, that ABA Formal Opinion 494, which expanded Model Rule 1.7 to apply to romantic relationships beyond marriage, was not adopted until July 29, 2020 – almost two years after Ms. Boelter started dating Mr. Lauria exclusively and less than two months prior to when Mr. Lahore avers that he first became aware of the relationship between Ms. Boelter and Mr. Lauria.  Thus, the period of any potential violation of the rule by Ms. Boelter is to be measured in weeks not years.  In any event, the Delaware

Nonetheless, assuming, *arguendo*, that Ms. Boelter should have disclosed to YPF as early as the fall of 2018 that Ms. Boelter was in a romantic relationship with Mr. Lauria and that YPF did not learn of the relationship until September 2020, the argument that this has any bearing on the probity of whether Ms. Boelter will comply with the ethical screen is unavailing.[68]  There is no link whatsoever between the two points.  Indeed, the Federal Rules of Evidence prohibit making such an inference.[69]  Rather, it is clear to the Court that the discussion of Ms. Boelter's and Mr. Lauria's marriage is solely offered by YPF in a shabby attempt to embarrass Ms. Boelter and Mr. Lauria and/or to prejudice the Court in some manner.  It has accomplished neither.

The Motion to Disqualify will be denied for the reasons set forth above.  The Court will enter an order.

---

Bankruptcy Court has not adopted ABA Formal Opinions as binding authority. *See* Model Rules of Professional Conduct, https://www.americanbar.org/groups/professional_responsibility/publications (last visited April 6, 2021) ("ABA Formal Opinions are not binding authority in any jurisdiction without adoption in such a jurisdiction. ").  As a result, ABA Formal Opinion 494 is not applicable, Model Rule 1.7 did not apply to Ms. Boelter prior to her marriage to Mr. Lauria, and she did not violate the rule while representing YPF.

[68] It is perhaps useful to consider what may have occurred had Ms. Boelter informed Mr. Lahore in Fall 2018 that she was in a romantic relationship with Mr. Lauria.  What would have been YPF's remedy?  YPF certainly could not have forced Ms. Boelter to end the relationship.  YPF would have had two options – consent to Ms. Boelter continuing to represent YPF, notwithstanding her relationship with Mr. Lauria, or fire her.  Recall that YPF executives have sworn that, among other things, they considered Ms. Boelter to be "an integral part of YPF's outside legal team and depended on her advice, counsel and discretion on a wide range of highly sensitive topics."  If one takes the Declarations of Mr. Casartelli and Mr. Lahore at face value it seems unlikely YPF would have fired her – she was too valuable to them.  Rather, it strikes the Court that it is more likely that all the handwringing about a purported violation of Rule 1.7 by Ms. Boelter is nothing more than a litigation tactic.

[69] FRE 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").