Civil Action No. 21-_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION,<br><br>Debtors[1]. | Chapter 11<br><br>Case No. 16-11501 (CSS)<br>(Jointly Administered) |
| MAXUS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>YPF S.A., et al.,<br><br>Defendant. | Adv. Proc. No. 18-50489 (CSS) |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., and CLH HOLDINGS, INC.,<br><br>Appellants,<br><br>v.<br><br>MAXUS LIQUIDATING TRUST,<br><br>Appellee. | Appeal from the United States Bankruptcy Court for the District of Delaware |

## YPF APPELLANTS' MOTION FOR LEAVE
## TO FILE INTERLOCUTORY APPEAL OF THE BANKRUPTCY COURT'S
## APRIL 6, 2021 DISQUALIFICATION ORDER

---

[1]    The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy corporation (1531), Tierra Solutions, Inc. (0498), Maxus international Energy Company (7620), Maxus (U.S.) Exploration Company (2349), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

## <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ............................................................................1

JURISDICTIONAL STATEMENT .......................................................................2

STATEMENT OF RELEVANT FACTS ...............................................................3

QUESTIONS PRESENTED...................................................................................8

RELIEF SOUGHT.................................................................................................9

LEAVE FOR APPEAL SHOULD BE GRANTED ...............................................9

    I.    The Bankruptcy Court Committed Reversible Error by Adding an
          "Exceptional Case" Requirement to the Test for the Effectiveness of a
          Screen .........................................................................................................10

    II.   The Bankruptcy Court Committed Reversible Error by Ruling that the
          Uncontested Facts Regarding Ms. Boelter's Role in the Case Did Not
          Favor Disqualification .................................................................................11

    III.  The Bankruptcy Court Committed Reversible Error by Holding the Screen
          Effective Even Though Ms. Boelter's Husband Is Not Prevented From
          Receiving Fees From White & Case's Representation of the Trust................14

    IV.  Immediate Appeal Would Materially Advance the Litigation ........................15

CONCLUSION.....................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Enzo Life Scis. v. Adipogen Corp.*,
No. 11-00088, 2013 WL 6138791 (D. Del. Nov. 20, 2013) (Andrews, J.) ........................ *passim*

*Hess v. A.I. DuPont Hosp. for Child.*,
No. Civ. A. 08-0229, 2009 WL 2776606 (E.D. Pa. Aug. 28, 2009)................................... 15

*In re Bertoli*,
812 F.2d 136 (3d Cir. 1987).................................................................................................. 10

*In re Dwek*,
Civ. No. 09-5046, 2010 WL 234938 (D.N.J. Jan. 15, 2010)............................................... 10

*In re L.A. Dodgers LLC*,
465 B.R. 18 (D. Del. 2011)..................................................................................................... 10

*In re Maxus Energy Corp*,
Case No. 21-mc-00070-RGA (D. Del.) ............................................................................... 4

*James v. Teleflex, Inc.*,
Civ. A. 97-1206, 1999 WL 98559 (E.D. Pa. Feb. 24, 1999) .............................................. 11

*Nemours Found. v. Gilbane. Aetna, Fed. Ins. Co.*,
632 F. Supp. 418 (D. Del. 1986)........................................................................................... 11

*Norfolk S. Ry. v. Reading Blue Mountain & N. R.R.*,
397 F. Supp. 2d 551 (M.D. Pa. 2005) .................................................................................. 11

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
690 F. Supp. 170 (S.D.N.Y. 1987)....................................................................................... 16

*United States v. RD 1, Box 1*,
952 F.2d 53 (3d Cir. 1991).................................................................................................... 14

*Warner Lambert Co. v. LEP Profit Int'l*,
517 F.3d 679 (3d Cir. 2008).................................................................................................. 14

**Rules and Statutes**

28 U.S.C. § 158 ................................................................................................ 10

Model Rule of Professional Conduct Rule 1.7, cmt. 10 ..................................... 6

Model Rule of Professional Conduct Rule 1.10 ................................................ 15

**Other Authorities**

State Bar of Mich., Ethics Op. R-3 (July 21, 1989) ........................................... 15

Pursuant to 28 U.S.C. § 158(a)(3), and in accordance with Federal Rule of Bankruptcy Procedure 8004, Appellants YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings, Inc. (collectively, "YPF"), hereby file their motion for leave to appeal the Order Denying Defendants' Motion to Disqualify [Adv. Dkt. 390] (the "Order"), and corresponding Opinion [Adv. Dkt. 389] (the "Opinion") entered on April 6, 2021 by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2]

