## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | Case No. 16-11501 (CSS) |
| Debtors.[1] | (Jointly Administered) |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | |
| -against- | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | Adv. Proc. No. 18-50489 (CSS) |
| Defendants. | |

## MOTION OF YPF DEFENDANTS FOR CERTIFICATION OF DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT PURSUANT TO 28 U.S.C. § 158(d)(2)

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..........................................................................................................ii

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND.......................................................................................................2

JURISDICTION AND VENUE ................................................................................................4

RELIEF REQUESTED................................................................................................................4

ISSUES PRESENTED..................................................................................................................4

ARGUMENT ....................................................................................................................................5

    A.   THE APPEAL RAISES SEVERAL PURE QUESTIONS OF LAW AS TO
         WHICH NO CONTROLLING COURT OF APPEALS AUTHORITY EXISTS..........5

    B.   A DIRECT APPEAL IS NECESSARY TO RESOLVE CONFLICTING
         AUTHORITY AMONG LOWER COURTS IN THE THIRD CIRCUIT......................11

    C.   THE ISSUES OF PROFESSIONAL CONDUCT AND EVIDENCE RAISED
         BY THIS APPEAL ARE OF PUBLIC IMPORT ...........................................................13

    D.   DIRECT APPEAL WILL MATERIALLY ADVANCE THE LITIGATION................15

CONCLUSION................................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Enzo Life Scis. v. Adipogen Corp.*,
No. 11-00088, 2013 WL 6138791 (D. Del. Nov. 20, 2013) ................................. *passim*

*In re Essar Steel Minn. LLC*,
No. 16-11626, 2020 WL 3574743 (D. Del. July 1, 2020) ................................... 6

*In re IMMC Corp.*,
No. 08-11178, 2016 WL 356026 (D. Del. Jan. 28, 2016) ................................. 6

*In re Millennium Lab Holdings II, LLC*,
543 B.R. 703 (Bankr. D. Del. 2016) ................................................................. 5, 11

*In re Qimonda AG*,
470 B.R. 374 (E.D. Va. 2012) ........................................................................... 14

*In re Sullivan*,
No. 91-5501, 1992 WL 68613 (E.D. Pa. Mar. 31, 1992) ................................. 15

*Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*,
No. 10-1067, 2011 WL 2692968 (D. Del. June 22, 2011) ............................... 7

*James v. Teleflex, Inc.*,
No. 97-1206, 1999 WL 98559 (E.D. Pa. Feb. 24, 1999) ................................. 7

*SEC v. Drescher*,
No. 99-1418, 2001 WL 1602978 (S.D.N.Y. Dec. 13, 2001) ........................... 10-11, 15

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
690 F. Supp. 170 (S.D.N.Y. 1987) ................................................................... 15

*United States v. Miller*,
624 F.2d 1198 (3d Cir. 1980) ........................................................................... 7, 8

*United States v. RD 1, Box 1*,
952 F.2d 53 (3d Cir. 1991) ............................................................................... 13

*Warner Lambert Co. v. LEP Profit Int'l, Inc.*,
517 F.3d 679 (3d Cir. 2008) ............................................................................. 13

**Rules and Statutes**

28 U.S.C. § 158(d)(2) ........................................................................................... 5, 6

Fed. R. Evid. 404 ................................................................................................. 10

**Other Authorities**

State Bar of Mich., Ethics Op. R-3 (July 21, 1989)............................................ 8

Model Rule of Professional Conduct Rule 1.7 .................................................... 9

ABA Formal Op. 494............................................................................................. 9

Wright & Miller, *Federal Practice & Procedure* § 5236 n.6............................ 10

Model Rule of Professional Conduct Rule 1.10, cmt. 7 ..................................... 14

Collier on Bankruptcy............................................................................................ 13

YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings, Inc. (collectively, "YPF"), by and through their undersigned counsel, hereby respectfully request this Court enter an order pursuant to 28 U.S.C. § 158(d)(2) and Rule 8006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") certifying for direct appeal to the United States Court of Appeals for the Third Circuit the Order Denying Defendants' Motion to Disqualify [D.I. 390] ("Order"), and corresponding Opinion [D.I. 389] ("Opinion," and with the Order, the "Disqualification Order") entered on April 6, 2021.

