## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 16-11501 (CSS) |
| MAXUS ENERGY CORPORATION, | ) | |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 18-50489 (CSS) |
| | ) | |
| YPF S.A., YPF INTERNATIONAL S.A., | ) | |
| YPF HOLDINGS, INC., CLH | ) | |
| HOLDINGS, INC., REPSOL, S.A., | ) | |
| REPSOL EXPLORATION, S.A, REPSOL | ) | |
| E&P USA, INC., REPSOL OFFSHORE | ) | |
| E&P USA, INC., REPSOL E&P T&T | ) | |
| LIMITED AND REPSOL SERVICES | ) | |
| COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

LANDIS RATH & COBB LLP                   FARNAN LLP
Adam G. Landis                                    Brian E Farnan
919 Market Street                                 919 North Market Street
Suite 1800                                            12th Floor
Wilmington, DE  19801                         Wilmington, DE  19801

       -and-                                              -and-

CLEARY GOTTLIEB STEEN                 WHITE & CASE LLP
 & HAMILTON LLP                              J. Christopher Shore
Victor L. Hou                                        Matthew L. Nicholson
Ari D. MacKinnon                                 1221 Avenue of the Americas
One Liberty Plaza                                  New York, New York 10020
New York, New York 10006

Counsel for the YPF Defendants            Counsel for the Liquidating Trust

Dated: May 10, 2021

Sontchi, C.J. _____

## OPINION

Before the Court is the Motion of YPF Defendants for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit Pursuant to 28 U.S.C. § 158(d)(2), D.I. 399 ("Motion for Direct Appeal"). The appeal that is the subject of the Motion for Direct Appeal is from this Court's April 6, 2021 Opinion ("Opinion") and Order, D.I. 389 and 390, respectively, denying YPF Defendants' Motion to Disqualify White & Case LLP as Counsel for the Maxus Liquidating Trust, D.I. 306 ("Motion to Disqualify"). For the reasons set forth below, the Court will grant, in part, and deny, in part, the Motion for Direct Appeal.

### 1. Plaintiff's Opposition

In Plaintiff's Opposition to YPF Defendants' Motion for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit Pursuant to 28 U.S.C. § 158(d)(2), D.I. 409, the Trust cites to the Court's opinion in *Simon & Schuster, Inc. v. Advanced Marketing Services Inc.* in arguing that the Court should "defer to the District Court and . . . refrain from deciding the Request for Direct Appeal, pending a decision from the District Court on the Motion for Leave to Appeal."[1] However, the rules in place at the time of the Court's decision in *Simon & Schuster* have changed. Interim Rule 8001(f),

---

[1] *Simon & Schuster, Inc. v. Advanced Marketing Services Inc.*, 360 B.R. 429, 434 (Bankr. D. Del. 2007).

which was in place at the time *Simon & Schuster* was decided, has been replaced by current Rule 8006.

Rule 8006(b) provides:

(b) Filing the Certification. The certification must be filed with the clerk of the court where the matter is pending. For purposes of this rule, a matter remains pending in the bankruptcy court for 30 days after the effective date under Rule 8002 of the first notice of appeal from the judgment, order, or decree for which direct review is sought. A matter is pending in the district court or BAP thereafter.[2]

Although the rule change does not directly address the incongruity identified in *Simon & Schuster* that "[t]he legal analysis under the Motion for Leave to Appeal and the Request for a Direct Appeal to be applied by the District Court and this Court, respectively, *is virtually identical*,"[3] Rule 8006 clearly contemplates that the Bankruptcy Court is to decide whether to issue a certification for direct appeal, even if the District Court has before it a motion for leave to appeal an interlocutory order.  Further, it provides a practical method for doing so by providing this Court with a 30-day window of jurisdiction to issue its decision.  Finally, given the Court's familiarity with the record in this case (and with the benefit of 14 more years of experience on the bench), it seems appropriate that the Court should take the laboring oar in deciding the Motion for Direct Appeal, which will at least provide a foundation for the District Court in the event it ultimately has to decide the

---

[2] Fed. R. Bankr. P. 8006(b).

[3] *Simon & Schuster*, 360 B.R. at 434 (emphasis in original).

Motion for Leave to Appeal.[4]  Thus, the Court will depart from its course in *Simon &*
*Schuster* and decide whether to issue a certification for direct appeal.[5]

### 2.  Statement of Facts[6]

This adversary proceeding has been pending since 2018 and grew out of the 2016
Chapter 11 case of Maxus Energy Corporation ("Maxus").  The plaintiff is the Maxus
Liquidating Trust (the "Trust"), which was formed under Maxus's confirmed plan of
reorganization to pursue litigation, including this adversary proceeding.  The relevant
defendants are YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings,
Inc. (collectively, "YPF").  At all relevant times, YPF was Maxus's parent.  The causes of
action in the complaint principally revolve around fraudulent conveyance, and alter
ego/veil-piercing claims.

