**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| MAXUS ENERGY CORPORATION, *et al.*, | ) | Case No. 16-11501 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| v. | ) | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) | Adv. Proc. No. 18-50489 (CSS) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) | |
| REPSOL, S.A., REPSOL EXPLORACIÓN, | ) | |
| S.A., | ) | |
| REPSOL USA HOLDINGS CORP., REPSOL | ) | |
| E&P USA, INC., REPSOL OFFSHORE E&P | ) | |
| USA, INC., REPSOL E&P T&T LIMITED, and | ) | |
| REPSOL SERVICES CO., | ) | |
| Defendants. | ) | |

**REPSOL DEFENDANTS' MOTION TO STRIKE THE EXPERT REPORT OF
STEPHEN A. JOHNSON, OR IN THE ALTERNATIVE, MOTION FOR
<u>AN EXTENSION OF TIME TO PREPARE A REBUTTAL</u>**

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   BACKGROUND ................................................................................................... 4

     A.    The Trust Has Long Known the Crux of this Litigation is Maxus's
         Liabilities for Environmental Damages Created By Its Predecessor
         Company. ........................................................................................................ 4

     B.    Despite That Knowledge, the Trust Chose Not to Disclose an Actual
         Environmental Expert in August 2021, While Defendants Disclosed Five
         Environmental Experts. ................................................................................... 5

     C.    As the Party Bearing the Burden of Proof, the Trust Was Required to
         Submit Opening Expert Reports in October 2021, But Did Not Serve a
         Report on Environmental Liabilities. ............................................................. 7

     D.    Defendants Spent Weeks Conferring with the Trust to Compromise on a
         Reasonable Deposition Schedule In Light of the Tight Timeline and
         Relying on the Trust's Representations Regarding its (Then) Two Experts. ......... 8

     E.    Less Than One Week Prior to the Commencement of Expert Depositions,
         the Trust Unexpectedly Served a Brand New, Over 200-Page Expert
         Report Authored by a Third Expert Never Disclosed or Mentioned Before. ......... 9

III.   ARGUMENT ...................................................................................................... 11

     A.    The Court Should Strike the Johnson Report Because it is Not Rebuttal. ............ 11

         i.    Rebuttal Expert Reports are Only Proper to Contradict or Rebut
             Evidence from an Opposing Expert, But the Johnson Report Goes
             Beyond That. .......................................................................................... 12

         ii.    At the Very Least, Opinions 1, 2, and 4 of the Johnson Report Are
             Not Rebuttal .......................................................................................... 13

     B.    The Untimely Johnson Report Causes Significant Prejudice to Repsol. .............. 17

         i.    The Law Prohibits Defendants From Surprising and Prejudicing
             Repsol with an Untimely Expert Report (Pennypack Factors 1, 2,
             and 3) .................................................................................................... 17

         ii.    The Untimely Disclosure by the Trust was Willful, Intentional, and
             Lacks any Explanation (Pennypack Factors 3, 4 and 5) ......................... 19

         iii.    While the Report Subject May be of Importance, it Does Not
             Outweigh the Willfulness of the Trust's Decision and the
             Prejudiced Caused By It (Totality of Factors) ....................................... 21

     C.    Alternatively, At The Very Least, Repsol Requests Additional Time to
         Serve a Response to the Johnson Report and to Prepare for Expert
         Deposition ...................................................................................................... 22

IV.   CONCLUSION .................................................................................................. 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amos v. Makita U.S.A., Inc.*,
No. 2:09-CV-01304-GMN, 2011 WL 43092 (D. Nev. Jan. 6, 2011) .....................................12

*Apotex, Inc. v. Cephalon, Inc.*,
No. 2:06-cv-2768, 2015 WL 12645745 (E.D. Pa. May 26, 2015)..........................................19

*Astellas Pharma Inc. v. Actavis Elizabeth LLC*,
No. 16-905-JFB-CJB, 2019 WL 2265570 (D. Del. May 13, 2019) .......................................23

*Bayer HealthCare LLC v. Baxalta Inc.*,
No. 16-CV-1122-RGA, 2019 WL 297039 (D. Del. Jan. 22, 2019).................................13, 15

*Blake v. Securitas Sec. Servs., Inc.*,
292 F.R.D. 15 (D.D.C. 2013)................................................................................................13

*Bowman v. General Motors Corp.*,
427 F. Supp. 234 (E.D. Pa. 1977) .........................................................................................12

*Bridgestone Sports Co. v. Acushnet Co.*,
No. CIVA 05-132 JJF, 2007 WL 521894 (D. Del. Feb. 15, 2007)........................................21

*Byrd v. Aaron's, Inc.*,
No. 1:11-CV-00101, 2017 WL 1093286 (W.D. Pa. Mar. 22, 2017) ................................12, 16

*Century Indem. Co. v. Marine Grp., LLC*,
2015 WL 5521986 (D. Or. Sept. 26, 2015) ..........................................................................13

*Coicca v. BJ's Wholesale Club, Inc.*,
No. 04-5606, 2011 WL 3563560 (E.D. Pa. Aug. 12, 2011) ..................................................23

*Columbia Grain, Inc. v. Hinrichs Trading, LLC*,
No. 3:14-CV-115-BLW, 2015 WL 6675538 (D. Idaho Oct. 30, 2015) ...........................12, 14

*EMC Corp. v. Pure Storage Inc.*,
No. 13-1985-RGA, 2016 WL 823110 (D. Del. Feb. 29, 2016) ..............................................13

*Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr.
v. State St. Bank & Tr. Co.*,
290 F.R.D. 11 (D. Mass. 2013)..................................................................................12, 13, 15

*Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*,
No. CV 15-819-LPS-CJB, 2017 WL 11558096 (D. Del. Dec. 11, 2017) ..............................19

*Johnson v. H.K. Webster, Inc.*,
    775 F.2d 1 (1st Cir. 1985) ................................................................17

*Konstantopoulos v. Westvaco Corp.*,
    112 F.3d 710 (3d Cir. 1997) ............................................................18

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
    559 F.2d 894 (3d Cir. 1977) ...........................................17, 18, 20, 21

*Novartis Pharms. Corp. v. Actavis, Inc.*,
    No. 12-366-RGA-CJB, 2013 WL 7045056 (D. Del. Dec. 23, 2013) ....................................23

