## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAXUS ENERGY CORPORATION, *et al.*, | ) | |
| | ) | Case No. 16-11501 (CSS) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 18-50489 (CSS) |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) | |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) | |
| REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., | ) | |
| REPSOL USA HOLDINGS CORP., REPSOL E&P | ) | |
| USA, INC., REPSOL OFFSHORE E&P USA, INC., | ) | |
| REPSOL E&P T&T LIMITED, and REPSOL | ) | |
| SERVICES CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II, IV, VI, VIII, X, XII, AND XIV OF THE COMPLAINT AND RELATED AFFIRMATIVE DEFENSES

Dated: March 16, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Jason Zakia (*pro hac vice* admission pending)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)

Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (*pro hac vice* admission pending)
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
jzakia@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

*Attorneys for the Liquidating Trust*

AMERICAS 111968923

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

TABLE OF CONTENTS................................................................... i

PRELIMINARY STATEMENT ........................................................1

FACTUAL BACKGROUND..............................................................2

    A.    The Parties ...............................................................3

    B.    The Diamond Alkali Superfund Site Has Always Been the Primary Driver of Maxus's Environmental Obligations ...........................................3

    C.    Maxus Offers Itself for Sale Knowing It Faces the Potential of Material Future Environmental Expenditures.............................................6

    D.    The First YPF Period: YPF Seeks to Acquire Maxus...............................8

    E.    YPF Fails to Identify the "Problem" of Maxus's Environmental Liabilities During Its Pre-Closing Diligence.........................................9

    F.    YPF's Post-Closing Diligence and Recognition of the "Problem" .......................10

    G.    YPF Develops a "Moonshot" Strategy .................................12

    H.    YPF Implements the "Global Restructurings".......................13

    I.    The Repsol Period: Repsol Acquires YPF (and Maxus) ......................15

    J.    Repsol YPF Learns About the DASS Post-Acquisition .......................16

    K.    The Crescendo Transfers (1999 to 2000)........................17

    L.    The YPFI Transfers (2000 to 2002)........................18

    M.    The King & Spalding Memo........................18

    N.    The NJ Litigation Commences ...................21

    O.    The EPA's 2007 Draft FFS Makes Clear that a Large-Scale, Active Remediation at the DASS is Expected..............................21

    P.    Repsol's Partial "Clean-Up" and Wind-Down of Maxus: The "Manage" Phase of the Strategy ......................................22

    Q.    The Second YPF Period: Project Jazz and the Run Up to the Chapter 11 Cases ..24

    R.    The Chapter 11 Cases ...................27

PARTIAL SUMMARY JUDGMENT STANDARDS ................................28

ARGUMENT ................................................................30

I.    Defendants Are Liable for Maxus's Legal Obligations, Including the Allowed Class 4 and Class 5 Claims, Should This Court Rule in Favor of the Trust's Alter Ego Claim against Each of the Named Defendants. ..........................30

i

A.     There Are Triable Issues on Whether Maxus, YPF, Repsol, and Their Subsidiaries Operated as a Single Economic Unit and Whether Such Operation Worked an Injustice on Creditors. ..........................................................................31

B.     Defendants Are Liable for the Debtors' Legal Obligations, Including the Allowed Class 4 and Class 5 Claims, Upon a Finding that Defendants are Alter Egos of the Debtors. ...........................................................................................33

     1.     The Proper Measure of Damages for The Trust's Alter Ego Claim Concerns All of the Debtors' Unpaid Obligations. ................................... 34

     2.     The Quantum and Validity of Damages Sought By the Trust Has Already Been Adjudicated and Resolved by the Amended Plan. ............. 35

II.     The Trust Is Entitled To Summary Judgment on Its Actual Fraudulent Transfer Claims Against Each of the Named Transferee Defendants. ..........................................................40

A.     There Is No Genuine Dispute of Material Fact That the Intentional Fraudulent Transfers Each Involved "Transfers" of "Interests" of the Debtors in "Property". ...........................................................................................................42

B.     There is No Genuine Dispute of Material Fact That the Badges of Fraud Provide Conclusive Evidence of Defendants' Intent to Defraud, Delay, or Hinder Creditors .....................................................................................................44

     1.     Factor 1: The Transfers Were Made to Insiders. ...................................... 49

     2.     Factor 2: The Debtors Retained Possession or Control of the Property Transferred After the Transfers. ............................................................... 50

     3.     Factor 3: The Transfer or Obligation Was Disclosed or Concealed. ........ 52

     4.     Factor 4: Before the Transfer Was Made or Obligation Was Incurred, the Debtors Had Been Sued or Threatened with Suit. ............................... 53

     5.     Factor 5: The Transfer Was of Substantially All the Debtor's Assets ...... 56

     6.     Factor 7: The Debtors Removed or Concealed Assets. ........................... 58

     7.     Factor 8: The Value of the Consideration Received by the Debtors Was Not Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred. .......................................................... 58

     8.     Factor 9: The Debtors Were Insolvent or Became Insolvent Shortly After the Transfer Was Made or the Obligation Was Incurred. ............... 61

     9.     Factor 10: The Transfer Occurred Shortly Before or Shortly After a Substantial Debt Was Liquidated .......................................................... 64

III.     Defendants Cannot Establish a Genuine Trial Issue Regarding Their Purported Affirmative Defenses .................................................................................................67

CONCLUSION ..................................................................................................................69

ii

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Asarco LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ..........................................................................45

*Blair v. Infineon Techs. AG*,
  720 F. Supp. 2d 462 (D. Del. 2010)..............................................................32, 34

*Branch Banking & Trust Co. v. Saiid Forouzan Rad*,
  No. 2:14-cv-01947-APG-PAL, 2016 U.S. Dist. LEXIS 119450 (D. Nev. Sept.
  1, 2016) ............................................................................................................69

*Carlson v. Arnot-Ogden Mem'l Hosp.*,
  918 F.2d 411 (3d Cir. 1990)..............................................................................29

*Carter v. McGrady*,
  292 F.3d 152 (3d Cir. 2002)..............................................................................28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................. *passim*

*Coffman v. Federal Laboratories*,
  171 F.2d 94 (3d Cir. 1948)................................................................................29

*David's Bridal, Inc. v. House of Brides, Inc.*,
  No. 06-5660 (SRC), 2010 U.S. Dist. LEXIS 4763 (D.N.J. Jan. 20, 2010)............67

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
  807 F.3d 572 (4th Cir. 2015) .............................................................................34

*Freeman v. Minn. Mining & Mfg. Co.*,
  675 F. Supp. 877 (D. Del. 1987)........................................................................29

*In re Aerogroup Int'l*,
  601 B.R. 571 (Bankr. D. Del. 2019) ..................................................................40

*In re All Am. Petroleum Corp.*,
  259 B.R. 6 (Bankr. E.D.N.Y. 2001)....................................................................48

*In re Arctic Glacier Int'l, Inc.*,
  255 F. Supp. 3d 534 (D. Del. 2017)....................................................................36

*In re Autobacs Strauss, Inc.*,
  473 B.R. 525 (Bankr. D. Del. 2012) ...................................................................31

AMERICAS 111968923

*In re Blackhawk Corp.*,
No. 13-10282(KG), 2016 Bankr. LEXIS 2217 (Bankr. D. Del. May 26, 2016) ....................36

*In re Digital Networks N. Am. Inc.*,
No. 15-11535, 2021 Bankr. LEXIS 3080 (Bankr. D. Del. Nov. 8, 2021) ..............................67

*In re E. Coast Foods, Inc.*,
No. 2:16-bk-13852-BB, 2017 WL 3701211 (Bankr. C.D. Cal. Aug. 25, 2017)...............48, 67

*In re FBI Window, Inc.*,
614 B.R. 460 (Bankr. D. Del. 2020) ...............................................................................28, 29

*In re G-I Holdings Inc.*,
No. 02-3082 (SRC), 2007 U.S. Dist. LEXIS 34947 (D.N.J. May 14, 2007)..........................29

*In re Grasso*,
497 B.R. 434 (Bankr. E.D. Pa. 2013) ...................................................................................30

*In re Hechinger Inv. Co. of Del.*,
327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ....................................45

*In re Hooker Invs., Inc.*,
155 B.R. 332 (Bankr. S.D.N.Y. 1993)....................................................................................43

*In re Livecchi*,
No. 09-20897, 2014 WL 6668886 (Bankr. W.D.N.Y. Nov. 20, 2014) ...................................48

*In re Meridian Auto. Systems-Composites Operations*,
372 B.R. 710 (Bankr. D. Del. 2007) .....................................................................................61

*In re Midway Games, Inc.*,
428 B.R. 303 (Bankr. D. Del. 2010) ...............................................................................41, 42

*In re Mortg. Lenders Network USA, Inc.*,
406 B.R. 213 (Bankr. D. Del. 2009) .....................................................................................40

*In re Northfield Labs. Inc.*,
467 B.R. 582 (Bankr. D. Del. 2010) .....................................................................................36

*In re Opus E., LLC*,
528 B.R. 30 (Bankr. D. Del. 2015), *aff'd*, 2016 U.S. Dist. LEXIS 42955 (D.
Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017)...................................................61

*In re ORBCOMM Global L.P.*,
No. 00-3636 (MFW), 2003 Bankr. LEXIS 759 (Bankr. D. Del. June 12, 2003)....................28

*In re Orion Refining Corp.*,
424 B.R. 156 (Bankr. D. Del. 2010) .....................................................................................40

iv

*In re PHP Healthcare Corp.*,
  128 F. App'x 839 (3d Cir. 2005) ..........................................................................41

*In re Prosser*,
  534 F. App'x 126 (3d Cir. 2013) ..........................................................................61

*In re S.I. Acquisition, Inc.*,
  817 F.2d 1142 (5th Cir. 1987) ..............................................................................34

*In re SemCrude*,
  No. 08-11525 (BLS), 2012 Bankr. LEXIS 3059 (Bankr. D. Del. Mar. 1, 2012) ...................29

*In re Sharp Int'l. Corp.*,
  403 F.3d 43 (2d Cir. 2005)....................................................................................45

*In re Syntax-Brillian Corp.*,
  No. 08-11407 (BLS), 2016 Bankr. LEXIS 988 (Bankr. D. Del. Feb. 8, 2016) ......................45

*In re Tronox Inc.*,
  855 F.3d 84 (2d Cir. 2017)....................................................................................34

*In re Vaso Active Pharms., Inc.*,
  No. 10-10855 (CSS), 2012 Bankr. LEXIS 4741 (Bankr. D. Del. Oct. 9, 2012)
  (Sontchi, J.) .......................................................................................... *passim*

*Kaucher v. Cty. of Bucks*,
  455 F.3d 418 (3d Cir. 2006)..................................................................................28

*Kelley v. Thomas Solvent Co.*,
  725 F. Supp. 1446 (W.D. Mich. 1988) .............................................................48, 49

*LG Philips LCD Co. v. Tatung Co.*,
  243 F.R.D. 133 (D. Del. 2007) ......................................................................67, 68

*Local Union 42 v. Absolute Envt'l. Services*,
  814 F. Supp. 392 (D. Del. 1993)....................................................................67, 68

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................................29

*Merrill Lynch Bus. Fin. Servs. v. Kupperman*,
  441 F. App'x. 938 (3d. Cir. 2011) ........................................................................46

*MSKP Oak Grove, Ltd. Liab. Co. v. Venuto*,
  839 F. App'x. 708 (3d Cir. 2020) ..................................................................45, 46

*Myers v. Martin (In re Martin)*,
  91 F.3d 389 (3d Cir. 1996)....................................................................................40

v

*NextGear Cap., Inc. v. Gutierrez*,
  No. 3:18-1617, 2021 U.S. Dist. LEXIS 99257 (M.D. Pa. May 26, 2021)............................64

*Pearson v. Component Tech. Corp.*,
  247 F.3d 471 (3d Cir. 2001)....................................................................................31, 34

*Pharmacia Corp. v. Motor Carrier Servs. Corp.*,
  309 F. App'x 666 (3d Cir. 2009) .........................................................................................32

*Philips Elecs. N. Am. Corp. v. Contec Corp.*,
  312 F. Supp. 2d 639 (D. Del. 2004)....................................................................................67

*Poultry Health Serv., Inc. v. Moxley*,
  538 F. Supp. 276 (S.D. Ga. 1982)......................................................................................30

*Ray v. Twp. of Warren*,
  626 F.3d 170 (3d Cir. 2010)................................................................................................28

*Reliance Insurance v. Woodward-Clyde*,
  243 F. App'x 674 (3d Cir. 2007) .........................................................................................30

*Sentry Ins. A Mut. Co. v. Brand Mgmt.*,
  120 F. Supp. 3d 277 (E.D.N.Y 2015) .................................................................................32

*Shapiro v. Wilgus*,
  287 U.S. 348 (1932)............................................................................................................44

*Soros Fund Mgmt. LLC v. Tradewinds Holdings, Inc.*,
  No. 17 Civ. 3187 (JFK), 2018 U.S. Dist. LEXIS 40164 (S.D.N.Y. Mar. 12,
  2018) ...................................................................................................................................33

*Temple-Inland Inc. v. United States*,
  68 Fed. Cl. 561 (Fed. Cl. 2005) .........................................................................................69

*Trevino v. Merscorp, Inc.*,
  583 F. Supp. 2d 521 (D. Del. 2008)....................................................................................31

*United States v. Pisani*,
  646 F.2d 83 (3d Cir. 1981)..................................................................................................32

*Valdes v. Leisure Res. Grp., Inc.*,
  810 F.2d 1345 (5th Cir. 1987) ............................................................................................34

*VFB LLC v. Campbell Soup Co.*,
  No. 02-137 KAJ, 2005 U.S. Dist. LEXIS 19999 (D. Del. Sept. 13, 2005),
  *aff'd*, 482 F.3d 624 (3d Cir. 2007)....................................................................................46

vi

# FEDERAL RULES AND STATAUES

6 Del. C. § 1301 ................................................................................................................50

6 Del. C. § 1304 .................................................................................................41, 44, 46

11 U.S.C. § 101 .................................................................................................................42

11. U.S.C. § 363 ...............................................................................................................39

11 U.S.C. § 502 ................................................................................................................41

11 U.S.C. § 544 ..................................................................................................41, 42, 44

11 U.S.C. § 548 ..................................................................................................42, 44, 61

11 U.S.C. § 550 ........................................................................................................42, 43

11 U.S.C. § 1123 ..............................................................................................................39

Federal Rules of Bankruptcy Procedure 7056 ...............................................1, 28, 49

Federal Rules of Bankruptcy Procedure 9019 ..........................................................39

Federal Rules of Bankruptcy Procedure 7001 ..........................................................28

Federal Rules of Civil Procedure 56 ......................................................28, 29, 30, 67

N.J.S.A. §§ 25:2-20 ..........................................................................................................41

OHIO REV. CODE §§ 1336.04 .........................................................................................41

AMERICAS 111968923

Joseph J. Farnan, Jr., the Liquidating Trustee for the Maxus Liquidating Trust (the "Trust"), appointed in the proceedings (the "Chapter 11 Cases") of Maxus Energy Corporation and its affiliated Debtors (the "Debtors" or "Maxus") pursuant to the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors*, which the Court confirmed on May 22, 2017 [Bankr. D.I. 1451] (the "Amended Plan"),[1] by and through his undersigned counsel, respectfully submits this brief in support of the Trust's motion for partial summary judgment on Counts I, II, IV, VI, VIII, X, XII, and XIV of the Trust's complaint in the above-captioned adversary proceeding, filed June 14, 2018 [D.I. 1] (the "Complaint" or "Compl."), and for dismissal of related affirmative defenses raised by Defendants YPF and Repsol (defined within) in their responsive pleadings.

## PRELIMINARY STATEMENT

One of the many remarkable facts in this remarkable proceeding is that, despite a record reaching back thirty years, so much of that record is at this point undisputed, with substantially all of the who, what, when, where, and even why having been the subject of decades of discovery and the development of an enormous cache of contemporaneous documentary evidence. The Trust now seeks to conserve judicial resources by having this Court resolve, pursuant to Bankruptcy Rule 7056, numerous legal issues and fact issues which are not genuinely disputed, leaving only a handful of disputed issues for trial.

As set forth in Section I, concerning the Trust's alter ego claims, the Court can and should (1) resolve the law applicable to those claims and (2) find that damages in connection with any imposition of alter ego liability must include all of the Debtors' unpaid Allowed Claims. Resolving this issue would then leave the sole issue to be tried as whether the conduct of

---

[1] "Bankr. D.I." refers to the docket of the main Chapter 11 Case, C.A. No. 16-11501-CSS.

1

Defendants comported with applicable standards of corporate conduct or whether, as the Trust submits, it constituted corporate domination and abuse.

As set forth in Section II, concerning Trust's intentional fraudulent conveyance claims, the Court can and should (1) resolve the applicable law and (2) find liability on behalf of Defendants at this time.  Specifically, the Court should find that the key asset transfers in the Debtors' history—the sales of substantially all of the Debtors' international businesses to YPF in the 1996-1997 timeframe and the subsequent transfers of those businesses and the Debtors' remaining assets to Repsol in the 1999-2002 period—were all made with the actual intent of hindering, delaying, and defrauding the Debtors' environmental creditors.  The mere fact that certain of Defendants' witnesses might disclaim "bad" intent does not require a trial, particularly when those demurrers are directly contrary to the contemporaneous documentary record conclusively establishing nearly every badge of fraud.  Such a finding of liability would then leave for trial only issues concerning solvency and reasonably equivalent value (relating to the Trust's pending constructive fraudulent transfer claims) and damages.

Finally, as set forth in Section III, the Court can and should dismiss the laundry list of Defendants' affirmative defenses, except to the extent that Defendants can establish any triable issue of material fact supporting any defense.  At the end of this motion sequence, any trial can be limited to a manageable set of legitimately disputed issues, not only providing the next trier of fact with a roadmap to a litigated resolution, but also providing the parties with a far more defined path to a consensual resolution of this three-decades-old dispute.

## FACTUAL BACKGROUND

In an attempt to allow this Court to resolve as many legal and factual issues as possible from the extensive factual record in this case, the Trust has submitted (1) a statement of undisputed

2

facts (the "SOF") setting forth what the Trust believes to be the undisputed issues of material fact in this Case, and (2) the Declaration of Erin M. Smith ("Smith Decl.") attaching the evidence supporting the SOF or otherwise relevant to the Motion. The key facts directly relevant to the relief sought by this Motion are summarized below.

### A. The Parties

Plaintiff the Maxus Liquidating Trust (the "Trust") was created on July 14, 2017 (the "Effective Date"), upon consummation of the Amended Plan (defined within). SOF ¶ 2. At that time, the Trust succeeded to ownership of all of the assets, including claims and causes of action, of Maxus Energy Corporation ("Maxus"), Tierra Solutions, Inc. ("Tierra"), Maxus International Energy Corporation ("MIEC"), Maxus (U.S.) Exploration Company ("MUSE"), and Gateway Coal Company ("Gateway") (collectively, the "Debtors"). SOF ¶ 2.

Defendant YPF, S.A. ("YPF") is an oil and gas company formed under the laws of Argentina and is the sole shareholder of subsidiaries YPF International, S.A. ("YPFI"), YPF Holdings, Inc. ("YPFH"), and CLH Holdings, Inc. ("CLHH") (together with YPF the "YPF Defendants" or "YPF"). SOF ¶¶ 9-12. Defendant Repsol, S.A. ("Repsol") is an oil and gas company formed under the laws of Spain and is the sole shareholder of subsidiaries Repsol Exploracion, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Company (together with Repsol the "Repsol Defendants" or "Repsol"). SOF ¶¶ 13-16.

