## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*, | ) |
| | ) Case No. 16-11501 (CSS) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |
| | ) |
| MAXUS LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adv. Proc. No. 18-50489 (CSS) |
| v. | ) |
| | ) **FILED UNDER SEAL** |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) |
| REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., | ) |
| REPSOL USA HOLDINGS CORP., REPSOL E&P | ) |
| USA, INC., REPSOL OFFSHORE E&P USA, INC., | ) |
| REPSOL E&P T&T LIMITED, and REPSOL | ) |
| SERVICES CO., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1.     Joseph J. Farnan, Jr., the Liquidating Trustee for the Maxus Liquidating Trust (the

"Trust"), appointed in the proceedings (the "Chapter 11 Cases") of Maxus Energy Corporation

and its affiliated Debtors (the "Debtors" or "Maxus") pursuant to the *Amended Chapter 11 Plan*

*of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of*

*Unsecured Creditors*, which the Court confirmed on May 22, 2017 [Bankr. D.I. 1451] (the

"Amended Plan"),[1] by and through his undersigned counsel, respectfully submits this Statement

---

[1] "Bankr. D.I." refers to the docket of the main Chapter 11 Case, C.A. No. 16-11501-CSS.

of Undisputed Facts, pursuant to Federal Rule of Civil Procedure 56(c) and made applicable to

this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, in support of *Plaintiff's*

*Motion for Partial Summary Judgment on Counts I, II, IV, VI, VIII, X, XII, and XIV of the*

*Complaint and Related Affirmative Defenses* which the Trust submits herewith.

A.    **The Parties**

2.    Plaintiff, the Trust, was created on July 14, 2017, the "Effective Date" of the

Amended Plan.  Compl. [D.I. 1] (the "Complaint" or "Compl.")[2] ¶ 18; Smith Decl. Ex. 1 ¶ 18.

The Trustee and Delaware Trustee of the Trust is the Honorable Joseph J. Farnan, Jr. (Rt.).  Compl.

¶ 18; Smith Decl. Ex. 1 ¶ 18; Smith Decl. Ex. 2 ¶ 18.  On the Effective Date, all of the Debtors'

assets, including their claims and causes of action, were transferred to the Trust.  Compl. ¶ 211;

Smith Decl. Ex. 1 ¶ 211; Smith Decl. Ex. 2 ¶ 211.

3.    Debtor Maxus Energy Corporation ("Maxus") is a Delaware corporation and

wholly-owned subsidiary of Defendant YPF Holdings, Inc. ("YPFH"), which is in turn wholly-

owned by Defendant YPF, S.A. ("YPF").  Compl. ¶ 19; Smith Decl. Ex. 1 ¶ 19.  At the time of the

filing of the Debtors' Chapter 11 petitions on June 17, 2016 (the "Petition Date"), Maxus's

business consisted of collecting onshore oil and gas royalties from over 3,000 wells located in six

states in the United States, overseeing the administration of benefits for Maxus and Debtor

Gateway Coal Company ("Gateway") retirees, complying with environmental remediation

obligations, providing general and administrative services for its subsidiaries and Debtor Tierra

---

[2] Attached as Exhibit 0 to the Smith Declaration is a true and correct copy of work product from White & Case LLP combining the operative paragraphs and causes of action in the Complaint with YPF's and Repsol's Answers, which are attached to the Smith Declaration and described below as Exhibits 1 and 2 to the Smith Declaration, respectively.

Solutions, Inc., and managing U.S.-based and international litigation on behalf of itself and Occidental Chemical Corporation ("OCC").  Compl. ¶ 19; Smith Decl. Ex. 1 ¶ 19.

4.      Following a corporate reorganization and name change in 1987, Maxus succeeded to certain rights and obligations of Diamond Shamrock Corporation ("DSC").  Compl. ¶¶ 5-6; Smith Decl. Ex. 1 ¶¶ 5-6; Smith Decl. Ex. 2 ¶¶ 5-6.  Specifically, DSC sold its active chemicals business to an affiliate of OCC in 1986 pursuant to a stock purchase agreement ("SPA").  Compl. ¶ 44; Smith Decl. Ex. 1 ¶ 44; Smith Decl. Ex. 2 ¶ 44; Smith Decl. Ex. 4.  The SPA contained an indemnification provision whereby DSC indemnified OCC from environmental liabilities arising from DSC's chemicals business.  Compl. ¶ 44; Smith Decl. Ex. 1 ¶ 44; Smith Decl. Ex. 4 § 9.03(a)(ii).

5.      Debtor Tierra Solutions, Inc. ("Tierra") is a Delaware corporation that is directly and wholly-owned by Defendant CLH Holdings, Inc., which is in turn owned by YPFH.  Compl. ¶ 20; Smith Decl. Ex. 1 ¶ 20.   Tierra's operations consisted solely of managing Maxus's environmental liabilities.  Compl. ¶ 20; Smith Decl. Ex. 1 ¶ 20.

6.      Debtor Maxus International Energy Company ("MIEC") is a Delaware corporation directly owned by Maxus.  Compl. ¶ 21; Smith Decl. Ex. 1 ¶ 21.

7.      Debtor Maxus (U.S.) Exploration Company ("MUSE") is a Delaware corporation and wholly-owned subsidiary of Maxus that was involved in oil and gas exploration efforts.  Compl. ¶ 22; Smith Decl. Ex. 1 ¶ 22.

8.      Debtor Gateway Coal Company (and collectively with the other Debtors above, "Debtors") is a Delaware corporation and wholly-owned subsidiary of Maxus responsible for making pension payments to former employees.  Compl. ¶ 23; Smith Decl. Ex. 1 ¶ 23.

9.      Defendant YPF is a corporation formed under the laws of Argentina with its principal place of business in Buenos Aires, Argentina.  Compl. ¶ 25; Smith Decl. Ex. 1 ¶ 25.  It is the former national oil company of Argentina.  Compl. ¶ 7; Smith Decl. Ex. 1 ¶ 7.

10.     Defendant YPFH is a Delaware corporation and wholly-owned subsidiary of Defendant YPF.  Compl. ¶ 24; Smith Decl. Ex. 1 ¶ 24.

11.     Defendant YPF International S.A. ("YPFI"), formerly known as YPF International Ltd., is a Bolivian entity, wholly owned by YPF, with its principal place of business in Bolivia. Compl. ¶ 26; Smith Decl. Ex. 1 ¶ 26.

12.     Defendant CLH Holdings, Inc. ("CLHH," an inactive entity) is a wholly-owned subsidiary of YPFH.  Compl. ¶ 27; Smith Decl. Ex. 1 ¶ 27.

13.     Defendant Repsol, S.A. ("Repsol") is a corporation formed under the laws of Spain with its principal place of business in Madrid, Spain.  Compl. ¶ 28; Smith Decl. Ex. 2 ¶ 28. It is the former national oil and gas company of Spain.  Compl. ¶ 110; Smith Decl. Ex. 2 ¶ 110.

14.     Defendant Repsol Exploración, S.A., a wholly-owned subsidiary of Repsol, is a corporation formed under the laws of Spain with its principal place of business in Madrid, Spain. Compl. ¶ 29; Smith Decl. Ex. 2 ¶ 29.

15.     Defendants Repsol USA Holdings Corporation, a wholly-owned subsidiary of Repsol, is a Texas corporation with its principal place of business in Texas.  Compl. ¶ 30; Smith Decl. Ex. 2 ¶ 30.

16.     Defendants Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and Repsol Services Company are all wholly-owned subsidiaries of Repsol USA Holdings Corporation with their principal places of business in Texas.  Compl. ¶ 31, 33-34; Smith Decl. Ex. 2 ¶ 31, 33-34.

### B.    Pre-Acquisition History

#### 1.    Maxus inherits environmental liabilities at the Diamond Alkali Superfund Site.

17.    In the 1950s and 60s, Diamond Alkali Company ("Diamond Alkali") manufactured pesticides and herbicides at a number of chemical plants.  Compl. ¶ 3-4; Smith Decl. Ex. 1 ¶ 3-4; Smith Decl. Ex. 2 ¶ 3-4.  In the late 1960s, Diamond Alkali became a wholly-owned subsidiary of DSC.  Compl. ¶ 4; Smith Decl. Ex. 1 ¶ 4; Smith Decl. Ex. 2 ¶ 4.  DSC's chemicals companies owned and/or operated a chemicals plant located at 80 and 120 Lister Avenue in Newark, New Jersey on the bank of the Passaic River.  Smith Decl. Ex. 10 at 9.  Until 1977, dioxins and dichlorodiphenyltrichloroethane ("DDT") were manufactured at the plant.  Smith Decl. Ex. 10 at 9.  As earlier noted, DSC sold its active chemicals business to OCC in 1986 and agreed to indemnify OCC for environmental liabilities arising from its chemicals business.  Compl. ¶ 44; Smith Decl. Ex. 1 ¶ 44; Smith Decl. Ex. 4 § 9.03(a)(ii).  DSC (renamed Maxus following the transaction just described) retained ownership of the Lister Avenue plant and certain other properties.  Compl. ¶ 44; Smith Decl. Ex. 1 ¶ 44.

18.    In 1982, the U.S. Environmental Protection Agency ("EPA") discovered dioxin contamination at the plant.  Compl. ¶ 42; Smith Decl. Ex. 1 ¶ 42; Smith Decl. Ex. 2 ¶ 42.  The dioxin−2,3,7,8 Tetrachlorodibenzo-p-dioxin or ("TCDD")−was identified as a "byproduct" of the manufacturing of Agent Orange that took place at the plant in the 1950s and 60s.  Smith Decl. Ex. 10 at 9, n. 2; Smith Decl. Ex. 6 at 58.  The EPA noted in 1994 that TCDD is "the most toxic of the dioxin family of compounds" and that it was "a proven animal carcinogen and a probable human carcinogen," with additional non-cancer health effects including "developmental and reproductive effects, immune suppression, and disruption of regulatory hormones."  Smith Decl. Ex. 7 at MAXUS2942548-2942549. ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████    By 1996, dioxin had been "found in the Passaic River surficial sediments (upper 6 inches) in the part-per-billion range and in deeper sediments (greater than 4 feet beneath the river bottom) next to the Diamond Alkali facility in the part-per-million range." Smith Decl. Ex. 9.  The EPA and the New Jersey Department of Environmental Protection ("NJDEP") cleanup standards for dioxin in the Passaic have grown more stringent over time, culminating in a cleanup level of 8.3 parts per trillion by 2016.  Smith Decl. Ex. 10 at 178.

19.    In 1983, the NJDEP issued an administrative order requiring DSC to implement certain partial site-stabilization measures designed to prevent off-site migration of dioxin and other contaminants from the plant.  Compl. ¶ 43; Smith Decl. Ex. 1 ¶ 43; Smith Decl. Ex. 2 ¶ 43; Smith Decl. Ex. 5.  Upon detection of dioxin, the 80 Lister Avenue property was secured by a fence and a 24-hour security guard, and exposed soils were covered with a geofabric to prevent potential migration of contamination via storm water runoff or wind dispersal.  Smith Decl. Ex. 6 at 60.

