# EXHIBIT 399
# (Filed Under Seal)

# EXHIBIT 400

# Tentative Plan for the sales of Repsol-YPF's Working Interest in Crescendo

**Background**

Crescendo is a Joint Venture Managed 50/50 by Repsol YPF and BP Amoco.
RepsolYPF owns 59% of the assets of the Crescendo and BP Amoco owns the remaining 41%.
Employees of BP Amoco and Repsol YPF are seconded to the Joint Venture
Top management positions are rotated between the two parents every three years. Currently the General Manager is seconded by Amoco

There are serious limitations to the selling of interests in the Joint Venture. Neither party can sell or transfer any interest in Crescendo to a non-affiliate prior to August 21, 2002 (five year from the formation date)

After 2002 partners can sell 100% of their interest to a single purchaser. Partners have the right of first refusal. The sale is also subject to a tag-along right. If the non-selling partner does not exercise the preferential right, then the potential purchaser must be willing to purchase the non-selling partner's interest at the same price as offered to the selling partner.

Data on the assets is jointly owned by the Partners and to show or release data outside the partnership permission must be obtained from the other partner.

The acquisition of one of the two partners enables a change of control clause that can trigger termination rights by the other partner. Termination rights include consequential damages. The right lasts one year from the change of control date.

The termination clause involves that the partner requesting dissolution splits the E&P assets in two parts representing 50% of the total value of the assets. The other partner has the choice of picking the 50% assets that he prefers to own. The majority partner will also own the difference between his share in Crescendo and the 50% he gets from the split as a minority interest in the 50% share of assets operated by the minority partners.

Upon split the majority partner will operate the G&P activities and provide the minority partner with gathering and processing services.

Original owners were YPF and Amoco.

Amoco was taken-over by BP on December 31, 1998. YPF could exert the change of control right until December 31, 1999.

YPF was taken over by Repsol on June 23rd. During the period: June 23-December31, 1999 both companies have the right to trigger the change of control clause and charge consequential damages to the other one. The right is based on the first to act - first served. Between December 31 1999 and June 23, 2000. BP Amoco will hold exclusively this right.

Upon Repsol taking over YPF a 90 day moratorium was signed between BP Amoco and YPF to preserve the rights of YPF and Repsol . During the period June 15 to September 15 BP Amoco

YPF-E-0000144546

and YPF waive their rights to trigger the change of control clause. Following the date of September 15 YPF has the sole right to enforce the change of control clause for 20 days. From October 5 to December 31 BP Amoco and Repsol YPF have equally the right with first to act first served. From January 1 to June 23, 2000 BP Amoco will be the sole owner of the right.

During the stand still period the parties intend to negotiate an amendment to the agreement. The goal of the negotiation is to permanently waive the right to dissolve Crescendo due to the Repsol and BP acquisitions and secure a greater flexibility in the partners' rights to sell their interests in Crescendo.

In addition to the above there are the following implications of Selling Crescendo.

> $ 240 MM of Maxus debt become immediately payable

> The sales may trigger a change of control relative to the severance of all Maxus employees (200 in Crescendo, 100 in Dallas, 30 in Indonesia) with a liability estimated at $ 30 MM

> Annual loss of $ 50 MM free cash flow, and $ 35 MM net Income (99 estimate)

> Potential book loss of $ 110 MM - The assets in the JV have a book value of $ 720 MM while in an high price scenario the market value is estimated at $ 600 MM

> The sale leaves the liabilities and annual losses of CLH without US assets or cash flow to support them creating a lack of tax efficiency. Leaves also significant liabilities related to Pension and Retiree Medical payments of ex Maxus employees

> The sale will leave a large unutilized tax net operating loss.

> The sale would have to be structured to minimize tax on significant US capital gains. Additionally, there is a potential impact on withholding tax when the funds coming from the sale are dividended up, which could add up to $60 million.

**Crescendo Internal Valuation**

Internally Crescendo is approximately valued at:

| HH Gas Price | WTI | NPV 12 |
|---|---|---|
| $ 2.10 | $ 15 | $ 800 MM |
| $ 2.30 | $ 19 | $ 1000 MM |

The current book value of Repsol YPF assets in Crescendo is $ 720MM

**Sale of Crescendo**

YPF-E-0000144547

It is assumed that for strategic and cash flow reasons Repsol YPF has decided to sell Crescendo and wants to divest of it as soon as possible.

In pursuing the sale, the following options need to be considered.

1) Exert the change of control clause and sell an operated asset and a minority interest in an asset operated by BP
2) Sell together with BP to a buyer
3) Sell Interest to BP
4) A combination of the above
5) Buy from BP and sell to a buyer

*Option 1*

It is anticipated that the separation of the Crescendo JV into two sets of assets operated by the initial parents will be a cumbersome and lengthy process lasting several months. The market value of the assets separated in two parts is expected to loose 15-20% versus the value of the Crescendo sold as a single asset. Using the high price scenario the cash flow derived from the sales would result in approximately

| | |
|---|---|
| Market Value: | $ 500  MM |
| Debt | $ 300 |
| Terminations Expense | $   30 |
| 1 year cash flow | $   50 |
| | |
| Net | $ 120 |

This option would also entail a write down of the assets of approximately $ 210 MM

Overall this option has the disadvantages of limited cash flow, lengthy implementation time and the write down. It has the advantage that we do not have to negotiate with BP to implement it.

BP would also see its value decreased by some $ 60 MM, therefore their strategy is to cooperate to avoid we use this option.

*Option 2*

In this options both parents sell jointly. This would create the best value for both partners.

There would a number of companies interested to purchase the whole Crescendo particularly if they could acquire the operatorship.

This options has the advantage of realizing maximum value from the market but does not have the agreement of BP Amoco

The following describes the position of BP Amoco on this subject after the YPF acquisition by Repsol

BP Amoco does not want to sell jointly to a third party

BP Amoco is against Repsol YPF selling its 59% of the assets to a third party

In particular BP Amoco is very much against Repsol selling to third parties such as Apache or Pioneer that BP Amoco seems to despise as a potential partner.