## PRELIMINARY STATEMENT

1.      At the outset of this $14 billion litigation, YPF chose Jessica C.K. Boelter[3] and James Conlan of Sidley Austin LLP ("Sidley") as its counsel.  After two years during which Ms. Boelter acted as one of YPF's key strategic advisors, YPF learned that Ms. Boelter would be leaving Sidley for White & Case LLP ("White & Case"), the very same firm that is litigating this case against YPF.  YPF also learned that during the entirety of Ms. Boelter's two years working on this litigation, she had been in a romantic relationship, which she never disclosed to YPF, with the head of the White & Case group that is litigating this case against YPF, who also serves as counsel of record to Occidental Chemical Corp. ("Occidental"), the very same company that controls YPF's adversary in this proceeding.  Under these extraordinary facts, disqualification is the only remedy to protect YPF's confidences and preserve the integrity of the proceedings.

2.      Following over 90 pages of briefing, including 12 declarations, submissions from two experts, 49 exhibits, and a full-day hearing on the merits, the Bankruptcy Court took one business day to issue its unprecedented Opinion denying YPF's motion to disqualify White &

---

[2]      Pursuant to Federal Rules of Bankruptcy Procedure 8004 and 8006, and contemporaneously herewith, YPF has filed a motion requesting that the Bankruptcy Court certify a direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2).

[3]      Jessica C.K. Boelter is now known as Jessica C. Lauria.  *See* Declaration of Jessica C. Lauria (Formerly Boelter), [Adv. Dkt. 331] ("Boelter Decl.").  For consistency with the prior briefing and the Order, Ms. Lauria is referred to herein as "Ms. Boelter."

Case (the "Disqualification Motion"). The Opinion commits several errors of law which require immediate review and reversal on interlocutory appeal.

3.    *First*, the Bankruptcy Court committed reversible error involving several controlling questions of law. The Bankruptcy Court committed reversible error by ruling White & Case's screening of Ms. Boelter was adequate even though her husband was not prevented from receiving fees from White & Case's representation of the Maxus Liquidating Trust (the "Trust") in this litigation. The Bankruptcy Court similarly erred by ruling that the uncontested facts regarding the substantial role that Ms. Boelter played as engagement partner, key strategic advisor, and counsel of record in the underlying adversary proceeding (the "Adversary Proceeding") did not require disqualification. The Bankruptcy Court also committed reversible error by articulating a new standard governing the availability of ethical screening to cure an imputed conflict, which is in conflict with the decisions of district courts in this Circuit, including of this Court.

4.    *Second*, an immediate appeal of the Order will materially advance the ultimate termination of the Adversary Proceeding because a reversal by this Court is the only way to protect YPF from the grave risk that its confidential information and litigation strategies will be disclosed to counsel for its direct adversary, and the only way to mitigate the risk of an expensive and time-consuming retrial if the Order is reversed after final judgment.

## JURISDICTIONAL STATEMENT

5.    YPF seeks review pursuant to 28 U.S.C. § 158(a)(3). This Motion and accompanying Notice of Appeal, filed within 14 days after the Order was entered on April 6, 2021, are timely filed under Federal Rules of Bankruptcy Procedure 8004(a)(1) and 8002.

6.      Though filed in the first instance with the Bankruptcy Court, this Motion is properly directed to this Court.

### STATEMENT OF RELEVANT FACTS

7.      The facts relevant to this appeal are largely undisputed, and can be found in the sworn declarations of YPF's General Counsel Germán Fernández Lahore and its former CEO Daniel González Casartelli, as well as YPF's litigation counsel at Sidley, John Kuster.  Although the Trust and the Bankruptcy Court had every opportunity to question these witnesses' testimony concerning the crucial role that Ms. Boelter played in advising YPF in the Adversary Proceeding, both the Trust and the Bankruptcy Court declined to do so.

8.      Shortly after the Trust commenced the Adversary Proceeding on June 14, 2018, Sidley partners Mr. Conlan and Ms. Boelter pitched Sidley to represent YPF in this matter. Daniel González Casartelli Declaration ¶ 3 [Adv. Dkt. 307] ("DG Decl."); Germán Fernández Lahore Declaration ¶¶ 3-4 [Adv. Dkt. 308] ("GFL Decl.").  Ms. Boelter subsequently negotiated the terms of Sidley's engagement letter with YPF and was one of the two Sidley partners copied on the executed engagement letter.  DG Decl. ¶ 3; GFL Decl. ¶¶ 3-4.  The very first document YPF filed in this Adversary Proceeding was a motion to admit Ms. Boelter *pro hac vice*, and she remained counsel of record to YPF until October 1, 2020, the same day she began at White & Case.  Motion and Order for Admission *Pro Hac Vice* [Adv. Dkt. 4]; Notice of Withdrawal of Appearance [Adv. Dkt. 261].