## PRELIMINARY STATEMENT

1.    Under 28 U.S.C. 158(d)(2), the Court must certify a direct appeal to the Circuit Court of any order that implicates one or more of four statutory factors: a lack of controlling authority, a conflict among lower court authority, an issue of public importance, or where an immediate appeal may materially advance the litigation.  Here, all four factors are present, and the Court must therefore certify a direct appeal.

2.    The Opinion announced several new points of law, none of which has been addressed by Third Circuit or Supreme Court precedent.  Specifically, the Court announced that an ethical screen is available in all but "exceptional cases" to cleanse the conflict created when a lawyer possessing confidential client information switches sides to an opposing firm mid-litigation.  Op. 11.  It announced that, although Model Rule 1.10(a)(2) requires that a screened lawyer be apportioned no part of the fee stemming from a conflicted representation, that fee can be provided to the lawyer's spouse.  It further announced that a concurrent personal conflict cannot arise, as a matter of law, because of a lawyer's romantic relationship with opposing counsel, unless the two are married.  And it announced that Federal Rule of Evidence 404 bars the admission of evidence regarding a lawyer's prior violation of her ethical duties to a client in

order to evaluate the sufficiency of an ethical screen, whose efficacy necessarily relies upon the future conduct of that attorney.

3.    The Disqualification Order also introduced serious uncertainty into the limited law of screening as it has been applied by district courts in this Circuit: the Court ruled that Jessica Boelter's involvement with her former client had been too limited to weigh in favor of disqualification, even though courts in this Circuit have ruled that far less significant involvement and access to confidential information weighed against the availability of screening.

4.    The issues raised by a direct appeal are all of significant public importance, since they have great consequence for the professional conduct of attorneys appearing before federal courts in this Circuit, as well as for the law of evidence.  Finally, a direct appeal of the Disqualification Order will materially advance the progress of this litigation by ensuring that there is no risk of an expensive and time-consuming retrial if the Order is reversed after final judgment.

5.    Therefore, YPF respectfully urges the Court to certify a direct appeal to the Circuit Court.

## **FACTUAL BACKGROUND**

6.    The Court is familiar with the factual background of this matter as presented in the YPF Defendants' Motion to Disqualify White & Case LLP as Counsel for the Maxus Liquidating Trust [D.I. 306] (the "Disqualification Motion") and in the Reply Memorandum of Law in Further Support of YPF Defendants' Motion to Disqualify White & Case LLP as Counsel for the Maxus Liquidating Trust [D.I. 345].  This includes sworn statements from YPF's General Counsel Germán Fernández Lahore and its former CEO Daniel González Casartelli, as well as Sidley Austin LLP ("Sidley") partner John Kuster, concerning the role that Ms. Boelter played in advising YPF in this very litigation, statements which were in large part uncontested by the Maxus Liquidating Trust ("Trust") or its witnesses, whether in the Trust's opposition briefing

[D.I. 327] or at the April 1, 2021 hearing (the "Disqualification Hearing").

7.    On April 6, 2021, this Court issued its Order and Opinion denying the Disqualification

Motion and holding that Ms. Boelter's undisputed role as key counsel and strategist to YPF in

this litigation, her move to White & Case LLP's restructuring group, which is representing

YPF's adversary in this very litigation, her undisclosed romantic relationship and subsequent

engagement to Mr. Lauria (the head of White & Case's restructuring group) while she was

counsel to YPF, and her eventual marriage to Mr. Lauria, did not create an "exceptional case"

that would render an ethical screen inadequate.