Since the Trust's formation, it has been represented by White & Case LLP ("White
& Case") as lead counsel, including in this adversary proceeding.  Similarly, since shortly
after the inception of this adversary proceeding, YPF has been represented by Sidley
Austin LLP ("Sidley") as lead counsel.  YPF is also represented in this adversary

---

[4] YPF Appellants' Motion for Leave to File Interlocutory Appeal of the Bankruptcy Court's April 6, 2021 Disqualification Order, D.I. 398 ("Motion for Leave to Appeal").  The Motion for Leave to Appeal will be moot if the Third Circuit exercises its discretion to accept the direct appeal. Fed. R. Bankr. P. 8004(e) ("If leave to appeal an interlocutory order or decree is required under 28 U.S.C. §158(a)(3), an authorization of a direct appeal by the court of appeals under 28 U.S.C. §158(d)(2) satisfies the requirement.").

[5] On May 7, 2021, YPF filed YPF Defendants' Reply in Support of Motion for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit Pursuant to 28 U.S.C. § 158(d)(2), D.I. 410 ("Reply").  Bankruptcy Rule 8006(f)(4) does not contemplate the filing of a reply in support of a motion for certification of a direct appeal. ("The request, cross-request, and any response are submitted without oral argument unless the court where the matter is pending orders otherwise").  Nonetheless, the Court has reviewed and considered the Reply.

[6] The Statement of Facts is drawn heavily from the Opinion denying the Motion to Disqualify.

proceeding by Cleary Gottlieb Steen & Hamilton LLP on issues related to the Motion to Disqualify and the appeal.

The facts and issues relevant to the Motion to Disqualify center on Ms. Jessica Lauria neé Boelter.[7]  Ms. Boelter was formerly a partner in the restructuring group of Sidley before she joined White & Case on October 1, 2020.[8]

Along with other lawyers, Ms. Boelter participated in the initial Sidley pitch to YPF in the summer of 2018.[9]  She was involved in negotiating the engagement letter between Sidley and YPF.[10]  She also consulted with other members of the Sidley team on certain motions, including the motion to dismiss, and related analysis and was admitted *pro hac vice* in the adversary proceeding.[11]  In addition, she participated in or was copied on email correspondence with the client.[12]  She also attended several in-person meetings with the client.[13]  Executives at YPF considered Ms. Boelter to be "an integral part of YPF's outside legal team and depended on her advice, counsel and discretion on a wide range of highly sensitive topics."[14]

---

[7] As Ms. Lauria was known as Ms. Boelter at the time relevant to the Motion to Disqualify, with respect, the Court shall refer to her as Ms. Boelter for clarity's sake.

[8] Exh. 27, Declaration of Jessica C. Lauria (formerly Boelter) ("Boelter Declaration") at ¶2.

[9] *Id.* at ¶4. Exh. 2, Declaration of German Fernandez Lahore ("Lahore Declaration") at ¶3.

[10] Boelter Declaration at ¶4.  Lahore Declaration at ¶3.  Exh. 3, Declaration of John J. Kuster ("Kuster Declaration") at ¶4.

[11] Boelter Declaration at ¶4. Order Approving Motion for Admission *pro hac vice* of Jessica C. Knowles Boelter, Esq.

[12] Lahore Declaration at ¶5.

[13] *Id.* at ¶¶5 and 7.  Exh. 1, Declaration of Daniel Gonzalez Casartelli ("Casartelli Declaration") at ¶¶5 and 7.

[14] Casartelli Declaration at ¶6.  *See also* Lahore Declaration at ¶11.

James Conlan led the Sidley engagement from the outset until his departure from Sidley in June 2020.[15]   Although Ms. Boelter was the senior remaining restructuring partner on the engagement, John Kuster assumed lead responsibility for the engagement after Mr. Conlan left the firm.[16]

Ms. Boelter's participation in this adversary proceeding varied over time.[17]   In total, she billed 300 hours to the engagement between 2018 and 2020.[18]  To the best of Ms. Boelter's recollection, approximately 200 of these hours were billed in 2018, approximately 100 hours were billed in 2019 (with the majority billed during the first half of the year), and no hours were billed in 2020.[19]  Ms. Boelter attended at least part of the 6-hour oral argument on the motion to dismiss and recalls making one appearance on the record during a discovery hearing.[20]   The Court has no recollection of Ms. Boelter appearing in the case.   Nonetheless, according to Mr. Kuster, Ms. Boelter worked on, supervised work on, and/or was privy to internal discussions concerning:

    a.    drafting the motion to dismiss the complaint and preparing YPF's initial disclosure;

    b.    document collection, document review, privilege determinations, and other discovery matters;

    c.    the motion to withdraw the reference and consideration of the merits of seeking another forum;

---

[15] Boelter Declaration at ¶3.  Kuster Declaration at ¶6.

[16] Boelter Declaration at ¶3; Kuster Declaration at ¶6.

[17] Kuster Declaration at ¶5.

[18] *Id.* at 3.

[19] Boelter Declaration at ¶5.  Like any responsible senior attorney, Ms. Boelter did not bill all her time spent consulting with her colleagues.  Those consultations occurred throughout her time at Sidley, including in 2020.  *See* Exh. 33, Declaration of Daniel J. Neppl, Exhibit B.