*Opengate Cap. Grp. LLC v. Thermo Fisher Sci. Inc.*,
    No. CV 13-1475-GMS, 2016 WL 8488409 (D. Del. Feb. 1, 2016) ........................................22

*R. M. W. by Wolfe v. Homewood Suites by Hilton Mt. Laurel*,
    No. CV 09-400, 2012 WL 13186031 (D.N.J. June 28, 2012) .................................23

*TQ Delta, LLC v. Adtran, Inc.*,
    No. 14-CV-954-RGA, 2021 WL 1200594 (D. Del. Mar. 30, 2021) ......................................22

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ................................................16

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013) .............................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 26 ...........................................................................7, 13, 22

Defendants Repsol, S.A., Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Company (collectively "**Repsol**"), hereby file this Motion to Strike the Expert Report of Stephen A. Johnson, or in the Alternative, Motion for an Extension of Time to Prepare a Rebuttal[1], and respectfully state as follows:

## I.    PRELIMINARY STATEMENT

Three and a half years ago, the Trust filed a Complaint principally alleging alter ego and fraudulent transfer claims that hinge on the known or knowable extent of Maxus's liabilities for certain environmental sites at the times of the challenged transactions. The extent of Maxus's obligations for environmental liabilities—whether under its contractual indemnity to OCC or primarily under state and federal environmental laws (collectively Maxus's "**environmental liabilities**")—is at the heart of this litigation. Specifically, the extent of those liabilities goes directly to the question of Maxus's solvency at the time of the transactions and whether or not those liabilities were substantial enough to even cause YPF, and then Repsol, to engage in the alleged asset-stripping scheme (i.e., the purported "**Strategy**") at the center of the Trust's Complaint. There is also no doubt the Trust bears the burden of proof on all of these issues. Despite knowing that and its obligations under the Third Amended Case Management Plan and Fifth Amended Scheduling Order ("**Scheduling Order**") to identify all experts it intended to utilize on matters on which it had the burden of proof, the Trust neither designated an expert nor served an initial expert report on the crucial issue of Maxus's environmental liabilities.

---

[1] Throughout this litigation, Repsol has been conscientious and reserved seeking relief from the Court. Indeed, since the ruling on its motion to dismiss and motion to abstain, Repsol has not sought a pretrial ruling from this Court. We only seek this Court's review now because of the importance of the issues at hand, the impact it will have on the schedule, and the significant prejudice Repsol now faces.

Instead, on August 18, 2021, the Trust disclosed that its only expert who would even remotely touch on the general issue of Maxus's environmental liabilities was a Certified Public Accountant that the Trust retained to provide a "financial autopsy" of Maxus: Mr. Todd Menenberg. In contrast, on that same date, the Defendants disclosed five experts that were expected to provide testimony regarding the known or knowable extent of Maxus's environmental liabilities at critical points in time (given they could constitute "initial" expert reports on matters not addressed in the initial expert reports of the Trust under ¶ 3(c) of the Scheduling Order). When the Trust provided its opening reports, Mr. Menenberg's opinion, as one would expect, did not actually opine on the salient issue of what Maxus's known or knowable environmental liabilities were (because he is not qualified to do so), but instead discussed the supposed importance of a single document prepared by a company for marketing purposes and the relevance of environmental reserves on GAAP financial reports to this case. Thereafter, the Defendants submitted their five reports from the environmental experts they had identified months earlier.

On January 14, 2022, nearly a month after the Defendants served their five environmental expert reports—and indeed, *five* months after the deadline had passed for the Trust's expert disclosure of the same—the Trust, in the second paragraph of a routine expert deposition scheduling email, revealed for the very first time that it had a new environmental expert, Mr. Stephen A. Johnson whose deposition needed to be scheduled too. This name was never discussed or mentioned by the Trust at any other point during the litigation, despite the fact that the Trust had engaged Mr. Johnson in October 2021.[2] Within hours, the Trust served an over 200-page

---

[2] In a series of emails scheduling a meet and confer in advance of Repsol's filing this motion, counsel for the Trust— in response to questions from Repsol and YPF as to when Mr. Johnson and/or his firm was retained by the Trust and when they began work on the report—indicated that Mr. Johnson and his firm Gnarus began discussions regarding a potential engagement at the beginning of October 2021 and signed the engagement letter in mid-October 2021. *See* Jan. 24, 2022 Email from C. Shore to J. Rosenthal re: expert reports, attached hereto as Ex. 1 (the "**Meet and Confer**

expert report (longer than both of the Trust's opening expert reports with over 900 citations). Tellingly, the report is not even titled a rebuttal report in contrast to those reports of the Trust's other experts, Mr. Pulliam (titled a reply report) and Mr. Menenberg (titled a rebuttal report), which were served simultaneously. The reason is apparent when one reads the extensive report: the vast majority of it goes to issues that the Trust bears the burden on and which are not rebuttals to Defendants' environmental experts' opening reports. And there is no reason to take Repsol's word on the matter: Mr. Johnson himself describes his "Assignment" from the Trust in Section 2.0 of his report, in which he draws a dichotomy between being asked to provide his opinions on relevant topics discussed in the expert reports of Drs. Palermo, Ram, Sharma, and Tomasi (Part 1) and then separately offer *affirmative opinions* on four different topics (Part 2), but which would have been appropriate in an initial report from the Trust, such as (i) the supposed state-of-technology for environmental remediation in the 1990s, (ii) the appropriateness of Maxus's pre-YPF assessment of likely remedies, (iii) the potential magnitude of Maxus's environmental liability at the Passaic River as of 1995, and (iv) changes to that potential magnitude over time post-1995. While the former is not actual rebuttal in sum and substance, the latter just on its face is not.

The Trust cannot undo its intentional decision *not* to designate an environmental expert in support of its case-in-chief by disguising what should be an opening expert report as a rebuttal—at Repsol's expense and prejudice. This tactical gamesmanship prejudices Repsol and Defendants by unfairly constraining the time allotted for Defendants' experts to formulate an appropriate response, while simultaneously usurping more time than permissible for its own experts. The Court should strike the Johnson Report in full as it is plainly an opening report on an issue as to which

---

Email"). That left the Trust over two months to disclose to the Defendants that he had been retained to provide expert opinion in this matter. The Trust never mentioned Mr. Johnson until it submitted his report.

the Trust bears the burden. At the very least, the Court should strike those substantial portions of

it that are clearly not proper rebuttal in that they do not even attempt to pertain to the opinions and

documents cited in the Defendants' opening expert opinions on Maxus's environmental liabilities.