### B. The Diamond Alkali Superfund Site Has Always Been the Primary Driver of Maxus's Environmental Obligations

It is undisputed that environmental liabilities always have been the centerpiece of the story of Maxus. At all relevant times, Maxus has been subject to massive existing and future legacy environmental liabilities, both as owner of various non-productive industrial properties across the

3

United States, and as an obligor on account of indemnification obligations it undertook to Occidental Chemical Corporation ("OCC") pursuant to a 1986 Stock Purchase Agreement ("SPA"). SOF ¶ 30. By that SPA, OCC had acquired Maxus's (then known as Diamond Shamrock Corporation) active chemical business, and Maxus contractually obligated itself to defend and indemnify OCC for liabilities arising out of environmental contamination at chemical sites around the country. SOF ¶¶ 4, 17.

It is also undisputed that, while Maxus has environmental liabilities at multiple sites across the United States, SOF ¶¶ 31-39, the primary driver of those liabilities has always been the Diamond Alkali Superfund Site ("DASS") in New Jersey. Decades ago, manufacturing of Agent Orange and other chemicals at a former Diamond Alkali plant, located at 80-120 Lister Avenue adjacent to the Passaic River in Newark, New Jersey, left the river sediments some of "the most highly dioxin-contaminated in the nation." SOF ¶¶ 17-18; Smith Decl. Ex. 9 at MAXUS4008122. Following the U.S. Environmental Protection Agency's ("EPA") discovery of dioxin contamination at the Lister Avenue plant in 1982, the EPA ordered Maxus's predecessor (Diamond Shamrock Corporation) to take immediate measures to prevent the migration of contamination in 1983. In 1984, the EPA placed the plant and surrounding areas on the Superfund National Priorities List, commonly considered the most hazardous or the most dangerous Superfund sites in the country, making it eligible for remediation under EPA's CERCLA authority. SOF ¶ 20. The DASS has since been expanded and divided for remediation purposes into several operable units ("OUs") including along the Passaic River and into Newark Bay. SOF ¶ 24.

All of the experts in this case generally acknowledge that (1) under CERCLA, persons responsible for the release of hazardous substances can be held jointly and severally liable for all the associated investigation and cleanup costs, SOF ¶ 22, and (2) remediation of contaminated

AMERICAS 111968923

sites under CERCLA typically involves several steps, each of which can take years: a remedial investigation ("RI") to determine and characterize the nature of the site and the contamination; an assessment of the human and ecological risks posed by the contamination; a feasibility study ("FS") to evaluate remedial technologies and potential remedial alternatives and technologies and identify a preferred alternative; and, ultimately, the formal selection of the chosen remedy in a record of decision ("ROD").   SOF ¶ 21.   The remedial options available for contaminated sediments generally include passive remedies (no action or monitored natural recovery) and active remedies (including capping, dredging, or a combination of dredging and capping).  SOF ¶ 23. Following issuance of a ROD, the selected remedy is designed and implemented.  SOF ¶ 21. CERCLA also authorizes damages for injury to natural resources, which requires its own investigatory and decision-making process.  SOF ¶ 21.

Over the past thirty years, the DASS has plodded through the CERCLA investigation and remediation stages, including, among other things (such as removal actions): the 1994 issuance of an administrative order on consent ("AOC") pursuant to which OCC agreed to carry out an RI/FS; the 2002 expansion of the study area to cover a 17-mile stretch of the Passaic River and Newark Bay; a multi-agency work group's February 2006 presentation that evaluated several dredging scenarios including bank-to-bank dredging of 10 million cubic yards of sediment at a cost of $1.2 billion; and the June 2007 EPA release of a draft Focused Feasibility Study ("FFS") that outlined several alternatives for remedial action in the Lower 8 Miles of the Lower Passaic River, including extensive dredging and capping, with estimated costs from $900 million to $2 billion.  SOF ¶¶ 29, 105, 129.  Ultimately, on March 3, 2016, just months before the Debtors filed for bankruptcy protection, the EPA published the ROD for the Lower 8.3 Miles of the Lower Passaic River (OU-2) which selected a final remedy that required dredging approximately 3.5 million cubic yards of

sediment and installing an engineered cap over the river bottom of the lower 8.3 miles for an estimated cost of $1.3 billion.  SOF ¶ 145.  Investigation and remedy selection, including the ongoing evaluation of natural resource damages, continues today in other OUs of the Passaic River and Newark Bay.  SOF ¶ 146.

It is also undisputed that, at all times relevant to the Trust's claims against YPF and Repsol, Maxus (like its predecessor) and other Debtors have accepted legal responsibility for the investigation and remediation costs at the DASS pursuant to CERCLA.  The only legitimate issue of fact has concerned the *liquidation* of the amount of that liability.  ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████.  Smith Decl. Ex. 94 at 94.[2]

Defendants' experts place that date later in time, though they admit that, at least by the time of the June 2007 Draft FFS, a qualified consultant would have advised that it was reasonable to assume Maxus's share of a remedy at the DASS could be over $1 billion.  *See* Smith Decl. Ex. 6 at 306. What the actual documents show is that the Debtors and Defendants knew that they were doomed long before that.

### C.    Maxus Offers Itself for Sale Knowing It Faces the Potential of Material Future Environmental Expenditures

In 1995, prior to the close of the YPF acquisition of Maxus, Maxus was one of the largest

---

[2] Although parties jointly and severally liable to the United States have an independent right to pursue contribution claims against other responsible parties to compel them to pay their fair and equitable share of the costs *they* are responsible to bear, no such CERCLA claims had been filed and—as is true of all litigation—the outcome of any contribution claims that might eventually be filed was wholly uncertain. *See Id.* at 189 ("The factors typically used in contribution claims to allocate costs among multiple parties (known as 'equitable factors') are difficult to apply in practice and include subjective assessments that make it even more uncertain that the party seeking contributions will successfully do so in the amounts it believes are appropriate.").

AMERICAS 111968923

independent oil and gas exploration and production companies in the United States with an asset value of approximately $2.9 billion, total long-term debt of approximately $858 million, other liabilities and adjustments of $1.2 billion, and an implied equity value of approximately $860 million.  Smith Decl. Ex. 29 ¶ 17.

In early 1995, in connection with the YPF due diligence process, Maxus openly acknowledged its responsibilities for remediation expenses at the DASS. *See, e.g.*, Smith Decl. Ex. 13 at YPF-AK-0052899-52900.  But, as set forth below, management represented to YPF's attorneys that they believed (1) contaminated sediments in the Passaic River would not be dredged and (2) Maxus's potential liability arising out of the contamination in the river ranged from just $14 million to $18 million.  *Id.* at YPF-AK-0052899, 52920.  But Maxus's own internal files at that time contained several years' worth of internal documents—created both by Maxus personnel and by outside consultants—reflecting an awareness that dredging or a similar large-scale active remedy could be pursued at the site at a cost of hundreds of millions or even billions of dollars. These documents included:

- A November 6, 1991 memorandum prepared by Hadley Bedbury of Maxus and entitled ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Smith Decl. Ex. 95 at MAXUS4067436);

- A March 4, 1992 memorandum, again prepared by Hadley Bedbury and entitled "River Strategy," which noted Maxus's concerns about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Smith Decl. Ex. 96 at MLTLEGACYESI_001934935);

- A January 7, 1993 presentation prepared by ChemRisk, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Smith Decl. Ex. 97 at MAXUS0614643);

- A June 25, 1993 engineering evaluation prepared for Maxus by Woodward-Clyde, another environmental consultant, evaluating several potential methods for capping contaminated Passaic River sediments (Smith Decl. Ex. 98 at MLTLEGACYESI_000627045);

7

- A December 16, 1993 memorandum from Dave Rabbe to Mel Skaggs, both of Maxus,

███████████████████████████████████████████████

[3] *Id.* at MAXUS4245232.

Maxus's files also contained copies of numerous publicly available technical documents, published by the EPA and others, which noted the necessity of expensive sediment removal by dredging under many circumstances and described the technological options available to implement it. *See, e.g.,* Smith Decl. Ex. 100 at MAXUS2760676-2760677. There is, however, no record that Maxus ever provided any of these documents to YPF in the due diligence process.

### D.    The First YPF Period: YPF Seeks to Acquire Maxus

Hoping to gain a toehold in the U.S. oil and gas markets, and unaware of the full extent of Maxus's own environmental assessments, YPF agreed to purchase Maxus through a leveraged buyout ("LBO") on February 28, 1995.[4] SOF ¶¶ 41-43. In April 1995, YPF reshaped Maxus's board and installed YPF-approved directors. SOF ¶ 46. On April 5, 1995, Houlihan Lokey Howard & Zukin ("Houlihan") prepared a solvency analysis ("Houlihan Solvency Opinion") of Maxus, concluding that Maxus would have been insolvent under the cash flow and reasonable capital tests at the time of the LBO but for a "Keepwell Covenant" that required YPF to provide up to $425 million in financial support to Maxus (the approximate cost of funded debt obligations Maxus took on in the LBO). SOF ¶¶ 44, 47. In reaching its conclusions, Houlihan accepted management's anticipated expenditures in respect of Maxus's contingent environmental liabilities

---

[3] ███████████████████████████████████████████████ Smith Decl. Ex. 99 at MAXUS4245232.

[4] YPF was one of 16 potential suitors of Maxus in 1995, All of the potential buyers, except for YPF, walked away from a potential acquisition (whether of Maxus or Maxus's Midgard asset) expressing concerns about Maxus's environmental liabilities, with several bidders explicitly citing those liabilities as their reasons for withdrawing from the bidding process. Smith Decl. Ex. 101 at YPF-AK-0026947, 26949.

8

until 2002 (totaling $ 81.9 million) and did not conduct an independent analysis or estimate of such liabilities.  SOF ¶ 47.

### E.   YPF Fails to Identify the "Problem" of Maxus's Environmental Liabilities During Its Pre-Closing Diligence

YPF ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████.  *See* Smith Decl. Ex. 102 at Tr. 13:20-25, 50:6-17; Smith Decl. Ex. 113 at Tr. 34:11-16.  In December 1994, Dexter Peacock (an attorney at Andrews & Kurth LLP, YPF's legal counsel) advised Jose Estenssoro (then CEO of YPF) that Maxus faced "█████████" and "████████████" "████████████████████," ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██  ███████  ████  ████  ██  ███  █████  Smith   Decl.   Ex.   103   at YPF_MAXUS_PRIV_0000010067.  In January 1995, prior to the Merger Agreement, Andrews & Kurth submitted an environmental due diligence report to YPF that was subject to material limitations, including that Andrews & Kurth "████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███  SOF ¶ 42.  ████████████████████████████████████

████████████████████████████████████.  Smith Decl. Ex. 13 at YPF-AK-0052920.  The parties agreed to increase Maxus's total environmental reserves from $87.1 million to $119 million.  Smith Decl. Ex. 131 at AA_MAXUS0014193.  Even that increased reserve amount proved radically inadequate within months.

9

## F.    YPF's Post-Closing Diligence and Recognition of the "Problem"

Only after the Merger Agreement close did YPF conduct actual, meaningful diligence into the range of Maxus's environmental liabilities at the DASS. In a June 1995 memo, written days after the close of the acquisition, Mr. Peacock (having just visited the environmental sites in New Jersey) informed Nells Leon (replacement CEO of YPF after Mr. Estenssoro's death):



During a February 2010 interview of Mr. Peacock by Kirkland & Ellis LLP ("K&E") (counsel to both YPF and Repsol in the NJ Litigation), Mr. Peacock stated that "                        ." Smith Decl. Ex. 106 at YPF_MAXUS_PRIV_0000025824, 25825. Mr. Peacock further recalled that, Andrews & Kurth "                        " and stated, "                        ." *Id.*

While Mr. Peacock's memorandum to Mr. Leon was being finalized, sediment sampling was being conducted at the DASS. Preliminary data from the summer of 1995 identified

                        . Smith Decl. Ex. 107 at MLTLEGACYESI_000278956-278957. Maxus management and YPF's advisors immediately understood that the evidence of

---

[5] Smith Decl. Ex. 104 at DEDES-YPF-P0000008.003, 8.004. Shortly after the acquisition was complete,                         Smith Decl. Ex. 105 at DEDES-YPF-AK-PRIV0000430. YPF ultimately did not pursue this option.

██████████████████████████████████████████████████.[6]    *Id.* at
MLTLEGACYESI_000278956-278957, 278975-278976.    Subsequent meeting notes reflect a
heightened sense of ████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████    Smith Decl. Ex. 109 at MLTLEGACYESI_003673527 (emphasis in
original).    ████████████████████████████████████████████████

████████████████████████████████████████████, among others, senior
Maxus environmental personnel and several of YPF's attorneys at Andrews & Kurth.    Smith Decl.
Ex. 107 at MLTLEGACYESI_000278953, 278975-278976).    The primary issue at that time was
████████████████████████████████████████████.    *Id.* at
MLTLEGACYESI_000278976.    To that end, in November 1995, Maxus received the preliminary
results of an engineering evaluation/cost analysis study ("EE/CA") performed by a recognized
consultant in the industry, EA Engineering, Science, and Technology ("EA"), ████████████
███████████████████.    Smith Decl. Ex. 110.    The EE/CA described that, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.    *Id.* at
MLTLEGACYESI_000627944.    The Houlihan Solvency Opinion issued only eight months earlier
had made clear that Maxus had no ability to fund that level of expenditure and remain solvent.
Smith Decl. Ex. 17 at HL000137 (assuming $81.9 million in total environmental expenditures
through 2002).    In other words, within a few months of its stock purchase, YPF was facing a total
wipeout of its investment.

---

[6] Meeting notes from an August 1995 strategy session show that Maxus and its consultants identified ████████
████████████████████████████████████████████████    Smith Decl. Ex. 108
at MLTLEGACYESI_00278999-279000.

### G.    YPF Develops a "Moonshot" Strategy

In spite of EA's disastrous diagnosis for Maxus, there appears to have been no serious consideration of taking any steps to preserve the Debtors' assets or reserve funds to cover or hedge Maxus's liabilities at the DASS. Instead, starting at the end of 1995, YPF took a different approach which three decades later has inexorably led to this litigation. Within weeks of receiving the EA EE/CA, YPF began to contemplate a transfer of all of Maxus's productive oil and gas assets beyond the reach of its environmental creditors by implementing a "strip, manage, and settle strategy" (the "Strategy"). Compl. ¶ 74. In a December 1995 memo, Mr. Peacock first advised Mr. Leon that, given the potential that remedial options at the DASS could require dredging and capping and cost multiples of the contingent environmental reserves, YPF should take steps to protect YPF from exposure to Maxus's obligations:



In subsequent months, YPF and its advisors continued to analyze YPF's risk of exposure to Maxus's environmental liabilities, develop the plan for salvaging its investment, and plot the course of the long-term Strategy. In a May 1996 memo, Mr. Peacock warned Mr. Leon that the

---

[7] Smith Decl. Ex. 8 at DEDES-YPF-P0000057.001-57.002.

AMERICAS 111968923

strategy to remove Maxus's environmental liabilities into a YPF subsidiary was risky because it could "

_____" but stated that "_____

_____."  Smith Decl. Ex. 112 at

YPF_MAXUS_PRIV_0000010071-10072.

Years later, during his interview with K&E, Mr. Peacock candidly recounted that "_____

_____

_____  Smith  Decl.  Ex.  106  at

YPF_MAXUS_PRIV_0000025824, 25826).  The first step in that moonshot—a plan for seriatim

debt, environmental and asset "restructurings"—was then presented to the YPF Board of Directors

for approval in May 1996.  SOF ¶ 48-51.  In a May 22, 1996 memo to the YPF Board, Mr. Peacock

presented the "_____" restructuring proposals including the

transfer of Maxus's environmental liabilities to CLH and the transfer of Maxus's assets in

Venezuela and Bolivia to YPF, which would "_____."

Smith Decl. Ex. 21 at MLT00238944, 238946.  The same memo also set out a proposal for

restructuring Maxus's debt "_____

_____" SOF ¶ 50; Smith Decl. Ex. 21 at MLT00238952.  Another contemporaneous

memo from Andrews & Kurth addressed to the YPF Board made clear the purpose of these

restructurings: _____

_____  Smith Decl. Ex. 114 at DEDES-YPF-P0000048.

**H.  YPF Implements the "Global Restructurings"**

In June 1996, YPF caused Maxus to proceed with Mr. Peacock's environmental, debt and

asset restructurings, which substituted Maxus's public debt for intercompany obligations, changed

13

its corporate structure, and reshuffled Maxus's assets and personnel.[8]

- By the "debt restructuring," YPF caused Maxus to replace old funded-debt obligations to third parties—which contained traditional covenant restrictions on sales of "all or substantially all" of Maxus's assets—with approximately $1.4 billion of new debt (comprised of approximately $863 million in new debt issued by YPFI and funded by YPF, and approximately $528.5 million in new debt issued by CSFB)[9] that did not contain such restrictions so that Maxus's valuable E&P assets could be moved away from Maxus's environmental liabilities.  SOF ¶¶ 50-51.

- By the "environmental restructuring," YPF generally sought to isolate Maxus's environmental obligations in a single entity (CLH, now known as Tierra), which would remain a subsidiary of YPFH (YPF's U.S. affiliate), pursuant to an "Assumption Agreement."  SOF ¶ 53.  While YPF guaranteed Maxus's contingent environmental liabilities to the extent of Maxus's balance sheet reserve for such liabilities (which then stood at $111.5 million dollars) pursuant to a "Contribution Agreement," YPF undertook no obligation for contingent liabilities in excess of that amount.  SOF ¶ 54. Tierra's assumption of the indemnity obligation owed to OCC did not, as a matter of law, relieve Maxus of its obligations to OCC, nor did it release Maxus from its direct obligations to the United States and New Jersey under CERCLA; instead, the Tierra Assumption Agreement merely added another obligor—Tierra—to the mix.

- By the "asset restructuring"—as described in greater detail below in Section II.A and in the SOF ¶¶ 55-74 —YPF directed Maxus to transfer its most valuable international E&P assets (Bolivia, Venezuela, Ecuador, and Indonesia Assets) by causing Maxus to sell those assets to YPFI, a Cayman Islands corporation.

All told, following the three "closely related and interdependent restructurings," Maxus's total assets were reduced from $2.9 billion in 1995 to $962 million by the end of 1998, *see* Smith Decl. Ex. 125 at CS001745, with substantially all of Maxus's international E&P assets being transferred to YPFI.   In return, YPFI "paid" for Maxus's international assets by forgiving Maxus's intercompany debt (which was effectively worthless given Maxus's functional insolvency stemming from its environmental liabilities) or paying down Maxus's funded debt obligations, including in respect of the LBO financing that YPF had guaranteed.  SOF ¶¶ 60, 65, 72.

---

[8] *See generally* Smith Decl. Ex. 115 at MAXUS5083359; Smith Decl. Ex. 130 at MAXUS3293061.
[9] *See* Smith Decl. Ex. 116 at MAXUS0430587; Smith Decl. Ex. 117 at MAXUS3277242; Smith Decl. Ex. 118 at REPSOL0001861; Smith Decl. Ex. 119at YPFH1642-1664); Smith Decl. Ex. 120 at REPSOL0001585; Smith Decl. Ex. 121 at REPSOL0001803; Smith Decl. Ex. 122 at MOM000576, 580); Smith Decl. Ex. 123 at MAXUS0625177; *see also* Smith Decl. Ex. 124 at MAXUS3212279-3212281.