20.    In 1984, the EPA placed the plant and certain surrounding areas, together designated as the Diamond Alkali Superfund Site ("DASS"), on the Superfund National Priorities List, making it eligible for remediation under the EPA's broadest CERCLA authorities.  Compl. ¶ 43; Smith Decl. Ex. 1 ¶ 43; Smith Decl. Ex. 2 ¶ 43.

21.    Remediation of contaminated sites under CERCLA typically involves several steps: a remedial investigation ("RI") to determine and characterize the nature of the site and the contamination, along with an assessment of the human and ecological risks posed by the contamination; a feasibility study ("FS") to evaluate potential remedial alternatives and technologies and, where possible, identify a preferred alternative; and, ultimately, the formal

selection of the chosen remedy in a record of decision ("ROD").  Following issuance of the ROD, the selected remedy is designed and implemented.  *See generally* Smith Decl. Ex. 10 at 40; Smith Decl. Ex. 6 at 40.  CERCLA further authorizes damages for injury to natural resources (which CERCLA defines as "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources") as well as the reasonable costs to assess the injury, destruction, or loss of natural resources.  Smith Decl. Ex. 6 at 193-94.

22.     Where multiple entities may have liability arising out of contamination at a given site, the CERCLA process can also entail efforts to identify and allocate responsibility among those entities, designated as "potentially responsible parties" or "PRPs".  Smith Decl. Ex. 10 at 153-54; Smith Decl. Ex. 6 at 139-42.  CERCLA allows the EPA to hold PRPs jointly and severally liable for investigation and remediation costs.  Smith Decl. Ex. 6 at 197.

23.     The remedial options available for contaminated sediments generally include passive remedies (no action or monitored natural recovery) and active remedies (including capping, dredging, or a combination of dredging and capping).  Smith Decl. Ex. 10 at 12; Smith Decl. Ex. 6 at 171.

24.     The DASS has been divided for remediation purposes into several "operable units" ("OUs"): the area immediately surrounding the former chemical plant at 80 and 120 Lister Avenue ("OU-1"); a nearby portion of the Passaic River, initially six miles in length, designated as the Passaic River Study Area; and parts of Newark Bay, the Hackensack River, Arthur Kill, and Kill Van Kull.  Smith Decl. Ex. 10 at 25 n. 46, 27; Smith Decl. Ex. 6 at 43.

25.     In 1987, the EPA approved an interim remedy for OU-1 which included construction of a slurry wall and a floodwall around the Lister Avenue properties, the installation

of a cap, and pumping and treating of groundwater.  Compl. ¶ 46; Smith Decl. Ex. 1 ¶ 46; Smith

Decl. Ex. 2 ¶ 46; Smith Decl. Ex. 6 at 60.

26.    On September 23, 1999, the EPA and the NJDEP approved the Final Modified

(100%) Remedial Design Report and construction began in the spring of 2000.  Smith Decl. Ex. 6

at 60.  In 2001, Tierra completed the interim remedies for OU-1.  Smith Decl. Ex. 1 ¶ 46.

27.    In 1993, ███████████████████████████████████████████████████

████████████████████████████.  Compl. ¶ 61; Smith Decl. Ex. 10 at 134, 137; Smith

Decl. Ex. 6 at 321.

28.    In a December 1993 memorandum prepared for use with its insurers, Maxus

estimated ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████    Smith Decl. Ex. 10 at 19, 105, 115-17; Smith Decl. Ex. 6 at 10-11, 232-35;

Smith Decl. Ex. 99 at MAXUS4245222.

29.    In 1994, the EPA issued an administrative order on consent ("AOC") pursuant to

which OCC agreed to carry out a remedial investigation/feasibility study ("RI/FS") and a human

and ecological risk assessment for the Passaic River Study Area (then defined as the lower six

miles of the river).  Smith Decl. Ex. 10 at 112; Smith Decl. Ex. 6 at 62.  Initial sampling and

analysis was completed in the summer of 1995.  Smith Decl. Ex. 10 at 112.

## 2.    Maxus inherits environmental liabilities at multiple other sites across the United States.

30.    Prior to YPF's acquisition of Maxus, Maxus (f/k/a DSC) had incurred

environmental liabilities through its operation of multiple sites across the United States, both

directly and by virtue of its OCC indemnification obligations.  Compl. ¶ 48; Smith Decl. Ex. 11 at 7; Smith Decl. Ex. 12 at 4-1.

31.    For example, in addition to the DASS, Maxus was also subject to environmental liability at a former ferrous chromate processing plant in Kearny, New Jersey (the "Kearny Plant Site").  Compl. ¶ 49; Smith Decl. Ex. 1 ¶ 49.  Tierra, OCC, and the NJDEP are parties to a consent judgment related to the Kearny Plant Site that became final and effective as of September 2011.  Compl. ¶ 49; Smith Decl. Ex. 1 ¶ 49.  Pursuant to this consent judgment, Maxus submitted an eight-year remediation schedule, which the NJDEP approved in 2013.  Compl. ¶ 49; Smith Decl. Ex. 1 ¶ 49.

32.    Maxus was also a member of the Cooperating Parties Group for the Standard Chlorine Company Superfund Site (the "Standard Chlorine Site") near the Kearny Plant Site.  Compl. ¶ 50; Smith Decl. Ex. 1 ¶ 50.  In 1990, Tierra, OCC, and the NJDEP signed an administrative consent order related to the Kearny Plant Site.  Compl. ¶ 50; Smith Decl. Ex. 1 ¶ 50.  In 2013, the Cooperating Parties Group entered into a CERCLA Administrative Order on Consent with the EPA, pursuant to which the Cooperating Parties were required to fund remedial investigation and prepare a focused feasibility study for remediation of the Standard Chlorine Site.  Compl. ¶ 50; Smith Decl. Ex. 1 ¶ 50.  In 2016, the EPA issued a record of decision setting forth the final remedy for the Standard Chlorine Site.  Compl. ¶ 50; Smith Decl. Ex. 1 ¶ 50.

33.    Maxus was also subject to environmental liability at a former ferrous chromate processing plant in Painesville, Ohio (the "Painesville Site").  Compl. ¶ 51; Smith Decl. Ex. 1 ¶ 51.  The Ohio Environmental Protection Agency has approved the remediation of 20 specific operable units at the Painesville Site.  Compl. ¶ 51; Smith Decl. Ex. 1 ¶ 51.

34.     Maxus was also subject to environmental liability at a facility for the manufacture of DDT and other chemicals in Greens Bayou, Texas (the "Greens Bayou Site").  Compl. ¶ 52; Smith Decl. Ex. 1 ¶ 52.  Pursuant to settlement agreements with the Port of Houston Authority and other parties, Tierra and Maxus are participating in the remediation of the Greens Bayou Site. Compl. ¶ 52; Smith Decl. Ex. 1 ¶ 52.  In January 2013, a consent decree was signed, in which Tierra and/or Maxus agreed to reimburse certain costs incurred by governmental agencies with respect to the Greens Bayou Site.  Compl. ¶ 52; Smith Decl. Ex. 1 ¶ 52.

35.     In June 2005, the EPA designated Maxus as a PRP at the Milwaukee Solvay Coke & Gas site in Milwaukee, Wisconsin (the "Milwaukee Solvay Site") as a successor to companies that formerly owned or operated the site during the period 1966 through 1973.  Compl. ¶ 53; Smith Decl. Ex. 1 ¶ 53.  In 2007, Maxus and four other potentially involved parties signed an Administrative Order on Consent to conduct a remedial investigation and feasibility study related to the Milwaukee Solvay Site.  Compl. ¶ 53; Smith Decl. Ex. 1 ¶ 53.

36.     In 2013, the EPA requested that Maxus (on behalf of OCC) perform specific remedial tasks and reimburse the EPA and local regulatory authorities for certain past costs incurred at a site called Black Leaf Chemical in Louisville, Kentucky (the "Black Leaf Site"). Compl. ¶ 54; Smith Decl. Ex. 1 ¶ 54.  In September 2014, the Environmental Protection Department of Kentucky began an investigation of the Black Leaf Site, and, in October 2015, required that the cooperation group for the Black Leaf Site present a remediation action plan. Compl. ¶ 54; Smith Decl. Ex. 1 ¶ 54.

37.     Maxus was also subject to environmental liability at a site in Holt, Tuscaloosa County, Alabama (the "Tuscaloosa Site").  Compl. ¶ 55; Smith Decl. Ex. 1 ¶ 55.  Remediation activities at the Tuscaloosa site have been completed.  Compl. ¶ 55; Smith Decl. Ex. 1 ¶ 55.

38.     Maxus is also part of a group of PRPs for waste contamination at the Malone Services Company Superfund Site in Galveston County, Texas.  Compl. ¶ 56; Smith Decl. Ex. 1 ¶ 56.  The EPA selected a final remedy for this site and signed the ROD in September 2009, and the PRP group signed a consent order in 2012.  Compl. ¶ 56; Smith Decl. Ex. 1 ¶ 56.

39.     Maxus also participated in the PRP group for the Central Chemical Superfund Site in Hagerstown, Maryland.  Compl. ¶ 57; Smith Decl. Ex. 1 ¶ 57.  In 2009, the EPA issued its Record of Decision selecting the final remedy for this site.  Compl. ¶ 57; Smith Decl. Ex. 1 ¶ 57.

**C.      YPF's Acquisition of Maxus**

40.     Throughout the period prior to acquisition by YPF, Maxus was a U.S.-registered independent oil and gas exploration and production company with operations in various domestic and foreign locations.  Compl. ¶ 6; Smith Decl. Ex. 1 ¶ 6.

41.     By 1995, Maxus was facing liquidity issues.  Compl. ¶ 59; Smith Decl. Ex. 1 ¶ 59. At that time YPF, which had been privatized in 1993, was seeking to become more involved in the international oil and gas market, and viewed a potential acquisition of Maxus as a means to accomplish that goal.  Compl. ¶ 60; Smith Decl. Ex. 1 ¶ 60.

42.     In contemplating an acquisition of Maxus, YPF retained the law firm Andrews & Kurth, ████████████████████████████████████████████████████ ████████████████████████████████.  Compl. ¶ 61-62; Smith Decl. Ex. 1 ¶ 61-62. In conducting this diligence, ████████████████████████████ ████████████████████████████████.  Smith Decl. Ex. 10 at 126-27.  ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

43.     YPF acquired Maxus as a leveraged buyout in 1995.  Compl. ¶¶ 63-64; Smith Decl. Ex. 1 ¶¶ 63-64; Smith Decl. Ex. 14.  The Merger Agreement was entered into on February 28, 1995, with YPF acquiring 88% of the then-outstanding shares of Maxus in April 1995, and the acquisition was finalized in June 1995 when YPF acquired the remaining 12% of outstanding shares.  Compl. ¶¶ 64, 66; Smith Decl. Ex. 1 ¶¶ 64, 66; Smith Decl. Ex. 18 at 27.  Maxus took on the approximately $425 million of funded debt obligations that comprised the bulk of the transaction financing.  Smith Decl. Ex. 18 at 27-28; Smith Decl. Ex. 15 at AA_MAXUS0014184.