BP Amoco does not want to release any data on the assets to be shown to third parties.

BP Amoco is of the view that any effort to market Crescendo will cause a decrease of performance of the JV and damage immediately their interest.

BP Amoco does not want to see a decrease of their value in the JV by the actions taken by Repsol YPF

BP Amoco is not particularly interested to purchase Repsol YPF share of Crescendo but has expressed interest on a realignment of interests that would create value for both BP Amoco and also for Repsol YPF.

BP Amoco view is to hold a meeting with Repsol YPF to explore realignment of interest worldwide and then decide how to best deal with our intention to sell Crescendo

BP Amoco has expressed some interest to buy the full operatorship in Crescendo plus an additional 30% interest and agreeing to let us sell the remaining interest to another partner.

BP Amoco is sympathetic to the cash flow problems of Repsol YPF and is prepared to explore olutions that fit both companies. For instance they have offered to swap with the cash that Repsol owes because of the purchase of Trinidad.

*Option 3*

BP Amoco has resisted up to this stage to agree to purchase the totality of the assets of Repsol YPF in Crescendo. In general the focus of the management is not on this type of assets and before the YPF acquisition Crescendo was on the list of properties considered for divestment.

In general BP would be interested to buy at least the operatorship and step up their interest in the JV to 50-55%. After this sales is completed BP Amoco agrees to let us sell our minority interest to a third party.

In this option the issue is how to come rapidly to an agreement of the value of the operatorship and the assets to be sold to BP Amoco. And in general we would have to accept a lesser valuation that if both parties were selling jointly to the market.

*Option 4*

This option is a combination of option 3 and 4 and it would be the solution I recommend for divesting of Crescendo.

Before the Repsol acquisition of YPF, BP Amoco and YPF were strongly aligned to create a business yielding a 16% ROCE on the core of the Crescendo assets.

Overall Crescendo is a conglomerate of over 2000 leases with different contracts and different partnership agreements with 3rd parties. The JV owns 2700 wells, 75% operated and with an average working interest of 75%

CONFIDENTIAL

In the strategy to boost ROCE. The area covered by Crescendo was segmented in 5 districts and an strategy was designed to reduce the business by divesting non-core and under-performing assets to other Midgard operating companies such as Phillips, Pioneer, Apache, Sonat, Enron and others.
One of the processing plants would be part of the divestments.

It is anticipated to dispose of an estimated market value of $ 400 MM. This may entail a write down of $ 70 MM of the book value of these assets.

Working together in this strategy with BP Amoco has the advantage of getting BP Amoco and Repsol YPF to a joint sale and testing the real market value of the properties in a high price scenario.

BP Amoco has also stated that the cash flow realized by the sales of these properties could go all to Repsol YPF and could be taken in exchange of decreasing Repsol YPF interest in Crescendo

BP Amoco has further stated that they would be prepared to exchange the cash due in Trinidad with the remaining interest of YPF in Crescendo.

The sales of Repsol YPF interests in Crescendo could then be tentatively planned as follows:

    Q4 1999 - Sales of $ 200 MM of Crescendo assets to third party
    Q4 1999 - Write Down of JV assets of $ 50 MM
    Q4 1999 - Step down of JV assets to $ 935 MM
    Q4 1999 - Decrease of Repsol YPF interest to 50%
    Q4 1999 - Cash flow to Repsol of $ 200 MM
    Q1 2000 - Decrease of Repsol YPF interest to 30%
    Q1 2000 - Cash Flow to Repsol of $ 200 MM in exchange of the Q1 payment of
                 Trinidad
    Q2 2000 - Sales of $ 200 MM of Crescendo assets to third party
    Q2 2000 - Write Down of JV assets of $ 50 MM
    Q2 2000 - Termination of Repsol interest in Crescendo

It is important to indicate that the cash flow from the sales would have to be first assigned to pay off the US debt. This will have some benefits (reduction of withholding taxes and elimination of a debt that was creating non tax effective interest expense), but will reduce the net cash flow available from the sale.

It is also important to note that when Midgard pays Repsol's debt with BP generated by the Trinidad transaction, then Midgard will generate an intercompany receivable against Repsol (Repsol would own the money to Midgard instead of BP). This can create a favorable tax situation by generating interest income on the receivable in Midgard (that will be offset with accumulated tax losses) and a deductible interest expense at the Spanish level.

In conclusion over a period of nine month Repsol YPF would divest completely of the interest in Crescendo and realize the best value possible from the sales by keeping the alignment of objectives with BP Amoco and marketing the assets to dispose jointly.

CONFIDENTIAL

I believe an agreement with BP reached in the next two months along the lines above is can be reached in a two months frame and could be announced to the investors by both companies.

In order to get both companies aligned on this process an extension to October 30 to the standstill agreement  has already been agreed verbally.

CONFIDENTIAL

YPF-E-0000144551

# EXHIBIT 401

ADVERTISEMENT

SCROLL DOWN FOR CONTENT

[x] CLOSE







Click for More

SCROLL DOWN FOR CONTENT

NEWS

# TEXACO FILES FOR BANKRUPTCY

By Michael Arndt
Chicago Tribune • Apr 13, 1987 at 12:00 am



**TODAY'S TOP VIDEOS**

Top Videos: - SpaceX launches 4 astronauts for NASA

SpaceX launches 4 astronauts for NASA
General news | 1:27

Soviet 'friendship monument' taken down in Kyiv
General news | 1:11

Chicago Tribune

$24 FOR 1 YEAR
Offer ends soon

LOG IN

Elon Musk's Twitter bid raises concerns over free speech
General news | 1:25

Top Videos: - SpaceX launches 4 astronauts for NASA



SpaceX launched four astronauts to the International Space Station for NASA on Wednesday. The astronauts were due to arrive at the space station Wednesday night, 16 hours after their predawn liftoff from Kennedy Space Center. (April 27) - Source: NASA TV










House passes bill to study new Asia American museum
General news | 2:08

Zelenskyy visits Mariupol children in hospital
General news | 0:41

WH COVID coordinator: US is at an 'inflection point'
General news | 1:51

UN Nuclear Chief Visits Chernobyl Nuclear Plant

Texaco Inc., the nation`s third-largest oil company, filed for bankruptcy protection Sunday to allow it to pursue its three-year legal battle with Pennzoil Co. without posting a crippling $12 billion bond, its top executives said.