9.      Based on the uncontroverted testimony of YPF's General Counsel, former CEO, and counsel at Sidley, Ms. Boelter was actively involved in formulating, and was at all times privy to, legal advice provided to YPF on a range of sensitive topics, including:

- the motion to dismiss and litigation strategy following denial of the motion;

- document review and related privilege determinations;

- the possibility of a motion to withdraw the reference, and the merits of litigating the case in another forum;

- White & Case's litigation tactics;

- the possibility of settlement or other out-of-court resolution of the litigation;

- disclosures pursuant to securities laws;

- engagement of local counsel;

- corporate law considerations related to this litigation; and

- expert strategy.

GFL Decl. ¶¶ 6-8; DG Decl. ¶ 7; Declaration of John Kuster ¶ 5 [Adv. Dkt. 309] ("JK Decl."); Declaration of Daniel Neppl ("DN Decl."), Ex. B at 10 [Adv. Dkt. 348-1].  Despite the Bankruptcy Court's suggestion that this sworn testimony was somehow "artfully drafted" in order to "exaggerate every interaction [with Ms. Boelter] to an implausible degree," Op. 15, the Trust never disputed Ms. Boelter's involvement in providing advice on these highly sensitive issues.  Indeed, the Trust declined the opportunity to depose or cross-examine YPF's witnesses about their declarations and the Bankruptcy Court stated that it had "no questions for any of the witnesses" and therefore declined the invitation to hear from them at the April 1, 2021 hearing (the "Disqualification Hearing").  Mar. 26, 2021 Hr'g Tr. at 9:11-13.[4]

10.     There is no question that the information about which Ms. Boelter provided advice remains ripe.  Her advice on document review and related privilege determinations is germane to the recent privilege-related decision by the Bankruptcy Court that is now on appeal to this Court.  *See In re Maxus Energy Corp.*, Case No. 21-mc-00070-RGA (D. Del.).  Her

---

[4]     For the Court's convenience, transcripts of hearings before the Bankruptcy Court are attached hereto as exhibits.

counsel on the possibility of withdrawing the reference remains highly relevant, including in light of the Bankruptcy Court's statement that this Adversary Proceeding is "a litigation arising out of a bankruptcy that is *focused on non-bankruptcy* factual and legal issues." Op. 18 (emphasis added). Ms. Boelter's counsel on settlement or other out-of-court resolution of the litigation similarly remains live, especially because of the Bankruptcy Court's recent directive that the parties seek mediation. Mar. 2, 2021 Hr'g Tr. at 17:15-18:7. And Ms. Boelter's advice on strategy related to experts is equally ripe, as experts in the Adversary Proceeding have not yet been identified

11.    Furthermore, the uncontested factual record shows that Ms. Boelter continued to be privy to highly sensitive YPF information until shortly before she left Sidley for White & Case. Ms. Boelter continued to be copied on Sidley communications with YPF until September 11, 2020. *See* GFL Decl. ¶ 5. Ms. Boelter also continued to act as the Sidley billing partner through at least May 2020, transmitting bills and time summaries to YPF. *See* Reply Declaration of Germán Fernández Lahore, Ex. A [Adv. Dkt. 346-1]. Furthermore, in July 2020, Ms. Boelter conferred with Mr. Kuster regarding expert discovery in this Adversary Proceeding. DN Decl., Ex. B at 10. And as recently as August 2020, Ms. Boelter was listed as an integral player in a Sidley presentation to YPF about ongoing litigation strategy. *See* GFL Decl. ¶ 9.

12.    Unbeknownst to YPF, Ms. Boelter began discussions to join White & Case right around the time of this presentation "in or around August 2020." Reply Declaration of Rebecca M. Michaud ("Reply RM Decl."), Ex. N, Interrog. Resp. No. 3 [Adv. Dkt. 385-1]. Although Ms. Boelter continued to be included on sensitive client communications until September 11, 2020, which was *after* Ms. Boelter had *already* accepted an offer of partnership from White & Case, Reply RM Decl., Ex. N, Interrog. Resp. No. 5, there is no dispute that she never notified YPF or

sought its informed consent regarding her decision to interview with White & Case, as required

by Comment 10 to Model Rule of Professional Conduct ("Model Rule") 1.7.