8.    When evaluating the relevant factors to determine the adequacy of a screen, as

established by the District Court of Delaware in *Enzo Life Sciences v. Adipogen Corp.*, No. 11-

cv-00088, 2013 WL 6138791, at *3 (D. Del. Nov. 20, 2013), and as applied throughout this

Circuit, this Court found "only one of the five factors would support concluding that the ethical

wall established by White & Case and the firm's adherence to the requirements of Model Rule

1.10(a)(2) is inadequate [which] is clearly insufficient to require disqualification of the entire

firm." Op. 18.  The Court specifically ruled:

- As to the first factor, "the relationship between Ms. Boelter and YPF was significant but not substantial," *id*. at 17;

- As to the second factor, the time lapse between the matters in dispute was "immediate," *id*.;

- As to the third factor, the size of the firm and the number of disqualified attorneys, "courts look at the firm as a whole and [White & Case is] about as large as they get," and "the only attorney at issue is Ms. Boelter," *id*.;

- As to the fourth factor, "Ms. Boelter's involvement in the YPF adversary [*sic*] was significant but not substantial" as this Court had "no memory of Ms. Boelter's involvement" and "attendance at part of a lengthy oral argument certainly does not qualify as substantial involvement," *id*. at 18; and

- As to the fifth factor, "timing of the wall, it was erected immediately upon Ms. Boelter joining the firm," *id*..

9.  On April 20, 2021, YPF filed its Notice of Appeal of the Disqualification Order.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 158(d)(2) and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

11. Pursuant to Bankruptcy Rule 8006(f) and 28 U.S.C. §§ 158(d)(2), YPF hereby requests that this Court certify the Disqualification Order for direct appeal to the United States Court of Appeals for the Third Circuit.

## ISSUES PRESENTED[2]

12. Whether the Court erred when it ruled that screening is available in all but "exceptional cases" to cleanse the imputed conflict created when a lawyer joins an opposing law firm;

13. Whether the Court erred when it ruled that an ethical screen complies with ABA Model Rule 1.10(a)(2) even when the screened lawyer's spouse is not prevented from receiving part of the fee from the conflicted representation;

14. Whether the Court erred when it ruled that, as a matter of law, a romantic relationship with opposing counsel short of marriage cannot give rise to a personal conflict requiring the informed consent of a client;

15. Whether the Court erred when it ruled that Federal Rule of Evidence 404 bars the admission of character evidence to show that an individual is likely to act in a particular way in the future;

16. Whether the Court erred when it ruled that a senior lawyer's 300 hours of work for a

---

[2]      YPF identifies the questions that form the basis for certification for direct appeal to the Third Circuit. Because 28 U.S.C. § 158(d)(1) gives the Court of Appeals jurisdiction over orders, and not just certified questions, YPF reserves the right to raise other points of error on appeal to the Circuit Court.

client, including work that put her in possession of confidential information about settlement and litigation strategy and pending legal issues regarding privilege and experts, did not constitute a level of involvement in a conflicted matter weighing against the availability of ethical screening;

17. Whether the Court erred when it ruled that a lawyer who is counsel of record, engagement partner, billing partner, and who has personally interacted with and advised the most senior management of her corporate client, does not have a sufficiently substantial relationship with her client that it weighs against the availability of ethical screening.

## ARGUMENT

18. Under 28 U.S.C. § 158(d)(2), the Court, on the request of a party, shall certify a direct appeal to the Court of Appeals when the order from which appeal is sought:

    A.  "involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court;"

    B.  "involves a question of law requiring resolution of conflicting decisions;"

    C.  "involves a matter of public importance;" or,

    D.  where "an immediate appeal from the[] order . . . may materially advance the progress of the case."

28 U.S.C. § 158(d)(2); *see In re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 708 (Bankr. D. Del. 2016) (noting four separate bases for certification).

19. Certification is not discretionary—the bankruptcy court *must* certify a direct appeal when *one or more* of these statutory factors is present. *Millennium Lab*, 543 B.R. at 717. Here, *all* four factors are met and therefore certification is required.