[20] Boelter Declaration at ¶5; Kuster Declaration at ¶4.

d.      the tactics of White & Case in the litigation;

e.      developing YPF's overall litigation strategy;

f.      YPF's disclosure pursuant to U.S. securities laws;

g.      the engagement of local counsel;

h.      corporate law considerations related to the case;

i.      the possibility of settlement or other out-of-court resolution of the case;

j.      discussions concerning litigation status; and

k.      potential expert issues.[21]

As noted above, Mr. Conlan, then the global head of Sidley's restructuring group, left Sidley to join Faegre Drinker Biddle & Reath LLP in June 2020.   As is often the case in these matters, Mr. Conlan's departure led to the departure of other attorneys in his group.  Ms. Boelter began exploring other opportunities and avers that her work for YPF played no role in her decision to explore lateral moves or to leave Sidley.[22]

In connection with her ultimate relocation to White & Case, Ms. Boelter went through a standard conflict screening process.[23]  During that process, Ms. Boelter did not discuss the YPF case other than to identify it as a matter on which she had worked, for purposes of conflict identification.[24]  Also, during that process, Ms. Boelter understood that she was not being recruited because of her prior work for YPF.[25]

---

[21] Kuster Declaration at ¶5.  *See also* Lahore Declaration at ¶6.

[22] Boelter Declaration at ¶7.  Ms. Boelter began discussions with White & Case in August 2020. *See* Exh. 41, Maxus Liquidating Trust's Supplemental Responses & Objections to YPF's Interrogatories, dated March 12, 2021 ("Interrogatory Responses") at p. 9 and p. 12 ("Ms. Boelter made no representations concerning her work with YPF to anyone employed by White & Case other than as set forth in her declaration.").

[23] Boelter Declaration at ¶8.

[24] *Id.*

[25] *Id.* at ¶9.

From the beginning of her recruitment, Ms. Boelter understood that, because of her prior work for YPF on this case, a screen would be necessary.[26]  A screen was implemented as of the day Ms. Boelter joined the firm;[27] and Ms. Boelter was promptly informed of, and acknowledged that she would comply with, the screen.[28]  Ms. Boelter avers that she has never seen any of the Trust's documents pertaining to this matter, whether hard copy or electronic, in White & Case's possession.[29]

Ms. Boelter avers that she has not revealed, either directly or indirectly, any confidential information (or substantive information of any sort) that she learned during her work for YPF, including during the conflicts screening process, to anyone at White & Case and there is no evidence to the contrary.[30]  Other than the limited necessary disclosures during the conflicts screening process, Ms. Boelter has not discussed this matter with anyone at White & Case and has not set foot in White & Case's New York office since she joined the firm (perhaps not surprising given the existing pandemic).[31]  Ms. Boelter understands that White & Case policy dictates that any disclosure of a YPF confidence, even inadvertent, will be punished as a disciplinary violation.[32]  Finally, Ms. Boelter has agreed to certify compliance with the White & Case screen periodically.[33]

---

[26] *Id.*

[27] Exh. 19, Declaration of Debra Kobrin Levy ("Levy Declaration") at ¶¶16, 25-28.

[28] Boelter Declaration at ¶¶ 9-10; Levy Declaration at ¶ 41.

[29] Boelter Declaration at ¶11.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

YPF executives first learned that Ms. Boelter was leaving Sidley and joining White & Case on September 12, 2020.[34]  Ms. Boelter joined White & Case on October 1, 2020, and sent a letter to Sidley to provide notice to YPF on the same date.[35]  The letter stated, among other things, that all relevant personnel (*i.e.*, Ms. Boelter and lawyers and staff working on the matter at White & Case) had been instructed that: (1) Ms. Boelter would not have access to electronic or hard copy files relating to the matter; (2) Ms. Boelter may not discuss this matter with anyone at White & Case; and (3) Ms. Boelter would not receive any part of the fee from this matter.[36]

Shortly thereafter, YPF's attorneys began a lengthy dialogue with White & Case over Ms. Boelter's departure.[37]  White & Case provided extensive information to YPF as to the screen that had been implemented and related information.[38]  YPF's lawyers never provided any comment as to the screen even though they were invited to do so.[39]  Rather, they took the position from the outset that due to Ms. Boelter's extensive involvement in the adversary proceeding on behalf of YPF no screen would be adequate.[40]

---

[34] Kuster Declaration at ¶8. Lahore Declaration at ¶10.  Ms. Boelter was offered a partnership position at White & Case on September 8, 2020, which she accepted on the same day. Interrogatory Responses at p. 10.

[35] Motion to Disqualify at Exhibit B.

[36] *Id.*

[37] *See generally* Exhs. 4-16, Declaration of Rebecca M. Michaud and exhibits thereto; and Exhs. 22-23, Declaration of Matthew L. Nicholson and exhibit thereto.