In the alternative, the Court should amend the schedule for this case to allow Repsol and

Defendants' experts the time to rebut the Johnson Report, which is an opportunity they would have

had had the Trust properly disclosed Mr. Johnson and submitted his report as required under the

Scheduling Order.

## II.    BACKGROUND

### A.    The Trust Has Long Known the Crux of This Litigation Is Maxus's Liabilities for Environmental Damages Created By Its Predecessor Company.

In this case, environmental liabilities comprise the overwhelming majority in value of both

liquidated claims—primarily OCC's contractual indemnity claim for environmental sites under

the 1986 SPA with Maxus—and unliquidated claims—including the EPA's over $10 billion claim

for potential CERCLA remediation and Natural Resource Damages. *See* Opinion [D.I. 227] ("The

Plan-related claims comprise approximately $700 million of the total allowed Class 4

environmental claims, which were liquidated and non-contingent."); U.S. Department of Justice

Proof of Claim No. 476 (submitting claim for total and past future responses cost and natural

resource damages between $7.1 and $11.9 billion).

The Trust's Complaint makes it clear that environmental liabilities are the focus of this

litigation as it alleges (incorrectly) that Maxus's "enormous environmental liabilities" were the

target of the Defendants' concocted strategy to strand with Maxus while Defendants removed

Maxus's assets. *See, e.g.*, Complaint [D.I. 1] ¶ 17 ("By this action, the Litigating Trustee seeks to

do what YPF (and later Repsol) should have done long ago—provide the necessary financial

support sufficient to create the proverbial 'warm safe bed' for all of Maxus's environmental

responsibilities."). The environmental liabilities that allegedly instigated this fictional Strategy were those associated with Maxus's predecessor's activities near the Passaic River (for which OCC is now primarily liable having purchased the predecessor company). *See* Omnibus Response of the Maxus Liquidating Trust to the Defendants' Motions to Dismiss [D.I. 74] at 2–3; *see also* Apr. 10, 2020 Letter from the Trust [D.I. 221] at 3, n.4 ("Here, the Trust has specifically alleged that the Defendants were attempting to avoid environmental liabilities when they siphoned assets out of the Debtors."). Additionally, in numerous rulings to date, this Court has viewed this case through the prism of environmental liabilities. *See* Opinion Denying Defendants' Motions to Dismiss [D.I. 107] at 2 (observing if the facts in the Complaint were true, YPF discovered post-due diligence that it "owned a company with valuable assets and huge environmental liabilities," and embarked on a scheme, with Repsol joining for some time, "…to discharge the environmental liabilities" through a bankruptcy).

**B.    Despite That Knowledge, the Trust Chose Not to Disclose an Actual Environmental Expert in August 2021, While Defendants Disclosed Five Environmental Experts.**

The Trust did not disclose an environmental expert to opine on the extent of those liabilities (at the very least at the Passaic River), and when that was known or knowable to the relevant actors in the Trust's story (YPF and Repsol) such that the claimed large extent of those liabilities could have conceivably driven those actors' alleged wrongful conduct vis-à-vis Maxus. This question is also relevant to Maxus's purported insolvency, as the Trust alleges that Maxus was insolvent or rendered insolvent by the various transactions[3] such that they constitute fraudulent transfers. But

---

[3] *See, e.g.*, Complaint ¶ 244 ("Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt) as a result of the 1996-1997 Transfers. Debtors were insolvent at the time of the Crescendo Transfer, the YPFI Transfers, and each of the Settlement Agreement Transfers, or became insolvent as a result of those Fraudulent Transfers. The Fraudulent Transfers were each part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.").

Maxus's solvency or insolvency in the context of a fraudulent transfer claim cannot be determined without a reliable estimate of the environmental liabilities Maxus faced at the time of the transactions.

Indeed, when the parties exchanged designations of initial experts on August 18, 2021, in compliance with the then-operative Scheduling Order,[4] the Trust identified only two experts: (1) Todd Menenberg, a CPA and (2) Barry Pulliam, an economist. *See* Aug. 18, 2021 Plaintiff Maxus Liquidating Trust Expert Designation, attached hereto as Ex. 2 (the "**Trust Disclosure**"). The Trust identified no environmental expert, such as an environmental engineer, former EPA employee, or another professional environmental consultant to opine on the extent of Maxus's environmental liabilities over the relevant periods. The Trust did, though, indicate that a potential area of testimony from Mr. Menenberg would be an "[a]nalysis of Maxus' potential environmental liabilities and actions taken by Maxus, YPF and Repsol in relation to same" (*see id.* at 2), notwithstanding Mr. Menenberg's lack of credentials or experience as an environmental expert.

In contrast, the Defendants simultaneously disclosed five environmental experts who were expected to offer opinions on the extent of Maxus's environmental liabilities at various sites at certain points in time including the time of the alleged wrongful asset transfers, including two (Drs. Ram and Palermo) who were specifically identified as performing such analysis for the Passaic River at the heart of the case. *See* Aug. 18, 2021 YPF Defendants Designation of Initial Expert Witnesses, attached hereto as Ex. 3 ("**YPF Disclosure**"), Aug. 18, 2021 Repsol Expert Designations, attached hereto as Ex. 4 ("**Repsol Disclosure**"). The Repsol Disclosure, in particular, provided the Trust with significant detail about what issues and topics Repsol

---

[4] Subsequently, the Scheduling Order was amended two times in order to change the relevant dates of certain events as the litigation proceedings required. The scheduling order is the Fifth Case Management Plan and Scheduling Order [D.I. 533 Ex. A], but it is indistinguishable from the Third other than the changes in dates.

anticipated providing expert opinions on. *See* Repsol Disclosure. Both YPF and Repsol were transparent with the Trust as to their good faith expectation as to the entire universe of anticipated expert testimony in this complicated case and put the Trust on notice[5] as to the typical sequencing of reports; plaintiffs first, defendants second. Though the Trust, in a footnote, "reserve[d] the right to supplement or amend its designations in light of further developments hereafter" (*see* Trust Disclosure at 1, n.1), it never exercised its reserved right to supplement or amend its designations.

### C.    As the Party Bearing the Burden of Proof, the Trust Was Required to Submit Opening Expert Reports in October 2021, But Did Not Serve a Report on Environmental Liabilities.