While the "restructurings" effected a formal change to the Debtors' corporate organization and balance sheets, the substance of Maxus's oil and gas exploration and production operations remained the same. Under the new umbrella of the YPF-created "Maxus Management Group" (a fictional corporate family described more fully in SOF ¶ 75), Maxus personnel continued to work on Maxus's primary revenue-generating international assets, even though these assets had been nominally sold to YPFI. Yet, although Maxus operated and managed the legacy Maxus assets, the revenues and cash flows did not go to Maxus, but instead now went to YPFI or its subsidiaries. *See* Smith Decl. Ex. 126 at YPF0130121, 130144; Smith Decl. Ex. 137 at 59–60.[10]

## I.    The Repsol Period: Repsol Acquires YPF (and Maxus)

Repsol came into the picture soon after YPF completed its reshuffling of Maxus. In a series of stock purchases commencing in January 1999 and concluding in November 1999, Repsol acquired a controlling interest in YPF and established "Repsol YPF S.A." ("Repsol YPF") as the combined enterprise. SOF ¶ 76. By this time, Maxus's remaining oil and gas assets consisted largely of its interest in the Crescendo Resources L.P. partnership ("Crescendo"), which was operated by Maxus's wholly-owned subsidiary Midgard Energy Company ("Midgard"), and other exploratory interests in the Gulf of Mexico. SOF ¶ 77. Like YPF, when Repsol YPF first acquired YPF, it "did not conduct any analysis" into Maxus's environmental liabilities, but rather relied on "the amount that was in the public record"[11]—i.e., the limited public disclosures that Maxus made in its 10-Ks and YPF's Form 20-Fs. As discussed more fully below at Section II.B.3, those public

---

[10] *See generally* Smith Decl. Ex. 127 at YPF0002285; Smith Decl. Ex. 128 at MAXUS3248703.

[11] Smith Decl. Ex. 129 at Tr. 84:24-85:10, 88:12-18 ("Q. What analysis, if any, did any of the Repsol defendants do in the pre-acquisition period regarding environmental liabilities in the United States of any subsidiary of YPF S.A.? A. I think they did not conduct any analysis. . . . Q. So is it fair to say that based upon your answers, that Repsol, S.A.'s knowledge with respect to any environmental matters in the United States was only as good as the disclosures that were made in YPF S.A.'s public filings? A. I think so. Yes."). This lack of due diligence was confirmed in an interview of Roberto Monti (Chairman and CEO of Maxus from 1995 to 1997, then CEO of YPF and Executive Vice President of Exploration and Production at Repsol YPF, and current Director of YPF) in an interview years later. Smith Decl. Ex. 106 at YPF_MAXUS_PRIV_0000025821, 25823.

15

filings did not disclose the true scope of Maxus's financial health.  Rather Maxus and YPF (and later Repsol) had taken the position that because there was "uncertainty" about the final remedy that would be selected for the DASS, the liabilities were "unknown" and "[could not] be reasonably forecast[ed]," and, as such, Maxus's stated environmental reserves on its balance sheet never anticipated *any* remedial costs for the DASS.[12]

J.    **Repsol YPF Learns About the DASS Post-Acquisition**

Only after Repsol looked behind the public financials post-acquisition did it learn of the full scope of Maxus's environmental problems.  According to Agustin Garcia Moratilla (Director of Corporate Legal Affairs at YPF), David Rabbe (President and CEO of Tierra) and David Wadsworth (VP and General Counsel of Maxus) were meeting with Repsol YPF, starting "shortly after the acquisition," Smith Decl. Ex. 129 Tr. at 109:8-15, and thereafter at least annually to keep Repsol YPF apprised of the status of Maxus's environmental liabilities.  Smith Decl. Ex. 133 at Tr. 184:12-21 ████████████████████████████████████████████████

██████████.  Repsol YPF's Board of Directors was also informed post-acquisition that Maxus's liabilities included those pursuant to CERCLA and the OCC SPA, which had "no time limit" and "no monetary limit."  Smith Decl. Ex. 134 at MLTLEGACYESI_003215383, 3215391-3215417.

Indeed, Repsol became fully aware of the accelerating regulatory activity at the DASS in the early years of Repsol's ownership, including the design and construction of the interim remedy

---

[12] *See, e.g.*, Smith Decl. Ex. 131 at AA_MAXUS0014272-142373 ("The Company has been conducting similar studies under its own auspices for several years.  Until these studies are completed and evaluated, the Company cannot reasonably forecast what regulatory program, if any, will be proposed for the Passaic River or the Newark Bay watershed and therefore cannot estimate what additional costs, if any, will be required to be incurred."); Smith Decl. Ex. 179, at 109 ("Maxus cannot reasonably forecast what regulatory program, if any, will be proposed for the Passaic River or the Newark Bay watershed and, therefore, cannot estimate what additional costs, if any, will be required to be incurred.  However, it is possible that additional work, including interim remedial measures, may be ordered with respect to the Passaic River."); Smith Decl. Ex. 198, at 139 ████████████████████████████████████
████████████████████████████████████████████████████████████████████████

16

for the area surrounding the Lister Avenue plant, overseen and paid for by Tierra between 1999 and 2001.  SOF ¶ 26.  At the same time, a large-scale, high-cost remediation scenario at the DASS was becoming ever more certain.  In 1999, the New Jersey Office of Maritime Resources published a "conceptual proposal" for dredging of highly contaminated "hot spots" in the Passaic River.  SOF ¶ 105.  In 2002, the EPA significantly expanded the size of the DASS remedial study area to 17 miles of the Passaic River into the Newark Bay.  SOF ¶ 105.  In September 2003, the state of New Jersey issued a directive to several potentially responsible parties ("PRPs"), including Maxus, to conduct an assessment of natural resource damages and restoration options at the Passaic River.  SOF ¶ 105; Smith Decl. Ex. 135 at MLTLEGACYESI_004032311.

### K.    The Crescendo Transfers (1999 to 2000)

Repsol, like YPF, did not sit still during these DASS developments.  In December 1999 and January 2000, Repsol YPF caused Maxus to sell its interests in Crescendo (Maxus's most valuable remaining asset) (the "Crescendo Transfer") to BP and Apache in exchange for $619.5 million in cash, plus a 1% royalty interest, an amount less than the parties to the Crescendo partnership valued the assets contributed by Maxus.  Smith Decl. Ex. 136 ¶¶ 132-44, Figure 9. The Crescendo Transfer was completed without the Maxus Board of Directors even meeting to discuss the intended sale.  SOF ¶ 80.  The balance of the proceeds from the Crescendo Sale were held for approximately one year by Maxus.  In January 2001, Repsol International Finance ("RIF") borrowed $325 million of the remaining Crescendo proceeds from Maxus, pursuant to a credit agreement calling for repayment by December 27, 2001 (the "RIF Loan").  SOF ¶ 85.  Repsol benefited from the RIF Loan (at Maxus's expense) because it paid below-LIBOR interests rates on the $325 million.  SOF ¶ 85.  The RIF Loan was ultimately repaid to Maxus over a four-year period (ending in approximately January 2005), SOF ¶ 85, based on Maxus's intermittent

estimated cash flow needs.  Smith Decl. Ex. 137 ¶ 135.

The combined effect of the Crescendo Transfer by Repsol and the earlier 1996-1997 Transfers by YPF (described above and in greater detail in the SOF ¶¶ 55-74) is indisputable.  By 2000, YPF and Repsol had completed the purchase and sale of virtually all of Maxus's productive assets.  Maxus's remaining fixed assets were reduced to $26 million, and its annual operating revenue declined to just over $4 million dollars.  *See, e.g.*, Smith Decl. Ex. 138 at MAXUS-E-0003420, 3423.  By 2000, within five years of the YPF acquisition, Maxus had essentially been liquidated as an E&P company.

### L.      The YPFI Transfers (2000 to 2002)

Between 2000 and 2002, Repsol also continued YPF's Strategy of transferring Maxus's international E&P assets (then held by YPFI following the 1996-1997 Transfers) to third parties or Repsol subsidiaries to further remove the assets from the reach of Maxus's creditors.  SOF ¶¶ 86-95.  The proceeds from those transfers were used to pay down or cancel debt or otherwise remitted to YPF as a dividend. Those proceeds were then further dividended to Repsol.  SOF ¶¶ 88, 90, 93, 95 (organizational charts reflecting Maxus's pre- and post-Strategy capital structures are set forth in the SOF at ¶ 73 and ¶ 74, respectively).

### M.      The King & Spalding Memo

When the RIF Loan proceeds from the Crescendo Transfer started to run out,[13] Repsol YPF became increasingly focused on avoiding its exposure to direct liability for Maxus's environmental obligations.  For example, a January 2005 presentation noted that Repsol YPF had been conducting its E&P activities in the United States through Maxus, but because Maxus ████████████

---

[13] *See* Smith Decl. Ex. 144 Email from Javier Nogales Aranguez, dated Jan. 14, 2005 with attached spreadsheet of RIF Loan repayments, MAXUS5761478_TR (showing that the RIF Loan was reduced to less than $100 million starting in early 2004).

18

██████████████ it would agree "███████████████████████████████████
█████████████████████████████████." Smith Decl. Ex. 139 at REP 085.  In

February 2005, Mr. Wadsworth sent to Mr. Moratilla an article regarding "potential parent

company responsibility for its subsidiaries' environmental liabilities," which noted the possibility

of "indirect parent company liability" through the "traditional doctrines of piercing the corporate

veil."  Smith Decl. Ex. 140 at MLTLEGACYESI_001920696-1920697.  Importantly, the State of

New Jersey had already issued (two years prior) a directive finding that Maxus and Tierra were

responsible for hazardous discharges of dioxin into the Passaic River, and indicating that the State

would seek reimbursement and damages by way of litigation if they (and other PRPs) failed to

arrange for the cleanup and removal of such discharges.  *See* Smith Decl. Ex. 135 at

MLTLEGACYESI_004032326-4032329, 4032365-4032366.  Reacting to the drumbeat of a

balance sheet catastrophe, Repsol YPF retained counsel (King & Spalding LLP) in late 2004 █
██████████████████████████████████████████. SOF ¶ 107.  By

February 2005, King & Spalding began to conduct due diligence to evaluate and analyze the

"██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████." Smith Decl. Ex. 141

at DEDES-YPFH0000004; *see* Smith Decl. Ex. 143 at REP 734-735.  The following month, in

March 2005, King & Spalding provided a "sufficiently finalized" draft memo titled "████████
██████████████████████████████████████████████████." in

which it concluded that the "██████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

██████████████████████████."[14]   Smith Decl. Ex. 142 at MLTLEGACYESI_002711955.  King &

Spalding advised ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████."  *Id.* at MLTLEGACYESI_002711992.

King & Spalding issued the final version of its memo to the Repsol YPF Board in May

2005 (the "King & Spalding Memo").    SOF ¶ 107;  Smith Decl.  Ex.  55  at

YPF_MAXUS_0000293057.  In it, King & Spalding ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.  SOF ¶ 109.  Repsol YPF was

further advised that ███████████████████████████████████████████████████

████████████████████████████████████████████████████████," *id.* at

YPF_MAXUS_0000293058, as Repsol and YPF would have to address the "███████████████

██████████████████████████████████"  *Id.* at YPF_MAXUS_0000293080.  King &

Spalding advised that a "█████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████.  Smith Decl. Ex. 142 at MLTLEGACYESI_002711992.  To

that end, King & Spalding recommended that (1) Repsol and YPF ██████████████████████

██████████████████████████████████" and "████████████████████████████████

████████████████████████████████████; and (2) Repsol, YPF, and Maxus

"████████████████████████████████████████████████████████████████████"

---

[14]. The conclusions and recommendations from this preliminary report were summarized and presented to the Repsol YPF Board in April 2005.  Smith Decl. Ex. 143 at REP 736-737.

20

██████████████████████████████████████ ."[15]

### N.    The NJ Litigation Commences

A few months later, in December 2005, the NJDEP sued OCC, Maxus, Tierra, YPF, and Repsol under the New Jersey Spill Act for discharges of hazardous substances from the Lister Avenue chemical plant into the Passaic River and parts of Newark Bay (the "NJ Litigation").   SOF ¶ 113.  The NJDEP's operative complaint alleged that Maxus's prior asset sales to its shareholders constituted fraudulent transfers, and that Repsol and YPF were liable for Maxus's environmental liability as alter-egos because they had abused the corporate form in their several attempts to capture the economic value of such assets.  SOF ¶¶ 115-16.  In October 2008, OCC filed cross-claims against Maxus for breach of the SPA indemnity obligation and for fraudulent transfers, and against Repsol and YPF for civil conspiracy, aiding and abetting civil conspiracy, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.  SOF ¶¶ 118.  OCC also sought to recover from Repsol and YPF as alter-egos of Maxus.  SOF ¶ 118.  The NJ Litigation and important case milestones are discussed in detail in the documents cited in the SOF at ¶¶ 113-19, 132-34, 138-43.

### O.    The EPA's 2007 Draft FFS Makes Clear that a Large-Scale, Active Remediation at the DASS is Expected

Meanwhile, in June 2007, the EPA issued a draft FFS for the lower 8 miles of the Passaic River, which estimated that the cost for "active alternatives" ranged "from $0.9 billion to $2.3 billion."  SOF ¶ 129; Smith Decl. Ex. 146 at YPF_MAXUS_PRIV_0000018136, 18144.  At this

---

[15] Shortly after receiving the King & Spalding Memo, a June 2005 presentation to Repsol YPF's General Secretariat and Board ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Smith Decl. Ex. 145 at DEDES-YPF-P0000021.004-21.006 (emphasis added).

point, even Repsol's expert concedes that it would have been reasonable for an environmental

██████████████████████████████████████████████████████████████. Smith

Decl. Ex. 6 at 306.    As of year end 2007, Maxus's consolidated balance sheet reflected

$358,379,000 in negative shareholder equity—and only $150 million was reserved for all of

Maxus's short- and long- term environmental liabilities. Smith Decl. Ex. 147 at MAXUS3219251-

3219252, 3219268.

### P.    Repsol's Partial "Clean-Up" and Wind-Down of Maxus: The "Manage" Phase of the Strategy

Consistent with the advice of King & Spalding, Repsol, YPF, and Maxus endeavored to

initiate a "█████████████████" effort while they ran the clock on creditors' potential claims.

SOF ¶¶ 110, 111. The "█████████" was largely on their lawyers' paper only, and was belied most

visibly by Repsol and YPF's unilateral development and control of the litigation strategy on behalf

of Maxus—without Maxus's involvement. Indeed, K&E was hired by Repsol to coordinate all

legal activities in the NJ Litigation, even though OCC had asserted alter ego claims against

Maxus's parents. *See, e.g.*, Smith Decl. Ex. 148; Smith Decl. Ex. 149.    K&E and Repsol

representatives met in Madrid to develop a new litigation strategy to be kept secret from Maxus.[16]

Additionally, Repsol YPF (between 2007 and 2009) presided over a series of

"intercompany settlement agreements" to address the "problematic financial arrangements"

between YPF, Repsol, and Maxus.[17]  SOF ¶¶ 120-28.

---

[16] Jon Slater (President and CEO of Maxus) testified, "████████████████████████████████████████████

█████████████████████████████████" Smith Decl. Ex. 150 at Tr. 69:3-71:15. Later on in the litigation, [K&E] took over swaths of Maxus's privilege review, document collection and directly negotiated the settlement of Maxus's liabilities to the State of New Jersey (the "RYM Settlement"). *See, e.g.*, Smith Decl. Ex. 151; Smith Decl. Ex. 152; Smith Decl. Ex.153. The New Jersey court approved the RYM Settlement on December 12, 2013, which released Repsol, YPF, and Maxus of all claims for $130 million. SOF ¶ 107.

[17] While the Trust is not presently moving for summary judgment on Counts XVI, XVII, XVIII, XIX, XX, and XXI, the Trust has alleged—and the contemporaneous record demonstrates—that each of these Settlement Agreements, and the related underlying transfers addressed therein, are fraudulent transfers themselves.

- In 2007, Maxus entered into three settlement agreements (the "2007 Settlement Agreements") with Repsol Services Company (RSC) and Repsol E&P T&T to resolve certain matters related to compensation for services Maxus provided to Repsol entities. SOF ¶ 120.

- At the direction of Repsol,[18] on October 8, 2007, the YPF entities, Maxus, CLH Holdings, Tierra, and MUSE entered into a settlement agreement to terminate the 1996 Assumption and Contribution Agreements (the "2007/2008 Settlement Agreement"). SOF ¶ 124. Maxus and Tierra received consideration of approximately $378.2 million, comprised of $14 million in cash and $364 million in loan forgiveness of an intercompany payable Maxus owed to YPFH, in exchange for YPF no longer having responsibility for payment to Tierra pursuant to the Contribution Agreement. SOF ¶¶ 124-25.

- On July 8, 2009, Repsol E&P USA, RSC, and Repsol Offshore entered into a settlement agreement with Maxus (the "2009 Settlement Agreement") to resolve the various disputes related to transfers of Maxus's employees services, data and software, and certain assets to Repsol subsidiaries, including the newly created Repsol E&P. SOF ¶¶ 97-98, 128. The Repsol affiliates paid Maxus $50 million in exchange for a full release by Maxus of its claims with respect to all these matters. SOF ¶ 128.

When Maxus's sole remaining E&P asset (Neptune) suffered a series of setbacks in 2008,[19] Maxus had virtually no revenue and no taxable income. From as early as 2004 (and certainly from 2007 forward), Maxus was only able to remain a going concern because YPF and Repsol provided financial support through the Settlement Agreements,[20] parent support letters to auditors,[21] and periodic capital contributions. SOF ¶¶ 147-48.

---

[18] See Smith Decl. Ex. 154.

[19] In June 2008, Mr. Mills told Mr. Slater that Neptune suffered from "[d]elays and cost overruns . . . due to poor management by the Operator" and Maxus needed to "continue to borrow to pay operating costs and to fund the cost overruns" for Neptune. Smith Decl. Ex. 155 at MAXUS5337380. A few months later, in October 2008, Mr. Mills updated Mr. Slater that Neptune was operating poorly and Maxus was "in trouble if we do not get some combination of higher oil prices, increased production volumes, or settlements with 'the Big R' [(i.e., Repsol)]." Smith Decl. Ex. 156 at MAXUS5614944. In December 2008, Mr. Mills bluntly informed Mr. Slater that poor market conditions and low production volumes in Neptune meant that Maxus was likely "not a going concern." Smith Decl. Ex. 157 at MAXUS5392370.

[20] See Smith Decl. Ex. 158 at Tr. 257:9-16, 324:14-20 ██████████████████████████████████
████████████████████████████████████████████████████████ .

[21] See Smith Decl. Ex. 159 at YPF_MAXUS_PRIV_0000102408, 102466 ███████████████████████████████
████████████████████████████████████████████ "); see, e.g., Smith Decl. Ex. 54; Smith Decl. Ex. 178; Smith Decl. Ex. 160; Smith Decl. Ex. 161.