44.     On February 26 and 28, 1995, the Maxus Board adopted resolutions approving the proposed merger agreement, including YPF's proposed financing structure.  Smith Decl. Ex. 1 ¶ 64.  As part of that structure, YPF committed to a Keepwell Covenant pursuant to which YPF would provide financial support to Maxus up to the amount of $425 million, and YPF stated it would guarantee unconditionally Maxus's outstanding $1 billion long-term debt upon the completion of the merger.  Smith Decl. Ex. 1 ¶ 65; Smith Decl. Ex. 18 at 28-29, 39.

45.     On May, 11, 1995, prior to the completion of the acquisition, YPF president and CEO José Estensorro, the primary architect of YPF's acquisition of Maxus, was killed in a plane crash.  Smith Decl. Ex. 16 at AA_MAXUS0017112.

46.     After the acquisition, the Maxus Board was changed from thirteen to eight board members.  Smith Decl. Ex. 1 ¶ 67.  YPF appointed five new members, Cedric Bridger, Nells Leon,

J.R. Lesch, Dexter Peacock, and Peter Gaffney to the Maxus Board, and retained three legacy board members.  Compl. ¶ 67; Smith Decl. Ex. 1 ¶ 67.

47.    The new Maxus Board accepted a solvency analysis prepared by Houlihan Lokey Howard & Zukin ("Houlihan Solvency Opinion").  Compl. ¶ 68; Smith Decl. Ex. 1 ¶ 68 (noting that YPF "refer[s] the Court to the entire documents for their true and accurate contents"); Smith Decl. Ex. 17.  Houlihan conducted three industry-standard solvency tests: the Balance Sheet Test, the Cash Flow Test, and the Reasonable Capital Test.  Smith Decl. Ex. 18 at 115-116.  Houlihan assumed the total value of Maxus's contingent environmental liabilities would be $81.9 million.  Smith Decl. Ex. 17 at HL000137.  Houlihan did not consider contingent environmental liabilities beyond 2002, and assumed the debt incurred in the transaction would remain outstanding as contemplated.  Smith Decl. Ex. 18 at 116; Smith Decl. Ex. 17 at HL000137.  The Houlihan Solvency Opinion concluded that Maxus would be solvent after the merger transaction under each of the three industry-standard solvency tests applied, but only by virtue of the Keepwell Covenant.  Smith Decl. Ex. 1 ¶ 68; Smith Decl. Ex. 18 at 115-16, 284.

48.    In 1996 and 1997, a global restructuring of Maxus and certain other YPF companies was undertaken, the components of which are described below.  Smith Decl. Ex. 1 ¶ 75.

### D.    The Debt Restructuring

49.    At the time of YPF's acquisition of Maxus, Maxus had three outstanding classes of preferred stock: $2.50 Preferred Stock, $4.00 Preferred Stock, and $9.75 Preferred Stock.  Smith Decl. Ex. 18 at 41.  Each class of preferred stock was subject to a restriction set forth in Article Ninth of Maxus's Certificate of Incorporation ("Article Ninth"), which required that "consent of the holders of at least a majority of the then outstanding shares of this Series . . . shall be necessary to permit, effect, or validate . . . the sale, lease or conveyance (other than by mortgage) of all or substantially all of the property or business."  Smith Decl. Ex. 18 at 41.

50.     YPF conducted a series of transactions that consolidated Maxus's debt with YPF and caused Maxus to borrow funds from YPF to prepay existing public and private debt and to redeem its preferred stock.  Compl. ¶ 77; Smith Decl. Ex. 1 ¶ 77 (noting that YPF "refer[s] the Court to the entire documents for their true and accurate contents"); Smith Decl. Ex. 19; Smith Decl. Ex. 20.



51.     Through these transactions, Maxus replaced substantial secured debt and preferred stock obligations to third-parties with syndicated bank and intercompany debt.  Smith Decl. Ex. 1 ¶ 77.  Certain YPF guarantees of Maxus's debt were eliminated when that public debt was retired.  Smith Decl. Ex. 1 ¶ 79.  A special dividend was paid by Maxus to preferred shareholders of "$0.625

per share . . . on all shares of $2.50 Cumulative Preferred Stock of the Corporation issued and outstanding . . . payable in cash on March 14, 1997."  Smith Decl. Ex. 1 ¶ 79; Smith Decl. Ex. 22 at REPSOL-P-000995.

### E.    The Environmental Restructuring

52.    Beginning in July 1996, YPF created YPFH, YPFI, CLHH, and "Chemical Land Holdings, Inc." ("CLH," later renamed Tierra).  Compl. ¶ 80; Smith Decl. Ex. 1 ¶ 80; Smith Decl. Ex. 23.

53.    Title to certain real estate properties, including the Lister Avenue plant, the Painesville Site, and the Tuscaloosa Site, was then transferred from Maxus to Tierra.  Compl. ¶ 81; Smith Decl. Ex. 1 ¶ 81. On August 14, 1996, Maxus and CLH/Tierra entered into an "Assumption Agreement" pursuant to which Tierra assumed Maxus's environmental liabilities with respect to certain properties, including the Lister, Painesville, and Tuscaloosa Sites.  Compl. ¶ 81; Smith Decl. Ex. 1 ¶ 81; Smith Decl. Ex. 24; Smith Decl. Ex. 25 at MLTLEGACYESI_000201807 ("As part of the reorganization, Maxus transferred certain liabilities related to environmental matters to its subsidiary, CLH, an indirect subsidiary of YPF International, effective as of August 1, 1996.").  Tierra also assumed Maxus's contractual indemnification obligations to OCC under the 1986 SPA.  Smith Decl. Ex. 18 at 188; Smith Decl. Ex. 1 ¶ 81; Smith Decl. Ex. 25 at MLTLEGACYESI_000201767 ("The work [for Newark] is being supervised and paid for by CLH pursuant to the above described indemnification obligation to Occidental.").

54.    Also on August 14, 1996, YPF, YPFH, YPFI, CLHH, CLH/Tierra, and Maxus entered into a "Contribution Agreement," pursuant to which YPF committed to contribute capital to Tierra, as and when requested by Tierra, up to an amount that would enable Tierra to satisfy its obligations under the Assumption Agreement.  Compl. ¶ 82; Smith Decl. Ex. 1 ¶ 82; Smith Decl.

Ex. 26.  Pursuant to an amendment in 1997, YPF guaranteed to make capital contributions of up to $111.5 million for the specific purpose of enabling Tierra to satisfy the environmental liabilities it had assumed under the Assumption Agreement.  Compl. ¶ 82; Smith Decl. Ex. 1 ¶ 82; Smith Decl. Ex. 26 § 2, REPSOL0000152.  This amount was based on the then-current environmental reserve on Maxus's financial statements.  Smith Decl. Ex. 27 at Nos. 6, 7.  In addition to the amount up to $111.5 million for environmental liabilities, the Contribution Agreement also required YPF to make cash contributions to Tierra to meet its general administrative expenses, up to 110% of the aggregate amount of approved expenses budgeted for any annual period.  Smith Decl. Ex. 18 at 275 n. 828 ██████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████); Smith Decl. Ex. 26

§§ 2, 3, REPSOL0000152; Smith Decl. Ex. 26A § 1.

### F.    1996-1997 Asset Transfers

#### 1.    Maxus's Bolivia and Venezuela Assets are transferred to newly-created YPFI.

55.    On June 19, 1996, MIEC created YPFI.  Smith Decl. Ex. 18 at 46; Smith Decl. Ex. 29 ¶ 226.  On June 28, 1996, MIEC contributed the stock of Maxus Bolivia and Maxus Venezuela (C.I.), the entirety of Maxus's operating interests in Bolivia (the "Bolivia Assets") and the majority of its operating interests in Venezuela (the "Venezuela Assets"), to YPFI.  Smith Decl. Ex. 18 at 51-52; Smith Decl. Ex. 29 ¶ 228; Smith Decl. Ex. 23.

56.    MIEC then sold YPFI to YPF for $266.4 million effective July 1, 1996.  Smith Decl. Ex. 18 at 52; Smith Decl. Ex. 29 ¶ 231. The purchase price was based on the book value of the Bolivia and Venezuela Assets at the time (Smith Decl. Ex. 18 at 53; Smith Decl. Ex. 29 ¶ 234), and consisted of a $165.4 million promissory note due to MIEC from YPF plus $101 million in

cash paid by YPF to MIEC.  Smith Decl. Ex. 18 at 53; Smith Decl. Ex. 29 ¶ 231.  On June 18, 1996, the Maxus Board approved the transfer of YPFI.  Smith Decl. Ex. 18 at 53; Smith Decl. Ex. 29 ¶ 231.

57.    Maxus's internal valuations – the Maxus Corporate Model or "MCM" – valued the Venezuela Assets at $245.7 million as of early 1996.  Smith Decl. Ex. 18 at 138.  The MCM valued the Bolivia Assets at $53.9 million as of early 1996. Smith Decl. Ex. 18 at 138.  Collectively, Maxus internally valued its Venezuela and Bolivia Assets at $300 million as of early 1996.  Smith Decl. Ex. 29 ¶¶ 245-246.

58.    Maxus retained Credit Suisse First Boston ("CSFB") to conduct a valuation of the Venezuela and Bolivia Assets, and CSFB opined that the FMV of these assets together was between $149 and $214 million as of June 30, 1996.  Smith Decl. Ex. 18 at 144; Smith Decl. Ex. 29 ¶ 233.  CSFB estimated that $100 to $140 million of that corresponded to the Venezuela Assets. Smith Decl. Ex. 18 at 144, n. 489; Smith Decl. Ex. 29 ¶ App. D, n. 51.  CSFB's valuation of the Venezuela assets did not include the Viboral well in the Quiriquire Unit, which was being drilled at the time and had not yet been booked prior to June 30, 1996.  Smith Decl. Ex. 29 ¶ 237.

59.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████  Smith Decl. Ex. 18 at 138-139; Smith Decl. Ex. 29 ¶ 245 n. 284; Smith Decl. Ex. 30.

60.    In August 1996, Maxus used the proceeds from the Bolivia and Venezuela Assets transaction for the redemption of its outstanding shares of publicly held $4.00 preferred stock, approximately $221 million in the aggregate.  Smith Decl. Ex. 18 at 53; Smith Decl. Ex. 29 ¶ 235.

## 2.     Maxus's Ecuador Assets are transferred to YPFI.

61.     MIEC sold the stock of its Ecuador subsidiary (the "Ecuador Assets") to YPFI effective December 31, 1997.  Smith Decl. Ex. 18 at 74; Smith Decl. Ex. 29 ¶ 272; Smith Decl. Ex. 31.  The Maxus Board approved the sale on December 19, 1997.  Smith Decl. Ex. 18 at 74 n. 272; Smith Decl. Ex. 29 ¶ 272.