Texaco is the largest company in U.S. history to seek protection under Chapter 11 of the U.S. Bankruptcy Code. Texaco filed its petition Sunday morning in U.S. District Court in White Plains, N.Y., near its corporate headquarters.

''This was a most difficult, painful and wrenching decision,'' said James Kinnear, Texaco`s chief executive officer. ''However, we had no choice in the matter'' because of what he said was Pennzoil`s ''unreasonable'' position.

''Pennzoil has placed its own greed above any consideration of fundamental fairness or the public welfare,'' Kinnear told reporters in New York. ''Pennzoil must ultimately bear responsibility for the consequences.''

The filing came six days after the U.S. Supreme Court overturned a federal court order that allowed Texaco to post a bond of only $1 billion as it appeals paying a record multibillion-dollar award for interfering with Pennzoil`s planned purchase of Getty Oil Co.

In Texas, where the case was heard, state law requires a party appealing a civil judgment to post a bond equal to the award, which now stands at $8.53 billion plus interest.

ADVERTISEMENT



FEEDBACK



Texaco`s appeal of the bond requirement is set to be heard Monday by the Texas Court of Appeals in Houston.

Texaco has warned since the jury`s verdict in November, 1985, that it would be forced into bankruptcy if it had to pay either the bond or the judgment.

Nevertheless, Baine Kerr, Pennzoil`s retired president who represented the company in settlement negotiations with Texaco, said he was surprised because Pennzoil made an offer to Texaco on Saturday that he said Texaco could afford.

The offer was believed to be between $3 billion and $5 billion. But Texaco was said to be willing to pay only $500 million plus interest.

Joe Jamail, Pennzoil`s chief attorney in the matter, called the filing

"irresponsible" and "stupid."

Texaco Chairman Alfred DeCrane, who was with Kinnear at the New York news conference, stressed that Texaco remains solvent and noted that the bankruptcy filing does not affect most of its subsidiaries.

These include its U.S. refining, marketing, transportation and chemical units, half its U.S. exploration and production operations and all foreign companies, which together generated 96 percent of Texaco`s 1986 consolidated revenue, DeCrane said.

But it takes in Texaco Inc., a holding company that directly controls half of Texaco`s oil and gas activities in the U.S., and two finance subsidiaries, Texaco Capital Inc. and Texaco Capital N.V.

With $34.9 billion in assets, Texaco is five times as large as Penn Central Corp., which previously had been the biggest U.S. company to file for bankrupcty when it sought Chapter 11 protection in 1970.

Two other large companies that have filed for Chapter 11 protection in recent years were Manville Corp. and A.H. Robins Co. Like Texaco, both were facing huge damage payments at the time of their bankruptcies.

Filing for Chapter 11 protection prevents creditors from moving against the company while it reorganizes. Until a reorganization plan is approved, a federal bankruptcy judge or a court-appointed trustee oversees the company`s operations.

Sanford Margoshes, an analyst with Shearson Lehman Brothers Inc., New York, said Texaco`s action should buy it enough time to take its case to the U.S. Supreme Court, where, he said, the company thinks it will be vindicated. Sunday`s action also ultimately could thwart Pennzoil`s efforts to receive the multibillion-dollar judgment, he said. In bankruptcy court, Pennzoil will have to wait in line, perhaps for years, with all of Texaco`s many other unsecured creditors.

"I think what they`re doing is seeking protection not from a creditor, but from a predator," Margoshes said.

But the filing is not without costs. Texaco said it was suspending its stock dividends, and Margoshes said Texaco`s stock could fall Monday to $26 a share from its Friday close of $31.87 a share, which was down

from $38 earlier in the week.

Analysts also believe the company may have even more difficulty carrying out day-to-day operations.

Since the Supreme Court ruling last Monday, Texaco`s "financial situation has deteriorated,'' Kinnear said.

"Major suppliers have refused to deal with Texaco or have demanded cash in advance,'' he said. "Banks have refused us credit and have, in some cases, canceled existing financings.

"Texaco`s bonds have fallen sharply from their already depressed levels, and our ability to finance and operate our business in a viable manner had virtually ceased.''

According to DeCrane, Texaco`s board of directors met for seven hours Saturday and another two hours Sunday morning before concluding that filing for bankruptcy was the best step to take.

The board convened after Pennzoil`s attorneys told the Texas Court of Appeals on Friday that the Houston-based company would not accept Texaco posting less than $5.6 billion in "liquid collateral'' for the bond.

The stance was seen by analysts as designed to put more pressure on Texaco to settle the case out of court, but Kinnear called the figure

"completely unrealistic,'' adding that "it would force Texaco to dismember itself.''

Texaco`s troubles began in February, 1984, when Pennzoil sued, accusing Texaco of obstructing its plans to buy Getty Oil Co. in 1984. Texaco later acquired Getty for $10.1 billion.

In November, 1985, a Houston jury awarded Pennzoil $7.53 billion in damages and $3 billion in punitive damages.

Texaco moved to appeal the judgment, but under Texas law was required to post a bond equal to the award.

Texaco appealed the bond requirement to a U.S. District Court in White Plains.

Texaco is the eighth-largest industrial company in the United States and was founded in 1902. It has 55,000 employees and operates in 140 countries. In the oil industry, it trails only Exxon Corp. and Mobil Corp. in size.

TEXACO-PENNZOIL LEGAL DISPUTE

Jan. 3, 1984:

Pennzoil board endorses an agreement to buy 43 percent of Getty Oil, including one billion barrels of crude oil reserves, for $5.3 billion. Pennzoil claims this agreement was a binding contract.