13.    It was not until a phone call on Saturday, September 12, 2020, that YPF learned

from Mr. Kuster (not Ms. Boelter) that Ms. Boelter was planning to leave Sidley for White &

Case.  *See* JK Decl. ¶ 8; GFL Decl. ¶ 10.  Not only does White & Case represent the Trust in

these proceedings, it also serves as counsel to Occidental, which controls three of the five seats

on the Trust's Oversight Committee, *see* Am. Ch. 11 Plan of Liquidation at 29-31, 42-45, Bankr.

Dkt. 1451, and is publicly recognized as a "longtime YPF adversary."[5]

14.    During that same phone call, YPF also learned of Ms. Boelter's engagement to

White & Case partner Thomas Lauria, head of White & Case's Financial Restructuring and

Insolvency Practice (the "Restructuring Group") and counsel of record to Occidental in the

bankruptcy proceeding underlying this Adversary Proceeding.  *See* GFL Decl. ¶ 10; JK Decl. ¶ 8.

In the course of discovery after filing the Disqualification Motion, YPF learned that this

relationship dated back to 2017, long before Ms. Boelter had pitched to represent YPF in this

matter.  Op. 20.  And unbeknownst to YPF, the relationship continued throughout the course of

Ms. Boelter's work as counsel of record to YPF in the Adversary Proceeding, progressing to

cohabitation in July 2019, Reply RM Decl., Ex. N, Interrog. Resp. No. 15, and to an engagement

at some later date.  There is no dispute that, at no point during Ms. Boelter's romantic

relationship with Mr. Lauria and her simultaneous representation of YPF, did she inform YPF of

her relationship.  *See* Boelter Decl. ¶ 6; DG Decl. ¶ 10; GFL Decl. ¶ 10.

15.    On October 1, 2020, White & Case informed YPF of the *fait accompli* that Ms.

Boelter had joined the firm and claimed that it had implemented an ethical screen that cured the

---

[5]     Jeff Montgomery, *Maxus Retains Del. Ch. 11 Control In Blow To YPF Strategy*, Law360 (Apr. 6, 2017),
https://www.law360.com/articles/910582/maxus-retains-del-ch-11-control-in-blow-to-ypf-strategy.

patent conflict created by Ms. Boelter's hiring. Declaration of Rebecca M. Michaud ("RM Decl."), Ex. B [Adv. Dkt. 310-1]. Given that Ms. Boelter had been a partner at the law firm then representing YPF (Sidley), YPF had to seek and hire new counsel to assess the conflict and advise on potential next steps. As YPF's new counsel got up to speed on this complex matter and investigated the facts of Ms. Boelter's departure, YPF promptly exercised its right under Model Rule 1.10(a)(2)(ii) to obtain further information about White & Case's screen, while putting White & Case on notice that it might seek disqualification. RM Decl., Ex. D; RM Decl., Ex. E.

16.     Thereafter, YPF made inquiries regarding White & Case's screen as permitted by Model Rule 1.10(a)(2)(ii), but White & Case often took weeks to respond, or otherwise provided responses that were inconsistent or incomplete. *See* RM Decl., Exs. E-I; Apr. 1, 2021 Hr'g Tr. at 59:25-60:7 (inconsistent representations regarding who the screen applies to); 61:2-62:20 (inconsistent representations regarding location of screened team member); 63:18-65:17 (inconsistent representations regarding whether Mr. Lauria is screened); 65:22-67:23 (incomplete representations regarding whether Ms. Boelter could benefit from fees received by Mr. Lauria); 73:23-74:19 (changing representations regarding Mr. Lauria's and Ms. Boelter's relationship timeline).

17.     Through these inquiries and limited discovery after YPF filed the Disqualification Motion, YPF identified important deficiencies in White & Case's screen. For instance, while White & Case initially suggested that Ms. Boelter's husband (Mr. Lauria) had been screened, it later conceded that he had simply been "instructed" not to discuss this matter with her. *See* RM Decl., Ex. I at 3; Pl.'s Opp'n to YPF's Mot. to Disqualify White & Case LLP at 33 [Adv. Dkt. 327] ("Opposition"); Declaration of Debra Kobrin Levy ¶¶ 48-49 [Adv. Dkt. 328]. Additionally,

White & Case eventually conceded that Mr. Lauria will continue to share in the fees billed by White & Case on this matter, Op. 14 n.56, but failed to provide any evidence that those fees would not be shared by Ms. Boelter.  White & Case also demonstrated a concerning inability to keep track of who was subject to the screen.  *See* RM Decl. Ex. A (White & Case claiming 13 Restructuring Group lawyers have worked on the matter since Oct. 1, 2020); Opp'n 27 n.8 (White & Case later claiming that two Restructuring Group lawyers have worked on the matter since Oct. 1, 2020, and 13 was the total amount of Restructuring Group lawyers who have worked on the case); Reply RM Decl., Ex. N at Ex. A (interrogatory responses revealing that 22 Restructuring Group lawyers have in fact worked on the case).