### A.  THE APPEAL RAISES SEVERAL PURE QUESTIONS OF LAW AS TO WHICH NO CONTROLLING COURT OF APPEALS AUTHORITY EXISTS

20. The Disqualification Order undoubtedly "involves [more than one] question of law as to

which there is no controlling decision of the court of appeals for the circuit or of the Supreme

Court." 28 U.S.C. § 158(d)(2). Controlling authority is only present when there is a Third

Circuit or Supreme Court decision "that admits of no ambiguity in resolving the issue." *In re*

*IMMC Corp.*, No. 08-11178, 2016 WL 356026, at *4 (D. Del. Jan. 28, 2016) (citation omitted);

*see also In re Essar Steel Minn. LLC*, No. 16-11626, 2020 WL 3574743, at *6 (D. Del. July 1,

2020) (finding certification warranted even where there is some higher authority on a question of

law, but the authority is ambiguous on the correct outcome on the order for which the appeal is

sought). This appeal involves several questions of law, regarding the law of professional ethics

and the law of evidence, for which there is no Third Circuit or Supreme Court authority at all, let

alone authority that admits of no ambiguity. The existence of these unsettled questions requires

the Court to certify a direct appeal to the Third Circuit.

21. *First*, the Court cited authority from district and appeals courts outside this Circuit to

reach the conclusion that "motions to disqualify are to be used as a protection against *exceptional*

*cases*." Op. 10-11 (citing the Sixth Circuit, Federal Circuit, Northern District of Indiana, and

Western District of Washington) (emphasis added). Viewing White & Case's screen through

this prism, the Court ruled that, "[i]n determining whether an 'exceptional case' exists where an

ethical screen that is compliant with Model Rule 1.10(a)(2) may be inadequate courts[,] have

applied a test that looks to several factors" laid out in *Enzo Life Sciences* and other district court

cases. Op. 12. And the Court went on to state the relevant question as "whether an 'exceptional

case'" exists such that "no screening measures could adequately protect YPF's confidential

information." Op. 15.

22. Respectfully, none of the district courts in this Circuit have held that the five-factor test

described in *Enzo* is to be used as a proxy for identifying "exceptional cases" in which

-6-

disqualification is required.  Indeed, the Court's "exceptional case" requirement reflects a departure from the district court case law, which holds that "any doubts which the court may have regarding the appropriateness of disqualification should be resolved in favor of disqualifying the former counsel and, thus, preserving the confidences of the former client." *Enzo*, 2013 WL 6138791, at *2; *see also Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*, No. 10-1067, 2011 WL 2692968, at *5 (D. Del. June 22, 2011); *James v. Teleflex, Inc.*, No. 97-1206, 1999 WL 98559, at *3 (E.D. Pa. Feb. 24, 1999) ("[A]ny doubts regarding the existence of a violation of the ethical rules governing attorneys favor disqualification.").  Accordingly, there is no basis under existing district court case law to tip the scales so decidedly against disqualification.

23. More importantly, the Third Circuit has not weighed in on this important question regarding the standard used to determine whether screening is available to cleanse an imputed conflict created when a lawyer switches firms.  The Court's reliance on non-binding authority from outside the Third Circuit to infer the "exceptional case" standard demonstrates the lack of, and need for, Third Circuit guidance on the issue.  Significantly, the "[s]upervision of the professional conduct of attorneys practicing in a federal court is a matter of federal law," *United States v. Miller*, 624 F.2d 1198, 1200 (3d Cir. 1980), but the Third Circuit has never opined as to the circumstances in which screening is effective to cleanse the conflict created when an attorney moves to a law firm representing her former client.  Similarly, whether a federal court exercising its "inherent authority" over the professional conduct of attorneys appearing before it should disqualify a firm from representing a litigant, including where the firm has erected a screen in an effort to cleanse an otherwise conflicted representation, is a question of federal law.  *Enzo*, 2013 WL 6138791, at *2.  But there is no Third Circuit or Supreme Court authority that controls this

question.