[38] *Id.*

[39] *Id.*

[40] *Id.*

On November 6, 2020, Ms. Boelter married Mr. Thomas Luria, the head of White & Case's restructuring group.[41]  Ms. Boelter and Mr. Lauria began dating intermittently in early 2017, the relationship became "exclusive" in or around the fall of 2018, and they began to cohabitate in July 2019.[42]  It is unclear from the record when they were engaged to be married.  Ms. Boelter disclosed her relationship with Mr. Lauria to Sidley in 2018 and believes persons at YPF were aware of the relationship in 2019.[43]  Mr. Lahore, YPF's general counsel, however, avers that he was not personally aware of the relationship until September 12, 2020.[44]

YPF filed the Motion to Disqualify on December 19, 2020.  Briefing was completed on February 26, 2021 and a hearing was held on April 1, 2021.  At the hearing, 49 exhibits were presented, including 12 declarations.  All exhibits were admitted other than Exhibits 14, 16, 32 and 40, which were excluded.  The Court took the admission of Exhibits 17, 24 and 30 under advisement at the hearing.  Those exhibits were excluded for the reasons set forth in the Opinion, which the Court issued on April 6, 2021.

On April 20, 2021, YPF filed a Notice of Appeal, D.I. 397, the Motion for Leave to Appeal, and the Motion for Direct Appeal.  The documents were transmitted to the District Court on April 21, 2021, and the appeal was docketed in the District Court on the same day.

---

[41] Boelter Declaration at ¶6.

[42] Interrogatory Responses at p. 17.

[43] Boelter Declaration at ¶6.

[44] Lahore Declaration at ¶10.

### 3.   Governing Law

Section 158(d)(2)(A) of Title 28 permits the direct appeal of a bankruptcy court order to the Circuit Court of Appeals if one or more of the specified statutory criteria are satisfied.[45]   Once certified, the Court of Appeals, in the exercise of its discretion, determines whether to accept the appeal.

Section 158(d)(2)(A) provides:

> (2)(A) The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—
>
> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;
>
> and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § 158(d)(2)(A).   While the section contains three subparts, there are four disjunctive criteria as subpart (i) sets forth two separate benchmarks for certification.   As

---

[45] *Millennium Lab Holdings II, LLC*, 543 B.R. 703, 708 (Bankr. D. Del. 2016) (citing *Mull Drilling Co. v. SemCrude, L.P. (In re SemCrude L.P.)*, 407 B.R. 82, 111 (Bankr. D. Del. 2009); and *In re Gen. Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009)).

here, when a party asserts that several issues satisfy the requisites for certification, courts undertake an analysis of each criterion against each issue.[46]

### 4. Discussion

YPF has identified six issues for appeal:

a.  Whether the Court erred when it ruled that screening is available in all but "exceptional cases" to cleanse the imputed conflict created when a lawyer joins an opposing law firm;

b.  Whether the Court erred when it ruled that an ethical screen complies with ABA Model Rule 1.10(a)(2) even when the screened lawyer's spouse is not prevented from receiving part of the fee from the conflicted representation;

c.  Whether the Court erred when it ruled that, as a matter of law, a romantic relationship with opposing counsel short of marriage cannot give rise to a personal conflict requiring the informed consent of a client;

d.  Whether the Court erred when it ruled that Federal Rule of Evidence 404 bars the admission of character evidence to show that an individual is likely to act in a particular way in the future;

e.  Whether the Court erred when it ruled that a senior lawyer's 300 hours of work for a client, including work that put her in possession of confidential information about settlement and litigation strategy and pending legal issues regarding privilege and experts, did not constitute a level of involvement in a conflicted matter weighing against the availability of ethical screening;

f.  Whether the Court erred when it ruled that a lawyer who is counsel of record, engagement partner, billing partner, and who has personally interacted with and advised the most senior management of her corporate client, does not have a sufficiently substantial relationship with her client that it weighs against the availability of ethical screening.

---

[46] *Id.* (citing *Stanziale v. Car–Ber Testing, Inc. (In re Conex Holdings, LLC)*, 534 B.R. 606 (D. Del. 2015); and *In re Tribune Co.*, 477 B.R. 465 (Bankr. D. Del.2012)).

YPF asserts that the issues they have identified for appeal satisfy all four criteria for certification of a direct appeal. The Court will address whether that is the case seriatim.

### a. Does the appeal raise a question of law as to which there is no controlling decision of the Third Circuit or the Supreme Court?

YPF asserts that the appeal raises four questions of law as to which there is no controlling Third Circuit precedent.