As required under the Scheduling Order, and as is common in litigation, The Trust, as the party bearing the burden of proof on an issue for which it is offering an expert opinion, was to submit its expert reports by October 27 (the date of which was extended to October 29 at the Trust's request). *See* Scheduling Order [D.I. 533 Exhibit A] ("October 27, 2021 shall be the date by which the Parties shall engage in the simultaneous exchange of expert reports on issues for which they bear the burden of proof."); *see also* Fed. R. Civ. P. 26 (advisory committee's notes to 1993 amendment) ("[I]n most cases the party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue."). Repsol advised far in advance that it would not be submitting expert reports on October 29 precisely because it did not bear the burden of proof.[6]

On October 30, 2021, the Trust served the expert reports of Mr. Menenberg (as amended by the November 17, 2021 email from the Trust, the "**Menenberg Report**") and Mr. Pulliam (as

---

[5] Indeed, the very purpose of the rule amendment to require expert disclosures prior to the issuance of expert reports is to provide the opposing party a "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *See* Fed. R. Civ. P. 26, 1993 Advisory Committee Notes.

[6] *See* Repsol Disclosure at 2 n.1 ("The Scheduling Order requires designations of 'initial experts.' While Repsol does not have the burden of proof on any issue in this litigation and is not subject to the initial Sept. 20, 2021 expert report deadline, Repsol makes its expert designations in an abundance of caution.").

amended by the November 17, 2021 email from the Trust, the "**Pulliam Report**"). Only Mr. Menenberg provided opinion—albeit limited—on the environmental reserves and contingent liabilities as well as various statements regarding the importance of a marketing presentation by a third-party. Despite the Defendants having disclosed back in August 2021 that they would submit expert opinion on the environmental liabilities,[7] the Trust opted not to file any similar expert reports on its expert report deadline.

> ### D. Defendants Spent Weeks Conferring with the Trust to Compromise on a Reasonable Deposition Schedule in Light of the Tight Timeline and Relying on the Trust's Representations Regarding Its (Then) Two Experts.

During discussions over the upcoming deadlines, in exchange for a one-week extension of the deadline for Defendants to submit their expert reports, the Defendants agreed to the Trust's requested one-week extension of the deadline for the Trust to submit its reply reports, and agreed to reasonably spread out the expert depositions. Both YPF and Repsol agreed to the Trust's proposal on the assumption that the Trust's request for deposition dates was meant to begin on January 17th, the first business day after the Trust's rebuttal and reply reports were due. But the Trust clarified that it was, in fact, seeking deposition dates for the Defendants' experts that would precede the Trust's reply and rebuttal reports, rebutting those very same experts.

After a meet and confer on the issue, YPF's counsel confirmed via email that Defendants were willing to commit to provide the Trust with dates that would ensure the Trust would not be "jammed" and have to take more than three Defendant expert depositions in a given week. *See* Dec. 3, 2021 email from J. Rosenthal to E. Smith, attached hereto as Ex. 5. YPF's counsel also advised the Trust that "to the extent there are experts who you advise us in a timely fashion will not be rebutted after you review our reports, we will consider trying to schedule some of them

---

[7] *See* YPF Disclosure at 2–3, Repsol Disclosure at 2, n.1.

even earlier in the process." *Id*. On December 5, 2021, upon this understanding, the Trust agreed to YPF's proposal on report deadlines and a commitment to reasonably spread out the deposition dates. *See* Dec. 5, 2021 email from E. Smith to J. Rosenthal, attached hereto as Ex. 5. Following that exchange, on December 17, 2021, Defendants served their expert reports: four on behalf of Repsol, as identified in the Repsol Disclosure, and six on behalf of YPF.

On January 6, 2022, counsel for Repsol provided potential expert deposition dates for the five environmental experts and sought clarification as to whether the Trust intended to issue responses to those experts. Based on the Trust's prior stated desire to take some depositions before the January 14th reply and rebuttal deadline, counsel for Repsol further advised that it could provide additional dates (prior to January 14), but only if the Trust did not intend to issue responses to those reports as it had previously intimated. The Trust did not respond as to whether it would be issuing such reports.

  **E.**  **Less Than One Week Prior to the Commencement of Expert Depositions, the Trust Unexpectedly Served a Brand New, Over 200-Page Expert Report Authored by a Third Expert Never Disclosed or Mentioned Before.**

On January 13, 2022, Repsol's counsel emailed Trust counsel, noting that while the Trust had yet to provide dates for its two experts, Defendants had put together a proposed overall calendar that balanced out the Trust's requests to reasonably spread out the depositions. *See* Jan. 13, 2022 Email from C. Berman to E. Smith, attached hereto as Ex. 5. The next day, Trust counsel informed Defendants that it could confirm a single date for each of the deponents. *See* Jan. 14, 2022 Email from E. Smith to C. Berman, attached hereto as Ex. 5. For the first time, buried in this routine correspondence, counsel for the Trust then nonchalantly indicated that it added "two potential dates for the deposition of the Trust's expert (Stephen A. Johnson of Gnarus Advisors) whose report *primarily* rebuts the reports of Dr. Palermo and Dr. Ram." *See id.* (emphasis added). This was the *first time* Mr. Johnson was disclosed as an expert for the Trust.

Less than five hours later, the Trust submitted the expert submissions of Messrs. Menenberg, Pulliam, and—on the first day Defendants learned of him—Mr. Johnson. The Johnson Report is over 200 pages. Section 2.0 of the Johnson Report (attached hereto as Ex. 6), which is titled the "Assignment," is telling: Mr. Johnson states that he was retained by the Trust to "1. [p]rovide my opinions on relevant topics discussed in the expert reports submitted by [Dr. Palermo, Dr. Ram, Mr. Sharma, and Dr. Tomasi]," *but also* to "2. *[p]rovide opinions* on the following [4] topics:

> a. The extent to which capping of contaminated sediments in water bodies or removal of such sediments using dredging technologies were being used or contemplated as remedial alternatives for contaminated sediment sites, including CERCLA sites, in the mid-1990s.
>
> b. The adequacy, appropriateness, and reliability of Maxus's 1994 analysis of the likely remedy for contaminated sediments in the Passaic River, the appropriateness of Maxus's 1995 estimate of environmental liability, and the appropriateness of Andrews & Kurth's ("A&K") acceptance of and reliance on Maxus's estimate in A&K's 1995 due diligence and liability estimation work.
>
> c. As of 1995, the potential magnitude of Maxus's liability for environmental contamination of the DASS.
>
> d. The extent to which the likelihood and amount of Maxus's potential costs to address environmental contamination of the DASS changed over time after 1995."