23

Q.      **The Second YPF Period: Project Jazz and the Run Up to the Chapter 11 Cases**

In or about May 2012, the Government of Argentina nationalized YPF, seizing Repsol's majority ownership stake in YPF.  SOF ¶ 136.  Around the same time, on May 21, 2012, the NJ Litigation continued and the specter of YPF's potential alter-ego liability increased due to a ruling from the New Jersey court finding that Tierra was an alter ego of Maxus.  SOF ¶ 134.  Javier Gonzalez (VP and General Counsel of Maxus and YPFH) was blunt in his assessment in a memo sent to his counterparts at YPF: █████████████████████████████████████████████████

████████████████████████████████████████  Smith Decl. Ex. 162 at MLT00222217.

YPF—again the sole head of the corporate family after the expropriation—and its counsel thereafter formulated a strategy dubbed "Project Jazz," involving a purportedly "global" (but in actuality, bilateral) settlement in the context of an inevitable Chapter 11 bankruptcy of the Debtors that would render the NJ Litigation irrelevant.  SOF ¶ 150.  Contemporaneous documents show that at all times from as early as July 2012,[22] Maxus and YPF (and their counsel) were focused on using Project Jazz to avoid the risks of an adverse ruling to YPF on alter ego liability and fraudulent transfer claims (either in the NJ Litigation or in the prospective bankruptcy proceedings:

- A September 2012 memo from Chadbourne & Parke LLP[23] (the "Chadbourne Memo") addressed █████████████████████████████████████████████████ and concluded that, █████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████." Smith Decl. Ex. 85 at

---

[22] In July 2012, John Enloe (President and CEO of Maxus) emailed Sebastian Sanchez Trolliet (at various times YPF's Chief Procurement Officer and Maxus's CFO and Director) asking Mr. Sanchez to obtain guidance from YPF with respect to the latest developments in New Jersey and stating, "I know that we will probably have to file Maxus for bankruptcy protection.  However, until we decide and take action, we fear that we must keep playing the game." Smith Decl. Ex. 163 at MLT00111479.

[23] YPF retained Chadbourne & Parke LLP to ██████████████████████████████████████████████ ████████████████████████████████████████).  *See* Smith Decl. Ex. 164 at MLT00219175.

YPF_MAXUS_PRIV_0000053670, 53675, 53677.

- A September 2013 email from Chadbourne advised Miguel Galuccio (CEO of YPF) that ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Smith Decl. Ex. 165 at YPF_MAXUS_PRIV_0000111177.

- A March 2014 memo from Milbank LLP[24] to YPF (the "Milbank Memo"), among other things: (1) ███████████████████████████████████████████████████████████ ████████████████████████████████[5] (2) ████████████████████ ███████████████████████ and (3) ██████████████████████████████ ████████████████████████████████████████████████████████"[26].

Following the EPA's 2014 estimate that its preferred remedy for the Lower 8 Miles would cost $1.731 billion, SOF ¶ 144, YPF and its counsel refocused on how to best protect YPF's interests and determining the strategic moment to file the Chapter 11 Cases:[27]

- A May 2014 memo on Project Jazz from Chadbourne (1) ███████████████████ ██████████████[2 ████████████████████████████████████████████ ██████████████████████; and (3) ████████████████████████████ Smith  Decl.  Ex.  167  at  YPF_MAXUS_PRIV_0000104830, YPF_MAXUS_PRIV_0000104877-104884.

- A June 2014 memo from Milbank to Rodrigo Cuesta (Corporate VP of Legal Affairs at YPF) and Mr. Pigretti reiterated to YPF that ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Smith Decl. Ex. 159

---

[24] Milbank was retained by YPF in December 2013 to provide a second opinion on the recommendations provided by Chadbourne regarding Project Jazz. *See* Smith Decl. Ex. 159 at YPF_MAXUS_PRIV_0000102401; Smith Decl. Ex. 166 at YPF_MAXUS_PRIV_0000056035.

[25] Smith Decl. Ex. 159 at YPF_MAXUS_PRIV_0000102411.

[26] *Id.* at YPF_MAXUS_PRIV_0000102464.

[27] Meanwhile, Maxus, YPF, and Repsol continued to litigate and seek dismissal of the claims in the NJ Litigation. *See* SOF ¶¶ 117, 139-41.

AMERICAS 111968923

at YPF_MAXUS_PRIV_0000102489, 102493.

- In June 2014, ██████████████████████████████████████
  ████████████████████████████████████████████████████
  ██████████████████████████████████████." Smith Decl.
  Ex. 168 at YPF_MAXUS_PRIV_0000111219.

- A June 2014 YPFH presentation contemplated ███████████
  ████████████████████████████████████. Smith Decl. Ex. 169 at
  MLT00204654, 204658.

- In June 2015, YPF caused Maxus's bylaws to be amended to allow for the creation of
  the Special Independent Committee (the "SIC"); in August 2015, two special
  independent directors were officially appointed; and in November 2015, the SIC
  engaged Morrison & Foerster LLP ("MoFo") to represent and assist the SIC in the
  performance of its investigation. SOF ¶ 151.

Thereafter, two events greatly increased the urgency of implementing Project Jazz: (1) in March

2016, the EPA issued an ROD formalizing its selection of a remedy for the lower 8.3 miles of the

Passaic, the estimated cost of which was $1.38 billion; and (2) in April 2016, the court in the NJ

Litigation adopted a number of recommendations by the Special Master resolving a series of

motions to dismiss for summary judgment, and set June 20, 2016 as the trial date for OCC's alter-

ego claims against YPF. SOF ¶¶ 141-42.

Throughout the Second YPF Period, the Maxus Board and Maxus Management, who at

this time included several two-hatters from YPF,[28] failed to prioritize the claims of its creditors

over the interests of YPF.[29] Despite the risks to success of the Strategy foreshadowed by its own

---

[28] Notable examples of two-hatters during the Second YPF Period include: Franciso Garcia Tobar, who was
"responsible for the supervision" of Maxus while employed at YPF before being installed as a director and then CFO
of Maxus before returning to YPF, ([D.I. 283-1] ¶¶ 2, 5-6, 12, 15); Sebastian Sanchez Trolliet, who was employed by
YPF and Repsol YPF prior to being installed as VP of Finance, CFO, and Treasurer of Maxus before returning to YPF
(Smith Decl. Ex. 170); and Javier Gonzalez, who was VP and General Counsel for both Maxus and YPFH from 2010
to 2017, and was a released party in the settlement of claims against YPF filed on the Petition Date (SOF ¶ 166).
[29] For example, in March 2015, Mr. Gonzalez (a two-hatter) disclosed to Eduardo Pigretti (Deputy General Counsel
at YPF) a January 2014 memo ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████. Smith Decl. Ex. 169
at MLT00204673.

AMERICAS 111968923

counsel regarding the decision of the *Tronox* court, YPF decided to implement Project Jazz.

### R.    The Chapter 11 Cases

On June 17, 2016, one business day before trial was set to commence in the NJ Litigation on OCC's alter ego claims against YPF, YPF caused the Debtors to file voluntary petitions for relief under Chapter 11.  As the Court will recall, the centerpiece of the Debtors' Chapter 11 was the "settlement agreement" with YPF in which Maxus was to release all of its, and its creditors', claims against YPF, including fraudulent transfer and veil-piercing claims, for a $164.35 million effective settlement amount.[30]

███████████████████████████████████████████████ YPF lost control of the bankruptcy process.  When a statutory fiduciary for creditors—the Official Committee of Unsecured Creditors (the "UCC")—was formed and investigated the claims against shareholders without constraint, the UCC vehemently opposed the settlement agreement.[31]  Ultimately, with the UCC's assistance, the creditors funded the Amended Plan that created the Trust with responsibility for prosecuting Maxus's claims against YPF and Repsol and that provided funding for Maxus's ongoing environmental remediation obligations.  SOF ¶¶ 159, 163.  The Court confirmed the Plan on May 22, 2017.  SOF ¶ 159.  This litigation ensued.

---

[30] The settlement agreement with YPF was the result of investigation by the SIC's counsel MoFo and financial advisor Zolfo Cooper LLC.  SOF ¶ 151.  In or around the end of May 2016, ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████.  *See* Smith Decl. Ex. 181 Transcript of Deposition of Scott W. Winn, dated Aug. 3, 2016, at 101:18-102:18.  The settlement amount would comprise an additional $34.35 million in debtor-in-possession financing that was subordinate to all general unsecured claims, which YPF agreed to lend without any expectation of being repaid.  SOF ¶ 151.  The Debtors were hamstrung in those negotiations because, as the Court will also recall, the resolution creating the SIC permitted them only to *settle* the Debtors' claims. The SIC was not authorized to sue on them, it was not granted discretion to decide whether suit was warranted (as would be typical of a true special investigative committee in Delaware), and it lacked the funds to pursue litigation even if it could have authorized the filing of a suit, which it could not.

[31] *See* [D.I. 536]; [D.I. 619]; [D.I. 777]; [D.I. 810].

AMERICAS 111968923

## PARTIAL SUMMARY JUDGMENT STANDARDS

Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), made applicable to this adversary proceeding by Rules 7001 and 7056 of the Federal Rules of Bankruptcy Procedure ("FRBP"), provides that summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." FRCP 56. Summary judgment is "an integral part of the Federal Rules as a whole, . . . which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FRCP 1); *see In re ORBCOMM Global L.P.*, No. 00-3636 (MFW), 2003 Bankr. LEXIS 759, at *2 (Bankr. D. Del. June 12, 2003) ("The underlying purpose of summary judgment is to avoid the inefficiencies of conducting an unnecessary trial."). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); *see Celotex Corp.*, 447 U.S. at 322–23. "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). When there is no dispute as to material facts, summary judgment is appropriate. *See Carter v. McGrady*, 292 F.3d 152, 157 n.2 (3d Cir. 2002).

In determining whether summary judgment is appropriate, the Court must "view the facts and draw inferences in the light most favorable to the nonmoving party." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010). The moving party has the initial burden of supporting the position that there is no genuinely disputed issue of material fact. FRCP 56(a); *In re FBI Windown, Inc.*, 614 B.R. 460, 473 (Bankr. D. Del. 2020) (Sontchi, J.) ("When seeking summary judgment,

28

the movant bears the initial burden of 'establishing the absence of a genuine issue of material fact'

. . . . In other words, the movant's goal is 'to establish an absence of evidence to support the

nonmoving party's case.'").  The non-moving party must then come forward with material facts

showing a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986) (citing FRCP 56(e)).  To carry its burden once shifted, the non-moving

party must "do more than [create] some metaphysical doubt as to the material facts." *Id.* at 586.

Summary judgment similarly cannot be avoided by introducing only "a mere scintilla of evidence."

*Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 413 (3d Cir. 1990); *see also In re FBI

Windown, Inc.*, 614 B.R. 472–74.

Under Rule 56 of the FRCP, a party may move for summary judgment "upon all or any

part" of a claim at issue.  FRCP 56(a), 56(b).  "Partial summary judgment is merely a pretrial

adjudication that certain issues shall be deemed established for the trial of the case." *Coffman v.

Federal Laboratories*, 171 F.2d 94, 98 n.11 (3d Cir. 1948); *In re SemCrude*, No. 08-11525 (BLS),

2012 Bankr. LEXIS 3059, at *10 (Bankr. D. Del. Mar. 1, 2012) ("[T]he newly revised rules permit

a party to move for partial summary judgment" as an "issue-narrowing adjudication.").  Motions

for partial summary judgment are permitted where they are conducive to conservation of judicial

resources and are of benefit to the parties.  *See Coffman*, 171 F.2d at 98 n.11 ("[T]he purpose of

[partial summary judgment is] speeding up litigation by eliminating before trial matters wherein

there is no genuine issue of fact."); *In re G-I Holdings Inc.*, No. 02-3082 (SRC), 2007 U.S. Dist.

LEXIS 34947, at *8 (D.N.J. May 14, 2007) ("[W]hen partial summary judgment is appropriately

granted the length and complexity of trial on the remaining issues are lessened, all to the advantage

of the litigants, the courts, those waiting in line for trial, and the American public in general.")

(citing *Calpetco 1981 v. Marshall Exploration*, 989 F.2d 1408, 1415 (5th Cir. 1993)); *Freeman v.

*Minn. Mining & Mfg. Co.,* 675 F. Supp. 877, 891 (D. Del. 1987) ("It would save judicial resources and be economical for the parties if the issue could be summarily disposed of.").  Consistent with this purpose, courts have entertained and decided motions for partial summary judgment on the question of damages to narrow the issues before trial.  *See, e.g.*, *Reliance Insurance v. Woodward-Clyde*, 243 F. App'x 674 (3d Cir. 2007) (affirming district court's grant of summary judgment on damages for unpaid retrospective insurance premiums); *Poultry Health Serv., Inc. v. Moxley*, 538 F. Supp. 276 (S.D. Ga. 1982) (granting in part and denying in part plaintiff's motion for partial summary judgment on the issue of damages).

Finally, "[i]f the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  FRCP 56(g); *see In re Grasso*, 497 B.R. 434, 439 (Bankr. E.D. Pa. 2013) (treating certain material facts "not genuinely in dispute" as established pursuant to FRCP 56(g) and "treat[ing] such facts as established for purposes of the trial."); FRCP Advisory Committee Notes, 2010 ("If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial.").

## **ARGUMENT**

## I. **DEFENDANTS ARE LIABLE FOR MAXUS'S LEGAL OBLIGATIONS, INCLUDING THE ALLOWED CLASS 4 AND CLASS 5 CLAIMS, SHOULD THIS COURT RULE IN FAVOR OF THE TRUST'S ALTER EGO CLAIM AGAINST EACH OF THE NAMED DEFENDANTS.**

The Trust's first cause of action seeks to pierce the corporate veil to impose liability on YPF and Repsol, as alter egos of Maxus, for all claims and liabilities asserted by the Debtors' creditors in the Chapter 11 Cases and seeks a declaratory judgment that Defendants are jointly and

30

severally liable for all losses that the creditors of the Debtors may incur or that may be imposed on such creditors in the future.  Compl. ¶¶ 74, 232.

The Trust's alter ego claims comport with the equitable underpinnings of alter ego and veil-piercing doctrines that a subsidiary's frustrated creditor need only establish (1) it holds a judgment against a dominated subsidiary, (2) that has been rendered unable to satisfy the judgment due to wrongful abuse of corporate separateness by a corporate parent, such that (3) equity demands that the parent make the creditor whole.  "Under both state and federal common law, abuse of the corporate form will allow courts to employ the 'tool of equity' known as veil-piercing." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001).  Under Delaware law (which the Parties agree is applicable here), to pierce the corporate veil a plaintiff must demonstrate "(1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present."  *See Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 555 (Bankr. D. Del. 2012) (Sontchi, J.) (same).

### A. There Are Triable Issues on Whether Maxus, YPF, Repsol, and Their Subsidiaries Operated as a Single Economic Unit and Whether Such Operation Worked an Injustice on Creditors.

Courts in the Third Circuit (and elsewhere) have analyzed seven main indicia to determine whether a parent and subsidiary operated as a single economic entity: (i) whether the subsidiary is undercapitalized, (ii) whether the subsidiary is insolvent at a relevant time, (iii) whether the companies failed to observe corporate formalities, (iv) whether the subsidiary did or did not pay dividends to the parent, (v) whether there was siphoning of the subsidiary's funds by the dominant stockholder, (vi) whether appropriate corporate records were maintained, and (vii) whether the subsidiary was merely a façade for the operations of the dominant stockholder.  *United States v.*

31

*Pisani*, 646 F.2d 83, 88 (3d Cir. 1981); *see In re Autobacs Strauss*, 373 B.R. at 526 (citations

omitted).  These seven factors are not exhaustive, no single factor is dispositive, and some

combination may be shown to establish liability.  *In re Autobacs Strauss*, 373 B.R. at 526.  "It is

not required that every single factor weigh in favor of piercing the corporate veil—a [court] need

only find that, as a matter of law, the balance of [the] factors weighs in favor of either party, on

proven facts not contradicted by other admissible proof."  *Sentry Ins. A Mut. Co. v. Brand Mgmt.*,

120 F. Supp. 3d 277, 288 (E.D.N.Y 2015). For the second factor of the test, the requisite injustice

or unfairness is not that the parent corporation committed an actual fraud or sham but just

'something that is similar in nature to fraud or a sham.'" *Blair v. Infineon Techs. AG*, 720 F. Supp.

2d 462, 471 (D. Del. 2010) (quoting *In re Foxmeyer*, 290 B.R. 229, 236 (Bankr. D. Del. 2003)).

The Trust is confident that the evidence uncovered during fact discovery is sufficient to

warrant piercing of the corporate veil between Maxus and YPF and Repsol.  Indeed, as set forth in

Section II, *infra*, that  record amply establishes that YPF and Repsol denuded Maxus of its valuable

E&P assets with the express intent of preventing environmental creditors from recovering against

those assets.  *See, e.g.*, *Pharmacia Corp. v. Motor Carrier Servs. Corp*., 309 F. App'x 666, 673

(3d Cir. 2009) ("[T]he hallmarks of . . . abuse [of the corporate form] are typically the engagement

of the subsidiary in no independent business of its own but exclusively the performance of a service

for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it

judgment-proof.").

Nevertheless, given the fact-intensive inquiry of the alter-ego exercise—s*ee, e.g.*, *CLP

Toxicology, Inc. v. Cala Bio Holdings LLC*, No. 2018-0783-PRW, 2020 Del. Ch. LEXIS 230, at

*61 (Del. Ch. Jun. 29, 2020) ("Whether to pierce the corporate veil is a fact-intensive inquiry that

requires the court to evaluate whether the owners of the entity unjustly misused the corporate

AMERICAS 111968923

form.")—the issue of whether the Defendants are alter egos of the Debtors might not be susceptible to resolution on summary judgment. As set forth in the next section, while alter ego *liability* may be a fact-intensive inquiry unsuited to summary judgment, the *amount* of damages recoverable once alter ego is proved is an undisputed question of law. The Court can and should resolve the extent of the Defendants' liability, leaving for trial only the issue of whether Defendants are liable.

### B. Defendants Are Liable for the Debtors' Legal Obligations, Including the Allowed Class 4 and Class 5 Claims, Upon a Finding that Defendants are Alter Egos of the Debtors.

The Trust now seeks to establish that there is no genuine triable issue of fact that Defendants can be held liable (1) for the $712,560,327.76 in respect of the Allowed Class 4 Claims,[32] plus pre-judgment interest, and (2) for a declaratory judgment that Defendants are liable as alter-egos for the unliquidated Class 5 Claims as they become due. *Cf. Soros Fund Mgmt. LLC v. Tradewinds Holdings, Inc.*, No. 17 Civ. 3187 (JFK), 2018 U.S. Dist. LEXIS 40164, at *12–13 (S.D.N.Y. Mar. 12, 2018) ("[A] judgment may be enforced against an alter ego, even if the alter ego was not a party to the underlying suit, so long as the alter ego is a party to the action determining the alter ego status."). The damages theory alleged in Count I of the Complaint is simple, as this Court noted in connection with a prior discovery dispute in this case:

> [H]ere, the wrong being alleged is the corporate misconduct and not the actual pollution, as a result it seems inconsistent that the Defendants also want discovery related to the soil samples. Here, the Trust is alleging that the alter ego has stripped the Debtors' assets so they could not pay their liabilities. The alleged harm to the Debtors is those liabilities, which are claims and/or settled claims against the estates. The damages are not related to the actual pollution or clean-up thereof. The Defendants, if liable, should be responsible for the damages arising from the corporate misconduct, and here that is the claims alleged and/or settled against the Debtors' estates.[33]

---

[32] The Amended Plan settled certain Allowed Claims (see Art. XI.F) , including the Class 4 Environmental Claims, discussed within, and gave the Liquidating Trust the right to deem claims Allowed after the Effective Date (see Art. X.B). A complete list of all Allowed Claims is set forth in the Pulliam Report, Smith Decl. Ex. 111, at Appendix 1.
[33] [D.I. 227] at 16.