62.     After post-closing adjustments, the final sales price paid by YPFI for the Ecuador Assets was $185.2 million.  Smith Decl. Ex. 18 at 175-76; Smith Decl. Ex. 29 ¶ 272.  This price was based on a valuation conducted by Gaffney Cline and Associates' ("GCA") of the oil and gas properties included in the Ecuador Assets, which concluded that such assets were worth $165 million (and that YPF Ecuador's non-oil and gas producing assets were worth approximately $20 million).  Smith Decl. Ex. 18 at 74; Smith Decl. Ex. 29 ¶ 272.  GCA's valuation, effective as of December 1, 1997, was provided to Maxus on December 3, 1997.  Smith Decl. Ex. 18 at 74; Smith Decl. Ex. 29 ¶ 272 n. 342.

63.     Separately, CSFB provided the Maxus Board with an opinion of the value of the Ecuador Assets on December 23, 1997.  Smith Decl. Ex. 18 at 175; Smith Decl. Ex. 29 ¶ 282.  CSFB estimated that the value of Maxus's Ecuador Assets was between $205 and $245 million.  Smith Decl. Ex. 18 at 175; Smith Decl. Ex. 29 ¶ 282.

64.     Based on the MCM, Maxus internally valued the Ecuador Assets at between $275 million and $310 million as of September 1997.  Smith Decl. Ex. 18 at 139; Bramer ¶ 304.

65.     Maxus used the proceeds from the sale of its Ecuador Assets to pay down a $200 million loan that had earlier been made from YPFI to MIEC.  Smith Decl. Ex. 18 at 74; Smith Decl. Ex. 29 ¶ 27.

### 3.    Maxus's Indonesia Assets are transferred to YPFI.

66.    On December 19, 1997, during the same meeting in which it approved the sale of Maxus's Ecuador Assets to YPFI, the Maxus Board approved the sale of Maxus's oil and gas interests in Indonesia (the "Indonesia Assets") to YPFI, effective as of December 31, 1997.  Smith Decl. Ex. 18 at 54; Smith Decl. Ex. 29 ¶ 273; Smith Decl. Ex. 31A.  The Indonesia Assets consisted of a majority (55.7%) interest in the Southeast Sumatra ("SES") Production Sharing Contract ("PSC") operated by Maxus and a 24.3% interest in the Northwest Java ("NWJ") PSC operated by ARCO.  Smith Decl. Ex. 18 at 54-55; Smith Decl. Ex. 29 App. G ¶ 1.

67.    The initial sales price for the Indonesia Assets was $505.3 million, consisting of $241.3 million for SES and $264 million for NWJ.  Smith Decl. Ex. 18 at 65-66; Smith Decl. Ex. 29 ¶¶ 274-275.  This price was based on YPFI's contemporaneous offer for smaller interests owned by Repsol in the SES and NWJ units.  Smith Decl. Ex. 29 ¶ 275.  Post-closing adjustments resulted in an adjusted price of $511.7 million ($246.5 million for SES and $262.2 million for NWJ).  Smith Decl. Ex. 18 at 65 n. 228; Smith Decl. Ex. 29 ¶ 276.

68.    The Indonesia Purchase and Sale Agreement ("PSA") provided for adjustment of the sale price if there was a subsequent third-party sale of operating interests in the SES and NWJ PSCs at an indicated price greater than the price set forth in the PSA derived from YPFI's bid. Smith Decl. Ex. 18 at 162-163; Smith Decl. Ex. 29 ¶ 277.  Ultimately, the sale price was adjusted upward by $63.7 million, triggered by a $20 million sale of Novus Petroleum's 3.72% interest in the SES PSC in June 1998.  Smith Decl. Ex. 18 at 66; Smith Decl. Ex. 29 ¶ 277.  The final transfer price for Maxus's Indonesia Assets was $575.3 million ($292.5 million for SES and $282.8 million for NWJ).  Smith Decl. Ex. 18 at 66; Smith Decl. Ex. 29 ¶ 277.

69.     Prior to the transaction, on December 3, 1997, GCA valued Maxus's NWJ assets at $286 million and its SES assets at $278 million ($564 million in total).  Smith Decl. Ex. 18 at 64; Smith Decl. Ex. 29 ¶ 296 n. 393.

70.     On November 8, 1996, CSFB issued an opinion valuing Maxus's NWJ assets between $232 million and $282 million and Maxus's SES assets between $413 million and $513 million, for a total Maxus Indonesia Assets valuation of $645 million to $795 million.  Smith Decl. Ex. 18 at 163.

71.     The Maxus Corporate Model valued Maxus's NWJ assets at $279 to $315 million, and its SES assets at $275 million to $352 million as of September 1997, for a total of $554 million to $667 million.  Smith Decl. Ex. 18 at 139; Smith Decl. Ex. 29 ¶ 294.

72.     Maxus used the proceeds from the sale of its Indonesia Assets to pay down intercompany loans made by YPFI to Maxus Indonesia in 1996 and 1997 to refinance certain third-party debts.  Smith Decl. Ex. 18 at 66-67; Smith Decl. Ex. 29 ¶ 276.

### 4.     Organizational Chart Pre- and Post-Global Reorganization

73.     Immediately after YPF's acquisition of Maxus and prior to the global reorganization and 1996-1997 asset transfers, the simplified organizational chart of YPF and Maxus looked like this:



Smith Decl. Ex. 18 at 31.

74.     After the global reorganization, the simplified organizational chart of YPF and Maxus looked like this:



Smith Decl. Ex. 18 at 77.

**5.      YPF creates the Maxus Management Group.**

75.      After the former Maxus international assets were transferred to YPFI, Maxus personnel with specialized knowledge and expertise continued to manage those assets.  Smith Decl. Ex. 32 ¶¶ 108-09; Smith Decl. Ex. 47 at 98-99.  YPF reported and monitored the performance of the former Maxus assets, managed by Maxus employees, under the designation "Maxus Management Group."  Smith Decl. Ex. 18 at 76; Smith Decl. Ex. 47 at 99-100.  This term ceased to be used after Repsol acquired YPF.  Smith Decl. Ex. 47 at 101.

### G.    Repsol's Acquisition of YPF

76.    In 1999, Repsol, S.A. acquired YPF through a series of stock purchases and changed its name to Repsol YPF, S.A. (Repsol, S.A. and Repsol YPF, S.A. are collectively referred to herein as "Repsol").  Compl. ¶ 110; Smith Decl. Ex. 1 ¶ 110; Smith Decl. Ex. 2 ¶ 110.  Repsol's debt to equity ratio significantly increased as a result of this acquisition.  Compl. ¶ 110; Smith Decl. Ex. 2 ¶ 110.

### H.    Sale of the Crescendo Assets

#### 1.    Background on the Crescendo Partnership

77.    By the time Repsol acquired YPF, Maxus's then-remaining oil and gas assets consisted of its interest in the Crescendo Resources L.P. partnership ("Crescendo") and other exploratory interests located in the Gulf of Mexico.  Smith Decl. Ex. 29 ¶ 329.

78.    Maxus's wholly-owned subsidiary Midgard Energy LP ("Midgard") owned and operated natural gas gathering and processing assets in the mid-continent region, including the Texas panhandle and Western Oklahoma.  Smith Decl. Ex. 29 ¶ 337.  On August 20, 1997, Midgard contributed its assets to the Crescendo partnership, of which a subsidiary of Amoco was the other member.  Smith Decl. Ex. 29 ¶ 337; Smith Decl. Ex. 33 ("Crescendo Partnership Agreement").  Maxus, through Midgard, owned a 59% interest in Crescendo, while Amoco owned 41%.  Smith Decl. Ex. 29 ¶ 337.  The Crescendo parties valued the assets contributed by Maxus at $700 million.  Smith Decl. Ex. 29 ¶ 337.

79.    Per the terms of the Crescendo Partnership Agreement, neither party could unilaterally sell or transfer its interest in Crescendo to a non-affiliate for five years after the date of formation.  Smith Decl. Ex. 29 ¶ 338.  During this period, a party could only unilaterally terminate the partnership if the other party underwent a change-of-control transaction.  Smith Decl. Ex. 29 ¶ 338. Both parties to the Crescendo partnership experienced a change of control; Amoco

was acquired by BP via merger in December 1998, and Repsol acquired YPF in June 1999. Smith Decl. Ex. 29 ¶ 338. These acquisitions triggered the change-of-control provision in the Crescendo Partnership Agreement, such that either party could terminate the partnership within the year following the other party's change of control event. Smith Decl. Ex. 29 ¶ 338.

### 2. Crescendo parties reach a dissolution agreement and Strategic Assets are sold to BP Amoco.

80.     Maxus and BP Amoco began to negotiate a dissolution of Crescendo in May 1999. Smith Decl. Ex. 29 ¶ 352. In November 1999, Maxus and BP Amoco agreed that BP Amoco would acquire Crescendo's "Strategic" assets, while Midgard kept the "Pinnacle" assets, which it could then sell. Smith Decl. Ex. 29 ¶¶ 340-341; Smith Decl. Ex. 34. The Maxus Board approved the Crescendo dissolution by written consent in lieu of a meeting. Smith Decl. Ex. 29 ¶ 356 n. 518. As part of the dissolution of Crescendo, Maxus received approximately $5 million in cash from the Crescendo partnership. Smith Decl. Ex. 29 ¶ 377.

81.     Per the parties' prior agreement, Maxus sold the Strategic Assets to BP Amoco for $400.5 million plus a 1% ORRI on December 31, 1999. Smith Decl. Ex. 29 ¶ 342; Smith Decl. Ex. 35.

### 3. The Pinnacle Assets are sold to Apache.

82.     On June 18, 1999, prior to Repsol's acquisition of a majority interest in YPF, Repsol and Apache Resources ("Apache") entered into an agreement for exclusive negotiations regarding the sale of Crescendo assets to Apache. Smith Decl. Ex. 29 ¶ 358; Smith Decl. Ex. 36. In October 1999, Crescendo retained Petrie Parkman to market the Pinnacle Assets. Smith Decl. Ex. 29 ¶ 367. In November 1999, Apache was given advanced access to data related to the Pinnacle Assets. Smith Decl. Ex. 29 ¶ 370.

83.     At least five companies bid on the Pinnacle Assets.  Smith Decl. Ex. 29 ¶ 343.  In January 2000, ONEOK and Kerr-McGee submitted bids for the Pinnacle Assets that exceeded the existing bid by Apache.  Smith Decl. Ex. 29 ¶ 370.

84.     Nonetheless, Maxus sold the Pinnacle Assets to Apache for $219 million plus a 1% ORRI on January 24, 2000.  Smith Decl. Ex. 29 ¶ 343; Smith Decl. Ex. 37.  The Maxus Board of Directors approved the sale of the Pinnacle Assets by written consent in lieu of a meeting.  Smith Decl. Ex. 29 ¶ 356; Smith Decl. Ex. 38.