Jan. 5, 1984:

Texaco board agrees to pursue a $10.1 billion offer for Getty.

Jan. 6-9, 1984:

Getty board votes to accept Texaco offer. Getty issues press release announcing sale to Texaco. Pennzoil learns of Getty-Texaco pact and sends telex to Getty board demanding it abide by Jan. 3 pact with Pennzoil.

Feb. 8, 1984:

Pennzoil sues Texaco in Houston, Tex., for interfering with Pennzoil-Getty pact.

July 9, 1985:







Four-and-a-half month long jury trial begins with instructions that New York laws apply. Pennzoil argues that it had a binding agreement under New York law and Texaco knowingly interfered with that pact. Texaco argues that there was no binding agreement.

Nov. 19, 1985:

Texas jury rules in favor of Pennzoil with the largest damage award in history, $10.53 billion plus interest. Of that amount, $7.53 billion represented the amount Pennzoil suffered by not acquiring Getty and $3 billion was awarded as a punishment. With interest, the total amount was about $12 billion. Texaco`s net worth at the time was $13.5 billion.

Dec. 10, 1985:

Texas State Judge Solomon Casseb enters judgment in case with jury`s damage award. In order to stay the order while the case is appealed, Texaco, under Texas law, would have had to post a bond of more than $12 billion to cover amount of judgment, interests and costs. Texaco says posting such a bond could force it into bankruptcy.

Dec. 17, 1985:

Texaco seeks injunction in federal court in New York to stop Pennzoil from taking action to enforce the Texas judgment. Texaco says the judgment violated federal law because, among other things, it prevented Texaco from effectively pursuing appeals. Court issues temporary restraining order.

Jan. 5-6, 1986:

Texaco and Pennzoil hold settlement talks to end legal dispute, but no accord is reached.

Jan. 10, 1986:

New York Federal Judge Charles Brieant rules in Texaco`s favor finding that it could be forced into bankruptcy or liquidation if it had to post the bond. The court holds that Texaco could post $1 billion instead of $12 billion bond.

Feb. 20, 1986:

U.S. Court of Appeals in New York partially upholds Brieant`s ruling. The court found the bond would violate Texaco`s right to due process of law. Court rules that Texaco may post $1 billion instead of $12 billion.

April 24, 1986:

Texaco files appeal with Texas Court of Appeals against the $10.53 billion damage award.

Feb. 12, 1987:

Texas state Court of Appeals upholds award for Pennzoil but trims judgment to $9.1 billion, including interest.

March 30, 1987:

Texaco asks Texas appeals court to reverse decision.

April 6, 1987:

U.S. Supreme Court rules against Texaco in bond case and invalidates New York federal appeals court decision lowering Texaco bond to $1 billion.

April 12, 1987:

Texaco announces iy has filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

Chicago Tribune Graphic; Source: Chicago Tribune news reports






**Roofers Tested 17 Gutter Guards… Here's What They Discovered**

LeafFilter Partner | Sponsored

**7 Mistakes Successful Retirees in Virginia Know to Avoid**

SmartAsset | Sponsored

**Avoid Grammatical Errors with This Helpful Desktop App**

Grammarly | Sponsored

**Get 60 OFF + Unlimited Languages**

Babbel | Sponsored

Sign Up

**Water Damage Restoration Pricing May Be Total Surprise**

Water Damage | Search Ads | Sponsored

**Retirement Question #1: What's A "Fiduciary"**

SmartAdvisorMatch | Sponsored

FEEDBACK

## This Is A Big Innovation In Diabetes Management

Dexcom | Sponsored



ADVERTISEMENT

ADVERTISEMENT

ADVERTISEMENT

ADVERTISEMENT

FEEDBACK





SHOP NOW

## Most Read

Chicagoan Abraham Bolden, first Black Secret Service agent
on a presidential detail, pardoned by Biden nearly 60 years
after conviction

7:30 PM





2022 Mr. and Ms. Basketball of Illinois winners: Braden Huff of
Glenbard West and Sophie Swanson of Barrington




1h







### 15-year-old Latin School student died by suicide after relentless bullying, lawsuit alleges, while school turned a 'blind eye'




April 26, 2022



ADVERTISEMENT



**Meet your new team of exp...**

SPONSORED BY UPWORK

## You May Like

Sponsored Links by Taboola

**Here's The Average Price Of A Gutter Protection**

LeafFilter Partner

Search Now

**Unbelievable New Buick Lineup Has Arrived**

Luxury SUV Savings

Learn More

**" I know these shoes will last for years." - Tom - Now 70% Off!**

horuste

Shop Now

**They're Like Walking On Clouds - Now 70% Off!**

Antoniglobal

Shop Now

FEEDBACK

ADVERTISEMENT





Copyright © 2021, Chicago Tribune

SUBSCRIBE NOW
Get full access

# EXHIBIT 402

# MAXUS ENERGY CORPORATION

## Facsimile Cover Sheet

|  |  |
|---|---|
| **To:** | Alicia Benitez |
| **Company:** | |
| **Phone:** | |
| **Fax:** | 011-541-326-8259 |
| | |
| **From:** | Anne Fitzgerald |
| | |
| **Phone:** | 214-953-2855 |
| **Fax:** | 214-979-1223 |
| | |
| **Date:** | 9/21/98 |

Dear Alicia:

Re:    Gulf of Mexico
         Underwriting Information

Attached is information from the 5-year plan regarding activity for the Gulf of Mexico.

Thanks.

*Anne Fitzgerald*

Anne Fitzgerald
Insurance Administrator

*No es lo q' necesitamos -
le pedí a Anne mayores
especificaciones -   A 21.9.98*

YPF 0126684
CONFIDENTIAL

PAGE 2

2148791223

FILE No. 050 09-21 '98 08:02 ID:YPF-MAXUS-USA



# GULF OF MEXICO
# MANAGEMENT SUMMARY
# 1999- 2003 FIVE YEAR PLAN

## I - BRIEF DESCRIPTION OF ASSET-

### Geography
Offshore U.S. Blocks (3 sq. miles) in the Gulf of Mexico are available for minerals exploration and extraction in the U.S. Exclusive Economic Zone. Blocks are administrated by the Minerals Management Service of the U.S. federal government.