**Disqualification Hearing and Opinion**

18.     On April 1, 2021, the Bankruptcy Court convened the Disqualification Hearing.

19.     One business day after the hearing, on April 6, 2021, the Bankruptcy Court issued its Opinion and Order, ruling that Ms. Boelter's role as key counsel and strategist to YPF, her move to White & Case's Restructuring Group during ongoing litigation against YPF, and her previously undisclosed romantic relationship with and eventual marriage to the head of that Group, did not create an "exceptional case" that would make an ethical screen inadequate.

20.     On April 20, 2021, YPF filed its Notice of Appeal of the Order.

## QUESTIONS PRESENTED

### QUESTION 1

21.     Whether the Bankruptcy Court erred when it ruled, contrary to the standard articulated by other courts in this Circuit, that screening is available to cure the imputed conflicts created by moving lawyers in all but "exceptional cases."

### QUESTION 2

22.     Whether the Bankruptcy Court erred when it ruled that a senior lawyer's at least 300 hours of work for a client, including work that put the lawyer in possession of confidential information about settlement and litigation strategy, did not constitute a level of involvement in a conflicted matter weighing against the availability of ethical screening.

## QUESTION 3

23.     Whether the Bankruptcy Court erred when it ruled that a lawyer who is counsel of record, engagement partner, billing partner, and who has personally interacted with and advised the most senior management of her corporate client, does not have a sufficiently substantial relationship with her client as to weigh against the availability of ethical screening.

## QUESTION 4

24.     Whether the Bankruptcy Court erred when it ruled that an ethical screen complies with Model Rule 1.10(a)(2) even when the screened lawyer's spouse is not prevented from receiving part of the fee from the conflicted representation.

## RELIEF SOUGHT

25.     YPF requests that this Court consider this appeal on an interlocutory basis and reverse the Order.

## LEAVE FOR APPEAL SHOULD BE GRANTED

26.     This Court has jurisdiction to hear appeals from interlocutory orders of the bankruptcy courts in this district on the same grounds that the Third Circuit reviews such appeals from the district courts.  28 U.S.C. § 158(a)(3); *In re Bertoli*, 812 F.2d 136, 139 (3d Cir. 1987). "In determining whether to grant leave to appeal an interlocutory order of the Bankruptcy Court, District Courts apply the standards of 28 U.S.C. § 1292(b), which permits appeal of an order: (1) involving a controlling question of law, (2) upon which there is substantial ground for difference

of opinion, and which (3) if appealed immediately may materially advance the ultimate

termination of the litigation." *In re L.A. Dodgers LLC*, 465 B.R. 18, 29 (D. Del. 2011).

27.     Here, the Order involves a controlling question of law because the Bankruptcy

Court's erroneous ruling as to whether a conflict of interest bars a representation and requires

disqualification is reversible on final appeal.  *See In re Dwek*, Civ. No. 09-5046, 2010 WL

234938, at *2 (D.N.J. Jan. 15, 2010) (a "'controlling question of law' encompasses 'any order

which, if erroneous, would be reversible error on final appeal.'") (quoting *Katz v. Carte Blanche

Corp.*, 496 F.2d 747, 755 (3d Cir. 1974) (*en banc*)).  There is substantial ground for difference of

opinion concerning this controlling question of law because the Order's resolution of several key

legal issues conflicts with the decisions of various district courts in this Circuit, including of this

Court.  And an immediate appeal of the Order will materially advance the termination of this

litigation because a reversal by this Court will protect YPF from the irreparable harm that its

confidential information and litigation strategies may be disclosed to counsel for its direct

adversary, and will mitigate the risk of an expensive and time-consuming retrial upon remand

from an appeal after trial.

## I.    The Bankruptcy Court Committed Reversible Error by Adding an "Exceptional Case" Requirement to the Test for the Effectiveness of a Screen

28.     For decades, where applicable rules of professional conduct permitted the use of

ethical screens to cure an imputed conflict, district courts in this Circuit, including this Court,

have applied a five-part test to determine whether screening was available.  *See Enzo Life Scis. v.