24. *Second*, the Court opined that White & Case's screen complied with Model Rule 1.10(a)(2) even though Ms. Boelter's husband is not prevented from receiving part of the fee from the firm's representation of the Trust, ruling that "it is sufficient to point out that, under Model Rule 1.10, it is Ms. Boelter and not Mr. Lauria who is prevented from receiving fees arising from this adversary proceeding." Op. 14 n.56. But the Court cited no case law supporting this conclusion, nor is the conclusion obvious from the face of the Rule. There is no dispute that a screen can be compliant with ABA Model Rule 1.10 *only* where the screened attorney "is apportioned no part of the fee." *Enzo*, 2013 WL 6138791, at *3. Absent some alternative arrangement—which the Trust had the burden to demonstrate, since it had the burden to show that Ms. Boelter will be apportioned no part of the Trust's fees, *id.* at *6—payment to a conflicted lawyer's spouse is as good as making payment to the conflicted lawyer directly, as the conflicted lawyer clearly can and will benefit from such funds. For this reason, ethics authorities have pointed out that a concurrent conflict may arise where a lawyer's spouse is a partner at an adversary firm and will earn part of the fee from a representation adverse to the lawyer's client. *See* State Bar of Mich., Ethics Op. R-3 (July 21, 1989).

25. On this issue, too, no controlling Third Circuit authority exists as to whether a screened lawyer has been "apportioned no part of the fee" from a conflicted matter in a scenario where, as here, the screened lawyer's spouse will receive part of the fee from the conflicted representation. This issue is accordingly ripe for certification to the Third Circuit. *See Miller*, 624 F.2d at 1201 (holding that "whether an ABA disciplinary rule prohibits certain professional conduct" is a pure question of law subject to plenary review by the Court of Appeals).

26. *Third*, the Court ruled, as a matter of law, that a serious romantic relationship short of

marriage could not give rise to a concurrent personal conflict under Model Rule 1.7.  Op. 20 n.67.  The Court did not cite case law to support this conclusion, which again is not evident from the face of the Rule.

27. Model Rule 1.7 requires an attorney to obtain the informed consent of his or her client where there is a "significant risk" the attorney's representation "will be materially limited by . . . a personal interest of the lawyer."  Model Rule of Professional Conduct 1.7.  Comment 11 to Model Rule 1.7 helps to define the contours of such "personal interest" by noting that marriage or other familial relationships with opposing counsel would almost certainly require informed consent on the part of the client.  But the Comment does not say that these are the *only* personal relationships that might give rise to a conflict under Model Rule 1.7.[3]  Authorities interpreting Model Rule 1.7 or materially similar rules, including ABA Formal Opinion 494, make clear that romantic relationships short of marriage can and do give rise to personal conflicts that risk materially limiting a lawyer's representation.  ABA Formal Op. 494 at 5 n.15, 6 n.17 (collecting authorities).  Although the Court acknowledged the existence of ABA Formal Opinion 494, it drew the erroneous conclusion that, even if the opinion were binding authority, Model Rule 1.7 did not apply to such relationships until the opinion was issued in July 2020.  Op. 20 n.67.  Far from "expand[ing]" the scope of Model Rule 1.7 (as the Court suggested, Op. 20 n.67), Formal Opinion 494 simply recognized—consistent with long-standing authority regarding materially similar rules of professional conduct, Op. 494 at 5 n.15, 6 n.17 (collecting authorities)—that the kinds of risks described by the text of Model Rule 1.7 "also arise when there are close personal or intimate relationships between lawyers who represent opposing clients."  *Id*. at 3.

28. Regardless, there is no question that the Third Circuit and Supreme Court have not

---

[3]    Indeed, the Court's ruling treats Comment 11 as though it overrides the text of the Model Rule, which inverts the proper relationship between the two.

weighed in on this issue.  Certification is therefore warranted so that the Third Circuit can

consider the question whether romantic relationships other than marriage can give rise to

concurrent conflicts under Model Rule 1.7.