First, YPF accurately notes that the Court cited authority from district and appeals courts outside the Third Circuit to reach the conclusion that "[i]n sum, motions to disqualify are to be used as a protection against exceptional cases."[47]  The Court went on to note that "Model Rule 1.10(a)(2)'s screening requirements[, which were established in 2009,] together with the 'extreme caution' standard under which courts review motions to disqualify support the idea that where a motion seeks to disqualify a firm complying with 1.10(a)(2), courts will likely find an 'exceptional case' only where the circumstances show that no screening measures could adequately protect a client's confidential information."[48]  The Court further stated that, "[i]n determining whether an 'exceptional case' exists where an ethical screen that is compliant with Model Rule 1.10(a)(2) may be inadequate courts[,] have applied a test that looks to several factors" laid out in *Enzo Life*

---

[47] Opinion at 10-11 (citing *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988); *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1576–77 (Fed. Cir. 1984); *Flo-Con Sys., Inc. v. Servsteel, Inc.*, 759 F. Supp. 456, 458 (N.D. Ind. 1990); and *U.S. for Use & Benefit of Lord Elec. Co. v. Titan Pac. Const. Corp.*, 637 F. Supp. 1556, 1563 (W.D. Wash. 1986)).

[48] *Id*. at 11.

*Sciences*.[49]    Ultimately, the Court stated that "the question turns to whether an 'exceptional case' exists such that no screening measures could adequately protect YPF's confidential information" and, based upon its factual findings, concluded that "[t]his is not such a case."[50]

YPF is correct that there is no controlling Third Circuit law on the rather narrow issue of when, if ever, an ethical screen that is fully compliant with Model Rule 1.10(a)(2) is nonetheless insufficient to prevent imputation of a conflict of a lawyer who has changed firms to her new firm.  Thus, Section 158(d)(2)(A)(i) applies to that issue. However, Section 158(d)(2)(A)(i) does not apply to the Court's application of the "exceptional case" standard to its factual findings in this case, rather it is limited to the Court's articulation of the legal standard.

Second, Model Rule 1.10(a)(2) provides that for an ethical screen to be effective the conflicted attorney must not be apportioned a part of the fee earned by her new firm in the conflicted matter.  It is undisputed that Ms. Boelter will not receive any portion of White & Case's fee from the YPF adversary proceeding.  Nonetheless, shortly after joining White & Case, Ms. Boelter married Mr. Thomas Lauria, who is the head of White & Case's restructuring group.  YPF raised for the first time in its reply brief that the screen is ineffective because Mr. Lauria might indirectly receive a portion of White & Case's fee from the YPF adversary proceeding.  No evidence was presented one way or another as

---

[49] *Id*. at 12 (referencing *Enzo Life Sciences, Inc. v. Adipogen Corp.*, C.A. No. 11-cv-00088-RGA, 2013 WL 6138791 (D. Del. Nov. 20, 2013)).

[50] *Id*. at 15.

to the financial arrangements of the marriage and there was no evidence that Ms. Boelter would receive any financial benefit from Mr. Lauria's indirect portion of the fee. Nonetheless, the Court disposed of the issue in a footnote by referring to the plain meaning of Model Rule 1.10, under which "it is Ms. Boelter and not Mr. Lauria who is prevented from receiving fees arising from this adversary proceeding."[51]  In its Motion for Direct Appeal, YPF noted that "the Court cited no case law supporting this conclusion, nor is the conclusion obvious from the face of the Rule."[52]

While it is true that the Court cited no case law in the footnote, no case law was required as the Court was simply applying the plain meaning of the Model Rule.  The Supreme Court and Third Circuit case law on the application of plain meaning is well developed.[53]  Moreover, YPF's argument that the Court's conclusion is not obvious is simply incorrect.  Model Rule 1.10(a)(2)(i) provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them

---

[51] *Id.* at 14, n. 56.

[52] Motion for Direct Appeal at 8.

[53] Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR.L.J. 195, 211 (2007) ("[C]ontemporary Supreme Court jurisprudence establishes that the purpose of statutory interpretation is to determine congressional intent.").  To that end, the starting point is to examine the plain meaning of the text of the statute or rule. *Id.* at 229.  *See also Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.").  As the Supreme Court observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank,* "when a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 7, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). *See also United States v. Ron Pair Enters.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); and *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms.").  The Third Circuit has, of course, followed the Supreme Court's teaching.  *See, e.g., Price v. Delaware State Police Federal Credit Union*, 370 F.3d 362 (3d Cir. 2004).

practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless . . . (2) the prohibition is based upon Rule 1.9(a) or (b) and arises out of the disqualified lawyer's association with a prior firm, and (i) *the disqualified lawyer . . . is apportioned no part of the fee therefrom.*"[54]   There is nothing in the rule that would support concluding that the receipt of income by anyone other than the disqualified lawyer, including her spouse, from a matter in which the lawyer is disqualified would violate Rule 1.10.  As the Court's ruling is based on established Supreme Court and Third Circuit precedent requiring the application of plain meaning in interpreting statutes and rules and there is no reasonable argument that the Court incorrectly applied the plain meaning, section 158(d)(2)(A)(i) does not apply.

Third, as stated above, Ms. Boelter and Mr. Lauria were married shortly after Ms. Boelter joined White & Case.  Ms. Boelter and Mr. Lauria began dating intermittently in early 2017, the relationship became "exclusive" in or around the fall of 2018, and they began to cohabitate in July 2019.  There was conflicting testimony as to when YPF representatives became aware of Ms. Boelter's relationship with Mr. Lauria.  Ms. Boelter averred that it was in 2019 and Mr. Lahore averred that it was in September 2020. Importantly, however, the Motion to Disqualify was not based on Ms. Boelter's personal relationship with Mr. Lauria, which was governed by Model Rule 1.7.  Nor could it be because a conflict under Model Rule 1.7 is not imputed to the firm.[55]  Rather, YPF raised

---

[54] Model Rule 1.10(a)(2)(i) (emphasis added).