Johnson Report at 3 (emphasis added). In *his own words*, Mr. Johnson admits above that his report does *more* than rebuttal, but also offers its own independent opinions on the topics listed. Arguably, the entire Johnson Report is not a rebuttal at all, and only Opinions 3 and 5 through 8 even *purport* to directly rebut or criticize the Palermo and Ram reports. *See* Johnson Report Table of Contents. Opinions 1, 2, and 4 make scant mention of Defendants' expert reports. Moreover, the "rebuttal" arguments are based upon information and analysis from Johnson's improper affirmative opinions, which should have been presented first as an initial report on environmental

liability matters, and improperly and unfairly used as "rebuttal" on those matters for which the Trust has the burden of proof.

Additionally, in a further attempt to disguise the Johnson Report as rebuttal, Trust counsel informed counsel for Repsol and YPF that Mr. Johnson was first contacted and retained in October of 2021 "(after we [Trust] learned that defendants had hired so many experts to defend the purported reasonableness of the plainly inadequate balance sheet reserves)." *See* Meet & Confer Email. But this attempt is off-base for a number of reasons. For one, based on the allegations in its own Complaint—centering on the environmental liabilities and Maxus's solvency—the Trust should not have been surprised by the disclosure of these environmental experts. The number of Maxus's sites at issue, the relevant time horizon, and their complexity—particularly at the Passaic River—necessitated the number of experts disclosed. The Trust should also not have been surprised as both Repsol and YPF submitted environmental expert opinion in the underlying New Jersey litigation regarding the very same issues and claims. Simply put, the Trust chose not to disclose and offer similar expert opinion until it was time for rebuttal reports, even though it is plainly appropriate for an initial report as it goes directly to a key issue for which the Trust bears the burden of proof.

III.    **ARGUMENT**

A.    **The Court Should Strike the Johnson Report Because It Is Not Rebuttal.**

Despite the Trust's knowledge that their case theory rests on demonstrating the extent of Maxus's known or knowable environmental liabilities impacting Maxus's solvency and Defendants' motivations at the time of the transactions challenged, the Trust made the choice not to present an expert on environmental liabilities. The Trust cannot now take a mulligan for itself; it cannot change its intentional decision to not submit affirmative expert opinions on the extent of Maxus's environmental liabilities over time by offering the Johnson Report as a "rebuttal," when

the report contains opinions that are clearly intended to compensate for the absence of an opening report on the issue. The Johnson Report should be stricken in its entirety for this reason. At the very least, the worst offending portions of the Johnson Report—specifically, Opinions 1, 2, and 4—should be stricken.

> i.    *Rebuttal Expert Reports Are only Proper to Contradict or Rebut Evidence from an Opposing Expert, but the Johnson Report Goes Beyond That*

A rebuttal expert report is only proper where the intent of the report is "'solely to contradict or rebut evidence on the same subject matter identified' by the opposing party's expert report." *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001 (D. Del. 2013) (citing *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013)). A rebuttal report "cannot be used to correct a party's oversights in its case-in-chief." *Byrd v. Aaron's, Inc.*, No. 1:11-CV-00101, 2017 WL 1093286, at *4 (W.D. Pa. Mar. 22, 2017) (finding Plaintiffs' "rebuttal" report an attempt to "establish a new theory and methodology in pursuit of its class certification" and granting motion to strike). Indeed, on rebuttal, it is properly within the discretion of the trial judge to "limit testimony to that which is precisely directed to rebutting new matter or new theories presented by the defendant's case-in-chief." *Bowman v. General Motors Corp.*, 427 F. Supp. 234, 240 (E.D. Pa. 1977). Importantly, "[t]he rebuttal date is not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Amos v. Makita U.S.A., Inc.*, No. 2:09-CV-01304-GMN, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011).

For that reason, rebuttal expert testimony "is limited to 'new unforeseen facts brought out in the other side's case.'" *Columbia Grain, Inc. v. Hinrichs Trading, LLC*, No. 3:14-CV-115-BLW, 2015 WL 6675538, at *2 (D. Idaho Oct. 30, 2015) (citing *Century Indem. Co. v. Marine Grp., LLC*, 2015 WL 5521986 at *3 (D. Or. Sept. 26, 2015)). Where expert reports address the same

general subject matter as a previously-submitted report, but do not directly contradict or rebut the contents of that report, it is not a proper rebuttal. *See Glass Dimensions*, 290 F.R.D. at 16 (holding "rebuttal" expert report was actually an untimely affirmative report).

Courts have also made it clear that an expert cannot mischaracterize the opposing party's expert report in an effort to advance new legal theories that are "at best, loosely related" to the opposing party's expert report. *See Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-CV-1122-RGA, 2019 WL 297039, at *5 (D. Del. Jan. 22, 2019) (Andrews, J.). Such actions go beyond rebuttal and "that witness may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order." *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 18 (D.D.C. 2013) ("In sum, the Court agrees with Defendant's characterization that Plaintiff's rebuttal report is 'a thinly veiled attempt to circumvent his failure to timely disclose Dr. Garmoe as a testifying expert, as well as this Court's order striking Dr. Garmoe.'"); *EMC Corp. v. Pure Storage Inc.*, No. 13-1985-RGA, 2016 WL 823110, at *2 (D. Del. Feb. 29, 2016) (striking late disclosure because "[t]he explanation offered by Plaintiffs for the late production of documents is not convincing, as Plaintiffs could have produced them [by the deadline]").

> ii.   *At the Very Least, Opinions 1, 2, and 4 of the Johnson Report Are Not Rebuttal, and Do Not Even Purport to Be*

While the entire Johnson Report presents new opinions (and indeed Mr. Johnson admits the Trust hired him to opine on four issues separate and apart from the rebuttal of any Defense experts, *see* Johnson Report at 3), Repsol submits that Opinions 1, 2, and 4 are the most obvious examples of the Johnson Report's presentation of new opinions. These opinions make scant mention of Drs. Ram and Palermo's reports, which they purportedly intend to rebut. Put plainly, these opinions serve as an opening expert report on new issues. *See, e.g.*, *Withrow*, 967 F. Supp.