33

The Trust simply seeks to convert the Court's observation into a judgment and forestall the cost and expense of a full-blown damages trial on the alter ego claims.

>    **1.    The Proper Measure of Damages for The Trust's Alter Ego Claim Concerns All of the Debtors' Unpaid Obligations.**

Where alter-ego liability is established, the dominating corporation becomes liable for all of the subservient corporation's obligations to creditors. *See, e.g.*, *In re Tronox Inc.*, 855 F.3d 84, 107 (2d Cir. 2017) ("[E]stablishing . . . that New Kerr-McGee is the alter ego of the relevant Tronox debtors and should therefore be charged with all its liabilities []would benefit all creditors of the Tronox debtors generally."); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 589 (4th Cir. 2015) ("Since [the] two entities were alter egos, they are liable for each other's debts."); *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1152 (5th Cir. 1987) ("The predominate policy of…alter ego law is that the control entity that has misused the corporation form will be held accountable for the corporation's obligations."); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 488 (3d Cir. 2001) (recognizing that veil-piercing is one test "to determine whether parent and grandparent corporations could be held liable for the debts of a subsidiary"); *Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1353 (5th Cir. 1987) ("[T]he dominant shareholder or parent entity, because it controls the subservient company, is the party responsible for creating the subservient's debts."); *Blair*, 720 F. Supp. 2d at 470 n.11 ("[v]eil piercing is not dependent on the nature of the [underlying] liability").

The Defendants' core argument against the imposition of derivative liability has been that Defendants acquired controlling interests in Maxus after Maxus's environmental liabilities had been incurred and therefore they did not "cause" the liability.[34]   This "defense" ignores that the

---

[34] *See, e.g.*, [D.I. 140] at 102–03 (affirmative defenses Ninth through Thirteenth in YPF's Answer).

AMERICAS 111968923

wrongful conduct complained of is not that Defendants participated in the underlying hazardous discharges, but rather that they improperly sought to strand Maxus's conceded and existing liabilities to environmental creditors by siphoning off Maxus's assets. *See In re Richesin*, No. 7-04-10884 MA, Adv. No. 07-1034 M, 2007 Bankr. LEXIS 3391, at *27–28 (Bankr. N.M. 2007) ("[W]ithin the context of bankruptcy, the implied improper purpose is to keep valuable assets out of the bankruptcy estate, *and the implied proximate cause of damage is that creditors of the estate will be prevented from sharing in those assets*.") (emphasis added).  Defendants' contention also assumes, without foundation, that while a corporate parent may not abuse the corporate form to judgment-proof a subsidiary from liabilities over the incurrence of which the parent presided, the corporate parent can freely seek to judgment-proof the subsidiary from claims pre-dating the parent's acquisition of the subsidiary.  This Court has already dismissed Defendants' post-hoc rationalization:

> This argument is too clever by half because *if* the wrongs alleged are true – then these environmental liabilities would have been the Defendants' responsibility, but now they want to limit the alleged wrongs to *just* the damages arising from the corporate behavior.  Environmental liability is not like a breach of contract claim or a tort – environmental liability stays with the land and the ownership regardless of who caused the original damage.  Here, the alleged alter-ego claims directly resulted in the claims against the estates, including the settled claims.[35]

In short, Defendants can be held, as a matter of law, liable for all "claims against the estates," and the Court should so rule at this time.

## 2.    The Quantum and Validity of Damages Sought By the Trust Has Already Been Adjudicated and Resolved by the Amended Plan.

The Court can and should rule at this time that there is no triable question of fact as to what the "claims against the estates" are.  As a matter of law, a bankruptcy court's allowance of a claim settlement (as happened here), conclusively fixes the liability of the debtor to the creditor no

---

[35] [D.I. 227] at 14.

AMERICAS 111968923

differently than would a judgment.  *See* 10 Collier on Bankruptcy P 9019.01 (16th ed. 2021)

("Once it has become final, an order approving a settlement has the same *res judicata* effect as any

other order of a court."); *In re Northfield Labs. Inc.*, 467 B.R. 582, 589 (Bankr. D. Del. 2010)

("Claim preclusion applies to confirmed plans of reorganization, just as it does to any final

judgment on the merits."); *In re Arctic Glacier Int'l, Inc.*, 255 F. Supp. 3d 534, 548 (D. Del. 2017)

("Upon confirmation, the [p]lan's distribution procedure became a final judgment that was binding

on all parties and cannot be re-litigated."); *In re Blackhawk Corp.*, No. 13-10282(KG), 2016

Bankr. LEXIS 2217, at *3 (Bankr. D. Del. May 26, 2016) ("The allowed proofs of claim are

equivalent to a final judgment and a bankruptcy court order allowing an uncontested proof of claim

constitutes a 'final judgment' and thus a predicate for *res judicata*.")

As the Debtors' claims register reflects, environmental creditors filed dozens of sworn

proofs of claim against the Debtors in the Chapter 11 Cases.[36]  There is no material dispute that,

after months of good-faith, arms-length negotiation over those filed claims, the Debtors reached

settlements with their key environmental creditors that formed the basis for the Amended Plan.

The Allowed Class 4 Claims comprise conceded liquidated environmental expenditures arising in

large part from the Debtors' pre-petition agreements with other PRPs or government agencies such

as the EPA, i.e., the "Class 4 Environmental Claims."  The Class 4 Environmental Claims are

"Claim[s] against any of the Debtors arising under or in connection with any Environmental Law

or the OCC Indemnity" to the extent those Claims constitute "actual out of pocket costs,"

"expenses incurred," or "costs and expenses . . . legally or contractually committed itself to expend

(as evidenced by a writing between such Holder and a Government Environmental Entity or a

judgment of a court of competent jurisdiction)."  Smith Decl. Ex. 3, at Art. I.A.29(a).  Class 4

---

[36] *See* Prime Clerk, Maxus Energy Corporation, Claims, accessible at https://cases.primeclerk.com/maxus/Home-ClaimInfo.

Environmental Claims also comprise "such other amounts as may be Allowed as a Class 4 Environmental Claim pursuant to (i) any agreement or settlement with the Debtors or (ii) order of the Bankruptcy Court." *Id.* Art. I.A.29(b).  As reflected in Article XI.F of the Amended Plan, following arms-length plan negotiations with the Debtors, the Class 4 Claims of the Debtors' primary environmental creditors were settled and allowed, including the claims of the Lower Passaic River Study Area Cooperating Parties Group, the State of Ohio Environmental Protection Agency, the State of Wisconsin Department of Natural Resources, the United States (on behalf of the EPA, DOI and NOAA), and OCC (Maxus's indemnitee under the SPA).  Pursuant to the Plan, those particular claims were settled in the total aggregate amount of $700,688,553.32.  *See* Smith Decl. Exs. 87-92 (attaching relevant proofs of claim); Smith Decl. Ex. 3 at Art. I. A.

The Class 5 Claims represent unliquidated future environmental expenditures, and comprise the portion of the United States EPA/Natural Resource Damages ("NRD") Trustee Claim that exceeds the allowed amount of the United States Class 4 Claim, and OCC's Class 5 Diamond Alkali Claim.  Smith Decl. Ex. 3 at Art. I.A.30; [Bankr. D.I. 1232] (the "Disclosure Statement") at 16–17.  The Class 5 Diamond Alkali Claims also comprise Environmental Remediation Expenses (i.e., the "reasonable and necessary fees, costs and expenses paid by a PRP for Response Work after the Effective Date of the [Amended] Plan") and Environmental Restoration Expenses (the "reasonable and necessary fees, costs and expenses paid by a PRP for or NRD Trustees for Restoration Work after the Effective Date of the Plan").  Smith Decl. Ex. 3 at Art. I.A.30; [Bankr. D.I. 1453-1] (the "ERRT Agreement") § 1.01.  These are the future costs that ultimately could exceed $12 billion.  *See* Smith Decl. Ex. 90.

Finally, the Amended Plan created the mechanism for, and gave the right to, the Trust to pursue payment of the Debtors' obligations from Defendants through this adversary proceeding.

AMERICAS 111968923

*See* Smith Decl. Ex. 3, Art. IV. Sec. H.  Article VI of the Amended Plan provides that cash proceeds obtained by the Trust in this adversary proceeding will be distributed to the Debtor's creditors according to the Liquidating Trust Waterfall.  *See* Smith Decl. Ex. 3, at Art. VI. Sec. D.[37]  With respect to the Class 5 Claims, which remain unliquidated, the Amended Plan creates a mechanism—the Environmental Remediation and Reclamation Trust ("ERRT")—by which the future response costs related to the Passaic River borne by the environmental creditors in Class 5 (including the EPA and OCC), will be reimbursed on an ongoing basis for an indefinite period. The Amended Plan specifies that the ERRT will hold and distribute to eligible creditors assets, including those generated in this litigation, that will then be available to fund future response costs.[38]  Judgment in the Liquidating Trust's favor on its count for Declaratory Relief as to Defendants' liability as alter-egos would therefore give rise to liability on the part of Defendants in respect of *future* remediation costs comprised by the Allowed Class 5 Diamond Alkali Claims as and when such costs are liquidated.  In that way, the relief sought actually benefits the Defendants in that it would only hold them liable for actual costs and expenses as incurred, rather than having the Parties have to speculate as to the quantum of future claims.

While not a prerequisite to a subsequent award of liability upon a finding of alter-ego, the Defendants had the opportunity to challenge the allowance of claims at the Plan stage and to protest the Debtors' agreement to them.[39]  Both YPF and Repsol were well aware of the nature and extent

---

[37] The Liquidating Trust Waterfall provides, in relevant part, that Trust recoveries will be applied 15% to Class 5 Claims and 85% to Class 4 Claims until then latter are paid in full, and then 100% to remaining Class 5 Claims.  The ERRT Waterfall provides, in relevant part, that the first $61 million in Trust recoveries applied to Class 5 Claims shall be applied 50% to the EPA Diamond Alkali Special Account and 50% to NRD restoration activities related to the Diamond Alkali Site, with any additional recoveries applied to Class 5 Claims allocated 90% to environmental remediation at the Diamond Alkali Site, and 10% to NRD restoration at that Site.  See Smith Decl. Ex. 3 Art. IX.B.

[38] See Smith Decl. Ex. 3 Art. III.E(5).

[39] Courts in this District routinely approve bankruptcy-court-approved settlements that resolve CERCLA liability. *See, e.g.*, *In re Barzel Indus. Inc., et al.*, No. 09-13204 (CSS) (Bankr. D. Del. Sept. 7, 2011) (ECF No. 973 and 973-1) (approving a settlement of EPA's proof of claim contending that the debtors were liable pursuant to CERCLA for past and future environmental response costs); *In re Apco Liquidating Trust & Apco Missing Stockholder Trust*, No.

AMERICAS 111968923

of the claims asserted against the Debtors in the Chapter 11 Cases, as well as the creditors' need for collective remedy against Defendants to obtain any distribution on their claims. YPF actively participated in the Chapter 11 Cases as DIP lender and proposed settlement counterparty.[40] Repsol likewise appeared on multiple occasions.[41] While YPF and Repsol originally objected to the allowance of certain claims filed by OCC, those objections were resolved prior to the filing of the Confirmation Order, and YPF withdrew its objection.[42] Neither YPF nor Repsol sought to appeal the Confirmation Order, which is now final.[43]

On May 22, 2017, the Court entered an order confirming the Amended Plan [Bankr. D.I. 1460] (the "Confirmation Order"). In it, the Court found that the Claim Settlements were "the culmination of extensive good faith, arms' length negotiations between and among the Debtors and various case constituencies." *See* Confirmation Order at Finding H. Further, the Court found the settlements in the Amended Plan to be "reasonable and appropriate under the circumstances and to satisfy sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as outlined by the . . . Third Circuit in *Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996)." Confirmation Order at 18–19. On July 17, 2017, the Debtors filed the Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III)

---

05-12355 (BLS) (Bankr. D. Del. Nov. 1, 2013) (ECF No. 780) (same); *In re Old AII, Inc., et al*., No. 09-10478 (BLS) (Bankr. D. Del. Jun. 28, 2011) (ECF No. 2675) (same).

[40] *See* [Bankr. D.I. 26]; [Bankr. D.I. 91]; [Bankr. D.I. 638]; [Bankr. D.I. 1306]; [Bankr. D.I. 1987]; [Bankr. D.I. 1462]; [Bankr. D.I. 1084].

[41] *See* [Bankr. D.I. 1986]; [Bankr. D.I. 1410]; [Bankr. D.I. 758].

[42] *See* [Bankr. D.I. 1411]; [Bankr. D.I. 1410]; *see also* [D.I. 1418]; [D.I. 1431].

[43] For the avoidance of doubt, the Trust is not seeking partial summary judgment on the ground that, because the Defendants did not challenge the settlements of Allowed Claims at the Plan Confirmation stage, those settlements are binding on Defendants as a matter of *res judicata*. *See* Smith Decl. Ex. 3, at Art. XV.P ("Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action and the Preserved Contribution Claims)."). Rather, the Trust seeks to establish now that there is no material factual dispute that (1) the Debtors, in fact, entered into the Claim Settlements in good faith and at arm's length, and (2) Defendants have adduced no facts to contradict any of the foregoing, despite having been given the opportunity to take discovery from the Debtors' independent directors.

AMERICAS 111968923

Related Bar Dates (the "Effective Date Notice") informing parties in interest that the Amended

Plan became effective on July 14, 2017.  The Claim Settlements became binding on the Debtors

as of that Effective Date.  Smith Decl. Ex. 3 at Art. XV.A.

*     *     *

In sum, this Court can and should determine the law applicable to the Trust's alter ego

claims, find those material facts relating to such claims that are not genuinely disputed, and find

that Defendants can each be held jointly and severally liable for all of the Debtors' Allowed Class

4 and Class 5 claims, with prejudgment interest at the applicable rate.[44]

## II.    THE TRUST IS ENTITLED TO SUMMARY JUDGMENT ON ITS ACTUAL FRAUDULENT TRANSFER CLAIMS AGAINST EACH OF THE NAMED TRANSFEREE DEFENDANTS.

The Trust asserts a series of actual and constructive fraudulent conveyance claims against

YPF and Repsol in Counts II-XXI of the Complaint.  The Trust now seeks partial summary

judgment establishing Defendants' liability on its actual fraudulent transfer claims against YPF

and Repsol on (1) the individual 1996-1997 Transfers (Bolivia Assets, Venezuela Assets, Ecuador

Assets, and Indonesia Assets) (Counts II, IV, VI, VIII, and X); (2) the Crescendo Transfer (Count

XII); and (3) the YPFI Transfers (of the Bolivia Assets, Venezuela Assets, Ecuador Assets, and

---

[44] This Court should rule that the Trust is entitled to prejudgment interest on the Allowed Class 4 Claims at the applicable rate under Delaware state law, from the effective date of the Amended Plan to the entry of judgment.  *See In re Aerogroup Int'l, Inc,* 601 B.R. 571, 599 (Bankr. D. Del. 2019) ("If the right to recovery arises under state law, state law also governs the availability of prejudgment interest."); *see also In re Ashinc Corporation*, No. 12-11564 (CSS) (Bankr. D. Del. July 23, 2021) (Sontchi, J.) (ECF No. 841) at 4 (granting summary judgment and awarding Litigation Trustee prejudgment interest at the applicable New York state rate on breach of contract claim brought in adversary proceeding along with fraudulent transfer claims, running from the date of the breach to judgment); *In re Mortg. Lenders Network USA, Inc.,* 406 B.R. 213, 247 (Bankr. D. Del. 2009) (awarding prejudgment interest in accordance with the rate under New York law on a claim to recover servicing advances under state law"); *In re Orion Refining Corp.*, 424 B.R. 156, 170 (Bankr. D. Del. 2010) (granting prejudgment interest in accordance with the rate set forth under Louisiana law on a state breach of contract claim brought in an adversary proceeding).  Thus, the Trust requests that this Court determine that Delaware's statutory rate of 6.75% be applied to the Allowed Claims (5% plus the Federal Reserve discount rate as of July 14, 2017, which was 1.75%).  *See* 6 Del. C. § 2301(a).

40

Indonesia Assets) (Count XIV) (collectively, the "Intentional Fraudulent Transfers").[45]

With respect to each of the Intentional Fraudulent Transfers, the Trust seeks to establish liability under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(A) and 6 Del. C. § 1304 (the "Delaware Uniform Fraudulent Transfer Act" or "DUFTA"),[46] made applicable through 11 U.S.C. § 544(b),[47] by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502. Section 544(b)(1) of the Bankruptcy Code generally provides that, subject to certain limitations, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowable] unsecured claim." 11 U.S.C. § 544(b)(1). This subsection allows the trustee to stand in the shoes of an actual creditor of the debtor to avoid a transfer of the debtor's property or an incurrence of an obligation by the debtor that such creditor could have avoided under nonbankruptcy law. 5 Collier on Bankruptcy ¶ 544.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). The trustee may use this "strong arm power" to exercise the rights that such a creditor would have against the debtor under state fraudulent transfer laws. *See, e.g.*, *In re Midway Games, Inc.*, 428 B.R. at 325 (using state law's Uniform Fraudulent Transfer Act to avoid transfer). Further, for purposes of Section

---

[45] The Trust reserves all rights with respect to any issues concerning damages in respect of the Intentional Fraudulent Transfers and all other intentional and constructive fraudulent conveyance and conspiracy claims alleged in the Complaint.

[46] *See In re Midway Games, Inc.*, 428 B.R. 303, 326 n.15 (Bankr. D. Del. 2010) ("6 Del. C. § 1304(b)(1) contains the same standard for fraudulent transfer as the Code, namely the 'actual intent to hinder, delay or defraud.' The [c]ourt will therefore consider the applicable Bankruptcy Code provisions as incorporating Delaware law."); *see also In re PHP Healthcare Corp.*, 128 F. App'x 839, 847 (3d Cir. 2005) ("We need not discuss the [actual-intent fraudulent transfer] provisions of the [DUFTA] . . . because they are substantially the same as the relevant parts of the Bankruptcy Code.").

[47] The standard for fraudulent transfer does not differ in other potential applicable laws. *See* Tex. Bus. & Com. Code § 24.005(a); Ohio Rev. Code §§ 1336.04(A); Wis. Stat. §§ 242.04; N.J.S.A. §§ 25:2-20 (containing largely the same elements and badges of fraud as laid out in DUFTA). Thus, for the same reasons that the Trust succeeds in a fraudulent transfer claim against Defendants under Delaware law, it also succeeds in a fraudulent transfer claim under New Jersey, Texas, Ohio, or Wisconsin law. Moreover, although the Bankruptcy Code and the DUFTA use the same substantive language (actual intent to hinder, delay, or defraud), the Trust will rely on the DUFTA because of its longer statute of limitations. *See Tronox II*, 503 B.R. at 277.