### 4.     Maxus uses the proceeds from the Crescendo sale to repurchase debt and as a loan to Repsol's subsidiary RIF.

85.     Maxus used $262.1 million of the proceeds from the sale of its Crescendo assets to pay down a $236 million credit facility and redeem $36.1 million of other notes, and loaned the remaining $325 million to Repsol's subsidiary Repsol International Finance ("RIF").  Smith Decl. Ex. 29 ¶ 344.  RIF, in turn, made periodic distributions of the loan proceeds for Maxus's operating expenses.  Smith Decl. Ex. 29 ¶ 349.  From January 2001 to January 2005, RIF paid Maxus on the proceeds from the sale of the Crescendo assets at a below-LIBOR interest rate.  Smith Decl. Ex. 29 ¶ 408.

### I.     2001-2002 Asset Transfers

### 1.     YPFI transfers legacy Maxus Venezuela Assets to Repsol.

86.     YPFI sold Repsol YPF Venezuela S.A. (formerly known as Maxus Venezuela S.A.) to Repsol Exploracion S.A. effective July 1, 2001.  Smith Decl. Ex. 29 ¶ 439; Smith Decl. Ex. 39.  The adjusted sales price paid by Repsol on December 5, 2001, was $26.6 million (inclusive of interest).  Smith Decl. Ex. 29 ¶ 442.  In connection with this sale, Repsol entities provided loans that Repsol YPF Venezuela used to repay $83 million in debt owed to YPFI.  Smith Decl. Ex. 29 ¶ 442.

87.     YPFI also sold Maxus Venezuela Ltd. and Maxus Guarapiche to Repsol Exploracion Venezuela B.V. effective September 1, 2001. Smith Decl. Ex. 29 ¶ 443; Smith Decl. Ex. 40. The sales price was $47.4 million. Smith Decl. Ex. 29 ¶ 443. Repsol entities also paid $155.6 million to YPFI as cancellation of debt owed by Maxus Venezuela in connection with the sale. Smith Decl. Ex. 29 ¶ 446.

88.     YPFI remitted all of the proceeds from its sale of the legacy Maxus Venezuela and Ecuador Assets to YPF as a $780 million dividend. Smith Decl. Ex. 29 ¶¶ 498-499. YPF in turn dividended these proceeds to Repsol affiliates on December 5, 2001. Smith Decl. Ex. 29 ¶¶ 501-502.

### 2.    YPFI transfers legacy Maxus Ecuador Assets to Repsol.

89.     YPFI sold its legacy Maxus Ecuador Assets to Repsol YPF Ecuador in 2001. Smith Decl. Ex. 29 ¶ 433; Smith Decl. Ex. 41; Smith Decl. Ex. 42. The sales price was $307.5 million. Smith Decl. Ex. 29 ¶ 433; Smith Decl. Ex. 2 ¶ 119.

90.     As noted above, YPFI remitted all of the proceeds from its sale of the legacy Maxus Venezuela and Ecuador Assets to YPF as a $780 million dividend. Smith Decl. Ex. 29 ¶¶ 498-499. YPF in turn dividended these proceeds to Repsol affiliates on December 5, 2001. Smith Decl. Ex. 29 ¶¶ 501-502.

### 3.    YPFI sells its shares of YPFH to YPF.

91.     Until December 1, 2001, YPFI directly owned YPFH, which, in turn, directly owned Maxus. Smith Decl. Ex. 47 at 74, n. 105. On this date, YPFI sold its shares of YPFH to YPF for $195.4 million prior to post-closing adjustments, but retained its operating subsidiaries outside the United States. Smith Decl. Ex. 47 at 74, n. 105; Smith Decl. Ex. 43. As a result, YPFH and YPFI were each owned directly by YPF and became sister corporations. Smith Decl. Ex. 47 at 74, n. 105.

92.     YPFI remained a holding company; its only assets were the shares of its operating subsidiaries, and its only activity was to act as the controlling shareholder of each of these subsidiaries.  Smith Decl. Ex. 47 at 80, n. 124.  YPFI had a board of directors and officers who performed these controlling shareholder functions, but had no employees of its own.  Smith Decl. Ex. 47 at 80, n. 124.

### 4.     YPFI sells legacy Maxus Indonesia Assets to CNOOC.

93.     YPF Energy Holdings, a subsidiary of YPFI, sold legacy Maxus Indonesia Assets (i.e., YPF Maxus Southeast Sumatra B.V. and YPF Java Baratlaut B.V.) to a subsidiary of China National Offshore Oil Corporation ("CNOOC"), in a purchase agreement dated January 18, 2002. Smith Decl. Ex. 29 ¶ 473; Smith Decl. Ex. 2 ¶ 121; Smith Decl. Ex. 44.  The total contract price, which included CNOOC's purchase of YPF entities unrelated to the legacy Maxus assets, was $585 million.  Smith Decl. Ex. 29 ¶ 473.  After debt reduction and post-closing adjustments, the total consideration received by YPFI and its subsidiaries for this transaction was $174 million. Smith Decl. Ex. 29 ¶ 475.  Approximately $128 million of this $174 million related to the legacy Maxus Indonesia assets.  Smith Decl. Ex. 29 ¶¶ 475-476.  YPF Energy Holdings remitted $172.4 million of the purchase proceeds to RIF in the form of a loan.  Smith Decl. Ex. 29 ¶ 477 n. 799.

### 5.     YPF transfers legacy Maxus Bolivia Assets to Repsol.

94.     YPFI spun off its Bolivian holdings into a subsidiary called Repsol YPF Santa Cruz S.A. and dividended the shares to YPF.  Smith Decl. Ex. 29 ¶ 483.  YPF then sold Repsol YPF Santa Cruz S.A. to Repsol for $883 million on July 10, 2002.  Smith Decl. Ex. 29 ¶ 485; Smith Decl. Ex. 45.  Of this purchase price, $197 million corresponded to the legacy Maxus Bolivia Assets.  Smith Decl. Ex. 29 ¶ 485.

95.     The $883 million purchase price was comprised of: (1) cancellation by Repsol of $251.9 million in debt owed by YPF on August 12, 2002, (2) forgiveness of $392.3 million of the

purchase price as a dividend payment from YPF to Repsol on December 3, 2002, and (3) a $239 million balance that Repsol was supposed to pay to YPF by August 12, 2007.  Smith Decl. Ex. 29 ¶ 489.

**J.    Gulf of Mexico Prospects**

**1.    Maxus invests in Gulf of Mexico exploration through the Neptune prospect.**

96.    On May 22, 2003, Maxus entered into a participation agreement for a 15% share in the Neptune joint venture ("Neptune") with BHP in the Deepwater Gulf of Mexico ("GOM") in May 2003.  Smith Decl. Ex. 29 ¶ 518; Smith Decl. Ex. 46.  At the time Maxus bought into the Neptune prospect in 2003, Neptune had an expected value of $0.8 million (using the 14.9% discount rate used in the planning proposal).  Smith Decl. Ex. 29 ¶ 518.  Maxus funded the development of Neptune through the repayment of funds loaned to RIF after the Crescendo sale and additional financing from YPF.  Smith Decl. Ex. 29 ¶ 519.  The Neptune project was ultimately not successful.  Smith Decl. Ex. 29 ¶ 522.

**2.    Repsol creates Repsol E&P USA.**

97.    On September 15, 2005, Repsol created Repsol E&P USA as a vehicle through which it would pursue business in the United States.  Smith Decl. Ex. 47 at 73.  Certain Maxus personnel were reallocated to Repsol E&P.  Smith Decl. Ex. 47 at 73.

98.    At the end of 2005, Maxus had approximately 69 employees.  Smith Decl. Ex. 47 at 79-80.  On March 1, 2007, the YPFH group of companies (YPFH, CLHH, Tierra, and Maxus) and RSC underwent a reorganization of personnel.  Smith Decl. Ex. 48 (cited in Smith Decl. Ex. 47 at 73, n. 101).  As part of this reorganization, officers, or directors within the YPFH group who moved to RSC were expected to resign.  Smith Decl. Ex. 48 (cited in Smith Decl. Ex. 47 at 73, n.

101).  Offer letters dated January 29, 2007 were extended to existing employees of Maxus inviting them to join RSC.  Smith Decl. Ex. 49 (cited in Smith Decl. Ex. 47 at 73, n. 101).

### 3.  Maxus's Ra prospect interest is exchanged for Repsol E&P USA's participation in the Ouachita prospect.

99.     On July 15, 2005, Maxus, Repsol E&P USA, and Hess entered into an agreement whereby Hess received a 10% interest in Maxus's Ra prospect in exchange for Repsol E&P USA's participation in Hess's Ouachita prospect.  Smith Decl. Ex. 29 ¶ 529; Smith Decl. Ex. 50.  Repsol E&P USA obtained a 15.5% interest in Ouachita from Hess.  Smith Decl. Ex. 29 ¶ 529.   Maxus was given a 1% interest in Ouachita.  Smith Decl. Ex. 29 ¶ 529.

100.    Tristone, who Maxus hired to market its Ra asset, valued Maxus's interest in Ra between $39 and $73 million.  Smith Decl. Ex. 29 ¶ 535.

101.    Repsol E&P USA gave Maxus $23.7 million as part of the July 8, 2009 settlement agreement to reimburse Maxus for the Ouachita/Ra encumbrance.  Smith Decl. Ex. 29 ¶ 531.

### 4.  Maxus assigns its rights in the Tiger/North Bronto and Stormy Monday prospects to Repsol.

102.     On March 9, 2007, Maxus assigned its rights in the Tiger/North Bronto and Stormy Monday prospects to Repsol Offshore E&P USA.  Smith Decl. Ex. 29 ¶ 541, Smith Decl. Ex. 51. In exchange, Maxus retained a 9% ORRI in Stormy Monday and a 19% ORRI in Tiger and North Bronto.  Smith Decl. Ex. 29 ¶ 541.

103.    Repsol drilled dry holes at Stormy Monday and North Bronto.  Smith Decl. Ex. 29 ¶ 555.

### 5.  Repsol E&P USA invests in Shenzi.

104.    Repsol elected to invest in the profitable Shenzi development through its subsidiary Repsol E&P USA rather than through Maxus.  Smith Decl. Ex. 29 ¶ 672.  Repsol E&P USA

entered into a purchase agreement with BP to acquire a 28% working interest in Shenzi on April 1, 2006. Smith Decl. Ex. 52.