### Geology
The GOM is one of the most prolific oil & gas producing basins in the world. Deltaic and deep water deposits provide excellent potential reservoirs.   Active salt and shale diapiric activity as well as active gravity tectonics provide many potential traps.

### History
The first offshore wells were drilled in the offshore GOM over 50 years ago. It is still a major play with high potential. Maxus has over 20 years of experience in this Basin. The deep water play is relatively new due to technological advances in deepwater production technology and strategies.

### Politics
Stable government with accessible Markets for either oil or gas or both.

### Role in YPF International
Opportunity to position YPF as an offshore Producer with significant reserves at acceptable F&D costs.

### Partners and WI %
Maxus USA has 100% WI in 6 blocks. Various partners in 7 other blocks with WI varying from 16% to 50%.
There are no Work Commitments on these blocks, however, most blocks will need a well to be drilled on them to preserve block beyond the initial five year term.

## II - ASSET OBJECTIVES-

**Haymaker (50%)**

| | |
|---|---|
| Reserve size: | 168.08 MMBOE |
| Expl. Drilling cost: | 17.4 MM$ |
| Delineation cost: | 28.9 MM$ |
| Dev. well cost: | 125  MM$ |
| TD: | 13,500 ft. |
| Spud date: | July 1, 2000 |
| TD date: | October 1, 2000 |
| # wells: | 14 |

**Dragonslayer (50%)**

| | |
|---|---|
| Reserve size: | 201.19 MMBOE |
| Expl. Drilling cost: | 17.5 MM$ |
| Delineation cost: | 33   MM$ |
| Dev. well cost: | 144.6 MM$ |
| TD: | 15,600 ft |
| Spud date: | January 1, 1999. |
| TD date: | April 1, 1999. |
| # wells: | 13 |

YPF 0126686
CONFIDENTIAL

**Black Diamond (50%)**

| | |
|---|---|
| Reserve size: | 119.71 MMBOE |
| Expl. Drilling cost: | 16.5 MM$ |
| Delineation cost: | 18   MM$ |
| Dev. well cost: | 56.4 MM$ |
| TD: | 11.15 ft |
| Spud date: | April 1, 2001. |
| TD date: | July 1, 2001. |
| # wells: | 6 |

**Stormy Monday (33%)**

| | |
|---|---|
| Reserve size: | 121.82 MMBOE |
| Expl. Drilling cost: | 17.5 MM$ |
| Delineation cost: | 31   MM$ |
| Dev. well cost: | 74   MM$ |
| TD: | 12,000 ft |
| Spud date: | October 1, 2001. |
| TD date: | January 1, 2002. |
| # wells: | 8 |

**Dassai (33%)**

| | |
|---|---|
| Reserve size: | 120.94 MMBOE |
| Expl. Drilling cost: | 8.6 MM$ |
| Delineation cost: | 17  MM$ |
| Dev. well cost: | 83.5 MM$ |
| TD: | 14,500 ft |
| Spud date: | April 1, 1999. |
| TD date: | July 1, 1999. |
| # wells: | 10 |

**Sledgehammer (50%)**

| | |
|---|---|
| Reserve size: | 93.17 MMBOE |
| Expl. Drilling cost: | 9.0 MM$ |
| Delineation cost: | 12  MM$ |
| Dev. well cost: | 24  MM$ |
| TD: | 14,000 ft |
| Spud date: | July 1, 2002. |
| TD date: | October 1, 2002. |
| # wells: | 4 |

**Mohegan (35%)**

| | |
|---|---|
| Reserve size: | 194.34 MMBOE |
| Expl. Drilling cost: | 13.5 MM$ |
| Delineation cost: | 12.3 MM$ |
| Dev. well cost: | 73.5 MM$ |
| TD: | 17,500 ft |
| Spud date: | January 1, 2000. |
| TD date: | April 1, 2000. |
| # wells: | 8 |

## III - ASSET STRATEGIES-

1. Opportunity to position YPF as an exploration participant throughout the world with experienced E & P staff in deepwater environments.
2. Make strategic alliances with various companies to share the exploration risks and costs of development by reducing WI % to ½ of our current positions.

YPF 0126687
CONFIDENTIAL

3. Make strategic alliances with other E&P companies or service providers to participate in the newly developed offshore production technologies.
4. Develop a stand alone business unit.

## IV - ASSET EXPLORATORY DRILLING

The average field size for our current Prospect portfolio is: 137 MMBOE. They vary from 93 - 194 MMBOE.

Economic risk is predominantly the presence of commercial hydrocarbons and also varies in relation to technological developments.

The reason for being here is the excellent seismic data available in a known productive Basin with world class reservoirs and potentially significant reserves.

Structural and stratigraphic, deepwater play.

## V - OTHER MAJOR ASSET PROJECTS

1) Much of the new technology being developed in the World for E&P is first developed, used, and generally available in the GOM exploration arena. YPF will have early access to these technological developments by participating in this play.
2) With participant in this Deepwater exploration arena, YPF International Upstream - Maxus positions itself for participation in other Deepwater exploration opportunities in the world such as: Offshore W. Africa, Offshore Australia, and Offshore North and East Kalimantan (Indonesia/Malaysia)
3) Opportunities for acquisitions of Producing Assets also exist. These would generally have both exploration and development projects available.