Adipogen Corp.*, No. 11-00088, 2013 WL 6138791, at *3 (D. Del. Nov. 20, 2013) (Andrews, J.);

*Norfolk S. Ry. v. Reading Blue Mountain & N. R.R.*, 397 F. Supp. 2d 551, 554 (M.D. Pa. 2005);

*James v. Teleflex, Inc*., Civ. A. 97-1206, 1999 WL 98559, at *5 (E.D. Pa. Feb. 24, 1999).

29.     The Bankruptcy Court grafted a sixth, overarching requirement onto this well-established test, holding that disqualification of a firm using a screen would only be proper in an "exceptional case," such as where "an entire trial team switched sides."  Op. 11, 17-18.  This misstatement of the legal standard ignores that screening serves principally to protect a firm from being disqualified because of, for example, a move by a relatively junior or peripherally involved lawyer, *see Nemours Found. v. Gilbane. Aetna, Fed. Ins. Co*., 632 F. Supp. 418, 429-430 (D. Del. 1986), not to bless a firm's deliberate decision to hire away the opposing counsel of record in an ongoing litigation, *Norfolk S. Ry.*, 397 F. Supp. 2d at 556.  The Bankruptcy Court's "exceptional case" gloss also ignores this Court's well-founded admonition that "any doubts which the court may have regarding the appropriateness of disqualification should be resolved in favor of disqualifying the former counsel and, thus, preserving the confidences of the former client."  *Enzo*, 2013 WL 6138791, at *2 (citation omitted).

30.     By holding that screening is available in all but "exceptional cases" in which whole teams of lawyers switch sides mid-litigation, the Bankruptcy Court erroneously endorsed the nearly categorical use of screens to cleanse the imputed conflict created even where, as here, an engagement partner and billing partner who had extensively participated in the crafting of her client's legal strategy and was privy to its most sensitive confidences, moved to join an opposing firm in the middle of a hotly contested lawsuit.  This is reversible error because it tipped the Bankruptcy Court's entire analysis of the relevant factors against disqualification.

## II.     The Bankruptcy Court Committed Reversible Error by Ruling that the Uncontested Facts Regarding Ms. Boelter's Role in the Case Did Not Favor Disqualification

31.     The Bankruptcy Court also committed reversible error in its application of the five-factor test governing the availability of screening.  The Bankruptcy Court correctly ruled that White & Case's decision to hire Ms. Boelter in the middle of litigation weighed in favor of

-11-

disqualification.  Op. 18.  But the Bankruptcy Court erred in ruling, on a set of uncontested facts,

that the "substantiality of the relationship" and "nature of the role" factors did not weigh in favor

of disqualification.  Once these errors are corrected, reversal is required because three of the five

factors favor disqualification.

32.    *First*, the Bankruptcy Court erroneously ruled that the *Enzo* factor regarding the

"substantiality of the relationship" did not favor disqualification because Ms. Boelter's

relationship with YPF was "significant but not substantial."  Op. 16-17.  Given the uncontested

evidence of Ms. Boelter's significant strategic involvement as counsel of record to YPF, the

Bankruptcy Court acknowledged that "Ms. Boelter was one of the senior attorneys in the YPF

adversary proceeding" and "[a]s such, she was privy to client confidences, and YPF's strategy

and tactics in defending the suit."  *Id.* at 15.  Nonetheless, the Bankruptcy Court determined that

because Ms. Boelter's partner Mr. Conlan was "the lead restructuring attorney," "the matter was

turned over to the litigators after denial of the motion to dismiss,"[6] and Ms. Boelter had *only*

billed 300 hours to the matter, Ms. Boelter's role was not important enough to be substantial.  *Id.*

33.    Even if the record supported the Bankruptcy Court's factual findings (it does not),

the Bankruptcy Court's legal conclusion regarding the non-substantiality of Ms. Boelter's

relationship with YPF is in direct conflict with decisions by other courts, including this one.