29. *Fourth*, the Court ruled that, if Ms. Boelter had violated Rule 1.7 during her tenure at

Sidley, either through her failure to disclose her employment negotiations with White & Case to

her client, or through her failure to disclose her relationship with the Global Head of White &

Case's Financial Restructuring and Insolvency Practice, Federal Rule of Evidence 404 would

"prohibit making . . . an inference" that Ms. Boelter's past failure to observe her ethical duties to

YPF raises doubts about whether she will carefully observe those duties in the future, including

by abiding by any screen implemented by White & Case.  Op. at 21.  But Rule 404 states that

"[e]vidence of a person's character or character trait is not admissible to prove that *on a*

*particular occasion* the person *acted* in accordance with the character or trait," and that

"[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character *in*

*order to show* that *on a particular occasion* the person acted in accordance with the character."

Fed. R. Evid. 404 (emphasis added).  Here, YPF did not offer evidence of Ms. Boelter's

violations of Model Rule 1.7 in order to show that Ms. Boelter had engaged in other violations

on particular occasions in the past.  Rather, the evidence was offered because one of the central

issues raised by the motion was whether YPF could be forced to rely on Ms. Boelter to comply

with the screen *in the future*.  As other authorities have noted, "[b]oth the use of the past tense—

'acted'—and the phrase 'on a particular occasion' suggest intent to exclude hypothetical future

conduct" from Rule 404's prohibition on the use of character evidence.  Wright & Miller,

*Federal Practice & Procedure* § 5236 n.6; *see also SEC v. Drescher*, No. 99-1418, 2001 WL

1602978, at *1 (S.D.N.Y. Dec. 13, 2001) (holding "the prohibition in Rule 404(a) is not even

triggered by" evidence offered with regard to "the likelihood that the person will engage in some conduct in the future." (citation omitted)).

30. Neither the Third Circuit nor the Supreme Court has opined as to whether the policy against the use of character evidence expressed by Rule 404 bars its use to show the likelihood of future conduct.  This is a further basis for certification.

### B.    A DIRECT APPEAL IS NECESSARY TO RESOLVE CONFLICTING AUTHORITY AMONG LOWER COURTS IN THE THIRD CIRCUIT

31.  Certification is also necessary where the appeal would involve questions of law as to which there are conflicting decisions within the Third Circuit.  *Millennium Lab*, 543 B.R. at 713. Two such conflicts were created by the Court's analysis in the Disqualification Order.

32.  *First*, the Court held that the *Enzo* factor regarding the "substantiality of the relationship between the attorney and the former client" did not favor disqualification because Ms. Boelter's relationship with YPF was "significant but not substantial."  Op. 16-17.  In so ruling, the Court acknowledged that "Ms. Boelter was one of the senior attorneys in the YPF adversary proceeding" and "[a]s such, she was privy to client confidences, and YPF's strategy and tactics in defending the suit."  *Id.* at 15.  The Court nonetheless ruled that because Ms. Boelter's partner Mr. Conlan was "the lead restructuring attorney" and "the matter was turned over to the litigators after denial of the motion to dismiss," Ms. Boelter's role was not important enough to be substantial.  *Id.*  This ruling is in direct conflict with decisions by other district courts.

33. No court has ruled that only the *most* senior or important lawyer involved with a matter has the requisite substantial relationship with a former client.  On the contrary, *Enzo Life Sciences* held that an attorney had a relationship with his former client weighing in favor of disqualification when he had simply been local counsel of record.  2013 WL 6138791, at *4. Litigants will find it impossible to reconcile the *Enzo* court's holding with this Court's holding

-11-

that Ms. Boelter—as an engagement partner, billing partner, counsel of record, and participant in key strategy meetings with her client, who continued to be copied on client communications up until her departure for the very same firm (and same Restructuring Group) representing the Trust in these proceedings—had an insufficiently substantial relationship with her client to favor disqualification.  Thus, to the extent the Court of Appeals agrees that the test set out in *Enzo* is the correct one, this conflict requires reconciliation by that court.