[55] Model Rule 1.7 governs when there is a "personal interest of the lawyer" that may interfere with representation of a client.  A conflict under Model Rule 1.7 is usually personal and is not imputed to the firm.  *See* Model Rule 1.10(a)(1) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7

Ms. Boelter's purported violation of Model Rule 1.7 to establish she was not likely to comply with the ethical screen established by White & Case.

As an initial step in making this showing, YPF had to establish that Ms. Boelter had, in fact, violated Rule 1.7. The Court found that YPF had not done so in a lengthy footnote because Rule 1.7, as a matter of law, did not apply to Ms. Boelter prior to her marriage, which occurred after she left Sidley.[56] YPF asserts that "[t]he Court did not cite case law to support this conclusion, which again is not evident from the face of the Rule."[57] *YPF fails to note, however, that footnote 67 is dicta and was not the basis for the Court's conclusion.* The Court assumed, arguendo, that Ms. Boelter, had, in fact, violated Model Rule 1.7 but, nonetheless, found that "the argument that this has any bearing on the probity of whether Ms. Boelter will comply with the ethical screen is unavailing," concluding that "[t]here is no link whatsoever between the two points."[58] This was a factual finding and not an issue of controlling Third Circuit law. Thus, section 158(d)(2)(A)(i) does not apply.

Fourth, and closely related to the point immediately above, in addition to finding that "[t]here is no link whatsoever between the two points," i.e., Ms. Boelter's violation of Rule 1.7 and the probity of her compliance with the ethical screen under 1.10, the Court

---

or 1.9 unless (1) the prohibition is based on a personal interest of the disqualified lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.").

[56] Opinion at 20-21, n. 67 ("As a result, ABA Formal Opinion 494 is not applicable, Model Rule 1.7 did not apply to Ms. Boelter prior to her marriage to Mr. Lauria, and she did not violate the rule while representing YPF.").

[57] Motion for Direct Appeal at 9.

[58] Opinion at 21.

held, in the alternative, that "the Federal Rules of Evidence prohibit making such an inference."[59]

Federal Rule of Evidence 404 states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait," and that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   YPF notes that it did not offer evidence of Ms. Boelter's purported violation of Model Rule 1.7 to show that Ms. Boelter had engaged in other violations in the past.   Rather, the evidence was offered because YPF argued Ms. Boelter could not be trusted to comply with the screen in the future.   As some authorities have noted, "[b]oth the use of the past tense - 'acted' - and the phrase 'on a particular occasion' suggest intent to exclude hypothetical future conduct" from Federal Rule of Evidence 404's prohibition on the use of character evidence.[60]   Neither the Third Circuit nor the Supreme Court has opined as to whether Federal Rule of Evidence 404's prohibition against the use of character evidence bars its use to show the likelihood of future conduct.   Thus, section 158(d)(2)(A)(i) applies to this issue.

---

[59] *Id.*

[60] Wright & Miller, *Federal Practice & Procedure* § 5236 n.6; *see also SEC v. Drescher*, No. 99-1418, 2001 WL 1602978, at *1 (S.D.N.Y. Dec. 13, 2001) (holding "the prohibition in Rule 404(a) is not even triggered by" evidence offered with regard to "the likelihood that the person will engage in some conduct in the future." (citation omitted)).

### b. Does the appeal raise an issue of public importance?

YPF argues that all the legal questions they have raised with the Opinion[61] are questions of public importance, which "transcend the litigants and involve a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case."[62]  Indeed, they argue that "the questions of law presented here go beyond this particular set of facts and even beyond the bankruptcy context: they concern the permissible professional conduct of attorneys appearing in any matter throughout the Third Circuit and implicate the confidence that clients and the public repose in the legal bar."[63]

YPF's generalities prove too much.  If YPF is correct, then every bankruptcy court decision involving professional ethics would qualify for direct appeal.  Clearly, more is needed.  While YPF characterizes the facts in this case to be "egregious" that does not comport with the Court's factual findings.   As the Court found after an evidentiary hearing, "Ms. Boelter was a restructuring attorney involved at a high level in a litigation arising out of a bankruptcy that is focused on non-bankruptcy factual and legal issues. She was not the lead trial lawyer billing thousands of hours to the matter."[64]  Moreover, the Court found:

> Remember, an ethical screen is only required to prevent a lawyer that leaves
> a firm from being adverse to her former client in the same or a substantially
> related matter.  Lawyers subject to a screen are universally privy to client

---

[61] *See* p. 12, *supra.*

[62] Motion for Direct Appeal at 13 (quoting 1 Collier on Bankruptcy ¶ 5.06.).