13

2d at 1002. But the Trust missed the deadline to disclose Mr. Johnson as their environmental expert and should have submitted an opening expert report from him months ago. The Johnson Report is based entirely on the Trust's allegations about environmental liabilities that clearly have been part of the Trust's case since the beginning, making this late disclosure even more egregious. *See Columbia Grain*, 2015 WL 6675538, at *3 ("Using a rebuttal report to provide new evidence that could have been provided in the original report is precisely what is forbidden."). Each of these opinions should be stricken in their entirety.

Opinion 1, while making an initial reference to Dr. Ram, actually mischaracterizes Dr. Ram's report in order to make affirmative points about dredging and capping that Dr. Ram did not dispute. More specifically, Opinion 1, which spans nearly fifty pages, goes into detail about dredging and capping being remedial technologies that were considered in 1995. *See* Johnson Report at 26.  But this is not an actual rebuttal to Dr. Ram's report. In fact, Dr. Ram's report includes a nearly 20-page discussion on dredging. *See* Ram Report at 167–184 ("This section discusses the industry practice of dredging or excavating and treating contaminated sediments in rivers and near shore settings (where dredging technologies similar to river systems would also apply."). Moreover, after the opening mention of Drs. Ram and Palermo, Sections 7.0, starting on page 26, through 7.3, ending at page 70, make absolutely *no* reference to Dr. Ram's opinions at all. Nor is Opinion 1 a rebuttal to Dr. Palermo's report. The only references Section 7.0 and 7.3 make to Dr. Palermo are a few sentences sprinkled in that state Dr. Palermo's report references a similar document, but then not addressing any opinion Dr. Palermo made. Mr. Johnson cannot mischaracterize Dr. Ram's report, and then add new opinions to refute his own mischaracterization, and call it rebuttal. *See, e.g.*, *Bayer HealthCare*, 2019 WL 297039, at *5. Neither should he be able to provide dozens of pages of opinion without tying it to any sort of

14

rebuttal of either expert. Given that the Johnson Report does not even reference those reports in a fifty-page span of this opinion, Mr. Johnson cannot be said to be solely "'contradict[ing] or rebut[ting] evidence on the same subject matter identified' by the opposing party's expert report." *Withrow*, 967 F. Supp. 2d at 1001.

Opinion 2 is similarly invalid rebuttal. Like Opinion 1, Mr. Johnson attempts to anchor his opinions to those of Drs. Ram and Palermo by beginning this section stating "[t]he question addressed in this section of my report, and answered very differently by the Palermo Report and Ram Report, is the extent to which an expensive, large-scale, active remed[y] . . . was predictable prior to the close of the YPF acquisition of Maxus in June 1996." Johnson Report at 70–71. But again, the first page of Opinion 2 is the *only* notable mention of the Ram and Palermo Reports in Opinion 2—with twenty more pages to follow that offer something entirely separate than what Drs. Ram and Palermo addressed. Indeed, Opinion 2 is not truly about environmental cost estimation, but instead opines on Maxus's strategy and motivations. *See, e.g.*, Johnson Report at 80 ("8.3.3. March 4, 1992 Maxus River Strategy"). It also references a number of sources that are not based in science or expert analysis at the time (such as the inherently unreliable 1994 ChemRisk marketing presentation, like Mr. Menenberg does). *Id.* Drs. Ram and Palermo, in contrast, addressed environmental cost estimation in a more objective and reasonably estimated manner, or as Mr. Johnson puts it, "very differently." In other words, Mr. Johnson is simply addressing a *similar* general subject matter *without* directly contradicting or rebutting the contents of Dr. Ram's report. The law holds that is not proper rebuttal. *See Glass Dimensions*, 290 F.R.D. at 16 (holding "rebuttal" expert report was actually an untimely affirmative report).

Further, Opinion 4 is perhaps the most obvious example of an opinion that should have been in an opening expert report, not in a rebuttal. In this Opinion, Mr. Johnson claims that by the

time of its bankruptcy, Maxus was facing a potential liability of more than $10 billion. If this is a position the Trust wanted to make in its case-in-chief—which, obviously based on the allegations in the Complaint, is essential to its claims—it should have done so in an opening report. Instead, the Trust only disclosed Mr. Menenberg, a CPA. As stated before, the only discussion offered of environmental liabilities by Mr. Menenberg in his opening expert report related to his opinion that GAAP environmental reserves for financial statements do not fully capture environmental contingencies and that the parties should have known that Passaic River liabilities *could* be substantial at some point in the future based on a 1994 marketing presentation from ChemRisk. However, Mr. Menenberg gave no estimate that the amount could have been more than $10 billion. This is clearly an attempt to correct oversights in the Trust's case-in-chief, made when they decided not to disclose an environmental expert apart from Mr. Menenberg, who does not touch on these issues. *See Byrd v. Aaron's, Inc.*, 2017 WL 1093286, at *4.

Rebuttal expert reports must be limited to "new unforeseen facts brought out in the other side's case," but there is no valid argument that the actual amount associated with Maxus's environmental liabilities was an unforeseen fact or issue by any measure. Indeed, the extent of Maxus's known or knowable environmental liabilities impacts Maxus's solvency at the time of the transactions challenged, which the Trust has always known since the inception of this case, but the Trust did not present an expert who could opine on that to inform the solvency analysis. It is without question the Trust's burden—not the Defendants'—to prove Maxus's insolvency at the time of the challenged transfers. *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 295 (Bankr. S.D.N.Y. 2013) ("The further and more hotly contested question is whether *Plaintiffs satisfied their burden of showing* that Tronox was, as a result of the transfers, *insolvent*, without sufficient capital or unable to pay its debts as they came due.") (emphasis added). But the only opinion offered in

relation to this was Mr. Menenberg's reliance on an inherently unreliable ChemRisk marketing proposal. The Trust cannot try to reverse its decision by adding an opinion on environmental liabilities weighing on solvency at this stage, months past their deadline to disclose. Accordingly, at the very least, Opinion 4 should be excluded, along with Opinions 1 and 2.