AMERICAS 111968923

544(b), while the amount of the unsecured creditor's claim is immaterial to the quantum the Trust can recover, the Trust can frame its fraudulent transfer claims by reference to the most permissive law applicable to any one of the Debtors' creditors.  The Trust submits the Declarations of Lanny Bilbrey and Daniel Fetsick, establishing both gentlemen as "triggering creditors" in whose shoes the Trust may stand on its Section 544 claims.  *See* Smith Decl. Exs. 189, 195.   Section 548(a)(1)(A) of the Bankruptcy Code provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . ."  11 U.S.C. § 548(a)(1)(A).

**A.     There Is No Genuine Dispute of Material Fact That the Intentional Fraudulent Transfers Each Involved "Transfers" of "Interests" of the Debtors in "Property".**

A "transfer" is broadly defined in the Bankruptcy Code, and includes (a) the creation of a lien, (b) the retention of title as a security interest, (c) the foreclosure of a debtor's equity of redemption, or (d) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property.  11 U.S.C. § 101(54).  Section 550(a) of the Bankruptcy Code provides that "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550(a).  Although the debtor cannot recover from "any immediate or mediate transferee of [the] initial transferee . . . that

AMERICAS 111968923

takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided," 11 U.S.C. § 550(b)(1), the subsequent transferee has the burden of proving elements of value, good faith, and lack of knowledge in support of any good faith defense it may assert under section 550(b). *See In re Hooker Invs., Inc.*, 155 B.R. 332, 337 (Bankr. S.D.N.Y. 1993).

There is no genuine dispute that YPF undertook a "global restructuring" of Maxus in 1996 and 1997 that resulted in YPF taking possession of substantially all of Maxus's international E&P assets. All were undoubtedly "transfers" of interest of Debtors in property under the plain meaning of the Bankruptcy Code. There is no factual dispute that, on the dates, for the amounts and pursuant to the procedures set forth in the documents cited in the SOF, (1) Maxus transferred its Bolivia Assets to YPFI in June 1996 (SOF ¶¶ 55-60), (2) Maxus transferred its Venezuela Assets to YPFI in June 1996 (SOF ¶¶ 55-60); (3) Maxus transferred its Ecuador Assets to YPFI in December 1997 (SOF ¶¶ 61-65); and Maxus transferred its Indonesia Assets to YPFI in December 1997 (SOF ¶¶ 66-72).

There is also no genuine factual dispute that, after its acquisition of YPF, and with full knowledge of the circumstances of YPF's transfers, Repsol took possession of Maxus's legacy international E&P assets (which then resided in YPFI) as an "immediate of mediate transferee" of the initial transferee YPFI, as defined in Section 550(a) of the Bankruptcy Code. Specifically, there is no dispute that, on the date, for the amounts and pursuant to the procedures set forth in the documents referenced in the SOF, (1) YPFI transferred Maxus's legacy Venezuela Assets to Repsol affiliates in July 2001 (SOF ¶¶ 86-88); (2) YPFI transferred Maxus's legacy Ecuador Assets to a Repsol affiliate in November 2001 (SOF ¶¶ 89-90); and (3) YPFI transferred Maxus's legacy Bolivia Assets to a Repsol affiliate in July 2002 (SOF ¶¶ 94-95). Further, there is no dispute that YPFI transferred Maxus's legacy Indonesia Assets to CNOOC in January 2002 or that the

43

proceeds were used for Repsol's benefit in the form of a "loan" by Maxus to RIF.  SOF ¶ 93.

Finally, there is no dispute that Maxus transferred its remaining oil and gas assets in the Crescendo

partnership to BP Amoco and Apache and the proceeds were similarly used for Repsol's benefit

in the form of a "loan" by Maxus to RIF.  SOF ¶¶ 80-85.

Given these undisputed facts, the Court should find that all of the Intentional Fraudulent

Transfers (i.e., the 1996-1997 Transfers, the 2001-2002 YPFI Transfers,[48] and the Crescendo

Transfer) involved transfers of interests of the Debtors in property to both initial transferees and

subsequent transferees, and that the Court may avoid these transfers under Sections 544(b)(1) and

548(a)(1)(A) of the Bankruptcy Code.

**B.     There is No Genuine Dispute of Material Fact That the Badges of Fraud Provide Conclusive Evidence of Defendants' Intent to Defraud, Delay, or Hinder Creditors.**

Under Sections 544(b)(1) and 548(a)(1)(A) of the Bankruptcy Code and the DUFTA,

prohibit three distinct intents: the intent to hinder, the intent to delay, and the intent to defraud.

*See Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent

to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and

delay them."); *Tronox II*, 503 B.R. at 278 ("Liability is imposed for an 'intentional fraudulent

conveyance' where the fact and purpose of a conveyance may have been known to creditors in

whole or in part, but the transferor intended to hinder or delay them.").  "Both statutes [11 U.S.C.

§ 548(a)(1)(A) and 6 Del. Code § 1304(a)(1)] are set out in the disjunctive, and a showing of any

one of the three requisite states of mind—the intent to hinder, the intent to delay, or the intent to

defraud—is sufficient to establish the intent element."  *In re Syntax-Brillian Corp.*, No. 08-11407

---

[48] The Trust submits that there may be triable issues of fact concerning whether YPFI was the alter ego of Maxus, and whether, as a result of being Maxus's alter ego, YPFI's subsequent transfers of the Bolivia Assets, Venezuela Assets, and Ecuador Assets to Repsol and the Indonesia Assets to CNOOC constituted transfers of "interest[s] of the Debtor in property" under Sections 544 and 548 of the Bankruptcy Code.  The Trust reserves all rights in this regard.

AMERICAS 111968923

(BLS), 2016 Bankr. LEXIS 988, at *12 (Bankr. D. Del. Feb. 8, 2016).

Importantly, "a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors, but knew that by entering the transaction, creditors would inevitably be hindered, delayed or defrauded." *Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278, 386–87 (S.D. Tex. 2008) ("Many fraudulent transfer cases cite to the Restatement (Second) of Torts for the definition of 'intent' under the UFTA . . . . According to the Restatement, '[t]he word 'intent' is used . . . to denote that the actor desires to cause consequences of his act, or that that he believes that the consequences are substantially certain to result from it."); *see Quadrant Structured Prods. Co. v. Vertin*, No. 6990-VCL, 2015 Del. Ch. LEXIS 266, at *57–58 (Del. Ch. Oct. 20, 2015) (same); *In re Syntax-Brillian Corp.*, 2016 Bankr. LEXIS 988, at *19 (finding that "if the natural consequence of a debtor's actions is that its creditors were hindered, delayed or defrauded, a court is more likely to find that an intentional fraudulent transfer occurred.").  Because few defendants ever admit an actual intent to "hinder, delay or defraud", the Court may find the presence of certain "badges of fraud" sufficient to demonstrate actual intent.  *Tronox II*, 503 B.R. at 282–83 (citing *In re Sharp Int'l. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005)); *MSKP Oak Grove, Ltd. Liab. Co. v. Venuto*, 839 F. App'x. 708, 712 (3d Cir. 2020) ("Because debtors rarely admit fraudulent intent, courts must usually infer it.") (citation omitted).  Such "badges" are circumstances "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  *In re Sharp Int'l Corp.*, 403 F.3d at 56; *see In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550–51 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ("Direct evidence of fraudulent intent, however, is often unavailable and courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent.").

The DUFTA lays out the following badges of fraud which the trier of fact may consider

45

when inferring actual intent to defraud, including whether:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[49]

6 Del. C. § 1304(b).  "Even one badge of fraud can trigger a presumption of fraud." *MSKP Oak Grove, LLC*, 839 F. App'x. at 713.  "Although the presence of a single factor, i.e., badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *VFB LLC v. Campbell Soup Co.*, No. 02-137 KAJ, 2005 U.S. Dist. LEXIS 19999, at *109–10 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007) (quotations and citation omitted); *see Merrill Lynch Bus. Fin. Servs. v. Kupperman*, 441 F. App'x. 938, 941 (3d. Cir. 2011) ("These circumstances demonstrate a 'confluence of several [badges of fraud] in one transaction,' which 'generally provides conclusive evidence of an actual intent to defraud.'").

Here, there is a conclusive body of indisputable evidence demonstrating that YPF's and Repsol's Strategy to strip, manage, settle, and escape from the environmental liabilities they subjected their investments to when acquiring Maxus was undertaken with the distinct purpose of

---

[49] Factors 6 and 11 are not relevant to the Trust's allegations and will not be discussed below.

AMERICAS 111968923

hindering and delaying the Debtors' environmental creditors.    The Trust anticipates that Defendants will (as did the defendants in *Tronox II*) vociferously attempt to disclaim any subjective intent to defraud, hinder, or delay and thereby obtain a trial by denial.    That is not enough.    In *Tronox II*, the court considered whether actual fraudulent conveyance claims that culminated in the spinoff of substantially all assets of a chemical company and leaving behind the property incapable of supporting the legacy environmental and tort liabilities were "made with actual intent to hinder, delay, or defraud" a creditor.    *Tronox II*, 503 B.R. at 277.    The *Tronox II* court found that, despite self-serving statements in the defendants' brief, the record (primarily the trial testimony of the CEO and CFO) supported a "finding that a principal goal of the separation of the E&P assets from the chemical business was to cleanse the E&P assets of every legacy liability" and to "make the cleansed company more attractive as a target of an acquisition." *Id.* at 280.    Like here, the contemporaneous documentary evidence in *Tronox II* demonstrated that, contrary to the testimonial evidence, the environmental liabilities were central to the transactions and the effect on creditors was well understood. *Id.*[50]    As such, the *Tronox II* court further found that there could be "no dispute that Kerr-McGee acted to free substantially all its assets—certainly its most valuable assets—from 85 years of environmental and tort liabilities" and that the "obvious" and "clear and intended consequence of the act, substantially certain to result from it" was that the "legacy creditors would not be able to claim against 'substantially all of the Kerr-McGee assets,' and with a minimal asset base against which to recover in the future" left at Tronox, those legacy creditors would be "'hindered or delayed.'" *Id.* at 280.[51]

---

[50] For example, the court discussed several instances in which defendants either deleted key evidence entirely or else directed that mentions of a "bankruptcy scenario" be removed from its documents.  503 B.R. at 280.

[51] Similarly, in *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446 (W.D. Mich. 1988) (a case analyzed in the *Tronox II* decision), the State of Michigan and the United States, among others, challenged the consequences of a spinoff where a company "reorganized its corporate structure and assets," reducing the assets and retained earnings of the company that had serious environmental liabilities.  The company undertook a reorganization that resulted in the transfer of the

47

While *Tronox II* was a decision after trial, *Kelley* was a summary judgment case, and this Court can similarly resolve Defendants' liability at this stage and on this record.  "The existence of several 'badges of fraud' can constitute clear and convincing evidence of actual fraudulent intent, where a motion for summary judgment is before the Court." *In re Livecchi*, No. 09-20897, 2014 WL 6668886, at *10 (Bankr. W.D.N.Y. Nov. 20, 2014).  In *Livecchi*, the court analyzed each of the five badges of fraud identified by the Second Circuit and found that "the record provides ample evidence of the existence of all of the badges of fraud, giving rise to circumstantial evidence sufficient to support a finding of the Debtor's actual intent to hinder, delay, or defraud creditors."' *Id.* at *14; *see also In re E. Coast Foods, Inc.*, No. 2:16-bk-13852-BB, 2017 WL 3701211, at *9 (Bankr. C.D. Cal. Aug. 25, 2017) (considering evidence and the badges of fraud and finding at the summary judgment stage that "[a]ll of the facts and circumstances surrounding the Subject Transfer scream actual intent to hinder, delay or defraud."); *In re All Am. Petroleum Corp.*, 259 B.R. 6, 18–19 (Bankr. E.D.N.Y. 2001) (finding, under Rule 7056, actual fraudulent intent where many of the badges of fraud were present, including that Debtor made transfer to an insider for no

---

majority of its assets into newly incorporated companies and the isolation of the company with the potential liabilities, leaving it with significantly reduced assets and retained earnings.  *Id.* at 1450.  The spinoff companies "continued to operate as substantially the same business in the same manner" as the original businesses, continued "to deal in substantially the same products and services," and retained "substantially the same employees, management, and facilities."  *Id.* at 1451.  After the company with the legacy liabilities went into bankruptcy and liquidated, paying virtually nothing to its creditors, the environmental authorities sued under the Michigan UFTA, claiming that the corporate reorganization was an intentional fraudulent conveyance.  The court agreed, indicating that "[t]o ascertain the intent of a corporation, it is necessary to look at the intent of its representatives," and noted how two of the company's directors "testified that their decision to authorize the conveyances [] was motivated by concern about environmental liabilities."  *Id.* at 1453.  The directors had indicated in their depositions that the potential liability was "a factor" in the decision to reorganize.  *Id.* at 1454.  The court stated that it did not matter whether there were additional reasons for the reorganization, and noted how "[a]ctual intent . . . exists when a corporation's decision to create one or more new corporations is motivated wholly or in part by a desire to hinder, delay, or defraud creditors." *Id.* at 1455 (emphasis added).  Ultimately, the court concluded that there was actual intent: "Even if the company only intended to hinder or delay creditors, these purposes satisfy the intent element . . . . The Court concludes that there is no factual dispute among the parties that one reason Thomas Solvent Company created its spinoff corporations was to avoid potential [environmental] liability."  *Id.* at 1455.  In considering the badges of fraud, the court further found that "a cursory inspection [of the badges of fraud] suggests that the Court could well find that an inference of actual fraud can be derived from the presence of undisputed facts here."  *Id.* at 1457.

48

consideration when Debtor was insolvent and faced with enormous tax liabilities).

The gravamen of these cases, and indeed the very existence of badges of fraud (which presume denials by participants in intentional fraudulent conveyance cases), is that self-serving witness testimony and/or pretextual documents seeking to disclaim the contemporaneous factual record do not create triable issues of fact. Even assuming that there were "good reasons" motivating the Intentional Fraudulent Transfers, the record shows that isolating Maxus's environmental liabilities was one (if not the driving) reason for the asset transfers.[52] That is enough to find actual intend to defraud, hinder, or delay. *See Tronox II*, 503 B.R. at 280 ("[A] principal goal of the separation of the E&P assets from the chemical business was to cleanse the E&P assets of every legacy liability."); *Kelley*, 725 F. Supp. at 1455 ("[T]here is no factual dispute among the parties that one reason Thomas Solvent Company created its spinoff corporations was to avoid potential [environmental] liability.").

In any event, the difficulty of separating out legitimate from illegitimate subjective intent is precisely why courts rely on the objective badges of fraud to resolve the issue. Here, fact discovery has confirmed that there is no genuine dispute of material fact that <u>nine</u> of the badges of fraud apply to the Defendants' conduct.

### 1.    Factor 1: The Transfers Were Made to Insiders.

Here, all but two of the Intentional Fraudulent Transfers[53] conveyed Maxus's assets to one

---

[52] For example, Diego Pando (YPF's corporate representative) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." Smith Decl. Ex. 171 at Tr. 155:2-22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[53] The transfer from YPFI to CNOOC of the Indonesia Assets and the Crescendo Transfer were made to non-affiliates and are not applicable under Factor 1.

of several YPF or Repsol affiliates, each of which was indisputably an insider of the Debtors. *Tronox II*, 503 B.R. at 283 ("Transfers to an affiliate are deemed transfers to insiders.") (citation omitted). If the debtor is a corporation, "the term 'insider' *includes*: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." *In re Vaso Active Pharms., Inc.*, No. 10-10855 (CSS), 2012 Bankr. LEXIS 4741, at *34 (Bankr. D. Del. Oct. 9, 2012) (Sontchi, J.) (quoting section 101(31) of the Bankruptcy Code). Under the DUFTA, an affiliate includes "[a] corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor." 6 Del. C. § 1301(1).

It is undisputed that with respect to the 1996-1997 Transfers, Maxus sold its international E&P assets to YPFI, an insider affiliate entity. *See* SOF ¶¶ 55-72. YPFI was initially formed as a direct subsidiary of MIEC, SOF ¶ 55, with the purpose of purchasing, receiving, and holding Maxus's Venezuela, Bolivia, Ecuador, and Indonesia Assets, and was later restructured as the holding company of YPFH. *See* Smith Decl. Ex. 137 at 56, Figure 9. It is also undisputed that the subsequent transfers between 2001 and 2002 of the Venezuela, Bolivia, and Ecuador assets to Repsol insider affiliate entities (Repsol Exploracion S.A., Repsol YPF Santa Cruz S.A., and Repsol YPF Ecuador, respectively) occurred while Repsol was the ultimate corporate parent of YPF and Maxus. *See* SOF ¶¶ 76, 86-95.

### 2. Factor 2: The Debtors Retained Possession or Control of the Property Transferred After the Transfers.

The second badge of fraud is met where a party has "exclusive control over the property

transferred" after the transfer.  *Tronox II*, 503 B.R. at 283–84.  There is no dispute here that, after the 1996-1997 Transfers, Maxus retained control over the transferred assets through the YPF-created "Maxus Management Group," through which Maxus personnel with specialized knowledge and expertise continued to manage and operate the international E&P assets.  SOF ¶ 75.  As evidenced in Maxus board meeting minutes, the Maxus Management Group was an "agreement" under which Maxus personnel managed the operations of Maxus *and* the former E&P assets that were transferred to YPFI, and the operational and financial results of the Maxus Management Group were presented to Maxus's directors as though they were Maxus's own.[54]

From the outside, and even for the large part internally, the management of the international E&P assets appeared as business as usual after the 1996-1997 Transfers.  The corporate "restructuring" existed through book entries only—while the same Maxus employees were running the day-to-day business, their records and reporting were mapped to different entities and the public debt had been replaced with intercompany debt.[55]  The situation remained the same through the Repsol acquisition in 1999 until the YPFI Transfers, at which point Repsol acquired control (or in the case of the Indonesian assets, a third party acquired control).[56]  Thereafter, Repsol transferred the majority of the remaining Maxus employees to be Repsol employees.[57]  SOF ¶ 98.

---

[54] *See* Smith Decl. Ex. 173 at MAXUS4264942; Smith Decl. Ex. 174 at MAXUS3257449-3257450; Smith Decl. Ex. 182 at MAXUS3384947-3384948.

[55] *See* Smith Decl. Ex. 175 at Tr. 121:8-22 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Smith Decl. Ex. 176 at Tr. 129:22-130:4 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

[56] *See* Smith Decl. Ex. 175 at Tr. 63:21-64:12 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████);

[57] *See* Smith Decl. Ex. 177 at Tr. 60:9-61:2 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

AMERICAS 111968923

### 3. Factor 3: The Transfer or Obligation Was Disclosed or Concealed.

A third badge of fraud exists when a transferor or transferee "concealed the nature and existence of transfers from Debtor's creditors at the time the transfers were made." *In re Vaso Active Pharms., Inc.*, 2012 Bankr. LEXIS 4741, at \*42. In *Tronox II*, the Court stated that certain public disclosures were "ineffective and insubstantial," because "[o]bviously, Defendants did not disclose that Tronox would *not* be able to support the legacy liabilities that were imposed on it." 503 B.R. at 278, 284 (emphasis in original).