### K.    Remedial Action at the DASS, 1999-2005

105.    In 1999, the New Jersey Office of Maritime Resources published a "conceptual proposal" for dredging of highly contaminated "hot spots" in the Passaic River. Smith Decl. Ex. 10 at 171 n. 408. In 2002, following the release of preliminary findings from the RI, the study area was expanded to cover a 17-mile stretch of the Passaic River and Newark Bay. Smith Decl. Ex. 10 at 18 n.9; Smith Decl. Ex. 6 at 286. In 2003, following the expansion of the study area, EPA created a joint project management plan for the site with other state and federal agencies. Smith Decl. Ex. 10 at 172; Smith Decl. Ex. 6 at 64. In September 2003, the State of New Jersey ordered several PRPs, including Maxus, to conduct an assessment of natural resource damages and restoration options at the Passaic River. Smith Decl. Ex. 6 at 109. In 2004, EPA executed an administrative consent order requiring 31 potentially responsible parties—collectively, the Cooperating Parties Group or the "CPG"—to contribute to the costs of performing an RI/FS throughout the expanded study area. Smith Decl. Ex. 10 at 173; Smith Decl. Ex. 6 at 64-65. ▮

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ Smith Decl. Ex. 53 (cited in Smith Decl. Ex. 6 at 266-68, 276). Also in 2005 and in parallel to these developments at the federal level, the state of New Jersey ordered OCC, Maxus, and Tierra to contribute to the costs of developing a dredging plan for the lower six miles of the river. Smith Decl. Ex. 6 at 82.

### L.    Financial Condition of Maxus, 1999-2005

106.    Repsol YPF provided financial-support letters to its external auditors, Deloitte & Touche, LLP ("Deloitte"), in connection with Deloitte's review of the financial records of YPFH and its subsidiaries, and confirmed that Repsol YPF was willing to provide financial support to

Maxus.  Smith Decl. Ex. 1 ¶ 161 (noting that YPF "refer[s] the Court to the entire documents for their true and accurate contents").  For example, in 2004, Repsol YPF represented:

> The Company is dependent upon financial support from Repsol YPF and affiliates.  As essentially all of the Company's cash flow comes from its parent or affiliates, Management believes that the Company will remain a going concern over the next 12 months based on expected cash inflows from the collection of cash from an intercompany note receivable being in excess of expected cash outflows.  Management is unaware of any plans or intentions by Repsol YPF or affiliates to discontinue its financial support, if any, of the Company for the next twelve months.

Smith Decl. Ex. 54 at DT000609.

### M.    King & Spalding Memo

107.    Repsol retained the law firm King & Spalding LLP to perform analyses on its behalf related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Compl. ¶ 129; Repsol Defs. Resp. to Pl. First Interrogs. No. 3, Aug. 16, 2019. King & Spalding memorialized its analysis in a memo for Repsol on May 24, 2005, which, among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl. ¶ 130; Smith Decl. Ex. 2 ¶ 130 (noting that the King & Spalding memo is "a document that speaks for itself."); Repsol Defs. Resp. to Pl. First Interrogs. No. 3, Aug. 16, 2019; Smith Decl. Ex. 55.

108.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

109.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮





110.

111.

112.

Smith Decl. Ex. 2 ¶ 129.

### N.    Commencement of the New Jersey Litigation, 2005-2009

113.    On December 13, 2005, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed a complaint in New Jersey Superior Court against OCC, Tierra, Maxus, MIEC, Repsol, YPF, YPFH, and CLHH (the "New Jersey Litigation").  Compl. ¶ 13; Smith Decl. Ex. 1 ¶ 13; Smith Decl. Ex. 2 ¶ 13; Smith Decl. Ex. 56.  The complaint alleged that dioxin, DDT, and other hazardous substances were discharged from the Lister Avenue plant, contaminating the plant area and the lower 17-mile portion of the Passaic River, Newark Bay, and other nearby waterways and surrounding areas.  Compl. ¶ 13; Smith Decl. Ex. 10 at 21-22.

114.    ██████████████████████████████████████████████ ██████████████████████████████████████████████████████  Smith Decl. Ex. 57.

115.    On November 29, 2006, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed their First Amended Complaint against OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH.  Smith Decl. Ex. 58.  The First Amended Complaint introduced alter ego allegations, saying that Maxus, YPF, and Repsol "worked to strand the environmental liabilities associated with the Newark Bay Complex in Maxus and Tierra, while systematically stripping Maxus's and Tierra's assets and ability to satisfy these obligations," and in doing so, were "acting jointly, as a common economic unit, and as alter egos of each other."  Smith Decl. Ex. 58 at ¶ 24.

116.    On April 15, 2008, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed a Second Amended Complaint against OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH.  Compl. ¶ 187; Smith Decl. Ex. 1 ¶ 187; Smith Decl. Ex. 2 ¶ 187; Smith Decl. Ex. 59.  The Second Amended Complaint alleged that Maxus's prior asset sales to its shareholders constituted fraudulent transfers.  Smith Decl. Ex. 59 at 43-44.

117.    On September 5, 2008, the New Jersey Superior Court denied YPF and Repsol's motion to dismiss the complaint, as well as their motion to bar OCC's proposed cross-claims. Smith Decl. Ex. 60.

118.    In October 2008, OCC brought cross-claims in the New Jersey Litigation against Maxus, Tierra, Repsol, YPF, YPFH, and CLHH asserting various claims, including breach of contract, fraudulent transfer of assets, unjust enrichment, and contribution under the Spill Act and statutory contribution.  Smith Decl. Ex. 10 at 23; Smith Decl. Ex. 2 ¶ 188; Def. OCC's Answer, Smith Decl. Ex. 61.  In its cross-claims, OCC also alleged that defendants Tierra, Maxus, YPF, and Repsol are "alter egos of each other and together constitute a cohesive economic unit."  Smith Decl. Ex. 61. at ¶ 25.

119.    In February 2009, Tierra and Maxus filed third-party claims against approximately 300 other companies and governmental entities under the Spill Act in connection with the environmental contamination alleged to be at issue in the New Jersey Litigation.  Smith Decl. Ex. 10 at 23; Smith Decl. Ex. 6 at 83 n. 186.  Smith Decl. Ex. 62.

### O.    Settlement Agreements

#### 1.    2007 Settlement Agreements

120.    In 2007, Maxus entered into three settlement agreements with Repsol Services Company ("RSC") and Repsol E&P T&T to resolve certain matters related to compensation for services Maxus provided to Repsol entities.  Smith Decl. Ex. 29 ¶ 573.

121.    The first of these settlement agreements, effective as of April 5, 2007, addressed uncompensated marketing and distribution services that Maxus provided to a Repsol subsidiary on behalf of RSC in 2006.  Smith Decl. Ex. 29 ¶¶ 577-580; Smith Decl. Ex. 63.  RSC paid Maxus $1.57 million per the terms of this agreement.  Smith Decl. Ex. 29 ¶¶ 580, 582.  In exchange,

Maxus released all claims against RSC and its affiliated companies specifically related to those 2006 services.  Smith Decl. Ex. 29 ¶ 580.

122.    The second 2007 settlement between Maxus and RSC, dated April 27, 2007, required RSC to reimburse Maxus for services provided between January 1, 2006 and February 28, 2007.  Smith Decl. Ex. 29 ¶ 588; Smith Decl. Ex. 64.  Maxus agreed to prepare invoices for certain services rendered during that time period, and RSC would then pay that amount in full.  Smith Decl. Ex. 29 ¶ 588.  Maxus also agreed to release all claims it might have against the RSC group related to these services.  Smith Decl. Ex. 29 ¶ 590.

123.    The third 2007 settlement agreement, dated July 1, 2007, resolved claims related to services including technical and economic evaluation, business development, oil and gas drilling and operations, seismic processing, and support to geological modelling provided by Maxus to Repsol E&P T&T between January 1, 2006 and March 31, 2007.  Smith Decl. Ex. 29 ¶ 594; Smith Decl. Ex. 65.  In exchange for $1.35 million from Repsol E&P T&T, Maxus released all claims against Repsol E&P T&T specifically related to services between January 1, 2006 and March 31, 2007.  Smith Decl. Ex. 29 ¶ 596.

### 2.    2007/2008 Settlement Agreement

124.    On October 8, 2007, the YPF entities, Maxus, CLHH, Tierra, and MUSE entered into a settlement agreement to terminate the 1996 Assumption and Contribution Agreements (the 2007/2008 Settlement Agreement).  *See* ¶¶ 53-54, *supra*; *see also* Smith Decl. Ex. 29 ¶ 605; Smith Decl. Ex. 66.  At that date, YPF had contributed $25.5 million to Tierra under the Contribution Agreement.  Smith Decl. Ex. 29 ¶ 606.

125.    In connection with the 2007/2008 Settlement Agreement, Maxus and Tierra received consideration of approximately $378.2 million, comprised of $14 million in cash and $364 million in loan forgiveness of an intercompany payable Maxus owed to YPFH.  Smith Decl.

Ex. 29 ¶ 607.  In exchange, the Assumption and Contribution Agreements were terminated, such that YPF no longer needed to make payments to Tierra pursuant to the Contribution Agreement. Smith Decl. Ex. 29 ¶ 605.

126.    As a condition of the 2007/2008 Settlement Agreement, the parties sought a fairness opinion by a third party.  Grant Thornton prepared a preliminary analysis, and as of November 20, 2006, first estimated the value of the Contribution Agreement to Maxus as $270 million.  Smith Decl. Ex. 29 ¶ 622; Smith Decl. Ex. 67.  As of December 6, 2006, Grant Thornton derived an estimate of $524 million.  Smith Decl. Ex. 29 ¶ 623; Smith Decl. Ex. 68.

127.    Despite being entered into on October 8, 2007, this settlement agreement did not close until March 31, 2008.  Smith Decl. Ex. 70 ¶ 68; Smith Decl. Ex. 69 at MAXUS6083667; Smith Decl. Ex. 69 at MAXUS6083650-51 (amending the latest possible closing date from Nov. 30, 2007 to Dec. 24, 2007); Smith Decl. Ex. 69 at MAXUS6083657 (amending the latest possible closing date from Dec. 24, 2007 to April 15, 2008).

### 3.    2009 Settlement Agreement

128.    On July 8, 2009, Repsol E&P USA, RSC, and Repsol Offshore entered into a settlement agreement with Maxus to resolve various disputes related to operations in the Gulf of Mexico, including software and data issues, transfer of certain assets, and compensation of invoices related to the work of Maxus' employees for Repsol entities.  Smith Decl. Ex. 29 ¶ 635, Smith Decl. Ex. 72.  The Repsol entities party to this settlement paid Maxus $50 million in exchange for a full release by Maxus of its claims with respect to all such matters.  Smith Decl. Ex. 29 ¶ 646.  An advance payment of $30 million was agreed to on February 2, 2009, and paid later that month.  Bramer ¶¶ 645, 647; Smith Decl. Ex. 73.  The $50 million included $3.62 million for the software, $23.69 million for the Ouachita/Ra and Valencia interests, $7.35 million for unpaid service invoices, and $15.34 million for use of seismic data.  Smith Decl. Ex. 29 ¶ 647.

**P.      Remedial Action at the DASS, 2006-2012 (Before the Expropriation of YPF)**

129.      A February 2006 presentation developed by the multi-agency Remedial Options Work Group (convened to consider potential interim remedial measures at the Passaic River), contained evaluations of the cost and effectiveness of several potential dredging scenarios, including bank-to-bank dredging of 10 million cubic yards of sediment at a cost of $1.2 billion. Smith Decl. Ex. 6 at 84-85, 296.  In June 2007, the EPA released a draft Focused Feasibility Study ("FFS") that outlined several alternatives for remedial action in the Lower 8 Miles of the Lower Passaic River.  Smith Decl. Ex. 10 at 22; Smith Decl. Ex. 6 at 11-12.  One potential remedial action was extensive dredging and capping with estimated costs from $900 million to $2 billion.  Smith Decl. Ex. 10 at 22; Smith Decl. Ex. 6 at 89.