YPF 0126688
CONFIDENTIAL

FILE No. 050 09/21 '98 08:04 ID:YPF-MAXUS-USA

2149791223

PAGE 6

MANAGEMENT SUMMARY 1999 - 2000 FIVE YEAR PLAN

# DEEP WATER GULF OF MEXICO



| Activity | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | | 2005 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| **Dragonslayer Prospect** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| G&G Acq. & Eval. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Exploratory Well | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Delineation Well #1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Delineation Well #2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Design & Fab. TLP or SPAR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pipeline | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Development Wells | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Mohegan Prospect** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| G&G Acq. & Eval. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Exploratory Well | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Delineation Well #1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Design & Fab. Comp. Tower | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pipeline | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Development Wells | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Haymaker Prospect** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| G&G Acq. & Eval. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Exploratory Well | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Delineation Well #1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Delineation Well #2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Design & Fab. TLP or SPAR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pipeline | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Development Wells | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Dassal Prospect** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| G&G Acq. & Eval. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Exploratory Well | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Delineation Well #1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Facilities | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pipeline | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Drill Development Wells | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

YPF 0126689
CONFIDENTIAL

# DEEP WATER GULF OF MEXICO



FILE No. 050 09/21 '98 08:06 ID:YPF-MAXUS-USA                    214979223                    PAGE 7

YPF 0126690
CONFIDENTIAL

# EXHIBIT 403

October 19, 1998

To: Crescendo Board of Governors
From: Crescendo Management Team

## Do We All Have the Same Vision and Expectations for Crescendo?
file: c:\data\winword\questbog.doc

Crescendo is just about a year old now. We have made progress and we have had disappointments. As we move forward it is important that Crescendo Management is in alignment with the desires of both of its owners. While we have talked about our ten year plan at a recent Board meeting the discussions are at a high level, sometimes are rushed, something's go unsaid and occasionally we will only hear what we want to hear. In an attempt to get any issues on the table I would ask that you complete the following questionnaire and return it to me by August 19. Each Board member may wish to complete a questionnaire or 1 questionnaire per company would also be appropriate. We will forward the responses to everyone prior to the August 24th Board meeting and discuss any differences at that time.

1. **Looking backwards from the year 2003, what would Crescendo have had to accomplish for you to consider it successful?**

   **Maxus:**
   Short term: better profitability and ROCE for each one of the partners, than what was produced by the assets stand-alone before the joint venture formation. The "profitability" has to be price normalized for this comparison.

   Longer term: better creation of value than what each individual partner would have created. 20% ROCE in a price environment with WTI @ $ 17/B and gas prices of 2.10/MCF

   **Amoco:**
   In 2003, Crescendo will be viewed as a success if;
   - the competition views it as savvy, shrewd, and the pre-eminent player in the Texas/Oklahoma Panhandle, and a threat to be reckoned with
   - it is viewed best in class for the last three years in all E&P cost categories
   - it is the low cost gatherer and processor
   - it has grown natural gas and NGL production over 1997 levels by over 15% and 20%, respectively
     it consistently generates in excess of 16 percent returns

   **Crescendo Comments:**
   I think we all agree that Crescendo needs to perform better than either parent company could have performed on their own and we should be the strongest competitor in the panhandle. *We need to work together more cooperatively to make this a reality.*

CONFIDENTIAL

*We must find a way to grow our production volumes and our drilling cost reduction effort is focused on achieving that objective.*

*We need to discuss in detail the expectations for generating a 16 or 20% return for Crescendo.* When you look at the basis on which Crescendo's Fair Market Value was established a Return on Assets of 16% appears unlikely in the short term and is only achieveable in the long term with product price growth. Our 10 year plan is an aggressive plan and with constant product prices we never achieve a ROA of 16%! (Note: The billion plus worth of assets that make up Crescendo were based on a 12% discount factor, an aggressive price forecast, no overhead, 100% for PUD's, 75% for probables and 50% for possibles.) With such a large base so aggressively valued at 12%, getting above that number is difficult in the short term. *Clearly all incremental investments will be above the 16% threshold.*

2.  **What role do you see the Board playing in Crescendo?  Have our meetings thus far addressed that role or what changes do you suggest?**

**Maxus:**
Review and approve strategic plan
Approve 5 year and 1 year plan
Approve yearly capital spending
Review and approve objectives of management and performance

So far, meetings have addressed that role except that quality of operating/financial reports has not permitted a good analysis of performance a clear forecast . This needs to be addressed with priority

**Amoco:**
The Board of Governors (BOG) is primarily a strategic direction setting and oversight group, with responsibility for approval and decision making over certain significant or unusual issues.  The BOG will play a critical role in assisting Crescendo in establishing its longer term strategic plan.  It is also responsible for ensuring strong internal controls are in place and for succession planning.  The BOG will periodically review the progress of Crescendo in meeting its stated objectives and goals, reviewing its performance, and will intervene if a significant deviation from plan is developing.  The BOG will approve the annual budget and business plan, as well as any significant transactions as outlined in the LLC Agreement.  Crescendo's management team is responsible for working with the BOG in developing long range plans, successfully implementing the approved business plan, and managing day-to-day operations.

The Board meetings have generally been addressing the needs of the NAMDs.

**Crescendo Comments:**
There appears to be a lot of agreement here.  Our Board meetings have been focused on strategy plans and objectives and reviewing results to date.

CONFIDENTIAL

MAXUS3209038

*We need to understand better the "poor quality of our financial reports." What are we not providing?*

We have started an internal control audit.

*Is there a concern that we are not doing succession planning?*

3. **Our overall focus or mission is to economically grow net income over the long term. Sometimes we are faced with decisions that negatively impact net income in the short term (i.e. one year) but can have a positive impact on net income and return on assets over the long term. From your perspective which takes priority, short term net income or long term net income and return on assets?**

**Maxus:**
Needs to show improvements in the short term profitability and return on capital employed before some emphasis is shifted to long term. We expect the JV to evolve gradually to the expected long term ROCE.

**Amoco:**
Long term value over short term net income is a trade-off every business must address. Crescendo has a role to play within Amoco's overall portfolio of businesses. The performance and requirements of other Amoco businesses can and do impact Crescendo. As Amoco adjusts it portfolio, the emphasis on Crescendo's short and long term net income may vary. Currently, Crescendo is viewed as a low risk business, with a high degree of predictability around net income (normalized for price). That said, it appears Crescendo is over emphasizing long term net income at the expense of near term results. This is unacceptable. Crescendo needs to show greater commitment to meeting or exceeding its annual budget. To this end, Crescendo must place increased emphasis on forecasting aggressive, but realistic targets, and meeting these targets.