Specifically, in *Enzo* this Court held that an attorney had a relationship with his former client

weighing in favor of disqualification when he had billed approximately 10 hours for the client as

local counsel of record.  2013 WL 6138791, at *4.  Litigants will find it impossible to reconcile

---

[6]    The Bankruptcy Court cited no record evidence for the proposition that this matter was turned over to "the litigators" after the motion to dismiss, because there is no such evidence.  The Bankruptcy Court's conclusion in this respect is contradicted by the uncontroverted sworn declarations of YPF's General Counsel and former CEO, as well as its counsel at Sidley, *see generally* DG Decl., GFL Decl., JK Decl., whom opposing counsel and the Bankruptcy Court declined to question, even though YPF offered to make them available, *see* Mar. 26, 2021 Hr'g Tr. at 9:11-10:25.

this Court's decision in *Enzo* with the Bankruptcy Court's erroneous holding that Ms. Boelter—

as an engagement partner, billing partner, counsel of record, and participant in key client strategy

meetings (including regarding settlement), who billed over 300 hours on the matter and

continued to be copied on client communications up until her departure for White & Case—had

an insufficiently substantial relationship with her client.[7]

34.    *Second*, the Bankruptcy Court's ruling with respect to the nature of Ms. Boelter's

involvement with the case is likewise in conflict with precedent in this Circuit.  The Bankruptcy

Court agreed that Ms. Boelter "was privy to client confidences, and YPF's strategy and tactics in

defending the suit."  Op. 15.  The Court was also presented with uncontested evidence that Ms.

Boelter was involved with discussions about highly sensitive matters like settlement, *id.* at 6, and

that she participated in strategy meetings with YPF management, DG Decl. ¶ 7; GFL Decl. ¶¶ 7-

8.  Nonetheless, the Bankruptcy Court held that this involvement, which totaled over 300 billed

hours (and some indeterminate number of unbilled hours),[8] was not so extensive that Ms.

Boelter's knowledge of YPF's confidences would weigh against the effectiveness of a screen.

Op. 16.  But again, this Court has held that an attorney's involvement in the case weighed in

---

[7]        In assessing the nature of Ms. Boelter's role, the Bankruptcy Court entirely disregarded that she was the only outside attorney who attended a celebration commemorating YPF's 25th anniversary as a publicly listed company, a fact that confirms Ms. Boelter's special relationship with YPF.  *See* DG Decl. ¶ 5.  In doing so, the Bankruptcy Court chided YPF's former CEO for supposedly sharing critical confidential information at a cocktail party.  Op. 15-16 ("[I]f Mr. [González] Casartelli believes that sharing critical confidences over drinks at a crowded cocktail party is appropriate, he needs to reexamine his thinking").  But Mr. González never stated that he shared confidences at this event, only that they discussed the case generally.  Moreover, while the Bankruptcy Court criticized Mr. González for supposedly sharing confidences at the event, it made no such criticism of Ms. Boelter, who was of course equally involved in the conversation and would have, if the Bankruptcy Court's rendition of the facts were true, deserved the most blame for this supposed carelessness, since as YPF's attorney it was her responsibility to advise her client about the steps necessary to preserve the attorney-client privilege under U.S. law. Instead, the Bankruptcy Court lauded Ms. Boelter's reputation.  Op. 4.
[8]        Sidley billing records show that Ms. Boelter's colleagues recorded discussing the case with her in 2020. *See* DN Decl., Ex. B at 10.  The Court addressed this issue by stating that Ms. Boelter "did not bill all her time spent consulting with her colleagues" because she was a "responsible senior attorney."  Op. 6 n.21.  While the Court did not explain the basis for its belief that "responsible senior attorneys" should not bill the time they spend conferring with colleagues about a case on which they are both counsel of record, whether the time was charged to the client or not is irrelevant, since the concern is whether Ms. Boelter's conversations with her colleagues about the case put her in possession of important client confidences.

favor of disqualification even though that attorney had "played significantly less than a pivotal role" and billed *only ten* hours to the conflicted matter. *Enzo*, 2013 WL 6138791, at *4. In reaching that conclusion, the Court noted that, in the course of those ten hours, the conflicted attorney had participated in preparing a mediation statement and in a mediation conference that would have made him "aware of the defense strategies" and exposed him to "an honest discussion of the strengths and weaknesses of the party's claims." *Id.* Once again, litigants and their counsel will find it impossible to reconcile *Enzo* with the Bankruptcy Court's erroneous decision.

35.    Because none of the facts relevant to the Bankruptcy Court's rulings on the substantiality of Ms. Boelter's relationship with YPF and the nature of her work are in dispute, the rulings on these issues raise pure questions of law that are ripe for *de novo* review by this Court. *See Warner Lambert Co. v. LEP Profit Int'l*, 517 F.3d 679, 681 (3d Cir. 2008) (holding that "the application of law to uncontested facts" is a legal question reviewed *de novo* by the Third Circuit); *United States v. RD 1, Box 1*, 952 F.2d 53, 55 (3d Cir. 1991) (same).