34.  *Second*, the Court's ruling with respect to the nature of Ms. Boelter's involvement with the case is likewise in conflict with in-Circuit precedent.  The Court agreed that Ms. Boelter "was privy to client confidences, and YPF's strategy and tactics in defending the suit."  Op. 15. The Court was also presented with uncontested evidence that Ms. Boelter was involved with discussions about highly sensitive matters like settlement, *id.* at 6, and that she participated in in-person strategy meetings with YPF management, Declaration of Daniel González Casartelli ¶ 7 [D.I. 307]; Declaration of Germán Fernández Lahore ¶¶ 7-8 [D.I. 308].  Nonetheless, the Court held that this involvement, which totaled over 300 billed hours (and some indeterminate number of unbilled hours), was not so extensive that Ms. Boelter's knowledge of YPF's confidences would weigh against the effectiveness of a screen.  Op. 16.  Again, the court in *Enzo* held the attorney's involvement in the case favored disqualification even though that attorney had "played significantly less than a pivotal role" and billed only ten hours to the conflicted matter.  *Enzo*, 2013 WL 6138791, at *4.  In reaching this conclusion, Judge Andrews noted that, in the course of those ten hours, the conflicted attorney had participated in the preparation of a mediation statement and mediation conference that would have made him "aware of the defense strategies" and exposed him to "an honest discussion of the strengths and weaknesses of the party's claims." *Id.*  The Disqualification Order draws a directly contrary conclusion based on facts that are more

extreme than those in *Enzo*. Once again, litigants and their counsel will find it impossible to reconcile *Enzo*, which held that a "less than a pivotal" attorney, *id.*, who worked for ten hours on a mediation statement, cannot be screened, with the Disqualification Order, which rules that an engagement partner who billed 300 hours and participated in strategy meetings with a client's CEO and general counsel that included consideration of settlement, can be screened.

35. Because none of the material facts relevant to the Court's rulings on the substantiality of Ms. Boelter's relationship with YPF and the nature of her work are in dispute, both of these issues raise pure questions of law, and are not disputes with the Court's factual findings. *See Warner Lambert Co. v. LEP Profit Int'l, Inc.*, 517 F.3d 679, 681 (3d Cir. 2008) (holding that "the application of law to uncontested facts" is a legal question reviewed *de novo* by the Third Circuit); *United States v. RD 1, Box 1*, 952 F.2d 53, 55 (3d Cir. 1991) (same). Accordingly, given the conflicting authority now created by the Disqualification Order, certification is required.

### C.    THE ISSUES OF PROFESSIONAL CONDUCT AND EVIDENCE RAISED BY THIS APPEAL ARE OF PUBLIC IMPORT

36. All of the legal questions raised by the Disqualification Order are questions of public importance which "transcend the litigants and involve a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." 1 Collier on Bankruptcy ¶ 5.06. While the circumstances of this case undoubtedly present an extreme set of facts comprising an "egregious" instance of a conflict of interest, Declaration of W. Bradley Wendel ¶ 33 [D.I. 311], the questions of law presented here go beyond this particular set of facts and even beyond the bankruptcy context: they concern the permissible professional conduct of attorneys appearing in any matter throughout the Third Circuit and implicate the confidence that clients and the public repose in the legal bar.

-13-

37. These questions are of critical importance to the legal profession, the courts, and the public. *See In re Qimonda AG*, 470 B.R. 374, 388 (E.D. Va. 2012) (holding that "important issues of . . . jurisprudence" and "substantial ramifications" for particular industries raised by order both gave appeal public importance). Whether screening is available to cure a conflict is of grave importance to law firms and clients alike, as both constituencies naturally seek predictability regarding the "additional factors" a court will consider in evaluating a motion to disqualify, Model Rule of Professional Conduct 1.10, cmt. 7, and therefore predictability as to whether they can agree to engage in a particular representation without risking disqualification.