[63] *Id.*

[64] Opinion at 18.

confidences and litigation strategy.  That is not the question.  The question is whether Ms. Boelter knows so much and was so involved as to make this an "exceptional case" where an ethical screen would be inadequate.  If that were the case then the Court would expect such a lawyer to have billed more than 300 hours over more than two years in defending an extremely hard fought, $14 billion lawsuit.[65]

There is simply nothing in this case that rises to the level of "public import" and, thus, section 158(d)(2)(A)(i) does not apply.

### c.   Does the appeal involve a question of law requiring resolution of conflicting decisions?

YPF asserts that the appeal raises questions of law requiring resolution of conflicting decisions.

YPF takes issue with the Court's disposition of one of the *Enzo Life Science* factors. Those factors are:

> (1) The substantiality of the relationship between the attorney and the former client,
>
> (2) The time lapse between the matters in dispute,
>
> (3) The size of the firm and the number of disqualified attorneys,
>
> (4) The nature of the disqualified attorney's involvement, and
>
> (5) The timing of the wall.[66]

The Court held that the first factor regarding the "substantiality of the relationship between the attorney and the former client" did not favor disqualification because Ms.

---

[65] *Id*. at 16.

[66] *Enzo Life Sciences, Inc.*, 2013 WL 6138791 at *3.

Boelter's relationship with YPF was "significant but not substantial."[67]  In so ruling, the

Court referenced its previous lengthy findings on the issue, which is set forth fully below:

> As such, the question turns to whether an "exceptional case" exists such that no screening measures could adequately protect YPF's confidential information.  This is not such a case.  There is no doubt that Ms. Boelter was one of the senior attorneys in the YPF adversary proceeding.  As such, she was privy to client confidences, and YPF's strategy and tactics in defending the suit.  However, her involvement was largely diminished after the Court's denial of the motion to dismiss in 2019.  Her billed hours were cut in half from 2018 to 2019 with most of those hours accruing early in the year, and she did not bill a single hour to the file in 2020.  This is not particularly surprising, as Mr. Conlan was the lead restructuring attorney on the matter until just a few months before Ms. Boelter left Sidley, and the matter was turned over to the litigators after denial of the motion to dismiss and the beginning of discovery.

> Moreover, Ms. Boelter's interactions with YPF executives were not sufficient to turn this matter into an "exceptional" case.  The declarations attempt to establish that Ms. Boelter was a key strategic advisor who was privy to the deepest and darkest YPF secrets.  The declarations are artfully drafted but they exaggerate every interaction to an implausible degree.  The Court was particularly struck by the declaration of YPF's CEO, Mr. Casartelli, who averred that Ms. Boelter was a trusted and critical confidante because he had a conversation with her at a cocktail party where they discussed the case.  The example is incongruous for several reasons, not the least of which is (1) they discussed the case – what else would they discuss, they barely knew each other, and it was all they had in common, and (2) it was a cocktail party – if Mr. Casartelli believes that sharing critical confidences over drinks at a crowded cocktail party is appropriate, he needs to reexamine his thinking.  In addition, the Court finds it disingenuous that a firm such as YPF, which changes law firms with striking frequency, is shocked that one (or more) of its lawyers may leave its employ, even by moving to a firm representing a legal opponent . . .

> The question is whether Ms. Boelter knows so much and was so involved as to make this an "exceptional case" where an ethical screen would be inadequate.  If that were the case then the Court would expect such a lawyer

---

[67] Opinion at 17.

to have billed more than 300 hours over more than two years in defending an extremely hard fought, $14 billion lawsuit.[68]

YPF argues that this ruling is in direct conflict with the Delaware District Court's ruling in *Enzo Life Sciences*.  More specifically, YPF argues that no Court has ruled that only the most senior or important lawyer involved with a matter has the requisite substantial relationship with his or her former client and, to so hold, would be inconsistent with the holding in *Enzo Life Sciences* where the District Court held that an attorney had a sufficiently substantial relationship with his former client to warrant imputation of his conflict to his new firm when he was serving as local counsel.[69] However, the Court did *not* hold that only the most senior or important lawyer involved with a matter has the requisite substantial relationship with his or her former client. Rather, the Court carefully reviewed the record and determined that, under these specific facts, Ms. Boelter who was a senior attorney on the matter, nonetheless, did not have a sufficiently substantial relationship with YPF to satisfy the first *Enzo Life Sciences* factor. This conclusion was based on several findings set forth above, not the least of which was that Ms. Boelter had not billed a minute to this massive litigation in the 12 months before she left Sidley.

Similarly, YPF argues that the Court's ruling with respect to the nature of Ms. Boelter's involvement with the case is likewise in conflict with *Enzo Life Sciences*.  The Court found, among other things, that Ms. Boelter's approximately 300 hours of billable

---

[68] *Id*. at 15-16 (citations omitted).