**B.    The Untimely Johnson Report Causes Significant Prejudice to Repsol.**

The Johnson Report constitutes expert opinion misrepresented as rebuttal; for that reason, the Court should consider the Johnson Report equivalent to an untimely served expert report. Once an expert report is determined untimely, courts analyze the totality of the *Pennypack* factors to determine whether to strike the untimely report. Those factors include: "(1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; (5) the explanation for the failure to disclose; and (6) the importance of the testimony sought to be excluded." *Withrow*, 967 F. Supp. 2d at 1000 (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). While arguably all of these factors weigh toward exclusion, the most important factors are the surprise and prejudice suffered by the opposing party, along with that party's ability to cure the prejudice. *See Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 7 (1st Cir. 1985). These factors weigh most heavily in favor of Repsol and excluding the Johnson Report, or at the very least the worst offending portions.

*i.    The Law Prohibits Defendants from Surprising and Prejudicing Repsol with an Untimely Expert Report (Pennypack Factors 1, 2, and 3)*

The Johnson Report is a prejudicial and unreasonable surprise for the Defendants that will be very difficult to cure without impacting the current case schedule, tipping the analysis decidedly in favor of Repsol on the first, second, and third *Pennypack* factors.

Despite the fact that the parties already exchanged expert names on August 18, 2021 and the Trust only identified Mr. Menenberg as an expert to cover any environmental topics, almost *five months later*, the Trust has abruptly added another expert, Mr. Johnson, on the eve of expert depositions. To do so was patently unreasonable, especially given the efforts Repsol has made to abide by the Court's schedule. Repsol had no reason to believe (because the Trust gave it none), that the Trust would be submitting a 200-plus page "rebuttal" report consisting of predominantly non-rebuttal opinion from an undisclosed expert. To be clear, Repsol at most could have expected a rebuttal from the lone expert the Trust disclosed, Mr. Menenberg—although, given the narrow scope of environmental issues addressed in his report, perhaps Repsol expected that rebuttal to be limited. The Johnson Report is not that. Repsol was not required to have "guessed" the Trust would exhibit such gamesmanship and disclose a surprise environmental expert on the eve of a truncated deposition schedule. *See, e.g.*, *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 720 n.4 (3d Cir. 1997) (finding prejudice from untimely report and rejecting explanation that opposing party "should have guessed" that the undisclosed expert would be added). This late disclosure flies in the face of the reason why discovery rules exist and scheduling orders are issued—to give notice to the opposing party.

The Trust's last-minute effort to backfill their expert testimony has prejudiced Repsol in a number of ways: Repsol now faces arguments it did not have to respond to before, it has left counsel scrambling during an already difficult and truncated deposition schedule, and the gamesmanship of this disclosure has robbed Repsol of submitting a rebuttal report to what really should have been the Trust's opening expert report. This is on top of the well-established law that "[p]rejudice is inherent when deadlines are disregarded in complex cases with extensive discovery[.]" *Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-cv-2768, 2015 WL 12645745, at *2 (E.D.

Pa. May 26, 2015). That is plainly occurring here. As one example, Repsol's expert, Dr. Ram, went to great lengths to provide careful and thorough analysis in his report. To spring a brand new report on him a week prior to his deposition, without any chance for him to fully digest it or have an opportunity to respond, is undoubtedly prejudicial. If he were allowed to provide a proper rebuttal, which would take at least thirty days, that still would not fully cure the problem, as it does not account for the "months of analysis" that could have been planned or accounted for if Dr. Ram had known Johnson's opinions were coming earlier, when his existence should have been disclosed. *See, e.g.*, *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc*., No. CV 15-819-LPS-CJB, 2017 WL 11558096, at *11 (D. Del. Dec. 11, 2017). There is also little chance that any "cure could be accomplished in sufficient time so as to avoid disruption of the pre-trial process and the trial." *Id.* The current deposition schedule is already tight, and if the Johnson Report had been anticipated months ago, the parties would have discussed the current schedule differently.

It is also worth noting that the Trust appears to take the position that submission of an expert report constitutes a disclosure of that expert, as that is exactly what it did on January 14, 2022. Putting aside the impropriety of that practice, the Trust did not even submit the Johnson Report when it was supposed to: at the initial expert report stage. Had the Trust even done that, we would be in a much different position today as the parties and experts could have dealt with this issue then and planned accordingly.

> ii.     *The Untimely Disclosure by the Trust Was Willful, Intentional, and Lacks any Explanation (Pennypack Factors 3, 4 and 5)*

Courts analyze a number of issues in determining the third, fourth, and fifth *Pennypack* factors. The analysis includes whether there was "bad faith" from the party presenting the report, whether the party had the ability to "discover[] the witnesses earlier," the "excuse offered by the party," the "willfulness of the party's failure to comply with the court's order," and the "parties'

intent to mislead or confuse his adversary." *Pennypack*, 559 F.2d at 904. All of these considerations are present here. This is not a situation where the Trust did not propose Mr. Johnson due to a "lack of diligence," but more akin to a "flagrant disregard" of the schedule. *Withrow*, 967 F. Supp. 2d at 1006. Such a disregard is especially difficult for courts to overlook where there was a clear ability to serve the report earlier. *Id.*

Here, all of the information within Mr. Johnson's report was available in August 2021 when the Trust disclosed its experts. None of the case theories were new; the Trust included them all in the Complaint it drafted and filed. Yet, the first mention of a Trust environmental expert came in passing in an email from opposing counsel five months after expert disclosures, a week before expert discovery was set to begin, and mere hours before the Johnson Report was exchanged. Indeed, that email also came a full month after Defendants' counsel initiated scheduling the expert depositions. Surely, there is no feasible way that the Johnson Report—nearly 200 pages with much new material cited in connection with its affirmative opinions—was completed in such a short time period over the holidays. If it was not completed in that short time, that means the Trust withheld the existence of its environmental expert for months, with the intention of presenting him merely as a "rebuttal" witness and surprising Defendants. While courts are cautious to find conduct arises to the level of egregious,[8] this demonstrates no less than the "flouting of discovery deadlines." *Id.*

Even worse, in an effort to mask the fact that they were coming up with a brand new report that was clearly not rebuttal to make up for prior deficiencies, the Trust offered no explanation for

---

[8] Even if the Court does not find the Trust's actions to arise to the level of egregious, this factor does not tip the scale in favor of the Trust. Courts applying the *Pennypack* factors in the case of sophisticated, complex litigation involving parties represented by competent counsel have been more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied. *Bridgestone Sports Co. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007). This case is clearly a complex litigation.

withholding the Johnson Report (let alone his existence as a potential testifying expert) for so long. Within a deposition scheduling email, the Trust's counsel casually mentioned: "I've added two potential dates for the deposition of the Trust's expert (Stephen A. Johnson of Gnarus Advisors) whose report *primarily* rebuts the reports of Dr. Palermo and Dr. Ram." *See* Ex. 5 (emphasis added). When counsel for Repsol relayed Repsol's surprise and concern, the same Trust counsel expressed disbelief "that you can't prepare to defend a single deposition [Dr. Ram's] in 5 days[.]" The Trust showed no regard for the prejudice caused by the late disclosure of this expert or consideration for Defendants' obligations to prepare their experts for upcoming depositions. Nor did the Trust proffer any reason as to why it did not disclose this expert long ago.