Here, Maxus, YPF and Repsol only made, at best, limited disclosures about the scope of the Debtors' potential environmental obligations, particularly with respect to the DASS. While certain public disclosures were made (for example with respect to the existence of the 1996-1997 Transfers), no disclosures were ever made concerning the effect of the Intentional Fraudulent Transfers on Maxus' ongoing solvency, creditworthiness or profitability. In fact, at all relevant times for the Intentional Fraudulent Transfers, both YPF (after its acquisition of Maxus) and Repsol YPF (after its acquisition of YPF), understood that Maxus's potential future environmental liabilities were far in excess of what was actually reserved on Maxus's published balance sheets.[58] There is no evidence that the Debtors, YPF, or Repsol ever disclosed the full extent of anticipated remedial costs related to the DASS. Rather, YPF, and later Repsol, routinely took the public position that, because there was "uncertainty" about the final remedy selected by the EPA, the liabilities were "unknown" and, as such, Maxus's stated environmental reserves never anticipated any final remedial costs for the Passaic River and Newark Bay—instead they stated only the short-

---

[58] *See* Smith Decl. Ex. 55 at YPF_MAXUS_0000293078 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ").

term expected expenditures on activities leading up to selection of a remedy.[59]  Even after Repsol

YPF (and later YPF) disclosed in its financial statements the June 2007 Draft FFS which outlined

alternatives for remedial action in the lower eight miles of the Passaic River (███████████████

███████████████████████████████████████████████████████████████████████████████

██████),[60] Defendants still maintained the position that they did not need to reserve for a final

remedy.[61]  In short, the public-facing reserves of the Debtors' and Defendants' balance sheets

never told a complete story of the looming nature of the DASS liability.

### 4.    Factor 4: Before the Transfer Was Made or Obligation Was Incurred, the Debtors Had Been Sued or Threatened with Suit.

Delaware courts have noted that "if, prior to the transfer, Debtor had been sued or was

threatened with suit relating to the disposition of [the funds]," it is a badge of fraud.  *In re Vaso*

*Active Pharms., Inc.*, 2012 Bankr. LEXIS 4741, at *42–43.  There is no dispute that Maxus had

been in active litigation or in pre-litigation discussions with third-parties and environmental

regulators for years regarding (1) its liabilities for environmental remediation at multiple sites other

than the DASS (SOF ¶¶ 30-39); (2) its indemnification responsibilities pursuant to the SPA with

---

[59] *See, e.g.*, Smith Decl. Ex. 131 at AA_MAXUS0014272-142373 ("The Company has been conducting similar studies under its own auspices for several years.  Until these studies are completed and evaluated, the Company cannot reasonably forecast what regulatory program, if any, will be proposed for the Passaic River or the Newark Bay watershed and therefore cannot estimate what additional costs, if any, will be required to be incurred."); Smith Decl. Ex. 179 at 109 ("Maxus cannot reasonably forecast what regulatory program, if any, will be proposed for the Passaic River or the Newark Bay watershed and, therefore, cannot estimate what additional costs, if any, will be required to be incurred.  However, it is possible that additional work, including interim remedial measures, may be ordered with respect to the Passaic River."); Smith Decl. Ex. 198, at 139 ("However, it is possible that other works, including interim remedial measures, may be ordered, or that additional claims may be brought. The resolutions of these matters could result in YPF Holdings incurring material costs in addition to the amount currently reserved.").
[60] *See, e.g.*, Smith Decl. Ex. 198 at 139.
[61] *See, e.g.*, Smith Decl. Ex. 129 at Tr. 236:3-16 ("Q. But again, you don't have any information about whether that reserve contained any projection of costs relating to any remediation efforts?  A. No. I think what you book as a reserve is the amount that you can quantifying it is probable to be spent.  So that's the amount that should be in their reserves . . . . I think that's why it says anything beyond that is highly speculative, because we don't know."); Smith Decl. Ex. 171 at Tr. 138:10-22 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

OCC (SOF ¶ 133); and (3) its liabilities for environmental remediation at the DASS (SOF ¶¶ 113-119, 132-134, 138-143).

*First*, there is no dispute that Maxus had, and YPF was (prior to the 1996-1997 Transfers), aware of Maxus's environmental liabilities relating to the remediation of multiple different sites which was subject to ongoing regularly proceedings. SOF ¶ 42. These obligations were summarized by Andrews & Kurth in connection with its due diligence of Maxus prior to the acquisition[62] and disclosed by Maxus in its publicly available financial statements.[63]

*Second*, there is no dispute that Maxus had "████████████████████████████" as summarized by YPF's counsel, Andrews & Kurth in connection with its due diligence prior to the acquisition of Maxus. Smith Decl. Ex. 13 at YPF-AK0052892-52893, 52930. Maxus disclosed this indemnification obligation in its publicly available financial statements. *See* Smith Decl. Ex. 180 at AA-YPF-0015005-15007. Moreover, in November 1995 (after the acquisition, and prior to the 1996-1997 Transfers), OCC filed suit against Maxus in Texas state court seeking a declaratory judgment against Maxus to affirm Maxus's obligation under the indemnification agreement to pay certain environmental remediation costs.[64] In September 1996 (after the "global restructuring" had begun), the Texas court granted summary judgment in OCC's favor, which the Court of Appeals of Texas affirmed in May 1998.[65] Maxus was involved in several similar litigations with OCC over Maxus's contractual indemnification obligations.[66]

---

[62] *See* Smith Decl. Ex. 13 at YPF-AK-0052889.

[63] *See* Smith Decl. Ex. 180 at AA-YPF-0015005-15007; Smith Decl. Ex. 183 at YPF0006879 (YPF seeking to discuss the '████████████████████ ).

[64] *See* Smith Decl. Ex. 131 at AA_MAXUS0014181 ("In November 1995, [OCC] filed suit in Texas state court seeking a declaration of certain of the parties' rights and obligations under the sales agreement pursuant to which the Company sold [DSCC] to [OCC].").

[65] *See Maxus Energy Corp. v. Occidental Chem. Corp.*, No. 05-96-01101-CV, 1998 Tex. App. LEXIS 3242, at *2, 5 (describing the procedural history and affirming the grant of summary judgment in OCC's favor).

[66] *See, e.g., Occidental Chem. Corp. v. Maxus Energy Corp.*, No. 97 CV 811 (Ohio Ct. Common Pleas); *Occidental Chem. Corp. v. Maxus Energy Corp.*, No. 02-09156-A (Tex. 14th Jud. Dist. Ct. Dallas).

*Third*, at acquisition, YPF was made aware that the DASS had been designated as a Superfund site in 1984, and that litigation brought under CERCLA or comparable state environmental laws could commence thereafter.[67]  Throughout the 1990s, Maxus was in frequent contact with the EPA to discuss the environmental sites related to DSCC and potential remedies prior to the 1996-1997 Transfers,[68] (SOF ¶¶ 26-29), and YPF was aware of the same.[69]  After YPF acquired Maxus, YPF received frequent updates regarding (and took part in) the ongoing discussions with the EPA and other developments with regards to the DASS.  CLH Board meetings—attended by Paul Bohannon (attorney at Andrews & Kurth), Roberto Monti (YPF-installed President and CEO of Maxus), and Raul Tanco (Chief Environmental Office at YPF)—all included updates on the EPA-mandated study at the DASS.[70]  In addition, ██████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████.[71]  Critically, in a key series of events discussed below, after the YPF acquisition but before the 1996-1997 Transfers, Mr. Bohannon attended a meeting with EPA to discuss the potential selection of an interim remedy for the DASS, evidently hoping to solicit a less expensive remedy than the potential billion dollar interim remedy then being contemplated by EA.  Once

---

[67] *See, e.g.,* Smith Decl. Ex. 13 at YPF-AK-0052898-52900 (Andrews & Kurth describing the ████████████████████████).

[68] *See, e.g.,* Smith Decl. Ex. 108 at MLTLEGACYESI_000278993-278994 (discussing ███████████████████); Smith Decl. Ex. 185 at MAXUS0775141-775142 (EPA letter asking for a deliverable similar to an EE/CA and noting that the agency will be in touch with Maxus); Smith Decl. Ex. 186 at MAXUS0655148 (letter from Maxus summarizing a meeting with EPA on May 9, 1996); Smith Decl. Ex. 187 at MAXUS0496511 (letter from Maxus submitting an Ecological Sampling Plan to EPA); Smith Decl. Ex. 188 at MLTLEGACYESI_000350873 (letter from CLH to EPA submitting an addendum to the Ecological Sampling Plan).

[69] *See* Smith Decl. Ex. 107 at MLTLEGACYESI_000278969-278973, 278975-278979 ("██████████████████████████████████████████").

[70] Smith Decl. Ex. 190 at MLTLEGACYESI_000372566 ("Mr. Herring next reported on the legal implications of work being performed in connection with an EPA mandated study of sediment in a portion of the Passaic River in New Jersey.").

[71] Smith Decl. Ex. 191 at MLTLEGACYESI_000372541 ("[Mr. Bohannon] reminded the Directors that a significant legal issue . . . relating to an EPA mandated study of sediment in a portion of the Passaic River . . . had been referred to Andrews & Kurth for further analysis.").

55

Repsol acquired YPF (and, with it, indirect control of Maxus), it also received periodic updates regarding pending litigation involving material environmental litigation and discussions with the EPA and state regulators, including before the Crescendo Transfer[72] and the YPFI Transfers.[73]

**5.      Factor 5: The Transfer Was of Substantially All the Debtor's Assets.**

When a transfer encompasses a significant part of a debtor's assets, this badge is met. The significance of the asset to the company is regarded higher than merely the percentage of the assets that are transferred. *See In re Vaso Active Pharms., Inc.*, 2012 Bankr. LEXIS 4741, at *43–46. Courts have thus found that this badge was met where "the company has fundamentally changed" as a result of the transfer. *Id.* at *45.

As described *supra*, prior to the YPF acquisition, Maxus was one of the largest independent oil and gas exploration and production companies in the United States with an asset value of approximately $2.9 billion. By the end of 1997, after the 1996-1997 Transfers, Maxus was stripped of its primary revenue-producing assets (with the exception of its Crescendo asset) and reported $6 million in net income for 1997. Smith Decl. Ex. 137 ¶¶ 188-92. Its shareholders' equity (which had been $348 million less than three years prior) declined to less than $1 million.

---

[72] *See, e.g.*, Smith Decl. Ex. 192 MLTLEGACYESI_001642597 ("Rio Passaic (New Jersey, United States). YPF International has recorded a provision for the estimated costs yet to be incurred in the tests and studies that are being carried out in order to identify the contaminated flora and fauna in the area adjacent to a former Diamond agricultural-chemical product plan. It is expected that these costs will range from €4 to €6 million. Additional work may be required, including remedial measures, which could lead to an increase in the costs associated with this area.").

[73] *See, e.g.*, Smith Decl. Ex. 129 at Tr.166:20-25 ("[D]id you ever ask about any additional work beyond 2001 during the period 2001 and 2009, the short answer would say yes, we asked about potential remediation work."); Smith Decl. Ex. 193 at MLTLEGACYESI_0003232052 ("Rio Passaic (New Jersey, United States). YPF International has recorded a provision for €6 million corresponding to its share of the costs to be borne in the tests and studies that are being carried out in this area adjacent to a former Diamond plant. Additional work may be required, including remedial measures, which could lead to an increase in the costs associated with this area."); Smith Decl. Ex. 194 at MLTLEGACYESI_001647295 ("Maxus, on behalf of Occidental, negotiated an agreement with the EPA under which CLH is conducting further testing and studies to characterize contaminated sediment and biota in a six-mile portion of the Passaic River near the plant site."); Smith Decl. Ex. 179 at 109 ("As agreed with Maxus, [Tierra] is conducting further testing and studies pursuant to an agreement with the [EPA] . . . in a six-mile portion of the Passaic River near the plant site. Maxus expects to complete these tests and studies in 2003 at a cost of approximately €3 million after December 31, 2002.").

Smith Decl. Ex. 137 ¶¶ 188-92. Then, before the end of 1999, Repsol YPF caused the Crescendo Transfer, resulting in the disposal of virtually all of Maxus's remaining productive assets. Smith Decl. Ex. 137 ¶¶ 199-200. Maxus's fixed assets were reduced to $26 million, and its annual operating revenue declined to just over $4 million dollars following the Crescendo Transfer. *See, e.g.*, Smith Decl. Ex. 138 at MAXUS-E-0003420, 3423. That is a "fundamental change."

Maxus's assets, and its ability to generate revenue never recovered—its annual operating revenue over the few years subsequent to the RIF loan (partial consideration for the Crescendo Transfers) did not reach $5 million. Smith Decl. Ex. 137 ¶ 201. Both YPF and Repsol YPF had to routinely submit financial support letters to its external auditor Deloitte & Touche LLP ("Deloitte"), in connection with Deloitte's annual audit of YPFH, reflecting Repsol's continuing commitment to provide YPFH with the resources necessary to enable Maxus and its subsidiaries to fund obligations as they came due so that Maxus could be considered a "going concern."[74] SOF ¶ 106. As stated succinctly by YPF's counsel at Milbank who later reflected on this badge of fraud:



---

[74] *See, e.g.*, Smith Decl. Ex. 54 at DT000609 ("[YPFH] is dependent upon financial support from Repsol YPF and affiliates. . . . [E]ssentially all of [YPFH's] cash flow comes from its parent or affiliates."); Smith Decl. Ex. 178 at YPF4237 _____ ; Smith Decl. Ex. 160 at YPF0021520 (same); Smith Decl. Ex. 161 at YPF0022574 (" _____ .").

[75] Smith Decl. Ex. 159 at YPF_MAXUS_PRIV_0000102466-102467.

6. **Factor 7: The Debtors Removed or Concealed Assets.**

With respect to the removal of assets badge, there is ample, undisputed evidence showing that, by virtue of the 1996-1997 Transfers, assets were removed from the reach of Maxus's creditors by having stock transferred from a domestic jurisdiction (Delaware, Maxus's state of incorporation) to the Cayman Islands (YPFI's place of incorporation.)[76]  The record also reveals that explicit consideration was given by YPF to remove U.S.-based assets to an offshore entity in order to make it more difficult for U.S. creditors to recover against those assets.[77]  During the Repsol period, the international E&P assets were thereafter removed another step further from Maxus by virtue of the transfers of the Venezuela, Ecuador, and Bolivia Assets from YPFI to offshore Repsol affiliates.  *See* SOF ¶¶ 86-95.

7. **Factor 8: The Value of the Consideration Received by the Debtors Was Not Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred.**

When a debtor accepts less than fair market value for transferred assets, it is a badge of fraud.  *See In re Green Field Energy Servs.*, No. 13-12783 (KG), Adv. No. 15-50262 (KG), 2015 Bankr. LEXIS 2914, at *23–24 (Bank. D. Del. Aug. 31, 2015).  In order "to assess the reasonable equivalence of the transfer or obligation and the value received by the debtor, a court should 'look to the totality of the circumstances, including (1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith.'"  *In Re Vaso*, 2012 Bankr. LEXIS 4741, at *56 (quoting *In re Jevic Holding Corp.*, Adv. No. 08-51903, 2011 Bankr. LEXIS 3553, at *27–28

---

[76] Smith Decl. Ex. 196 at MLTLEGACYESI_000202240.

[77] *See* Smith Decl. Ex. 197 at YPF0204789 (Memo on tax issues regarding the restructuring from David O. Smith (Chief Tax Counsel at Maxus) to Fernando Nardini (International Tax Manager at YPF) contemplating that

AMERICAS 111968923

(Bankr. D. Del. Sept. 15, 2011). Here, each of the Intentional Fraudulent Transfers were made at the direction of and/or to an insider, such that there is no expectation, much less evidence, of any arm's-length relationship involving fully-informed, independent fiduciaries. Nor was there an expectation of the transferees' good faith, given that—with the assistance of an ever-expanding cadre of law firms and financial advisors whose advice has, in large part, been revealed to the Trust—YPF (and Repsol when it later took over) "reorganized" Maxus to separate its valuable "good" assets from its demonstrably "bad" liabilities.[78]

The Trust acknowledges that, in certain respects, the questions posed by this badge of fraud may substantially overlap with factual questions which may not be amenable to summary judgment (such as whether YPFI can be deemed an alter-ego of Maxus in connection with the YPFI Transfers), and to certain disputes over asset valuation. To be clear, at trial the Trust expects to demonstrate with competent expert testimony that Maxus was undercompensated by approximately $365.6 million in respect of the 1996-1997 Transfers, which, depending on the pre-judgment interest rate, would support an all-in damages award ranging between approximately $803.6 million and $3.6 billion.[79]

For purposes of this Motion, though, it is fundamentally undisputed that Maxus's and YPFH's internal models for valuing certain assets transferred pursuant to the 1996-1997 Transfers establish a materially higher price than what Maxus received in consideration for those assets. SOF ¶¶ 57, 64, 71. Even Defendants' own expert submissions reflect that there is *no* genuine factual dispute that Maxus did not receive fair market value in the sales of its Ecuadorian and

---

[78] *See, e.g.,* Smith Decl. Ex. 114 at DEDES-YPF-P0000048 (███████████████████████████████████████████████████████████ ."); *see also* Smith Decl. Ex. 139 at REP 085) (██████████████████████████████████████████████████████████████████████████ .").

[79] *See* Smith Decl. Ex. 111 at Appendix 3 (the values therein attributable to Crescendo and Maxus's Gulf of Mexico Assets have been removed to derive the amounts indicated here).

AMERICAS 111968923

Indonesian Assets in 1997. The Ecuadorian Assets were sold for a total sale price of $165 million (in respect of producing assets only—Maxus received approximately $20 million in respect of certain non-producing assets). *See* SOF ¶ 62. Repsol's valuation expert, Ms. Bramer, concedes that the fair market value of the producing Ecuador Assets was at least $209 million at the time of the sale, indicating an underpayment of $44 million in respect of the those assets, i.e., a 21% discount from contemporaneous fair market value.[80] The Indonesian Assets were sold for a total adjusted sale price of $575.3 million. *See* SOF ¶ 68. YPF's valuation expert, Professor Williams, concludes that the fair market value of the Indonesian assets ranged between $674.6 million and $761.4 million, and that the actual sale price undercompensated Maxus by between $99.3 million and $186.1 million, reflecting a discount from the fair market value of between 14.7% and 24.4%. These conceded value shortfalls (totaling between $143.3 and $230.1 million), *without more*, would support a finding of underpayment ranging from approximately $313.97 million to $2.23 billion, depending on the applicable pre-judgment interest rate.[81]

---

[80] *See* Smith Decl. Ex. 29 at Appendix F ¶ 44. After post-closing adjustments the final sale price was recorded at $185.2 million, with $164.3 million attributed to producing assets and the balance, and $20.9 attributed to non-producing assets. (Smith Decl. Ex. 199). Ms. Bramer's valuation did not include the non-operating assets.