130.      In June 2008, the EPA, OCC, and Tierra entered into an Administrative Order on Consent ("2008 AOC"), under which Tierra (on behalf of OCC pursuant to the OCC indemnity) would undertake the removal of sediment from a portion of the Passaic River beside the Lister Avenue plant.  Smith Decl. Ex. 10 at 22; Smith Decl. Ex. 6 at 145.  The first phase of the removal work outlined in the 2008 AOC began in July 2011, and was substantially completed in late 2012. Smith Decl. Ex. 10 at 23; Smith Decl. Ex. 6 at 77.

131.      In June 2012, the EPA entered into an Administrative Order on Consent ("2012 AOC") with the Cooperating Parties Group ("CPG", a group of potentially responsible parties for Passaic River contamination) for remediation at River Mile 10.9.  Smith Decl. Ex. 10 at 23; Smith Decl. Ex. 6 at 78-79.  The CPG completed dredging and capping in 2013-2014.  Smith Decl. Ex. 10 at 23; Smith Decl. Ex. 6 at 79.

**Q.    Continuation of New Jersey Litigation, 2010 – 2012 (Before the Expropriation of YPF)**

132.    On July 19, 2011, the New Jersey Superior Court found OCC liable under the Spill Act for cleanup and removal costs associated with the Lister Avenue plant.  Smith Decl. Ex. 74.

133.    On August 24, 2011, the New Jersey Superior Court entered an order affirming Maxus's contractual indemnification obligations to OCC.  Smith Decl. Ex. 75.  Also on August 24, 2011, the New Jersey Superior Court found Tierra jointly and severally liable under the Spill Act for cleanup and removal costs associated with the Lister Avenue plant.  Smith Decl. Ex. 75A. Also on that same day, the New Jersey Superior Court affirmed Tierra's contribution liability to OCC under the Spill Act.  Smith Decl. Ex. 76.

134.    On May 21, 2012, the New Jersey Superior Court held that Tierra was an alter ego of Maxus.  Smith Decl. Ex. 77.

**R.    Repsol's Displacement as the Majority Holder of YPF's Shares**

135.    On February 21, 2008, Petersen Energia purchased 14.9% of YPF, S.A.'s capital stock from Repsol for $2.2 billion.  Smith Decl. Ex. 47 at 74, n. 104.  Repsol also granted options to shareholders of Petersen Energia or to companies that were, directly or indirectly, wholly controlled by ay of them to purchase up to an additional 10.1% of the outstanding capital stock of YPF within four years.  Smith Decl. Ex. 47 at 74, n. 104.  Following this, Repsol's controlling interest in YPF was reduced to 84.4% of the capital stock and voting rights.  Smith Decl. Ex. 47 at 74, n. 104.  By December 2008, Petersen Energia held a 15.4% interest in YPF.  Smith Decl. Ex. 47 at 74, n. 104.

136.    In May 2012, Repsol was displaced as the majority holder of YPF's shares when the Argentine government expropriated Repsol's interests in YPF.  Compl. ¶ 171; Smith Decl. Ex. 1 ¶ 171; Smith Decl. Ex. 2 ¶ 171.  Argentina's May 3, 2012 "Expropriation Law" expropriated

from Repsol YPF shares in an amount equal to 51% of YPF's share capital.  Smith Decl. Ex. 47 at 74, n. 105.  Certain members of the Argentine government criticized Repsol's management of YPF.  Compl. ¶ 172; Smith Decl. Ex. 1 ¶ 172.  A report commenting on Repsol's management of YPF (the "Mosconi Report") was authored by Argentina's comptroller, Julio de Vido, in July 2012.  Compl. ¶ 172; Smith Decl. Ex. 1 ¶ 172 (noting that YPF "refer[s] the Court to the documents for their true and accurate contents"); Smith Decl. Ex. 78.  The Mosconi Report posited that under Repsol's management, Repsol, YPF, Maxus, and Tierra operated as a single economic unit.  Smith Decl. Ex. 78 at 24.

137.    In 2014, Repsol entered into a $5 billion settlement agreement with the government of Argentina in which Repsol was compensated for the expropriation of YPF.  Smith Decl. Ex. 29 ¶ 46.

**S.    Continuation of New Jersey Litigation, 2012-2016 (After the Expropriation of YPF)**

138.    On September 26, 2012, OCC filed its second amended cross-claims against the YPF/Repsol entities in the New Jersey Litigation.  Compl. ¶ 189; Smith Decl. Ex. 1 ¶ 189; Smith Decl. Ex. 2 ¶ 189; Smith Decl. Ex. 79.  OCC added cross-claims for civil conspiracy/aiding and abetting, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty against cross-claim defendants.  Smith Decl. Ex. 79 ¶¶ 115-139.

139.    On December 12, 2013, the New Jersey Superior Court approved a settlement between the State of New Jersey and the non-OCC defendants.  Compl. ¶ 190; Smith Decl. Ex. 1 ¶ 190; Smith Decl. Ex. 2 ¶ 190.  All claims the State of New Jersey had asserted against Repsol, YPF, YPFI, YPFH, CLHH, Maxus, Tierra, MUSE, and some, but not all, claims against OCC were dismissed in exchange for $130 million.  Compl. ¶ 190; Smith Decl. Ex. 1 ¶ 190; Smith Decl. Ex. 2 ¶ 190.  Repsol funded $65 million and Maxus/Tierra/YPF funded the remaining $65 million;

Repsol subsequently brought a contribution claim against OCC for its $65 million share.  Compl. ¶ 190; Smith Decl. Ex. 1 ¶ 190; Smith Decl. Ex. 2 ¶ 190.

140.   On December 16, 2014, the New Jersey Superior Court approved a settlement between the State of New Jersey ("the State") and OCC.  Compl. ¶ 191; Smith Decl. Ex. 1 ¶ 191; Smith Decl. Ex. 2 ¶ 191.  In connection with that settlement, OCC paid $190 million for the release of the State's claims that remained against OCC.  Compl. ¶ 191; Smith Decl. Ex. 1 ¶ 191; Smith Decl. Ex. 2 ¶ 191.  OCC sought indemnification from Maxus for the settlement amount, and Maxus challenged the settlement amount.  Compl. ¶ 191; Smith Decl. Ex. 1 ¶ 191; Smith Decl. Ex. 2 ¶ 191.

141.   Following additional discovery, the parties engaged in motion practice culminating in a December 10, 2015 hearing on six motions.  Compl. ¶ 192; Smith Decl. Ex. 1 ¶ 192; Smith Decl. Ex. 2 ¶ 192.  On January 14, 2016, the Special Master rendered its opinions on those six motions.  Compl. ¶ 192; Smith Decl. Ex. 1 ¶ 192; Smith Decl. Ex. 2 ¶ 192.  In one of its opinions, the Special Master recommended dismissal of OCC's alter ego claims against Repsol on the ground that OCC must sequentially pierce the corporate structure to reach Repsol.  Compl. ¶ 192; Smith Decl. Ex. 1 ¶ 192; Smith Decl. Ex. 81.  The Special Master also recommended dismissal of OCC's claims related to Maxus's indemnification obligations with respect to potential future obligations.  Compl. ¶ 192; Smith Decl. Ex. 1 ¶ 192; Smith Decl. Ex. 81A. The Special Master also recommended that the New Jersey court hold that OCC is entitled to indemnification from Maxus for OCC's own pre-closing conduct in relation to the Lister Avenue plant.  Compl. ¶ 193; Smith Decl. Ex. 81B.   Finally, the Special Master recommended denying YPF's summary judgment motion on OCC's alter-ego allegations.  Compl. ¶ 193; Smith Decl. Ex. 1 ¶ 193; Smith Decl. Ex. 81C.

142.    All six recommendations were appealed to New Jersey Superior Court Judge Garry Furnari, including OCC's appeal of the dismissal of its alter ego claims against Repsol, and YPF's appeal of the denial of its partial summary judgment motion.  Compl. ¶ 194; Smith Decl. Ex. 1 ¶ 194; Smith Decl. Ex. 2 ¶ 194.  On April 5, 2016, Judge Furnari adopted all six of the Special Master's opinions and issued rulings on all six motions, and denied the YPF Defendants' motion for summary judgment on OCC's alter ego allegations.  Compl. ¶ 195; Smith Decl. Ex. 1 ¶ 195.

143.    A bench trial on OCC's alter ego claims against YPF was scheduled to begin on June 20, 2016.  Compl. ¶ 195; Smith Decl. Ex. 1 ¶ 195.  However, the Debtors' filing of Chapter 11 petitions triggered the automatic stay of the claims OCC had brought against Maxus.  OCC therefore removed all of its cross claims to the United States Bankruptcy Court for the District of New Jersey, and filed a motion to transfer those claims to this Court, which was granted.  *New Jersey Dep't of Env. Prot. v. Occidental Chemical Corp. (In re Maxus Energy Corp.)*, Adv. Proc. No. 16-51025 (Bankr. D. Del.) [D.I. Nos. 1, 2, 12].  Repsol then moved the Court to remand OCC's claims against it back to the New Jersey Superior Court, which the Court granted on November 15, 2016.  Adv. Pro. No. 16-51025 [D.I. 42, 43].  (OCC's individual claims against YPF technically remain pending before this Court in the initial adversary action initiated upon OCC's removal and transfer of claims; however, the Court determined that OCC lacked standing to prosecute alter-ego claims against YPF, as such claims became property of the Debtors' estates by operation of Delaware law.  Adv. Pro. 16-51025 [D.I. 42, 43, 65, 66].)  Upon remand, the Trust made a limited intervention in the New Jersey proceedings, and appealed the trial division's summary judgment order dismissing OCC's claims against Repsol.  On December 27, 2021, the Appellate Division reversed the trial court and remanded OCC's alter-ego claim against Repsol for further proceedings.  *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, Nos. A-2036-17, A-2038-

17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. App. Div. Dec. 27, 2021).  Repsol has sought certiorari to appeal the Appellate Division's determination before the New Jersey Supreme Court on March 3, 2022; the Trust will oppose that petition in April.

**T.    Remedial Action at the DASS, 2012-2016 (After the Expropriation of YPF)**

144.    In spring 2014, the FFS for the Lower 8 Miles of the Lower Passaic River was completed, and on April 11, 2014, the EPA released a proposed plan in which it estimated that its preferred remediation measure (involving dredging followed by offsite dewatering and incineration or disposal of approximately 4.3 million cubic yards of sediment, and the placement of a bank-to-bank cap) would cost $1.731 billion.  Smith Decl. Ex. 10 at 24; Smith Decl. Ex. 6 at 53.