**Crescendo Comments:**
There is unanimous agreement that short term results must improve. Crescendo is currently very focused on achieving that objective. *The original expectations established for Crescendo are not going to be achieved unless something unforeseen happens. From our perspective we are more focused on the short term than the long term which is contrary to statements above.*

4. **In order to grow net income we must continue to economically find and develop significant reserves each and every year. Our portfolio of economic low risk infill wells is decreasing. This requires us to drill riskier wells although the risked economics are more attractive than the lower risk investment opportunities. (Ps between 30 and 70% vs. 80 and 95%) Are you in agreement**

**that that is the direction we should to take?  If not what direction do you suggest?**

**Maxus:**
This is OK provided we meet the short term profitability goals and the riskier wells do not reduce the short term profitability. The planned cash flow has to be met. Value has to increase in a balanced way through growth of the net income and growth of reserves.

Acquisition of producing properties that still have lower risk drilling opportunities (infill or close-in exploration) can help balance the portfolio.
May have to take partners/reduce W.I. on high risk wells and drill more of them to yield "predictable" results.
Should focus some effort to solicit 3rd party prospects as supplement to our in-house generated exploration portfolio.

**Amoco:**
One of the challenges Crescendo faces is to grow production and net income while generating returns in excess of 16%. Amoco does not view Crescendo as a high risk entity. The area in which the JV operates is mature and well understood. While a portion of the drilling portfolio will consist of higher risk opportunities, the vast majority should be low to slightly moderate risk. At no time should a significant portion of the drilling portfolio be high risk. There are several other areas besides high risk drilling where Crescendo has opportunities to create value. It is not clear that Crescendo has fully utilize a rigorous risk assessment process. Cost reductions opportunities related to efficiencies and improved processes in other areas of the business are still apparent. Crescendo must be ruthless and creative in controlling and reducing costs. Cost management options should include continued partnering with suppliers and better utilization of alliances.

**Crescendo Comments:**
It is not clear if we are all on the same page on this issue or not. *Everyone agrees that we should not be drilling a high risk portfolio but that probably means different things to different people. We are currently targeting in the range of 20% of our spending towards the higher risk plays. It is important to remember that in most cases a riskier prospect is supported by a low risk "bail out zone" that gives us at least some payout on our investment. Drilling 150 wells per year with less than 10 dry holes is a pretty low risk over all program in our opinion.*

We believe we have a good post appraisal process; we are conducting our second portfolio risk review in November; we are seeking partners on our riskier plays; we are looking at third party prospects; and we are moving forward very aggressively with alliances.

MAXUS3209040

*As of yet we do not have a good acquisition strategy and process in place and this is discussed in more detail below.*

5. **We see acquisitions of producing properties as a critical part of our development portfolio. Economies of scale in operations, technical expertise, development of low risk reserves and deeper exploration potential are the value additions expected from this activity. Do you agree? Are there any "sideboards" or guidelines you wish to express concerning our tact in this activity?**

### Maxus:
We support acquisitions as a vehicle of profitable growth leading to the 20% ROCE. The acquisitions should meet the ROCE standard within the next five years and should trigger an immediate improvement of current ROCE.

Acquisition effort needs to be very focused or can result in much wasted effort. This requires sticking to properties where Crescendo has clear competitive advantage over other prospective purchasers. Should also pursue privately negotiated deals more than auctions. Acquisitions where both producing properties and gathering/processing are available can offer an advantage of reduced competition. Many firms are interested in only one sector.

### Amoco:
Amoco does not view large scale producing property acquisitions as critical to Crescendo's success. Individual property acquisitions below $1 MM or in annual aggregate below $5 MM, and consistent with the annual business plan are within the scope of the strategy. Acquisitions over these levels will be considered on a case-by-case basis and require approval by the Board of Governors. Cost associated with chasing, capturing, and setting up large scale producing property acquisitions are outside the scope of the existing JV Agreements and would be borne by the Partnership. There is significant concern in Amoco that Crescendo does not have the skill set to effectively carry out a large scale producing property acquisition. If developed, this skill set would at a minimum duplicate a competency already possessed by Amoco and at a maximum be very cost ineffective because the frequency of use is unknown. Amoco suggests that Crescendo develop a recommendation on how an efficient and cost effective process can be developed for both small and large scale producing property acquisitions.

### Crescendo Comments:
*It is clear this topic needs some discussion at the our next Board meeting.* We all agree we need to be selective on which acquisitions to pursue. There is not agreement on the importance of acquisitions, who performs and who pays for the evaluations and a clear strategy and approval process has not been established.

6. **We see a combined E&P and G&P business in the Texas Panhandle as a competitive advantage. Do you? If not, what do you suggest we do? If yes do**

MAXUS3209041

you see the advantage to be strong enough to merit acquisitions of gathering assets that are intended to support future E&P activity?

**Maxus:**
A combined business should offer a competitive advantage provided it creates value in all of its segments. In the G&P business we should be first as in the E&P business. An Integrated E&P and G&P should offer the benefits of reducing the risks associated to price volatility.

E&P and G&P capacity should be balanced. Third party mix in the G&P should be optimized. Contract with third parties have to be structured to eliminate the risk of volatility in the differential between gas and NGL prices. Third party gas purchases need to be additive of value regardless of gas/NGL price relationship.

All gathering acquisitions should integrate with and support our E&P activity - either current or future.

**Amoco:**
Crescendo holds a strong position in the Texas Panhandle partly due to significant participation in the value chain from the wellhead to plant tailgate. Amoco is supportive of Crescendo further consolidating its respective positions in the value chain and will consider synergistic gathering asset acquisitions. However, there is not a lot of appetite for acquisition of gathering systems that are not integral to Crescendo exploration and production activities.