## III.    The Bankruptcy Court Committed Reversible Error by Holding the Screen Effective Even Though Ms. Boelter's Husband Is Not Prevented From Receiving Fees From White & Case's Representation of the Trust

36.    The Bankruptcy Court also erred in holding that White & Case's screen was sufficient even though the screen featured no measures that would prevent Ms. Boelter's husband, head of White & Case's Restructuring Group, from receiving fees from White & Case's representation of the Trust against YPF in this Adversary Proceeding and sharing them with Ms. Boelter. Op. 14 n.56. Model Rule 1.10 requires, at a minimum, that in order for a screen to cure an imputed conflict, the screened lawyer must be "apportioned no part of the fee" from the representation. The firm seeking to employ the screen has the burden of showing it has fully complied with this requirement. *Enzo*, 2013 WL 6138791, at *6.

-14-

37.      In considering the adequacy of White & Case's screen, the Bankruptcy Court stated that Model Rule 1.10 only requires that Ms. Boelter, not her spouse, be prevented from receiving fees from White & Case's representation of the Trust in this Adversary Proceeding. Op. 14 n.56.  While there is no controlling Third Circuit case law and very little other case law on the issue,[9] ethics authorities have opined that a concurrent conflict may arise where a conflicted lawyer's spouse is a partner at an adversary firm and will earn part of the fee from a representation adverse to the conflicted lawyer's former client.  *See* State Bar of Mich., Ethics Op. R-3 (July 21, 1989).  This makes good sense since, absent evidence to the contrary (which it was White & Case's burden to adduce), there is every reason to conclude that spouses will share with one another the fees they earn, which would violate Model Rule 1.10's injunction against the apportionment of fees to screened lawyers.

38.      Accordingly, the Bankruptcy Court erred in holding that White & Case had met its burden to establish the adequacy of the screen it had erected.  Correcting the Bankruptcy Court's error on this point requires reversal because White & Case must, at a minimum, comply with the letter of Model Rule 1.10 in order to permissibly represent the Trust.

## IV.    Immediate Appeal Would Materially Advance the Litigation

39.      The Order permits White & Case to continue as the Trust's counsel after a case of lawyer side-switching that is unprecedented in the case law, in which courts have found—on less egregious facts than those present here—that disqualification was the only solution to protect a client's confidences and preserve the integrity of the proceedings.  If this litigation is allowed to

---

[9]      The lack of controlling Third Circuit authority on this issue supports a finding of a difference of opinion that warrants interlocutory appeal.  *See Hess v. A.I. DuPont Hosp. for Child.*, No. Civ. A. 08-0229, 2009 WL 2776606, at *2 (E.D. Pa. Aug. 28, 2009) ("'[T]he absence of controlling law on a particular issue can constitute substantial grounds' for difference of opinion.") (citing *Chase Manhattan Bank v. Iridium Afr. Corp.*, 324 F. Supp. 2d 540, 545 (D. Del. 2004)).

continue with White & Case remaining as counsel of record to the Trust, the proceedings will be
indelibly tainted because a senior lawyer, who was privy to YPF's most important confidences,
will be working every day alongside the lawyers at White & Case and may inadvertently expose
YPF confidences.  Immediate appeal of the Order will not only protect YPF from this
unacceptable risk, it will also materially advance the litigation by ensuring that there is no need
for a retrial with new counsel if the Order is reversed on final judgment.  *See Telectronics
Proprietary, Ltd. v. Medtronic, Inc.*, 690 F. Supp. 170, 176 (S.D.N.Y. 1987) (holding immediate
appeal warranted in order to avoid reduplication of effort by new counsel).  Thus, the Order
should be reviewed and reversed now.

## **CONCLUSION**

40.    WHEREFORE, YPF respectfully requests that this Court grant leave to appeal the
Order.

Dated: April 20, 2021
        Wilmington, Delaware

Respectfully submitted,

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware
T: 302-467-4400
F: 302-467-4450
landis@lrclaw.com
mcguire@lrclaw.com

-and-

Victor L. Hou (*pro hac vice*)
Ari D. MacKinnon (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

*Counsel for YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings, Inc.*

## **Certification of Compliance**

Undersigned counsel certifies that this document complies with the word limit of Fed. R. Bankr. P. 8013(f)(3)(A).  Excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 5,191 words.


Dated:  April 20, 2021                    */s/ Matthew B. McGuire*
                                          Matthew B. McGuire (No. 4366)