38. Likewise, attorneys need guidance as to the kinds of personal relationships that might give rise to conflicts requiring informed consent under Model Rule 1.7. The Court's ruling on this question does not bind other Delaware bankruptcy judges, much less other courts in this Circuit, and attorneys now face uncertainty as to whether a court would apply the Court's approach or the approach adopted by the ABA (and, to the best of YPF's knowledge, the approach adopted by every other authority to have considered the issue since at least the 1980s). This appeal gives the Third Circuit the opportunity to determine the appropriate balance to strike between a client's interest in attorney loyalty and an attorney's right to privacy regarding her personal affairs.[4]

39. Finally, it will advance the cause of jurisprudence significantly to allow the Third Circuit to consider the question whether Federal Rule of Evidence 404 bars the use of prior bad acts or character evidence to show the likelihood of future conduct just as much as it bars the use of prior bad acts or character evidence to prove specific past acts. Here, the question was whether

---

[4]     The Court recognized the importance to the legal profession of striking the right balance on this issue at the April 1 hearing, when it urged that "[c]lients aren't entitled to run lawyers' lives. Whether or not they like it or not, there is a—there is a limit. . . . [M]aybe where we disagree is where is that limit." Disqualification Hearing Tr. at 152:12-16 [D.I. 388].

Ms. Boelter's past violations of Model Rule 1.7 could be used to suggest she is less likely to observe her ethical duties to YPF in the future, a question of critical relevance given that the efficacy of White & Case's screen relies on Ms. Boelter's promise to adhere to it. Similar prospective uses of prior bad acts or character evidence have been permitted in the context of injunctions to enforce the securities laws. *See Drescher*, 2001 WL 1602978, at *1. Clarifying the application of this rule of evidence will be of value to courts considering admissibility questions in suits seeking forward-looking relief or in which future conduct is otherwise relevant. These multiple issues of public importance require certification to the Third Circuit.

### D.    DIRECT APPEAL WILL MATERIALLY ADVANCE THE LITIGATION

40.  Finally, certification is appropriate because it will materially advance the progress of the case by allowing the Third Circuit to consider the propriety of White & Case's representation of the Trust now, rather than potentially later, after final judgment. There would likely be no undoing the harm that could be caused to YPF if its confidences are disclosed to its litigation adversaries. If nothing else, reviewing the Order now will ensure that there is no need for an expensive and time-consuming retrial with new counsel, as there would be if the Order were reversed after final judgment. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 690 F. Supp. 170, 176 (S.D.N.Y. 1987); *see also In re Sullivan*, No. 91-5501, 1992 WL 68613, at *4 (E.D. Pa. Mar. 31, 1992) (holding that propriety of continued representation was "too important to be denied review and too independent of the cause itself to require that . . . consideration be deferred"). The presence of this factor, like the others, requires certification.

### CONCLUSION

41.  YPF respectfully requests that the Court certify the Disqualification Order for direct appeal to the Third Circuit.

-15-

Dated: April 20, 2021
       Wilmington, Delaware

                        Respectfully submitted,

                        */s/ Matthew B. McGuire*
                        Adam G. Landis (No. 3407)
                        Matthew B. McGuire (No. 4366)
                        LANDIS RATH & COBB LLP
                        919 Market Street, Suite 1800
                        Wilmington, Delaware
                        T: 302-467-4400
                        F: 302-467-4450
                        landis@lrclaw.com
                        mcguire@lrclaw.com

                        -and-

                        Victor L. Hou (*pro hac vice*)
                        Ari D. MacKinnon (*pro hac vice*)
                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                        One Liberty Plaza
                        New York, New York  10006
                        T: 212-225-2000
                        F: 212-225-3999

                        *Attorneys for the YPF Defendants*