[69] Motion for Direct Appeal at 11-12.

work on the matter was insufficient to create a substantial relationship.    This is purportedly in conflict with the holding in *Enzo Life Sciences* that the conflict of a "less than pivotal attorney" who worked for ten hours on a mediation statement must be imputed to his new firm.[70]    Again, YPF misstates the Court's ruling.    The point of noting that Ms. Boelter billed 300 hours to the matter, in the context of this massive litigation and the purportedly overwhelmingly important role she played in YPF's defense, was that she *only* billed 300 hours to the matter over more than 2 years.    Again, this conclusion was based on several factual findings set forth above, not the least of which was the Court's finding that YPF's declarations "exaggerate every interaction [with Ms. Boelter] to an implausible degree," which is certainly not an undisputed fact.[71]

Finally, there is no legal conflict between *Enzo Life Sciences* and the Court's opinion because the Court applied the *Enzo Life Sciences* factors.    When different courts review different facts under the same legal standard but reach different results that does not create a conflict between the courts that needs reconciliation by the Court of Appeals on direct appeal.[72]    Thus, section 158(d)(2)(A)(ii) does not apply.

---

[70] *Id*. at 13 (quoting *Enzo Life Sciences, Inc.*, 2013 WL 6138791 at *4).

[71] Opinion at 15.    Recognizing that the purported conflicts between the Court's opinion and *Enzo Life Sciences* are questions of fact not law, YPF argues that the issues are a matter of law because the facts are undisputed.    *Warner Lambert Co. v. LEP Profit Int'l, Inc.*, 517 F.3d 679, 681 (3d Cir. 2008) (holding that "the application of law to uncontested facts" is a legal question reviewed *de novo* by the Third Circuit); *United States v. RD 1, Box 1*, 952 F.2d 53, 55 (3d Cir. 1991) (same).    *The facts here were very much disputed*.    Besides the Court's finding that the YPF declarations, which were virtually YPF's sole evidence, are exaggerated and, thus, unreliable, there were numerous inconsistencies and conflicts in the record that needed to be reconciled by the Court.

[72] *Compare* 28 U.S.C. § 158(2)(A) (allowing grounds for direct appeal where "the judgment, order, or decree involves *a question of law* requiring resolution of conflicting decisions . . .") (emphasis added) *with In re Millennium Lab Holdings*, 543 B.R. at 709 ("Application of long-standing, settled law to the facts of a particular case is not a basis for direct appeal to the Third Circuit.") (citing *Am. Home Mortg. Inv. Corp. v.*

### d. Would a direct appeal materially advance the litigation?

Finally, YPF argues that certification is appropriate because it will materially advance the progress of the case by allowing the Third Circuit to consider the propriety of White & Case's representation of the Trust now, rather than potentially later, after final judgment.

This argument is incorrect and there is no need to shorten the appeals process. First, this case in nowhere near final judgment. Even if the appeal were to take two years proceeding through the normal channels it will still be resolved before trial. Unfortunately, progress in this case has been at a standstill since last summer over a lengthy dispute as to YPF's waiver of attorney client privilege and the disqualification issues. Motions to dismiss have been decided, document discovery is complete, and the Court has decided several discovery disputes as well as the disqualification motion but only a small handful of depositions have occurred. At the direction of the Court, the parties submitted competing scheduling orders on April 16, 2021 and the Court entered the Third Amended Case Management and Scheduling Order on April 20, 2021.[73] If the schedule is not amended further, it calls for the completion of briefing on case dispositive motions in April 2022. The Court fully expects cross motions for summary judgment and expects the issues to be numerous and complex. Thus, a decision on those motions very well may not be issued until the fall of 2022 or later. In addition, the defendants have

---

*Lehman Bros. (In re Am. Home Mortg. Inv. Corp.),* 408 B.R. 42, 44 (D. Del. 2009) (denying certification on mixed question of law and fact)) (other citations omitted).

[73] D.I. 396.

preserved their right to a jury trial and have already filed motions to withdraw the reference that were previously denied without prejudice by the District Court. If the matter is transferred to the District Court for trial in early 2023, given the backlog caused by the pandemic and the large amount of trial time that will probably be required, it could very well be 2024 before the matter is tried. The normal appeals process on the Court's disqualification opinion will have been completed well before that.

Second, the Court has ordered the parties to select a mediator by May 14, 2021 and to agree to a schedule and format for mediation. There is a possibility of settlement of this matter that would make accelerating this appeal unnecessary.

Thus, section 158(d)(2)(A)(iii) does not apply.

### 5. Conclusion

For the foregoing reasons, the Court will grant, in part, and deny, in part, the Motion for Direct Appeal. Pursuant to 28 U.S.C. § 158(d)(2)(A)(i), the Court will certify a direct appeal of the Court's Opinion and Order denying the Motion to Disqualify to the Third Circuit Court of Appeals with regard to (i) when, if ever, an ethical screen that is fully compliant with Model Rule 1.10(a)(2) is, nonetheless, insufficient to prevent imputation of a conflict of a lawyer who has changed firms to the new firm and what legal standard should apply in making that determination; and (ii) whether Federal Rule of Evidence 404's prohibition against the use of character evidence bars its use to show the likelihood of future conduct. The balance of the Motion for Direct Appeal will be denied. The Court will enter an order.