> iii.    *While the Report Subject May Be of Importance, It Does Not Outweigh the Willfulness of the Trust's Decision and the Prejudice Caused by It (Totality of Factors)*

The Johnson Report is simply not rebuttal, and it is clear that the information contained in the Johnson Report rightfully belongs in an opening report. Repsol cannot determine the importance of this report to the Trust (though the Trust should have realized that an environmental remediation expert was needed to prove their case-in-chief long ago). Moreover, if this Johnson Report is that important to the Trust so as to be a factor in its favor, there is all the more reason to provide Repsol—at a minimum—the right to rebut such an important report (as sought in the alternative relief to this motion), and such a right is equally, if not more, important.

Regardless, given the clear prejudice and surprise caused by this report, there is very little to support a position that the importance of admitting the Johnson Report "overrides" the interest in excluding it. *See, e.g.*, *TQ Delta, LLC v. Adtran, Inc.*, No. 14-CV-954-RGA, 2021 WL 1200594, at *2 (D. Del. Mar. 30, 2021) ("Even if the opinions on invalidity in Dr. Madisetti's Declaration are not entirely fungible with others presented by Plaintiff, their importance does not outweigh the prejudice to Defendant, which received these new opinions during the middle of summary

judgment briefing and would have had to 'rush[ ] to supplement Mr. McNair's opinions in the seven days between opposition and reply briefs.'"); *Opengate Cap. Grp. LLC v. Thermo Fisher Sci. Inc*., No. CV 13-1475-GMS, 2016 WL 8488409, at *4 (D. Del. Feb. 1, 2016) ("Plaintiffs have always known the importance of their damages proof. To apply to me two months after I excluded part of that proof in order to 'correct' it not only subverts the notion of its criticality, but also constitutes sufficient flouting of discovery deadlines by failing to conform to the Rule 26(e) requirement that a party's disclosures must be made 'in a timely manner'. Opengate Capital knew or should have known there might be a day of reckoning. That day is today."). Therefore, absent a valid excuse for missing the deadline, and given the Trust's communications on the issue, this factor should weigh in favor of exclusion. The Trust should not be rewarded in any way for so blatantly flouting this Court's deadlines.

### C.    Alternatively, at the Very Least, Repsol Requests Additional Time to Serve a Response to the Johnson Report and to Prepare for Expert Deposition

To the extent the Johnson Report, or the worst offending portions in it are not struck, the Defendants' environmental experts should have an opportunity to rebut the Johnson Report, which should have been included in an opening expert report on October 29th. As stated, the Johnson Report is of material length, comprising over 200 pages replete with technical arguments, citing numerous new EPA documents and reports among its 900 citations, all of which must be checked and reviewed in order to properly consider Mr. Johnson's opinions the Trust provided improperly at the eleventh hour and to prepare for his deposition. Defendants' experts should be given the same opportunity to respond to his report, which will take time to both review Mr. Johnson's opinions and citations—which includes arguments and documents never raised before—and then formulate their own responses to them.

Fairness demands that Repsol's environmental experts be given a meaningful chance to respond to the Trust's late expert submission. In circumstances like this, courts have cured prejudice by allowing a party to file a reply report in response to new information provided in a rebuttal report, which is what Repsol alternatively requests here. *See, e.g.*, *Astellas Pharma Inc. v. Actavis Elizabeth LLC*, No. 16-905-JFB-CJB, 2019 WL 2265570, at *2 (D. Del. May 13, 2019); *see also R. M. W. by Wolfe v. Homewood Suites by Hilton Mt. Laurel*, No. CV 09-400 (JHR/AMD), 2012 WL 13186031, at *8 (D.N.J. June 28, 2012) (noting that any prejudice that may result from additional expert reports may be cured by granting additional time to conduct responsive discovery); *Coicca v. BJ's Wholesale Club, Inc.*, No. 04-5606, 2011 WL 3563560, at *5 (E.D. Pa. Aug. 12, 2011) (granting additional time to respond to expert report, depose expert, and obtain expert).

Despite the Trust's statement to the contrary, Repsol's counterpart to Mr. Johnson, Dr. Ram, cannot reasonably be expected to prepare a response (or sit for deposition on this topic) in five days, which is what the Trust sought to impose on him and Repsol. While Dr. Ram was prepared to testify on the topics addressed in his own report, as well as any material from a proper rebuttal report—as evidence by the fact that the Repsol Defendants made him available even before Mr. Johnson's surprise report was submitted—he could not reasonably analyze the various opinions in the Johnson Report that go beyond rebutting his own. In addition to this matter, the experts work on a variety of other matters. They had meticulously planned their calendars around the Scheduling Order and had not anticipated the need to issue further reply reports until the Trust untimely served the Johnson Report.

Additionally, Defendants' environmental experts should only sit for deposition once, just as the Trust's experts will. Courts have held in similar circumstances that prejudice is curable by

allowing additional deposition time. *See, e.g.*, *Novartis Pharms. Corp. v. Actavis, Inc.*, No. 12-366-RGA-CJB, 2013 WL 7045056, at *10 (D. Del. Dec. 23, 2013). As such, Repsol respectfully requests that the Court grant the Defendants an additional thirty days from the date of the Court's order on this motion to submit reports responsive to the Johnson Report, and an additional fourteen days thereafter to schedule and take those expert depositions.

## IV.    CONCLUSION

For the foregoing reasons, Repsol respectfully requests the Court grant this Motion.

Dated: January 28, 2022
      Wilmington, Delaware

Respectfully submitted,

*/s/ Daniel B. Butz*
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*- and -*

WEIL, GOTSHAL & MANGES LLP
Edward Soto
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

*Attorneys for Repsol Defendants*