[81] The low case derives from multiplying the low-case value shortfall of $143.3 million by the interest-multiplier of 2.19 derived by Mr. Pulliam applicable to the sales of the Ecuador and Indonesia assets at non-compounding Federal Judgment Rate interest running from the December 31, 1997 sale date (*see* Smith Decl. Ex. 111 at Appendix 3a); the high case derives from multiplying the high-case shortfall of $230.1 million by the interest rate multiplier of 9.689 applicable to those sales at the Delaware State Statutory Rate compounding annually and running from the same date (*see* Smith Decl. Ex. 111 at Appendix 3d). The Trust notes that Mr. Pulliam's calculation of potential pre-judgment interest scenarios was unrebutted by the Defendants' experts, and can be approved by the Court at this time, once again, limiting the issues needed to be resolved at trial. In that regard, pre-judgment interest should run from the transfer date to entry of judgment, at a rate that the Court deems equitable. *See In re Meridian Auto. Systems-Composites Operations*, 372 B.R. 710, 726 (Bankr. D. Del. 2007) ("The determination of the appropriate rate of interest to be awarded is within the Court's discretion."); *In re Ashinc Corporation*, (ECF No. 841) at 4 (granting summary judgment and awarding prejudgment interest based on quarterly compounded interest at the average Federal Reserve discount rate between the date of each transfer and the date judgment was entered, plus 5.0%, calculated from the date of each transfer through the date this judgment is entered); *In re Opus E., LLC*, 528 B.R. 30, 109 (Bankr. D. Del. 2015), *aff'd*, 2016 U.S. Dist. LEXIS 42955 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017) (granting partial summary judgment and awarding a trust prejudgment interest on the fraudulent transfer claims from the date of the transfer at the federal judgment rate applicable on the date of the transfer).

AMERICAS 111968923

### 8.   Factor 9: The Debtors Were Insolvent or Became Insolvent Shortly After the Transfer Was Made or the Obligation Was Incurred.

Solvency is not a required element of an intentional fraudulent transfer claim. 11 U.S.C. § 548(a)(1); *In re Prosser*, 534 F. App'x 126, 132 (3d Cir. 2013) ("[I]nsolvency is not a necessary element of the [actual] fraudulent transfer claims."). To the extent there remains a factual dispute requiring expert testimony as to what was known or knowable about the Debtors' solvency at particular moments in time, it will be addressed at trial. But such an analysis misses the mark on the intentional fraudulent conveyance claims, which are designed to focus on the improper conduct of transferors and transferees. Here, the undisputed evidence shows that there was, *at best*, a concerted effort by YPF and Repsol to remain willfully blind to the issue of Maxus's solvency over time as they carried out each of the transfers at issue:

- Prior to the close of the Merger Agreement, YPF conducted almost no due diligence of Maxus's environmental liabilities and simply accepted Maxus's representations on the issue. SOF ¶ 42. YPF decided not to hire an environmental consultant and never saw key documents in Maxus's files which were inconsistent with Maxus's stated technical assumption that Maxus would not be required to dredge the Passaic River as a remedial option, leading YPF's attorneys to be "upset."[82]

- Following the close of YPF's acquisition of Maxus, Dexter Peacock went to New Jersey to conduct post-close diligence in June 1995. His advice to YPF immediately after was that the remediation costs at the DASS were "█████████████████████████████████████████████████████ ██████████████ ." Smith Decl. Ex. 104 at DEDES-YPF-P0000008.003-8.004. At the same time, YPF's agents (Paul Bohannon) learned of sampling on the Passaic River conducted in June 1995 which showed █████████████████ ███████████████████ . Smith Decl. Ex. 107 at MLTLEGACYESI_000278956-278957. In light of that evidence, Maxus asked its consultant (EA) to consider it and provide Maxus with a draft EE/CA of ████████████████████████ ████████████████████████████████████████████ Smith Decl. Ex. 108 at

---

[82] Paul Bohannon expressed that he was "upset" that Maxus had not provided relevant due diligence materials such as the ChemRisk report. Smith Decl. Ex. 200 at Tr. 354:12-23; *see id.* 272:13-273:17, 274:7-275:1 (████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████ ").

MLTLEGACYESI_00278999-279000.  On November 2, 1995, Maxus received a draft letter report that estimated ████████████████████████████ ████████████████████. Smith Decl. Ex. 110 at MLTLEGACYESI_000627944. Soon afterwards, the YPF Board approved the global reorganization, including the 1996-1997 Transfers from Maxus to YPFI.[83]  There is no record evidence that the Maxus Board (including its independent directors) were ever informed of any of the EA draft EE/CAs.

- As Maxus's international assets were transferred to YPFI in 1996 and 1997 and before approximately 2005, the next phases in the DASS remedial action, including a feasibility study and remedy selection were looming.  All of Maxus's most remaining valuable assets had been transferred out (the Crescendo Transfers) and the legacy assets were transferred further away from the reach of creditors (the YPFI Transfer) before the scope of the DASS study area was significantly expanded to 17 miles in 2002.  SOF ¶ 105.  That expansion postponed a draft FFS (ultimately issued in June 2007 wherein EPA stated it was considering a bank-to-bank dredging and capping remedy with a high-end estimated cost of over $2 billion).  SOF ¶ 129.

- For the entire time period after May 2005, and certainly no later than June 2007, until the filing of the Chapter 11 Cases, Repsol and YPF simply ████████ ████████████████████. SOF ¶ 109.  Repsol YPF was further advised that, because the statutes of limitations had not yet run on creditors' potential fraudulent transfer claims in connection with the earlier transfers, Repsol and YPF should delay and strategically time the inevitable filing for bankruptcy.  SOF ¶¶ 110-11.

Put simply, the conduct to be policed here is the indisputable unwillingness of YPF and Repsol to honestly assess the Debtors' financial wherewithal before causing transfers that effectively liquidated the business.  From the time of YPF's acquisition of Maxus in 1995 (and the consideration of the Houlihan Solvency Opinion by the "old" Maxus Board) until the Debtors filed for bankruptcy in 2016, *the record does not contain a single solvency analysis of Maxus*.  That was deliberate, according to Dave Rabbe, President and CEO of Tierra.  Until his 2010 interview with K&E, no one from YPF or Repsol ever directly asked what it would cost to fund the DASS to completion and his thought process about why is telling: "████████████████████████ ████████████████████" Smith Decl. Ex. 184 at Tr. 318:24-3:19:20.  There is also *zero*

---

[83] *See generally* Smith Decl. Ex. 115; Smith Decl. Ex. 130.

evidence in the Defendants' files from any environmental consultant showing or estimating the total remedial costs for the DASS over the full life cycle of the site (again, the EA draft EE/CA addressed just an interim remedy).  This is particularly egregious given that YPF and Repsol's own experts have testified that environmental consultants were available to provide a range of reasonable estimates of these costs.[84]  Perhaps most tellingly, the Trust is not aware of a *single* traditional three- to five-year business plans created after the 1996-1997 Transfers, and none of the experts identified any business plan or projection that reflects any expectation of management that the Debtors would ever be cash flow positive over a projection period.  Rather, all existing projections show material, year-over-year cash shortfalls that had to be remedied with parent equity contributions.  Smith Decl. Ex. 137 ¶¶ 202-04.

Just like removing any reference to "bankruptcy" from a parent company's files, it is an indisputable badge of fraud that Defendants (as Maxus's parent corporations) so assiduously avoided considering the issue of Maxus's solvency.  *See, e.g. Tronox II*, 503 B.R. at 280 (finding that "testimony that the effect on creditors was never considered is contradicted by the record, and by Defendants' efforts to cleanse the record" including deletion of the phrase "complicated under a bankruptcy scenario" as well as the destruction of documents).  A defense of willful blindness should not negate the Court's ability to find, as a matter of fact, that the Debtors have been insolvent at all relevant times.  One more time—there is *no* dispute here that all of the liabilities related to the DASS have existed since the time contaminants were discharged, decades prior to Defendants' entry onto the scene.  There is *no* legitimate dispute that those liabilities have now been partially liquidated as the Class 4 Claims ($712,560,327.76).  There is *no* dispute that, with

---

[84] *See* Smith Decl. Ex. 10 at 167-72; Smith Decl. Ex. 6 at 185-201, 279-321; Smith Decl. Ex. 11 at 12-13, 86-88; Smith Decl. Ex. 12 at 2-1–2-2; 5-1–5-5.

AMERICAS 111968923

respect to Class 5 Claims, the anticipated remediation costs for just the lower 8 miles of the Passaic River (the estimated cost of which was $1.38 billion in the March 2016 ROD) are approximately $2 billion dollars.  And, finally, there is *no* dispute that, after the Intentional Fraudulent Transfers, the Debtors were projected to, and did, run an operating deficit for every year thereafter.

### 9.    Factor 10: The Transfer Occurred Shortly Before or Shortly After a Substantial Debt Was Liquidated.

Another badge of fraud is present where a transfer occurs shortly before or after a substantial debt was incurred.  While the DASS "debt" had been *incurred* long prior, the Intentional Fraudulent Transfers all occurred during a window of time after YPF and Repsol first came to know that Maxus was facing substantial remedial costs as a result of the 1994 AOC, SOF ¶ 29, but before those remedial costs were finalized and *liquidated* by the regulators.  Similar to cases in which this badge was found as a result of transfers made in anticipation of a substantial judgment—*see e.g. NextGear Cap., Inc. v. Gutierrez*, No. 3:18-1617, 2021 U.S. Dist. LEXIS 99257, at *13 (M.D. Pa. May 26, 2021) (granting plaintiff's motion for summary judgment where a transfer occurred "roughly two weeks before [plaintiff] filed its civil lawsuit in New Jersey that resulted in a $4.5 million consent judgment [against defendants]")—the Court can find that the Intentional Fraudulent Transfers were plainly executed in anticipation of a decision by regulatory authorities that could impose potentially billions of dollars in remedial costs on entities with no wherewithal to fund them.  Andrews & Kurth acknowledged that, by year end 1996, ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████.  It also recognized legal consequences if Maxus's environmental liabilities ████████████████████████

██████████████████████████████████████████."  Smith Decl. Ex.

21 at MLT00238954.

YPF's corporate representative testified ███████████████████████████
████████████████████████████████,[85] ████████████████████████████████

████████████████████████████████████████████,"[86]

Nevertheless, as catalogued above and in the documents cited in the SOF, YPF opted to proceed with the Strategy to save its investment, knowingly causing Maxus to increasingly be unable to pay its obligations and removing assets away from the reach of its creditors. Thus, in a December 1995 internal memo, Bob Simon (a corporate tax lawyer at Andrews & Kurth) stated that he was "████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████" Smith Decl. Ex. 206 at YPF_MAXUS_PRIV_0000227516 (emphasis added); *see* Smith Decl. Ex. 112 at YPF_MAXUS_PRIV_0000010042. An internal March 1996 email from Jim Prince (another lawyer at Andrews & Kurth) sought opinions concerning "█████

████████████████████████████████████████████████████"

████████████████████████████████████████████████████

████████████████. Smith Decl. Ex. 207 at DEDES-YPF-AK-PRIV0000259. In the email, Mr. Prince explained "█████████████████████████████████████████████

---

[85] Smith Decl. Ex. 171 at Tr. 71:3-17, 79:2-20 ("████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████"); *id.* 82:2-10 (█████████████████████████████████████████████████████████████

████████████████").

[86] Smith Decl. Ex. 205 at Tr 338:12-24 ("██████████████████████

██████████████████████████████████████████████████████

████████████").

AMERICAS 111968923

████████████████████████████████████████████████████████████████

██████████████████████████." *Id.*

Similarly, Repsol's corporate representative testified that, when Repsol first acquired YPF, it "did not conduct any analysis" into Maxus's environmental liabilities, but rather relied on "the amount that was in the public record."[87] Repsol only understood Maxus had substantial contingent environmental liabilities based on information provided "shortly after the acquisition" by David Wadsworth and David Rabbe[88] as well as the numerous significant regulatory developments at the DASS in the years immediately following the Repsol acquisition of YPF. For its part, once the potential (and growing) size of Maxus's environmental liabilities became clear to Repsol, Repsol maintained the YPF-instituted Strategy,[89] and effectuated the 1999 Crescendo Transfer and the 2001-2002 YPFI Transfers soon thereafter.

The undisputed record, then, is that, for both YPF and Repsol, the sequence of events was (1) a purchase of stock, (2) a subsequent realization of the worthless nature of that stock (which would be junior to subsidiaries' environmental obligations), and (3) engagement in transfers before those obligations were liquidated by the regulators.

*            *            *

In sum, the record here is so clear and so indisputable that a trial on "intent" is not

---

[87] Smith Decl. Ex. 129 at Tr. 84:24-85:10 ("Q. What analysis, if any, did any of the Repsol defendants do in the pre-acquisition period regarding environmental liabilities in the United States of any subsidiary of YPF S.A.? A. I think they did not conduct any analysis."); *id.* 88:12-18 (Q. So it is fair to say that based upon your answers, that Repsol, S.A.'s knowledge with respect to any environmental matters in the United States was only as good as the disclosures that were made in YPF S.A.'s public filings? A. I think so. Yes.").

[88] *Id.* 109:03-15 ("I would think that shortly after the acquisition we would start asking for information [regarding environmental matters related to the operations of subsidiaries of YPF in the United States]. And as I said, David Wadsworth or Dave Rabbe in Tierra, they were reporting from time to time to people in YPF and Repsol. So, by that time, we would have received some of this information.").

[89] *See, e.g.*, Smith Decl. Ex. 139 at REP085 ("████████████████████████████████

██████████).

AMERICAS 111968923

necessary, regardless of any demurrers and subjective rationalizations that Defendants might proffer.  The key question here is what do the badges of fraud indicate, and, here, nine of them "scream" intentional fraudulent transfer.  *See In re E. Coast Foods, Inc.*, No. 2:16-bk-13852-BB, 2017 WL 3701211, at *9.

## III.    DEFENDANTS CANNOT ESTABLISH A GENUINE TRIAL ISSUE REGARDING THEIR PURPORTED AFFIRMATIVE DEFENSES

Partial summary judgment is also an appropriate means of resolving affirmative defenses that raise no genuine issue for trial.  *See, e.g.*, *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 312 F. Supp. 2d 639 (D. Del. 2004); *David's Bridal, Inc. v. House of Brides, Inc*., No. 06-5660 (SRC), 2010 U.S. Dist. LEXIS 4763, at *22 (D.N.J. Jan. 20, 2010); *see also* FRCP Advisory Committee Notes, 2010 ("The first sentence [of FRCP 56(a)] is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense.").  Properly understood, a "genuine" affirmative defense consists of '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true."  *LG Philips LCD Co. v. Tatung Co.*, 243 F.R.D. 133, 137 (D. Del. 2007).  As the defendant bears the burden of proof on affirmative defenses, *see, e.g., In re Digital Networks N. Am. Inc.*, No. 15-11535, 2021 Bankr. LEXIS 3080, *13 (Bankr. D. Del. Nov. 8, 2021), the plaintiff "need only establish that there exists no genuine issue of material fact as to any essential element of the nonmovant's . . . defense." *Local Union 42 v. Absolute Envt'l. Services*, 814 F. Supp. 392, 401 (D. Del. 1993).  Upon such a showing, the nonmovant "may withstand summary judgment only by coming forward with evidence sufficient to create a genuine issue of material fact as to every essential element."  *Id.* at 402.

In their answers, YPF and Repsol have alleged, respectively, 50 and 29 affirmative defenses. *See* [D.I 140] at 100-12; [D.I. 139] at 111-14. The Defendants bear the burden of establishing that each of these defenses constitute triable issues of fact, and, owing to their decision not to issue expert reports on the deadline for reports addressing issues on which a party bears the burden, they may not rely on the submissions of their testifying experts to make that showing.[90] These purported affirmative defenses, of which a substantial number are overlapping or repetitious, generally fall into three categories:

*First*, several affirmative defenses are simply conclusory assertions that the Trust will not be able to support its claims (Repsol 3-4, 23) or that Defendants conducted themselves appropriately at all times and that, to the extent Maxus's creditors went unpaid, it simply "wasn't their fault" (YPF 33, 35-36; Repsol 17). However, general denials do not independently preclude the Defendants from being held liable if the Trust establishes that the allegations in its Complaint are true. *See LG Philips LCD*, 243 F.R.D. at 137 ("A defense which 'merely negates some element of plaintiff's *prima facie* case is not truly an affirmative defense.'") (citations omitted).

*Second*, many of the affirmative defenses invoke legal doctrines that either (i) do not clearly apply to any of the claims at issue in the litigation, such as *in pari delicto*, unclean hands, consent, waiver, ratification, unjust enrichment, the business judgment rule, and accord and satisfaction (YPF 6-8, 31; Repsol 6-7, 9, 14-16); (ii) are framed as mere assertions, such as Defendants are entitled to set-off, contribution or apportionment, or that the relief sought by the Trust is excessive, unreasonable, punitive or arbitrary and capricious (YPF 14-17, 39; Repsol 10, 25-27); (iii) have already been denied by the Court during previous motion practice, such as that the Trust lacks

---

[90] [D.I. 607] at 3 n.1 ("Defendants have raised numerous affirmative defenses for which they bear the burden of proof. To the extent [D]efendants seek to rely on any expert testimony in support of those affirmative defenses, the report of any such expert was required to be filed in October 2021.").

AMERICAS 111968923

standing to litigate alter ego claims that belonged to individual creditors prior to the Petition Date (YPF 3, 34; Repsol 1), or that collateral estoppel or the New Jersey "entire controversy" doctrine bars the Trust's claims (YPF 5; Repsol 5, 8); or (iv) are simply unsound as a matter of law, such as that the Trust failed to mitigate damages by not initiating litigation against other parties (YPF 29, 41).[91]

*Third*, Defendants allege a number of affirmative defenses, such as statutes of limitation defenses (YPF 4; Repsol 5); transfer in exchange for reasonably equivalent value (YPF 18; Repsol 19); Debtor solvency (YPF 21); lack of wrongful intent (YPF 24); improper or disqualifying transferor or transferee for fraudulent transfer claims (YPF 21, 24-26, 28, 37; Repsol 21-22); and triggering creditor defects (such as timing of claim origination, public disclosure of transactions and lack of contemporaneous objection to transactions) (YPF 23-24, 37) that will not require a trial to resolve.

As to all such defenses, Defendants cannot establish that any constitutes a legally cognizable affirmative defense that would preclude the relief sought by the Trust, nor establish a triable issue of fact as to any such affirmative defense that could potentially apply to the Trust's claims.

## CONCLUSION

For the foregoing reasons, the Trust respectfully requests that the Court grant partial summary judgment in favor of the Trust on Counts I, II, IV, VI, VIII, X, XII, and XIV of the

---

[91] *See Branch Banking & Trust Co. v. Saiid Forouzan Rad*, No. 2:14-cv-01947-APG-PAL, 2016 U.S. Dist. LEXIS 119450, at *14–15 (D. Nev. Sept. 1, 2016) ("The general rule is that injured parties need not institute and prosecute lawsuits in order to mitigate damages.") (quotation omitted); *see also Temple-Inland Inc. v. United States*, 68 Fed. Cl. 561, 568 (Fed. Cl. 2005) ("The duty to mitigate does not include the duty to face legal action . . . [mitigation] does not require injured parties to take expensive and burdensome steps to minimize their losses, and certainly legal action is not typical of the kinds of behavior which courts expect of such victims.") (quotation omitted); *Rosen v. Davis & Drum*, No. B147804, 2002 Cal. App. Unpub. LEXIS 7045, at *21 (Cal. App. July 30, 2002) ("Because of the costs and uncertainties inherent in legal action, a plaintiff generally is not required to resort to legal action in order to satisfy the duty to mitigate.").

AMERICAS 111968923

Complaint and the related Affirmative Defenses, and grant such other and further relief that the Court deems appropriate and necessary.

Dated: March 16, 2022

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Jason Zakia (*pro hac vice* admission pending)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (*pro hac vice* admission pending)
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
jzakia@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

*Attorneys for the Liquidating Trust*