145.    On March 3, 2016, the EPA published the ROD for the Lower 8 Miles of the Lower Passaic River.  Smith Decl. Ex. 10 at 24; Smith Decl. Ex. 6 at 99; Smith Decl. Ex. 82.  The final remedy includes dredging approximately 3.5 million cubic yards of sediment and installing an engineered cap over the river bottom of the lower 8.3 miles.  Smith Decl. Ex. 1 ¶ 47; Smith Decl. Ex. 6 at 53.  The selected remedy for the Lower 8 Miles, capping with dredging for flooding and navigation, is estimated to cost $1.38 billion.  Smith Decl. Ex. 10 at 24; Smith Decl. Ex. 6 at 53.

146.    The investigation and remediation process continues today in various portions of the Passaic River and Newark Bay.  In July 2019, the EPA completed an RI for the upper 9 miles of the 17-mile Passaic River Study Area, and issued a ROD in September 2021 requiring a dredging remedy in this area at a cost of $441 million.  Smith Decl. Ex. 6 at 55-57.  The RI/FS process remains ongoing in portions of Newark Bay, the Hackensack River, and Kill Van Kull, and no remedy has yet been selected for these areas.  Smith Decl. Ex. 6 at 53, 108.  Evaluation and quantification of natural resource damages at the DASS reflecting the costs of restoring injured natural and ecological resources is also ongoing following the release in January 2020 of the

federal natural resource trustees' Final Natural Resource Damage Assessment Plan.  Smith Decl. Ex. 6 at 121-22.

U.    **Cash Flows and Environmental Expenditures**

147.    YPF contributed cash to the Debtors to meet operations shortfalls regularly throughout the period from 1996 to 2016.  *See* Smith Decl. Ex. 83 at No. 4 ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

148.    Exhibit 11 to the Smith Decl. Ex. 70 contains a schedule detailing Maxus's spending on environmental remediation efforts from the years 1983 to 2016.  This schedule shows that, during the period from 1983 through April of 2016, Maxus spent approximately $755.1 million on environmental remediation efforts.  *See* Smith Decl. Ex. 70 at Ex. 11; *see also* Smith Decl. Ex. 70 ¶ 90.

V.    **Project Jazz and the Chapter 11 Cases**

1.    **Two-Hatters.**

149.    From approximately 2010 to at least 2016, the Debtors and YPF had "shared" employees that held positions at Debtor and non-Debtor entities YPFH and CLHH such that they wore "two hats."   [D.I. 227] at 17–18 ("These 'shared' employees include the Debtors' management, including their ex-Chief Executive Officers, Chief Financial Offers, treasurer, comptroller, Human Resources director, and the Debtors' successive general counsels.").

2.    **Project Jazz begins and a Chapter 11 petition is filed.**

150.    YPF sought legal advice from Chadbourne & Park LLP regarding a potential Chapter 11 bankruptcy petition on behalf of Maxus, Tierra, and certain other affiliates and termed this plan "Project Jazz."  Compl. ¶ 197; Smith Decl. Ex. 1 ¶ 197.  In this litigation, the Court has already adjudicated two discovery disputes relating to documents associated with Project Jazz, "the legal and operational 'Strategy' adopted by YPF that involved installation of 'independent

directors' at Maxus." *See* Feb. 8, 2021 Opinion [D.I. 333] at 3, n. 9.  The most recent of these related to a memorandum prepared by Chadbourne & Park—an "analysis of potential fraudulent conveyance claims and . . . piercing the corporate veil/ alter ego claims against YPF, which, combined, are the crux of the complaint in this case"—which the Court ordered YPF to produce to the Trust on the grounds that the disclosure of the executive summary of the memorandum to Mr. Francisco García Tobar while he was a director of Maxus effected a waiver of any privilege YPF could have asserted against Maxus regarding that document.  *See* March 11, 2021 Opinion [D.I. 366] at 3.

151.    In 2015, YPF established a Special Independent Committee ("SIC") of the Maxus Board to evaluate potential claims and defenses arising in relation to certain transactions and the historical course of dealing among Maxus and its affiliates.  Compl. ¶ 201; Smith Decl. Ex. 1 ¶ 201.  The SIC engaged Morrison & Foerster LLP and Zolfo Cooper, LLC as professional advisors.  Compl. ¶ 202; Smith Decl. Ex. 1 ¶ 202.  The SIC and YPF agreed on a settlement pursuant to which the YPF Defendants would pay $130 million and provide approximately $63 million in debtor-in-possession financing as consideration for the release of claims against the YPF Defendants.  Compl. ¶ 205; Smith Decl. Ex. 1 ¶ 205; Declaration of J. Gonzalez in Support of Chapter 11 Petitions and Request for First Day Relief, dated June 18, 2016 at ¶ 10 (No. 16-11501, Bankr. D.I. 2).

152.    On June 17, 2016, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  Compl. ¶ 206; Smith Decl. Ex. 1 ¶ 206; Smith Decl. Ex. 2 ¶ 206. The trial in the New Jersey Superior Court (set to begin on June 20, 2016) was stayed.  Compl. ¶ 206; Smith Decl. Ex. 1 ¶ 206.

### 3.    Creditors file proofs of claim.

153.    On October 11, 2016, the State of Wisconsin filed a Proof of Claim in the amount of $18.9 million concerning environmental cleanup of the Milwaukee Solvay Site.  Smith Decl. Ex. 87.

154.    On October 31, 2016, OCC filed a Proof of Claim corresponding to unreimbursed actual or committed costs and expenses the Debtors owed to OCC pursuant to the SPA and its indemnification clause.  Smith Decl. Ex. 88.

155.    On October 31, 2016, the Kearny Peninsula Sites Environmental Remediation Trust filed a Proof of Claim in the amount of $243.6 thousand plus an unliquidated amount related to environmental contamination at the Kearny Plant Site.  Oct. 31, 2016 Kearny Remediation Trust Proof of Claim. Smith Decl. Ex. 89.

156.    On December 15, 2016, the United States on behalf of EPA, DOI, and NOAA filed a Proof of Claim in the amount of $7.2 billion to $11.9 billion including claims related to the Diamond Alkali Superfund Site in New Jersey and the Milwaukee Solvay Superfund Site.  Smith Decl. Ex. 90.

157.    On December 15, 2016, the State of Ohio filed a Proof of Claim in the amount of $143.2 million concerning environmental violations at the Painesville Site. Smith Decl. Ex. 91.

158.    On April 17, 2017, the Lower Passaic River Study Area Cooperating Parties Group filed a Proof of Claim in the amount of $14.4 million plus certain unliquidated amounts pertaining to agreements to remediate the Passaic River.  Apr. 17, 2017 Smith Decl. Ex. 92.

### 4.    The Amended Plan is approved.

159.    On April 19, 2017, OCC proposed replacement debtor-in-possession financing and the Debtors and the official committee of unsecured creditors (the "Committee") filed an amended plan [Bankr. D.I. 1231] and a disclosure statement [Bankr. D.I. 1232].  Compl. ¶¶ 209-10; Smith

Decl. Ex. 1 ¶¶ 209-10; Smith Decl. Ex. 2 ¶ 210.  The plan was further amended as of May, 20, 2017.  Smith Decl. Ex. 3 (Bankr. D.I. 1451, the "Amended Plan").  On May 22, 2017, the Court entered an order confirming the Amended Plan [Bankr. D.I. 1460] (the "Confirmation Order").  Compl. ¶ 210; Smith Decl. Ex. 1 ¶ 210; Smith Decl. Ex. 2 ¶ 210.  On July 17, 2017, the Debtors filed the Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III) Related Bar Dates [Bankr. D.I. 1701] (the "Effective Date Notice"); informing parties in interest that the Amended Plan became effective on July 14, 2017.  Compl. ¶ 211; Smith Decl. Ex. 1 ¶ 211; Smith Decl. Ex. 2 ¶ 211.

160.   The Amended Plan provided for the allowance and settlement of six of the many claims filed against the Debtors' estates in the Chapter 11 Cases in exchange for allowed Class 4 Environmental Claims (the "Class 4 Claims") and Class 5 Diamond Alkali Claims (the "Class 5 Claims").  Smith Decl. Ex. 3 Art. XI.F, Compromises and Settlements of Certain Claims.

161.   The Class 4 Environmental Claims comprise "Claim[s] against any of the Debtors arising under or in connection with any Environmental Law or the OCC Indemnity" to the extent those Claims constitute "actual out of pocket costs," "expenses incurred," or "costs and expenses . . . legally or contractually committed itself to expend (as evidenced by a writing between such Holder and a Government Environmental Entity or a judgment of a court of competent jurisdiction)."  Smith Decl. Ex. 3 Art. I.A.29(a).  Class 4 Environmental Claims also comprise "such other amounts as may be Allowed as a Class 4 Environmental Claim pursuant to (i) any agreement or settlement with the Debtors or (ii) order of the Bankruptcy Court."  Smith Decl. Ex. 3 Art. I.A.29(b).  As reflected in Article XI.F of the Amended Plan, following negotiations with the Debtors, the Class 4 Claims of substantially all of the Debtors' creditors were settled and allowed in the total aggregate amount of $700,688,553.32.

162.    The Class 5 Claims represent unliquidated environmental expenditures, and comprise the portion of the United States EPA Natural Resource Damages ("NRD") Trustee Claim that exceeds the allowed amount of the United States Class 4 Claim, and OCC's Class 5 Diamond Alkali Claim.  Smith Decl. Ex. 3 Art. I.A.30; Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors (the "Disclosure Statement") (Bankr. D.I. 1232) at 16-17.  The Class 5 Diamond Alkali Claims also comprise Environmental Remediation Expenses (the "reasonable and necessary fees, costs and expenses paid by a PRP for Response Work after the Effective Date of the Plan") and Environmental Restoration Expenses (the "reasonable and necessary fees, costs and expenses paid by a PRP for or NRD Trustees for Restoration Work after the Effective Date of the Plan").    Smith Decl. Ex. 3 Art. I.A.30; Environmental Response/Restoration Trust Agreement (the "ERRT Agreement") (Bankr. D.I. 1453-1) § 1.01.

163.    On the Effective Date, the Trust was formed and all of the Debtors' assets, including all of the Debtors' claims and causes of action, were transferred to the Trust.  Compl. ¶ 211; Smith Decl. Ex. 1 ¶ 211; Smith Decl. Ex. 2 ¶ 211. The Trust was also vested with the Debtors' attorney-client privilege, work-product privilege, joint interest privilege, and any other privilege or immunities attaching to the documents and communications transferred to the Trust.  Compl. ¶ 211; Smith Decl. Ex. 1 ¶ 211.  The Amended Plan contemplated that the main asset of the Trust and its creditors would be its causes of action, particularly those against YPF and Repsol.  *See* Smith Decl. Ex. 3 Art. IV(H).

164.    On June 14, 2018, the Trust filed a complaint commencing this adversary proceeding.  Bankr. D.I. 2030.

Dated: March 16, 2022

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Jason Zakia (*pro hac vice* admission pending)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (*pro hac vice* admission pending)
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
jzakia@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

*Attorneys for the Liquidating Trust*