**Crescendo Comments:**
We all agree that there is value added in being involved in both the E&P and G&P business and that we do not want to be in the G&P business where we are not in the E&P business. *We are exploring different ways to capture the value from the G&P business and understanding where we can be the best and where we can't. Trades and working with some of our competitors to find operating efficiencies is our current focus. Acquisitions are generally quite small. Any large ones will obviously be brought to the attention of the Board first.*

7. **What financial and operational measures are most important to you in determining Crescendo's success? Please prioritize if you have more than a couple.**

**Maxus:**

| Financial | Operational |
|---|---|
| Net Income, | Production growth with low operating expense |
| ROCE | Reserve growth at attractive F/D costs |
| Value Creation | |

MAXUS3209042

We need to lead benchmarking with competitors with lowest costs, efficiency, productivity indicators.

**Amoco:**
Key Operating and financial measures:
- safety
- net income
- cash flow
- ROCE
- natural gas and NGL production
- operating cost/mmbtu (E&P and G&P) relative to competition
- finding and developing cost/reserve addition relative to competition
  general and administrative cost/mmbtu relative to competition

**Crescendo Comments:**
Looks like total agreement on the measures of success. Needs to be both on an absolute basis and also on a relative basis with the competition. Net income; ROCE; safety; find, develop and operate growing production volumes through low cost leadership which all leads to value creation.

8. **What are the 5 most important items that you think Crescendo needs to accomplish in the next 2 years?**

**Maxus:**
Planned Net Income
Planned ROCE
Planned Production Growth
Solid profitability of G&P business in a "negative" price environment
Optimal risk-reward portfolio

Reliable operating/financial reports from Shared Services organization need to be demanded by Crescendo management.

Arrive at definitive answer as to applicability of 3-D seismic -- if "yes" develop a plan to exploit this competitive advantage.
Successful start-up of Hemphill Plant, balancing of load between 2 plants [next 6 months].
Complete automation project
"Take-out" smaller G&P competitors now as window of opportunity maybe short.

**Amoco:**
Five key accomplishments in the next two years:
- low cost operator as compared to external benchmarking (complete well automation)

MAXUS3209043

- meet production growth targets
- rationalize portfolio of properties and contracts
- resolve O&S issues (put right drivers in place to help manage costs)
- exceed return on capital targets

**Crescendo Comments:**
We all agree on the need to deliver the financial results although we all may have different target levels as discussed above. We need to be real clear about expectations for 1999. Benchmarking efforts are being done with some completed and some still underway. *Need to quantify what is meant by "exceed return on capital targets".*

*The O&S fee needs to be resolved and a process is in place to do that. The parents opposite view points on this item is a real distraction for Crescendo employees.*

*We are drilling our first 3D wells and we should know within 6 months if this can be made into a competitive advantage tool.*

Automation project is being accelerated as well as implementation of its use.

Two plants will be optimized by year end.

*We have tried and continue to try to preemptively acquire some competitively disadvantaged G&P assets but our success has been poor indicating this may not be much of a window.*

9. **What are your 3 biggest concerns standing in the way of Crescendo being successful?**

**Maxus:**
Stagnant production
Quality of accounting services
Low profitability YTD

**Amoco:**
Three impediments to Crescendo being successful:
- Lack of communication between the owners
- Disputes around and lack of cost reduction drivers in the O&S Agreement
- Inability of Crescendo to forecast accurately and meet its targets

**Crescendo Comments:**
Our inability to grow our production volumes is a big issue. We are addressing this through our drilling cost reduction effort.

There has been frustration with our accounting services earlier this year and in some instances it still exists because of fixes that will not be made until we shift to SAP in

CONFIDENTIAL

April. A lot of the frustration with the accounting system is our own lack of familiarity with it, priority differences and occassional unilateral decisions. We need to understand better the "quality issue."

*Crescendo's ability to predict accurately is poor and continues to be less than adequate. We lack baselines to use as validity checks because of the young age of the company and the confusion that still exists about the asset values of contributed properties, expenses and who pays and the predictability of some of our newer reservoirs.*

*One of Crescendo's concerns is that our parents don't have a common mind set and set of objectives which creates some difficult situations for us.*

10. **What are we not doing today that you would like to see us do?**

**Maxus:**
Increase Focus on the results vs. plan, execute improvements. Make sure the employee do know we are not doing good.

**Amoco:**
What is Crescendo doing or not doing that Amoco would like to see?
- Crescendo has shown it understands and is in touch with its business
- Crescendo has progressed nicely towards a cultural transformation of empowerment
- The management team has done a good job of assimilating the organization
- The leadership team has been proactive in supporting Y2K and SAP
- Crescendo must build on its knowledge of the business to identify creative ways to manage costs or take advantage of opportunities
- Crescendo has not performed a reserve audit

**Crescendo Comments:**
We are very focused on improving the results and it clear we have not demonstrated any success yet. We will. Our employees clearly understand things are not going well. Costs are coming out of the system and it will be evident during the 4th quarter.

A reserve audit is set for November 5th.

11. **Are there other comments you wish to share with us?**

**Maxus:**
Overall the JV has been successful in getting together people from two different corporations . It has however not shown the profitability (cost reduction, efficiency, productivity increases) improvements expected.

MAXUS3209045

**Amoco:**
- Concern that Crescendo's reserve booking practices are overly aggressive.
- Is Crescendo optimizing its near term net income opportunities by funding all rate acceleration projects?
- Must demonstrate increased urgency in achieving best in class cost performance by fully utilizing creative alliances and supply partnerships.
- Emphasize importance of delivering on the Business Plan and other commitments.
- Be more proactive in planning and capturing increased value of the G&P assets.

**Crescendo Comments:**
Most of the items mentioned in the parents response to this question have been discussed above. *We believe we have made significant cost reductions although some of them have just been in effect the last month or two. What efficiency, productivity increases were expected that we are not delivering on? (besides of course gas production)* We are funding projects that give us the best economics and biggest production volumes in the short term including rate accleration projects. We are very deligently working on delivering what we say we will deliver. *What do you see us doing to be "more proactive in planning and capturing increased value of the G&P assets?"*

CONFIDENTIAL

MAXUS3209046