# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | ) | |
| | ) | Case No. 16-11501 (CSS) |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |
| | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) | Case No. 18-50489 (CSS) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) | |
| REPSOL, S.A., REPSOL EXPLORACIÓN, | ) | |
| S.A., REPSOL USA HOLDINGS CORP., | ) | |
| REPSOL E&P USA, INC., REPSOL | ) | |
| OFFSHORE E&P USA, INC., REPSOL E&P | ) | |
| T&T LIMITED, and REPSOL SERVICES CO., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO REPSOL
DEFENDANTS' AFFIRMATIVE STATEMENT OF
UNDISPUTED MATERIAL FACTS**

Dated: May 18, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas

New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

The Trust, operating under limited time, has categorized the submitted facts below for the convenience of the Court. The Trust concurs that the green highlighted facts are undisputed in this proceeding and the Court should determine the submitted facts are undisputed findings accordingly. The Trust submits that the yellow highlighted facts are not material and/or irrelevant to any issues relating to the adversary proceeding. Given that these facts have no bearing on any issues relevant to the proceeding, the Trust does not admit or dispute them, and further submits that the Court should not make any findings relating to these facts. The Trust has highlighted in red relevant facts that are in dispute. The Trust submits that these disputed facts, while being potentially relevant to Repsol's Motion for Partial Summary Judgment, have no bearing on the facts necessary to prove the Trust's Motion for Partial Summary Judgment and the Court can still grant Summary Judgment in favor of the Trust notwithstanding the disputed facts.

## GENERAL OBJECTIONS

The following general objections ("General Objections") apply to each paragraph of the Repsol Defendants' statement of facts, and shall have the same force and effect as if fully set forth in the response to each individual paragraph. To the extent the Trust responds to a paragraph, the Trust reserves all objections as to relevance, privilege, and admissibility, as well as to any and all other objections on any ground that would require or permit the exclusion of a fact in the paragraph, if that fact were offered into evidence. The Trust notes that the Repsol Defendants' "Counter Statement of Undisputed Material Facts" overlaps in material respects with the Repsol Defendants' "Affirmative Statement of Undisputed Material Facts," and specifies that to the extent there is any inconsistency between the Trust's responses to the Repsol Defendants' two statements, the responses to the "Counter Statement of Undisputed Material Facts" control.

The Trust object as follows:

1.    The Trust objects to the Repsol Defendants' submission as being beyond the scope of the applicable rules of this Court and contrary to the spirit in which the Trust submitted its own statement. By responding, the Trust does not concede that Repsol is permitted to utilize an "affirmative statement of undisputed material facts" to satisfy its evidentiary burdens, or that the Trust's responses herein in any way limit its ability to rely on any fact or argument in connection with any pending motion or at trial.

2.    The Trust objects to any emphasis added or characterizations of documents cited to in each paragraph.  To the extent the Repsol Defendants are relying on a document, the document speaks for itself.

3.    To the extent the Trust does not dispute a statement of fact, the Trust is not admitting to the admissibility, veracity, submitting that the particular document or testimony is evidence of the purported fact, or ascribing any meaning or definition to the document or testimony cited as evidence for the purported fact. The Trust reserves the right to challenge the admissibility of any document, statement or testimony cited, on any grounds, including but not limited to, hearsay or the doctrine of completeness.

4.    To the extent the Trust does not dispute a statement of fact, the Trust is not admitting the Repsol Defendants have properly and accurately cited such statements.  Where a citation is incorrect, the Trust has endeavored to note this below.

5.    Where the Trust objects to a paragraph as non-material or irrelevant, the Trust is

2

not admitting or disputing the facts set forth therein.

6.   The Trust objects to any paragraph that characterizes or ascribes meaning to a document, deposition testimony, or expert testimony (including expert reports). The testimony and expert reports speak for themselves.  To the extent the Trust does not dispute a statement of fact citing a document, deposition testimony, or expert testimony, the Trust is not admitting to the characterization or summary of the cited evidence.

7.   To the extent the Repsol Defendants cite to, summarize, or rely on a document, the Trust submits that the document speaks for itself and the Court should review the entire document for completeness.  The Trust reserves its right to object to any characterization or summary of a document on the basis for a completeness.

8.   To the extent the Trust does not dispute any statement of Defendants' experts, the Trust does not concede that the expert is otherwise qualified to testify or that the associated report is wholly admissible.

9.   To the extent any facts submitted by the Repsol Defendants in their Affirmative Statement of Facts ("Repsol's SOF") contradict facts submitted by the Trust's Statement of Undisputed Facts, the Trust submits that those facts are in dispute.

10.  To the extent the Trust submits that a fact is not material and/or irrelevant, the Trust is not admitting nor disputing the veracity of the submitted fact.

11.  Where the Trust disputes or does not dispute a material of fact, the Trust is only providing sufficient evidence to demonstrate that there is a genuine issue of material fact and not providing an exhaustive set of counter-facts or evidence.

3

The Trust reserves the right at trial to dispute any of the proposed facts using all available facts and admissible evidence.

12. To the extent the Trust responds to a statement that includes footnotes, the Trust's response to the footnote should be understood to be the same as the Trust's response to the body of the associated text.

13. The Trust objects to the use by the Repsol Defendants of documents, expert reports, or testimony that are not admissible, particularly that are not admissions of the debtors, offered without proper foundation or a sponsoring witness with personal knowledge.

14. The Trust objects to the use, by the Repsol Defendants, of expert testimony offered by the Defendants' expert witnesses on any issue as to which Defendants bear the burden of proof, as Defendants' experts did not submit reports by the deadline set in the Scheduling Order for expert reports on issues as to which a party bears the burden of proof. See Letter Opinion dated February 22, 2022 [D.I. 607].

15. The Trust objects to the Repsol Defendants' citation of their own corporate representative testimony as the basis for a fact. The Repsol Defendants' cannot rely on testimony from their corporate representative as it is inadmissible hearsay. The Repsol Defendants' repeatedly cite to testimony of a corporate representative who has no personal knowledge of the submitted facts. The Trust objects that testimony outside the witness's personal knowledge is only admissible as a party admission under FRE 801(d).

16. The Trust objects to the Repsol Defendants' reliance and citations to expert

reports to prove the truth of facts for purposes of summary judgment without offering the Court the underlying evidence relied upon by such experts or the context in which they offered their opinions.

17.    The Trust objects to the Repsol Defendants' use of previously withheld privileged material to serve as evidence for their submitted facts while still maintaining privilege over documents concerning the same subject matter.  To the extent the Trust was not provided with sufficient evidence to dispute the submitted fact on the basis of privilege, the Trust submits that the Court draw an adverse inference from Repsol's failure to produce the relevant documents.  In the event the Court does not draw an adverse inference, the Trust reserves the right to demand production of the withheld privileged materials and revise these responses accordingly.

18.    To the extent the Repsol Defendants assert that any particular fact as to which the Trust has identified, in a pleading or otherwise on notice to Defendants, any dispute, or, to the extent any assertion of fact submitted by the Repsol Defends contradicts any assertion of fact by the Trust, the Trust objects to the Repsol Defendants' assertion that any such fact is undisputed.

19.    The Trust objects to any of the Repsol Defendants' submitted facts to the extent they are argumentative or assert legal conclusions.

20.    The Trust objects to Repol Defendants' reliance on the NJ Litigation Summary Judgment Orders.  *See* Repsol's SOF ¶ 18, 169.  These Orders have been vacated and are not binding on this or any Court.  *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).  The Trust submits that these

Orders are therefore irrelevant and cannot constitute the basis for any undisputed facts.

21. The Trust construes the headings in Repsol's "Affirmative Statement of Undipsuted Material Facts" as organizational in nature, and does not understand that such headings set forth factual allegations that require response, denial or objection.

## I.    The Parties

1.    Repsol, S.A. is a Spanish corporation, headquartered in Madrid, Spain. *See* Declaration of Edward Soto ("**Soto Decl.**"), filed contemporaneously herewith, at Exhibit 1 (Repsol, S.A. Schedule 13D, dated Nov. 8, 2012, at Schedule A).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 1.

2.    Repsol Exploración, S.A., a wholly-owned subsidiary of Repsol, S.A., is a corporation formed under the laws of Spain and has maintained its principal place of business in Madrid, Spain. MLT Statement of Facts [Adv. D.I. 623] ¶ 14.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 2.

3.    Repsol USA Holdings Corporation is a United States subsidiary of Repsol, S.A. MLT Statement of Facts ¶ 15. Repsol USA Holdings Corporation has its principal place of business in Texas. Compl. ¶ 30. From 1999 to 2012 (the "**Repsol YPF Period**"), Repsol USA Holdings Corporation was domiciled at 2001 Timberloch Pl., Suite 3000, The Woodlands, Texas, 77381. *E.g.*, Soto Decl. Ex. 4 (Dec. 30, 2010 Repsol Offshore E&P USA Inc. Unanimous Written Consent of the Board of Directors, REPSOL-E-0000000689 – REPSOL-E-0000000695, at

REPSOL-E-0000000691). Repsol USA Holdings Corporation was incorporated in Delaware. *Id.*

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 3.

    4.    Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and Repsol Services Company ("**RSC**") are all wholly-owned subsidiaries of Repsol USA Holdings Corporation, incorporated in Delaware, with their principal places of business in Texas. MLT Statement of Facts ¶ 16. During the Repsol YPF Period, Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and RSC were domiciled at 2001 Timberloch Pl., Suite 3000, The Woodlands, Texas, 77381. *E.g.*, Soto Decl. Ex. 4 (Dec. 30, 2010 Repsol Offshore E&P USA Inc. Unanimous Written Consent of the Board of Directors, REPSOL-E-0000000689 – REPSOL-E-0000000695, at REPSOL-E-0000000691); Soto Decl. Ex. 5 (Mar. 1, 2007, Services Agreement, REPSOL0013272 – REPSOL0013286, at REPSOL0013276).

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 4.

    5.    Repsol E&P T&T Limited ("**Repsol E&P T&T**")[1] was a subsidiary of Repsol, S.A. until 2016. Soto Decl. Ex. 6 (Oct. 20, 2021, Pablo Blanco Corp. Rep. Dep. ("**Repsol Corp. Rep. Dep.**") at 34:25-35:3). During the Repsol YPF Period, Repsol E&P T&T was domiciled at #4 Queen's Park West, Port of Spain, Trinidad and Tobago. *E.g.*, Soto Decl. Ex. 5 (Mar. 1, 2007, Services Agreement, REPSOL0013272 – REPSOL0013286, at REPSOL0013276). It is no longer an affiliate of Repsol. Repsol E&P T&T was incorporated under the laws of Trinidad and Tobago. *Id.*

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 5.

---

[1] "Repsol," as used herein, refers to the aforementioned Repsol entities, collectively.

6.      YPF Sociedad Anonima ("**YPF**") was incorporated on June 2, 1977 under the laws of the Republic of Argentina as a governmental entity. *See* Soto Decl. Ex. 58 (YPF 1999 Form 20-F at p. 7). YPF maintains in headquarters in Argentina. Compl. ¶ 25; YPF Defendants' Answer and Affirmative Defenses to the Complaint [Adv. D.I. 140] ("Answer") ¶ 25.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 6.

7.      YPF Holdings, Inc. ("**YPFH**") is a Delaware corporation and subsidiary of YPF. Compl. ¶ 24.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 7.

8.      YPF International, S.A. ("**YPFI**"), a holding company formed under Bolivian law, is a subsidiary of YPF with its principal place of business in Bolivia. Compl. ¶ 26; MLT Statement of Facts ¶ 92.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 8.

9.      CLH Holdings, Inc. ("**CLHH**") is a formerly-active subsidiary of YPFH. Compl. ¶ 27.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 9.

10.      Maxus Energy Corporation ("**Maxus**"), a Delaware corporation, is a wholly-owned subsidiary of YPFH. Compl. ¶ 19. Maxus was incorporated on July 19, 1983 under the laws of Delaware. *See* Soto Decl. Ex. 9 (Maxus Certificate of Incorporation, MAXUS3376157 – MAXUS3376186). During the Repsol YFP Period, Maxus was domiciled at 1330 Lake Robbins

Dr., # 300, the Woodlands, Texas. Soto Decl. Ex. 10 (May 13, 2015, Harvey Smith[2] Dep. at 11:14-12:1); Soto Decl. Ex. 11 (July 8, 2009 Settlement Agreement, REPSOL0009506 – REPSOL0009526, at REPSOL0009515 (listing Maxus's address for notice at "1330 Lake Robins Drive, Suite 300, the Woodlands, Texas 77380 ")).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 10.

11.    Tierra Solutions, Inc. ("**Tierra**"), a Delaware corporation, is wholly-owned by CLHH. Compl. ¶ 20.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 11.

12.    Maxus International Energy Company ("**MIEC**"), a Delaware corporation, is wholly-owned by Maxus. Compl. ¶ 21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 12.

13.    Maxus (U.S.) Exploration Company ("**MUSE**"), a Delaware Corporation, is a wholly-owned subsidiary of Maxus. Compl. ¶ 22.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 13.

14.    Gateway Coal Company, a Delaware corporation, is a wholly-owned subsidiary of Maxus. Compl. ¶ 23.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 14.

15.    The Maxus Liquidating Trust ("**MLT**") was formed on July 14, 2017, pursuant to

---

[2] Harvey Smith was Maxus's in-house counsel from 1975-2007. See MLT's Initial Disclosures, In re Maxus Energy Corp., et al., No. 16-11501 ("MLT Disclosures") at 17 (Apr. 24, 2019); Soto Decl. Ex. 26 (July 9, 2021, Harvey Smith Dep. ("2021 H.R. Smith Dep.") at 36:4-9; 37:24-25; 80:7-17).

the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors. *See* Compl. ¶ 18.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 15.

## II.    Pre-Acquisition Maxus

### A.    Maxus's Environmental Liability

16.    On September 4, 1986, Diamond Shamrock Corporation (later renamed Maxus) sold all of the outstanding stock in Diamond Shamrock Chemicals Company ("**DSCC**") to Oxy-Diamond Alkali Corporation, a subsidiary of Occidental Petroleum Corporation, through a stock purchase agreement ("**SPA**"). Soto Decl. Ex. 13 (1986 Stock Purchase Agreement, OCCNJ0026349 – OCCNJ0027225, at OCCNJ0026362 – OCCNJ0026363); MLT Statement of Facts ¶ 4.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 16.

17.    Pursuant to the SPA, Diamond Shamrock Corporation agreed to indemnify Oxy-Diamond (which would later become OCC) for certain environmental liabilities arising out of DSCC's chemicals business, including activities at the Lister Site on the Passaic River. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 17.

18.    "At the time of the acquisition, OCC knew that DSCC had discharged hazardous pollutants into the Passaic River, that the federal and state governments had required cleanup of the [Diamond Alkali Superfund Site ("**DASS**")], and that an investigation of the Passaic River's environmental contamination was underway and could result in future cleanup." Soto Decl. Ex. 14

(Order Granting Repsol, S.A.'s Motion for Summary Judgment on its Spill Act Contribution Counterclaim Against Occidental Chemical Corporation, *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. ESX-L9868-05, at 1-2 (N.J. Super. Ct. Oct. 19, 2017)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 18. In addition, subject to its General Objections, the Trust submits that the facts highlighted in yellow in this paragraph are not material and/or irrelevant to this adversary proceeding. The Trust submits that the Summary Judgment Orders in the NJ Litigation have been vacated and are therefore not evidence. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).

19.    Between 1983 and 2014, Maxus and Tierra contributed over $700 million dollars in connection with OCC indemnified sites. Soto Decl. Ex. 102 (Decl. of Javier Gonzalez[3] in Support of Chapter 11 Petitions and Requests for First Day Relief, *In re Maxus Energy Corp., et al.*, No. 16-11501, D.I. No. 2 ("**Gonzalez Decl.**") at ¶ 8 (June 18, 2016)); Soto Decl. Ex. 100 (Mar. 31, 2015, David Rabbe Dep. (personal capacity) at 248:5-251:19 ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in paragraph 19 are not material and/or irrelevant to this adversary proceeding. The Trust does not dispute that generally Maxus and Tierra spent funds

---

[3] Javier Gonzalez was Maxus's general counsel from 2010 to 2017. See MLT Disclosures at 7; Soto Decl. Ex. 104 (Oct. 13, 2021, Javier Gonzalez Dep. at 191:14-15).

on various efforts related to OCC-indemnified sites, but none of the sources cited provide a breakdown of what constitutes an appropriate "remediation effort."

20.     After the SPA was executed, "DSCC was . . . merged into the OCC entities, and ultimately to [OCC] . . . ." Soto Decl. Ex. 16 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 237:7-8 (July 19, 2011) (Lombardi, J.) OCC therefore became the successor to DSCC, an entity that polluted the Passaic River. Soto Decl. Ex. 15 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 218:4-9 (July 15, 2011) (Lombardi, J.) ("I also think it's not in dispute that old Diamond Shamrock and DSCC as the alleged successor, that they are considered a discharger. It's not in dispute that they did dump or spill or pour hazardous substances, toxic substances, into the waters of the State, into the Passaic River ")); Soto Decl. Ex. 16 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 244:7-11 (July 19, 2011) (Lombardi, J.) ("So I am going to enter an order that OCC is as the undisputed legal, you know, successor by merger with DSCC, that they are responsible for the liabilities of the original Diamond Shamrock Corporation.")). Repsol was neither a polluter of the Passaic River nor party to the SPA. Soto Decl. Ex. 13 (1986 Stock Purchase Agreement, OCCNJ0026349 – OCCNJ0027225).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 20.  However, with respect to the term "polluter," it is more appropriate to say Repsol did not discharge contaminants into the river.

**B.    Maxus Was in Poor Financial Condition Prior to YPF's Acquisition**

21.     "In the early 1990s, Maxus experienced a liquidity crisis resulting from, among other things, depressed oil and gas prices, Maxus' high cost of debt, and its limited access to the capital markets." Soto Decl. Ex. 102 (Gonzalez Decl. at ¶ 26). At the time, Maxus could not access capital markets on favorable terms, so it explored various strategies, including asset sales and

raising capital at the subsidiary level. *Id.* Maxus's financial advisor presented strategic alternatives including, for example: (1) a public or private sale of an interest in Maxus's Midgard subsidiary; (2) a private sale of 100% of Midgard; (3) a private sale of Maxus's Indonesia assets; or (4) a sale of the entire company. Soto Decl. Ex. 103 (CSFB, Maxus Energy Corp., Materials Prepared for Discussion, dated Jan. 31, 1995, CS000490 – CS000511, at CS000499).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph, including the quotation from the Gonzalez declaration, are not material and/or irrelevant to this adversary proceeding.  Maxus financial status in the early 1990s is not material to any claims or defenses presented in this case.  The Trust also notes that at the time of the Gonzalez declaration, although he does not disclose this fact in his declaration, Mr. Gonzalez was an officer of YPFH, one of the Defendants in this action.

III.    **YPF Period (1995-1999)**

    A.    **YPF Acquires Maxus in 1995**

22.    In January 1995, Maxus considered "an unsolicited preliminary indication of interest from YPF to acquire all the common stock of [Maxus] for $5.00 per share." Soto Decl. Ex. 17 (Maxus Energy Corp. Board Meeting Minutes, dated Jan. 31, 1995, YPF-AK-0027194 – YPF-AK-0027213, at YPF-AK-0027201); Soto Decl. Ex. 18 (YPF Press Release, YPF-AK-0049443 – YPF-AK-0049444, dated Feb. 28, 1995). YPF ultimately offered to purchase all of the outstanding shares of Maxus for $5.50 per share in cash for a total of $762 million. Soto Decl. Ex. 19 (CSFB, Maxus Energy Corp., Materials Prepared for Discussion, dated Feb. 26, 1995, CS000472 – CS000489, at CS000480); Soto Decl. Ex. 20 (Maxus Energy Corp. Form 10-K for the Fiscal Year Ended Dec. 31, 1995, AA_MAXUS0014167 – AA_MAXUS0014283, at AA_MAXUS0014169).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 22.

23.    On February 28, 1995, YPF and Maxus entered into a merger agreement, accepting the terms of YPF's revised $5.50 offer. *See* Soto Decl. Ex. 21 (Agreement of Merger among YPF Sociedad Anónima, YPF Acquisition Corp. and Maxus Energy Corp., dated Feb. 28, 1995, YPF 0008584 – YPF 0008664). YPF paid a premium for Maxus's shares and guaranteed that it would contribute capital in the event that Maxus was unable to meet its obligations of the full extent of the loan, up to $550 million under the Keepwell Covenant, for a period of nine years. *See* Soto Decl. Ex. 52 (Houlihan Lokey Solvency Analysis re: Maxus Energy Corp., dated Apr. 5, 1995, HL000095 – HL000190, HL000096, HL000099 ("YPF unconditionally guarantees the payment in full of the principal and interest on the loans (defined as $550 million) to the Company.")); Soto Decl. Ex. 22 (Maxus Energy Corp. Letter to Stockholders, dated Mar. 3, 1995, YPF0011629 – YPF0011672, at YPF0011637).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 23. However, the Trust disputes that YPF guaranteed it would contribute capital up to $550 million under the Keepwell Covenant. The Keepwell Covenant provided a backstop guarantee for the acquisition facilities which totaled $425 million. *See* Propps Decl. Ex. 86 (Menenberg Initial Report ¶ 77); Propps Decl. Ex. 254 (Williams Report at 283).

24.    On February 28, 1995, Maxus's Board of Directors approved the terms of the merger agreement with YPF. *See* Soto Decl. Ex. 23 (Maxus Energy Corp. Board Meeting Minutes, dated Feb. 28, 1995, YPF-AK-0027382 – YPF-AK-0027414).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 24.

25.    YPF completed its acquisition of Maxus via credit agreement on June 8, 1995. Soto Decl. Ex. 20 (Maxus Energy Corp. Form 10-K for the fiscal year ended Dec. 31, 1995,

AA_MAXUS0014167 – AA_MAXUS0014283, at AA_MAXUS0014169).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 25.

26.     Repsol was not involved in YPF's acquisition of Maxus. Soto Decl. Ex. 24 (July 27, 2021, Dexter Peacock[4] Dep. ("**2021 Peacock Dep.**") at 231:13-16); Soto Decl. Ex. 26 (2021 H.R. Smith Dep.) at 53:25-54:3); Soto Decl. Ex. 27 (July 29, 2021, Richard Hartline[5] Dep. ("**2021 Hartline Dep.**") at 54:4-12); Soto Decl. Ex. 28 (Aug. 3, 2021, Paul Bohannon[6] Dep. at 211:19-212:24); Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 369:8-24).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 26.

**B.    1996-97 Maxus Transactions**

27.    YPF sought to reorganize Maxus to align with its corporate strategy and to achieve tax efficiencies. Soto Decl. Ex. 105 (June 2, 1997, Email from Fernando Nardini to Roberto Monti re: International Tax Structure, YPF-E-0000143791 – YPF-E-0000143796, at YPF-E-0000143792) In June of 1996, YPFI was created as a subsidiary of MIEC. Soto Decl. Ex. 29 (June 28, 1996, Maxus International Energy Company Board Resolution, MAXUS0205173 – MAXUS0205176). From 1996 to 1997, Maxus and its subsidiaries sold their holdings in Venezuela, Bolivia, Indonesia, and Ecuador to YPF or YPFI (collectively, the "**1996-97 Maxus Transnsactions**"). Soto Decl. Ex. 30 (July 1, 1996, Stock Purchase and Sale Agreement, REPSOL0000937 – REPSOL0000949) (Maxus Bolivia, Inc., Maxus Venezuela (C.I.) Ltd., and Maxus Venezuela S.A.); Soto Decl. Ex. 31 (Sept. 1, 1996, Stock Purchase and Sale Agreement,

---

[4] Dexter Peacock is a former Maxus director and Andrews & Kurth attorney. See MLT Disclosures at 14.
[5] Richard Hartline was a Maxus accountant from 1970 to 2008. See MLT Disclosures at 8; Soto Decl. Ex. 27 (2021 Hartline Dep. at 24:15-25:14).
[6] Paul Bohannon is a former Andrews & Kurth attorney. See MLT Disclosures at 3.

MAXUS3212317 – MAXUS3212323) (Maxus Guarapiche Ltd.); Soto Decl. Ex. 32 (Dec. 31, 1997, Purchase and Sale Agreement, REPSOL0001719 – REPSOL0001730) (Indonesian assets— YPF Java Baralaut B.V. and Maxus Southeast Sumatra LLC); Soto Decl. Ex. 33 (Dec. 31, 1997, Stock Purchase and Sale Agreement, REPSOL0001701 – REPSOL0001708) (YPF Ecuador, Inc.).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 27.  The Trust disputes the reason YPF sought to reorganize Maxus.  YPF sought to reorganize Maxus in order to isolate the environmental liabilities away from any profitable assets.  Trust's Mot. at 14.

1.      Bolivian & Venezuelan Asset Sales

28.      On June 28, 1996, MIEC contributed its interests in Maxus Venezuela Inc., Maxus Venezuela (C.I.) Ltd., and Maxus Venezuela S.A. to YPFI. Soto Decl. Ex. 34 (June 28, 1996, MIEC Unanimous Written Consent and Resolutions of the Board of Directors, MAXUS3373560 – MAXUS3373562). On June 28, 1996, MIEC contributed its interest in Maxus Bolivia Inc. to YPFI. Soto Decl. Ex. 35 (June 18, 1996, Minutes of the Meeting of Maxus Board of Directors, YPF0036941 – YPF0036965). MIEC then sold YPFI (then holding the Bolivian and Venezuelan assets) to YPF for $263.1 million, which later was adjusted upward to $266.37 million. Soto Decl. Ex. 30 (July 1, 1996, Stock Purchase and Sale Agreement, REPSOL0000937 – REPSOL0000949); Soto Decl. Ex. 106 (YPF Holdings & Subsidiaries Summary of Cash and Corporate Activities in Relation to Keep Well Covenant for Years 1996 – 1998, YPF563 – YPF1113, at YPF566).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 28.

29.      YPF publicly disclosed the sale of YPFI to YPF. *See* Soto Decl. Ex. 36 (Maxus Energy Corp. Form 10-Q for the period ended Sept. 30, 1996, MAXUS3198525 – MAXUS3198556, at MAXUS3198536).

*Responses and Objections:* Subject to its General Objections, the Trust does not

dispute the facts set forth in paragraph 29.

30.      The Maxus board, containing four independent directors,[7] approved the sale of Maxus's Venezuelan and Bolivian assets at book value after its board determined the book value was higher than the fair market valuation conducted by CS First Boston ("**CSFB**"). Soto Decl. Ex. 38 (June 18, 1996, Minutes of the Regular Meeting of Board of Directors of Maxus Energy Corp., MAXUS3293061 – MAXUS3293089, at MAXUS3293068, MAXUS3293071). YPF publicly disclosed the sale. *See* Soto Decl. Ex. 39 (Maxus Energy Corp. Form 8-K, MAXUS3214472 – MAXUS3214480, at MAXUS3214472 (July 1, 1996)); Soto Decl. Ex. 40 (Maxus Energy Corp. Form 10-K for fiscal year ended Dec. 31, 1996, at 2-3).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 30.  The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

    2.      Ecuadorian Asset Sale

31.      On December 31, 1997, MIEC sold its shares of its Ecuador subsidiary to YPFI via a Stock Purchase and Sale Agreement for $185.2 million. MLT Statement of Facts ¶¶ 61-62.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 31.

32.      The Maxus board, containing four independent directors,[8] approved the transaction. Soto Decl. Ex. 41 (Dec. 19, 1997, Minutes of Special Meeting of Board of Directors of Maxus

---

[7] Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064 at REP 050) ████████████████████████████████████████
[8] Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064, at REP 050) ████████████████████████████████████████

Energy Corp., REPSOL0009213 – REPSOL0009226, at REPSOL0009218 – REPSOL0009222).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 32.   The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

33.     Gaffney, Cline & Associates ("**GCA**") determined that Maxus received fair market value for its Ecuadorian assets. *Id.* at REPSOL0009215.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 33.

34.     YPF publicly disclosed the sale. Soto Decl. Ex. 42 (YPF S.A. 1997 Form 20-F (filed Mar. 27, 1998) at 75).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 34.

3.     Indonesian Asset Sale

35.     On December 31, 1997, Maxus sold YPF Java Baralaut B.V. and Maxus Southeast Sumatra, Inc. ("**SES**") to YPFI for $505.3 million via a stock purchase and sale agreement. MLT Statement of Facts ¶ 67.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 35.

36.     The Maxus board, containing four independent directors,[9] approved the sale. Soto Decl. Ex. 41 (Dec. 19, 1997, Minutes of Special Meeting of Board of Directors of Maxus Energy Corp., REPSOL0009213 – REPSOL0009226, at REPSOL0009218 – REPSOL0009222).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 36.  The Trust disputes the use of

---

[9] Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064, at REP 050) (███████████████████████████████████████████████████████)

the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

37.    The value of the sale was "determined by comparison to the equivalent value being offered in a contemporaneous third party transaction for the purchase of certain companies . . . owning interests in the same Indonesian oil and gas properties." *Id.* at REPSOL0009214 – REPSOL0009215. After the sale closed, the purchase price was adjusted upward pursuant to a clause in the sale agreement, triggered by an "an arm's length sale of an interest in the same property in which Maxus SES owns an interest." Soto Decl. Ex. 43 (Aug. 4, 1998, Minutes of Meeting of Board of Directors of Maxus Energy Corp., YPF0030102 – YPF0030108, at YPF0030103 – YPF0030106). The final purchase price was $575.3 million. MLT Statement of Facts ¶ 68.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 37.

38.    YPF publicly disclosed the sale. Soto Decl. Ex. 42 (YPF S.A. 1997 Form 20-F (filed Mar. 27, 1998) at 75).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 38.

39.    In total, Maxus received approximately $1 billion in proceeds in connection with the 1996-97 Maxus Transactions, which it used for general corporate purposes, including paying down debt and redeeming interest-bearing preferred stock. Soto Decl. Ex. 106 (YPF Holdings & Subsidiaries Summary of Cash and Corporate Activities in Relation to Keep Well Convinence for Years 1996 – 1998, YPF563 – YPF1113); Soto Decl. Ex. 30 (July 1, 1996, Stock Purchase and

19

Sale Agreement, REPSOL0000937 – REPSOL0000949); Soto Decl. Ex. 31 (Sept. 1, 1996, Stock Purchase and Sale Agreement, MAXUS3212317 – MAXUS3212323); Soto Decl. Ex. 32 (Dec. 31, 1997, Purchase and Sale Agreement, REPSOL0001719 – REPSOL0001730); Soto Decl. Ex. 33 (Dec. 31, 1997, Stock Purchase and Sale Agreement, REPSOL0001701 – REPSOL0001708); Soto Decl. Ex. 74 (Sept. 3, 2015, Fernando Nardini Dep. at 187:25-189:20). After the 1996-97 Maxus Transactions, Maxus had no ownership interests in the assets underlying the sales. Soto Decl. Ex. 44 (May 19, 2015, David Wadsworth[10] Dep. at 290:14-291:14); Soto Decl. Ex. 45 (Jan. 20, 2015, Linda Engelbrecht[11] Dep. at 256:20-257:14); *see also* Soto Decl. Ex. 46 (MLT Corrected Expert Witness Report of Todd D. Menenberg ("**Menenberg Rep.**") at ¶ 198 ▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 39. The Trust disputes that after the 1996-97 Maxus Transactions, Maxus had no ownership interests in the assets underlying the sales. To the extent Maxus and YPFI are alter egos, the assets of one are the assets of the other.

4.    Contribution Agreement

40.    Also during 1996, YPF, YPFI, YPFH, CLH Holdings, CLH, and Maxus entered into a contribution agreement ("**Contribution Agreement**"), whereby YPF agreed to fund CLH's liabilities up to at least $108.4 million (later amended to $111.5 million). Soto Decl. Ex. 49 (Contribution Agreement, dated Aug. 14, 1996, REPSOL0000151 – REPSOL0000161); Soto Decl. Ex. 50 (First Addendum to Contribution Agreement, dated Feb. 5, 1997, MAXUS2999355 – MAXUS2999356).

---

[10] David Wadsworth is former general counsel and director of Maxus from 1979 to 2004. MLT Disclosures at 19; Soto Decl. Ex. 48 (Aug. 6, 2021, David Wadsworth Dep. at 23:18-26:7).

[11] Linda Engelbrecht is a former Maxus controller. MLT Disclosures at 4-5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 40.

41.    Repsol was not a party to the Contribution Agreement. *Id.*; Soto Decl. Ex. 51 (June 23, 2021, Walter Forwood[12] Dep. at 33:21-23 ███████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 41.

5.  Repsol Was Not Involved in the YPF Acquisition or 1996-97 Maxus Transactions

42.    The MLT acknowledges that "the Repsol Defendants did not exert direct or indirect control over Maxus or the Debtors prior to Repsol's acquisition of YPF in 1999." Soto Decl. Ex. 225 (MLT's Resps. & Objs. to Repsol Defs.' First Set of Requests for Admission, Resp. to Admission No. 3 (Aug. 23, 2019)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 42.

43.    Repsol was not involved with Maxus prior to Repsol's acquisition of YPF in 1999. Soto Decl. Ex. 26 (2021 H.R. Smith Dep. at 53:25-54:3, 65:3-16); Soto Decl. Ex. 53 (Dec. 17, 2014, Dexter Peacock Dep. at 149:3-13 ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

---

[12] Walter Forwood is a former CFO at YPF. See MLT Disclosures at 6.

[REDACTED]

[REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 43. However, the Trust notes that the 2021 H.R. Smith Dep. cited is actually the transcript for the October 31, 2020 deposition of David Oliver Smith, and is thus cited incorrectly.

44.    Maxus-affiliated witnesses similarly testified that Repsol was not involved in any of the 1996-97 Maxus Transactions. *See* Soto Decl. Ex. 54 (July 2, 2021, David Blair[13] Dep. at 165:16-167:4 [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 44.

## IV.    Repsol YPF Period (1999-2012)

### A.    Repsol Seeks to Expand Its Footprint in Latin America and Acquires YPF

---

[13] David Blair is a former CPA at Arthur Anderson. See MLT Disclosures at 17.
[14] David Smith is Maxus's Director of Tax and Chief Tax Counsel. See MLT Disclosures at 17.

45.     As the Spanish State sold its last shares of Repsol, S.A. in 1997, Repsol, S.A. began a "strategy of expansion of its operations throughout Latin America." Soto Decl. Ex. 57 (Repsol 1998 Form 20-F, at 5–6). From 1996 to 1998, Repsol, S.A. invested billions of dollars in Latin America. *Id.* at 6. By 1998, "Repsol's Latin American operations accounted for 25.8% of [its] assets." *Id.* at 7. With a goal of becoming "the leading oil and gas concern in Latin America," Repsol acquired a 14.99% equity stake in YPF, Argentina's largest company, on January 20, 1999. *Id.* at 7, 55. "Through the acquisition of YPF, Repsol YPF sought to achieve a balance between upstream and downstream operations [and] position itself as a market leader in Latin America . . . ." Soto Decl. Ex. 57 (Repsol 1998 Form 20-F, at 7); Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 102:22-3 ███████████████████████████ 77:25-78:10).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 45.  However, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for the fact highlighted in red.  Mr. Blanco was not at Repsol at the time of the acquisition and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16) ███████████████████████████ ████████████.  In addition, the Trust disputes the quote attributed to Soto Decl. Ex. 57 as the quote is not present in the exhibit.

46.     On June 3, 1999, Repsol, S.A. acquired an additional 82.47% interest in YPF. Soto Decl. Ex. 58 (YPF 1999 Form 20-F, at 55). Repsol invested $15 billion to acquire a total 97.81% stake in YPF via hostile takeover. *Id.* at 8; Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 91:11-13, 123:5-13).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 46.  The Trust notes that page 8 of the Soto Decl. Ex. 58 is not included in the exhibit, and page 91 of Soto Decl. Ex. 6 is not included in the exhibit.

47.     There is no evidence that YPF or Maxus, at the time of acquisition, provided Repsol

23

any non-public information about the 1996-97 Maxus Transactions. Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 91:11-13, 123:5-13); *see also* Soto Decl. Ex. 37 *(*discussed *infra* ¶ 70). Repsol's corporate representative testified ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 123:14-17).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 47. However, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for this fact. Mr. Blanco was not at Repsol at the time of the acquisition and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. at 29:13-16) ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

48.     As of 1999, Maxus's oil and gas assets consisted of its interests in a joint venture named Crescendo (discussed below), and other exploratory interests located in the Gulf of Mexico, which included working interests ranging from 16.67 percent to 100 percent in 23 blocks and Overriding Royalty Interests ("**ORRIs**")[15] in two other exploration blocks. Soto Decl. Ex. 58 (YPF 1999 Form 20-F, at 27).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 48.

### B.    Crescendo Sale

49.     Maxus, through its subsidiary Midgard LP Sub, owned a 59% interest in the Crescendo oil and gas asset, while its joint venture partner, BP Amoco, owned 41%. MLT Statement of Facts ¶ 78. Maxus's internal valuation valued the Crescendo asset at $1 billion, of which Midgard's interest totaled $590 million (or 59%). Soto Decl. Ex. 25 (Tentative Plan for the Sales of Repsol YPF's Working Interest in Crescendo, YPF-E-0000144546 – YPF-E-0000144551,

---

[15] An "ORRI" is an overriding royalty interest which provides the owner with an economic interest in the upside performance of an oil and/or gas asset without the requirement to invest capital in the development of that asset. See Wright, C. and Gallun, R., *Fundamentals of Oil & Gas Accounting*, 5th ed., 2008, at p. 547.

at YPF-E-0000144547).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 49. For completeness, the Trust notes that Maxus's valuation of the Crescendo asset was not contemporaneous with the sale. In addition, the Trust notes that Soto Decl. Ex. 25 cites the incorrect document, as the document in Soto Decl. Ex. 25 is in fact "Plaintiff Maxus Liquidating Trust's Initial Disclosures Pursuant to Rule 7026 of the Federal Rules of Bankruptcy Procedure."

50.    The Limited Partnership Agreement for the joint venture included a change of control clause in Article 10, which set out dissolution terms for either party terminating the joint venture without consent. Soto Decl. Ex. 59 (Limited Partnership Agreement of Crescendo Resources, L.P., Aug. 20, 1997, MAXUS3377703 – MAXUS3377846, at MAXUS3377727 – MAXUS3377732). BP acquired Amoco on December 31, 1998, while Repsol acquired YPF on June 23, 1999. Soto Decl. Ex. 60 (BP Amoco Form 20-F at 5 (Dec. 31, 1998)); Soto Decl. Ex. 61 (Repsol Form 20-F at 7 (Dec. 31, 1999)). "These acquisitions triggered the change-of-control provision in the Crescendo Partnership Agreement, such that either party could terminate the partnership within the year following the other party's change of control event, Maxus and BP Amoco's began to negotiate a dissolution of Crescendo in May 1999." MLT Statement of Facts at ¶ 79.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 50.

51.    Ultimately, both Amoco and Midgard LP Sub agreed to dissolve the joint venture and sell the assets. Soto Decl. Ex. 62 (Letter of Intent (Nov. 9, 1999), MAXUS0437453 – MAXUS0437458, at MAXUS0437454). The Maxus board approved the Crescendo dissolution. MLT Statement of Facts ¶ 80; Soto Decl. Ex. 63 (Dec. 12, 1999, Maxus Energy Corporation Unanimous Written Consent of the Board of Directors, REPSOL0008230 – REPSOL0008234).

Maxus received $5 million in connection with the dissolution of the Crescendo joint venture. MLT Statement of Facts ¶ 80.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 51.

52.     Following a public bidding process, Maxus sold its Midgard interest in two tranches to third parties, not affiliated with Maxus, YPF, or Repsol: (1) the first to BP Amoco for $400.5 million in December 1999 and (2) the second to Apache for $219 million in cash and a 1% ORRI (valued at $7.5 million) in January 2000. *See* Soto Decl. Ex. 208 (Recommendation Memorandum, Project Pinnacle, MAXUS3205777 – MAXUS3205780); Soto Decl. Ex. 64 (Purchase and Sale Agreement, dated Dec. 31, 1999, MAXUS0173078 – MAXUS0173121 at MAXUS0173083 – MAXUS0173092); Soto Decl. Ex. 65 (Jan. 24, 2000, Stock Purchase Agreement, YPF0038264 –YPF0038289); Soto Decl. Ex. 4 (Jan. 6, 2000, Arthur Andersen Memo on the Disposal of Midgard, AA-YPF-0027508 – AA-YPF-0027533, at AA-YPF-27510); MLT Statement of Facts ¶ 84. None of the terms of the Crescendo Sale agreements refer to any other challenged transaction. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 52. The Trust disputes that there was a public bidding process for the sale of Maxus's Midgard interests to the extent that the Repsol Defendants have not submitted any evidence for this assertion, nor is the Trust aware of any support.

53.     Maxus received approximately $632 million in connection with the Crescendo dissolution and sale ($5 million upon dissolution, $400.5 million from the sale to BP Amoco, $219 million from the sale to Apache, and an ORRI estimated to be worth $7.5 million) (collectively, "**Crescendo Sale**"). *See* Soto Decl. Ex. 69 (Bramer Rep. at ¶ 383); Soto Decl. Ex. 47 (Pulliam

Rep. at ¶ 201); *supra* ¶ 52.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 53.  The Trust disputes that Maxus received $632 million in connection with the Crescendo dissolution and sale.  Maxus in fact received $627 million.  Propps Decl. Ex. 315 (Pulliam Reply Rep. at ¶ 146).

54.    Repsol was not a party to either of the Crescendo Sale agreements. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 54.

55.    The Maxus board approved, with two independent directors, the Crescendo Sale. *See* Soto Decl. Ex. 63 (Dec. 12, 1999, Maxus Energy Corp. Unanimous Written Consent of the Board of Directors, REPSOL0008230 – REPSOL0008234); Soto Decl. Ex. 66 (Jan. 20, 1999, Maxus Energy Corp. Unanimous Written Consent of the Board of Directors, REPSOL0008220 – REPSOL0008224); Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064 at 050)

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green set forth in paragraph 55.  The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

56.    Maxus sold its interests in Crescendo

Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 57:2-6).

> *Responses and Objections:* The Trust disputes that Maxus sold its interests in Crescendo because Maxus wanted to focus on development in the Gulf of Mexico because Maxus was dominated by Repsol.  *See* Trust SOF ¶¶ 96-104.  Repsol and Maxus were alter egos, thus any decisions made by Maxus would have been attributable to Repsol's, not Maxus's, direction and leadership.  *See* Trust SOF ¶¶ 97-98.

27

57.     Repsol and YPF publicly disclosed the Crescendo Sale. Soto Decl. Ex. 67 (Repsol 2000 Form 20-F, at 20); Soto Decl. Ex. 68 (YPF 2000 Form 20-F, at F-28).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 57.

58.     Maxus used $262.1 million of the proceeds from the Crescendo Sale to pay down a $236 million five-year credit facility and redeem $36.1 million of other notes unrelated to Repsol. MLT Statement of Facts ¶ 85.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 58.  The Trust disputes that Maxus used $262.1 million of the sale proceeds from the Crescendo Sale to repurchase debt, this number was actually $272.1.  Propps Decl. Ex. 315 (Pulliam Reply Rep. at ¶ 103).

59.     The remaining $362.4 million of proceeds remained in Maxus's bank accounts for the period January 4, 2000 through October 24, 2000. Soto Decl. Ex. 69 (Bramer Rep. at ¶ 346); Soto Decl. Ex. 70 (Email from Rick Hartline re: Interest Income, dated Nov. 4, 2000, YPF0104935 – YPF0104948).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 59.  The Trust notes that the account details referenced in Soto Decl. Ex. 70 are currently only through the beginning of the month of April and that the date on the email is "11/04/2000," i.e., April 11 in European date format.

60.     On January 2, 2001, Maxus, as Lender, and Repsol International Finance B.V. ("**RIF**"), as Borrower, entered into a Credit Facility Agreement with a principal of $325 million. Soto Decl. Ex. 71 (Credit Facility Agreement, dated Jan. 2, 2001 and Amendments,

REPSOL0003601 – REPSOL0003611, at REPSOL0003604). RIF was the Repsol subsidiary that managed the enterprise's central cash management system, Soto Decl. Ex. 133 (Sept. 9, 2015, Pablo Blanco Dep. at 63:23-64:14), and is not a defendant in this lawsuit, Compl. at 1.

       *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 60.

61.      Under the terms of the Credit Facility, Maxus as "Lender will calculate the interest rate on the basis of the alternative yield of funds in market conditions. Lender will have the right to modify the abovementioned interest rate if, in Lender's good-faith determination, due to market conditions such interest rate becomes no longer representative of Lender's cost of funds or is not available for the relevant Interest Period." Soto Decl. Ex. 71 (Credit Facility Agreement, dated Jan. 2, 2001 and Amendments, REPSOL0003601 – REPSOL0003611, at REPSOL0003604); *accord* Soto Decl. Ex. 27 (2021 Hartline Dep. at 93:24-94:25). The Credit Facility Agreement was amended several times to extend its period on an annual basis. Soto Decl. Ex. 71 (Credit Facility Agreement, dated Jan. 2, 2001 and Amendments, REPSOL0003601 – REPSOL0003611); Soto Decl. Ex. 27 (2021 Hartline Dep. at 97:16-19).

       *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 61.

62.      As of January 2005, "the balance of the RIF loan to Maxus [was] only $130,000." Soto Decl. Ex. 27 (2021 Hartline Dep. at 101:23-102:4); Soto Decl. Ex. 72 (Jan. 14, 2005, Email from Javier Nogales to Javier Jose Ares re the Crescendo Loan, MAXUS5761478_TR) (attaching chart showing payments on the loan over time). The $325 million loan was ultimately paid off in full, with interest, by 2005. MLT Statement of Facts ¶ 85; Soto Decl. Ex. 27 (2021 Hartline Dep. at 100:14-17); Soto Decl. Ex. 72 (Email from J. Nogales Aranguez to J. Ares Ascariz, dated Jan.

14, 2005, MAXUS5761478); Soto Decl. Ex. 73 (Loan Repayment Schedule, MAXUS5761479); Soto Decl. Ex. 74 (Sept. 3, 2015, Fernando Nardini[16] Dep. at 307:16-22); Soto Decl. Ex. 46 (Menenberg Rep. at ¶ 135)

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 62.

63.    RIF paid interest on the loan according to a standard intercompany formula that was used across companies. Soto Decl. Ex. 27 (2021 Hartline Dep. at 95:1-21); Soto Decl. Ex. 75 (Jan. 23, 2015, Richard Hartline Dep. at 182:17-22).

*Responses and Objections:* Subject to its General Objections, the Trust does not generally dispute the facts highlighted in green paragraph 63. The Trust disputes the representation that a standard intercompany formula was used "across companies" as it may be inaccurate to the extent the record reflects various entities used different intercompany rates. *See, e.g.*, Yoo Decl. Ex. 16, "Contratos" spreadsheet produced natively under Bates REPSOL-E-0000103185. The Trust submits the Court should refer to the cited testimony as it speaks for itself.

64.    Maxus used the proceeds from the loan to fund exploration and development initiatives in the Gulf of Mexico, including its acquisition of a 15% interest in the Neptune prospect, as well as to pay for its ongoing operations and liabilities, including environmental liabilities under the OCC SPA indemnity. MLT Statement of Facts ¶¶ 85, 96; Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 195); Soto Decl. Ex. 58 (YPF Sociedad Anónima Form 20-F for the fiscal year ended December 31, 1999, at p. F-17); Soto Decl. Ex. 76 (YPFI Ltd. Financial Statements as of December 31, 1999 and 1998, YPF0106311 – YPF0106358, at YPF0106329); Soto Decl. Ex. 74 (Sept. 3, 2015, Nardini Dep. at 207:22-208:13)

---

[16] Fernando Nardini was an employee in YPF's Tax Group. See MLT Disclosures at 12.

==highlighted text redacted==; Soto Decl. Ex. 77 (YPFH Financial Statements for the fiscal years ended December 31, 2003 and 2002, YPFH011 – YPFH033, at YPFH021); Soto Decl. Ex. 78 (YPFH Financial Statements for the fiscal years ended December 31, 2005 and 2004, YPFH058 – YPFH081, at YPFH069); Soto Decl. Ex. 70 (Email from Rick Hartline re: Interest Income, dated Nov. 4, 2000, YPF0104935 – YPF0104948).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 64. The Trust disputes the quote attributed to Soto Decl. Ex. 74 because the quote is not present in the exhibit. The Trust also notes that page YPFH069 cited in Soto Decl. Ex. 78 is not present in the exhibit.

65. 

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 65 as being an unfair characterization of Mr. Pulliam's report, and advises the Court refer to the report itself.

### C.    The 2001-02 YPFI Transactions

66.    Prior to its acquisition of YPF, Repsol stated the following in a public filing: "If Repsol were to acquire control of YPF, Repsol would expect to integrate the operations of the respective companies with a view to achieving operating synergies and cost savings and to providing a stronger base from which to support the business strategies of the two companies." Soto Decl. Ex. 57 (Repsol 1998 20-F, at 55).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that

the facts in paragraph 66 are not material and/or irrelevant to this adversary proceeding.  Repsol's public statements regarding the YPF acquisition is not material to any claims or defenses presented in this case.

67.    From 1999 to 2012, more than 90% of YPF's proved oil and gas reserves were located in Argentina, while Repsol's reserves were located throughout "Latin America (Argentina, Bolivia, Trinidad and Tobago, Venezuela, Brazil, Ecuador, Colombia and Peru), North Africa (Libya and Algeria), the Middle East, Spain and the United States." *See* Soto Decl. Ex. 79 (Repsol 2005 Form 20-F, at 18-19) (showing that more than 50% of Repsol's proved reserves for oil and gas reserves were located outside of Argentina); Soto Decl. Ex. 80 (YPF 2005 Form 20-F, at 17-18) ("More than the 99% of these reserves are located in Argentina."); Soto Decl. Ex. 81 (Repsol 2009 20-F, at 15) (showing that more than 50% of Repsol's proved reserves for oil and gas reserves were located outside of Argentina); Soto Decl. Ex. 82 (YPF 2009 Form 20-F, at 26) (showing more than 90% of oil and gas reserves were located in Argentina).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 67.

68.    After Repsol acquired a majority interest in YPF, it considered several transactions in an effort to: (1) gain tax efficiencies by integrating certain Latin America assets; (2) simplify its corporate structure following the YPF acquisition; and (3) mitigate risks associated with the Argentine financial crisis. Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 93:5-96:6); Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 390:1-25, 391:7-11, 393:8-13, 363:5-14); Soto Decl. Ex. 61 (Repsol Form 20-F 1999, at F-59); Soto Decl. Ex. 57 (Repsol Form 20-F 1998, at 55).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  A primary reason for considering the transactions was the threat of Maxus' environmental liabilities. *See, e.g.*, Yoo Ex. 10 (March 15, 2001, Memo from David A. Wadsworth to Augustin Garcia Moratilla on Former

Chemical Company Liabilities REP 065 – REP 072).  Further, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for this fact. Mr. Blanco was not at Repsol at the time of the acquisition and has no personal knowledge to testify to this issue.  Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16) ███████████████████████████████████████████████████

69.    These efforts coincided with YPF's efforts to "refocus[] its strategy within Argentina" and "sell all of its international operations . . . held by YPF International." Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 389:17-21).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 69.



███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 70.

1. <u>YPFI's Venezuelan, Ecuadorian, Indonesian, and Bolivian Assets</u>

71.    The MLT challenges the 2001-02 transactions relating to YPFI's sale of its Venezuela, Ecuador, Indonesia, and Bolivia assets (**"2001-02 YPFI Transactions"**), as fraudulent transfers. Compl. ¶ 219 & Count XV.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 71.

72.    The 2001-02 YPFI Transactions included some assets formerly owned by Maxus and many additional assets that Maxus never owned. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 333).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 72.

73.    The MLT's expert does not opine that the sale price for the 2001-02 YPFI Transactions constituted less than fair value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–22)███

███████████████████████████████████

███████████████████████████████████

███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 73.

74.    The 2001-02 YPFI Transactions were all publicly disclosed in SEC filings. Soto Decl. Ex. 84 (YPF Form 20-F, December 31, 2002 at 22) (disclosing Bolivia transaction); *id.* at

104 (disclosing Indonesia transaction); Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 12) (disclosing Ecuador transaction); *id.* at F-28 (disclosing Venezuela transaction).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust does not dispute that certain aspects of the YPFI transfers were publicly disclosed in SEC filings (*see* Trust's Omnibus Reply Section II.D.3), but the Trust submits that the filings did not provide adequate information for a creditor to understand the impact of these transactions on the liquidity of Maxus and its ability to meet its environmental obligations as they come due as Maxus and YPFI were alter egos.

75.     Maxus was not a party to any of the 2001-02 YPFI Transaction agreements as it was not a buyer or seller of any of the assets. Soto Decl. Ex. 225 (MLT's Resps. & Objs. to Repsol Defs.' First Set of Requests for Admission, Resp. to Admission No. 9 (Aug. 23, 2019)). None of the terms of the 2001-02 YPFI Transaction agreements refer to any other challenged transaction. *See* Soto Decl. Ex. 90 (Aug. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045339 – REPSOL0045345) (Repsol YPF Venezuela S.A.); Soto Decl. Ex. 96 (Sept. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045346 – REPSOL0045354) (Maxus Venezuela Limited); Soto Decl. Ex. 95 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045355 – REPSOL0045363) (Maxus Guarapiche Ltd.); Soto Decl. Ex. 108 (Assignment of Rights and Obligations Corresponding to the Block 16 and Tivacuno Areas, dated Jan. 3, 2001, MAXUS5657547_TR – MAXUS5657549_TR); Soto Decl. Ex. 117 (Jan. 18, 2002, Stock Purchase Agreement, REPSOL0009893 – REPSOL0010146); Soto Decl. Ex. 126 (July 10, 2002, Agreement for the Purchase of Shares of Repsol YPF Santa Cruz S.A., REPSOL 0022627_TR – REPSOL 0022631_TR).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust disputes that Maxus was not a buyer or seller of any of the assets. To the extent Maxus and YPFI are alter egos, the assets of one are the assets of the other.

2.    YPFI Venezuelan Assets

76.    A November 13, 2000 presentation by the Repsol Executive Committee stated that the integration of YPFI's Venezuelan assets into the Repsol group would provide several tax advantages, leading to tax savings from 2001-2005 of $180 million to $200 million. Soto Decl. Ex. 86 (Repsol YPF Presentation on Venezuela Integration, Nov. 13, 2000, REPSOL-E-0000067640_TR at slide 5).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 76, but notes that no statements were made with respect to tax savings, if any, for YPFI.

77.    In 2001, Repsol Exploración S.A. and Repsol Exploración Venezuela B.V. purchased YPFI's Venezuelan holdings, which included: Maxus Venezuela, renamed on June 1, 2001 to Repsol YPF Venezuela S.A. ("**Repsol YPF Venezuela**"); Maxus Venezuela (C.I.) Ltd.; and Maxus Guarapiche. Soto Decl. Ex. 92 (Calendar Year 2001 Corporate Reorganization among Certain Subsidiaries of Repsol YPF, S.A., at MAXUS3215009 – MAXUS3215010).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 77.

78.    At the time of the sale, Repsol YPF Venezuela had interests in several assets that had not previously been owned by Maxus: (1) a 45% interest in the Quiriquire Block, which was acquired by Repsol YPF Venezuela on June 30, 2000 from BP Exploration Venezuela Limited for approximately $53.0 million;[17] (2) a 75% interest in the Guarapiche Block;[18] (3) a 25% interest in

---

[17] Soto Decl. Ex. 67 (Repsol 2000 Form 20-F, at 21); Soto Decl. Ex. 87 (June 28, 2000, Excerpt from Quiriquire Sale and Purchase Agreement between BP Exploration Venezuela Limited and Maxus Venezuela S.A., YPF0038255 –

Quiamare La Ceiba Block and 50% interest in the Guarico Occidental Block;[19] and (4) an entity named Astra Produccion Petrolera.[20]

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 78.

79.     On August 1, 2001, the YPFI Board approved the sale of Repsol YPF Venezuela S.A. (a Venezuela corporation) to Repsol Exploración S.A. (a Spanish corporation), effective July 1, 2001, for $26,297,243. Soto Decl. Ex. 2 (Aug. 1, 2001, YPFI Ltd.'s Directors' Resolutions, REPSOL0007441 – REPSOL0007450); Soto Decl. Ex. 90 (Aug. 20, 2001, Stock Purchase and Sale Agreement, REPSOL0045339 – REPSOL0045345); Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 329). Following the acquisition, Repsol Venezuela S.A. paid off $83,049,268 in debt owed by Repsol YPF Venezuela to YPFI. *See* Soto Decl. Ex. 91 (Corporate Restructuring of Latin America and Distribution of YPF S.A. Dividend, REPSOL-E-0000068136); Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 329). The total consideration paid to YPFI in connection with the sale was $109,682,950. *Id.* KPMG performed a valuation of Repsol YPF Venezuela on December 31, 2000, and determined that its stock was worth $87,090,485. *Id.* KPMG arrived at the $26.3 million as of June 30, 2001 after "movements related to [certain assets] [were] excluded (reversed) in order to prevent duplication" from an earlier purchase of Repsol YPF Venezuela's Quiriquire Block by Maxus Venezuela (C.I.) Ltd.,[21] and working capital adjustments. Soto Decl. Ex. 93 (Email re: Reconciliation of Purchase Price of Repsol YPF Venezuela to KPMG Finance Valuation Report,

---

YPF0038263).

[18] Soto Decl. Ex. 88 (June 28, 2000, Guarapiche Sale and Purchase Agreement between BP Exploration Orinoco Limited, Amoco Venezuela Energy Company B.V., and Maxus Venezuela S.A., YPF0038171 – YPF0038254).

[19] Soto Decl. Ex. 86 (Mar. 16, 2000, Email regarding Integration Projects, REPSOL-E-0000067640_TR).

[20] Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 412:13-23); Soto Decl. Ex. 89 (Apr. 27, 2001, KPMG Valuation of Maxus Venezuela S.A., Astra Producción Petrolera, S.A., and Maxus Venezuela (C.I.), YPF0031903_CTR – YPF 0031955_CTR).

[21] Soto Decl. Ex. 92 (Calendar Year 2001 Corporate Reorganization among Certain Subsidiaries of Repsol YPF, S.A., MAXUS3215009 – MAXUS3215011, at MAXUS3215009).

dated Aug. 24, 2001, YPF-E-0000146603_CTR – YPF-E-0000146604_CTR).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 79.

80.    On September 1, 2001, YPFI sold its equity interest in Maxus Venezuela Ltd. ("**Maxus Venezuela Limited**," a Cayman islands company) to Repsol Exploración Venezuela B.V. (a Dutch corporation) for $47,379,731. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 330); Soto Decl. Ex. 94 (Sept. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045346 – REPSOL0045354). Repsol Exploración Venezuela B.V. also paid $155,649,132 to YPFI is cancellation of debt owed by Maxus Venezuela Limited in connection with the sale, such that the total consideration to YPFI was $203,028,863. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 330); Soto Decl. Ex. 91 (Corporate Restructuring of Latin America and Distribution of YPF S.A. Dividend, REPSOL-E-0000068136). KPMG performed a valuation of Maxus Venezuela Limited and determined it was worth $(11,651,689). Soto Decl. Ex. 89 (KPMG Valuation of Maxus Venezuela S.A., Astra Producción Petrolera, S.A., and Maxus Venezuela Ltd. as of Dec. 31, 2000, YPF0031903 – YPF0031955, at YPF0031905). The purchase price of approximately $47.4 million reflected the approximately $58.9 million value of Repsol YPF Venezuela's Quiriquire Block that Maxus Venezuela Limited acquired, minus KPMG's valuation of $(11,651,689). Soto Decl. Ex. 93 (Email re: Reconciliation of Purchase Price of Repsol YPF Venezuela to KPMG Finance Valuation Report, dated Aug. 24, 2001, YPF-E-0000146603_CTR – YPF-E-0000146604_CTR); Soto Decl. Ex. 94 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045346 – REPSOL0045354).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 80.  The Trust notes that according to the Pulliam Report, YPFI sold its equity interest in Maxus Venezuela Ltd. on September 20, 2001, not September 1.  Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 330).

81.    Also on September 1, 2001, YPFI sold its equity interest in Maxus Guarapiche Ltd. (a Cayman Islands company) to Repsol Exploración Venezuela B.V. for $1.00. Soto Decl. Ex. 95 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045355 – REPSOL0045363, at REPSOL0045358). Maxus Guarapiche's only asset was an exploration block that was a dry hole. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 424:4-11).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 81.

82.    Repsol Exploración Venezuela B.V. is not a Defendant in this lawsuit. Compl. at 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 82.

83.    Maxus was not a party to the 2001 agreements for the sale of Repsol YPF Venezuela S.A., Maxus Venezuela Limited, or Maxus Guarapiche Ltd. Soto Decl. Ex. 90 (Aug. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045339 – REPSOL0045345) (Repsol YPF Venezuela S.A.); Soto Decl. Ex. 96 (Sept. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045346 – REPSOL0045354) (Maxus Venezuela Limited); Soto Decl. Ex. 95 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045355 – REPSOL0045363) (Maxus Guarapiche Ltd.).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to the agreements.  To the extent Maxus and Repsol were alter egos, the assets of one are the assets of the other.

84.    The YPFI board approved the sale of its Venezuelan assets. Soto Decl. Ex. 96 (Aug.

39

1, 2001 YPFI Directors' Resolutions, MAXUS4142856 – MAXUS4142863); Soto Decl. Ex. 97 (Sept. 20, 2001 YPFI Directors' Resolutions, REPSOL0007421 – REPSOL0007440).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 84.

85.    The sale was publicly disclosed. Soto Decl. Ex. 85 (YPF 2001 Form 20-F, at F-28).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 85.

86.    The MLT's expert, Mr. Pulliam, does not dispute that YPFI sold its Venezuelan assets for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–122).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, including the Indonesian assets, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

3.    YPFI Ecuadorian Assets

87.    In an April 5, 2000, presentation, the Repsol Fiscal Committee addressed the integration of certain of YPFI's and YPF's Ecuador assets under one entity in the Repsol group. Soto Decl. Ex. 98 (Apr. 5, 2000, Integration Ecuador Repsol YPF Presentation, YPF-E-0000235242). The presentation noted that dividends from YPFI (a Cayman Islands company) to YPF (an Argentine company) were subject to a 10% taxation on top of a 25% Ecuador taxation. *Id.* at slide 4. "Fiscal losses in Ecuador [were] expected until 2003." *Id.* Repsol estimated that the proposed integration to generate a net tax saving of $14.5 million. Soto Decl. Ex. 99 (Apr. 5, 2000, Ecuador, Repsol – YPF Integration Presentation and Accompanying Notes YPF-E-

0000235233_TR – YPF-E-0000235241_TR, at YPF-E-0000235241_TR).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 87.

88.     On May 9, 2000 the YPF Board approved the potential sale of YPFI's assets in Ecuador. Soto Decl. Ex. 107 (YPF Board of Directors Resolution, YPF0045526 – YPF0045526, dated May 9, 2000). On January 3, 2001, YPFI assigned its rights and obligations in certain assets held by YPF Ecuador, Inc. (a Cayman Islands company) to Repsol YPF Ecuador S.A. ("**Repsol YPF Ecuador**") (a Spanish company) for $307,456,685. Soto Decl. Ex. 108 (Assignment of Rights and Obligations Corresponding to the Block 16 and Tivacuno Areas, dated Jan. 3, 2001, MAXUS5657547_TR – MAXUS5657549_TR). YPF Ecuador, Inc. obtained a valuation of the assets assigned from KPMG, which found the assets had a fair market value of $351,580,000 as of December 31, 1999. Soto Decl. Ex. 109 (KPMG Valuation of Ecuadorian Assets, dated Apr. 12, 2000, MAXUS5656664 – MAXUS5656682). The sale price for the 2001 assignment resulted from KPMG's $351 million valuation plus "book equity variance" of $31.1mm and minus and intercompany receivable of $75.24mm. Soto Decl. Ex. 110 (Email from Javier Vega Lera to Gabriel Leiva re: Intergroup Sales, dated Apr. 24, 2001, YPF-E-0000235465_TR).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 88.

89.     Repsol YPF Ecuador is not a Defendant in this lawsuit. Compl. at 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 89. The Trust further submits that transfers concerning YPF Ecuador may still be fraudulent to the extent YPF Ecuador is an alter ego of YPF, Maxus, or Repsol.

90.     Maxus was not a party to the agreement for the sale of YPF Ecuador to Repsol YPF

Ecuador. Soto Decl. Ex. 108 (Assignment of Rights and Obligations Corresponding to the Block 16 and Tivacuno Areas, dated Jan. 3, 2001, MAXUS5657547_TR – MAXUS5657549_TR).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to the agreement.  To the extent Maxus and Repsol were alter egos, the assets of one are the assets of the other.

91.    On November 30, 2001, the YPFI board approved the sale of the YPFI Ecuadorian Assets to Repsol YPF Ecuador for $307,456,685. Soto Decl. Ex. 111 (Nov. 30, 2001, YPFI Directors' Resolutions, YPF-E-0000050546 – YPF-E-0000050547).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 91.

92.    The sale was publicly disclosed. Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 12).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 92.

93.    Repsol YPF Ecuador also purchased YPF's 25% interest in Block 14 in Ecuador from YPF on October 31, 2001 for $6,805,678. Soto Decl. Ex. 112 (Oct. 26, 2001 Email from Javier Nogales to Miguel Benavides de la Vega re Latin American Operations REPSOL-E_0000226092_TR). Maxus never owned Block 14. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 398-18:399-5).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 93.

94.    The MLT's expert, Mr. Pulliam, does not dispute that YPFI assigned or YPFI sold the YPFI Ecuador Assets for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–122).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in

42

dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, including the Indonesian assets, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

    4.    <u>YPFI Indonesian Assets</u>

95.    In July of 1999, Repsol's Integration Committee "studied a project regarding the financial, accounting, and fiscal integration of Indonesia." Soto Decl. Ex. 113 (Jan. 19, 2000 Email from Carmelo de las Morenas to Mario Rosso re Reorganization of Shareholdings in Indonesia, YPF-E-0000144962_TR). However, the Integration Committee determined that Indonesia was non-strategic and suspended the integration process to focus on a sale of the group's Indonesian assets. *Id.* at YPF-E-0000144963_TR.

    *Responses and Objections:* Subject to its General Objections, the Trust a does not dispute the facts set forth in paragraph 95.

96.    YPF also had a strategy to refocus in Argentina, and part of that refocusing involved the sale of its international assets, which included Indonesia. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 363:5-14). "On February 2, 2000, [YPF's] Board of Directors approved undertaking efforts to divest the investments held by [YPFI] in Indonesia." Soto Decl. Ex. 68 (YPF S.A. Form 20-F for the fiscal year ended Dec. 31, 2000, at p. 9).

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 96.

97.    Repsol retained Schroder Salomon Smith Barney ("**SSSB**") and Waterous and Co. ("**Waterous**") to assist with divestment of Indonesian assets held by YPFI, other YPF subsidiaries, Repsol Exploración S.A., and RIF (collectively the "**Indonesian Assets**"). *See* Soto Decl. Ex. 114 (May 2000 Waterous/Schroder Salomon Smith Barney Indonesian Portfolio Opportunity

Information Memorandum SW-USA-000246 – SW-USA-000483, at SW-USA-000267). The Indonesian Assets were comprised of more than just YPFI's interests in Southeast Sumatra (SES) and Northwest Java (ONWJ), previously owned by Maxus. *Id.* at SW-USA-000255–56, SW-USA-000259; Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 333). SSSB and Waterous valued the Indonesian Assets at a range of $597 million to $1.01 billion. Soto Decl. Ex. 115 (July 31, 2000, Project Almeria Indicative Valuation Summary, REPSOL0035636 – REPSOL0035649, at REPSOL0035643).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 97.

98.    After reaching out to 72 entities, Repsol received three offers for the YPFI Indonesian Assets and seven offers for parts of the YPFI Indonesian Assets. Soto Decl. Ex. 116 (Oct. 30, 2000, Project Almeria Bid Summary, REPSOL0040011 – REPSOL0040021, at REPSOL0040012). After a potential deal with the Korean National Oil Company fell through,[22] Repsol (and certain of its subsidiaries), YPFI, YPF Energy Holdings, and China National Offshore Oil Corporation and its subsidiaries ("**CNOOC**") entered into a share purchase agreement whereby CNOOC, an independent company, purchased nine Indonesian companies (two YPFI subsidiaries, several YPF subsidiaries, and several Repsol subsidiaries) for a total contract purchase price of $585.0 million. Soto Decl. Ex. 117 (Jan. 18, 2002, Stock Purchase Agreement, REPSOL0009893 – REPSOL0010146, at REPSOL0009901 – REPSOL0009902). None of the parties to the January 18, 2002 Stock Purchase Agreement are domiciled in the United States. *Id.* at REPSOL0009896. The parties attributed $386,365,000 to YPF – Maxus Southeast Sumatra B.V. and YPF Java Baratlaut B.V., collectively. *Id.* at REPSOL0009901; Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 333).

---

[22] Soto Decl. Ex. 118 (Email regarding Indonesian Deal, dated June 19, 2001, REPSOL0021417 – REPSOL0021419, at REPSOL0021417 – REPSOL0021419).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 98.

99.    Maxus was not a party to the January 18, 2002 stock purchase agreement with CNOOC. Soto Decl. Ex. 117 (Jan. 18, 2002, Stock Purchase Agreement, REPSOL0009893 – REPSOL0010146, at REPSOL0009901 – REPSOL0009902).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to the agreement to the extent Maxus and YPFI are alter egos.

100.    The YPF Energy Holdings N.V. and YPFI boards approved the sale of their respective Indonesian assets. Soto Decl. Ex. 119 (Jan. 17, 2002 Email from Gerry Conner to Dick Smith attaching the relevant YPFI and YPF Energy Holdings N.V. board resolutions, MAXUS1211202 – MAXUS1211207).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 100.

101.    The sale was publicly disclosed. Soto Decl. Ex. 84 (YPF Form 20-F, December 31, 2002 at 104).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 101.

102.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, including the Indonesian

45

assets, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

5.    YPFI Bolivian Assets

103.    On December 14, 2000, the Executive Committee of Repsol approved a project for the integration of the international assets in Bolivia. Soto Decl. Ex. 120 (Presentation on Relocation of Assets in Bolivia, REPSOL0044422_TR – REPSOL0044430_TR, at REPSOL0044422_TR). The objective of this integration was to simplify the corporate structure of the Bolivian entities (*id.*) and to gain tax advantages that would result in an estimated savings of $17 million from 2001-2010. Soto Decl. Ex. 121 (Nov. 13, 2000, Bolivia Repsol YPF Integration Presentation, REPSOL-E-0000067641, at slide 4).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 103.  The Trust disputes the facts highlighted in red to the extent that they are unsupported by the cited evidence.

104.    On May 17, 2002, YPFI re-domiciled from the Cayman Islands to Bolivia. Soto Decl. Ex. 122 (May 17, 2002, Administrative Resolution 23972/2002, Bolivian Ministry of Economic Development, MAXUS5659428 – MAXUS5659433, at MAXUS5659432). YPFI then split into YPFI, S.A. (a Bolivian company holding all of YPFI's assets except those in Bolivia) and Repsol YPF Santa Cruz S.A. (holding Bolivian assets known as Andina Corp. and Maxus Bolivia Inc.). Soto Decl. Ex. 123 (May 21, 2002 Email from Fernando Nardini to Carlos Felices re Bolivian Transactions, YPF-E-0000051697).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 104.

105.    On March 17, 2002, KPMG valued YPF's stake in Andina at $705-$741 million. Soto Decl. Ex. 124 (Mar. 17, 2002 KPMG Letter to the YPF Board, YPF-E-0000120438 – YPF-E-000012043).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 105.

106.    Maxus never owned Andina Corp. *See* Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 433:17-21).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 106.

107.    BDO Lichtenstein valued Maxus Bolivia, Inc. between approximately $174 and $203 million. *See* Soto Decl. Ex. 125 (Mar. 5, 2002 BDO Valuation, YPF0031407 – YPF0031488, at YPF0031424).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 107.

108.    YPF sold the shares of Repsol YPF Santa Cruz (a Spanish company) to Repsol S.A. on July 10, 2002 for $883 million. Soto Decl. Ex. 126 (July 10, 2002, Agreement for the Purchase of Shares of Repsol YPF Santa Cruz S.A., REPSOL 0022627_TR – REPSOL 0022631_TR); MLT Statement of Facts ¶ 94. Around 80% of the $883 million related to Andina Corp., which Maxus never owned. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 384:17-385:1, 433:17-21).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 108.  The Trust disputes the facts highlighted in red to the extent that that Soto Decl. Ex. 83 does not support Repsol Defendants' assertion that "[a]round 80% of the $883 million related to Andina Corp."

109.    Maxus was not a party to 2002 sale of YPFI's Bolivian Assets. Soto Decl. Ex. 126 (July 10, 2002 Share Purchase Agreement, REPSOL0022627 – REPSOL0022631).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to

the agreement to the extent Maxus and YPFI are alter egos.

110.    Both the YPFI and YPF boards approved the Bolivian transaction. Soto Decl. Ex. 127 (Mar. 8, 2002 YPFI Board Minutes & Mar. 8, 2002, YPF Board Minutes, YPF0045154 – YPF0045164).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 110.

111.    The sale was publicly disclosed. Soto Decl. Ex. 84 (YPF 2002 Form 20-F at 22).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 111.

112.    The MLT's expert does not dispute that YPFI sold the YPFI Bolivian Assets for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–122).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

113.    During the 2001-02 YPFI Transactions, and until Repsol was expropriated from YPF (discussed *infra* section VI), the YPF Board of Directors, in accordance with Argentine law, contained independent directors, including some appointed by the Argentine government. *E.g.*, Soto Decl. Ex. 84 (YPF 2002 Form 20-F at 85) ("The Government of the Argentine Republic, sole holder of Class A shares, in accordance with YPF's bylaws and in accordance with the above mentioned modification to YPF's Bylaws, are entitled to elect one director and one alternate to serve up to a one-year term."); Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 69) (same); YPF 2000

Form 20-F at 64) (same); Soto Decl. Ex. 127 (YPF 2002 Form 20-F at 70-71) (listing Board of Directors); Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 57) (same); Soto Decl. Ex. 128 (Repsol 2002 Form 20-F at 91) (same); Soto Decl. Ex. 129 (Repsol 2001 Form 20-F at 90) (same); Soto Decl. Ex. 67 (Repsol 2000 Form 20-F at 75) (same); Soto Decl. Ex. 130 (Sept. 1, 2015, Carlos Olivieri Dep. at 116:11-117:13) Soto Decl. Ex. 131 (Sept. 2, 2015, Carlos Olivieri Dep. at 392:1-393:24)

Soto Decl. Ex. 132 (Oct. 16, 2015, Pablo Blanco Dep. at 352:4-353:4)

Soto Decl. Ex. 133 (Sept. 9, 2015, Pablo Blanco Dep. at 177:16-178:14)

The YPF board met and conducted company business through board resolutions. *See e.g.*, Soto Decl. Ex. 107 (YPF Board of Directors Resolution, YPF0045526 – YPF0045526, dated May 9, 2000).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 113. The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

### D.      Repsol Creates Repsol E&P

114.      Repsol created a new Repsol subsidiary in 2005, Repsol USA Holdings, as well as various operating subsidiaries underneath the holding company, including Repsol E&P USA, Inc. and Repsol Services Company. *See* Soto Decl. Ex. 134 (Repsol, S.A. Form 20-F for the fiscal year ended December 31, 2006, at p. 36, F-136). Repsol E&P USA, Inc. sought to invest in less risky, more developed prospects. *E.g.*, Soto Decl. Ex. 27 (2021 Hartline Dep. at 71:5-10, 72:3-8). Maxus sought to invest in less developed prospects. *Id.* at 72:13-16. These were different types of investments from an oil and gas perspective. *Id.* at 72:17-24.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 114. The Trust disputes that Repsol E&P USA, Inc. invested in less risky, more developed prospects, as Repsol E&P USA also invested in numerous lease sales and purchased numerous undeveloped properties such as Ra, Stormy Monday, and Tiger.

115.      Repsol E&P USA, Inc. maintained a separate office from Maxus. *See supra* ¶¶ 4, 10; *see also* Soto Decl. Ex. 135 (Aug. 4, 2021, Michael Mills[23] Dep. ("**2021 Mills Dep.**") at 265:17-266:19)

*Responses and Objections:* The Trust disputes the facts set forth in paragraph 115 to the extent that Repsol E&P USA, Inc. did not initially maintain separate offices from Maxus, had the same leadership as Maxus, and initially hired no staff of it's own..

116.      From 2003 to 2009, Maxus and its subsidiaries, on the one hand, entered into many

---

[23] Michael Mills was Maxus's CFO from 2007 to 2009. See MLT Disclosures at 11; Soto Decl. Ex. 134 (2021 Mills Dep. at 34:21-35:2; 153:16-25).

service agreements with Repsol or its subsidiaries, on the other. *See, e.g.*, Soto Decl. Ex. 136 (Jan. 1, 2003 Services Agreement between Maxus and Repsol S.A., MAXUS5865835 – MAXUS5865843); Soto Decl. Ex. 137 (Nov. 16, 2003 Services Agreement between Repsol Exploration Mexico S.A. de C.V., and MIEC, RSC-E-0000001863 – RSC-E-0000001869); Soto Decl. Ex. 138 (Jan. 1, 2005 Services Agreement between Maxus and Repsol S.A., RSC-E-0000002480 – RSC-E-0000002488); Soto Decl. Ex. 139 (Jan. 1, 2005 Services Agreement between Maxus and Repsol E&P USA Inc., REPSOL0009494 – REPSOL0009500); Soto Decl. Ex. 140 (June 1, 2005 Services Agreement between Maxus and Repsol YPF Brasil, S.A., RSC-E-0000000682 – RSC-E-0000000688); Soto Decl. Ex. 141 (Dec. 1, 2005 Services Agreement between Maxus and Repsol Exploracion, S.A., RSC-E-0000002277 – RSC-E-0000002285); Soto Decl. Ex. 142 (Jan. 1, 2006 Services Agreement between RSC and Maxus, MAXUS4503275 – MAXUS4503280); Soto Decl. Ex. 143 (Jan. 1, 2007 Services Agreement between RSC and Maxus, MAXUS5695134 – MAXUS5695143); Soto Decl. Ex. 144 (Mar. 1, 2007 Transition Services Agreement between Maxus and RSC, MAXUS5142656 – MAXUS5142662); Soto Decl. Ex. 145 (Jan. 8, 2008 Services Agreement between RSC and Maxus, MAXUS5887388 – MAXUS5887396); Soto Decl. Ex. 146 (May 17, 2006 Email from Dick Smith to Luis Garcia re Services Agreements, MAXUS5828965 – MAXUS5828968) (listing certain Maxus service agreements with certain affiliates); Soto Decl. Ex. 27 (2021 Hartline Dep. at 44:13-15).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 116. The Trust disputes that there were "many" service agreements, as the YPF Holdings' Internal Controls audits clearly explains that many services were performed without a service agreement. *See* Yoo Ex. 11 (YPF Holdings' Internal Controls Summary of Internal and External Audits, RSC-E-00000010309).

117.    Where no such agreement was in place, Maxus would invoice Repsol for its employees' time. Soto Decl. Ex. 27 (2021 Hartline Dep. at 44:18-23)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 117.  Many services provided by Maxus were written off as shown in the YPF Holdings' Internal Controls audits, and the intercompany rate Maxus received for providing these services was below the market. *See* Yoo Ex. 11 (YPF Holdings' Internal Controls Summary if Internal and External Audits, RSC-E-00000010309); Lee Decl. Ex. 115 (Pulliam Rep. at ¶ 251).

## E.    Maxus's Gulf of Mexico Activity

118.    By 2006, Maxus had increased its portfolio of exploratory prospects to 74 deepwater lease blocks in the Gulf of Mexico (up from 25 blocks, including 2 ORRIs, in 1999, when Repsol acquired YPF). Soto Decl. Ex. 147 (Feb. 14, 2006, YPFH Board of Directors Minutes, MAXUS6097677 – MAXUS609687, at MAXUS6097678); Soto Decl. Ex. 58 (YPF S.A. Form 20-F for the fiscal year ended December 31, 1999, at p. 27).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 118.

### 1.    Maxus Purchases an Interest in Neptune

119.    On May 22, 2003, Maxus entered into a participation agreement for a 15% share in the Neptune joint venture ("**Neptune**") with BHP in the Deepwater Gulf of Mexico in May 2003. MLT Statement of Facts ¶ 96; Soto Decl. Ex. 148 (July 31, 2002 Memo from TJ Winczewski to the Files, Houston re YPF Hodgins Related Party Receivable, DT000137 – DT000138); Soto Decl. Ex. 27 (2021 Hartline Dep. at 92:8-22).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 119.  The Trust notes that neither Soto Decl. Ex. 148 nor Soto Decl. Ex. 27 reference the Neptune joint venture.

120.    By 2005, the estimated value of Neptune was between $150 million and upwards of $600 million. Soto Decl. Ex. 149 (Randall & Dewey December 2005 Presentation to the YPFH Board of Directors, YPF0021272 – YPF0021339, at YPF0021277).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 120.

121.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Soto Decl. Ex. 151 (Project Yazstremski Asset Assessment, dated Feb. 14, 2006, SW-USA 000011

– SW-USA 000078, at SW-USA 000036)

      *Responses and Objections:* Subject to its General Objections, the Trust disputes the

---

[24] Jon Slater was Maxus's CEO and President from 2007 to 2009. See MLT Disclosures at 17; Soto Decl. Ex. 150 (Slater Dep. at 18:13-21).

statements of fact in this paragraph.  The Trust submits that operational expenses would include the ability to pay off environmental liabilities and increase environmental reserves.  Neptune, even if successful, would not be sufficient enough to pay off those expenses as they came due.



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 122.



These repairs resulted in a delay from March 2008 to June 2008. Soto Decl. Ex. 153 (YPFH Consolidated Financial Statements as of December 31, 2008 and 2007, at 5, MAXUS3219247 – MAXUS3219275).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 123.

124.    Once Neptune came online in July of 2008 (*id.*), it suffered from two hurricanes that shut down production. Soto Decl. Ex. 135 (2021 Mills Dep. at 60:20-25). One of them was Hurricane Ike, a category 4 hurricane, which hit in September of 2008. Robbie Berg, *Tropical*

[25] Tamara Saront was a financial analyst at YPF from 1998 to 2005, Maxus CFO from 2005-2007, and financial manager at RSC from 2007 to 2014. See MLT Disclosures at 16; Soto Decl. Ex. 152 (Mar. 6, 2015, Tamara Saront Dep. at 14:4-18:20).

*Cyclone Report, Hurricane Ike*, NOAA (updated Mar. 18, 2014), available at https://www.nhc.noaa.gov/data/tcr/AL092008_Ike.pdf.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 124.

125.

This resulted in a monthly decrease in cash of $11 million, or $131.9 million annualized. *Id.* at 62:20-63:2. From April 2008 to December of 2008, the price of a barrel of oil dropped from almost $140 a barrel to below $40.00 a barrel. *Id.* at 50:23-52:5; Soto Decl. Ex. 69 (Bramer Rep. at ¶¶ 555–56).

Michael Mills, Maxus's CFO from 2007-2009,[26] stated the following:

I think I am partially focusing my frustration on my friends at parent when the frustration is more a result of the 40% volume reduction and 65% price drop since August. In August I was formulating analytical means for recommending the best way to invest our surplus cash flows (vs. paying back the Neptune loan early) and am now I am trying to make payroll. Poor pitiful Pearl but physiologically we first took a body blow with the pontoon delay and now the market is in the toilet and Neptune is producing nothing close to platform capacity and [BHP] is likely to make more cash calls that we will economically need to participate in. We sure could have used that late March to early July production and at those prices along with the $17M lost revenue from the two hurricanes to have a cash balance to draw on heading into 2009 … The current market and operational conditions do not result in a successful outcome to the strategy by parent to leave us with assets to make us self supporting. We need revenue of $16M to $18M per month (i.e. basically the numbers I calculated on the plane coming back from Cleveland) not the $5M that $40 per barrel and 29,000 volume gives us.

Dec. 5, 2008 email from M. Mills to J. Slater, MAXUS5392370 – MAXUS5392371, at MAXUS5392370.

---

[26] See MLT Disclosures at 11; Soto Decl. Ex. 135 (2021 Mills Dep. at 34:21-35:2; 153:16-25).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 125.

**F.    Tiger/North Bronto and Stormy Monday**

126.    In 2005, the YPFH Board of Directors authorized an independent assessment of the fair market value of the Gulf of Mexico. Soto Decl. Ex. 154 (YPF Holdings, Inc. Board of Directors Minutes, Nov. 15, 2005, REPSOL0001429 – REPSOL0001440). YPFH engaged Scotia Waterous to value its Gulf of Mexico Assets, which included Tiger/North Bronto and Stormy Monday. Soto Decl. Ex. 155 (Project Yazstremski Asset Assessment, dated June 21, 2006, RSC-E-0000002585 – RSC-E-0000002640).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 126.

127.    On June 21, 2006, Scotia Waterous valued Tiger/North Bronto and Stormy Monday between $22 million and $29 million. *Id.* at RSC-E-0000002640. In June 2006, Repsol E&P USA, Inc. offered to purchase Maxus's interest in Stormy Monday and Tiger/North Bronto for a cash payment of $28 million. *See* Soto Decl. Ex. 227 (Email from David Wadsworth re: Offer to Purchase, MAXUS5087418 – MAXUS5087420, dated June 29, 2006). The YPFH board discussed the "benefits of potentially having a future cash flow from overriding royalty interests to offset Company expenses over time," as opposed to obtaining an upfront cash payment. *See* Soto Decl. Ex. 226 (YPFH Board of Directors Meeting minutes, MAXUS5824913 – MAXUS5824923, dated June 21, 2006).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 127.

128.    The YPFH board requested Scotia Waterous provide an analysis for the Board to

consider the basis of a cash offer, ORRI, or a combination. *Id.* On July 5, 2006, Repsol E&P USA, Inc. submitted an offer in the form of an ORRI of 8% interest in Stormy Monday and 19% interest in Tiger/North Bronto. *See* Soto Decl. Ex. 156 (Email re: Repsol Offer, dated July 5, 2006, MAXUS5088380 – MAXUS5088381). On July 6, 2006, Guzman Solana requested authorization from the YPF S.A. Board to enter into an agreement with Repsol E&P USA, Inc. for the exchange of 9% ORRI for Stormy Monday and 19% ORRI for Tiger/North Bronto. *See* Soto Decl. Ex. 157 (Email from Guzman Solana, dated July 6, 2006, YPF0022184). Additionally, Repsol E&P USA, Inc. would be responsible for 100% of the exploration and production of the holdings. *Id.*



On July 12, 2006, Maxus and Repsol E&P USA, Inc. entered into a Memorandum of Understanding, whereby Repsol E&P USA, Inc. agreed to an increased ORRI of 9.5% in exchange for the Stormy Monday interest, and 19% ORRI for Tiger/North Bronto. *See* Soto Decl. Ex. 158 (Memorandum of Understanding, dated July 12, 2006, REPSOL-E-0000001621 – REPSOL-E-0000001648).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 128.

129.    In August 2006, Scotia Waterous presented a fairness valuation to the YPFH Board, concluding that the terms of the transaction provided in the Memorandum of Understanding were

fair from a financial point of view. *See* Soto Decl. Ex. 159 (YPF Holdings, Inc. Board Minutes, dated Aug. 8, 2006, MAXUS3372923 – MAXUS3372937); Soto Decl. Ex. 160 (Aug. 10, 2021, Shaun Finnie Dep. at 113:4-15) (Scotia Waterous managing director testifying that the 19% ORRI that Repsol E&P USA, Inc. transferred for Tiger/North Bronto was on the higher end of the range provided in Scotia Waterous's recommendation). The YPFH Board considered "the limited sources of income to fund the development of the Stormy Monday, Tiger and North Bronto prospects and the level of expenditures required to explore and . . . develop these prospects." *Id.*

The Board determined that the terms of the transaction "would relieve the Company from the obligation of funding the exploration and development of these prospects," while also "preserve an 'up-side potential for the Company." *Id.* The Board unanimously approved the transaction. *Id.* The Board included independent directors. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 121:9-18).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 129. The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

130.    Maxus was represented by outside counsel, Jones Walker, in connection with the transaction. Soto Decl. Ex. 161 (Email from David Wadsworth, dated July 19, 2006, MAXUS5091288 – MAXUS5091290) ("It is my understanding that each company has selected an outside law firm to represent it in connection with this matter. Maxus US has selected Jones Walker.").

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 130.

131.    In July 2006, Repsol E&P USA, Inc. bought the remaining 50% interest in Stormy Monday owned by third-party Murphy Exploration (Maxus owned only 50%) for only 5% gross/2.5% net ORRI, less than what Maxus received. Soto Decl. Ex. 162 (Email from Wanda Slocum, dated Aug. 23, 2006, MAXUS5096128 – MAXUS5096130.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 131.

132.    Repsol E&P USA, Inc. drilled dry holes at Stormy Monday and Tiger/North Bronto. MLT Statement of Facts ¶ 103. Repsol incurred $43.1 million in drilling costs for Stormy Monday, and $7.6 million for Tiger/North Bronto. Soto Decl. Ex. 163 (Repsol USA Financial Statements for Year End 2007, MAXUS5288786, at 2007 Tax. Inc. Summary sheet).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 132.

133.    Other than the sale of Stormy Monday and Tiger/North Bronto, there was no sale of an E&P asset from a Maxus subsidiary to a Repsol subsidiary. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 125:12-23).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in paragraph 133. ████████████████████████████████
████████████████████████████

134.    Maxus rejected an offer from Repsol Offshore E&P USA, Inc. to purchase its Guppy Wake asset. *See* Soto Decl. Ex. 164 (Dec. 4, 2007 Letter from Tom Duncan to James Higgins, REPSOL-E-0000109152 – REPSOL-E-0000109155, at REPSOL-E-0000109154).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 134.

135.    Maxus rejected an offer from Repsol Offshore E&P USA, Inc. to purchase its Ra asset. Soto Decl. Ex. 165 (Sept. 3, 2007 Email from James Higgins to Walter Forwood, MAXUS5670543 – MAXUS5670547, at MAXUS5670544).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 135.

136.    Cumulatively, the MLT asserts a total shortfall of $568.5 to $675.4 million to Maxus on account of the 1996-97 Maxus Transactions, and $202.9 to 309.8 million attributable to Repsol on account of the Crescendo Sale and undefined Gulf of Mexico. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 9).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 136.  The Trust disputes the use of "and $202.9 to 309.8 attributable" as being misleading, it should say instead "of $202.9 to 309.8 attributable."

## V.    The King & Spalding Memo

137.



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 137.  However, the Trust objects to

the use of Repsol's corporate representative testimony as admissible evidence for the fact highlighted in red. Mr. Blanco was not at Repsol at the time of the hiring of King & Spalding and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16) ███████████████████████

██████████████████████

138.    On May 24, 2005, King & Spalding sent a letter to Augustin Garcia Moratilla regarding evaluation of strategic alternatives regarding Maxus Energy Corporation and Tierra Solutions, Inc. Soto Decl. Ex. 166 (May 24, 2005 Letter from James Pardo to Agustin Garcia Moratilla re: Evaluation of Strategic Alternatives Regarding Maxus and Tierra, YPF_MAXUS_0000293057 – YPF_MAXUS_0000293103). To conduct its analysis, King & Spalding was advised to assume for purposes of the analysis that Maxus was insolvent given the uncertainty surrounding the extent of Maxus's contingent environmental liabilities. *Id.* at YPF_MAXUS_0000293083; Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 274:21-275:6) ██████

████████████████████████████████████

████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Repsol and YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege. In seeking to establish the facts in paragraph 138, the Trust submits that the Repsol and YPF Defendants have effectuated a subject matter waiver of all King & Spalding documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield the Repsol or YPF Defendants from Maxus' environmental liabilities. Repsol is requesting this Court to make a finding that Repsol requested King & Spalding assume Maxus's insolvency. However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact. Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact. The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver. Further, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for this fact. Mr. Blanco was not at Repsol at the time of the hiring of King & Spalding and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep.

29:13-16)

139.    At no point did King & Spalding conduct a solvency analysis. Rather, King & Spalding was directed to assume for purposes of its analysis that Maxus was insolvent. Soto Decl. Ex. 166 (May 24, 2005 Letter from James Pardo to Agustin Garcia Moratilla re Evaluation of Strategic Alternatives Regarding Maxus and Tierra, YPF_MAXUS_0000293057 – YPF_MAXUS_0000293103, at YPF_MAXUS_0000293083 – YPF_MAXUS_0000293084)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege. In seeking to establish the facts in paragraph 139, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities. Repsol is requesting this Court to make a finding that King & Spalding never conducted a solvency analysis. However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact. Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact. The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.

140.

63

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege. In seeking to establish the facts in paragraph 140, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities. Repsol is requesting this Court to make a finding that King & Spalding presented possible alternatives in dealing with the contingent environmental liabilities and made certain recommendations to ensure Repsol did not become liable for Maxus's contingent environmental liabilities. However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact. Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact. The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.

141.    Though bankruptcy was one alternative presented to achieve finality, as Repsol's corporate representative stated: ██████████████████████████████████████████████ ███████████████████████████████████ Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 303:20-304:3). ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege. In seeking to establish the facts in paragraph 141, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities. Repsol is requesting this Court to make a finding that Repsol was not interested in the alternative of bankruptcy presented by King & Spalding. However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact. Accordingly, the Trust submits this Court should determine that Repsol has effectuated a subject matter waiver or find an adverse inference against Repsol concerning this fact. The Trust reserves the right to seek discovery related to this fact in the event the Court

determines Repsol has effected a subject matter waiver. In addition, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for the fact highlighted in red.  Mr. Blanco was not at Repsol at the time of the King & Spalding memo, and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16) ███████████████████
████████████████████████████████

142.    The King & Spalding memorandum does not reference the 1996-97 Maxus Transactions, Crescendo Sale, or 2001-02 YPFI Transactions.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege.  In seeking to establish the facts in paragraph 142, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities.  Repsol is requesting this Court to make a finding that the King & Spalding memo does not reference the 1996-97 Maxus Transactions, Crescendo Sale, or 2001-02 YPFI Transactions.  However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact.  Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact.  The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.

A.    **2007 Settlement Agreements**

143.    In 2007, Maxus entered into three settlement agreements ("**2007 Settlement Agreements**") with RSC and Repsol E&P T&T to resolve disputes regarding intercompany services: on April 5, 2007 and April 27, 2007 with RSC, and on July 1, 2007 with Repsol E&P T&T. MLT Statement of Facts ¶ 120.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 143.

144.    The first of the 2007 Settlement Agreements, effective as of April 5, 2007, resolved a dispute between Maxus and RSC in connection with certain marketing and distribution services

that Maxus provided. MLT Statement of Facts ¶ 121; Soto Decl. Ex. 167 (Settlement Agreement between Maxus Energy Corporation and Repsol Services Company, dated Apr. 5, 2007, REPSOL0009487 – REPSOL0009489, at REPSOL0009487. On December 18, 2006, Maxus presented RSC with an invoice for $1,566,653.58 for annual fees. Soto Decl. Ex. 168 (Dec. 18, 2006 Maxus Invoice to RSC, MAXUS4534348 – MAXUS4534352, at MAXUS4534348). On April 5, 2007, RSC agreed to reimburse Maxus for all brokerage fees under the Agency Agreement, a total of $1,566,653.58. Soto Decl. Ex. 167 (Settlement Agreement between Maxus Energy Corporation and Repsol Services Company, dated Apr. 5, 2007, REPSOL0009487 – REPSOL0009489, at REPSOL0009487). In exchange, Maxus agreed that "the Settlement Amount shall be in full and final settlement of all claims by Maxus against RSC and its affiliated companies . . . arising from or in connection with claims for payment or reimbursement for Services rendered or expenses incurred under the Agency Agreement for the Applicable Period." *Id.* Sara Galley, secretary and in-house counsel of Maxus,[27] signed on behalf of Maxus. *Id.* at REPSOL0009489.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 144.

145.    The Maxus board of directors approved the April 5, 2007 settlement. Soto Decl. Ex. 169 (May 15, 2007 Maxus Written Consent of the Board of Directors in Lieu of a Special Meeting, REPSOL-E-0000010745 – REPSOL-E-0000010747). Two of the three directors, Messrs. Notestine and Sprouse, were independent of YPF and Repsol. Soto Decl. Ex. 10 (May 13, 2015, Harvey Smith Dep. at 158:7-59:12).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green set forth in paragraph 145. The Trust notes that Soto Decl. Ex. 169 does not mention the April 5, 2007 settlement specifically, but instead resolves "that all actions taken by the offices of the Company, and all acts and

---

[27] Slater Dep. at 52:20-24 ████████████████████████

things done under their authority, since the last general election of the officers of the Company, are hereby ratified and approved as acts of the Company." The Trust disputes the use of the term "independent" as the Repsol Defendants have not set forth a standard of independence. The Trust also disputes that there was any evidence showing that the directors were fully advised.

146.    The MLT's expert, Mr. Pulliam, does not dispute that the April 5, 2007 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–17).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Mr. Pulliam explicitly states in his report that:



Soto Decl. Ex. 47 (Pulliam Rep. ¶ 36).

Mr. Pulliam further states:



Soto Decl. Ex. 47 (Pulliam Rep. at 117).

147.    The second 2007 Settlement Agreement, dated April 27, 2007, was also between Maxus and RSC. MLT Statement of Facts ¶ 122. "[F]rom January 1, 2006 to and including February 28, 2007 (the 'Applicable Period')" Maxus and RSC provided services to and for the benefit of each other. Soto Decl. Ex. 170 (Settlement Agreement between Maxus Energy

67

Corporation and Repsol Services Company, dated Apr. 27, 2007, REPSOL0009583 – REPSOL0009586, at REPSOL0009586).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 147.

148.    On April 27, 2007, RSC and Maxus entered into a Settlement Agreement whereby Maxus agreed to prepare invoices for certain services rendered during the Applicable Period, and RSC, or the appropriate entity, would then pay such invoices. *Id.* In exchange, Maxus released "all members of the RSC Group and their affiliated companies . . . arising from or in connection with all claims for payment for the Maxus Services rendered during the Applicable Period." *Id.* at REPSOL0009584.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 148.

149.    The Maxus board of directors approved the April 27, 2007 settlement. Soto Decl. Ex. 171 (July 20, 2007 Minutes of the meeting of the Board of Directors of Maxus Energy Corporation, MAXUS3374225 – MAXUS3374225, at MAXUS3374225 – MAXUS3374226).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 149.

150.    The MLT's expert, Mr. Pulliam, does not dispute that the April 27, 2007 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–17).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.   Mr. Pulliam explicitly states in his report that:



Soto Decl. Ex. 47 (Pulliam Rep. ¶ 36).

151.    The July 1, 2007 Settlement Agreement resolved claims related to services including technical and economic evaluation, business development, oil and gas drilling and operations, seismic processing, and support to geological modelling provided by Maxus to Repsol E&P T&T between January 1, 2006 and March 31, 2007. MLT Statement of Facts ¶ 123. In exchange for $1.35 million from Repsol E&P T&T, Maxus released all claims against Repsol E&P T&T specifically related to services between January 1, 2006 and March 31, 2007 "related to Repsol E&P operations in the Republic of Trinidad and Tobago." Soto Decl. Ex. 172 (Settlement Agreement between Maxus Energy Corporation and Repsol E&P T&T Limited, dated July 1, 2007, REPSOL-E-0000011476 – REPSOL-E-0000011478, at REPSOL-E-0000011476).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 151.

152.    The MLT's expert, Mr. Pulliam, does not dispute that the July 1, 2007 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–17).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.   Mr. Pulliam explicitly states in his report that:



██████████████████████████████

Soto Decl. Ex. 47 (Pulliam Rep. ¶ 36).

B.    **The 2007/2008 Settlement Agreement**

153.    On October 8, 2007, YPF, YPFI, YPFH, Maxus, CLHH, Tierra, and MUSE entered into a settlement agreement to terminate the 1996 Assumption and Contribution Agreements (the "**2007/2008 Settlement Agreement**"). Under the 2007/2008 Settlement Agreement, Maxus and Tierra received "$14,430,000" in cash, and forgiveness of an "approximately US $363,772,381.92" receivable "YPFH [had] from Maxus." Soto Decl. Ex. 173 (Settlement Agreement, dated Oct. 8, 2007, YPF0030240 – YPF0030300, at YPF0030243, YPF0030245).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 153.

154.    The boards of Maxus and Tierra retained Stout Risius Ross, Inc. ("**SRR**") to analyze the fairness of the 2007/2008 Settlement Agreement and they concluded that it was "fair from a financial point of view." Soto Decl. Ex. 174 (Mar. 17, 2008, Maxus Energy Corporation and Tierra Solutions, Inc. Fairness Opinion, Stout Risius Ross, MAXUS5299922 – MAXUS5300081, at MAXUS5299935). In negotiating the 2007/2008 Settlement Agreement, Jones Walker represented Maxus and Bracewell Giuliani LLP represented YPF. Soto Decl. Ex. 175 (Mar. 13, 2015, Walter Forwood Dep. at 313:3-9).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 154.

155.    Repsol was not a party to 2007/2008 Settlement Agreement or required to make any payments, promises, releases, or representations thereunder, and was not involved in the negotiations thereof. *Supra* ¶ 153; Soto Decl. Ex. 51 (June 23, 2021, Walter Forwood Dep. at

70

39:24-40:3 [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust does not dispute that Repsol was not a named party to the 2007/2008 Settlement Agreement, but the Trust submits that the 2007/2008 Settlement Agreement was entered into at the direction of Repsol [REDACTED]

[REDACTED]

## C.    2009 Settlement Agreement

156.    On July 8, 2009, Repsol E&P USA, Inc., RSC, and Repsol Offshore E&P USA, Inc. (collectively, the "**2009 Settling Repsol Entities**") entered into a settlement agreement with Maxus to resolve various "good faith" disputes related to operations in the Gulf of Mexico, including software and data issues, and transfer of certain assets. Soto Decl. Ex. 11 (July 8, 2009 Settlement Agreement, REPSOL0009506 – REPSOL0009526, at REPSOL0009506). The 2009 Settlement Agreement related to outstanding invoices for services Maxus rendered to the 2009 Settling Repsol Entities, as well as invoices outstanding for services RSC provided to Maxus. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 156.

157.    The 2009 Settling Repsol Entities paid $50 million to Maxus and Maxus released the 2009 Settling Repsol Entities from the following:

> any and all claims by Maxus and/or any of the other Maxus Entities against any Repsol Entity and/or any of the other Maxus Entities against any Repsol Entity and/or any Affiliate thereof (other than Maxus and the other Maxus Entities), including without limitation,

71

against each of their respective partners, directors, officers, employees, contractors and agents, arising from or in connection with all [issues mentioned in the 2009 Settlement], or by virtue of the same, and has the effect of releasing, discharging, terminating and extinguishing any and all claims, liabilities and obligations in respect thereto.

The Settling Repsol Entities released Maxus from:

any and all claims, causes of action, damages, costs, obligations and liabilities that such Person and the Successors may have of any kind or nature whatsoever, whether now known or not currently known, anticipated or unanticipated, fixed, contingent or conditional, suspected or unsuspected, at law or in equity, existing or claimed to exist, arisen or that could be originated in whole or in part, in each in respect of any and all events, facts or circumstances existing on or before the date of execution of this Agreeent arising out of, in respect, or in connection with [issues mentioned in the 2009 Settlement].

*Id.* at REPSOL9513 – REPSOL9514.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 157.

158.    The 2009 Settlement Agreement was negotiated throughout mid-2008 up and until July 2009. Soto Decl. Ex. 176 (July 24, 2008 Email from Jon Slater to Matias Eskenazi re Maxus Presentation January Final, MAXUS5344755); Soto Decl. Ex. 177 (Nov. 26, 2008 Email from Jon Slater to James Higgins re Draft Settlement Agreement, MLTLEGACYESI_002053137 – MLTLEGACYESI_002053153) (attaching a draft of the 2009 Settlement Agreement, discussing problems with the draft); Soto Decl. Ex. 178 (Dec. 18, 2008 Email from Jon Slater to Paul Bohannon re Draft Settlement Agreement, MLTLEGACYESI_002071342 – MLTLEGACYESI_002071343) (attaching another round of edits to the 2009 Settlement Agreement).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 158.

159.    Maxus was represented by outside counsel, Andrews & Kurth, in connection with the 2009 Settlement Agreement. *See* Soto Decl. Ex. 179 (Dec. 1, 2008 Email from Jon Slater to Paul Bohannon re Draft Settlement Agreement, MLTLEGACYESI_002071295) (forwarding draft of 2009 Settlement Agreement to outside counsel); Soto Decl. Ex. 150 (Slater Dep. at 68:17-21)

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph, even if accurate, as irrelevant.  The Trust further objects to the characterization of Andrews & Kurth as "outside counsel" to the extent this characterizes Andrews & Kurth as independent outside counsel to Maxus.

160.    The Maxus board approved the 2009 Settlement Agreement. Soto Decl. Ex. 180 (July 2, 2009 Maxus Unanimous Written Consent, MAXUS3374090 – MAXUS3374112).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 160.

161.    Prior to entering into the 2009 Settlement Agreement, the parties entered into an Agreement for Advanced Payment, where Repsol agreed to provide an advanced payment to Maxus of $30 million in connection with the 2009 Settlement. Soto Decl. Ex. 181 (Feb. 9, 2009 Agreement for Advanced Payment REPSOL0009501 – REPSOL0009505). Jon Slater, Maxus's then CEO, ██████████████████████████████████████

████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 161.

162.    The 2009 Settlement Agreement contains the following provision:

Advice of counsel. The parties declare and acknowledge that each have had the opportunity to consult with, and receive advice from, competent legal counsel and that he negotiation and execution of this Agreement resulted from such consultations and advice, and that the terms of this Agreement are fully understood and voluntarily accepted without duress or coercion.

Soto Decl. Ex. 181 (Feb. 9, 2009 Agreement for Advanced Payment REPSOL0009501 –

REPSOL0009505, at REPSOL0009503). ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 162.

163.    The Maxus board approved the Agreement for Advanced Payment. Soto Decl. Ex. 182 (Jan. 30, 2009 Maxus Unanimous Written Consent and Resolutions, MAXUS3374132 – MAXUS3374133). Two of the three directors, Jon Slater and Harlow Sprouse, were independent. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 74:22-75:15); Soto Decl. Ex. 183 (Dec. 19, 2014, David Wadsworth Dep. at 398:14-399:7); Soto Decl. Ex. 150 (Slater Dep. at 20:19-21:1).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green as set forth in paragraph 145.  The Trust disputes the use of the term "independent" as the Repsol Defendants have not set forth a standard of independence.  The Trust also disputes that there was any evidence showing that the directors were fully advised.

164.    The MLT's expert, Mr. Pulliam, does not dispute that the 2009 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–117).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements of fact in this paragraph.  Mr. Pulliam states in his report:



Soto Decl. Ex. 47 (Pulliam Rep. ¶ 321).

**D.      The New Jersey Litigation**

165.      On December 13, 2005, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed a complaint in New Jersey Superior Court against OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH, related to pollution of the Passaic River emanating from the Lister Site (the "**New Jersey Litigation**"). Soto Decl. Ex. 184 (Compl., *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Dec. 13, 2005)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 165.

166.      On November 29, 2006, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed their First Amended Complaint against OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH. Soto Decl. Ex. 185 (First Am. Compl., *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Nov. 29, 2006)). The First Amended Complaint asserted "Alter-Ego/Common Economic Unit" and fraudulent transfer allegations against certain defendants. *Id.* ¶ 24.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 166.

167.    In October 2008, OCC brought cross-claims in the New Jersey Litigation against Maxus, Tierra, Repsol, YPF, YPFH, and CLHH asserting various claims, including breach of contract, fraudulent transfer of assets, unjust enrichment, and contribution under the Spill Act and statutory contribution. MLT Statement of Facts ¶ 118. In its cross-claims, OCC alleged that the 1996-97 Maxus Transactions, Crescendo Sale, and 2001-02 YPFI Transactions were fraudulent transfers. Soto Decl. Ex. 186 (OCC's Answer, Affirmative Defenses and Crossclaims to Pls' Second Am. Compl., ¶¶ 76-83, *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Oct. 3, 2008)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 167.

168.    OCC's fraudulent transfer, civil conspiracy, and unjust enrichment claims were dismissed as time-barred as of 2003 based on the public disclosure of the 1996-97 Maxus Transactions in YPF's public SEC filings. Soto Decl. Ex. 187 (Special Master Recommendation and Op., *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. L-009868-05 (N.J. Super. Ct. Jan. 13, 2015)); Soto Decl. Ex. 188 (Order, *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. L-009868-05 (N.J. Super. Ct. Jan. 29, 2015)).

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The Order cited by Repsol has been vacated. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).

169.    The alter ego-based claims against Repsol were subsequently dismissed on summary judgment. Soto Decl. Ex. 189 (Special Master Recommendation on Maxus Energy

Corporation's Mot. to Dismiss First Count of OCC's Second Am. Cross-Cls. and Strike Prayers for Declaratory Relief as to Future Obligations and Costs, *N.J. Dep't of Env't Prot. et. al. v. Occidental Chem. Corp. et al.*, No. ESX-L9868-05, at 11 (N.J. Super. Ct. Jan. 14, 2016)); Soto Decl. Ex. 190 (Apr. 5, 2016 Summary Judgment Order) (adopting entirely the Special Master's recommendation as the Opinion of the court). Repsol also obtained a $65 million contribution judgment against OCC under the Spill Act. Soto Decl. Ex. 14 (Order Granting Repsol, S.A.'s Motion for Summary Judgment on its Spill Act Contribution Counterclaim Against Occidental Chemical Corporation, *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. ESX-L9868-05, at 1-2 (N.J. Super. Ct. Oct. 19, 2017)).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The Order cited by Repsol has been vacated. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).

170.    The MLT intervened in the New Jersey Litigation. MLT Statement of Facts ¶ 143. On September 14, 2018, the MLT appealed the summary judgment ruling. The New Jersey Appellate Division held that fact issues remained on alter ego but confirmed that sequential veil-piercing was necessary. Soto Decl. Ex. 191 (Corrected Op. at 57, *N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, Nos. A-2036-17, A-2038-17 (N.J. App. Div. Dec. 27, 2021)). Repsol petitioned the New Jersey Supreme Court for certiorari review on March 3, 2022. Soto Decl. Ex. 192 (Pet. for Cert. and Appendix on Behalf of Defendant-Petitioner Repsol, S.A., *NJDEP v. Occidental Chem. Corp.*, No. A-002038-17T2 (N.J. Mar. 3, 2022)). The MLT filed its opposition on April 8, 2002. Soto Decl. Ex. 193 (Brief in Opp'n to Pet. for Cert. on Behalf of Intervenor-Respondent Joseph J. Farnan, Jr., as Liquidating Trustee for Maxus Liquidating Trust, *NJDEP v.*

*Occidental Chem. Corp.*, No. A-002038-17T2 (N.J. Apr. 8, 2022)).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 170. The Trust submits that the MLT made a limited appearance in the New Jersey Litigation. The Trust disputes that the Appellate Division confirmed that sequential veil-piercing was necessary. The discussion regarding sequential veil-piercing was dicta and the Court did not hold that it was necessary. Additionally, the Trust disputes that it filed its opposition in 2002; the opposition was filed in 2022.

### E.    Corporate Formalities During the Repsol YPF Period

171.    Maxus and the Repsol Defendants had no board overlap during any of the challenged transactions. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 242); Soto Decl. Ex. 194 (Dec. 17, 2021 Expert Report of Professor Merritt B. Fox ("**Fox Rep.**"), Appendix C). The only year with any board overlap was 2005 when H.R. Smith was appointed to the Repsol E&P USA board and also served as Maxus's board secretary. Soto Decl. Ex. 47 (Pulliam Rep. ¶ 242); Soto Decl. Ex. 194 (Fox Rep. at Appendix C). Maxus had its own personnel and executive leadership, and the Maxus board elected its own officers. Soto Decl. Ex. 194 (Fox Rep. at 76). Maxus further maintained its own books and records. *Id.* at 10.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 171. The Trust disputes the statements highlighted in red, and in particular disputes the claim that "Maxus and the Repsol Defendants had no board overlap during any of the challenged transactions" as entirely unsupported by ¶ 242 of the Pulliam Report to which is cited. The Trust refers the Court to the full contents of the document which speaks for itself. As ¶¶ 241-242 of Mr. Pulliam's report make clear, Repsol E&P USA had no leadership or personnel other than those seconded from Maxus and there was near-complete overlap between the boards in 2005. *See also* Soto Decl. Ex. 46 (Menenberg Rep. ¶ 262 and Figure 47).

172.    Maxus's board voted through in-person meetings or through unanimous written consent from 1999 to 2012. Soto Decl. Ex. 195 (Compilation of Maxus Board Minutes and Consents from 1999 to 2010; Index of Maxus Board resolutions, MLT00010816) (showing Maxus's board resolutions from 2007-2014).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the fact set forth in paragraph 172.

173.    Maxus set the agenda for its board meetings and determined when they would be held, not Repsol. *E.g.,* Soto Decl. Ex. 26 (2021 H.R. Smith Dep. at 70:6-12) ███████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the claim highlighted in red as a misrepresentation of the quoted testimony ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████    The Trust further notes that the page cited by the Repsol Defendants appears to be missing from Soto Decl. Ex. 26.

174.    Maxus also elected its own officers from 1999 to 2011. Soto Decl. Ex. 46 (Menenberg Rep. at 150–59) ████████████████████████████████████

████████████████████████████████████████████████ Soto Decl. Ex. 196 (Aug. 1999 Maxus Board Meeting Minutes (Telephonic), MAXUS4883080 – MAXUS4883092); Soto Decl. Ex. 197 (Feb. 29, 2000 Maxus Board Written Consent, REPSOL0008211 – REPSOL0008215); Soto Decl. Ex. 198 (Jan. 15, 2001 Maxus Board Unanimous Written Consent, REPSOL0008198 – REPSOL0008202); Soto Decl. Ex. 199 (Dec. 17, 2002 Maxus Board Unanimous Written Consent, REPSOL0008162 – REPSOL0008164); Soto Decl. Ex. 200 (July 7, 2003 Unanimous Maxus Board Written Consent, REPSOL0008151 – REPSOL0008160); Soto Decl. Ex. 201 (Dec. 9, 2005 Maxus Board Meeting Minutes, MAXUS4571002 – MAXUS4571007); Soto Decl. Ex. 202 (June 21, 2006 Maxus Board Meeting

Minutes MAXUS5093744 – MAXUS5093746); Soto Decl. Ex. 203 (May 15, 2007 Maxus Board Written Consent in Lieu of a Special Meeting, REPSOL-E-0000010740 – REPSOL-E-0000010772, at REPSOL-E-0000010745 – REPSOL-E-0000010747); Soto Decl. Ex. 204 (Oct. 19, 2007 Maxus Board Written Consent in Lieu of a Special Meeting, MAXUS4075978 – MAXUS4075979); Soto Decl. Ex. 205 (June 30, 2008 Maxus Board Written Consent in Lieu of a Special Meeting, MAXUS4618589 – MAXUS4618611); Soto Decl. Ex. 206 (Feb. 24, 2009 Maxus Board Unanimous Written Consent, MAXUS3374122 – MAXUS3374123); Soto Decl. Ex. 207 (Oct. 21, 2009 Maxus Board Unanimous Written Consent, MAXUS3374084 – MAXUS3374085); Soto Decl. Ex. 195 (Index of Maxus Board resolutions, MLT00010816) (noting the election of Maxus officers on June 16, 2010).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. As the Repsol Defendants themselves acknowledge, Maxus and Repsol E&P had identical management structures in 2005.

175.    Repsol was not involved in the day-to-day management of Maxus. Soto Decl. Ex. 104 (Oct. 13, 2021, Javier Gonzalez[28] Dep. at 238:2-240:1) (explaining his day-to-day activities at Maxus as general counsel and noting that he did not speak with anyone at Repsol in order to carry out his day-to-day activities); Soto Decl. Ex. 27 (2021 Hartline Dep. at 54:5-56:1) ████████████████

████████████████████████████████

Soto Decl. Ex. 26 (2021 H.R. Smith Dep. at 70:13-15) ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[28] Javier Gonzalez was Maxus's general counsel from 2010-2017. *See* MLT Disclosures at 7; Soto Decl. Ex. 104(Oct. 13, 2021, Javier Gonzalez Dep. at 191:14-15).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and refers the Court to the full contents of the depositions cited.  Repsol's involvement in the day-to-day management of Maxus is the subject of conflicting opinions offered by the parties' experts (see, e.g., Soto Decl. Ex. 46 at ¶ 270) and a subject of material dispute to be resolved at trial.

---

[29] Wendy Weber-Francis is a former Maxus compliance consultant. *See* MLT Disclosures at 6.

176.    Throughout the Repsol YPF Period, Maxus's financials were consolidated into Repsol's financial statements. *See e.g.*, Soto Decl. Ex. 211 (Repsol 2004 20-F, at F-9, F-149) ("The Exhibit I hereto shows the consolidated dependent, associated and multigroup companies directly or indirectly owned by REPSOL YPF, S.A." and includes Maxus).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 176.

177.    Repsol did not interfere with Maxus's or Tierra's environmental remediation efforts:



Soto Decl. Ex. 212 (Aug. 5, 2021, David Rabbe[30] Dep. at 183:21-184:18); Soto Decl. Ex. 213 (Nov. 14, 2005 email from D. Wadsworth to T. Saront re payment to CLH-Tierra, MAXUS5033950 – MAXUS5033951) ("I have had no role in preparing or approving the Tierra/CLH budget. I understand that Tierra/CLH prepares a proposed budget, presents it to its board, the Tierra/CLH board approves the budget, and finally the approved budget is included within the overall YPFH budget."); Soto Decl. Ex. 29 (2021 H.R. Smith Dep. at 70:16-18 ▮▮▮▮

---

[30] David Rabbe was president of Tierra from 1999-2016. *See* MLT Disclosures at 15; Soto Decl. Ex. 212 (Aug. 5,2021, David Rabbe Dep. at 21:4-15).



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Among other things, Repsol was an active participant and supported Maxus in the NJ Litigation challenging its environmental obligations and its indemnification obligations vis-a-vis OCC.

178.    Maxus was never denied requested funds. *See* Soto Decl. Ex. 212 (Aug. 5, 2021, David Rabbe Dep. at 37:17-39:3)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust objects to this statement to the extent it is unlimited in time, and does not specify who never denied Maxus requested funds. The Trust submits that the Repsol defendants' unsupported statement that "Maxus was never denied requested funds" is irrelevant to whether the fact actually exists.

179.    Repsol also had numerous internal policies for intercompany transactions, including policies setting forth procedures for invoicing personnel services between Repsol entities. *E.g.*, Soto Decl. Ex. 214 (June 4, 2008 List of Repsol Policies/Norms, RSC-E-0000012801 – RSC-E-0000012807) (Repsol Policy 010-PR404MG, Invoicing of Personnel Services in Affiliated/Associated Companies) (Repsol Policy 011-PR405MG, Payment Processing) (Repsol Policy 060-NO051MG, Authorization of Investments, Divestments and Expenses).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 179

180.    The MLT does not allege that Repsol, S.A. dominated and controlled YPF, S.A. *See generally* Compl.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  Whether Repsol, S.A. dominated and controlled YPF, S.A., is not material to any claims or defenses presented in this case.

181.    At the end of 2005, YPF had 10,574 employees, Soto Decl. Ex. 80 (YPF 2005 Form 20-F at p. 91), and Maxus had approximately 69 employees, Soto Decl. Ex. 215 (Jan. 20, 2006 email from L. Jones to X. Fava attaching employee list by department, RSC-E-0000035066).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 181.

182.    From 1999 to 2011, the Repsol S.A. board had twelve to sixteen members, the YPF board had twelve to seventeen members, and the Repsol S.A. and YPF boards never had more than three members in common. Soto Decl. Ex. 194 (Fox Rep. at Appendix C). YPF and Maxus also never had more than one board member in common from 1999 to 2011. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The overlap between the Repsol, YPF, and Maxus' boards, is not material to any claims or defenses presented in this case.

183.    From 1999 until 2012, YPF consistently had over $10 billion in assets, and more than $6 billion dollars of shareholders' equity. Soto Decl. Ex. 58 (YPF S.A. Form 20-F for the fiscal year ended December 31, 1999 at 3, F-4); Soto Decl. Ex. 84 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2002 at 7, 86, F-36); Soto Decl. Ex. 80 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2005 at 7, F-42); Soto Decl. Ex. 216 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2008 at 8, 9); Soto Decl. Ex. 217 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2011 at 6, 7). Repsol and YPF's public filings throughout the

Repsol YPF Period show frequent actions taken by each company with respect to distinct business and operational decisions. Soto Decl. Ex. 194 (Fox Rep. at 78).

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The value of assets of Repsol and YPF and their business and operational decision are not material to any claims or defenses presented in this case.

### F. The MLT Has Not Shown Maxus was Insolvent During the Repsol YPF Period

184.    From 1999 through the end of the Repsol YPF Period, Maxus paid its obligations as they became due. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 125:24-126:7)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Specifically, the Trust disputes that the cited testimony supports the proposition for which it is cited because

The Trust submits that the Court should refer to the cited testimony as it speaks for itself.

185.    Maxus was not insolvent from 1999 to 2012. Soto Decl. Ex. 69 (Bramer Rep. at 99

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements of fact in this paragraph.  The Trust has submitted evidence that demonstrates that Maxus was insolvent from 1999 to 2012.  Trust's Mot. at 61-64. The only evidence Repsol cites to dispute this is self-serving testimony from their experts' reports which raises a triable issue in fact.

186.    The MLT's expert, Todd Menenberg, has failed to demonstrate that Maxus was insolvent from a balance sheet or cash flow perspective at any point from 1999 to 2012. Soto Decl. Ex. 46 (Menenberg Rep. ¶¶ 78–79, 249).

Soto Decl. Ex. 219 (Feb. 17, 2022, Todd Menenberg Dep. ("**Menenberg Dep.**") at 26:21-23).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as an incomplete and inaccurate summary of Mr. Menenberg's conclusions, and refers the court to the full contents of Mr. Menenberg's report.

## VI.    Second YPF Period (2012-2016)

### A.    Argentina Expropriates Repsol's YPF Shares

187.    In May 2012, Repsol was displaced as the majority holder of YPF's shares when the Argentine government expropriated Repsol's interests in YPF. MLT Statement of Facts ¶ 136.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 187.

188.    After the expropriation, Repsol had no control of YPF or Maxus. Soto Decl. Ex. 6

87

(Repsol Corp. Rep. Dep. at 106:18-21, 376:1-10); Soto Decl. Ex. 193 (Brief in Opp'n to Pet. for Cert. on Behalf of Intervenor-Respondent Joseph J. Farnan, Jr., as Liquidating Trustee for Maxus Liquidating Trust, at 15, *NJDEP v. Occidental Chem. Corp.*, No. A-002038-17T2 (N.J. Apr. 8, 2022) ("Repsol has not owned or controlled YPF since 2012.")).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 188.

189.    There is no evidence of disruption to Repsol or YPF as a result of the expropriation. *See* Soto Decl. Ex. 220 (YPF S.A. Form 20-F for fiscal year ended Dec. 31, 2013 at F-3) (showing a total income increase from $8 million in 2012 to $17 million in 2013); Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 106:22-25) ███████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████ Thereafter, YPF remained profitable. *See* YPF Form 20-F for fiscal year ended Dec. 31, 2013, at F-3.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 189  However, the Trust notes that the $8 million in 2012 and $17 million in 2013 quote were actually reported as 8 billion and 17 billion Argentine pesos in Soto Decl. Ex. 220.  These amounts would need to converted to USD based on the exchange rates ranging from 4.30-4.92 pesos per USD in 1992 and 4.92-6.52 pesos per USD in 1993.

190.    Following  the  expropriation  of  Repsol's  YPF  shares,  Project  Jazz  was implemented. Feb. 8, 2021 Opinion [Adv. D.I. 333] at 3, n.9; Soto Decl. Ex. 221 (Oct. 18, 2021, YPF Corporate Representative Diego Pando Dep. at 188:17-23, 188:24-189:19) ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 190.

191.     Repsol was not involved in Project Jazz. Soto Decl. Ex. 221 (Oct. 18, 2021, Diego Pando Dep. at 187:21-188:1 [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Soto Decl. Ex. 225 (MLT's Resps. & Objs. to Repsol Defs.' First Set of Requests for Admission, Resp. to Admission No. 4 (Aug. 23, 2019) ("[T]he Repsol Defendants had no material involvement in the Strategy prior to Repsol's acquisition of YPF in 1999.")).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. As the record evidence makes clear, [REDACTED]

---

[31] Eduardo Pigretti was in-house counsel at YPF from 2006-2017. *See* Soto Decl. Ex. 222 (July 1, 2021, Eduardo Pigretti Dep. at 19:6-20:5).

[32] Fernando Gilberti has been an accountant at YPF since 1993. *See* Soto Decl. Ex. 223 (July 13, 2021, Fernando Gilberti Dep. at 16:3-17:4).

[33] Guillermo Jalfin is Maxus's former CEO. *See* MLT Disclosures at 9.

█████████████████████        The Repsol Defendants were involved in that process prior to the expropriation whether or not it was titled "Project Jazz."

## B.    The Maxus Bankruptcy

192.    On June 17, 2016, Maxus, Tierra, MIEC, Maxus (U.S.) Exploration Company, and Gateway Coal Company (the "**Debtors**") filed voluntary petitions for bankruptcy under chapter 11. Soto Decl. Ex. 102 (Gonzalez Decl. at 1).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 192.

193.    As of their bankruptcy filings "[t]he Debtors [had] performed dutifully their environmental remediation obligations at an aggregate cost of more than $755 million, the vast majority of which is on account of Maxus' contractual environmental indemnification obligations to OCC." *Id.* ¶ 8; Soto Decl. Ex. 100 (Mar. 31, 2015, David Rabbe Dep. (personal capacity) at 248:5-251:19.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 193.

194.    Repsol was not involved with the decision to place the Debtors in bankruptcy. Soto Decl. Ex. 104 (Oct. 13, 2021, Javier Gonzalez Dep. at 296:19-297:2 ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Repsol was involved in the bankruptcy strategy as it possessed the assets that Project Jazz and the King & Spalding strategy sought to protect.

---

[34] Theodore Nikolis is a former Maxus special independent director. See MLT Disclosures at 13.

Date:  May 18, 2022

Respectfully submitted,

FARNAN LLP

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | Case No. 16-11501 (CSS) |
| Debtors. | Jointly Administered |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | **FILED UNDER SEAL** |
| v. | Adversary Proceeding |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | Case No. 18-50489 (CSS) |
| Defendants. | |

PLAINTIFF'S RESPONSES AND OBJECTIONS TO REPSOL
DEFENDANTS' AFFIRMATIVE STATEMENT OF
UNDISPUTED MATERIAL FACTS

Dated: May 18, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020

(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

The Trust, operating under limited time, has categorized the submitted facts below for the convenience of the Court.  The Trust concurs that the green highlighted facts are undisputed in this proceeding and the Court should determine the submitted facts are undisputed findings accordingly.  The Trust submits that the yellow highlighted facts are not material and/or irrelevant to any issues relating to the adversary proceeding.  Given that these facts have no bearing on any issues relevant to the proceeding, the Trust does not admit or dispute them, and further submits that the Court should not make any findings relating to these facts.   The Trust has highlighted in red relevant facts that are in dispute.  The Trust submits that these disputed facts, while being potentially relevant to Repsol's Motion for Partial Summary Judgment, have no bearing on the facts necessary to prove the Trust's Motion for Partial Summary Judgment and the Court can still grant Summary Judgment in favor of the Trust notwithstanding the disputed facts.

### GENERAL OBJECTIONS

The following general objections ("General Objections") apply to each paragraph of the Repsol Defendants' statement of facts, and shall have the same force and effect as if fully set forth in the response to each individual paragraph.  To the extent the Trust responds to a paragraph, the Trust reserves all objections as to relevance, privilege, and admissibility, as well as to any and all other objections on any ground that would require or permit the exclusion of a fact in the paragraph, if that fact were offered into evidence.  The Trust notes that the Repsol Defendants' "Counter Statement of Undisputed Material Facts" overlaps in material respects with the Repsol Defendants' "Affirmative Statement of Undisputed Material Facts," and specifies that to the extent there is any inconsistency between the Trust's responses to the Repsol Defendants' two statements, the responses to the "Counter Statement of Undisputed Material Facts" control.

18

1

The Trust object as follows:

1.    The Trust objects to the Repsol Defendants' submission as being beyond the scope of the applicable rules of this Court and contrary to the spirit in which the Trust submitted its own statement. By responding, the Trust does not concede that Repsol is permitted to utilize an "affirmative statement of undisputed material facts" to satisfy its evidentiary burdens, or that the Trust's responses herein in any way limit its ability to rely on any fact or argument in connection with any pending motion or at trial.

2.    The Trust objects to any emphasis added or characterizations of documents cited to in each paragraph.  To the extent the Repsol Defendants are relying on a document, the document speaks for itself.

3.    To the extent the Trust does not dispute a statement of fact, the Trust is not admitting to the admissibility, veracity, submitting that the particular document or testimony is evidence of the purported fact, or ascribing any meaning or definition to the document or testimony cited as evidence for the purported fact. The Trust reserves the right to challenge the admissibility of any document, statement or testimony cited, on any grounds, including but not limited to, hearsay or the doctrine of completeness.

4.    To the extent the Trust does not dispute a statement of fact, the Trust is not admitting the Repsol Defendants have properly and accurately cited such statements.  Where a citation is incorrect, the Trust has endeavored to note this below.

5.    Where the Trust objects to a paragraph as non-material or irrelevant, the Trust is

18

2

not admitting or disputing the facts set forth therein.

6. The Trust objects to any paragraph that characterizes or ascribes meaning to a document, deposition testimony, or expert testimony (including expert reports). The testimony and expert reports speak for themselves. To the extent the Trust does not dispute a statement of fact citing a document, deposition testimony, or expert testimony, the Trust is not admitting to the characterization or summary of the cited evidence.

7. To the extent the Repsol Defendants cite to, summarize, or rely on a document, the Trust submits that the document speaks for itself and the Court should review the entire document for completeness. The Trust reserves its right to object to any characterization or summary of a document on the basis for a completeness.

8. To the extent the Trust does not dispute any statement of Defendants' experts, the Trust does not concede that the expert is otherwise qualified to testify or that the associated report is wholly admissible.

9. To the extent any facts submitted by the Repsol Defendants in their Affirmative Statement of Facts ("Repsol's SOF") contradict facts submitted by the Trust's Statement of Undisputed Facts, the Trust submits that those facts are in dispute.

10. To the extent the Trust submits that a fact is not material and/or irrelevant, the Trust is not admitting nor disputing the veracity of the submitted fact.

11. Where the Trust disputes or does not dispute a material of fact, the Trust is only providing sufficient evidence to demonstrate that there is a genuine issue of material fact and not providing an exhaustive set of counter-facts or evidence. The Trust reserves the right at trial to dispute any of the proposed facts using all

18

3

available facts and admissible evidence.

12.  To the extent the Trust responds to a statement that includes footnotes, the Trust's response to the footnote should be understood to be the same as the Trust's response to the body of the associated text.

13.  The Trust objects to the use by the Repsol Defendants of documents, expert reports, or testimony that are not admissible, particularly that are not admissions of the debtors, offered without proper foundation or a sponsoring witness with personal knowledge.

14.  The Trust objects to the use, by the Repsol Defendants, of expert testimony offered by the Defendants' expert witnesses on any issue as to which Defendants bear the burden of proof, as Defendants' experts did not submit reports by the deadline set in the Scheduling Order for expert reports on issues as to which a party bears the burden of proof. See Letter Opinion dated February 22, 2022 [D.I. 607].

15.  The Trust objects to the Repsol Defendants' citation of their own corporate representative testimony as the basis for a fact.  The Repsol Defendants' cannot rely on testimony from their corporate representative as it is inadmissible hearsay. The Repsol Defendants' repeatedly cite to testimony of a corporate representative who has no personal knowledge of the submitted facts.  The Trust objects that testimony outside the witness's personal knowledge is only admissible as a party admission under FRE 801(d).

16.  The Trust objects to the Repsol Defendants' reliance and citations to expert reports to prove the truth of facts for purposes of summary judgment without

18

offering the Court the underlying evidence relied upon by such experts or the context in which they offered their opinions.

17. The Trust objects to the Repsol Defendants' use of previously withheld privileged material to serve as evidence for their submitted facts while still maintaining privilege over documents concerning the same subject matter. To the extent the Trust was not provided with sufficient evidence to dispute the submitted fact on the basis of privilege, the Trust submits that the Court draw an adverse inference from Repsol's failure to produce the relevant documents. In the event the Court does not draw an adverse inference, the Trust reserves the right to demand production of the withheld privileged materials and revise these responses accordingly.

18. To the extent the Repsol Defendants assert that any particular fact as to which the Trust has identified, in a pleading or otherwise on notice to Defendants, any dispute, or, to the extent any assertion of fact submitted by the Repsol Defends contradicts any assertion of fact by the Trust, the Trust objects to the Repsol Defendants' assertion that any such fact is undisputed.

19. The Trust objects to any of the Repsol Defendants' submitted facts to the extent they are argumentative or assert legal conclusions.

20. The Trust objects to Repol Defendants' reliance on the NJ Litigation Summary Judgment Orders. *See* Repsol's SOF ¶ 18, 169. These Orders have been vacated and are not binding on this or any Court. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021). The Trust submits that these Orders are therefore irrelevant and cannot constitute the basis for any undisputed facts.

18

21.  The Trust construes the headings in Repsol's "Affirmative Statement of Undipsuted Material Facts" as organizational in nature, and does not understand that such headings set forth factual allegations that require response, denial or objection.

**I.    The Parties**

1.    Repsol, S.A. is a Spanish corporation, headquartered in Madrid, Spain. *See* Declaration of Edward Soto ("**Soto Decl**."), filed contemporaneously herewith, at Exhibit 1 (Repsol, S.A. Schedule 13D, dated Nov. 8, 2012, at Schedule A).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 1.

2.    Repsol Exploración, S.A., a wholly-owned subsidiary of Repsol, S.A., is a corporation formed under the laws of Spain and has maintained its principal place of business in Madrid, Spain. MLT Statement of Facts [Adv. D.I. 623] ¶ 14.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 2.

3.    Repsol USA Holdings Corporation is a United States subsidiary of Repsol, S.A. MLT Statement of Facts ¶ 15. Repsol USA Holdings Corporation has its principal place of business in Texas. Compl. ¶ 30. From 1999 to 2012 (the "**Repsol YPF Period**"), Repsol USA Holdings Corporation was domiciled at 2001 Timberloch Pl., Suite 3000, The Woodlands, Texas, 77381. *E.g.*, Soto Decl. Ex. 4 (Dec. 30, 2010 Repsol Offshore E&P USA Inc. Unanimous Written Consent of the Board of Directors, REPSOL-E-0000000689 – REPSOL-E-0000000695, at REPSOL-E-0000000691). Repsol USA Holdings Corporation was incorporated in Delaware. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 3.

18    6

4.      Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and Repsol Services Company ("**RSC**") are all wholly-owned subsidiaries of Repsol USA Holdings Corporation, incorporated in Delaware, with their principal places of business in Texas. MLT Statement of Facts ¶ 16. During the Repsol YPF Period, Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., and RSC were domiciled at 2001 Timberloch Pl., Suite 3000, The Woodlands, Texas, 77381. *E.g.,* Soto Decl. Ex. 4 (Dec. 30, 2010 Repsol Offshore E&P USA Inc. Unanimous Written Consent of the Board of Directors, REPSOL-E-0000000689 – REPSOL-E-0000000695, at REPSOL-E-0000000691); Soto Decl. Ex. 5 (Mar. 1, 2007, Services Agreement, REPSOL0013272 – REPSOL0013286, at REPSOL0013276).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 4.

5.      Repsol E&P T&T Limited ("**Repsol E&P T&T**")[1] was a subsidiary of Repsol, S.A. until 2016. Soto Decl. Ex. 6 (Oct. 20, 2021, Pablo Blanco Corp. Rep. Dep. ("**Repsol Corp. Rep. Dep.**") at 34:25-35:3). During the Repsol YPF Period, Repsol E&P T&T was domiciled at #4 Queen's Park West, Port of Spain, Trinidad and Tobago. *E.g.,* Soto Decl. Ex. 5 (Mar. 1, 2007, Services Agreement, REPSOL0013272 – REPSOL0013286, at REPSOL0013276). It is no longer an affiliate of Repsol. Repsol E&P T&T was incorporated under the laws of Trinidad and Tobago. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 5.

6.      YPF Sociedad Anonima ("**YPF**") was incorporated on June 2, 1977 under the laws of the Republic of Argentina as a governmental entity. *See* Soto Decl. Ex. 58 (YPF 1999 Form 20-

---

[1] "Repsol," as used herein, refers to the aforementioned Repsol entities, collectively.

F at p. 7). YPF maintains in headquarters in Argentina. Compl. ¶ 25; YPF Defendants' Answer and Affirmative Defenses to the Complaint [Adv. D.I. 140] ("Answer") ¶ 25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 6.

7.    YPF Holdings, Inc. ("**YPFH**") is a Delaware corporation and subsidiary of YPF. Compl. ¶ 24.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 7.

8.    YPF International, S.A. ("**YPFI**"), a holding company formed under Bolivian law, is a subsidiary of YPF with its principal place of business in Bolivia. Compl. ¶ 26; MLT Statement of Facts ¶ 92.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 8.

9.    CLH Holdings, Inc. ("**CLHH**") is a formerly-active subsidiary of YPFH. Compl. ¶ 27.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 9.

10.    Maxus Energy Corporation ("**Maxus**"), a Delaware corporation, is a wholly-owned subsidiary of YPFH. Compl. ¶ 19. Maxus was incorporated on July 19, 1983 under the laws of Delaware. *See* Soto Decl. Ex. 9 (Maxus Certificate of Incorporation, MAXUS3376157 – MAXUS3376186). During the Repsol YFP Period, Maxus was domiciled at 1330 Lake Robbins Dr., # 300, the Woodlands, Texas. Soto Decl. Ex. 10 (May 13, 2015, Harvey Smith[2] Dep. at 11:14-12:1); Soto

---

[2] Harvey Smith was Maxus's in-house counsel from 1975-2007. See MLT's Initial Disclosures, In re Maxus Energy Corp., et al., No. 16-11501 ("MLT Disclosures") at 17 (Apr. 24, 2019); Soto Decl. Ex. 26 (July 9, 2021, Harvey Smith Dep. ("2021 H.R. Smith Dep.") at 36:4-9; 37:24-25; 80:7-17).

~~18~~                    8

Decl. Ex. 11 (July 8, 2009 Settlement Agreement, REPSOL0009506 – REPSOL0009526, at REPSOL0009515 (listing Maxus's address for notice at "1330 Lake Robins Drive, Suite 300, the Woodlands, Texas 77380 ")).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 10.

11.    Tierra Solutions, Inc. ("**Tierra**"), a Delaware corporation, is wholly-owned by CLHH. Compl. ¶ 20.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 11.

12.    Maxus International Energy Company ("**MIEC**"), a Delaware corporation, is wholly-owned by Maxus. Compl. ¶ 21.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 12.

13.    Maxus (U.S.) Exploration Company ("**MUSE**"), a Delaware Corporation, is wholly-owned subsidiary of Maxus. Compl. ¶ 22.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 13.

14.    Gateway Coal Company, a Delaware corporation, is a wholly-owned subsidiary of Maxus. Compl. ¶ 23.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 14.

15.    The Maxus Liquidating Trust ("**MLT**") was formed on July 14, 2017, pursuant to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors. *See* Compl. ¶ 18.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 15.

## II.    Pre-Acquisition Maxus

### A.    Maxus's Environmental Liability

16.    On September 4, 1986, Diamond Shamrock Corporation (later renamed Maxus) sold all of the outstanding stock in Diamond Shamrock Chemicals Company ("**DSCC**") to Oxy-Diamond Alkali Corporation, a subsidiary of Occidental Petroleum Corporation, through a stock purchase agreement ("**SPA**"). Soto Decl. Ex. 13 (1986 Stock Purchase Agreement, OCCNJ0026349 – OCCNJ0027225, at OCCNJ0026362 – OCCNJ0026363); MLT Statement of Facts ¶ 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 16.

17.    Pursuant to the SPA, Diamond Shamrock Corporation agreed to indemnify Oxy-Diamond (which would later become OCC) for certain environmental liabilities arising out of DSCC's chemicals business, including activities at the Lister Site on the Passaic River. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 17.

18.    "At the time of the acquisition, OCC knew that DSCC had discharged hazardous pollutants into the Passaic River, that the federal and state governments had required cleanup of the [Diamond Alkali Superfund Site ("**DASS**")], and that an investigation of the Passaic River's environmental contamination was underway and could result in future cleanup." Soto Decl. Ex. 14 (Order Granting Repsol, S.A.'s Motion for Summary Judgment on its Spill Act Contribution Counterclaim Against Occidental Chemical Corporation, *N.J. Dep't of Env't Prot. et al. v.*

~~18~~                    10

==Occidental Chem. Corp. et al.==, No. ESX-L9868-05, at 1-2 (N.J. Super. Ct. Oct. 19, 2017)).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 18. In addition, subject to its General Objections, the Trust submits that the facts highlighted in yellow in this paragraph are not material and/or irrelevant to this adversary proceeding. The Trust submits that the Summary Judgment Orders in the NJ Litigation have been vacated and are therefore not evidence. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).

19.    Between 1983 and 2014, Maxus and Tierra contributed over $700 million dollars in connection with OCC indemnified sites. Soto Decl. Ex. 102 (Decl. of Javier Gonzalez[3] in Support of Chapter 11 Petitions and Requests for First Day Relief, *In re Maxus Energy Corp., et al.*, No. 16-11501, D.I. No. 2 ("**Gonzalez Decl.**") at ¶ 8 (June 18, 2016)); Soto Decl. Ex. 100 (Mar. 31, 2015, David Rabbe Dep. (personal capacity) at 248:5-251:19

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in paragraph 19 are not material and/or irrelevant to this adversary proceeding. The Trust does not dispute that generally Maxus and Tierra spent funds on various efforts related to OCC-indemnified sites, but none of the sources cited provide a breakdown of what constitutes an appropriate "remediation effort."

---

[3] Javier Gonzalez was Maxus's general counsel from 2010 to 2017. See MLT Disclosures at 7; Soto Decl. Ex. 104 (Oct. 13, 2021, Javier Gonzalez Dep. at 191:14-15).

~~18~~    11

20.    After the SPA was executed, "DSCC was . . . merged into the OCC entities, and ultimately to [OCC] . . . ." Soto Decl. Ex. 16 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 237:7-8 (July 19, 2011) (Lombardi, J.) OCC therefore became the successor to DSCC, an entity that polluted the Passaic River. Soto Decl. Ex. 15 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 218:4-9 (July 15, 2011) (Lombardi, J.) ("I also think it's not in dispute that old Diamond Shamrock and DSCC as the alleged successor, that they are considered a discharger. It's not in dispute that they did dump or spill or pour hazardous substances, toxic substances, into the waters of the State, into the Passaic River  ")); Soto Decl. Ex. 16 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 244:7-11 (July 19, 2011) (Lombardi, J.) ("So I am going to enter an order that OCC is as the undisputed legal, you know, successor by merger with DSCC, that they are responsible for the liabilities of the original Diamond Shamrock Corporation.")). Repsol was neither a polluter of the Passaic River nor party to the SPA. Soto Decl. Ex. 13 (1986 Stock Purchase Agreement, OCCNJ0026349 – OCCNJ0027225).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 20.  However, with respect to the term "polluter," it is more appropriate to say Repsol did not discharge contaminants into the river.

**B.    Maxus Was in Poor Financial Condition Prior to YPF's Acquisition**

21.    "In the early 1990s, Maxus experienced a liquidity crisis resulting from, among other things, depressed oil and gas prices, Maxus' high cost of debt, and its limited access to the capital markets." Soto Decl. Ex. 102 (Gonzalez Decl. at ¶ 26). At the time, Maxus could not access capital markets on favorable terms, so it explored various strategies, including asset sales and raising capital at the subsidiary level. *Id.* Maxus's financial advisor presented strategic alternatives including, for example: (1) a public or private sale of an interest in Maxus's Midgard subsidiary;

12

(2) a private sale of 100% of Midgard; (3) a private sale of Maxus's Indonesia assets; or (4) a sale of the entire company. Soto Decl. Ex. 103 (CSFB, Maxus Energy Corp., Materials Prepared for Discussion, dated Jan. 31, 1995, CS000490 – CS000511, at CS000499).

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph, including the quotation from the Gonzalez declaration, are not material and/or irrelevant to this adversary proceeding.  Maxus financial status in the early 1990s is not material to any claims or defenses presented in this case.  The Trust also notes that at the time of the Gonzalez declaration, although he does not disclose this fact in his declaration, Mr. Gonzalez was an officer of ~~YPF~~YPFH, one of the Defendants in this action.

III.    **YPF Period (1995-1999)**

A.    **YPF Acquires Maxus in 1995**

22.    In January 1995, Maxus considered "an unsolicited preliminary indication of interest from YPF to acquire all the common stock of [Maxus] for $5.00 per share." Soto Decl. Ex. 17 (Maxus Energy Corp. Board Meeting Minutes, dated Jan. 31, 1995, YPF-AK-0027194 – YPF-AK-0027213, at YPF-AK-0027201); Soto Decl. Ex. 18 (YPF Press Release, YPF-AK- 0049443 – YPF-AK-0049444, dated Feb. 28, 1995). YPF ultimately offered to purchase all of the outstanding shares of Maxus for $5.50 per share in cash for a total of $762 million. Soto Decl. Ex. 19 (CSFB, Maxus Energy Corp., Materials Prepared for Discussion, dated Feb. 26, 1995, CS000472 – CS000489, at CS000480); Soto Decl. Ex. 20 (Maxus Energy Corp. Form 10-K for the Fiscal Year Ended Dec. 31, 1995, AA_MAXUS0014167 – AA_MAXUS0014283, at AA_MAXUS0014169).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 22.

23.    On February 28, 1995, YPF and Maxus entered into a merger agreement, accepting the terms of YPF's revised $5.50 offer. *See* Soto Decl. Ex. 21 (Agreement of Merger among YPF

13

Sociedad Anónima, YPF Acquisition Corp. and Maxus Energy Corp., dated Feb. 28, 1995, YPF 0008584 – YPF 0008664). YPF paid a premium for Maxus's shares and guaranteed that it would contribute capital in the event that Maxus was unable to meet its obligations of the full extent of the loan, up to $550 million under the Keepwell Covenant, for a period of nine years. *See* Soto Decl. Ex. 52 (Houlihan Lokey Solvency Analysis re: Maxus Energy Corp., dated Apr. 5, 1995, HL000095 – HL000190, HL000096, HL000099 ("YPF unconditionally guarantees the payment in full of the principal and interest on the loans (defined as $550 million) to the Company.")); Soto Decl. Ex. 22 (Maxus Energy Corp. Letter to Stockholders, dated Mar. 3, 1995, YPF0011629 – YPF0011672, at YPF0011637).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 23. However, the Trust disputes that YPF guaranteed it would contribute capital up to $550 million under the Keepwell Covenant. The Keepwell Covenant provided a backstop guarantee for the acquisition facilities which totaled $425 million. *See* Propps Decl. Ex. 86 (Menenberg Initial Report ¶ 77); Propps Decl. Ex. 254 (Williams Report at 283).

24.     On February 28, 1995, Maxus's Board of Directors approved the terms of the merger agreement with YPF. *See* Soto Decl. Ex. 23 (Maxus Energy Corp. Board Meeting Minutes, dated Feb. 28, 1995, YPF-AK-0027382 – YPF-AK-0027414).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 24.

25.     YPF completed its acquisition of Maxus via credit agreement on June 8, 1995. Soto Decl. Ex. 20 (Maxus Energy Corp. Form 10-K for the fiscal year ended Dec. 31, 1995, AA_MAXUS0014167 – AA_MAXUS0014283, at AA_MAXUS0014169).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 25.

26.     Repsol was not involved in YPF's acquisition of Maxus. Soto Decl. Ex. 24 (July 27, 2021, Dexter Peacock[4] Dep. ("**2021 Peacock Dep.**") at 231:13-16); Soto Decl. Ex. 26 (2021 H.R. Smith Dep.) at 53:25-54:3); Soto Decl. Ex. 27 (July 29, 2021, Richard Hartline[5] Dep. ("**2021 Hartline Dep.**") at 54:4-12); Soto Decl. Ex. 28 (Aug. 3, 2021, Paul Bohannon[6] Dep. at 211:19-212:24); Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 369:8-24).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 26.

**B.     1996-97 Maxus Transactions**

27.     YPF sought to reorganize Maxus to align with its corporate strategy and to achieve tax efficiencies. Soto Decl. Ex. 105 (June 2, 1997, Email from Fernando Nardini to Roberto Monti re: International Tax Structure, YPF-E-0000143791 – YPF-E-0000143796, at YPF-E-0000143792). In June of 1996, YPFI was created as a subsidiary of MIEC. Soto Decl. Ex. 29 (June 28, 1996, Maxus International Energy Company Board Resolution, MAXUS0205173 – MAXUS0205176). From 1996 to 1997, Maxus and its subsidiaries sold their holdings in Venezuela, Bolivia, Indonesia, and Ecuador to YPF or YPFI (collectively, the "**1996-97 Maxus Transnsactions**"). Soto Decl. Ex. 30 (July 1, 1996, Stock Purchase and Sale Agreement, REPSOL0000937 – REPSOL0000949) (Maxus Bolivia, Inc., Maxus Venezuela (C.I.) Ltd., and Maxus Venezuela S.A.); Soto Decl. Ex. 31 (Sept. 1, 1996, Stock Purchase and Sale Agreement, MAXUS3212317 – MAXUS3212323) (Maxus Guarapiche Ltd.); Soto Decl. Ex. 32 (Dec. 31, 1997, Purchase and Sale Agreement, REPSOL0001719 – REPSOL0001730) (Indonesian assets—

---

[4] Dexter Peacock is a former Maxus director and Andrews & Kurth attorney. See MLT Disclosures at 14.
[5] Richard Hartline was a Maxus accountant from 1970 to 2008. See MLT Disclosures at 8; Soto Decl. Ex. 27 (2021 Hartline Dep. at 24:15-25:14).
[6] Paul Bohannon is a former Andrews & Kurth attorney. See MLT Disclosures at 3.

YPF Java Baralaut B.V. and Maxus Southeast Sumatra LLC); Soto Decl. Ex. 33 (Dec. 31, 1997, Stock Purchase and Sale Agreement, REPSOL0001701 – REPSOL0001708) (YPF Ecuador, Inc.).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 27.  The Trust disputes the reason YPF sought to reorganize Maxus.  YPF sought to reorganize Maxus in order to isolate the environmental liabilities away from any profitable assets.  Trust's Mot. at 14.

       1.     <u>Bolivian & Venezuelan Asset Sales</u>

28.     On June 28, 1996, MIEC contributed its interests in Maxus Venezuela Inc., Maxus Venezuela (C.I.) Ltd., and Maxus Venezuela S.A. to YPFI. Soto Decl. Ex. 34 (June 28, 1996, MIEC Unanimous Written Consent and Resolutions of the Board of Directors, MAXUS3373560 – MAXUS3373562). On June 28, 1996, MIEC contributed its interest in Maxus Bolivia Inc. to YPFI. Soto Decl. Ex. 35 (June 18, 1996, Minutes of the Meeting of Maxus Board of Directors, YPF0036941 – YPF0036965). MIEC then sold YPFI (then holding the Bolivian and Venezuelan assets) to YPF for $263.1 million, which later was adjusted upward to $266.37 million. Soto Decl. Ex. 30 (July 1, 1996, Stock Purchase and Sale Agreement, REPSOL0000937 – REPSOL0000949); Soto Decl. Ex. 106 (YPF Holdings & Subsidiaries Summary of Cash and Corporate Activities in Relation to Keep Well Covenant for Years 1996 – 1998, YPF563 – YPF1113, at YPF566).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 28.

29.     YPF publicly disclosed the sale of YPFI to YPF. *See* Soto Decl. Ex. 36 (Maxus Energy Corp. Form 10-Q for the period ended Sept. 30, 1996, MAXUS3198525 – MAXUS3198556, at MAXUS3198536).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 29.

~~18~~

16

30.     The Maxus board, containing four independent directors,[7] approved the sale of Maxus's Venezuelan and Bolivian assets at book value after its board determined the book value was higher than the fair market valuation conducted by CS First Boston ("**CSFB**"). Soto Decl. Ex. 38 (June 18, 1996, Minutes of the Regular Meeting of Board of Directors of Maxus Energy Corp., MAXUS3293061 – MAXUS3293089, at MAXUS3293068, MAXUS3293071). YPF publicly disclosed the sale. *See* Soto Decl. Ex. 39 (Maxus Energy Corp. Form 8-K, MAXUS3214472 – MAXUS3214480, at MAXUS3214472 (July 1, 1996)); Soto Decl. Ex. 40 (Maxus Energy Corp. Form 10-K for fiscal year ended Dec. 31, 1996, at 2-3).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 30.  The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

2.     Ecuadorian Asset Sale

31.     On December 31, 1997, MIEC sold its shares of its Ecuador subsidiary to YPFI via a Stock Purchase and Sale Agreement for $185.2 million. MLT Statement of Facts ¶¶ 61-62.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 31.

32.     The Maxus board, containing four independent directors,[8] approved the transaction. Soto Decl. Ex. 41 (Dec. 19, 1997, Minutes of Special Meeting of Board of Directors of Maxus Energy Corp., REPSOL0009213 – REPSOL0009226, at REPSOL0009218 – REPSOL0009222).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 32.   The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a

[7] Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064 at REP 050) ████████████
[8] Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064, at REP 050) ████████████

standard of independence.

33.    Gaffney, Cline & Associates ("**GCA**") determined that Maxus received fair market value for its Ecuadorian assets. *Id.* at REPSOL0009215.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 33.

34.    YPF publicly disclosed the sale. Soto Decl. Ex. 42 (YPF S.A. 1997 Form 20-F (filed Mar. 27, 1998) at 75).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 34.

3.    Indonesian Asset Sale

35.    On December 31, 1997, Maxus sold YPF Java Baralaut B.V. and Maxus Southeast Sumatra, Inc. ("**SES**") to YPFI for $505.3 million via a stock purchase and sale agreement. MLT Statement of Facts ¶ 67.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 35.

36.    The Maxus board, containing four independent directors,[9] approved the sale. Soto Decl. Ex. 41 (Dec. 19, 1997, Minutes of Special Meeting of Board of Directors of Maxus Energy Corp., REPSOL0009213 – REPSOL0009226, at REPSOL0009218 – REPSOL0009222).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 36.  The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

---

[9] Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064, at REP 050) ███████████████

18

37.    The value of the sale was "determined by comparison to the equivalent value being offered in a contemporaneous third party transaction for the purchase of certain companies . . . owning interests in the same Indonesian oil and gas properties." *Id.* at REPSOL0009214 – REPSOL0009215. After the sale closed, the purchase price was adjusted upward pursuant to a clause in the sale agreement, triggered by an "an arm's length sale of an interest in the same property in which Maxus SES owns an interest." Soto Decl. Ex. 43 (Aug. 4, 1998, Minutes of Meeting of Board of Directors of Maxus Energy Corp., YPF0030102 – YPF0030108, at YPF0030103 – YPF0030106). The final purchase price was $575.3 million. MLT Statement of Facts ¶ 68.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 37.

38.    YPF publicly disclosed the sale. Soto Decl. Ex. 42 (YPF S.A. 1997 Form 20-F (filed Mar. 27, 1998) at 75).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 38.

39.    In total, Maxus received approximately $1 billion in proceeds in connection with the 1996-97 Maxus Transactions, which it used for general corporate purposes, including paying down debt and redeeming interest-bearing preferred stock. Soto Decl. Ex. 106 (YPF Holdings & Subsidiaries Summary of Cash and Corporate Activities in Relation to Keep Well Convinence for Years 1996 – 1998, YPF563 – YPF1113); Soto Decl. Ex. 30 (July 1, 1996, Stock Purchase and Sale Agreement, REPSOL0000937 – REPSOL0000949); Soto Decl. Ex. 31 (Sept. 1, 1996, Stock Purchase and Sale Agreement, MAXUS3212317 – MAXUS3212323); Soto Decl. Ex. 32 (Dec.

18    19

31, 1997, Purchase and Sale Agreement, REPSOL0001719 – REPSOL0001730); Soto Decl. Ex. 33 (Dec. 31, 1997, Stock Purchase and Sale Agreement, REPSOL0001701 – REPSOL0001708); Soto Decl. Ex. 74 (Sept. 3, 2015, Fernando Nardini Dep. at 187:25-189:20). After the 1996-97 Maxus Transactions, Maxus had no ownership interests in the assets underlying the sales. Soto Decl. Ex. 44 (May 19, 2015, David Wadsworth[10] Dep. at 290:14-291:14); Soto Decl. Ex. 45 (Jan. 20, 2015, Linda Engelbrecht[11] Dep. at 256:20-257:14); *see also* Soto Decl. Ex. 46 (MLT Corrected Expert Witness Report of Todd D. Menenberg ("**Menenberg Rep.**") at ¶ 198 ████████

████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 39. The Trust disputes that after the 1996-97 Maxus Transactions, Maxus had no ownership interests in the assets underlying the sales. To the extent Maxus and YPFI are alter egos, the assets of one are the assets of the other.

4.    Contribution Agreement

40.    Also during 1996, YPF, YPFI, YPFH, CLH Holdings, CLH, and Maxus entered into a contribution agreement ("**Contribution Agreement**"), whereby YPF agreed to fund CLH's liabilities up to at least $108.4 million (later amended to $111.5 million). Soto Decl. Ex. 49 (Contribution Agreement, dated Aug. 14, 1996, REPSOL0000151 – REPSOL0000161); Soto Decl. Ex. 50 (First Addendum to Contribution Agreement, dated Feb. 5, 1997, MAXUS2999355 – MAXUS2999356).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 40.

---

[10] David Wadsworth is former general counsel and director of Maxus from 1979 to 2004. MLT Disclosures at 19; Soto Decl. Ex. 48 (Aug. 6, 2021, David Wadsworth Dep. at 23:18-26:7).
[11] Linda Engelbrecht is a former Maxus controller. MLT Disclosures at 4-5.

18    20

41. Repsol was not a party to the Contribution Agreement. *Id.*; Soto Decl. Ex. 51 (June 23, 2021, Walter Forwood[12] Dep. at 33:21-23

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 41.

5. Repsol Was Not Involved in the YPF Acquisition or 1996-97 Maxus Transactions

42. The MLT acknowledges that "the Repsol Defendants did not exert direct or indirect control over Maxus or the Debtors prior to Repsol's acquisition of YPF in 1999." Soto Decl. Ex. 225 (MLT's Resps. & Objs. to Repsol Defs.' First Set of Requests for Admission, Resp. to Admission No. 3 (Aug. 23, 2019)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 42.

43. Repsol was not involved with Maxus prior to Repsol's acquisition of YPF in 1999. Soto Decl. Ex. 26 (2021 H.R. Smith Dep. at 53:25-54:3, 65:3-16); Soto Decl. Ex. 53 (Dec. 17, 2014, Dexter Peacock Dep. at 149:3-13

[12] Walter Forwood is a former CFO at YPF. See MLT Disclosures at 6.

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not
dispute the facts set forth in paragraph 43. However, the Trust notes that the 2021
H.R. Smith Dep. cited is actually the transcript for the October 31, 2020 deposition of
David Oliver Smith, and is thus cited incorrectly.

44.    Maxus-affiliated witnesses similarly testified that Repsol was not involved in any
of the 1996-97 Maxus Transactions. *See* Soto Decl. Ex. 54 (July 2, 2021, David Blair[13] Dep. at
165:16-167:4 ███████████████

████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not
dispute the facts set forth in paragraph 44.

**IV.    Repsol YPF Period (1999-2012)**

    **A.    Repsol Seeks to Expand Its Footprint in Latin America and Acquires YPF**

---

[13] David Blair is a former CPA at Arthur Anderson. See MLT Disclosures at 17.
[14] David Smith is Maxus's Director of Tax and Chief Tax Counsel. See MLT Disclosures at 17.

45.    As the Spanish State sold its last shares of Repsol, S.A. in 1997, Repsol, S.A. began a "strategy of expansion of its operations throughout Latin America." Soto Decl. Ex. 57 (Repsol 1998 Form 20-F, at 5–6). From 1996 to 1998, Repsol, S.A. invested billions of dollars in Latin America. *Id.* at 6. By 1998, "Repsol's Latin American operations accounted for 25.8% of [its] assets " *Id.* at 7. With a goal of becoming "the leading oil and gas concern in Latin America," Repsol acquired a 14.99% equity stake in YPF, Argentina's largest company, on January 20, 1999. *Id.* at 7, 55. "Through the acquisition of YPF, Repsol YPF sought to achieve a balance between upstream and downstream operations [and] position itself as a market leader in Latin America . . ." Soto Decl. Ex. 57 (Repsol 1998 Form 20-F, at 7); Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 102:22-3█████████████████████████████████77:25-78:10).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 45.  However, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for the fact highlighted in red.  Mr. Blanco was not at Repsol at the time of the acquisition and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16)█████████████████ █████████. In addition, the Trust disputes the quote attributed to Soto Decl. Ex. 57 as the quote is not present in the exhibit.

46.    On June 3, 1999, Repsol, S.A. acquired an additional 82.47% interest in YPF. Soto Decl. Ex. 58 (YPF 1999 Form 20-F, at 55). Repsol invested $15 billion to acquire a total 97.81% stake in YPF via hostile takeover. *Id.* at 8; Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 91:11-13, 123:5-13).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 46.  The Trust notes that page 8 of the Soto Decl. Ex. 58 is not included in the exhibit, and page 91 of Soto Decl. Ex. 6 is not included in the exhibit.

47.    There is no evidence that YPF or Maxus, at the time of acquisition, provided Repsol

~~18~~

23

any non-public information about the 1996-97 Maxus Transactions. Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 91:11-13, 123:5-13); *see also* Soto Decl. Ex. 37 (discussed *infra* ¶ 70). Repsol's corporate representative testified ██████████████████████████████████████ ███████████████████████████████████████" Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 123:14-17).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 47. However, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for this fact. Mr. Blanco was not at Repsol at the time of the acquisition and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. at 29:13-16) ██ ██████████████████████████████████████.

48.    As of 1999, Maxus's oil and gas assets consisted of its interests in a joint venture named Crescendo (discussed below), and other exploratory interests located in the Gulf of Mexico, which included working interests ranging from 16.67 percent to 100 percent in 23 blocks and Overriding Royalty Interests ("**ORRIs**")[15] in two other exploration blocks. Soto Decl. Ex. 58 (YPF 1999 Form 20-F, at 27).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 48.

**B.    Crescendo Sale**

49.    Maxus, through its subsidiary Midgard LP Sub, owned a 59% interest in the Crescendo oil and gas asset, while its joint venture partner, BP Amoco, owned 41%. MLT Statement of Facts ¶ 78. Maxus's internal valuation valued the Crescendo asset at $1 billion, of which Midgard's interest totaled $590 million (or 59%). Soto Decl. Ex. 25 (Tentative Plan for the

---

[15] An "ORRI" is an overriding royalty interest which provides the owner with an economic interest in the upside performance of an oil and/or gas asset without the requirement to invest capital in the development of that asset. See Wright, C. and Gallun, R., *Fundamentals of Oil & Gas Accounting*, 5th ed., 2008, at p. 547.

Sales of Repsol YPF's Working Interest in Crescendo, YPF-E-0000144546 – YPF-E-0000144551, at YPF-E-0000144547).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 49.  For completeness, the Trust notes that Maxus's valuation of the Crescendo asset was not contemporaneous with the sale. In addition, the Trust notes that Soto Decl. Ex. 25 cites the incorrect document, as the document in Soto Decl. Ex. 25 is in fact "Plaintiff Maxus Liquidating Trust's Initial Disclosures Pursuant to Rule 7026 of the Federal Rules of Bankruptcy Procedure."

50.    The Limited Partnership Agreement for the joint venture included a change of control clause in Article 10, which set out dissolution terms for either party terminating the joint venture without consent. Soto Decl. Ex. 59 (Limited Partnership Agreement of Crescendo Resources, L.P., Aug. 20, 1997, MAXUS3377703 – MAXUS3377846, at MAXUS3377727 – MAXUS3377732). BP acquired Amoco on December 31, 1998, while Repsol acquired YPF on June 23, 1999. Soto Decl. Ex. 60 (BP Amoco Form 20-F at 5 (Dec. 31, 1998)); Soto Decl. Ex. 61 (Repsol Form 20-F at 7 (Dec. 31, 1999)). "These acquisitions triggered the change-of-control provision in the Crescendo Partnership Agreement, such that either party could terminate the partnership within the year following the other party's change of control event, Maxus and BP Amoco's began to negotiate a dissolution of Crescendo in May 1999." MLT Statement of Facts at ¶ 79.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 50.

51.    Ultimately, both Amoco and Midgard LP Sub agreed to dissolve the joint venture and sell the assets. Soto Decl. Ex. 62 (Letter of Intent (Nov. 9, 1999), MAXUS0437453 – MAXUS0437458, at MAXUS0437454). The Maxus board approved the Crescendo dissolution. MLT Statement of Facts ¶ 80; Soto Decl. Ex. 63 (Dec. 12, 1999, Maxus Energy Corporation

18    25

Unanimous Written Consent of the Board of Directors, REPSOL0008230 – REPSOL0008234). Maxus received $5 million in connection with the dissolution of the Crescendo joint venture. MLT Statement of Facts ¶ 80.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 51.

52.    Following a public bidding process, Maxus sold its Midgard interest in two tranches to third parties, not affiliated with Maxus, YPF, or Repsol: (1) the first to BP Amoco for $400.5 million in December 1999 and (2) the second to Apache for $219 million in cash and a 1% ORRI (valued at $7.5 million) in January 2000. *See* Soto Decl. Ex. 208 (Recommendation Memorandum, Project Pinnacle, MAXUS3205777 – MAXUS3205780); Soto Decl. Ex. 64 (Purchase and Sale Agreement, dated Dec. 31, 1999, MAXUS0173078 – MAXUS0173121 at MAXUS0173083 – MAXUS0173092); Soto Decl. Ex. 65 (Jan. 24, 2000, Stock Purchase Agreement, YPF0038264 – YPF0038289); Soto Decl. Ex. 4 (Jan. 6, 2000, Arthur Andersen Memo on the Disposal of Midgard, AA-YPF-0027508 – AA-YPF-0027533, at AA-YPF-27510); MLT Statement of Facts ¶ 84. None of the terms of the Crescendo Sale agreements refer to any other challenged transaction. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 52. The Trust disputes that there was a public bidding process for the sale of Maxus's Midgard interests to the extent that the Repsol Defendants have not submitted any evidence for this assertion, nor is the Trust aware of any support.

53.    Maxus received approximately $632 million in connection with the Crescendo dissolution and sale ($5 million upon dissolution, $400.5 million from the sale to BP Amoco, $219 million from the sale to Apache, and an ORRI estimated to be worth $7.5 million) (collectively, "**Crescendo Sale**"). *See* Soto Decl. Ex. 69 (Bramer Rep. at ¶ 383); Soto Decl. Ex. 47 (Pulliam

18    26

Rep. at ¶ 201); *supra* ¶ 52.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 53. The Trust disputes that Maxus received $632 million in connection with the Crescendo dissolution and sale. Maxus in fact received $627 million. Propps Decl. Ex. 315 (Pulliam Reply Rep. at ¶ 146).

54.    Repsol was not a party to either of the Crescendo Sale agreements. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 54.

55.    The Maxus board approved, with two independent directors, the Crescendo Sale. *See* Soto Decl. Ex. 63 (Dec. 12, 1999, Maxus Energy Corp. Unanimous Written Consent of the Board of Directors, REPSOL0008230 – REPSOL0008234); Soto Decl. Ex. 66 (Jan. 20, 1999, Maxus Energy Corp. Unanimous Written Consent of the Board of Directors, REPSOL0008220 – REPSOL0008224); Soto Decl. Ex. 37 (July 17, 2000, Memo from David A. Wadsworth to Alberto Rueda Garcia REP 047 – REP 064 at 050)

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green set forth in paragraph 55. The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

56.    Maxus sold its interests in Crescendo

Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 57:2-6)

> *Responses and Objections:* The Trust disputes that Maxus sold its interests in Crescendo because Maxus wanted to focus on development in the Gulf of Mexico because Maxus was dominated by Repsol. *See* Trust SOF ¶¶ 96-104. Repsol and Maxus were alter egos, thus any decisions made by Maxus would have been attributable to Repsol's, not Maxus's, direction and leadership. *See* Trust SOF ¶¶ 97-98.

18

57.    Repsol and YPF publicly disclosed the Crescendo Sale. Soto Decl. Ex. 67 (Repsol 2000 Form 20-F, at 20); Soto Decl. Ex. 68 (YPF 2000 Form 20-F, at F-28).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 57.

58.    Maxus used $262.1 million of the proceeds from the Crescendo Sale to pay down a $236 million five-year credit facility and redeem $36.1 million of other notes unrelated to Repsol. MLT Statement of Facts ¶ 85.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 58.  The Trust disputes that Maxus used $262.1 million of the sale proceeds from the Crescendo Sale to repurchase debt, this number was actually $272.1.  Propps Decl. Ex. 315 (Pulliam Reply Rep. at ¶ 103).

59.    The remaining $362.4 million of proceeds remained in Maxus's bank accounts for the period January 4, 2000 through October 24, 2000. Soto Decl. Ex. 69 (Bramer Rep. at ¶ 346); Soto Decl. Ex. 70 (Email from Rick Hartline re: Interest Income, dated Nov. 4, 2000, YPF0104935 – YPF0104948).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 59.  The Trust notes that the account details referenced in Soto Decl. Ex. 70 are currently only through the beginning of the month of April and that the date on the email is "11/04/2000," i.e., April 11 in European date format.

60.    On January 2, 2001, Maxus, as Lender, and Repsol International Finance B.V. ("**RIF**"), as Borrower, entered into a Credit Facility Agreement with a principal of $325 million. Soto Decl. Ex. 71 (Credit Facility Agreement, dated Jan. 2, 2001 and Amendments,

18

REPSOL0003601 – REPSOL0003611, at REPSOL0003604). RIF was the Repsol subsidiary that managed the enterprise's central cash management system, Soto Decl. Ex. 133 (Sept. 9, 2015, Pablo Blanco Dep. at 63:23-64:14), and is not a defendant in this lawsuit, Compl. at 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 60.

61.    Under the terms of the Credit Facility, Maxus as "Lender will calculate the interest rate on the basis of the alternative yield of funds in market conditions. Lender will have the right to modify the abovementioned interest rate if, in Lender's good-faith determination, due to market conditions such interest rate becomes no longer representative of Lender's cost of funds or is not available for the relevant Interest Period." Soto Decl. Ex. 71 (Credit Facility Agreement, dated Jan. 2, 2001 and Amendments, REPSOL0003601 – REPSOL0003611, at REPSOL0003604); *accord* Soto Decl. Ex. 27 (2021 Hartline Dep. at 93:24-94:25). The Credit Facility Agreement was amended several times to extend its period on an annual basis. Soto Decl. Ex. 71 (Credit Facility Agreement, dated Jan. 2, 2001 and Amendments, REPSOL0003601 – REPSOL0003611); Soto Decl. Ex. 27 (2021 Hartline Dep. at 97:16-19).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 61.

62.    As of January 2005, "the balance of the RIF loan to Maxus [was] only $130,000." Soto Decl. Ex. 27 (2021 Hartline Dep. at 101:23-102:4); Soto Decl. Ex. 72 (Jan. 14, 2005, Email from Javier Nogales to Javier Jose Ares re the Crescendo Loan, MAXUS5761478_TR) (attaching chart showing payments on the loan over time). The $325 million loan was ultimately paid off in full, with interest, by 2005. MLT Statement of Facts ¶ 85; Soto Decl. Ex. 27 (2021 Hartline Dep. at 100:14-17); Soto Decl. Ex. 72 (Email from J. Nogales Aranguez to J. Ares Ascariz, dated Jan.

18    29

14, 2005, MAXUS5761478); Soto Decl. Ex. 73 (Loan Repayment Schedule, MAXUS5761479);
Soto Decl. Ex. 74 (Sept. 3, 2015, Fernando Nardini[16] Dep. at 307:16-22); Soto Decl. Ex. 46
(Menenberg Rep. at ¶ 135) ███████████████████████████████████
████████████████████████

  *Responses and Objections:* Subject to its General Objections, the Trust does not
  dispute the facts set forth in paragraph 62.


  63.    RIF paid interest on the loan according to a standard intercompany formula that
was used across companies. Soto Decl. Ex. 27 (2021 Hartline Dep. at 95:1-21); Soto Decl. Ex. 75
(Jan. 23, 2015, Richard Hartline Dep. at 182:17-22).

  *Responses and Objections:* Subject to its General Objections, the Trust does not
  generally dispute the facts highlighted in green paragraph 63. The Trust disputes the
  representation that a standard intercompany formula was used "across companies" as
  it may be inaccurate to the extent the record reflects various entities used different
  intercompany rates. *See, e.g.*, Yoo Decl. Ex. 16, "Contratos" spreadsheet produced
  natively under Bates REPSOL-E-0000103185. The Trust submits the Court should
  refer to the cited testimony as it speaks for itself.


  64.    Maxus used the proceeds from the loan to fund exploration and development
initiatives in the Gulf of Mexico, including its acquisition of a 15% interest in the Neptune
prospect, as well as to pay for its ongoing operations and liabilities, including environmental
liabilities under the OCC SPA indemnity. MLT Statement of Facts ¶¶ 85, 96; Soto Decl. Ex. 47
(Pulliam Rep. at ¶ 195); Soto Decl. Ex. 58 (YPF Sociedad Anónima Form 20-F for the fiscal year
ended December 31, 1999, at p. F-17); Soto Decl. Ex. 76 (YPFI Ltd. Financial Statements as of
December 31, 1999 and 1998, YPF0106311 – YPF0106358, at YPF0106329); Soto Decl. Ex. 74

---

[16] Fernando Nardini was an employee in YPF's Tax Group. See MLT Disclosures at 12.

(Sept. 3, 2015, Nardini Dep. at 207:22-208:13) ████████████████

████████████████████████████████████████ ; Soto Decl. Ex. 77

(YPFH Financial Statements for the fiscal years ended December 31, 2003 and 2002, YPFH011 – YPFH033, at YPFH021); Soto Decl. Ex. 78 (YPFH Financial Statements for the fiscal years ended December 31, 2005 and 2004, YPFH058 – YPFH081, at YPFH069); Soto Decl. Ex. 70 (Email from Rick Hartline re: Interest Income, dated Nov. 4, 2000, YPF0104935 – YPF0104948).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 64.  The Trust disputes the quote attributed to Soto Decl. Ex. 74 because the quote is not present in the exhibit.  The Trust also notes that page YPFH069 cited in Soto Decl. Ex. 78 is not present in the exhibit.

65. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 65 as being an unfair characterization of Mr. Pulliam's report, and advises the Court refer to the report itself.

C.    **The 2001-02 YPFI Transactions**

66.    Prior to its acquisition of YPF, Repsol stated the following in a public filing: "If Repsol were to acquire control of YPF, Repsol would expect to integrate the operations of the respective companies with a view to achieving operating synergies and cost savings and to providing a stronger base from which to support the business strategies of the two companies." Soto Decl. Ex. 57 (Repsol 1998 20-F, at 55).

18    31

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in paragraph 66 are not material and/or irrelevant to this adversary proceeding.  Repsol's public statements regarding the YPF acquisition is not material to any claims or defenses presented in this case.

67.     From 1999 to 2012, more than 90% of YPF's proved oil and gas reserves were located in Argentina, while Repsol's reserves were located throughout "Latin America (Argentina, Bolivia, Trinidad and Tobago, Venezuela, Brazil, Ecuador, Colombia and Peru), North Africa (Libya and Algeria), the Middle East, Spain and the United States." *See* Soto Decl. Ex. 79 (Repsol 2005 Form 20-F, at 18-19) (showing that more than 50% of Repsol's proved reserves for oil and gas reserves were located outside of Argentina); Soto Decl. Ex. 80 (YPF 2005 Form 20-F, at 17-18) ("More than the 99% of these reserves are located in Argentina."); Soto Decl. Ex. 81 (Repsol 2009 20-F, at 15) (showing that more than 50% of Repsol's proved reserves for oil and gas reserves were located outside of Argentina); Soto Decl. Ex. 82 (YPF 2009 Form 20-F, at 26) (showing more than 90% of oil and gas reserves were located in Argentina).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 67.

68.     After Repsol acquired a majority interest in YPF, it considered several transactions in an effort to: (1) gain tax efficiencies by integrating certain Latin America assets; (2) simplify its corporate structure following the YPF acquisition; and (3) mitigate risks associated with the Argentine financial crisis. Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 93:5-96:6); Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 390:1-25, 391:7-11, 393:8-13, 363:5-14); Soto Decl. Ex. 61 (Repsol Form 20-F 1999, at F-59); Soto Decl. Ex. 57 (Repsol Form 20-F 1998, at 55).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  A primary reason for considering the transactions was the threat of Maxus' environmental liabilities. *See, e.g.*, Yoo Ex. 10 (March 15,

~~18~~

2001, Memo from David A. Wadsworth to Augustin Garcia Moratilla on Former Chemical Company Liabilities REP 065 – REP 072).  Further, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for this fact.  Mr. Blanco was not at Repsol at the time of the acquisition and has no personal knowledge to testify to this issue.  Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16) ████████████

69.    These efforts coincided with YPF's efforts to "refocus[] its strategy within Argentina" and "sell all of its international operations . . . held by YPF International." Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 389:17-21).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 69.



[black redaction bar]

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 70.

1.    YPFI's Venezuelan, Ecuadorian, Indonesian, and Bolivian Assets

71.    The MLT challenges the 2001-02 transactions relating to YPFI's sale of its Venezuela, Ecuador, Indonesia, and Bolivia assets (**"2001-02 YPFI Transactions"**), as fraudulent transfers. Compl. ¶ 219 & Count XV.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 71.

72.    The 2001-02 YPFI Transactions included some assets formerly owned by Maxus and many additional assets that Maxus never owned. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 333).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 72.

73.    The MLT's expert does not opine that the sale price for the 2001-02 YPFI Transactions constituted less than fair value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–22)

[black redaction bars]

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 73.

74.    The 2001-02 YPFI Transactions were all publicly disclosed in SEC filings. Soto Decl. Ex. 84 (YPF Form 20-F, December 31, 2002 at 22) (disclosing Bolivia transaction); *id.* at

18    34

104 (disclosing Indonesia transaction); Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 12) (disclosing Ecuador transaction); *id.* at F-28 (disclosing Venezuela transaction).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust does not dispute that certain aspects of the YPFI transfers were publicly disclosed in SEC filings (*see* Trust's Omnibus Reply Section II.D.3), but the Trust submits that the filings did not provide adequate information for a creditor to understand the impact of these transactions on the liquidity of Maxus and its ability to meet its environmental obligations as they come due as Maxus and YPFI were alter egos.

75. Maxus was not a party to any of the 2001-02 YPFI Transaction agreements as it was not a buyer or seller of any of the assets. Soto Decl. Ex. 225 (MLT's Resps. & Objs. to Repsol Defs.' First Set of Requests for Admission, Resp. to Admission No. 9 (Aug. 23, 2019)). None of the terms of the 2001-02 YPFI Transaction agreements refer to any other challenged transaction. *See* Soto Decl. Ex. 90 (Aug. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045339 – REPSOL0045345) (Repsol YPF Venezuela S.A.); Soto Decl. Ex. 96 (Sept. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045346 – REPSOL0045354) (Maxus Venezuela Limited); Soto Decl. Ex. 95 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045355 – REPSOL0045363) (Maxus Guarapiche Ltd.); Soto Decl. Ex. 108 (Assignment of Rights and Obligations Corresponding to the Block 16 and Tivacuno Areas, dated Jan. 3, 2001, MAXUS5657547_TR – MAXUS5657549_TR); Soto Decl. Ex. 117 (Jan. 18, 2002, Stock Purchase Agreement, REPSOL0009893 – REPSOL0010146); Soto Decl. Ex. 126 (July 10,2002, Agreement for the Purchase of Shares of Repsol YPF Santa Cruz S.A., REPSOL 0022627_TR – REPSOL 0022631_TR).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust disputes that Maxus was not a buyer or seller of any of the assets. To the extent Maxus and YPFI are alter egos, the assets of one are the assets of the other.

18                                                      35

2.    YPFI Venezuelan Assets

76.    A November 13, 2000 presentation by the Repsol Executive Committee stated that the integration of YPFI's Venezuelan assets into the Repsol group would provide several tax advantages, leading to tax savings from 2001-2005 of $180 million to $200 million. Soto Decl. Ex. 86 (Repsol YPF Presentation on Venezuela Integration, Nov. 13, 2000, REPSOL-E-0000067640_TR at slide 5).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 76, but notes that no statements were made with respect to tax savings, if any, for YPFI.

77.    In 2001, Repsol Exploración S.A. and Repsol Exploración Venezuela B.V. purchased YPFI's Venezuelan holdings, which included: Maxus Venezuela, renamed on June 1, 2001 to Repsol YPF Venezuela S.A. ("**Repsol YPF Venezuela**"); Maxus Venezuela (C.I.) Ltd.; and Maxus Guarapiche. Soto Decl. Ex. 92 (Calendar Year 2001 Corporate Reorganization among Certain Subsidiaries of Repsol YPF, S.A., at MAXUS3215009 – MAXUS3215010).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 77.

78.    At the time of the sale, Repsol YPF Venezuela had interests in several assets that had not previously been owned by Maxus: (1) a 45% interest in the Quiriquire Block, which was acquired by Repsol YPF Venezuela on June 30, 2000 from BP Exploration Venezuela Limited for

18    36

approximately $53.0 million;[17] (2) a 75% interest in the Guarapiche Block;[18] (3) a 25% interest in Quiamare La Ceiba Block and 50% interest in the Guarico Occidental Block,[19] and (4) an entity named Astra Produccion Petrolera.[20]

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 78.

79.    On August 1, 2001, the YPFI Board approved the sale of Repsol YPF Venezuela S.A. (a Venezuela corporation) to Repsol Exploración S.A. (a Spanish corporation), effective July 1, 2001, for $26,297,243. Soto Decl. Ex. 2 (Aug. 1, 2001, YPFI Ltd.'s Directors' Resolutions, REPSOL0007441 – REPSOL0007450); Soto Decl. Ex. 90 (Aug. 20, 2001, Stock Purchase and Sale Agreement, REPSOL0045339 – REPSOL0045345); Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 329). Following the acquisition, Repsol Venezuela S.A. paid off $83,049,268 in debt owed by Repsol YPF Venezuela to YPFI. *See* Soto Decl. Ex. 91 (Corporate Restructuring of Latin America and Distribution of YPF S.A. Dividend, REPSOL-E-0000068136); Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 329). The total consideration paid to YPFI in connection with the sale was $109,682,950. *Id.* KPMG performed a valuation of Repsol YPF Venezuela on December 31, 2000, and determined that its stock was worth $87,090,485. *Id.* KPMG arrived at the $26.3 million as of June 30, 2001 after "movements related to [certain assets] [were] excluded (reversed) in order to prevent duplication" from an earlier purchase of Repsol YPF Venezuela's Quiriquire Block by Maxus

---

[17] Soto Decl. Ex. 67 (Repsol 2000 Form 20-F, at 21); Soto Decl. Ex. 87 (June 28, 2000, Excerpt from Quiriquire Sale and Purchase Agreement between BP Exploration Venezuela Limited and Maxus Venezuela S.A., YPF0038255 – YPF0038263).
[18] Soto Decl. Ex. 88 (June 28, 2000, Guarapiche Sale and Purchase Agreement between BP Exploration Orinoco Limited, Amoco Venezuela Energy Company B.V., and Maxus Venezuela S.A., YPF0038171 – YPF0038254).
[19] Soto Decl. Ex. 86 (Mar. 16, 2000, Email regarding Integration Projects, REPSOL-E-0000067640_TR).
[20] Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 412:13-23); Soto Decl. Ex. 89 (Apr. 27, 2001, KPMG Valuation of Maxus Venezuela S.A., Astra Producción Petrolera, S.A., and Maxus Venezuela (C.I.), YPF0031903_CTR – YPF 0031955_CTR).

Venezuela (C.I.) Ltd.,[21] and working capital adjustments. Soto Decl. Ex. 93 (Email re: Reconciliation of Purchase Price of Repsol YPF Venezuela to KPMG Finance Valuation Report, dated Aug. 24, 2001, YPF-E-0000146603_CTR – YPF-E-0000146604_CTR).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 79.

80.    On September 1, 2001, YPFI sold its equity interest in Maxus Venezuela Ltd. (**"Maxus Venezuela Limited**," a Cayman islands company) to Repsol Exploración Venezuela B.V. (a Dutch corporation) for $47,379,731. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 330); Soto Decl. Ex. 94 (Sept. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045346 – REPSOL0045354). Repsol Exploración Venezuela B.V. also paid $155,649,132 to YPFI as cancellation of debt owed by Maxus Venezuela Limited in connection with the sale, such that the total consideration to YPFI was $203,028,863. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 330); Soto Decl. Ex. 91 (Corporate Restructuring of Latin America and Distribution of YPF S.A. Dividend, REPSOL-E-0000068136). KPMG performed a valuation of Maxus Venezuela Limited and determined it was worth $(11,651,689). Soto Decl. Ex. 89 (KPMG Valuation of Maxus Venezuela S.A., Astra Producción Petrolera, S.A., and Maxus Venezuela Ltd. as of Dec. 31, 2000, YPF0031903 – YPF0031955, at YPF0031905). The purchase price of approximately $47.4 million reflected the approximately $58.9 million value of Repsol YPF Venezuela's Quirinquire Block that Maxus Venezuela Limited acquired, minus KPMG's valuation of $(11,651,689). Soto Decl. Ex. 93 (Email re: Reconciliation of Purchase Price of Repsol YPF Venezuela to KPMG Finance Valuation Report, dated Aug. 24, 2001, YPF-E-0000146603_CTR – YPF-E-0000146604_CTR); Soto Decl. Ex. 94 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045346

---

[21] Soto Decl. Ex. 92 (Calendar Year 2001 Corporate Reorganization among Certain Subsidiaries of Repsol YPF, S.A., MAXUS3215009 – MAXUS3215011, at MAXUS3215009).

– REPSOL0045354).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 80. The Trust notes that according to the Pulliam Report, YPFI sold its equity interest in Maxus Venezuela Ltd. on September 20, 2001, not September 1. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 330).

81.    Also on September 1, 2001, YPFI sold its equity interest in Maxus Guarapiche Ltd. (a Cayman Islands company) to Repsol Exploración Venezuela B.V. for $1.00. Soto Decl. Ex. 95 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045355 – REPSOL0045363, at REPSOL0045358). Maxus Guarapiche's only asset was an exploration block that was a dry hole. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 424:4-11).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 81.

82.    Repsol Exploración Venezuela B.V. is not a Defendant in this lawsuit. Compl. at 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 82.

83.    Maxus was not a party to the 2001 agreements for the sale of Repsol YPF Venezuela S.A., Maxus Venezuela Limited, or Maxus Guarapiche Ltd. Soto Decl. Ex. 90 (Aug. 20, 2001 Stock Purchase and Sale Agreement, REPSOL0045339 – REPSOL0045345) (Repsol YPF Venezuela S.A.); Soto Decl. Ex. 96 (Sept. 20, 2001 Stock Purchase and Sale Agreement REPSOL0045346 – REPSOL0045354) (Maxus Venezuela Limited); Soto Decl. Ex. 95 (Stock Purchase and Sale Agreement, dated Sept. 20, 2001, REPSOL0045355 – REPSOL0045363) (Maxus Guarapiche Ltd.).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

18

statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to the agreements.  To the extent Maxus and Repsol were alter egos, the assets of one are the assets of the other.

84.    The YPFI board approved the sale of its Venezuelan assets. Soto Decl. Ex. 96 (Aug. 1, 2001 YPFI Directors' Resolutions, MAXUS4142856 – MAXUS4142863); Soto Decl. Ex. 97 (Sept. 20, 2001 YPFI Directors' Resolutions, REPSOL0007421 – REPSOL0007440).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 84.

85.    The sale was publicly disclosed. Soto Decl. Ex. 85 (YPF 2001 Form 20-F, at F-28).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 85.

86.    The MLT's expert, Mr. Pulliam, does not dispute that YPFI sold its Venezuelan assets for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–122).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, including the Indonesian assets, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

3.    YPFI Ecuadorian Assets

87.    In an April 5, 2000, presentation, the Repsol Fiscal Committee addressed the integration of certain of YPFI's and YPF's Ecuador assets under one entity in the Repsol group. Soto Decl. Ex. 98 (Apr. 5, 2000, Integration Ecuador Repsol YPF Presentation, YPF-E-0000235242). The presentation noted that dividends from YPFI (a Cayman Islands company) to YPF (an Argentine company) were subject to a 10% taxation on top of a 25% Ecuador taxation.

*Id.* at slide 4. "Fiscal losses in Ecuador [were] expected until 2003." *Id.* Repsol estimated that the proposed integration to generate a net tax saving of $14.5 million. Soto Decl. Ex. 99 (Apr. 5, 2000, Ecuador, Repsol – YPF Integration Presentation and Accompanying Notes YPF-E-0000235233_TR – YPF-E-0000235241_TR, at YPF-E-0000235241_TR).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 87.

88.     On May 9, 2000 the YPF Board approved the potential sale of YPFI's assets in Ecuador. Soto Decl. Ex. 107 (YPF Board of Directors Resolution, YPF0045526 – YPF0045526, dated May 9, 2000). On January 3, 2001, YPFI assigned its rights and obligations in certain assets held by YPF Ecuador, Inc. (a Cayman Islands company) to Repsol YPF Ecuador S.A. ("**Repsol YPF Ecuador**") (a Spanish company) for $307,456,685. Soto Decl. Ex. 108 (Assignment of Rights and Obligations Corresponding to the Block 16 and Tivacuno Areas, dated Jan. 3, 2001, MAXUS5657547_TR – MAXUS5657549_TR). YPF Ecuador, Inc. obtained a valuation of the assets assigned from KPMG, which found the assets had a fair market value of $351,580,000 as of December 31, 1999. Soto Decl. Ex. 109 (KPMG Valuation of Ecuadorian Assets, dated Apr. 12, 2000, MAXUS5656664 – MAXUS5656682). The sale price for the 2001 assignment resulted from KPMG's $351 million valuation plus "book equity variance" of $31.1mm and minus an intercompany receivable of $75.24mm. Soto Decl. Ex. 110 (Email from Javier Vega Lera to Gabriel Leiva re: Intergroup Sales, dated Apr. 24, 2001, YPF-E-0000235465_TR).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 88.

89.     Repsol YPF Ecuador is not a Defendant in this lawsuit. Compl. at 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not

~~18~~                                        41

dispute the facts set forth in paragraph 89. The Trust further submits that transfers concerning YPF Ecuador may still be fraudulent to the extent YPF Ecuador is an alter ego of YPF, Maxus, or Repsol.

90.    Maxus was not a party to the agreement for the sale of YPF Ecuador to Repsol YPF Ecuador. Soto Decl. Ex. 108 (Assignment of Rights and Obligations Corresponding to the Block 16 and Tivacuno Areas, dated Jan. 3, 2001, MAXUS5657547_TR – MAXUS5657549_TR)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to the agreement.  To the extent Maxus and Repsol were alter egos, the assets of one are the assets of the other.

91.    On November 30, 2001, the YPFI board approved the sale of the YPFI Ecuadorian Assets to Repsol YPF Ecuador for $307,456,685. Soto Decl. Ex. 111 (Nov. 30, 2001, YPFI Directors' Resolutions, YPF-E-0000050546 – YPF-E-0000050547).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 91.

92.    The sale was publicly disclosed. Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 12).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 92.

93.    Repsol YPF Ecuador also purchased YPF's 25% interest in Block 14 in Ecuador from YPF on October 31, 2001 for $6,805,678. Soto Decl. Ex. 112 (Oct. 26, 2001 Email from Javier Nogales to Miguel Benavides de la Vega re Latin American Operations REPSOL-E_0000226092_TR). Maxus never owned Block 14. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 398-18:399-5).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 93.

94.     The MLT's expert, Mr. Pulliam, does not dispute that YPFI assigned or YPFI sold the YPFI Ecuador Assets for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–122).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, including the Indonesian assets, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

4.    <u>YPFI Indonesian Assets</u>

95.     In July of 1999, Repsol's Integration Committee "studied a project regarding the financial, accounting, and fiscal integration of Indonesia." Soto Decl. Ex. 113 (Jan. 19, 2000 Email from Carmelo de las Morenas to Mario Rosso re Reorganization of Shareholdings in Indonesia, YPF-E-0000144962_TR). However, the Integration Committee determined that Indonesia was non-strategic and suspended the integration process to focus on a sale of the group's Indonesian assets. *Id.* at YPF-E-0000144963_TR.

*Responses and Objections:* Subject to its General Objections, the Trust a does not dispute the facts set forth in paragraph 95.

96.     YPF also had a strategy to refocus in Argentina, and part of that refocusing involved the sale of its international assets, which included Indonesia. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 363:5-14). "On February 2, 2000, [YPF's] Board of Directors approved undertaking efforts to divest the investments held by [YPFI] in Indonesia." Soto Decl. Ex. 68 (YPF S.A. Form 20-F for the fiscal year ended Dec. 31, 2000, at p. 9).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 96.

18

43

97.    Repsol retained Schroder Salomon Smith Barney ("**SSSB**") and Waterous and Co. ("**Waterous**") to assist with divestment of Indonesian assets held by YPFI, other YPF subsidiaries, Repsol Exploración S.A., and RIF (collectively the "**Indonesian Assets**"). *See* Soto Decl. Ex. 114 (May 2000 Waterous/Schroder Salomon Smith Barney Indonesian Portfolio Opportunity Information Memorandum SW-USA-000246 – SW-USA-000483, at SW-USA-000267). The Indonesian Assets were comprised of more than just YPFI's interests in Southeast Sumatra (SES) and Northwest Java (ONWJ), previously owned by Maxus. *Id.* at SW-USA-000255–56, SW-USA-000259; Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 333). SSSB and Waterous valued the Indonesian Assets at a range of $597 million to $1.01 billion. Soto Decl. Ex. 115 (July 31, 2000, Project Almeria Indicative Valuation Summary, REPSOL0035636 – REPSOL0035649, at REPSOL0035643).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 97.

98.    After reaching out to 72 entities, Repsol received three offers for the YPFI Indonesian Assets and seven offers for parts of the YPFI Indonesian Assets. Soto Decl. Ex. 116 (Oct. 30, 2000, Project Almeria Bid Summary, REPSOL0040011 – REPSOL0040021, at REPSOL0040012). After a potential deal with the Korean National Oil Company fell through,[22] Repsol (and certain of its subsidiaries), YPFI, YPF Energy Holdings, and China National Offshore Oil Corporation and its subsidiaries ("**CNOOC**") entered into a share purchase agreement whereby CNOOC, an independent company, purchased nine Indonesian companies (two YPFI subsidiaries, several YPF subsidiaries, and several Repsol subsidiaries) for a total contract purchase price of $585.0 million. Soto Decl. Ex. 117 (Jan. 18, 2002, Stock Purchase Agreement, REPSOL0009893

---

[22] Soto Decl. Ex. 118 (Email regarding Indonesian Deal, dated June 19, 2001, REPSOL0021417 – REPSOL0021419, at REPSOL0021417 – REPSOL0021419).

~~18~~

– REPSOL0010146, at REPSOL0009901 – REPSOL0009902). None of the parties to the January 18, 2002 Stock Purchase Agreement are domiciled in the United States. *Id.* at REPSOL0009896. The parties attributed $386,365,000 to YPF – Maxus Southeast Sumatra B.V. and YPF Java Baratlaut B.V., collectively. *Id.* at REPSOL0009901; Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 333).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 98.

99.    Maxus was not a party to the January 18, 2002 stock purchase agreement with CNOOC. Soto Decl. Ex. 117 (Jan. 18, 2002, Stock Purchase Agreement, REPSOL0009893 – REPSOL0010146, at REPSOL0009901 – REPSOL0009902).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust disputes that Maxus was not a party to the agreement to the extent Maxus and YPFI are alter egos.

100.    The YPF Energy Holdings N.V. and YPFI boards approved the sale of their respective Indonesian assets. Soto Decl. Ex. 119 (Jan. 17, 2002 Email from Gerry Conner to Dick Smith attaching the relevant YPFI and YPF Energy Holdings N.V. board resolutions, MAXUS1211202 – MAXUS1211207).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 100.

101.    The sale was publicly disclosed. Soto Decl. Ex. 84 (YPF Form 20-F, December 31, 2002 at 104).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 101.

102.    ████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that the dispute is not whether the price paid for the assets was fair market value. The issue in dispute is whether Maxus ultimately received any consideration for the assets. The record reflects that Maxus did not receive consideration for the assets sold, including that the purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and Repsol through a series of dividends. As to all the YPFI transfers, including the Indonesian assets, a triable issue of fact also exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those transfers.

5.    YPFI Bolivian Assets

103.    On December 14, 2000, the Executive Committee of Repsol approved a project for the integration of the international assets in Bolivia. Soto Decl. Ex. 120 (Presentation on Relocation of Assets in Bolivia, REPSOL0044422_TR – REPSOL0044430_TR, at REPSOL0044422_TR). The objective of this integration was to simplify the corporate structure of the Bolivian entities (*id.*) and to gain tax advantages that would result in an estimated savings of $17 million from 2001-2010. Soto Decl. Ex. 121 (Nov. 13, 2000, Bolivia Repsol YPFIntegration Presentation, REPSOL-E-0000067641, at slide 4).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 103.  The Trust disputes the facts highlighted in red to the extent that they are unsupported by the cited evidence.

104.    On May 17, 2002, YPFI re-domiciled from the Cayman Islands to Bolivia. Soto Decl. Ex. 122 (May 17, 2002, Administrative Resolution 23972/2002, Bolivian Ministry of Economic Development, MAXUS5659428 – MAXUS5659433, at MAXUS5659432). YPFI then split into YPFI, S.A. (a Bolivian company holding all of YPFI's assets except those in Bolivia) and Repsol YPF Santa Cruz S.A. (holding Bolivian assets known as Andina Corp. and Maxus Bolivia Inc.). Soto Decl. Ex. 123 (May 21, 2002 Email from Fernando Nardini to Carlos Felices re Bolivian Transactions, YPF-E-0000051697).

18

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 104.

105.    On March 17, 2002, KPMG valued YPF's stake in Andina at $705-$741 million. Soto Decl. Ex. 124 (Mar. 17, 2002 KPMG Letter to the YPF Board, YPF-E-0000120438 – YPF-E-000012043).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 105.

106.    Maxus never owned Andina Corp. *See* Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 433:17-21).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 106.

107.    BDO Lichtenstein valued Maxus Bolivia, Inc. between approximately $174 and $203 million. *See* Soto Decl. Ex. 125 (Mar. 5, 2002 BDO Valuation, YPF0031407 – YPF0031488. at YPF0031424).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 107.

108.    YPF sold the shares of Repsol YPF Santa Cruz (a Spanish company) to Repsol S.A. on July 10, 2002 for $883 million. Soto Decl. Ex. 126 (July 10, 2002, Agreement for the Purchase of Shares of Repsol YPF Santa Cruz S.A., REPSOL 0022627_TR – REPSOL 0022631_TR); MLT Statement of Facts ¶ 94. Around 80% of the $883 million related to Andina Corp., which Maxus never owned. Soto Decl. Ex. 83 (Oct. 15, 2015, Fernando Nardini Dep. at 384:17-385:1, 433:17-21).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 108.  The Trust disputes the facts

18

47

highlighted in red to the extent that that Soto Decl. Ex. 83 does not support Repsol
Defendants' assertion that "[a]round 80% of the $883 million related to Andina Corp."

109.    Maxus was not a party to 2002 sale of YPFI's Bolivian Assets. Soto Decl. Ex. 126
(July 10, 2002 Share Purchase Agreement, REPSOL0022627 – REPSOL0022631).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the
statements of fact in this paragraph.  The Trust disputes that Maxus was not a party to
the agreement to the extent Maxus and YPFI are alter egos.

110.    Both the YPFI and YPF boards approved the Bolivian transaction. Soto Decl. Ex.
127 (Mar. 8, 2002 YPFI Board Minutes & Mar. 8, 2002, YPF Board Minutes, YPF0045154 –
YPF0045164).

*Responses and Objections:* Subject to its General Objections, the Trust does not
dispute the facts set forth in paragraph 110.

111.    The sale was publicly disclosed. Soto Decl. Ex. 84 (YPF 2002 Form 20-F at 22).

*Responses and Objections:* Subject to its General Objections, the Trust does not
dispute the facts set forth in paragraph 111.

112.    The MLT's expert does not dispute that YPFI sold the YPFI Bolivian Assets for
fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 121–122).

*Responses and Objections:* Subject to its General Objections, the Trust does not
dispute the facts highlighted in green in paragraph 86.  However, the Trust submits that
the dispute is not whether the price paid for the assets was fair market value. The issue in
dispute is whether Maxus ultimately received any consideration for the assets. The record
reflects that Maxus did not receive consideration for the assets sold, including that the
purchase price of the sales of the Venezuelan and Ecuadorian assets was gifted to YPF and
Repsol through a series of dividends. As to all the YPFI transfers, a triable issue of fact also
exists regarding whether YPFI and Maxus can be adjudicated alter egos with respect to those
transfers.

113.    During the 2001-02 YPFI Transactions, and until Repsol was expropriated from
YPF (discussed *infra* section VI), the YPF Board of Directors, in accordance with Argentine law,

18

48

contained independent directors, including some appointed by the Argentine government. *E.g.*, Soto Decl. Ex. 84 (YPF 2002 Form 20-F at 85) ("The Government of the Argentine Republic, sole holder of Class A shares, in accordance with YPF's bylaws and in accordance with the above mentioned modification to YPF's Bylaws, are entitled to elect one director and one alternate to serve up to a one-year term."); Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 69) (same); YPF 2000 Form 20-F at 64) (same); Soto Decl. Ex. 127 (YPF 2002 Form 20-F at 70-71) (listing Board of Directors); Soto Decl. Ex. 85 (YPF 2001 Form 20-F at 57) (same); Soto Decl. Ex. 128 (Repsol 2002 Form 20-F at 91) (same); Soto Decl. Ex. 129 (Repsol 2001 Form 20-F at 90) (same); Soto Decl. Ex. 67 (Repsol 2000 Form 20-F at 75) (same); Soto Decl. Ex. 130 (Sept. 1, 2015, Carlos Olivieri Dep. at 116:11-117:13) ███████████████████ Soto Decl. Ex. 131 (Sept. 2, 2015, Carlos Olivieri Dep. at 392:1-393:24) ███████

████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████ Soto Decl. Ex. 132 (Oct. 16, 2015, Pablo Blanco Dep. at 352:4-353:4) ████
██████████████████████; Soto Decl. Ex. 133 (Sept. 9, 2015, Pablo Blanco Dep. at 177:16-178:14) ██████
████████████████████████
████████████████████████
████████████████████████
██████████████████ The YPF board met and conducted

company business through board resolutions. *See e.g.,* Soto Decl. Ex. 107 (YPF Board of Directors Resolution, YPF0045526 – YPF0045526, dated May 9, 2000).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 113. The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

### D.    Repsol Creates Repsol E&P

114.    Repsol created a new Repsol subsidiary in 2005, Repsol USA Holdings, as well as various operating subsidiaries underneath the holding company, including Repsol E&P USA, Inc. and Repsol Services Company. *See* Soto Decl. Ex. 134 (Repsol, S.A. Form 20-F for the fiscal year ended December 31, 2006, at p. 36, F-136). Repsol E&P USA, Inc. sought to invest in less risky, more developed prospects. *E.g.,* Soto Decl. Ex. 27 (2021 Hartline Dep. at 71:5-10, 72:3-8). Maxus sought to invest in less developed prospects. *Id.* at 72:13-16. These were different types of investments from an oil and gas perspective. *Id.* at 72:17-24. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 114. The Trust disputes that Repsol E&P USA, Inc. invested in less risky, more developed prospects, as Repsol E&P USA also invested in numerous lease sales and purchased numerous undeveloped properties such as Ra, Stormy Monday, and Tiger.

115.    Repsol E&P USA, Inc. maintained a separate office from Maxus. *See supra* ¶¶ 4, 10; *see also* Soto Decl. Ex. 135 (Aug. 4, 2021, Michael Mills[23] Dep. ("**2021 Mills Dep.**") at

---

[23] Michael Mills was Maxus's CFO from 2007 to 2009. See MLT Disclosures at 11; Soto Decl. Ex. 134 (2021 Mills Dep. at 34:21-35:2; 153:16-25).

~~18~~

**265:17-266:19)** ████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* The Trust disputes the facts set forth in paragraph 115 to the extent that Repsol E&P USA, Inc. did not initially maintain separate offices from Maxus, had the same leadership as Maxus, and initially hired no staff of it's own..

116.    From 2003 to 2009, Maxus and its subsidiaries, on the one hand, entered into many service agreements with Repsol or its subsidiaries, on the other. *See, e.g.,* Soto Decl. Ex. 136 (Jan. 1, 2003 Services Agreement between Maxus and Repsol S.A., MAXUS5865835 – MAXUS5865843); Soto Decl. Ex. 137 (Nov. 16, 2003 Services Agreement between Repsol Exploration Mexico S.A. de C.V., and MIEC, RSC-E-0000001863 – RSC-E-0000001869); Soto Decl. Ex. 138 (Jan. 1, 2005 Services Agreement between Maxus and Repsol S.A., RSC-E-0000002480 – RSC-E-0000002488); Soto Decl. Ex. 139 (Jan. 1, 2005 Services Agreement between Maxus and Repsol E&P USA Inc., REPSOL0009494 – REPSOL0009500); Soto Decl. Ex. 140 (June 1, 2005 Services Agreement between Maxus and Repsol YPF Brasil, S.A., RSC-E-0000000682 – RSC-E-0000000688); Soto Decl. Ex. 141 (Dec. 1, 2005 Services Agreement between Maxus and Repsol Exploracion, S.A., RSC-E-0000002277 – RSC-E-0000002285); Soto Decl. Ex. 142 (Jan. 1, 2006 Services Agreement between RSC and Maxus, MAXUS4503275 – MAXUS4503280); Soto Decl. Ex. 143 (Jan. 1, 2007 Services Agreement between RSC and Maxus, MAXUS5695134 – MAXUS5695143); Soto Decl. Ex. 144 (Mar. 1, 2007 Transition Services Agreement between Maxus and RSC, MAXUS5142656 – MAXUS5142662); Soto Decl. Ex. 145 (Jan. 8, 2008 Services Agreement between RSC and Maxus, MAXUS5887388 – MAXUS5887396); Soto Decl. Ex. 146 (May 17, 2006 Email from Dick Smith to Luis Garcia re Services Agreements, MAXUS5828965 – MAXUS5828968) (listing certain Maxus service agreements with certain affiliates); Soto Decl. Ex. 27 (2021 Hartline Dep. at 44:13-15) ████

~~18~~    51

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 116. The Trust disputes that there were "many" service agreements, as the YPF Holdings' Internal Controls audits clearly explains that many services were performed without a service agreement. *See* Yoo Ex. 11 (YPF Holdings' Internal Controls Summary of Internal and External Audits, RSC-E-00000010309).

117.   Where no such agreement was in place, Maxus would invoice Repsol for its employees' time. Soto Decl. Ex. 27 (2021 Hartline Dep. at 44:18-23) ████████████

██████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 117. Many services provided by Maxus were written off as shown in the YPF Holdings' Internal Controls audits, and the intercompany rate Maxus received for providing these services was below the market. *See* Yoo Ex. 11 (YPF Holdings' Internal Controls Summary if Internal and External Audits, RSC-E-00000010309); Lee Decl. Ex. 115 (Pulliam Rep. at ¶ 251).

**E.   Maxus's Gulf of Mexico Activity**

118.   By 2006, Maxus had increased its portfolio of exploratory prospects to 74 deepwater lease blocks in the Gulf of Mexico (up from 25 blocks, including 2 ORRIs, in 1999, when Repsol acquired YPF). Soto Decl. Ex. 147 (Feb. 14, 2006, YPFH Board of Directors Minutes, MAXUS6097677 – MAXUS609687, at MAXUS6097678); Soto Decl. Ex. 58 (YPF S.A. Form 20-F for the fiscal year ended December 31, 1999, at p. 27).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 118.

1.   Maxus Purchases an Interest in Neptune

119.   On May 22, 2003, Maxus entered into a participation agreement for a 15% share in

18                                   52

the Neptune joint venture ("**Neptune**") with BHP in the Deepwater Gulf of Mexico in May 2003.
MLT Statement of Facts ¶ 96; Soto Decl. Ex. 148 (July 31, 2002 Memo from TJ Winczewski to
the Files, Houston re YPF Hodgins Related Party Receivable, DT000137 – DT000138); Soto Decl.
Ex. 27 (2021 Hartline Dep. at 92:8-22).

>    *Responses and Objections:* Subject to its General Objections, the Trust does not
>    dispute the facts set forth in paragraph 119.  The Trust notes that neither Soto Decl.
>    Ex. 148 nor Soto Decl. Ex. 27 reference the Neptune joint venture.

120.    By 2005, the estimated value of Neptune was between $150 million and upwards
of $600 million. Soto Decl. Ex. 149 (Randall & Dewey December 2005 Presentation to the YPFH
Board of Directors, YPF0021272 – YPF0021339, at YPF0021277).

>    *Responses and Objections:* Subject to its General Objections, the Trust does not
>    dispute the facts set forth in paragraph 120.



18                          53

[24] Jon Slater was Maxus's CEO and President from 2007 to 2009. See MLT Disclosures at 17; Soto Decl. Ex. 150 (Slater Dep. at 18:13-21).

18

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Soto Decl. Ex. 151 (Project Yazstremski Asset Assessment, dated Feb. 14, 2006, SW-USA 000011 SW-USA 000078, at SW-USA 000036).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust submits that operational expenses would include the ability to pay off environmental liabilities and increase environmental reserves. Neptune, even if successful, would not be sufficient enough to pay off those expenses as they came due.

122. █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 122.

123. █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ These repairs resulted in a delay

---

[25] Tamara Saront was a financial analyst at YPF from 1998 to 2005, Maxus CFO from 2005-2007, and financial manager at RSC from 2007 to 2014. See MLT Disclosures at 16; Soto Decl. Ex. 152 (Mar. 6, 2015, Tamara Saront Dep. at 14:4-18:20).

18

from March 2008 to June 2008. Soto Decl. Ex. 153 (YPFH Consolidated Financial Statements as of December 31, 2008 and 2007, at 5, MAXUS3219247 – MAXUS3219275).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 123.

124.   Once Neptune came online in July of 2008 (*id.*), it suffered from two hurricanes that shut down production. Soto Decl. Ex. 135 (2021 Mills Dep. at 60:20-25). One of them was Hurricane Ike, a category 4 hurricane, which hit in September of 2008. Robbie Berg, *Tropical Cyclone Report, Hurricane Ike*, NOAA (updated Mar. 18, 2014), available at https://www.nhc.noaa.gov/data/tcr/AL092008_Ike.pdf.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 124.

125. ██████████████████████████████████████
████████████████████████████████████████████
██ . This resulted in a monthly decrease in cash of $11 million, or $131.9 million annualized. *Id.* at 62:20-63:2. From April 2008 to December of 2008, the price of a barrel of oil dropped from almost $140 a barrel to below $40.00 a barrel. *Id.* at 50:23-52:5; Soto Decl. Ex. 69 (Bramer Rep. at ¶¶ 555–56).

Michael Mills, Maxus's CFO from 2007-2009,[26] stated the following:

I think I am partially focusing my frustration on my friends at parent when the frustration is more a result of the 40% volume reduction and 65% price drop since August. In August I was formulating analytical means for recommending the best way to invest our surplus cash flows (vs. paying back the Neptune loan early) and am now I am trying to make payroll. Poor pitiful Pearl but physiologically we first took a body blow with the pontoon delay and now the market is in the toilet and Neptune is producing nothing

---

[26] See MLT Disclosures at 11; Soto Decl. Ex. 135 (2021 Mills Dep. at 34:21-35:2; 153:16-25).

~~18~~

close to platform capacity and [BHP] is likely to make more cash calls that we will economically need to participate in. We sure could have used that late March to early July production and at those prices along with the $17M lost revenue from the two hurricanes to have a cash balance to draw on heading into 2009 … The current market and operational conditions do not result in a successful outcome to the strategy by parent to leave us with assets to make us self supporting. We need revenue of $16M to $18M per month (i.e. basically the numbers I calculated on the plane coming back from Cleveland) not the $5M that $40 per barrel and 29,000 volume gives us.

Dec. 5, 2008 email from M. Mills to J. Slater, MAXUS5392370 – MAXUS5392371, at MAXUS5392370.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 125.

**F.    Tiger/North Bronto and Stormy Monday**

126.    In 2005, the YPFH Board of Directors authorized an independent assessment of the fair market value of the Gulf of Mexico. Soto Decl. Ex. 154 (YPF Holdings, Inc. Board of Directors Minutes, Nov. 15, 2005, REPSOL0001429 – REPSOL0001440). YPFH engaged Scotia Waterous to value its Gulf of Mexico Assets, which included Tiger/North Bronto and Stormy Monday. Soto Decl. Ex. 155 (Project Yazstremski Asset Assessment, dated June 21, 2006, RSC-E-0000002585 – RSC-E-0000002640).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 126.

127.    On June 21, 2006, Scotia Waterous valued Tiger/North Bronto and Stormy Monday between $22 million and $29 million. *Id.* at RSC-E-0000002640. In June 2006, Repsol E&P USA, Inc. offered to purchase Maxus's interest in Stormy Monday and Tiger/North Bronto for a cash payment of $28 million. *See* Soto Decl. Ex. 227 (Email from David Wadsworth re: Offer to Purchase, MAXUS5087418 – MAXUS5087420, dated June 29, 2006). The YPFH board discussed

18                                    57

the "benefits of potentially having a future cash flow from overriding royalty interests to offset Company expenses over time," as opposed to obtaining an upfront cash payment. *See* Soto Decl. Ex. 226 (YPFH Board of Directors Meeting minutes, MAXUS5824913 – MAXUS5824923, dated June 21, 2006).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 127.

128.    The YPFH board requested Scotia Waterous provide an analysis for the Board to consider the basis of a cash offer, ORRI, or a combination. *Id.* On July 5, 2006, Repsol E&P USA, Inc. submitted an offer in the form of an ORRI of 8% interest in Stormy Monday and 19% interest in Tiger/North Bronto. *See* Soto Decl. Ex. 156 (Email re: Repsol Offer, dated July 5, 2006, MAXUS5088380 – MAXUS5088381). On July 6, 2006, Guzman Solana requested authorization from the YPF S.A. Board to enter into an agreement with Repsol E&P USA, Inc. for the exchange of 9% ORRI for Stormy Monday and 19% ORRI for Tiger/North Bronto. *See* Soto Decl. Ex. 157 (Email from Guzman Solana, dated July 6, 2006, YPF0022184). Additionally, Repsol E&P USA, Inc. would be responsible for 100% of the exploration and production of the holdings. *Id.*



. On July 12, 2006, Maxus and Repsol E&P USA, Inc. entered into a Memorandum of Understanding, whereby Repsol E&P USA, Inc.

18    58

agreed to an increased ORRI of 9.5% in exchange for the Stormy Monday interest, and 19% ORRI for Tiger/North Bronto. *See* Soto Decl. Ex. 158 (Memorandum of Understanding, dated July 12, 2006, REPSOL-E-0000001621 – REPSOL-E-0000001648).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 128.

129.    In August 2006, Scotia Waterous presented a fairness valuation to the YPFH Board, concluding that the terms of the transaction provided in the Memorandum of Understanding were fair from a financial point of view. *See* Soto Decl. Ex. 159 (YPF Holdings, Inc. Board Minutes, dated Aug. 8, 2006, MAXUS3372923 – MAXUS3372937); Soto Decl. Ex. 160 (Aug. 10, 2021, Shaun Finnie Dep. at 113:4-15) (Scotia Waterous managing director testifying that the 19% ORRI that Repsol E&P USA, Inc. transferred for Tiger/North Bronto was on the higher end of the range provided in Scotia Waterous's recommendation). The YPFH Board considered "the limited sources of income to fund the development of the Stormy Monday, Tiger and North Bronto prospects and the level of expenditures required to explore and . . . develop these prospects." *Id.* The Board determined that the terms of the transaction "would relieve the Company from the obligation of funding the exploration and development of these prospects," while also "preserve an 'up-side potential for the Company." *Id.* The Board unanimously approved the transaction. *Id.* The Board included independent directors. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 121:9-18).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 129.   The Trust disputes the use of the term "independent directors" as the Repsol Defendants have not set forth a standard of independence.

18                                                      59

130.    Maxus was represented by outside counsel, Jones Walker, in connection with the transaction. Soto Decl. Ex. 161 (Email from David Wadsworth, dated July 19, 2006, MAXUS5091288 – MAXUS5091290) ("It is my understanding that each company has selected an outside law firm to represent it in connection with this matter. Maxus US has selected Jones Walker.").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 130.

131.    In July 2006, Repsol E&P USA, Inc. bought the remaining 50% interest in Stormy Monday owned by third-party Murphy Exploration (Maxus owned only 50%) for only 5% gross/2.5% net ORRI, less than what Maxus received. Soto Decl. Ex. 162 (Email from Wanda Slocum, dated Aug. 23, 2006, MAXUS5096128 – MAXUS5096130.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 131.

132.    Repsol E&P USA, Inc. drilled dry holes at Stormy Monday and Tiger/North Bronto. MLT Statement of Facts ¶ 103. Repsol incurred $43.1 million in drilling costs for Stormy Monday, and $7.6 million for Tiger/North Bronto. Soto Decl. Ex. 163 (Repsol USA Financial Statements for Year End 2007, MAXUS5288786, at 2007 Tax. Inc. Summary sheet).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 132.

133.    Other than the sale of Stormy Monday and Tiger/North Bronto, there was no sale of an E&P asset from a Maxus subsidiary to a Repsol subsidiary. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 125:12-23).

**Formatted:** Highlight

18                                60

*Responses and Objections:* Subject to its General Objections, the Trust ~~does not dispute~~disputes the ~~facts set forth~~statements in paragraph 133. ████████████████████ ███████████████ -

134.   Maxus rejected an offer from Repsol Offshore E&P USA, Inc. to purchase its Guppy Wake asset. *See* Soto Decl. Ex. 164 (Dec. 4, 2007 Letter from Tom Duncan to James Higgins, REPSOL-E-0000109152 – REPSOL-E-0000109155, at REPSOL-E-0000109154).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 134.

135.   Maxus rejected an offer from Repsol Offshore E&P USA, Inc. to purchase its Ra asset. Soto Decl. Ex. 165 (Sept. 3, 2007 Email from James Higgins to Walter Forwood, MAXUS5670543 – MAXUS5670547, at MAXUS5670544).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 135.

136.   Cumulatively, the MLT asserts a total shortfall of $568.5 to $675.4 million to Maxus on account of the 1996-97 Maxus Transactions, and $202.9 to 309.8 million attributable to Repsol on account of the Crescendo Sale and undefined Gulf of Mexico. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 9).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 136.  The Trust disputes the use of "and $202.9 to 309.8 attributable" as being misleading, it should say instead "of $202.9 to 309.8 attributable."

**V.     The King & Spalding Memo**

137.  ██████████████████████████████████████████

████████████████████████████████████████████████████



**Formatted:** Highlight

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts ~~set forth in paragraph 137~~ highlighted in green in paragraph 137. However, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for the fact highlighted in red. Mr. Blanco was not at Repsol at the time of the hiring of King & Spalding and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16)

138.    On May 24, 2005, King & Spalding sent a letter to Augustin Garcia Moratilla regarding evaluation of strategic alternatives regarding Maxus Energy Corporation and Tierra Solutions, Inc. Soto Decl. Ex. 166 (May 24, 2005 Letter from James Pardo to Agustin Garcia Moratilla re: Evaluation of Strategic Alternatives Regarding Maxus and Tierra, YPF_MAXUS_0000293057 – YPF_MAXUS_0000293103). To conduct its analysis, King & Spalding was advised to assume for purposes of the analysis that Maxus was insolvent given the uncertainty surrounding the extent of Maxus's contingent environmental liabilities. *Id.* at YPF_MAXUS_0000293083; Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 274:21-275:6)

**Formatted:** Highlight

~~18~~

*Responses and Objections:* Subject to its General Objections, the Trust ~~does not dispute the facts set forth in paragraph 138.~~ disputes the statements of fact in this paragraph. The Repsol and YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege.  In seeking to establish the facts in paragraph 138, the Trust submits that the Repsol and YPF Defendants have effectuated a subject matter waiver of all King & Spalding documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield the Repsol or YPF Defendants from Maxus' environmental liabilities.  Repsol is requesting this Court to make a finding that Repsol requested King & Spalding assume Maxus's insolvency.  However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact.  Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact.  The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.  Further, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for this fact.  Mr. Blanco was not at Repsol at the time of the hiring of King & Spalding and has no personal knowledge to testify to this issue.  Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16) ██████████████████████████████████████████

Formatted: Justified

139.    At no point did King & Spalding conduct a solvency analysis. Rather, King & Spalding was directed to assume for purposes of its analysis that Maxus was insolvent. Soto Decl. Ex. 166 (May 24, 2005 Letter from James Pardo to Agustin Garcia Moratilla re Evaluation of Strategic Alternatives Regarding Maxus and Tierra, YPF_MAXUS_0000293057 – YPF_MAXUS_0000293103, at YPF_MAXUS_0000293083 – YPF_MAXUS 0000293084)

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege.  In seeking to establish the facts in paragraph 139, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from

~~18~~
63

Maxus' environmental liabilities.  Repsol is requesting this Court to make a finding that King & Spalding never conducted a solvency analysis.  However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact.  Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact.  The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege.  In seeking to establish the facts in paragraph 140, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities.  Repsol is requesting this Court to make a finding that King & Spalding presented possible alternatives in dealing with the contingent environmental liabilities and made certain recommendations to ensure Repsol did not become liable for Maxus's contingent environmental liabilities.  However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact.  Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against Repsol concerning this fact.  The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.

141.    Though bankruptcy was one alternative presented to achieve finality, as Repsol's

corporate representative stated: ███████████████████████████████████████

████████████████████████████ Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at

18                                                         64

303:20-304:3).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege. In seeking to establish the facts in paragraph 141, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities. Repsol is requesting this Court to make a finding that Repsol was not interested in the alternative of bankruptcy presented by King & Spalding. However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact. Accordingly, the Trust submits this Court should determine that Repsol has effectuated a subject matter waiver or find an adverse inference against Repsol concerning this fact. The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver. In addition, the Trust objects to the use of Repsol's corporate representative testimony as admissible evidence for the fact highlighted in red. Mr. Blanco was not at Repsol at the time of the King & Spalding memo, and has no personal knowledge to testify to this issue. Propps Decl. Ex. 417 (Repsol. Corp. Rep. Dep. 29:13-16)

142.   The King & Spalding memorandum does not reference the 1996-97 Maxus Transactions, Crescendo Sale, or 2001-02 YPFI Transactions.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Repsol and the YPF Defendants have withheld numerous King & Spalding documents on the basis of privilege. In seeking to establish the facts in paragraph 142, the Trust submits that Repsol and the YPF Defendants have effectuated a subject matter waiver of all K&S documents and analyses regarding Maxus' solvency, potential bankruptcy, alter ego concerns, fraudulent transfers, and/or any strategy to shield Repsol or the YPF Defendants from Maxus' environmental liabilities. Repsol is requesting this Court to make a finding that the King & Spalding memo does not reference the 1996-97 Maxus Transactions, Crescendo Sale, or 2001-02 YPFI Transactions. However, by shielding the King & Spalding documents from the Trust, the Trust has been denied the evidence necessary to refute this fact. Accordingly, the Trust submits this Court should determine that Repsol has effected a subject matter waiver or find an adverse inference against

18
65

Repsol concerning this fact.  The Trust reserves the right to seek discovery related to this fact in the event the Court determines Repsol has effected a subject matter waiver.

**A.       2007 Settlement Agreements**

143.     In 2007, Maxus entered into three settlement agreements ("**2007 Settlement Agreements**") with RSC and Repsol E&P T&T to resolve disputes regarding intercompany services: on April 5, 2007 and April 27, 2007 with RSC, and on July 1, 2007 with Repsol E&P T&T. MLT Statement of Facts ¶ 120.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 143.

144.     The first of the 2007 Settlement Agreements, effective as of April 5, 2007, resolved a dispute between Maxus and RSC in connection with certain marketing and distribution services that Maxus provided. MLT Statement of Facts ¶ 121; Soto Decl. Ex. 167 (Settlement Agreement between Maxus Energy Corporation and Repsol Services Company, dated Apr. 5, 2007, REPSOL0009487 – REPSOL0009489, at REPSOL0009487. On December 18, 2006, Maxus presented RSC with an invoice for $1,566,653.58 for annual fees. Soto Decl. Ex. 168 (Dec. 18, 2006 Maxus Invoice to RSC, MAXUS4534348 – MAXUS4534352, at MAXUS4534348). On April 5, 2007, RSC agreed to reimburse Maxus for all brokerage fees under the Agency Agreement, a total of $1,566,653.58. Soto Decl. Ex. 167 (Settlement Agreement between Maxus Energy Corporation and Repsol Services Company, dated Apr. 5, 2007, REPSOL0009487 – REPSOL0009489, at REPSOL0009487). In exchange, Maxus agreed that "the Settlement Amount shall be in full and final settlement of all claims by Maxus against RSC and its affiliated companies . . . arising from or in connection with claims for payment or reimbursement for Services rendered or expenses incurred under the Agency Agreement for the Applicable Period." *Id.* Sara Galley,

18                                                66

secretary and in-house counsel of Maxus,[27] signed on behalf of Maxus. *Id.* at REPSOL0009489.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 144.

145.    The Maxus board of directors approved the April 5, 2007 settlement. Soto Decl. Ex. 169 (May 15, 2007 Maxus Written Consent of the Board of Directors in Lieu of a Special Meeting, REPSOL-E-0000010745 – REPSOL-E-0000010747). Two of the three directors, Messrs. Notestine and Sprouse, were independent of YPF and Repsol. Soto Decl. Ex. 10 (May 13, 2015, Harvey Smith Dep. at 158:7-59:12).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green set forth in paragraph 145. The Trust notes that Soto Decl. Ex. 169 does not mention the April 5, 2007 settlement specifically, but instead resolves "that all actions taken by the offices of the Company, and all acts and things done under their authority, since the last general election of the officers of the Company, are hereby ratified and approved as acts of the Company." The Trust disputes the use of the term "independent" as the Repsol Defendants have not set forth a standard of independence. The Trust also disputes that there was any evidence showing that the directors were fully advised.

146.    The MLT's expert, Mr. Pulliam, does not dispute that the April 5, 2007 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–17).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Mr. Pulliam explicitly states in his report that:

---

[27] Slater Dep. at 52:20-24 ████████████████████████████

**Formatted:** Highlight

Soto Decl. Ex. 47 (Pulliam Rep. ¶ 36).

Mr. Pulliam further states:



Soto Decl. Ex. 47 (Pulliam Rep. at 117).

147.   The second 2007 Settlement Agreement, dated April 27, 2007, was also between Maxus and RSC. MLT Statement of Facts ¶ 122. "[F]rom January 1, 2006 to and including February 28, 2007 (the 'Applicable Period')" Maxus and RSC provided services to and for the benefit of each other. Soto Decl. Ex. 170 (Settlement Agreement between Maxus Energy Corporation and Repsol Services Company, dated Apr. 27, 2007, REPSOL0009583 – REPSOL0009586, at REPSOL0009586).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 147.

148.   On April 27, 2007, RSC and Maxus entered into a Settlement Agreement whereby Maxus agreed to prepare invoices for certain services rendered during the Applicable Period, and RSC, or the appropriate entity, would then pay such invoices. *Id.* In exchange, Maxus released "all members of the RSC Group and their affiliated companies . . . arising from or in connection with all claims for payment for the Maxus Services rendered during the Applicable Period." *Id.* at REPSOL0009584.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 148.

18

149.    The Maxus board of directors approved the April 27, 2007 settlement. Soto Decl. Ex. 171 (July 20, 2007 Minutes of the meeting of the Board of Directors of Maxus Energy Corporation, MAXUS3374225 – MAXUS3374225, at MAXUS3374225 – MAXUS3374226).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 149.

150.    The MLT's expert, Mr. Pulliam, does not dispute that the April 27, 2007 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–17).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.   Mr. Pulliam explicitly states in his report that:



Soto Decl. Ex. 47 (Pulliam Rep. ¶ 36).

151.    The July 1, 2007 Settlement Agreement resolved claims related to services including technical and economic evaluation, business development, oil and gas drilling and operations, seismic processing, and support to geological modelling provided by Maxus to Repsol E&P T&T between January 1, 2006 and March 31, 2007. MLT Statement of Facts ¶ 123. In exchange for $1.35 million from Repsol E&P T&T, Maxus released all claims against Repsol E&P T&T specifically related to services between January 1, 2006 and March 31, 2007 "related to Repsol E&P operations in the Republic of Trinidad and Tobago." Soto Decl. Ex. 172 (Settlement

18                                                      69

Agreement between Maxus Energy Corporation and Repsol E&P T&T Limited, dated July 1, 2007, REPSOL-E-0000011476 – REPSOL-E-0000011478, at REPSOL-E-0000011476).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 151.

152.    The MLT's expert, Mr. Pulliam, does not dispute that the July 1, 2007 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–17).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.   Mr. Pulliam explicitly states in his report that:



Soto Decl. Ex. 47 (Pulliam Rep. ¶ 36).

**B.    The 2007/2008 Settlement Agreement**

153.    On October 8, 2007, YPF, YPFI, YPFH, Maxus, CLHH, Tierra, and MUSE entered into a settlement agreement to terminate the 1996 Assumption and Contribution Agreements (the "**2007/2008 Settlement Agreement**"). Under the 2007/2008 Settlement Agreement, Maxus and Tierra received "$14,430,000" in cash, and forgiveness of an "approximately US $363,772,381.92" receivable "YPFH [had] from Maxus." Soto Decl. Ex. 173 (Settlement Agreement, dated Oct. 8, 2007, YPF0030240 – YPF0030300, at YPF0030243, YPF0030245.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 153.

154.   The boards of Maxus and Tierra retained Stout Risius Ross, Inc. ("**SRR**") to analyze the fairness of the 2007/2008 Settlement Agreement and they concluded that it was "fair from a financial point of view." Soto Decl. Ex. 174 (Mar. 17, 2008, Maxus Energy Corporation and Tierra Solutions, Inc. Fairness Opinion, Stout Risius Ross, MAXUS5299922 – MAXUS5300081, at MAXUS5299935). In negotiating the 2007/2008 Settlement Agreement, Jones Walker represented Maxus and Bracewell Giuliani LLP represented YPF. Soto Decl. Ex. 175 (Mar. 13, 2015, Walter Forwood Dep. at 313:3-9).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 154.

155.   Repsol was not a party to 2007/2008 Settlement Agreement or required to make any payments, promises, releases, or representations thereunder, and was not involved in the negotiations thereof. *Supra* ¶ 153, Soto Decl. Ex. 51 (June 23, 2021, Walter Forwood Dep. at 39:24-40:3)

*Responses and Objections:* Subject to its General Objections, the Trust ~~does not dispute the facts set forth in paragraph 155.~~disputes the statements of fact in this paragraph.  The Trust does not dispute that Repsol was not a named party to the 2007/2008 Settlement Agreement, but the Trust submits that the 2007/2008 Settlement Agreement was entered into at the direction of Repsol

C.    **2009 Settlement Agreement**

156.   On July 8, 2009, Repsol E&P USA, Inc., RSC, and Repsol Offshore E&P USA,

~~18~~                                        71

Inc. (collectively, the "**2009 Settling Repsol Entities**") entered into a settlement agreement with Maxus to resolve various "good faith" disputes related to operations in the Gulf of Mexico, including software and data issues, and transfer of certain assets. Soto Decl. Ex. 11 (July 8, 2009 Settlement Agreement, REPSOL0009506 – REPSOL0009526, at REPSOL0009506). The 2009 Settlement Agreement related to outstanding invoices for services Maxus rendered to the 2009 Settling Repsol Entities, as well as invoices outstanding for services RSC provided to Maxus. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 156.

157.    The 2009 Settling Repsol Entities paid $50 million to Maxus and Maxus released the 2009 Settling Repsol Entities from the following:

> any and all claims by Maxus and/or any of the other Maxus Entities against any Repsol Entity and/or any of the other Maxus Entities against any Repsol Entity and/or any Affiliate thereof (other than Maxus and the other Maxus Entities), including without limitation, against each of their respective partners, directors, officers, employees, contractors and agents, arising from or in connection with all [issues mentioned in the 2009 Settlement], or by virtue of the same, and has the effect of releasing, discharging, terminating and extinguishing any and all claims, liabilities and obligations in respect thereto.

The Settling Repsol Entities released Maxus from:

> any and all claims, causes of action, damages, costs, obligations and liabilities that such Person and the Successors may have of any kind or nature whatsoever, whether now known or not currently known, anticipated or unanticipated, fixed, contingent or conditional, suspected or unsuspected, at law or in equity, existing or claimed to exist, arisen or that could be originated in whole or in part, in each in respect of any and all events, facts or circumstances existing on or before the date of execution of this Agreeemnt arising out of, in respect, or in connection with [issues mentioned in the 2009 Settlement].

*Id.* at REPSOL9513 – REPSOL9514.

*Responses and Objections:* Subject to its General Objections, the Trust does not

72

18

dispute the facts set forth in paragraph 157.

158.    The 2009 Settlement Agreement was negotiated throughout mid-2008 up and until July 2009. Soto Decl. Ex. 176 (July 24, 2008 Email from Jon Slater to Matias Eskenazi re Maxus Presentation January Final, MAXUS5344755); Soto Decl. Ex. 177 (Nov. 26, 2008 Email from Jon Slater to James Higgins re Draft Settlement Agreement, MLTLEGACYESI_002053137 – MLTLEGACYESI_002053153) (attaching a draft of the 2009 Settlement Agreement, discussing problems with the draft); Soto Decl. Ex. 178 (Dec. 18, 2008 Email from Jon Slater to Paul Bohannon re Draft Settlement Agreement, MLTLEGACYESI_002071342 – MLTLEGACYESI_002071343) (attaching another round of edits to the 2009 Settlement Agreement).

   *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 158.

159.    Maxus was represented by outside counsel, Andrews & Kurth, in connection with the 2009 Settlement Agreement. *See* Soto Decl. Ex. 179 (Dec. 1, 2008 Email from Jon Slater to Paul Bohannon re Draft Settlement Agreement, MLTLEGACYESI_002071295) (forwarding draft of 2009 Settlement Agreement to outside counsel); Soto Decl. Ex. 150 (Slater Dep. at 68:17-21)

   *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph, even if accurate, as irrelevant.  The Trust further objects to the characterization of Andrews & Kurth as "outside counsel" to the extent this characterizes Andrews & Kurth as independent outside counsel to Maxus.

18

73

160.    The Maxus board approved the 2009 Settlement Agreement. Soto Decl. Ex. 180 (July 2, 2009 Maxus Unanimous Written Consent, MAXUS3374090 – MAXUS3374112).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 160.

161.    Prior to entering into the 2009 Settlement Agreement, the parties entered into an Agreement for Advanced Payment, where Repsol agreed to provide an advanced payment to Maxus of $30 million in connection with the 2009 Settlement. Soto Decl. Ex. 181 (Feb. 9, 2009 Agreement for Advanced Payment REPSOL0009501 – REPSOL0009505). Jon Slater, Maxus's then CEO,



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 161.

162.    The 2009 Settlement Agreement contains the following provision:

18    74

Advice of counsel. The parties declare and acknowledge that each have had the opportunity to consult with, and receive advice from, competent legal counsel and that he negotiation and execution of this Agreement resulted from such consultations and advice, and that the terms of this Agreement are fully understood and voluntarily accepted without duress or coercion.

Soto Decl. Ex. 181 (Feb. 9, 2009 Agreement for Advanced Payment REPSOL0009501 – REPSOL0009505, at REPSOL0009503).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 162.

163.    The Maxus board approved the Agreement for Advanced Payment. Soto Decl. Ex. 182 (Jan. 30, 2009 Maxus Unanimous Written Consent and Resolutions, MAXUS3374132 – MAXUS3374133). Two of the three directors, Jon Slater and Harlow Sprouse, were independent. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 74:22-75:15); Soto Decl. Ex. 183 (Dec. 19, 2014, David Wadsworth Dep. at 398:14-399:7); Soto Decl. Ex. 150 (Slater Dep. at 20:19-21:1).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 163 highlighted in green as set forth in paragraph 145.  The Trust disputes the use of the term "independent" as the Repsol Defendants have not set forth a standard of independence.  The Trust also disputes that there was any evidence showing that the directors were fully advised.

164.    The MLT's expert, Mr. Pulliam, does not dispute that the 2009 Settlement Agreement was for fair market value. Soto Decl. Ex. 47 (Pulliam Rep. at 116–117).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

18

statements of fact in this paragraph.  Mr. Pulliam states in his report:



Soto Decl. Ex. 47 (Pulliam Rep. ¶ 321).

**D.      The New Jersey Litigation**

165.    On December 13, 2005, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed a complaint in New Jersey Superior Court against OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH, related to pollution of the Passaic River emanating from the Lister Site (the "**New Jersey Litigation**"). Soto Decl. Ex. 184 (Compl., *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Dec. 13, 2005)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 165.

166.    On November 29, 2006, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund filed their First Amended Complaint against OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH. Soto Decl. Ex. 185 (First Am. Compl., *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Nov. 29, 2006)). The First Amended Complaint asserted "Alter-Ego/Common Economic Unit" and fraudulent transfer allegations against certain defendants. *Id.* ¶ 24.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 166.

18                                    76

167.    In October 2008, OCC brought cross-claims in the New Jersey Litigation against Maxus, Tierra, Repsol, YPF, YPFH, and CLHH asserting various claims, including breach of contract, fraudulent transfer of assets, unjust enrichment, and contribution under the Spill Act and statutory contribution. MLT Statement of Facts ¶ 118. In its cross-claims, OCC alleged that the 1996-97 Maxus Transactions, Crescendo Sale, and 2001-02 YPFI Transactions were fraudulent transfers. Soto Decl. Ex. 186 (OCC's Answer, Affirmative Defenses and Crossclaims to Pls' Second Am. Compl., ¶¶ 76-83, *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Oct. 3, 2008)).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 167.

168.    OCC's fraudulent transfer, civil conspiracy, and unjust enrichment claims were dismissed as time-barred as of 2003 based on the public disclosure of the 1996-97 Maxus Transactions in YPF's public SEC filings. Soto Decl. Ex. 187 (Special Master Recommendation and Op., *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. L-009868-05 (N.J. Super. Ct. Jan. 13, 2015)); Soto Decl. Ex. 188 (Order, *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. L-009868-05 (N.J. Super. Ct. Jan. 29, 2015)).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The Order cited by Repsol has been vacated. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).

169.    The alter ego-based claims against Repsol were subsequently dismissed on summary judgment. Soto Decl. Ex. 189 (Special Master Recommendation on Maxus Energy

18

Corporation's Mot. to Dismiss First Count of OCC's Second Am. Cross-Cls. and Strike Prayers for Declaratory Relief as to Future Obligations and Costs, *N.J. Dep't of Env't Prot. et. al. v. Occidental Chem. Corp. et al.*, No. ESX-L9868-05, at 11 (N.J. Super. Ct. Jan. 14, 2016)); Soto Decl. Ex. 190 (Apr. 5, 2016 Summary Judgment Order) (adopting entirely the Special Master's recommendation as the Opinion of the court). Repsol also obtained a $65 million contribution judgment against OCC under the Spill Act. Soto Decl. Ex. 14 (Order Granting Repsol, S.A.'s Motion for Summary Judgment on its Spill Act Contribution Counterclaim Against Occidental Chemical Corporation, *N.J. Dep't of Env't Prot. et al. v. Occidental Chem. Corp. et al.*, No. ESX-L9868-05, at 1-2 (N.J. Super. Ct. Oct. 19, 2017)).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The Order cited by Repsol has been vacated. *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp*, Nos. A-2036-17, A-2038-17, 2021 N.J. Super. Unpub. LEXIS 3156 (N.J. Super. Ct. App. Div. Dec. 27, 2021).

170.    The MLT intervened in the New Jersey Litigation. MLT Statement of Facts ¶ 143. On September 14, 2018, the MLT appealed the summary judgment ruling. The New Jersey Appellate Division held that fact issues remained on alter ego but confirmed that sequential veil-piercing was necessary. Soto Decl. Ex. 191 (Corrected Op. at 57, *N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, Nos. A-2036-17, A-2038-17 (N.J. App. Div. Dec. 27, 2021)). Repsol petitioned the New Jersey Supreme Court for certiorari review on March 3, 2022. Soto Decl. Ex. 192 (Pet. for Cert. and Appendix on Behalf of Defendant-Petitioner Repsol, S.A., *NJDEP v. Occidental Chem. Corp.*, No. A-002038-17T2 (N.J. Mar. 3, 2022)). The MLT filed its opposition on April 8, 2002. Soto Decl. Ex. 193 (Brief in Opp'n to Pet. for Cert. on Behalf of Intervenor-Respondent Joseph J. Farnan, Jr., as Liquidating Trustee for Maxus Liquidating Trust, *NJDEP v.*

*Occidental Chem. Corp.*, No. A-002038-17T2 (N.J. Apr. 8, 2022)).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 170. The Trust submits that the MLT made a limited appearance in the New Jersey Litigation. The Trust disputes that the Appellate Division confirmed that sequential veil-piercing was necessary. The discussion regarding sequential veil-piercing was dicta and the Court did not hold that it was necessary. Additionally, the Trust disputes that it filed its opposition in 2002; the opposition was filed in 2022.

### E.    Corporate Formalities During the Repsol YPF Period

171.    Maxus and the Repsol Defendants had no board overlap during any of the challenged transactions. Soto Decl. Ex. 47 (Pulliam Rep. at ¶ 242); Soto Decl. Ex. 194 (Dec. 17, 2021 Expert Report of Professor Merritt B. Fox ("**Fox Rep.**"), Appendix C). The only year with any board overlap was 2005 when H.R. Smith was appointed to the Repsol E&P USA board and also served as Maxus's board secretary. Soto Decl. Ex. 47 (Pulliam Rep. ¶ 242); Soto Decl. Ex. 194 (Fox Rep. at Appendix C). Maxus had its own personnel and executive leadership, and the Maxus board elected its own officers. Soto Decl. Ex. 194 (Fox Rep. at 76). Maxus further maintained its own books and records. *Id.* at 10.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in paragraph 171. The Trust disputes the statements highlighted in red, and in particular disputes the claim that "Maxus and the Repsol Defendants had no board overlap during any of the challenged transactions" as entirely unsupported by ¶ 242 of the Pulliam Report to which is cited. The Trust refers the Court to the full contents of the document which speaks for itself. As ¶¶ 241-242 of Mr. Pulliam's report make clear, Repsol E&P USA had no leadership or personnel other than those seconded from Maxus and there was near-complete overlap between the boards in 2005. *See also* Soto Decl. Ex. 46 (Menenberg Rep. ¶ 262 and Figure 47).

172.    Maxus's board voted through in-person meetings or through unanimous written consent from 1999 to 2012. Soto Decl. Ex. 195 (Compilation of Maxus Board Minutes and Consents from 1999 to 2010; Index of Maxus Board resolutions, MLT00010816) (showing Maxus's board resolutions from 2007-2014).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the fact set forth in paragraph 172.

173.   Maxus set the agenda for its board meetings and determined when they would be held, not Repsol. *E.g.,* Soto Decl. Ex. 26 (2021 H.R. Smith Dep. at 70:6-12)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the claim highlighted in red as a misrepresentation of the quoted testimony, which

. The Trust further notes that the page cited by the Repsol Defendants appears to be missing from Soto Decl. Ex. 26.

174.   Maxus also elected its own officers from 1999 to 2011. Soto Decl. Ex. 46 (Menenberg Rep. at 150–59).                                          Soto Decl. Ex. 196 (Aug. 1999 Maxus Board Meeting Minutes (Telephonic), MAXUS4883080 – MAXUS4883092); Soto Decl. Ex. 197 (Feb. 29, 2000 Maxus Board Written Consent, REPSOL0008211 – REPSOL0008215); Soto Decl. Ex. 198 (Jan. 15, 2001 Maxus Board Unanimous Written Consent, REPSOL0008198 – REPSOL0008202); Soto Decl. Ex. 199 (Dec. 17, 2002 Maxus Board Unanimous Written Consent, REPSOL0008162 – REPSOL0008164); Soto Decl. Ex. 200 (July 7, 2003 Unanimous Maxus Board Written Consent, REPSOL0008151 – REPSOL0008160); Soto Decl. Ex. 201 (Dec. 9, 2005 Maxus Board Meeting Minutes, MAXUS4571002 – MAXUS4571007); Soto Decl. Ex. 202 (June 21, 2006 Maxus Board Meeting

18

80

Minutes MAXUS5093744 – MAXUS5093746); Soto Decl. Ex. 203 (May 15, 2007 Maxus Board Written Consent in Lieu of a Special Meeting, REPSOL-E-0000010740 – REPSOL-E-0000010772, at REPSOL-E-0000010745 – REPSOL-E-0000010747); Soto Decl. Ex. 204 (Oct. 19, 2007 Maxus Board Written Consent in Lieu of a Special Meeting, MAXUS4075978 – MAXUS4075979); Soto Decl. Ex. 205 (June 30, 2008 Maxus Board Written Consent in Lieu of a Special Meeting, MAXUS4618589 – MAXUS4618611); Soto Decl. Ex. 206 (Feb. 24, 2009 Maxus Board Unanimous Written Consent, MAXUS3374122 – MAXUS3374123); Soto Decl. Ex. 207 (Oct. 21, 2009 Maxus Board Unanimous Written Consent, MAXUS3374084 – MAXUS3374085); Soto Decl. Ex. 195 (Index of Maxus Board resolutions, MLT00010816) (noting the election of Maxus officers on June 16, 2010).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. As the Repsol Defendants themselves acknowledge, Maxus and Repsol E&P had identical management structures in 2005.

175.    Repsol was not involved in the day-to-day management of Maxus. Soto Decl. Ex. 104 (Oct. 13, 2021, Javier Gonzalez[28] Dep. at 238:2-240:1) (explaining his day-to-day activities at Maxus as general counsel and noting that he did not speak with anyone at Repsol in order to carry out his day-to-day activities); Soto Decl. Ex. 27 (2021 Hartline Dep. at 54:5-56:1)                    . Soto Decl. Ex. 26 (2021 H.R. Smith Dep. at 70:13-15)

---

[28] Javier Gonzalez was Maxus's general counsel from 2010-2017. *See* MLT Disclosures at 7; Soto Decl. Ex. 104(Oct. 13, 2021, Javier Gonzalez Dep. at 191:14-15).

18

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and refers the Court to the full contents of the depositions cited. Repsol's involvement in the day-to-day management of Maxus is the subject of conflicting opinions offered by the parties' experts (see, e.g., Soto Decl. Ex. 46 at ¶ 270) and a subject of material dispute to be resolved at trial.

---

[29] Wendy Weber-Francis is a former Maxus compliance consultant. *See* MLT Disclosures at 6.

176.    Throughout the Repsol YPF Period, Maxus's financials were consolidated into Repsol's financial statements. *See e.g.,* Soto Decl. Ex. 211 (Repsol 2004 20-F, at F-9, F-149) ("The Exhibit I hereto shows the consolidated dependent, associated and multigroup companies directly or indirectly owned by REPSOL YPF, S.A." and includes Maxus).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 176.

177.    Repsol did not interfere with Maxus's or Tierra's environmental remediation efforts:



Soto Decl. Ex. 212 (Aug. 5, 2021, David Rabbe[30] Dep. at 183:21-184:18); Soto Decl. Ex. 213 (Nov. 14, 2005 email from D. Wadsworth to T. Saront re payment to CLH-Tierra, MAXUS5033950 – MAXUS5033951) ("I have had no role in preparing or approving the Tierra/CLH budget. I understand that Tierra/CLH prepares a proposed budget, presents it to its board, the Tierra/CLH board approves the budget, and finally the approved budget is included

---

[30] David Rabbe was president of Tierra from 1999-2016. *See* MLT Disclosures at 15; Soto Decl. Ex. 212 (Aug. 5,2021, David Rabbe Dep. at 21:4-15).

18

83

within the overall YPFH budget."); Soto Decl. Ex. 29 (2021 H.R. Smith Dep. at 70:16-18 ███

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Among other things, Repsol was an active participant and supported Maxus in the NJ Litigation challenging its environmental obligations and its indemnification obligations vis-a-vis OCC.

178.    Maxus was never denied requested funds. *See* Soto Decl. Ex. 212 (Aug. 5, 2021 David Rabbe Dep. at 37:17-39:3)

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust objects to this statement to the extent it is unlimited in time, and does not specify who never denied Maxus requested funds. The Trust submits that the Repsol defendants' unsupported statement that "Maxus was never denied requested funds" is irrelevant to whether the fact actually exists.

179.    Repsol also had numerous internal policies for intercompany transactions, including policies setting forth procedures for invoicing personnel services between Repsol entities. *E.g.*, Soto Decl. Ex. 214 (June 4, 2008 List of Repsol Policies/Norms, RSC-E-0000012801 – RSC-E-0000012807) (Repsol Policy 010-PR404MG, Invoicing of Personnel Services in Affiliated/Associated Companies) (Repsol Policy 011-PR405MG, Payment Processing) (Repsol Policy 060-NO051MG, Authorization of Investments, Divestments and Expenses).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 179

18
84

180.    The MLT does not allege that Repsol, S.A. dominated and controlled YPF, S.A. *See generally* Compl.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  Whether Repsol, S.A. dominated and controlled YPF, S.A., is not material to any claims or defenses presented in this case.

181.    At the end of 2005, YPF had 10,574 employees, Soto Decl. Ex. 80 (YPF 2005 Form 20-F at p. 91), and Maxus had approximately 69 employees, Soto Decl. Ex. 215 (Jan. 20, 2006 email from L. Jones to X. Fava attaching employee list by department, RSC-E-0000035066).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 181.

182.    From 1999 to 2011, the Repsol S.A. board had twelve to sixteen members, the YPF board had twelve to seventeen members, and the Repsol S.A. and YPF boards never had more than three members in common. Soto Decl. Ex. 194 (Fox Rep. at Appendix C). YPF and Maxus also never had more than one board member in common from 1999 to 2011. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The overlap between the Repsol, YPF, and Maxus' boards, is not material to any claims or defenses presented in this case.

183.    From 1999 until 2012, YPF consistently had over $10 billion in assets, and more than $6 billion dollars of shareholders' equity. Soto Decl. Ex. 58 (YPF S.A. Form 20-F for the fiscal year ended December 31, 1999 at 3, F-4); Soto Decl. Ex. 84 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2002 at 7, 86, F-36); Soto Decl. Ex. 80 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2005 at 7, F-42); Soto Decl. Ex. 216 (YPF S.A. Form 20-F for the fiscal year ended December 31, 2008 at 8, 9); Soto Decl. Ex. 217 (YPF S.A. Form 20-F for the

18

85

fiscal year ended December 31, 2011 at 6, 7). Repsol and YPF's public filings throughout the Repsol YPF Period show frequent actions taken by each company with respect to distinct business and operational decisions. Soto Decl. Ex. 194 (Fox Rep. at 78).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The value of assets of Repsol and YPF and their business and operational decision are not material to any claims or defenses presented in this case.

**F. The MLT Has Not Shown Maxus was Insolvent During the Repsol YPF Period**

184.    From 1999 through the end of the Repsol YPF Period, Maxus paid its obligations as they became due. Soto Decl. Ex. 48 (2021 Wadsworth Dep. at 125:24-126:7) ████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Specifically, the Trust disputes that the cited testimony supports the proposition for which it is cited because ████████████ ███   The Trust submits that the Court should refer to the cited testimony as it speaks for itself.

185.    Maxus was not insolvent from 1999 to 2012. Soto Decl. Ex. 69 (Bramer Rep. at 99

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

18    86

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust has submitted evidence that demonstrates that Maxus was insolvent from 1999 to 2012. Trust's Mot. at 61-64. The only evidence Repsol cites to dispute this is self-serving testimony from their experts' reports which raises a triable issue in fact.

186.    The MLT's expert, Todd Menenberg, has failed to demonstrate that Maxus was insolvent from a balance sheet or cash flow perspective at any point from 1999 to 2012. Soto Decl. Ex. 46 (Menenberg Rep. ¶¶ 78–79, 249). ███████████████████████████████ ████████████████████████████████████ Soto Decl. Ex. 219 (Feb. 17, 2022, Todd Menenberg Dep. ("**Menenberg Dep.**") at 26:21-23). ████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as an incomplete and inaccurate summary of Mr. Menenberg's conclusions, and refers the court to the full contents of Mr. Menenberg's report.

## VI.    Second YPF Period (2012-2016)

### A.    Argentina Expropriates Repsol's YPF Shares

187.    In May 2012, Repsol was displaced as the majority holder of YPF's shares when the Argentine government expropriated Repsol's interests in YPF. MLT Statement of Facts ¶ 136.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 187.

18    87

188.    After the expropriation, Repsol had no control of YPF or Maxus. Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 106:18-21, 376:1-10); Soto Decl. Ex. 193 (Brief in Opp'n to Pet. for Cert. on Behalf of Intervenor-Respondent Joseph J. Farnan, Jr., as Liquidating Trustee for Maxus Liquidating Trust, at 15, *NJDEP v. Occidental Chem. Corp.*, No. A-002038-17T2 (N.J. Apr. 8, 2022) ("Repsol has not owned or controlled YPF since 2012.")).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 188.

189.    There is no evidence of disruption to Repsol or YPF as a result of the expropriation. *See* Soto Decl. Ex. 220 (YPF S.A. Form 20-F for fiscal year ended Dec. 31, 2013 at F-3) (showing a total income increase from $8 million in 2012 to $17 million in 2013); Soto Decl. Ex. 6 (Repsol Corp. Rep. Dep. at 106:22-25) ███████████████████████

████████████████████████████████████████████████

█████████████████████ Thereafter, YPF remained profitable. *See* YPF Form 20-F for fiscal year ended Dec. 31, 2013, at F-3.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 189  However, the Trust notes that the $8 million in 2012 and $17 million in 2013 quote were actually reported as 8 billion and 17 billion Argentine pesos in Soto Decl. Ex. 220.  These amounts would need to converted to USD based on the exchange rates ranging from 4.30-4.92 pesos per USD in 1992 and 4.92-6.52 pesos per USD in 1993.

190.    Following the expropriation of Repsol's YPF shares, Project Jazz was implemented. Feb. 8, 2021 Opinion [Adv. D.I. 333] at 3, n.9; Soto Decl. Ex. 221 (Oct. 18, 2021, YPF Corporate Representative Diego Pando Dep. at 188:17-23, 188:24-189:19) ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 190.

191.    Repsol was not involved in Project Jazz. Soto Decl. Ex. 221 (Oct. 18, 2021, Diego Pando Dep. at 187:21-188: ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████ Soto Decl. Ex. 225 (MLT's Resps. & Objs. to Repsol Defs.' First Set of Requests for Admission, Resp. to Admission No. 4 (Aug. 23, 2019) ("[T]he Repsol Defendants had no material involvement in the Strategy prior to Repsol's acquisition of YPF in 1999.")).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. As the record evidence makes clear, ███████████████████

---

[31] Eduardo Pigretti was in-house counsel at YPF from 2006-2017. *See* Soto Decl. Ex. 222 (July 1, 2021, Eduardo Pigretti Dep. at 19:6-20:5).

[32] Fernando Gilberti has been an accountant at YPF since 1993. *See* Soto Decl. Ex. 223 (July 13, 2021, Fernando Gilberti Dep. at 16:3-17:4).

[33] Guillermo Jalfin is Maxus's former CEO. *See* MLT Disclosures at 9.

██████████████████████. The Repsol Defendants were involved in that process prior to the expropriation whether or not it was titled "Project Jazz."

**B.    The Maxus Bankruptcy**

192.    On June 17, 2016, Maxus, Tierra, MIEC, Maxus (U.S.) Exploration Company, and Gateway Coal Company (the "**Debtors**") filed voluntary petitions for bankruptcy under chapter 11. Soto Decl. Ex. 102 (Gonzalez Decl. at 1).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 192.

193.    As of their bankruptcy filings "[t]he Debtors [had] performed dutifully their environmental remediation obligations at an aggregate cost of more than $755 million, the vast majority of which is on account of Maxus' contractual environmental indemnification obligations to OCC." *Id.* ¶ 8; Soto Decl. Ex. 100 (Mar. 31, 2015, David Rabbe Dep. (personal capacity) at 248:5-251:19 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 193.

194.    Repsol was not involved with the decision to place the Debtors in bankruptcy. Soto Decl. Ex. 104 (Oct. 13, 2021, Javier Gonzalez Dep. at 296:19-297:2████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Repsol was involved in the bankruptcy strategy as it possessed the assets that Project Jazz and the King & Spalding strategy sought to protect.

---

[34] Theodore Nikolis is a former Maxus special independent director. See MLT Disclosures at 13.

Date:  May 18, 2022

Respectfully submitted,

FARNAN LLP

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

18

92

# EXHIBIT C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*, | ) |
| | ) Case No. 16-11501 (CSS) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |
| | ) |
| MAXUS LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adv. Proc. No. 18-50489 (CSS) |
| v. | ) |
| | ) **FILED UNDER SEAL** |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) |
| REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., | ) |
| REPSOL USA HOLDINGS CORP., REPSOL E&P | ) |
| USA, INC., REPSOL OFFSHORE E&P USA, INC., | ) |
| REPSOL E&P T&T LIMITED, and REPSOL | ) |
| SERVICES CO., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S OMNIBUS REPLY IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated: May 18, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)

WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

3

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS .............................................................................................7

ARGUMENT...................................................................................................................8

I.    THE ALLOWED CLAIMS AGAINST THE DEBTORS ESTABLISH THE
      PROPER QUANTUM OF YPF'S AND REPSOL'S PROSPECTIVE
      LIABILITY, AS ALTER EGOS OF MAXUS.......................................................8

      A.    The Trust Has Standing ................................................................ 9
      B.    The Trust Is Not Seeking an Advisory Opinion ...................................... 14
      C.    Defendants' Arguments Regarding the "All Liabilities" Theory Fail ...... 17
      D.    Defendants' CERCLA Contentions Fail.................................................. 22
      E.    Defendants Misconstrue the Plan Reservation of Rights......................... 25

II.   THE TRUST IS ENTITLED TO SUMMARY JUDGMENT ON ITS
      ACTUAL FRAUDULENT TRANSFER CLAIMS AGAINST EACH OF THE
      NAMED TRANSFEREE DEFENDANTS ..........................................................32

      A.    Defendants Misconstrue the Summary Judgment Standard in the
            Context of the Badges of Fraud ............................................................ 32
      B.    Defendants Cannot Obtain a Trial Simply By Disclaiming Their Own
            Documents ............................................................................................. 33
      C.    Despite Defendants' Efforts to Feign Confusion and Manufacture
            Issues of Fact, the Trust Is Entitled to the Relief It Seeks With Respect
            To Each of the Intentional Fraudulent Transfers. ................................... 45
      D.    There is No Genuine Dispute of Material Fact that the Badges of Fraud
            Provide Conclusive Evidence of Defendants' Intent to Defraud, Delay,
            or Hinder Maxus's Environmental Creditors.......................................... 47
            1.    Badge 1: The Transfers Were Made to Insiders ........................... 47
            2.    Badge 2: The Debtors Retained Possession or Control of the
                  Property Transferred After the Transfers.................................... 49
            3.    Badge 3: The Transfer or Obligation Was Disclosed or
                  Concealed................................................................................... 51
            4.    Badge 4: Before the Transfer Was Made or Obligation Was
                  Incurred, the Debtors Had Been Sued or Threatened with Suit.... 53
            5.    Badge 5: The Transfer Was of Substantially All of the Debtors'
                  Assets. ....................................................................................... 56
            6.    Badge 7: The Debtors Removed or Concealed Assets. ................. 58
            7.    Badge 8: The Value of the Consideration Received by the
                  Debtors Was Not Reasonably Equivalent to the Value of the
                  Asset Transferred or the Amount of the Obligation Incurred....... 59
            8.    Badge 9: The Debtors Were Insolvent or Became Insolvent
                  Shortly After the Transfer Was Made or the Obligation Was
                  Incurred. .................................................................................... 62
            9.    Badge 10: The Transfer Occurred Shortly Before or Shortly
                  After a Substantial Debt Was Liquidated. ................................... 64
      E.    None of Defendants' Other Technical Attacks on the Intentional
            Fraudulent Conveyances Warrant a Trial ............................................... 66
      F.    There is No Genuine Issue of Material Fact Concerning Repsol's Good
            Faith Defense ........................................................................................ 71

III.  DEFENDANTS HAVE NOT ESTABLISHED A GENUINE TRIABLE

i

ISSUE REGARDING THEIR PURPORTED AFFIRMATIVE AND OTHER
DEFENSES TO ANY OF THE TRUST'S CLAIMS............................................75

A.     All of Defendants' Statute of Limitations Affirmative Defenses Fail...... 79

    1.     The Discovery Tolling Rule Tolls the Statute of Limitations on
the Intentional Fraudulent Conveyance Claims Until the
Petition Date................................................................................. 85

        a.     Mr. Bilbrey's Actual Fraudulent Claims under Texas
Law are Timely ................................................................. 85

        b.     Mr. Fetsick's Actual Fraudulent Transfer Claims Under
New Jersey Law are Timely ............................................. 88

    2.     The Trust's Actual Fraudulent Transfer Claims are Viable
through the *Nullum Tempus* Doctrine ........................................... 89

    3.     The Trust's Actual Fraudulent Transfer Claims Are Timely
Through *Tronox* Collapsing......................................................... 91

        a.     Repsol's Arguments that the Trust has "Failed to
Adduce Evidence to Collapse" the Transactions Are
Unavailing......................................................................... 94

B.     Any Affirmative Defense Not Mentioned or Supported by Law and
Fact in Defendants' Motions Should be Dismissed................................ 103

C.     Any Non-Affirmative Defense Not Mentioned by Defendants or
Supported by Fact Should Be Dismissed................................................ 105

D.     None of Defendants' Damages Defenses Impact This Court's Ability to
Grant the Trust Summary Judgment on Alter Ego Damages. ................ 107

E.     Defendants Have Waived Certain of Their Jurisdictional Defenses. ..... 109

CONCLUSION............................................................................................................110

ii

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Ahcom, Ltd. v. Smeding*,
  623 F.3d 1248 (9th Cir. 2010) ............................................................11

*Amerada Hess Corp. v. Yuma Shipping Corp.*,
  No. 82 Civ. 2136, 1985 U.S. Dist. LEXIS 21490 (S.D.N.Y. Mar. 22, 1985)........................16

*Ameriserv Fin. Bank v. Commercebank, N.A.*,
  No. 07-1159, 2009 U.S. Dist. LEXIS 24559 (W.D. Pa. Mar. 26, 2009) ..........................72, 73

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
  473 B.R. 525 (Bankr. D. Del. 2012) ......................................................60

*Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*,
  520 B.R. 15 (Bankr. S.D.N.Y. 2014).....................................................29

*Bank of Am., N.A. v. Sonali Energees USA, LLC*,
  Civ. Action No. 19-cv-20992 (JXN)(JBC), 2022 U.S. Dist.
  LEXIS 3422 (D.N.J. Jan. 7, 2022).......................................................104

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*,
  No. 3:17-CV-01147-X, 2019 WL 5578510 (N.D. Tex. Oct. 28, 2019),
  *aff'd*, 976 F.3d 585 (5th Cir. 2020)......................................................87

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)..........................................................106, 108

*Bertram v. WFI Stadium, Inc.*,
  41 A.3d 1239 (D.C. 2012) .............................................................40

*Campbell v. City of New York*,
  16-cv-8719, 2021 U.S. Dist. LEXIS 40933 (S.D.N.Y. Mar. 4, 2021)....................................15

*Conoshenti v. Pub. Serv. Elec. & Gas Co.*,
  364 F.3d 135 (3d Cir. 2004).............................................................76

*Cooke v. General Dynamics Corp.*,
  No. 3:95 cv 31, 1998 U.S. Dist. LEXIS 15981 (D. Conn. Sept. 11, 1998) ...........................16

iii

*Covey v. Casey's Gen. Stores, Inc. (In re Duckworth)*,
  Nos. 10-83603, 11-8104, 2012 Bankr. LEXIS 4379
  (Bankr. C.D. Ill. Sep. 21, 2012) ...................................................................68

*Deepstar Marine, Inc. v. Xylem Dewatering Solutions, Inc.*,
  No. 12-7628, 2014 U.S. Dist. LEXIS 104358 (D.N.J. July 30, 2014) ...................................15

*Diaz-Cruz v. Symons*,
  No. 1:11-CV-1302, 2016 U.S. Dist. LEXIS 165690 (M.D. Pa. Dec. 1, 2016).......................87

*EdgeCo Inc. v. FastCap, LLC*,
  Civ. Action No. 02-2624 (JAG), 2005 U.S. Dist.
  LEXIS 46220 (D.N.J. July 8, 2005*)* ...................................................................105

*Elway Co. v. Miller (In re Elrod Holdings Corp.)*,
  421 B.R. 700 (Bankr. D. Del. 2010) .........................................................70, 71

*Ettinger v. Johnson*,
  556 F.2d 692 (3d Cir. 1977)...................................................................87

*FDIC v. Martinez Almodovar*,
  671 F. Supp. 851 (D.P.R. 1987)...................................................................90

*Feinberg v. RM Acquisition, LLC*,
  629 F.3d 671 (7th Cir. 2011) ...................................................................61

*Finkel v. Polichuk (In re Polichuk)*,
  506 B.R. 405 (Bankr. E.D. Pa. 2014) ...........................................................83, 84

*Fr. Winkler KG v. Stoller*,
  839 F.2d 1002 (3rd Cir. 1988) ...................................................................27

*FTC v. Hope Now Modifications, LLC*,
  No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 35550 (D.N.J. Apr. 12, 2010)......................79

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*,
  313 B.R. 612 (Bankr. D.N.J. 2004),
  *rev'd in part on other grounds*, *Off. Comm. of Asbestos Claimants v.
  Bank of N.Y.*, No. 04-3423 (WGB), 2006 WL 1751793 (D.N.J. June 21, 2006)....................88

*Gierum v. Glick (In re Glick)*,
  568 B.R. 634 (Bankr. N.D. Ill. 2017) ...................................................................68

*Goodman v. Mead Johnson & Co.*,
  534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977)...........................32

*Greiff v. T.I.C. Enters., L.L.C.*,
  No. 03-882-SLR, 2004 U.S. Dist. LEXIS 680 (D. Del. Jan. 9, 2004)...................................79

AMERICAS 114201192

*Guido v. Spina*,
No. A-3215-08T3, 2010 WL 1928985 (N.J. Super. Ct. App. Div. May 14, 2010) ................ 88

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
2015 Bankr. LEXIS 2914 .............................................................................. 66

*Hammersmith v. TIG Ins. Co.*,
480 F.3d 220 (3d Cir. 2007) ......................................................................... 83

*Harper v. Del. Valley Broadcasters, Inc.*,
743 F. Supp. 1076 (D. Del. 1990) ............................................................ 76, 105

*Hawkins v. Lister (In re Lister)*,
Nos. 08-13738-B-7, 09-1140, 2011 Bankr. LEXIS 5579
(Bankr. E.D. Cal. Mar. 30, 2011) ................................................................... 44

*In re AMC Investors, LLC*,
637 B.R. 43, 2022 WL 248133 (Bankr. D. Del. Jan. 27, 2022) ............................... 82

*In re Blatstein*,
192 F.3d 88 (3d Cir. 1999) ........................................................................... 40

*In re Bressman*,
No. 02-1725, 327 F.3d 229 (3d Cir. 2003) ........................................................ 73

*In re Collins*,
540 B.R. 54 (Bankr. E.D.N.Y. 2015) ............................................................... 50

*In re Combustion Engineering, Inc.*,
391 F.3d 216 (3d Cir. 2004) ......................................................................... 29

*In re CVAH, Inc.*,
570 B.R. 816 (Bankr. D. Idaho 2017) .............................................................. 83

*In re Emoral, Inc.*,
740 F.3d 875 (3rd Cir. 2014) ........................................................................ 14

*In re Grasso*,
497 B.R. 434 (Bankr. E.D. Pa. 2013) ............................................................... 8

*In re Greater Se. Cmty. Hosp. Corp. I*,
365 B.R. 293 (Bankr. D.D.C. 2006) ................................................................ 84

*In re Guiliano v. Schnabel (In re DSI Renal Holdings, LLC)*,
574 B.R. 446 (Bankr. D. Del. 2017) .......................................................... 101, 102

*In re Jevic Holding Corp.*,
2011 WL 4345204 ................................................................................ 94, 95

v

*In re Kern*,
   No. 20-18381, 2021 Bankr. LEXIS 2462 (Bankr. D.N.J. Sept. 7, 2021) ...................33, 38, 39

*In re LATAM Airlines Grp.*
   S.A., No. 20-11254 (JLG), 2022 Bankr. LEXIS 248
   (Bankr. S.D.N.Y. Jan. 28, 2022) ............................................................................................59

*In re Leslie Controls, Inc.*,
   No. 10-12199 CSS, 2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010) ...............................29

*In re Mervyn's Holdings, LLC*,
   426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................................102

*In re Mongelluzzi*,
   587 B.R. 392 (Bankr. M.D. Fla. 2018) .......................................................................72, 73, 75

*In re N.J. Affordable Homes Corp.*,
   2013 Bankr. LEXIS 4798
   (Bankr. N.J. Nov. 8, 2013) .....................................................................................................89

*In re NJ Affordable Homes Corp.*,
   2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013) .................................................................88

*In re Norvergence, Inc.*,
   405 B.R. 709 (Bankr. D.N.J. 2009) .......................................................................................60

*In re Prosser*,
   No. 06-30009, 2009 Bankr. Lexis 3279
   (Bankr. D. Virgin Islands Oct. 9, 2009) ................................................................................39

*In re SemCrude, L.P.*,
   2013 WL 2490179 (Bankr. D. Del. 2015) .............................................................................61

*In re Tronox, Inc.*,
   464 B.R. 606 (Bankr. S.D.N.Y. 2012) ..................................................................................29

*In re Vaso Active Pharms.*,
   No. 10-10855 (CSS), 2012 Bankr. LEXIS 4741
   (Bankr. D. Del. Oct. 9, 2012) .......................................................................................... passim

*In re Webster*,
   629 B.R. 654 (Bankr. N.D. Ga. 2021) ...................................................................................83

*In re Weidner*,
   476 B.R. 873 (Bankr. E.D. Pa. 2012) ....................................................................................39

AMERICAS 114201192

*Indus. Enters. of Am. v. Tabor Acad. (In re Pitt Penn Holding Co.)*,
   Nos. 09-11475 (BLS), 11-51879, 2011 Bankr. LEXIS 3554
   (Bankr. D. Del. Sep. 16, 2011) ................................................................82

*Janvey v. Democratic Senatorial Campaign Comm. Inc. (DSCC)*,
   712 F.3d 185 (5th Cir. 2013) ...........................................................86, 87

*Jet Midwest Int'l Co. v. Jet Midwest Grp.*,
   No. 5:18-cv-06019, 2020 U.S. Dist. LEXIS 159166 (W.D. Mo. May 26, 2020)...................58

*Johnston v. Crook*,
   93 S.W.3d 263 (Tex. App. 2002).............................................................86

*Jones v. Mackey Price Thompson & Ostler*,
   469 P.3d 879 (Utah 2020)....................................................................40

*Kendall McGaw Laboratories, Inc. v. Comm. Mem'l Hosp.*,
   125 F.R.D. 420 (D.N.J. 1989) ...............................................................16

*Kinnel v. Mid-Atlantic Mausoleums, Inc.*,
   850 F.2d 958 (3rd. Cir. 1988) ..............................................................16

*Leonard v. Superpumper, Inc.*,
   No. CV13-G2663, 2019 Nev. Dist. LEXIS 712 (2d. Dist. Nev., Mar. 28, 2019)...................58

*LG Philips LCD Co. v. Tatung Co.*,
   243 F.R.D. 133 (D. Del. 2007) ..............................................................78

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
   2019 WL 10252607 (D. Del. June 21, 2019)....................................................32

*Lovely H. v. Eggleston*,
   No. 05 Civ. 6920 (KBF), 2012 U.S. Dist. LEXIS 139462 (S.D.N.Y. Sep. 19, 2012)............16

*Ltd. v. Patriarch Partners, LLC (In re Zohar III, Corp.)*,
   631 B.R. 133 (Bankr. D. Del. 2021) ........................................................80

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).........................................................................39

*Michaelson ex rel. Appleseed's Litig. Trust v. Farmer
   (In re Appleseed's Intermediate Holdings, LLC)*,
   470 B.R. 289 (D. Del. 2012).............................................................61, 69

*Moran v. Pardo (In re Life Partners Holdings, Inc.)*,
   No. 15-40289-RFN-11, 2016 U.S. Dist. LEXIS 192191 (N.D. Tex. Dec. 20, 2016)..............86

vii

*Mullin v. Dzikowski*,
  257 B.R. 356 (S.D. Fla. 2000) ........................................................12

*N.J. Dep't of Envt'l Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*,
  560 B.R. 111 (Bankr. D. Del. 2016) ...............................................9, 13

*Nat'l Union Fire Ins Co. v. City Sav., F.S.B.*,
  28 F.3d 376 (3d Cir. 1994)...........................................................78, 79

*New Castle County v. Halliburton NUS Corp.*,
  903 F. Supp. 771 (D. Del. 1995).....................................................30

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) (Gropper, J.) .......................39

*Norman v. Elkin*,
  726 F. Supp. 2d 464 (D. Del. 2010)................................................81

*Norman v. Riddell (In re Green Valley Seeds, Inc.)*,
  27 B.R. 34 (Bankr. D. Or. 1982).....................................................13

*of Biliouris v. Patman*,
  751 F. App'x 603 (5th Cir. 2019) ...................................................87

*Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements, Inc.
  (In re Midway Games, Inc.)*,
  428 B.R. 303 (Bankr. D. Del. 2010) ...............................................80

*Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.
  (In re Sunbeam Corp.)*,
  284 B.R. 355 (Bankr. S.D.N.Y. 2002).........................................91, 92

*Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*,
  280 B.R. 573 ................................................................................29

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp.
  Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*,
  444 F.3d 203 (3d Cir. 2006)...........................................................106

*Penson Techs. v. Schonfeld Grp. Holdings (In re Penson Worldwide)*,
  624 B.R. 66 (Bankr. D. Del. 2020) .................................................109

*RES-NV CHLV, LLC v. Rosenberg*,
  No. 2:13CV115DAK, 2015 U.S. Dist. LEXIS 12617 (D. Utah Feb. 2, 2015).................72

*Robson v. Duckpond Ltd.*,
  No. 4:19-cv-01862, 2021 U.S. Dist. LEXIS 63278 (E.D. Mo. Mar. 31, 2021).................16

AMERICAS 114201192

*Rosenberg v. N. Bergen*,
    61 N.J. 190 (1972) ....................................................................................................88

*Shabazz v. Del. Dep't of Corr.*,
    2021 WL 4502034 (D. Del. Oct. 1, 2021) .............................................................32

*Smith v. George (In re RCK Modular Homes Sys.)*,
    402 B.R. 463 (Bankr. D.N.H. 2008) ......................................................................82

*Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*,
    516 B.R. 163 (Bankr. E.D. Ky. 2014) ...................................................................68

*Springel v. Prosser (In re Innovative Commun. Corp.)*,
    Nos. 07-30012, 08-3004, 2011 Bankr. LEXIS 3040 (Bankr. D.V.I. Aug. 5, 2011)...............55

*Techniek v. Strategic DSRG, LLC*,
    No. 09 Civ. 5644, 2011 U.S. Dist. LEXIS 9624 (S.D.N.Y. 2011) .........................15

*The Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*,
    716 F.3d 736 (3d Cir. 2013)....................................................................................11

*United States v. Bestfoods*,
    524 U.S. 51 (1998)...................................................................................................25

*United States v. Moore*,
    968 F.2d 1099 (11th Cir. 1992) ..............................................................................90

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir.1986)...................................................................................95

*United States v. Werner*,
    No. 3:13-CV-2759, 2015 U.S. Dist. LEXIS 28290 (M.D. Pa. Mar. 9, 2015) ......105

*United States v. White-Sun Cleaners Corp.*,
    No. 09-cv-2484 (ARR) (JO), 2011 U.S. Dist. LEXIS 36470 (E.D.N.Y. Mar. 9, 2011)..........50

*Voiland v. Marston (In re Marston)*,
    417 B.R. 766 (Bankr. N.D. Ill. 2009) ....................................................................11

*Weinstein Enters., Inc. v. Orloff*,
    870 A.2d 499 (Del. 2005) .......................................................................................48

*Williams v. Bier Int'l, LLC*,
    No. 14CV03894, 2015 U.S. Dist. LEXIS 94609 (S.D.N.Y. July 21, 2015)...........17

*Wolff v. Tzanides*,
    574 B.R. 489 (Bankr. D.N.J. 2017) ........................................................................88

ix

*Yoo v. Garoian (In re Garoian)*,
 No. 2:10-bk-20883 RK, 2014 Bankr. LEXIS 5254 (Bankr. C.D. Cal. Oct. 7, 2014)..............50

*YPF S.A., v. Maxus Liquidating Trust*,
 No. 21-2496 (3d Cir. Feb. 17, 2022).........................................................................................2

## STATE STATUTES

N.J.S.A. 25:2-31(a) (2001) ........................................................................................................88

N.J. Stat. Ann. § 25:2-31...........................................................................................................88

New Jersey UFTA.......................................................................................................................88

NY Labor Law ...........................................................................................................................17

Ohio Rev. Code § 1336.04.......................................................................................................102

Okla. Stat. Title 24, § 121(1)-(2) ..............................................................................................92

Oklahoma UFTA ........................................................................................................................92

Tex. Bus. & Com. Code Ann. § 24.010 ...................................................................................102

Tex. Bus. & Com. Code § 24.010(a)(1) .....................................................................................86

Wis. Stat. Ann. § 893.87 ...........................................................................................................90

Wis. Stat. Ann. § 893.425 .......................................................................................................102

## FEDERAL STATUTES AND RULES

11 U.S.C. § 108(a) .....................................................................................................................86

11 U.S.C. § 542...........................................................................................................................12

11 U.S.C.A. § 548(c) ..................................................................................................................71

11 U.S.C. § 550..............................................................................................................66, 67, 69

11 U.S.C. 550(a) ..........................................................................................69, 78, 105, 106

28 U.S.C. § 2415.......................................................................................................................103

28 U.S.C. § 2416.........................................................................................................................90

AMERICAS 114201192

42 U.S.C. § 9607...................................................................................................................85

Federal Rules of Bankruptcy Procedure Rule 7056..........................................................8

Federal Rules of Civil Procedure Rule 30(b)(6)..............................................................72

Federal Rules of Civil Procedure Rule 42(b)...................................................................16

Federal Rules of Civil Procedure Rule 56(g)........................................................8, 15, 16

AMERICAS 114201192

## PRELIMINARY STATEMENT[1]

One of the most *un*remarkable features of Defendants' oppositions to the Trust's Motion and their accompanying counterstatements of disputed and undisputed facts is the sheer number of pages that Defendants take to say that every issue in this case which could go against them is a triable one.  Given the Court's impending retirement, and the short time period in which it will have to resolve the pending motions, it is surely no surprise that Defendants would seek to crowd the record with 140 pages of largely uncoordinated briefs, 534 pages of counterstatements of facts disputing nearly everything said by their own experts and in their own documents, 139 pages of briefing on their own motions (oftentimes repeating opposition arguments verbatim) and 207 pages of their own versions of the "undisputed" facts.  The Trust anticipates that the Court is already deep into its analysis of the law and facts raised by all three motions, and to that end the Trust will endeavor to keep it simple.  There are only three issues framed by the Motion—(1) if Defendants are determined at trial to be Maxus's alter ego, are they liable to the Trust in an amount sufficient to pay Maxus's creditors?; (2) did Defendants engage in intentional fraudulent conveyances with their Debtor subsidiaries?; and (3) have Defendants presented any legitimate defenses to the Trust's claims sufficient to warrant a trial?

As the Trust has maintained from the outset of this proceeding, there really are no genuine issues of fact as to the who, what, when, where, or why, or of the law applicable to these three questions, and the Court can and should resolve each in the Trust's favor at this time.  There are, however, so many aspects of Defendants' oppositions that are truly remarkable.

*First*, having spent the last four years desperately trying to avoid having this Court rule on any substantive issue, and most recently having publicly accused this Court of both bias and

---

[1] The definitions of all capitalized terms in the Trust's Motion for Partial Summary Judgment are incorporated by reference in this Opposition (unless otherwise defined herein).

1

precipitousness,[2] Defendants affirmatively invoke this Court's jurisdiction to enter judgment in their favor right now.  The Trust welcomes that change of heart and, in its companion briefs opposing the YPF and the Repsol motions for summary judgment, explains why Defendants are not entitled to relief at this time.  But Defendants can hardly claim now that this process is moving too fast for them to keep up.

*Second*, Defendants' oppositions largely read as if this case were a garden-variety civil dispute over good-faith corporate business decisions as to which reasonable people could have legitimate disagreements.  And, in attempting to advocate that point, Defendants simply ignore what this dispute is really about—how does one appropriately run a business with productive assets, short-term funded debt, and long-tailed environmental liabilities that will destroy the business when they come to fruition?  All of Defendants' talk about the benefits of their having paid down the funded debt (which they had guaranteed), or not fully understanding exactly how catastrophic the environmental expenses would be, or having paid portions of environmental expenses leading up to the catastrophe, simply miss the point.  This case has, from inception, been about Defendants' open-eyed anticipation of an environmental claim reckoning coupled with an unwillingness to leave anything of value within Maxus when that moment inevitably came.  Dexter Peacock's *first* memorandum after YPF purchased Maxus in 1995 indisputably centers on the cliff,

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[2] To the Third Circuit: "[t]he bankruptcy court has suddenly declared an intention to render a potentially final judgment in this case before this Court can rule . . . This unexpected acceleration threatens the integrity of the judicial process."  *See* Appellants YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc.'s Motion to Stay Pending Appeal, *YPF S.A., v. Maxus Liquidating Trust*, No. 21-2496 (3d Cir. Feb. 17, 2022) [ECF 35-1] at 5.

2

███████████████████████████████████████████████████████████████████

█████████████████████████. From that point forward, the contemporaneous written record establishes that Defendants' handling of Maxus's affairs was always, at least in very large part, directed at ████████████████████████ and Defendants' attempts to salvage their investments in Maxus without having to foot the ultimate remediation bill. The Trust has always maintained that what happened here is not appropriate corporate behavior and that Defendants went far too far in their attempts to disenfranchise legitimate federal, state, and individual environmental creditors in favor of their own asset-salvaging exercise. So, can Defendants now be held liable to pay an amount to satisfy the claims of the environmental creditors which were always and ever the focus of their corporate machinations? As set forth in Section I, of course they can.

*Third*, despite having had nearly three decades to get their stories straight, Defendants' explanations for the corporate machinations are surprisingly weak and uncoordinated. One would have thought with the dry run of the NJ Litigation they would at least by now have a coherent explanation for why they did what they did when they did it. Part of the problem, of course, is that Defendants were so successful in managing the factual record in the NJ Litigation that their full story was never revealed. Until this proceeding, Defendants never produced, for example, hundreds of pages of key legal documents—the full suite of King & Spalding memoranda, the Kirkland & Ellis interview notes, the Chadbourne & Park Project Jazz documents—even though they had, as this Court has ruled, already waived privilege over them. [D.I. 227]. More critically, if one peruses the record of the NJ Litigation, it is apparent that the central, highly contentious back-and-forth was over the import of the 1993 ChemRisk report (Smith Decl. Ex. 97) ███████

████████████████████████████████████████████████████████. As

3

to that, Defendants were then, and are now, crisp in their narratives.  Despite being ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  And,

with that facile explanation in hand, the witnesses could then breathlessly testify that, until a

decade after the transfers first started they had "never seen" any reliable prediction of Passaic

remediation costs in the billions.  *See* Repsol Opp. at 46 ("Maxus's own witnesses consistently

testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Repsol

Statement of Facts ("SOF") ¶¶ 55, 113 (citing deposition testimony from Dave Rabbe and Repsol's

experts).  The problem is that, when this narrative was first advanced in the NJ Litigation,

Defendants' lawyers had already convinced themselves that Maxus did not need to produce some

of the most damning documents in this case—the November 1995 EA Report ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Smith Decl. Ex. 110) and EA's subsequent

draft EE/CA's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Soto Decl. Ex. 185), all of

which resided in Maxus's files before Defendants ever transferred a dime out of Maxus.  And, as

this Court has itself seen in this action, Defendants' current lawyers have continued that subversion

by failing to provide any of these materials to their experts for use in their opening reports.  But,

the back-filling from experts that has now occurred—essentially, "we've now reviewed the

documents and have naturally concluded in our professional judgment that they are and always

were completely unreliable and irrelevant"—is only one example of Defendants' shifting stories.

For decades, one of the three reasons championed for the 1996-1997 transfers was to

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—it appears right in Dexter

Peacock's May 1996 Memorandum announcing the Global Restructuring.  Smith Decl. Ex. 21 at

MLT00238950.  That justification of course has never made sense.  Why would a company transfer

4

billions of dollars in assets just to create a ███████ corporate reporting-structure, when it could just have someone in the financial function prepare reports that cross legal entities?  Now, that rationale appears almost nowhere in Defendants' oppositions.   So, too, goes Defendants' justification proffered in 1995 that the Global Restructuring was for "legitimate tax reasons." Discovery has failed to unearth any detailed contemporaneous analysis, much less one presented to any board, explicating what *Maxus* might expect to save in taxes if it transferred its entire international business to its parents.   Defendants are now left to argue that, while the transferor Maxus (an entity that Defendants have not established paid any taxes and that had a massive un-utilized NOL) might not have saved any taxes, the "corporate group" did (*i.e.*, the transferee, YPF). But, the question here has never been how would transferees benefit from taking Maxus's assets, it has been why would Maxus ever want to transfer them.   And, for good measure, the third reason championed in 1995—that Maxus could reduce interest expense by selling its assets to pay down funded debt—was a truism then as much as it is today.  Any company with funded debt can reduce interest expense by liquidating itself.  The proper question is "why would a company do that?" The only logical answer remaining was right there for all to see in 1995: █████████████████

███████████████████████████████████████████████

████████████████    Smith Decl. Ex. 8 at DEDES-YPF-P0000057.001.

What follows in Defendants' oppositions is simply a cavalcade of unsupported excuses as to why Defendants are blameless, all of which are contradicted by the very record that they have now put before this Court:

- "Maxus was dead long before we purchased it," when Defendants' own experts concede that after the initial transfers Maxus had billions in assets left to satisfy environmental creditors.

- "We thought Maxus would recover," despite the absence of a single contemporaneous business plan in Defendants' enormous record showing that Maxus would ever

generate positive cash flow over an extended projection period and numerous other documents showing that no balance sheet reserve was ever established for the looming remediation expenses at the DASS.

- "The exact dollar amount of the Passaic remediation was 'uncertain,'" despite testimony from witness after witness that they knew that the *range* of potential outcomes included the exact scenario that has played out in the 2016 ROD—dredging and capping of the river on just one operable unit of the DASS (the lower six miles) at the cost of billions of dollars.

- "Demonstrating our good corporate behavior, we contributed funds to Maxus to pay remediation expenses leading up to the remedy," when Defendants' own contemporaneous documents show that the reason why they funded Maxus was to avoid the very situation they now face—a trustee for a bankrupt Maxus suing to recover for their looting of the Debtors' estates.

On and on and on. In the end, it is perfectly appropriate, as set forth in Section II, *infra*, for this Court to exercise its jurisdiction and discretion and conclude the obvious—this case started with intentionally fraudulent transfers from Maxus to YPF and Repsol, which were intended to strand the very environmental claims that eventually manifested themselves in the Debtors' Class 4 and Class 5 claims. From that conclusion, all the relief sought in the Motion flows.

*Finally*, one last remarkable aspect of the Motion is the Defendants' treatment of their 79 affirmative (and other) defenses alleged in their answers. As set forth in Section III, there can be no legitimate dispute about the applicable burdens here. The Third Circuit and this Court have plainly stated that a plaintiff need only "point out" the absence of facts to support a defense and the burden shifts to the defendant to submit evidence to the Court sufficient to establish a triable issue. In other words, a plaintiff like the Trust need not disprove every alleged defense to any particular relief sought in order to obtain summary judgment on a claim. In their oppositions, Defendants only attempt to meet that burden for a scant handful of their alleged defenses, each of which is addressed below. But, having already been burned on a burden issue before (in the context of Defendants' legal privilege assertions), it is truly astonishing that Defendants would

6

attempt to meet their burdens with unsupported, passing reference to defenses in a bullet point or, for the vast majority, no mention at all, and still maintain their optimistic "do I ever have things to prove at trial" attitude. As the Third Circuit aptly put it, the time for a defendant to "put up, or shut up" on a defense is in its opposition to a plaintiff's summary judgment motion. Defendants have not put up anything, and it is now appropriate for this Court to dismiss all unarticulated defenses for lack of prosecution and all articulated defenses for failing to establish a triable issue.

## STATEMENT OF FACTS

Weeks ago, the Trust submitted, alongside its Motion for Partial Summary Judgment ("Trust Motion" or "Trust Mot."), a Statement of Undisputed Material Facts ("SOF") sourced exclusively from Defendants' own admissions, expert reports, and documents. That pleading was offered as a good faith attempt by the Trust to simply accede to what Defendants' experts had said in their reports, what Defendants admitted in their pleadings, and what Defendants said in a handful of business records and depositions. And, for weeks, Defendants remained silent. Then, in an obvious attempt to crowd the record, Defendants each submitted hundred-plus page "counterstatements" and hundred-page affirmative statements of undisputed material facts, sourced not from what the Trust even said, but rather from their own expert reports and own documents which are plainly in material dispute. Had this been a different case, we might have simply abandoned the project and just referred the Court to the underlying evidence in the form of the reports, answers, deposition transcripts, and deposition exhibits cited in our SOF. But, with the certainty that Defendants will cry "foul," the Trust now, in reply, submits a formal counterstatement of facts (1) to clarify just what facts are and are not disputed and (2) to ensure that the Trust is not argued to have conceded facts that are obviously in dispute. At best, we hope the Court can accept at least the statements highlighted in green in those two counterstatements as undisputed for purposes of all three pending motions.

7

For purposes of this pleading, all of these facts and responses are incorporated as fully set forth herein.  And, with that state of play, one thing is now crystal clear: based on all those pleadings, and pursuant to Rule 56(g) of the Federal Rules of Civil Procedure ("FRCP") (made applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure), whether or not this Court grants any affirmative relief to any party, the Court may now enter, without protest, its contemplated "heavy lifting" order (1) establishing those material facts set forth by the parties that are not genuinely in dispute, and (2) declaring that those facts shall be treated as established for purposes of trial.  *See* Fed. R. Civ. P. 56(g); *In re Grasso*, 497 B.R. 434, 439 (Bankr. E.D. Pa. 2013) (treating certain material facts "not genuinely in dispute" as established pursuant to FRCP 56(g) and "treat[ing] such facts as established for purposes of the trial.").

## ARGUMENT

The parties are in general agreement regarding the applicable standards to the Trust's Motion.  Where disagreements exist with respect to particular procedural points, such as burden shifting on affirmative defenses, they are addressed within the applicable sections below.

## I.    THE ALLOWED CLAIMS AGAINST THE DEBTORS ESTABLISH THE PROPER QUANTUM OF YPF'S AND REPSOL'S PROSPECTIVE LIABILITY, AS ALTER EGOS OF MAXUS

As its first form of relief, the Trust seeks to establish that, with respect to its alter ego claims, there is no genuine triable issue of fact that Defendants can and should be held liable (1) for the $712,560,327.76 representing the amount of Allowed Class 4 Claims, plus pre-judgment interest at a rate determined by this Court in its discretion, and (2) for a declaratory judgment that Defendants are liable as the Debtors' alter egos for the Debtors' unliquidated Class 5 Claims as they become due.  Trust Mot. at 33.

In opposing the Trust's Motion, Defendants contend (a) the Trust lacks standing to pursue the Class 4 and Class 5 Claims (Repsol Opp. at 27-31); (b) the Trust is seeking an impermissible

AMERICAS 114201192

"advisory opinion" as to damages (Repsol Opp. at 14-17; YPF Opp. at 27-28); (c) the Trust cannot

legally support its "all liabilities" theory (Repsol Opp. at 17-27, 31-36; YPF Opp. at 25-31); and

(e) Article XV.P of the Plan affirmatively prevents the relief sought by the Trust (Repsol Opp. 36-

38; YPF Opp. at 31-35).  As addressed below, none of these arguments offers a legal impediment

or bona fide triable issue of fact regarding the alter ego aspect of the Trust's Motion.

### A.    The Trust Has Standing

During the Chapter 11 Cases, Repsol moved to remand several claims pending in the NJ

Litigation, including OCC's alter ego claims against it, to the New Jersey Court.  *N.J. Dep't of*

*Envt'l Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 560 B.R. 111, 114 (Bankr.

D. Del. 2016) (the "Remand Opinion").  In granting Repsol's requested relief over the objection

of OCC, the Court found that the Debtors had standing to pursue alter ego claims "when the cause

of action in question is based upon an alter ego theory of liability, and is 'a general one, with no

particularized injury arising from it, and if that claim could be brought by any creditor of the

debtor, the trustee is the proper person to assert the claim.'"  *Id.* at 120.  The Court also specifically

found that the "OCC Claims"—i.e., the alter ego claims that OCC had actually brought and

prosecuted for years against Repsol—"are in fact property of the estate, and as such, the proper

party to bring the Claims is the Debtor, not OCC."  *Id.*  Thereafter, the Debtors filed the Amended

Plan [Bankr. D.I. 1231] and the disclosure statement for the Amended Plan describing that the

"Liquidating Trust Causes of Action,"[3] which includes all alter ego claims against YPF and

Repsol, would be transferred to the Trust and the Trust would have the "exclusive right" to

---

[3] The Plan defines "Liquidating Trust Causes of Action" as "all Claims and Causes of Action of
the Estates that are not otherwise settled or released on or prior to the Effective Date that will be
transferred to the Liquidating Trust on the Effective Date, including any Claims and Causes of
Action set forth in the Plan Supplement.  For the avoidance of doubt, Liquidating Trust Causes of
Action shall include the YPF Causes of Action, the Repsol Causes of Action, and the Preserved
Contribution Claims."  Smith Decl. Ex. 3, Art. I.A.120.

9

prosecute those claims against YPF and Repsol.[4]  The Court then entered an order confirming the Amended Plan (hereinafter, the "Plan") without a pending objection from any of the Defendants. [Bankr. D.I. 1460].   Under the Plan, the Trust was then formed and all of the Debtors' assets— including the Debtors' alter ego claims and other "Causes of Action"—were transferred to the Trust as indicated in the Disclosure Statement.  One year later, the Trust asserted the Debtors' alter ego claims on behalf of itself and the Debtors' creditors, initiating the adversary proceeding here.

Now, four years after the Trust succeeded to the Debtors' (and OCC's) claims, Repsol contends that the Trust lacks standing to pursue recoveries of creditor-based claims for three reasons: (1) that the Trust's seeking recovery of an amount necessary to pay the Class 4 and 5 Claims do not "rectify a generalized harm to Maxus"; (2) recovery should be limited to only those assets that Repsol stripped; and (3) recovery of an amount necessary to pay the Class 4 and 5 Claims are "not connected to the nature of the claim" and are, as a result, not "generalized."[5]  *See* Repsol Opp. at 27-31.  Repsol is wrong on all counts.

*First*, Repsol's argument that the Trust lacks standing to pursue any damages beyond the Debtors' claims arising from fraudulent transfers (*see* Repsol Opp. at 28) conflates two distinct concepts: the Trust's *standing* to pursue an alter ego claim on behalf of the estate and all creditors and the *measure* of alter ego damages.  Repsol concedes that the Court has already found that "under Delaware law, a trustee possesses standing to bring an alter ego claim on behalf of a creditor

---

[4] Smith Decl. Ex. 3, Art. IV.H. ("The Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action . . . . For the avoidance of doubt and without limiting the breadth and generality of the foregoing, the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims shall be preserved for prosecution by the Liquidating Trust.").

[5] YPF does not address any standing argument in any of its submissions, even though it asserts "standing" as its Third Affirmative Defense.  [D.I. 140] at 101.  For reasons addressed in Section III, *infra*, the Court can now dismiss that defense.

AMERICAS 114201192

of the debtor, as long as the claim qualifies as a 'general' claim." Repsol Opp. at 27 (quoting *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 759 (S.D.N.Y. 2008)). Repsol contends, instead, that the Trust cannot "seek[] to hold Repsol liable for *each* creditor claim" because this would no longer "rectify[] a generalized harm to Maxus." Repsol Opp. at 28 (emphasis in original). The Trust has already set forth the reasons why the alter ego damages sought will, in fact, rectify a generalized harm to the Debtors and will not repeat them here, other than to say this: the fact that the harm here concerns a very specific set of environmental claimants is due only to the fact that Defendants' prepetition acts were directed at ensuring that the only remaining unpaid claims of Maxus would be these held by those claimants. *See* Trust Mot. at 33-35.

None of the cases Repsol cites counsel otherwise. The court in *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 (9th Cir. 2010) clearly specified that its findings related to alter ego liability were based on California law. And here, unlike in *Ahcom*, this Court has already determined that, under Delaware law, the alter ego theory of liability is a general one, with no particularized injury arising from it. The language Repsol quotes from *The Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736 (3d Cir. 2013) (that bankruptcy proceedings do not permit a trustee to recover more than the debtor on the date of bankruptcy) and *Voiland v. Marston (In re Marston)*, 417 B.R. 766 (Bankr. N.D. Ill. 2009) (that the trustee is confined to enforcing entitlements of the debtor not a creditor) are entirely consistent with the recovery the Trust is seeking—a damage claim capped at the Debtors' actual, allowed unsecured claims.

Repsol's contention that the Trust is seeking to put creditors in a "better position than it would have been had the transfers never occurred" (Repsol Opp. at 28) is a red herring, and without support from binding legal authority. The Trust is seeking to recover, on behalf of the Debtors'

AMERICAS 114201192

estates and their creditors, an amount sufficient to pay claims against the Debtors that the Court has already allowed and are no longer in dispute for payment under the Plan.  In *Block v. Warehouse Consultants, Inc. (In re Americana Servs., Inc.)*, the court rejected defendants' argument—based on Eighth Circuit precedent—that a trustee-plaintiff could not seek a turnover order pursuant to Section 542 of the Bankruptcy Code, alleging that defendant transferee corporations were alter egos of the transferor principals and denied defendants' motion to dismiss. 173 B.R. 650, 653 (Bankr. W.D. Mo. 1994) (finding that trustee's action "may demonstrate unity of ownership with the estate or demonstrate the fraudulent nature of a conveyance due to the knowledge and intent of the parties").  Similarly, the issue in *Cedarbrook Plaza, Inc. v. Gottfried*, was whether an alter-ego claim in a creditor's complaint, which alleged that a debtor corporation's principal transferred corporate assets to a new entity "amount[ing] to nothing more than a continuation of the debtor . . . solely to act as a repository for [the debtor corporation's] assets and thereby to hinder, delay and defraud . . . creditors," stated a particularized injury.  No. CIV.A. 97-1560, 1997 WL 330390, at *11 (E.D. Pa. June 6, 1997).  There, the court found that the creditor's claim alleged a general harm (i.e., dissipation of assets belonging to the estate), and was therefore property of the estate.  *Id.*  Here, the Court has already entered a similar adjudication, described above, finding that the "Repsol Causes of Action" brought by OCC in fact belong to the estate.

Although the court in *Mullin v. Dzikowski*, 257 B.R. 356 (S.D. Fla. 2000) held that a trustee lacked standing to seek to hold an individual shareholder liable beyond the value of stock and cash he converted, *id.* at 363, the district court reversed the bankruptcy court's final judgment on the grounds that the trustee had not even demonstrated that the shareholder dominated or controlled the debtor corporation.  *Id.* at 362.  Here, on the other hand, the Trust's factual proffer demonstrates that Defendants dominated and controlled the Debtors precisely to strand the environmental

AMERICAS 114201192

liabilities that are now owed in the form of the Class 4 and Class 5 Claims (as discussed more fully below).[6]   Finally, the court in *Norman v. Riddell (In re Green Valley Seeds, Inc.)*, 27 B.R. 34 (Bankr. D. Or. 1982), granted a motion to dismiss the alter-ego claim pleaded by the trustee, but, as the court describes, that claim does not appear to have alleged that the defendants' domination and control of caused fraud or similar injustice separate from conduct alleged in connection with claims for fraudulent transfer and breach of fiduciary duty, which were not dismissed and which rendered the alter-ego claim "superfluous."   *Id.*   Here, the Trust has demonstrated that the Defendants' conduct (an overt attempt to strand massive environmental liabilities) caused the harm complained of (the inability to pay those liabilities).  *See* Trust Mot. at 33-35.

*Second*, Repsol makes a half-hearted argument that, as a matter of law, an entity that pierces its own veil "would only have the right [to] recover assets allegedly stripped from it"—here, the Fraudulent Transfers.  Repsol Opp. at 30.  Yet, in its Remand Opinion, the Court recognized that alter ego claims are distinct from fraudulent conveyance claims.  Specifically, the Court observed that "OCC is simply the party which has asserted and removed the claims in question," but that "the Debtors could have asserted the OCC Claims on their own behalf under New Jersey law."  *In re Maxus Energy Corp.*, 560 B.R. at 120.  The Opinion made clear that the Court was addressing "causes of action relating to contractual indemnity claims predicated on an alter ego theory of liability," and *not* claims for fraudulent transfer (which were not even discussed).  *Id.* at 117. Repsol neither cites to any legal authority nor addresses the Trust's case law standing for the proposition that alter ego recoveries are *not* capped at fraudulent transfer damages.  Trust Mot. at 34-35.  Repsol's silence is certainly explainable given the bad policy implications here—capping

---

[6] As this Court has stated, "environmental liability is not like a breach of contract claim or a tort" and the alter ego claims "directly resulted in the claims against the estates."  [D.I. 227] at 14.

AMERICAS 114201192

alter ego damages at an amount equal to the exact amount transferred from the dominated and denuded subsidiary would incentivize would-be alter egos to avoid liabilities to third parties simply by transferring assets and then relying on an artificial cap. *See* Section I.C, *infra*. There should be no free option here.

*Third*, in arguing that the Trust is not seeking to rectify "generalized" harms, Repsol misreads *In re Emoral*. In that case, the Third Circuit reviewed the bankruptcy court's determination that the plaintiffs' successor liability claims were property of the bankruptcy estate and set forth that a particular cause of action constitutes "property of the estate" when it is a "general" (as opposed to a "particularized") claim that "inures to the benefit of all creditors." *In re Emoral, Inc.*, 740 F.3d 875, 879 (3rd Cir. 2014) (internal citations omitted). The court concluded that the plaintiffs not only "fail[ed] to demonstrate how any of the factual allegations that would establish their cause of action . . . is unique to them as compared to other creditors of [the debtor]. Likewise, they fail to demonstrate how *recovery on their successor liability cause of action would not benefit all creditors of [the debtor]*." *Id.* at 880 (emphasis added). Although Repsol protests (without supporting authority or further explanation) that full recovery is "not connected to the nature of [the alter ego] claim" (Repsol Opp. at 30), it is difficult to imagine a more fitting analogy for alter ego than successor liability, both of which find, in essence, that a corporation lacks a distinct, separate legal identity from its successor or corporate parent. Here, full recovery on the alter ego cause of action—one of the Repsol Causes of Action transferred to the Trust under the Plan—would confer a benefit to *all* of the Debtors' creditors and thus is a generalized claim that the Trustee has standing to assert.

## B.    The Trust Is Not Seeking an Advisory Opinion

As their second line of defense to a damages finding on the alter ego claims, both Defendants contend that seeking a ruling on the issue of damages prior to a finding of liability

AMERICAS 114201192

would amount to an impermissible "advisory opinion."  Repsol Opp. at 15-17; YPF Opp. at 27-28.  Defendants ignore the clear text of FRCP 56(g), which states that "if the court does not grant all the relief requested by the motion," the court may "enter an order stating that any material fact—*including an item of damages or other relief*—that is not genuinely in dispute and treating the fact as established" for purposes of trial.[7]  Fed. R. Civ. Pro. 56(g) (emphasis added).

Here, the Trust, Repsol, and YPF have all requested "relief" on the Trust's alter ego claims. FRCP 56(g), by its terms, expressly gives the Court the ability to find that "damages" related to those claims are genuinely not in dispute and treat the fact as established for purposes of trial.  *See, e.g.*, *Deepstar Marine, Inc. v. Xylem Dewatering Solutions, Inc.*, No. 12-7628, 2014 U.S. Dist. LEXIS 104358, at *31 (D.N.J. July 30, 2014) (finding as established fact under FRCP 56(g) that certain invoices in the amount of $176,921.20 were unpaid and leaving the adjudication of breach of contract liability to be established at trial); *Campbell v. City of New York*, 16-cv-8719, 2021 U.S. Dist. LEXIS 40933, at *29 (S.D.N.Y. Mar. 4, 2021) (declining to issue a summary judgment ruling, but treating as an established fact pursuant to FRCP 56(g) that defendant failed to include night-shift differentials in its calculation of plaintiffs' overtime pay); *Pensioenfonds Metaal en Techniek v. Strategic DSRG, LLC*, No. 09 Civ. 5644, 2011 U.S. Dist. LEXIS 9624, at *18 (S.D.N.Y. 2011) (declining to issue summary judgment, but ruling as a matter of law that it is an established fact pursuant to FRCP 56(g) that an agreement between the parties required that use of a methodology that calculates actual value).

None of the cases cited by Defendants to support their constitutional argument—which

---

[7] YPF only briefly argues in a footnote that FRCP 56(g) should not apply because there are "material underlying facts [that] are subject to significant dispute between the parties," but does not contend that the Court lacks the authority to treat certain facts (including damages) as established under FRCP 56(g).  *See* YPF Opp. at 24 n.40.  Repsol, for its part, declines to address FRCP 56(g) at all.

AMERICAS 114201192

would imply that FRCP 56(g) is itself unconstitutional—are on point. *See Lovely H. v. Eggleston,* No. 05 Civ. 6920 (KBF), 2012 U.S. Dist. LEXIS 139462, at *5 (S.D.N.Y. Sep. 19, 2012) (where plaintiffs moved for partial summary judgment on question of whether a New York statute would preclude payment to certain class members, finding the question premature because it assumed liability but offering to issue a ruling on the question of damages if the parties were to stipulate as to liability); *Amerada Hess Corp. v. Yuma Shipping Corp.*, No. 82 Civ. 2136, 1985 U.S. Dist. LEXIS 21490, at *10-11 (S.D.N.Y. Mar. 22, 1985) (on plaintiff's motion pursuant to FRCP 42(b) to bifurcate trial on the issues of liability and damages, denying defendant's request for a damages trial to precede the liability trial in order to facilitate settlement because the damages question depended on the liability issue of if and when defendants' delay became unreasonable and such a request "ask[ed] too much in view of the [c]ourt's crowded docket"); *Robson v. Duckpond Ltd.*, No. 4:19-cv-01862, 2021 U.S. Dist. LEXIS 63278, at *23-25 (E.D. Mo. Mar. 31, 2021) (denying plaintiff's motion to adjudicate defendants' damage claims because the damages issues relied on whether defendants were the "proper parties to claim the damages or that they presented insufficient evidence to support recovery"); *Kinnel v. Mid-Atlantic Mausoleums, Inc.*, 850 F.2d 958, 967 n.12 (3rd. Cir. 1988) (in case involving a bifurcated liability and damages trial, jury did not name individual defendant liable but found damages against him; on appeal, Third Circuit noted that a finding of damages could not precede the liability determination "in the context of this case" because defendant's liability should not be inferred from the damages); *Kendall McGaw Laboratories, Inc. v. Comm. Mem'l Hosp.*, 125 F.R.D. 420, 422-23 (D.N.J. 1989) (where plaintiff and defendant cross-moved for summary judgment on competing measures of damages, declining to do so because determination of damages depended on the validity of multiple contracts); *Cooke v. General Dynamics Corp.*, No. 3:95 cv 31, 1998 U.S. Dist. LEXIS 15981, at *1-2 (D. Conn.

16

Sept. 11, 1998) (denying defendant's motion for partial summary judgment as to the correct methodology for calculating damages as not ripe for decision, without further explanation); *Williams v. Bier Int'l, LLC*, No. 14CV03894, 2015 U.S. Dist. LEXIS 94609, *4-7 (S.D.N.Y. July 21, 2015) (declining to rule on whether plaintiff could recover liquidated damages under the FLSA and NY Labor Law in case where damages issue was genuinely in dispute, such as the number of hours of back pay plaintiff was due and whether the plaintiff had worked overtime).

### C.    Defendants' Arguments Regarding the "All Liabilities" Theory Fail

Moving past Defendants' threshold contentions regarding standing and jurisdiction, the heart of the dispute here is whether the Trust's proposed measure of alter ego damages is appropriate under Delaware law.  It is.  The thrust of the Defendants' arguments to the contrary is that they cannot be held liable for all of the Debtors' stranded environmental liabilities because the Trust cannot establish a causal link between Defendants' alter ego conduct and the Debtors' incurrence of the liabilities set forth in the Class 4 and 5 Claims.  In essence, Defendants argue granting the Trust's Motion on this point would be therefore "inequitable."  *See* Repsol Opp. at 17-25; YPF Opp. at 28-31.  These contentions are without merit.

*First*, the Allowed Claims correspond, almost entirely,[8] to Maxus's obligations relating to

---

[8] Although a small proportion of the Allowed Class 4 Claims include pension claims, the Trust directs the Court's focus at this time to the Class 4 Claims comprising of the environmental claims for purposes of streamlining the Court's analysis.  To be clear, these pension claims were known, long-term liabilities that were also addressed by Defendants as part of the Strategy.  *See, e.g.*, Smith Decl. Ex. 112 at YPF_MAXUS_PRIV_0000010121, 10105 ████████████████████████████

████████████ Smith Decl. Ex. 55 at YPF_MAXUS_0000293077-293078. ██████

████ Smith Decl. Ex. 142 at MLTLEGACYESI_002711953 ████████████

its environmental remediation obligations.[9]  (YPF admits as much in its version of "undisputed

facts.").[10]  Defendants' environmental expert witnesses recognize that ████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████  Indeed, the environmental due diligence memo Andrews & Kurth LLP

provided  YPF  in  early  1995  specifically  ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.  See Smith Decl.

Ex. 13 at YPF-AK-0052889.   Given that the Trust has compiled substantial evidence that the

anticipated  magnitude  of  these  environmental  remediation  obligations  was  the  primary  factor

bearing on YPF's and Repsol's management of Maxus and Tierra for two decades following YPF's

acquisition, there is nothing "inequitable" in making them pay that amount if they are found to be

alter egos.  See Trust Mot. at 10-17, 22-26.

Second, Defendants' causation arguments are fundamentally questions of liability, which

involve triable issues that are not the subject of the Trust's Motion.  For example:

- Defendants emphasize the disjunctive nature of the elements of alter ego liability under
  Delaware—i.e., domination and control plus fraud or injustice—and suggest that the Trust
  has not and cannot establish fraud or injustice.  See Repsol Opp. at 17-18 ("There is no
  allegation, let alone evidence, that Repsol incorporated Maxus without capital, had it
  pollute on its behalf, and then hid behind the corporate veil when the environmental
  liabilities came due.  Only in such a case could the 'all liabilities' theory possibly make
  sense."); YPF Opp. at 30 n.49 ("[T]here was no 'spin off' of environmental liabilities like

---

[9] Environmental creditors—i.e., Lower Passaic River Study Area Cooperating Parties Group (the
"CPG"), the State of Ohio Environmental Protection Agency, the State of Wisconsin Department
of Natural Resources, the United States (on behalf of the EPA, DOI, and NOAA), and OCC
(Maxus's indemnitee under the SPA)—hold $700,688,553.32 worth of Allowed Class 4 Claims.
Even the remainder of the Allowed Class 4 Claims, which are held by retiree and trade creditors,
were  contemplated  as  part  of  the  Strategy  to  siphon  Maxus's  assets  and  manage  Maxus's
environmental obligations.
[10] See YPF SOF ¶¶ 82, 91, 513, 522.

AMERICAS 114201192

what occurred in *Tronox II . . .* The only possible harm caused by YPF Defendants thus is the amount they allegedly caused Maxus not to be able to pay for those pre-existing liabilities."). Those are all issues going to liability, not damages.

- Defendants disclaim that their own conduct caused any harm to Debtors or the Debtors' creditors, citing, for example, business, or economic reasons outside of Defendants' control. *See* Repsol Opp. at 24-25; YPF Opp. at 29-31.[11] YPF also alleges that the Trust seeks to hold YPF and Repsol liable for all of Maxus's obligations "irrespective of [the] alleged harm" that they caused. YPF Opp. at 26. Repsol also argues that it cannot be held liable because, in connection with the asset sales by which Repsol converted Maxus assets to its own gain were supported by third-party fairness opinions, documented in sales agreements, and publicly disclosed. Repsol Opp. at 18. Those arguments all go to liability.

- Defendants seek to establish a narrative that they are victims of persecution by opportunistic creditors looking for a "deep pocket" from which to recover for obligations of Maxus. *See* Repsol Opp. at 24 ("[The Trust] wants to pin the disappointment of all of Maxus's creditors on Repsol and YPF."); YPF Opp. at 29 ("An equitable alter ego remedy simply cannot be used to impose a judgment that would result in such a massive windfall to Oxy or other creditors."). Those, too, all go to whether the Court should, in the first instance, pierce the corporate veil.

Taken together, these arguments simply distort the relief being sought by the Trust in its Motion. To be clear, the Trust has and will establish a detailed factual record at trial demonstrating that Defendants abused the Debtors' corporate form as a means to ensure that Maxus's environmental liabilities would not diminish the economic value (to YPF and Repsol) of Maxus's productive assets. *See* Trust Mot. at 32. But, as addressed in Section I.D of the Trust's Opposition to Repsol's Motion for Partial Summary Judgment (incorporated by reference herein), the Trust is of the view that the record is sufficiently compendious and complicated that a determination on liability, which will involve significant dueling expert opinions as to appropriate business practices, is premature.

---

[11] In addition to contending that it provided "over $1.4 billion of financial support" to Maxus, YPF goes so far as to allege that "YPF lost the entirety of its $2.2 billion investment in Maxus, from which creditors already benefitted." YPF Opp. at 25. Not only is this statement made without any support as to whether Maxus's creditors were the actual beneficiaries of YPF's "investment" in Maxus (and is in dispute), but it also does not matter for purposes of the Trust's Motion, which seeks this Court's ruling that there is no genuine dispute of material fact as to the measure of damages on a finding of alter ego liability. *See generally* Trust Mot. at 30-40.

19

At this juncture, all the Trust seeks is a judgment from this Court establishing the proper *measure* of damages, not whether Defendants are actually *liable* for them.

*Third*, Repsol once again takes the position that the Fraudulent Transfers are the only possible "harm" to Maxus caused by Repsol's conduct and that the underlying environmental obligations of Maxus are irrelevant.  Repsol Opp. at 18-19.  But Respol does not meaningfully grapple with any of the evidence that establishes that both YPF and Repsol kept Maxus in existence by providing periodic funding for Maxus's environmental obligations—while they were manageable—in a deliberate attempt to run statutes of limitations and preclude environmental creditors from ever challenging the asset sales as fraudulent transfers.  Nor does Repsol meaningfully address the record evidence demonstrating that Repsol determined that, despite Maxus's presumed insolvency as of 2005, Maxus should not be permitted to file for bankruptcy protection because of a potential suit from a bankruptcy trustee for Maxus.  Trust Mot. at 19; Smith Decl. Ex. 142 at MLTLEGACYESI_002711992-2711993 ████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████.[12]

*Finally*, Defendants contend that it would be unfair to hold them responsible for the Debtors' liabilities and thereby give creditors a $14 billion "windfall."  *See* YPF Opp. at 29 ("The

---

[12] Repsol's one attempt to explain away the King & Spalding advice—by claiming that it refused to rely on that advice—falls flat in light of its concurrent request that this Court credit King & Spalding's advice as appropriate on its Statement of Undisputed Facts (Repsol SOF ¶ 141) and the lack of any contemporaneous document to support Mr. Pablo Blanco Perez's self-serving testimony, and the fact that Repsol did exactly what King & Spalding advised.

20

evidence is overwhelming that Maxus never would have been able to satisfy $14 billion in creditors' claims (or anything remotely close to that amount) had YPF never acquired Maxus in the first place."); Repsol Opp. at 18 ("Even if YPF had purchased Maxus and immediately burned it to the ground, it could not have caused $14 billion in damages."). Defendants' continued emphasis on the magnitude of the "$14 billion" Class 4 and Class 5 Claims is presumably a plea for this Court's clemency. In making their hyperbolic arguments, however, Defendants ignore the facts. As to the Class 5 Claims (where the "14 billion" would arise), the Trust seeks only a declaratory judgment on alter ego holding YPF and Repsol responsible for those amounts as they liquidate, not an award of cash damages. If future remediation of the DASS turns out to be less costly than OCC and the EPA have outlined in their proofs of claim, Defendants' ultimate liability in respect of Class 5 Claims would, by definition, be less than $14 billion, perhaps materially less. This feature of the Plan is a benefit to, not burden on, Defendants.[13] As to the Allowed Class 4 Claims, Defendants do not take the position that their alleged alter-ego conduct could not have visited anywhere near $712.5 million in damages to Debtors. *See* Trust Mot. at 33. As Repsol observes, the Trust has identified approximately $675 million in shortfalls just from its fraudulent transfers, prior to any assessment of prejudgment interest. *See* Repsol Opp. at 19.

But, even if the actual DASS expenses into the future (i.e., the Class 5 Claims) do total into the tens of billions, there is nothing fundamentally unfair about holding an alter ego liable for debts of its dominated subsidiary, particularly those that it intended to strand at the subsidiary. That is the very purpose of the doctrine. There is no dispute Defendants knew for decades that the Debtors faced environmental liabilities that could, if not would, run into the billions. In fact, the magnitude

---

[13] Had the treatment of the OCC and EPA claims been different in the Plan, then there would have to been an adjudication at that time of the allowable amounts of those claims, which Defendants can hardly claim would have served their interests.

21

of the potential environmental remediation costs and indemnification obligation Maxus had under the SPA with respect to the DASS were *precisely* what motivated the Strategy that Defendants ran for years, culminating in YPF's causing Maxus to file for bankruptcy with a purported settlement in hand. Instead of doing the right thing, Defendants made a risky gamble: strip Maxus of its productive assets to put them out of reach of environmental creditors, replace public debt with insider debt guaranteed by shareholders (and thereby reduce the number of eyes upon them), manage Maxus's environmental obligations to preclude future environmental creditors from asserting that the transfers were fraudulent, and later settle claims in a slate of insider settlements and a strategically timed bankruptcy. Defendants, having lost their bet that their Strategy would work, cannot now claim that it would be unfair—upon a finding of liability—to pay exactly what they so desperately tried (and failed) to avoid by their alter ego conduct.

### D.    Defendants' CERCLA Contentions Fail

The validity and the amount of Debtors' environmental obligations has already been determined in the form of the Class 4 and Class 5 Claims and should be the measure of damages upon a finding of alter ego liability. Trust Mot. at 35-40. After all (and as described more fully below), those Claims emanate from an arm's-length, good-faith settlement between the subsidiaries and their creditors that the alter ego parents do not even attempt to challenge on the merits. Although Defendants broadly invoke issues concerning the assessment of CERCLA damages as precluding the Trust's underlying theory of liability, Defendants (particularly Repsol) only complain that they will be prejudiced by having to pay those claims—representing the Debtors' joint and several liability for all environmental claims relating to the DASS—without having access to a right of contribution against other potentially responsible parties ("PRPs"). *See* Repsol Opp. at 33 ("[T]he MLT is seeking to put Repsol in the position . . . subject to joint and several liability without a right of contribution."); YPF Opp. at 27 n.46 ("The Trust has failed to

22

identify any principle of law or equity that would require the YPF Defendants to assume [a] PRP's liability for the DASS."). This contention fails because Defendants simply are not entitled to a right of contribution in the event that they are held liable in this action, even if the underlying Class 4 and 5 Claims might be related to CERCLA. Defendants simply are not paying CERCLA claims, nor are they subrogating to any of the Debtors' rights if they do.

As an initial matter, none of the parties dispute certain key concepts related to the Debtors' CERCLA-related environmental liabilities that form the vast majority of the Class 4 and 5 Claims. *One*, Tierra has primary liability under CERCLA as a landowner. *See* Repsol Opp. at 35. *Two*, Maxus was held to be Tierra's alter ego in the NJ Litigation, and is thus co-liable with Tierra. SOF ¶ 134. *Three*, Maxus was responsible for OCC's CERCLA-related liability under the SPA indemnity. *See* Repsol Opp. at 34-35. *Four*, under CERCLA, responsible parties, like Maxus and Tierra, can be held jointly and severally liable for remediation costs, which Repsol itself concedes is how CERCLA liability operates. *See* Repsol Opp. at 31 ("[T]he MLT is correct that under CERCLA a private party may be held jointly and severally liable to the United States for the cleanup of a contaminated site."). With regard to the environmental claims of the Debtors' creditors, then, it was entirely appropriate for creditors like the EPA, the CPG, and OCC to file claims against the Debtors for the entire amount of damages (or indemnification for the same) relating to the Debtors' Superfund sites. And, that is exactly what they did. *See* Smith Decl. Exs. 87-92 (proofs of claim filed by the State of Wisconsin, OCC, Kearney Remediation Trust, EPA, State of Ohio, and CPG).

The facts relating to the Debtors' settlement of those claims is also indisputable, as addressed below. The Class 4 Claims comprise settled and allowed claims for money already spent by Maxus's environmental creditors. *See* SOF ¶ 161. The Class 5 Claims represent

23

unliquidated future environmental expenditures and expenses for which Maxus could be held jointly and severally liable, limited only to amounts incurred with respect to the DASS and not any of the Debtors' other Superfund sites. *See* SOF ¶ 162. These are the amounts *agreed* to be owed by Debtors, and their liquidated amounts are fully consistent with Defendants' experts' opinions. *Compare* Smith Decl. Ex. 6 at 279 ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ *with* Smith Decl. Ex. 88 (OCC's proof of claim stating that the amount Maxus owes to OCC "exceeds $406 million" as of the date of the filing of the proof of claim).

Having no basis to dispute that the agreed amounts of the claims are proper, Repsol essentially complains about the lack of a purported counter-asset that would arise if and when it is required to pay any damages to the Trust that are calculated by reference to creditors' claims— i.e., a right by contribution from other PRPs. *See* Repsol Opp. at 33. Again, paying damages to the Trust for alter ego conduct is not paying the Debtors' CERCLA liability. In any event, the "right of contribution" argument comes years too late.

As Repsol acknowledges, the Plan gave the Trust control over the "Preserved Contribution Claims." Repsol Opp. at 33 (citing Art.IV.H); *see* Smith Decl. Ex. 3, Art. I.A.164 (defining "Preserved Contribution Claims" as "certain Contribution Claims, which shall be transferred to the Liquidating Trust on the Effective Date."). The Plan also specified that "[t]he Plan shall constitute . . . an offer by the Debtors to release all Contribution Claims other than the Preserved Contribution Claims" (Smith Decl. Ex. 3, Art. XI.H), and set forth that "[n]o Creditor or party in interest shall be entitled to assert a right to contribution under CERCLA or other applicable law on account of amounts collected by the Liquidating Trust." Smith Decl. Ex. 3, Art. VII.M. The

24

time for Repsol to protest the absence of an asset that it might have availed itself has long passed.[14]

Whatever right Repsol might have had outside the Plan to subrogate to Maxus's rights in the event that it paid a debt of Maxus, it did not survive the provisions in the Plan that give "exclusive" authority to the Trust (which is not Maxus) to assert "Preserved Contribution Claims."

Repsol's remaining CERCLA argument is meritless.[15]  It references *United States v. Bestfoods*, 524 U.S. 51 (1998) to argue that it cannot be subject to CERCLA liability because it did not control Maxus's and Tierra's decision-making with regard to environmental matters. Setting aside whether or not the record supports this (it does not), this argument once again misses the point.  The Trust is not the EPA, cannot impose liability under CERCLA, and does not base its claims on CERCLA.  The Trust can, however, pursue a common law alter ego cause of action against Repsol (which it has), prove that the corporate veil should be pierced because Repsol deliberately interfered with the Debtors' ability to meet obligations to its environmental creditors (which it has), and seek recovery for the claims that they were permitted to, and did, bring.

### E.    Defendants Misconstrue the Plan Reservation of Rights

Defendants' final argument against the imposition of damages is that the Plan somehow precludes the Trust from recovering an amount equal to the Allowed Claims of the Debtors' creditors.  That argument goes too far.  The Trust's Motion establishes that, as a matter of *fact*, the Debtors (represented by its Special Independent Directors) and the UCC were co-proponents of the Plan.  Trust Mot. at 27, 36.  As a matter of *fact*, that Plan settled the vast majority of the Debtors' environmental claims, with the support of the UCC as co-proponent.  *See* Trust Mot. at

---

[14] While the same might not apply as to YPF, YPF makes no argument that any entitlement to contribution affects the relief sought by the Trust's Motion.

[15] Repsol states in its section heading that the Trust's liability theory "is inconsistent with . . . the Bankruptcy Code" (Repsol Opp. at 31), but it does not actually argue that point anywhere in its Opposition.

AMERICAS 114201192

36.  As a matter of *fact*, this Court held in its Confirmation Order that those settlements were made at "arm's length and in good faith" and resulted in the Class 4 and Class 5 Claims.  Trust Mot. at 38-39.  And, as a matter of *fact*, the settlements were noticed and received no objections except from YPF, which later withdrew its objection.  *See* YPF Opp. at 31-32.  That lack of any protest by the Defendants to the settlements of environmental claims was obviously well-placed.  For, even after years of discovery, neither the Defendants nor any of their experts have challenged the amounts, nature, or bona fides of *any* environmental claim settlement between the Debtors and its creditors.[16]  In other words, the undisputed record is that the settlement amounts which aggregate to the Class 4 and 5 creditors are a complete and accurate reflection of what Debtors actually owe to their creditors.

Notwithstanding any of that, both YPF and Repsol contend that the Reservation of Rights set forth in Article XV, Section P of the Plan affirmatively bars the Trust from recovering damages calculated in respect of the Allowed Claims from YPF and Repsol even if there is a finding of alter ego liability.  *See* Repsol Opp. at 36-38; YPF Opp. at 31-35.  The Reservation of Rights sets forth:

> Neither the allowance or disallowance of any Claim against any
> Debtor in these Chapter 11 Cases, nor the allowed amount of any

---

[16] *See* Yoo Decl. Ex. 8 at Tr. 88:6-14



AMERICAS 114201192

> Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action and the Preserved Contribution Claims).

Smith Decl. Ex. 3, Art. XV.P.

Both Defendants have sought to introduce evidence with respect to the negotiation background that lead to the inclusion of the Reservation of Rights in the confirmed Plan. *See* YPF Opp. at 31-32; Repsol Opp. at 37-38. Such extrinsic evidence is inadmissible because the provision is plainly unambiguous. *See Fr. Winkler KG v. Stoller*, 839 F.2d 1002, 1005 (3rd Cir. 1988) ("Simply stated, the [parol evidence] rule is that absent fraud, accident, or mistake . . . oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify, or supersede the written contract is inadmissible in evidence") (internal quotations omitted).

Each of the Defendants next argues in various iterations that they have somehow been deprived of the opportunity to challenge the Debtors' agreement with respect to the proper quantum of the Class 4 and 5 Claims. Not so. Both Defendants initially sought discovery into the merits of the Debtors' underlying environmental obligations. *See* [D.I. 216, 217, and 218]. But, appreciating that "the Trust is alleging that the alter ego has stripped the Debtors' assets so they could not pay their liabilities," and that "the alleged harm to the Debtors is those liabilities, which are claims and/or settled claims against the estates," the Court ruled that Defendants would not be permitted to take searching discovery into the underlying merits of environmental claims. [D.I. 227] at 16. *The Court left open, however, that Defendants could take discovery "concerning the settlements in the Plan and that spring out of the Plan."* *Id.* at 15. Both Defendants then sought such discovery, seeking documents related to the settlements and a deposition from the Special

27

Independent Committee (the "SIC") as to "the Oxy Plan [] and the SIC's ultimate decision to support the Oxy Plan, including the Disclosure Statement." [D.I. 437] at 13. From that discovery, Defendants simply failed to adduce any evidence to challenge the Court's conclusion that all of the settlements were at arm's length and in good faith.

Ultimately, Defendants are forced to rely on a strained reading of the *Reservation* of Rights as an actual *modification of* rights in their favor. YPF contends that the Reservation of Rights affirmatively "prohibits the [Trust's] use of allowed claim amounts for determining alter ego damages" because the "plain language"[17] of the Reservation of Rights precludes the Trust from "rely[ing] on settled or allowed claims to prove its alter ego damages." YPF Opp. at 34. Specifically, YPF contends that "no matter what Debtors or the Trust does with regard to resolution of any creditor's Claim . . . that cannot be used . . . against the YPF Defendants." YPF Opp. at 31, 34. This contention distorts the plain language of the Reservation of Rights, which does not limit the ability of any party to "use" facts "with regard to resolution" in subsequent litigation but merely makes clear that the legal act of allowance, in its own right, does not have a precedential or preclusive effect in such litigation. Here, the Trust has not argued that the Court's allowance of claims is res judicata against Defendants in this litigation—rather, the Trust seeks to hold Defendants liable for damages equal to the acknowledged amount of the Debtors' obligations, liquidated in the Allowed Claims, on account of their conduct that caused those obligations to go unpaid. YPF's position, in essence, is that the deal struck at confirmation prevents the Trustee from recovering on a settled claim even where there is no articulated challenge, but instead must

---

[17] The Trust does not generally dispute YPF's statement of the law as requiring that the Court construe and apply the Reservation of Rights by giving the words and phrases their plain meaning so as to give full meaning to all the terms set forth therein. *See* YPF Opp. at 34 (collecting cases). Likewise, the Trust agrees with YPF that the Reservation of Rights is unambiguous.

AMERICAS 114201192

try every creditor claim to judgment in order to establish a valid debt.  That is not what the Plan says, and YPF cites to no authority that sets out such a requirement.  Disclosed settlements, negotiated by fiduciaries such as the SIC, reviewed by fiduciaries such as the UCC, subjected to objection by any creditor such as Defendants, ultimately approved by the Court as being at arm's-length and in good faith, and without challenge by Defendants who were specifically informed they could do so, is more than enough here.

YPF seeks to bolster its counter-textual argument by observing that "it is common for a plan or confirmation order to contain provisions carving out particular issues and claims, such that the issue (as to which the order might otherwise be preclusive) will be litigated, if necessary, in the future." YPF Opp. at 32.  While this statement is generally accurate, it does not support YPF's reading of the Reservation of Rights.  *First*, YPF does not contend that the Reservation of Rights reserved for YPF the right to challenge *ad infinitum* the allowance of claims or the allowed amounts, which is unsurprising given that the plain language of the Reservation in no way supports such a contention.[18]  *Second*, YPF attempts to undercut the Plan's Allowed Claims settlements by

---

[18] The cases YPF cites for the (undisputed) proposition that plans and confirmation orders carve out issues for future litigation are inapposite, as all relate either to plan provisions preserving claims for litigation against the debtors or their estates (or the absence of such provisions)—*see, e.g.*, *Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 23 (Bankr. S.D.N.Y. 2014) (plaintiffs' claims barred where plan disclosed the treatment of their claims and plaintiffs had notice of confirmation proceedings); *Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280 B.R. 573, 588-89 (denying defendants' res judicata argument where plan preserved trustee's right to bring avoidance actions)—or to issues relating to "insurance neutrality" provisions, which are not at issue here—*see, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 216, 218 (3d Cir. 2004); *In re Leslie Controls, Inc.*, No. 10-12199 CSS, 2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010).  On the other hand, in *In re Tronox, Inc.*, 464 B.R. 606, 610 (Bankr. S.D.N.Y. 2012), the court did reject Tronox's argument that "the plan conclusively determines the value of the environmental and tort claims at the value of their *contingent* right to recovery" (emphasis added), but the opinion makes clear that Tronox's environmental and tort creditors had filed *unliquidated* proofs of claim and agreed to satisfaction of their claims in return for all proceeds from the adversary proceeding against Anadarko.  Here, in contrast, the Debtors actually settled the amount of the Allowed Class 4 Claims.

29

observing that the Plan contained a disclaimer stating that those settlements "shall not constitute an admission of the Debtors' actual liability." YPF Opp. at 35, n. 51. From this, YPF extrapolates that "if Debtors themselves took the position that the settlements were not for their actual liability, there is no reason for the Court to find as a matter of law that the YPF Defendants are liable for those settled amounts." *Id.* But, YPF overlooks that, per the Plan, the Class 4 Environmental Claims are specifically defined as "Claim[s] against any of the Debtors arising under or in connection with any Environmental Law or the OCC Indemnity" to the extent those Claims constitute "actual out of pocket costs," "expenses incurred," or "costs and expenses . . . legally or contractually committed itself to expend (as evidenced by a writing between such Holder and a Government Environmental Entity or a judgment of a court of competent jurisdiction)." Trust Mot. at 36. YPF adduces no legal authority for the proposition that the Court cannot find Defendants liable in an amount equal to the actual out of pocket costs and expenses upon a finding of alter-ego liability simply because the Plan contains a boilerplate disclaimer of any admission of liability. Indeed, in the CERCLA context, the absence of an admission of liability in an administrative settlement does not bar a settling party from bringing a contribution action against other PRPs. *See, e.g.*, *New Castle County v. Halliburton NUS Corp.*, 903 F. Supp. 771, 779 (D. Del. 1995) ("[T]he fact that the consent agreement does not contain an admission of liability is not dispositive.").

For its part, Repsol simply suggests that, by bringing the Trust Motion, the Trust has contended that the Allowed Claims are res judicata and binding on Defendants. *See* Repsol Opp. at 36 ("Even if the Claim settlements between Debtors and Creditors were arm's length, it does not make them binding alter ego damages against Repsol."). As noted above, that is not what the Trust is arguing. Similarly, Repsol mischaracterizes the Trust's position as being "that Repsol sat

AMERICAS 114201192

on its rights and must accept the allowed amount of claims as the measure of alter ego damages." Repsol Opp. at 37. The Trust has never argued that Repsol's liability as alter ego was finally established or liquidated as a result of its sitting on its rights during the Plan process. Rather, the Trust contends that Repsol must accept the allowed amount of the claims as the measure of alter ego damages because it sat on its rights during *this* proceeding.

*    *    *

In sum, now is the time for the Court to resolve a legal issue that has plagued the Parties since before the Petition Date—is a Chapter 11 debtor's alter ego claim an alternate measure of damages for a debtor to recover on wrongs committed against it by a shareholder (i.e., the estate damage backfilling doctrine),[19] is it a mechanism for a debtor to attempt in a collective action to vindicate the rights that each one of its creditors who could have recovered against a shareholder which abuses the corporate form (i.e., the creditor claim aggregation doctrine), or is it something else? Here, given the near total overlap between the intended victims of the shareholder's abuse (the environmental creditors) and the Debtors' unsatisfied claims pool, the Trust submits that the Court can and should find at this time that, to the extent that alter ego liability is established at trial, Defendants must pay an amount sufficient to satisfy those stranded claims in full, with interest.[20]

---

[19] As the Trust has argued previously, Defendants' argument that the Trust's potential recovery on behalf of creditors is limited to fraudulent transfer damages is without legal support. [D.I. 221] (citing *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F App'x 623, 627 (2d Cir. 2010)) ("[The Defendants'] argument confuses the fraudulent transfer statute, which . . . generally limits recovery to the particular property that was fraudulently transferred, and [ ] piercing the corporate veil, which permits plaintiffs to hold those behind the corporation liable for some underlying corporate obligation." (quotation and citation omitted)).

[20] Neither Defendant disputes that the Trust is entitled to pre-judgment interest, that this Court has the discretion to award pre-judgment interest, or that the formula for awarding of pre-judgment interest can be assessed now if the Court does, in fact, set the quantum of total damages at this time.

## II.   THE TRUST IS ENTITLED TO SUMMARY JUDGMENT ON ITS ACTUAL FRAUDULENT TRANSFER CLAIMS AGAINST EACH OF THE NAMED TRANSFEREE DEFENDANTS

With respect to the Trust's second request for relief against Defendants—a finding that Defendants are liable for intentional fraudulent transfers in amounts to be determined a trial—Defendants' opposition papers throw up an oftentimes dissonant wall of sound, layering argument after argument as to why the Court simply cannot grant any relief in the Trust's favor.  All of that, however, resolves itself into one plaintive note—that Defendants be permitted to call their witnesses to explain away the contemporaneous record of corporate malfeasance and swear they had no any actual intent to hinder, delay, or defraud Maxus's environmental creditors.  That will not work.

### A.   Defendants Misconstrue the Summary Judgment Standard in the Context of the Badges of Fraud

Throughout their pleadings, the Defendants conflate the "inferences" courts are forbidden to draw against non-movants at summary judgment with what they also call the "inference"—more accurately, the *presumption*—of intent which arises out of the presence of the badges of fraud.  *See* YPF Opp. at 23 ("[T]he Court must draw all reasonable inferences in favor of the nonmoving party without making credibility determinations or weighing the evidence, while taking the nonmovants' inferences 'as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.'");[21] Repsol Opp. at 14 ("[T]he Court 'must view the facts and evidence presented on the motion in the light most favorable to' Repsol as 'the nonmoving party.' It 'may not make credibility determinations or engage in any weighing of the evidence'; instead,

---

[21] The YPF Defendants cite to *Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977), a wrongful death case; *Liqwd, Inc. v. L'Oreal USA, Inc.,* 2019 WL 10252607 (D. Del. June 21, 2019), a trade secrets case; and *Shabazz v. Del. Dep't of Corr.*, 2021 WL 4502034 (D. Del. Oct. 1, 2021), a prisoner-rights case.

32

the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'").

To be clear, the Trust is not asking the Court to draw inferences against the Defendants or to interpret disputed facts in favor of the Trust. Rather, the Trust is asking the Court to make a specific finding as to the *undisputed* facts—the contents of the contemporaneous reports, memos, meeting notes, contracts, and emails—which establish the presence of virtually all of the badges of fraud for each of the Intentional Fraudulent Transfers. Such an observation is appropriate and even necessary at the summary judgment stage. As the *Kern* court held, granting summary judgment on fraudulent transfer claims based on the presence of the badges of fraud; "while the court is not to weigh evidence on a summary judgment motion, it *is* tasked with determining whether there is a genuine issue of material fact requiring trial." *In re Kern*, No. 20-18381, 2021 Bankr. LEXIS 2462, at *47 (Bankr. D.N.J. Sept. 7, 2021) (emphasis added). That is exactly what the Trust is requesting here.

### B.    Defendants Cannot Obtain a Trial Simply By Disclaiming Their Own Documents

More substantively, as set forth in the Trust's Motion, Defendants cannot obtain a trial merely by disclaiming any "bad intent" for the Intentional Fraudulent Transfers. Trust Mot. at 44-49. The Trust has laid out a significant record of indisputable, contemporaneous evidence that demonstrates that YPF and Repsol, following their direct and indirect acquisitions of Maxus, sought to pay off all their liquidated third-party claims, isolate Maxus's environmental liabilities, protect themselves from exposure to potentially "catastrophic" future environmental liabilities,

33

and developed a scheme (the Strategy) to do so.  Indeed, what the Trust has established are facts, not in material dispute, showing a classic, parent-driven intentional fraudulent transfer scheme:[22]

- Following the close of YPF's acquisition of Maxus, its lawyers at Andrews & Kurth sought additional diligence into Maxus's environmental liabilities, and Dexter Peacock went to New Jersey in June 1995.  His advice to YPF immediately after that visit was that ███████ ████████████████████████████████████████████████████████ Smith Decl. Ex. 104 at DEDES-YPF-P0000008.003-8.004.  Years later, ████████████████████████ ████████████████████████████████████████████████████ Smith Decl. Ex. 106 at YPF_MAXUS_PRIV_0000025824, 25825.  Similarly, YPF's agent (Paul Bohannon) expressed ███████████████████████████████████████████████████████████ █████████████████████████████████ Smith Decl. Ex. 200 Tr. 354:12-23; 272:13-273:17, 274:7-275:1.

- During that year, in November 1995, Mr. Bohannon (another YPF lawyer) learned of ████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ Smith Decl. Ex. 107 at MLTLEGACYESI_000278956-278957. ████████████████████████ ████████████████████████████████████████████████████████████ Smith Decl. Ex. 108 at MLTLEGACYESI_00278999-279000.  On November 2, 1995, Maxus received a draft letter report from EA that ███████ ████ ████ ██████ Smith Decl. Ex. 110 at MLTLEGACYESI_000627944.

- Prior to the receipt of the EA Letter, there was no talk of a "Global Restructuring."  In a December 1995 memo, Mr. Peacock (YPF's lawyer) ██████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

  ███████████████████████████████████████████████

---

[22] Each of these documents is before the Court, not only as summarized in the Trust's Motion and submitted to the Court as exhibits to the Smith Declaration, but many, if not all, are also referenced in Repsol's Affirmative Statement of Undisputed Facts [D.I. 639] ("Repsol SOF"), Repsol's Counterstatement of Undisputed Material Facts [D.I. 641] ("Repsol Counter SOF"), and YPF's Statement of Undisputed Facts [D.I. 646] ("YPF SOF").  *See, e.g.*, Repsol SOF ¶¶ 39, 140; YPF SOF ¶ 492.



- In a contemporaneous internal memo, again within a month of the EA report, Bob Simon (a corporate tax lawyer at Andrews & Kurth) stated that ███████████████████ ████████████████████████████████████████████████████████████████ An internal March 1996 email from Jim Prince (another lawyer at Andrews & Kurth) sought ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

- In a May 1996 memo, written within a year of the acquisition, Mr. Peacock ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████ Smith Decl. Ex. 112 at YPF MAXUS PRIV 0000010071-10072.  A second memo from Andrews & Kurth ███████████████████████████████████████ ████████████████████████████████ Smith Decl. Ex. 114 at DEDES-YPF-P0000048.

- In June 1996, EA issued a final draft EE/CA to Maxus, ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[23] Smith Decl. Ex. 8 at DEDES-YPF-P0000057.001-57.002.

AMERICAS 114201192

██████████████████████████████████████████████████████████

- Between June 1996 and December 31, 1997, YPF directed Maxus to complete the sale of its Bolivia, Ecuador, Indonesia, and Venezuela Assets to YPFI.  SOF ¶¶ 55-74.  YPFI "paid" for Maxus's international assets by forgiving Maxus's intercompany debt or paying down Maxus's funded debt obligations, including in respect of the LBO financing that YPF had guaranteed.  Trust SOF ¶¶ 60, 65, 72; Repsol SOF ¶ 39.  While the Maxus board approved the transactions, there is no evidence that the board was fully informed about any of the foregoing matters related to Maxus's environmental exposures.

- The scenario was no different when Repsol came onto the scene in 1999.  According to Agustin Garcia Moratilla (Director of Corporate Legal Affairs at YPF), David Rabbe (President and CEO of Tierra) and David Wadsworth (VP and General Counsel of Maxus) ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  Repsol YPF's Board of Directors was also informed in 2001, post-acquisition, that ███████████ ████████████ ███████ ██████ ████████████ Smith    Decl.    Ex.    134    at MLTLEGACYESI_003215383, 3215391-3215417.

- In December 1999 and January 2000, Repsol YPF caused Maxus to sell its interests in Crescendo (its last remaining productive asset) to BP and Apache.  SOF ¶¶ 80-84.  Proceeds from the sale went from Maxus to YPF via a $262.1 million debt repayment from Maxus to YPFI (which were then dividended up to Repsol), and to Repsol via the remaining $325 million being loaned to Repsol's cash management affiliate.  SOF ¶ 85; *see also* Repsol SOF ¶¶ 58-60.  It took almost one full year after the Crescendo Transfer for Repsol YPF to decide the most advantageous use of the remaining proceeds for Repsol YPF.  *See* Repsol SOF ¶ 59; Yoo Decl. Ex. 1 at REPSOL0002185 (Memorandum from Arthur Andersen to David Rabbe evaluating use of the proceeds of the Crescendo sale and potential tax implications); Yoo Decl. Ex. 2 at MAXBK000310130 (Memorandum from Arthur Andersen to Javier Escudero advising that YPFH's use of the Crescendo proceeds to buy Repsol bonds on the open market would be preferable to a loan to Repsol to "avoid possible attacks by the Internal Revenue Service on the arm-s length nature of the loan provisions" and "characterization to a constructive dividend.").

- Between 2001 and 2002, after being advised of ████████████████████████ ████████████████, Repsol performed its own "restructuring," having YPFI transfer Maxus's legacy E&P assets to Repsol subsidiaries or third parties.  SOF ¶¶ 86-95.  The proceeds from the YPFI Transfers were used to pay down or cancel debt or otherwise remitted to YPF as dividends.  Trust SOF ¶¶ 88, 90, 93, 95.  Ultimately, those "proceeds" were dividended up to Repsol.  YPF SOF ¶ 450.

36

- When the RIF Loan proceeds from the Crescendo Transfer started to run out,[24] Repsol YPF became increasingly focused on avoiding exposure.  A January 2005 presentation to the Repsol Board noted ███████████████████████████████████████████████████████████ ████████████████████████████████████████████  Smith Decl. Ex. 139 at REP 085. In February 2005, Mr. Wadsworth sent to Mr. Moratilla ███████████████████████████████ ███████████████████████████████████████  Smith Decl. Ex. 140 at MLTLEGACYESI_001920696-1920697.

- Repsol YPF retained counsel (King & Spalding LLP) in late 2004 to evaluate ████████████ SOF ¶ 107.  In March 2005, King & Spalding provided a "███████████████████████████████████████



- In April 2005, the Repsol Board received a presentation ████████████████████████████



- A few months later, in December 2005, the NJ Litigation commenced.  For the next decade Repsol and YPF caused Maxus to fight the NJDEP's claims (and in October 2008, OCC's cross claims for alter ego liability).  SOF ¶¶ 113-119.  Repsol and YPF controlled the litigation strategy without Maxus's involvement in key matters.  *See* Trust Mot. at 22;

---

[24] *See* Smith Decl. Ex. 144, Email from Javier Nogales Aranguez, dated Jan. 14, 2005 with attached spreadsheet of RIF Loan repayments, MAXUS5761478_TR ███████████████████████████████

[25] The ████████████████████████████████████████  Smith Decl. Ex. 143 at REP 736-737.

37

Smith Decl. Ex. 148; Smith Decl. Ex. 149.

- , Repsol YPF presided over a series of "intercompany settlement agreements" ██████ █ ████████ ███ ████████████████████████████. SOF ¶¶ 120-128.

- In May 2012, Repsol, by no act of its own, was taken out of the Strategy—except for the continued joint defense against the NJ Litigation—when the Government of Argentina nationalized YPF, seizing Repsol's majority ownership stake in YPF.  SOF ¶ 136.

- Beginning in June 2012, YPF, alone in control of the Strategy once more, refined the plan for the last phase of the Strategy (a/k/a Project Jazz), in part informed by the *Tronox* decision, which would culminate in the Debtors' inevitable Chapter 11 bankruptcy with a settlement and release that would purportedly avoid the risks of an adverse ruling to YPF on alter ego liability and fraudulent transfer claims in either the NJ Litigation or in a prospective bankruptcy proceeding.  Trust Mot. at 24-27. █████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████. 167 at YPF_MAXUS_PRIV_0000104830, YPF_MAXUS_PRIV_0000104877-104884.    One business day before trial was set to commence in the NJ Litigation on OCC's alter ego claims against YPF, the Debtors filed for Chapter 11 in this Court.

In response to this damning record, Defendants raise essentially two forms of arguments in an abject plea to obtain a trial on the Trust's Intentional Fraudulent Conveyance claims: (1) certain people involved with each of the Intentional Fraudulent Transfers have later sworn that they individually had no "intent to hinder, delay or defraud" creditors; and (2) that certain documents in this case have disclosed other intents or purposes for the asset transfers.  *See, e.g.*, YPF Opp. at 37-38; 57-58; Repsol Opp. at 38-40; 41-42.  But, as the *Kern* court found, a party cannot raise a genuine dispute of fact as to intentional fraudulent transfer simply by means of a "flat denial of intent to defraud."  *In re Kern*, 2021 Bankr. LEXIS 2462 at *47.

The badges of fraud were developed as a practical response to the reality that defendants, if asked directly, will disclaim fraudulent intent or proffer pretextual justifications for fraudulent transfers, just as the Defendants have done here.   "[A] court can hardly expect one who

38

fraudulently transfers property to step up and admit it under oath. […] As a result, courts routinely look to badges of fraud as circumstantial evidence of a debtor's subjective state of mind as more reliable than after-the-fact testimony." 5 Collier on Bankruptcy P 548.04 (16th ed. 2021). Where, as they do here, "the undisputed facts and badges of fraud overcome any denial" of fraudulent intent, or any pretextual explanation for the transfers, courts can and do grant summary judgment on fraudulent transfer claims. *In re Kern*, Bankr. LEXIS 2462 at *47*; see also In re Prosser*, No. 06-30009, 2009 Bankr. Lexis 3279, at *75-76 (Bankr. District of the Virgin Islands 2009) (defendant's "contradictory statements, none of which comport with the exhibits and testimony of other witnesses," did not "offer a credible and innocent explanation for the conveyances" sufficient to survive motion for summary judgment). Even in the fraudulent transfer context, it is "well-recognized that the summary-judgment rule would be rendered sterile . . . if the mere incantation of intent would operate as a talisman to defeat an otherwise valid motion." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 401 (Bankr. S.D.N.Y. 2007) (Gropper, J.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)) (internal quotations omitted). When, as here "the evidence is so one-sided that reasonable minds could not differ as to the only rational outcome . . . the factual issue of intent can be decided by the court as a matter of law." *In re Weidner*, 476 B.R. 873, 883 (Bankr. E.D. Pa. 2012). Here, the record as a whole contains abundant, unambiguous, and contemporaneous documentary evidence of virtually all of the badges of fraud, and Defendants cannot now avoid summary judgment merely by pointing to their witnesses' bare after-the-fact denials or sowing "metaphysical doubt" as to whether the record is missing any yet-undiscovered facts that could exonerate them. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Defendants also plead that a handful of documents in the record disclose some other intent behind each of the underlying transfers—namely, a purportedly legitimate desire to complete debt and tax restructurings "of Maxus." YPF Opp. at 39-41; Repsol Opp. at 41-42, 48. As an initial matter, Defendants do not address that, as a matter of law, even if there are some other, credible explanations for the Intentional Fraudulent Transfers in the contemporaneous documents (which the Trust generally disputes), that does not negate the record of the badges of fraud. *In re Blatstein*, 192 F.3d 88 (3d Cir. 1999); *see also Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 (Utah 2020) ("[A] plaintiff may carry her burden of showing that a defendant had actual intent to hinder, delay, or defraud without showing that it was the defendant's sole or primary motivation."); *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1247 (D.C. 2012) ("[E]ven if a debtor has at least one non-fraudulent motive for a transaction, the additional motive of effecting the transaction to hinder a creditor is a sufficient ground for un unassailable conclusion of fraudulent intent.") (internal citations omitted). Courts have therefore found that even mixed-intents are sufficient to find actual intent to defraud, hinder, or delay. *See Tronox II*, 503 B.R. 239, 280 (Bankr. S.D.N.Y. 2013) ("[A] principal goal of the separation of the E&P assets from the chemical business was to cleanse the E&P assets of every legacy liability."); *Kelley v. Thomas Solvent Co.,* 725 F. Supp. 1446, 1455 (W.D. Mich. 1988) ("[T]here is no factual dispute among the parties that one reason Thomas Solvent Company created its spinoff corporations was to avoid potential [environmental] liability."). Here, Defendants cannot credibly dispute that, at the very least, the "management" of Maxus's environmental liabilities was "one" of the "primary" goals of the Fraudulent Transfers.

More generally, Defendants' insistence on the purported tax or debt rationales miss the point. YPF Opp. at 63-64. As *Tronox* makes clear, Defendants' "burden [is] not to prove whether

there was some legitimate reason for the challenged transactions.  The burden [is] to prove a legitimate supervening purpose for the 'manner in which the transfer was structured.'" *Tronox II*, 503 B.R. at 289 (quoting *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 392 (S.D. Tex. 2008)).  Like the defendants in *Tronox II*, Defendants are not being sued because of their decision, in isolation, to restructure Maxus's debt or their tax liabilities; they are being sued (as they have long anticipated) because of their decision to transfer valuable assets in a way that inevitably left Maxus unable to meet what they knew to be potentially catastrophic environmental liabilities.  *Id.* And like the defendants in *Tronox II*, Defendants "have never articulated"—and cannot credibly articulate—"a legitimate business reason for imposing all of the legacy liabilities" on Maxus.  *Id.*

In any event, even if Defendants can cherry-pick certain documents purporting to show that YPF, Repsol and Maxus were not as wholly craven as the Trust claims, but were motivated by certain tax and debt restructuring benefits, two things become clear: (1) the purported benefits (if any) were to entities other than Maxus and (2) the purported direct "benefits" to Maxus were largely pretextual.  For example, while Andrews & Kurth was advising YPF and Maxus on the



AMERICAS 114201192

████████████████████████████████████████████████████████████[26]

With respect to Defendants' purported tax benefit motivation for the asset transfers, Defendants never point to a single document, presentation to the Maxus Board, or snippet of sworn testimony that supports the idea that the 1996-1997 Transfers (which YPF euphemistically refers to as the "tax restructuring") would create meaningful tax savings for *Maxus*.  On this point, while there may have been some tax savings to the larger corporate group, the issue is not what the parent corporations might save but rather what the transferring subsidiary would.  When one focuses on Maxus and its creditors, and there is simply no support for a contention that its estate or its creditors received a tax benefit that appreciably changed its balance sheet or income statement.  On the contrary, all the evidence shows that Maxus had not reported taxable income for years before the YPF acquisition (YPF SOF ¶ 264) and that Maxus had substantial unutilized NOLs.  Smith Decl. 172 ¶ 93, 180.  Moreover, Defendants have not even established that Maxus was an entity that paid any taxes.  Similarly, the evidence shows that, during the time YPF and Repsol maintained direct and indirect control of Maxus, there is not a single business plan that would suggest either the Defendants or Maxus's management anticipated that Maxus would ever be profitable—and therefore, taxable—at some point in the future.  Not one.  Similarly, with respect to the Crescendo Transfers, the contemporaneous records do not include any analysis or presentation to the Maxus Board which articulated tax or debt savings to Maxus.  Remarkably, despite the significance of the

---

[26] YPF offers no evidentiary support for its contention that ███████████████████████████
███████████████████████████████████████████████████████ YPF Mot. at 62, n. 82. In fact, YPF's argument that bankruptcy discussions less than a year after closing an acquisition and weeks before transfers of a subsidiary's entire business line are "standard" or normal business practice, is completely contrary to the approach taken by the *Tronox II* defendants. There, the transferees were so concerned with the contemporaneous consideration of bankruptcy in their files that they took the extreme step of trying to delete any references to bankruptcy in their files. *Tronox II,* 503 B.R. at 281.

42

Crescendo interests to Maxus's financial wherewithal and overall asset portfolio, the Maxus Board never met to discuss the Crescendo Transfer at all.  SOF ¶ 80.

Equally unavailing are Defendants' contentions that the use of sale proceeds to pay down third-party debt and that the corporate streamlining of the "environmental restructuring" are both proof of "good intent" in the 1996-1997 Transfers.[27]  The key strategy memoranda to the YPF Board shows that ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████  Smith Decl. Ex. 21 at MLT00238952 (cited in Smith Decl. Ex. 18 at 32, n. 80).  In the YPF advisors' "judgment" at the time, ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[27]  In one paragraph of its opposition, YPF ███████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████  YPF Mot. at 61-62.
Notably, YPF does not disclaim that the environmental restructuring (nor the purported business purpose behind the environmental restructuring) was a motivating factor for the 1996-1997 Transfers.  In any case, separating Maxus's environmental liabilities to allow for separate management and financial reporting appears to be nothing more than an after-the-fact justification that makes no rational business sense.  Nothing about the environmental issues was rendered more manageable by having Maxus's professionals (like Dave Rabbe) move to a sister subsidiary, and the idea that Maxus's overall financial performance would be viewed favorably by the market is at odds with YPF's contemporaneous decision to move Maxus's productive international assets out of Maxus in the next years.

AMERICAS 114201192

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

Ultimately, Defendants' defense for the legitimacy of their acts is rooted in their contention that "YPF and Maxus always intended to pay fair market value for the assets" (YPF Opp. at 15) and that ████████████████████████████████████████████████████████ ████████████."[28] (Repsol Opp. at 56).  But, the ████████████████████████████████ ██████████████████████████████████████████████████████ ████████[29]  In any event, Defendants own experts have concluded that not all of the assets were, in fact, sold for reasonably equivalent value.  Trust Mot. at 59-60.  Simply, transactions at FMV is not a license to engage in illegal transfers, as discussed in greater detail in Section III.D.7 below— even when a transaction was, in fact, made for reasonably equivalent value, a court may still find it was still done with actual intent to hinder, delay or defraud creditors.  *Hawkins v. Lister (In re Lister),* Nos. 08-13738-B-7, 09-1140, 2011 Bankr. LEXIS 5579, at *21 (Bankr. E.D. Cal. Mar. 30, 2011) ("If property is transferred with actual fraudulent intent, then the questions of 'reasonably

---

[28] As noted throughout, the Trust objects to Defendants' last-minute subject matter waivers and will address the issue in subsequent pleadings, if necessary.
[29] Smith  Decl.  Ex.  142  at  MLTLEGACYESI_002711990 ████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

44

equivalent value' and insolvency, while still relevant as possible 'badges of fraud,' are not required as elements of a claim.")

C.  **Despite Defendants' Efforts to Feign Confusion and Manufacture Issues of Fact, the Trust Is Entitled to the Relief It Seeks With Respect To Each of the Intentional Fraudulent Transfers.**

As set forth in the Trust's Motion, the Trust clearly articulated the relief sought and the statutory requirements for finding that each of the Intentional Fraudulent Transfers is an avoidable transfer.  Trust Mot. at 41-46.  Reading the Counts in the Complaint and Motion together (as one must), it is clear that, by the Motion, the Trust seeks partial summary judgment establishing: (1) YPF's liability on its actual fraudulent transfer claims against YPF with respect to the 1996-1997 Transfers of the Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets (Counts IV, VI, VII, and X); (2) YPF *and* Repsol's liability on its actual fraudulent transfer claims with respect to the Crescendo Transfer (Count XII); and (3) YPF and Repsol's liability on its actual fraudulent transfer claims with respect to the YPFI Transfers (Count XIV).  Trust Mot. at 40.

Nevertheless, in an attempt to manufacture the appearance of genuine issues of material fact, Defendants simply attempt to sow confusion about what is at issue here.  For example, Defendants state that the Trust "scramble[s] the facts and alleged intent collectively over the transfers" (YPF Opp. at 39), and "improperly aggregates all transactions, lumps together all defendants" (Repsol Opp. at 60-61).  This feigned confusion about what the Trust has pleaded seems to be based on two related mistakes that Defendants make.  Defendants' first (and, in this case, explainable) mistake is its argument that the Trust is seeking summary judgment on Count II (seeking to collapse the intentional fraudulent transfers of Maxus's assets including, but not limited to, the individual 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and the underlying transfers of Maxus's personnel, data, technical resources, and well and other offshore interests which lead to the Settlement Agreements).  The Trust is not moving on Count

AMERICAS 114201192

II.  Defendants' misperception seems to be based on a repeat typo in the Motion which is contrary to the substance and text of the Motion.  *See, e.g.*, YPF Opp. at 36-39, 49, 54; Repsol Opp. at 39-41, 61, 65-66.  The Motion refers to the "the individual 1996-1997 Transfers (Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets) (*Counts II*, IV, VI, VIII, and X)."  Trust Mot. at 40 (emphasis added).  Count II was mistakenly included in the parenthetical defining the 1996-1997 Transfers and then repeated in the title and conclusion of the Motion.  Any confusion as to Count II does not warrant a trial on Counts IV, VI, VIII, and X—Repsol essentially acknowledges that the typo does not comport with the substance of the Motion in a footnote, finding it "curious" that the Trust moves on Count II which includes transfers on which the Trust has not moved for partial summary judgment.  Repsol Opp. at 39, n.29.

Relatedly, Defendants seek to confuse how the Trust seeks to use the extensive, undisputed evidence about Defendants' Strategy—including hundreds of pages of memoranda between Defendants and their legal counsel—and the way the Court should treat that evidence in the context of its analysis of the badges of fraud and *Tronox* collapsing.  YPF Opp. at 36-39; Repsol Opp. at 65; Repsol Mot. at 6, 45-54.  The Trust has now repeatedly articulated that YPF, and later, Repsol, carried out a "single integrated scheme" (the Strategy) to siphon the valuable and profitable assets from the Debtors in order to leave the environmental liabilities stranded in empty corporate shells, the precise strategy underlying multiple transactions that the *Tronox II* court collapsed.  *See* [D.I. 74] at 54-58.  Discovery has confirmed these facts about the Strategy (summarized and undisputed in the Trust's Motion) sufficient to support a finding that the requirements for collapsing are present and that *Tronox II* applies.[30]  All of that is discussed below in Section III.A.3.

---

[30] Given the unique nature of contingent environmental liabilities, something Judge Gropper recognized in *Tronox II* (506 B.R. at 313), when the Strategy began (immediately following the close of YPF's acquisition of Maxus and Andrews & Kurth's due diligence of Maxus's

AMERICAS 114201192

But as laid out in Section II.B of the Motion, *without regard to collapsing*, the record here has confirmed that there is no genuine dispute of material fact that nine of the badges of fraud apply to the Defendants' conduct in carrying out *each* of the Intentional Fraudulent Transfers and the Court can find the legal intent of the Defendants with respect to *each* of claims related to the Intentional Fraudulent Transfers for which the Trust has now moved: the 1996-1997 Transfers, the Crescendo Transfer, and the YPFI Transfers.  Trust Mot. at 44-67.  Put simply, the Trust has asked the Court to analyze the badges of fraud for the Intentional Fraudulent Transfers individually and it has not yet asked this Court to analyze the badges of fraud which might apply to later collapse-able transactions (including the Settlement Agreements and underlying conduct leading to the Settlement Agreements and Project Jazz).

### D.    There is No Genuine Dispute of Material Fact that the Badges of Fraud Provide Conclusive Evidence of Defendants' Intent to Defraud, Delay, or Hinder Maxus's Environmental Creditors

Having cleared up any purported confusion regarding what is and is not at issue in the Trust's Motion, we turn now to the badges of fraud.

### 1.    Badge 1: The Transfers Were Made to Insiders

As stated in the Trust's Motion, 8 of 10 transactions that make up the Intentional Fraudulent Transfers were indisputably made to insiders.  Trust Mot. at 49-50.[31]  Defendants' challenges to

---

environmental liabilities recognized the potentially catastrophic liabilities associated with the DASS) YPF had no idea how long the Strategy would last.  But the last step in the Strategy—a bankruptcy filing of Maxus and its subsidiaries if and when the "catastrophic" liability at the DASS was about to come due, was always clear.  Ultimately, while the Strategy lasted for twenty years, continuing well past the time that the Intentional Fraudulent Transfers on which the Trust has now moved took place, the evidence in the record about the Strategy may be used in the Court's consideration of the Defendants' actual intent to hinder, defraud or delay its creditors during the part of the timeline most relevant to the Intentional Fraudulent Transfers that are the subject of the Trust's Motion.

[31] Both Defendants make hay of the fact that the sale of the Crescendo assets and sale of the Indonesia Assets from YPFI in 2002 were made to third parties.  The Trust does not dispute that and stated the same in the Motion.  Trust Mot. at 17.

47

this badge are that (1) Maxus's "disinterested directors" controlled the decision to enter into the 1996-1997 Transfers, not YPF (YPF Opp. at 41), (2) the sale of the Crescendo assets and sale of the Indonesia Assets from YPFI in 2002 were to third-parties and that the YPFI Transfers were not made from a Debtor, and (3) the YPFI Transfers were not made by a Debtor.  YPF Opp. at 43-44; Repsol Opp. at 43-44.  None overcome the simple, undisputed facts here.

*First*, YPF's argument regarding board involvement is based on a purposeful selective definition of an insider under the Delaware Uniform Fraudulent Transfer Act (DUFTA) which would exclude "affiliates."  Even under its selective definition, YPF's argument fails because it mischaracterizes the "control" relevant to the analysis.  YPF appointed a majority of Maxus's directors (5 of 8) and YPF was Maxus's sole shareholder.  That, as a practical matter, the disinterested directors also needed to approve the 1996-1997 Transfers, does not mean the disinterested directors had "control."  Under Delaware law, a shareholder is deemed to have control if the shareholder owns a majority of the voting stock.  *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) ("[I]t is well established in the corporate jurisprudence of Delaware that control exists when a stockholder owns, directly or indirectly, more than half of a corporation's voting power.").

*Second*, each of the 1996-1997 Transfers were made from one set of YPF subsidiaries (Maxus and its subsidiaries, MIEC and Maxus Indonesia) to another YPF subsidiary (YFPI), *i.e.*, from one affiliate to another.  While the Crescendo assets were sold to a third party, all of the proceeds from that sale—the money the Trust now seeks to recover from the Defendants—indisputably went from one set of Repsol subsidiaries (Maxus and its subsidiary, Midgard) to Repsol or a Repsol subsidiary (YPF, as a result of the $262.1 million in debt repayments to YPFI which were ultimately dividended up to Repsol, with the $325 million remainder of the proceeds

48

going to RIF in the form of a loan with a below LIBOR rate of interest). Trust Mot. at 17-18; SOF ¶ 85. Each of the YPFI Transfers in 2001-2002 of the legacy Bolivia, Ecuador, and Venezuela Assets, were made from one Repsol subsidiary (YPFI) to other Repsol subsidiaries (Repsol YPF Santa Cruz S.A., Repsol YPF Ecuador, Repsol Exploracion S.A., and Repsol Exploracion Venezuela B.V. respectively). The proceeds from the YPFI Transfers also were first used to cancel or pay down intercompany debt or otherwise dividended to YPF (SOF ¶¶ 88, 90, 93, 95), and then dividended up to Repsol. YPF SOF ¶ 450. Given the foregoing, there is no legitimate dispute that the transactions at issue here involved transfers made to insiders.

2.    **Badge 2: The Debtors Retained Possession or Control of the Property Transferred After the Transfers**

As described in greater detail in the Motion, prior to the 1996-1997 Transfers, Maxus's management ran its international E&P operations from Maxus's office in Texas, subject to the oversight of the Maxus Board. After the 1996-1997 Transfer and through the Repsol acquisition and completion of the YPFI Transfers in 2002, Maxus's management ran its former E&P operations from Maxus's office in Texas, subject to the oversight of the Maxus Board. Trust Mot. at 51. Neither YPF nor Repsol dispute (because they cannot) that the day-to-day management of the international E&P assets by the MMG (a fictional corporate family run by Maxus employees) remained largely unchanged after the 1996-1997 Transfers until the completion of the YPFI Transfers. Indeed, YPF states that expert testimony would establish that ██████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████     YPF Opp. at 44-45.[32]

---

[32] For its part, Repsol argues that the Trust's evidence with respect to the MMG is inapplicable as to Repsol because the "Maxus Management Group ceased to be used after Repsol acquired YPF."—which Repsol incorrectly attributes to the Trust. Repsol Opp. at 44. To the contrary, the

AMERICAS 114201192

Instead, Defendants essentially argue against a finding of this badge of fraud because

███████████████████████████████████████████████████ YPF Opp. at 45.  But that

argument completely ignores that the analysis with respect to the control of the transferred property

is from the perspective of an outsider.  *See, e.g.*, *In re Collins*, 540 B.R. 54, 60, 66 (Bankr. E.D.N.Y.

2015) (finding that a debtor retained control of his transferred business when he became an

employee of the new business, and ran the business with the same proprietary information, trade

secrets, contacts, and computers in the same space as the prior business); *Yoo v. Garoian (In re*

*Garoian)*, No. 2:10-bk-20883 RK, 2014 Bankr. LEXIS 5254, at *73-74 (Bankr. C.D. Cal. Oct. 7,

2014) (holding debtor retained possession or control of his transferred dental practice assets when

he continued to work as a dentist in the same office his transferred business was located in, under

the nominal control of the new owner, and treated the dental practice assets as his corporation's

own on the corporation's tax return that year); *United States v. White-Sun Cleaners Corp.*, No. 09-

cv-2484 (ARR) (JO), 2011 U.S. Dist. LEXIS 36470, at *32-33 (E.D.N.Y. Mar. 9, 2011) (finding

transferor still controlled his transferred business when he continued to manage the business, and

employees, who were not informed of the change of ownership, continued to report to him).  YPF's

proffered facts—████████████████████████████████████████████████████

██████████████████ (YPF Opp. at 45)—only serve to underscore the Trust's point in the Motion

that any change in the operation of the international E&P assets following the 1996-1997 Transfers

was "on the books" only.  From the outside, everything remained the same: prior to the transfers,

---

uncontroverted evidence here demonstrates that for at least the three years between Repsol's
acquisition of YPF and the completion of the YPFI Transfers, the MMG managed the operations
of Maxus's legacy assets for YPFI.  Trust Mot. at 51.  Additionally, to the extent the question
whether YPFI and Maxus were alter egos is determined at trial, the undisputed facts concerning
the existence, purpose, and use of the MMG between the 1996-1997 Transfers and the 2001-2002
YPFI Transfers to Repsol affiliates is highly relevant to that alter-ego inquiry.

50

Maxus had an office in Texas, with employees who ran its assets world-wide.  After the transfers, there was still one office and one set of employees who ran the assets.  The fact that, internally, there was a new corporate entity (YPFI), a new intercompany payment arrangement, and a new board and management for that entity (comprised of Maxus officers and directors) does not change anything insofar as Badge 2 is concerned.

### 3.    Badge 3: The Transfer or Obligation Was Disclosed or Concealed

As stated in the Motion, the Trust acknowledges that certain public disclosures about the existence of the Intentional Fraudulent Transfers were made, but that material disclosures about the scope of Debtors' potential environmental obligations and their effects on the Debtors' ongoing wherewithal, were never made.  Trust Mot. at 52-53.  In challenging this badge, YPF argues that the inclusion of some details regarding "remedial efforts" and some details about YPF's "contributions to Maxus for the debt restructuring"—were sufficient to disclose the "effect" of the Intentional Fraudulent Transfers "on Maxus's ongoing solvency, creditworthiness, or profitability."  YPF Opp. at 45-46.  Not true.  As an initial matter, neither Defendant disputes that Maxus only ever disclosed a small fraction of expected future environmental obligations (i.e., a two-year forecast of expected outflows) and never disclosed any expected costs of *any* remediation for the DASS, having taken the position with its auditors that the amount of that liability not both probable and estimable.  *See* Trust Mot. at 16.

In any event, as discussed more fully in the Trust's responses to Defendants' statute of limitations arguments, Section III.A, *infra*, Maxus's public disclosures never disclosed that, as a result of the Intentional Fraudulent Transfers, Maxus did not have the asset base or cash flows to pay even the long-tailed environmental obligations when they came due.  It bears repeating once again that Defendants have not produced a *single* business plan or projection created after the 1996-1997 Transfers (much less one disclosed to creditors) reflecting any expectation that the

<div align="center">51</div>

Debtors would ever be cash flow positive over any projection period.

For its part, Repsol argues that, in order to prevail on this badge of fraud, the Trust must prove that the environmental liabilities were in the billions of dollars in the mid to late 1990s and early 2000s and further that Repsol knew that to be case.   Repsol Opp. at 45-46.   That misunderstands the Trust's argument and seeks to impose an inappropriate, unsupported test.  The Trust has demonstrated by undisputed evidence that both Defendants *and* Maxus understood at the time of each Intentional Fraudulent Transfer that, while a final remedy at the DASS might have remained uncertain, Maxus's potential future environmental liabilities were far in excess of what was actually reserved on Maxus's published balance sheets.[33]  The Trust has also demonstrated by undisputed evidence that those liabilities were, at a minimum, going to be in the nine digits and could, depending on the remedy selected for the DASS, bleed far into the ten digits.  SOF ¶ 129. Repsol attempts to dismiss the Trust's record regarding early estimates of Maxus's potential liability at the DASS, for example, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████ as "random pieces of paper" with "big numbers" on them that cannot be "connected" to Repsol.  Repsol Opp. at 46 (citing to Repsol SOF ¶¶ 58, 69-75).  The Trust addresses Repsol and YPF's mischaracterizations of the facts with respect to these documents in the Trust's Response to YPF SOF and the Trust's Response to Repsol SOF and Counterstatement.  Simply, far from being a wildly hypothetical possibility, there is a bevy of contemporaneous documentation from both within the corporate group and without, that extensive dredging and an associated

---

[33] *See* Smith Decl. Ex. 55 at YPF_MAXUS_0000293078 ██████████████████████

████████████████████████████████████████████████████████

AMERICAS 114201192

liability starting with a "B" was very much on the table for the DASS. In an attempt to deflect

from that point, Repsol states that "Maxus's own witnesses" disclaimed the reliability of particular

documents mentioning liabilities in the billions.  Repsol Opp. at 46.  But, as the badge of fraud

jurisprudence predicts, it is not surprising that Maxus employees who worked for nearly twenty

years at a corporation directly and indirectly owned by YPF and Repsol, and worked arm-in-arm

with YPF and Repsol employees defending against the NJ Department of Environmental

Protection and OCC litigation, would articulate views consistent with YPF and Repsol's self-

serving or pretextual justifications for the transfers and management of Maxus's environmental

liabilities.  But, the documents are the documents, and several key pieces of that evidence, notably

the November 1995 EA report, the draft EA EE/CA, and meeting minutes ███████████████████

████████████████████████████████████████ were never addressed, much less explained away, by

any fact witness in the almost two decades of continuous litigation.  Again, "[c]ourts routinely

look to badges of fraud as circumstantial evidence of a debtor's subjective state of mind as more

reliable than after-the-fact testimony." 5 Collier on Bankruptcy P 548.04 (16th ed. 2022).

*Finally*, both YPF and Repsol argue that, because certain creditors, including OCC and

EPA would have been "aware" of the facts and circumstances informing the amount of Maxus's

contingent environmental liabilities, they were not "secret."  YPF Opp. at 46; Repsol Opp. at 46.

That certain of the Debtors' more sophisticated creditors may have had additional insight into the

ongoing regulatory developments at the Passaic River—and no proof is offered on that point—is

of no moment.  The Trust stands in the shoes of all of the Debtors' creditors, not just a few.

### 4.    Badge 4: Before the Transfer Was Made or Obligation Was Incurred, the Debtors Had Been Sued or Threatened with Suit.

In contesting this badge, YPF argues that, because litigation concerning Maxus's

environmental remediation and indemnification obligations were pending for several years before

AMERICAS 114201192

and after the Intentional Fraudulent Transfers, the timing of the transfer[s] cannot be found to be "motivated to avoid the consequence of that litigation." (YPF Opp. at 47). As described in the Motion, the undisputed record makes clear that the timing of each Intentional Fraudulent Transfer was directly related to YPF's and Repsol's appreciation of, and desire to avoid, the "consequence" of Maxus's future environmental obligations coming to fruition in regulatory, if not judicial, proceedings. Trust Mot. at 10-20. The 1996-1997 Transfers (and indeed the beginning of the Strategy itself) occurred shortly after YPF realized that YPF itself could be on the hook for "the consequences" of Maxus's uncertain, but potentially significant contingent obligations. As the record shows, almost immediately after the closing of the Merger Agreement in 1995, Maxus, YPF, and YPF's advisors learned of several developments—including sediment sampling data ██████████████████████████████ (Trust Mot. at 10-11), the November 1995 EA report that suggested ████████████████████████████████ ████████ id. at 11), and the November 1995 OCC lawsuit seeking a declaratory judgment against Maxus to affirm Maxus's indemnification obligations relating to the DASS (id. at 54)— that revealed to YPF and its advisors one key point: while the exact amount of remediation may have been uncertain, the scope of Maxus's environmental obligations with respect to the DASS had the potential to be catastrophic to their investment.[34] And, it is undisputed that shortly after these developments, in a December 1995 memo, ████████████████████████.[35]

Similarly, "shortly after the [Repsol] acquisition of YPF" and its indirect control of Maxus, Repsol received an introduction ████████████████████████████ ████████ Smith Decl. Ex. 129 Tr. at 109:8-15. While Repsol argues there is no evidence that

---

[34] See Repsol Counter SOF ¶¶ 89-90; YPF SOF ¶¶ 202-210.
[35] YPF SOF ¶¶ 281-287.

AMERICAS 114201192

Repsol was advised the environmental liabilities were "substantial (i.e. billions)," Repsol Opp. at 45, there is plenty of undisputed, contemporaneous evidence that Repsol was advised "shortly after the acquisition" that ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Then, within months after the Repsol acquisition, Repsol proceeded to transfer Crescendo, representing virtually all of Maxus's remaining productive assets, away from those liabilities.  Similarly, the YPFI Transfers in 2001 and 2002 were made around the same time as significant developments at the DASS, at a time when Repsol was receiving annual updates on Maxus's environmental liabilities. Trust Mot. at 16 (citing Smith Decl. Ex. 133 at Tr. 184:12-21); SOF ¶ 105.

Ultimately, Defendants' arguments on this badge boil down to an unsupported contention that the badge only applies when a litigation outcome becomes certain.  But as the case law recognizes, no litigation outcome is ever certain.  *See Springel v. Prosser (In re Innovative Commun. Corp.),* Nos. 07-30012, 08-3004, 2011 Bankr. LEXIS 3040, at *119 (Bankr. D.V.I. Aug. 5, 2011) (finding presence of the fourth badge of fraud when "Debtors were facing litigation and clearly analyzing potential liability."); *Tronox II,* 503 B.R. at 284 (in finding actual fraud, the Court's analysis of badge four was limited to "Kerr-McGee of course had been in litigation for years regarding its environmental and tort liabilities. As one example . . .[it] received a demand from the EPA for $179 million in remediation costs at Manville, New Jersey.").[36]

More important, the emphasis on certainty ignores the nature of the environmental liabilities that Maxus faced.  In that regard, Defendants offer as an "uncontested fact" that the

---

[36] The handful of other "facts" YPF introduces concerning this badge are either not material or are very much in dispute.  *See, e.g.,* Trust's Response to YPF's SOF ¶¶ 76, 463.

AMERICAS 114201192

environmental remediation obligations are by nature "uncertain" and can take years to be determined.  Repsol SOF ¶ 138; YPF SOF ¶ 283.  At the same time, Defendants' position on the badge would leave all environmental creditors in an untenable position: if Defendants' argument is correct, any company facing uncertain, to be determined environmental liabilities (no matter how devastating they could potentially be to that company's financial wherewithal), may freely transfer any and all of their assets any time prior to the EPA, in effect, issuing a bill.

    5.    **Badge 5: The Transfer Was of Substantially All of the Debtors' Assets.**

In contesting this badge of fraud, Defendants argue that there are disputed issues of fact related to whether the 1996-1997 Transfers "fundamentally changed" Maxus and the Crescendo Transfers "fundamentally changed" Maxus.  YPF Opp. at 49; Repsol Opp. at 48-50.  Taking each in turn, the record makes clear that Maxus indisputably "fundamentally changed" *both* after the 1996-1997 Transfers and again after the Crescendo Transfers.  *See In re Vaso Active Pharms.*, No. 10-10855 (CSS), 2012 Bankr. LEXIS 4741, at *45 (Bankr. D. Del. Oct. 9, 2012) (Sontchi, J.) (finding that a transfer of 48% of the debtors' assets would constitute a fundamental change in the company and qualify as an avoidable unauthorized post-petition transfer).

As laid out in the Motion, prior to the 1996-1997 Transfers, Maxus was one of the largest independent oil and gas exploration and production companies, with significant international and domestic assets.  Trust Mot. at 56.  After the 1996-1997 Transfers, Maxus was stripped of its primary revenue producing E&P assets (with the exception of its Crescendo asset).  Trust Mot. at 56. YPF's argument that the "Global Restructuring," in addition to admittedly decreasing Maxus's asset base, also cut off Maxus's funded debt liabilities is easily dismissed.  YPF Opp. at 49. Through the Global Restructuring, YPF replaced Maxus's less expensive, public debt (which was guaranteed by YPF) with significant intercompany debt to YPF and then used the consideration from the 1996-1997 Transfers to pay off Maxus's debt to YPF (for YPF's benefit).  Trust Mot. at

13.  And, as discussed above at the Omnibus Reply at 13, one key purpose of the debt restructuring was to reduce the perceived risk that stakeholders would bring litigation claims as a result of the 1996-1997 Transfers.  In sum, before the 1996-1997 Transfers—Maxus was an international E&P company with approximately $2.9 billion in book assets.  Trust Mot. at 56.  After, it was a domestic E&P company with $1 billion in book assets.  Repsol Opp. at 49.  That is a fundamental shift.

The Crescendo Transfer fundamentally changed Maxus once again, contrary to YPF's contention.  The *totality* of Maxus's domestic assets—which consisted primarily of Maxus's interests in Crescendo—were reduced to $26 million following the Crescendo Transfer, and that Maxus's annual operating revenue declined to just over $4 million dollars.  Trust Mot. at 18 (citing Smith Decl. Ex. 138 at MAXUS-E-0003420, 3423).  How could that be any more "fundamental"?

For its part in analyzing this badge, Repsol argues that Maxus received the consideration from the Crescendo Transfer it orchestrated.  Repsol Opp. at 49.  However, as discussed above (Section II.C), the proceeds from the Crescendo Transfer were not invested in new, significant E&P producing assets.  Instead, it is undisputed that more than 40% of the consideration from the Crescendo Transfer was used to pay off debt to YPF, which Repsol points out was not debt paid to Repsol.  Smith Decl. Ex. 137 ¶ 135.  Even so, the proceeds used to pay down Maxus's debt to YPF were ultimately dividended up from YPF to Repsol (undisputedly for the benefit of YPF and Repsol).  Trust Mot. at 18; Smith Decl. Ex. 137 ¶ 140.  The remainder of the proceeds—after a full year in which Repsol (not Maxus) considered how best to direct Maxus to use the proceeds— was ultimately put into a loan to a Repsol cash management entity (RIF) at below LIBOR rates.  Trust Mot. at 17-18; Smith Decl. Ex. 137 ¶ 140.  While the loan was paid back to Maxus as Maxus made requests for its cash needs over the next four years, the majority of those funds were spent on Maxus's backward-looking environmental obligations.  Only a small fraction was spent on

AMERICAS 114201192

forward-looking exploratory assets that Maxus's business was originally built around before the transfers.  Trust Mot. at 18.

### 6.    Badge 7: The Debtors Removed or Concealed Assets.

YPF argues that the Trust has failed to support this badge with "legal authority."  YPF Opp. at 50.  But the legal authority is clear, this badge may be found when an asset is transferred or sold into a foreign jurisdiction, especially in order to make it harder for creditors to access.  *See, e.g.*, *Jet Midwest Int'l Co. v. Jet Midwest Grp.*, No. 5:18-cv-06019, 2020 U.S. Dist. LEXIS 159166, at *189-91 (W.D. Mo. May 26, 2020) ("removal of assets" badge of fraud satisfied when share certificates were assigned to a recipient located outside the jurisdiction); *Leonard v. Superpumper, Inc.*, No. CV13-G2663, 2019 Nev. Dist. LEXIS 712, at *65 (2d. Dist. Nev., Mar. 28, 2019) (interpreting Nevada equivalent of DUFTA and finding debtor met "removal of assets" prong when he transferred corporate interests out of Nevada to corporation incorporated in New York). While YPF demurs that the "sole purpose" behind the 1996-1997 transfers was to "rationalize taxes and reduce Maxus's oppressive third party debt and preferred stock" (YPF Opp. at 51) –a characterization which is not at all supported by the record in this adversary proceeding—YPF can only minimize, and does not dispute, the Trust's evidence.  The Chief Tax Counsel at Maxus described to YPF's International Tax Manager that ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████    Trust Mot. at 59, n. 77.

For its part, Repsol argues that, with respect to the YPFI Transfers, this badge cannot be met because the concealment at issue would be carried out by the non-debtor YPFI and it would be "nonsensical" to claim there were concealment or removal by Repsol "offshore" affiliates to purchase (already offshore) assets.  Repsol Opp. at 50.  As the Trust made clear in its Motion, the

salient issue for analyzing this badge is whether the assets were removed steps farther away from

the potential claims of U.S. creditors.  Trust Mot. at 58. The undisputed evidence shows that ███

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████    Smith Decl. Ex. 207 at DEDES-YPF-AK-PRIV0000259.  When the assets

were transferred from YPFI to Repsol offshore affiliates, the assets were both removed from the

Maxus/YPFI corporate group and were moved away from their creditors' claims by at least one

more international layer of the corporate form.

       7.      **Badge 8: The Value of the Consideration Received by the Debtors Was Not Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred.**

As stated in the Trust's Motion, in order to assess whether a transfer has been made for

reasonably equivalent value, a court must evaluate the totality of the circumstances, including three

factors: (1) the fair market value of the benefit received as a result of the transfer; (2) the existence

of an arm's length relationship between the debtor and the transferee, and (3) the transferee's good

faith.  Trust Mot. at 58 (citing to *In re Vaso*, 2012 Bankr. LEXIS 4741, at *56) (quoting *In re Jevic

Holding Corp.*, Adv. No. 08-51903, 2011 Bankr. LEXIS 3553, at *27–28 (Bankr. D. Del. Sept.

15, 2011)).  As discussed in the Motion and in Section II.C.1 above, there is no disputed issue of

material fact that each of the Intentional Fraudulent Transfers was made to insiders, and therefore,

"inherently suspect because they are rife with the possibility of abuse." *In re LATAM Airlines Grp.

S.A.*, No. 20-11254 (JLG), 2022 Bankr. LEXIS 248, at *38-39 (Bankr. S.D.N.Y. Jan. 28, 2022)

(internal quotations omitted).

As further stated in the Trust's opening brief, the question of the first factor here, fair

market value, may be a triable issue.  Trust Mot. at 59.  And, Defendants agree there will be a

"battle of the experts" regarding the reasonably equivalent value of the assets involved in the

AMERICAS 114201192

Intentional Fraudulent Transfers.[37]  YPF Opp. at 52; Repsol Opp. at 51.  Nevertheless, as pointed out in the Trust's opening brief, even Defendants' own experts have conceded that sales of the Ecuadorian Assets and Indonesian Assets sold to YPFI in the 1996-1997 Transfers were sold for hundreds of millions of dollars less than fair market value.  Trust Mot. at 60 (noting that Ms. Bramer ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ Defendants have no answer to these facts.

In challenging this badge, Defendants then both emphasize in their opposition briefs that the Debtors and Defendants attempted to obtain "fair, objective valuations" and to sell Debtors' assets for fair market value.  YPF Opp. at 53; Repsol Opp. at 52.  However, the mere attempt to sell an asset for market value will not bar a finding of actual fraudulent intent.  *See In re Norvergence, Inc.*, 405 B.R. 709, 729 (Bankr. D.N.J. 2009) ("Regarding intent, the absence of any of the enumerated badges of fraud will not preclude the finding of actual fraud"); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 565 (Bankr. D. Del. 2012) ("The presence or absence of any single badge of fraud is not conclusive.  The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.").  More important, there is nothing in the record that would suggest that Defendants and Debtors wanted to sell the assets involved in the Intentional Fraudulent Transfers for fair market value specifically because

---

[37] This battle of the experts is also likely to include testimony concerning the credibility of the various contemporaneous valuations of the underlying assets involved in the 1996-1997 Transfers, including the internal Maxus Corporate Model (or MCM) and contemporaneous valuations conducted by third-parties (CSFB and Gaffney Cline).

AMERICAS 114201192

they were trying to preserve value for Maxus and its environmental creditors.  To the contrary, the contemporaneous record here shows that, as early as March 1996, █████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████  Smith Decl. Ex. 207.  Accordingly when YPF decided to move forward with the Global Restructuring, and separated Maxus productive international E&P assets from its environmental liabilities, YPF had decided to transact whether Debtors received reasonably equivalent value in the 1996-1997 Transfers or not.  The proceeds from the 1996-1997 Transfers were likewise used to forgive intercompany loans or pay down Maxus's funded debt obligations to YPF—which YPF had, in fact, guaranteed.  SOF ¶¶ 60, 65, 72.  With respect to the YPFI Transfers, Repsol contends that the Trust's expert, Mr. Barry Pulliam, does not dispute that the YPFI Transfers were not for less than reasonably equivalent value.  Repsol Opp. at 12, 59.  But, as noted above, Repsol misses the point.  The proceeds of the Crescendo Transfer and the YFPI Transfers were dividended up to YPF and ultimately to Repsol.  YPF SOF ¶ 450.  It is well established that dividends and distributions are not reasonably equivalent value as a matter of law. *In re SemCrude, L.P.*, 2013 WL 2490179, at *5 (Bankr. D. Del. 2015) ("The Bankruptcy Code defines 'value' as 'property, or satisfaction or securing of a present or antecedent debt of the debtor...' Case law teaches that equity distributions on account of partnership interests do not confer 'value' upon the transferor."); *see also Michaelson ex rel. Appleseed's Litig. Trust v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 300 (D. Del. 2012) ("Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some of the payments are a return of capital, constitutes reasonably equivalent value."); *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011) ("[A] dividend is not an exchange for reasonably equivalent value[.]").

61

8.    **Badge 9: The Debtors Were Insolvent or Became Insolvent Shortly After the Transfer Was Made or the Obligation Was Incurred.**

As laid out in the Trust's Motion, it is undisputed that the liabilities related to the DASS have existed since the time contaminants were discharged, decades before YPF, Repsol and even OCC came onto the scene.  Trust Mot. at 4-6, 63.  It is also undisputed that potential remediation costs at an environmental site like the DASS could vary wildly ███████████████ ██████████  Trust Mot. at 65; YPF Opp. at 60.  It is further undisputed that, whatever may have been foreseeable in the 1990s, by the time they filed for bankruptcy in 2016, the Debtors ultimately were massively insolvent as a direct result of the environmental liabilities that they had incurred decades before.  *See* Lee Decl. Ex. 4 at 13-23, 54; SOF ¶¶ 44-45.

In its Opposition to a finding of this particular badge, Defendants first argue that solvency is typically a fact specific question which often requires a "battle of the experts" and a trial.  YPF Opp. at 55; Repsol Opp. at 52, 57.  The Trust does not disagree with the general proposition and stated as much in its Motion.  Trust Mot. at 61.[38]  The Trust's expert, Stephen Johnson, will testify at trial that, ████████████████████████████████████████████████████ ██████████████████████  Smith Decl. Ex. 94 at 94.  The Defendants' experts will testify that, ██████████████████████████████████████████████████████████████████ ████████████████████████████.  Smith Decl. Ex. 6 at 306.  But those are issues for trial.

For present purposes, Defendants' argument on this badge essentially seems to be that unless the Trust can show that Defendants *actually* concluded the remediation costs would run into the billions of dollars at the time of the Intentional Fraudulent Transfers, the Trust will not have

---

[38] The Trust also stated in its Motion, while solvency is an element of the Trust's constructive fraudulent transfer claims, it is not an element of the Trust's intentional fraudulent transfer claims on which it has moved for a finding of liability on summary judgment.  Trust Mot. at 61.

AMERICAS 114201192

sufficiently demonstrated the insolvency badge of fraud.  YPF Opp. at 56; Repsol Opp. at 57.

Defendants miss the point.  The focus in analyzing the solvency badge (just like every other) is to address the conduct at issue in seeking to hinder, delay or defraud creditors.  The mere fact that a known future liability has uncertainty about an actual liquidated amount should not provide license for a debtor and its shareholders to transfer substantially all of the debtors' assets and use the proceeds to pay off those creditors whose claims were liquidated and who could protest.  Defendants certainly cite no cases that say so.  In any event, there is an extensive record of contemporaneous evidence establishing that Maxus and Defendants *in fact* knew of the *certainty* that there would be some amount spent on a DASS remedy (even if that remedy was "No Action" or "MNR") coupled with the *possibility* that the EPA might select an active and expensive remedy to clean up the DASS before, during, and after each of the Intentional Fraudulent Transfers.  Trust Mot. at 6-8, 16-18.  Further, for the period after the close of YPF's acquisition until the Debtors filed for bankruptcy, the record does not contain: (1) a single solvency analysis of Maxus; (2) any evidence that Maxus or Defendants hired an environmental consultant to estimate the *total* remedial costs for the DASS or even provide a range of outcomes and their probabilities;[39] nor (3) even one traditional three-to five-year business plan (created after the 1996-1997 Transfers) that would reflect any expectation that Debtors would ever be cash flow positive over a projection

---

[39] Here, Repsol's expert Dr. Neil Ram takes an extreme position and ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As a matter of policy, it is not good corporate behavior to assume away a contingent liability, then eventually hire someone to estimate a reasonable range of costs associated with that liability, and, when presented with an unfavorable, partial analysis decide not to analyze it any further.

AMERICAS 114201192

period.[40]  Defendants also assiduously avoid any discussion of Dave Rabbe's conceding ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████  Smith Decl. Ex. 184 at Tr. 318:24-3:18-20.  In

short, blind ignorance as to solvency does not bespeak solvency.

9.     **Badge 10: The Transfer Occurred Shortly Before or Shortly After a Substantial Debt Was Liquidated.**

YPF asserts that this badge cannot be met because the remedial costs at the DASS were

not liquidated until 2016, "*twenty* years after the first transaction at issue here and *fourteen* years

after the last" Intentional Fraudulent Transfer relevant to the Trust's summary judgment motion.

YPF Opp. at 60 (emphasis in original).  But, once again, Defendants miss the key undisputed point,

laid out in the Trust's Motion.  Each of the Intentional Fraudulent Transfers were conceived and/or

took place within the first two years after YPF—and later Repsol—learned of the potential, if

uncertain scope of Maxus's liabilities at the DASS, and the risks those future liabilities posed to

wipe out Defendants' respective investments in Maxus, if and when they were liquidated by the

EPA's selection and imposition of a DASS remedy.  Trust Mot. at 61-62.

YPF's explanations are unavailing.   *First*, that YPF thought Maxus's internal

environmental group was "excellent, with blue chip consultants" who could manage the day-to-

day environmental expenses in no way undermines the fact that, the admitted purpose of the

environmental restructuring and 1996-1997 Transfers was ████████████████████████

████████████████████████████████   Smith Decl. Ex. 114 at DEDES-YPF-

---

[40] Indeed, one of the few planning documents pertaining to Maxus's operations after the 1996-1997 Transfers, a September 2010 YPF Holdings/Maxus presentation addressing "2011 Budget, Ten-Year Plan, Environmental Issues and Other Matters" projected negative cash flow of $437 million, with $337 million in projected site remediation costs and $121 million in projected spend on outside environmental legal costs. Yoo Decl. Ex. 5 at YPF_MAXUS_0000160584.

AMERICAS 114201192

P0000048.  That YPF recognized the potential risk that 

*Second*, while YPF states that "the Trust complains" that environmental restructuring was ▮▮▮▮▮▮▮▮▮▮" (YPF Opp. at 61) it is the undisputed record, including at least two undisputed Andrews & Kurth memoranda that demonstrate ▮▮▮▮▮▮▮▮▮▮▮▮ Trust Mot. at 65; Smith Decl. Ex. 207 at DEDES-YPF-AK-PRIV0000259.

Repsol, for its part, attempts to disclaim knowledge of Maxus's "substantial environmental liabilities" by relying narrowly on what various fact deponents supposedly did not say—ignoring what they did—and ignoring the documentary evidence cited by the Trust or misstating its contents.  Repsol admits that, at the time of its acquisition of YPF, it had knowledge of the "uncertain" scale of the environmental liabilities disclosed in Maxus's SEC filings, and that in 2000 it received "a primer" from Maxus's in-house counsel "on U.S. law." Repsol Opp. at 58-60. To be more specific, the subject of this memorandum, dated barely a year after the acquisition, was Maxus's purported observance of corporate formalities "in an effort to shield its stockholders, first YPF and later Repsol, from Maxus' liabilities to the fullest extent allowed by law" (Soto Decl. Ex. 37 at REP 049), and the memorandum attached a leading Supreme Court opinion on veil piercing in the context of CERCLA liability.  Far from exonerating Repsol, this document powerfully suggests that, very soon after the acquisition, Repsol was aware of significant environmental liability residing within Maxus and concerned enough to seek legal advice about

ways to avoid its imputation to Repsol.  Repsol's argument also ignores the 2001 presentation in which it was advised that ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Trust Mot. at 16.  This evidence certainly is probative enough to have had a Repsol witness with *personal* knowledge ███████████████

████████████████████████████████████████████████████████████

███████████████. Thus, sufficient evidence is before the court to compel a grant of summary judgment against Repsol as to this badge of fraud.  *See, e.g.*, Trust Mot. at 16-17; SOF ¶ 105.

> **E.      None of Defendants' Other Technical Attacks on the Intentional Fraudulent Conveyances Warrant a Trial**

Throughout their papers, Defendants then throw up a grab bag of purported issues of fact and law pertaining to the transfers at issue, none of which are availing.

For its part, Repsol argues that the Trust has not established that Repsol can be held liable for fraudulent conveyance in respect of the Crescendo Transfer or the YPFI Transfers.  Repsol Opp. at 61.  As to the sale of Crescendo, Repsol first raises a technical defense by observing that the Trust has not properly distinguished whether Repsol is a "transferee" or "beneficiary" under Section 550.  Repsol Opp. at 62.  However, Repsol does not articulate how this distinction would preclude recovery by the Trust in respect of its fraudulent transfer claims, and any such contention would be contrary to established law:  Courts recognize that because of the "lack of statutory definitions of [transferee] and 'entity for whose benefit such a transfer was made,' courts [should] consider the particular facts of each case to determine whether a third party should be liable for recovery of an avoided transfer as an entity for whose benefit the transfer was made."  5 Collier on Bankruptcy P. 550.02 (16th ed. 2022); *see also Halperin v. Moreno* (*In re Green Field Energy Servs.*), 2015 Bankr. LEXIS 2914 at *50-51 (Bankr. D. Del. Aug. 31, 2015) (quoting *Official*

66

*Comm. Of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp*.), 178 B.R. 956, 962 (D. Del 1994) "[Section 550] applies on its face to any 'entity' for whose benefit a transfer is made, and contains no express limitation upon the type of 'benefit' required.").

Repsol then contends that the Trust has not established sufficient undisputed facts to prove that Repsol, S.A. benefitted from the "initial" transfer (i.e., the sale of Maxus's Crescendo interests to BP and Apache). Repsol Opp. at 63. However, the Trust has articulated several benefits to Repsol. *First*, the Trust's opening submission demonstrated that the Crescendo Transfer advanced Repsol's parochial economic interests and furthered its overall goal of reducing debt incurred in acquiring YPF. *See* Smith Decl. Ex. 137 ¶ 129; Smith Decl. Ex. 111 ¶ 23.[41] *Second*, the balance of the Crescendo proceeds ($325 million) were held for approximately one year by Maxus without being put to work for Maxus, before they were loaned to Repsol's subsidiary RIF at a below-LIBOR interest rate. Trust Mot. at 17; SOF ¶ 85. Repsol, in turn, used the loan proceeds to reduce the debt it incurred in the YPF acquisition. Smith Decl. Ex. 136 ¶ 23. *Third*, the Crescendo Transfer proceeded against a backdrop of Repsol learning that Maxus's environmental liabilities could comprise, *inter alia,* hotspot dredging on the Passaic River. *See* Mot. at 16-17.

With respect to the YPFI Transfers, Repsol argues that the YPFI Transfers cannot be

---

[41] Specifically, the first $272 million of Crescendo sale proceeds were applied to funded-debt obligations of Maxus that YPF had guaranteed (which YPF knew Maxus would be unlikely to otherwise repay) in the context of the Debt Restructuring, as a necessary step to the effectuate the 1996-1997 Transfers. *See* Trust SOF ¶ 51; Smith Decl. Ex. 137 ¶ 134; *see also* YPF SOF ¶ 441. Repsol's interest in directing the Crescendo Transfer was at odds with Maxus's prior plan to fund its Gulf of Mexico ("GOM") prospects with the steady stream of cash flow Maxus had previously expected from Crescendo and which, post-Crescendo Transfer, Repsol dictated Maxus could only allocate $100 million to develop its GOM prospects through 2005 (as the rest was primarily used to fund Maxus's short-term environmental expenses). Smith Decl. Ex. 111 ¶ 30; Repsol SOF ¶ 64.

AMERICAS 114201192

considered transfers "by a Debtor" or "of the debtor's property" because, at the time, YPFI (not

Maxus) was the nominal owner of the assets sold. Repsol Opp. at 63; Repsol Mot. at Section

III.B.1. Repsol asserts that the Trust cannot establish that YPFI and Maxus were alter egos for

purposes of analyzing the YPFI Transfers because "alter ego cannot be used to alter the identity of

parties to a transaction." Repsol Opp. at 63, n. 52; Repsol Mot. at Section I.C. However, the cases

on which Repsol relies do not stand for this proposition, but address non-Delaware law an

inapposite facts. *See, e.g.*, *Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*, 516 B.R. 163,

169 (Bankr. E.D. Ky. 2014) (speculating as to whether Kentucky law would accept a theory of

reverse veil piercing); *Covey v. Casey's Gen. Stores, Inc. (In re Duckworth)*, Nos. 10-83603, 11-

8104, 2012 Bankr. LEXIS 4379, at *27 (Bankr. C.D. Ill. Sep. 21, 2012) (holding that chain of

general stores was good faith transferee and not subject to liability for fraudulent transfer for credit

transactions with debtor); *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 672 (Bankr. N.D. Ill. 2017)

(opining in dicta that reverse veil-piercing claim, which trustee did not actually allege, may not

have been available under the relevant, non-Delaware, state law). Repsol identifies no court

opinion barring the relief sought by the Trust under *Delaware* law. And, as laid out in the Motion,

there is no genuine issue of material fact that Maxus's legacy international E&P assets—the

Bolivia Assets, Ecuador Assets, and Venezuela Assets—were fraudulently transferred to YPFI as

the 1996-1997 Transfers and managed by the Maxus Management Group (though "on the books"

for YPFI), until the Repsol-directed YPFI Transfers. Trust Mot. at 51.

Repsol also appears to contend that none of the various Repsol entities can be deemed a

"transferee" because the Trust has not shown domination "by any Repsol entity over another

Repsol affiliate as a matter of undisputed fact." Repsol Opp. at 64. But, Repsol does not

fundamentally dispute that the 2001-2002 YPFI Transfers (like the Crescendo Transfer) were part

AMERICAS 114201192

of Repsol S.A.'s continued efforts to (1) reduce Repsol YPF debt levels following the acquisition of YPF in 1999, and (2) isolate Maxus's environmental liabilities. *See* Trust Mot. at 18; *see also* YPF SOF ¶ 450. Repsol also appears to concede that the proceeds from the YPFI Transfers were dividended from YPF to Repsol.[42] *See* Repsol SOF ¶¶ 79-80. Repsol was therefore an entity for whose benefit the YPFI Transfers were made for purposes of Section 550(a) of the Bankruptcy Code, and cannot avoid liability simply because it was not (in every case) a direct transferee.[43] *But see* Repsol Opp. at 65 (conceding that a Repsol entity was the transferee with respect to the sale of Repsol YPF S.A. Santa Cruz and certain Maxus legacy Venezuela assets); *see also* Trust Opposition to Repsol Mot. at Section III (discussing Section 550 of the Bankruptcy Code).

For its part, YPF argues that, although the Trust has cited evidence demonstrating the *YPF Defendants*' intent to hinder or delay creditors, the Trust has failed to make the showing required to impute YPF's intent to the Debtors. YPF Opp. at 39. That contention is, of course, absurd. Dexter Peacock, who wrote the very documents that establish YPF's intent, was (1) a Maxus board member at the time of the transfers, and (2) was Maxus's lawyer. Numerous other Maxus employees and agents were fully aware of what EA was saying right before Maxus divested its entire international business line. In addition, Paul Bohannon, who was also a lawyer for Maxus and YPF, participated in the very meetings in 1995 ██████████████████, received a copy of EA report, and actively participated before the Maxus Board with regard to the transfers. *See,*

---

[42] *Michaelson ex rel. Appleseed's Litig. Trust v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 300 (D. Del. 2012) ("Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some of the payments are a return of capital, constitutes reasonably equivalent value.").

[43] This analysis does not change whether the Court finds that with respect to the YPFI Transfers, the Repsol subsidiaries may properly be viewed as an "immediate or mediate transferee" under the Bankruptcy Code, or in the alternative, YPFI is an alter-ego of Maxus (an inquiry reserved for trial).

69

*e.g.*, Smith Decl. Ex. 107.

In any event, YPF's contention that the Trust must, but cannot, establish that individuals acting on behalf of YPF were in position to dominate or control the Debtor, and that such domination and control related to the transfer at issue is wrong.[44]  *Id.*  The factual record compiled by the Trust fully establishes that YPF dominated and controlled Debtors with respect to the transactions complained of.  It is undisputed that YPF was the sole shareholder of Maxus at the time of the 1996-1997 Transfers and had changed the Maxus Board from thirteen to eight members, with a majority of Maxus Board (five members) appointed by YPF.  SOF ¶¶ 45-46.  With respect to the 1996-1997 Transfers, neither Maxus—nor its three legacy directors not appointed by YPF—were represented by separate counsel with regard to the 1996-1997 Transfers.  To the contrary, Maxus and YPF (counterparties to the asset sales) were all advised by Andrews & Kurth, including lawyer Dexter Peacock, one of the YPF-approved members of the Maxus Board.  YPF SOF ¶¶ 266, 294, 321.  Indeed, YPF relies on cases that suggest imputation of intent would be entirely appropriate here.  *See, e.g., In re Vaso*, 2012 Bankr. LEXIS 4741, at *49-51 ("Cases imputing a transferee's intent to a transferor have typically involved sole shareholders of the transferor, with complete control of the transferor, transferring assets to themselves as a transferee."); *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 711-12 (Bankr. D. Del. 2010) (same).[45]

---

[44] At the outset, YPF supplies no legal authority for its contention that a litigant may not obtain summary judgment on the issue of whether intent for an actual fraudulent transfer claim can be imputed from Party A to Party B if it does not also obtain summary judgment that Party A and Party B are alter-egos.  *See* YPF Opp. at 39.

[45] As the Court will recall, although "the bulk of the evidence weigh[ed] in favor of finding defendants dominated and controlled debtor" in *In re Vaso*, summary judgment was improper "based on the existence of an independent [b]oard of [d]irectors and [one director-defendant's] legal inability to bind Vaso." 2012 Bankr. LEXIS 4741, at *49-51.  However, the Court emphasized that neither director defendant sat on the debtor's independent board.  *Id.*  Similarly,

70

YPF attempts to distinguish its own cases factually by alleging that the "*disinterested directors controlled* whether to execute" the Global Restructuring, including the 1996-1997 Transfers, on the ground that their approval was required pursuant to Maxus's Articles of Control. YPF Opp. at 41 (emphasis in the original).  However, the record here also establishes that the three legacy Maxus board members (a minority of the board) were not advised by separate counsel, YPF SOF ¶¶ 266, 294, 321, and were kept out of the loop of critical information regarding the valuation of the 1996-1997 Transfers.  Smith Decl. Ex. 130; SOF ¶¶ 56-59, 61-62, 66-71.  Critically, there is *no* evidence in the record that Maxus's Board was ever made aware of the potential scope of Maxus's liability in connection with the DASS as reflected in the 1995 EA ███████████ ████████████████████████████████████ or of the 1995 data ███████████████ ██████████████████  Accordingly, YPF has failed to identify a triable issue of fact regarding the legacy Maxus directors' ability (formal, legal or functional) to forestall the 1996-1997 Transfers that could preclude imputation of the YPF Defendants' intent to Debtors for the relevant actual fraudulent transfer claims (Counts IV, VI, VIII, and X).

F.    **There is No Genuine Issue of Material Fact Concerning Repsol's Good Faith Defense**

As their final defense to the Intentional Fraudulent Transfer Claims, Repsol asserts, in conclusory fashion, that it would be improper for this Court to grant summary judgment on the Trust's fraudulent transfer claims against them because they have "a complete affirmative 'good faith' defense pursuant to 11 U.S.C.A. § 548(c) and Del. Code Ann. tit. 6 § 1308."  Repsol Opp. at 58.  Repsol Opp. at 58.  As an initial matter, contrary to Repsol's implication, courts have not hesitated to grant summary judgment on intentional fraudulent transfer claims where, as here,

---

in *In re Elrod Holdings Corp.*, the trustee could not prevail on the intent-imputation issue because the debtors' directors installed by an acquirer maintained formal legal control and were advised by separate legal counsel.  421 B.R. at 712-13.

71

defendants' proffered evidence of "good faith" was insufficient to create a triable issue of fact. *See Ameriserv Fin. Bank v. Commercebank, N.A*., No. 07-1159, 2009 U.S. Dist. LEXIS 24559, at *26 (W.D. Pa. Mar. 26, 2009) (finding that "no reasonable jury could find that Defendant met its burden of proof that it took in good faith within the affirmative defense" provided by the Pennsylvania fraudulent transfer statute); *In re Mongelluzzi*, 587 B.R. 392, 412-13 (Bankr. M.D. Fla. 2018) (holding that transferees had "failed to provide evidence sufficient to withstand summary judgment" on the issue of good faith based on "overwhelming and incontrovertible evidence" that they "deliberately chose not to inquire regarding Debtors' possible insolvency"); *RES-NV CHLV, LLC v. Rosenberg*, No. 2:13CV115DAK, 2015 U.S. Dist. LEXIS 12617, at *10 (D. Utah Feb. 2, 2015) (granting summary judgment in favor of plaintiffs who had "produced evidence of the badges of fraud, whereas defendants have provided only assertions of good faith" and concluding as a result that "this is an instance in which the court can find a fraudulent transfer as a matter of law").

Repsol correctly states that this is an affirmative defense (Repsol Opp. 58) for which they bear the burden of proof. In support, Repsol cites to self-serving testimony from its FRCP 30(b)(6) corporate witness Mr. Blanco (Repsol Opp. at 59), but Mr. Blanco did not begin his employment at Repsol until 2005, years after the fraudulent transfers. They also cite to a statement from Mr. Wadsworth (a lawyer) that "care has been taken to preserve Maxus's assets." Repsol Opp. at 59-60. These meagre pieces of evidence are hardly enough to support Repsol's burden on this affirmative defense, which at the very least should have included testimony from a witness with personal knowledge.

More importantly, Repsol is wrong in asserting that the Trust must prove that Repsol did *not* know that the prior transfers were fraudulent—the question is rather one of inquiry notice:

72

what *should* have Repsol known.  The Third Circuit has been clear that "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge." *In re Bressman*, No. 02-1725, 327 F.3d 229, 236 (3d Cir. 2003); *see also Ameriserv*, 2009 U.S. Dist. LEXIS 24559, at *18-20, 25 (collecting cases and granting summary judgment where "Defendant was in possession of information more than sufficient to affirmatively suggest to a reasonable person" that transfer was fraudulent); *Mongelluzzi*, 587 B.R. at 413 (good-faith defense unavailable to defendants who "just did not want to ask too many questions because they did not want to know too much") (quotations omitted).

Here, Repsol's insistence on what it supposedly did or did not know at or shortly after the time of its acquisition of YPF (Repsol Opp. at 59-60), is belied by the record evidence of regular meetings between Repsol executives and high-level Maxus and Tierra environmental personnel, as well as by the advice Repsol received ████████████████████████████████████ ████████████████████████████████████████████████████████ Smith Decl. Ex. 129 Tr. at 109:8-15; Smith Decl. Ex. 133 at Tr. 184:12-21; Smith Decl. Ex. 134 at MLTLEGACYESI_003215383, 3215391-3215417.

Under the *Bressman* standard, even if its "knowledge of the circumstances of the YPF transfers pre-acquisition was limited to SEC filings," (Repsol Opp. at 59) Repsol would have known (1) that the transfers occurred and that the transferred assets resided at YPFI, and (2) that Maxus had legacy environmental liabilities, including to public creditors like EPA and the state of New Jersey, the amount of which was "unknown" and "could not be reasonably forecasted."  Trust Mot. at 16.  In fact, in late 2004, Repsol retained King & Spalding to perform analyses on its behalf

███████████████████████████████████████████████████████████

███████████████████. SOF ¶ 107. In its due diligence, King & Spalding requested, among many

other things, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████ There is no reason that

---

[46] Repsol in pleadings and statements of facts makes sweeping statements about King & Spalding's advice ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████. Repsol
cannot ask this Court to enter summary judgment in its favor and make myriad findings concerning
what King & Spalding advised Repsol generally based on a handful of documents when Repsol
continues to withhold as privileged other contemporaneous King & Spalding communications. In
that regard, the Trust believes that Defendants are withholding thousands of documents from King
& Spalding, as well as other legal advice and communications pertaining to the Defendants'
potential alter ego liability and Debtors' environmental liabilities.  While YPF makes similarly
improper conclusory statements about advice it received from its advisors (Andrews & Kurth and
Chadbourne & Parke), Repsol's requests that this Court make findings of fact with respect to the
draft King & Spalding memoranda are particularly egregious because, on their face, the Trust has
only two drafts of the memorandum at issue ████████████████████████████████

████████████    ██ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Repsol has never produced a full and final memorandum with all of the

AMERICAS 114201192

Repsol could not have done all of this before they transferred anything.   Under these circumstances, it does not establish Repsol's good faith as a matter of law to assert, essentially, that it simply did not want to ask too many questions and did not want to know too much at the time it acquired YPF.  "Parties who rely on the good-faith defense bear the burden of proving their own good faith," *Mongelluzzi*, 587 B.R. at 412, and Repsol points to no evidence suggesting a trier of fact could find that it has done so.

## III.    DEFENDANTS HAVE NOT ESTABLISHED A GENUINE TRIABLE ISSUE REGARDING THEIR PURPORTED AFFIRMATIVE AND OTHER DEFENSES TO ANY OF THE TRUST'S CLAIMS

As the Trust observed in its opening summary judgment submission, YPF's and Repsol's answers to the Trust's Complaint allege a total of 79 defenses, many of which are overlapping, repetitious, factually unsound, or entirely inapposite to the issues at bar, along with several general (and counterfactual) averments that the Trust simply cannot satisfy the elements of its claims.  *See* [D.I 140] at 100-12; [D.I. 139] at 111-14.  In response, Defendants once again attempt to muddy the waters with mischaracterizations of the Trust's burden on summary judgment and distracting differentiations between affirmative and non-affirmative defenses.   At heart though, Defendants' central contention is that the Trust was required, in its opening submission, to establish with detailed record evidence an absence of any triable issue of fact as to each of Defendants' 79 defenses, and that because the Trust did not do so it has waived any right to summary judgment. YPF Opp. at 67 n.88; Repsol Opp. at 66 n. 57.  These contentions, however, meaningfully misstate the summary judgment burdens at play here.

---

likely hundreds of pages of attachments listed in the indices.  In such a clear cut case of using privilege as a sword and a shield, the Court should either deny Repsol the relief they seek or find a general subject matter waiver with respect to, at the very least, all the King & Spalding communications and advice.  The Trust reserves the right to properly present this issue before the Court at a later time.

AMERICAS 114201192

Obviously, Defendants bear the ultimate burden of proof for their affirmative defenses. *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090-91 (D. Del. 1990) ("A party resisting summary judgment cannot expect to rely on the bare assertions or mere cataloguing of affirmative defenses"). To be granted summary judgment, the Trust only needed to "point out" or "aver" an absence of evidence supporting the affirmative defenses.[47] *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) ("With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, *pointing out* to the district court—that there is an absence of evidence to support the nonmoving party's case.") (emphasis added);[48] *In re Vaso*, 2012 Bankr. LEXIS 4741, at *1 ("[W]hen requesting summary judgment, the moving party must put the ball in play, averring an absence of evidence to support the nonmoving party's case. In order to continue, the burden shifts to the nonmovant to identify some factual disagreement sufficient to deflect brevis disposition.").

With those standards in mind, the Trust indisputably "point[ed] out" and "averred" in its Motion the absence of evidence to support the Defendants' defenses to the Court, whereupon the

---

[47] The Trust did enumerate all but three of the Affirmative Defenses (as defined below), in its opening summary judgment submission. It did not mention YPF 36 (avoidable consequences), but avoidable consequences are akin to mitigation, YPF 29, which the Trust did enumerate. The Trust also did not specifically enumerate YPF 28 (extraterritorial fraudulent transfer) and Repsol 22 (extraterritoriality), but Repsol *did* actually move on this affirmative defense, which the Trust addresses in Opp. to Repsol Mot. at Section II.B.I.

[48] YPF argues that *Conoshenti* supports its contention that the Trust bears the burden of proof, on summary judgment, of "showing that there is an absence of evidence to support the YPF Defendants' affirmative defenses." YPF Opp. at 68. However, *Conoshenti* does not contain any discussion of the burden on affirmative defenses, let alone suggest that a plaintiff seeking summary judgment must "prove the negative" for each of a defendant's affirmative defenses.

76

burden shifted to Defendants to "respond with specific facts establishing a genuine issue" about the essential elements of the defenses.[49]  They have plainly failed to carry that burden.

As noted in the Trust's Motion, the 79 defenses fall into three categories which are detailed in Exhibit A hereto:[50] (1) "true" affirmative defenses; (2) non-affirmative defenses; and (3) damage defenses.[51]  Several of Defendants' defenses qualify as "true" affirmative defenses (collectively, the "Affirmative Defenses"),[52] because, if established by record evidence, they would defeat the

_____

[49] To the extent that Defendants attempt to establish a triable issue of fact with respect to this issue, they may not rely on the submissions of their testifying experts to make such a showing.  [D.I. 607] at 3 n.1 ("Defendants have raised numerous affirmative defenses for which they bear the burden of proof.  To the extent [D]efendants seek to rely on any expert testimony in support of those affirmative defenses, the report of any such expert was required to be filed in October 2021.").

[50] In addition to misstating the burden-shifting analysis, YPF and Repsol distract with the distinction between affirmative and non-affirmative defenses in each of their oppositions.  Yet, neither YPF nor Repsol clearly state which of their defenses are actually affirmative defenses at all.  For its part, YPF has taken the position (providing no legal authority in support) that the Trust bore the initial burden of identifying which of YPF's defenses are affirmative defenses, while purporting to identify 17 defenses as "indisputably not affirmative defenses."  YPF Opp. at 68 n.90.  YPF further contends (again, without citation to legal authority) that such *non-affirmative* defenses too are "all preserved for trial on the basis that the Trust has made no showing to support summary judgment," and that "YPF has no obligation to argue them further."  YPF Opp. at 68.  Repsol, on the other hand, asserts that "two of the three categories of defenses" identified by the Trust in its motion for summary judgment "consist almost entirely of issues on which the MLT bears the burden," but similarly chooses not to clarify which of its 29 defenses it considers to be affirmative (or non-affirmative).  Repsol Mot. at 67.  Even accepting Defendants' premise that their defenses can be categorized as "affirmative" or "other" defenses, this Court can still grant the Trust summary judgment on *all* of the defenses in Defendants' answers.

[51] Aside from the three main categories, YPF includes certain CERCLA defenses: YPF Nos. 40 (all defenses available under CERCLA), 41 (CERCLA failure to mitigate), 42 (CERCLA allocation of damages), 43 (CERCLA contributory or comparative negligence), 44 (CERCLA proximate cause), 45 (costs exceed those allowed for under CERCLA), 46 (costs incurred prior to effective date of CERLCA), 47 (not necessary costs of response under CERCLA), which have no bearing on the Trust's claims as the Trust is not seeking CERCLA recoveries and are therefore simply irrelevant.  Even if not, YPF does not mention any of its CERCLA defenses in its responsive pleadings, and therefore has not met its burden with respect to them and therefore should be dismissed.

[52] Affirmative Defenses include: YPF 4 (statutes of limitations and repose), 5 (collateral estoppel, res judicata, and "the entire controversy" doctrine), 6 (pari delicto, acquiescence, waiver, ratification, release, laches, and/or estoppel), 7 (unclean hands), 8 (unjust enrichment), 28

77

Trust's claims, even if all of the allegations in the Complaint are true. *See Nat'l Union Fire Ins Co. v. City Sav., F.S.B.*, 28 F.3d 376, 393 (3d Cir. 1994) (citing Black's Law Dictionary 419 (6th ed. 1990)).  These are addressed in Section III.B.  Others can be identified as non-affirmative defenses (collectively, the "Non-Affirmative Defenses")[53] because they "merely negate some element of plaintiff's prima facie case." *LG Philips LCD Co. v. Tatung Co.*, 243 F.R.D. 133, 137 (D. Del. 2007) ("A defense which merely negates some element of plaintiff's prima facie case is not truly an affirmative defense.").[54]  These are addressed in Section III.C.  Finally, other defenses

---

(extraterritorial fraudulent transfers), 29 (mitigation), 31 (accord and satisfaction), 36 (avoidable consequences), 37 (assumption of risk); Repsol 5 (statute of limitations, statutes of repose, estoppel, and laches), 6 (waiver, consent, estoppel, and release), 7 (unclean hands and pari delicto), 8 (collateral estoppel, res judicata, judicial estoppel, abstention, the New Jersey "entire controversy" doctrine, accord and satisfaction, and payment), 9 (business judgment rule), 14 (unjust enrichment), 16 (ratification), 22 (extraterritoriality), and 23 (§ 546 (e)).  *See* Ex. A.

[53] Non-Affirmative Defenses include:  YPF 1 (failure to state a claim), 2 (subject matter jurisdiction), 3 (standing), 9 (proximate cause), 10 (YPF did not cause or contribute to environmental conditions), 11 (YPF did not dispose of hazardous substances), 12 (YPF did not cause third party to dispose of hazardous substances), 13 (YPF did not release, dispose of, or arrange for disposal of hazardous substances) 18 (reasonably equivalent value), 19 (good faith and for value), 20 (no harm to debtors), 21 (insolvency), 22 (11 U.S.C. 550(a)), 23 (creditors not creditors of Debtors at time of transfers), 24 (not a party to the Stock Purchase Agreement), 25 (no transfer of an interest of a Debtor in property), 26 (no transfer of an interest of a Debtor in property), 27 (initial, immediate, or mediate transferees), 32 (compliance with law), 33 (compliance with law), 34 (claims of creditors not assigned to Trust), 35 (Defendants' exercised due care); 48 (incorporate by reference any and all additional defenses by other defendants), 49 (no waiver of additional affirmative defenses), 50 (no consent to final orders); Repsol 1 (standing), 2 (failure to state a claim), 3 (Plaintiff legally cannot establish requisite elements of claims), 4 (Debtors are not the alter egos of Repsol), 11 (Repsol took in good faith and for value, and may retain any interest to the extent it gave value to Debtors in exchange for transfer), 12 (Repsol took in good faith and for value, without knowledge of voidability), 17 (transfers authorized by law), 18 (doctrine of subsequent intervening cause), 19 (reasonably equivalent value), 20 (actual and proximate cause), 21 (transfers not made to or on behalf of Repsol), and 24 (Repsol not a party of the SPA).  *See* Ex. A.

[54] The Repsol Defendants contend that a general denial is a "perfectly appropriate affirmative defense to include in the answer," citing *S.E.C. v. Toomey*, 866 F. Supp. 719, 723 (S.D.N.Y. 1992) (evaluating SEC's Rule 12(f) motion to strike defense that "the complaint failed to state a claim on which relief could be granted" and concluding that inclusion of such a general denial in the pleadings would not sufficiently prejudice the SEC to warrant striking).  However, whether or not Repsol's general denials were properly included in its answer, or could have been stricken under

78

relate only to damages, which are not an affirmative defense as to liability (the "Damage Defenses" and together with the Affirmative Defenses and the Regular Defenses, the "Defenses").[55]  *See Greiff v. T.I.C. Enters., L.L.C.*, No. 03-882-SLR, 2004 U.S. Dist. LEXIS 680, at *8 (D. Del. Jan. 9, 2004) (finding that damages defenses were "averments [that] do not constitute affirmative defenses because they will not defeat defendants' counterclaims if proven. In other words, these averments entirely overlook liability and focus solely on potential relief.").  These defenses are addressed in Section III.D., *infra*.

### A.    All of Defendants' Statute of Limitations Affirmative Defenses Fail

We now turn to the one set of defenses that Defendants have indisputably put before this Court for resolution at this stage—what YPF refers to as the "obvious statute of limitations problems" that the Trust is purportedly so "concerned" about regarding its Intentional Fraudulent Transfer Claims.  YPF Mot. 63.  Far from being concerned, the Trust welcomes the opportunity for this Court to resolve all of Defendants' limitations defenses in the Trust's favor.  After all, Defendants have already been waiting for decades to argue this point to Maxus's bankruptcy court

---

Rule 12(f), has no bearing on whether such general denials preclude summary judgment in favor of the Trust.  In any event, the courts of this circuit appear to be in general agreement that such general denials are not true affirmative defenses.  *See Nat'l Union Fire Ins Co.,* 28 F.3d at 393. ("A defense may be as simple as a flat denial of the other party's factual allegations or may involve entirely new factual allegations.  In the *latter* situation, the defense is an affirmative defense." (emphasis added)); *see also FTC v. Hope Now Modifications, LLC*, No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 35550, at *3 (D.N.J. Apr. 12, 2010) (striking "general denial[] of fault" as "not [a] true affirmative defense").

[55] Damage Defenses include:  YPF 14 (relief is speculative, unreasonable, excessive, arbitrary, and capricious), 15 (joint and several liability), 16 (right to setoff), 17 (reduction of Trust's claims by any settlement payments), 32 (no prospective declaratory relief); 38 (allowance or disallowance of proof of claim has no precedential or preclusive effect); 39 (relief barred to extent creditors have not incurred damages in excess of their own equitable share of liability); Repsol 10 (setoff or recoupment), 15 (single satisfaction rule), 25 (relief is unreasonable, arbitrary, excessive, and capricious), 26 (punitive damages barred by policy and law), and 27 (contribution, reduction or offset of damages from other parties).  *See* Ex. A.

AMERICAS 114201192

when the inevitable fraudulent conveyance challenge came, so delaying that argument any further seems counterproductive.

At the outset, we note that neither Defendant has contended, much less shown, that the Trust's *alter ego claims* are subject to any limitations defense.  Thus, the Court can dismiss any such defense, as it pertains to those claims, at this time.

The thrust of Defendants' limitations arguments apply to the Trust's *fraudulent conveyance claims*.  YPF, for its part, purports to "not [be] moving on any issues relating to the statute of limitations (except on the constructive fraudulent transfer claims) other than the permissibility of collapsing."  YPF Mot. at 62-65.  YPF's constructive fraudulent transfer limitations analysis is addressed in the Trust's Opposition to YPF's Motion for Summary Judgment.  But, as to the Trust's Motion, having failed to establish any basis for its assertions that the Trust's *Intentional Fraudulent Transfer Claims*, the Court can dismiss YPF's limitations defenses at this time.[56]

As established in its opening brief, the Trust, through § 544(b)(1), may use its "strong arm power" to exercise the rights that a creditor would have under state intentional fraudulent transfer law.  *See, e.g.*, *Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements, Inc. (In re Midway Games, Inc.)*, 428 B.R. 303 (Bankr. D. Del. 2010).  Through this, the Trust's Intentional Fraudulent Transfer Claims are "timely so long as *one of [the debtors'] creditors* was entitled as of the Petition Date to assert a claim against the Defendants under" applicable law.  *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC (In re Zohar III, Corp.)*, 631 B.R. 133, 160 (Bankr. D. Del. 2021) (emphasis added).  While the Trust's theory of tolling the statute of limitations for its actual fraudulent transfer claims through *Tronox* collapsing should

---

[56] Even if the Court were willing to let YPF piggy-back off of Repsol's analysis (and it should not), none of the limitations defenses bar the Trust's Intentional Fraudulent Transfer Claims against YPF.

AMERICAS 114201192

prevail for the reasons discussed below, the Trust's Intentional Fraudulent Transfer Claims are not time-barred under two other doctrines.[57]  *First*, at least two of Maxus's creditors held timely actual fraudulent transfer claims through applicable state laws' discovery tolling as of the Petition Date. *Second*, at least three of Maxus's government creditors have timely actual fraudulent transfer claims through the doctrine of *nullum tempus occurrit regi* ("no time runs against the king").

Before getting to the substance of the Trust's triggering creditors' claims, however, the Trust addresses three threshold issues: (1) burden shifting; (2) choice of law, and; (3) what constitutes a proper triggering creditor for limitations purposes.

*First*, YPF alleges (citing no authority) that the Trust cannot "save its motion for summary judgment on the YPF Defendants' statute of limitation defense by raising new issues for the first time on reply." YPF Opp. at 69 n.92.  Repsol has a similar blanket reservation in its Opposition arguing that the Trust "waived any argument for summary judgment on the" defenses the Trust identified by name or paragraph number.  Repsol Opp. at 66 n.57.  As noted above, this is a mischaracterization of how the burden shifting on affirmative defenses works.  Indeed, with respect to statute of limitations defenses for fraudulent transfer claims, Defendants must *first* assert that the claim is untimely, and *then* the movant responds.  *See Norman v. Elkin*, 726 F. Supp. 2d 464, 468 n.2 (D. Del. 2010) (allowing the plaintiffs to respond to arguments raised in Defendant's

---

[57] Both Defendants contend that this Court has already ruled that the Trust's fraudulent transfer claims "occurred outside the statute of limitations" and that by this Court's ruling on the Motion to Dismiss has foreclosed the Trust proceeding on any other theory under the statute of limitations. YPF Opp. at 69; Rep. Opp. at 69.  But this is a misread of the Court's ruling.  The Court stated that it "has not specifically addressed every argument submitted by the defendants but has limited itself to those it believes are material.  Arguments in favor of the motion to dismiss that are not specifically referenced in this letter are rejected by the Court."  [D.I. 107].  Indeed, the Court did not explicitly address, or more importantly, dismiss any of the Trust's other tolling theories in its opinion, it merely pointed out that the statute of limitations was something that the Trust must overcome.  [D.I. 107].

AMERICAS 114201192

answer brief with issues it didn't include in its opening brief).[58]  The Trust's only obligation in its

Motion was to demonstrate the existence of a triggering creditor for its claims.  *Indus. Enters. of*

*Am. v. Tabor Acad. (In re Pitt Penn Holding Co.)*, Nos. 09-11475 (BLS), 11-51879, 2011 Bankr.

LEXIS 3554, at *37 (Bankr. D. Del. Sep. 16, 2011) ("[W]hen analyzing the sufficiency of a

complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the

existence of an unsecured creditor by name, although the trustee must *ultimately* prove such a

creditor exists.") (emphasis added); *see also Smith v. George (In re RCK Modular Homes Sys.)*,

402 B.R. 463, 469-70 (Bankr. D.N.H. 2008) (holding that Plaintiff established triggering creditors

who had filed proofs of claim relating to its fraudulent transfer claims and granting Plaintiff partial

summary judgment).  The Trust explicitly identified qualifying triggering creditors in its Opening

Brief.  Trust Mot. at 42 ("The Trust submits the Declarations of Lanny Bilbrey and Daniel Fetsick,

establishing both gentlemen as 'triggering creditors' in whose shoes the Trust may stand on its

Section 544 claims.").   In doing so, the Trust met its narrow burden in its moving papers of

establishing the elements of its claim and obviously has not lost its opportunity to respond to any

arguments the Defendants raise regarding their defenses as to the claims of those creditors.

To be clear, however, the Defendants have now lost the opportunity to challenge the

viability of the Trust's identified triggering creditors through testimony at trial.  Indeed, during the

discovery phase of this litigation, the Trust identified in interrogatory responses its list of potential

triggering creditors for both its constructive and intentional fraudulent conveyance claims.  *See*

Yoo Decl. Ex. 6 (Trust's Supplemental Responses and Objections to YPF Defendant's First

---

[58] YPF cites *In re AMC Investors, LLC*, 637 B.R. 43, 2022 WL 248133, at *56 (Bankr. D. Del. Jan. 27, 2022) (Sontchi, J.) for its proposition that it is the movant's burden to prove it qualifies for some sort of tolling, but that case is a breach of fiduciary case dealing with arguments of equitable tolling, neither of which are applicable here.

AMERICAS 114201192

Interrogatories).  Both Messrs. Bilbrey and Fetsick were on that list.  Defendants then had the chance to seek discovery from any of Maxus's creditors the Trust identified as potential triggering creditors, and in fact, Defendants subpoenaed 20 of them for depositions.  [D.I. 538-546, 548-559].  Repsol specifically subpoenaed Mr. Bilbrey, but instead chose not to go forward with his, or any other potential triggering creditors' depositions.  [D.I. 558].  As it stands, neither Defendant proffers any evidence in any of its papers that either gentleman cannot serve as a valid triggering creditor.

*Second*, for purposes of proving the *elements* of an intentional fraudulent transfer claim, the Trust relied upon the standards set forth in the DUFTA as applicable law to its substantive claims.  As discussed in the Trust's motion for summary judgment, those elements of proof share no material differences across the various jurisdictions.  In contrast, the statutes of limitations applicable in the various jurisdictions can materially differ, requiring this Court to look at various jurisdictions' limitation laws depending on the triggering creditor at issue.  *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (undergoing choice of law analysis where two state laws conflicted).  That analysis allows a debtor to "use the statute of limitations available to any actual creditor of the debtor as of the commencement of the case."  *Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 419 (Bankr. E.D. Pa. 2014).

Indeed, it is well established that "applicable law" in § 544(b)(1) is to be construed broadly, "[a]llowing a trustee to utilize *all* available applicable law" because doing so furthers § 544(b)(1)'s purpose "to restore the bankruptcy estate to the financial condition it would have enjoyed if the fraudulent transfers had not occurred."  *In re Webster*, 629 B.R. 654, 679 (Bankr. N.D. Ga. 2021) (FDCPA is applicable law) (emphasis added) (citation omitted); *In re CVAH, Inc.*, 570 B.R. 816, 825, 834 (Bankr. D. Idaho 2017) (FDCPA and IRC are applicable law).  Therefore, the Trust is

83

not confined to relying on DUFTA as applicable law on limitations issues, and instead can utilize any limitations law that any one of its creditors could rely on. *In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. 293, 304 (Bankr. D.D.C. 2006) ("The estate representative steps into the shoes of each such unsecured creditor and is cloaked with the rights of that creditor.").

*Third*, § 544(b) requires that an *actual* creditor of the debtor, holding an allowable claim as of the petition date, be considered a "triggering creditor." *In re Polichuk*, 506 B.R. at 432.  For the purposes of defending limitations challenges to its Intentional Fraudulent Transfer Claims, Maxus's triggering creditors can include, but are not limited to, Mr. Bilbrey (of Texas), Mr. Fetsick (of New Jersey), the EPA, the State of Ohio, the State of Wisconsin, each of whom had "allowable" claims in the Chapter 11 Cases.[59]  *See* SOF ¶¶ 156, 157 and 153; Smith Decl. Exs. 189 (hereinafter "Bilbrey Decl."), 195 (hereinafter "Fetsick Decl."), 90, 91, 87.  Further it is undisputed that each of these creditors' claims arose long before YPF purchased Maxus in 1995.  As sworn to, without any existing challenge from Defendants, Mr. Bilbrey and Mr. Fetsick both are former employees of Maxus and have claims arising from benefits owed to them before 1995.  Bilbrey Decl. ¶¶ 2, 5-6 (being an employee of Maxus until his retirement in 1999 and being owed healthcare benefits until Maxus's bankruptcy); Fetsick Decl. ¶¶ 2, 5-6 (being an employee of Diamond Shamrock until 1987 and having been owed retiree medical coverage since his retirement).  Although the Trust has not submitted declarations from the Governmental Creditors, it did not need to.  Even Defendants' experts admit that these creditors' claims all arose well before the first transaction in the Strategy occurred (the State of Ohio alleges that discharge occurred anytime between 1924 through 1982, the EPA alleges the discharge occurred between 1951 and 1969; and State of

---

[59] The Trust reserves all rights with respect to identifying any other triggering creditors to the extent necessary at trial.

AMERICAS 114201192

Wisconsin alleges the discharge between 1873 and 1983).  Lee Decl. Ex. 23 (Andrews & Kurth

Due Diligence Memo discussing ████████████████████████████████████

████████████████ Smith Decl. Exs. 90, 87, 91; 42 U.S.C. § 9607.  Finally, all of the

triggering creditors' Claims were settled and Allowed either through the Plan (with respect to the

Government Creditors) or through a settlement incorporated by the Plan (with respect to Mssrs.

Bilbrey and Fetsick), again without any present challenge from Defendants.[60]  *See* Smith Decl. Ex.

3.

> **1.    The Discovery Tolling Rule Tolls the Statute of Limitations on the Intentional Fraudulent Conveyance Claims Until the Petition Date**

Turning now to the substantive question:  have Defendants established, as a matter of law

and undisputed fact, that the statute of limitations had run prior to the Petition Date as to every

intentional fraudulent conveyance claim that any creditor of Maxus could have brought?  Far from

having done so, the undisputed record establishes that the statute of limitations on one or more

creditor claims were, in fact, preserved under the discovery rules of various applicable laws—

namely, Texas, New Jersey, and applicable federal law.

> **a.    Mr. Bilbrey's Actual Fraudulent Claims under Texas Law are Timely**

As established by his Declaration, on the Petition Date, Mr. Lanny Bilbrey had viable

actual fraudulent transfer claims against YPF and Repsol that have been tolled under the laws of

Texas until the Petition Date.  Bilbrey Decl. ¶¶ 5-6.  Mr. Bilbrey is a resident of Texas and has

lived there since his employment by Crescendo in 1977.  Bilbrey Decl. ¶ 3. Under Texas' UFTA

("TUFTA"), a plaintiff has one year from the date that the claimant knew or reasonably could have

---

[60] Both Messrs. Bilbrey and Fetsick's Claims were settled pursuant to the *Stipulation and Agreed Order Between the Debtors and the Official Committee of Retirees Regarding Modification of Retiree Benefits Pursuant to Section 1114(e)(1)(B) of the Bankruptcy Code*, dated May 10, 2017 [D.I. 1398], which is incorporated and referenced to in the Plan.

AMERICAS 114201192

known both of the transfer, *and* that it was fraudulent in nature to sue for an actual fraudulent transfer.[61]   Tex. Bus. & Com. Code § 24.010(a)(1); *Janvey v. Democratic Senatorial Campaign Comm. Inc. (DSCC)*, 712 F.3d 185, 196 n.10 (5th Cir. 2013) ("The crucial issue is when the Receiver knew or could reasonably have known of the fraudulent nature of the transfers, not simply when he knew or could reasonably have known that the transfers had been made."); *Moran v. Pardo* (*In re Life Partners Holdings, Inc.*), No. 15-40289-RFN-11, 2016 U.S. Dist. LEXIS 192191, at *17 (N.D. Tex. Dec. 20, 2016) (finding that plaintiff could not have reasonably discovered fraudulent nature of transaction where Wall Street Journal article did not mention "many aspects of the fraudulent scheme"); *Johnston v. Crook*, 93 S.W.3d 263, 269 (Tex. App. 2002) (finding that the defendant had not conclusively established that the plaintiff knew or should have known of the transfers on a specific date and of their fraudulent nature).   In *DSCC*, the Fifth Circuit found that the record "did not reflect that the [plaintiff] had any feasible means to discover [the fraudulent nature of the transactions] other than to have an expert examine the books and records" of the defendants. *DSCC*, 712 F.3d at 197 (granting summary judgment on the plaintiff's TUFTA claim). The court therefore ruled that any applicable statute of limitations had been tolled. *Id.* at 195 ("Instead, a claim under section 24.005(a)(1) of TUFTA has been held to accrue only when the claimant discovers or reasonably could have discovered the fraudulent nature of the conveyance").

As he testified under oath, Mr. Bilbrey did not know that the Transfers occurred until the Petition Date.  *See* Bilbrey Decl. ¶ 18.  Defendants have not (and cannot) produce any evidence that Mr. Bilbrey actually did know, or reasonably could have known, of the Transfers.  Moreover, any argument that Mr. Bilbrey could reasonably have known about the Transfers based on Maxus's

---

[61] Pursuant to section 108 of the Bankruptcy Code this one-year period was extended to two years for the Trust.  11 U.S.C. § 108(a).

86

publicly filed financial statements, such as its 10-K, fails under TUFTA, because their public disclosure did not identify the "fraudulent nature" of the Fraudulent Transfers. *DSCC*, 712 F.3d at 197.[62]  Even if Defendants could prove Mr. Bilbrey saw Maxus's financials each year, similar to the claimant in *DSCC*, Mr. Bilbrey had no "feasible means" to discover the fraudulent nature of the transactions without having an expert's assistance or insider-access to corporate documents. *Id.*  Indeed, Mr. Bilbrey has testified to the opposite—he had no actual knowledge about the Fraudulent Transfers at all.  Bilbrey Decl. ¶ 18.  Defendants cannot obtain a trial merely by contending that they can impeach Mr. Bilbrey at that trial.  *See, e.g.*, *Ettinger v. Johnson*, 556 F.2d 692, 696 (3d Cir. 1977) (quoting Moore's Federal Practice ¶ 56.15[4] at 56-523 (2d ed. 1976) ("When at the hearing on a motion for summary judgment . . . the movant's evidence is impeached, an issue of credibility is present, provided the . . . impeaching evidence is not too incredible to be believed by reasonable minds.  The evidence contradicting or impeaching that of the movant will usually be produced by the opposing party . . . .")); *see also Diaz-Cruz v. Symons*, No. 1:11-CV-1302, 2016 U.S. Dist. LEXIS 165690, at *11 (M.D. Pa. Dec. 1, 2016) (plaintiff could not avoid summary judgment with bare promise to impeach medical expert because "party resisting a [Rule

---

[62] Cases holding that the plaintiffs could have reasonably discovered the fraudulent nature of transactions that were disclosed in public records involve plaintiffs who were involved in ongoing litigation with the defendants at the time those reports were released. *Biliouris v. Patman*, 751 F. App'x 603, 605 (5th Cir. 2019) (distinguishing the facts from *DSCC* and stating that plaintiffs "had the resources and opportunity to discern the fraudulent nature of this single transaction when it was recorded"); *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, No. 3:17-CV-01147-X, 2019 WL 5578510, at *5 (N.D. Tex. Oct. 28, 2019), *aff'd*, 976 F.3d 585 (5th Cir. 2020).  These cases are not analogous to the facts in this case.  The pertinent records were not publicly released during the NJ Litigation, they are not even publicly released now.  Indeed, as discussed, there was no reason for Mr. Bilbrey to suspect the fraudulent nature of the transactions in the public filings.  This case is therefore akin to *DSCC*, as Mr. Bilbrey "was faced with a sophisticated, extensive, worldwide [] scheme," without the proper resources to know about it.  *Biliouris*, 751 App'x 603 at 605.

87

56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions").

### b.    Mr. Fetsick's Actual Fraudulent Transfer Claims Under New Jersey Law are Timely

Similarly, as established by his Declaration, Mr. Daniel Fetsick has viable actual fraudulent transfer claims against YPF and Repsol that have been tolled under the laws of New Jersey until the Petition Date.  Mr. Fetsick lived and worked in New Jersey throughout the entirety of his employment with Diamond Shamrock Chemicals Company (from 1951 until 1987) and still rents an apartment in New Jersey.  Fetsick Decl. ¶¶ 2-3.  Pursuant to N.J. Stat. Ann. § 25:2-31, a creditor may bring an actual fraud claim "if the four-year limitations period expired and *one unsecured creditor* exists who first learned of the fraudulent conveyance within the year prior to the petition date." *In re NJ Affordable Homes Corp.*, 2013 WL 6048836, at *32 (Bankr. D.N.J. Nov. 8, 2013); *Wolff v. Tzanides*, 574 B.R. 489, 514-15 (Bankr. D.N.J. 2017) (as long as the trustee could establish a creditor who did not actually know of the transfer, its claims would not be barred based on the petition date, which was more than 20 years after the transfer).  This rule "fosters the just result of protecting those who have suffered injury from losing a right to redress because of ignorance of the wrong done."  *Rosenberg v. N. Bergen*, 61 N.J. 190, 197 (1972).

The applicable discovery rule standard in New Jersey is actual knowledge.[63] *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 639-40 (Bankr.

---

[63] Before the 2002 amendment, the New Jersey UFTA required actual fraudulent-transfer claims (the type at issue here) to be brought "within four years after the transfer was made . . . or, if later, within one year after the transfer . . . was or reasonably could have been discovered by the claimant." N.J.S.A. 25:2-31(a) (2001). The 2002 amendment eliminated the phrase "or reasonably could have been," thus ensuring creditors could sue one year after actual discovery of a transfer. However, if claims are still viable as of the date that the amendment was made, the amendment applies retroactively. *See Guido v. Spina*, No. A-3215-08T3, 2010 WL 1928985 (N.J. Super. Ct. App. Div. May 14, 2010) (holding that because "[t]he amendment affected a procedural remedy

AMERICAS 114201192

D.N.J. 2004), *rev'd in part on other grounds*, *Off. Comm. of Asbestos Claimants v. Bank of N.Y.*, No. 04-3423 (WGB), 2006 WL 1751793 (D.N.J. June 21, 2006) (concluding that the trustee's claims were timely because "it is reasonable to expect that it is possible that at least one claimant exists who was unaware of any asbestos-related injury prior to one year before G-I Holdings filed for bankruptcy"); *In re N.J. Affordable Homes Corp.*, 2013 Bankr. LEXIS 4798, at *121-22 (Bankr. N.J. 2013) (denying the defendants' motion to dismiss because the trustee alleged an unsecured creditor of the debtor exists who did not have knowledge of the mortgage transactions at issue and who could have filed a timely pre-petition complaint under New Jersey UFTA).

As he testified under oath in his Declaration, Mr. Fetsick did not *actually* know about the Fraudulent Transfers until at least the Petition Date. *See* Fetsick Decl. ¶ 18. And, just as Defendants had an opportunity to disprove Mr. Fetsick's actual knowledge of the Fraudulent Transfers, they have not (and cannot) produce any facts to the contrary. Therefore, through Mr. Fetsick, the Trust's actual fraudulent transfer claims, whether for each Fraudulent Transfer individually, or together as part of the Strategy, are not time-barred.

### 2. The Trust's Actual Fraudulent Transfer Claims are Viable through the *Nullum Tempus* Doctrine

Now that Defendants have formally raised their limitations defenses in their respective Motions, the Trust can and will also defend their contentions with the claims of its Government Creditors. Indeed, as set forth in the Trust's Opposition to YPF's Motion for Partial Summary Judgment, the Trust, through the State of Ohio, the EPA, and the State of Wisconsin can establish,

---

or defense, the statute of limitations applicable to a claim that had not yet arisen at the time the statute was amended" applied). Mr. Fetsick's actual fraudulent transfer claim had not expired for the Fraudulent Transfers as of 2002 because he did not have reasonable or constrictive notice of the Transfers. As he testified in his Declaration, he did not know about the Fraudulent Transfers until the Petition Date, Fetsick Decl. ¶ 18, therefore his claim did not arise until the Petition Date regardless of whether the Court applies the standard under the pre- or post-2002 amendment.

for the same reasons cited there, that the Trust's actual fraudulent transfer claims are viable.  As stated in Section IV.A. of the Trust's Opposition to YPF's Cross-Motion for Partial Summary Judgment, the State of Ohio has a potentially unlimited statute of limitations period with respect to its fraudulent transfer claims (whether constructive or actual).  Similarly, by stepping into the EPA's shoes, the Trust can take advantage of discovery tolling for the 6-year statute of limitations available in 28 U.S.C. §§ 2415 and 2416.  *See United States v. Moore*, 968 F.2d 1099, 1101 (11th Cir. 1992) (tolling the statute of limitations for a fraudulent conveyance action under § 2416 where "an official of the government did not learn of the material facts giving rise to [the] action until" within 6 years of the claim); *FDIC v. Martinez Almodovar*, 671 F. Supp. 851, 871 (D.P.R. 1987) (statute of limitations was tolled for fraudulent conveyance claim under § 2416 where the evidence did "not disclose the date on which the government became aware of" the fraudulent conduct).  *See also Tronox II*, 503 B.R. at 271-72, 275 & n.43 (statute of limitations under § 2416 may be tolled where government official could not have known about fraudulent transaction despite public financial filings).  The Trust can also utilize the State of Wisconsin's 10-year statute of limitations, plus the built-in discovery rule prescribed by its Code. Wis. Stat. Ann. § 893.87. Both of these statutes make clear that discovery of the fraud by the respective government entity starts the clock for fraudulent actions, which extends the limitations to when that discovery occurred.  Neither the State of Wisconsin nor the EPA could have discovered the facts constituting the fraudulent transfers until at least the Petition Date.  As a matter of law, and as mentioned above, mere disclosure of the transactions in a 10-K cannot put the Government Creditors on notice of the Transfers for purposes of starting the "clock" with respect to the Government Creditors' actual fraudulent transfer claims.  *Tronox II*, 503 B.R. at 271-72, 275 & n.43.  Moreover, Defendants have not (and cannot) produce factual evidence that the Government Creditors actually knew about

90

the Transactions, their fraudulent nature, and that the Transfers would affect the Government

Creditor's rights.

### 3. The Trust's Actual Fraudulent Transfer Claims Are Timely Through *Tronox* Collapsing

Even if none of the foregoing triggering creditors suffice (and they all do), the Court can

still dismiss Defendants' limitations defenses to the Intentional Fraudulent Conveyance Claims.

Both Defendants have argued that the Trust "cannot rely on the collapsing doctrine to extent the

statute of limitations for its fraudulent transfer claims," claiming that the Trust "may not invoke

the collapsing doctrine to save any claims which may be time-barred or otherwise avoid analyzing

the Fraudulent Transfers separately from one another."  Repsol Mot. at 45-54; YPF Mot. at 66.

Defendants challenge the Trust's ability to prove that "(i) all the parties involved had knowledge

at the outset of the multiple transactions to follow; (ii) each transaction would not have occurred

on its own; and (iii) each transaction was dependent or conditioned on other transactions."  YPF

Mot. at 63; Rep. Mot. at 50. Defendants also claim that the Trust cannot collapse the transactions

as a matter of law.  YPF Mot. at 62-66; Repsol Mot. at 45-50; YPF Opp. at 36-39; Repsol Opp. at

41, 61, 65.  They have it all wrong.

"Courts have 'collapsed' a series of transactions into one transaction when it appears that,

despite the formal structure erected and the labels attached, the segments, in reality, comprise a

single integrated scheme when evaluated focusing on the knowledge and intent of the parties

involved in the transaction." *Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan*

*Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370-71 (Bankr. S.D.N.Y. 2002).  The

most iconic collapsing, of course, came in the case of *Tronox II*, which is strikingly similar to this

case.

91

In *Tronox II*, Kerr-McGee Corporation ("Kerr-McGee"), consisting of a large and thriving oil E&P operation and a smaller chemical business, faced massive legacy environmental and tort liabilities. *Tronox II*, 503 B.R. at 249-50. As the legacy liabilities were deterring investors, the company considered a restructuring that would spin off the E&P business to "get[] out from under legacy [chemical] liabilities." *Id.* In 2002, Kerr-McGee transferred the E&P subsidiaries to New Kerr- McGee and transferred the chemicals business and the legacy liabilities to a new wholly-owned subsidiary, Tronox Worldwide LLC ("Tronox"). *Id.* Kerr-McGee continued to fund Tronox's operations and pay its debts (including its legacy liability expenses) from a central cash management system until, following an IPO of Tronox Class A common stock in November 2005, Tronox Class B common stock was distributed to Kerr-McGee's shareholders. *Id.* at 259. Shortly thereafter, defendant Anadarko acquired Kerr McGee, including the profitable E&P business, but purportedly not including the liabilities. *Id.* at 251. Tronox eventually commenced bankruptcy proceedings because the chemicals business was never profitable enough to fund its operations and service its burgeoning legacy environmental liabilities. *Id.* at 260-61.

As here, Tronox confirmed a plan that created the "Anadarko Litigation Trust" to pursue certain claims brought against Anadarko and several of Anadarko's subsidiaries, including Kerr McGee. And, as here, upon commencement of the Trust's litigation, the shareholder-transferees claimed that the fraudulent conveyance challenges were untimely. After trial, the bankruptcy court found, based on a developed record, that the Oklahoma UFTA, which provides for a four year lookback period to recover actual and constructive fraudulent transfers (*see* Okla. Stat. tit. 24, § 121(1)-(2)), applied. *Tronox II*, 503 B.R. at 266. The four-year look-back period from the date of Tronox's Chapter 11 Petition in January 2009 facially encompassed the IPO in November 2005 and the final spinoff in March 2006, but not the 2002 transfers. The issue in *Tronox*, then, was

92

whether the 2002 and 2005-2006 transactions which occurred outside the look back were

independent transactions—in which case the trust's claims were time-barred—or part of a larger

scheme encompassing the various steps—in which case the 2002 transactions could be collapsed

into the avoidable 2005-2006 transactions and be deemed timely.  The court held the latter,

indicating that fraudulent transfers should be examined "for their substance, not their form," and

that "[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with

all its composite implications."  *Id.* at 268 (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.

1993)).  For statute of limitations purposes, the court opined, the question is "not whether good

business reasons existed for [the transfers].  The question is whether there was a single integrated

scheme." *Id.* at 270-71.[64]

> At the dismissal stage, regarding Defendants' limitations arguments, this Court stated:

>> [T]he Trust asserts that the very strategy that the *Tronox II* court
>> rejected has happened in this case, and, as such, the statute of
>> limitations does not bar the Trust's claims.  The Court agrees.  While

---

[64] Moreover, the "conclusive reason" why the limitations period in *Tronox II* could not be measured from the defendants' internal reorganization in 2002 was one of policy.  *Tronox II*, 503 B.R. at 271 (citing *United States v. Atlantic Res. Corp.*, 551 U.S. 128, 136 (2007)).  "The environmental laws of the United States and many of the States are founded on the principle of strict liability." *Id.*  Indeed, Judge Gropper explained that an entity that has had or has assumed an obligation to clean up an environmental site or assist in remediation cannot avoid that obligation, except maybe in a bankruptcy case:

> Defendants' view of the law would permit a shrewd and unscrupulous enterprise
> to divest itself of "substantially all of its assets," as Kerr-McGee represented it did,
> continue to satisfy environmental liabilities from the cash flow of the combined
> entity until the statute of limitations period had run and the divestiture was ready
> for completion, and then split the good assets from the bad. If the architects of
> such a scheme could claim that the statute of limitations had already run by virtue
> of the first step in the scheme, they would have free reign to hinder and delay
> creditors so long as they could do it in two steps several years apart (at least four
> years under Oklahoma law).

*Id.* This analysis applies squarely to the case at hand.  Maxus's bankruptcy was an attempt by Defendants to entirely avoid responsibility for environmental obligations by running the statute of limitations – an even more outrageous implementation of the type of strategy Judge Gropper strongly rejected.

AMERICAS 114201192

it remains to be seen whether the Trust can prove its allegations, the facts alleged in the Complaint support a plausible theory that would expand the statute of limitations under *Tronox II*.

*Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, Adv. Proc. No. 18-50489 (CSS), 2019 Bankr. LEXIS 446, at *20-21 (Bankr. D. Del. Feb. 15, 2019) (Sontchi, J.).  Following that ruling, the Trust has developed and now provided evidence that, much like the *Tronox II* defendants, YPF and Repsol devised, carried out, and had complete knowledge that the transfers from 1995 to 2016 were part of a "single integrated scheme" to syphon the valuable and profitable assets from the Debtors to leave them stranded with all the environmental liabilities that YPF and Repsol wanted isolated from their value-producing assets.  For their part, Defendants contend that the Trust (a) has not produced enough evidence to collapse the transactions, and (b) simply reiterate their prior argument that this Court cannot collapse the transactions as a matter of law.  We address each in turn.

### a. Repsol's Arguments that the Trust has "Failed to Adduce Evidence to Collapse" the Transactions Are Unavailing.

*First*, Repsol argues that "it is impossible [that Repsol] had the requisite knowledge or notice of the 'overall scheme' when it was allegedly implemented," because they were "not even around for any transaction before 1999."  *See* Repsol Mot. at 51.  Repsol notes that "because four of [the transfers] happened before Repsol acquired YPF," and "Repsol Defendants were not involved in the decision to place Maxus into bankruptcy in 2016, which [The Trust] contends is the culmination of the 'strategy,'" the Trust has not established the knowledge component of the collapsing analysis.  *Id.*  Courts have, however, collapsed transactions where a Defendant was not part of every transaction in a fraudulent scheme.  *See In re Jevic Holding Corp.*, 2011 WL 4345204, at *7 (Bankr. D. Del. Sept. 15, 2011) (collapsing transactions despite defendant maintaining that "[it] did not play any role in the [final transaction] whatsoever.").  And here, the

94

evidence demonstrates that even though Repsol was "not around" for the inception of the scheme,

it surely continued the scheme that its subsidiary, YPF, began prior to the acquisition.  Indeed, the

Trust has undoubtedly established that Repsol both intended to effectuate the Strategy, and that it

had knowledge of the "overall scheme." *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288

(3d Cir.1986) (affirming collapsing where parties acted in bad faith); *In re Jevic Holding Corp.*,

2011 WL 4345204, at *5 ("To determine whether a series of transactions should be "collapsed"

and viewed as a single integrated transaction, courts focus on the substance rather than on the form

of the transactions and consider the overall intent and impact of the transactions.").  For instance:

- Repsol received an introduction ███████████████████████ "shortly after its acquisition" of YPF.  Smith Decl. Ex. 129 Tr. at 109:8-15.[65]  Repsol was advised soon after its acquisition that ████████████████████████████████████████████ *See, e.g.*, Smith Decl. Ex. 134. Though Repsol argues that "there is no evidence that anyone at YPF informed Repsol of any 'Strategy,' and there was nothing ostensibly wrong with the 1996-97 Maxus Transactions" (Repsol Mot. at 52), it is clear that YPF and Repsol both knew about Maxus's substantial environmental liabilities, that Maxus would not likely ever be able to satisfy these liabilities, and that, were they to leave assets at Maxus, they would be available to satisfy environmental claims.  Trust Mot. at 16-17, 18-21.

- Soon after the Repsol acquisition, Repsol proceeded to transfer virtually all of Maxus's remaining productive assets away from those liabilities in the Crescendo Transfer, with the benefits of the proceeds accruing not to Maxus but to YPF and Repsol.  Trust Mot. at 17-18.

- Repsol became fully aware of the accelerating regulatory activity at the DASS in the early part of Repsol's ownership, including the design and construction of the interim remedy and 2001. SOF ¶ 26. At the same time, a large-scale, high-cost remediation scenario at the DASS was becoming ever more certain.  In 1999, the New Jersey Office of Maritime Resources published a "conceptual proposal" for dredging of highly contaminated "hot spots" in the Passaic River.  Trust Mot. at 17.

- The YPFI Transfers in 2001 and 2002 were made around the same time as significant developments were occurring at the DASS, including the expansion of

---

[65] ███████████████████████████████████████████ Smith Decl. Ex. 133.

the DASS remedial study area from the lower six miles to 17 miles and into the Newark Bay.  Trust Mot. at 56.

- In 2002, the EPA did expand the size of the DASS remedial study area to 17 miles of the Passaic River into the Newark Bay. In September 2003, the state of New Jersey issued a directive to several PRPs, including Maxus, to conduct an assessment of natural resource damages and restoration options at the Passaic River.  Trust Mot. at 16-17.

- In 2005, King & Spalding advised Repsol that



- The Repsol Board also received a presentation regarding



*Second*, Repsol contends that there "is no evidence that any party intended that [the] transactions be linked or depend on one another," and that "none of the allegedly fraudulent transactions had interdependent terms."  Repsol Mot. at 54. With respect to the latter contention, there is ample evidence that the transactions were dependent on or conditioned on the other transactions as Defendants managed the risks along what they knew could be a long road in their scheme to protect their exposure to Maxus's contingent environmental liabilities along the way towards an inevitable bankruptcy.  As soon as YPF began to appreciate that, while perhaps uncertain, Maxus's environmental liabilities could be catastrophic, YPF adopted the Strategy— the "Global Restructuring," by which YPF directed Maxus to make seriatim, "closely related and

96

in fact interdependent" debt, environmental and asset restructurings[66] █████████████████
████████████████████████████████████████████ Trust Mot. at 13-15.  In

considering and swiftly implementing the "interdependent" restructurings, Andrews & Kurth was

already concerned that ████████████████████████████████████████████████████

██████████████████████    ██████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████    The goal of the Strategy was to use the clock effectively to separate

Maxus's productive assets quickly and isolate the environmental liabilities before creditors' claims

driven by the DASS remediation became certain.  Smith Decl. Ex. 21 at YPF0210163 ██████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████    Next, "shortly after" Repsol acquired YPF, it learned about Maxus's contingent

environmental liabilities.  Smith Decl. Ex 129 Tr. at 109:8-15.  Every year, between 1999 and

2012, personnel from Repsol, YPF, and Maxus met with auditors to discuss Maxus's public

disclosures and they agreed they would only publicly disclose the short term expected expenditures

and never reserve for any remedial costs, which they deemed "uncertain" but knew carried the

potential to be "catastrophic."  Trust Mot. at 16, 65.  After Repsol had directed Maxus to sell

virtually all its productive E&P assets, the YPFI Transfers had moved Maxus's legacy assets

additional steps away from the reach of environmental creditors, and the proceeds from the

---

[66] Smith Decl. Ex. 21 at MLT00238944, 238946.
[67] Smith Decl. Ex. 114 at DEDES-YPF-P0000048.

AMERICAS 114201192

Crescendo Transfer were drying up, Repsol sought and received legal advice concerning how best to manage the risks presented by Maxus's contingent environmental liabilities. *See* Smith Decl. Ex. 143. As described elsewhere in this Reply, King & Spalding advised Repsol (and YPF later learned of the advice) that ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Smith Decl. Ex. 55 at YPF_MAXUS_0000293080-83; SOF ¶¶ 110-111.  Over the next several years Repsol, in fact, took steps to address ██████████████████████████ including by setting up Repsol E&P ████████████████████████ and transferring Maxus's personnel, resources, and technical models, and valuable prospects to it and then effectuating the "Settlement Agreements" in an attempt to release its own and YPF's prior fraudulent actions, and continuing to conceal the insolvency of Maxus to the public and in violation of its directors' fiduciary duties, all while actively litigating against creditors' claims in connection with the DASS remediation. Trust Mot. at 21-23.[68]  Almost all of those steps were taken *after* late 2006/early 2007 and the

---

[68] As part of its Motion, the Trust submitted the expert reports of Todd Menenberg (Smith Decl. Ex. 137, the Menenberg Report) and the reply expert report of Todd Menenberg (Smith Decl. Ex. 172) (the "Menenberg Reply").  The Trust also submitted the expert reports of Barry Pulliam

publication of the draft FFS for the lower 8 miles of the Passaic River, the time when even Repsol's expert concedes it would have been reasonable to estimate that Maxus's liability could exceed $1 billion.  Smith Decl. Ex. 6 at 306.  Until the expropriation in 2012, the litigation strategy was developed and controlled by Repsol and YPF through their counsel, Kirkland & Ellis LLP.  *See* Trust Mot. at 22; Smith Decl. Exs. 12, 106, 146, 151.

Given this significant, consistent body of evidence of the Strategy, the Defendants' arguments that the transactions cannot be collapsed as a matter of law fail.  Perhaps recognizing that reality, both sets of Defendants then argue that, even if the facts do support collapsing, the Court cannot collapse the transactions as a matter of law.  Not so.

*First*, Defendants try to distinguish facts of *Tronox* as inapplicable.  At heart, Defendants claim that their scheme was too long and had too many parental transactions to be similar to *Tronox II*—despite having precisely the same pattern of conduct: identify the issue of looming environmental liability, transfer the good assets, leave the environmental liabilities behind, run out the statute of limitations on claims related to the transfer, and then on for dear life until an inevitable bankruptcy.  The fact that certain details of this Strategy were not determined precisely from the outset, that both YPF and Repsol dealt with contingencies and changing conditions as they implemented the Strategy, that the Strategy took several years, or that the Defendants failed to predict all aspects of the Strategy at inception does not mean, however, that there was no Strategy at all.  And, it certainly does not render *Tronox II* inapplicable.  Under the Defendants' strict interpretation of *Tronox II*, if YPF (and Repsol) failed to create an exhaustive, "all issue

---

(Smith Dec. Ex. 111) (the "Pulliam Report").  Each of these reports marshals significant evidence about the post-2005 Strategy to assist the Court.  *See* Smith Decl. Ex. 137 ¶¶ 151-177, 270; Smith Decl. Ex. 172 ¶¶ 144, 164-165, and Smith Decl. Ex. 111 ¶¶ 33-39, 215-218, 240-309.

99

spotting" master plan in 1995, inclusive of every discreet transfer of assets and a Chapter 11 filing, than their creditors have no recourse under the Bankruptcy Code. Surely, that is not the result the *Tronox II* court envisioned or one this Court should condone.

If anything, the long, winding road to a Chapter 11 filing that Defendants orchestrated took is only more compelling evidence of an integrated scheme that supports application of the collapsing doctrine. As noted throughout, a key, openly discussed component of the Defendants' Strategy was to run the clock as long as possible in an effort to avoid collapsing the statute of limitations set out in *Tronox II.* Trust Mot. at 20, 25. In fact, these Defendants had the benefit of the *Tronox II* decision to shape the last phase of the Strategy, as indicated by the flurry of evidence created when the decision was handed down. Trust Mot. at 25. Whereas in *Tronox II*, the completion of the transaction was driven by the market's appetite for an IPO, the final steps in the Defendants' Strategy here was always and ever to put Maxus in bankruptcy the moment it appeared environmental creditors' claims were going to be liquidated, for the sole purpose of closure with respect to its alter ego and fraudulent transfer claims (which Defendants had actively been litigating for over ten years). And that's exactly what happened—Maxus filed for bankruptcy immediately before the trial was to start on OCC's claims. Failure to apply *Tronox* collapsing here would permit precisely what the Judge Gropper sought to prevent, "a shrewd and unscrupulous enterprise" by a debtor and its parent corporation to denude the environmental obligor of substantially all of its assets, continue to satisfy environmental liabilities from the cash flow of the combined entity until the statute of limitations period had run and the divestiture was ready for completion, and then leave the environmental claimants without any source of recovery. *Tronox II*, 503 B.R. at 271. ("If the architects of such a scheme could claim that the statute of limitations

100

had already run by virtue of the first step in the scheme, they would have free reign to hinder and delay creditors so long as they could do it in two steps several years apart.").

*Second*, Repsol asserts that the collapsing doctrine "is not used to aggregate multiple transactions that are each themselves alleged to be fraudulent transfers." Repsol Mot. at 47. This is not true. *See, e.g.*, *In re Guiliano v. Schnabel (In re DSI Renal Holdings, LLC),* 574 B.R. 446, 467 (Bankr. D. Del. 2017) (collapsing multiple allegedly fraudulent transactions to assess defendants' actual fraudulent transfer liability). In *Guiliano* (a case cited by Repsol in its motion), the trustee alleged that the "Defendants orchestrated a restructuring [] through a complex series of agreements, transfers, and transactions that, ultimately stripped [the debtor] of its valuable assets," leaving debtors "as insolvent shells, with liabilities in excess of $40 million and assets as little as $300,000." *Id.* at 455-56. The Trustee brought a series of intentional and constructive fraudulent transfer claims for the transfers leading up to the restructuring. *Id.* at 464. At the motion to dismiss stage, defendants argued that the transfers of certain assets did not constitute transfers of property belonging to the debtor. The court collapsed the allegedly intentional fraudulent transactions to assess whether the trustee had pled sufficient facts to "support an inference that the Defendants [effectuated fraudulent transfers] through an intermediary with actual intent to" defraud creditors. *Id.* at 468. The court indicated that "[t]he circumstances surrounding the debtor's demise and new entity's ascendance matter more than the classification of each transfer." *Id.* at 467. It also noted that "[t]he creation of an intermediary corporation does not insulate the defendants from liability for fraudulent transfers." *Id.* After assessing the facts and viewing the multiple transactions as a "single integrated transaction," the court held that the trustee had properly alleged that the defendants moved the debtor's assets through an intermediary with actual intent to defraud creditors, and that there was a fraudulent scheme to shield the debtor's assets from creditors. *Id.*

AMERICAS 114201192

Repsol also claims that the transactions were not concealed such that the Trust's creditors could have known about the alleged injury and brought a timely claim. Repsol Mot. at 49. They are once again wrong. *First*, the Trust has alleged that the harm to creditors culminated in the final act of the Strategy—the bankruptcy in 2016. Trust Mot. at 24-27. *See Tronox II*, 503 B.R. at 267-68 ("[A] fraudulent conveyance takes effect when there is an actual effect on creditors and their rights.") Indeed, the Strategy with the Fraudulent Transfers "must be viewed as a whole with all its composite implications" for purposes of determining the statute of limitations, because the statutes of limitations should be examined for their substance, not their form. *Id. Second*, the Trust has established multiple creditors who had no legal notice of each fraudulent conveyance before it was too late to bring a timely claim. *See supra* Sections III.D.1, III.D.2. *Finally*, as discussed above, Repsol misunderstands the entire purpose of *Tronox*—preventing the very scheme that Defendants have implemented here. *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 498 (Bankr. D. Del. 2010) (collapsing transactions and indicating "[p]ursuant to Tabor Court Realty the Court must also examine the overall financial consequences the transactions have had on creditors.").

To the extent that the Court allows collapsing, it is indisputable under DUFTA that the last act in the Strategy (June 17, 2016), falls within the four-year statute of limitation for actual and constructive fraudulent transfer claims.[69]  6 Del. C. § 1309.  Therefore, because each of the

---

[69] To be sure, the last act of Defendants' Strategy, Maxus's Bankruptcy in 2016, is not only timely under DUFTA—it is timely under *multiple* applicable laws available to the Trust via § 544(b)(1). Indeed, the Trust's claims are timely under most applicable state fraudulent conveyance laws. 6 Del. C. § 1309 (four-year statute of limitations for actual fraudulent transfer claims); Ohio Rev. Code § 1336.04 (same); Wis. Stat. Ann. § 893.425 (same); Tex. Bus. & Com. Code Ann. § 24.010 (same). *See also supra* Section III.A. (establishing that Ohio, Wisconsin, and Texas laws qualify as "applicable law"). Moreover, by standing in the shoes of its federal creditors, the Trust can utilize the statute of limitations in applicable federal law, including 28 U.S.C. § 2415, which

AMERICAS 114201192

Fraudulent Transfers, including those spanning back to the 1996, were part of the Strategy, the Trust's claims are all timely through *Tronox* collapsing.

**B.      Any Affirmative Defense Not Mentioned or Supported by Law and Fact in Defendants' Motions Should be Dismissed**

Now we turn to Defendants' defenses other than those relating to limitations periods.  In their 279 pages of pleadings, Defendants have only discussed in any meaningful way five classic affirmative defenses: Repsol 22 (extraterritoriality); a portion of Repsol 5 (statute of limitations); Repsol 14 (unjust enrichment), Repsol 11-12 (good faith transferee) (discussed more fully at Section II.F., *supra*) and YPF Defense 4 (statute of limitations and statutes of repose).  Repsol Mot. at 45, 59, 66; YPF Mot. at 66.  The Trust has already addressed extraterritoriality (Opp. to Repsol Mot. at Section III.B.2.), unjust enrichment (Opp. to Repsol Mot. at Section IV.A.), standing (Opp. to Repsol Mot. at Section IV.B., *supra* Section I.A.), and the statute of limitations affirmative defenses (in the preceding section).  However, Defendants fail to mention, much less discuss, many of their other Affirmative Defenses, and largely omit discussion of how any of these defenses present triable issues of facts.  The entirely unmentioned Affirmative Defenses include: YPF 5 (collateral estoppel, res judicata, and "the entire controversy" doctrine), 28 (extraterritorial fraudulent transfers), and 29 (mitigation); Repsol 9 (business judgment rule), 16 (ratification), 23 (§ 546 (e)), and part of 5 (estoppel).  Consequently, all of these unmentioned affirmative defenses should be dismissed at this time.[70]  *See Bailey-P.V.S. Oxides, LLC* 2009 U.S. Dist. LEXIS 95007, at **4-7 (W.D. Pa. Oct. 13, 2009) (granting Plaintiff's motion for summary judgment on

---

affords the Trust's EPA creditor at least a six-year statute of limitations.  *See supra* Section III.A.2. (discussing available statute of limitations under § 2415).

[70] YPF acknowledges its "decision not to discuss in detail any particular defense" and urges their non-response is not a waiver of that defense.  YPF Opp. at 67 n. 89.  This is not so, as the Trust's only obligation was to "point out" that there were no triable issues of fact to support the defense. The rest fell to YPF.

AMERICAS 114201192

defendant's affirmative defense where "[d]efendant did not proffer[] any facts or law that would support their entitlement to proceed on th[e] defense."); *Bank of Am., N.A. v. Sonali Energees USA, LLC*, Civ. Action No. 19-cv-20992 (JXN)(JBC), 2022 U.S. Dist. LEXIS 3422, at *12 (D.N.J. Jan. 7, 2022) (granting plaintiff summary judgment when "Defendants have submitted no evidence or any further allegations in support of their affirmative defenses, and thereby failed to establish a dispute as to any material facts of this case."); *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090 (Bankr. Del. 1990) (granting summary judgment for Plaintiff when "defendants not only failed to point to any specific facts that would raise a genuine dispute as to their affirmative defenses, they failed to raise the affirmative defenses at all").

Those Affirmative Defenses that Defendants did at least mention by name or concept in their opposing pleadings, but did not brief at all, include: YPF 6 (pari delicto, acquiescence, waiver, ratification, release, laches, and/or estoppel), 7 (unclean hands), 8 (unjust enrichment),[71] 19 (good faith and for value), 31 (accord and satisfaction), 36 (avoidable consequences),[72] 37 (assumption of risk); Repsol 6 (waiver, consent, estoppel, and release), 7 (unclean hands and pari delicto), 8 (collateral estoppel, res judicata, judicial estoppel, abstention, the New Jersey "entire controversy" doctrine, accord and satisfaction, and payment).  Repsol alone made a superficial attempt to identify triable issues of fact with respect to five Affirmative Defenses, in three bullet points on one page in its opposition.  Two reference Repsol's Affirmative Defenses 6, 7, 8, and the last references Repsol's Damage Defenses 15 and 27.  Each bullet point merely recites the defense and then provides a single sentence (or less) of "support." Repsol Opp. Mot. 68.  But a single sentence

---

[71] The Trust notes that, while Repsol has sought affirmative summary judgment on its unjust enrichment defense, YPF has not moved on its own unjust enrichment defense.  YPF, therefore, cannot prevail affirmatively with that defense, as it is not able to rely on Repsol's pleadings.

[72] As discussed above, the Trust categorizes YPF 36 as an Affirmative Defense.

AMERICAS 114201192

of "support" is insufficient to defeat summary judgment, just as a conclusory statement merely mentioning the Defense is insufficient. *United States v. Werner*, No. 3:13-CV-2759, 2015 U.S. Dist. LEXIS 28290, at *13 (M.D. Pa. Mar. 9, 2015) (citing *Bhatla v. U.S. Cap. Corp.*, 990 F.2d 780, 787 (3d Cir. 1993)) ("Mere assertions set out in a pleading are insufficient to defeat summary judgment."); *EdgeCo Inc. v. FastCap, LLC,* Civ. Action No. 02-2624 (JAG), 2005 U.S. Dist. LEXIS 46220, at *39 (D.N.J. July 8, 2005*)* ("[Defendant] may not rest on a mere listing of defenses, without presenting factual support for at least the basis of these defenses, in its efforts to preclude summary judgment"); *Harper*, 743 F. Supp. at 1090 ("[D]efendants not only failed to point to any specific facts that would raise a genuine dispute as to their affirmative defenses, they failed to raise the affirmative defenses at all.").

YPF on the other hand, merely avers that the Trust did not identify or address the elements of each Affirmative Defense that it names in its pleading and alleges that "regardless, material facts are in dispute relating to the YPF Defendants' affirmative defenses, precluding summary judgment." YPF Opp. at 69. This general statement is not enough to save any of YPF's unexplicated Affirmative Defenses. *See Werner*, No. 3:13- 2015 U.S. Dist. LEXIS at *13.

### C.    Any Non-Affirmative Defense Not Mentioned by Defendants or Supported by Fact Should Be Dismissed.

Defendants' answers also include, as purported defenses, conclusory averments that the Trust cannot establish the various elements of its fraudulent transfer and alter ego claims.[73] *See*

---

[73] These general denials include: standing (YPF 3, Repsol 1); failure to state a claim upon which relief may be granted (YPF 1; Repsol 2), legally establishing the requisite elements of the claims (Repsol 3), no subject matter jurisdiction (YPF 2), general denial of alter ego liability (Repsol 4), proximate cause (YPF 9, Repsol 18 and 20), reasonably equivalent value (YPF 18; Repsol 19), the transfers were not made to or on behalf of Repsol (Repsol 21), lack of harm to the Debtors (YPF 20), insolvency (YPF 21), 11 U.S.C. 550(a) applies only to extent a transfer is avoided (YPF 22), the majority of Debtor's creditors were not creditors at the time of the relevant transfers (YPF 23), lack of actual intent and transfers were publicly disclosed (YPF 24), no transfer of an interest of a Debtor in property (YPF 25 and 26), Repsol was not a party to the 1986 Stock Purchase Agreement

AMERICAS 114201192

Ex. A.  Those types of denials alone have no impact on the Trust's Motion.  Indeed, "[o]nce the Trustee establishes his prima facie case, *he need not affirmatively disprove every other theory*." *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 217 (3d Cir. 2006) (emphasis added).  For the Non-Affirmative Defenses, the Trust only needs to make the showing that it meets the elements of the underlying claim it is seeking summary judgment on, and the burden shifts to the Defendants to establish in its opposition papers that a genuine issue of material fact exists.  *See In re Vaso*, 2012 Bankr. LEXIS 4741 at *28 (holding that once trustee made a preliminary showing of an avoidable transfer, the burden shifted to the defendant nonmovant alleging non-affirmative defense to "supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant").

*First*, numerous Non-Affirmative Defenses are not mentioned at all in Defendants' papers[74] and therefore do not impact any of the relief that the Trust seeks in its motion.  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 197 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

---

(Repsol 24), the YPF Defendants were not the initial, immediate, or mediate transferees nor beneficiaries of the transfers (YPF 27), and that the claims in the Complaint were not assigned to the Trust (YPF 34).

[74] Unmentioned Regular Defenses Include: YPF 2 (subject matter jurisdiction), 10 (YPF did not cause or contribute to environmental conditions), 11 (YPF did not dispose of hazardous substances), 12 (YPF did not cause third party to dispose of hazardous substances), 13 (YPF did not release, dispose of, or arrange for disposal of hazardous substances), 20 (no harm to Debtors), 22 (11 U.S.C. 550(a)), 27 (initial, immediate, or mediate transferees), 32 (compliance with law), 48 (incorporate by reference any and all additional defenses by other defendants), and 49 (no waiver of additional affirmative defenses); Repsol 17 (compliance with law), 18 (subsequent intervening cause), 20 (proximate cause), and 24 (not a party to the Stock Purchase Agreement).

106

*Second*, the Non-Affirmative Defenses to the Trust's claims for relief that are at least mentioned are being addressed elsewhere through the parties' summary judgment pleadings, and the Trust will prevail for the reasons set forth in its response to each.[75]

*Finally*, YPF also mentions its CERCLA-linked defense (YPF 41), but like the other CERCLA linked defenses in its answer (YPF 40, 42, 43, 44, 45, 46, and 47) (that go unmentioned), it has no bearing on the Trust's Claims at issue in the Trust's Motion, as the Trust is not seeking "CERCLA damages" for any of its claims.  *See supra* Section I.D.  Therefore, these CERCLA defenses can be dismissed as well.

**D.    None of Defendants' Damages Defenses Impact This Court's Ability to Grant the Trust Summary Judgment on Alter Ego Damages.**

To be clear, by requesting this Court to establish the measure of damages on its alter ego claims, the Trust (1) squarely put Defendants' purported Damages Defenses at issue, and (2) pointed out that none are sufficient to forestall the relief sought.  Trust Mot. at 1, 35-40, 68-69.[76]

---

[75] Non-Affirmative Defenses pertaining to fraudulent transfer claims include: YPF 1 (failure to state a claim), 2 (subject matter jurisdiction), 9 (proximate cause), 18 (reasonably equivalent value), 19 (good faith and for value), 20 (no harm to debtors), 21 (insolvency), 23 (creditors not creditors of Debtors at time of transfers), 24 (no actual intent and publicly disclosed transfers), 25 (no transfer of an interest of a Debtor in property), 26 (no transfer of an interest of a Debtor in property), 27 (initial, immediate, or mediate transferees), 33 (compliance with applicable laws); Repsol 2 (failure to state a claim), 11 (Repsol took in good faith and for value, and may retain any interest to the extent it gave value to Debtors in exchange for transfer) 12 (Repsol took for value, in good faith, without knowledge of voidability), 17 (transfers authorized by law), 18 (doctrine of subsequent intervening cause), 19 (reasonably equivalent value), 20 (actual and proximate cause), 21 (transfers were not made to or on behalf of Repsol), and 24 (not a party to Stock Purchase Agreement).  Non-Affirmative Defenses pertaining to alter ego claims include: YPF 1 (failure to state a claim), 2 (subject matter jurisdiction), 9 (proximate cause), 22 (Defendants' conduct was lawfully undertaken), 23 (creditors not creditors of Debtors at time of transfers), 34 (claims of creditors not assigned to Trust), 35 (Defendants exercised due care); Repsol 2 (failure to state a claim), Repsol 3 (Plaintiff legally cannot establish requisite elements of claims); 4 (Debtors are not the alter egos of Repsol), 18 (doctrine of subsequent intervening cause), 20 (actual and proximate cause); 24 (Repsol not a party of SPA).

[76] The Damage Defenses include: YPF 14 (relief is speculative, unreasonable, excessive, arbitrary, and capricious), 15 (joint and several liability), 16 (right of setoff), 17 (reduction of Trust's claims by any settlement payments) 30 (prospective declaratory relief); Repsol 10 (setoff or recoupment)

AMERICAS 114201192

In response, YPF fails to address any of the Damages Defenses in its papers, instead listing them only by number in a single footnote as defenses that are not affirmative and somehow "therefore preserved for trial." YPF Opp. at 68, n.90. Given the inadequacy of that statement, the Court can consequently summarily dismiss all of YPF's Damages Defenses, particularly as they pertain to the exact quantum of alter ego damages sought by the Trust. *See Berckeley*, 455 F.3d at 197.

Repsol, for its part, does mention certain Damages Defenses in its bulleted point list that "even if [the Trust] were to succeed….[a]ny damages would be subject to setoff, recoupment, or reduction according to the value Repsol *paid* for assets involved in the transactions, or financial assistance any Defendant provided to Maxus" (Repsol Opp. at 68) and that "overwhelming evidence of Maxus's creditors' intentional, decades-long pollution of the Passaic" apparently "shows that damages the MLT seeks…are excessive and unreasonable, and would cause unlawful punitive damages." *Id*., n.60. Again, these bare averments are not sufficient to establish a genuine triable dispute. *See In re Vaso*, 2012 Bankr. LEXIS 4741 at *28.

Here is the problem: the Trust has asked for the Court to find a specific quantum of damages on its alter ego claims. Repsol, in an attempt to push off any reckoning, simply lists the issues it wants tried, without identifying, must less supporting, any with evidence. For example, nowhere in Repsol's summary judgment pleadings do they specify what right they believe they have to setoff, recoup, or reduce for value, let alone address what actual amounts they believe they are entitled to setoff, recoup, or reduce. Where is the evidence of Repsol having any claim against the Debtors or the identity of any funds or other assets subject to recoup? Where is the evidence of the amounts that Repsol contends it gave directly to Maxus as "financial assistance" (as opposed

---

13 (attorney fees), 15 (single satisfaction rule), 25 (relief is unreasonable, arbitrary, excessive, and capricious), 26 (punitive damages barred by policy and law), 27 (contribution, reduction or offset of damages from other parties).

AMERICAS 114201192

to funds that YPFH provided)?  Where in its papers does Repsol address that the relief sought by the Trust is punitive, or arbitrary and capricious?  What amount does Repsol believe would not be arbitrary or capricious?  Why is Repsol even talking about punitive damages at this stage of the proceeding?

The time for answering these questions was in Repsol's response to the Trust's Motion seeking a specific assessment of damages in connection with the settlements, negotiated in good-faith and at arms' length, with the key creditors that formed the basis for the Plan: $712,560,327.76 in respect of the Allowed Class 4 Claims, plus pre-judgment interest,[77] and (2) a declaratory judgment that Defendants are liable as alter-egos for the unliquidated Class 5 Claims as they become due.  Repsol just dropped the ball.  In short, having failed to discuss any purported Damages Defenses in their opposition papers, Defendants have waived them all.

### E.    Defendants Have Waived Certain of Their Jurisdictional Defenses.

Finally, Defendants have alleged several jurisdictional defenses to the Trust's claims, including the lack of consent to the Court's entry of final orders (YPF 50) and lack of subject matter jurisdiction (YPF 2).  Neither of these issues, however, are briefed in Defendants' papers. YPF does mention its "defense" of lack of consent to this Court's entry of final orders (YPF 50), as does Repsol at the end of each brief (YPF Opp. at 70; Repsol Opp. at 70), but this, or the mention of it at the end of a brief, will not preclude this Court from entering summary judgment (or from entering a judgment at trial).  *Penson Techs. v. Schonfeld Grp. Holdings (In re Penson Worldwide)*, 624 B.R. 66, 75 (Bankr. D. Del. 2020) ("In its Answer, Defendant affirmatively states that it does not consent to the entry of a final order.  Notwithstanding Defendant's lack of consent, I can enter a final order on this summary judgment motion"); *see also Jalbert v. Souza (In re F-Squared Inv.*

---

[77] As noted above, none of the Defendants meaningfully contested the award of prejudgment interest on the damages to be awarded.

AMERICAS 114201192

*Mgmt., LLC)*, Adv. No. 17-50786, at *13 n.50 (Bankr. D. Del. Sep. 6, 2019) ("Unless a non-consenting entity briefs the issue of authority to enter a final order on a given matter, a statement that a party does not consent if the court cannot enter final orders absent consent of the parties is of little value.").[78] Nor does YPF explain how it can both maintain its defense as to subject matter jurisdiction (which is unarticulated anywhere in its papers) and at the same time seek to have the Court enter summary judgment in its favor.

## **CONCLUSION**

Therefore, the Trust respectfully requests that the Court grant partial summary judgment in favor of the Trust, and grant such other and further relief that the Court deems just.

---

[78] While non-consent to entry of a final judgment is not a "defense" of Repsol, Repsol does include a "No Consent to Entry of a Final Order or Judgment" section in its brief. It too, is of little value, given that the Trust's Motion will not result in a total adjudication of any claim.

110

Date:  May 18, 2022

Respectfully submitted,

FARNAN LLP

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

111

# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*, | ) |
| | ) Case No. 16-11501 (CSS) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |
| | ) |
| MAXUS LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adv. Proc. No. 18-50489 (CSS) |
| v. | ) |
| | ) **FILED UNDER SEAL** |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) |
| REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., | ) |
| REPSOL USA HOLDINGS CORP., REPSOL E&P | ) |
| USA, INC., REPSOL OFFSHORE E&P USA, INC., | ) |
| REPSOL E&P T&T LIMITED, and REPSOL | ) |
| SERVICES CO., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S OMNIBUS REPLY IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated: May 18, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)

WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

3

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS .................................................................... 7

ARGUMENT ................................................................................. 8

I.    THE ALLOWED CLAIMS AGAINST THE DEBTORS ESTABLISH THE
      PROPER QUANTUM OF YPF'S AND REPSOL'S PROSPECTIVE
      LIABILITY, AS ALTER EGOS OF MAXUS ......................................... 8
      A.    The Trust Has Standing ............................................... 9
      B.    The Trust Is Not Seeking an Advisory Opinion ....................... 15
      C.    Defendants' Arguments Regarding the "All Liabilities" Theory Fail ... 17
      D.    Defendants' CERCLA Contentions Fail ................................ 22
      E.    Defendants Misconstrue the Plan Reservation of Rights ............... 25

II.   THE TRUST IS ENTITLED TO SUMMARY JUDGMENT ON ITS
      ACTUAL FRAUDULENT TRANSFER CLAIMS AGAINST EACH OF THE
      NAMED TRANSFEREE DEFENDANTS ........................................... 32
      A.    Defendants Misconstrue the Summary Judgment Standard in the
            Context of the Badges of Fraud ..................................... 32
      B.    Defendants Cannot Obtain a Trial Simply By Disclaiming Their Own
            Documents .......................................................... 33
      C.    Despite Defendants' Efforts to Feign Confusion and Manufacture
            Issues of Fact, the Trust Is Entitled to the Relief It Seeks With Respect
            To Each of the Intentional Fraudulent Transfers. ................... 45
      D.    There is No Genuine Dispute of Material Fact that the Badges of Fraud
            Provide Conclusive Evidence of Defendants' Intent to Defraud, Delay,
            or Hinder Maxus's Environmental Creditors .......................... 47
            1.    Badge 1: The Transfers Were Made to Insiders .................. 47
            2.    Badge 2: The Debtors Retained Possession or Control of the
                  Property Transferred After the Transfers ..................... 49
            3.    Badge 3: The Transfer or Obligation Was Disclosed or
                  Concealed .................................................... 51
            4.    Badge 4: Before the Transfer Was Made or Obligation Was
                  Incurred, the Debtors Had Been Sued or Threatened with Suit ... 54
            5.    Badge 5: The Transfer Was of Substantially All of the Debtors'
                  Assets. ...................................................... 56
            6.    Badge 7: The Debtors Removed or Concealed Assets. ............ 58
            7.    Badge 8: The Value of the Consideration Received by the
                  Debtors Was Not Reasonably Equivalent to the Value of the
                  Asset Transferred or the Amount of the Obligation Incurred .... 59
            8.    Badge 9: The Debtors Were Insolvent or Became Insolvent
                  Shortly After the Transfer Was Made or the Obligation Was
                  Incurred. .................................................... 62
            9.    Badge 10: The Transfer Occurred Shortly Before or Shortly
                  After a Substantial Debt Was Liquidated. ..................... 64
      E.    None of Defendants' Other Technical Attacks on the Intentional
            Fraudulent Conveyances Warrant a Trial ............................. 66
      F.    There is No Genuine Issue of Material Fact Concerning Repsol's Good
            Faith Defense ...................................................... 72

III.  DEFENDANTS HAVE NOT ESTABLISHED A GENUINE TRIABLE

i

ISSUE REGARDING THEIR PURPORTED AFFIRMATIVE AND OTHER
DEFENSES TO ANY OF THE TRUST'S CLAIMS............................................75

A.      All of Defendants' Statute of Limitations Affirmative Defenses Fail...... 80

       1.      The Discovery Tolling Rule Tolls the Statute of Limitations on
the Intentional Fraudulent Conveyance Claims Until the
Petition Date............................................................................ 85

             a.      Mr. Bilbrey's Actual Fraudulent Claims under Texas
Law are Timely ............................................................... 86

             b.      Mr. Fetsick's Actual Fraudulent Transfer Claims Under
New Jersey Law are Timely ............................................ 88

       2.      The Trust's Actual Fraudulent Transfer Claims are Viable
through the *Nullum Tempus* Doctrine ............................................ 90

       3.      The Trust's Actual Fraudulent Transfer Claims Are Timely
Through *Tronox* Collapsing ........................................................ 91

             a.      Repsol's Arguments that the Trust has "Failed to
Adduce Evidence to Collapse" the Transactions Are
Unavailing...................................................................... 95

B.      Any Affirmative Defense Not Mentioned or Supported by Law and
Fact in Defendants' Motions Should be Dismissed ............................... 103

C.      Any Non-Affirmative Defense Not Mentioned by Defendants or
Supported by Fact Should Be Dismissed.............................................. 106

D.      None of Defendants' Damages Defenses Impact This Court's Ability to
Grant the Trust Summary Judgment on Alter Ego Damages. ................ 108

E.      Defendants Have Waived Certain of Their Jurisdictional Defenses. ..... 110

CONCLUSION .............................................................................................................111

AMERICAS 114201192

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Ahcom, Ltd. v. Smeding*,
  623 F.3d 1248 (9th Cir. 2010) ..............................................................11

*Amerada Hess Corp. v. Yuma Shipping Corp.*,
  No. 82 Civ. 2136, 1985 U.S. Dist. LEXIS 21490 (S.D.N.Y. Mar. 22, 1985).........................16

*Ameriserv Fin. Bank v. Commercebank, N.A.*,
  No. 07-1159, 2009 U.S. Dist. LEXIS 24559 (W.D. Pa. Mar. 26, 2009) ...........................72, 73

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
  473 B.R. 525 (Bankr. D. Del. 2012) ..............................................60

*Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*,
  520 B.R. 15 (Bankr. S.D.N.Y. 2014)..............................................29

*Bank of Am., N.A. v. Sonali Energees USA, LLC*,
  Civ. Action No. 19-cv-20992 (JXN)(JBC), 2022 U.S. Dist.
  LEXIS 3422 (D.N.J. Jan. 7, 2022)..............................................104

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*,
  No. 3:17-CV-01147-X, 2019 WL 5578510 (N.D. Tex. Oct. 28, 2019),
  *aff'd*, 976 F.3d 585 (5th Cir. 2020) ..............................................87

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)..............................................106, 108

*Bertram v. WFI Stadium, Inc.*,
  41 A.3d 1239 (D.C. 2012) ..............................................40

*Campbell v. City of New York*,
  16-cv-8719, 2021 U.S. Dist. LEXIS 40933 (S.D.N.Y. Mar. 4, 2021)...................15

*Conoshenti v. Pub. Serv. Elec. & Gas Co.*,
  364 F.3d 135 (3d Cir. 2004)..............................................76

*Cooke v. General Dynamics Corp.*,
  No. 3:95 cv 31, 1998 U.S. Dist. LEXIS 15981 (D. Conn. Sept. 11, 1998) ...........................16

AMERICAS 114201192

*Covey v. Casey's Gen. Stores, Inc. (In re Duckworth)*,
  Nos. 10-83603, 11-8104, 2012 Bankr. LEXIS 4379
  (Bankr. C.D. Ill. Sep. 21, 2012) ........................................................................68

*Deepstar Marine, Inc. v. Xylem Dewatering Solutions, Inc.*,
  No. 12-7628, 2014 U.S. Dist. LEXIS 104358 (D.N.J. July 30, 2014) ...................15

*Diaz-Cruz v. Symons*,
  No. 1:11-CV-1302, 2016 U.S. Dist. LEXIS 165690 (M.D. Pa. Dec. 1, 2016).......87

*EdgeCo Inc. v. FastCap, LLC*,
  Civ. Action No. 02-2624 (JAG), 2005 U.S. Dist.
  LEXIS 46220 (D.N.J. July 8, 2005*)* .................................................................105

*Elway Co. v. Miller (In re Elrod Holdings Corp.)*,
  421 B.R. 700 (Bankr. D. Del. 2010) ...............................................................70, 71

*Ettinger v. Johnson*,
  556 F.2d 692 (3d Cir. 1977)................................................................................87

*FDIC v. Martinez Almodovar*,
  671 F. Supp. 851 (D.P.R. 1987)...........................................................................90

*Feinberg v. RM Acquisition, LLC*,
  629 F.3d 671 (7th Cir. 2011) ..............................................................................61

*Finkel v. Polichuk (In re Polichuk)*,
  506 B.R. 405 (Bankr. E.D. Pa. 2014) ............................................................83, 84

*Fr. Winkler KG v. Stoller*,
  839 F.2d 1002 (3rd Cir. 1988) ............................................................................27

*FTC v. Hope Now Modifications, LLC*,
  No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 35550 (D.N.J. Apr. 12, 2010).....79

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*,
  313 B.R. 612 (Bankr. D.N.J. 2004),
  *rev'd in part on other grounds*, *Off. Comm. of Asbestos Claimants v.*
  *Bank of N.Y.*, No. 04-3423 (WGB), 2006 WL 1751793 (D.N.J. June 21, 2006)...................88

*Gierum v. Glick (In re Glick)*,
  568 B.R. 634 (Bankr. N.D. Ill. 2017) ..................................................................68

*Goodman v. Mead Johnson & Co.*,
  534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977)..........................32

*Greiff v. T.I.C. Enters., L.L.C.*,
  No. 03-882-SLR, 2004 U.S. Dist. LEXIS 680 (D. Del. Jan. 9, 2004)...................79

AMERICAS 114201192

*Guido v. Spina*,
  No. A-3215-08T3, 2010 WL 1928985 (N.J. Super. Ct. App. Div. May 14, 2010) ................88

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
  2015 Bankr. LEXIS 2914 ..................................................................................................66

*Hammersmith v. TIG Ins. Co.*,
  480 F.3d 220 (3d Cir. 2007)..............................................................................................83

*Harper v. Del. Valley Broadcasters, Inc.*,
  743 F. Supp. 1076 (D. Del. 1990).................................................................................76, 105

*Hawkins v. Lister (In re Lister)*,
  Nos. 08-13738-B-7, 09-1140, 2011 Bankr. LEXIS 5579
  (Bankr. E.D. Cal. Mar. 30, 2011)......................................................................................44

*In re AMC Investors, LLC*,
  637 B.R. 43, 2022 WL 248133 (Bankr. D. Del. Jan. 27, 2022) ............................................82

*In re Blatstein*,
  192 F.3d 88 (3d Cir. 1999)................................................................................................40

*In re Bressman*,
  No. 02-1725, 327 F.3d 229 (3d Cir. 2003) .........................................................................73

*In re Collins*,
  540 B.R. 54 (Bankr. E.D.N.Y. 2015)..................................................................................50

*In re Combustion Engineering, Inc.*,
  391 F.3d 216 (3d Cir. 2004)..............................................................................................29

*In re CVAH, Inc.*,
  570 B.R. 816 (Bankr. D. Idaho 2017).................................................................................83

*In re Emoral, Inc.*,
  740 F.3d 875 (3rd Cir. 2014) ............................................................................................14

*In re Grasso*,
  497 B.R. 434 (Bankr. E.D. Pa. 2013) ..................................................................................8

*In re Greater Se. Cmty. Hosp. Corp. I*,
  365 B.R. 293 (Bankr. D.D.C. 2006) ...................................................................................84

*In re Guiliano v. Schnabel (In re DSI Renal Holdings, LLC)*,
  574 B.R. 446 (Bankr. D. Del. 2017) .............................................................................101, 102

*In re Jevic Holding Corp.*,
  2011 WL 4345204 ......................................................................................................94, 95

v

*In re Kern*,
No. 20-18381, 2021 Bankr. LEXIS 2462 (Bankr. D.N.J. Sept. 7, 2021) ...................33, 38, 39

*In re LATAM Airlines Grp.*
S.A., No. 20-11254 (JLG), 2022 Bankr. LEXIS 248
(Bankr. S.D.N.Y. Jan. 28, 2022)............................................................................................59

*In re Leslie Controls, Inc.*,
No. 10-12199 CSS, 2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010) ................................29

*In re Mervyn's Holdings, LLC*,
426 B.R. 488 (Bankr. D. Del. 2010) .....................................................................................102

*In re Mongelluzzi*,
587 B.R. 392 (Bankr. M.D. Fla. 2018) ......................................................................72, 73, 75

*In re N.J. Affordable Homes Corp.*,
2013 Bankr. LEXIS 4798
(Bankr. N.J. Nov. 8, 2013)......................................................................................................89

*In re NJ Affordable Homes Corp.*,
2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013)...................................................................88

*In re Norvergence, Inc.*,
405 B.R. 709 (Bankr. D.N.J. 2009) ........................................................................................60

*In re Prosser*,
No. 06-30009, 2009 Bankr. Lexis 3279
(Bankr. D. Virgin Islands Oct. 9, 2009)..................................................................................39

*In re SemCrude, L.P.*,
2013 WL 2490179 (Bankr. D. Del. 2015) ..............................................................................61

*In re Tronox, Inc.*,
464 B.R. 606 (Bankr. S.D.N.Y. 2012)....................................................................................29

*In re Vaso Active Pharms.*,
No. 10-10855 (CSS), 2012 Bankr. LEXIS 4741
(Bankr. D. Del. Oct. 9, 2012).......................................................................................... passim

*In re Webster*,
629 B.R. 654 (Bankr. N.D. Ga. 2021) ....................................................................................83

*In re Weidner*,
476 B.R. 873 (Bankr. E.D. Pa. 2012) .....................................................................................39

vi

*Indus. Enters. of Am. v. Tabor Acad. (In re Pitt Penn Holding Co.)*,
    Nos. 09-11475 (BLS), 11-51879, 2011 Bankr. LEXIS 3554
    (Bankr. D. Del. Sep. 16, 2011) ......................................................................82

*Janvey v. Democratic Senatorial Campaign Comm. Inc. (DSCC)*,
    712 F.3d 185 (5th Cir. 2013) ...............................................................86, 87

*Jet Midwest Int'l Co. v. Jet Midwest Grp.*,
    No. 5:18-cv-06019, 2020 U.S. Dist. LEXIS 159166 (W.D. Mo. May 26, 2020)..................58

*Johnston v. Crook*,
    93 S.W.3d 263 (Tex. App. 2002).........................................................................86

*Jones v. Mackey Price Thompson & Ostler*,
    469 P.3d 879 (Utah 2020)................................................................................40

*Kendall McGaw Laboratories, Inc. v. Comm. Mem'l Hosp.*,
    125 F.R.D. 420 (D.N.J. 1989) ........................................................................16

*Kinnel v. Mid-Atlantic Mausoleums, Inc.*,
    850 F.2d 958 (3rd. Cir. 1988) ........................................................................16

*Leonard v. Superpumper, Inc.*,
    No. CV13-G2663, 2019 Nev. Dist. LEXIS 712 (2d. Dist. Nev., Mar. 28, 2019)..................58

*LG Philips LCD Co. v. Tatung Co.*,
    243 F.R.D. 133 (D. Del. 2007) ......................................................................78

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    2019 WL 10252607 (D. Del. June 21, 2019).......................................................32

*Lovely H. v. Eggleston*,
    No. 05 Civ. 6920 (KBF), 2012 U.S. Dist. LEXIS 139462 (S.D.N.Y. Sep. 19, 2012).............16

*Ltd. v. Patriarch Partners, LLC (In re Zohar III, Corp.)*,
    631 B.R. 133 (Bankr. D. Del. 2021) ................................................................80

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................................39

*Michaelson ex rel. Appleseed's Litig. Trust v. Farmer
(In re Appleseed's Intermediate Holdings, LLC)*,
    470 B.R. 289 (D. Del. 2012)....................................................................61, 69

*Moran v. Pardo (In re Life Partners Holdings, Inc.)*,
    No. 15-40289-RFN-11, 2016 U.S. Dist. LEXIS 192191 (N.D. Tex. Dec. 20, 2016)..............86

AMERICAS 114201192

*Mullin v. Dzikowski*,
  257 B.R. 356 (S.D. Fla. 2000) .......................................................................12

*N.J. Dep't of Envt'l Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*,
  560 B.R. 111 (Bankr. D. Del. 2016) ..........................................................9, 13

*Nat'l Union Fire Ins Co. v. City Sav., F.S.B.*,
  28 F.3d 376 (3d Cir. 1994)........................................................................78, 79

*New Castle County v. Halliburton NUS Corp.*,
  903 F. Supp. 771 (D. Del. 1995).....................................................................30

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) (Gropper, J.) .....................................39

*Norman v. Elkin*,
  726 F. Supp. 2d 464 (D. Del. 2010)................................................................81

*Norman v. Riddell (In re Green Valley Seeds, Inc.)*,
  27 B.R. 34 (Bankr. D. Or. 1982)....................................................................13

*of Biliouris v. Patman*,
  751 F. App'x 603 (5th Cir. 2019) ...................................................................87

*Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements, Inc.
  (In re Midway Games, Inc.)*,
  428 B.R. 303 (Bankr. D. Del. 2010) ..............................................................80

*Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.
  (In re Sunbeam Corp.)*,
  284 B.R. 355 (Bankr. S.D.N.Y. 2002) .......................................................91, 92

*Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*,
  280 B.R. 573 ..................................................................................................29

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp.
  Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*,
  444 F.3d 203 (3d Cir. 2006)..........................................................................106

*Penson Techs. v. Schonfeld Grp. Holdings (In re Penson Worldwide)*,
  624 B.R. 66 (Bankr. D. Del. 2020) ...............................................................109

*RES-NV CHLV, LLC v. Rosenberg*,
  No. 2:13CV115DAK, 2015 U.S. Dist. LEXIS 12617 (D. Utah Feb. 2, 2015).......................72

*Robson v. Duckpond Ltd.*,
  No. 4:19-cv-01862, 2021 U.S. Dist. LEXIS 63278 (E.D. Mo. Mar. 31, 2021).......................16

viii

*Rosenberg v. N. Bergen*,
   61 N.J. 190 (1972) ....................................................................................................88

*Shabazz v. Del. Dep't of Corr.*,
   2021 WL 4502034 (D. Del. Oct. 1, 2021) ..............................................................32

*Smith v. George (In re RCK Modular Homes Sys.)*,
   402 B.R. 463 (Bankr. D.N.H. 2008) ........................................................................82

*Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*,
   516 B.R. 163 (Bankr. E.D. Ky. 2014) ......................................................................68

*Springel v. Prosser (In re Innovative Commun. Corp.)*,
   Nos. 07-30012, 08-3004, 2011 Bankr. LEXIS 3040 (Bankr. D.V.I. Aug. 5, 2011)...............55

*Techniek v. Strategic DSRG, LLC*,
   No. 09 Civ. 5644, 2011 U.S. Dist. LEXIS 9624 (S.D.N.Y. 2011) ..........................15

*The Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*,
   716 F.3d 736 (3d Cir. 2013)......................................................................................11

*United States v. Bestfoods*,
   524 U.S. 51 (1998)....................................................................................................25

*United States v. Moore*,
   968 F.2d 1099 (11th Cir. 1992) ................................................................................90

*United States v. Tabor Court Realty Corp.*,
   803 F.2d 1288 (3d Cir.1986).....................................................................................95

*United States v. Werner*,
   No. 3:13-CV-2759, 2015 U.S. Dist. LEXIS 28290 (M.D. Pa. Mar. 9, 2015) ......................105

*United States v. White-Sun Cleaners Corp.*,
   No. 09-cv-2484 (ARR) (JO), 2011 U.S. Dist. LEXIS 36470 (E.D.N.Y. Mar. 9, 2011)..........50

*Voiland v. Marston (In re Marston)*,
   417 B.R. 766 (Bankr. N.D. Ill. 2009) .......................................................................11

*Weinstein Enters., Inc. v. Orloff*,
   870 A.2d 499 (Del. 2005) .........................................................................................48

*Williams v. Bier Int'l, LLC*,
   No. 14CV03894, 2015 U.S. Dist. LEXIS 94609 (S.D.N.Y. July 21, 2015)...........................17

*Wolff v. Tzanides*,
   574 B.R. 489 (Bankr. D.N.J. 2017) ..........................................................................88

ix

*Yoo v. Garoian (In re Garoian)*,
No. 2:10-bk-20883 RK, 2014 Bankr. LEXIS 5254 (Bankr. C.D. Cal. Oct. 7, 2014).............50

*YPF S.A., v. Maxus Liquidating Trust*,
No. 21-2496 (3d Cir. Feb. 17, 2022)...................................................................................2

## STATE STATUTES

N.J.S.A. 25:2-31(a) (2001) .........................................................................................88

N.J. Stat. Ann. § 25:2-31 .............................................................................................88

New Jersey UFTA ........................................................................................................88

NY Labor Law ..............................................................................................................17

Ohio Rev. Code § 1336.04 .........................................................................................102

Okla. Stat. Title 24, § 121(1)-(2) ................................................................................92

Oklahoma UFTA ..........................................................................................................92

Tex. Bus. & Com. Code Ann. § 24.010 ......................................................................102

Tex. Bus. & Com. Code § 24.010(a)(1) .......................................................................86

Wis. Stat. Ann. § 893.87 ..............................................................................................90

Wis. Stat. Ann. § 893.425 ...........................................................................................102

## FEDERAL STATUTES AND RULES

11 U.S.C. § 108(a) ......................................................................................................86

11 U.S.C. § 542 ...........................................................................................................12

11 U.S.C.A. § 548(c) ...................................................................................................71

11 U.S.C. § 550 ...............................................................................................66, 67, 69

11 U.S.C. 550(a) ......................................................................................69, 78, 105, 106

28 U.S.C. § 2415 ........................................................................................................103

28 U.S.C. § 2416 ..........................................................................................................90

AMERICAS 114201192

42 U.S.C. § 9607 ......................................................................................................85

Federal Rules of Bankruptcy Procedure Rule 7056 .........................................................8

Federal Rules of Civil Procedure Rule 30(b)(6) ...........................................................72

Federal Rules of Civil Procedure Rule 42(b) ................................................................16

Federal Rules of Civil Procedure Rule 56(g) .....................................................8, 15, 16

AMERICAS 114201192

## PRELIMINARY STATEMENT[1]

One of the most *un*remarkable features of Defendants' oppositions to the Trust's Motion and their accompanying counterstatements of disputed and undisputed facts is the sheer number of pages that Defendants take to say that every issue in this case which could go against them is a triable one.  Given the Court's impending retirement, and the short time period in which it will have to resolve the pending motions, it is surely no surprise that Defendants would seek to crowd the record with 140 pages of largely uncoordinated briefs, 534 pages of counterstatements of facts disputing nearly everything said by their own experts and in their own documents, 139 pages of briefing on their own motions (oftentimes repeating opposition arguments verbatim) and 207 pages of their own versions of the "undisputed" facts.  The Trust anticipates that the Court is already deep into its analysis of the law and facts raised by all three motions, and to that end the Trust will endeavor to keep it simple.  There are only three issues framed by the Motion—(1) if Defendants are determined at trial to be Maxus's alter ego, are they liable to the Trust in an amount sufficient to pay Maxus's creditors?; (2) did Defendants engage in intentional fraudulent conveyances with their Debtor subsidiaries?; and (3) have Defendants presented any legitimate defenses to the Trust's claims sufficient to warrant a trial?

As the Trust has maintained from the outset of this proceeding, there really are no genuine issues of fact as to the who, what, when, where, or why, or of the law applicable to these three questions, and the Court can and should resolve each in the Trust's favor at this time.  There are, however, so many aspects of Defendants' oppositions that are truly remarkable.

*First*, having spent the last four years desperately trying to avoid having this Court rule on

---

[1] The definitions of all capitalized terms in the Trust's Motion for Partial Summary Judgment are incorporated by reference in this Opposition (unless otherwise defined herein).

AMERICAS 114201192

any substantive issue, and most recently having publicly accused this Court of both bias and precipitousness,[2] Defendants affirmatively invoke this Court's jurisdiction to enter judgment in their favor right now. The Trust welcomes that change of heart and, in its companion briefs opposing the YPF and the Repsol motions for summary judgment, explains why Defendants are not entitled to relief at this time. But Defendants can hardly claim now that this process is moving too fast for them to keep up.

*Second*, Defendants' oppositions largely read as if this case were a garden-variety civil dispute over good-faith corporate business decisions as to which reasonable people could have legitimate disagreements. And, in attempting to advocate that point, Defendants simply ignore what this dispute is really about—how does one appropriately run a business with productive assets, short-term funded debt, and long-tailed environmental liabilities that will destroy the business when they come to fruition? All of Defendants' talk about the benefits of their having paid down the funded debt (which they had guaranteed), or not fully understanding exactly how catastrophic the environmental expenses would be, or having paid portions of environmental expenses leading up to the catastrophe, simply miss the point. This case has, from inception, been about Defendants' open-eyed anticipation of an environmental claim reckoning coupled with an unwillingness to leave anything of value within Maxus when that moment inevitably came. Dexter Peacock's *first* memorandum after YPF purchased Maxus in 1995 indisputably centers on the cliff,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[2] To the Third Circuit: "[t]he bankruptcy court has suddenly declared an intention to render a potentially final judgment in this case before this Court can rule . . . This unexpected acceleration threatens the integrity of the judicial process." *See* Appellants YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc.'s Motion to Stay Pending Appeal, *YPF S.A., v. Maxus Liquidating Trust*, No. 21-2496 (3d Cir. Feb. 17, 2022) [ECF 35-1] at 5.

AMERICAS 114201192

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    From that point forward, the contemporaneous written record

establishes that Defendants' handling of Maxus's affairs was always, at least in very large part,

directed at ██████████████████████████████    and Defendants' attempts to salvage their

investments in Maxus without having to foot the ultimate remediation bill.  The Trust has always

maintained that what happened here is not appropriate corporate behavior and that Defendants

went far too far in their attempts to disenfranchise legitimate federal, state, and individual

environmental creditors in favor of their own asset-salvaging exercise.  So, can Defendants now

be held liable to pay an amount to satisfy the claims of the environmental creditors which were

always and ever the focus of their corporate machinations?  As set forth in Section I, of course

they can.

*Third*, despite having had nearly three decades to get their stories straight, Defendants'

explanations for the corporate machinations are surprisingly weak and uncoordinated.  One would

have thought with the dry run of the NJ Litigation they would at least by now have a coherent

explanation for why they did what they did when they did it.  Part of the problem, of course, is that

Defendants were so successful in managing the factual record in the NJ Litigation that their full

story was never revealed.  Until this proceeding, Defendants never produced, for example,

hundreds of pages of key legal documents—the full suite of King & Spalding memoranda, the

Kirkland & Ellis interview notes, the Chadbourne & Park Project Jazz documents—even though

they had, as this Court has ruled, already waived privilege over them.  [D.I. 227].  More critically,

if one peruses the record of the NJ Litigation, it is apparent that the central, highly contentious

back-and-forth was over the import of the 1993 ChemRisk report (Smith Decl. Ex. 97) ██████

3

█████████████████████████████████████████████████████████ As to that, Defendants were then, and are now, crisp in their narratives.  Despite being ████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████ And, with that facile explanation in hand, the witnesses could then breathlessly testify that, until a decade after the transfers first started they had "never seen" any reliable prediction of Passaic remediation costs in the billions.  *See* Repsol Opp. at 46 ("Maxus's own witnesses consistently testified that ████████████████████████████████████████."); Repsol Statement of Facts ("SOF") ¶¶ 55, 113 (citing deposition testimony from Dave Rabbe and Repsol's experts).  The problem is that, when this narrative was first advanced in the NJ Litigation, Defendants' lawyers had already convinced themselves that Maxus did not need to produce some of the most damning documents in this case—the November 1995 EA Report ████████████ ████████████████████████████ (Smith Decl. Ex. 110) and EA's subsequent draft EE/CA's ██████████████████████████ (Soto Decl. Ex. 185), all of which resided in Maxus's files before Defendants ever transferred a dime out of Maxus.  And, as this Court has itself seen in this action, Defendants' current lawyers have continued that subversion by failing to provide any of these materials to their experts for use in their opening reports.  But, the back-filling from experts that has now occurred—essentially, "we've now reviewed the documents and have naturally concluded in our professional judgment that they are and always were completely unreliable and irrelevant"—is only one example of Defendants' shifting stories.

For decades, one of the three reasons championed for the 1996-1997 transfers was to ███████████████████████████████████████████"—it appears right in Dexter Peacock's May 1996 Memorandum announcing the Global Restructuring.  Smith Decl. Ex. 21 at

4

MLT00238950.  That justification of course has never made sense.  Why would a company transfer billions of dollars in assets just to create a ███████ corporate reporting-structure, when it could just have someone in the financial function prepare reports that cross legal entities?  Now, that rationale appears almost nowhere in Defendants' oppositions.    So, too, goes Defendants' justification proffered in 1995 that the Global Restructuring was for "legitimate tax reasons."  Discovery has failed to unearth any detailed contemporaneous analysis, much less one presented to any board, explicating what *Maxus* might expect to save in taxes if it transferred its entire international business to its parents.  Defendants are now left to argue that, while the transferor Maxus (an entity that Defendants have not established paid any taxes and that had a massive un-utilized NOL) might not have saved any taxes, the "corporate group" did (*i.e.*, the transferee, YPF).  But, the question here has never been how would transferees benefit from taking Maxus's assets, it has been why would Maxus ever want to transfer them.  And, for good measure, the third reason championed in 1995—that Maxus could reduce interest expense by selling its assets to pay down funded debt—was a truism then as much as it is today.  Any company with funded debt can reduce interest expense by liquidating itself.  The proper question is "why would a company do that?"  The only logical answer remaining was right there for all to see in 1995: ███████

███████████████████████████████████████████████████████

███████████████████████████

What follows in Defendants' oppositions is simply a cavalcade of unsupported excuses as to why Defendants are blameless, all of which are contradicted by the very record that they have now put before this Court:

- "Maxus was dead long before we purchased it," when Defendants' own experts concede that after the initial transfers Maxus had billions in assets left to satisfy environmental creditors.

5

- "We thought Maxus would recover," despite the absence of a single contemporaneous business plan in Defendants' enormous record showing that Maxus would ever generate positive cash flow over an extended projection period and numerous other documents showing that no balance sheet reserve was ever established for the looming remediation expenses at the DASS.

- "The exact dollar amount of the Passaic remediation was 'uncertain,'" despite testimony from witness after witness that they knew that the *range* of potential outcomes included the exact scenario that has played out in the 2016 ROD—dredging and capping of the river on just one operable unit of the DASS (the lower six miles) at the cost of billions of dollars.

- "Demonstrating our good corporate behavior, we contributed funds to Maxus to pay remediation expenses leading up to the remedy," when Defendants' own contemporaneous documents show that the reason why they funded Maxus was to avoid the very situation they now face—a trustee for a bankrupt Maxus suing to recover for their looting of the Debtors' estates.

On and on and on. In the end, it is perfectly appropriate, as set forth in Section II, *infra*, for this Court to exercise its jurisdiction and discretion and conclude the obvious—this case started with intentionally fraudulent transfers from Maxus to YPF and Repsol, which were intended to strand the very environmental claims that eventually manifested themselves in the Debtors' Class 4 and Class 5 claims. From that conclusion, all the relief sought in the Motion flows.

*Finally*, one last remarkable aspect of the Motion is the Defendants' treatment of their 79 affirmative (and other) defenses alleged in their answers. As set forth in Section III, there can be no legitimate dispute about the applicable burdens here. The Third Circuit and this Court have plainly stated that a plaintiff need only "point out" the absence of facts to support a defense and the burden shifts to the defendant to submit evidence to the Court sufficient to establish a triable issue. In other words, a plaintiff like the Trust need not disprove every alleged defense to any particular relief sought in order to obtain summary judgment on a claim. In their oppositions, Defendants only attempt to meet that burden for a scant handful of their alleged defenses, each of which is addressed below. But, having already been burned on a burden issue before (in the

AMERICAS 114201192

context of Defendants' legal privilege assertions), it is truly astonishing that Defendants would attempt to meet their burdens with unsupported, passing reference to defenses in a bullet point or, for the vast majority, no mention at all, and still maintain their optimistic "do I ever have things to prove at trial" attitude.  As the Third Circuit aptly put it, the time for a defendant to "put up, or shut up" on a defense is in its opposition to a plaintiff's summary judgment motion.  Defendants have not put up anything, and it is now appropriate for this Court to dismiss all unarticulated defenses for lack of prosecution and all articulated defenses for failing to establish a triable issue.

## STATEMENT OF FACTS

Weeks ago, the Trust submitted, alongside its Motion for Partial Summary Judgment ("Trust Motion" or "Trust Mot."), a Statement of Undisputed Material Facts ("SOF") sourced exclusively from Defendants' own admissions, expert reports, and documents.  That pleading was offered as a good faith attempt by the Trust to simply accede to what Defendants' experts had said in their reports, what Defendants admitted in their pleadings, and what Defendants said in a handful of business records and depositions.  And, for weeks, Defendants remained silent.  Then, in an obvious attempt to crowd the record, Defendants each submitted hundred-plus page "counterstatements" and hundred-page affirmative statements of undisputed material facts, sourced not from what the Trust even said, but rather from their own expert reports and own documents which are plainly in material dispute.  Had this been a different case, we might have simply abandoned the project and just referred the Court to the underlying evidence in the form of the reports, answers, deposition transcripts, and deposition exhibits cited in our SOF.  But, with the certainty that Defendants will cry "foul," the Trust now, in reply, submits a formal counterstatement of facts (1) to clarify just what facts are and are not disputed and (2) to ensure that the Trust is not argued to have conceded facts that are obviously in dispute.  At best, we hope the Court can accept at least the statements highlighted in green in those two counterstatements as

7

undisputed for purposes of all three pending motions.

For purposes of this pleading, all of these facts and responses are incorporated as fully set forth herein. And, with that state of play, one thing is now crystal clear: based on all those pleadings, and pursuant to Rule 56(g) of the Federal Rules of Civil Procedure ("FRCP") (made applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure), whether or not this Court grants any affirmative relief to any party, the Court may now enter, without protest, its contemplated "heavy lifting" order (1) establishing those material facts set forth by the parties that are not genuinely in dispute, and (2) declaring that those facts shall be treated as established for purposes of trial. *See* Fed. R. Civ. P. 56(g); *In re Grasso*, 497 B.R. 434, 439 (Bankr. E.D. Pa. 2013) (treating certain material facts "not genuinely in dispute" as established pursuant to FRCP 56(g) and "treat[ing] such facts as established for purposes of the trial.").

## **ARGUMENT**

The parties are in general agreement regarding the applicable standards to the Trust's Motion. Where disagreements exist with respect to particular procedural points, such as burden shifting on affirmative defenses, they are addressed within the applicable sections below.

## I. THE ALLOWED CLAIMS AGAINST THE DEBTORS ESTABLISH THE PROPER QUANTUM OF YPF'S AND REPSOL'S PROSPECTIVE LIABILITY, AS ALTER EGOS OF MAXUS

As its first form of relief, the Trust seeks to establish that, with respect to its alter ego claims, there is no genuine triable issue of fact that Defendants can and should be held liable (1) for the $712,560,327.76 representing the amount of Allowed Class 4 Claims, plus pre-judgment interest at a rate determined by this Court in its discretion, and (2) for a declaratory judgment that Defendants are liable as the Debtors' alter egos for the Debtors' unliquidated Class 5 Claims as they become due. Trust Mot. at 33.

In opposing the Trust's Motion, Defendants contend (a) the Trust lacks standing to pursue

AMERICAS 114201192

the Class 4 and Class 5 Claims (Repsol Opp. at 27-31); (b) the Trust is seeking an impermissible "advisory opinion" as to damages (Repsol Opp. at 14-17; YPF Opp. at 27-28); (c) the Trust cannot legally support its "all liabilities" theory (Repsol Opp. at 17-27, 31-36; YPF Opp. at 25-31); and (e) Article XV.P of the Plan affirmatively prevents the relief sought by the Trust (Repsol Opp. 36-38; YPF Opp. at 31-35).  As addressed below, none of these arguments offers a legal impediment or bona fide triable issue of fact regarding the alter ego aspect of the Trust's Motion.

### A.      The Trust Has Standing

During the Chapter 11 Cases, Repsol moved to remand several claims pending in the NJ Litigation, including OCC's alter ego claims against it, to the New Jersey Court.  *N.J. Dep't of Envt'l Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 560 B.R. 111, 114 (Bankr. D. Del. 2016) (the "Remand Opinion").  In granting Repsol's requested relief over the objection of OCC, the Court found that the Debtors had standing to pursue alter ego claims "when the cause of action in question is based upon an alter ego theory of liability, and is 'a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim.'"  *Id.* at 120.  The Court also specifically found that the "OCC Claims"—i.e., the alter ego claims that OCC had actually brought and prosecuted for years against Repsol—"are in fact property of the estate, and as such, the proper party to bring the Claims is the Debtor, not OCC."  *Id.*  Thereafter, the Debtors filed the Amended Plan [Bankr. D.I. 1231] and the disclosure statement for the Amended Plan describing that the "Liquidating Trust Causes of Action,"[3] which includes all alter ego claims against YPF and

---

[3] The Plan defines "Liquidating Trust Causes of Action" as "all Claims and Causes of Action of the Estates that are not otherwise settled or released on or prior to the Effective Date that will be transferred to the Liquidating Trust on the Effective Date, including any Claims and Causes of Action set forth in the Plan Supplement.  For the avoidance of doubt, Liquidating Trust Causes of

AMERICAS 114201192

Repsol, would be transferred to the Trust and the Trust would have the "exclusive right" to prosecute those claims against YPF and Repsol.[4]  The Court then entered an order confirming the Amended Plan (hereinafter, the "Plan") without a pending objection from any of the Defendants. [Bankr. D.I. 1460].  Under the Plan, the Trust was then formed and all of the Debtors' assets— including the Debtors' alter ego claims and other "Causes of Action"—were transferred to the Trust as indicated in the Disclosure Statement.  One year later, the Trust asserted the Debtors' alter ego claims on behalf of itself and the Debtors' creditors, initiating the adversary proceeding here.

Now, four years after the Trust succeeded to the Debtors' (and OCC's) claims, Repsol contends that the Trust lacks standing to pursue recoveries of creditor-based claims for three reasons: (1) that the Trust's seeking recovery of an amount necessary to pay the Class 4 and 5 Claims do not "rectify a generalized harm to Maxus"; (2) recovery should be limited to only those assets that Repsol stripped; and (3) recovery of an amount necessary to pay the Class 4 and 5 Claims are "not connected to the nature of the claim" and are, as a result, not "generalized."[5]  *See* Repsol Opp. at 27-31.  Repsol is wrong on all counts.

*First*, Repsol's argument that the Trust lacks standing to pursue any damages beyond the Debtors' claims arising from fraudulent transfers (*see* Repsol Opp. at 28) conflates two distinct concepts: the Trust's *standing* to pursue an alter ego claim on behalf of the estate and all creditors

---

Action shall include the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims."  Smith Decl. Ex. 3, Art. I.A.120.

[4] Smith Decl. Ex. 3, Art. IV.H. ("The Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action . . . . For the avoidance of doubt and without limiting the breadth and generality of the foregoing, the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims shall be preserved for prosecution by the Liquidating Trust.").

[5] YPF does not address any standing argument in any of its submissions, even though it asserts "standing" as its Third Affirmative Defense.  [D.I. 140] at 101.  For reasons addressed in Section III, *infra*, the Court can now dismiss that defense.

AMERICAS 114201192

and the *measure* of alter ego damages.  Repsol concedes that the Court has already found that "under Delaware law, a trustee possesses standing to bring an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim."  Repsol Opp. at 27 (quoting *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 759 (S.D.N.Y. 2008)).  Repsol contends, instead, that the Trust cannot "seek[] to hold Repsol liable for *each* creditor claim" because this would no longer "rectify[] a generalized harm to Maxus."  Repsol Opp. at 28 (emphasis in original).  The Trust has already set forth the reasons why the alter ego damages sought will, in fact, rectify a generalized harm to the Debtors and will not repeat them here, other than to say this: the fact that the harm here concerns a very specific set of environmental claimants is due only to the fact that Defendants' prepetition acts were directed at ensuring that the only remaining unpaid claims of Maxus would be these held by those claimants.  *See* Trust Mot. at 33-35.

None of the cases Repsol cites counsel otherwise.  The court in *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 (9th Cir. 2010) clearly specified that its findings related to alter ego liability were based on California law.  And here, unlike in *Ahcom*, this Court has already determined that, under Delaware law, the alter ego theory of liability is a general one, with no particularized injury arising from it.  The language Repsol quotes from *The Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736 (3d Cir. 2013) (that bankruptcy proceedings do not permit a trustee to recover more than the debtor on the date of bankruptcy) and *Voiland v. Marston (In re Marston)*, 417 B.R. 766 (Bankr. N.D. Ill. 2009) (that the trustee is confined to enforcing entitlements of the debtor not a creditor) are entirely consistent with the recovery the Trust is seeking—a damage claim capped at the Debtors' actual, allowed unsecured claims.

Repsol's contention that the Trust is seeking to put creditors in a "better position than it

11

would have been had the transfers never occurred" (Repsol Opp. at 28) is a red herring, and without support from binding legal authority.  The Trust is seeking to recover, on behalf of the Debtors' estates and their creditors, an amount sufficient to pay claims against the Debtors that the Court has already allowed and are no longer in dispute for payment under the Plan.  In *Block v. Warehouse Consultants, Inc. (In re Americana Servs., Inc.)*, the court rejected defendants' argument—based on Eighth Circuit precedent—that a trustee-plaintiff could not seek a turnover order pursuant to Section 542 of the Bankruptcy Code, alleging that defendant transferee corporations were alter egos of the transferor principals and denied defendants' motion to dismiss. 173 B.R. 650, 653 (Bankr. W.D. Mo. 1994) (finding that trustee's action "may demonstrate unity of ownership with the estate or demonstrate the fraudulent nature of a conveyance due to the knowledge and intent of the parties").  Similarly, the issue in *Cedarbrook Plaza, Inc. v. Gottfried*, was whether an alter-ego claim in a creditor's complaint, which alleged that a debtor corporation's principal transferred corporate assets to a new entity "amount[ing] to nothing more than a continuation of the debtor . . . solely to act as a repository for [the debtor corporation's] assets and thereby to hinder, delay and defraud . . . creditors," stated a particularized injury.  No. CIV.A. 97-1560, 1997 WL 330390, at *11 (E.D. Pa. June 6, 1997).  There, the court found that the creditor's claim alleged a general harm (i.e., dissipation of assets belonging to the estate), and was therefore property of the estate.  *Id.*  Here, the Court has already entered a similar adjudication, described above, finding that the "Repsol Causes of Action" brought by OCC in fact belong to the estate.

Although the court in *Mullin v. Dzikowski*, 257 B.R. 356 (S.D. Fla. 2000) held that a trustee lacked standing to seek to hold an individual shareholder liable beyond the value of stock and cash he converted, *id.* at 363, the district court reversed the bankruptcy court's final judgment on the grounds that the trustee had not even demonstrated that the shareholder dominated or controlled

AMERICAS 114201192

the debtor corporation. *Id.* at 362. Here, on the other hand, the Trust's factual proffer demonstrates that Defendants dominated and controlled the Debtors precisely to strand the environmental liabilities that are now owed in the form of the Class 4 and Class 5 Claims (as discussed more fully below).[6] Finally, the court in *Norman v. Riddell (In re Green Valley Seeds, Inc.)*, 27 B.R. 34 (Bankr. D. Or. 1982), granted a motion to dismiss the alter-ego claim pleaded by the trustee, but, as the court describes, that claim does not appear to have alleged that the defendants' domination and control of caused fraud or similar injustice separate from conduct alleged in connection with claims for fraudulent transfer and breach of fiduciary duty, which were not dismissed and which rendered the alter-ego claim "superfluous." *Id.* Here, the Trust has demonstrated that the Defendants' conduct (an overt attempt to strand massive environmental liabilities) caused the harm complained of (the inability to pay those liabilities). *See* Trust Mot. at 33-35.

*Second*, Repsol makes a half-hearted argument that, as a matter of law, an entity that pierces its own veil "would only have the right [to] recover assets allegedly stripped from it"—here, the Fraudulent Transfers. Repsol Opp. at 30. Yet, in its Remand Opinion, the Court recognized that alter ego claims are distinct from fraudulent conveyance claims. Specifically, the Court observed that "OCC is simply the party which has asserted and removed the claims in question," but that "the Debtors could have asserted the OCC Claims on their own behalf under New Jersey law." *In re Maxus Energy Corp.*, 560 B.R. at 120. The Opinion made clear that the Court was addressing "causes of action relating to contractual indemnity claims predicated on an alter ego theory of liability," and *not* claims for fraudulent transfer (which were not even discussed). *Id.* at 117. Repsol neither cites to any legal authority nor addresses the Trust's case law standing for the

---

[6] As this Court has stated, "environmental liability is not like a breach of contract claim or a tort" and the alter ego claims "directly resulted in the claims against the estates." [D.I. 227] at 14.

AMERICAS 114201192

proposition that alter ego recoveries are *not* capped at fraudulent transfer damages.  Trust Mot. at 34-35.  Repsol's silence is certainly explainable given the bad policy implications here—capping alter ego damages at an amount equal to the exact amount transferred from the dominated and denuded subsidiary would incentivize would-be alter egos to avoid liabilities to third parties simply by transferring assets and then relying on an artificial cap.  *See* Section I.C, *infra*.  There should be no free option here.

*Third*, in arguing that the Trust is not seeking to rectify "generalized" harms, Repsol misreads *In re Emoral*.  In that case, the Third Circuit reviewed the bankruptcy court's determination that the plaintiffs' successor liability claims were property of the bankruptcy estate and set forth that a particular cause of action constitutes "property of the estate" when it is a "general" (as opposed to a "particularized") claim that "inures to the benefit of all creditors."  *In re Emoral, Inc.*, 740 F.3d 875, 879 (3rd Cir. 2014) (internal citations omitted).  The court concluded that the plaintiffs not only "fail[ed] to demonstrate how any of the factual allegations that would establish their cause of action . . . is unique to them as compared to other creditors of [the debtor].  Likewise, they fail to demonstrate how *recovery on their successor liability cause of action would not benefit all creditors of [the debtor]*."  *Id.* at 880 (emphasis added).  Although Repsol protests (without supporting authority or further explanation) that full recovery is "not connected to the nature of [the alter ego] claim" (Repsol Opp. at 30), it is difficult to imagine a more fitting analogy for alter ego than successor liability, both of which find, in essence, that a corporation lacks a distinct, separate legal identity from its successor or corporate parent.  Here, full recovery on the alter ego cause of action—one of the Repsol Causes of Action transferred to the Trust under the Plan—would confer a benefit to *all* of the Debtors' creditors and thus is a generalized claim that the Trustee has standing to assert.

14

## B.    The Trust Is Not Seeking an Advisory Opinion

As their second line of defense to a damages finding on the alter ego claims, both Defendants contend that seeking a ruling on the issue of damages prior to a finding of liability would amount to an impermissible "advisory opinion."  Repsol Opp. at 15-17; YPF Opp. at 27-28.  Defendants ignore the clear text of FRCP 56(g), which states that "if the court does not grant all the relief requested by the motion," the court may "enter an order stating that any material fact—*including an item of damages or other relief*—that is not genuinely in dispute and treating the fact as established" for purposes of trial.[7]  Fed. R. Civ. Pro. 56(g) (emphasis added).

Here, the Trust, Repsol, and YPF have all requested "relief" on the Trust's alter ego claims.  FRCP 56(g), by its terms, expressly gives the Court the ability to find that "damages" related to those claims are genuinely not in dispute and treat the fact as established for purposes of trial.  *See, e.g.*, *Deepstar Marine, Inc. v. Xylem Dewatering Solutions, Inc.*, No. 12-7628, 2014 U.S. Dist. LEXIS 104358, at *31 (D.N.J. July 30, 2014) (finding as established fact under FRCP 56(g) that certain invoices in the amount of $176,921.20 were unpaid and leaving the adjudication of breach of contract liability to be established at trial); *Campbell v. City of New York*, 16-cv-8719, 2021 U.S. Dist. LEXIS 40933, at *29 (S.D.N.Y. Mar. 4, 2021) (declining to issue a summary judgment ruling, but treating as an established fact pursuant to FRCP 56(g) that defendant failed to include night-shift differentials in its calculation of plaintiffs' overtime pay); *Pensioenfonds Metaal en Techniek v. Strategic DSRG, LLC*, No. 09 Civ. 5644, 2011 U.S. Dist. LEXIS 9624, at *18 (S.D.N.Y. 2011) (declining to issue summary judgment, but ruling as a matter of law that it is an

---

[7] YPF only briefly argues in a footnote that FRCP 56(g) should not apply because there are "material underlying facts [that] are subject to significant dispute between the parties," but does not contend that the Court lacks the authority to treat certain facts (including damages) as established under FRCP 56(g).  *See* YPF Opp. at 24 n.40.  Repsol, for its part, declines to address FRCP 56(g) at all.

AMERICAS 114201192

established fact pursuant to FRCP 56(g) that an agreement between the parties required that use of a methodology that calculates actual value).

None of the cases cited by Defendants to support their constitutional argument—which would imply that FRCP 56(g) is itself unconstitutional—are on point. *See Lovely H. v. Eggleston,* No. 05 Civ. 6920 (KBF), 2012 U.S. Dist. LEXIS 139462, at *5 (S.D.N.Y. Sep. 19, 2012) (where plaintiffs moved for partial summary judgment on question of whether a New York statute would preclude payment to certain class members, finding the question premature because it assumed liability but offering to issue a ruling on the question of damages if the parties were to stipulate as to liability); *Amerada Hess Corp. v. Yuma Shipping Corp.*, No. 82 Civ. 2136, 1985 U.S. Dist. LEXIS 21490, at *10-11 (S.D.N.Y. Mar. 22, 1985) (on plaintiff's motion pursuant to FRCP 42(b) to bifurcate trial on the issues of liability and damages, denying defendant's request for a damages trial to precede the liability trial in order to facilitate settlement because the damages question depended on the liability issue of if and when defendants' delay became unreasonable and such a request "ask[ed] too much in view of the [c]ourt's crowded docket"); *Robson v. Duckpond Ltd.*, No. 4:19-cv-01862, 2021 U.S. Dist. LEXIS 63278, at *23-25 (E.D. Mo. Mar. 31, 2021) (denying plaintiff's motion to adjudicate defendants' damage claims because the damages issues relied on whether defendants were the "proper parties to claim the damages or that they presented insufficient evidence to support recovery"); *Kinnel v. Mid-Atlantic Mausoleums, Inc.*, 850 F.2d 958, 967 n.12 (3rd. Cir. 1988) (in case involving a bifurcated liability and damages trial, jury did not name individual defendant liable but found damages against him; on appeal, Third Circuit noted that a finding of damages could not precede the liability determination "in the context of this case" because defendant's liability should not be inferred from the damages); *Kendall McGaw Laboratories, Inc. v. Comm. Mem'l Hosp.*, 125 F.R.D. 420, 422-23 (D.N.J. 1989) (where plaintiff

16

and defendant cross-moved for summary judgment on competing measures of damages, declining to do so because determination of damages depended on the validity of multiple contracts); *Cooke v. General Dynamics Corp.*, No. 3:95 cv 31, 1998 U.S. Dist. LEXIS 15981, at *1-2 (D. Conn. Sept. 11, 1998) (denying defendant's motion for partial summary judgment as to the correct methodology for calculating damages as not ripe for decision, without further explanation); *Williams v. Bier Int'l, LLC*, No. 14CV03894, 2015 U.S. Dist. LEXIS 94609, *4-7 (S.D.N.Y. July 21, 2015) (declining to rule on whether plaintiff could recover liquidated damages under the FLSA and NY Labor Law in case where damages issue was genuinely in dispute, such as the number of hours of back pay plaintiff was due and whether the plaintiff had worked overtime).

## C.    Defendants' Arguments Regarding the "All Liabilities" Theory Fail

Moving past Defendants' threshold contentions regarding standing and jurisdiction, the heart of the dispute here is whether the Trust's proposed measure of alter ego damages is appropriate under Delaware law.  It is.  The thrust of the Defendants' arguments to the contrary is that they cannot be held liable for all of the Debtors' stranded environmental liabilities because the Trust cannot establish a causal link between Defendants' alter ego conduct and the Debtors' incurrence of the liabilities set forth in the Class 4 and 5 Claims.  In essence, Defendants argue granting the Trust's Motion on this point would be therefore "inequitable."  *See* Repsol Opp. at 17-25; YPF Opp. at 28-31.  These contentions are without merit.

*First*, the Allowed Claims correspond, almost entirely,[8] to Maxus's obligations relating to

---

[8] Although a small proportion of the Allowed Class 4 Claims include pension claims, the Trust directs the Court's focus at this time to the Class 4 Claims comprising of the environmental claims for purposes of streamlining the Court's analysis.  To be clear, these pension claims were known, long-term liabilities that were also addressed by Defendants as part of the Strategy.  *See, e.g.*, Smith Decl. Ex. 112 at YPF_MAXUS_PRIV_0000010121, 10105 ▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

AMERICAS 114201192

its environmental remediation obligations.[9]  (YPF admits as much in its version of "undisputed facts.").[10]  Defendants' environmental expert witnesses recognize that ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████  Indeed, the environmental due diligence memo Andrews & Kurth LLP provided  YPF  in  early  1995  specifically ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████  *See* Smith Decl. Ex. 13 at YPF-AK-0052889.  Given that the Trust has compiled substantial evidence that the anticipated magnitude of these environmental remediation obligations was the primary factor bearing on YPF's and Repsol's management of Maxus and Tierra for two decades following YPF's acquisition, there is nothing "inequitable" in making them pay that amount if they are found to be alter egos.  *See* Trust Mot. at 10-17, 22-26.

*Second*, Defendants' causation arguments are fundamentally questions of *liability*, which involve triable issues that are not the subject of the Trust's Motion.  For example:

███████████████  Smith Decl. Ex. 55 at YPF_MAXUS_0000293077-293078. ████

███████  Smith Decl. Ex. 142 at MLTLEGACYESI_002711953 ██████████

[9] Environmental creditors—i.e., Lower Passaic River Study Area Cooperating Parties Group (the "CPG"), the State of Ohio Environmental Protection Agency, the State of Wisconsin Department of Natural Resources, the United States (on behalf of the EPA, DOI, and NOAA), and OCC (Maxus's indemnitee under the SPA)—hold $700,688,553.32 worth of Allowed Class 4 Claims. Even the remainder of the Allowed Class 4 Claims, which are held by retiree and trade creditors, were contemplated as part of the Strategy to siphon Maxus's assets and manage Maxus's environmental obligations.

[10] *See* YPF SOF ¶¶ 82, 91, 513, 522.

18

- Defendants emphasize the disjunctive nature of the elements of alter ego liability under Delaware—i.e., domination and control plus fraud or injustice—and suggest that the Trust has not and cannot establish fraud or injustice. *See* Repsol Opp. at 17-18 ("There is no allegation, let alone evidence, that Repsol incorporated Maxus without capital, had it pollute on its behalf, and then hid behind the corporate veil when the environmental liabilities came due. Only in such a case could the 'all liabilities' theory possibly make sense."); YPF Opp. at 30 n.49 ("[T]here was no 'spin off' of environmental liabilities like what occurred in *Tronox II* . . . The only possible harm caused by YPF Defendants thus is the amount they allegedly caused Maxus not to be able to pay for those pre-existing liabilities."). Those are all issues going to liability, not damages.

- Defendants disclaim that their own conduct caused any harm to Debtors or the Debtors' creditors, citing, for example, business, or economic reasons outside of Defendants' control. *See* Repsol Opp. at 24-25; YPF Opp. at 29-31.[11] YPF also alleges that the Trust seeks to hold YPF and Repsol liable for all of Maxus's obligations "irrespective of [the] alleged harm" that they caused. YPF Opp. at 26. Repsol also argues that it cannot be held liable because, in connection with the asset sales by which Repsol converted Maxus assets to its own gain were supported by third-party fairness opinions, documented in sales agreements, and publicly disclosed. Repsol Opp. at 18. Those arguments all go to liability.

- Defendants seek to establish a narrative that they are victims of persecution by opportunistic creditors looking for a "deep pocket" from which to recover for obligations of Maxus. *See* Repsol Opp. at 24 ("[The Trust] wants to pin the disappointment of all of Maxus's creditors on Repsol and YPF."); YPF Opp. at 29 ("An equitable alter ego remedy simply cannot be used to impose a judgment that would result in such a massive windfall to Oxy or other creditors."). Those, too, all go to whether the Court should, in the first instance, pierce the corporate veil.

Taken together, these arguments simply distort the relief being sought by the Trust in its Motion. To be clear, the Trust has and will establish a detailed factual record at trial demonstrating that Defendants abused the Debtors' corporate form as a means to ensure that Maxus's environmental liabilities would not diminish the economic value (to YPF and Repsol) of Maxus's productive assets. *See* Trust Mot. at 32. But, as addressed in Section I.D of the Trust's Opposition to Repsol's

---

[11] In addition to contending that it provided "over $1.4 billion of financial support" to Maxus, YPF goes so far as to allege that "YPF lost the entirety of its $2.2 billion investment in Maxus, from which creditors already benefitted." YPF Opp. at 25. Not only is this statement made without any support as to whether Maxus's creditors were the actual beneficiaries of YPF's "investment" in Maxus (and is in dispute), but it also does not matter for purposes of the Trust's Motion, which seeks this Court's ruling that there is no genuine dispute of material fact as to the measure of damages on a finding of alter ego liability. *See generally* Trust Mot. at 30-40.

19

Case 18-50489-CSS    Doc 715-1    Filed 06/01/22    Page 349 of 903

Motion for Partial Summary Judgment (incorporated by reference herein), the Trust is of the view that the record is sufficiently compendious and complicated that a determination on liability, which will involve significant dueling expert opinions as to appropriate business practices, is premature. At this juncture, all the Trust seeks is a judgment from this Court establishing the proper *measure* of damages, not whether Defendants are actually *liable* for them.

*Third*, Repsol once again takes the position that the Fraudulent Transfers are the only possible "harm" to Maxus caused by Repsol's conduct and that the underlying environmental obligations of Maxus are irrelevant.  Repsol Opp. at 18-19.  But Respol does not meaningfully grapple with any of the evidence that establishes that both YPF and Repsol kept Maxus in existence by providing periodic funding for Maxus's environmental obligations—while they were manageable—in a deliberate attempt to run statutes of limitations and preclude environmental creditors from ever challenging the asset sales as fraudulent transfers.  Nor does Repsol meaningfully address the record evidence demonstrating that Repsol determined that, despite Maxus's presumed insolvency as of 2005, Maxus should not be permitted to file for bankruptcy protection because of a potential suit from a bankruptcy trustee for Maxus.  Trust Mot. at 19; Smith Decl. Ex. 142 at MLTLEGACYESI_002711992-2711993 ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.[12]

---

[12] Repsol's one attempt to explain away the King & Spalding advice—by claiming that it refused to rely on that advice—falls flat in light of its concurrent request that this Court credit King &

AMERICAS 114201192

*Finally*, Defendants contend that it would be unfair to hold them responsible for the Debtors' liabilities and thereby give creditors a $14 billion "windfall." *See* YPF Opp. at 29 ("The evidence is overwhelming that Maxus never would have been able to satisfy $14 billion in creditors' claims (or anything remotely close to that amount) had YPF never acquired Maxus in the first place."); Repsol Opp. at 18 ("Even if YPF had purchased Maxus and immediately burned it to the ground, it could not have caused $14 billion in damages."). Defendants' continued emphasis on the magnitude of the "$14 billion" Class 4 and Class 5 Claims is presumably a plea for this Court's clemency. In making their hyperbolic arguments, however, Defendants ignore the facts. As to the Class 5 Claims (where the "14 billion" would arise), the Trust seeks only a declaratory judgment on alter ego holding YPF and Repsol responsible for those amounts as they liquidate, not an award of cash damages. If future remediation of the DASS turns out to be less costly than OCC and the EPA have outlined in their proofs of claim, Defendants' ultimate liability in respect of Class 5 Claims would, by definition, be less than $14 billion, perhaps materially less. This feature of the Plan is a benefit to, not burden on, Defendants.[13] As to the Allowed Class 4 Claims, Defendants do not take the position that their alleged alter-ego conduct could not have visited anywhere near $712.5 million in damages to Debtors. *See* Trust Mot. at 33. As Repsol observes, the Trust has identified approximately $675 million in shortfalls just from its fraudulent transfers, prior to any assessment of prejudgment interest. *See* Repsol Opp. at 19.

But, even if the actual DASS expenses into the future (i.e., the Class 5 Claims) do total into

---

Spalding's advice as appropriate on its Statement of Undisputed Facts (Repsol SOF ¶ 141) and the lack of any contemporaneous document to support Mr. Pablo Blanco Perez's self-serving testimony, and the fact that Repsol did exactly what King & Spalding advised.

[13] Had the treatment of the OCC and EPA claims been different in the Plan, then there would have to been an adjudication at that time of the allowable amounts of those claims, which Defendants can hardly claim would have served their interests.

AMERICAS 114201192

the tens of billions, there is nothing fundamentally unfair about holding an alter ego liable for debts of its dominated subsidiary, particularly those that it intended to strand at the subsidiary.  That is the very purpose of the doctrine.  There is no dispute Defendants knew for decades that the Debtors faced environmental liabilities that could, if not would, run into the billions.  In fact, the magnitude of the potential environmental remediation costs and indemnification obligation Maxus had under the SPA with respect to the DASS were *precisely* what motivated the Strategy that Defendants ran for years, culminating in YPF's causing Maxus to file for bankruptcy with a purported settlement in hand.  Instead of doing the right thing, Defendants made a risky gamble: strip Maxus of its productive assets to put them out of reach of environmental creditors, replace public debt with insider debt guaranteed by shareholders (and thereby reduce the number of eyes upon them), manage Maxus's environmental obligations to preclude future environmental creditors from asserting that the transfers were fraudulent, and later settle claims in a slate of insider settlements and a strategically timed bankruptcy.  Defendants, having lost their bet that their Strategy would work, cannot now claim that it would be unfair—upon a finding of liability—to pay exactly what they so desperately tried (and failed) to avoid by their alter ego conduct.

### D.    Defendants' CERCLA Contentions Fail

The validity and the amount of Debtors' environmental obligations has already been determined in the form of the Class 4 and Class 5 Claims and should be the measure of damages upon a finding of alter ego liability.  Trust Mot. at 35-40.  After all (and as described more fully below), those Claims emanate from an arm's-length, good-faith settlement between the subsidiaries and their creditors that the alter ego parents do not even attempt to challenge on the merits.  Although Defendants broadly invoke issues concerning the assessment of CERCLA damages as precluding the Trust's underlying theory of liability, Defendants (particularly Repsol) only complain that they will be prejudiced by having to pay those claims—representing the

22

Debtors' joint and several liability for all environmental claims relating to the DASS—without having access to a right of contribution against other potentially responsible parties ("PRPs"). *See* Repsol Opp. at 33 ("[T]he MLT is seeking to put Repsol in the position . . . subject to joint and several liability without a right of contribution."); YPF Opp. at 27 n.46 ("The Trust has failed to identify any principle of law or equity that would require the YPF Defendants to assume [a] PRP's liability for the DASS."). This contention fails because Defendants simply are not entitled to a right of contribution in the event that they are held liable in this action, even if the underlying Class 4 and 5 Claims might be related to CERCLA. Defendants simply are not paying CERCLA claims, nor are they subrogating to any of the Debtors' rights if they do.

As an initial matter, none of the parties dispute certain key concepts related to the Debtors' CERCLA-related environmental liabilities that form the vast majority of the Class 4 and 5 Claims. *One*, Tierra has primary liability under CERCLA as a landowner. *See* Repsol Opp. at 35. *Two*, Maxus was held to be Tierra's alter ego in the NJ Litigation, and is thus co-liable with Tierra. SOF ¶ 134. *Three*, Maxus was responsible for OCC's CERCLA-related liability under the SPA indemnity. *See* Repsol Opp. at 34-35. *Four*, under CERCLA, responsible parties, like Maxus and Tierra, can be held jointly and severally liable for remediation costs, which Repsol itself concedes is how CERCLA liability operates. *See* Repsol Opp. at 31 ("[T]he MLT is correct that under CERCLA a private party may be held jointly and severally liable to the United States for the cleanup of a contaminated site."). With regard to the environmental claims of the Debtors' creditors, then, it was entirely appropriate for creditors like the EPA, the CPG, and OCC to file claims against the Debtors for the entire amount of damages (or indemnification for the same) relating to the Debtors' Superfund sites. And, that is exactly what they did. *See* Smith Decl. Exs. 87-92 (proofs of claim filed by the State of Wisconsin, OCC, Kearney Remediation Trust, EPA,

AMERICAS 114201192

State of Ohio, and CPG).

The facts relating to the Debtors' settlement of those claims is also indisputable, as addressed below.  The Class 4 Claims comprise settled and allowed claims for money already spent by Maxus's environmental creditors.  *See* SOF ¶ 161.  The Class 5 Claims represent unliquidated future environmental expenditures and expenses for which Maxus could be held jointly and severally liable, limited only to amounts incurred with respect to the DASS and not any of the Debtors' other Superfund sites.  *See* SOF ¶ 162.  These are the amounts *agreed* to be owed by Debtors, and their liquidated amounts are fully consistent with Defendants' experts' opinions. *Compare* Smith Decl. Ex. 6 at 279 ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ *with* Smith Decl. Ex. 88 (OCC's proof of claim stating that the amount Maxus owes to OCC "exceeds $406 million" as of the date of the filing of the proof of claim).

Having no basis to dispute that the agreed amounts of the claims are proper, Repsol essentially complains about the lack of a purported counter-asset that would arise if and when it is required to pay any damages to the Trust that are calculated by reference to creditors' claims— i.e., a right by contribution from other PRPs.  *See* Repsol Opp. at 33.  Again, paying damages to the Trust for alter ego conduct is not paying the Debtors' CERCLA liability.  In any event, the "right of contribution" argument comes years too late.

As Repsol acknowledges, the Plan gave the Trust control over the "Preserved Contribution Claims."  Repsol Opp. at 33 (citing Art.IV.H); *see* Smith Decl. Ex. 3, Art. I.A.164 (defining "Preserved Contribution Claims" as "certain Contribution Claims, which shall be transferred to the Liquidating Trust on the Effective Date.").  The Plan also specified that "[t]he Plan shall

24

constitute . . . an offer by the Debtors to release all Contribution Claims other than the Preserved

Contribution Claims" (Smith Decl. Ex. 3, Art. XI.H), and set forth that "[n]o Creditor or party in

interest shall be entitled to assert a right to contribution under CERCLA or other applicable law

on account of amounts collected by the Liquidating Trust."  Smith Decl. Ex. 3, Art. VII.M.  The

time for Repsol to protest the absence of an asset that it might have availed itself has long passed.[14]

Whatever right Repsol might have had outside the Plan to subrogate to Maxus's rights in the event

that it paid a debt of Maxus, it did not survive the provisions in the Plan that give "exclusive"

authority to the Trust (which is not Maxus) to assert "Preserved Contribution Claims."

Repsol's remaining CERCLA argument is meritless.[15]  It references *United States v.*

*Bestfoods*, 524 U.S. 51 (1998) to argue that it cannot be subject to CERCLA liability because it

did not control Maxus's and Tierra's decision-making with regard to environmental matters.

Setting aside whether or not the record supports this (it does not), this argument once again misses

the point.  The Trust is not the EPA, cannot impose liability under CERCLA, and does not base its

claims on CERCLA.  The Trust can, however, pursue a common law alter ego cause of action

against Repsol (which it has), prove that the corporate veil should be pierced because Repsol

deliberately interfered with the Debtors' ability to meet obligations to its environmental creditors

(which it has), and seek recovery for the claims that they were permitted to, and did, bring.

### E.    Defendants Misconstrue the Plan Reservation of Rights

Defendants' final argument against the imposition of damages is that the Plan somehow

precludes the Trust from recovering an amount equal to the Allowed Claims of the Debtors'

---

[14] While the same might not apply as to YPF, YPF makes no argument that any entitlement to contribution affects the relief sought by the Trust's Motion.

[15] Repsol states in its section heading that the Trust's liability theory "is inconsistent with . . . the Bankruptcy Code" (Repsol Opp. at 31), but it does not actually argue that point anywhere in its Opposition.

AMERICAS 114201192

creditors.  That argument goes too far.  The Trust's Motion establishes that, as a matter of *fact*, the Debtors (represented by its Special Independent Directors) and the UCC were co-proponents of the Plan.  Trust Mot. at 27, 36.  As a matter of *fact*, that Plan settled the vast majority of the Debtors' environmental claims, with the support of the UCC as co-proponent.  *See* Trust Mot. at 36.  As a matter of *fact*, this Court held in its Confirmation Order that those settlements were made at "arm's length and in good faith" and resulted in the Class 4 and Class 5 Claims.  Trust Mot. at 38-39.  And, as a matter of *fact*, the settlements were noticed and received no objections except from YPF, which later withdrew its objection.  *See* YPF Opp. at 31-32.  That lack of any protest by the Defendants to the settlements of environmental claims was obviously well-placed.  For, even after years of discovery, neither the Defendants nor any of their experts have challenged the amounts, nature, or bona fides of *any* environmental claim settlement between the Debtors and its creditors.[16]  In other words, the undisputed record is that the settlement amounts which aggregate to the Class 4 and 5 creditors are a complete and accurate reflection of what Debtors actually owe to their creditors.

Notwithstanding any of that, both YPF and Repsol contend that the Reservation of Rights

---

[16] *See* Yoo Decl. Ex. 8 at Tr. 88:6-14

AMERICAS 114201192

set forth in Article XV, Section P of the Plan affirmatively bars the Trust from recovering damages

calculated in respect of the Allowed Claims from YPF and Repsol even if there is a finding of alter

ego liability.  *See* Repsol Opp. at 36-38; YPF Opp. at 31-35.  The Reservation of Rights sets forth:

> Neither the allowance or disallowance of any Claim against any
> Debtor in these Chapter 11 Cases, nor the allowed amount of any
> Claim, shall have any precedential, preclusive or other effect,
> including as a purported measure of any valuation or damages,
> against any person or entity in any litigation, including in any
> Causes of Action preserved under the Plan (including the YPF
> Causes of Action, the Repsol Causes of Action and the Preserved
> Contribution Claims).

Smith Decl. Ex. 3, Art. XV.P.

Both Defendants have sought to introduce evidence with respect to the negotiation

background that lead to the inclusion of the Reservation of Rights in the confirmed Plan.  *See* YPF

Opp. at 31-32; Repsol Opp. at 37-38.  Such extrinsic evidence is inadmissible because the

provision is plainly unambiguous.  *See Fr. Winkler KG v. Stoller*, 839 F.2d 1002, 1005 (3rd Cir.

1988) ("Simply stated, the [parol evidence] rule is that absent fraud, accident, or mistake . . . oral

representations or agreements are merged in or superseded by the subsequent written contract, and

parol evidence to vary, modify, or supersede the written contract is inadmissible in evidence")

(internal quotations omitted).

Each of the Defendants next argues in various iterations that they have somehow been

deprived of the opportunity to challenge the Debtors' agreement with respect to the proper

quantum of the Class 4 and 5 Claims.  Not so.  Both Defendants initially sought discovery into the

merits of the Debtors' underlying environmental obligations.  *See* [D.I. 216, 217, and 218].  But,

appreciating that "the Trust is alleging that the alter ego has stripped the Debtors' assets so they

could not pay their liabilities," and that "the alleged harm to the Debtors is those liabilities, which

are claims and/or settled claims against the estates," the Court ruled that Defendants would not be

27

permitted to take searching discovery into the underlying merits of environmental claims.  [D.I. 227] at 16.  *The Court left open, however, that Defendants could take discovery "concerning the settlements in the Plan and that spring out of the Plan."*  *Id.* at 15.  Both Defendants then sought such discovery, seeking documents related to the settlements and a deposition from the Special Independent Committee (the "SIC") as to "the Oxy Plan [] and the SIC's ultimate decision to support the Oxy Plan, including the Disclosure Statement."  [D.I. 437] at 13.  From that discovery, Defendants simply failed to adduce any evidence to challenge the Court's conclusion that all of the settlements were at arm's length and in good faith.

Ultimately, Defendants are forced to rely on a strained reading of the *Reservation* of Rights as an actual *modification of* rights in their favor.  YPF contends that the Reservation of Rights affirmatively "prohibits the [Trust's] use of allowed claim amounts for determining alter ego damages" because the "plain language"[17] of the Reservation of Rights precludes the Trust from "rely[ing] on settled or allowed claims to prove its alter ego damages."  YPF Opp. at 34.  Specifically, YPF contends that "no matter what Debtors or the Trust does with regard to resolution of any creditor's Claim . . . that cannot be used . . . against the YPF Defendants."  YPF Opp. at 31, 34.  This contention distorts the plain language of the Reservation of Rights, which does not limit the ability of any party to "use" facts "with regard to resolution" in subsequent litigation but merely makes clear that the legal act of allowance, in its own right, does not have a precedential or preclusive effect in such litigation.  Here, the Trust has not argued that the Court's allowance of claims is res judicata against Defendants in this litigation—rather, the Trust seeks to hold

---

[17] The Trust does not generally dispute YPF's statement of the law as requiring that the Court construe and apply the Reservation of Rights by giving the words and phrases their plain meaning so as to give full meaning to all the terms set forth therein.  *See* YPF Opp. at 34 (collecting cases).  Likewise, the Trust agrees with YPF that the Reservation of Rights is unambiguous.

AMERICAS 114201192

Defendants liable for damages equal to the acknowledged amount of the Debtors' obligations, liquidated in the Allowed Claims, on account of their conduct that caused those obligations to go unpaid.  YPF's position, in essence, is that the deal struck at confirmation prevents the Trustee from recovering on a settled claim even where there is no articulated challenge, but instead must try every creditor claim to judgment in order to establish a valid debt.  That is not what the Plan says, and YPF cites to no authority that sets out such a requirement.  Disclosed settlements, negotiated by fiduciaries such as the SIC, reviewed by fiduciaries such as the UCC, subjected to objection by any creditor such as Defendants, ultimately approved by the Court as being at arm's-length and in good faith, and without challenge by Defendants who were specifically informed they could do so, is more than enough here.

YPF seeks to bolster its counter-textual argument by observing that "it is common for a plan or confirmation order to contain provisions carving out particular issues and claims, such that the issue (as to which the order might otherwise be preclusive) will be litigated, if necessary, in the future." YPF Opp. at 32.  While this statement is generally accurate, it does not support YPF's reading of the Reservation of Rights.  *First*, YPF does not contend that the Reservation of Rights reserved for YPF the right to challenge *ad infinitum* the allowance of claims or the allowed amounts, which is unsurprising given that the plain language of the Reservation in no way supports such a contention.[18]  *Second*, YPF attempts to undercut the Plan's Allowed Claims settlements by

---

[18] The cases YPF cites for the (undisputed) proposition that plans and confirmation orders carve out issues for future litigation are inapposite, as all relate either to plan provisions preserving claims for litigation against the debtors or their estates (or the absence of such provisions)—*see, e.g.*, *Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 23 (Bankr. S.D.N.Y. 2014) (plaintiffs' claims barred where plan disclosed the treatment of their claims and plaintiffs had notice of confirmation proceedings); *Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280 B.R. 573, 588-89 (denying defendants' res judicata argument where plan preserved trustee's right to bring avoidance actions)—or to issues relating to "insurance neutrality"

AMERICAS 114201192

observing that the Plan contained a disclaimer stating that those settlements "shall not constitute an admission of the Debtors' actual liability." YPF Opp. at 35, n. 51. From this, YPF extrapolates that "if Debtors themselves took the position that the settlements were not for their actual liability, there is no reason for the Court to find as a matter of law that the YPF Defendants are liable for those settled amounts." *Id.* But, YPF overlooks that, per the Plan, the Class 4 Environmental Claims are specifically defined as "Claim[s] against any of the Debtors arising under or in connection with any Environmental Law or the OCC Indemnity" to the extent those Claims constitute "actual out of pocket costs," "expenses incurred," or "costs and expenses . . . legally or contractually committed itself to expend (as evidenced by a writing between such Holder and a Government Environmental Entity or a judgment of a court of competent jurisdiction)." Trust Mot. at 36. YPF adduces no legal authority for the proposition that the Court cannot find Defendants liable in an amount equal to the actual out of pocket costs and expenses upon a finding of alter-ego liability simply because the Plan contains a boilerplate disclaimer of any admission of liability. Indeed, in the CERCLA context, the absence of an admission of liability in an administrative settlement does not bar a settling party from bringing a contribution action against other PRPs. *See, e.g.*, *New Castle County v. Halliburton NUS Corp.*, 903 F. Supp. 771, 779 (D. Del. 1995) ("[T]he fact that the consent agreement does not contain an admission of liability is not dispositive.").

---

provisions, which are not at issue here—*see, e.g.*, *In re Combustion Engineering, Inc*., 391 F.3d 216, 218 (3d Cir. 2004); *In re Leslie Controls, Inc.*, No. 10-12199 CSS, 2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010). On the other hand, in *In re Tronox, Inc.*, 464 B.R. 606, 610 (Bankr. S.D.N.Y. 2012), the court did reject Tronox's argument that "the plan conclusively determines the value of the environmental and tort claims at the value of their *contingent* right to recovery" (emphasis added), but the opinion makes clear that Tronox's environmental and tort creditors had filed *unliquidated* proofs of claim and agreed to satisfaction of their claims in return for all proceeds from the adversary proceeding against Anadarko. Here, in contrast, the Debtors actually settled the amount of the Allowed Class 4 Claims.

AMERICAS 114201192

For its part, Repsol simply suggests that, by bringing the Trust Motion, the Trust has contended that the Allowed Claims are res judicata and binding on Defendants. *See* Repsol Opp. at 36 ("Even if the Claim settlements between Debtors and Creditors were arm's length, it does not make them binding alter ego damages against Repsol."). As noted above, that is not what the Trust is arguing. Similarly, Repsol mischaracterizes the Trust's position as being "that Repsol sat on its rights and must accept the allowed amount of claims as the measure of alter ego damages." Repsol Opp. at 37. The Trust has never argued that Repsol's liability as alter ego was finally established or liquidated as a result of its sitting on its rights during the Plan process. Rather, the Trust contends that Repsol must accept the allowed amount of the claims as the measure of alter ego damages because it sat on its rights during *this* proceeding.

<div align="center">*    *    *</div>

In sum, now is the time for the Court to resolve a legal issue that has plagued the Parties since before the Petition Date—is a Chapter 11 debtor's alter ego claim an alternate measure of damages for a debtor to recover on wrongs committed against it by a shareholder (i.e., the estate damage backfilling doctrine),[19] is it a mechanism for a debtor to attempt in a collective action to vindicate the rights that each one of its creditors who could have recovered against a shareholder which abuses the corporate form (i.e., the creditor claim aggregation doctrine), or is it something else? Here, given the near total overlap between the intended victims of the shareholder's abuse

---

[19] As the Trust has argued previously, Defendants' argument that the Trust's potential recovery on behalf of creditors is limited to fraudulent transfer damages is without legal support. [D.I. 221] (citing *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F App'x 623, 627 (2d Cir. 2010)) ("[The Defendants'] argument confuses the fraudulent transfer statute, which . . . generally limits recovery to the particular property that was fraudulently transferred, and [ ] piercing the corporate veil, which permits plaintiffs to hold those behind the corporation liable for some underlying corporate obligation." (quotation and citation omitted)).

<div align="center">31</div>

(the environmental creditors) and the Debtors' unsatisfied claims pool, the Trust submits that the Court can and should find at this time that, to the extent that alter ego liability is established at trial, Defendants must pay an amount sufficient to satisfy those stranded claims in full, with interest.[20]

## II.    THE TRUST IS ENTITLED TO SUMMARY JUDGMENT ON ITS ACTUAL FRAUDULENT TRANSFER CLAIMS AGAINST EACH OF THE NAMED TRANSFEREE DEFENDANTS

With respect to the Trust's second request for relief against Defendants—a finding that Defendants are liable for intentional fraudulent transfers in amounts to be determined a trial—Defendants' opposition papers throw up an oftentimes dissonant wall of sound, layering argument after argument as to why the Court simply cannot grant any relief in the Trust's favor.  All of that, however, resolves itself into one plaintive note—that Defendants be permitted to call their witnesses to explain away the contemporaneous record of corporate malfeasance and swear they had no any actual intent to hinder, delay, or defraud Maxus's environmental creditors.  That will not work.

### A.    Defendants Misconstrue the Summary Judgment Standard in the Context of the Badges of Fraud

Throughout their pleadings, the Defendants conflate the "inferences" courts are forbidden to draw against non-movants at summary judgment with what they also call the "inference"—more accurately, the *presumption*—of intent which arises out of the presence of the badges of fraud.  *See* YPF Opp. at 23 ("[T]he Court must draw all reasonable inferences in favor of the nonmoving party without making credibility determinations or weighing the evidence, while taking the nonmovants'

---

[20] Neither Defendant disputes that the Trust is entitled to pre-judgment interest, that this Court has the discretion to award pre-judgment interest, or that the formula for awarding of pre-judgment interest can be assessed now if the Court does, in fact, set the quantum of total damages at this time.

AMERICAS 114201192

inferences 'as true and, when these assertions conflict with those of the movant, the former must

receive the benefit of the doubt.'");[21] Repsol Opp. at 14 ("[T]he Court 'must view the facts and

evidence presented on the motion in the light most favorable to' Repsol as 'the nonmoving party.'

It 'may not make credibility determinations or engage in any weighing of the evidence'; instead,

the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in

his favor.'").

To be clear, the Trust is not asking the Court to draw inferences against the Defendants or

to interpret disputed facts in favor of the Trust.  Rather, the Trust is asking the Court to make a

specific finding as to the *undisputed* facts—the contents of the contemporaneous reports, memos,

meeting notes, contracts, and emails—which establish the presence of virtually all of the badges

of fraud for each of the Intentional Fraudulent Transfers.  Such an observation is appropriate and

even necessary at the summary judgment stage.  As the *Kern* court held, granting summary

judgment on fraudulent transfer claims based on the presence of the badges of fraud; "while the

court is not to weigh evidence on a summary judgment motion, it *is* tasked with determining

whether there is a genuine issue of material fact requiring trial."  *In re Kern*, No. 20-18381, 2021

Bankr. LEXIS 2462, at *47 (Bankr. D.N.J. Sept. 7, 2021) (emphasis added).  That is exactly what

the Trust is requesting here.

### B.    Defendants Cannot Obtain a Trial Simply By Disclaiming Their Own Documents

More substantively, as set forth in the Trust's Motion, Defendants cannot obtain a trial

merely by disclaiming any "bad intent" for the Intentional Fraudulent Transfers.  Trust Mot. at 44-

---

[21] The YPF Defendants cite to *Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977), a wrongful death case; *Liqwd, Inc. v. L'Oreal USA, Inc.,* 2019 WL 10252607 (D. Del. June 21, 2019), a trade secrets case; and *Shabazz v. Del. Dep't of Corr.*, 2021 WL 4502034 (D. Del. Oct. 1, 2021), a prisoner-rights case.

33

49.  The Trust has laid out a significant record of indisputable, contemporaneous evidence that demonstrates that YPF and Repsol, following their direct and indirect acquisitions of Maxus, sought to pay off all their liquidated third-party claims, isolate Maxus's environmental liabilities, protect themselves from exposure to potentially "catastrophic" future environmental liabilities, and developed a scheme (the Strategy) to do so.  Indeed, what the Trust has established are facts, not in material dispute, showing a classic, parent-driven intentional fraudulent transfer scheme:[22]

- Following the close of YPF's acquisition of Maxus, its lawyers at Andrews & Kurth sought additional diligence into Maxus's environmental liabilities, and Dexter Peacock went to New Jersey in June 1995.  His advice to YPF immediately after that visit was that ███ ████████████████████████████████████████████████████ Smith Decl. Ex. 104 at DEDES-YPF-P0000008.003-8.004.  Years later, ████████████████████████████ ████████████████████████████████████████████ Smith Decl. Ex. 106 at YPF_MAXUS PRIV 0000025824, 25825.  Similarly, YPF's agent (Paul Bohannon) expressed ████████████████████████████████████████████ ████████████████████████ Smith Decl. Ex. 200 Tr. 354:12-23; 272:13-273:17, 274:7-275:1.

- During that year, in November 1995, Mr. Bohannon (another YPF lawyer) learned of ████████████████████████████████████████████████████████████ ███████████████████████████████ Smith Decl. Ex. 107 at MLTLEGACYESI_000278956-278957. ████████████████████████████████████████████████ ████████████████████████ Smith Decl. Ex. 108 at MLTLEGACYESI_00278999-279000.  On November 2, 1995, Maxus received a draft letter report from EA that ████ ██ ██ ███ Smith Decl. Ex. 110 at MLTLEGACYESI_000627944.

---

[22] Each of these documents is before the Court, not only as summarized in the Trust's Motion and submitted to the Court as exhibits to the Smith Declaration, but many, if not all, are also referenced in Repsol's Affirmative Statement of Undisputed Facts [D.I. 639] ("Repsol SOF"), Repsol's Counterstatement of Undisputed Material Facts [D.I. 641] ("Repsol Counter SOF"), and YPF's Statement of Undisputed Facts [D.I. 646] ("YPF SOF").  *See, e.g.*, Repsol SOF ¶¶ 39, 140; YPF SOF ¶ 492.

- Prior to the receipt of the EA Letter, there was no talk of a "Global Restructuring." In a December 1995 memo, Mr. Peacock (YPF's lawyer) ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



- In a contemporaneous internal memo, again within a month of the EA report, Bob Simon (a corporate tax lawyer at Andrews & Kurth) stated that ████████████████████████████████████████████████████████████████████████ An internal March 1996 email from Jim Prince (another lawyer at Andrews & Kurth) sought ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- In a May 1996 memo, written within a year of the acquisition, Mr. Peacock ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Smith Decl. Ex. 112 at YPF_MAXUS_PRIV_0000010071-10072. A

---

[23] Smith Decl. Ex. 8 at DEDES-YPF-P0000057.001-57.002.

AMERICAS 114201192

second memo from Andrews & Kurth ████████████████████████████████████████
████████████████████████████████████████ Smith Decl. Ex. 114 at DEDES-YPF-
P0000048.

- In June 1996, EA issued a final draft EE/CA to Maxus, ██████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

- Between June 1996 and December 31, 1997, YPF directed Maxus to complete the sale of
its Bolivia, Ecuador, Indonesia, and Venezuela Assets to YPFI.  SOF ¶¶ 55-74.  YPFI
"paid" for Maxus's international assets by forgiving Maxus's intercompany debt or paying
down Maxus's funded debt obligations, including in respect of the LBO financing that YPF
had guaranteed.  Trust SOF ¶¶ 60, 65, 72; Repsol SOF ¶ 39.  While the Maxus board
approved the transactions, there is no evidence that the board was fully informed about any
of the foregoing matters related to Maxus's environmental exposures.

- The scenario was no different when Repsol came onto the scene in 1999.  According to
Agustin Garcia Moratilla (Director of Corporate Legal Affairs at YPF), David Rabbe
(President and CEO of Tierra) and David Wadsworth (VP and General Counsel of Maxus)
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
Repsol YPF's Board of Directors was also informed in 2001, post-acquisition, that
██████ ██████ ██████ ████████ ███████████ Smith    Decl.    Ex.    134    at
MLTLEGACYESI_003215383, 3215391-3215417.

- In December 1999 and January 2000, Repsol YPF caused Maxus to sell its interests in
Crescendo (its last remaining productive asset) to BP and Apache.  SOF ¶¶ 80-84.  Proceeds
from the sale went from Maxus to YPF via a $262.1 million debt repayment from Maxus
to YPFI (which were then dividended up to Repsol), and to Repsol via the remaining $325
million being loaned to Repsol's cash management affiliate.  SOF ¶ 85; *see also* Repsol
SOF ¶¶ 58-60.  It took almost one full year after the Crescendo Transfer for Repsol YPF
to decide the most advantageous use of the remaining proceeds for Repsol YPF.  *See* Repsol
SOF ¶ 59; Yoo Decl. Ex. 1 at REPSOL0002185 (Memorandum from Arthur Andersen to
David Rabbe evaluating use of the proceeds of the Crescendo sale and potential tax
implications); Yoo Decl. Ex. 2 at MAXBK000310130 (Memorandum from Arthur
Andersen to Javier Escudero advising that YPFH's use of the Crescendo proceeds to buy
Repsol bonds on the open market would be preferable to a loan to Repsol to "avoid possible
attacks by the Internal Revenue Service on the arm-s length nature of the loan provisions"
and "characterization to a constructive dividend.").

AMERICAS 114201192

- Between 2001 and 2002, after being advised of ██████████████████ ██████████ Repsol performed its own "restructuring," having YPFI transfer Maxus's legacy E&P assets to Repsol subsidiaries or third parties. SOF ¶¶ 86-95. The proceeds from the YPFI Transfers were used to pay down or cancel debt or otherwise remitted to YPF as dividends. Trust SOF ¶¶ 88, 90, 93, 95. Ultimately, those "proceeds" were dividended up to Repsol. YPF SOF ¶ 450.

- When the RIF Loan proceeds from the Crescendo Transfer started to run out,[24] Repsol YPF became increasingly focused on avoiding exposure. A January 2005 presentation to the Repsol Board noted that ███████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ Smith Decl. Ex. 139 at REP 085. In February 2005, Mr. Wadsworth sent to Mr. Moratilla ████████████████████ ████████████████████████████████████████████████ ████████████████████████ Smith Decl. Ex. 140 at MLTLEGACYESI_001920696-1920697.

- Repsol YPF retained counsel (King & Spalding LLP) in late 2004 to evaluate ████████████████████ SOF ¶ 107. In March 2005, King & Spalding provided a ████████████████████



- In April 2005, the Repsol Board received a presentation ████████████████████



---

[24] *See* Smith Decl. Ex. ~~152~~144, Email from Javier Nogales Aranguez, dated Jan. 14, 2005 with attached spreadsheet of RIF Loan repayments, MAXUS5761478_TR ████████████████████████████████

[25]The ████████████████████████████████████ Smith Decl. Ex. 143 at REP 736-737.

████████████████████████████████████████████████████████████████

- A few months later, in December 2005, the NJ Litigation commenced.  For the next decade Repsol and YPF caused Maxus to fight the NJDEP's claims (and in October 2008, OCC's cross claims for alter ego liability).  SOF ¶¶ 113-119.  Repsol and YPF controlled the litigation strategy without Maxus's involvement in key matters.  *See* Trust Mot. at 22; Smith Decl. Ex. 148; Smith Decl. Ex. 149.

- ███████████████████████████████ Repsol YPF presided over a series of "intercompany settlement agreements" ██████████████ █████████ SOF ¶¶ 120-128. ███████

- In May 2012, Repsol, by no act of its own, was taken out of the Strategy—except for the continued joint defense against the NJ Litigation—when the Government of Argentina nationalized YPF, seizing Repsol's majority ownership stake in YPF.  SOF ¶ 136.

- Beginning in June 2012, YPF, alone in control of the Strategy once more, refined the plan for the last phase of the Strategy (a/k/a Project Jazz), in part informed by the *Tronox* decision, which would culminate in the Debtors' inevitable Chapter 11 bankruptcy with a settlement and release that would purportedly avoid the risks of an adverse ruling to YPF on alter ego liability and fraudulent transfer claims in either the NJ Litigation or in a prospective bankruptcy proceeding.  Trust Mot. at 24-27. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ One business day before trial was set to commence in the NJ Litigation on OCC's alter ego claims against YPF, the Debtors filed for Chapter 11 in this Court.

In response to this damning record, Defendants raise essentially two forms of arguments in an abject plea to obtain a trial on the Trust's Intentional Fraudulent Conveyance claims: (1) certain people involved with each of the Intentional Fraudulent Transfers have later sworn that they individually had no "intent to hinder, delay or defraud" creditors; and (2) that certain documents in this case have disclosed other intents or purposes for the asset transfers.  *See, e.g.*, YPF Opp. at 37-38; 57-58; Repsol Opp. at 38-40; 41-42.  But, as the *Kern* court found, a party cannot raise a genuine dispute of fact as to intentional fraudulent transfer simply by means of a

38

"flat denial of intent to defraud." *In re Kern*, 2021 Bankr. LEXIS 2462 at \*47.

The badges of fraud were developed as a practical response to the reality that defendants, if asked directly, will disclaim fraudulent intent or proffer pretextual justifications for fraudulent transfers, just as the Defendants have done here.  "[A] court can hardly expect one who fraudulently transfers property to step up and admit it under oath. […] As a result, courts routinely look to badges of fraud as circumstantial evidence of a debtor's subjective state of mind as more reliable than after-the-fact testimony."  5 Collier on Bankruptcy P 548.04 (16th ed. 2021).  Where, as they do here, "the undisputed facts and badges of fraud overcome any denial" of fraudulent intent, or any pretextual explanation for the transfers, courts can and do grant summary judgment on fraudulent transfer claims.  *In re Kern*, Bankr. LEXIS 2462 at \*47*; see also In re Prosser*, No. 06-30009, 2009 Bankr. Lexis 3279, at \*75-76 (Bankr. District of the Virgin Islands 2009) (defendant's "contradictory statements, none of which comport with the exhibits and testimony of other witnesses," did not "offer a credible and innocent explanation for the conveyances" sufficient to survive motion for summary judgment).  Even in the fraudulent transfer context, it is "well-recognized that the summary-judgment rule would be rendered sterile . . . if the mere incantation of intent would operate as a talisman to defeat an otherwise valid motion." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 401 (Bankr. S.D.N.Y. 2007) (Gropper, J.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)) (internal quotations omitted).  When, as here "the evidence is so one-sided that reasonable minds could not differ as to the only rational outcome . . . the factual issue of intent can be decided by the court as a matter of law." *In re Weidner*, 476 B.R. 873, 883 (Bankr. E.D. Pa. 2012).  Here, the record as a whole contains abundant, unambiguous, and contemporaneous documentary evidence of virtually all of the badges of fraud, and Defendants cannot now avoid summary judgment merely by pointing to

39

their witnesses' bare after-the-fact denials or sowing "metaphysical doubt" as to whether the record is missing any yet-undiscovered facts that could exonerate them.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Defendants also plead that a handful of documents in the record disclose some other intent behind each of the underlying transfers—namely, a purportedly legitimate desire to complete debt and tax restructurings "of Maxus."  YPF Opp. at 39-41; Repsol Opp. at 41-42, 48.  As an initial matter, Defendants do not address that, as a matter of law, even if there are some other, credible explanations for the Intentional Fraudulent Transfers in the contemporaneous documents (which the Trust generally disputes), that does not negate the record of the badges of fraud.  *In re Blatstein*, 192 F.3d 88 (3d Cir. 1999); *see also Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 (Utah 2020) ("[A] plaintiff may carry her burden of showing that a defendant had actual intent to hinder, delay, or defraud without showing that it was the defendant's sole or primary motivation."); *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1247 (D.C. 2012) ("[E]ven if a debtor has at least one non-fraudulent motive for a transaction, the additional motive of effecting the transaction to hinder a creditor is a sufficient ground for un unassailable conclusion of fraudulent intent.") (internal citations omitted).  Courts have therefore found that even mixed-intents are sufficient to find actual intent to defraud, hinder, or delay.  *See Tronox II*, 503 B.R. 239, 280 (Bankr. S.D.N.Y. 2013) ("[A] principal goal of the separation of the E&P assets from the chemical business was to cleanse the E&P assets of every legacy liability."); *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1455 (W.D. Mich. 1988) ("[T]here is no factual dispute among the parties that one reason Thomas Solvent Company created its spinoff corporations was to avoid potential [environmental] liability.").  Here, Defendants cannot credibly dispute that, at the very least, the

40

"management" of Maxus's environmental liabilities was "one" of the "primary" goals of the Fraudulent Transfers.

More generally, Defendants' insistence on the purported tax or debt rationales miss the point. YPF Opp. at 63-64. As *Tronox* makes clear, Defendants' "burden [is] not to prove whether there was some legitimate reason for the challenged transactions. The burden [is] to prove a legitimate supervening purpose for the 'manner in which the transfer was structured.'" *Tronox II*, 503 B.R. at 289 (quoting *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 392 (S.D. Tex. 2008)). Like the defendants in *Tronox II*, Defendants are not being sued because of their decision, in isolation, to restructure Maxus's debt or their tax liabilities; they are being sued (as they have long anticipated) because of their decision to transfer valuable assets in a way that inevitably left Maxus unable to meet what they knew to be potentially catastrophic environmental liabilities. *Id.* And like the defendants in *Tronox II*, Defendants "have never articulated"—and cannot credibly articulate—"a legitimate business reason for imposing all of the legacy liabilities" on Maxus. *Id.*

In any event, even if Defendants can cherry-pick certain documents purporting to show that YPF, Repsol and Maxus were not as wholly craven as the Trust claims, but were motivated by certain tax and debt restructuring benefits, two things become clear: (1) the purported benefits (if any) were to entities other than Maxus and (2) the purported direct "benefits" to Maxus were largely pretextual. For example, while Andrews & Kurth was advising YPF and Maxus on the

AMERICAS 114201192

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████.[26]

With respect to Defendants' purported tax benefit motivation for the asset transfers, Defendants never point to a single document, presentation to the Maxus Board, or snippet of sworn testimony that supports the idea that the 1996-1997 Transfers (which YPF euphemistically refers to as the "tax restructuring") would create meaningful tax savings for *Maxus*. On this point, while there may have been some tax savings to the larger corporate group, the issue is not what the parent corporations might save but rather what the transferring subsidiary would. When one focuses on Maxus and its creditors, and there is simply no support for a contention that its estate or its creditors received a tax benefit that appreciably changed its balance sheet or income statement. On the contrary, all the evidence shows that Maxus had not reported taxable income for years before the YPF acquisition (YPF SOF ¶ 264) and that Maxus had substantial unutilized NOLs. Smith Decl. 172 ¶ 93, 180. Moreover, Defendants have not even established that Maxus was an entity that paid any taxes. Similarly, the evidence shows that, during the time YPF and Repsol maintained direct and indirect control of Maxus, there is not a single business plan that would suggest either the Defendants or Maxus's management anticipated that Maxus would ever be profitable—and therefore, taxable—at some point in the future. Not one. Similarly, with respect to the Crescendo

---

[26] YPF offers no evidentiary support for its contention that ███████████████████████ ███████████████████████████████████████ YPF Mot. at 62, n. 82. In fact, YPF's argument that bankruptcy discussions less than a year after closing an acquisition and weeks before transfers of a subsidiary's entire business line are "standard" or normal business practice, is completely contrary to the approach taken by the *Tronox II* defendants. There, the transferees were so concerned with the contemporaneous consideration of bankruptcy in their files that they took the extreme step of trying to delete any references to bankruptcy in their files. *Tronox II,* 503 B.R. at 281.

AMERICAS 114201192

Transfers, the contemporaneous records do not include any analysis or presentation to the Maxus Board which articulated tax or debt savings to Maxus.  Remarkably, despite the significance of the Crescendo interests to Maxus's financial wherewithal and overall asset portfolio, the Maxus Board never met to discuss the Crescendo Transfer at all.  SOF ¶ 80.

Equally unavailing are Defendants' contentions that the use of sale proceeds to pay down third-party debt and that the corporate streamlining of the "environmental restructuring" are both proof of "good intent" in the 1996-1997 Transfers.[27]  The key strategy memoranda to the YPF Board shows that ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████  Smith Decl. Ex. 21 at MLT00238952 (cited in Smith Decl. Ex. 18 at 32, n. 80).  In the YPF advisors' "judgment" at the time, ██████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[27]  In one paragraph of its opposition, YPF contends that ████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  YPF Mot. at 61-62. Notably, YPF does not disclaim that the environmental restructuring (nor the purported business purpose behind the environmental restructuring) was a motivating factor for the 1996-1997 Transfers.  In any case, separating Maxus's environmental liabilities to allow for separate management and financial reporting appears to be nothing more than an after-the-fact justification that makes no rational business sense.  Nothing about the environmental issues was rendered more manageable by having Maxus's professionals (like Dave Rabbe) move to a sister subsidiary, and the idea that Maxus's overall financial performance would be viewed favorably by the market is at odds with YPF's contemporaneous decision to move Maxus's productive international assets out of Maxus in the next years.

43



Ultimately, Defendants' defense for the legitimacy of their acts is rooted in their contention that "YPF and Maxus always intended to pay fair market value for the assets" (YPF Opp. at 15) and that ████████████████████████████████████████████████████████████████████

████████████████[28] (Repsol Opp. at 56).  But, the ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████[29]  In any event, Defendants own experts have concluded that not all of the assets were, in fact, sold for reasonably equivalent value.  Trust Mot. at 59-60.  Simply, transactions at FMV is not a license to engage in illegal transfers, as discussed in greater detail in Section III.D.7 below—even when a transaction was, in fact, made for reasonably equivalent value, a court may still find it was still done with actual intent to hinder, delay or defraud creditors.  *Hawkins v. Lister (In re*

---

[28] As noted throughout, the Trust objects to Defendants' last-minute subject matter waivers and will address the issue in subsequent pleadings, if necessary.
[29] Smith Decl. Ex. 142 at MLTLEGACYESI_002711990 ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

*Lister),* Nos. 08-13738-B-7, 09-1140, 2011 Bankr. LEXIS 5579, at \*21 (Bankr. E.D. Cal. Mar. 30, 2011) ("If property is transferred with actual fraudulent intent, then the questions of 'reasonably equivalent value' and insolvency, while still relevant as possible 'badges of fraud,' are not required as elements of a claim.")

> **C.    Despite Defendants' Efforts to Feign Confusion and Manufacture Issues of Fact, the Trust Is Entitled to the Relief It Seeks With Respect To Each of the Intentional Fraudulent Transfers.**

As set forth in the Trust's Motion, the Trust clearly articulated the relief sought and the statutory requirements for finding that each of the Intentional Fraudulent Transfers is an avoidable transfer.  Trust Mot. at 41-46.  Reading the Counts in the Complaint and Motion together (as one must), it is clear that, by the Motion, the Trust seeks partial summary judgment establishing: (1) YPF's liability on its actual fraudulent transfer claims against YPF with respect to the 1996-1997 Transfers of the Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets (Counts IV, VI, VII, and X); (2) YPF *and* Repsol's liability on its actual fraudulent transfer claims with respect to the Crescendo Transfer (Count XII); and (3) YPF and Repsol's liability on its actual fraudulent transfer claims with respect to the YPFI Transfers (Count XIV).  Trust Mot. at 40.

Nevertheless, in an attempt to manufacture the appearance of genuine issues of material fact, Defendants simply attempt to sow confusion about what is at issue here.  For example, Defendants state that the Trust "scramble[s] the facts and alleged intent collectively over the transfers" (YPF Opp. at 39), and "improperly aggregates all transactions, lumps together all defendants" (Repsol Opp. at 60-61).  This feigned confusion about what the Trust has pleaded seems to be based on two related mistakes that Defendants make.  Defendants' first (and, in this case, explainable) mistake is its argument that the Trust is seeking summary judgment on Count II (seeking to collapse the intentional fraudulent transfers of Maxus's assets including, but not limited to, the individual 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and

<center>45</center>

the underlying transfers of Maxus's personnel, data, technical resources, and well and other offshore interests which lead to the Settlement Agreements).  The Trust is not moving on Count II.  Defendants' misperception seems to be based on a repeat typo in the Motion which is contrary to the substance and text of the Motion.  *See, e.g.*, YPF Opp. at 36-39, 49, 54; Repsol Opp. at 39-41, 61, 65-66.  The Motion refers to the "the individual 1996-1997 Transfers (Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets) (*Counts II*, IV, VI, VIII, and X)."  Trust Mot. at 40 (emphasis added).  Count II was mistakenly included in the parenthetical defining the 1996-1997 Transfers and then repeated in the title and conclusion of the Motion.  Any confusion as to Count II does not warrant a trial on Counts IV, VI, VIII, and X—Repsol essentially acknowledges that the typo does not comport with the substance of the Motion in a footnote, finding it "curious" that the Trust moves on Count II which includes transfers on which the Trust has not moved for partial summary judgment.  Repsol Opp. at 39, n.29.

Relatedly, Defendants seek to confuse how the Trust seeks to use the extensive, undisputed evidence about Defendants' Strategy—including hundreds of pages of memoranda between Defendants and their legal counsel—and the way the Court should treat that evidence in the context of its analysis of the badges of fraud and *Tronox* collapsing.  YPF Opp. at 36-39; Repsol Opp. at 65; Repsol Mot. at 6, 45-54.  The Trust has now repeatedly articulated that YPF, and later, Repsol, carried out a "single integrated scheme" (the Strategy) to siphon the valuable and profitable assets from the Debtors in order to leave the environmental liabilities stranded in empty corporate shells, the precise strategy underlying multiple transactions that the *Tronox II* court collapsed.  *See* [D.I. 74] at 54-58.  Discovery has confirmed these facts about the Strategy (summarized and undisputed in the Trust's Motion) sufficient to support a finding that the requirements for collapsing are

46

present and that *Tronox II* applies.[30]  All of that is discussed below in Section III.A.3.

But as laid out in Section II.B of the Motion, *without regard to collapsing*, the record here has confirmed that there is no genuine dispute of material fact that nine of the badges of fraud apply to the Defendants' conduct in carrying out *each* of the Intentional Fraudulent Transfers and the Court can find the legal intent of the Defendants with respect to *each* of claims related to the Intentional Fraudulent Transfers for which the Trust has now moved: the 1996-1997 Transfers, the Crescendo Transfer, and the YPFI Transfers.  Trust Mot. at 44-67.  Put simply, the Trust has asked the Court to analyze the badges of fraud for the Intentional Fraudulent Transfers individually and it has not yet asked this Court to analyze the badges of fraud which might apply to later collapse-able transactions (including the Settlement Agreements and underlying conduct leading to the Settlement Agreements and Project Jazz).

### D.    There is No Genuine Dispute of Material Fact that the Badges of Fraud Provide Conclusive Evidence of Defendants' Intent to Defraud, Delay, or Hinder Maxus's Environmental Creditors

Having cleared up any purported confusion regarding what is and is not at issue in the Trust's Motion, we turn now to the badges of fraud.

### 1.    Badge 1: The Transfers Were Made to Insiders

---

[30] Given the unique nature of contingent environmental liabilities, something Judge Gropper recognized in *Tronox II* (506 B.R. at 313), when the Strategy began (immediately following the close of YPF's acquisition of Maxus and Andrews & Kurth's due diligence of Maxus's environmental liabilities recognized the potentially catastrophic liabilities associated with the DASS) YPF had no idea how long the Strategy would last.  But the last step in the Strategy—a bankruptcy filing of Maxus and its subsidiaries if and when the "catastrophic" liability at the DASS was about to come due, was always clear.  Ultimately, while the Strategy lasted for twenty years, continuing well past the time that the Intentional Fraudulent Transfers on which the Trust has now moved took place, the evidence in the record about the Strategy may be used in the Court's consideration of the Defendants' actual intent to hinder, defraud or delay its creditors during the part of the timeline most relevant to the Intentional Fraudulent Transfers that are the subject of the Trust's Motion.

AMERICAS 114201192

As stated in the Trust's Motion, 8 of 10 transactions that make up the Intentional Fraudulent Transfers were indisputably made to insiders.  Trust Mot. at 49-50.[31]  Defendants' challenges to this badge are that (1) Maxus's "disinterested directors" controlled the decision to enter into the 1996-1997 Transfers, not YPF (YPF Opp. at 41), (2) the sale of the Crescendo assets and sale of the Indonesia Assets from YPFI in 2002 were to third-parties and that the YPFI Transfers were not made from a Debtor, and (3) the YPFI Transfers were not made by a Debtor.  YPF Opp. at 43-44; Repsol Opp. at 43-44.  None overcome the simple, undisputed facts here.

*First*, YPF's argument regarding board involvement is based on a purposeful selective definition of an insider under the Delaware Uniform Fraudulent Transfer Act (DUFTA) which would exclude "affiliates."  Even under its selective definition, YPF's argument fails because it mischaracterizes the "control" relevant to the analysis.  YPF appointed a majority of Maxus's directors (5 of 8) and YPF was Maxus's sole shareholder.  That, as a practical matter, the disinterested directors also needed to approve the 1996-1997 Transfers, does not mean the disinterested directors had "control."  Under Delaware law, a shareholder is deemed to have control if the shareholder owns a majority of the voting stock.  *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) ("[I]t is well established in the corporate jurisprudence of Delaware that control exists when a stockholder owns, directly or indirectly, more than half of a corporation's voting power.").

*Second*, each of the 1996-1997 Transfers were made from one set of YPF subsidiaries (Maxus and its subsidiaries, MIEC and Maxus Indonesia) to another YPF subsidiary (YFPI), *i.e.*, from one affiliate to another.  While the Crescendo assets were sold to a third party, all of the

---

[31] Both Defendants make hay of the fact that the sale of the Crescendo assets and sale of the Indonesia Assets from YPFI in 2002 were made to third parties.  The Trust does not dispute that and stated the same in the Motion.  Trust Mot. at 17.

AMERICAS 114201192

proceeds from that sale—the money the Trust now seeks to recover from the Defendants—indisputably went from one set of Repsol subsidiaries (Maxus and its subsidiary, Midgard) to Repsol or a Repsol subsidiary (YPF, as a result of the $262.1 million in debt repayments to YPFI which were ultimately dividended up to Repsol, with the $325 million remainder of the proceeds going to RIF in the form of a loan with a below LIBOR rate of interest). Trust Mot. at 17-18; SOF ¶ 85. Each of the YPFI Transfers in 2001-2002 of the legacy Bolivia, Ecuador, and Venezuela Assets, were made from one Repsol subsidiary (YPFI) to other Repsol subsidiaries (Repsol YPF Santa Cruz S.A., Repsol YPF Ecuador, Repsol Exploracion S.A., and Repsol Exploracion Venezuela B.V. respectively). The proceeds from the YPFI Transfers also were first used to cancel or pay down intercompany debt or otherwise dividended to YPF (SOF ¶¶ 88, 90, 93, 95), and then dividended up to Repsol. YPF SOF ¶ 450. Given the foregoing, there is no legitimate dispute that the transactions at issue here involved transfers made to insiders.

**2.    Badge 2: The Debtors Retained Possession or Control of the Property Transferred After the Transfers**

As described in greater detail in the Motion, prior to the 1996-1997 Transfers, Maxus's management ran its international E&P operations from Maxus's office in Texas, subject to the oversight of the Maxus Board. After the 1996-1997 Transfer and through the Repsol acquisition and completion of the YPFI Transfers in 2002, Maxus's management ran its former E&P operations from Maxus's office in Texas, subject to the oversight of the Maxus Board. Trust Mot. at 51. Neither YPF nor Repsol dispute (because they cannot) that the day-to-day management of the international E&P assets by the MMG (a fictional corporate family run by Maxus employees) remained largely unchanged after the 1996-1997 Transfers until the completion of the YPFI Transfers. Indeed, YPF states that expert testimony would establish that ███████████████

███████████████████████████████████████████████████████

AMERICAS 114201192

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ YPF Opp. at 44-45.[32]

Instead, Defendants essentially argue against a finding of this badge of fraud because

██████████████████████████████████████████████████ YPF Opp. at 45.  But that

argument completely ignores that the analysis with respect to the control of the transferred property

is from the perspective of an outsider.  *See, e.g., In re Collins*, 540 B.R. 54, 60, 66 (Bankr. E.D.N.Y.

2015) (finding that a debtor retained control of his transferred business when he became an

employee of the new business, and ran the business with the same proprietary information, trade

secrets, contacts, and computers in the same space as the prior business); *Yoo v. Garoian (In re*

*Garoian)*, No. 2:10-bk-20883 RK, 2014 Bankr. LEXIS 5254, at *73-74 (Bankr. C.D. Cal. Oct. 7,

2014) (holding debtor retained possession or control of his transferred dental practice assets when

he continued to work as a dentist in the same office his transferred business was located in, under

the nominal control of the new owner, and treated the dental practice assets as his corporation's

own on the corporation's tax return that year); *United States v. White-Sun Cleaners Corp.*, No. 09-

cv-2484 (ARR) (JO), 2011 U.S. Dist. LEXIS 36470, at *32-33 (E.D.N.Y. Mar. 9, 2011) (finding

transferor still controlled his transferred business when he continued to manage the business, and

employees, who were not informed of the change of ownership, continued to report to him).  YPF's

proffered  facts— ███████████████████████████████████████████████████

---

[32] For its part, Repsol argues that the Trust's evidence with respect to the MMG is inapplicable as to Repsol because the "Maxus Management Group ceased to be used after Repsol acquired YPF."—which Repsol incorrectly attributes to the Trust.  Repsol Opp. at 44.  To the contrary, the uncontroverted evidence here demonstrates that for at least the three years between Repsol's acquisition of YPF and the completion of the YPFI Transfers, the MMG managed the operations of Maxus's legacy assets for YPFI.  Trust Mot. at 51.  Additionally, to the extent the question whether YPFI and Maxus were alter egos is determined at trial, the undisputed facts concerning the existence, purpose, and use of the MMG between the 1996-1997 Transfers and the 2001-2002 YPFI Transfers to Repsol affiliates is highly relevant to that alter-ego inquiry.

50

██████████████ (YPF Opp. at 45)—only serve to underscore the Trust's point in the Motion that any change in the operation of the international E&P assets following the 1996-1997 Transfers was "on the books" only.  From the outside, everything remained the same: prior to the transfers, Maxus had an office in Texas, with employees who ran its assets world-wide.  After the transfers, there was still one office and one set of employees who ran the assets.  The fact that, internally, there was a new corporate entity (YPFI), a new intercompany payment arrangement, and a new board and management for that entity (comprised of Maxus officers and directors) does not change anything insofar as Badge 2 is concerned.

### 3.    Badge 3: The Transfer or Obligation Was Disclosed or Concealed

As stated in the Motion, the Trust acknowledges that certain public disclosures about the existence of the Intentional Fraudulent Transfers were made, but that material disclosures about the scope of Debtors' potential environmental obligations and their effects on the Debtors' ongoing wherewithal, were never made.  Trust Mot. at 52-53.  In challenging this badge, YPF argues that the inclusion of some details regarding "remedial efforts" and some details about YPF's "contributions to Maxus for the debt restructuring"—were sufficient to disclose the "effect" of the Intentional Fraudulent Transfers "on Maxus's ongoing solvency, creditworthiness, or profitability." YPF Opp. at 45-46.  Not true.  As an initial matter, neither Defendant disputes that Maxus only ever disclosed a small fraction of expected future environmental obligations (i.e., a two-year forecast of expected outflows) and never disclosed any expected costs of *any* remediation for the DASS, having taken the position with its auditors that the amount of that liability not both probable and estimable.  *See* Trust Mot. at 16.

In any event, as discussed more fully in the Trust's responses to Defendants' statute of limitations arguments, Section III.A, *infra*, Maxus's public disclosures never disclosed that, as a result of the Intentional Fraudulent Transfers, Maxus did not have the asset base or cash flows to

51

pay even the long-tailed environmental obligations when they came due.  It bears repeating once again that Defendants have not produced a *single* business plan or projection created after the 1996-1997 Transfers (much less one disclosed to creditors) reflecting any expectation that the Debtors would ever be cash flow positive over any projection period.

For its part, Repsol argues that, in order to prevail on this badge of fraud, the Trust must prove that the environmental liabilities were in the billions of dollars in the mid to late 1990s and early 2000s and further that Repsol knew that to be case.  Repsol Opp. at 45-46.  That misunderstands the Trust's argument and seeks to impose an inappropriate, unsupported test.  The Trust has demonstrated by undisputed evidence that both Defendants *and* Maxus understood at the time of each Intentional Fraudulent Transfer that, while a final remedy at the DASS might have remained uncertain, Maxus's potential future environmental liabilities were far in excess of what was actually reserved on Maxus's published balance sheets.[33]  The Trust has also demonstrated by undisputed evidence that those liabilities were, at a minimum, going to be in the nine digits and could, depending on the remedy selected for the DASS, bleed far into the ten digits.  SOF ¶ 129. Repsol attempts to dismiss the Trust's record regarding early estimates of Maxus's potential liability at the DASS, for example, █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████  as "random pieces of paper" with "big numbers" on them that cannot be "connected" to Repsol.  Repsol Opp. at 46 (citing to Repsol SOF ¶¶ 58, 69-75).  The Trust addresses Repsol and YPF's mischaracterizations of the facts with respect to these documents in the Trust's

---

[33] *See* Smith Decl. Ex. 55 at YPF_MAXUS_0000293078 ████████████████████████████

██████████████████████████████████████████████████████████████

AMERICAS 114201192

Response to YPF SOF and the Trust's Response to Repsol SOF and Counterstatement.  Simply, far from being a wildly hypothetical possibility, there is a bevy of contemporaneous documentation from both within the corporate group and without, that extensive dredging and an associated liability starting with a "B" was very much on the table for the DASS. In an attempt to deflect from that point, Repsol states that "Maxus's own witnesses" disclaimed the reliability of particular documents mentioning liabilities in the billions.  Repsol Opp. at 46.  But, as the badge of fraud jurisprudence predicts, it is not surprising that Maxus employees who worked for nearly twenty years at a corporation directly and indirectly owned by YPF and Repsol, and worked arm-in-arm with YPF and Repsol employees defending against the NJ Department of Environmental Protection and OCC litigation, would articulate views consistent with YPF and Repsol's self-serving or pretextual justifications for the transfers and management of Maxus's environmental liabilities.  But, the documents are the documents, and several key pieces of that evidence, notably the November 1995 EA report, the draft EA EE/CA, and meeting minutes ███████████ ███████████████████████ were never addressed, much less explained away, by any fact witness in the almost two decades of continuous litigation.  Again, "[c]ourts routinely look to badges of fraud as circumstantial evidence of a debtor's subjective state of mind as more reliable than after-the-fact testimony." 5 Collier on Bankruptcy P 548.04 (16th ed. 2022).

*Finally*, both YPF and Repsol argue that, because certain creditors, including OCC and EPA would have been "aware" of the facts and circumstances informing the amount of Maxus's contingent environmental liabilities, they were not "secret."  YPF Opp. at 46; Repsol Opp. at 46.  That certain of the Debtors' more sophisticated creditors may have had additional insight into the ongoing regulatory developments at the Passaic River—and no proof is offered on that point—is of no moment.  The Trust stands in the shoes of all of the Debtors' creditors, not just a few.

53

4.      **Badge 4: Before the Transfer Was Made or Obligation Was Incurred, the Debtors Had Been Sued or Threatened with Suit.**

In contesting this badge, YPF argues that, because litigation concerning Maxus's environmental remediation and indemnification obligations were pending for several years before and after the Intentional Fraudulent Transfers, the timing of the transfer[s] cannot be found to be "motivated to avoid the consequence of that litigation." (YPF Opp. at 47). As described in the Motion, the undisputed record makes clear that the timing of each Intentional Fraudulent Transfer was directly related to YPF's and Repsol's appreciation of, and desire to avoid, the "consequence" of Maxus's future environmental obligations coming to fruition in regulatory, if not judicial, proceedings. Trust Mot. at 10-20. The 1996-1997 Transfers (and indeed the beginning of the Strategy itself) occurred shortly after YPF realized that YPF itself could be on the hook for "the consequences" of Maxus's uncertain, but potentially significant contingent obligations. As the record shows, almost immediately after the closing of the Merger Agreement in 1995, Maxus, YPF, and YPF's advisors learned of several developments—including sediment sampling data ███████████████████████████████████████████████ (Trust Mot. at 10-11), the November 1995 EA report that suggested █████████████████████████████████████████ ██████████ (*id.* at 11), and the November 1995 OCC lawsuit seeking a declaratory judgment against Maxus to affirm Maxus's indemnification obligations relating to the DASS (*id.* at 54)— that revealed to YPF and its advisors one key point: while the exact amount of remediation may have been uncertain, the scope of Maxus's environmental obligations with respect to the DASS had the potential to be catastrophic to their investment.[34] And, it is undisputed that shortly after these developments, in a December 1995 memo, ████████████████████████████████[35]

---

[34] *See* Repsol Counter SOF ¶¶ 89-90; YPF SOF ¶¶ 202-210.
[35] YPF SOF ¶¶ 281-287.

AMERICAS 114201192

Similarly, "shortly after the [Repsol] acquisition of YPF" and its indirect control of Maxus, Repsol received an introduction to ██████████████████████████████████████████ ██████ Smith Decl. Ex. 129 Tr. at 109:8-15.  While Repsol argues there is no evidence that Repsol was advised the environmental liabilities were "substantial (i.e. billions)," Repsol Opp. at 45, there is plenty of undisputed, contemporaneous evidence that Repsol was advised "shortly after the acquisition" that █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Then, within months after the Repsol acquisition, Repsol proceeded to transfer Crescendo, representing virtually all of Maxus's remaining productive assets, away from those liabilities.  Similarly, the YPFI Transfers in 2001 and 2002 were made around the same time as significant developments at the DASS, at a time when Repsol was receiving annual updates on Maxus's environmental liabilities. Trust Mot. at 16 (citing Smith Decl. Ex. 133 at Tr. 184:12-21); SOF ¶ 105.

Ultimately, Defendants' arguments on this badge boil down to an unsupported contention that the badge only applies when a litigation outcome becomes certain.  But as the case law recognizes, no litigation outcome is ever certain.  *See Springel v. Prosser (In re Innovative Commun. Corp.),* Nos. 07-30012, 08-3004, 2011 Bankr. LEXIS 3040, at *119 (Bankr. D.V.I. Aug. 5, 2011) (finding presence of the fourth badge of fraud when "Debtors were facing litigation and clearly analyzing potential liability."); *Tronox II*, 503 B.R. at 284 (in finding actual fraud, the Court's analysis of badge four was limited to "Kerr-McGee of course had been in litigation for years regarding its environmental and tort liabilities. As one example . . .[it] received a demand

from the EPA for $179 million in remediation costs at Manville, New Jersey.").[36]

More important, the emphasis on certainty ignores the nature of the environmental liabilities that Maxus faced.  In that regard, Defendants offer as an "uncontested fact" that the environmental remediation obligations are by nature "uncertain" and can take years to be determined.  Repsol SOF ¶ 138; YPF SOF ¶ 283.  At the same time, Defendants' position on the badge would leave all environmental creditors in an untenable position: if Defendants' argument is correct, any company facing uncertain, to be determined environmental liabilities (no matter how devastating they could potentially be to that company's financial wherewithal), may freely transfer any and all of their assets any time prior to the EPA, in effect, issuing a bill.

**5.    Badge 5: The Transfer Was of Substantially All of the Debtors' Assets.**

In contesting this badge of fraud, Defendants argue that there are disputed issues of fact related to whether the 1996-1997 Transfers "fundamentally changed" Maxus and the Crescendo Transfers "fundamentally changed" Maxus.  YPF Opp. at 49; Repsol Opp. at 48-50.  Taking each in turn, the record makes clear that Maxus indisputably "fundamentally changed" *both* after the 1996-1997 Transfers and again after the Crescendo Transfers.  *See In re Vaso Active Pharms.*, No. 10-10855 (CSS), 2012 Bankr. LEXIS 4741, at *45 (Bankr. D. Del. Oct. 9, 2012) (Sontchi, J.) (finding that a transfer of 48% of the debtors' assets would constitute a fundamental change in the company and qualify as an avoidable unauthorized post-petition transfer).

As laid out in the Motion, prior to the 1996-1997 Transfers, Maxus was one of the largest independent oil and gas exploration and production companies, with significant international and domestic assets.  Trust Mot. at 56.  After the 1996-1997 Transfers, Maxus was stripped of its primary revenue producing E&P assets (with the exception of its Crescendo asset).  Trust Mot. at

---

[36] The handful of other "facts" YPF introduces concerning this badge are either not material or are very much in dispute.  *See, e.g.*, Trust's Response to YPF's SOF ¶¶ 76, 463.

AMERICAS 114201192

56.  YPF's argument that the "Global Restructuring," in addition to admittedly decreasing Maxus's asset base, also cut off Maxus's funded debt liabilities is easily dismissed.  YPF Opp. at 49. Through the Global Restructuring, YPF replaced Maxus's less expensive, public debt (which was guaranteed by YPF) with significant intercompany debt to YPF and then used the consideration from the 1996-1997 Transfers to pay off Maxus's debt to YPF (for YPF's benefit).  Trust Mot. at 13.  And, as discussed above at the Omnibus Reply at 13, one key purpose of the debt restructuring was to reduce the perceived risk that stakeholders would bring litigation claims as a result of the 1996-1997 Transfers.  In sum, before the 1996-1997 Transfers—Maxus was an international E&P company with approximately $2.9 billion in book assets.  Trust Mot. at 56.  After, it was a domestic E&P company with $1 billion in book assets.  Repsol Opp. at 49.  That is a fundamental shift.

The Crescendo Transfer fundamentally changed Maxus once again, contrary to YPF's contention.  The *totality* of Maxus's domestic assets—which consisted primarily of Maxus's interests in Crescendo—were reduced to $26 million following the Crescendo Transfer, and that Maxus's annual operating revenue declined to just over $4 million dollars.  Trust Mot. at 18 (citing Smith Decl. Ex. 138 at MAXUS-E-0003420, 3423).  How could that be any more "fundamental"?

For its part in analyzing this badge, Repsol argues that Maxus received the consideration from the Crescendo Transfer it orchestrated.  Repsol Opp. at 49.  However, as discussed above (Section II.C), the proceeds from the Crescendo Transfer were not invested in new, significant E&P producing assets.  Instead, it is undisputed that more than 40% of the consideration from the Crescendo Transfer was used to pay off debt to YPF, which Repsol points out was not debt paid to Repsol.  Smith Decl. Ex. 137 ¶ 135.  Even so, the proceeds used to pay down Maxus's debt to YPF were ultimately dividended up from YPF to Repsol (undisputedly for the benefit of YPF and Repsol).  Trust Mot. at 18; Smith Decl. Ex. 137 ¶ 140.  The remainder of the proceeds—after a

AMERICAS 114201192

full year in which Repsol (not Maxus) considered how best to direct Maxus to use the proceeds—was ultimately put into a loan to a Repsol cash management entity (RIF) at below LIBOR rates. Trust Mot. at 17-18; Smith Decl. Ex. 137 ¶ 140.  While the loan was paid back to Maxus as Maxus made requests for its cash needs over the next four years, the majority of those funds were spent on Maxus's backward-looking environmental obligations.  Only a small fraction was spent on forward-looking exploratory assets that Maxus's business was originally built around before the transfers.  Trust Mot. at 18.

### 6.    Badge 7: The Debtors Removed or Concealed Assets.

YPF argues that the Trust has failed to support this badge with "legal authority."  YPF Opp. at 50.  But the legal authority is clear, this badge may be found when an asset is transferred or sold into a foreign jurisdiction, especially in order to make it harder for creditors to access.  *See, e.g.*, *Jet Midwest Int'l Co. v. Jet Midwest Grp.*, No. 5:18-cv-06019, 2020 U.S. Dist. LEXIS 159166, at *189-91 (W.D. Mo. May 26, 2020) ("removal of assets" badge of fraud satisfied when share certificates were assigned to a recipient located outside the jurisdiction); *Leonard v. Superpumper, Inc.*, No. CV13-G2663, 2019 Nev. Dist. LEXIS 712, at *65 (2d. Dist. Nev., Mar. 28, 2019) (interpreting Nevada equivalent of DUFTA and finding debtor met "removal of assets" prong when he transferred corporate interests out of Nevada to corporation incorporated in New York). While YPF demurs that the "sole purpose" behind the 1996-1997 transfers was to "rationalize taxes and reduce Maxus's oppressive third party debt and preferred stock" (YPF Opp. at 51) –a characterization which is not at all supported by the record in this adversary proceeding—YPF can only minimize, and does not dispute, the Trust's evidence.  The Chief Tax Counsel at Maxus described to YPF's International Tax Manager that ████████████████████

████████████████████████

████████████████████████

58

███████████████████████████████████ Trust Mot. at 59, n. 77.

For its part, Repsol argues that, with respect to the YPFI Transfers, this badge cannot be met because the concealment at issue would be carried out by the non-debtor YPFI and it would be "nonsensical" to claim there were concealment or removal by Repsol "offshore" affiliates to purchase (already offshore) assets. Repsol Opp. at 50. As the Trust made clear in its Motion, the salient issue for analyzing this badge is whether the assets were removed steps farther away from the potential claims of U.S. creditors. Trust Mot. at 58. The undisputed evidence shows that ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ Smith Decl. Ex. 207 at DEDES-YPF-AK-PRIV0000259. When the assets were transferred from YPFI to Repsol offshore affiliates, the assets were both removed from the Maxus/YPFI corporate group and were moved away from their creditors' claims by at least one more international layer of the corporate form.

      **7.**      **Badge 8: The Value of the Consideration Received by the Debtors Was Not Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred.**

As stated in the Trust's Motion, in order to assess whether a transfer has been made for reasonably equivalent value, a court must evaluate the totality of the circumstances, including three factors: (1) the fair market value of the benefit received as a result of the transfer; (2) the existence of an arm's length relationship between the debtor and the transferee, and (3) the transferee's good faith. Trust Mot. at 58 (citing to *In re Vaso*, 2012 Bankr. LEXIS 4741, at *56) (quoting *In re Jevic Holding Corp.*, Adv. No. 08-51903, 2011 Bankr. LEXIS 3553, at *27–28 (Bankr. D. Del. Sept. 15, 2011)). As discussed in the Motion and in Section II.C.1 above, there is no disputed issue of material fact that each of the Intentional Fraudulent Transfers was made to insiders, and therefore, "inherently suspect because they are rife with the possibility of abuse." *In re LATAM Airlines Grp.*

S.A., No. 20-11254 (JLG), 2022 Bankr. LEXIS 248, at *38-39 (Bankr. S.D.N.Y. Jan. 28, 2022) (internal quotations omitted).

As further stated in the Trust's opening brief, the question of the first factor here, fair market value, may be a triable issue. Trust Mot. at 59. And, Defendants agree there will be a "battle of the experts" regarding the reasonably equivalent value of the assets involved in the Intentional Fraudulent Transfers.[37] YPF Opp. at 52; Repsol Opp. at 51. Nevertheless, as pointed out in the Trust's opening brief, even Defendants' own experts have conceded that sales of the Ecuadorian Assets and Indonesian Assets sold to YPFI in the 1996-1997 Transfers were sold for hundreds of millions of dollars less than fair market value. Trust Mot. at 60 (noting that Ms. Bramer ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████ Defendants have no answer to these facts.

In challenging this badge, Defendants then both emphasize in their opposition briefs that the Debtors and Defendants attempted to obtain "fair, objective valuations" and to sell Debtors' assets for fair market value. YPF Opp. at 53; Repsol Opp. at 52. However, the mere attempt to sell an asset for market value will not bar a finding of actual fraudulent intent. *See In re Norvergence, Inc.*, 405 B.R. 709, 729 (Bankr. D.N.J. 2009) ("Regarding intent, the absence of any of the enumerated badges of fraud will not preclude the finding of actual fraud"); *Autobacs Strauss,*

---

[37] This battle of the experts is also likely to include testimony concerning the credibility of the various contemporaneous valuations of the underlying assets involved in the 1996-1997 Transfers, including the internal Maxus Corporate Model (or MCM) and contemporaneous valuations conducted by third-parties (CSFB and Gaffney Cline).

AMERICAS 114201192

*Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 565 (Bankr. D. Del. 2012) ("The presence or absence of any single badge of fraud is not conclusive.  The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.").  More important, there is nothing in the record that would suggest that Defendants and Debtors wanted to sell the assets involved in the Intentional Fraudulent Transfers for fair market value specifically because they were trying to preserve value for Maxus and its environmental creditors.  To the contrary, the contemporaneous record here shows that, as early as March 1996, ██████████████████

████████████████████████████████████████████████████████████

████████████  Smith Decl. Ex. 207.  Accordingly when YPF decided to move forward with the Global Restructuring, and separated Maxus productive international E&P assets from its environmental liabilities, YPF had decided to transact whether Debtors received reasonably equivalent value in the 1996-1997 Transfers or not.  The proceeds from the 1996-1997 Transfers were likewise used to forgive intercompany loans or pay down Maxus's funded debt obligations to YPF—which YPF had, in fact, guaranteed.  SOF ¶¶ 60, 65, 72.  With respect to the YPFI Transfers, Repsol contends that the Trust's expert, Mr. Barry Pulliam, does not dispute that the YPFI Transfers were not for less than reasonably equivalent value.  Repsol Opp. at 12, 59.  But, as noted above, Repsol misses the point.  The proceeds of the Crescendo Transfer and the YFPI Transfers were dividended up to YPF and ultimately to Repsol.  YPF SOF ¶ 450.  It is well established that dividends and distributions are not reasonably equivalent value as a matter of law.  *In re SemCrude, L.P.*, 2013 WL 2490179, at *5 (Bankr. D. Del. 2015) ("The Bankruptcy Code defines 'value' as 'property, or satisfaction or securing of a present or antecedent debt of the debtor...' Case law teaches that equity distributions on account of partnership interests do not confer 'value' upon the transferor."); *see also Michaelson ex rel. Appleseed's Litig. Trust v.*

*Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 300 (D. Del. 2012) ("Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some of the payments are a return of capital, constitutes reasonably equivalent value."); *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011) ("[A] dividend is not an exchange for reasonably equivalent value[.]").

8.    **Badge 9: The Debtors Were Insolvent or Became Insolvent Shortly After the Transfer Was Made or the Obligation Was Incurred.**

As laid out in the Trust's Motion, it is undisputed that the liabilities related to the DASS have existed since the time contaminants were discharged, decades before YPF, Repsol and even OCC came onto the scene. Trust Mot. at 4-6, 63. It is also undisputed that potential remediation costs at an environmental site like the DASS could vary wildly ███████████████████ ████████ Trust Mot. at 65; YPF Opp. at 60. It is further undisputed that, whatever may have been foreseeable in the 1990s, by the time they filed for bankruptcy in 2016, the Debtors ultimately were massively insolvent as a direct result of the environmental liabilities that they had incurred decades before. *See* Lee Decl. Ex. 4 at 13-23, 54; SOF ¶¶ 44-45.

In its Opposition to a finding of this particular badge, Defendants first argue that solvency is typically a fact specific question which often requires a "battle of the experts" and a trial. YPF Opp. at 55; Repsol Opp. at 52, 57. The Trust does not disagree with the general proposition and stated as much in its Motion. Trust Mot. at 61.[38] The Trust's expert, Stephen Johnson, will testify at trial that, ██████████████████████████████████████████████ ████████████████████ Smith Decl. Ex. 94 at 94. The Defendants' experts will testify that, ██████████████████████████████████████████████

---

[38] The Trust also stated in its Motion, while solvency is an element of the Trust's constructive fraudulent transfer claims, it is not an element of the Trust's intentional fraudulent transfer claims on which it has moved for a finding of liability on summary judgment. Trust Mot. at 61.

████████████████████████████████████    Smith Decl. Ex. 6 at 306.  But those are issues

for trial.

For present purposes, Defendants' argument on this badge essentially seems to be that

unless the Trust can show that Defendants *actually* concluded the remediation costs would run into

the billions of dollars at the time of the Intentional Fraudulent Transfers, the Trust will not have

sufficiently demonstrated the insolvency badge of fraud.  YPF Opp. at 56; Repsol Opp. at 57.

Defendants miss the point.  The focus in analyzing the solvency badge (just like every

other) is to address the conduct at issue in seeking to hinder, delay or defraud creditors.  The mere

fact that a known future liability has uncertainty about an actual liquidated amount should not

provide license for a debtor and its shareholders to transfer substantially all of the debtors' assets

and use the proceeds to pay off those creditors whose claims were liquidated and who could

protest.  Defendants certainly cite no cases that say so.  In any event, there is an extensive record

of contemporaneous evidence establishing that Maxus and Defendants *in fact* knew of the *certainty*

that there would be some amount spent on a DASS remedy (even if that remedy was "No Action"

or "MNR") coupled with the *possibility* that the EPA might select an active and expensive remedy

to clean up the DASS before, during, and after each of the Intentional Fraudulent Transfers.  Trust

Mot. at 6-8, 16-18.  Further, for the period after the close of YPF's acquisition until the Debtors

filed for bankruptcy, the record does not contain: (1) a single solvency analysis of Maxus; (2) any

evidence that Maxus or Defendants hired an environmental consultant to estimate the *total*

remedial costs for the DASS or even provide a range of outcomes and their probabilities;[39] nor (3)

---

[39] Here, Repsol's expert Dr. Neil Ram takes an extreme position and ███████████████████████
████████████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████████

AMERICAS 114201192

even one traditional three-to five-year business plan (created after the 1996-1997 Transfers) that would reflect any expectation that Debtors would ever be cash flow positive over a projection period.[40]  Defendants also assiduously avoid any discussion of Dave Rabbe's conceding ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████  Smith Decl. Ex. 184 at Tr. 318:24-3:18-20.  In short, blind ignorance as to solvency does not bespeak solvency.

9.    **Badge 10: The Transfer Occurred Shortly Before or Shortly After a Substantial Debt Was Liquidated.**

YPF asserts that this badge cannot be met because the remedial costs at the DASS were not liquidated until 2016, "*twenty* years after the first transaction at issue here and *fourteen* years after the last" Intentional Fraudulent Transfer relevant to the Trust's summary judgment motion. YPF Opp. at 60 (emphasis in original).  But, once again, Defendants miss the key undisputed point, laid out in the Trust's Motion.  Each of the Intentional Fraudulent Transfers were conceived and/or took place within the first two years after YPF—and later Repsol—learned of the potential, if uncertain scope of Maxus's liabilities at the DASS, and the risks those future liabilities posed to wipe out Defendants' respective investments in Maxus, if and when they were liquidated by the EPA's selection and imposition of a DASS remedy.  Trust Mot. at 61-62.

---

████████████████████████████████████████████████████████████████  As a matter of policy, it is not good corporate behavior to assume away a contingent liability, then eventually hire someone to estimate a reasonable range of costs associated with that liability, and, when presented with an unfavorable, partial analysis decide not to analyze it any further.

[40] Indeed, one of the few planning documents pertaining to Maxus's operations after the 1996-1997 Transfers, a September 2010 YPF Holdings/Maxus presentation addressing "2011 Budget, Ten-Year Plan, Environmental Issues and Other Matters" projected negative cash flow of $437 million, with $337 million in projected site remediation costs and $121 million in projected spend on outside environmental legal costs. Yoo Decl. Ex. 5 at YPF_MAXUS_0000160584.

64

YPF's explanations are unavailing. *First*, that YPF thought Maxus's internal environmental group was "excellent, with blue chip consultants" who could manage the day-to-day environmental expenses in no way undermines the fact that, the admitted purpose of the environmental restructuring and 1996-1997 Transfers was █████████████████████████████████████████████████████████████████████████████████ " Smith Decl. Ex. 114 at DEDES-YPF-P0000048.  That YPF recognized the potential risk that █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████ *Second*, while YPF states that "the Trust complains" that environmental restructuring was ████████████████ (YPF Opp. at 61) it is the undisputed record, including at least two undisputed Andrews & Kurth memoranda that demonstrate ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Trust Mot. at 65; Smith Decl. Ex. 207 at DEDES-YPF-AK-PRIV0000259.

Repsol, for its part, attempts to disclaim knowledge of Maxus's "substantial environmental liabilities" by relying narrowly on what various fact deponents supposedly did not say—ignoring what they did—and ignoring the documentary evidence cited by the Trust or misstating its contents.  Repsol admits that, at the time of its acquisition of YPF, it had knowledge of the "uncertain" scale of the environmental liabilities disclosed in Maxus's SEC filings, and that in 2000 it received "a primer" from Maxus's in-house counsel "on U.S. law." Repsol Opp. at 58-60.  To be more specific, the subject of this memorandum, dated barely a year after the acquisition, was Maxus's purported observance of corporate formalities "in an effort to shield its stockholders,

AMERICAS 114201192

first YPF and later Repsol, from Maxus' liabilities to the fullest extent allowed by law" (Soto Decl. Ex. 37 at REP 049), and the memorandum attached a leading Supreme Court opinion on veil piercing in the context of CERCLA liability.   Far from exonerating Repsol, this document powerfully suggests that, very soon after the acquisition, Repsol was aware of significant environmental liability residing within Maxus and concerned enough to seek legal advice about ways to avoid its imputation to Repsol.   Repsol's argument also ignores the 2001 presentation in which it was advised that ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  Trust Mot. at 16.   This evidence certainly is probative enough to have had a Repsol witness with *personal* knowledge ██████████████

████████████████████████████████████████████████████████████

████████████████████  Thus, sufficient evidence is before the court to compel a grant of summary judgment against Repsol as to this badge of fraud.  *See, e.g.*, Trust Mot. at 16-17; SOF ¶ 105.

### E.   None of Defendants' Other Technical Attacks on the Intentional Fraudulent Conveyances Warrant a Trial

Throughout their papers, Defendants then throw up a grab bag of purported issues of fact and law pertaining to the transfers at issue, none of which are availing.

For its part, Repsol argues that the Trust has not established that Repsol can be held liable for fraudulent conveyance in respect of the Crescendo Transfer or the YPFI Transfers.   Repsol Opp. at 61.   As to the sale of Crescendo, Repsol first raises a technical defense by observing that the Trust has not properly distinguished whether Repsol is a "transferee" or "beneficiary" under Section 550.   Repsol Opp. at 62.   However, Repsol does not articulate how this distinction would preclude recovery by the Trust in respect of its fraudulent transfer claims, and any such contention would be contrary to established law:   Courts recognize that because of the "lack of statutory

66

definitions of [transferee] and 'entity for whose benefit such a transfer was made,' courts [should] consider the particular facts of each case to determine whether a third party should be liable for recovery of an avoided transfer as an entity for whose benefit the transfer was made." 5 Collier on Bankruptcy P. 550.02 (16th ed. 2022); *see also Halperin v. Moreno* (*In re Green Field Energy Servs*.), 2015 Bankr. LEXIS 2914 at *50-51 (Bankr. D. Del. Aug. 31, 2015) (quoting *Official Comm. Of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp*.), 178 B.R. 956, 962 (D. Del 1994) "[Section 550] applies on its face to any 'entity' for whose benefit a transfer is made, and contains no express limitation upon the type of 'benefit' required.").

Repsol then contends that the Trust has not established sufficient undisputed facts to prove that Repsol, S.A. benefitted from the "initial" transfer (i.e., the sale of Maxus's Crescendo interests to BP and Apache). Repsol Opp. at 63. However, the Trust has articulated several benefits to Repsol. *First*, the Trust's opening submission demonstrated that the Crescendo Transfer advanced Repsol's parochial economic interests and furthered its overall goal of reducing debt incurred in acquiring YPF. *See* Smith Decl. Ex. 137 ¶ 129; Smith Decl. Ex. 111 ¶ 23.[41] *Second*, the balance of the Crescendo proceeds ($325 million) were held for approximately one year by Maxus without being put to work for Maxus, before they were loaned to Repsol's subsidiary RIF at a below-

---

[41] Specifically, the first $272 million of Crescendo sale proceeds were applied to funded-debt obligations of Maxus that YPF had guaranteed (which YPF knew Maxus would be unlikely to otherwise repay) in the context of the Debt Restructuring, as a necessary step to the effectuate the 1996-1997 Transfers. *See* Trust SOF ¶ 51; Smith Decl. Ex. 137 ¶ 134; *see also* YPF SOF ¶ 441. Repsol's interest in directing the Crescendo Transfer was at odds with Maxus's prior plan to fund its Gulf of Mexico ("GOM") prospects with the steady stream of cash flow Maxus had previously expected from Crescendo and which, post-Crescendo Transfer, Repsol dictated Maxus could only allocate $100 million to develop its GOM prospects through 2005 (as the rest was primarily used to fund Maxus's short-term environmental expenses). Smith Decl. Ex. 111 ¶ 30; Repsol SOF ¶ 64.

AMERICAS 114201192

LIBOR interest rate.  Trust Mot. at 17; SOF ¶ 85.  Repsol, in turn, used the loan proceeds to reduce the debt it incurred in the YPF acquisition.  Smith Decl. Ex. 136 ¶ 23.  *Third*, the Crescendo Transfer proceeded against a backdrop of Repsol learning that Maxus's environmental liabilities could comprise, *inter alia,* hotspot dredging on the Passaic River.  *See* Mot. at 16-17.

With respect to the YPFI Transfers, Repsol argues that the YPFI Transfers cannot be considered transfers "by a Debtor" or "of the debtor's property" because, at the time, YPFI (not Maxus) was the nominal owner of the assets sold.  Repsol Opp. at 63; Repsol Mot. at Section III.B.1.  Repsol asserts that the Trust cannot establish that YPFI and Maxus were alter egos for purposes of analyzing the YPFI Transfers because "alter ego cannot be used to alter the identity of parties to a transaction."  Repsol Opp. at 63, n. 52; Repsol Mot. at Section I.C.  However, the cases on which Repsol relies do not stand for this proposition, but address non-Delaware law an inapposite facts.  *See, e.g.*, *Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*, 516 B.R. 163, 169 (Bankr. E.D. Ky. 2014) (speculating as to whether Kentucky law would accept a theory of reverse veil piercing); *Covey v. Casey's Gen. Stores, Inc. (In re Duckworth)*, Nos. 10-83603, 11-8104, 2012 Bankr. LEXIS 4379, at *27 (Bankr. C.D. Ill. Sep. 21, 2012) (holding that chain of general stores was good faith transferee and not subject to liability for fraudulent transfer for credit transactions with debtor); *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 672 (Bankr. N.D. Ill. 2017) (opining in dicta that reverse veil-piercing claim, which trustee did not actually allege, may not have been available under the relevant, non-Delaware, state law).  Repsol identifies no court opinion barring the relief sought by the Trust under *Delaware* law.  And, as laid out in the Motion, there is no genuine issue of material fact that Maxus's legacy international E&P assets—the Bolivia Assets, Ecuador Assets, and Venezuela Assets—were fraudulently transferred to YPFI as the 1996-1997 Transfers and managed by the Maxus Management Group (though "on the books"

AMERICAS 114201192

for YPFI), until the Repsol-directed YPFI Transfers.  Trust Mot. at 51.

Repsol also appears to contend that none of the various Repsol entities can be deemed a "transferee" because the Trust has not shown domination "by any Repsol entity over another Repsol affiliate as a matter of undisputed fact."  Repsol Opp. at 64.  But, Repsol does not fundamentally dispute that the 2001-2002 YPFI Transfers (like the Crescendo Transfer) were part of Repsol S.A.'s continued efforts to (1) reduce Repsol YPF debt levels following the acquisition of YPF in 1999, and (2) isolate Maxus's environmental liabilities.  *See* Trust Mot. at 18; *see also* YPF SOF ¶ 450.  Repsol also appears to concede that the proceeds from the YPFI Transfers were dividended from YPF to Repsol.[42]  *See* Repsol SOF ¶¶ 79-80.  Repsol was therefore an entity for whose benefit the YPFI Transfers were made for purposes of Section 550(a) of the Bankruptcy Code, and cannot avoid liability simply because it was not (in every case) a direct transferee.[43]  *But see* Repsol Opp. at 65 (conceding that a Repsol entity was the transferee with respect to the sale of Repsol YPF S.A. Santa Cruz and certain Maxus legacy Venezuela assets); *see also* Trust Opposition to Repsol Mot. at Section III (discussing Section 550 of the Bankruptcy Code).

For its part, YPF argues that, although the Trust has cited evidence demonstrating the *YPF Defendants*' intent to hinder or delay creditors, the Trust has failed to make the showing required to impute YPF's intent to the Debtors.  YPF Opp. at 39.  That contention is, of course, absurd. Dexter Peacock, who wrote the very documents that establish YPF's intent, was (1) a Maxus board

---

[42] *Michaelson ex rel. Appleseed's Litig. Trust v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 300 (D. Del. 2012) ("Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some of the payments are a return of capital, constitutes reasonably equivalent value.").

[43] This analysis does not change whether the Court finds that with respect to the YPFI Transfers, the Repsol subsidiaries may properly be viewed as an "immediate or mediate transferee" under the Bankruptcy Code, or in the alternative, YPFI is an alter-ego of Maxus (an inquiry reserved for trial).

69

member at the time of the transfers, and (2) was Maxus's lawyer.  Numerous other Maxus employees and agents were fully aware of what EA was saying right before Maxus divested its entire international business line.  In addition, Paul Bohannon, who was also a lawyer for Maxus and YPF, participated in the very meetings in 1995 ███████████████████, received a copy of EA report, and actively participated before the Maxus Board with regard to the transfers.  *See, e.g.*, Smith Decl. Ex. 107.

In any event, YPF's contention that the Trust must, but cannot, establish that individuals acting on behalf of YPF were in position to dominate or control the Debtor, and that such domination and control related to the transfer at issue is wrong.[44]  *Id.*  The factual record compiled by the Trust fully establishes that YPF dominated and controlled Debtors with respect to the transactions complained of.  It is undisputed that YPF was the sole shareholder of Maxus at the time of the 1996-1997 Transfers and had changed the Maxus Board from thirteen to eight members, with a majority of Maxus Board (five members) appointed by YPF.  SOF ¶¶ 45-46.  With respect to the 1996-1997 Transfers, neither Maxus—nor its three legacy directors not appointed by YPF—were represented by separate counsel with regard to the 1996-1997 Transfers.  To the contrary, Maxus and YPF (counterparties to the asset sales) were all advised by Andrews & Kurth, including lawyer Dexter Peacock, one of the YPF-approved members of the Maxus Board.  YPF SOF ¶¶ 266, 294, 321.  Indeed, YPF relies on cases that suggest imputation of intent would be entirely appropriate here.  *See, e.g.*, *In re Vaso*, 2012 Bankr. LEXIS 4741, at *49-51 ("Cases imputing a transferee's intent to a transferor have typically involved sole shareholders of

---

[44] At the outset, YPF supplies no legal authority for its contention that a litigant may not obtain summary judgment on the issue of whether intent for an actual fraudulent transfer claim can be imputed from Party A to Party B if it does not also obtain summary judgment that Party A and Party B are alter-egos.  *See* YPF Opp. at 39.

the transferor, with complete control of the transferor, transferring assets to themselves as a transferee."); *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 711-12 (Bankr. D. Del. 2010) (same).[45]

YPF attempts to distinguish its own cases factually by alleging that the "*disinterested directors controlled* whether to execute" the Global Restructuring, including the 1996-1997 Transfers, on the ground that their approval was required pursuant to Maxus's Articles of Control. YPF Opp. at 41 (emphasis in the original). However, the record here also establishes that the three legacy Maxus board members (a minority of the board) were not advised by separate counsel, YPF SOF ¶¶ 266, 294, 321, and were kept out of the loop of critical information regarding the valuation of the 1996-1997 Transfers. Smith Decl. Ex. 130; SOF ¶¶ 56-59, 61-62, 66-71. Critically, there is *no* evidence in the record that Maxus's Board was ever made aware of the potential scope of Maxus's liability in connection with the DASS as reflected in the 1995 EA ███████████ █████████████████████████████ or of the 1995 data ███████████ ███████████ Accordingly, YPF has failed to identify a triable issue of fact regarding the legacy Maxus directors' ability (formal, legal or functional) to forestall the 1996-1997 Transfers that could preclude imputation of the YPF Defendants' intent to Debtors for the relevant actual fraudulent transfer claims (Counts IV, VI, VIII, and X).

---

[45] As the Court will recall, although "the bulk of the evidence weigh[ed] in favor of finding defendants dominated and controlled debtor" in *In re Vaso*, summary judgment was improper "based on the existence of an independent [b]oard of [d]irectors and [one director-defendant's] legal inability to bind Vaso." 2012 Bankr. LEXIS 4741, at *49-51. However, the Court emphasized that neither director defendant sat on the debtor's independent board. *Id.* Similarly, in *In re Elrod Holdings Corp.*, the trustee could not prevail on the intent-imputation issue because the debtors' directors installed by an acquirer maintained formal legal control and were advised by separate legal counsel. 421 B.R. at 712-13.

71

### F.    There is No Genuine Issue of Material Fact Concerning Repsol's Good Faith Defense

As their final defense to the Intentional Fraudulent Transfer Claims, Repsol asserts, in conclusory fashion, that it would be improper for this Court to grant summary judgment on the Trust's fraudulent transfer claims against them because they have "a complete affirmative 'good faith' defense pursuant to 11 U.S.C.A. § 548(c) and Del. Code Ann. tit. 6 § 1308."  Repsol Opp. at 58.  Repsol Opp. at 58.  As an initial matter, contrary to Repsol's implication, courts have not hesitated to grant summary judgment on intentional fraudulent transfer claims where, as here, defendants' proffered evidence of "good faith" was insufficient to create a triable issue of fact. *See Ameriserv Fin. Bank v. Commercebank, N.A*., No. 07-1159, 2009 U.S. Dist. LEXIS 24559, at *26 (W.D. Pa. Mar. 26, 2009) (finding that "no reasonable jury could find that Defendant met its burden of proof that it took in good faith within the affirmative defense" provided by the Pennsylvania fraudulent transfer statute); *In re Mongelluzzi*, 587 B.R. 392, 412-13 (Bankr. M.D. Fla. 2018) (holding that transferees had "failed to provide evidence sufficient to withstand summary judgment" on the issue of good faith based on "overwhelming and incontrovertible evidence" that they "deliberately chose not to inquire regarding Debtors' possible insolvency"); *RES-NV CHLV, LLC v. Rosenberg*, No. 2:13CV115DAK, 2015 U.S. Dist. LEXIS 12617, at *10 (D. Utah Feb. 2, 2015) (granting summary judgment in favor of plaintiffs who had "produced evidence of the badges of fraud, whereas defendants have provided only assertions of good faith" and concluding as a result that "this is an instance in which the court can find a fraudulent transfer as a matter of law").

Repsol correctly states that this is an affirmative defense (Repsol Opp. 58) for which they bear the burden of proof.  In support, Repsol cites to self-serving testimony from its FRCP 30(b)(6) corporate witness Mr. Blanco (Repsol Opp. at 59), but Mr. Blanco did not begin his employment

72

at Repsol until 2005, years after the fraudulent transfers.  They also cite to a statement from Mr. Wadsworth (a lawyer) that "care has been taken to preserve Maxus's assets."  Repsol Opp. at 59-60.  These meagre pieces of evidence are hardly enough to support Repsol's burden on this affirmative defense, which at the very least should have included testimony from a witness with personal knowledge.

More importantly, Repsol is wrong in asserting that the Trust must prove that Repsol did *not* know that the prior transfers were fraudulent—the question is rather one of inquiry notice: what *should* have Repsol known.  The Third Circuit has been clear that "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge." *In re Bressman*, No. 02-1725, 327 F.3d 229, 236 (3d Cir. 2003); *see also Ameriserv*, 2009 U.S. Dist. LEXIS 24559, at *18-20, 25 (collecting cases and granting summary judgment where "Defendant was in possession of information more than sufficient to affirmatively suggest to a reasonable person" that transfer was fraudulent); *Mongelluzzi*, 587 B.R. at 413 (good-faith defense unavailable to defendants who "just did not want to ask too many questions because they did not want to know too much") (quotations omitted).

Here, Repsol's insistence on what it supposedly did or did not know at or shortly after the time of its acquisition of YPF (Repsol Opp. at 59-60), is belied by the record evidence of regular meetings between Repsol executives and high-level Maxus and Tierra environmental personnel, as well as by the advice Repsol received ███████████████████████████████ ████████████████████████████████████████████████████████ Smith Decl. Ex. 129 Tr. at 109:8-15; Smith Decl. Ex. 133 at Tr. 184:12-21; Smith Decl. Ex. 134 at MLTLEGACYESI_003215383, 3215391-3215417.

AMERICAS 114201192

Under the *Bressman* standard, even if its "knowledge of the circumstances of the YPF transfers pre-acquisition was limited to SEC filings," (Repsol Opp. at 59) Repsol would have known (1) that the transfers occurred and that the transferred assets resided at YPFI, and (2) that Maxus had legacy environmental liabilities, including to public creditors like EPA and the state of New Jersey, the amount of which was "unknown" and "could not be reasonably forecasted." Trust Mot. at 16. In fact, in late 2004, Repsol retained King & Spalding to perform analyses on its behalf

███████████████████████████████████████████████████████████████████████

██████████████████ SOF ¶ 107. In its due diligence, King & Spalding requested, among many other things, ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████   ███████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ There is no reason that

_____

[46] Repsol in pleadings and statements of facts makes sweeping statements about King & Spalding's advice ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Repsol cannot ask this Court to enter summary judgment in its favor and make myriad findings concerning what King & Spalding advised Repsol generally based on a handful of documents when Repsol continues to withhold as privileged other contemporaneous King & Spalding communications. In that regard, the Trust believes that Defendants are withholding thousands of documents from King

AMERICAS 114201192

Repsol could not have done all of this before they transferred anything.    Under these circumstances, it does not establish Repsol's good faith as a matter of law to assert, essentially, that it simply did not want to ask too many questions and did not want to know too much at the time it acquired YPF.  "Parties who rely on the good-faith defense bear the burden of proving their own good faith," *Mongelluzzi*, 587 B.R. at 412, and Repsol points to no evidence suggesting a trier of fact could find that it has done so.

## III.    DEFENDANTS HAVE NOT ESTABLISHED A GENUINE TRIABLE ISSUE REGARDING THEIR PURPORTED AFFIRMATIVE AND OTHER DEFENSES TO ANY OF THE TRUST'S CLAIMS

As the Trust observed in its opening summary judgment submission, YPF's and Repsol's answers to the Trust's Complaint allege a total of 79 defenses, many of which are overlapping, repetitious, factually unsound, or entirely inapposite to the issues at bar, along with several general (and counterfactual) averments that the Trust simply cannot satisfy the elements of its claims.  *See* [D.I 140] at 100-12; [D.I. 139] at 111-14.  In response, Defendants once again attempt to muddy

---

& Spalding, as well as other legal advice and communications pertaining to the Defendants' potential alter ego liability and Debtors' environmental liabilities.  While YPF makes similarly improper conclusory statements about advice it received from its advisors (Andrews & Kurth and Chadbourne & Parke), Repsol's requests that this Court make findings of fact with respect to the draft King & Spalding memoranda are particularly egregious because, on their face, the Trust has only two drafts of the memorandum at issue ████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████████  Repsol has never produced a full and final memorandum with all of the likely hundreds of pages of attachments listed in the indices.  In such a clear cut case of using privilege as a sword and a shield, the Court should either deny Repsol the relief they seek or find a general subject matter waiver with respect to, at the very least, all the King & Spalding communications and advice.  The Trust reserves the right to properly present this issue before the Court at a later time.

the waters with mischaracterizations of the Trust's burden on summary judgment and distracting differentiations between affirmative and non-affirmative defenses.  At heart though, Defendants' central contention is that the Trust was required, in its opening submission, to establish with detailed record evidence an absence of any triable issue of fact as to each of Defendants' 79 defenses, and that because the Trust did not do so it has waived any right to summary judgment.  YPF Opp. at 67 n.88; Repsol Opp. at 66 n. 57.  These contentions, however, meaningfully misstate the summary judgment burdens at play here.

Obviously, Defendants bear the ultimate burden of proof for their affirmative defenses.  *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090-91 (D. Del. 1990) ("A party resisting summary judgment cannot expect to rely on the bare assertions or mere cataloguing of affirmative defenses").  To be granted summary judgment, the Trust only needed to "point out" or "aver" an absence of evidence supporting the affirmative defenses.[47]  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) ("With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, *pointing out* to

the district court—that there is an absence of evidence to support the nonmoving party's case.") (emphasis added);[48] *In re Vaso*, 2012 Bankr. LEXIS 4741, at *1 ("[W]hen requesting summary

---

[47] The Trust did enumerate all but three of the Affirmative Defenses (as defined below), in its opening summary judgment submission.  It did not mention YPF 36 (avoidable consequences), but avoidable consequences are akin to mitigation, YPF 29, which the Trust did enumerate.  The Trust also did not specifically enumerate YPF 28 (extraterritorial fraudulent transfer) and Repsol 22 (extraterritoriality), but Repsol *did* actually move on this affirmative defense, which the Trust addresses in Opp. to Repsol Mot. at Section II.B.I.

[48] YPF argues that *Conoshenti* supports its contention that the Trust bears the burden of proof, on summary judgment, of "showing that there is an absence of evidence to support the YPF

AMERICAS 114201192

judgment, the moving party must put the ball in play, averring an absence of evidence to support

the nonmoving party's case.  In order to continue, the burden shifts to the nonmovant to identify

some factual disagreement sufficient to deflect brevis disposition.").

With those standards in mind, the Trust indisputably "point[ed] out" and "averred" in its

Motion the absence of evidence to support the Defendants' defenses to the Court, whereupon the

burden shifted to Defendants to "respond with specific facts establishing a genuine issue" about

the essential elements of the defenses.[49]  They have plainly failed to carry that burden.

As noted in the Trust's Motion, the 79 defenses fall into three categories which are detailed

in Exhibit A hereto:[50] (1) "true" affirmative defenses; (2) non-affirmative defenses; and (3) damage

---

Defendants' affirmative defenses."  YPF Opp. at 68.  However, *Conoshenti* does not contain any
discussion of the burden on affirmative defenses, let alone suggest that a plaintiff seeking summary
judgment must "prove the negative" for each of a defendant's affirmative defenses.

[49] To the extent that Defendants attempt to establish a triable issue of fact with respect to this issue,
they may not rely on the submissions of their testifying experts to make such a showing.  [D.I.
607] at 3 n.1 ("Defendants have raised numerous affirmative defenses for which they bear the
burden of proof.  To the extent [D]efendants seek to rely on any expert testimony in support of
those affirmative defenses, the report of any such expert was required to be filed in October
2021.").

[50] In addition to misstating the burden-shifting analysis, YPF and Repsol distract with the
distinction between affirmative and non-affirmative defenses in each of their oppositions.  Yet,
neither YPF nor Repsol clearly state which of their defenses are actually affirmative defenses at
all.  For its part, YPF has taken the position (providing no legal authority in support) that the Trust
bore the initial burden of identifying which of YPF's defenses are affirmative defenses, while
purporting to identify 17 defenses as "indisputably not affirmative defenses."  YPF Opp. at 68
n.90.  YPF further contends (again, without citation to legal authority) that such *non-affirmative*
defenses too are "all preserved for trial on the basis that the Trust has made no showing to support
summary judgment," and that "YPF has no obligation to argue them further."  YPF Opp. at 68.
Repsol, on the other hand, asserts that "two of the three categories of defenses" identified by the
Trust in its motion for summary judgment "consist almost entirely of issues on which the MLT
bears the burden," but similarly chooses not to clarify which of its 29 defenses it considers to be
affirmative (or non-affirmative).  Repsol Mot. at 67.  Even accepting Defendants' premise that
their defenses can be categorized as "affirmative" or "other" defenses, this Court can still grant the
Trust summary judgment on *all* of the defenses in Defendants' answers.

AMERICAS 114201192

defenses.[51]   Several of Defendants' defenses qualify as "true" affirmative defenses (collectively,

the "Affirmative Defenses"),[52] because, if established by record evidence, they would defeat the

Trust's claims, even if all of the allegations in the Complaint are true.   *See Nat'l Union Fire Ins*

*Co. v. City Sav., F.S.B.*, 28 F.3d 376, 393 (3d Cir. 1994) (citing Black's Law Dictionary 419 (6th

ed. 1990)).   These are addressed in Section III.B.   Others can be identified as non-affirmative

defenses (collectively, the "Non-Affirmative Defenses")[53] because they "merely negate some

---

[51] Aside from the three main categories, YPF includes certain CERCLA defenses: YPF Nos. 40 (all defenses available under CERCLA), 41 (CERCLA failure to mitigate), 42 (CERCLA allocation of damages), 43 (CERCLA contributory or comparative negligence), 44 (CERCLA proximate cause), 45 (costs exceed those allowed for under CERCLA), 46 (costs incurred prior to effective date of CERLCA), 47 (not necessary costs of response under CERCLA), which have no bearing on the Trust's claims as the Trust is not seeking CERCLA recoveries and are therefore simply irrelevant.   Even if not, YPF does not mention any of its CERCLA defenses in its responsive pleadings, and therefore has not met its burden with respect to them and therefore should be dismissed.

[52] Affirmative Defenses include: YPF 4 (statutes of limitations and repose), 5 (collateral estoppel, res judicata, and "the entire controversy" doctrine), 6 (pari delicto, acquiescence, waiver, ratification, release, laches, and/or estoppel), 7 (unclean hands), 8 (unjust enrichment), 28 (extraterritorial fraudulent transfers), 29 (mitigation), 31 (accord and satisfaction), 36 (avoidable consequences), 37 (assumption of risk); Repsol 5 (statute of limitations, statutes of repose, estoppel, and laches), 6 (waiver, consent, estoppel, and release), 7 (unclean hands and pari delicto), 8 (collateral estoppel, res judicata, judicial estoppel, abstention, the New Jersey "entire controversy" doctrine, accord and satisfaction, and payment), 9 (business judgment rule), 14 (unjust enrichment), 16 (ratification), 22 (extraterritoriality), and 23 (§ 546 (e)).   *See* Ex. A.

[53] Non-Affirmative Defenses include:   YPF 1 (failure to state a claim), 2 (subject matter jurisdiction), 3 (standing), 9 (proximate cause), 10 (YPF did not cause or contribute to environmental conditions), 11 (YPF did not dispose of hazardous substances), 12 (YPF did not cause third party to dispose of hazardous substances), 13 (YPF did not release, dispose of, or arrange for disposal of hazardous substances) 18 (reasonably equivalent value), 19 (good faith and for value), 20 (no harm to debtors), 21 (insolvency), 22 (11 U.S.C. 550(a)), 23 (creditors not creditors of Debtors at time of transfers), 24 (not a party to the Stock Purchase Agreement), 25 (no transfer of an interest of a Debtor in property), 26 (no transfer of an interest of a Debtor in property), 27 (initial, immediate, or mediate transferees), 32 (compliance with law), 33 (compliance with law), 34 (claims of creditors not assigned to Trust), 35 (Defendants' exercised due care); 48 (incorporate by reference any and all additional defenses by other defendants), 49 (no waiver of additional affirmative defenses), 50 (no consent to final orders);   Repsol 1 (standing), 2 (failure to state a claim), 3 (Plaintiff legally cannot establish requisite elements of claims), 4 (Debtors are not the alter egos of Repsol), 11 (Repsol took in good faith and for value, and may

78

element of plaintiff's prima facie case." *LG Philips LCD Co. v. Tatung Co.*, 243 F.R.D. 133, 137 (D. Del. 2007) ("A defense which merely negates some element of plaintiff's prima facie case is not truly an affirmative defense.").[54]  These are addressed in Section III.C.  Finally, other defenses relate only to damages, which are not an affirmative defense as to liability (the "Damage Defenses" and together with the Affirmative Defenses and the Regular Defenses, the "Defenses").[55]  *See Greiff v. T.I.C. Enters., L.L.C.*, No. 03-882-SLR, 2004 U.S. Dist. LEXIS 680, at *8 (D. Del. Jan. 9, 2004) (finding that damages defenses were "averments [that] do not constitute affirmative defenses because they will not defeat defendants' counterclaims if proven. In other words, these

---

retain any interest to the extent it gave value to Debtors in exchange for transfer), 12 (Repsol took in good faith and for value, without knowledge of voidability), 17 (transfers authorized by law), 18 (doctrine of subsequent intervening cause), 19 (reasonably equivalent value), 20 (actual and proximate cause), 21 (transfers not made to or on behalf of Repsol), and 24 (Repsol not a party of the SPA).  *See* Ex. A.

[54] The Repsol Defendants contend that a general denial is a "perfectly appropriate affirmative defense to include in the answer," citing *S.E.C. v. Toomey*, 866 F. Supp. 719, 723 (S.D.N.Y. 1992) (evaluating SEC's Rule 12(f) motion to strike defense that "the complaint failed to state a claim on which relief could be granted" and concluding that inclusion of such a general denial in the pleadings would not sufficiently prejudice the SEC to warrant striking).  However, whether or not Repsol's general denials were properly included in its answer, or could have been stricken under Rule 12(f), has no bearing on whether such general denials preclude summary judgment in favor of the Trust.  In any event, the courts of this circuit appear to be in general agreement that such general denials are not true affirmative defenses.  *See Nat'l Union Fire Ins Co.,* 28 F.3d at 393. ("A defense may be as simple as a flat denial of the other party's factual allegations or may involve entirely new factual allegations.  In the *latter* situation, the defense is an affirmative defense." (emphasis added)); *see also FTC v. Hope Now Modifications, LLC*, No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 35550, at *3 (D.N.J. Apr. 12, 2010) (striking "general denial[] of fault" as "not [a] true affirmative defense").

[55] Damage Defenses include:  YPF 14 (relief is speculative, unreasonable, excessive, arbitrary, and capricious), 15 (joint and several liability), 16 (right to setoff), 17 (reduction of Trust's claims by any settlement payments), 32 (no prospective declaratory relief); 38 (allowance or disallowance of proof of claim has no precedential or preclusive effect); 39 (relief barred to extent creditors have not incurred damages in excess of their own equitable share of liability); Repsol 10 (setoff or recoupment), 15 (single satisfaction rule), 25 (relief is unreasonable, arbitrary, excessive, and capricious), 26 (punitive damages barred by policy and law), and 27 (contribution, reduction or offset of damages from other parties).  *See* Ex. A.

AMERICAS 114201192

averments entirely overlook liability and focus solely on potential relief.").  These defenses are addressed in Section III.D., *infra*.

## A.    All of Defendants' Statute of Limitations Affirmative Defenses Fail

We now turn to the one set of defenses that Defendants have indisputably put before this Court for resolution at this stage—what YPF refers to as the "obvious statute of limitations problems" that the Trust is purportedly so "concerned" about regarding its Intentional Fraudulent Transfer Claims.  YPF Mot. 63.  Far from being concerned, the Trust welcomes the opportunity for this Court to resolve all of Defendants' limitations defenses in the Trust's favor.  After all, Defendants have already been waiting for decades to argue this point to Maxus's bankruptcy court when the inevitable fraudulent conveyance challenge came, so delaying that argument any further seems counterproductive.

At the outset, we note that neither Defendant has contended, much less shown, that the Trust's *alter ego claims* are subject to any limitations defense.  Thus, the Court can dismiss any such defense, as it pertains to those claims, at this time.

The thrust of Defendants' limitations arguments apply to the Trust's *fraudulent conveyance claims*.  YPF, for its part, purports to "not [be] moving on any issues relating to the statute of limitations (except on the constructive fraudulent transfer claims) other than the permissibility of collapsing."  YPF Mot. at 62-65.  YPF's constructive fraudulent transfer limitations analysis is addressed in the Trust's Opposition to YPF's Motion for Summary Judgment.  But, as to the Trust's Motion, having failed to establish any basis for its assertions that the Trust's *Intentional Fraudulent Transfer Claims*, the Court can dismiss YPF's limitations defenses at this time.[56]

---

[56] Even if the Court were willing to let YPF piggy-back off of Repsol's analysis (and it should not), none of the limitations defenses bar the Trust's Intentional Fraudulent Transfer Claims against YPF.

80

As established in its opening brief, the Trust, through § 544(b)(1), may use its "strong arm power" to exercise the rights that a creditor would have under state intentional fraudulent transfer law.  *See, e.g.*, *Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements, Inc. (In re Midway Games, Inc.)*, 428 B.R. 303 (Bankr. D. Del. 2010).  Through this, the Trust's Intentional Fraudulent Transfer Claims are "timely so long as *one of [the debtors'] creditors* was entitled as of the Petition Date to assert a claim against the Defendants under" applicable law.  *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC (In re Zohar III, Corp.)*, 631 B.R. 133, 160 (Bankr. D. Del. 2021) (emphasis added).  While the Trust's theory of tolling the statute of limitations for its actual fraudulent transfer claims through *Tronox* collapsing should prevail for the reasons discussed below, the Trust's Intentional Fraudulent Transfer Claims are not time-barred under two other doctrines.[57]  *First*, at least two of Maxus's creditors held timely actual fraudulent transfer claims through applicable state laws' discovery tolling as of the Petition Date. *Second*, at least three of Maxus's government creditors have timely actual fraudulent transfer claims through the doctrine of *nullum tempus occurrit regi* ("no time runs against the king").

Before getting to the substance of the Trust's triggering creditors' claims, however, the Trust addresses three threshold issues: (1) burden shifting; (2) choice of law, and; (3) what constitutes a proper triggering creditor for limitations purposes.

---

[57] Both Defendants contend that this Court has already ruled that the Trust's fraudulent transfer claims "occurred outside the statute of limitations" and that by this Court's ruling on the Motion to Dismiss has foreclosed the Trust proceeding on any other theory under the statute of limitations. YPF Opp. at 69; Rep. Opp. at 69.  But this is a misread of the Court's ruling.  The Court stated that it "has not specifically addressed every argument submitted by the defendants but has limited itself to those it believes are material.  Arguments in favor of the motion to dismiss that are not specifically referenced in this letter are rejected by the Court."  [D.I. 107].  Indeed, the Court did not explicitly address, or more importantly, dismiss any of the Trust's other tolling theories in its opinion, it merely pointed out that the statute of limitations was something that the Trust must overcome.  [D.I. 107].

AMERICAS 114201192

*First*, YPF alleges (citing no authority) that the Trust cannot "save its motion for summary judgment on the YPF Defendants' statute of limitation defense by raising new issues for the first time on reply." YPF Opp. at 69 n.92. Repsol has a similar blanket reservation in its Opposition arguing that the Trust "waived any argument for summary judgment on the" defenses the Trust identified by name or paragraph number. Repsol Opp. at 66 n.57. As noted above, this is a mischaracterization of how the burden shifting on affirmative defenses works. Indeed, with respect to statute of limitations defenses for fraudulent transfer claims, Defendants must *first* assert that the claim is untimely, and *then* the movant responds. *See Norman v. Elkin*, 726 F. Supp. 2d 464, 468 n.2 (D. Del. 2010) (allowing the plaintiffs to respond to arguments raised in Defendant's answer brief with issues it didn't include in its opening brief).[58] The Trust's only obligation in its Motion was to demonstrate the existence of a triggering creditor for its claims. *Indus. Enters. of Am. v. Tabor Acad. (In re Pitt Penn Holding Co.)*, Nos. 09-11475 (BLS), 11-51879, 2011 Bankr. LEXIS 3554, at *37 (Bankr. D. Del. Sep. 16, 2011) ("[W]hen analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must *ultimately* prove such a creditor exists.") (emphasis added); *see also Smith v. George (In re RCK Modular Homes Sys.)*, 402 B.R. 463, 469-70 (Bankr. D.N.H. 2008) (holding that Plaintiff established triggering creditors who had filed proofs of claim relating to its fraudulent transfer claims and granting Plaintiff partial summary judgment). The Trust explicitly identified qualifying triggering creditors in its Opening Brief. Trust Mot. at 42 ("The Trust submits the Declarations of Lanny Bilbrey and Daniel Fetsick,

---

[58] YPF cites *In re AMC Investors, LLC*, 637 B.R. 43, 2022 WL 248133, at *56 (Bankr. D. Del. Jan. 27, 2022) (Sontchi, J.) for its proposition that it is the movant's burden to prove it qualifies for some sort of tolling, but that case is a breach of fiduciary case dealing with arguments of equitable tolling, neither of which are applicable here.

establishing both gentlemen as 'triggering creditors' in whose shoes the Trust may stand on its

Section 544 claims.").   In doing so, the Trust met its narrow burden in its moving papers of

establishing the elements of its claim and obviously has not lost its opportunity to respond to any

arguments the Defendants raise regarding their defenses as to the claims of those creditors.

To be clear, however, the Defendants have now lost the opportunity to challenge the

viability of the Trust's identified triggering creditors through testimony at trial.   Indeed, during the

discovery phase of this litigation, the Trust identified in interrogatory responses its list of potential

triggering creditors for both its constructive and intentional fraudulent conveyance claims.   *See*

Yoo Decl. Ex. 6 (Trust's Supplemental Responses and Objections to YPF Defendant's First

Interrogatories).   Both Messrs. Bilbrey and Fetsick were on that list.   Defendants then had the

chance to seek discovery from any of Maxus's creditors the Trust identified as potential triggering

creditors, and in fact, Defendants subpoenaed 20 of them for depositions.   [D.I. 538-546, 548-559].

Repsol specifically subpoenaed Mr. Bilbrey, but instead chose not to go forward with his, or any

other potential triggering creditors' depositions.   [D.I. 558].   As it stands, neither Defendant

proffers any evidence in any of its papers that either gentleman cannot serve as a valid triggering

creditor.

*Second*, for purposes of proving the *elements* of an intentional fraudulent transfer claim,

the Trust relied upon the standards set forth in the DUFTA as applicable law to its substantive

claims.   As discussed in the Trust's motion for summary judgment, those elements of proof share

no material differences across the various jurisdictions.   In contrast, the statutes of limitations

applicable in the various jurisdictions can materially differ, requiring this Court to look at various

jurisdictions' limitation laws depending on the triggering creditor at issue.   *See Hammersmith v.*

*TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (undergoing choice of law analysis where two state

83

laws conflicted).  That analysis allows a debtor to "use the statute of limitations available to any actual creditor of the debtor as of the commencement of the case."  *Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 419 (Bankr. E.D. Pa. 2014).

Indeed, it is well established that "applicable law" in § 544(b)(1) is to be construed broadly, "[a]llowing a trustee to utilize *all* available applicable law" because doing so furthers § 544(b)(1)'s purpose "to restore the bankruptcy estate to the financial condition it would have enjoyed if the fraudulent transfers had not occurred."  *In re Webster*, 629 B.R. 654, 679 (Bankr. N.D. Ga. 2021) (FDCPA is applicable law) (emphasis added) (citation omitted); *In re CVAH, Inc.*, 570 B.R. 816, 825, 834 (Bankr. D. Idaho 2017) (FDCPA and IRC are applicable law).  Therefore, the Trust is not confined to relying on DUFTA as applicable law on limitations issues, and instead can utilize any limitations law that any one of its creditors could rely on.  *In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. 293, 304 (Bankr. D.D.C. 2006) ("The estate representative steps into the shoes of each such unsecured creditor and is cloaked with the rights of that creditor.").

*Third*, § 544(b) requires that an *actual* creditor of the debtor, holding an allowable claim as of the petition date, be considered a "triggering creditor." *In re Polichuk*, 506 B.R. at 432.  For the purposes of defending limitations challenges to its Intentional Fraudulent Transfer Claims, Maxus's triggering creditors can include, but are not limited to, Mr. Bilbrey (of Texas), Mr. Fetsick (of New Jersey), the EPA, the State of Ohio, the State of Wisconsin, each of whom had "allowable" claims in the Chapter 11 Cases.[59]  *See* SOF ¶¶ 156, 157 and 153; Smith Decl. Exs. 189 (hereinafter "Bilbrey Decl."), 195 (hereinafter "Fetsick Decl."), 90, 91, 87.  Further it is undisputed that each of these creditors' claims arose long before YPF purchased Maxus in 1995.  As sworn to, without

---

[59] The Trust reserves all rights with respect to identifying any other triggering creditors to the extent necessary at trial.

AMERICAS 114201192

any existing challenge from Defendants, Mr. Bilbrey and Mr. Fetsick both are former employees of Maxus and have claims arising from benefits owed to them before 1995.  Bilbrey Decl. ¶¶ 2, 5-6 (being an employee of Maxus until his retirement in 1999 and being owed healthcare benefits until Maxus's bankruptcy); Fetsick Decl. ¶¶ 2, 5-6 (being an employee of Diamond Shamrock until 1987 and having been owed retiree medical coverage since his retirement).  Although the Trust has not submitted declarations from the Governmental Creditors, it did not need to.  Even Defendants' experts admit that these creditors' claims all arose well before the first transaction in the Strategy occurred (the State of Ohio alleges that discharge occurred anytime between 1924 through 1982, the EPA alleges the discharge occurred between 1951 and 1969; and State of Wisconsin alleges the discharge between 1873 and 1983).  Lee Decl. Ex. 23 (Andrews & Kurth Due Diligence Memo discussing ███████████████████████████████████████ ██████████████████████ Smith Decl. Exs. ~~80~~90, 87, 91; 42 U.S.C. § 9607.  Finally, all of the triggering creditors' Claims were settled and Allowed either through the Plan (with respect to the Government Creditors) or through a settlement incorporated by the Plan (with respect to Mssrs. Bilbrey and Fetsick), again without any present challenge from Defendants.[60]  *See* Smith Decl. Ex. 3.

### 1.    The Discovery Tolling Rule Tolls the Statute of Limitations on the Intentional Fraudulent Conveyance Claims Until the Petition Date

Turning now to the substantive question:  have Defendants established, as a matter of law and undisputed fact, that the statute of limitations had run prior to the Petition Date as to every intentional fraudulent conveyance claim that any creditor of Maxus could have brought?  Far from

---

[60] Both Messrs. Bilbrey and Fetsick's Claims were settled pursuant to the *Stipulation and Agreed Order Between the Debtors and the Official Committee of Retirees Regarding Modification of Retiree Benefits Pursuant to Section 1114(e)(1)(B) of the Bankruptcy Code*, dated May 10, 2017 [D.I. 1398], which is incorporated and referenced to in the Plan.

AMERICAS 114201192

having done so, the undisputed record establishes that the statute of limitations on one or more creditor claims were, in fact, preserved under the discovery rules of various applicable laws—namely, Texas, New Jersey, and applicable federal law.

        **a.**     **Mr. Bilbrey's Actual Fraudulent Claims under Texas Law are Timely**

As established by his Declaration, on the Petition Date, Mr. Lanny Bilbrey had viable actual fraudulent transfer claims against YPF and Repsol that have been tolled under the laws of Texas until the Petition Date.  Bilbrey Decl. ¶¶ 5-6.  Mr. Bilbrey is a resident of Texas and has lived there since his employment by Crescendo in 1977.  Bilbrey Decl. ¶ 3. Under Texas' UFTA ("TUFTA"), a plaintiff has one year from the date that the claimant knew or reasonably could have known both of the transfer, *and* that it was fraudulent in nature to sue for an actual fraudulent transfer.[61]  Tex. Bus. & Com. Code § 24.010(a)(1); *Janvey v. Democratic Senatorial Campaign Comm. Inc. (DSCC)*, 712 F.3d 185, 196 n.10 (5th Cir. 2013) ("The crucial issue is when the Receiver knew or could reasonably have known of the fraudulent nature of the transfers, not simply when he knew or could reasonably have known that the transfers had been made."); *Moran v. Pardo (In re Life Partners Holdings, Inc.)*, No. 15-40289-RFN-11, 2016 U.S. Dist. LEXIS 192191, at *17 (N.D. Tex. Dec. 20, 2016) (finding that plaintiff could not have reasonably discovered fraudulent nature of transaction where Wall Street Journal article did not mention "many aspects of the fraudulent scheme"); *Johnston v. Crook*, 93 S.W.3d 263, 269 (Tex. App. 2002) (finding that the defendant had not conclusively established that the plaintiff knew or should have known of the transfers on a specific date and of their fraudulent nature).  In *DSCC*, the Fifth Circuit found that the record "did not reflect that the [plaintiff] had any feasible means to discover [the fraudulent

---

[61] Pursuant to section 108 of the Bankruptcy Code this one-year period was extended to two years for the Trust.  11 U.S.C. § 108(a).

AMERICAS 114201192

nature of the transactions] other than to have an expert examine the books and records" of the

defendants. *DSCC*, 712 F.3d at 197 (granting summary judgment on the plaintiff's TUFTA claim).

The court therefore ruled that any applicable statute of limitations had been tolled. *Id.* at 195

("Instead, a claim under section 24.005(a)(1) of TUFTA has been held to accrue only when the

claimant discovers or reasonably could have discovered the fraudulent nature of the conveyance").

    As he testified under oath, Mr. Bilbrey did not know that the Transfers occurred until the

Petition Date. *See* Bilbrey Decl. ¶ 18. Defendants have not (and cannot) produce any evidence

that Mr. Bilbrey actually did know, or reasonably could have known, of the Transfers. Moreover,

any argument that Mr. Bilbrey could reasonably have known about the Transfers based on Maxus's

publicly filed financial statements, such as its 10-K, fails under TUFTA, because their public

disclosure did not identify the "fraudulent nature" of the Fraudulent Transfers. *DSCC*, 712 F.3d

at 197.[62] Even if Defendants could prove Mr. Bilbrey saw Maxus's financials each year, similar

to the claimant in *DSCC*, Mr. Bilbrey had no "feasible means" to discover the fraudulent nature of

the transactions without having an expert's assistance or insider-access to corporate documents.

*Id.* Indeed, Mr. Bilbrey has testified to the opposite—he had no actual knowledge about the

Fraudulent Transfers at all. Bilbrey Decl. ¶ 18. Defendants cannot obtain a trial merely by

---

[62] Cases holding that the plaintiffs could have reasonably discovered the fraudulent nature of transactions that were disclosed in public records involve plaintiffs who were involved in ongoing litigation with the defendants at the time those reports were released. *Biliouris v. Patman*, 751 F. App'x 603, 605 (5th Cir. 2019) (distinguishing the facts from *DSCC* and stating that plaintiffs "had the resources and opportunity to discern the fraudulent nature of this single transaction when it was recorded"); *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, No. 3:17-CV-01147-X, 2019 WL 5578510, at *5 (N.D. Tex. Oct. 28, 2019), *aff'd*, 976 F.3d 585 (5th Cir. 2020). These cases are not analogous to the facts in this case. The pertinent records were not publicly released during the NJ Litigation, they are not even publicly released now. Indeed, as discussed, there was no reason for Mr. Bilbrey to suspect the fraudulent nature of the transactions in the public filings. This case is therefore akin to *DSCC*, as Mr. Bilbrey "was faced with a sophisticated, extensive, worldwide [] scheme," without the proper resources to know about it. *Biliouris*, 751 App'x 603 at 605.

AMERICAS 114201192

contending that they can impeach Mr. Bilbrey at that trial. *See, e.g.*, *Ettinger v. Johnson*, 556 F.2d 692, 696 (3d Cir. 1977) (quoting Moore's Federal Practice ¶ 56.15[4] at 56-523 (2d ed. 1976) ("When at the hearing on a motion for summary judgment . . . the movant's evidence is impeached, an issue of credibility is present, provided the . . . impeaching evidence is not too incredible to be believed by reasonable minds. The evidence contradicting or impeaching that of the movant will usually be produced by the opposing party . . . .")); *see also Diaz-Cruz v. Symons*, No. 1:11-CV-1302, 2016 U.S. Dist. LEXIS 165690, at *11 (M.D. Pa. Dec. 1, 2016) (plaintiff could not avoid summary judgment with bare promise to impeach medical expert because "party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions").

> **b.    Mr. Fetsick's Actual Fraudulent Transfer Claims Under New Jersey Law are Timely**

Similarly, as established by his Declaration, Mr. Daniel Fetsick has viable actual fraudulent transfer claims against YPF and Repsol that have been tolled under the laws of New Jersey until the Petition Date. Mr. Fetsick lived and worked in New Jersey throughout the entirety of his employment with Diamond Shamrock Chemicals Company (from 1951 until 1987) and still rents an apartment in New Jersey. Fetsick Decl. ¶¶ 2-3. Pursuant to N.J. Stat. Ann. § 25:2-31, a creditor may bring an actual fraud claim "if the four-year limitations period expired and *one unsecured creditor* exists who first learned of the fraudulent conveyance within the year prior to the petition date." *In re NJ Affordable Homes Corp.*, 2013 WL 6048836, at *32 (Bankr. D.N.J. Nov. 8, 2013); *Wolff v. Tzanides*, 574 B.R. 489, 514-15 (Bankr. D.N.J. 2017) (as long as the trustee could establish a creditor who did not actually know of the transfer, its claims would not be barred based on the petition date, which was more than 20 years after the transfer). This rule "fosters the just result of

protecting those who have suffered injury from losing a right to redress because of ignorance of the wrong done." *Rosenberg v. N. Bergen*, 61 N.J. 190, 197 (1972).

The applicable discovery rule standard in New Jersey is actual knowledge.[63] *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 639-40 (Bankr. D.N.J. 2004), *rev'd in part on other grounds*, *Off. Comm. of Asbestos Claimants v. Bank of N.Y.*, No. 04-3423 (WGB), 2006 WL 1751793 (D.N.J. June 21, 2006) (concluding that the trustee's claims were timely because "it is reasonable to expect that it is possible that at least one claimant exists who was unaware of any asbestos-related injury prior to one year before G-I Holdings filed for bankruptcy"); *In re N.J. Affordable Homes Corp.*, 2013 Bankr. LEXIS 4798, at *121-22 (Bankr. N.J. 2013) (denying the defendants' motion to dismiss because the trustee alleged an unsecured creditor of the debtor exists who did not have knowledge of the mortgage transactions at issue and who could have filed a timely pre-petition complaint under New Jersey UFTA).

As he testified under oath in his Declaration, Mr. Fetsick did not *actually* know about the Fraudulent Transfers until at least the Petition Date. *See* Fetsick Decl. ¶ 18.  And, just as Defendants had an opportunity to disprove Mr. Fetsick's actual knowledge of the Fraudulent

---

[63] Before the 2002 amendment, the New Jersey UFTA required actual fraudulent-transfer claims (the type at issue here) to be brought "within four years after the transfer was made . . . or, if later, within one year after the transfer . . . was or reasonably could have been discovered by the claimant." N.J.S.A. 25:2-31(a) (2001). The 2002 amendment eliminated the phrase "or reasonably could have been," thus ensuring creditors could sue one year after actual discovery of a transfer. However, if claims are still viable as of the date that the amendment was made, the amendment applies retroactively. *See Guido v. Spina*, No. A-3215-08T3, 2010 WL 1928985 (N.J. Super. Ct. App. Div. May 14, 2010) (holding that because "[t]he amendment affected a procedural remedy or defense, the statute of limitations applicable to a claim that had not yet arisen at the time the statute was amended" applied).  Mr. Fetsick's actual fraudulent transfer claim had not expired for the Fraudulent Transfers as of 2002 because he did not have reasonable or constrictive notice of the Transfers.  As he testified in his Declaration, he did not know about the Fraudulent Transfers until the Petition Date, Fetsick Decl. ¶ 18, therefore his claim did not arise until the Petition Date regardless of whether the Court applies the standard under the pre- or post-2002 amendment.

AMERICAS 114201192

Transfers, they have not (and cannot) produce any facts to the contrary.  Therefore, through Mr. Fetsick, the Trust's actual fraudulent transfer claims, whether for each Fraudulent Transfer individually, or together as part of the Strategy, are not time-barred.

> **2.      The Trust's Actual Fraudulent Transfer Claims are Viable through the** ***Nullum Tempus*** **Doctrine**

Now that Defendants have formally raised their limitations defenses in their respective Motions, the Trust can and will also defend their contentions with the claims of its Government Creditors.  Indeed, as set forth in the Trust's Opposition to YPF's Motion for Partial Summary Judgment, the Trust, through the State of Ohio, the EPA, and the State of Wisconsin can establish, for the same reasons cited there, that the Trust's actual fraudulent transfer claims are viable.  As stated in Section IV.A. of the Trust's Opposition to YPF's Cross-Motion for Partial Summary Judgment, the State of Ohio has a potentially unlimited statute of limitations period with respect to its fraudulent transfer claims (whether constructive or actual).  Similarly, by stepping into the EPA's shoes, the Trust can take advantage of discovery tolling for the 6-year statute of limitations available in 28 U.S.C. §§ 2415 and 2416.  *See United States v. Moore*, 968 F.2d 1099, 1101 (11th Cir. 1992) (tolling the statute of limitations for a fraudulent conveyance action under § 2416 where "an official of the government did not learn of the material facts giving rise to [the] action until" within 6 years of the claim); *FDIC v. Martinez Almodovar*, 671 F. Supp. 851, 871 (D.P.R. 1987) (statute of limitations was tolled for fraudulent conveyance claim under § 2416 where the evidence did "not disclose the date on which the government became aware of" the fraudulent conduct).  *See also Tronox II*, 503 B.R. at 271-72, 275 & n.43 (statute of limitations under § 2416 may be tolled where government official could not have known about fraudulent transaction despite public financial filings).  The Trust can also utilize the State of Wisconsin's 10-year statute of limitations, plus the built-in discovery rule prescribed by its Code. Wis. Stat. Ann. § 893.87. Both of these

AMERICAS 114201192

statutes make clear that discovery of the fraud by the respective government entity starts the clock for fraudulent actions, which extends the limitations to when that discovery occurred. Neither the State of Wisconsin nor the EPA could have discovered the facts constituting the fraudulent transfers until at least the Petition Date. As a matter of law, and as mentioned above, mere disclosure of the transactions in a 10-K cannot put the Government Creditors on notice of the Transfers for purposes of starting the "clock" with respect to the Government Creditors' actual fraudulent transfer claims. *Tronox II*, 503 B.R. at 271-72, 275 & n.43. Moreover, Defendants have not (and cannot) produce factual evidence that the Government Creditors actually knew about the Transactions, their fraudulent nature, and that the Transfers would affect the Government Creditor's rights.

### 3.    The Trust's Actual Fraudulent Transfer Claims Are Timely Through *Tronox* Collapsing

Even if none of the foregoing triggering creditors suffice (and they all do), the Court can still dismiss Defendants' limitations defenses to the Intentional Fraudulent Conveyance Claims. Both Defendants have argued that the Trust "cannot rely on the collapsing doctrine to extent the statute of limitations for its fraudulent transfer claims," claiming that the Trust "may not invoke the collapsing doctrine to save any claims which may be time-barred or otherwise avoid analyzing the Fraudulent Transfers separately from one another." Repsol Mot. at 45-54; YPF Mot. at 66. Defendants challenge the Trust's ability to prove that "(i) all the parties involved had knowledge at the outset of the multiple transactions to follow; (ii) each transaction would not have occurred on its own; and (iii) each transaction was dependent or conditioned on other transactions." YPF Mot. at 63; Rep. Mot. at 50. Defendants also claim that the Trust cannot collapse the transactions as a matter of law. YPF Mot. at 62-66; Repsol Mot. at 45-50; YPF Opp. at 36-39; Repsol Opp. at 41, 61, 65. They have it all wrong.

AMERICAS 114201192

"Courts have 'collapsed' a series of transactions into one transaction when it appears that, despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction." *Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370-71 (Bankr. S.D.N.Y. 2002).   The most iconic collapsing, of course, came in the case of *Tronox II*, which is strikingly similar to this case.

In *Tronox II*, Kerr-McGee Corporation ("Kerr-McGee"), consisting of a large and thriving oil E&P operation and a smaller chemical business, faced massive legacy environmental and tort liabilities. *Tronox II*, 503 B.R. at 249-50.  As the legacy liabilities were deterring investors, the company considered a restructuring that would spin off the E&P business to "get[] out from under legacy [chemical] liabilities." *Id.* In 2002, Kerr-McGee transferred the E&P subsidiaries to New Kerr-McGee and transferred the chemicals business and the legacy liabilities to a new wholly-owned subsidiary, Tronox Worldwide LLC ("Tronox").  *Id.* Kerr-McGee continued to fund Tronox's operations and pay its debts (including its legacy liability expenses) from a central cash management system until, following an IPO of Tronox Class A common stock in November 2005, Tronox Class B common stock was distributed to Kerr-McGee's shareholders. *Id.* at 259.  Shortly thereafter, defendant Anadarko acquired Kerr McGee, including the profitable E&P business, but purportedly not including the liabilities.  *Id.* at 251. Tronox eventually commenced bankruptcy proceedings because the chemicals business was never profitable enough to fund its operations and service its burgeoning legacy environmental liabilities.  *Id.* at 260-61.

As here, Tronox confirmed a plan that created the "Anadarko Litigation Trust" to pursue certain claims brought against Anadarko and several of Anadarko's subsidiaries, including Kerr

AMERICAS 114201192

McGee.  And, as here, upon commencement of the Trust's litigation, the shareholder-transferees

claimed that the fraudulent conveyance challenges were untimely.  After trial, the bankruptcy court

found, based on a developed record, that the Oklahoma UFTA, which provides for a four year

lookback period to recover actual and constructive fraudulent transfers (*see* Okla. Stat. tit. 24,

§ 121(1)-(2)), applied.  *Tronox II*, 503 B.R. at 266.  The four-year look-back period from the date

of Tronox's Chapter 11 Petition in January 2009 facially encompassed the IPO in November 2005

and the final spinoff in March 2006, but not the 2002 transfers.  The issue in *Tronox*, then, was

whether the 2002 and 2005-2006 transactions which occurred outside the look back were

independent transactions—in which case the trust's claims were time-barred—or part of a larger

scheme encompassing the various steps—in which case the 2002 transactions could be collapsed

into the avoidable 2005-2006 transactions and be deemed timely.  The court held the latter,

indicating that fraudulent transfers should be examined "for their substance, not their form," and

that "[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with

all its composite implications."  *Id.* at 268 (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.

1993)).  For statute of limitations purposes, the court opined, the question is "not whether good

business reasons existed for [the transfers].  The question is whether there was a single integrated

scheme." *Id.* at 270-71.[64]

---

[64] Moreover, the "conclusive reason" why the limitations period in *Tronox II* could not be
measured from the defendants' internal reorganization in 2002 was one of policy.  *Tronox II*, 503
B.R. at 271 (citing *United States v. Atlantic Res. Corp.*, 551 U.S. 128, 136 (2007)).  "The
environmental laws of the United States and many of the States are founded on the principle of
strict liability." *Id.*  Indeed, Judge Gropper explained that an entity that has had or has assumed an
obligation to clean up an environmental site or assist in remediation cannot avoid that obligation,
except maybe in a bankruptcy case:

> Defendants' view of the law would permit a shrewd and unscrupulous enterprise
> to divest itself of "substantially all of its assets," as Kerr-McGee represented it did,
> continue to satisfy environmental liabilities from the cash flow of the combined

AMERICAS 114201192

At the dismissal stage, regarding Defendants' limitations arguments, this Court stated:

> [T]he Trust asserts that the very strategy that the *Tronox II* court rejected has happened in this case, and, as such, the statute of limitations does not bar the Trust's claims.  The Court agrees.  While it remains to be seen whether the Trust can prove its allegations, the facts alleged in the Complaint support a plausible theory that would expand the statute of limitations under *Tronox II*.

*Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, Adv. Proc. No. 18-50489 (CSS), 2019 Bankr. LEXIS 446, at *20-21 (Bankr. D. Del. Feb. 15, 2019) (Sontchi, J.).  Following that ruling, the Trust has developed and now provided evidence that, much like the *Tronox II* defendants, YPF and Repsol devised, carried out, and had complete knowledge that the transfers from 1995 to 2016 were part of a "single integrated scheme" to syphon the valuable and profitable assets from the Debtors to leave them stranded with all the environmental liabilities that YPF and Repsol wanted isolated from their value-producing assets.  For their part, Defendants contend that the Trust (a) has not produced enough evidence to collapse the transactions, and (b) simply reiterate their prior argument that this Court cannot collapse the transactions as a matter of law.  We address each in turn.

---

entity until the statute of limitations period had run and the divestiture was ready for completion, and then split the good assets from the bad. If the architects of such a scheme could claim that the statute of limitations had already run by virtue of the first step in the scheme, they would have free reign to hinder and delay creditors so long as they could do it in two steps several years apart (at least four years under Oklahoma law).

*Id.* This analysis applies squarely to the case at hand.  Maxus's bankruptcy was an attempt by Defendants to entirely avoid responsibility for environmental obligations by running the statute of limitations – an even more outrageous implementation of the type of strategy Judge Gropper strongly rejected.

AMERICAS 114201192

a.      **Repsol's Arguments that the Trust has "Failed to Adduce Evidence to Collapse" the Transactions Are Unavailing.**

*First*, Repsol argues that "it is impossible [that Repsol] had the requisite knowledge or notice of the 'overall scheme' when it was allegedly implemented," because they were "not even around for any transaction before 1999."  *See* Repsol Mot. at 51.  Repsol notes that "because four of [the transfers] happened before Repsol acquired YPF," and "Repsol Defendants were not involved in the decision to place Maxus into bankruptcy in 2016, which [The Trust] contends is the culmination of the 'strategy,'" the Trust has not established the knowledge component of the collapsing analysis.  *Id.*  Courts have, however, collapsed transactions where a Defendant was not part of every transaction in a fraudulent scheme.  *See In re Jevic Holding Corp.*, 2011 WL 4345204, at *7 (Bankr. D. Del. Sept. 15, 2011) (collapsing transactions despite defendant maintaining that "[it] did not play any role in the [final transaction] whatsoever.").  And here, the evidence demonstrates that even though Repsol was "not around" for the inception of the scheme, it surely continued the scheme that its subsidiary, YPF, began prior to the acquisition.  Indeed, the Trust has undoubtedly established that Repsol both intended to effectuate the Strategy, and that it had knowledge of the "overall scheme." *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986) (affirming collapsing where parties acted in bad faith); *In re Jevic Holding Corp.*, 2011 WL 4345204, at *5 ("To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions.").  For instance:

- Repsol received an introduction ███████████████████████████████████ ███████████████████ "shortly after its acquisition" of YPF.  Smith Decl. Ex. 129 Tr. at 109:8-15.[65]  Repsol was advised soon after its acquisition that ████████████████████████████████████████████

---

[65] ████████████████████████████████████████████████████████ ████████████████████  Smith Decl. Ex. 133.

AMERICAS 114201192

████████████████████████████████████████ *See, e.g.*, Smith Decl. Ex. 134. Though Repsol argues that "there is no evidence that anyone at YPF informed Repsol of any 'Strategy,' and there was nothing ostensibly wrong with the 1996-97 Maxus Transactions" (Repsol Mot. at 52), it is clear that YPF and Repsol both knew about Maxus's substantial environmental liabilities, that Maxus would not likely ever be able to satisfy these liabilities, and that, were they to leave assets at Maxus, they would be available to satisfy environmental claims. Trust Mot. at 16-17, 18-21.

- Soon after the Repsol acquisition, Repsol proceeded to transfer virtually all of Maxus's remaining productive assets away from those liabilities in the Crescendo Transfer, with the benefits of the proceeds accruing not to Maxus but to YPF and Repsol. Trust Mot. at 17-18.

- Repsol became fully aware of the accelerating regulatory activity at the DASS in the early part of Repsol's ownership, including the design and construction of the interim remedy and 2001. SOF ¶ 26. At the same time, a large-scale, high-cost remediation scenario at the DASS was becoming ever more certain. In 1999, the New Jersey Office of Maritime Resources published a "conceptual proposal" for dredging of highly contaminated "hot spots" in the Passaic River. Trust Mot. at 17.

- The YPFI Transfers in 2001 and 2002 were made around the same time as significant developments were occurring at the DASS, including the expansion of the DASS remedial study area from the lower six miles to 17 miles and into Newark Bay. Trust Mot. at 56.

- In 2002, the EPA did expand the size of the DASS remedial study area to 17 miles of the Passaic River into the Newark Bay. In September 2003, the state of New Jersey issued a directive to several PRPs, including Maxus, to conduct an assessment of natural resource damages and restoration options at the Passaic River. Trust Mot. at 16-17.

- In 2005, King & Spalding advised Repsol that ████████████████████████████



- The Repsol Board also received a presentation regarding ████████████████████

AMERICAS 114201192

[REDACTED]

*Second*, Repsol contends that there "is no evidence that any party intended that [the] transactions be linked or depend on one another," and that "none of the allegedly fraudulent transactions had interdependent terms."  Repsol Mot. at 54. With respect to the latter contention, there is ample evidence that the transactions were dependent on or conditioned on the other transactions as Defendants managed the risks along what they knew could be a long road in their scheme to protect their exposure to Maxus's contingent environmental liabilities along the way towards an inevitable bankruptcy.  As soon as YPF began to appreciate that, while perhaps uncertain, Maxus's environmental liabilities could be catastrophic, YPF adopted the Strategy— the "Global Restructuring," by which YPF directed Maxus to make seriatim, "closely related and in fact interdependent" debt, environmental and asset restructurings[66] [REDACTED] [REDACTED]"[67] Trust Mot. at 13-15.  In considering and swiftly implementing the "interdependent" restructurings, Andrews & Kurth was already concerned that [REDACTED]

[REDACTED]    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]    The goal of the Strategy was to use the clock effectively to separate Maxus's productive assets quickly and isolate the environmental liabilities before creditors' claims

---

[66] Smith Decl. Ex. 21 at MLT00238944, 238946.
[67] Smith Decl. Ex. 114 at DEDES-YPF-P0000048.

AMERICAS 114201192

driven by the DASS remediation became certain.  Smith Decl. Ex. ~~12~~21 at YPF0210163 ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████     Next, "shortly after" Repsol acquired YPF, it learned about Maxus's contingent environmental liabilities.  Smith Decl. Ex 129 Tr. at 109:8-15.  Every year, between 1999 and 2012, personnel from Repsol, YPF, and Maxus met with auditors to discuss Maxus's public disclosures and they agreed they would only publicly disclose the short term expected expenditures and never reserve for any remedial costs, which they deemed "uncertain" but knew carried the potential to be "catastrophic." Trust Mot. at 16, 65.  After Repsol had directed Maxus to sell virtually all its productive E&P assets, the YPFI Transfers had moved Maxus's legacy assets additional steps away from the reach of environmental creditors, and the proceeds from the Crescendo Transfer were drying up, Repsol sought and received legal advice concerning how best to manage the risks presented by Maxus's contingent environmental liabilities.  *See* Smith Decl. Ex. 143.  As described elsewhere in this Reply, King & Spalding advised Repsol (and YPF later learned of the advice) that ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

AMERICAS 114201192

██████████████████████████████████████████████████████████

████████████████████████████████████████    Smith Decl. Ex. 55 at

YPF_MAXUS_0000293080-83; SOF ¶¶ 110-111.  Over the next several years Repsol, in fact,

took steps to address ████████████████████████ including by setting up Repsol

E&P (██████████████████████████) and transferring Maxus's personnel, resources,

and technical models, and valuable prospects to it and then effectuating the "Settlement

Agreements" in an attempt to release its own and YPF's prior fraudulent actions, and continuing

to conceal the insolvency of Maxus to the public and in violation of its directors' fiduciary duties,

all while actively litigating against creditors' claims in connection with the DASS remediation.

Trust Mot. at 21-23.[68] Almost all of those steps were taken *after* late 2006/early 2007 and the

publication of the draft FFS for the lower 8 miles of the Passaic River, the time when even Repsol's

expert concedes it would have been reasonable to estimate that Maxus's liability could exceed $1

billion.  Smith Decl. Ex. 6 at 306.  Until the expropriation in 2012, the litigation strategy was

developed and controlled by Repsol and YPF through their counsel, Kirkland & Ellis LLP.  *See*

Trust Mot. at 22; Smith Decl. Exs. 12, 106, 146, 151.

    Given this significant, consistent body of evidence of the Strategy, the Defendants'

arguments that the transactions cannot be collapsed as a matter of law fail.  Perhaps recognizing

that reality, both sets of Defendants then argue that, even if the facts do support collapsing, the

Court cannot collapse the transactions as a matter of law.  Not so.

---

[68] As part of its Motion, the Trust submitted the expert reports of Todd Menenberg (Smith Decl. Ex. 137, the Menenberg Report) and the reply expert report of Todd Menenberg (Smith Decl. Ex. 172) (the "Menenberg Reply").  The Trust also submitted the expert reports of Barry Pulliam (Smith Dec. Ex. 111) (the "Pulliam Report").  Each of these reports marshals significant evidence about the post-2005 Strategy to assist the Court.  *See* Smith Decl. Ex. 137 ¶¶ 151-177, 270; Smith Decl. Ex. 172 ¶¶ 144, 164-165, and Smith Decl. Ex. 111 ¶¶ 33-39, 215-218, 240-309.

AMERICAS 114201192

*First*, Defendants try to distinguish facts of *Tronox* as inapplicable.  At heart, Defendants claim that their scheme was too long and had too many parental transactions to be similar to *Tronox II*—despite having precisely the same pattern of conduct: identify the issue of looming environmental liability, transfer the good assets, leave the environmental liabilities behind, run out the statute of limitations on claims related to the transfer, and then on for dear life until an inevitable bankruptcy.  The fact that certain details of this Strategy were not determined precisely from the outset, that both YPF and Repsol dealt with contingencies and changing conditions as they implemented the Strategy, that the Strategy took several years, or that the Defendants failed to predict all aspects of the Strategy at inception does not mean, however, that there was no Strategy at all.  And, it certainly does not render *Tronox II* inapplicable.  Under the Defendants' strict interpretation of *Tronox II*, if YPF (and Repsol) failed to create an exhaustive, "all issue spotting" master plan in 1995, inclusive of every discreet transfer of assets and a Chapter 11 filing, than their creditors have no recourse under the Bankruptcy Code.  Surely, that is not the result the *Tronox II* court envisioned or one this Court should condone.

If anything, the long, winding road to a Chapter 11 filing that Defendants orchestrated took is only more compelling evidence of an integrated scheme that supports application of the collapsing doctrine.  As noted throughout, a key, openly discussed component of the Defendants' Strategy was to run the clock as long as possible in an effort to avoid collapsing the statute of limitations set out in *Tronox II.*  Trust Mot. at 20, 25.  In fact, these Defendants had the benefit of the *Tronox II* decision to shape the last phase of the Strategy, as indicated by the flurry of evidence created when the decision was handed down.  Trust Mot. at 25.  Whereas in *Tronox II*, the completion of the transaction was driven by the market's appetite for an IPO, the final steps in the Defendants' Strategy here was always and ever to put Maxus in bankruptcy the moment it appeared

100

environmental creditors' claims were going to be liquidated, for the sole purpose of closure with respect to its alter ego and fraudulent transfer claims (which Defendants had actively been litigating for over ten years).  And that's exactly what happened—Maxus filed for bankruptcy immediately before the trial was to start on OCC's claims.  Failure to apply *Tronox* collapsing here would permit precisely what the Judge Gropper sought to prevent, "a shrewd and unscrupulous enterprise" by a debtor and its parent corporation to denude the environmental obligor of substantially all of its assets, continue to satisfy environmental liabilities from the cash flow of the combined entity until the statute of limitations period had run and the divestiture was ready for completion, and then leave the environmental claimants without any source of recovery.  *Tronox II*, 503 B.R. at 271.  ("If the architects of such a scheme could claim that the statute of limitations had already run by virtue of the first step in the scheme, they would have free reign to hinder and delay creditors so long as they could do it in two steps several years apart.").

*Second*, Repsol asserts that the collapsing doctrine "is not used to aggregate multiple transactions that are each themselves alleged to be fraudulent transfers." Repsol Mot. at 47. This is not true. *See, e.g.*, *In re Guiliano v. Schnabel (In re DSI Renal Holdings, LLC),* 574 B.R. 446, 467 (Bankr. D. Del. 2017) (collapsing multiple allegedly fraudulent transactions to assess defendants' actual fraudulent transfer liability).  In *Guiliano* (a case cited by Repsol in its motion), the trustee alleged that the "Defendants orchestrated a restructuring [] through a complex series of agreements, transfers, and transactions that, ultimately stripped [the debtor] of its valuable assets," leaving debtors "as insolvent shells, with liabilities in excess of $40 million and assets as little as $300,000." *Id.* at 455-56.  The Trustee brought a series of intentional and constructive fraudulent transfer claims for the transfers leading up to the restructuring. *Id*. at 464.  At the motion to dismiss stage, defendants argued that the transfers of certain assets did not constitute transfers of property

101

belonging to the debtor.  The court collapsed the allegedly intentional fraudulent transactions to assess whether the trustee had pled sufficient facts to "support an inference that the Defendants [effectuated fraudulent transfers] through an intermediary with actual intent to" defraud creditors. *Id*. at 468. The court indicated that "[t]he circumstances surrounding the debtor's demise and new entity's ascendance matter more than the classification of each transfer." *Id.* at 467.  It also noted that "[t]he creation of an intermediary corporation does not insulate the defendants from liability for fraudulent transfers." *Id.*  After assessing the facts and viewing the multiple transactions as a "single integrated transaction," the court held that the trustee had properly alleged that the defendants moved the debtor's assets through an intermediary with actual intent to defraud creditors, and that there was a fraudulent scheme to shield the debtor's assets from creditors.  *Id.*

Repsol also claims that the transactions were not concealed such that the Trust's creditors could have known about the alleged injury and brought a timely claim.  Repsol Mot. at 49. They are once again wrong. *First*, the Trust has alleged that the harm to creditors culminated in the final act of the Strategy—the bankruptcy in 2016. Trust Mot. at 24-27.  *See Tronox II*, 503 B.R. at 267-68 ("[A] fraudulent conveyance takes effect when there is an actual effect on creditors and their rights.") Indeed, the Strategy with the Fraudulent Transfers "must be viewed as a whole with all its composite implications" for purposes of determining the statute of limitations, because the statutes of limitations should be examined for their substance, not their form.  *Id.  Second*, the Trust has established multiple creditors who had no legal notice of each fraudulent conveyance before it was too late to bring a timely claim.  *See supra* Sections III.D.1, III.D.2.  *Finally*, as discussed above, Repsol misunderstands the entire purpose of *Tronox*—preventing the very scheme that Defendants have implemented here.  *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 498 (Bankr. D. Del. 2010) (collapsing transactions and indicating "[p]ursuant to Tabor Court

Realty the Court must also examine the overall financial consequences the transactions have had on creditors.").

To the extent that the Court allows collapsing, it is indisputable under DUFTA that the last act in the Strategy (June 17, 2016), falls within the four-year statute of limitation for actual and constructive fraudulent transfer claims.[69]  6 Del. C. § 1309.  Therefore, because each of the Fraudulent Transfers, including those spanning back to the 1996, were part of the Strategy, the Trust's claims are all timely through *Tronox* collapsing.

## B.    Any Affirmative Defense Not Mentioned or Supported by Law and Fact in Defendants' Motions Should be Dismissed

Now we turn to Defendants' defenses other than those relating to limitations periods.  In their 279 pages of pleadings, Defendants have only discussed in any meaningful way five classic affirmative defenses: Repsol 22 (extraterritoriality); a portion of Repsol 5 (statute of limitations); Repsol 14 (unjust enrichment), Repsol 11-12 (good faith transferee) (discussed more fully at Section II.F., *supra*) and YPF Defense 4 (statute of limitations and statutes of repose).  Repsol Mot. at 45, 59, 66; YPF Mot. at 66.  The Trust has already addressed extraterritoriality (Opp. to Repsol Mot. at Section III.B.2.), unjust enrichment (Opp. to Repsol Mot. at Section IV.A.), standing (Opp. to Repsol Mot. at Section IV.B., *supra* Section I.A.), and the statute of limitations affirmative defenses (in the preceding section).  However, Defendants fail to mention, much less

---

[69] To be sure, the last act of Defendants' Strategy, Maxus's Bankruptcy in 2016, is not only timely under DUFTA—it is timely under *multiple* applicable laws available to the Trust via § 544(b)(1).  Indeed, the Trust's claims are timely under most applicable state fraudulent conveyance laws.  6 Del. C. § 1309 (four-year statute of limitations for actual fraudulent transfer claims); Ohio Rev. Code § 1336.04 (same); Wis. Stat. Ann. § 893.425 (same); Tex. Bus. & Com. Code Ann. § 24.010 (same).  *See also supra* Section III.A. (establishing that Ohio, Wisconsin, and Texas laws qualify as "applicable law").  Moreover, by standing in the shoes of its federal creditors, the Trust can utilize the statute of limitations in applicable federal law, including 28 U.S.C. § 2415, which affords the Trust's EPA creditor at least a six-year statute of limitations.  *See supra* Section III.A.2. (discussing available statute of limitations under § 2415).

103

discuss, many of their other Affirmative Defenses, and largely omit discussion of how any of these defenses present triable issues of facts.  The entirely unmentioned Affirmative Defenses include: YPF 5 (collateral estoppel, res judicata, and "the entire controversy" doctrine), 28 (extraterritorial fraudulent transfers), and 29 (mitigation); Repsol 9 (business judgment rule), 16 (ratification), 23 (§ 546 (e)), and part of 5 (estoppel).  Consequently, all of these unmentioned affirmative defenses should be dismissed at this time.[70]  *See Bailey-P.V.S. Oxides, LLC* 2009 U.S. Dist. LEXIS 95007, at **4-7 (W.D. Pa. Oct. 13, 2009) (granting Plaintiff's motion for summary judgment on defendant's affirmative defense where "[d]efendant did not profer[] any facts or law that would support their entitlement to proceed on th[e] defense."); *Bank of Am., N.A. v. Sonali Energees USA, LLC*, Civ. Action No. 19-cv-20992 (JXN)(JBC), 2022 U.S. Dist. LEXIS 3422, at *12 (D.N.J. Jan. 7, 2022) (granting plaintiff summary judgment when "Defendants have submitted no evidence or any further allegations in support of their affirmative defenses, and thereby failed to establish a dispute as to any material facts of this case."); *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090 (Bankr. Del. 1990) (granting summary judgment for Plaintiff when "defendants not only failed to point to any specific facts that would raise a genuine dispute as to their affirmative defenses, they failed to raise the affirmative defenses at all").

Those Affirmative Defenses that Defendants did at least mention by name or concept in their opposing pleadings, but did not brief at all, include: YPF 6 (pari delicto, acquiescence, waiver,

---

[70] YPF acknowledges its "decision not to discuss in detail any particular defense" and urges their non-response is not a waiver of that defense.  YPF Opp. at 67 n. 89.  This is not so, as the Trust's only obligation was to "point out" that there were no triable issues of fact to support the defense. The rest fell to YPF.

AMERICAS 114201192

ratification, release, laches, and/or estoppel), 7 (unclean hands), 8 (unjust enrichment),[71] 19 (good faith and for value), 31 (accord and satisfaction), 36 (avoidable consequences),[72] 37 (assumption of risk); Repsol 6 (waiver, consent, estoppel, and release), 7 (unclean hands and pari delicto), 8 (collateral estoppel, res judicata, judicial estoppel, abstention, the New Jersey "entire controversy" doctrine, accord and satisfaction, and payment).  Repsol alone made a superficial attempt to identify triable issues of fact with respect to five Affirmative Defenses, in three bullet points on one page in its opposition.  Two reference Repsol's Affirmative Defenses 6, 7, 8, and the last references Repsol's Damage Defenses 15 and 27.  Each bullet point merely recites the defense and then provides a single sentence (or less) of "support." Repsol Opp. Mot. 68.  But a single sentence of "support" is insufficient to defeat summary judgment, just as a conclusory statement merely mentioning the Defense is insufficient.  *United States v. Werner*, No. 3:13-CV-2759, 2015 U.S. Dist. LEXIS 28290, at *13 (M.D. Pa. Mar. 9, 2015) (citing *Bhatla v. U.S. Cap. Corp.*, 990 F.2d 780, 787 (3d Cir. 1993)) ("Mere assertions set out in a pleading are insufficient to defeat summary judgment."); *EdgeCo Inc. v. FastCap, LLC,* Civ. Action No. 02-2624 (JAG), 2005 U.S. Dist. LEXIS 46220, at *39 (D.N.J. July 8, 2005*)* ("[Defendant] may not rest on a mere listing of defenses, without presenting factual support for at least the basis of these defenses, in its efforts to preclude summary judgment"); *Harper*, 743 F. Supp. at 1090 ("[D]efendants not only failed to point to any specific facts that would raise a genuine dispute as to their affirmative defenses, they failed to raise the affirmative defenses at all.").

---

[71] The Trust notes that, while Repsol has sought affirmative summary judgment on its unjust enrichment defense, YPF has not moved on its own unjust enrichment defense.  YPF, therefore, cannot prevail affirmatively with that defense, as it is not able to rely on Repsol's pleadings.

[72] As discussed above, the Trust categorizes YPF 36 as an Affirmative Defense.

AMERICAS 114201192

YPF on the other hand, merely avers that the Trust did not identify or address the elements of each Affirmative Defense that it names in its pleading and alleges that "regardless, material facts are in dispute relating to the YPF Defendants' affirmative defenses, precluding summary judgment." YPF Opp. at 69. This general statement is not enough to save any of YPF's unexplicated Affirmative Defenses. *See Werner*, No. 3:13- 2015 U.S. Dist. LEXIS at *13.

### C. Any Non-Affirmative Defense Not Mentioned by Defendants or Supported by Fact Should Be Dismissed.

Defendants' answers also include, as purported defenses, conclusory averments that the Trust cannot establish the various elements of its fraudulent transfer and alter ego claims.[73] *See* Ex. A. Those types of denials alone have no impact on the Trust's Motion. Indeed, "[o]nce the Trustee establishes his prima facie case, *he need not affirmatively disprove every other theory*." *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 217 (3d Cir. 2006) (emphasis added). For the Non-Affirmative Defenses, the Trust only needs to make the showing that it meets the elements of the underlying claim it is seeking summary judgment on, and the burden shifts to the Defendants to establish in its opposition papers that a genuine issue of material fact exists. *See In re Vaso*, 2012 Bankr. LEXIS 4741 at *28 (holding that once trustee made a preliminary showing

---

[73] These general denials include: standing (YPF 3, Repsol 1); failure to state a claim upon which relief may be granted (YPF 1; Repsol 2), legally establishing the requisite elements of the claims (Repsol 3), no subject matter jurisdiction (YPF 2), general denial of alter ego liability (Repsol 4), proximate cause (YPF 9, Repsol 18 and 20), reasonably equivalent value (YPF 18; Repsol 19), the transfers were not made to or on behalf of Repsol (Repsol 21), lack of harm to the Debtors (YPF 20), insolvency (YPF 21), 11 U.S.C. 550(a) applies only to extent a transfer is avoided (YPF 22), the majority of Debtor's creditors were not creditors at the time of the relevant transfers (YPF 23), lack of actual intent and transfers were publicly disclosed (YPF 24), no transfer of an interest of a Debtor in property (YPF 25 and 26), Repsol was not a party to the 1986 Stock Purchase Agreement (Repsol 24), the YPF Defendants were not the initial, immediate, or mediate transferees nor beneficiaries of the transfers (YPF 27), and that the claims in the Complaint were not assigned to the Trust (YPF 34).

AMERICAS 114201192

of an avoidable transfer, the burden shifted to the defendant nonmovant alleging non-affirmative

defense to "supply sufficient evidence (not mere allegations) for a reasonable jury to find for the

nonmovant").

*First*, numerous Non-Affirmative Defenses are not mentioned at all in Defendants'

papers[74] and therefore do not impact any of the relief that the Trust seeks in its motion.  *Berckeley*

*Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 197 (3d Cir. 2006) ("[S]ummary judgment is essentially

'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion

with facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument.").

*Second*, the Non-Affirmative Defenses to the Trust's claims for relief that are at least

mentioned are being addressed elsewhere through the parties' summary judgment pleadings, and

the Trust will prevail for the reasons set forth in its response to each.[75]

---

[74] Unmentioned Regular Defenses Include: YPF 2 (subject matter jurisdiction), 10 (YPF did not cause or contribute to environmental conditions), 11 (YPF did not dispose of hazardous substances), 12 (YPF did not cause third party to dispose of hazardous substances), 13 (YPF did not release, dispose of, or arrange for disposal of hazardous substances), 20 (no harm to Debtors), 22 (11 U.S.C. 550(a)), 27 (initial, immediate, or mediate transferees), 32 (compliance with law), 48 (incorporate by reference any and all additional defenses by other defendants), and 49 (no waiver of additional affirmative defenses); Repsol 17 (compliance with law), 18 (subsequent intervening cause), 20 (proximate cause), and 24 (not a party to the Stock Purchase Agreement).

[75] Non-Affirmative Defenses pertaining to fraudulent transfer claims include: YPF 1 (failure to state a claim), 2 (subject matter jurisdiction), 9 (proximate cause), 18 (reasonably equivalent value), 19 (good faith and for value), 20 (no harm to debtors), 21 (insolvency), 23 (creditors not creditors of Debtors at time of transfers), 24 (no actual intent and publicly disclosed transfers), 25 (no transfer of an interest of a Debtor in property), 26 (no transfer of an interest of a Debtor in property), 27 (initial, immediate, or mediate transferees), 33 (compliance with applicable laws); Repsol 2 (failure to state a claim), 11 (Repsol took in good faith and for value, and may retain any interest to the extent it gave value to Debtors in exchange for transfer) 12 (Repsol took for value, in good faith, without knowledge of voidability), 17 (transfers authorized by law), 18 (doctrine of subsequent intervening cause), 19 (reasonably equivalent value), 20 (actual and proximate cause), 21 (transfers were not made to or on behalf of Repsol), and 24 (not a party to Stock Purchase Agreement).  Non-Affirmative Defenses pertaining to alter ego claims include: YPF 1 (failure to

AMERICAS 114201192

*Finally*, YPF also mentions its CERCLA-linked defense (YPF 41), but like the other CERCLA linked defenses in its answer (YPF 40, 42, 43, 44, 45, 46, and 47) (that go unmentioned), it has no bearing on the Trust's Claims at issue in the Trust's Motion, as the Trust is not seeking "CERCLA damages" for any of its claims. *See supra* Section I.D. Therefore, these CERCLA defenses can be dismissed as well.

### D.     None of Defendants' Damages Defenses Impact This Court's Ability to Grant the Trust Summary Judgment on Alter Ego Damages.

To be clear, by requesting this Court to establish the measure of damages on its alter ego claims, the Trust (1) squarely put Defendants' purported Damages Defenses at issue, and (2) pointed out that none are sufficient to forestall the relief sought. Trust Mot. at 1, 35-40, 68-69.[76] In response, YPF fails to address any of the Damages Defenses in its papers, instead listing them only by number in a single footnote as defenses that are not affirmative and somehow "therefore preserved for trial." YPF Opp. at 68, n.90. Given the inadequacy of that statement, the Court can consequently summarily dismiss all of YPF's Damages Defenses, particularly as they pertain to the exact quantum of alter ego damages sought by the Trust. *See Berckeley*, 455 F.3d at 197.

Repsol, for its part, does mention certain Damages Defenses in its bulleted point list that "even if [the Trust] were to succeed….[a]ny damages would be subject to setoff, recoupment, or

---

state a claim), 2 (subject matter jurisdiction), 9 (proximate cause), 22 (Defendants' conduct was lawfully undertaken), 23 (creditors not creditors of Debtors at time of transfers), 34 (claims of creditors not assigned to Trust), 35 (Defendants exercised due care); Repsol 2 (failure to state a claim), Repsol 3 (Plaintiff legally cannot establish requisite elements of claims); 4 (Debtors are not the alter egos of Repsol), 18 (doctrine of subsequent intervening cause), 20 (actual and proximate cause); 24 (Repsol not a party of SPA).

[76] The Damage Defenses include: YPF 14 (relief is speculative, unreasonable, excessive, arbitrary, and capricious), 15 (joint and several liability), 16 (right of setoff), 17 (reduction of Trust's claims by any settlement payments) 30 (prospective declaratory relief); Repsol 10 (setoff or recoupment) 13 (attorney fees), 15 (single satisfaction rule), 25 (relief is unreasonable, arbitrary, excessive, and capricious), 26 (punitive damages barred by policy and law), 27 (contribution, reduction or offset of damages from other parties).

AMERICAS 114201192

reduction according to the value Repsol *paid* for assets involved in the transactions, or financial assistance any Defendant provided to Maxus" (Repsol Opp. at 68) and that "overwhelming evidence of Maxus's creditors' intentional, decades-long pollution of the Passaic" apparently "shows that damages the MLT seeks…are excessive and unreasonable, and would cause unlawful punitive damages." *Id*., n.60.  Again, these bare averments are not sufficient to establish a genuine triable dispute. *See In re Vaso*, 2012 Bankr. LEXIS 4741 at *28.

Here is the problem: the Trust has asked for the Court to find a specific quantum of damages on its alter ego claims.  Repsol, in an attempt to push off any reckoning, simply lists the issues it wants tried, without identifying, must less supporting, any with evidence.  For example, nowhere in Repsol's summary judgment pleadings do they specify what right they believe they have to setoff, recoup, or reduce for value, let alone address what actual amounts they believe they are entitled to setoff, recoup, or reduce.  Where is the evidence of Repsol having any claim against the Debtors or the identity of any funds or other assets subject to recoup? Where is the evidence of the amounts that Repsol contends it gave directly to Maxus as "financial assistance" (as opposed to funds that YPFH provided)? Where in its papers does Repsol address that the relief sought by the Trust is punitive, or arbitrary and capricious?  What amount does Repsol believe would not be arbitrary or capricious?  Why is Repsol even talking about punitive damages at this stage of the proceeding?

The time for answering these questions was in Repsol's response to the Trust's Motion seeking a specific assessment of damages in connection with the settlements, negotiated in good-faith and at arms' length, with the key creditors that formed the basis for the Plan: $712,560,327.76

in respect of the Allowed Class 4 Claims, plus pre-judgment interest,[77] and (2) a declaratory judgment that Defendants are liable as alter-egos for the unliquidated Class 5 Claims as they become due.  Repsol just dropped the ball.  In short, having failed to discuss any purported Damages Defenses in their opposition papers, Defendants have waived them all.

### E.        Defendants Have Waived Certain of Their Jurisdictional Defenses.

Finally, Defendants have alleged several jurisdictional defenses to the Trust's claims, including the lack of consent to the Court's entry of final orders (YPF 50) and lack of subject matter jurisdiction (YPF 2).  Neither of these issues, however, are briefed in Defendants' papers.  YPF does mention its "defense" of lack of consent to this Court's entry of final orders (YPF 50), as does Repsol at the end of each brief (YPF Opp. at 70; Repsol Opp. at 70), but this, or the mention of it at the end of a brief, will not preclude this Court from entering summary judgment (or from entering a judgment at trial).  *Penson Techs. v. Schonfeld Grp. Holdings (In re Penson Worldwide)*, 624 B.R. 66, 75 (Bankr. D. Del. 2020) ("In its Answer, Defendant affirmatively states that it does not consent to the entry of a final order.  Notwithstanding Defendant's lack of consent, I can enter a final order on this summary judgment motion"); *see also Jalbert v. Souza (In re F-Squared Inv. Mgmt., LLC)*, Adv. No. 17-50786, at *13 n.50 (Bankr. D. Del. Sep. 6, 2019) ("Unless a non-consenting entity briefs the issue of authority to enter a final order on a given matter, a statement that a party does not consent if the court cannot enter final orders absent consent of the parties is of little value.").[78]  Nor does YPF explain how it can both maintain its defense as to subject matter

---

[77] As noted above, none of the Defendants meaningfully contested the award of prejudgment interest on the damages to be awarded.

[78] While non-consent to entry of a final judgment is not a "defense" of Repsol, Repsol does include a "No Consent to Entry of a Final Order or Judgment" section in its brief.  It too, is of little value, given that the Trust's Motion will not result in a total adjudication of any claim.

AMERICAS 114201192

jurisdiction (which is unarticulated anywhere in its papers) and at the same time seek to have the

Court enter summary judgment in its favor.

## CONCLUSION

Therefore, the Trust respectfully requests that the Court grant partial summary judgment

in favor of the Trust, and grant such other and further relief that the Court deems just.

Date:  May 18, 2022

<div align="right">

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

</div>

<div align="center">111</div>

# EXHIBIT E

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.*,<br><br>    Debtors.[1] | Chapter 11<br><br>Case No. 16-11501 (CSS)<br><br>Jointly Administered |
| MAXUS LIQUIDATING TRUST,<br><br>    Plaintiff,<br><br>v.<br><br>YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO.,<br><br>    Defendants. | Adv. Proc. No. 18-50489 (CSS)<br><br>**FILED UNDER SEAL** |

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO YPF DEFENDANTS'
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AND COUNTERSTATEMENT OF UNDISPUTED FACTS IN
OPPOSITION TO THE TRUST'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Dated: May 18, 2022

        Brian E. Farnan (Bar No. 4089)
        Michael J. Farnan (Bar No. 5165)
        FARNAN LLP
        919 North Market Street, 12th Floor
        Wilmington, DE 19801
        (302) 777-0300
        bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

The YPF Defendants have proposed over five-hundred paragraphs of "undisputed" facts in support of the *YPF's Cross Motion for Partial Summary Judgment* ("YPF Motion" or YPF Mot.") and *YPF Defendants' Memorandum of Law in Opposition to the Trust's Motion for Partial Summary Judgment* ("YPF Opposition" or YPF Opp."). The Trust, operating under limited time, has categorized the submitted facts below for the convenience of the Court. The Trust concurs that the green highlighted facts are undisputed in this proceeding and the Court should determine the submitted facts are undisputed findings accordingly. The Trust submits that the yellow highlighted facts are not material and/or irrelevant to any issues relating to the adversary proceeding. Given that these facts have no bearing on any issues relevant to the proceeding, the Trust does not admit or dispute them, and further submits that the Court should not make any findings relating to these facts. The Trust has highlighted in red relevant facts that are in dispute. The Trust submits that these disputed facts, while being potentially relevant to the YPF Motion, have no bearing on the facts necessary to prove the Trust's Motion and the Court can still grant Summary Judgment in favor of the Trust notwithstanding the disputed facts.

## <u>GENERAL OBJECTIONS</u>

The following general objections ("<u>General Objections</u>") apply to each paragraph of the YPF Defendants' statement of facts, and shall have the same force and effect as if fully set forth in the response to each individual paragraph. To the extent the Trust responds to a paragraph, the Trust reserves all objections as to relevance, privilege, and admissibility, as well as to any and all other objections on any ground that would require or permit the exclusion of a fact in the paragraph, if that fact were offered into evidence. The Trust object as follows:

1.    The Trust objects to the YPF Defendants' submission as being beyond the scope of the applicable rules of this Court and contrary to the spirit in which the Trust submitted its own statement. By responding, the Trust does not concede that YPF

1

may rely on an uncontested statement of material facts to satisfy its evidentiary burdens, or that the Trust's responses herein in any way limit its ability to rely on any fact or argument in connection with any pending motion or at trial.

2.    The Trust objects to any emphasis added or characterizations of documents cited to in each paragraph.  To the extent the YPF Defendants are relying on a document, the document speaks for itself.

3.    To the extent the Trust admits to a statement of fact, the Trust is not admitting to the admissibility, veracity, submitting that the particular document or testimony is evidence of the purported fact, or ascribing any meaning or definition to the document or testimony cited as evidence for the purported fact.  The Trust reserves the right to challenge the admissibility of any document, statement or testimony cited, on any grounds, including but not limited to, hearsay or the doctrine of completeness.  Failure to indicate that the Trust objects to the admissibility of specific paragraphs or statements herein is not intended and should not be understood to effect a waiver of the right to object to the admissibility of any document, statement or testimony offered as evidence.

4.    To the extent the Trust does not dispute a statement of fact, the Trust is not admitting the Repsol Defendants have properly and accurately cited such statements.  Where a citation is incorrect, the Trust has endeavored to note this below.

5.    Where the Trust objects to a paragraph as non-material or irrelevant, the Trust neither admits nor disputes the facts set forth therein.

6.    The Trust objects to any paragraph that characterizes or ascribes meaning to a document, deposition testimony, or expert testimony (including expert reports).  The

testimony and expert reports speak for themselves.  To the extent the Trust admits to a statement of fact citing a document, deposition testimony, or expert testimony, the Trust is not admitting to the characterization or summary of the cited evidence.

7.    To the extent the YPF Defendants cite to, summarize, or rely on a document, the Trust submits that the document speaks for itself and the Court should review the entire document for completeness.  The Trust reserves its right to object to any characterization or summary of a document on the basis of completeness.

8.    To the extent the Trust does not dispute any statement of Defendants' experts, the Trust does not concede that the expert is otherwise qualified to testify or that the associated report is wholly admissible.

9.    To the extent any facts submitted by the YPF Defendants in their Affirmative Statement of Facts ("YPF's SOF") contradict facts submitted by the Trust's Statement of Undisputed Facts ("Trust SOF"), the Trust submits that those facts are in dispute.

10.    Where the Trust disputes or does not dispute a statement of fact, the Trust is only providing sufficient evidence to demonstrate that there is a genuine issue of material fact and not providing an exhaustive set of counter-facts or evidence.  The Trust reserves the right at trial to dispute any of the proposed facts using all available facts and admissible evidence.

11.    To the extent the Trust responds to a statement that includes footnotes, the Trust's response to the footnote should be understood to be the same as the Trust's response to the body of the associated text.

12.    The Trust objects to the use by the YPF Defendants of documents, expert, reports or

testimony that are not admissible, particularly that are not admissions of the debtors, offered without proper foundation or a sponsoring witness with personal knowledge.

13.    The Trust objects to the use, by the YPF Defendants, of expert testimony offered by the Defendants' expert witnesses on any issue as to which Defendants bear the burden of proof, as Defendants' experts did not submit reports by the deadline set in the Scheduling Order for expert reports on issues as to which a party bears the burden of proof. See Letter Opinion dated February 22, 2022 [D.I. 607].

14.    The Trust objects to the YPF Defendants' reliance on expert reports as establishing the truth of any factual allegations for purposes of summary judgment without offering the Court the underlying evidence relied upon by such experts or the context in which they offered their opinions.

15.    The Trust objects to the YPF Defendants' use of previously withheld privileged material to serve as evidence for their submitted facts while still maintaining privilege over documents covering the same subject matter.  To the extent the Trust was not provided with sufficient evidence to dispute the submitted fact on the basis of privilege, the Trust reserves the right to move the Court to draw an adverse inference from YPF's failure to produce the relevant documents, and/or to demand production of the withheld privileged materials and revise these responses accordingly.

16.    To the extent the YPF Defendants assert that any particular fact as to which the Trust has identified, in a pleading or otherwise on notice to Defendants, any dispute, or, to the extent any assertion of fact by the YPF Defendants submitted contradicts any assertion of fact by the Trust, the Trust objects to the YPF Defendants' assertion that any such fact is undisputed.

4

17.    The Trust objects to any of the YPF Defendants' submitted facts to the extent they are argumentative or assert legal conclusions.

18.    The Trust objects to the YPF Defendants use of the term "YPF" to mean anything other than the legal entity YPF, SA.  The Trust further objects to the YPF Defendants use of the term "YPF Defendants" to mean anything other than as defined in the Trust's Motion.  To the extent YPF or the YPF Defendants are found to be the alter ego of the Debtors after a trial, then the Trust's responses and objections herein may no longer be valid insofar as the terms may be construed to include a larger corporate group, to include the Debtors.

19.    The Trust construes the headings in YPF's Factual Submission as organizational in nature, and does not understand that such headings set forth factual allegations that require response, denial or objection.

20.    The Trust, by not contesting statements made by defendant's experts, are not admitting the expert is otherwise qualified to testify or that the associated report is fully admissible.

## SPECIFIC RESPONSES AND OBJECTIONS

### I.    THE DEBTORS

1.    As addressed in further detail at Section XI, *infra,* Maxus Energy Corporation ("Maxus"), Tierra Solutions, Inc. ("Tierra"), Maxus International Energy Company ("MIEC"), Maxus U.S. Exploration Company ("MUSE"), and Gateway Coal Company ("Gateway Coal") (collectively, "Debtors") filed their voluntary petitions for bankruptcy on June 17, 2016. Main Proc. D.I. 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

2.    In conjunction with the bankruptcy filing, the Creditors' Committee was formed. Main Proc. D.I. 1258-1, at 44, 132. The Creditors' Committee consisted at various times of (1) Oxy, the CPG, Brown & Caldwell, (2) Oxy & the CPG, and (3) Oxy, CPG, Mallinckrodt Pharmaceuticals plc. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to the identity of the committee members as irrelevant as all members of the committee owe a fiduciary duty to all creditors regardless of composition.

3.    A plan of liquidation proposed by the Debtors and the Creditors' Committee was confirmed on May 22, 2017. Main Proc. D.I. 1460.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

4.    By dollar amount, and as addressed in further detail below, the vast majority of the claims asserted in the bankruptcy against the Debtors related to pollution in the Lower Passaic River in Northern New Jersey. *See* Main Proc. D.I. 1258-1 Ex. B at 8-9; Main Proc. D.I. 2493.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

5.    Certain of the Debtors, including Maxus, Tierra, Gateway, and MUSE, had continuing operations following the transfers at issue here, and up to at least the Petition Date. Main Proc. D.I. 2, ¶ 12.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## A.    MAXUS

6.      Maxus was incorporated in Delaware in 1983 as a holding company for the former Diamond Shamrock Corporation ("Diamond Shamrock") and held the stock of a number of corporations, the oldest of which, the Diamond Alkali Company, was founded in 1910. *See* Propps Decl. Ex. 15 at YPF0001491; Propps Ex. 16 at 2. By 1994, Maxus, together with its subsidiaries, was an oil and gas exploration and production company with both foreign and domestic operations. *See* Propps Decl. Ex. 17 at 1. Maxus's domestic efforts were primarily based in the Anadarko Basin in the Texas Panhandle and western Oklahoma, Texas and Louisiana offshore, and onshore Gulf Coast areas. *Id.* at 2. Its international operations were primarily located in Indonesia, Ecuador, Venezuela, and Bolivia. *See* Propps Decl. Ex. 16 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## B.    TIERRA

7.      Tierra is a Delaware corporation that is directly owned by CLHH. Tierra was an environmental management company which also held title to certain real estate properties. *See* Main Proc. D.I. 2, ¶ 12. "Tierra's business is to manage environmental remediation obligations owed by Maxus, either as principal or when acting on behalf of third parties, principally OCC." *Id.* at 7.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

8.      The entity known as Tierra has changed names multiple times including a July 11, 1986 name change from Diamond Shamrock Process Chemicals, Inc. to Diamond Shamrock Chemical Land Holdings, Inc. and a December 4, 1987 name change to Chemical Land Holdings,

7

Inc. ("CLH"). Propps Decl. Ex. 18. In 2002, CLH changed its name to Tierra. Propps Ex. 190, at

34.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

## C.    MIEC

9.    MIEC is a "Delaware corporation, and a wholly-owned subsidiary of Maxus, whose

business is inactive." *See* Main Proc. D.I. 2, ¶ 12.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

## D.    MAXUS (U.S.) EXPLORATION COMPANY

10.    MUSE is a Delaware Corporation, and a wholly-owned subsidiary of Maxus, which

was involved in oil and gas exploration efforts in the deep waters of the Gulf of Mexico primarily

through its ownership of a 15% non-operating working interest in an offshore oil drilling field

known as Neptune. *See* Main Proc. D.I. 2, ¶ 12.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

## E.    GATEWAY COAL

11.    Gateway Coal is a Delaware corporation, and a wholly-owned subsidiary of Maxus,

whose business was limited to the administration of retiree benefits. *See* Main Proc. D.I. 2, ¶ 12.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

.

II.     **THE PARTIES**

A.     **THE YPF DEFENDANTS**

   *YPF*

   12.     YPF is Argentina's leading energy company producing approximately 36% of the total oil and gas in the country and supplying 54% of the fuel markets through a network of more than 1600 service stations and other assets. YPF operates a fully integrated oil and gas chain with leading market positions across the Argentine domestic upstream, downstream and gas and power segments. Propps Decl. Ex. 1 at 18. YPF's upstream operations consist of the exploration, development and production of crude oil, natural gas and NGLs. YPF's downstream operations include the refining, marketing, transportation and distribution of oil and a wide range of petroleum products, petroleum derivatives, petrochemicals, LPG and biofuels. Additionally, through its Gas and Power business segment, YPF is active in the gas separation, natural gas distribution and power generation sectorsboth directly and through investments in several affiliated companies.

   *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The present and historical operations are not material to any claims or defenses presented in this case.

   13.     YPF is the "largest integrated oil and gas company in Argentina." Propps Decl. Ex. 1 at 11.

   *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The operation size of YPF is not material to any claims or defenses presented in this case.

   14.     From the 1920s to 1990, the government of Argentina controlled the exploration and production of oil and natural gas, the refining of crude oil, and the marketing of refined petroleum products in Argentina through YPF. *See* Propps Decl. Ex. 2 at 1. Argentina enacted laws

9

to deregulate its economy and privatize state-owned companies including YPF in 1989. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The historical operations of YPF are not material to any claims or defenses presented in this case.

15.    Pursuant to Privatization Law No. 24,145, in July 1993, YPF completed a worldwide offering of 160 million Class D Shares. *See* Propps Decl. Ex. 3 at 31. The shares were traded on the New York, London, and Buenos Aires exchanges. *See id.*; Propps Decl. Ex. 4. The shares traded represented 45% of YPF's outstanding stock previously owned by the Argentine government. *See* Propps Decl. Ex. 2 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The historical operations and operation size of YPF are not material to any claims or defenses presented in this case.

***YPFI***

16.    As discussed more fully below, YPFI was created in June 1996 as a subsidiary of MIEC (as defined below), and became a direct subsidiary of YPF in July 1996; YPFI started as a Cayman Islands entity, then re-domesticated to Bolivia in 2002. Propps Decl. Ex. 191. *See also* Propps Decl. Ex. 192; Propps Decl. Ex. 193; Propps Decl. Ex. 283 at MAXUS3258579.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

***YPFH***

17.    As discussed more fully below, YPFH, a Delaware corporation, was created in August 1996 as a subsidiary of YPFI and holding company for Maxus. YPFH became a direct subsidiary of YPF in 2002. Propps Decl. Ex. 115 at 9-10; Propps Decl. Ex. 194 at F-12.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the facts set forth in this paragraph.

***CLHH***

18.    As discussed more fully below, CLHH, a Delaware corporation, was created in August 1996 as a subsidiary of YPFH and holding company for CLH. Propps Decl. Ex. 287.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**B.    REPSOL**

19.    During the relevant time period, Repsol, S.A., Repsol Exploracion, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Co. (collectively, the "Repsol Defendants") were one of the leading oil and gas companies in the world with significant market shares in Spain and other countries. *See* Propps Decl. Ex. 5 at REP14155. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the fact that ████████████████████████████████████████. The Trust submits that the remaining facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The historical operations and operation size of Repsol are not material to any claims or defenses presented in this case.

20.    Though it had previously sold portions of its ownership interest in YPF, Repsol's remaining holdings were affected when, in May 2012, the Argentine Congress passed Law No. 26,741 ("Public Interest Law"), which made 51% of the share capital of YPF held by Repsol

11

"subject to expropriation" and under "temporary occupation" by the Republic. *See* Propps Decl. Ex. 3 at 31. The expropriation of the shares was completed in 2014 after a two-year legal dispute between Repsol and the Argentine government. *Id.* at 32. Following the expropriation, Argentina maintained a controlling stake in YPF. *Id.*

*Responses and Objection:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## C.    THE TRUST

21.    Plaintiff, the Maxus Liquidating Trust (the "Trust"), was created on July 14, 2017, the "Effective Date" of the Amended Plan. Compl. (the "Complaint" or "Compl.") Adv. Proc. D.I. 1 ¶ 18. The Hon. Joseph J. Farnan, Jr. (Ret.), is the Liquidating Trustee of the Trust. *See* Exhibit A-1 to C-2 of Notice of Further Amendment to Plan Supplement to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. Main Proc. D.I. 1453 at 7, 42, The Liquidating Trustee is appointed and overseen by the Liquidating Trust Oversight Committee (the "Oversight Committee"). *See* Main Proc. D.I. 1460-1 at 44 Art. VI.G.. The Oversight Committee consists of five members. *Id.* Occidental Chemical Corporation ("Oxy") has the right to appoint three of the five members, and the Lower Passaic River Study Area Cooperating Parties Group (the "CPG") has the right to appoint the other two. *See Id.* at 18 § 4.01.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust submits that the remaining facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The composition of the Oversight Committee is irrelevant as all members of the Oversight Committee owe a fiduciary duty to all creditors.

22.    At the time of appointment, the members of the Oversight Committee were Messrs. Frank Parigi, Mark D. Collins, Phillip T. Bruns, William J. Hengemihle, and Charles A. Dale III.

*See* Exhibit A-1 to C-2 of Notice of Further Amendment to Plan Supplement to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al., at 43, Main Proc. D. I. 1453-1; *Id* at A-1; *see, generally*, Notice of Filing, Main Proc. D.I. 1444. The first three – Messrs. Parigi, Collins, and Bruns – are Oxy's appointees. *Id* at 2-3.

*Responses and Objections:* Same objection as paragraph 21.

23.      All three of Oxy's appointees indirectly work for Oxy: the first appointee, Frank Parigi, is the Vice President and General Counsel of Glenn Springs Holdings, Inc., a holding company used by Oxy to address its environmental liabilities (Notice of Filing of Identities, Main Proc. D.I. 1444 at 2-3; Propps Decl. Ex. 11 at 56:21-23; the second appointee, Mark D. Collins, is a director of the law firm Richards, Layton & Finger, P.A., and is co-counsel to Oxy in connection with the Chapter 11 cases (*see* Notice of Appearance, Main Proc. D.I. 77); the third appointee, Phillip T. Bruns, was a founding partner of Gibbs & Bruns LLP, the law firm that represents Oxy in connection with this action and in its New Jersey Allocation lawsuit. *See generally id; See* Exhibit A-1 to C-2 of Notice of Further Amendment to Plan Supplement to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al., Main Proc. D.I. 1453, Ex. A.

*Responses and Objections:* Same objection as paragraph 21.

**D.      THE DEBTORS' MAJOR CREDITORS**

Among the creditors who have filed claims in the above captioned action, are the following:

**1.      <u>The United States</u>**

24.      The United States has filed proofs of claim on behalf of United States Environmental Protection Agency ("EPA"), National Oceanic and Atmospheric Administration ("NOAA"), and Department of the Interior-Fish & Wildlife Service ("DOI-FWS") in these

bankruptcy cases.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

25.    The *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation,* et al. *and the Official Committee of Unsecured Creditors* (Main Proc. D.I. 1460-1) (the "Plan"), confirmed by this Court on May 22, 2017 (Main Proc. D.I. 1460) included settlements of several claims, including with the United States. Main Proc. D.I. 1460-1, at 21-22, 64-65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**2.    Oxy**

26.    As addressed above and in further detail below, Oxy is one of the major creditors in the above captioned bankruptcy. Main Proc. D.I. 1460-1, at 15, 64-65. As discussed in more detail below, Oxy purchased Maxus's subsidiary Diamond Shamrock Chemicals Company ("DSCC") which, with its predecessors and subsidiaries, operated a chemicals business that had a facility adjacent to the Passaic River responsible for a portion of the contamination of that river, including dioxin. Oxy subsequently merged with DSCC. *See infra* at ¶ 93. Oxy was a direct operator of the plant that discharged dioxin into the Passaic River. *See infra* at III.B.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

27.    Oxy was also a member of the statutory committee of unsecured creditors (the "Creditors' Committee"). Main Proc. D.I. 1258-1, at 44, 132.

*Responses and Objections:* Same objection as paragraph 21.

14

28.    Oxy, ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Same objection as paragraph 21.

29.    The Plan in this action included settlements of several claims, including with Oxy.

Main Proc. D.I. 1460-1, at 15, 64-65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

3.    **CPG**

30.    EPA has identified a lengthy list of potentially responsible parties ("PRPs") for the Lower Passaic River. Propps Decl. Ex. 13 at 4. Those PRPs include Benjamin Moore & Co., Alcan Aluminum Corp., Ashland Chemical Co., Monsanto Company, Sherwin-Williams Co., Reilly Tar and Chemicals Corp., Chris-Craft Industries, and E.I. du Pont de Nemours and Co. Propps Decl. Ex. 12 at -121, -123.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding, as the identification of PRPs by the EPA is not material to any claims or defenses presented in this case.  The Trust objects that the list of identified PRPs is incomplete.

31.    Those companies subsequently formed the CPG in 2004. Propps Decl. Ex. 13 at 4; Propps Decl. Ex. 14.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the companies included in the CPG was fixed at all times.

32.     The CPG was also a member of the Creditors' Committee formed as part of the above captioned bankruptcy. Main Proc. D.I. 1258-1, at 44, 132.

*Responses and Objections:* Same objection as paragraph 21.

33.     The Bankruptcy Plan in this action included settlements of several claims, including with CPG. Main Proc. D.I. 1460-1, at 6, 64-65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## III.    THE YPF DEFENDANTS DID NOT POLLUTE THE PASSAIC RIVER

### A.    THE PASSAIC RIVER

34.     The Passaic River is located in northern New Jersey and empties into Newark Bay. Propps Decl. Ex. 19; Dundee Dam, in Garfield, New Jersey, 17.4 miles from the mouth of the Passaic River, separates the headwaters of the Passaic River from the lower (seaward) 17.4 miles of the Passaic River (the "Lower Passaic River"). *Id.* Much of the Lower Passaic River is estuarine, with salt water flowing upriver from Newark Bay as the tide comes in and back toward Newark Bay as the tide goes out. *E.g.*, Propps Decl. Ex. 13 at 16, 51, and 162. The area is densely populated, industrial, and traversed with transportation and telecommunications infrastructure. Propps Decl. Ex. 13, Ex. A at 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

16

35.    Long before YPF acquired Maxus, and long before DSCC manufactured pesticides on its banks, the Passaic River had become heavily polluted. Propps Decl. Ex. 13 at 3. As noted by EPA, the Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. Propps Decl. Ex. 13, Ex. A at 4. "By the end of the nineteenth century, a multitude of industrial operations, such as manufactured gas plants, paper manufacturing and recycling facilities, petroleum refineries, shipping, tanneries, creosote wood preservers, metal recyclers and manufacturers of materials such as rubber, rope, textiles, paints and dyes, pharmaceuticals and chemicals, had located along the river's banks as cities such as Newark and Paterson grew. Industrial operations and municipalities used the river for wastewater disposal. To date, over 100 industrial facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead and other metals." Propps Decl. Ex. 13 at 3. These companies include Benjamin Moore, Pfizer, and General Electric Company. Propps Decl. Ex. 55.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

36.    Thus, pollution of the Passaic River, which was caused by many U.S. companies and local governments, dates back more than two centuries—long before YPF's 1995 acquisition of Maxus. Propps Decl. Ex. 21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust submits that any of the companies' country of origin is not material and/or irrelevant to this adversary proceeding.

**B.    THE LISTER SITE**

17

37.    From the 1940s until 1969, DSCC (and its predecessors, including Diamond Alkali), manufactured DDT, Agent Orange, and other pesticides and herbicides at its agricultural chemical plant located at 80-120 Lister Avenue in Newark ("Lister Site"). *See* Propps Decl. Ex. 22 at MAXBK000430096; Propps Decl. Ex. 23.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

38.    One of the byproducts of DSCC's manufacturing process was a dioxin congener known as 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD"). Propps Decl. Ex. 22 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

39.    During that time, Oxy's legal predecessor DSCC discharged waste and off-specification product, including 2,3,7,8-TCDD, into the Passaic River. *Id.* ("dioxin" is often used herein to refer to 2,3,7,8-TCDD).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

40.    ███████████████████████████████████████
███████████████████████████████████████████████
██████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects to the extent the statement mischaracterizes ████████████████████████████████ The cited document speaks for itself.

41.    By 1977, substantially all operations at the Lister Site ceased, 18 years before

YPF's acquisition of Maxus. *See* Propps Decl. Ex. 24 at -337.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

42.    The record in this litigation further confirms that the YPF Defendants never discharged a drop of dioxin, DDT, or any other contaminants in the Passaic River, and no party— not Oxy, not the Trust, not a regulator, not anyone else—contends otherwise. *See* Propps Decl. Ex. 22 at MAXBK000430098 ("Repsol, YPF and their subsidiaries other than Maxus/Tierra were not alleged to be directly responsible as dischargers under the Spill Act, only vicariously liable for the environmental liabilities of Maxus."); Propps Decl. Ex. 13.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether or not YPF or Repsol directly contaminated the Passaic River is not material to any claims or defenses presented in this case.

43.    Nor did Debtors do so during the more than two decades they were affiliated with the YPF Defendants. *Id.* Neither EPA, NJDEP, nor even the Trust, contends otherwise. *See generally* Adv. Proc. D.I. 1.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether or not Maxus contaminated the Passaic River while they were affiliated with the YPF Defendants is not material to any claims or defenses presented in this case.

## C.    REGULATORY ACTION AT THE LISTER SITE AND LOWER PASSAIC RIVER

### 1.    The CERCLA Process

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Federal agencies

must follow the procedures and standards detailed in the NCP when remediating Superfund sites.

*See generally* 400 CFR Part 300.2 et seq.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The cited provisions of law speak for themselves and the Trust expresses no view as to the accuracy of any legal opinion set forth in this paragraph.

45. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

46. ████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

47. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

48. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

49. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. ████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ The Trust objects to this mischaracterization as the document speaks for itself.

50. ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust objects to the text highlighted in red as mischaracterizing the cited document.  *See* Propps. Decl. Ex. 29 at 9 ███████████████████████████████████████████████

████████████████████████████████

██████████████████     The Trust further objects on the grounds that any document cited speaks for itself.

51.   ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

D.    **REGULATORY ACTION AT THE LISTER SITE AND PASSAIC RIVER**

52.   In 1983, EPA discovered dioxin at the Lister Site, and in 1983, the NJDEP issued an order requiring DSCC (now Oxy) to take actions to prevent run-off pollution. *See* Propps Decl. Ex. 42.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

53.    In 1984 (before Oxy purchased DSCC), EPA added the Lister Site and the adjoining six mile stretch of the Passaic River to the Superfund National Priority List as the Diamond Alkali Superfund Site. Propps Decl. Ex. 13 at 4.

   *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to the text highlighted in red as mischaracterizing the cited document. *See* Propps Decl. Ex. 13 at 4 ("Based on investigations by NJDEP and EPA, the Diamond Alkali Site was placed on the National Priorities List in 1984. . . . OCC agreed to an administrative order on consent (AOC) with EPA to investigate a six- mile stretch of the Lower Passaic River (RM 1 to RM 7), with the work performed by Tierra on OCC's behalf."). The Trust further objects on the grounds that any document cited speaks for itself.

54.    In 1987, EPA selected an interim containment remedy for the Lister Site, including capping, subsurface slurry walls, a flood wall, and a groundwater collection and treatment system. *See* Propps Decl. Ex. 43; Propps Decl. Ex. 44 at 9-12. Construction was completed in 2001. Propps Decl. Ex. 13 at 4.

   *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

55.    Between 1987 and 1994, Maxus continued its analysis and study of remedial options for the Passaic River. *See* Propps Decl. Ex. 145; Propps Decl. Ex. 150.

   *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

56.    In 1994, Oxy signed an Administrative Order on Consent ("1994 AOC") with EPA and NJDEP to investigate 6 miles of the Lower Passaic River (the Lower Passaic River Study Area, or "LPRSA"). Propps Decl. Ex. 45 at -313. The work required under the 1994 AOC was

24

performed, pursuant to the Oxy Indemnity (as defined below), by Maxus and then by CLH (later renamed Tierra). Propps Decl. Ex. 13 at 4 ("2.1.2. The Six Mile Study / In 1994, OCC agreed to an administrative order on consent (AOC) with EPA to investigate a six-mile stretch of the Lower Passaic River (RM 1 to RM 7), with the work performed by Tierra on OCC's behalf.").

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to the text highlighted in red as mischaracterizing of the cited document. The 1994 AOC was concluded by OCC and EPA. NJDEP was not a party to the 1994 AOC. Propps Decl. Ex. 45 at -304, -313. The Trust further objects on the grounds that any document cited speaks for itself.

57.    The 1994 AOC relied on data showing that this investigation found some of the contaminants of concern ("COCs") that originated from the Lister Site, in particular, dioxin 2,3,7,8-TCDD and pesticides, throughout the six miles, with the highest concentrations adjacent to the Lister Site. Propps Decl. Ex. 13 at 4. Oxy was ordered to conduct further investigation of the six-mile study area in the 1994 AOC. *Id.* This investigation also found many other COCs not linked to the Lister Site, and indicated that contaminated sediments moved into and out of the six-mile stretch, leading to the conclusion that a more comprehensive study was required. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

58.    Pursuant to the 1994 AOC and subsequent January 1995 Investigation Work Plan ("IWP") approved by EPA, more studies were conducted by Maxus regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See infra* ¶¶ 219-20; *see also* Propps Decl. Ex. 46 at -197-98; Propps Decl. Ex. 47.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

25

59.    In 2002, EPA expanded the LPRSA and the scope of the investigation to include the entire 17-mile stretch of the Lower Passaic River. Propps Decl. Ex. 13 at 4. The scope was changed because EPA recognized many other COCs were present throughout the river requiring an expanded scope of investigation, and that surficial contaminated sediment from the six-mile study area may be moving outside that area based on new data. Propps Decl. Ex. 13 at 4; Propps Decl. Ex. 48 at 1-7;Propps Decl. Ex. 49 at 6.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

60.    While working with Oxy, Maxus, and CLH/Tierra on the Lister Avenue facility and the first studies of the river, EPA also identified other potentially responsible parties (PRPs) for the Lower Passaic River. Propps Decl. Ex. 13 at 4. A number of companies that owned or operated facilities (including Oxy, Maxus, and Tierra) from which hazardous substances were potentially discharged to the river were identified in the 1996, including Benjamin Moore & Co., Alcan Aluminum Corp., Ashland Chemical Co., Monsanto Company, Sherwin-Williams Co., Reilly Tar and Chemicals Corp., Chris-Craft Industries, and E.I. du Pont de Nemours and Co. Propps Decl. Ex. 12 at -121, -123. Those companies subsequently formed the CPG. Propps Decl. Ex. 13 at 4. By August 1996 EPA had sent letters to 92 additional PRPs that each may be responsible for pollution in the Passaic River. *See* Propps Decl. Ex. 50 at -887 (EPA "[h]ave now named 12 official 'PRP's' (2 in 8/95) / 80 more parties under official investigation / Invited all 92 to August 29, 1996 meeting"); ███████████████████████████████

████████████████████████████████████████    Among those

26

primarily responsible for this pollution were Oxy and one of its predecessor entities, Diamond Alkali.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

61.     In 2004, a number of PRPs formed the CPG, including CLH on behalf of Oxy. Propps Decl. Ex. 195. By March 30, 2007, it included 76 entities. *Id.* As of February 7, 2017, it included 52 parties (but not Oxy, Maxus, or Tierra). Propps Decl. Ex. 14.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

62.     In 2004, the CPG agreed to pay for the RI/FS of these 17 miles, and in 2007, the CPG took over the RI/FS. *Id.* The settlement agreement was amended in 2005 and 2007, adding more parties to reach a total of over 70 settling parties. *See, generally, Id.* at 4-5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

63.     In 2004, Oxy agreed to conduct an RI/FS of the Newark Bay Study Area, and EPA partnered with the USACE, the New Jersey Department of Transportation, US Fish & Wildlife Service, NOAA, and NJDEP to conduct a joint study of the LPRSA. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

64.     In connection with this joint study, EPA concluded that the lower 8.3 miles of the

27

LPRSA contained the bulk of the contaminated sediment and required the most immediate action. *Id.* at 1. EPA then undertook a targeted RI and focused feasibility study of the lower 8.3 miles. *Id.* at 5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

65.    In November 2005, NJDEP commenced a lawsuit against Oxy, Maxus, Tierra, YPF, Repsol, and certain of their affiliates, seeking recovery under various New Jersey environmental statutes. *See* Propps Decl. Ex. 28. It also directed the parties to design a dredging remedy. Propps Decl. Ex. 52 at -4591, -4603.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

66.    EPA's Regional Administrator Alan Steinberg was quoted as criticizing NJDEP in the Newark Star Ledger that NJDEP was "prejudging that dredging is the solution. Dredging without the data doesn't make sense… I understand the temptation to take action immediately. I understand this river has been contaminated over a long period of time  But just taking an action for the sake of taking an action, particularly when that action is not particularly well informed, is not good." Propps Decl. Ex. 53 at -67.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The Trust does not dispute that Mr. Steinberg made the above statement, however, the Trust notes that a statement made by an EPA administrator in his personal capacity to a local newspaper is not comparable to an official position published by the EPA.

67.    In 2007, EPA proposed a feasibility study advocating for a dredging and/or capping remediation plan costing $900 million to $2.3 billion. Propps Decl. Ex. 186, at Table A, Table B, Figure A. In the face of critical public comments, EPA withdrew that proposal. See Propps Decl. Ex. 196.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph, but objects to the highlighted statements in red as mischaracterizations of the cited documents and testimony: The draft FFS did not "advocate for" any of the remediation plans presented in the cited tables, and Propps Decl. Ex. 196 does not indicate that the EPA "withdrew" any proposal or work product of any kind.  The document says: "After careful consideration and in recognition of the importance of the decisions at hand, EPA has decided, in consultation with its partners, to take additional time to review and address, as appropriate, the comments received."  The Trust further objects on the grounds that any document cited speaks for itself.

The testimony of *one* Maxus employee, especially in his personal capacity, that



68.    After another decade of study, on March 3, 2016, EPA issued a Record of Decision for the lower 8.3 miles of the Lower Passaic River. As of the 2016 ROD, EPA had notified over 100 PRPs that they may be liable for contamination of the Passaic River. Propps Decl. Ex. 13 at

38.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, except that the Trust notes the April 2014 FFS ended the "study" period.

69.    EPA did not issue such a letter to any YPF Defendant. *See* Propps Decl. Ex. 55.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 69.

70.    In the 2016 ROD, EPA also identified eight chemical compounds found in the lower 8.3 miles that necessitated a significant remedy for the Lower Passaic River at an estimated cost of $1.38 billion. Propps Decl. Ex. 13 at 14-16, 96. Only two of those compounds (DDT and dioxins) were produced by Oxy's predecessor, and both also were produced by other PRPs. *See* Propps Decl. Ex. 61 at ¶ 7; Propps Decl. Ex. 56 at ¶¶ 11, 44.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

71.    Notably, the $1.38 billion remedy in the 2016 ROD requires the Lower Passaic River be capped with a thick layer of sand bank-to-bank, keeping the most concentrated dioxin buried far below the surface of the riverbed. Propps Decl. Ex. 13 at 85-87, 269. Dredging is only being used for flood control and navigational purposes. Propps Decl. Ex. 13 at 52.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. However, the Trust disputes the statement highlighted in red. Dredging is being used for more than flood control and navigational purposes. As admitted by the YPF Defendants in the next paragraph, dredging is required to accommodate the sand-based cap.

72.    The dredging would remove surficial sediment from the top 2.5 feet of the riverbed to accommodate two-feet of a sand-based cap. Propps Decl. Ex. 13 at 52-53. The lower 1.9 miles of the Lower Passaic River is to be dredged for navigational purposes, not to remediate the river.

The total estimated sediment to be removed is 3.5 million cubic yards. Propps Decl. Ex. 13 at 95. The 2016 ROD further contemplates the construction of a de-watering facility adjacent to the Passaic River, where the removed sediment will be de-watered, shipped to a landfill outside of New Jersey or with the more concentrated contaminated sediment being further treated by incineration (an estimated 10 percent of the removed sediment). *See* Propps Decl. Ex. 13 at 2; Propps Decl. Ex. 22.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. However, the Trust disputes the statements highlighted in red. The Trust submits that the lower 1.7 miles of the Lower Passaic River is to be dredged for navigational purposes. *See* Propps Decl. Ex. 13 at 52. The Trust also disputes that "an estimated 10 percent of the removed sediment" would be treated by incineration. Out of a total of 3.5 million cubic yards, the cited document says: "the selected remedy is estimated to provide treatment of approximately 130,000 cy of contaminated sediment through incineration off-site." *Id.* at 88. The Trust further objects on the grounds that any document cited speaks for itself.

73.     In September 2016, Oxy agreed to conduct the remedial design, which was estimated to cost $165 million. *See* Proof of Claim no. 413 of Occidental Chemical Corp. at ¶ 10(c).; Propps Decl. Ex. 57. To date, the remedial design has not been completed or submitted for public review. Propps Decl. Ex. 157.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

74.     There is local opposition to locating and constructing the de-watering facility required by the 2016 ROD, according to a recent press report. *See* Propps Decl. Ex. 58.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether there is local opposition to requirements of the 2016 ROD is not material to any claims or defenses presented in this case.

75.     EPA also selected "hot spot" dredging to remediate isolated areas of the Upper Passaic River, utilizing natural monitored recovery for the rest of that part of the River. Propps

Decl. Ex. 59 at 62.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

76.      Despite the fact EPA knew dioxin was found in the Passaic River since 1983, ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Propps Decl. Ex. 34 at 64:12-20; *see also* Propps Decl. Ex. 60; Propps Decl. Ex. 13 at 5-6. Further, despite having concerns about dioxin since 1984, even today -- almost 40 years later -- no remediation has occurred in the Passaic River. *Id.* Notably, Maxus' environmental engineers were correct about the nature of the contaminated sediment: even in the 2016 ROD, EPA did *not* order the most concentrated dioxin-contaminated sediment to be dredged, but rather only the top 2.5 feet of sediment and not for the purpose of removing dioxin from the river but only to protect against flood and permit navigation. Propps Decl. Ex. 13 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statement that "no remediation has occurred in the Passaic River." In June 2008, EPA, OCC, and Tierra signed an AOC for a non-time-critical removal action to remove 200,000 cy of contaminated sediment from the river, and 40,000 cy had been dredged by 2012. Propps Decl. Ex. 13 at 5. In June 2012, EPA and the CPG signed an AOC for a time-critical removal action at RM 10.9. Removal was substantially completed in 2014. *Id.* at 5-6. The Trust objects to the remainder of the statements in this paragraph as mischaracterizing the cited documents which speak for themselves.

77.      The Natural Resource Damages Trustee also is pursuing Natural Resource Damages pursuant to 42 U.S.C. § 9607. *See* Propps Decl. Ex. 61 ¶ 41. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the

statements highlighted in red as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, are inadmissible hearsay and cannot constitute the basis for an undisputed fact.  The Trust further notes that █████████████████████ ████████████████████████████████████████████████. *See* Propps Decl. Ex. 29 at 183 n.851.

## E.    REMEDIATION

c

78.    Over the three decades preceding their bankruptcy filings on June 17, 2016, Maxus and/or CLH/Tierra funded and conducted a multitude of investigations and clean-up activities associated with the Lister Site and the Passaic River on behalf of Oxy, working over that span of time with both State and Federal regulatory authorities and other potentially responsible parties. Propps Decl. Ex. 13 at 13-19. This work included:

- 1983-1986: site and sediment characterization studies and remediation feasibility evaluations

- 1994-1995: RI, human and ecological risk assessment, and a FS for the study area

- 2005 sediment bed erosion tests (Sedflume and Gust Microcosm)

- 2005-2007 high resolution sediment coring program

- 2005 small volume water column sampling program

- 2006 low resolution sediment coring program

- 2007-2008 berylium-7 bearing sediment collection program

- 2008 tributary, CSO and SWO sampling program

- 2008 low resolution sediment coring program

- 2009-2010 benthic and surface sediment program

- 2009-2010 physical water column monitoring program

- 2010 high-flow water column suspended solids sampling

- 2011-2012 chemical water column monitoring program

- 2009-2010 fish community and tissue collection surveys

- 2010 habitat identification survey

- 2010 summer/fall avian community survey

- 2007 through 2012 single and multi-beam bathymetric surveys

- 2011-2012 RM 10.9 characterization sampling

- 2012 background benthic sediment sampling

- 2012 low resolution supplemental sediment sampling program

*Id.* at 13.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

79.     Far from running away from Maxus's indemnity obligation to pay for Oxy's environmental liabilities in the Passaic River, the YPF Defendants continued supporting Debtors efforts to cooperate with regulators. *Id.* Debtors contributed substantially to the remediation while under YPF's ownership. *See, id.* (listing EPA enforcement activities with which Debtors cooperated during YPF's ownership).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The YPF Defendants encouraged and assisted Maxus in litigation against Occidental seeking to escape any indemnity obligation. Further, YPF Defendants actively litigated against environmental regulators at both the State and Federal level in an attempt to avoid any environmental remediation obligations.

80.     As noted below, Diamond Shamrock put the properties of which Oxy refused to accept title (including the Lister Site property which Oxy had operated previously between 1976 and 1977) in a new company, now known as Tierra. *See infra* ¶¶ 95-98. Tierra never had any operations that polluted the Passaic River; it was only a passive landowner that eventually became responsible for meeting Maxus's indemnification obligations to Oxy. *See infra* ¶ 335. Tierra

34

completed the interim remediation measures at the Lister Site in 2001, ending even passive runoff from that site into the Passaic River.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statement highlighted in red. Judge Corodemus has already determined that Maxus and Tierra are alter egos and jointly and severally liable for the environmental damages, including any indemnification obligations to Oxy. Trust SOF ¶¶ 133-34; Smith Decl. Exs. 75A, 76, 77. Moreover, under CERCLA, environmental damages pass with ownership of the land to the new owner, in this case, Tierra.

81.    In its 2013 Response to Comments Received on Proposed Settlements in the Passaic River Litigation, the NJDEP noted that YPF and Maxus were willing to settle, while Oxy was not. *See* Propps Decl. Ex. 22 at 3. In contrast, NJDEP described Oxy as both "legally responsible and recalcitrant" for the extensive environmental liabilities it caused. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether or not Oxy was willing to settle or was legally responsible is irrelevant. Judge Corodemus has already determined that Maxus is required to indemnify Oxy for the relevant environmental liabilities. Smith Decl. Ex. 75.

## F.    OTHER SITES

82.    Although the Complaint (Adv. Proc. D.I. 1) references polluted sites elsewhere (¶¶ 48-57), under Defendants' ownership Debtors effectively remediated them to manageable levels before Debtors filed for bankruptcy. Indeed, there are only three material allowed claims (for two sites in Ohio and Wisconsin), totaling around $30 million, for any other sites. *See* D.I. 1460-1 at Art. I.A.197 (def'n of "State of Wisconsin Milwaukee Solvay Class 4 Claim"), I.A.210 (def'n of "United States Milwaukee Solvay Class 4 Claim"), I.A.195 (def'n of "State of Ohio Painesville Class 4 Claim").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

83.    Through its historical connection to DSCC (now Oxy) by means of the SPA Maxus's contractual and liabilities extend to a few other sites, including in Kearny, New Jersey; Painesville, Ohio; and Milwaukee, Wisconsin.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

84.    ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

85.    The Kearny Plant Site is a former chromate chemical manufacturing facility that consists of approximately 28 acres in in Kearny, New Jersey. *See* Propps Decl. Ex. 64 at -348. DSCC acquired the plant in 1948 and processed chromite until 1971, and the plant was closed in 1976. *Id.* A majority of the chromite was generated and disposed of onsite, but some was also used by offsite properties, almost all of which were located in the industrial area in the town of Kearny. *Id.* In 1986, Maxus's subsidiary CLH, later Tierra, acquired the site pursuant to the terms of the SPA. *See* Propps Decl. Ex. 500 at 1-2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

86.    In 1990, Maxus entered into an Administrative Consent Order with the State of New Jersey to investigate and remediate both onsite and offsite properties (the latter of which were not owned by CLH, OCC or any Maxus affiliate). Propps Decl. Ex. 64 at -348-349. NJDEP proposed cleanup standards in September 1998, which Maxus indicated could be adopted by 2001. *Id*. at -348. In 1999, current activities included execution of remedial investigation at offsite properties, preparation of remedial investigation reports for sites not delisted, and continued toxicology studies to maintain to improve cleanup standards. *Id.* at -357. The future work schedule projected remedial investigation completion in 2001, feasibility study completion in 2004, a record of decision in 2005, remedial design activities in 2006, and remedial construction and Operation and Maintenance ("O&M") occurring from 2006 to 2016. *Id.* at -358.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

87. ██████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes this paragraph as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, and cannot constitute the basis for an undisputed fact.

88.    The site in Painesville, Ohio is located on the banks of the Grand River and a short distance from Lake Erie. Propps Decl. Ex. 64 at -8363. The former chemical manufacturing facility at the site operated from 1912 through 1976 and produced a variety of hazardous chemicals. *Id.*

Operations at the facility ceased in 1976. *See id.* Investigative and remedial work on the site was performed by Tierra, who was under contract with Maxus. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

89. ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, are inadmissible hearsay and cannot constitute the basis for an undisputed fact. The Trust also notes that the statement is an incomplete characterization of Dr. Cutler's estimates. Notably, ████████████████████████████

90.    The Milwaukee Solvay Coke and Gas Co. site consisted of 46 acres in a predominately industrial and commercial area in Milwaukee, Wisconsin. *See* Propps Decl. Ex. 61 at MAXBK000829952. The site saw more than a century of industrial use, which included coke and manufactured gas production, coal and coke storage, rail car ferrying, electric railroad, blast furnace for iron production, and hide tanning. *See* Propps Decl. Ex. 67 at 5. DSCC owned and operated the site between 1969 and 1973. Main Proc. D.I. 969 at 17. As of 2019, the site houses crushed brick, concrete, brick and concrete fines, and fill. *See* Propps Decl. Ex. 67 at 5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

91.    None of these sites have resulted in significant environmental liabilities for Debtors in their bankruptcy cases. The Milwaukee and Painesville sites resulted in settled claims, with the State of Wisconsin receiving an allowed claim for $5 million and EPA receiving an allowed claim

for $696,361 in connection with the former, and the State of Ohio receiving an allowed claim for $25 million in connection with the latter. *See* Amended Plan Art. I.A.197 (def'n of "State of

Wisconsin Milwaukee Solvay Class 4 Claim"), I.A.211 (def'n of "United States Milwaukee

Solvay Class 4 Claim"), I.A.195 (def'n of "State of Ohio Painesville Class 4 Claim") Main Proc.

D.I. 1460-1. Four entities submitted proofs of claim in connection with the Kearny Plant Site:

Apogent Transition Corp., Beazer East, Inc., Kearny Peninsula Sites Environmental Remediation

Trust, and Standard Chlorine Chemical Company Superfund Site Trust. *See* Quarterly Claims

Register, filed Apr. 18, 2022. Main Proc. D.I. 2493. Only two – Kearny Peninsula Sites

Environmental Remediation Trust, Claim 332, and Standard Chlorine Chemical Company

Superfund Site Trust, Claim 249 – are listed at anything other than $0; each is listed at $243,622.71

as a general unsecured claim. *Id.* at 100, 172.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust objects to and disputes the characterization of environmental liabilities as at sites other than the DASS insignificant.

## IV.    THE OXY INDEMNITY AND MAXUS'S CORPORATE PREDECESSORS

92.    On September 4, 1986, nearly a decade before YPF acquired Maxus, by the terms

of a Stock Purchase Agreement (the "SPA") by and among Diamond Shamrock, Occidental

Petroleum Corporation, Occidental Chemical Holding Corporation, and Oxy-Diamond Alkali

Corporation, Diamond Shamrock sold its chemical business, DSCC, to an Oxy affiliate for the

purchase price of $411,132,672. *See* Propps Decl. Ex. 68; Propps Decl. Ex. 69.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

93.    DSCC became known as Occidental Electrochemicals Corporation and was merged

into Oxy a year later on November 30, 1987. *See* Propps Decl. Ex. 70; Propps Decl. Ex. 71.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

94.     On April 28, 1987, the remaining Diamond Shamrock changed its name to Maxus Energy Corporation, (now Maxus), an independent oil and gas exploration and production company. *See* Propps Decl. Ex. 72 at 0031409; Propps Decl. Ex. 73 at -11264.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

95.     Despite that the sale occurred over 35 years ago, there were several key provisions of the transaction relevant to the present action. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

96.     As a result, on June 26, 1986, Diamond Shamrock created a new subsidiary, Diamond Shamrock Process Chemicals, Inc., which changed its name on July 11, 1986 Diamond Shamrock Chemical Land Holdings, Inc., also known as Chemical Land Holdings, Inc. *See* Propps Decl. Ex. 76; Propps Decl. Ex. 77. Diamond Shamrock Chemical Land Holdings, Inc. was renamed Chemical Land Holdings, Inc., on December 4, 1987, (Propps Decl. Ex. 78), and subsequently renamed Tierra Solutions, Inc. on February 25, 2002 (Propps Decl. Ex. 79).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust objects to and dispute the characterization that the name changes were "as a result" of the purported

41

facts in Paragraph 95 as unsupported by the documents cited.

97.     On August 28, 1986, via deed DSCC transferred ownership of 120 Lister and 80 Lister to Diamond Shamrock Chemical Land Holdings for $10.00 each. *See* Propps Decl. Ex. 80 & Propps Decl. Ex. 81 (reflecting the transfer of 120 Lister and 80 Lister from DSCC to Diamond Shamrock Chemical Land Holdings).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

98. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The details concerning the structure of Oxy and DSCC's sale agreement is not material to any claims or defenses presented in this case.

99.     In addition to retaining ownership of the Lister Site and certain other properties, Diamond Shamrock also agreed to defend, indemnify and hold harmless Oxy for certain environmental liabilities related to Diamond Shamrock's (now Oxy's) chemicals business, including certain remediation obligations at the Lister Site. *See* Propps Decl. Ex. 68 at Section 9.03. Oxy required Diamond Shamrock to indemnify it for environmental liabilities associated with the chemicals business (the "Oxy Indemnity"), even though it understood the

remaining yet much smaller oil and gas exploration company (renamed Maxus Energy Corporation) would be burdened with satisfying those liabilities.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to, and disputes, the statement of fact highlighted in red as argumentative and notes that YPF fails to point to any evidence in the record supporting this statement.

100. Debtors' environmental liabilities arise almost entirely under the Oxy Indemnity. *See* Propps Decl. Ex. 68; Propps Decl. Ex. 82 at 8.

Thus, of at least $722 million expended by the Debtors from 1987 through 2016 in connection with environmental remediation, approximately $717 (or 99%) million was spent in satisfaction of the Oxy indemnity. *See* Propps Decl. Ex. 85.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph. The Trust further objects on the grounds that any document cited speaks for itself.

101. Moreover, none of the YPF Defendants were ever parties to that SPA, or guarantors of Maxus's obligations thereunder, at any relevant time. *See generally,* Propps Decl. Ex. 68.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph. The Trust further objects on the grounds and to the extent that this paragraph offers a legal conclusion, to which no response is required. The

43

Trust further objects on the grounds that any document alluded to speaks for itself.

**102.** ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph. The Trust further objects on the grounds and to the extent that this paragraph offers a legal conclusion, to which no response is required. The Trust further objects on the grounds that any document alluded to speaks for itself.

**103.** ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ In fact, even in

its most recently filed 10-K, Occidental Petroleum estimates its "remediation balance" for NPL

sites (i.e., Superfund Sites) as $427 million, of which at most 96% relates to the DASS. Propps

Decl. Ex. 187.

> *Responses and Objections:* Subject to its General Objections, the Trust expresses no view as to whether the allegations in this paragraph are accurate, but disputes that Occidental's belief as to the ultimate magnitude of Passaic remediation at any given time is relevant to this proceeding.  The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

104. 

> *Responses and Objections:* Subject to its General Objections, the Trust expresses no view as to whether the allegations in this paragraph are accurate, but disputes that Occidental's belief as to the ultimate magnitude of Passaic remediation at any given time is relevant to this proceeding.  The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

105.    The SPA did not include covenants restricting Maxus's ability to sell major assets, nor did it otherwise provide protections for Oxy's indemnity. *See* Propps Decl. Ex. 68 at -26349. From 1987 through 1995, Maxus had paid over $38 million in connection with its cost-sharing obligations with Oxy. *See* Propps Decl. Ex. 85.

> *Responses and Objections:* Subject to its General Objections, the Trust expresses no view as to whether the allegations in this paragraph are accurate, but disputes that Occidental's belief as to the ultimate magnitude of Passaic remediation at any given time is relevant to this proceeding.  The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

## V.    MAXUS'S FINANCIAL DISTRESS LEADS MAXUS TO SELL ITSELF

A.    **MAXUS'S DETERIORATING FINANCIAL PERFORMANCE BEFORE THE 1995 YPFACQUISITION**

106.    During the years following the sale of the chemicals business to Oxy, Maxus engaged in a series of assets sales and dividends. Diamond Shamrock spun off Diamond Shamrock R&M, Inc., its refining and marketing assets, to shareholders in 1987 and sold its coal and geothermal assets in 1987. *See* Propps Decl. Ex. 98 at 7-8; Propps Decl. Ex. 15 at YPF0001491.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

107.    During this period, Maxus also used $147 million from the stock sale of the chemicals business to fund shareholder dividends (Propps Decl. Ex. 99) and continued its contraction by, among other things, spinning off a number of other segments of its business, including Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Coal Company, and Transworld Petroleum (U.K.) Limited (which held substantially all of Maxus's oil and gas interests in the British North Sea). *Id.* at 2-3, 21-22.

*Responses and Objections:* Subject to its General Objections, the Trust can neither concur with nor dispute the allegations set forth in this paragraph, as the YPF Defendants have not provided or identified the exhibit cited to as support.

108.    The spin-off of the refining and marketing business alone eliminated $799.3 million in physical assets ($521.7 million, net of accumulated amortization of $277.6 million) and reduced paid-in capital by approximately $258.1 million. *Id.* at 41, 50-51.

*Responses and Objections:* Subject to its General Objections, the Trust can neither concur with nor dispute the allegations set forth in this paragraph, as the YPF Defendants have not provided or identified the exhibit cited to as support.

109. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ and resulted in Maxus's shareholders being paid $147 million in dividends at the same time Maxus had agreed to indemnify, defend, and hold harmless Oxy and its affiliates for certain of their environmental liabilities and related costs. *See* Propps Decl. Ex. 98 at 7-8; Propps Decl. Ex. 68 at -488-498.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph on the grounds that the phrases ███████████████ ████████████████████████████████████████████ are vague, ambiguous, and/or fail to articulate with sufficient clarity the factual allegation being made. The Trust disputes that the documents cited support these allegations, and objects on the grounds that any document cited speaks for itself.

The Trust also objects that the phrases "resulted in Maxus's shareholders being paid $147 million in dividends," and "at the same time Maxus had agreed to indemnify, defend, and hold harmless Oxy and its affiliates for certain of their environmental liabilities and related costs" are vague, ambiguous, and/or fail to articulate with sufficient clarity the factual allegation being made. The Trust disputes that the documents cited support these allegations, and objects on the grounds that any document cited speaks for itself.

110. Faced with its lackluster performance, Maxus engaged in a corporate restructuring in the early 1990s. From 1991 to 1993, Maxus restructured its debt and equity to provide immediate funding for its major development and construction projects and matched its debt repayment schedule with the future cash flows expected from those projects, while maintaining adequate working capital. Propps Decl. Dex. 98 at 30.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph on the grounds and to the extent that the factual allegations set forth therein mischaracterize the cited document, which speaks for itself.

111.    During this period, there were substantial increases in capital expenditures for new plant and drilling expansion but those expenses included addressing "dry hole costs" as well. *See* Propps Decl. Ex. 100 at F-3 (showing "expenditures for properties and equipment – including dry hole costs"). That capital campaign resulted in a significant increase in Maxus's debt in 1993.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph on the grounds and to the extent that the factual allegations set forth therein mischaracterize the cited document, which speaks for itself.

112.    In 1993, Maxus also put its Northwest Java contract area up for sale, but only received disappointing bids. Propps Decl. Ex. 101 at -511; Propps Decl. Ex. 102 at -438.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph on the grounds and to the extent that the factual allegations set forth therein mischaracterize the cited document, which speaks for itself.

113.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ During 1993, Maxus issued additional debt and preferred stock to continue funding its operations and refinance maturing debt obligations and preferred stock obligations. "Of the $413 million proceeds received in 1993 from the issuance of long-term debt, $204 million was used to refinance currently maturing debt and to fund the early retirement of a portion of the Company's 11¼% sinking fund debentures…with the remainder partially funding the 1993 capital program." *See* Propps Decl. Ex. 98 at 30. Additionally, Maxus issued a new class of $2.50 preferred stock and used the majority of the proceeds to pay for the mandatory redemption of 625,000 shares of Maxus's $9.75 preferred stock by February 1994, as

48

required by the terms of the preferred stock. Propps Decl. Ex. 98 at 31.

*Responses and Objections:* The Trust notes that $412 million, not $413 million, of proceeds was received in 1993. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

114.    Maxus incurred losses each year from 1987 to 1994, with the exception of 1990 and 1992. *See* Propps Decl. Ex. 104 at 3 ("with the exception of 1990 and 1992, the Company has incurred losses each year since 1987"); Propps Decl. Ex. 17 at 14, F-1. The positive results in 1992 were largely the result of a one-time settlement of a lawsuit. In 1992, Maxus settled a lawsuit filed against Kidder Peabody that resulted in Maxus receiving $165 million. That sum was largely responsible for Maxus's positive performance that year. *See* Propps Decl. Ex. 17 at 17.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

115.    In January 1994, Maxus retained Credit Suisse First Boston ("CSFB") and Merrill Lynch to review strategic alternatives to address Maxus's funding shortfall. *See* Propps Decl. Ex. 102 at CS 001438.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

116.    To bridge this shortfall, Maxus sold its partnership interest in Diamond Shamrock Offshore Partners in April 1994, and two producing oil and gas properties in June 1994. Propps Decl. Ex. 17 at 19. These asset sales raised net proceeds of approximately $325 million. Propps Decl. Ex. 105 at YPF0005357; Propps Decl. Ex. 17 at 19.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

49

the facts set forth in this paragraph.

117.   Maxus's financial circumstances were so dire that CSFB discussed the sale of Maxus's mid-continent E&P assets held primarily by a Maxus subsidiary, Midgard Energy Company ("Midgard"), with a number of potential purchasers during May 1994. *See* Propps Decl. Ex. 102 at CS 001439 ("In May 1994, shortly after the sale of Diamond Shamrock Offshore Partners, discussions were held with Apache, Phillips Petroleum, Parker & Parsley and Seagull Energy regarding the purchase of Maxus's Mid-Continent assets (renamed Midgard)."). These discussions did not result in a sale and were ultimately terminated in June 1994. *Id.;* Propps Decl. Ex. 106 at -195-96.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the characterization of Maxus's financial circumstances as highlighted in red to the extent the documents cited, which speak for themselves, do not support this allegation.  The Trust also disputes YPF Defendant's claim that discussions regarding a sale were terminated in June 1994, as the cited documents indicate that discussions continued until 1995.

118.   In 1994, Maxus also completed a restructuring program that featured staff reductions and asset sales. *See* Propps Decl. Ex. 17 at 16, 18 (describing staff reductions and asset sales). This restructuring generated a pre-tax net benefit of $101 million and expected annualized cost savings of approximately $35 million. *Id.*

*Responses and Objections:* The Trust is unable to confirm the $35 million annualized cost figure cited above. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph. The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

119.   Despite its attempts to address its fiscal troubles, at an August 1994 Board Meeting,

==Credit Suisse First Boston advised Maxus's Board that "Maxus was experiencing a significant near-term liquidity problem" and that "Maxus runs out of excess cash by the 1st quarter of 1996."==

*See* Propps Decl. Ex. 101 at CS001511-12; *See* Main Proc. D.I. 2 ¶ 26.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph, but objects to the extent the phrase highlighted in red mischaracterizes the documents cited, which speak for themselves.

==120.    By August 1994, proceeds from asset sales and reductions in projected program spending pushed the threshold for Maxus's funding shortfall from October 1994 to the first quarter of 1996. As Maxus explained in its public SEC filings: "In the Company's opinion, adequate cash from operations, asset sales and project financing will be available to fund a *significantly reduced* program spending budget in 1994, service debt and pay dividends and trade obligations" and "[d]uring 1994, however, the Company plans total domestic and international program spending in the amount of approximately $212 million, *substantially below* the levels of 1990 through 1993. Consequently, during the year, the Company intends to focus its international efforts primarily on its present interests in Indonesia, Ecuador, Bolivia and Venezuela, while reducing its activities outside these areas." *See* Propps Decl. Ex. 98 at 2, 29 (emphasis added). *See also* Propps Decl. Ex. 108 at CS 000671-673.==

> *Responses and Objections:* The Trust is unable to confirm the timeline of Maxus's funding shortfall. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph, except to the extent that the documents cited do not establish that the phrase "by August 1994" inaccurately states when "proceeds from asset sales pushed the threshold for Maxus's funding shortfall from October 1994 to the first quarter of 1996." The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

121.    Despite its attempts to solidify its financial footing, Maxus only temporarily bridged its expected funding shortfall. *See* Propps Decl. Ex. 101 at CS001531. Thus, Maxus began actively seeking a suitor. Propps Decl. Ex. 109 at -97. Maxus not only continued to have a "significant near-term funding gap" of between $300-$500 million, CSFB told Maxus that it "was experiencing a significant near-term liquidity problem" and that "Maxus runs out of excess cash by the 1st quarter of 1996." *See* Propps Decl. Ex. 101 at CS 001510, CS 001511, CS 001512. CSFB concluded that the "status quo does not appear to be an attractive prospect for Maxus" and that "under any realistic pricing scenario, the company cannot fund its program spending internally for more than 1 1/2 years, the post 1995 funding gap becomes substantial ($300-$500 million), reserve replacement is well below prior performance, underlying net asset value does not materially increase, access to the capital markets will be increasingly difficult." CSFB urged Maxus to make changes in order "to avoid any future liquidity problems." *Id.* at CS001531.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

122.    By 1995, Maxus owed $976 million in long-term debt with annual interest payments, had $432 million in preferred shares outstanding, and paid interest payments and preferred stock dividends amounting to $135 million per year. *See* Propps Decl. Ex. 110; *See* Propps Decl. Ex. 100 at F-53; Propps Decl. Ex. 106 at 6 ("the Corporation's discretionary cash flow has beendropping over the course of the last several years and has failed to keep pace with program spending").

*Responses and Objections:* The Trust disputes that total amount of interest payments and preferred stock dividends. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph, except to the extent the allegation that Maxus "paid interest payments and preferred stock dividends amounting to $135 million" misstates or inaccurately reflects the cited documents.  The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

123. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the factual allegations embedded in the testimony cited in this paragraph are not material and/or irrelevant to this adversary proceeding.  The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

## B.    OTHER POTENTIAL INTERESTED INVESTORS

124. ████████████████████████████████████████

███████████████████████████████████████. All of those sixteen bidders conducted diligence on Maxus, including its environmental liabilities. Propps Decl. Ex. 102 at - 437.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph and highlighted in green. The Trust disputes that the allegation highlighted in red mischaracterizes the cited document, which states in relevant part that "[s]everal of the companies [i.e., bidders] including Amoco and YPF completed thorough due diligence of all or significant blocks of assets and liabilities" of Maxus.

125.    For example, in mid-November 1994, Amoco Corporation ("Amoco") began the process of exploring a merger with, or acquisition of, Maxus. However, Amoco and Maxus failed to reach an agreement regarding the value of Maxus as a whole, and instead Amoco submitted a proposal to acquire individual Maxus assets. *Id.* at -439. On January 27, 1995, Amoco offered $585 million to purchase Maxus's Indonesian subsidiaries and expressed interest in the acquisition of a controlling interest in Maxus's mid-continent properties held by Midgard. *Id.* at 439-440. Maxus and its advisors rejected Amoco's offer as too low. *Id*; *see also* Propps Decl. Ex. 106 at YPF-AK-0027194-195.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

126.    While all bidders – including YPF – diligenced Maxus's environmental liabilities (as addressed in further detail below), only Amoco and another company, ARCO, stated that they were specifically declining to bid on the company as a result of its environmental liabilities. *See* Propps Decl. Ex. 102 at CS 001439.

*Responses and Objections:* The Trust disputes the allegation in this paragraph for the reasons set forth in its response to paragraph 124, supra, and on the ground that the cited document does not state that, of all bidders, only Amoco and ARCO stated that the were

specifically declining to bid on the company as a result of its environmental liabilities, but rather identifies only Amoco and ARCO as having declined to bid for that stated reason.

127.    For example, another, bidder, Enterprise Oil PLC did not pursue acquisition of Maxus as a whole because strategically it was interested only in acquiring Maxus's international assets, not its significant U.S. assets. Propps Decl. Ex. 102 at -439.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The details of a potential acquisition that was never presented to Maxus is not material to any claims or defenses presented in this case.

## C.    YPF'S ACQUISITION OF MAXUS

128.    ███████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

129.    ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

130.    ███████████████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the allegation set forth in this paragraph, but does object on the ground that the cited document reflects testimony by David Smith.

131.    The negotiation of the potential acquisition was above-board and arm's-length, with Maxus having retained highly reputable financial and legal advisors. Propps Decl. Ex. 111 at -639-644.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

132.    On January 27, 1995, YPF submitted a bid for Maxus as a whole, offering to purchase all the issued and outstanding stock of Maxus at $5.00 per share, a 33.3% premium over its trading price of $3.75 per share. *See* Propps Decl. Ex. 112; Propps Decl. Ex. 113.

*Responses and Objections:* The Trust notes that Maxus stock had a trading price of $3.60 per share, not $3.75 during the period of December 30, 1994 to January 31, 1995. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

133.    Maxus's independent Board rejected the offer. Propps Decl. Ex. 106 at YPF-AK-0027194-195. Maxus determined that the offer had too many conditions attached, and, even without conditions, considered the offer price insufficient for further evaluation. *See id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

134.    Amoco (addressed above) and YPF both continued their respective pursuit of Maxus and/or its certain of its assets. Propps Decl. Ex. 111. By the end of February 1995, Maxus

56

received new bids from both Amoco and YPF. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

135.    On February 26 and 28, 1995, the Board of Directors of Maxus Energy Corporation (the "Maxus Board") met to consider the offers from Amoco and YPF. Propps Decl. Ex. 111.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

136.    YPF enhanced its offer to acquire all issued and outstanding common stock of Maxus for $5.50 per share by means of a tender offer followed by a merger with a wholly owned YPF subsidiary, YPF Acquisition Holding Corp. (the "Tender Offer"). *See* Propps Decl. Ex. 111 at AA_MAXUS0021613-614. The Maxus Board was informed that while the Amoco offer would be preferable to an initial public offering for the Midgard assets, *id.*, and would solve its "funding shortfall, it would not be effective to reduce [Maxus's] financial leverage . . . [and] would result in [Maxus] being smaller, but with essentially the same negative credit characteristics . . . and more limited flexibility." *Id.* at AA_MAXUS0021625.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

137.    The Maxus Board noted during the February 26, 1995 portion of the meeting that the YPF offer expressly required Maxus "to assume additional debt, use $100 million of [Maxus's] existing cash, and use income from certain properties of [Maxus] to amortize such additional debt." *Id.* at AA_MAXUS0021616-617. The proposed structure would be as follows:

Chase Manhattan would advance up to $800 million, directly or indirectly, to YPF to finance the acquisition, and $600 million of such debt would be restructured in the following manner: (i) $250 million of debt would be refinanced by a loan to Midgard to be amortized by proceeds from oil and gas production, (ii) $250 million of debt would be refinanced by a loan to [Maxus's] Indonesian subsidiaries to be amortized by proceeds from oil and gas production, and (iii) $100 million would be repaid out of [Maxus's] existing cash on hand.

*Id.* at AA_MAXUS0021619- AA_MAXUS0021620. The $800 million advance would subsequently become an advance of up to $400 million. *Id.*

*Responses and Objections:* The Trust has been unable to verify amount of the subsequent advance. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

138.    After further negotiations with YPF, and after considering the proposals and the advice of CSFB and its counsel from Jones, Day, Reavis & Pogue LLP, Maxus's independent Board determined that the offer from YPF was in the best interests of Maxus and its shareholders,

and voted to recommend acceptance of the YPF offer. *Id.* at AA_MAXUS0021639-

AA_MAXUS0021644.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> that the board members considered the proposals and upon advice determined that the
> offer from YPF was in the best interests of Maxus and its shareholders and voted to
> recommend acceptance of the YPF offer. Further, the Trust does not dispute that there
> were board members who could be classified as "independent" under the New York
> Stock Exchange's legal definition of "independent." However, the Trust disputes that at
> these meetings the independent board members were fully informed of Maxus's financial
> conditions, most particularly the full extent of its environmental liabilities.

139.    The record also reflects that Maxus's board recognized that it lacked alternatives to being acquired by YPF. *See* Propps Decl. Ex. 111 at -37. The alternative proposal by Amoco was perceived as unlikely to create value for shareholders. *Id.* at 39–44. ("in the opinion of management, the Amoco proposal would result in the Corporation having materially diminished financial flexibility going forward.").

> *Responses and Objections:* Maxus expressed that the YPF offer was a better alternative,
> not that it lacked alternatives to being acquired by YPF. Subject to its General
> Objections, the Trust does not dispute the other facts set forth in this paragraph.

140.    Maxus's advisers felt that Maxus was out of options despite the fact that it had issued a press release advertising that it was pursuing strategic alternatives and was being marketed by CSFB. *See* Propps Decl. Ex. 111 at -615. The Maxus Board was informed by both its legal advisers (Jones Day) and its financial advisers (Credit Suisse) that it was "unlikely that a superior alternative" to the transaction proposed by YPF was available. *See* Propps Decl. Ex. 111 at -615.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the statements of fact highlighted in green in this paragraph. The Trust does not dispute
> that Maxus issued a press release advertising that it was pursuing strategic alternatives
> and was being marketed by CFSB. The Trust objects to and disputes the characterization
> that "Maxus's advisers felt that Maxus was out of options" as baseless and unsupported
> by record evidence.

141.    On February 28, 1995, YPF, YPF Acquisition Corp. ("YPFA"), a wholly-owned subsidiary of YPF, and Maxus entered into a merger agreement (the "Merger Agreement"), Propps Decl. Ex. 114, pursuant to which YPFA commenced a tender offer to purchase all of the outstanding shares of Maxus (the "Acquisition") for approximately $762 million. Propps Decl. Ex. 2 at 76; Propps Decl. Ex. 16 at 2. Through that Merger Agreement, Maxus agreed to the financing structure set forth above. *See* Propps Decl. Ex. 114 at MAXUS3059126 (§ 3.7). The financing was also approved by Maxus's new board (including three pre-YPF legacy members). *See* Propps Decl. Ex. 111 at -619-20, -639-44. The $5.50 cash per share tender offer resulted in YPF acquiring approximately 88% of the outstanding common stock of Maxus in April 1995. *See* Propps Decl. Ex. 2 at 76. The remaining outstanding common stock of Maxus was redeemed for cash in June 1995 after a special meeting of Maxus shareholders approved the merger of YPFA with Maxus. *Id.* The "Maxus shareholders not accepting the tender offer received the same amount of $5.50 per share paid under the tender offer." *Id.* at 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

142.    The tender offer was financed by a capital contribution of $250 million from YPF to YPFA, and YPFA's drawdown of approximately $442 million from a $500 million credit facility obtained from Chase Manhattan Bank ("Chase") and other lenders. *See* Propps Decl. Ex. 2 at 76. Following the merger, as anticipated by YPF and Maxus, Chase provided credit facilities totaling $425 million (the "Acquisition Facilities") to two Maxus subsidiaries, which were guaranteed by Maxus and by YPF; a $250.0 million credit facility extended to Midgard Energy

Company (the "Midgard Facility"), and a $175.0 million credit facility extended to Maxus Indonesia, Inc. (the "Chase Indonesia Facility"). *Id.* at 76-77; Propps Decl. Ex. 115 at 10; Propps Decl. Ex. 100 at F-42. Maxus used $94 million in cash and the proceeds from the $425 million loan to repay, in part, (i) the facility entered into by YPFA to acquire Maxus's shares, and (ii) the payment to holders of the outstanding shares of common stock that did not accept the tender offer. *See* Propps Decl. Ex. 115 at 10. These shares were converted into the right to receive cash in connection with the tender offer and merger with YPFA. Propps Decl. Ex. 2 at 76.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

143.    The Merger Agreement included a covenant pursuant to which YPF agreed to provide capital contributions to Maxus up to the amount of the Acquisition Facilities (of $425 million) if necessary over a period of nine (9) years following the effective date of the merger in an amount necessary to permit Maxus to meet its obligations, whether upon maturity or otherwise (the "Keepwell Covenant"). Propps Decl. Ex. 2 at 77. Those obligations included preferred stock dividends and redemption payments. *Id.* The Keepwell Covenant was:

> [L]imited to the amount paid by Maxus to service the acquisition loans, including any loans refinancing such loans and will be reduced by the amount of any capital contribution by YPF to Maxus after the date of the merger, and by the amount of the net proceeds from any sale by Maxus of common or nonredeemable preferred stock after the merger. *Id.*

Propps Decl. Ex. 116 at § 5.15; Propps Decl. Ex. 117 at 75 ("YPF committed to contribute capital to CLH up to an amount that will enable CLH to satisfy its obligations."). YPF also agreed to provide a parental guarantee on Maxus's obligations for future preferred stock dividends and redemption payments. Propps Decl. Ex. 2 at 77.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

61

144.    As of March 31, 1995, Maxus had 1,250,000 shares of $9.75 redeemable preferred stock outstanding ("$9.75 Preferred Stock") with a liquidation value of $101 per share; 3,500,000 shares of $2.50 preferred stock outstanding ("$2.50 Preferred Stock") with a liquidation value of $25 per share; 4,356,958 shares of $4.00 convertible preferred stock with voting rights outstanding ("$4.00 Preferred Stock") with a liquidation value of $50 per share; and long-term debt obligations of $975.6 million. Propps Decl. Ex. 16 at F-2, F-16, F-18 and F-19. The $9.75 Preferred Stock was subject to mandatory redemptions of 625,000 shares per year, with the next redemption scheduled for early 1996. *See Id.* at 1, 20, 25, 27, 28, F-17, Note Seventeen.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

145.    ████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

146.    Solvency experts, Houlihan, Lokey, Howard & Zukin ("Houlihan"), retained by YPF, opined that with the Keepwell in place, Maxus would be solvent even after absorbing $425 million in acquisition debt. *See* Propps Decl. Ex. 109 at -096. Houlihan opined that Maxus would pass the cash-flow and reasonable capital tests with this in place, and would be balance-sheet solvent with or without it, even after absorbing the acquisition debt. Id. at -096.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

147.    All of the material terms of the acquisition were included in public SEC filings by Maxus and YPF – Maxus even sent a copy of its SEC filings to Oxy – and neither Oxy nor any other creditors objected to the transaction. *See* Propps Decl. Ex. 88 at 162:14-166:19 and Propps Decl. Ex. 89, Propps Decl. Ex. 90, Propps Decl. Ex. 91, Propps Decl. Ex. 92, Propps Decl. Ex. 93; Propps Decl. Ex. 94; Propps Decl. Ex. 95 at 95:20-25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

148.

[redacted]

[redacted]

[redacted]

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust objects that the witnesses whose testimonies are cited are not percipient witnesses and further objects that these statements

149.    Without the YPF acquisition, Maxus would have sold off its major assets, or it would have filed for bankruptcy. Propps Decl. Ex. 101 at -511-512, -531, -548. In a presentation prepared by CSFB at the time, CSFB noted that Maxus had few options remaining and that it would "run of out excess cash by the 1st quarter of 1996." *Id.* at -512. CSFB presented Maxus's options as limited to a merger, equity carve out, JV, or asset sale, all of which presented significant disadvantages. *Id.* Maxus also never would have had any ability to satisfy its contractual obligation to pay Oxy's share of massive environmental liabilities relating to the Passaic River that only emerged years later, or anything more to EPA either. *See* Propps Decl. Ex. 101 at CS001512 (noting Maxus' funding gap, and that Maxus would run out of excess cash by 1996).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust objects to this statement of fact as pure speculation as to what Maxus "would have" done.  The YPF Defendants have provided no evidence of what Maxus would have done and citing to presentations listing out options is not indicative of what Maxus would have done (or its ability to satisfy its contractual obligations) in a hypothetical world where YPF did not acquire Maxus.

D.    **YPF'S DILIGENCE WAS APPROPRIATE AS MAXUS AND YPF REASONABLY BELIEVED MAXUS COULD MANAGE ITS OXY INDEMNITY OBLIGATIONS**

1.    **Historical Background**

150.    In 1983, EPA discovered dioxin at the Lister Site, and in 1983, the New Jersey Department of Environmental Protection ("NJDEP") issued an order requiring DSCC to take

actions to prevent run-off pollution. *See* Propps Decl. Ex. 42.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

151.    In 1985, as part of the investigation of the DASS, Maxus retained the consultants at International Technology Corp. to conduct a comprehensive study of the Passaic River to determine, among other things, whether the dioxin in the river's sediment posed an immediate risk to human health or the environment; a report on that study was submitted to the NJDEP. Propps Decl. Ex. 124 (the "IT Report").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

152.    Among other things, the IT Report concluded:

i.    "Dioxin occurs throughout the entire length of the lower Passaic River although strong fresh water discharge conditions tend to limit the extent of site-area reach-associated sediment mobility to approximately 6.5 miles upstream." Propps Decl. Ex. 124 at -90606.

ii.    "The occurrence of dioxin at some locations could not be attributed to the site-areareach as a source [and] was relatively confined to pockets rather than distributed over a wide area."*Id.*

iii.    There was no immediate and substantial risk to public health or the environment associated with the present distribution of dioxin in the site-area reach associated sediment in the Lower Passaic River below Dundee Dam. *Id.* at -90607.

iv.    Higher concentrations of dioxin were generally found below the top 2

65

feet of sediment, which may pose an additional risk to humans the environment if the sediments were disturbed. *Id.* at -90607.

v.    In fact, the highest concentration of dioxin found was at a location 8 to 10 feet below the surface of the riverbed outside of the Lister Site. *Id.* at -90605.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

153.    In 1987, the NJDEP and EPA issued a ROD for OU-1, the Lister Site itself.  ("1987 Lister Site ROD") Propps Decl. Ex. 125. NJDEP and EPA considered seven different alternatives, ranging from No Action to removal, treatment (via incineration) and disposal of dioxin-contaminated waste. *Id.* at -127. Estimates of the capital costs ranged from $422,000 to $247,808,000. *Id.* at -128. Alternative 3 was selected, which involved containment of dioxin waste above 1 ppb for storage in drums that would be buried and capped at the Lister Site itself, rather than being removed. *Id.* at -132, -146. Alternative 3's estimated cost was just over $8 million. *Id.* at -128. EPA selected Alternative 3 notwithstanding it did "not fully satisfy the preference for treatment expressed in Section 121(b) of CERCLA." *Id.* at -132.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

154.    The 1987 Lister Site ROD selected an interim remedy, with a requirement that the remedy be revisited every two years. Propps Decl. Ex.125 at -195.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

155.    To date, no large-scale sediment removal has occurred, and no interim remedy has been implemented, in the Passaic River. Propps Decl. Ex. 126 at 5. Only two limited removal actions have been carried out – one of 40,000 cubic yards of contaminated sediment adjacent to the Lister Site completed in 2012, and the other at river mile 10.9 in Lyndhurst, which was substantially completed in 2014. Propps Decl. Ex. 13 at 5-6.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The state of dredging at relevant times is disputed by the parties' experts and is not an issue of fact that can be determined absent the resolution of expert testimony.

156. ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████. Of the 54 largest remedial dredging projects before 2000, the aggregate cost of them was $552 million *combined*. Propps Decl. Ex. 127 at -842. EPA and NRC also issued guidance documents at that time observing that remedies for such large-scale contaminated sediment projects could be "prohibitively expensive and involve such extensive areas that disposal of contaminated sediment in a safe manner may not be technologically or economically feasible" given the millions of cubic yards that would have to be removed, treated and disposed of after it was dredged. Propps Decl. Ex. 128 at 8-10, 20; Propps Decl.Ex. 129 at p. 89 of 189. EPA stated at a May 1996 Newark community meeting that "*it's unlikely that all of the contamination could be dredged because there is no place large enough to dispose of the material*," and that "*there would be few options for remediating the river.*" Propps Decl. Ex. 130. Similarly, ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████

67

*Responses and Objections:* Subject to its General Objections, the Trust submits that the statement of fact highlighted in yellow in this paragraph is not material and/or irrelevant to this adversary proceeding. The Trust disputes as unsupported by the cited document the statement that "of the 54 largest remedial dredging projects before 2000, the aggregate cost of them was $552 million combined." The cited document does not specify that these were the largest sites or contain any cost figures at all.

157.        In the 1990s, environmental remedial dredging was employed for sites that were either pilot study dredging operations or small-scale sites with respect to the volumes dredged. *See* Propps Decl. Ex. 131 at 12, 27, 51, 162. *See also* Propps Decl. Ex. 127 at -842 (confirming that no large scale dredging involving large-scale dredging of high volumes of contaminated sediment was ordered by EPA before 2000).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as incorrect and as mischaracterizations of the cited documents. The Trust notes that the term "small-scale" is entirely undefined and submits that there were several sites in the 1990s with dredging projects in the tens of thousands of cy. *See* Soto Decl. Ex. 168 at Appendix C ███████████████████████████████████████████ . The Trust also objects to the statement that EPA did not order "large-scale dredging of high volumes of contaminated sediment" before 2000 as entirely unsupported by the cited document which speaks for itself.

158.    Particular aspects of the Passaic River also presented challenges for selecting a large-scale dredging and removal remedy. For example, the Lower Passaic River is located in a densely populated and highly industrialized area, in contrast to other rivers like the Hudson River and the Fox River, which are in areas with relatively low population density. Propps Decl. Ex. 13 at 1-2; Propps Decl. Ex. 132 at 8; Propps Decl. Ex. 133 at 2.

*Responses and Objections:*  Subject to its General Objections, the Trust disputes the statements highlighted in red in this paragraph as stating Maxus's own self-serving opinions and advocacy positions with respect to the likelihood of dredging, which are not facts.  *See* Propps Decl. Ex. 134 at -514-515 █████████████████████████████
███████████████████████████████████████ (emphasis added).  While the Trust does not dispute that resuspension was a known problem, the Trust submits that it is not, and was not during the 1990s, a technically unmanageable or insurmountable problem.

159.    Maxus records reflected that in July 1986, Diamond Shamrock Chemicals Company prepared cost estimates for remediation of various contaminated sites in preparation for negotiations with its insurance carriers prepared for counsel. *See* Propps Decl. Ex. 135. These potential cost estimates were summarized in a memo dated July 15, 1986 from R.C. Halden to W.C. Hutton, including potential Passaic River and Lister Site remediation costs. *See id.* The memo contained a Low-Cost option and a High-Cost option for the remediation of the Passaic River, which were $5 million and $50 million, respectively for the Passaic River, and $40 million and $90 million, respectively, for the Lister Site. *Id.* at -628.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

160.    The Low-Cost option was based on the assumption that only additional studies of the dioxin occurrence in the Passaic River would be necessary, with the least risk being realized by leaving the sediments in place. *Id.* The High-Cost option was based on the assumption that dredging would be required for those limited areas of the Lower Passaic River where sediments with high levels of dioxin were found (resulting in 47,250 cubic yards of sediment dredged and shipped for incineration). *Id.* at -531.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

161.    In 1991, ████████████████████████████████████████
██████████████████████████ There is no evidence that ████████████████████
69

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statements highlighted in red as argumentative and unsupported by evidence in the record.

162.    In early 1993, one of the consultants Maxus used for toxicology and risk assessments for its work on analyzing data from the Passaic River was ChemRisk. *See* Propps Decl. Ex. 137.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

163.    The people working at ChemRisk at this time were toxicologists, not remediation engineers. In fact, ChemRisk was the toxicology/risk assessment arm of McClaren/Hart Environmental Engineering, a large firm that had a separate remediation engineering group that did not work on the Passaic River for Maxus. *See* Propps Decl. Ex. 138; Propps Decl. Ex. 139; Propps Decl. Ex. 140.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. It is undisputed that McLaren/Hart is a large firm, with significant experience in robust remediation engineering. The YPF Defendants' inappropriate separation of ChemRisk and McClaren/Hart is an attempt to mislead this Court. First, as demonstrated in the Memorandum cited by YPF, the proposed project team was referred to as "McLaren/Hart-ChemRisk's Project Team" and the team "include[d] scientists, engineers and technicians from McLaren/Hart as well as environmental and human health scientists from ChemRisk." Propps Decl. Ex. 140 at -111. Moreover, the individual members of the team were selected because they have "a proven track record working with Maxus." *Id.* The team's Project Director, Project Manager, and Field Team Leader all had significant experience in CERCLA related projects and RI/FS studies. *Id.* at -112.

164.    In its presentation made to Maxus, ChemRisk ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the characterization ████████████████████  This characterization is not based on any cited evidence.  Propps. Decl. Ex. 137 at -643.  To the extent the YPF Defendants cite ██████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

<span style="background-color:red">165.    Significantly,</span> ████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph as a mischaracterization of the cited document. ███████████████████████████████

The Trust objects to this mischaracterization as the document speaks for itself.

<span style="background-color:red">166.</span> ███████████████████████████████████

███████████████████████████████████████████████

71

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust objects to the YPF Defendants' characterization of deposition testimony.  To the extent the YPF Defendants intend to rely on deposition testimony elicited twenty years later, the testimony speaks for itself.

167.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust objects to the YPF Defendants' characterization of deposition testimony and further objects that the testimony is incomplete.



*Id.* at 355:11-22.

168.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the statement highlighted in red as a mischaracterization of the cited document.  The Trust objects to this mischaracterization as the document speaks for itself.

169. Maxus

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the statements highlighted in red. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

170. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph.   The quoted testimony ███████████████

████████████████████████████████████████████████████ The Trust objects to this mischaracterization as the document speaks for itself.

171. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Indeed, before 1996, capping was rarely selected as a remedy for contaminated sediment. *See* Propps Decl. Ex. 26 at 6 (noting that only 3 of 44 sediment remediation projects included capping).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████

███████ The Trust objects to these mischaracterizations as the document speaks for itself.

172.    The 1994 AOC relied on the IT Report, which had concluded that the dioxin traceable to the Lister Site was primarily located within that six-mile area. Propps Decl. Ex. 45 at -313-319; Propps Decl. Ex. 124 at -606. The 1994 AOC required Oxy to conduct an RI/FS for the Passaic River Study Area, including a human and ecological risk assessment. Propps Decl. Ex. 45 at -313-319. The Statement of Work in the AOC required that Oxy assess in the feasibility study, at a minimum, the following alternatives: (1) treatment for source control of river sediments that would eliminate the need for long-term management (including monitoring); (2) treatment as principal element (presumably after dredging) to reduce the toxicity, mobility or volume of waste; (3) containment with little or no treatment; and (4) No Action. Propps Decl. Ex. 45 at -349.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statement highlighted in red as a mischaracterization of the cited document. The cited page in the IT Report says, "Dioxin occurs throughout the entire length of the lower Passaic River, although strong fresh water discharge conditions tend to limit the extent of site area reach-associated sediment mobility to approximately 6.5 miles upstream." Propps Decl. Ex. 124 at -606. This does not support the statement that dioxin was "primarily" located in the six-mile area. The Trust objects to this mischaracterization as the document speaks for itself.

173.    During this time, the EPA and other state environmental regulators had selected monitored natural recovery at other sites, such as James River and Lake Hartwell. *See* Propps Decl. Ex. 36 at 296; Propps Decl. Ex. 147 at 102.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph insofar as it is suggested that there were additional sites other than the James River and Lake Hartwell at which monitored natural recovery was used, when

76

these were in fact the only known examples.  The Trust also notes that the James River remedy was selected in 1978, prior to the promulgation of CERCLA and prior to the discovery of dioxin contamination at the DASS.

174. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as misleading in the absence of necessary context. ████████████████████████████████████████████████████████████████████████████

175.    The Lake Hartwell site is another example of a successful natural recovery remedy selected by EPA in 1994 over a more expensive remedy that would have involved dredging, removal and treatment of contaminated sediment. Propps Decl. Ex. 147 at 4, 102. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements in this paragraph as misleading in the absence of necessary context. ████

**176.** ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**177.** ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**178.** ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████

179.    Maxus set forth the reasons for its conclusion that a no action remedy was appropriate for the Passaic River in a briefing memo in August 1994. *See* Propps Decl. Ex. 150. The memo reflects information based on IT Report data, river characteristics and natural sedimentation, that the most concentrated dioxin was buried under the riverbed such that it was not exposed to biota, and there were no viable, cost effective options for removing and treating the contaminated sediment, or for a capping remedy, which Maxus had studied in 1993. *See id.*; *see supra* at ¶ 171. Data also showed cleaner sediment was burying contaminated sediment at a reasonably rapid rate, further mitigating risks of dioxin exposure. *Id.*

*Responses and Objections:* Subject to its General Objections, The Trust disputes as misleading the characterization of Propps Decl. Ex. 150 as a "briefing memo" or "a memo" and disputes the presentation of its contents as neutral facts. The YPF Defendants' own expert ██████████████████████████████████████████████████ Propps Decl. Ex. 25 at 26. Its own contents make clear that this document was drafted as advocacy and not as neutral or complete scientific analysis. *See*, e.g., Propps Decl. Ex. 150 at 6 ("The Project Team would be pleased to brief the Governor's Dredged Material Management Team…The Project Team would appreciate a copy of the Dredged Materials Team draft

79

report to aid in its collection of information in the Remedial Investigation and Feasibility Studies."). The Trust objects to these mischaracterizations as the document speaks for itself.

2.    **The Diligence of the Environmental Liabilities Prior to the YPF Acquisition**

<span style="background-color: #00ff00">180.</span> ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes as imprecise and argumentative the characterization ███████████████████ ███████████ The Trust does not dispute he had prior experience.

181.    ███████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact in this paragraph.

<span style="background-color: #00ff00">182.</span> ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████ <span style="background-color: #00ff00">Mr. Skaggs presented various slides explaining the</span> <span style="background-color: #00ff00">status of different sites, including the Lister Site and Passaic River, indicating that the Passaic</span> <span style="background-color: #00ff00">River was still in the RI/FS stage. Propps Decl. Ex. 154 at -53102.</span> ████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statement that ████████████████████████████████████████
███████████████████

183. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as irrelevant, and disputes that this is an accurate statement of liabilities.

184. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and

Second,

Likewise,

185.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Rabbe's personal recollections and opinions as undisputed facts.

186.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Skaggs' personal recollections and opinions as undisputed facts.

187. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Bohannon's personal recollections and opinions as undisputed facts.

188. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Bohannon's personal recollections and opinions as undisputed facts.

189.    ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

190.  ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  However, the Trust notes that this characterization of Propps Decl. Ex. 155 is incomplete, given that the same memo also discusses ████████ ████████

191. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

192. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as argumentative and objects to the presentation of Mr. Skaggs' and Mr. Rabbe's personal recollections and opinions as undisputed facts.

193. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

194. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ Maxus disclosed in its SEC filings the possibility that its environmental liabilities could be in excess of Maxus's reserves for them. Propps Decl. Ex. 118 at 13.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

195. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ The requested increase in reserves related to analysis of the Kearny plant site, not the Passaic River. Propps Decl. Ex. 17 at 16.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph

196. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts.   The Trust further notes that █████████████████████████████████████████████████████████████████

197. ██████████████████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts.   The Trust further notes that ████████████████████████████████████████████████████████████

198. ██████████████████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts.  The Trust further notes that ██████████████████████████████████████████████████████

199. ██████████████████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████

[REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts.  The Trust further notes that [REDACTED]

[REDACTED]

**3.        Post-Acquisition**

200.    Studies of the Passaic River were continuing after the YPF acquisition closed, and in the summer of 1995, Maxus received [REDACTED] from ChemRisk, the toxicologists performing the risk assessment for Maxus. *See* Propps Decl. Ex. 47.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

201.    In July 1995, Chemrisk drafted a Screening Level Human and Ecological Risk Assessment ("SLHERA").  *Id.* [REDACTED]

[REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

202.    After the YPF acquisition closed in June 1995, [REDACTED]

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the claim

███████████████████████████████████████████████
██████████████████████████████

203. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

204.    Nonetheless, Maxus ████████████████████████████

███ and on October 26, 1995 authorized its environmental consultant, EA Engineering, to

conduct an Engineering Evaluation / Cost Analysis ("EE/CA"), which was commonly deployed in assessing potential alternative remedies for a CERCLA site, (Propps Decl. Ex. 160), during the RI/FS stage. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the claim that the authorization to EA was ▮▮▮▮▮▮▮▮▮▮▮ The YPF Defendants cite no evidence for this claim. The Trust also objects to the characterization of the EE/CA as "commonly deployed in assessing potential alternative remedies for a CERCLA site" as unsupported by any language in the document cited and as factually incorrect. EE/CAs are used specifically in the context of non-time critical removal actions, of which they are a required step. *See* Propps Decl. Ex. 29 at 9-10.

205. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust submits, however, that in April 1996 the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

206. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements highlighted in green in this paragraph. ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

207. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

208. ███████████████████████████████████████████

███████████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as stating the opinions of YPF's expert which are not facts, and are subject to material dispute.

209.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited document and the quotations as incomplete and misleading.

210.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited document and the quotations as incomplete and misleading.



211.    ChemRisk also published these results under the name of its corresponding author Steven Huntley. The 1995 Huntley Report described how ChemRisk analyzed radiochemical data to conclude natural sedimentation likely was occurring, and that "the high rate of sediment deposition in the lower Passaic River and previously reported hydrodynamic data suggest that the lower Passaic River is not likely to be a major contributor of sediments to Newark Bay." *See* Propps Decl. Ex. 165 at -494.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. The YPF Defendants do not establish as a fact or cite any evidence to show that the "results" described in Propps Decl. Ex. 165 were the same as the data discussed in Propps Decl. Ex. 163.

212.    An interim draft of the EE/CA was delivered to Maxus in late November and early December 1995.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the claim that

213.    EA did not issue another draft EE/CA until June 1996. ███████

██████████████████████████████████████████████████

███████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. ████████

██████████████████████████████████████████████████

████████████████████████████████████

214. ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████

████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statements highlighted in red as stating the opinions of YPF's expert, which are not facts, and are subject to material dispute.

215.    At the time, EPA publicly stated a remedy for the Lister Site of $250 million was too expensive such that EPA "scotch[ed] the idea" of such an expensive remedy. *See* Propps Decl. Ex. 173 at -423.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as a mischaracterization of the cited document and the quotation as incomplete and misleading. The EPA stated that it "ventured a cost estimate -- $241 million plus transportation costs – that it said would scotch the idea." Propps Decl. Ex. 173 at -423. The EPA project manager further stated, however, that "Moreover . . .the agency does not have the authority to dump the contaminants elsewhere, or to compel Occidental to undertake a totally new plan." *Id.* The Trust also notes that the phrase "Lister Site" designates the factory buildings and surrounding land (OU-1), not the sediments in the river, and objects to this paragraph's attempted conflation of distinct segments of the DASS with distinct characteristics and distinct remediation histories. The Trust objects to these mischaracterization as the document speaks for itself.

216.    EPA and USACE ████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements in this paragraph as mischaracterizations of the cited documents, ████████████
████████████████████████████████████████████████████
████████████████████████████████████

217.    EPA also made a public statement in 1998 that "EPA is currently evaluating the feasibility of a hot spot-type removal, but the usefulness of such a removal is questionable at this time. EPA has not confirmed that the consumption of fish from the river poses a health threat to the population in the vicinity of the Passaic River Study Area. In addition, there appear to be other sources of contamination in the Passaic River (such as CSOs) that have to be identified before EPA can determine if a hot spot removal could be beneficial. If EPA performs a hot spot removal and the other sources re-contaminate the sediments, the money and effort spent on the hot spot removal would be futile, since there would not be an overall improvement in the river." Propps Decl. Ex. 168 at -065.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. For completeness, the Trust notes that, as the cited document makes clear, these remarks were limited to the appropriateness of hot-spot removal as an interim remedy in 1998 and not a statement about the larger RI/FS process, which was ongoing.

218.    EPA also cautioned in June 1996 that the recent data "[a]lone, this sediment characterization data cannot tell us who is responsible for dumping these contaminants into the river; effects these contaminants have on crabs, fish or humans; and whether or not contaminated sediments have moved up river or down into the Bay." Propps Decl. Ex. 12 at -121.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

219.    ████████████████████████████████████████████████
████████████████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements highlighted in red as stating the opinions of YPF's expert, which are not facts,

are subject to material dispute, are inadmissible hearsay and cannot constitute the basis for an undisputed fact.

4.    **Continued EPA Assessment of the Lister Site in the 1990s**

221.    In the mid- to late-1990s, EPA was attempting to revisit the interim remedy in the ROD to assess excavation of the waste at the Lister Avenue Site, and to potentially arrange for a mobile incinerator to be located on site to treat the dioxin waste, or potentially explore off-site treatment and disposal. *See, e.g.*, Propps Decl. Ex. 171 at -09-10; Propps Decl. Ex. 172 at -47-53.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements in this paragraph

222.    The realities of the situation were evident regarding the limitations on what could be practical for off-site treatment or disposal of any dioxin-contaminated sediments. *See, e.g.*, Propps Decl. Ex. 172 at -48-49 (describing difficulties connected with incinerating dioxin-contaminated waste from the Lister Site).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as argumentative and as a mischaracterization of the cited document. The cited document discusses waste from the Lister Site, which, as stated above, corresponded to a complex of buildings and the surrounding land area, and the waste under discussion corresponded to dioxin-contaminated soils and other wastes located on land, not to river sediments. The Trust disputes this mischaracterization as the document speaks for itself.

223.    In the 1990s, there was only a single facility (owned and operated by Aptus, Inc.) licensed to incinerate dioxin waste, and that facility was located in Coffeyville, Kansas. *See* MAXUS0793406-423, Propps Decl. Ex. 173 at -423. This facility had limited capacity or throughput to perform the incineration, resulting in timelines of many years to complete incineration of large volumes, which EPA recognized made such a treatment and disposal option "extremely expensive." *See id.* ("The agency maintains that the only plant in the nation licensed to destroy dioxin by burning, which is in Coffeyville, Kan,. could not handle the construction

materials from the Diamond Alkali site…"); Propps Decl. Ex. 174 at -375 ("Question: Why can't you remove all of the material from the Site? Answer [by Lance Richman, project manager for the Diamond Alkali Superfund Site]: Because there is only one place in the U.S. that can take listed dioxin waste which makes it extremely expensive.").

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as a mischaracterization of the cited documents.   As the parenthetical quotation from Propps Decl. Ex. 174 makes clear, the Coffeyville facility was used to incinerate listed dioxin waste.  Neither document supports the claim that there were no other facilities available to handle non-listed dioxin waste such as sediment from the Passaic River.  The Trust again notes that this discussion referred to land waste from the Lister Site (OU-1) and not to contaminated river sediments.  The Trust objects to this mischaracterization as the documents speaks for themselves.

224.    An additional problem posed by large scale dredging was that dioxin waste could not simply be put in any landfill because it was considered a hazardous substance requiring special permitted landfill disposal. *Id.*

*Responses and Objections:*   Subject to its General Objections, the Trust disputes the statements in this paragraph as a mischaracterization of the cited document, which does not say or imply that the dioxin always was or needed to be treated as a listed waste subject to special handling.

225.    EPA also publicly stated in May 1996 that "the data shows widespread contamination of the river, and it's unlikely that all of the contamination could be dredged because there is no place large enough to dispose of the material. Mr. Frisco stated that there will be few options for remediating the river. Depending on the results of the next two parts of the study, EPA may consider limited movement of material, limited containment in place, or possibly a treatment alternative. The sediment contamination seems to be a large problem that may require a long-term solution." Propps Decl. Ex. 130 at -878 (emphasis added).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

226.    By the end of 1997, Aptus publicly stated it was shutting down that facility, and

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. For completeness, the Trust again notes that any discussion of the Coffeyville facility was in relation to the disposal of land wastes from OU-1, not river sediments.

227. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited document and the quotations as incomplete.

███████████████████████████████████

228.    In the 1990s, Maxus continued to identify PRPs who also were responsible for polluting the Passaic River, who Maxus believed had to participate in paying for their fair share of cleanup costs, and by 1995 ███████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

229.    In addition, EPA had notified several other large corporations they were PRPs and continued identifying more. Propps Decl. Ex. 12 at -121; ████████████████████████

███████████████████████████████████████

███████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

230. ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. ██████████████████████████
███████████████████████████████████████
███████████████████████████████████████

231. ████████████████████████████████
███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Rabbe's personal recollections and opinions as undisputed facts.

232.    In 2007, EPA decided to drop cleanup levels two orders of magnitude lower than what was originally set by EPA for dioxin in the 1990s for other sites (1 part per billion at the Lister Site and Love Canal) – to as low as 7.1 parts per trillion, before settling on 8.3 parts per trillion in 2016. Propps Decl. Ex. 125 at -266; Propps Decl. Ex. 166 at -2886; Propps Decl. Ex. 13 at 94. Cleanup levels that low required millions more of cubic yards of sediment to be removed, vastly increasing costs. Propps Decl. Ex. 13 at 149-150.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as argumentative and as mischaracterizations of the cited documents.  The fact that different cleanup standards may have been ordered at different sites at different points in time does not support the claim that there was a single overall "cleanup level for dioxin" that "dropped" over time.  In addition, the assertion that "cleanup levels that low required millions more cubic yards of sediment to removed, vastly increasing costs" is entirely unsupported by any language appearing in the cited page range. The Trust objects to these mischaracterizations as the documents speak for themselves.

VI.    **AFTER THE ACQUISITION BY YPF, MAXUS REMAINED A SEPARATE COMPANY NOT DOMINATED OR CONTROLLED BY YPF, WHILE BOTH COMPANIES AGREED TO THE GLOBAL RESTRUCTURING**

A.    **MAXUS AND YPF MAINTAINED CORPORATE SEPARATENESS**

233.    Following the acquisition by YPF, Maxus's corporate form was consistently honored and its separateness was consistently maintained. *See, e.g.,* Propps Decl. Ex. 179 at 56; Propps Decl. Ex. 100 at 31; Propps Decl. Ex. 180 at -061-63; Propps Decl. Ex. 217; Propps Decl. Ex. 207 at 85.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements of fact in this paragraph.  The Trust submits that whether or not Maxus and the YPF Defendants honored the corporate form is a genuine issue of material fact to be determined at trial by a factfinder.  The Trust has submitted countless pieces of evidence demonstrating that Maxus and the YPF Defendants did not honor the corporate form. *See, e.g.,* Trust SOF at ¶¶ 55-72 (discussing YPF's transfer of Maxus's international assets to YPFI to render Maxus judgment-proof); ¶ 75 (discussing the "Maxus Management Group" whereby YPF had Maxus personnel continue to manage the assets that had been transferred to YPFI; ¶¶ 86-95 (discussing the subsequent transfer of the legacy Maxus assets from YPFI to Repsol); Smith Decl. Ex. 137 at 143-173 (discussing the ways Maxus and Defendants abused the corporate form including financial dependency, lack of corporate separateness, and domination and control).

234.    Following the acquisition, Maxus continued to have three independent and disinterested board members through 1999, Charles Blackburn, George Jackson, and R.A. Walker, although Mr. Blackburn resigned in 1997. Propps Decl. Ex. 98 at 13, 21–22; Propps Decl. Ex. 17 at 24–25, 38; Propps Decl. Ex. 100 at 32; Propps Decl. Ex. 16 at 35-36; Propps Decl. Ex. 208 at 56, 59); Propps Decl. Ex. 209 at 38, 41; Propps Decl. Ex. 210 at -76; Propps Decl. Ex. 211 at 1; Propps Decl. Ex. 212 at -693; Propps Decl. Ex. 214 at 14; Propps Decl. Ex. 215 at -942;YPF 0059118–9 Propps Decl. Ex. 216 at 9; Propps Decl. Ex. 217 at 9; Propps Decl. Ex. 218 at 20;Propps Decl. Ex. 219 at 51.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

235.    Mr. Blackburn was a Director of Lone Star Technologies, Inc. and Landmark Graphics Corporation. Propps Decl. Ex. 17 at 24. He received a B.S. from the University of Oklahoma. *Id.* He was a member of the Society of Petroleum Engineers, the American Association of Petroleum Geologists and the Executive and Budget Committees of the Mid-Continent Oil and Gas Association. *Id.* ██████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

236.    Mr. Jackson was an oil field service consultant in Kerrville, Texas. Propps Decl. Ex. 17 at 24-25. He received a B.S. from Southern Methodist University. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

237.    Mr. Walker was a managing director at Prudential Capital Group and vice president at The Prudential Insurance Company. Propps Decl. Ex. 17 at 24. He received his B.S./B.A. and MBA from the University of Tulsa. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

238.    Maxus directors were engaged in Maxus's governance in a manner entirely independent of YPF, and participated actively in Board discussions regarding oil and gas production, strategic planning, and the Company's annual financial results, among other topics. *See* Propps Decl. Ex. 220 at 55-60; Propps Decl. Ex. 100 at 32; Propps Decl. Ex. 221 at -585-94; Propps Decl. Ex.222 at 85.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  *See* response to ¶ 233.

239.    The Maxus Board regularly took corporate action, voting on over 100 separate board resolutions. *See, e.g.,* Propps Decl. Ex. 223 at 209-10; *See, e.g.,* Propps Decl. Ex. 231 at 197-98; Propps Decl. Ex. 214 at -530; Propps Decl. Ex. 225 at 398-99. The Maxus board approved dividend payments to preferred shareholders, elected corporate officers, approved changes to

==employee compensation plans, approved contracts with third parties, approved sales of assets after==

==reasonably determining that the consideration received for such sales was fair to Maxus. *Id.*==

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

240.    

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 240.

<span style="background-color:red">241.     Maxus had its own substantial workforce separate from any of the YPF Defendants. *See* Propps Decl. Ex. 230 at 2. As of March 31, 1996, Maxus had 2,303 employees, the vast majority of whom were never separately employed by YPF. *See id.* at 4.</span>

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The total number of Maxus employees, and the nature and extent of their affiliation with any of the YPF Defendants, is a genuine issue of material fact to be determined at trial. For example, by the end of 2005, Maxus had only 69 employees. Trust SOF ¶ 98. Further, from approximately 2010 to at least 2016, Maxus and the other Debtors and YPF had "shared" employees that held positions at Debtor and non-Debtor entities YPFH and CLHH such that they wore "two hats"; these shared employees included the Debtors' management. Trust SOF ¶ 149.

242. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

243. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*See, e.g.*, Trust SOF ¶¶ 48-76.

244. ████████████████████████████████████

████████████████████████████████████

████████████████████ *See* Propps Decl. Ex. 237 at 593, 599, 604, 609. According to a 1995 report from the Maxus Audit Department, Maxus had an Audit Plan that included Treasury and Marketing audits, an audit of internal controls at Maxus Southeast Sumatra Inc., vendor audits, and JV audits. *Id.* at 593.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its responses to ¶ 243.

245.    Further, at least one Maxus subsidiary had its own accounting policies for part of the Relevant Period. Propps Decl. Ex. 238 at 38-42. Maxus Bolivia had its own accounting procedures for at least accounts payable, general accounting, joint interest billing, banking, and management reporting and government reporting. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its responses to ¶ 243.

246.    Maxus used its own letterhead, and Maxus had its own corporate email address (@MAXUSA), as did its separately incorporated subsidiaries (@MAXECU). *See e.g.,* Propps Decl. Ex. 239; Propps Decl. Ex. 230 at 10.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its responses to ¶ 243.

247.    Maxus maintained banking relationships separate from YPF, as evidenced by Maxus's separate accounts at Chase Bank. *See* Propps Decl. Ex. 241.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements of fact in this paragraph.  The Trust incorporates its responses to ¶ 243.

248.    In addition, the record indicates that Maxus's accounting personnel communicated directly with its auditor, Arthur Andersen. Propps Decl. Ex. 242 at 08–12,& Propps Decl. Ex. 243.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust incorporates its responses to ¶ 243.

**B.    THE GLOBAL RESTRUCTURING**

249.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

**1.    YPF and Maxus Plan the Tax and Debt Restructuring**

250.    Prior to the Acquisition, Maxus filed a U.S. consolidated income tax return ("Maxus Consolidated Tax Group") that included the activities of its Indonesian and South

American subsidiaries. Propps Decl. Ex. 248. Maxus was the sole shareholder of Maxus International Energy Company ("MIEC"), which, in turn, owned the Indonesian and South American subsidiaries. Propps Decl. Ex. 98.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

251. ██████████████████████████████████████████
███████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph

252. ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
███████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that the cited testimony

████████████████████████████████████████████████████

███████████████████████████

253.    On April 3, 1995, prior to the YPF acquisition closed in June 1995, YPF's tax consultants at Arthur Andersen advised YPF that it should explore restructuring options in its new corporate family to address tax inefficiencies. *See* Propps Decl. Ex. 250 at -137-141 (observing "it is not generally tax efficient for a foreign corporation (YPF) to own the stock of a U.S. corporation (Maxus) that, in turn, has foreign operations (i.e., Indonesia, Ecuador, Bolivia.)").

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249 by reference. The Trust further objects on the grounds that the cited document speaks for itself. Further, YPF's intent in carrying out the restructuring of Maxus is a triable issue of fact as, inter alia, YPF's legal counsel Andrews & Kurth, advised YPF that Maxus should undertake a restructuring in order to isolate Maxus's potentially extremely high environmental liabilities. Trust MOL at 12-13.

254.    The April 3rd Letter explained how the repatriation of Maxus profits to YPF was potentially costly, noting "[t]he U.S. and Argentina do not currently have an income tax treaty in force. Accordingly, the withholding rate for dividends and interest paid by a U.S. company is 30%." *Id.* at YPF0030133.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249.

255. ███████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249. The Trust further objects on the ground that the cited testimony speaks for itself.

256.    Exacerbating this issue was the fact that such profits would have been already subject to taxes in foreign jurisdictions as well as in the U.S. Propps Decl. Ex. 246 at YPF0030136.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249. The Trust further objects on the ground that the cited document speaks for itself.

257.    Tax efficiencies are reached for U.S. corporations only if their foreign source income is at least 80% of the gross income. *See* 26 U.S.C. § 871 (a)(1)(A). If a corporation reaches the 80% threshold, that portion of the distribution is exempt from U.S. withholding tax. *See* Propps Decl. Ex. 246 at YPF0030133. Prior to the Acquisition, the 80%-20% status was not a relevant issue to Maxus for tax planning purposes as a domestic, independent public company because it is a rule that comes into play following an acquisition. *See id.* at YPF0030136. After the acquisition, due to the nature of Maxus's international assets (*i.e.* for certain international assets Maxus served as the operator, whereas for other international assets Maxus held non-working interests), AA concluded that the satisfaction of the active component of the 80% threshold may prove problematic. Propps Decl. Ex. 246 at YPF0030135-137.

111

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249. The Trust further objects on the ground that the cited document speaks for itself. To the extent this paragraph purports to describe any tax attribute of Maxus at any given time, the Trust submits that such a description entails a legal argument to which no factual response is needed.

258.    Moreover, in the April 3rd Letter, AA identified other significant tax inefficiencies associated with the then existing corporate structure, leading AA to conclude that "it is not generally tax efficient for a foreign corporation (YPF) to own the stock of a U.S. corporation (Maxus) that, in turn, has foreign operations (i.e., Indonesia, Ecuador, Bolivia)." *Id.* at -137. To address these inefficiencies, AA advised YPF to transfer Maxus's non-U.S. operations to a foreign corporation inside of the YPF group. Propps Decl. Ex. 246 at YPF0030138- YPF0030139.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249. The Trust further objects on the ground that the cited document speaks for itself. To the extent this paragraph purports to describe any tax attribute of Maxus or YPF at any given time, the Trust submits that such a description entails a legal argument to which no factual response is needed.

259.    AA also identified one way in which the tax inefficiencies could be addressed was by the sale of the international assets by Maxus to a foreign subsidiary of YPF for fair market value. Propps Decl. Ex. 246 at -137.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249. The Trust further objects on the ground that the cited document speaks for itself. To the extent this paragraph purports to describe any tax attribute of Maxus at any given time, the Trust submits that such a description entails a legal argument to which no factual response is needed.

260.

███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust further objects on the grounds that this paragraph mischaracterizes the cited documents, which speak for themselves.  The Trust incorporates its responses to ¶ 249.

261. ██████████████████████████████

████████████████████████

**Figure 1.    Pre-Reorganization U.S. Tax Structure**[2]



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust submits that expert testimony is self-serving hearsay, and whether or not the post-Acquisition structure was "tax efficient" is, if relevant to any claim or defense, a genuine issue of material fact to be resolved at trial.

---

[2] *See* Propps Decl. Ex. 251; Propps Decl. Ex. 252; Propps Decl. Ex. 250.

The Trust incorporates its responses to ¶ 249.

262.    The Maxus Tax Department led efforts to come up with an appropriate restructuring that would provide the most benefit to the YPF corporate group. In an October 7, 1995 memo, Maxus's Tax Director, David Smith, noted that movement of profits from Maxus's international assets to Maxus in the U.S., and then on to YPF as dividends, was "not efficient" from a tax perspective. Propps Decl. Ex. 244 at -269-70. He explained that (a) Maxus had significant debt, but could not take full advantage of the deductibility of its interest payments because the international operations already had foreign tax credits; (b) YPF could save $25-$28 million per year in Argentine taxes if the company was restructured; (c) under the companies' projections, YPF would run out of net operating losses ("NOLs") to shelter its income years before Maxus would (1996 vs. 1999). Propps Decl. Ex. 244 at -269.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Specifically, the Trust objects that the paragraph mischaracterizes the documents cited, which speak for themselves.  The Trust disputes the characterization of Maxus' restructuring as appropriate for the reasons set forth in its responses to ¶ 249.

263.    Mr. Smith then explained one option for Maxus and YPF was "a sale of properties by Maxus to YPF at fair market value," and that Maxus "should use the sale proceeds to pay down its debt, immediately reducing its interest cost" while creating tax efficiencies in the process. *Id.* at YPF0069270.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

264.    Maxus had not reported taxable income for years before the YPF acquisition in part because of the interest expense on Maxus's debt, and the preferred shareholder dividends it was required to pay, which together cost Maxus $135 million annually. Propps Decl. Ex. 100 at F-1, F-

35.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust clarifies, however, that preferred dividends, which are paid from taxable income, could not have caused Maxus not to earn taxable income.

265. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

266. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

267. ████████████████████████████████████

████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.

268.    In a letter to the leadership of Maxus, including Maxus's Chief Executive Officer, Roberto Monti, on October 23, 1995, the Maxus Tax Director, David Smith, discussed the business purposes of the proposed restructuring: to address "two problems presented by the present organizational structure," which were that "Maxus has a large debt and will be paying $137 million in interest during 1996," and the tax inefficiencies with that structure. Mr. Smith outlined the tax inefficiencies as follows:

> Currently Maxus Energy has direct or indirect subsidiaries which operate all of its properties outside the U.S. When YPF desires to transfer cash earned in international operations to Argentina, moving the cash through the U.S. tax return is not efficient. There will be two opportunities for the U.S. to tax international profits, once when the cash is brought into the U.S. and again when the cash leaves the U.S. Taxing the income coming into the U.S. will be at a minimum 2%, which is the Alternative Minimum Tax (AMT) rate of 20% times 10% taxable portion of foreign source income sheltered by foreign credits. Since there is no tax treaty between the U.S. and Argentina, any dividend of foreign sourced income paid out of the U.S. to an Argentine shareholder is subject to a 30% withholding tax, unless the 80-20 rule applies.

117

Propps Decl. Ex. 256 at -551. ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust disputes the statements highlighted in red as being unsupported by the evidence cited.

269.    Under "Long Term Actions," Mr. Smith further explained that the Maxus Tax Department would analyze "the savings of moving the interest expense from Maxus to YPF," noting that the tax cost of moving the international operations under YPF will be included in the models." The memo further stated Carlos Olivieri, YPF's vice president and controller, "will begin discussions at YPF regarding restructuring issues." Propps Decl. Ex. 256 at -552.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the factual allegations in this paragraph are relevant to any claim or defense as to which summary judgment is sought, and objects on the grounds that the cited document speaks for itself.

270.    There was no mention of any purpose other than addressing Maxus's debt problems and the tax inefficiencies of the new YPF corporate group were discussed with respect to the proposed restructuring to move Maxus's international assets to a new YPF subsidiary. In fact, environmental issues were never even mentioned. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  Specifically, the cited document speaks for itself, and what the document does not say cannot establish the absence or existence of a triable issue of fact.  The Trust incorporate its response to ¶267.

118

271.    Although the option of selling Maxus's Midgard assets was discussed, the Tax Group did not consider selling *both* the Midgard *and* international assets. Propps Decl. Ex. 258 at -274.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust further objects on the grounds that the memorandum cited by YPF Defendants (which speaks for itself) does not demonstrate that the group did not consider selling both the assets.

272. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    Memorandum from A&K to YPF Board dated May 28, 1996 Propps Decl. Ex. 251 at 456 ████████████████████████████    Propps Decl. Ex. 259 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████    Propps Decl. Ex. 261 at -4053 ("For legal and tax purposes Maxus has hired an outside appraiser to determine the fair market value of any properties sold by Maxus to YPF. This is for the purpose of insuring that the preferred stock holders are protected and to document the values in preparation of an IRS challenge to the transactions.").

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust further disputes that the cited documents (which speak for themselves), establish that ████████████████████████████
████████████████    The Trust incorporates its responses to ¶ 249.

273. ██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust further objects on the grounds that the quoted text, from the expert report of YPF's expert witness, Mr. Jack Williams, is inadmissible hearsay that does not establish the existence or absence of any triable issue of fact.  The Trust incorporates its responses to ¶ 249.

274.    It was repeatedly emphasized by Maxus's management and advisors that any transfers of Maxus's international assets to a YPF entity would have to be done at Fair Market Value, given that the intercompany transfers would be facing IRS scrutiny. ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited in this paragraph, which speak for themselves, support the statements of fact therein.  The Trust incorporates its responses to ¶ 249.

275.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited in this paragraph, which speak for themselves, support the statements of fact therein.  The Trust incorporates its responses to ¶ 249.

276.    At the time both YPF and Maxus recognized that the Global Restructuring could not be implemented without the disinterested directors' approval.  Maxus's Articles of Incorporation precluded transactions of more than $25 million between Maxus and any shareholder owning more than 25% of its shares without the approval of a majority of Maxus's disinterested directors. Propps Decl. Ex. 267 at Sec. 2 ; Propps Decl. Ex. 268.

*Responses and Objections:* The Trust disputes that that the cited documents, which speak for themselves, are accurately cited as supporting the stated proposition.

277. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

278.    On October 7, 1995, David Smith, Director of Tax and Chief Tax Counsel of Maxus, sent an interoffice memorandum stating, "If these sales are accomplished over a period of years, Maxus can use NOL [Net Operating Losses] and excess foreign tax credits to offset much of the resulting tax liability. The transactions need to be carefully scheduled to minimize U.S. taxes." Propps Decl. Ex. 258 at YPF 0069273.

*Responses and Objections:* The Trust notes that the proper citation for this paragraph is YPF006972, not YPF0069273. Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

279. ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statement of fact set forth in this paragraph on the grounds that it mischaracterizes the cited document, which speaks for itself.

280. ███████████████████████████████████████████

███████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green.  The Trust disputes that

**2. <u>The Environmental Restructuring Did Not Include Any "Strategy" to hinder,delay or defraud creditors.</u>**

281.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  For the reasons set forth above, the Trust disputes that the tax and debt issues were the purpose behind the Global Restructuring planning.  The Trust further objects that the cited document speaks for itself.

282.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects that the cited document speaks for itself.

283. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects that the cited document speaks for itself.

284. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

285. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

286. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

287. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph are relevant to any claim or defense.  Specifically, what the cited document does *not* say cannot establish the existence or absence of a triable issue of fact.  The Trust incorporates its responses from ¶ 267.  The Trust further objects that the cited document speaks for itself.

288. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

289. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

290. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

291. ██████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████ █

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

292. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

293. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph and highlighted in green.  The Trust objects that the cited document speaks for itself. ███████████████████████████

████████████████████████████████████████

███████████

294. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document (which the Trust submits constitutes a business record of YPF) speaks for itself.

295.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.

The Trust incorporates its responses from ¶ 267.

296.

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects that the document cited speaks for itself, ████████████████████████████████████████████

297.    In February 1996, CSFB provided a presentation recommending how to execute the debt restructuring. Among the recommendations was for YPF to assume $863 million in Maxus's debt obligations, including redemption of part of Maxus's preferred shareholders. Propps Decl. Ex. 275. ████████████████████████████████████

████████████████    *See* Propps Decl. Ex. 276 at 81:8-82:1. *See also* Propps Decl. Ex. 180 at -73, -75 (Maxus GC noting $17 million per year in savings of redemption of $4.00 preferreds, and Maxus Comptroller telling Maxus Board Maxus had sufficient surplus to effectuate dividend). The purpose of doing so was to effectuate the tax and debt restructurings. Propps Decl. Ex. 275. Moreover, YPF could borrow at lower rates than Maxus. Propps Decl. Ex. 277 at -006.

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph highlighted in red.  The Trust does not dispute that CFSB provided a presentation recommending how to execute the debt restructuring, or that the presentation contained the recommendations and numbers relied upon by the YPF Defendants in the above paragraph. ███████████████████████████████████ ████████████████████████████████████████    The Trust does not dispute the facts highlighted in green.

298. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph. █████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

299.    Following an "analysis of the taxability of these proposed transactions," Maxus found that a sale of the foreign operations of Maxus be made to YPF because the tax credits would benefit Maxus, with the sales allowing Maxus to "use NOL [Net Operating Losses] and excess foreign tax credits to offset much of the resulting tax liability." Propps Decl. Ex. 281 at -264; Propps Decl. Ex. 244 at -272.

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph.

300. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph. As described above, the Trust has cited numerous pieces of evidence demonstrating that the reorganization was intended to primarily confer a benefit to the YPF Defendants, not Maxus.

301. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph highlighted in red.  As described above, the Trust has cited numerous pieces of evidence demonstrating that the reorganization was intended to protect valuable assets from Maxus' creditors.  *See, e.g.,* Trust MOL at 12-13. ████

████████████████████████████████████████████

302.    In addition to Arthur Andersen, international tax lawyers provided advice on the Global Restructuring including A&K, Marval O'Farrell & Marial, a prominent law firm with tax expertise in Argentina ("Marval"), and Alan Klein. Propps Decl. Ex. 280.

*Responses and Objections:* Subject to its General Objections, the Trust disputes

statements of fact in this paragraph.  There is no record in the evidence that Marval or Alan Klein provided Maxus or the YPF Defendants advice relating to the Global Restructuring.  The Trust objects to the YPF Defendants' withholding of relevant material and submits that the YPF Defendants' have waived privilege regarding this advice by affirmatively requesting this Court to make factual findings regarding the receipt of legal advice.

303.    Marval created a presentation on the restructuring process that also provided tax and legal advice to YPF and Maxus in connection with the Global Restructuring. Propps Decl. Ex. 280. In their analysis, Marval confirmed the same objectives as in the memos discussed above: address tax inefficiencies of the YPF corporate group, addressed its debt, and remove the environmental liabilities from Maxus's financial statements to CLH "that will administer the environmental problems." Propps Decl. Ex. 280. There is no mention of a strategy to isolate Maxus's assets, or to otherwise hinder or delay creditors in some fashion.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust incorporate its responses and objections to ¶ 302. Further, as described above, the Trust has cited numerous pieces of evidence demonstrating that the reorganization was intended to protect valuable assets from Maxus' creditors.  *See, e.g.,* Trust MOL at 12-13 ███████████████████████
██████████████████████████████████████████

304.    In February 1996, CSFB created a presentation for YPF regarding the proposed debt restructuring. It noted that YPF could address $863 million worth of Maxus's third party debt and preferred shares. It recommended that YPF raise capital and use it to pay off the $4.00 preferred shareholders and replace expensive debt with new, cheaper debt more affordable to Maxus. *See* Propps Decl. Ex. 277 at -16; Propps Decl. Ex. 251 at 456 ("the price must be set at fair market value" for Maxus's international assets).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the facts set forth in this paragraph.

305.    In a May 16, 1996, email, David Smith wrote that "Pursuant to the meeting held in Maxus's offices. . .the portion of the Tax Restructure that would be proposed to the YPF and Maxus Board of Directors would be the sale of Maxus's Bolivian properties and Venezuelan properties to YPF. Based upon analysis of the taxability of these proposed transactions and subject to comments and suggestions from you, the Tax Department recommends that these transactions take place in the following manner . . ." Propps Decl. Ex. 281.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

306.    On May 22, 1996, Mr. Peacock sent a memo to the YPF Board of Directors. Propps Decl. Ex. 251 at 456. Mr. Peacock explained ██████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ (*Id.* at -159). ██████████████████████████████████████ (*Id. -161).*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

307.    ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

308. ██████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

309. ██████████████████████████████████
██████████████████████████████████████
████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the cited testimony establishes the proposition for which it is cited. █████████
███████████████████████████████████████
████████████████████████

310.    In any event, in his April 10, 1996 Memo, Mr. Peacock also informed the YPF Board about YPF's "indirect liability" for Maxus' environmental problems, via its equity and other support of Maxus, which totaled $1.1 billion (and another $1.2 billion if guaranteed debt was included). Propps Decl. Ex. 283.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green accurately paraphrase portions of the memorandum cited (i.e., Propps Decl. Ex. 270), which speaks for itself.  The Trust disputes that the statement highlighted in yellow is relevant to any claim or defense as to which summary judgment is sought, as what a document does *not* say cannot establish the existence or absence of a triable issue of fact.



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph in green are accurately quoted, with the exception that YPF omits the text highlighted in yellow in the above.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

3.      **The Maxus Board, Including the Disinterested Directors, Approved the 1996 Global Restructuring Transactions**

314.    The Maxus Board held a meeting on June 18, 1996, at which the sale of the Bolivian and Venezuelan assets to YPF, the redemption of the $4.00 preferred stock, and the environmental restructuring would be debated and voted on. Propps Decl. Ex. 180 at -63-64. In addition to the Board, the meeting was attended by certain members of management and representatives of A&K and CSFB. *Id.* at -61. Disinterested Directors Charles Blackburn, George Jackson, and R.A. Walker attended the Board meeting. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

315.    Maxus's Disinterested Directors met with, and were debriefed by, Maxus management, including Maxus General Counsel and Vice President, Legal, David Wadsworth, with respect to the Global Restructuring before the Board meeting. Propps Decl. Ex. 180 at 65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

316.    At the Board meeting, Mr. Wadsworth reminded the board that fair market value

138

was required and noted that "it is proposed that the consideration for the transfer equal the higher of the fair market value of the subsidiaries and the carrying value of the assets held by such subsidiaries on the consolidated books and accounts of the Corporation as of the time of transfer." Propps Decl. Ex. 180 at -64. This carrying value was estimated at approximately "$260 million which is believed by management to exceed substantially the sum of the respective fair market values of the subsidiaries." *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

317.    William M. Wicker and Alex Sundich, of CSFB, addressed the Board regarding the valuations. Propps Decl. Ex. 180 at -65. Mr. Wicker stated CSFB had conducted a discounted cash flow ("DCF") analysis and a comparable acquisitions analysis, *id.*, and that Maxus Bolivia, Inc., was valued at $35 million to $55 million under the DCF method and $30 million to $54 million under the comparable acquisitions method, while Maxus Venezuela (C.I.) Ltd. was valued at $100 million to $140 million under the DCF method (and the comparable acquisitions method was inapplicable). *Id.* at -68.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

318.    Mr. Wicker also stated that Maxus Guarapiche – one of the subsidiaries in Venezuela – was properly valued at approximately $27 million, the recent acquisition cost of its only asset. *Id.* at -67.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

319.    Mr. Wadsworth noted that Maxus Venezuela S.A., "which had been formed to pursue business opportunities in Venezuela and which held no substantial assets," was not valued by CSFB. Propps Decl. Ex. 180 at -68. Under these circumstances, the transfer of either Maxus Guarapiche or Maxus Venezuela S.A., was not anticipated to result in a gain or loss to Maxus or YPF. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

320.    After the presentations, "[a] general discussion ensued and a consensus developed among members of the Board that the proposed transfer of the Corporation's Bolivian and Venezuelan subsidiaries is in the best interests of the Corporation . . .   Each of the Independent Directors.......indicated that he was entirely comfortable with the proposed transactions." *Id.* at -69. The sale of those subsidiaries was approved unanimously by the Disinterested Directors, *id.* at -69-70, and the full Board. *Id.* at 70-72.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

321.    Mr. Peacock later testified ██████████████████████████████████████████████████████████████████████████████████████████. Propps Decl. Ex. 157 182:8-22.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

322.    At that meeting, the Board, was informed that YPF had committed to fund the cost of redeeming the $4.00 Preferred Stock (at a cost of approximately $220 million), that the

redemption would save approximately $17.4 million in dividend payments, and that Maxus had a sufficient surplus for paying the dividends. Propps Decl. Ex. 180 at -73.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

323.    The Disinterested Directors unanimously approved the redemption, *id.* at -74, followed by a unanimous approval by the full Board. *Id.* at -74-77.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, but notes that there is no evidence that the Disinterested Directors were ever provided material information regarding the environmental liabilities.

324.    Mr. Wadsworth explained the environmental restructuring to the Board, including the contribution of CLH to a newly created subsidiary of CLH and the entry into the Assumption Agreement and the Contribution Agreement. *Id.* at -77. By the terms of the Contribution Agreement, YPF agreed to provide Tierra up to $108.1 million (later amended to $111.5 million) for environmental expenses and to cover general and administrative expenses (including legal feels). He also explained the cap on contributions under the Contribution Agreement and that it was tied to the environmental reserve as of June 30, 1996, that contributions would also include CLH's G&A expenses, and that Maxus would remain primarily liable. *Id.* at -77-78.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust does not dispute that Mr. Wadsworth explained certain aspects of the environmental restructuring to the Board. However, the Trust submits that there is no evidence that the disinterested directors were given a full briefing on the consequences of the restructuring on Maxus's solvency and therefore were not adequately informed. The trust objects that the document cited speaks for itself.

325.    The Disinterested Directors unanimously approved the environmental restructuring, *id.* at -78-79, followed by a unanimous approval by the full Board. *Id.* at -79-80.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact highlighted in this paragraph.  The Trust does not dispute that the disinterested directors unanimously approved the environmental restructuring.  However, the Trust submits that there is no evidence that the disinterested directors were given a full briefing on the consequences of the restructuring on Maxus's solvency and therefore were not adequately informed.  The trust objects that the document cited speaks for itself.

326.    Other business was discussed at the June 18, 1996, Board meeting, including the approval of a loan by YPF to Maxus, *id.* at -80-81, the approval of a Services Agreement between YPF and Maxus, *id.* at -81-82, approval of the issuance of additional stock to YPF in relation to capital contributions of approximately $64 million to Maxus through May 1996, *id.* at -82-84, and discussions about efforts to develop a JV between Midgard Energy Company and Amoco Corporation. *Id.* at -84. Roberto Monti reported that "Midgard's profits continue to improve." *Id*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**4.    The Sale of the Bolivian and Venezuelan Assets**

327.    On June 28, 1996, MIEC contributed 100% of the common stock of Maxus Bolivia, Inc., Maxus Venezuela (C.I.) Ltd. and Maxus Venezuela S.A. to its newly created wholly owned subsidiary, YPFI. Propps Decl. Ex. 283.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

142

328. ████████████████████████████████████████

████    United States-based corporations often create subsidiaries in the Cayman Islands for the tax benefits. According to a recent study, at the end of 2016, Goldman Sachs had 511 subsidiaries registered in the Cayman Islands, Morgan Stanley had 251, Wells Fargo 48, and J.P. Morgan had 25. Propps Decl. Ex. 240; Propps Decl. Ex. 245; Propps Decl. Ex. 253; Propps Decl. Ex. 268.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Likewise, ████████████████████████████████████████ ████████████████████████████

329.    On July 1, 1996, MIEC sold all of the issued and outstanding shares of capital stock of YPFI to YPF, pursuant to a Stock Purchase and Sale Agreement by and between YPF and MIEC. Propps Decl. Ex. 283 at MAXUS3258579. MIEC had previously received a $101 million advance against the purchase price from YPF. Propps Decl. Ex. 285 at 24-25. At closing, the remainder of the estimated purchase price was paid in the form of a promissory note payable by YPF to MIEC in the principal amount of $165.2 million. *Id.*; Propps Decl. Ex. 16 at 3 and F-40.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

330.    The total purchase price for the outstanding shares of capital stock of YPFI was approximately $266.4 million, which represented the book value of YPFI on the financial reporting books of MIEC as of June 30, 1996. Propps Decl. Ex. 285 at 24-25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

143

331.    On July 30, 1996, CSFB issued a Fair Market Value opinion with regard to YPFI (based on the values of its subsidiaries) with a range of $149 to $214 million. *See* Propps Decl. Ex. 284 at MAXUS1212200.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

332.    On August 13, 1996, Maxus used the proceeds from this transaction, along with a $56 million advance from YPF, for the redemption of all of its outstanding shares of $4.00 Preferred Stock at a price of $50 per share plus accrued and unpaid dividends (approximately $221 million in the aggregate). Propps Decl. Ex. 285 at 24-25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph and highlighted in green.  The Trust notes that the cited document does not appear to refer to the $56 million advance.

5.    **Environmental Restructuring**

333.    YPFH was incorporated on July 31, 1996 as a subsidiary of YPFI. Thereafter, on August 13, 1996, YPF contributed Maxus to YPFH. *See* Maxus Energy Corp., SEC Form 10-Q filed November 12, 1996, Propps Decl. Ex. 115 at 9-10.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

334.    On August 14, 1996, CLHH, a newly formed subsidiary of YPFH, and Maxus Corporate Company ("MCC"), a Maxus subsidiary, entered into a Stock Purchase and Sale

144

Agreement (the "CLH SPA"), which transferred ownership of CLH (n/k/a Tierra) from MCC to CLHH. *See* Propps Decl. Ex. 287.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

335.    Concurrently with the execution of the CLH SPA, Tierra and Maxus executed an assumption agreement (the "Assumption Agreement"), under which Tierra agreed to assume certain environmental obligations, as well as contractual indemnification obligations related to environmental liabilities, from Maxus. *See* Propps Decl. Ex. 288.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

336.    YPF, YPFI, YPFH, Maxus, and CLHH entered into an agreement (the "Contribution Agreement") under which the parties agreed to provide Tierra with certain financial support upon Tierra's request in conjunction with its obligations under the Assumption Agreement. Propps Decl. Ex. 289 at -152.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

337.    As originally executed, the Contribution Agreement provided support for up to $108.4 million, plus up to 110% of approved expenses. Propps Decl. Ex. 289 at -152. On February 5, 1997, the parties amended the Contribution Agreement, adding an additional $3.1 million, in potential support. Propps Decl. Ex. 290. The total of potential support under the Contribution Agreement was therefore $111.5 million.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

338.    By its terms, the Contribution Agreement provides that funding made by YPF to CLH for environmental remediation expenses are not counted toward the Keepwell Covenant, but that operating expenses of CLH are counted toward the Keepwell Covenant. Propps Decl. Ex. 289.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

339.    After execution, and prior to Repsol's hostile takeover (*see infra* ¶ 435), YPF contributed a documented $25.5 million under the Contribution Agreement. Propps Decl. Ex. 291.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

340.    ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

341.    As of June 30, 1996, Maxus's reserves for the environmental contingencies totaled $109 million. Propps Decl. Ex. 285 at 16. As of December 31, 1996, reserves for environmental contingencies totaled roughly $101 million. *See* Propps Decl. Ex. 16 at 17.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

342. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.

████████████████████████████████

6. **The 1996 Transactions in Connection with the Global Restructuring Were Extensively Disclosed**

343.    Extensive SEC filings also evidence that Maxus and YPF contemporaneously and robustly disclosed the transfer of the Bolivian and Venezuelan assets and the environmental restructuring, and the details were widely available to the public. *See, e.g.,* Propps Decl. Ex. 285 at 22-23; Propps Decl. Ex. 298 at 1; Propps Decl. Ex. 115 at 11; Propps Decl. Ex. 16 at 24-25;

Propps Decl. Ex. 299 at 9-10; Propps Decl. Ex. 117 at 75; Propps Decl. Ex. 226 at 80. The disclosures provided detail on every aspect of the transfers, including details about each of the international assets being transferred and the amount of consideration paid for each. *See id.*

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Specifically, the Trust disputes the characterization of the SEC filings as "extensive" and "robust." Maxus and YPF Defendants may have disclosed in SEC filings certain aspects regarding the transfer of the assets; the cited documents speak for themselves in this respect. However, the disclosures did not adequately disclose, among other things, the impact of these transfers on Maxus' liquidity and its ability to pay its creditors potential environmental liability claims and other claims as they come due. Accordingly, the disclosures were inadequate to inform potential creditors, shareholders of Maxus, and the public of necessary information.

344.    These disclosures also had detailed financial information concerning the relative contribution each of the international assets (and Maxus' remaining domestic assets) were generating for the company. *See* Propps Decl. Ex. 16 at 24-25; Propps Decl. Ex. 299 at 15-17; Propps Decl. Ex. 380 at 2-5; Propps Decl. Ex. 228 at 16-20; Propps Decl. Ex. 498 at 16-21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust also references and incorporates its responses and objections to ¶ 233 herein. The Trust disputes the accuracy of the term "detailed," but the cited document speaks for itself.

345.    These public disclosures further included that the Contribution Agreement "cut off" YPF's obligations to fund CLH above $108 million "based on the Company's reserves" plus certain operating expenses. Propps Decl. Ex. 289; Propps Decl. Ex. 290; Propps Decl. Ex. 285 at 16.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the cited documents establish that public disclosures stated that the Contribution Agreement "cut off" YPF's obligations. The Trust also references and incorporates its responses and objections to ¶ 233 herein.

346.    Maxus further disclosed that it could not predict whether regulators would require "more vigorous enforcement policies" which could require material expenditures by the Company, and that changes in circumstances—including specifically at the Passaic River—could result in additions to the company's environmental liability reserves in the future as well. *See* Propps Decl. Ex. 100 at 12-14; Propps Decl. Ex. 16 at 11-12; Propps Decl. Ex. 299 at 9-10.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust also references and incorporates its responses and objections to ¶ 233 herein.

347.    Moreover, detailed descriptions of remedial efforts at the major Oxy sites for which Maxus was responsible under the Oxy Indemnity were all publicly disclosed. *Id.* 12-16. Maxus also disclosed the limits of when environmental expenditures are recorded. *See, e.g.,* Propps Decl. Ex. 16 at F-6 ("Environmental liabilities are recorded when environmental assessments and/or remediation are probable and material such that costs to the Company can be reasonably estimated," which is based on either "1) detailed feasibility studies of remediation approach and costs for individual sites or 2) the Company' estimate of costs to be incurred based on historical experience and publicly available information, based on the state of assessment and/or remediation of each site.").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust also references and incorporates its responses and objections to ¶ 233 herein.  The Trust disputes the accuracy of the term "detailed," but the cited document speaks for itself.

348.    The New Jersey Court previously ruled that these disclosures were robust such that Oxy knew or should have known about them when disclosed in the 1996 and 1997 SEC filings. As such, in 2015 the New Jersey Court granted the YPF and Repsol Defendants' motion to dismiss

149

those claims as time-barred. Propps Decl. Ex. 300 at * 21 ("OCC did not act as a reasonable creditor would have. If it acted as a (sic) reasonably, it would have learned about the transfers at issue when they were announced in SEC filings, and it would have brought its claims within one year. It did not."), *aff'd in relevant part,* 2021 WL 6109820 (N.J. App. Div. Dec. 27, 2021) Propps Decl. Ex. 301.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that dismissal of claims brought by OCC does not establish the existence or absence of a triable issue of fact in this litigation.  The Trust objects that the opinion cited speaks for itself.  To the extent this paragraph sets forth a legal contention, no additional response is warranted.

### 7.    The Maxus Board, Including the Disinterested Directors, Approved the 1997 Global Restructuring Transactions

349.    The Maxus Board held a meeting on December 19, 1997, at which the sale of the Indonesian and Ecuadorian assets to YPFI and certain unrelated matters would be debated and voted on. Propps Decl. Ex. 302. In addition to the Board, the meeting was attended by certain members of management, Fernando Nardini and Francis Fernie of YPF, and representatives of Gaffney, Cline & Associates Inc. *Id.* Disinterested Directors George Jackson and R.A. Walker attended the Board meeting. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects on the ground the cited document speaks for itself.

350.    Mr. Rosso, Maxus's CEO, stated that the proposed combined consideration for the Indonesian and Ecuadorian assets was $689,278,768. *Id.*, at -14. This consisted of $241,336,869 for the stock of Maxus Southeast Sumatra Inc., $263,975,810 for the stock of YPF Java Baratlaut B.V., ("YPF Java") and $183,966,089 for the stock of YPF Ecuador, Inc. ("YPF Ecuador") *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects on the ground the cited document

speaks for itself.

351.    Mr. Rosso stated that management believed this price to be fair. *Id.* The purchase price for the Indonesian subsidiaries had "been determined by comparison to the equivalent value being offered in a contemporaneous third party transaction," the sale of stock in Repsol entities that held interests in the same properties in which Maxus's Indonesian subsidiaries owned interests. *Id.* at 14-15. Notably, Mr. Rosso informed the Board that the price to be paid to Maxus for the Indonesian subsidiaries would increase if the Repsol sale were to indicate a fair market value greater than $505,312,679. *Id.* In the event of an implied fair market value in excess of $1 billion, YPFI would have the right to cancel the sale. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.    The Trust objects on the ground the cited document speaks for itself.

352.    Mr. Rosso informed the board that the proposed sale price for YPF Ecuador Inc. was "the appraised fair market value as determined by an independent expert, Gaffney, Cline & Associates Inc., an engineering and management advisory firm having expertise in the petroleum industry." *Id.* Further, all prices were based on November 30, 1997, balance sheets and would be adjusted after year-end. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects on the ground the cited document speaks for itself.

353.    Mr. Rosso emphasized the need to obtain fair value and for Maxus to continue to meet certain debt covenants, including maintaining a net tangible assets-to-liabilities ratio of over 1:1. *Id.* at -16. Maxus's Controller, Linda Engelbrecht, advised that after the sale, that ratio would

remain greater than 1:1. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself.

354.    The Board discussed the sales, and asked William Cline of Gaffney, Cline, about the basis of the appraisal of YPF Ecuador; "Mr. Cline responded that the determination of the fair value of such subsidiary is based on the appraised value of the underlying assets owned by the subsidiary and represents Gaffney Cline's best judgment of the sales price that a willing buyer would pay and that a willing seller would accept in a purchase and sale transaction arrived at pursuant to an arms-length negotiation." *Id.* at -17.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself. The Trust does not dispute that William Cline made the statement above, but submits that the question of whether the Ecuador Assets were exchanged for fair market value is a genuine issue of material fact to be resolved at trial.

355.    After the Board's discussions concluded, the Board (including the Disinterested Directors) unanimously approved the sales. *Id.* at -17-22.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust notes for completeness that there is no evidence the Board was advised of the full nature and scope of the environmental liabilities.

8.    **The Sale of the Indonesian Assets**

356.    On December 3, 1997, Gaffney Cline provided opinion letters stating that "the represented net property interests of [YPF Java encompassed] a financial value of US$286,000,000

(two hundred eighty six million United States dollars) at 1st December 1997," and "the represented net property interests of [Maxus Sumatra LLC ("Maxus Sumatra") encompassed] a financial value of US$278,000,000 (two hundred seventy eight million United States dollars) at 1st December 1997." Propps Decl. Ex. 303 at MAXUS3050255-56; Propps Decl. Ex. 304 at MAXUS3058105.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

357.    On December 31, 1997, Maxus Indonesia sold all the issued and outstanding capital stock of YPF Java, all its interest in Maxus Sumatra, and a right to repayment under a $41 million June 1, 1992 Promissory Note (the "Indonesian Promissory Note") between Maxus Java and Maxus Indonesia (as successor in interest of MIEC) to YPFI for $505.3 million. Propps Decl. Ex. 305. Maxus recorded total consideration of $511.7 million, which retired intercompany debt. Propps Decl. Ex. 306; Propps Decl. Ex. 502 at MAXUS0091796.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

358.    The potentially comparable sale of the Repsol Indonesian entities did not close. Propps Decl. Ex. 308 at -35.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

359.    However, on June 22, 1998, another participant in the Sumatra-PSC, Novus Petroleum Ltd. ("Novus") sold its 3.72% interest for $20 million. *See* Propps Decl. Ex. 309. This transaction was then used, in accordance with the purchase agreement, as a basis to increase the consideration for the sale of Maxus Sumatra LLC from $241.3 million to $292.5 million. Propps Decl. Ex. 308; Propps Decl. Ex. 310, and for the sale of YPF Java and the promissory note from

$264.0 to $282.8 million, Propps Decl. Ex. 305 at YPF0055849-850, for a total price for the Indonesian Assets of $575.3 million.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green. The Trust disputes the accuracy of the statement highlighted in red, on the grounds that the post-closing adjustment of the YPF Java purchase price was based on a valuation prepared by Gaffney Cline, not on the Novus sale. *See* YPF0055719 at 37, Maxus Board Meeting Minutes, August 4, 1998. The Trust objects on the ground the cited documents speak for themselves.

9. **The Sale of the Ecuadorian Assets**

360. On December 3, 1997, Gaffney Cline provided an opinion of the valuation of YPF Ecuador (previously Maxus Ecuador, Inc. (Propps Decl. Ex. 311), valuing YPF Ecuador at $165 million. Propps Decl. Ex. 312 at 12. Later in the month, on December 22, 1997, CSFB provided a valuation of about $205 million to $245 million. Propps Decl. Ex. 313.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust does not dispute the opinion letters are correctly quoted above, but objects to the extent the statements are being offered as expert evidence. The Trust objects on the ground the cited document speaks for itself.

361. On December 31, 1997, MIEC sold its shares of YPF Ecuador to YPFI for $185,246,734.85, as adjusted after year-end. Propps Decl. Ex. 314.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself.

10. **The 1997 Transactions in Connection with the Global Restructuring Were Extensively Disclosed**

362. Extensive SEC filings also evidence that Maxus and YPF contemporaneously and

robustly disclosed the transfer of the Indonesian and Ecuadorian assets, and the details were widely available to the public. *See, e.g.,* Propps Decl. Ex. 117 at 75; Propps Decl. Ex. 226 at 80. The disclosures provided detail on every aspect of the transfers, including details about each of the international assets being transferred and the amount of consideration paid for each. *See id.*

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes the characterization of the SEC filings as "extensive" and "robust."  Maxus and YPF Defendants may have disclosed in SEC filings the transfer of the assets.  However, the disclosures did not adequately disclose the impact of these transfers on Maxus' liquidity and its ability to pay its creditors potential environmental liability claims and other claims as they come due.  Accordingly, the Trust disputes that the disclosures were adequate to inform potential creditors and the public of necessary information.  The Trust objects on the ground the cited documents speak for themselves.

363.    These disclosures also had detailed financial information concerning the relative contribution each of the international assets (and Maxus' remaining domestic assets) were generating for the company. *See* Propps Decl. Ex. 16 at 4.; Propps Decl. Ex. 16 at 24-25; Propps Decl. Ex. 299 at 7-8; Propps Decl. Ex. 228 at 16-20.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

364.    Maxus further disclosed that it could not predict whether regulators would require "more vigorous enforcement policies" which could require material expenditures by the Company, and that changes in circumstances – including specifically at the Passaic River -- could result in additions to the company's environmental liability reserves in the future as well. *See* Propps Decl. Ex. 16 at 12-14; Propps Decl. Ex. 16 at 24-25; Propps Decl. Ex. 299 at 9-10; Propps Decl. Ex. 228 at 35, 42.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

365.    Moreover, detailed descriptions of remedial efforts at the major Oxy site for which Maxus was responsible under the Oxy Indemnity were all publicly disclosed. *Id.* 12-16; Propps Decl. Ex. 228 at 35-39. Maxus also disclosed the limits of when environmental expenditures are recorded. *See, e.g.,* Propps Decl. Ex. 16 at F-6; Propps Decl. Ex. 299 at 8 ("Environmental liabilities are recorded when environmental assessments and/or remediation are probably and material such that costs to the Company can be reasonably estimated," which is based on either "1) detailed feasibility studies of remediation approach and costs for individual sites or 2) the Company' estimate of costs to be incurred based on historical experience and publicly available information, based on the state of assessment and/or remediationof each site."); Propps Decl. Ex. 299 at 7-8.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

366.    The New Jersey Court previously ruled that these disclosures were robust such that Oxy knew or should have known about them when disclosed in the 1998 and 1999 SEC filings. As such, in 2015 the New Jersey Court granted the YPF and Repsol Defendants' motion to dismiss those claims as time-barred. Propps Decl. Ex. 300 at * 21 ("OCC did not act as a reasonable creditor would have. If it acted as a (sic) reasonably, it would have learned about the transfers at issue when they were announced in SEC filings, and it would have brought its claims within one year. It did not."), Propps Decl. Ex. 301.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that dismissal of claims brought by OCC does not establish the existence or absence of a triable issue of fact in this litigation.  The Trust objects that the opinion cited speaks for itself.  To the extent this paragraph sets forth a legal contention, no additional response is warranted.

11.    **The Maxus Corporate Model**

367. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute that ███████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute that

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

368. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements to the extent it characterizes or ascribes meaning to Mr. Pulliam's expert report and testimony.  Mr. Pulliam's testimony and expert reports speak for themselves.

369. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph to the extent they imply that ████████████████████████████████████████████████████████████████████████████████ The Trust objects that the documents cited speak for themselves.

370. ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ Moreover, CSFB, Maxus's valuation consultant *did* discuss its valuations of the assets with Maxus's management who were using their internal model. Propps Decl. Ex. 321 at YPF0039405-6; Propps Decl. Ex. 321 at YPF0039403 (CSFB representative describing to Maxus board whether CSFB valuation of international transfers included information from Maxus's

recent Viboral well in the Quiriquire unit); Propps Decl. Ex. 277, at CS 000007 (noting the Maxus Corporate Planning Model as a source for a CSFB assumption regarding future cash flows).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the factual statements in this paragraph are relevant to any claims or defenses as to which summary judgment is sought. The Trust objects that the cited documents speak for themselves.

## 12.   IRS Scrutiny of the Asset Sales

371. ████████████████████████████████████████████████████

████████████████████████████

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects on the grounds that the documents cited speak for themselves.

372.    There is no evidence in the record that the IRS challenged the sale prices for the Bolivian, Venezuelan, or Indonesian Assets. However, the IRS did challenge Maxus's valuation of YPF Ecuador Inc. On Maxus's consolidated 1996 federal tax return, because of the involuntary termination of a risk service contract, Maxus Ecuador reported a loss in the amount of $101,470,583, which reduced the adjusted tax basis of $221,470,583, to amount shown on "a Property Valuation Report of Maxus Ecuador prepared by Gaffney, Cline and Associates" of $120,000,000. Propps Decl. Ex. 322 at -59; Propps Decl. Ex. 323 at -36.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects on the grounds that the documents cited speak for themselves.

373.    On Maxus's 1997 return, after redomiciling Maxus Ecuador to Cayman, Maxus

recognized a tax *gain* of $26,006,665. Propps Decl. Ex. 322 at -58 & -67, Propps Decl. Ex. 324 at -67 (line 9), -71 (line 24). This was based on a Gaffney Cline valuation. Propps Decl. Ex. 322 at -60.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the documents cited speak for themselves.

374.     The IRS challenged the $101 million loss for 1996, Propps Decl. Ex. 323 at -935, and recalculated the 1997 effect on income of the redomiciliation from a $26 million tax gain to a $135,854 tax loss. Propps Decl. Ex. 322 at -457. Based on the IRS calculation of the tax basis as $225,135,854 as of December 31, 1996, this resulted in a valuation of $225,000,000 to match the midpoint of the CSFB valuation. Propps Decl. Ex. 322 at -462. *See also generally* Propps Decl. Ex. 325 (combining these explanations).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the documents cited speak for themselves.

375.     In July 2003, Maxus protested the IRS's positions on this and a number of other issues. *See* Propps Decl. Ex. 326 at -62 & Propps Decl. Ex. 327. The protest argues that the $101 million loss should be allowed for 1996 and that the gain in 1997 should be reinstated – but if the $101 million loss were not fully restored, the reduction in gain for 1997 would be appropriate. Propps Decl. Ex. 327 at -67-68.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the documents cited speak for

themselves.

376.    By March 2006, Maxus and the IRS had reached a settlement. For 1996, the IRS agreed to a loss of $42,820,290. Propps Decl. Ex. 328 at -262. For 1997, the tax gain ($26,006,665) was fully eliminated. Propps Decl. Ex. 329 at -202. This resulted in a value of $182,315,564 ($225,135,854 (the tax basis previously determined by IRS) - $42,820,290). As stated above, the final sale price of YPF Ecuador Inc., as adjusted for the year-end balance sheet, was $185,246,735, almost $3 million above the value determined by the IRS.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the documents cited speak for themselves.  The Trust further objects that the allegations in this paragraph not supported by citations to record evidence do not establish the existence or absence of a triable issue of fact.

377.    In August 2006, the Congressional Joint Committee on Taxation approved the settlement of Maxus's audits for 1994-1997. Propps Decl. Ex. 330.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the document and testimony cited speak for themselves.  The Trust further objects on the ground that the cited testimony constitutes hearsay to the extent offered for the truth of the matter asserted.

13.        **No negative effects on creditors of Global Restructuring**

378.      There is no evidence in the record of *any* creditor ever raising a concern with Maxus or YPF about the Global Restructuring, whether Oxy, an environmental regulator, or any other person or entity.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Among other things, the Trust submits that the cross-claims brought by OCC in the New Jersey Litigation constitute "concerns about the Global Restructuring."

379.      In fact, from the environmental restructuring until after the bankruptcy filing, environmental regulators consistently corresponded with the entity known in the 1990s as CLH in connection with the remediation of the Lister Site, the Passaic River, and other sites. Propps Decl. Ex. 332 at -3389; Propps Decl. Ex. 46 at -194; Propps Decl. Ex. 45; Propps Decl. Ex. 52.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the document and testimony cited speak for themselves.  .

380.      As shown above, nothing in any of the planning documents, memoranda, minutes, or transcripts suggests that these transfers were being done to hinder, delay or defraud creditors.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  As explained above, the Trust has cited numerous pieces of evidence in the record demonstrating that a primary reason for the transfers at issue was to protect assets and segregate them away from Maxus in an attempt to prevent environmental liability creditors from reaching said assets.

381.      ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought..  The Trust does not dispute that Prof. Williams will provide the testimony indicated; however, ████████████████████████████
███████████████████████████████████████████
█████████████████████████

382. █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████ |

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the purported factual allegations in this paragraph are, in actuality, descriptions of conclusions reached by YPF's expert on matters of live dispute.  The Trust further objects that the cited document speaks for itself.  Further, whether Maxus was ████████████████████ ████████████████████

## 14.    **Maxus Guarapiche and Greenstone**

383.    Maxus sold two other entities to YPFI in the 1990s, neither of which is specifically challenged by the Trust.

*Responses and Objections:* On the understanding that the sales referred to in this paragraph are the sales of Maxus Guarapiche and Greenstone (as described in paragraphs 384 and 385), the Trust does not dispute this factual allegation.

384.    On September 1, 1996, MIEC sold all of the capital stock of Maxus Guarapiche to YPFI for $26.4 million, which represented the book value of Maxus Guarapiche on its underlying financial statements as of August 31, 1996. Propps Decl. Ex. 299 at 9. As discussed above, during the June 18, 1996, Board meeting, CSFB informed the Board that the acquisition cost (approximately $27 million) was the proper valuation for Maxus Guarapiche, and Maxus Guarapiche was one of the entities the sale of which was authorized by the Maxus Board on June 18, 1996. Propps Decl. Ex. 180 at -69-72.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

385.    ████████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

386.    This transaction was considered by the Maxus Board of Directors at a meeting on December 14, 1998. Propps Decl. Ex. 335. The Maxus Board of Directors accepted the recommendation of Maxus management that the sale of Greenstone was justified from a business point of view in light of the fact that Maxus's "continued ownership of Greenstone is of questionable benefit given the Corporation's current organization and operation" and unanimously approved the sale. *Id.* at 57-58.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

387.    An additional business justification for the sale of Greenstone was that Greenstone was classified as a controlled foreign corporation for U.S. tax purposes. This classification meant that Greenstone's passive investment income, which it earned on insurance, was considered taxable income for Maxus, and the transfer to YPFI was expected to reduce the tax burden of the overall entity. Propps Decl. Ex. 336 at 69. As such, it was determined that the transfer of Greenstone to YPFI would be efficient because Greenstone was "more valuable to YPFI than to

Maxus." *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

388.    Maxus relied on an independent valuation performed by Arthur Andersen to determine the fair value of Greenstone. *Id.* The independent valuation that Arthur Andersen prepared was distributed to the Maxus Directors in advance of the December 14, 1998 meeting. Gus Krause of Arthur Andersen was available to the Maxus Board of Directors meeting at which the sale to Greenstone was considered and approved to answer any questions concerning the Arthur Andersen valuation. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust disputes the fact that Maxus "relied on" the Arthur Andersen evaluation. The Trust does not dispute that Maxus was provided with the evaluation, but disputes that the evaluation was "relied on" to the extent it is unsupported by the evidence.

**15.    YPFI—Post Global Restructuring**

389.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the allegation in this paragraph ████████████████████

████████████████████████████████████████

390.    The figure below sets forth a simplified organizational chart for YPF and Maxus after the Global Restructuring, which demonstrates, that consistent with the objectives of the tax restructuring, only Maxus's international assets were moved to YPFI, while all of its substantial domestic assets remained with Maxus (Propps Decl. Ex. 338; Propps Decl. Ex. 337 at -674):

*Responses and Objections:* Subject to its General Objections, the Trust disputes the implication created by this paragraph that Maxus's domestic assets were "substantial" as compared to the international assets sold to YPFI.   As explained above, the Trust has also provided evidence to demonstrate that one of the objectives of the tax restructuring was to avoid exposing Maxus's most valuable assets to its lingering environmental liability.

**Figure 2.    Post Reorganization U.S. Tax Structure**



391.      Prior to its acquisition by YPF, Maxus was highly leveraged and not able to access

the capital markets.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.



392.



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

393.    The Global Restructuring enabled Maxus to reduce its debt load by approximately $1 billion in debt and preferred stock, reducing future projected interest and preferred stock dividends. *See* Propps Decl. Ex. 100 at F-50; Propps Decl. Ex. 285 at 5, 13-15 and 25; Propps Decl. Ex. 16 at F-49; Propps Decl. Ex. 340; Propps Decl. Ex. 341; Propps Decl. Ex. 342 at AA-YPF-0011760, AA-YPF-0011769 & AA-YPF-0011770; Propps Decl. Ex. 343; Propps Decl. Ex. 344; Propps Decl. Ex. 345 at AA-YPF-0011828, AA-YPF-0011837, AA-YPF-0011838; Propps Decl. Ex. 346; Propps Decl. Ex. 307, at MAXUS0091799 & MAXUS0091807, MAXUS0091808; Propps Decl. Ex. 347; Propps Decl. Ex. 348; Propps Decl. Ex. 349 at AA- YPF-0033426, AA-YPF-0033435 and AA-YPF-0033436; Propps Decl. Ex. 350 at tabs $430.2mm Note, $232.5mm Note, $200mm Note; Propps Decl. Ex. 351.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

394. █████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.


16.    **The Maxus Management Group**

395. █████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.


396.    According to Maxus Audit Committee Minutes, the Maxus Management Group was defined as "...the Corporation [Maxus] and certain affiliated companies whose operations are managed by the Corporation under a Services Agreement..."; Minutes of the Meeting of the Audit Review Committee of the Board of Directors of Maxus Energy Corporation held on August 18, 1996. Propps Decl. Ex. 358.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph.  The Trust disputes that the minutes cited in Propps Decl. Ex. 358 are dated August 18, 1996 to the extent the evidence shows they are dated August 18, 1997.

397. ███████████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

398. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the assertion in this paragraph that ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

399. ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

400.    YPFI also had its own, separate board of directors and officers. *See* Propps Decl. Ex. 363; Propps Decl. Ex. 364. At all times after each of the international asset sales were completed, YPFI had legal control over those assets. *See* Propps Decl. Ex. 365; Propps Decl. Ex. 366; Propps Decl. Ex. 305; Propps Decl. Ex. 367; Propps Decl. Ex. 368; Propps Decl. Ex. 369; Propps Decl. Ex. 370; Propps Decl. Ex. 371; Propps Decl. Ex. 372.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

401.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether YPFI ████████████████████████████████████████████
████████████████████████████████████████

402. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts in this paragraph.

VII.    **AFTER THE GLOBAL RESTRUCTURING MAXUS HAD $1 BILLION IN DOMESTIC ASSETS WITH ESTIMATED FUTURE REVENUES OF $200 MILLION ANNUALLY**

403.    In the period leading up to the acquisition by Repsol, Maxus continued as an oil and gas exploration and production company. Propps Decl. Ex. 16 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

404. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green.  The Trust disputes the accuracy of the phrase ███████████████████████████████████████████ ████████████████████████████████████  The Trust objects that the cited documents speak for themselves.

**Crescendo**

405.    Specifically, Maxus focused its domestic exploration and production efforts in the mid-continent region through its wholly-owned subsidiary, Midgard. *See* Propps Decl. Ex. 380 at AA_MAXUS001417172. At the time of the YPF acquisition, Maxus saw improving results from Midgard. *See* Propps Decl. Ex. 16 at 5 ("In 1996, Midgard continued an aggressive drilling program on its Midcontinent properties, drilling and completing 109 wells compared to 81 wells in 1995. Production for 1996 rose 12% over 1995 rates to an average of 145 mmcfpd and year-end reserves increased 22% from December 31, 1995 to 724 bcf equivalent. Midgard replaced 330%

of production during the year at a cost of $0.34 per thousand cubic feet ("mcf" equivalent and, as compared to 1995, reduced unit production costs by 12% and unit gathering costs by 6%").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

406.    The Midgard Assets were located in the Midcontinent region of the United States, specifically in the Texas Panhandle and western Oklahoma. *Id.* at 3. Midgard was the second largest producer in the area. Propps Decl. Ex. 381 at -653.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

407.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

408.    Midgard also owned 2,400 miles of natural gas gathering systems and two processing plants with a total capacity of 250 million cubic feet per day. Propps Decl. Ex. 381 at 651; Propps Decl. Ex. 497.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

409.    In 1995, YPF's financial consultant, Salomon Brothers, valued Midgard between $643 million and $705 million. Propps Decl. Ex. 385 at YPF0001000. CSFB, Maxus's consultant at that time, had estimated Midgard's value if sold to be $675 million. Propps Decl. Ex. 497 at CS000425; Propps Decl. Ex. 387 at CS 001446 ; ███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

410.    ████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

411.    While YPF supported Maxus in this because it had hopes of turning Maxus around and wanted to support Maxus's financial growth, Maxus was making its own decisions with respect to strategy for Midgard. *Id.*; Propps Decl. Ex. 392; Propps Decl. Ex. 393 at MAXUS3223014; Propps Decl. Ex. 16 at 5; Propps Decl. Ex. 394 at MAXUS321786.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited support the assertion that YPF supported Maxus's development of its Midgard assets "because it had hopes of turning Maxus around," or that "Maxus was making its own decisions with respect to strategy for Midgard." The Trust has cited to demonstrable evidence showing that the YPF group prevented Maxus from making its own decisions with respect to strategy for its assets, including Midgard. *See* Trust MOL at 17-18.

412.    For example, in November 1995, Maxus's President and CEO, Roberto Monti, presented a plan to the Maxus Board of Directors to form a JV with Amoco involving the Midgard assets (the "Crescendo JV"). Propps Decl. Ex. 390 at YPF0000176-7; Propps Decl. Ex. 391 at YPF0012198). He explained that Maxus wanted to retain significant interests in the strategic U.S. gas market and that increased gas volumes through the Crescendo JV would allow for enhanced marketing capabilities as well as reduced operating costs of $10 million annually. *Id.* Around April 1996, Mr. Monti presented that Maxus had been in discussions with Amoco and exchanging technical data. *See* Propps Decl. Ex. 180 at -84.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust notes that Mr. Monti actually presented about Maxus's discussions with Amoco in June 1996, although the negotiations had begun in April.  *See* Propps Decl. Ex. 180 at -84.

413.    Maxus began negotiating with Amoco regarding the formation of the Crescendo JV in April 1996. Propps Decl. Ex. 395 at YPF 0039420.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

414.    In June 1996, Mr. Monti updated the Maxus Board on the progress towards developing the Crescendo JV. *Id.* ▮

▮

▮

▮

▮ Maxus also retained exploratory interests in the Gulf of Mexico, including working interests ranging from

16.67 percent to 100 percent in 23 blocks, and overriding royalty interests in two other blocks. Propps Decl. Ex. 227 at 27.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the mischaracterization of Mr. Menenberg's exert report. Crescendo was an asset owned by Maxus's subsidiary, Midgard. ███████████████████████████████ ████████████████████████████████████████ Importantly, Crescendo was not developed and instead was siphoned by Repsol. Trust Mot. at 17-18..

415.    In October 1996, Maxus and Amoco directly negotiated the value of the assets each would contribute to the Crescendo JV. Propps Decl. Ex. 396. Maxus and Amoco signed a Letter of Intent regarding this JV in January 1997. Propps Decl. Ex. 393.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust disputes the mischaracterization of the text highlighted in red because Maxus was an alter ego of the YPF Defendants and was dominated by the YPF. *See* Omnibus Reply Section II.E.

416.    There is nothing in the record to suggest that YPF opposed, or tried to prevent Midgard from entering into, the JV.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, the Trust states that it is not aware of record evidence demonstrating that YPF opposed, or tried to prevent, Midgard from entering the Crescendo JV, but submits that the absence of such record evidence does not establish the existence or absence of a triable issue of fact regarding any claim or defense as to which summary judgment is sought.

417.    The Maxus Board meeting on June 20, 1997 indicates that the formation and

178

participation of the Crescendo JV was a product of Maxus/Midgard board decision-making rather than YPF. *See* Propps Decl. Ex. 397 at 46. Specifically, William M. Wicker and Karim Rashid of CFSB attended the June 20, 1997 meeting and made a presentation about the proposed JV. *Id.* at 46. The minutes indicated that the due diligence was done by CSFB at Maxus's direction. *Id.* at 47-48. The Maxus board was involved in planning the details of the transaction, such as the technical issues of partnership accounting for the financial results of the JV. *Id.* at 48.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes that the participation in Crescendo JV was not a product of YPF decision-making. Among other things, the board minutes on which YPF relies for this assertion reflect that YPF-affiliated directors (Messrs. Rosso, Bridger, Lesch, Monti and Peacock – see Menenberg Report at ¶ 256) were present at the meeting at which entry into the JV was deliberated, and one such director, Mr. Rosso, was one of two directors appointed to an Ad Hoc Committee to consider the Crescendo prospect. *See* Propps Decl. 397.

418.    In August 1997, Maxus and Amoco formed the Crescendo JV. Propps Decl. Ex. 392; Propps Decl. Ex. 399 ¶ 98. Maxus contributed $700 million in exploration and production and midstream assets including its Midgard operations to the Crescendo JV on August 20, 1997. *Id.*; Propps Decl. Ex. 392 at -611; Propps Decl. Ex. 393 at MAXUS3223014. Amoco contributed E&P interests in the partnership area and agreed to install a gas processing plant. Propps Decl. Ex. 393 at MAXUS3223014; Propps Decl. Ex. 398 at YPF3645 ).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

419.    Based on its contributed assets, Maxus received a 59% interest in Crescendo.

Propps Decl. Ex. 339 ¶ 21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

420.    YPF supported Maxus's efforts with regards to the Crescendo JV in the hopes of helping Maxus develop further profits. *See* Propps Decl. Ex. 400 at YPF-E-0000144549. "Before the Repsol acquisition of YPF, BP Amoco[3] and YPF were strongly aligned to create a business yielding a 16% ROCE [Return on Capital Employed] on the core of the Crescendo assets." *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

421.    ████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

422.    ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

---

[3] In 1998, Amoco and BP merged combining their operations into a single operation.

423.    [RESERVED]

424.    In its 1999 business plan (dated June 1998), Maxus projected annual net cash flows from Midgard to average approximately $80 million per year between 2000 and 2002 even with the low natural gas prices at that time. Propps Decl. Ex. 405 (average of cells F113:H113).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph.  The Trust disputes natural gas prices were low at the time as being unsupported by the evidence.

425.    Moreover, Crescendo's production was expected to remain at or above 1998 levels for the next decade, even with no significant new investment. Propps Decl. Ex. 406 at MAXUS3205818. As BP Amoco described it, "Crescendo is viewed as a low risk business, with a high degree of predictability around net income (normalized for price)." Propps Decl. Ex. 403 at MAXUS3209039.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

426.    ██████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

427. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph to the extent they ████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

428. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, subject to the qualification that ████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████

429.    By the time of the Crescendo Board meeting on April 22, 1999, the company was on track toward its goals and had made significant improvements. Propps Decl. Ex. 410. The first quarter of 1999 had gone well. Maxus (with YPF's support) and BP Amoco made plans to work together on building their 3 and 10 year plans.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

430.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

431.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

***Gulf of Mexico***

432.    At the same time, Maxus also held assets in the Gulf of Mexico and other assets that Maxus was developing (having sold its original Gulf of Mexico assets in 1994 for $325 million

as part of Maxus's pre-YPF acquisition attempts to address its diminishing financial condition, *supra* ¶ 116). Propps Decl. Ex. 380 at 30. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

*Responses and Objections:* The Trust cannot ████████████████████████████████
████████████████████████ Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

433.    As of June 1999 (the quarter-end immediately following Repsol's acquisition of a controlling interest in YPF), Maxus's assets were valued at a book value of $942.6 million, and consisted of Maxus's indirect interests in Crescendo and certain Gulf of Mexico fields. *See* Propps Decl. Ex. 413 at TAB BS-YPFFORMAT. Those assets were never the subject of being transferred to any YPF entity or sold as part of YPF's restructurings – instead, Maxus was actively involved in monetizing and developing these assets. *See* Propps Decl. Ex. 414; *see also* Propps Decl. Ex. 402 at YPF0126684, at -86-88.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes that Maxus "valued" the assets at a book value, but concurs that the recorded book value of the assets were $942.6 million.  The Trust also disputes the accuracy of the assertion that "Maxus was actively involved in monetizing and developing the[] assets" in question.  The documents cited do not support this assertion:  Propps Decl. Ex. 414 is the Master Agreement governing the joint venture, which at most establishes that Maxus was formally involved, while Propps Decl. Ex. 402, a management summary and five-year plan regarding certain Gulf of Mexico Assets indicates that well blocks apparently belonging to Maxus would provide an "opportunity to position YPF as an offshore Producer with significant reserves at acceptable F&D costs."

## VIII.  THE REPSOL ACQUISITION MAKES CLEAR THAT THERE WAS NO DECADES LONG CONSPIRACY

434.    In 1999, prior to the Repsol acquisition, YPF and Maxus were actively working to

turn around Maxus's finances and they were seeing results. *See* Propps Decl. Ex. 415 at -793.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

435. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

436. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Indeed, press outlets were reporting that Repsol was "circumventing YPF's board and its chairman, Robert Monti… who… made no secret of his desire to seek a dialogue of equals with Repsol, if not to remain independent." Propps Decl. Ex. 416 at 2. There was also "strong opposition in the management of YPF to Repsol taking charge." Propps Decl. Ex. 7 at 2. After its acquisition of YPF, the Spanish parent entity changed its name from "Repsol" to "Repsol YPF". Propps Decl. Ex. 183 at v; Propps Decl. Ex. 184 at v.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## IX.    MAXUS FOLLOWING THE REPSOL ACQUISITION

437.    Following the Repsol acquisition, major decisions of the corporate family were directed by Repsol. Under Repsol's leadership, Maxus was free to pursue a strategy to develop assets in the Gulf of Mexico, and it decided which assets to sell and which to keep, with a few exceptions discussed below. Propps Decl. Ex. 419 at -194.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes that Maxus was free to pursue a strategy to develop assets in the Gulf of Mexico as it was dominated by Repsol. *See* Trust SOF ¶¶ 96-104. Repsol and Maxus were alter egos with at many times, shared employees and management. Trust SOF ¶¶ 97-98. Further, the document cited in support (minutes of the Board of Directors of YPFH on May 3, 2006, presided over by YPFH director and then-CFO of YPF, Carlos Olivieri), merely reflects that director M.G. Smith provided an update on Stormy Monday, North Bronto and Neptune. This document does not establish the existence or absence of a triable issue of fact regarding Maxus's "freedom" to pursue a development strategy.

438.    Maxus never tried to evade any of its contractually assumed environmental

obligations during Repsol's ownership of YPF either. *See* Propps Decl. Ex. 13 at 3-9; Propps Decl. Ex. 420. It entered into consent arrangements with EPA and NJDEP, and it continued to engage in massive cleanup efforts of the Passaic River and other sites.  Propps Decl. Ex. 13 at 3-9.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Maxus litigated its indemnification obligations with OCC for years, including in the New Jersey Litigation.

**Crescendo JV Ends**

439. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████ Maxus ultimately sold its share in Crescendo to Apache Resources and BP Amoco for $625 million. ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

*Responses and Objections:* ████████████████████████████████ Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

440.    Thus, in 1999-2000, the Crescendo partnership terminated. Propps Decl. Ex. 421 at -318. Neither partner could liquidate the partnership before 2002, absent a change in control.



Propps Decl. Ex. 392 at AA-YPF-0029601-02. But in 1999, both parties had changes in control (Amoco having been acquired by BP, and Maxus by Repsol). Propps Decl. Ex. 422 at 11; Propps Decl. Ex. 5 at REP14154 .

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

441.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.

442.

██████████████████████████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

443. ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited support the assertion highlighted in red.  Among other things, ████ ████████████████████████████████████████████████████ ████████████████████████████████████

444.     Including Neptune and its other Gulf of Mexico prospects, Maxus was estimated to have $429 million in assets in 2006. *See* Propps Decl. Ex. 430 at MAXUS5829746 - MAXUS5829766.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the accuracy of this assertion of fact.  Among other things, the document cited for support establishes that Maxus's GOM assets could be valued from $309 to $429 million (depending on discount rate), and concludes by stating the actual valuation range from $300 to $365 million.

*YPFI Transfers*

445.     From 2000-01, Repsol engaged in a tax restructuring of its international assets. *See* Propps Decl. Ex. 431; Propps Decl. Ex. 202; *see also* Propps Decl. Ex. 432; Propps Decl. Ex. 433;

Propps Decl. Ex. 434; Propps Decl. Ex. 435; Propps Decl. Ex. 436; Propps Decl. Ex. 437 at YPF-E-0000238023; Propps Decl. Ex. 438.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph as irrelevant. Repsol restructuring of its international assets was not relevant to why they made transfers with YPFI assets. The Trust also notes that Repsol's restructuring of its international assets were not primarily for tax reasons, but to siphon Maxus's valuable assets and protect their investment in acquiring the company.

446.     Repsol caused YPFI to transfer the former Maxus international assets (Bolivia, Ecuador, Indonesia and Venezuela, discussed *supra* 327-32) to Repsol entities, and/or sell them to third parties, with the Indonesian assets sold to the China Offshore Cooperation Southeast Asia Limited ("CNOOC"). *See* Propps Decl. Ex. 376 at 462-63; Propps Decl. Ex. 369; Propps Decl. Ex. 439; Propps Decl. Ex. 440; Propps Decl. Ex. 441; Propps Decl. Ex. 442 at 50-53

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 446.

447.    The YPFI assets were no longer Maxus assets, as they had been sold to YPFI for more than $1 billon several years earlier. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Specifically, the factual record supporting the Trust's summary judgment submissions create a triable issue of fact regarding whether YPFI and Maxus were alter egos and the assets of one are the assets of the other.

448.    Certain of these assets (in particular the Bolivian assets) sold included a combination of both former Maxus assets as well as legacy or later-acquired *YPF* assets. Propps Decl. Ex. 374 at- 629 and -637; Propps Decl. Ex. 443 at 863; Propps Decl. Ex. 375 at -681; Propps

Decl. Ex. 376 at 463; Propps Decl. Ex. 377; Propps Decl. Ex. 378 at 166; Propps Decl. Ex. 379.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

449.    Repsol asserts that it transferred the assets in order to pay down debt in connection with its acquisition of YPF, to rationalize taxes, and to divest non-core assets (like Indonesia) outside Spain or Latin America. Propps Decl. Ex. 376 at -462-63, at 462-63; Propps Decl. Ex. 439; Propps Decl. Ex. 441; Propps Decl. Ex. 442 at 50-53; Propps Decl. Ex. 5 at REP 14207 (describing the asset divestment plan that permitted Repsol YPF to progressively reduce its debt levels following the acquisition of YPF in 1999); Propps Decl. Ex. 444 (discussing asset disposals including its interest in Crescendo Resources will help Repsol YPF exceed its target debt reduction amount).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, with the qualification that the Trust does dispute that the documents cited establish that Repsol's divestment initiative was motivated by tax concerns.

450. ███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes that ████ ██████████████████████████████ YPF received the proceeds of the sale (as admitted by the YPF Defendants) and was required to consent to the transaction. Trust SOF ¶¶ 86-95.

*King & Spalding Memo*

451. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes █ ████████████████████████████████ The Trust further objects on the reliance of any documents withheld for privilege or legal advice by the YPF Defendants. To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding. Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

452. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust incorporates its responses and objections from ¶ 451. The Trust further objects on the reliance of any documents withheld for privilege or legal advice by the YPF Defendants. To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding. Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld

documents.

The Trust disputes that the memorandum is ███████████████████████ ███████████ The first discussions of a potential bankruptcy occurred much earlier, including in the context of a global restructuring.

453. ████████████████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust to any reliance by YPF reliance on any documents that YPF withheld or sought to withhold for privilege or legal advice by the YPF Defendants.  To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding.  Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

454. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

455. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

456. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes ████████████████████ ████████████ the documents that would prove or refute that fact have been categorically withheld by the YPF Defendants and Repsol.  Further, the memorandum advised Repsol on filing for bankruptcy in the future and no further analysis was necessary as the time for Maxus' bankruptcy was not ripe.  To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding.  Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

457.    Maxus never tried to evade any of its environmental obligations from 1999 through the date the bankruptcy petition was filed in June 2016. It entered into consent arrangements with EPA and NJDEP, and it continued to engage in massive cleanup efforts of the Passaic River and

other sites. *See* Propps Decl. Ex. 13 at 3-9; Propps Decl. Ex. 84. During this time, among other things, Maxus and Tierra were conducting investigations of the Lower Passaic River, and agreed to a removal action in which hot spots immediately adjacent to the Lister Site were dredged. Propps Decl. Ex. 13 at 3-9. During the New Jersey Litigation, when NJDEP was settling with Maxus, Tierra, YPF, and Repsol, NJDEP recognized that Tierra was taking actions to facilitate the remediation efforts. Propps Decl. Ex. 22 at 14.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Among other instances of trying to evade its obligations, Maxus (under the direction of Repsol and YPF) litigated its indemnification obligations with OCC for years, despite having no good faith legal basis for their dispute. Further, Maxus continued to litigate in the NJ litigation from until 2016, where the core of the dispute involved its environmental obligations. For example, Maxus disputed that it was not an alter ego of Tierra (the vehicle used to maintain the environmental obligations).

458. At the end of 2005, NJDEP sued Oxy, Maxus, Tierra, and some of the YPF and Repsol Defendants. Propps Decl. Ex. 28. As of 2007, NJDEP had asserted claims against the YPF and Repsol Defendants on alter ego and fraudulent transfer theories based on many of the same transfers at issue here. *See* Propps Decl. Ex. 449 ¶¶ 33-53, 118-124. Oxy asserted cross claims for alter-ego and fraudulent transfer claims against the YPF Defendants in 2007. *See* Propps Decl. Ex. 450 at 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

*2007/08 Settlement Agreement Between YPF and Maxus*

459.

██████████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

460. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

461.     The settlement amount offered by YPF – $378.2 million – *exceeded* SRR's highest estimated value for the Contribution Agreement by over $18 million. Propps Decl. Ex. 453 at -935. After SRR's backup was prepared, the parties to the Settlement Agreement entered into a Third Amendment, which added $43 million in contributions to Maxus ultimately from YPF to fund Maxus's pension plan, bringing the total consideration to $421.2 million. *See* Propps Decl. Ex. 454 at -296-300.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

462.     Accordingly, SRR concluded that Maxus was fully compensated by the Settlement Agreement and that "the terms and conditions of the 2007/2008 Settlement Agreements were fair,

from a financial point of view, to Tierra and Maxus." Propps Decl. Ex. 452 at -330.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, but refers the court to the document which sets forth certain of SRR's assumptions with respect to their conclusions.



463.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

*Maxus's Gulf of Mexico Assets & Project Neptune*

464.

This included $125 million in credit made newly available in connection with the closing of the 2007/2008 Settlement Agreement. Propps Decl. Ex. 454 at YPF 0030246 (§ 8).

██████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust incorporates its response and objections to ¶ 463 herein.  As explained above, ████████████████████████████████
████████████████████

465.    Project Neptune relates to Maxus's 2003 acquisition of Neptune assets in the Gulf of Mexico using part of the proceeds from the Crescendo sale. *See* Propps Decl. Ex. 455 at -943-44("Subsequently, in 2003 Maxus US entered into an agreement whereby it participated in drilling the fifth (5th) well and thereby earned a fifteen percent (15%) interest in the five (5) lease blocks comprising the Neptune Unit."). This was part of a larger Gulf of Mexico portfolio, which included right to the Stormy Monday Tiger/North Bronto, Guppy Wake, Ra, Coronado, and Ouachita prospects. *See* Propps Decl. Ex. 456 at REPSOL-E-0000005637; Propps Decl. Ex. 460 at -436; Propps Decl. Ex. 262 at 81:20-84:12; Propps Decl. Ex. 229 at -507.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

466.    In 2006, outside consultants at Scotia Waterous determined that Maxus should focus on Neptune rather than other more speculative prospects in Maxus's portfolio; Maxus's decision to do so was made based on the recommendation of these consultants, not YPF. *See* Propps Decl. Ex. 457 at REPSOL-E-0000006666.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes that the document cited establishes that Maxus's purported decision to focus on Neptune rather than more speculative assets was not influenced or directed by YPF (or Repsol).  As described above, Repsol and YPF wholly dominated Maxus during this time period. Moreover, the YPF Defendants provide no evidence, and their cited evidence does not demonstrate, that this decision was based solely on the recommendation of the consultants.

467.    Scotia Waterous estimated Maxus's Gulf of Mexico exploratory well portfolio to be worth between $309 million and $429 million as of August 8, 2006 (with most of the value assigned to Neptune and North Neptune). *See* Propps Decl. Ex. 430 at MAXUS5829758; *see also* Propps Decl. Ex. 458 at MAXUS3226979.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  *See* Response 444, *supra*.

468.

*Responses and Objections:* Subject to its General Objections, the Trust that cannot establish the existence or absence of a triable issue of fact as to any issue on which summary judgment is sought.

469.    On August 8, 2006, YPFH's board of directors authorized the sale of two exploratory wells in the Gulf of Mexico, Stormy Monday and Tiger/North Bronto, in exchange for certain ORRIs that outside financial advisor found to be at a fair market value. *See* Propps Decl. Ex. 459 at 934-35.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

199

the facts set forth in this paragraph highlighted in green, but notes that the document cited in support reflects that YPFH's board authorized the sale of interests in leases, not exploratory wells themselves.

470. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

471.     In 2007, adverse weather conditions and a succession of technical problems stalled Neptune's development. Propps Decl. Ex. 463 at -931; Propps Decl. Ex. 460 at -436; Propps Decl. Ex. 464 at -205.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

472.     Initial production finally began in mid-2008, but shortly thereafter the global financial crises led to a crash in oil prices and demand for oil. *See* Propps Decl. Ex. 465 at -723.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

473. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the assertions highlighted in red as not supported by the cited document.  See Response 443, *supra*.



*Responses and Objections:* Subject to its General Objections, the Trust disputes the chronology of the factual assertion in the above paragraph.  Specifically,

. Propps Decl. Ex. 178 at 35:6-14.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes that

## X.    THE ARGENTINE GOVERNMENT'S TEMPORARY OCCUPATION AND EXPROPRIATION PROCESS FURTHER MAKES CLEAR THAT THERE WAS NO DECADES LONG CONSPIRACY

476.    On May 3, 2012, Argentina's Congress passed the Public Interest Law, making 51% of the share capital of YPF held by Repsol "subject to expropriation" and under "temporary occupation" by the Republic. *See* Propps Decl. Ex. 236. The Republic's temporary occupation of

Repsol's 51% share capital continued through 2014, when the expropriation was completed.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

477. ███████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. It is undisputed that YPF and Repsol were in a joint defense agreement in the NJ action after the expropriation and prior to Maxus filing its bankruptcy petition.

478.    On June 4, 2012, a shareholders' meeting convened pursuant to the Public Interest Law resolved to replace virtually all of YPF's Board members. *See* Ex. Propps Decl. Ex. 158. YPF thereafter developed a brand-new business plan—which notably did not mention Maxus—focused on boosting oil and gas production in Argentina to reverse its decline and achieve "sufficient supply to meet growing demand." Propps Decl. Ex. 204.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust does not dispute that a meeting occurred. The Trust disputes the characterization of a "brand-new business plan" and submits that the document cited by YPF speaks for itself.

479. ████████████████████████████████ █

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. It is undisputed that during this time, YPF had requested memoranda from Chadbourne concerning strategies involving Maxus.

480.    Following the arrival of new management, YPF and its subsidiaries conscientiously observed corporate formalities (as they had done pre-Repsol)., Propps Decl. Ex. 442 at 72-75

████████████████████████████████████████ Propps

Decl. Ex. 468; Propps Decl. Ex. 469; Propps Decl. Ex. 470.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

481. ████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

482.    Maxus made no material transfers to the YPF Defendants during this time and EPA's remediation plans remained unresolved. Propps Decl. Ex. 442 at 72-75 ████████ ████████████████████████ Propps Decl. Ex. 13 at 3-6.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements contained in this paragraph.

## XI.    "PROJECT JAZZ" AND MAXUS'S BANKRUPTCY[4]

483.    After Argentina began the process of expropriating the controlling shares of YPF, in August 2012, the YPF Defendants retained Chadbourne & Parke LLP ("Chadbourne") as conflicts counsel in the NJ Action. Propps Decl. Ex. 501 ¶ 6.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects to the YPF Defendants requesting this Court to determine facts based upon documents that they continue to maintain are privileged.

---

[4] Many of the facts in this section are derived from documents over which the YPF Defendants have asserted privilege, which assertions were overruled by the Court in its orders dated August 16, 2021 (Adv. Proc. D.I. 482); August 19, 2021 (Adv. Proc. D.I. 490); September 16, 2021 (Adv. Proc. D.I. 518). The YPF Defendants continue to believe the Court's privilege decisions were erroneous and reserve all rights.

484.    In late September 2012, NJDEP filed its Fourth Amended Complaint, alleging actions taken by Repsol contrary to YPF's interests, Kirkland & Ellis LLP, which had been representing both YPF and Repsol in the NJ Action since 2008, determined that continuing to represent either YPF or Repsol would present ethical issues. Propps Decl. Ex. 501 ¶¶ 10-11.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

485.    Chadbourne then became lead counsel for the YPF Defendants, and Weil, Gotshal & Manges LLP became lead counsel for Repsol. *See generally* Propps Decl. Ex. 501 ¶¶ 3, 12, 15, and 17.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

486.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

487.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

488. ██████████████████████████ Propps Decl. Ex. 472 at 165:5-25 ██████

████████████████████████████████████████████████████████

Remediation costs were increasing Propps Decl. Ex. 84. ██████████████

████████████████████████ Propps Decl. Ex. 472 at 57:23-58:18, 164:17-165:165.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

489.    In May 2012, Javier Gonzalez sent an email to Eduardo Pigretti, John Enloe, Teodoro Marco, and Sebastian Sanchez stating that he was "certain the Judge will rule against us" on alter ego. Propps Decl. Ex. 473. ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to and disputes the YPF Defendants' ████████████████████████████████

████████████████████████████████████

490. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the statements of fact highlighted in green in this paragraph.  The Trust disputes the
███████████████████████████████████████████████  As described above, the key
elements of the strategy were presented much earlier including, as admitted by the YPF
Defendants, in 2005 by King & Spading.

491.    In its September 2012 memo, Chadbourne ████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████ Propps Decl. Ex. 205, App'x A at -
780-814. █████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
█████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the
statements of fact in this paragraph are.  The Trust disputes that ███████████████████
███████████████████████████████████ The Trust incorporates its responses to ¶ 490
herein.

492.    Many companies doing business in the United States, including through
subsidiaries, avail themselves (or their subsidiaries) of the United States Bankruptcy Code when
facing catastrophic litigation. Examples include Takata, faced with mounting consumer lawsuits
and recalls over faulty air bags, Propps Decl. Ex. 427, Owens Corning, besieged by asbestos
litigation, Propps Decl. Ex. 407, and Texaco, hit with a judgment it could not appeal without posting
a multi-billion dollar bond, Propps Decl. Ex. 401.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the
statements of fact in this paragraph.  Companies do not avail themselves for bankruptcy
as part of a near two-decade strategy to siphon assets and hinder creditors.

206

493.    In 2013, the *Tronox* decision was rendered. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes the characterization of the advice presented in the memorandum and refer the Court to the documents.  The Trust further objects to the statements of fact to the extent they are being submitted for the truth of the matters asserted as inadmissible hearsay and based on evidence that the YPF Defendants seek to withhold as privileged.

494.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in this paragraph.

495.    On or about July 13, 2015, Maxus amended its bylaws (the "2015 Amended Bylaws") to add two directors to its three-member Board. Propps Decl. Ex. 480 at -011, -026] At least two of the members of the Board were to be Special Independent Directors (as defined therein) (*id.* at -011), who would form a Special Independent Committee ("SIC"). (*Id.* at -014). As

laid out in the 2015 Amended Bylaws, the SIC was empowered to:

> (i)    design and implement a process and procedure for the review and assessment of (A) all material transactions entered into between the Corporation and any affiliate involving aggregate consideration of $10 million or more in any instance that occurred after April 8, 1995, and prior to the date of creation of the Special Independent Committee, (B) the historic course of dealing and interrelationships between the Corporation and its affiliates over the same time period, and (C) potential claims and defenses arising in relation to these transactions and interrelationships (collectively, the "Special Independent Committee Investigative Responsibilities");

> (ii)    negotiate a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities, which settlement, discharge or agreement shall be subject to the prior approval of the Board;

> (iii)    engage, at the expense of the Corporation, such financial and other experts and consultants, including legal counsel, in respect of the Special Independent Committee Investigative Responsibilities as the Special Independent Committee in it sole discretion believes to be necessary or advisable for the Special Independent Committee to properly assess any of such transactions and interrelationships; and

> (iv)    communicate and make proposals and recommendations to the Board regarding (A) the potential prosecution of claims identified in connection with execution of the Special [sic] Committee Investigative Responsibilities, and (B) a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities.

(*Id.* at -015, Section 2(a)). The SIC could not delegate any of these powers to any other person. (*Id.*, Section 2(b)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

496.    Bradley I. Dietz and Theodore P. Nikolis were selected as the Special Independent Directors. Main Proc. D.I. 3 ¶¶ 2, 7; Propps Decl. Ex. 386. In November 2015, the SIC engaged former Bankruptcy Judge Peck of Morrison & Foerster LLP ("MoFo") as its legal advisor; in April 2016, the SIC engaged Scott Winn of Zolfo Cooper, LLC ("Zolfo"), as its financial advisor. Main

Proc. D.I. 3 ¶¶ 10, 11. ███████████████████████████████████

█████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust notes that at this point, ██████████
████████████████████████████████████████████

497.    After being hired, the Special Independent Directors, MoFo, and Zolfo spent eight

months and at least $1.7 million assisting in its investigation. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. ████████████████████

498. █████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ There

were limited (i.e., 1-2) occasions when MoFo/Zolfo spoke with the full Maxus board to explain in general terms the work being performed for the independent directors; however, the professionals' communications to Maxus were done through the independent board members. Neither firm dealt directly with the Maxus management team while conducting the investigation for the Special Committee.").

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.   The Trust incorporates its responses to ¶ 497 herein. The Trust disputes that

499.    At the conclusion of the investigation, MoFo issued a 196-page report, concluding that Maxus had potentially viable, albeit uncertain, claims against the YPF Defendants. Compl. ¶ 204; Ex. 488 at 8; Main Proc. D.I. 3 ¶ 13. With MoFo's report in hand, the SIC engaged in negotiations with YPF regarding a potential settlement.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 499.

500.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 500.

501.    The settlement included two primary components: YPF would pay $130 million in cash after approval of the settlement, and YPFH would provide a DIP Facility to the Debtors. Main Proc. D.I. 3 ¶ 15; Main Proc. D.I. 3, Ex. A §§ 2.1, 2.2. The DIP Facility proposed at the time of filing included a Tranche A Facility, a senior secured, superpriority $31.9 million facility Main Proc. D.I. 10 ¶ 3(a), and a Tranche B Facility, a subordinated unsecured $31.2 million facility. Main Proc. D.I. 10 ¶ 3(b). As ultimately approved by the Court, the Tranche A Facility was reduced to $28.75 million(Main Proc. D.I. 268-1 at 14 (Definition of "Tranche A Commitment")), and the Tranche B Facility was increased to $34.35 million. Main Proc. D.I. 268-1 at 14 (Definition of "Tranche B Commitment"). The Tranche B Facility was "subordinate to all general unsecured claims" and would "most likely never be repaid." Main Proc. D.I. 300-3] ¶ 20.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. the Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

502. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ Later that day,

Maxus and the other Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in this Court. Main Proc. D.I. 3 at ¶ 4. In support of their petitions and other first-day filings, the Debtors filed a declaration from Mr. Dietz, in which he described the process leading up to the bankruptcy filing and the Settlement Agreement. Main Proc. D.I. 3. The Settlement Agreement was attached to Mr. Dietz's declaration. Main Proc. D.I. 3, Ex. A.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. the Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

503. On August 29, 2016, the Debtors filed a motion for approval of the Settlement Agreement. Main Proc. D.I. 300. In connection with the prosecution of the settlement motion, Zolfo's Scott Winn submitted an excerpt report regarding potential liability on the part of the YPF Defendants. Propps Decl. Ex. 488. In that report, he concluded that "the potential, estimated, reasonable range of damages recoverable on account of the Debtors' alter ego claims against YPF is between zero and $253.0 million when assuming, as directed by Counsel, that there is between a 10% and 49% chance that the Debtors would prevail on such claims." *Id.* at 9 (emphasis added). He also concluded that "the potential, estimated, reasonable range of damages related to the

Debtors' fraudulent conveyance claims against YPF are between zero and $57.7 million with a Midpoint of $21.7 million, when assuming, as directed by Counsel, that there is a 5% to 10% chance that the Debtors will prevail on such claims." *Id.* at 19. Overall, Mr. Winn's assessment was that "the potential, estimated, reasonable range of damages recoverable on account of the Debtors' alter ego and fraudulent conveyance claims against YPF is between zero and $274.6 million." *Id.* at 8. He noted that "[e]ven if a judgment was awarded against YPF, based upon assumptions provided to me by Counsel, potential collection risk may exist as YPF's operations and assets are primarily located outside the United States." *Id.* He also noted that Judge Peck and/or his colleagues had asked Mr. Winn "to assume that, under an alter ego theory of liability, an unlimited recovery against YPF would be extremely unlikely." *Id.* at 7 (emphasis added). The bankruptcy filing triggered the automatic stay in section 362(a) of the Bankruptcy Code, which stayed Oxy's claims against Maxus and Oxy's alter ego cross-claim against YPF and Repsol pending in the NJ Action. Main Proc. D.I. 1258-1 at 37.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding. Details of an expert report filed in connection with the bankruptcy proceeding is inadmissible hearsay is not material to any claims or defenses presented in this case.

504.    On June 16, 2016, the Debtors filed a motion seeking approval of the DIP facility referred to in the Settlement Agreement. Main Proc. D.I. 10. The proposed Tranche A Facility would "be used for the Debtors' general bankruptcy and restructuring expenses," while the proposed Tranche B Facility would "be used to fund the Debtors' corporate overhead expenses, such as salaries and administrative fees, the E&P operations and related overhead, and the operations of [Tierra], including all current and active remediation projections [sic] being undertaken by Tierra." Main Proc. D.I. 10, ¶¶ 4-5. On August 19, 2016, the Court approved the

DIP Facility, which had been modified from the original proposal, including as to the amounts of the two sub-facilities described above. Main Proc. D.I. 268. The DIP Credit Agreement, as approved, provided it would be an event of default if a Debtor were to "file any Chapter 11 plan of reorganization or liquidation that is not approved by the Lender unless such Chapter 11 plan of reorganization or liquidation provides for (A) the repayment in full in cash of the Tranche A Obligations and termination in full of all Revolving Credit Commitments, (B) subject to Section 2.06, the payment of Tranche B Obligations in accordance with Section 8.03 hereof and (C) the implementation of the Settlement Agreement and the transactions contemplated therein." Main Proc. D.I. 268-2, § 8.01(t). The occurrence of a default would permit the lender (YPFH) to terminate its commitments under the DIP Facility, declare all amounts immediately due and payable (except that the outstanding obligations under the Tranche B Facility would not be payable until, among other things, all general unsecured claims were paid in full), and exercise its remedies. Main Proc. D.I. 268-2, § 8.02.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

505.    On November 8, 2016, each of the Debtors amended their bylaws (as amended, the "2016 Amended Bylaws") to concentrate authority over the bankruptcy cases in the SIC. The Debtors filed the 2016 Amended Bylaws with this Court on November 9, 2016. Main Proc. D.I. 533. Pursuant to the 2016 Amended Bylaws, among other things:

- any settlement arising from its investigation would no longer be subject to the full board's approval (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(ii));

- the SIC would be able to prosecute or settle any claims revealed by its investigation on its own authority (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(iv));

- the SIC would have decision making authority as to the Settlement Agreement, the DIP Facility or any other debtor-in-possession financing, and the commencement, prosecution, or settlement of claims against affiliates (except as limited by the

Settlement Agreement) (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(vii));

- the SIC would be responsible for any dealings with the YPF Entities and any dealings in which the Debtors and the YPF Entities were not fully aligned (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(viii)); and

- on certain matters, including as to a Chapter 11 Plan, the SIC would make recommendations to the full Board. (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(x)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

506.    Even before these amendments, Judge Peck had previously represented to the Court and parties in interest that he had "taken the position with the company that I'm only listening to the independent directors." Propps Decl. Ex. 11 at 42:5-7.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the phrase "Judge Peck" as misleading – at this point, Mr. Peck was no longer serving as a Judge and is operating in his capacity as a partner of MoFo.

507.    On December 29, 2016, the Debtors filed a proposed plan (the "December 2016 Plan") (Main Proc. D.I. 697) and disclosure statement. Main Proc. D.I. 698. The December 2016 Plan anticipated the Court's approval of the Settlement Agreement, but provided that if the Settlement Agreement were not approved, the causes of action that would have been settled thereby would become assets of a liquidating trust. Main Proc. D.I. 697, § IV.A.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

508.    On March 1, 2017, the Creditors' Committee wrote to the SIC to express continued

dismay that the SIC was going forward with the December 2016 Plan, as to which a hearing on the disclosure statement had been scheduled for March 7. Propps Decl. Ex. 489. The letter attached three term sheets: one for replacement debtor-in-possession financing and one for exit financing, both to be provided by Oxy. The third was for a plan of liquidation "formally supported by the Committee." *Id.* at 2. The Creditors' Committee's proposed plan would "(i) preserve the causes of action against YPF and the Debtors' other claims against third parties, (ii) transfer all of the Debtors' assets to a liquidating trust (the 'Liquidating Trust') to liquidate those in the creditors' best interests, ... and (iv) provide for a recovery waterfall of the Liquidating Trust prioritizing liquidated claims over future remediation costs, while ensuring that a reasonable portion of the recoveries from the Liquidating Trust will be apportioned towards current and future remediation efforts and utilized in the most efficient way possible." *Id.* at 2-3. The Creditors' Committee asked that the March 7, 2017, disclosure statement hearing be adjourned. *Id.* at 3.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.


509.    The disclosure statement hearing was adjourned to April 7, 2017, with the Court holding a status conference on March 7 instead. Main Proc. D.I. 1005. At that status conference, Debtors' counsel stated that the SIC "concluded that it was appropriate and consistent with the fiduciary duties of the independent directors . . . for a period of time to be dedicated to a further evaluation of the proposal." Propps Decl. Ex. 490 at 5:10-20.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.


510.    After the Creditors' Committee provided its term sheet, YPF presented the SIC with

a revised settlement proposal. Main Proc. D.I. 1258-1 at 54.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

511. ████████████████████████████████

████████████████████████████████████

████████████████    On March 28, 2017, the Debtors filed an amended plan (Main Proc. D.I. 1056) and disclosure statement (Main Proc. D.I. 1058) and a motion for approval of replacement debtor-in-possession financing provided by Oxy (Main Proc. D.I. 1063). The plan and disclosure statement were also proposed by the Creditor's Committee. On April 10, 2017, YPFH sent a notice of default. Main Proc. D.I. 1258-1 at 144.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

512.    On April 17, 2017, the Debtors and the Creditors' Committee filed an amended disclosure statement, in which the plan proponents recounted the history of the proposal of the Settlement Agreement and related plan, the Creditors' Committee's term sheets, YPF's enhanced settlement offer, and the SIC's decision to pursue confirmation of the plan supported by the Creditors' Committee. Main Proc. D.I. 1210, at 51-55. The plan proponents – the Debtors and the Creditors' Committee – included that "[t]he decision to enter into the YPF Settlement Agreement was an unbiased and fair-minded one madein good faith with the support of professional advisors." *Id.* at 55. On April 19, 2017, the Court approved the disclosure statement Main Proc. D.I. 1237,

and the plan proponents thereafter distributed the solicitation version of the disclosure statement Main Proc. D.I. 1258-1, seeking creditor approval of the Plan.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

513.    As of April 19, 2017, the Plan included settlements of several claims, including those of Oxy (which would receive a Class 4 Claim allowed in the amount of $510,626,872.18), the CPG (which would receive a Class 4 Claim allowed in the amount of $14,365,320.14, "reduced to the extent of any duplication between the Claim asserted by the CPG and any Claim asserted by any member of the Gibbons Parties," allowed by agreement or court order), and the United States (on behalf of EPA, NOAA, and DOI-FWS). Main Proc. D.I. 1258-1, Ex. A, at 12-13, 62, and the payment of all allowed claims pursuant to waterfalls. Main Proc. D.I. 1258-1, Ex. A, at 69.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

514.    The Plan also provided in Article X.C that "[o]n or after the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests; (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim or Cause of Action without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court." Main Proc. D.I. 1258-1, Ex. A, at 55 (page 62 of 335). The Liquidating Trust would be subject to oversight by the Liquidating Trust Oversight Committee, which would have five members, three of whom were to be appointed by Oxy and two by the CPG. Main Proc.

218

D.I. 1258-1, Ex. A, at 42 (page 49 of 335).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

515.    YPF, Debtors, and the Creditors' Committee (which included Oxy – represented by White & Case) engaged in negotiations regarding the Plan; on May 3, 2017, YPF's counsel emailed counsel to the Debtors and to the Creditors' Committee about various concerns, including Article X.C, with regard to which YPF's proposal was to

> [m]odify the procedures for resolving disputed claims so that (i) the Liquidating Trust does not have the "exclusive" authority to object to claims after the Effective Date (other parties would also have the ability to dispute claims), (ii) any the [sic] allowance of any creditor's claim under the plan would not be binding on YPF and (iii) YPF's right to challenge such claims would be preserved post-confirmation."

Propps Decl. Ex. 182 at 4-5.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

516.    After speaking with counsel to the Debtors and to the Committee on May 4, 2017, YPF's counsel emailed proposed language to address this issue:

> Below please find suggested language to address several of the points we discussed this morning[.] Please let us know if you have any questions or would like to discuss.. . .
>
> New Article XV.P. [Renumber "Conflicts" as XV.O]

219

**O [sic]. No Impact on Other Litigation.**

Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any Person in any litigation, including in any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action and the Preserved Contribution Claims).

*Id.* at 1-2.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

517.    On May 7, 2017, counsel to the Creditors' Committee responded that the "Committee directed us to try and move forward to resolve your client's concerns as set forth in your email. We are reviewing the language suggestions you sent and are looking at the other changes requested. Will hopefully be in a position to respond later tomorrow." *See* Propps Decl. Ex. 493.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

518.    On May 12, 2017, the YPF Entities filed a limited objection to confirmation of the Plan on May 12, 2017. Main Proc. D.I. 1411. The objection noted that settlement discussions had been productive, and had resulted in an agreement on the above language. Main Proc. D.I. 1411 at

8-9. However, the parties had not resolved one final concern of YPF, which was the basis of YPF's objection – that Oxy should not appoint three members of the Liquidating Trust Oversight Committee, but rather the third Oxy appointee should have been independent. *Id*. at 10. On the same date, the YPF Entities also objected to Oxy's claims. Main Proc. D.I. 1418.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

519.    The next version of the Plan that was filed, as an attachment to the plan proponents' confirmation brief on May 14, 2017. Main Proc. D.I. 1433-1, included the agreed language, with a minor change of "against any Person in any litigation" to "against any person or entity in any litigation." Otherwise, the language was as the YPF Entities had proposed.

> Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action and the Preserved Contribution Claims).
> Main Proc. D.I. 1433-1, Ex. C at 85 (page 140 of 144).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

520.    On May 17, 2017, Debtors' claims and noticing agent filed a certification of the ballots cast on the Plan, Main Proc. D.I. 1429; 1429-1, showing that over 90% of creditors (both in number and in amount) entitled to vote on the Plan had voted in its favor. In light of these results

and the resolution of most of their issues (including the alter ego damages issue), "and in the interest of avoiding unnecessary use of judicial resources," the YPF Entities withdrew their limited objection to the Plan and their objection to Oxy's claims. *See* Main Proc. D.I. 1431.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust does not dispute that the YPF Entities withdrew their limited objection to the Plan and Oxy's claims, however, the Trust disputes (and the YPF Defendants provide no evidence in support) that this was due to a resolution of any alter ego damages issue. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

521.    The Court held a confirmation hearing on the Plan on May 22, 2017. At the hearing, Judge Peck informed the Court that YPF had withdrawn its objections, "sav[ing] the estate and the planned [sic] proponents some time and energy and, hopefully, will save the court some time as well," Propps Decl. Ex. 494 at 13:6-25, and his colleague Ms. Marines noted that the Plan had been amended to help YPF settle or withdraw its objection. Propps Decl. Ex. 494 at 20:8-14. Mr. Zumbro, on behalf of YPF and its affiliates, highlighted for the Court that among these amendments was that "neither the allowance or the disallowance of any claim nor the allowed amount of any claim will have any precedential, preclusive or other effect on any litigation including the YPF causes of action" Propps Decl. Ex. 494 at 84:18-85:2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust submits that the facts highlighted in yellow in this paragraph are immaterial and/or irrelevant to this adversary proceeding. Amendments and negotiations to the Plan are not material to any claims or defenses presented in this case. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

522.    The Court confirmed the Plan, entering the Confirmation Order on May 22, 2017.

Main Proc. D.I. 1460. The confirmed Plan included the text of Article XV.P. from the May 12, 2017, version. Main Proc. D.I. 1460-1 at 77 (page 84 of 89). The confirmed Plan also included the settlements with Oxy, the United States, and the CPG as described above (*supra* ¶ 513 (Main Proc. D.I. 1460-1 at 12-13, 62)), as well as settlements with the State of Ohio (which received an allowed claim of $25 million, described above (*supra* ¶ 91)) and the State of Wisconsin (which received an allowed claim of $5 million, described above (*supra* ¶ 91)). The definition of the "CPG Class 4 Claim" was modified to specify it was allowed in the amount of $14,365,320.14, "provided that the Allowed Amount of the CPG Class 4 Claim shall be reduced by an amount equal to the Gibbons Group Allowed Class 4 RI/FS Claims." Main Proc. D.I. 1460-1 at 6. The Gibbons Group Allowed Class 4 RI/FS Claims totaled $1,205,681.32. Main Proc. D.I. 1460-1 at 11.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

523.    The Plan included provisions for "Class 5 Diamond Alkali Claims," which included a partially liquidated amount for the United States and any amounts consisting of Environmental Remediation Expenses or Environmental Restoration Expenses, as defined in the ERRT Agreement (as defined in the Plan), reimbursed by the Environmental Response/Restoration Trust (as defined in the Plan). Main Proc. D.I. 1460-1, Art. I.A.30. Pursuant to the terms of the ERRT Agreement, "Environmental Remediation Expenses" are the "reasonable and necessary fees, costs and expenses paid by a PRP for Response Work after the Effective Date of the Plan" (with certain exclusions) and "Environmental Restoration Expenses" are "the reasonable and necessary costs and expenses paid by a PRP or NRD Trustees for Restoration Work after the Effective Date of the Plan" (with certain exclusions). Main Proc. D.I. 1453-1, Ex. B-1, at 2. Section 3.03 of the ERRT Agreement provides for the reimbursement of such expenses to the extent a PRP or NRD Trustee expends them in connection with the DASS and submits invoices "accompanied by reasonable

223

documentation" according to a specified waterfall. *Id.* § 3.03. There is no requirement that any such PRP pay its equitable share of the costs of remediation or restoration of the DASS.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

524.    The provisions of the Plan providing for the settlements with Oxy, the CPG, and the United States (Art. XI.F.1), the State of Wisconsin and the State of Ohio (Art. XI.F.2), and the Gibbons Group (Art. XI.F.3) each explicitly provide "that this settlement shall not constitute an admission of the Debtors' actual liability " Main Proc. D.I. 1460-1, at 64-66 (pages 71-73 of 89).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts in this paragraph as being irrelevant.

525.    The Effective Date of the Plan occurred on July 17, 2017. Main Proc. D.I. 1701.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

526.    The Plan is governed by New York law. Main Proc. D.I. 1460-1, at 24 Art. I.D.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

527.    "Liquidating Trust Causes of Action" is defined as including "the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims." Main Proc. D.I. 1460-1, at 13 Art. I.A.120. "Preserved Contribution Claims' is defined as "certain Contribution Claims, which shall be transferred to the Liquidating Trust on the Effective Date," all of which were "Filed on April 11, 2017" under Main Proc. D.I. 1147. Main Proc. D.I. 1460-1, at 17, Art. I.A. 164. "Contribution Claims" is defined as "Causes of Action held by the Debtors against any non-Debtor for contribution or cost recovery under any Environmental Law for actual expenses

paid by or on behalf of the Debtor prior to the Petition Date." Main Proc. D.I. 1460-1, at 6, Art. I.A.36. The Trustee is "vested with full authority to make all decisions regarding whether to prosecute any Preserved Contribution Claim, in furtherance of his or her fiduciary duty to the Liquidating Trust Beneficiaries." Main Proc. D.I. 1460-1, at 45, Art. VI.G.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

528.    Almost a year later, and just before the two-year anniversary of the bankruptcy filing, on June 14, 2018, the Trust commenced this action by filing the Complaint. Adv. Proc. D.I. 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

Date:  May 18, 2022

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

# EXHIBIT F

IN THE  UNITED STATES BANKRUPTCY COURT
FOR THE  DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al*.,<br><br>             Debtors.[1] | Chapter 11<br><br>Case No. 16-11501 (CSS)<br><br>Jointly Administered |
| MAXUS LIQUIDATING TRUST,<br><br>             Plaintiff,<br><br>v.<br><br>YPF S.A., YPF INTERNATIONAL S.A., YPF<br>HOLDINGS, INC., CLH HOLDINGS, INC.,<br>REPSOL, S.A., REPSOL EXPLORACIÓN, S.A.,<br>REPSOL USA HOLDINGS CORP., REPSOL E&P<br>USA, INC., REPSOL OFFSHORE E&P USA, INC.,<br>REPSOL E&P T&T LIMITED, and REPSOL<br>SERVICES CO.,<br><br>             Defendants. | Adv. Proc. No. 18-50489 (CSS)<br><br>**FILED UNDER SEAL** |

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO ~~YPF'~~YPF DEFENDANTS'
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AND COUNTERSTATEMENT OF UNDISPUTED FACTS IN
OPPOSITION TO THE TRUST'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Dated: May 18, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

The YPF Defendants have proposed over five-hundred paragraphs of "undisputed" facts in support of the *YPF's Cross Motion for Partial Summary Judgment* ("YPF Motion" or YPF Mot.") and *YPF Defendants' Memorandum of Law in Opposition to the Trust's Motion for Partial Summary Judgment* ("YPF Opposition" or YPF Opp."). The Trust, operating under limited time, has categorized the submitted facts below for the convenience of the Court. The Trust concurs that the green highlighted facts are undisputed in this proceeding and the Court should determine the submitted facts are undisputed findings accordingly. The Trust submits that the yellow highlighted facts are not material and/or irrelevant to any issues relating to the adversary proceeding. Given that these facts have no bearing on any issues relevant to the proceeding, the Trust does not admit or dispute them, and further submits that the Court should not make any findings relating to these facts. The Trust has highlighted in red relevant facts that are in dispute. The Trust submits that these disputed facts, while being potentially relevant to the YPF Motion, have no bearing on the facts necessary to prove the Trust's Motion and the Court can still grant Summary Judgment in favor of the Trust notwithstanding the disputed facts.

## **GENERAL OBJECTIONS**

The following general objections ("General Objections") apply to each paragraph of the YPF Defendants' statement of facts, and shall have the same force and effect as if fully set forth in the response to each individual paragraph. To the extent the Trust responds to a paragraph, the Trust reserves all objections as to relevance, privilege, and admissibility, as well as to any and all other objections on any ground that would require or permit the exclusion of a fact in the paragraph, if that fact were offered into evidence. The Trust object as follows:

1.  The Trust objects to the YPF Defendants' submission as being beyond the scope of the applicable rules of this Court and contrary to the spirit in which the Trust submitted its own statement. By responding, the Trust does not concede that YPF

1

may rely on an uncontested statement of material facts to satisfy its evidentiary burdens, or that the Trust's responses herein in any way limit its ability to rely on any fact or argument in connection with any pending motion or at trial.

2.  The Trust objects to any emphasis added or characterizations of documents cited to in each paragraph.  To the extent the YPF Defendants are relying on a document, the document speaks for itself.

3.  To the extent the Trust admits to a statement of fact, the Trust is not admitting to the admissibility, veracity, submitting that the particular document or testimony is evidence of the purported fact, or ascribing any meaning or definition to the document or testimony cited as evidence for the purported fact.  The Trust reserves the right to challenge the admissibility of any document, statement or testimony cited, on any grounds, including but not limited to, hearsay or the doctrine of completeness.  Failure to indicate that the Trust objects to the admissibility of specific paragraphs or statements herein is not intended and should not be understood to effect a waiver of the right to object to the admissibility of any document, statement or testimony offered as evidence.

4.  To the extent the Trust does not dispute a statement of fact, the Trust is not admitting the Repsol Defendants have properly and accurately cited such statements.  Where a citation is incorrect, the Trust has endeavored to note this below.

5.  Where the Trust objects to a paragraph as non-material or irrelevant, the Trust neither admits nor disputes the facts set forth therein.

6.  The Trust objects to any paragraph that characterizes or ascribes meaning to a document, deposition testimony, or expert testimony (including expert reports).  The

testimony and expert reports speak for themselves.  To the extent the Trust admits to a statement of fact citing a document, deposition testimony, or expert testimony, the Trust is not admitting to the characterization or summary of the cited evidence.

7. To the extent the YPF Defendants cite to, summarize, or rely on a document, the Trust submits that the document speaks for itself and the Court should review the entire document for completeness.  The Trust reserves its right to object to any characterization or summary of a document on the basis of completeness.

8. To the extent the Trust does not dispute any statement of Defendants' experts, the Trust does not concede that the expert is otherwise qualified to testify or that the associated report is wholly admissible.

9. To the extent any facts submitted by the YPF Defendants in their Affirmative Statement of Facts ("YPF's SOF") contradict facts submitted by the Trust's Statement of Undisputed Facts ("Trust SOF"), the Trust submits that those facts are in dispute.

10. Where the Trust disputes or does not dispute a statement of fact, the Trust is only providing sufficient evidence to demonstrate that there is a genuine issue of material fact and not providing an exhaustive set of counter-facts or evidence.  The Trust reserves the right at trial to dispute any of the proposed facts using all available facts and admissible evidence.

11. To the extent the Trust responds to a statement that includes footnotes, the Trust's response to the footnote should be understood to be the same as the Trust's response to the body of the associated text.

12. The Trust objects to the use by the YPF Defendants of documents, expert, reports or

2

testimony that are not admissible, particularly that are not admissions of the debtors, offered without proper foundation or a sponsoring witness with personal knowledge.

13. The Trust objects to the use, by the YPF Defendants, of expert testimony offered by the Defendants' expert witnesses on any issue as to which Defendants bear the burden of proof, as Defendants' experts did not submit reports by the deadline set in the Scheduling Order for expert reports on issues as to which a party bears the burden of proof. See Letter Opinion dated February 22, 2022 [D.I. 607].

14. The Trust objects to the YPF Defendants' reliance on expert reports as establishing the truth of any factual allegations for purposes of summary judgment without offering the Court the underlying evidence relied upon by such experts or the context in which they offered their opinions.

15. The Trust objects to the YPF Defendants' use of previously withheld privileged material to serve as evidence for their submitted facts while still maintaining privilege over documents covering the same subject matter. To the extent the Trust was not provided with sufficient evidence to dispute the submitted fact on the basis of privilege, the Trust reserves the right to move the Court to draw an adverse inference from YPF's failure to produce the relevant documents, and/or to demand production of the withheld privileged materials and revise these responses accordingly.

16. To the extent the YPF Defendants assert that any particular fact as to which the Trust has identified, in a pleading or otherwise on notice to Defendants, any dispute, or, to the extent any assertion of fact by the YPF Defendants submitted contradicts any assertion of fact by the Trust, the Trust objects to the YPF Defendants' assertion that any such fact is undisputed.

4

17.  The Trust objects to any of the YPF Defendants' submitted facts to the extent they are argumentative or assert legal conclusions.

18.  The Trust objects to the YPF Defendants use of the term "YPF" to mean anything other than the legal entity YPF, SA.  The Trust further objects to the YPF Defendants use of the term "YPF Defendants" to mean anything other than as defined in the Trust's Motion.  To the extent YPF or the YPF Defendants are found to be the alter ego of the Debtors after a trial, then the Trust's responses and objections herein may no longer be valid insofar as the terms may be construed to include a larger corporate group, to include the Debtors.

19.  The Trust construes the headings in YPF's Factual Submission as organizational in nature, and does not understand that such headings set forth factual allegations that require response, denial or objection.

20.  The Trust, by not contesting statements made by defendant's experts, are not admitting the expert is otherwise qualified to testify or that the associated report is fully admissible.

## SPECIFIC RESPONSES AND OBJECTIONS

I.  **THE DEBTORS**

1.  As addressed in further detail at Section XI, *infra,* Maxus Energy Corporation ("Maxus"), Tierra Solutions, Inc. ("Tierra"), Maxus International Energy Company ("MIEC"), Maxus U.S. Exploration Company ("MUSE"), and Gateway Coal Company ("Gateway Coal") (collectively, "Debtors") filed their voluntary petitions for bankruptcy on June 17, 2016. Main Proc. D.I. 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

2.    In conjunction with the bankruptcy filing, the Creditors' Committee was formed. Main Proc. D.I. 1258-1, at 44, 132. The Creditors' Committee consisted at various times of (1) Oxy, the CPG, Brown & Caldwell, (2) Oxy & the CPG, and (3) Oxy, CPG, Mallinckrodt Pharmaceuticals plc. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to the identity of the committee members as irrelevant as all members of the committee owe a fiduciary duty to all creditors regardless of composition.

3.    A plan of liquidation proposed by the Debtors and the Creditors' Committee was confirmed on May 22, 2017. Main Proc. D.I. 1460.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

4.    By dollar amount, and as addressed in further detail below, the vast majority of the claims asserted in the bankruptcy against the Debtors related to pollution in the Lower Passaic River in Northern New Jersey. *See* Main Proc. D.I. 1258-1 Ex. B at 8-9; Main Proc. D.I. 2493.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

5.    Certain of the Debtors, including Maxus, Tierra, Gateway, and MUSE, had continuing operations following the transfers at issue here, and up to at least the Petition Date. Main Proc. D.I. 2, ¶ 12.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

6.

A.      **MAXUS**

6.      Maxus was incorporated in Delaware in 1983 as a holding company for the former Diamond Shamrock Corporation ("Diamond Shamrock") and held the stock of a number of corporations, the oldest of which, the Diamond Alkali Company, was founded in 1910. *See* Propps Decl. Ex. 15 at YPF0001491; Propps Ex. 16 at 2. By 1994, Maxus, together with its subsidiaries, was an oil and gas exploration and production company with both foreign and domestic operations. *See* Propps Decl. Ex. 17 at 1. Maxus's domestic efforts were primarily based in the Anadarko Basin in the Texas Panhandle and western Oklahoma, Texas and Louisiana offshore, and onshore Gulf Coast areas. *Id.* at 2. Its international operations were primarily located in Indonesia, Ecuador, Venezuela, and Bolivia. *See* Propps Decl. Ex. 16 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

B.      **TIERRA**

7.      Tierra is a Delaware corporation that is directly owned by CLHH. Tierra was an environmental management company which also held title to certain real estate properties. *See* Main Proc. D.I. 2, ¶ 12. "Tierra's business is to manage environmental remediation obligations owed by Maxus, either as principal or when acting on behalf of third parties, principally OCC." *Id.* at 7.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

8.      The entity known as Tierra has changed names multiple times including a July 11, 1986 name change from Diamond Shamrock Process Chemicals, Inc. to Diamond Shamrock Chemical Land Holdings, Inc. and a December 4, 1987 name change to Chemical Land Holdings,

Inc. ("CLH"). Propps Decl. Ex. 18. In 2002, CLH changed its name to Tierra. Propps Ex. 190, at

34.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

## C.    MIEC

9.    MIEC is a "Delaware corporation, and a wholly-owned subsidiary of Maxus, whose
business is inactive." *See* Main Proc. D.I. 2, ¶ 12.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

## D.    MAXUS (U.S.) EXPLORATION COMPANY

10.    MUSE is a Delaware Corporation, and a wholly-owned subsidiary of Maxus, which
was involved in oil and gas exploration efforts in the deep waters of the Gulf of Mexico primarily
through its ownership of a 15% non-operating working interest in an offshore oil drilling field
known as Neptune. *See* Main Proc. D.I. 2, ¶ 12.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

## E.    GATEWAY COAL

11.    Gateway Coal is a Delaware corporation, and a wholly-owned subsidiary of Maxus,
whose business was limited to the administration of retiree benefits. *See* Main Proc. D.I. 2, ¶ 12.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts set forth in this paragraph.

.

II.     **THE PARTIES**

A.      **THE YPF DEFENDANTS**

       *YPF*

       12.     ==YPF is Argentina's leading energy company producing approximately 36% of the total oil and gas in the country and supplying 54% of the fuel markets through a network of more than 1600 service stations and other assets. YPF operates a fully integrated oil and gas chain with leading market positions across the Argentine domestic upstream, downstream and gas and power segments. Propps Decl. Ex. 1 at 18. YPF's upstream operations consist of the exploration, development and production of crude oil, natural gas and NGLs. YPF's downstream operations include the refining, marketing, transportation and distribution of oil and a wide range of petroleum products, petroleum derivatives, petrochemicals, LPG and biofuels. Additionally, through its Gas and Power business segment, YPF is active in the gas separation, natural gas distribution and power generation sectorsboth directly and through investments in several affiliated companies.==

       *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The present and historical operations are not material to any claims or defenses presented in this case.

       13.     ==YPF is the "largest integrated oil and gas company in Argentina." Propps Decl. Ex. 1 at 11.==

       *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The operation size of YPF is not material to any claims or defenses presented in this case.

       14.     ==From the 1920s to 1990, the government of Argentina controlled the exploration and production of oil and natural gas, the refining of crude oil, and the marketing of refined==

petroleum products in Argentina through YPF. *See* Propps Decl. Ex. 2 at 1. Argentina enacted laws to deregulate its economy and privatize state-owned companies including YPF in 1989. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The historical operations of YPF are not material to any claims or defenses presented in this case.

15.    Pursuant to Privatization Law No. 24,145, in July 1993, YPF completed a worldwide offering of 160 million Class D Shares. *See* Propps Decl. Ex. 3 at 31. The shares were traded on the New York, London, and Buenos Aires exchanges. *See id.*; Propps Decl. Ex. 4. The shares traded represented 45% of YPF's outstanding stock previously owned by the Argentine government. *See* Propps Decl. Ex. 2 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The historical operations and operation size of YPF are not material to any claims or defenses presented in this case.

**YPFI**

16.    As discussed more fully below, YPFI was created in June 1996 as a subsidiary of MIEC (as defined below), and became a direct subsidiary of YPF in July 1996; YPFI started as a Cayman Islands entity, then re-domesticated to Bolivia in 2002. Propps Decl. Ex. 191. *See also* Propps Decl. Ex. 192; Propps Decl. Ex. 193; Propps Decl. Ex. 283 at MAXUS3258579.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**YPFH**

17.    As discussed more fully below, YPFH, a Delaware corporation, was created in August 1996 as a subsidiary of YPFI and holding company for Maxus. YPFH became a direct subsidiary of YPF in 2002. Propps Decl. Ex. 115 at 9-10; Propps Decl. Ex. 194 at F-12.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

***CLHH***

18.    As discussed more fully below, CLHH, a Delaware corporation, was created in August 1996 as a subsidiary of YPFH and holding company for CLH. Propps Decl. Ex. 287.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**B.    REPSOL**

19.    During the relevant time period, Repsol, S.A., Repsol Exploracion, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Co. (collectively, the "Repsol Defendants") were one of the leading oil and gas companies in the world with significant market shares in Spain and other countries. *See* Propps Decl. Ex. 5 at REP14155.

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the fact that ████████████████████████████████ The Trust submits that the remaining facts in this paragraph are not material and/or irrelevant to this adversary proceeding.  The historical operations and operation size of Repsol are not material to any claims or defenses presented in this case.

20.    Though it had previously sold portions of its ownership interest in YPF, Repsol's remaining holdings were affected when, in May 2012, the Argentine Congress passed Law No. 26,741 ("Public Interest Law"), which made 51% of the share capital of YPF held by Repsol

"subject to expropriation" and under "temporary occupation" by the Republic. *See* Propps Decl. Ex. 3 at 31. The expropriation of the shares was completed in 2014 after a two-year legal dispute between Repsol and the Argentine government. *Id.* at 32. Following the expropriation, Argentina maintained a controlling stake in YPF. *Id.*

*Responses and Objection:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## C.    THE TRUST

21.    Plaintiff, the Maxus Liquidating Trust (the "Trust"), was created on July 14, 2017, the "Effective Date" of the Amended Plan. Compl. (the "Complaint" or "Compl.") Adv. Proc. D.I. 1 ¶ 18. The Hon. Joseph J. Farnan, Jr. (Ret.), is the Liquidating Trustee of the Trust. *See* Exhibit A-1 to C-2 of Notice of Further Amendment to Plan Supplement to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. Main Proc. D.I. 1453 at 7, 42, The Liquidating Trustee is appointed and overseen by the Liquidating Trust Oversight Committee (the "Oversight Committee"). *See* Main Proc. D.I. 1460-1 at 44 Art. VI.G.. The Oversight Committee consists of five members. *Id.* Occidental Chemical Corporation ("Oxy") has the right to appoint three of the five members, and the Lower Passaic River Study Area Cooperating Parties Group (the "CPG") has the right to appoint the other two. *See Id.* at 18 § 4.01.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust submits that the remaining facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The composition of the Oversight Committee is irrelevant as all members of the Oversight Committee owe a fiduciary duty to all creditors.

22.    At the time of appointment, the members of the Oversight Committee were Messrs. Frank Parigi, Mark D. Collins, Phillip T. Bruns, William J. Hengemihle, and Charles A. Dale III.

*See* Exhibit A-1 to C-2 of Notice of Further Amendment to Plan Supplement to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al., at 43, Main Proc. D. I. 1453-1; *Id* at A-1; *see, generally*, Notice of Filing, Main Proc. D.I. 1444. The first three – Messrs. Parigi, Collins, and Bruns – are Oxy's appointees. *Id* at 2-3.

*Responses and Objections:* Same objection as paragraph 21.

23.     All three of Oxy's appointees indirectly work for Oxy: the first appointee, Frank Parigi, is the Vice President and General Counsel of Glenn Springs Holdings, Inc., a holding company used by Oxy to address its environmental liabilities (Notice of Filing of Identities, Main Proc. D.I. 1444 at 2-3; Propps Decl. Ex. 11 at 56:21-23; the second appointee, Mark D. Collins, is a director of the law firm Richards, Layton & Finger, P.A., and is co-counsel to Oxy in connection with the Chapter 11 cases (*see* Notice of Appearance, Main Proc. D.I. 77); the third appointee, Phillip T. Bruns, was a founding partner of Gibbs & Bruns LLP, the law firm that represents Oxy in connection with this action and in its New Jersey Allocation lawsuit. *See generally id; See* Exhibit A-1 to C-2 of Notice of Further Amendment to Plan Supplement to the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al., Main Proc. D.I. 1453, Ex. A.

*Responses and Objections:* Same objection as paragraph 21.

**D.    THE DEBTORS' MAJOR CREDITORS**

Among the creditors who have filed claims in the above captioned action, are the following:

**1.    <u>The United States</u>**

24.    The United States has filed proofs of claim on behalf of United States Environmental Protection Agency ("EPA"), National Oceanic and Atmospheric Administration ("NOAA"), and Department of the Interior-Fish & Wildlife Service ("DOI-FWS") in these

bankruptcy cases.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

25.    The *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation,* et al. *and the Official Committee of Unsecured Creditors* (Main Proc. D.I. 1460-1) (the "Plan"), confirmed by this Court on May 22, 2017 (Main Proc. D.I. 1460) included settlements of several claims, including with the United States. Main Proc. D.I. 1460-1, at 21-22, 64-65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**2.    Oxy**

26.    As addressed above and in further detail below, Oxy is one of the major creditors in the above captioned bankruptcy. Main Proc. D.I. 1460-1, at 15, 64-65. As discussed in more detail below, Oxy purchased Maxus's subsidiary Diamond Shamrock Chemicals Company ("DSCC") which, with its predecessors and subsidiaries, operated a chemicals business that had a facility adjacent to the Passaic River responsible for a portion of the contamination of that river, including dioxin. Oxy subsequently merged with DSCC. *See infra* at ¶ 93. Oxy was a direct operator of the plant that discharged dioxin into the Passaic River. *See infra* at III.B.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

27.    Oxy was also a member of the statutory committee of unsecured creditors (the "Creditors' Committee"). Main Proc. D.I. 1258-1, at 44, 132.

*Responses and Objections:* Same objection as paragraph 21.

28.     Oxy, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Same objection as paragraph 21.

29.     The Plan in this action included settlements of several claims, including with Oxy.

Main Proc. D.I. 1460-1, at 15, 64-65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

3.     **CPG**

30.     EPA has identified a lengthy list of potentially responsible parties ("PRPs") for the Lower Passaic River. Propps Decl. Ex. 13 at 4. Those PRPs include Benjamin Moore & Co., Alcan Aluminum Corp., Ashland Chemical Co., Monsanto Company, Sherwin-Williams Co., Reilly Tar and Chemicals Corp., Chris-Craft Industries, and E.I. du Pont de Nemours and Co. Propps Decl. Ex. 12 at -121, -123.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding, as the identification of PRPs by the EPA is not material to any claims or defenses presented in this case. The Trust objects that the list of identified PRPs is incomplete.

31.     Those companies subsequently formed the CPG in 2004. Propps Decl. Ex. 13 at 4; Propps Decl. Ex. 14.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the companies included in the CPG was fixed at all times.

32.    The CPG was also a member of the Creditors' Committee formed as part of the above captioned bankruptcy. Main Proc. D.I. 1258-1, at 44, 132.

*Responses and Objections:* Same objection as paragraph 21.

33.    The Bankruptcy Plan in this action included settlements of several claims, including with CPG. Main Proc. D.I. 1460-1, at 6, 64-65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

III.    **THE YPF DEFENDANTS DID NOT POLLUTE THE PASSAIC RIVER**

A.    **THE PASSAIC RIVER**

34.    The Passaic River is located in northern New Jersey and empties into Newark Bay. Propps Decl. Ex. 19; Dundee Dam, in Garfield, New Jersey, 17.4 miles from the mouth of the Passaic River, separates the headwaters of the Passaic River from the lower (seaward) 17.4 miles of the Passaic River (the "Lower Passaic River"). *Id.* Much of the Lower Passaic River is estuarine, with salt water flowing upriver from Newark Bay as the tide comes in and back toward Newark Bay as the tide goes out. *E.g.*, Propps Decl. Ex. 13 at 16, 51, and 162. The area is densely populated, industrial, and traversed with transportation and telecommunications infrastructure. Propps Decl. Ex. 13, Ex. A at 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

86

35.      Long before YPF acquired Maxus, and long before DSCC manufactured pesticides on its banks, the Passaic River had become heavily polluted. Propps Decl. Ex. 13 at 3. As noted by EPA, the Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. Propps Decl. Ex. 13, Ex. A at 4. "By the end of the nineteenth century, a multitude of industrial operations, such as manufactured gas plants, paper manufacturing and recycling facilities, petroleum refineries, shipping, tanneries, creosote wood preservers, metal recyclers and manufacturers of materials such as rubber, rope, textiles, paints and dyes, pharmaceuticals and chemicals, had located along the river's banks as cities such as Newark and Paterson grew. Industrial operations and municipalities used the river for wastewater disposal. To date, over 100 industrial facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead and other metals." Propps Decl. Ex. 13 at 3. These companies include Benjamin Moore, Pfizer, and General Electric Company. Propps Decl. Ex. 55.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

36.      Thus, pollution of the Passaic River, which was caused by many U.S. companies and local governments, dates back more than two centuries—long before YPF's 1995 acquisition of Maxus. Propps Decl. Ex. 21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust submits that any of the companies' country of origin is not material and/or irrelevant to this adversary proceeding.

**B.      THE LISTER SITE**

37.    From the 1940s until 1969, DSCC (and its predecessors, including Diamond Alkali), manufactured DDT, Agent Orange, and other pesticides and herbicides at its agricultural chemical plant located at 80-120 Lister Avenue in Newark ("Lister Site"). *See* Propps Decl. Ex. 22 at MAXBK000430096; Propps Decl. Ex. 23.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

38.    One of the byproducts of DSCC's manufacturing process was a dioxin congener known as 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD"). Propps Decl. Ex. 22 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

39.    During that time, Oxy's legal predecessor DSCC discharged waste and off-specification product, including 2,3,7,8-TCDD, into the Passaic River. *Id.* ("dioxin" is often used herein to refer to 2,3,7,8-TCDD).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

40.    ███████████████████████████████████████

███████████████████████████████████████████

███████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects to the extent the statement mischaracterizes ████████████████████████████████ The cited document speaks for itself.

41.    By 1977, substantially all operations at the Lister Site ceased, 18 years before

YPF's acquisition of Maxus. *See* Propps Decl. Ex. 24 at -337.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

42.    The record in this litigation further confirms that the YPF Defendants never discharged a drop of dioxin, DDT, or any other contaminants in the Passaic River, and no party— not Oxy, not the Trust, not a regulator, not anyone else—contends otherwise. *See* Propps Decl. Ex. 22 at MAXBK000430098 ("Repsol, YPF and their subsidiaries other than Maxus/Tierra were not alleged to be directly responsible as dischargers under the Spill Act, only vicariously liable for the environmental liabilities of Maxus."); Propps Decl. Ex. 13.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether or not YPF or Repsol directly contaminated the Passaic River is not material to any claims or defenses presented in this case.

43.    Nor did Debtors do so during the more than two decades they were affiliated with the YPF Defendants. *Id.* Neither EPA, NJDEP, nor even the Trust, contends otherwise. *See generally* Adv. Proc. D.I. 1.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether or not Maxus contaminated the Passaic River while they were affiliated with the YPF Defendants is not material to any claims or defenses presented in this case.

C.    **REGULATORY ACTION AT THE LISTER SITE AND LOWER PASSAIC RIVER**

1.    **The CERCLA Process**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Federal agencies

must follow the procedures and standards detailed in the NCP when remediating Superfund sites.

*See generally* 400 CFR Part 300.2 et seq.

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The cited provisions of law speak for themselves and the Trust expresses no view as to the accuracy of any legal opinion set forth in this paragraph.

45. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

46. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

48. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

49. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. ███████████████████████████████████████████████████████████████████████████████ The Trust objects to this mischaracterization as the document speaks for itself.

50. ███████████████████████████████████

███████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust objects to the text highlighted in red as mischaracterizing the cited document.  *See* Propps. Decl. Ex. 29 at 9

.  The Trust further objects on the grounds that any document cited speaks for itself.

51.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**D.    REGULATORY ACTION AT THE LISTER SITE AND PASSAIC RIVER**

52.     In 1983, EPA discovered dioxin at the Lister Site, and in 1983, the NJDEP issued an order requiring DSCC (now Oxy) to take actions to prevent run-off pollution. *See* Propps Decl. Ex. 42.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

53.    In 1984 (before Oxy purchased DSCC), EPA added the Lister Site and the adjoining six mile stretch of the Passaic River to the Superfund National Priority List as the Diamond Alkali Superfund Site. Propps Decl. Ex. 13 at 4.

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to the text highlighted in red as mischaracterizing the cited document. *See* Propps Decl. Ex. 13 at 4 ("Based on investigations by NJDEP and EPA, the Diamond Alkali Site was placed on the National Priorities List in 1984. . . . OCC agreed to an administrative order on consent (AOC) with EPA to investigate a six- mile stretch of the Lower Passaic River (RM 1 to RM 7), with the work performed by Tierra on OCC's behalf."). The Trust further objects on the grounds that any document cited speaks for itself.

54.    In 1987, EPA selected an interim containment remedy for the Lister Site, including capping, subsurface slurry walls, a flood wall, and a groundwater collection and treatment system. *See* Propps Decl. Ex. 43; Propps Decl. Ex. 44 at 9-12. Construction was completed in 2001. Propps Decl. Ex. 13 at 4.

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

55.    Between 1987 and 1994, Maxus continued its analysis and study of remedial options for the Passaic River. *See* Propps Decl. Ex. 145; Propps Decl. Ex. 150.

    *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

56.    In 1994, Oxy signed an Administrative Order on Consent ("1994 AOC") with EPA and NJDEP to investigate 6 miles of the Lower Passaic River (the Lower Passaic River Study Area, or "LPRSA"). Propps Decl. Ex. 45 at -313. The work required under the 1994 AOC was

performed, pursuant to the Oxy Indemnity (as defined below), by Maxus and then by CLH (later renamed Tierra). Propps Decl. Ex. 13 at 4 ("2.1.2. The Six Mile Study / In 1994, OCC agreed to an administrative order on consent (AOC) with EPA to investigate a six-mile stretch of the Lower Passaic River (RM 1 to RM 7), with the work performed by Tierra on OCC's behalf.").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust objects to the text highlighted in red as mischaracterizing of the cited document.  The 1994 AOC was concluded by OCC and EPA.  NJDEP was not a party to the 1994 AOC.  Propps Decl. Ex. 45 at -304, -313.  The Trust further objects on the grounds that any document cited speaks for itself.

57.     The 1994 AOC relied on data showing that this investigation found some of the contaminants of concern ("COCs") that originated from the Lister Site, in particular, dioxin 2,3,7,8-TCDD and pesticides, throughout the six miles, with the highest concentrations adjacent to the Lister Site. Propps Decl. Ex. 13 at 4. Oxy was ordered to conduct further investigation ofthe six-mile study area in the 1994 AOC. *Id.* This investigation also found many other COCs not linked to the Lister Site, and indicated that contaminated sediments moved into and out of the six-mile stretch, leading to the conclusion that a more comprehensive study was required. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

58.     Pursuant to the 1994 AOC and subsequent January 1995 Investigation Work Plan ("IWP") approved by EPA, more studies were conducted by Maxus regarding ████████████

███████████████████████████████████████

*See infra* ¶¶ 219-20; *see also* Propps Decl. Ex. 46 at -197-98; Propps Decl. Ex. 47.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

25

59.    In 2002, EPA expanded the LPRSA and the scope of the investigation to include the entire 17-mile stretch of the Lower Passaic River. Propps Decl. Ex. 13 at 4. The scope was changed because EPA recognized many other COCs were present throughout the river requiring an expanded scope of investigation, and that surficial contaminated sediment from the six-mile study area may be moving outside that area based on new data. Propps Decl. Ex. 13 at 4; Propps Decl. Ex. 48 at 1-7;Propps Decl. Ex. 49 at 6.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

60.    While working with Oxy, Maxus, and CLH/Tierra on the Lister Avenue facility and the first studies of the river, EPA also identified other potentially responsible parties (PRPs) for the Lower Passaic River. Propps Decl. Ex. 13 at 4. A number of companies that owned or operated facilities (including Oxy, Maxus, and Tierra) from which hazardous substances were potentially discharged to the river were identified in the 1996, including Benjamin Moore & Co., Alcan Aluminum Corp., Ashland Chemical Co., Monsanto Company, Sherwin-Williams Co., Reilly Tar and Chemicals Corp., Chris-Craft Industries, and E.I. du Pont de Nemours and Co. Propps Decl. Ex. 12 at -121, -123. Those companies subsequently formed the CPG. Propps Decl. Ex. 13 at 4. By August 1996 EPA had sent letters to 92 additional PRPs that each may be responsible for pollution in the Passaic River. *See* Propps Decl. Ex. 50 at -887 (EPA "[h]ave now named 12 official 'PRP's' (2 in 8/95) / 80 more parties under official investigation / Invited all 92 to August 29, 1996 meeting"); ███████████████████████████████████
████████████████████████████████████████████ Among those

primarily responsible for this pollution were Oxy and one of its predecessor entities, Diamond Alkali.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

61.      In 2004, a number of PRPs formed the CPG, including CLH on behalf of Oxy. Propps Decl. Ex. 195. By March 30, 2007, it included 76 entities. *Id.* As of February 7, 2017, it included 52 parties (but not Oxy, Maxus, or Tierra). Propps Decl. Ex. 14.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

62.      In 2004, the CPG agreed to pay for the RI/FS of these 17 miles, and in 2007, the CPG took over the RI/FS. *Id.* The settlement agreement was amended in 2005 and 2007, adding more parties to reach a total of over 70 settling parties. *See, generally, Id.* at 4-5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

63.      In 2004, Oxy agreed to conduct an RI/FS of the Newark Bay Study Area, and EPA partnered with the USACE, New Jersey Department of Transportation, US Fish & Wildlife Service, NOAA, and NJDEP to conduct a joint study of the LPRSA. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

64.      In connection with this joint study, EPA concluded that the lower 8.3 miles of the

LPRSA contained the bulk of the contaminated sediment and required the most immediate action. *Id.* at 1. EPA then undertook a targeted RI and focused feasibility study of the lower 8.3 miles. *Id.* at 5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

65.    In November 2005, NJDEP commenced a lawsuit against Oxy, Maxus, Tierra, YPF, Repsol, and certain of their affiliates, seeking recovery under various New Jersey environmental statutes. *See* Propps Decl. Ex. 28. It also directed the parties to design a dredging remedy. Propps Decl. Ex. 52 at -4591, -4603.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

66.    EPA's Regional Administrator Alan Steinberg was quoted as criticizing NJDEP in the Newark Star Ledger that NJDEP was "prejudging that dredging is the solution. Dredging without the data doesn't make sense… I understand the temptation to take action immediately. I understand this river has been contaminated over a long period of time  But just taking an action for the sake of taking an action, particularly when that action is not particularly well informed, is not good." Propps Decl. Ex. 53 at -67.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The Trust does not dispute that Mr. Steinberg made the above statement, however, the Trust notes that a statement made by an EPA administrator in his personal capacity to a local newspaper is not comparable to an official position published by the EPA.

28

67.    In 2007, EPA proposed a feasibility study advocating for a dredging and/or capping remediation plan costing $900 million to $2.3 billion. Propps Decl. Ex. 186, at Table A, Table B, Figure A. In the face of critical public comments, EPA withdrew that proposal. See Propps Decl. Ex. 196. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph, but objects to the highlighted statements in red as mischaracterizations of the cited documents and testimony: The draft FFS did not "advocate for" any of the remediation plans presented in the cited tables, and Propps Decl. Ex. 196 does not indicate that the EPA "withdrew" any proposal or work product of any kind.  The document says: "After careful consideration and in recognition of the importance of the decisions at hand, EPA has decided, in consultation with its partners, to take additional time to review and address, as appropriate, the comments received."  The Trust further objects on the grounds that any document cited speaks for itself.

The testimony of *one* Maxus employee, especially in his personal capacity, that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

68.    After another decade of study, on March 3, 2016, EPA issued a Record of Decision for the lower 8.3 miles of the Lower Passaic River. As of the 2016 ROD, EPA had notified over 100 PRPs that they may be liable for contamination of the Passaic River. Propps Decl. Ex. 13 at

38.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, except that the Trust notes the April 2014 FFS ended the "study" period.

69.     EPA did not issue such a letter to any YPF Defendant. *See* Propps Decl. Ex. 55.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 69.

70.     In the 2016 ROD, EPA also identified eight chemical compounds found in the lower 8.3 miles that necessitated a significant remedy for the Lower Passaic River at an estimated cost of $1.38 billion. Propps Decl. Ex. 13 at 14-16, 96. Only two of those compounds (DDT and dioxins) were produced by Oxy's predecessor, and both also were produced by other PRPs. *See* Propps Decl. Ex. 61 at ¶ 7; Propps Decl. Ex. 56 at ¶¶ 11, 44.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

71.     Notably, the $1.38 billion remedy in the 2016 ROD requires the Lower Passaic River be capped with a thick layer of sand bank-to-bank, keeping the most concentrated dioxin buried far below the surface of the riverbed. Propps Decl. Ex. 13 at 85-87, 269. Dredging is only being used for flood control and navigational purposes. Propps Decl. Ex. 13 at 52.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. However, the Trust disputes the statement highlighted in red. Dredging is being used for more than flood control and navigational purposes. As admitted by the YPF Defendants in the next paragraph, dredging is required to accommodate the sand-based cap.

72.     The dredging would remove surficial sediment from the top 2.5 feet of the riverbed to accommodate two-feet of a sand-based cap. Propps Decl. Ex. 13 at 52-53. The lower 1.9 miles of the Lower Passaic River is to be dredged for navigational purposes, not to remediate the river.

The total estimated sediment to be removed is 3.5 million cubic yards. Propps Decl. Ex. 13 at 95. The 2016 ROD further contemplates the construction of a de-watering facility adjacent to the Passaic River, where the removed sediment will be de-watered, shipped to a landfill outside of New Jersey or with the more concentrated contaminated sediment being further treated by incineration (an estimated 10 percent of the removed sediment). *See* Propps Decl. Ex. 13 at 2; Propps Decl. Ex. 22.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. However, the Trust disputes the statements highlighted in red. The Trust submits that the lower 1.7 miles of the Lower Passaic River is to be dredged for navigational purposes. *See* Propps Decl. Ex. 13 at 52. The Trust also disputes that "an estimated 10 percent of the removed sediment" would be treated by incineration. Out of a total of 3.5 million cubic yards, the cited document says: "the selected remedy is estimated to provide treatment of approximately 130,000 cy of contaminated sediment through incineration off-site." *Id.* at 88. The Trust further objects on the grounds that any document cited speaks for itself.

73.    In September 2016, Oxy agreed to conduct the remedial design, which was estimated to cost $165 million. *See* Proof of Claim no. 413 of Occidental Chemical Corp. at ¶ 10(c).; Propps Decl. Ex. 57. To date, the remedial design has not been completed or submitted for public review. Propps Decl. Ex. 157.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

74.    There is local opposition to locating and constructing the de-watering facility required by the 2016 ROD, according to a recent press report. *See* Propps Decl. Ex. 58.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether there is local opposition to requirements of the 2016 ROD is not material to any claims or defenses presented in this case.

75.    EPA also selected "hot spot" dredging to remediate isolated areas of the Upper Passaic River, utilizing natural monitored recovery for the rest of that part of the River. Propps

Decl. Ex. 59 at 62.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

76.    Despite the fact EPA knew dioxin was found in the Passaic River since 1983,

*See* Propps Decl. Ex. 34 at 64:12-20; *see also* Propps Decl. Ex. 60; Propps Decl. Ex. 13 at 5-6. Further, despite having concerns about dioxin since 1984, even today – almost 40 years later – no remediation has occurred in the Passaic River. *Id.* Notably, Maxus' environmental engineers were correct about the nature of the contaminated sediment: even in the 2016 ROD, EPA did *not* order the most concentrated dioxin-contaminated sediment to be dredged, but rather only the top 2.5 feet of sediment and not for the purpose of removing dioxin from the river but only to protect against flood and permit navigation. Propps Decl. Ex. 13 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statement that "no remediation has occurred in the Passaic River." In June 2008, EPA, OCC, and Tierra signed an AOC for a non-time-critical removal action to remove 200,000 cy of contaminated sediment from the river, and 40,000 cy had been dredged by 2012. Propps Decl. Ex. 13 at 5. In June 2012, EPA and the CPG signed an AOC for a time-critical removal action at RM 10.9. Removal was substantially completed in 2014. *Id.* at 5-6. The Trust objects to the remainder of the statements in this paragraph as mischaracterizing the cited documents which speak for themselves.

77.    The Natural Resource Damages Trustee also is pursuing Natural Resource Damages pursuant to 42 U.S.C. § 9607. *See* Propps Decl. Ex. 61 ¶ 41.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the

statements highlighted in red as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, are inadmissible hearsay and cannot constitute the basis for an undisputed fact.  The Trust further notes that ███████████. *See* Propps Decl. Ex. 29 at 183 n.851.

E.    **REMEDIATION**

c

78.    Over the three decades preceding their bankruptcy filings on June 17, 2016, Maxus and/or CLH/Tierra funded and conducted a multitude of investigations and clean-up activities associated with the Lister Site and the Passaic River on behalf of Oxy, working over that span of time with both State and Federal regulatory authorities and other potentially responsible parties. Propps Decl. Ex. 13 at 13-19. This work included:

- 1983-1986: site and sediment characterization studies and remediation feasibility evaluations

- 1994-1995: RI, human and ecological risk assessment, and a FS for the study area

- 2005 sediment bed erosion tests (Sedflume and Gust Microcosm)

- 2005-2007 high resolution sediment coring program

- 2005 small volume water column sampling program

- 2006 low resolution sediment coring program

- 2007-2008 berylium-7 bearing sediment collection program

- 2008 tributary, CSO and SWO sampling program

- 2008 low resolution sediment coring program

- 2009-2010 benthic and surface sediment program

- 2009-2010 physical water column monitoring program

- 2010 high-flow water column suspended solids sampling

- 2011-2012 chemical water column monitoring program

- 2009-2010 fish community and tissue collection surveys

- 2010 habitat identification survey
- 2010 summer/fall avian community survey
- 2007 through 2012 single and multi-beam bathymetric surveys
- 2011-2012 RM 10.9 characterization sampling
- 2012 background benthic sediment sampling
- 2012 low resolution supplemental sediment sampling program

*Id.* at 13.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

79.    Far from running away from Maxus's indemnity obligation to pay for Oxy's environmental liabilities in the Passaic River, the YPF Defendants continued supporting Debtors efforts to cooperate with regulators. *Id.* Debtors contributed substantially to the remediation while under YPF's ownership. *See, id.* (listing EPA enforcement activities with which Debtors cooperated during YPF's ownership).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The YPF Defendants encouraged and assisted Maxus in litigation against Occidental seeking to escape any indemnity obligation. Further, YPF Defendants actively litigated against environmental regulators at both the State and Federal level in an attempt to avoid any environmental remediation obligations.

80.    As noted below, Diamond Shamrock put the properties of which Oxy refused to accept title (including the Lister Site property which Oxy had operated previously between 1976 and 1977) in a new company, now known as Tierra. *See infra* ¶¶ 95-98. Tierra never had any operations that polluted the Passaic River; it was only a passive landowner that eventually became responsible for meeting Maxus's indemnification obligations to Oxy. *See infra* ¶ 335. Tierra

34

completed the interim remediation measures at the Lister Site in 2001, ending even passive runoff from that site into the Passaic River.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statement highlighted in red. Judge Corodemus has already determined that Maxus and Tierra are alter egos and jointly and severally liable for the environmental damages, including any indemnification obligations to Oxy. Trust SOF ¶¶ 133-34; Smith Decl. Exs. 75A, 76, 77. Moreover, under CERCLA, environmental damages pass with ownership of the land to the new owner, in this case, Tierra.

81.     In its 2013 Response to Comments Received on Proposed Settlements in the Passaic River Litigation, the NJDEP noted that YPF and Maxus were willing to settle, while Oxy was not. *See* Propps Decl. Ex. 22 at 3. In contrast, NJDEP described Oxy as both "legally responsible and recalcitrant" for the extensive environmental liabilities it caused. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether or not Oxy was willing to settle or was legally responsible is irrelevant. Judge Corodemus has already determined that Maxus is required to indemnify Oxy for the relevant environmental liabilities. Smith Decl. Ex. 75.

## F.     OTHER SITES

82.     Although the Complaint (Adv. Proc. D.I. 1) references polluted sites elsewhere (¶¶ 48-57), under Defendants' ownership Debtors effectively remediated them to manageable levels before Debtors filed for bankruptcy. Indeed, there are only three material allowed claims (for two sites in Ohio and Wisconsin), totaling around $30 million, for any other sites. *See* D.I. 1460-1 at Art. I.A.197 (def'n of "State of Wisconsin Milwaukee Solvay Class 4 Claim"), I.A.210 (def'n of "United States Milwaukee Solvay Class 4 Claim"), I.A.195 (def'n of "State of Ohio Painesville Class 4 Claim").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

83.    Through its historical connection to DSCC (now Oxy) by means of the SPA Maxus's contractual and liabilities extend to a few other sites, including in Kearny, New Jersey; Painesville, Ohio; and Milwaukee, Wisconsin.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

84.    ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

85.    The Kearny Plant Site is a former chromate chemical manufacturing facility that consists of approximately 28 acres in in Kearny, New Jersey. *See* Propps Decl. Ex. 64 at -348. DSCC acquired the plant in 1948 and processed chromite until 1971, and the plant was closed in 1976. *Id.* A majority of the chromite was generated and disposed of onsite, but some was also used by offsite properties, almost all of which were located in the industrial area in the town of Kearny. *Id.* In 1986, Maxus's subsidiary CLH, later Tierra, acquired the site pursuant to the terms of the SPA. *See* Propps Decl. Ex. 500 at 1-2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

86.    In 1990, Maxus entered into an Administrative Consent Order with the State of New Jersey to investigate and remediate both onsite and offsite properties (the latter of which were not owned by CLH, OCC or any Maxus affiliate). Propps Decl. Ex. 64 at -348-349. NJDEP proposed cleanup standards in September 1998, which Maxus indicated could be adopted by 2001. *Id.* at -348. In 1999, current activities included execution of remedial investigation at offsite properties, preparation of remedial investigation reports for sites not delisted, and continued toxicology studies to maintain to improve cleanup standards. *Id.* at -357. The future work schedule projected remedial investigation completion in 2001, feasibility study completion in 2004, a record of decision in 2005, remedial design activities in 2006, and remedial construction and Operation and Maintenance ("O&M") occurring from 2006 to 2016. *Id.* at -358.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

87.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes this paragraph as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, and cannot constitute the basis for an undisputed fact.

88.    The site in Painesville, Ohio is located on the banks of the Grand River and a short distance from Lake Erie. Propps Decl. Ex. 64 at -8363. The former chemical manufacturing facility at the site operated from 1912 through 1976 and produced a variety of hazardous chemicals. *Id.*

357

Operations at the facility ceased in 1976. *See id.* Investigative and remedial work on the site was performed by Tierra, who was under contract with Maxus. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

89. ████████████████████████████████████
████████████████████████████████████████
██████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, are inadmissible hearsay and cannot constitute the basis for an undisputed fact. The Trust also notes that the statement is an incomplete characterization of Dr. Cutler's estimates. Notably, ████████████████████
████████████████████████

90. The Milwaukee Solvay Coke and Gas Co. site consisted of 46 acres in a predominately industrial and commercial area in Milwaukee, Wisconsin. *See* Propps Decl. Ex. 61 at MAXBK000829952.The site saw more than a century of industrial use, which included coke and manufactured gas production, coal and coke storage, rail car ferrying, electric railroad, blast furnace for iron production, and hide tanning. *See* Propps Decl. Ex. 67 at 5. DSCC owned and operated the site between 1969 and 1973. Main Proc. D.I. 969 at 17. As of 2019, the site houses crushed brick, concrete, brick and concrete fines, and fill. *See* Propps Decl. Ex. 67 at 5.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

91. None of these sites have resulted in significant environmental liabilities for Debtors in their bankruptcy cases. The Milwaukee and Painesville sites resulted in settled claims, with the State of Wisconsin receiving an allowed claim for $5 million and EPA receiving an allowed claim

for $696,361 in connection with the former, and the State of Ohio receiving an allowed claim for $25 million in connection with the latter. *See* Amended Plan Art. I.A.197 (def'n of "State of

Wisconsin Milwaukee Solvay Class 4 Claim"), I.A.211 (def'n of "United States Milwaukee Solvay Class 4 Claim"), I.A.195 (def'n of "State of Ohio Painesville Class 4 Claim") Main Proc. D.I. 1460-1. Four entities submitted proofs of claim in connection with the Kearny Plant Site: Apogent Transition Corp., Beazer East, Inc., Kearny Peninsula Sites Environmental Remediation Trust, and Standard Chlorine Chemical Company Superfund Site Trust. *See* Quarterly Claims Register, filed Apr. 18, 2022. Main Proc. D.I. 2493. Only two – Kearny Peninsula Sites Environmental Remediation Trust, Claim 332, and Standard Chlorine Chemical Company Superfund Site Trust, Claim 249 – are listed at anything other than $0; each is listed at $243,622.71 as a general unsecured claim. *Id.* at 100, 172. ████████████████████████

████████████████████████████████████████████

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to and disputes the characterization of environmental liabilities as at sites other than the DASS insignificant.

## IV.    THE OXY INDEMNITY AND MAXUS'S CORPORATE PREDECESSORS

92.    On September 4, 1986, nearly a decade before YPF acquired Maxus, by the terms of a Stock Purchase Agreement (the "SPA") by and among Diamond Shamrock, Occidental Petroleum Corporation, Occidental Chemical Holding Corporation, and Oxy-Diamond Alkali Corporation, Diamond Shamrock sold its chemical business, DSCC, to an Oxy affiliate for the purchase price of $411,132,672. *See* Propps Decl. Ex. 68; Propps Decl. Ex. 69.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

93.    DSCC became known as Occidental Electrochemicals Corporation and was merged into Oxy a year later on November 30, 1987. *See* Propps Decl. Ex. 70; Propps Decl. Ex. 71.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

94.    On April 28, 1987, the remaining Diamond Shamrock changed its name to Maxus Energy Corporation, (now Maxus), an independent oil and gas exploration and production company. *See* Propps Decl. Ex. 72 at 0031409; Propps Decl. Ex. 73 at -11264.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

95.    Despite that the sale occurred over 35 years ago, there were several key provisions of the transaction relevant to the present action. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

96.    As a result, on June 26, 1986, Diamond Shamrock created a new subsidiary, Diamond Shamrock Process Chemicals, Inc., which changed its name on July 11, 1986 Diamond Shamrock Chemical Land Holdings, Inc., also known as Chemical Land Holdings, Inc. *See* Propps Decl. Ex. 76; Propps Decl. Ex. 77. Diamond Shamrock Chemical Land Holdings, Inc. was renamed Chemical Land Holdings, Inc., on December 4, 1987, (Propps Decl. Ex. 78), and subsequently renamed Tierra Solutions, Inc. on February 25, 2002 (Propps Decl. Ex. 79).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to and dispute the characterization that the name changes were "as a result" of the purported

facts in Paragraph 95 as unsupported by the documents cited.

97.     On August 28, 1986, via deed DSCC transferred ownership of 120 Lister and 80 Lister to Diamond Shamrock Chemical Land Holdings for $10.00 each. *See* Propps Decl. Ex. 80 & Propps Decl. Ex. 81 (reflecting the transfer of 120 Lister and 80 Lister from DSCC to Diamond Shamrock Chemical Land Holdings).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

98.     ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The details concerning the structure of Oxy and DSCC's sale agreement is not material to any claims or defenses presented in this case.

99.     In addition to retaining ownership of the Lister Site and certain other properties, Diamond Shamrock also agreed to defend, indemnify and hold harmless Oxy for certain environmental liabilities related to Diamond Shamrock's (now Oxy's) chemicals business, including certain remediation obligations at the Lister Site. *See* Propps Decl. Ex. 68 at Section 9.03. Oxy required Diamond Shamrock to indemnify it for environmental liabilities associated with the chemicals business (the "Oxy Indemnity"), even though it understood the

42

remaining yet much smaller oil and gas exploration company (renamed Maxus Energy Corporation) would be burdened with satisfying those liabilities.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust objects to, and disputes, the statement of fact highlighted in red as argumentative and notes that YPF fails to point to any evidence in the record supporting this statement.

100.    Debtors' environmental liabilities arise almost entirely under the Oxy Indemnity. *See* Propps Decl. Ex. 68; Propps Decl. Ex. 82 at 8. ███████████████████████

████████████████████████████████████████

██████████████████ Thus, of at least $722 million expended by the Debtors from 1987 through 2016 in connection with environmental remediation, approximately $717 (or 99%) million was spent in satisfaction of the Oxy indemnity. *See* Propps Decl. Ex. 85. ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph. The Trust further objects on the grounds that any document cited speaks for itself.

101.    Moreover, none of the YPF Defendants were ever parties to that SPA, or guarantors of Maxus's obligations thereunder, at any relevant time. *See generally,* Propps Decl. Ex. 68.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph. The Trust further objects on the grounds and to the

43

extent that this paragraph offers a legal conclusion, to which no response is required.  The Trust further objects on the grounds that any document alluded to speaks for itself.

102.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph.  The Trust further objects on the grounds and to the extent that this paragraph offers a legal conclusion, to which no response is required.  The Trust further objects on the grounds that any document alluded to speaks for itself.

103.

In fact, even in its most recently filed 10-K, Occidental Petroleum estimates its "remediation balance" for NPL sites (i.e., Superfund Sites) as $427 million, of which at most 96% relates to the DASS. Propps

Decl. Ex. 187.

     *Responses and Objections:* Subject to its General Objections, the Trust expresses no view as to whether the allegations in this paragraph are accurate, but disputes that Occidental's belief as to the ultimate magnitude of Passaic remediation at any given time is relevant to this proceeding. The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

     104.

     *Responses and Objections:* Subject to its General Objections, the Trust expresses no view as to whether the allegations in this paragraph are accurate, but disputes that Occidental's belief as to the ultimate magnitude of Passaic remediation at any given time is relevant to this proceeding. The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

     105.    The SPA did not include covenants restricting Maxus's ability to sell major assets, nor did it otherwise provide protections for Oxy's indemnity. *See* Propps Decl. Ex. 68 at -26349. From 1987 through 1995, Maxus had paid over $38 million in connection with its cost-sharing obligations with Oxy. *See* Propps Decl. Ex. 85.

     *Responses and Objections:* Subject to its General Objections, the Trust expresses no view as to whether the allegations in this paragraph are accurate, but disputes that Occidental's belief as to the ultimate magnitude of Passaic remediation at any given time is relevant to this proceeding. The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

**V.      MAXUS'S FINANCIAL DISTRESS LEADS MAXUS TO SELL ITSELF**

45

A.    **MAXUS'S DETERIORATING FINANCIAL PERFORMANCE BEFORE THE 1995 YPFACQUISITION**

106.    During the years following the sale of the chemicals business to Oxy, Maxus engaged in a series of assets sales and dividends. Diamond Shamrock spun off Diamond Shamrock R&M, Inc., its refining and marketing assets, to shareholders in 1987 and sold its coal and geothermal assets in 1987. *See* Propps Decl. Ex. 98 at 7-8; Propps Decl. Ex. 15 at YPF0001491.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

107.    During this period, Maxus also used $147 million from the stock sale of the chemicals business to fund shareholder dividends (Propps Decl. Ex. 99) and continued its contraction by, among other things, spinning off a number of other segments of its business, including Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Coal Company, and Transworld Petroleum (U.K.) Limited (which held substantially all of Maxus's oil and gas interests in the British North Sea). *Id.* at 2-3, 21-22.

*Responses and Objections:* Subject to its General Objections, the Trust can neither concur with nor dispute the allegations set forth in this paragraph, as the YPF Defendants have not provided or identified the exhibit cited to as support.

108.    The spin-off of the refining and marketing business alone eliminated $799.3 million in physical assets ($521.7 million, net of accumulated amortization of $277.6 million) and reduced paid-in capital by approximately $258.1 million. *Id.* at 41, 50-51.

*Responses and Objections:* Subject to its General Objections, the Trust can neither concur with nor dispute the allegations set forth in this paragraph, as the YPF Defendants have not provided or identified the exhibit cited to as support.

109. ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████ and resulted in Maxus's shareholders being paid $147 million in dividends at the same time Maxus had agreed to indemnify, defend, and hold harmless Oxy and its affiliates for certain of their environmental liabilities and related costs. *See* Propps Decl. Ex. 98 at 7-8, Propps Decl. Ex. 68 at -488-498.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph on the grounds that the phrases ██████████████ ██████████████████████████████ are vague, ambiguous, and/or fail to articulate with sufficient clarity the factual allegation being made.  The Trust disputes that the documents cited support these allegations, and objects on the grounds that any document cited speaks for itself.

The Trust also objects that the phrases "resulted in Maxus's shareholders being paid $147 million in dividends," and "at the same time Maxus had agreed to indemnify, defend, and hold harmless Oxy and its affiliates for certain of their environmental liabilities and related costs" are vague, ambiguous, and/or fail to articulate with sufficient clarity the factual allegation being made.  The Trust disputes that the documents cited support these allegations, and objects on the grounds that any document cited speaks for itself.

110.     Faced with its lackluster performance, Maxus engaged in a corporate restructuring in the early 1990s. From 1991 to 1993, Maxus restructured its debt and equity to provide immediate funding for its major development and construction projects and matched its debt repayment schedule with the future cash flows expected from those projects, while maintaining adequate working capital. Propps Decl. Dex. 98 at 30.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph on the grounds and to the extent that the factual allegations set forth therein mischaracterize the cited document, which speaks for itself.

111.    During this period, there were substantial increases in capital expenditures for new plant and drilling expansion but those expenses included addressing "dry hole costs" as well. *See* Propps Decl. Ex. 100 at F-3 (showing "expenditures for properties and equipment – including dry hole costs"). That capital campaign resulted in a significant increase in Maxus's debt in 1993.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph on the grounds and to the extent that the factual allegations set forth therein mischaracterize the cited document, which speaks for itself.

112.    In 1993, Maxus also put its Northwest Java contract area up for sale, but only received disappointing bids. Propps Decl. Ex. 101 at -511; Propps Decl. Ex. 102 at -438.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of facts in this paragraph on the grounds and to the extent that the factual allegations set forth therein mischaracterize the cited document, which speaks for itself.

113.    ██████████████████████████████
██████████████████████████████████
████████████████████  During 1993, Maxus issued additional debt and preferred stock to continue funding its operations and refinance maturing debt obligations and preferred stock obligations. "Of the $413 million proceeds received in 1993 from the issuance of long-term debt, $204 million was used to refinance currently maturing debt and to fund the early retirement of a portion of the Company's 11¼% sinking fund debentures…with the remainder partially funding the 1993 capital program." *See* Propps Decl. Ex. 98 at 30. Additionally, Maxus issued a new class of $2.50 preferred stock and used the majority of the proceeds to pay for the mandatory redemption of 625,000 shares of Maxus's $9.75 preferred stock by February 1994, as

48

required by the terms of the preferred stock. Propps Decl. Ex. 98 at 31.

*Responses and Objections:* The Trust notes that $412 million, not $413 million, of proceeds was received in 1993. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

114.    Maxus incurred losses each year from 1987 to 1994, with the exception of 1990 and 1992. *See* Propps Decl. Ex. 104 at 3 ("with the exception of 1990 and 1992, the Company has incurred losses each year since 1987"); Propps Decl. Ex. 17 at 14, F-1. The positive results in 1992 were largely the result of a one-time settlement of a lawsuit. In 1992, Maxus settled a lawsuit filed against Kidder Peabody that resulted in Maxus receiving $165 million. That sum was largely responsible for Maxus's positive performance that year. *See* Propps Decl. Ex. 17 at 17.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

115.    In January 1994, Maxus retained Credit Suisse First Boston ("CSFB") and Merrill Lynch to review strategic alternatives to address Maxus's funding shortfall. *See* Propps Decl. Ex. 102 at CS 001438.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

116.    To bridge this shortfall, Maxus sold its partnership interest in Diamond Shamrock Offshore Partners in April 1994, and two producing oil and gas properties in June 1994. Propps Decl. Ex. 17 at 19. These asset sales raised net proceeds of approximately $325 million. Propps Decl. Ex. 105 at YPF0005357; Propps Decl. Ex. 17 at 19.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

117.    Maxus's financial circumstances were so dire that CSFB discussed the sale of Maxus's mid-continent E&P assets held primarily by a Maxus subsidiary, Midgard Energy Company ("Midgard"), with a number of potential purchasers during May 1994. *See* Propps Decl. Ex. 102 at CS 001439 ("In May 1994, shortly after the sale of Diamond Shamrock Offshore Partners, discussions were held with Apache, Phillips Petroleum, Parker & Parsley and Seagull Energy regarding the purchase of Maxus's Mid-Continent assets (renamed Midgard)."). These discussions did not result in a sale and were ultimately terminated in June 1994. *Id.;* Propps Decl. Ex. 106 at -195-96.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the characterization of Maxus's financial circumstances as highlighted in red to the extent the documents cited, which speak for themselves, do not support this allegation.  The Trust also disputes YPF Defendant's claim that discussions regarding a sale were terminated in June 1994, as the cited documents indicate that discussions continued until 1995.

118.    In 1994, Maxus also completed a restructuring program that featured staff reductions and asset sales. *See* Propps Decl. Ex. 17 at 16, 18 (describing staff reductions and asset sales). This restructuring generated a pre-tax net benefit of $101 million and expected annualized cost savings of approximately $35 million. *Id.*

*Responses and Objections:* The Trust is unable to confirm the $35 million annualized cost figure cited above. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph. The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

119.    Despite its attempts to address its fiscal troubles, at an August 1994 Board Meeting,

Credit Suisse First Boston advised Maxus's Board that "Maxus was experiencing a significant near-term liquidity problem" and that "Maxus runs out of excess cash by the 1st quarter of 1996."

*See* Propps Decl. Ex. 101 at CS001511-12; *See* Main Proc. D.I. 2 ¶ 26.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph, but objects to the extent the phrase highlighted in red mischaracterizes the documents cited, which speak for themselves.

120.    By August 1994, proceeds from asset sales and reductions in projected program spending pushed the threshold for Maxus's funding shortfall from October 1994 to the first quarter of 1996. As Maxus explained in its public SEC filings: "In the Company's opinion, adequate cash from operations, asset sales and project financing will be available to fund a *significantly reduced* program spending budget in 1994, service debt and pay dividends and trade obligations" and "[d]uring 1994, however, the Company plans total domestic and international program spending in the amount of approximately $212 million, *substantially below* the levels of 1990 through 1993. Consequently, during the year, the Company intends to focus its international efforts primarily on its present interests in Indonesia, Ecuador, Bolivia and Venezuela, while reducing its activities outside these areas." *See* Propps Decl. Ex. 98 at 2, 29 (emphasis added). *See also* Propps Decl. Ex. 108 at CS 000671-673.

> *Responses and Objections:* The Trust is unable to confirm the timeline of Maxus's funding shortfall. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph, except to the extent that the documents cited do not establish that the phrase "by August 1994" inaccurately states when "proceeds from asset sales pushed the threshold for Maxus's funding shortfall from October 1994 to the first quarter of 1996." The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

121.   Despite its attempts to solidify its financial footing, Maxus only temporarily bridged its expected funding shortfall. *See* Propps Decl. Ex. 101 at CS001531. Thus, Maxus began actively seeking a suitor. Propps Decl. Ex. 109 at -97. Maxus not only continued to have a "significant near-term funding gap" of between $300-$500 million, CSFB told Maxus that it "was experiencing a significant near-term liquidity problem" and that "Maxus runs out of excess cash by the 1st quarter of 1996." *See* Propps Decl. Ex. 101 at CS 001510, CS 001511, CS 001512. CSFB concluded that the "status quo does not appear to be an attractive prospect for Maxus" and that "under any realistic pricing scenario, the company cannot fund its program spending internally for more than 1 1/2 years, the post 1995 funding gap becomes substantial ($300-$500 million), reserve replacement is well below prior performance, underlying net asset value does not materially increase, access to the capital markets will be increasingly difficult." CSFB urged Maxus to make changes in order "to avoid any future liquidity problems." *Id.* at CS001531

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

122.   By 1995, Maxus owed $976 million in long-term debt with annual interest payments, had $432 million in preferred shares outstanding, and paid interest payments and preferred stock dividends amounting to $135 million per year. *See* Propps Decl. Ex. 110; *See* Propps Decl. Ex. 100 at F-53; Propps Decl. Ex. 106 at 6 ("the Corporation's discretionary cash flow has been dropping over the course of the last several years and has failed to keep pace with program spending").

*Responses and Objections:* The Trust disputes that total amount of ~~interst~~interest payments and preferred stock dividends. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph, except to the extent the allegation that Maxus "paid interest payments and preferred stock dividends amounting to $135 million" misstates or inaccurately reflects the cited documents.  The Trust objects to this

52

paragraph on the grounds that any document cited speaks for itself.

123. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the factual allegations embedded in the testimony cited in this paragraph are not material and/or irrelevant to this adversary proceeding.  The Trust objects to this paragraph on the grounds that any document cited speaks for itself.

**B.**    **OTHER POTENTIAL INTERESTED INVESTORS**

124. ███████████████████████████████████
██████████████████████████. All of those sixteen bidders conducted diligence on Maxus, including its environmental liabilities. Propps Decl. Ex. 102 at -437.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph and highlighted in green. The Trust disputes that the allegation highlighted in red mischaracterizes the cited document, which states in relevant part that "[s]everal of the companies [i.e., bidders] including Amoco and YPF completed thorough due diligence of all or significant blocks of assets and liabilities" of Maxus.

125.    For example, in mid-November 1994, Amoco Corporation ("Amoco") began the process of exploring a merger with, or acquisition of, Maxus. However, Amoco and Maxus failed to reach an agreement regarding the value of Maxus as a whole, and instead Amoco submitted a proposal to acquire individual Maxus assets. *Id.* at -439. On January 27, 1995, Amoco offered $585 million to purchase Maxus's Indonesian subsidiaries and expressed interest in the acquisition of a controlling interest in Maxus's mid-continent properties held by Midgard. *Id.* at 439-440. Maxus and its advisors rejected Amoco's offer as too low. *Id; see also* Propps Decl. Ex. 106 at YPF-AK-0027194-195.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

126.    While all bidders – including YPF – diligenced Maxus's environmental liabilities (as addressed in further detail below), only Amoco and another company, ARCO, stated that they were specifically declining to bid on the company as a result of its environmental liabilities. *See* Propps Decl. Ex. 102 at CS 001439.

**Formatted:** Highlight

*Responses and Objections:* The Trust disputes the allegation in this paragraph for the

reasons set forth in its response to paragraph 124, *supra*, and on the ground that the cited document does not state that, of all bidders, only Amoco and ARCO stated that the were specifically declining to bid on the company as a result of its environmental liabilities, but rather identifies only Amoco and ARCO as having declined to bid for that stated reason.

127.    For example, another, bidder, Enterprise Oil PLC did not pursue acquisition of Maxus as a whole because strategically it was interested only in acquiring Maxus's international assets, not its significant U.S. assets. Propps Decl. Ex. 102 at -439.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. The details of a potential acquisition that was never presented to Maxus is not material to any claims or defenses presented in this case.

## C.    YPF'S ACQUISITION OF MAXUS

128.    ███████████████████████████████████████████
███████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

129.    ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

130.    ███████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the allegation set forth in this paragraph, but does object on the ground that the cited document reflects testimony by David Smith.

131.    The negotiation of the potential acquisition was above-board and arm's-length, with Maxus having retained highly reputable financial and legal advisors. Propps Decl. Ex. 111 at -639-644.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

132.    On January 27, 1995, YPF submitted a bid for Maxus as a whole, offering to purchase all the issued and outstanding stock of Maxus at $5.00 per share, a 33.3% premium over its trading price of $3.75 per share. *See* Propps Decl. Ex. 112; Propps Decl. Ex. 113.

*Responses and Objections:* The Trust notes that Maxus stock had a trading price of $3.60 per share, not $3.75 during the period of December 30, 1994 to January 31, 1995. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

133.    Maxus's independent Board rejected the offer. Propps Decl. Ex. 106 at YPF-AK-0027194-195. Maxus determined that the offer had too many conditions attached, and, even without conditions, considered the offer price insufficient for further evaluation. *See id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

134.    Amoco (addressed above) and YPF both continued their respective pursuit of

Maxus and/or its certain of its assets. Propps Decl. Ex. 111. By the end of February 1995, Maxus received new bids from both Amoco and YPF. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

135.    On February 26 and 28, 1995, the Board of Directors of Maxus Energy Corporation (the "Maxus Board") met to consider the offers from Amoco and YPF. Propps Decl. Ex. 111.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

136.    YPF enhanced its offer to acquire all issued and outstanding common stock of Maxus for $5.50 per share by means of a tender offer followed by a merger with a wholly owned YPF subsidiary, YPF Acquisition Holding Corp. (the "Tender Offer"). *See* Propps Decl. Ex. 111 at AA_MAXUS0021613-614. The Maxus Board was informed that while the Amoco offer would be preferable to an initial public offering for the Midgard assets, *id.*, and would solve its "funding shortfall, it would not be effective to reduce [Maxus's] financial leverage . . . [and] would result in [Maxus] being smaller, but with essentially the same negative credit characteristics . . . and more limited flexibility." *Id.* at AA_MAXUS0021625.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

137.    The Maxus Board noted during the February 26, 1995 portion of the meeting that the YPF offer expressly required Maxus "to assume additional debt, use $100 million of [Maxus's] existing cash, and use income from certain properties of [Maxus] to amortize such additional debt."

*Id.* at AA_MAXUS0021616-617. The proposed structure would be as follows:

> Chase Manhattan would advance up to $800 million, directly or indirectly, to YPF to finance the acquisition, and $600 million of such debt would be restructured in the following manner: (i) $250 million of debt would be refinanced by a loan to Midgard to be amortized by proceeds from oil and gas production, (ii) $250 million of debt would be refinanced by a loan to [Maxus's] Indonesian subsidiaries to be amortized by proceeds from oil and gas production, and (iii) $100 million would be repaid out of [Maxus's] existing cash on hand.

*Id.* at AA_MAXUS0021619- AA_MAXUS0021620. The $800 million advance would subsequently become an advance of up to $400 million. *Id.*

*Responses and Objections:* The Trust has been unable to verify amount of the subsequent advance. Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

138.    After further negotiations with YPF, and after considering the proposals and the advice of CSFB and its counsel from Jones, Day, Reavis & Pogue LLP, Maxus's independent Board determined that the offer from YPF was in the best interests of Maxus and its shareholders.

and voted to recommend acceptance of the YPF offer. *Id.* at AA_MAXUS0021639-
AA_MAXUS0021644.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> that the board members considered the proposals and upon advice determined that the
> offer from YPF was in the best interests of Maxus and its shareholders and voted to
> recommend acceptance of the YPF offer.  Further, the Trust does not dispute that there
> were board members who could be classified as "independent" under the New York
> Stock Exchange's legal definition of "independent."  However, the Trust disputes that at
> these meetings the independent board members were fully informed of Maxus's financial
> conditions, most particularly the full extent of its environmental liabilities.

139.    The record also reflects that Maxus's board recognized that it lacked alternatives to being acquired by YPF. *See* Propps Decl. Ex. 111 at -37. The alternative proposal by Amoco was perceived as unlikely to create value for shareholders. *Id.* at 39–44. ("in the opinion of management, the Amoco proposal would result in the Corporation having materially diminished financial flexibility going forward.").

> *Responses and Objections:* Maxus expressed that the YPF offer was a better alternative,
> not that it lacked alternatives to being acquired by YPF. Subject to its General
> Objections, the Trust does not dispute the other facts set forth in this paragraph.

140.    Maxus's advisers felt that Maxus was out of options despite the fact that it had issued a press release advertising that it was pursuing strategic alternatives and was being marketed by CSFB. *See* Propps Decl. Ex. 111 at -615. The Maxus Board was informed by both its legal advisers (Jones Day) and its financial advisers (Credit Suisse) that it was "unlikely that a superior alternative" to the transaction proposed by YPF was available. *See* Propps Decl. Ex. 111 at -615.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the statements of fact highlighted in green in this paragraph.  The Trust does not dispute
> that Maxus issued a press release advertising that it was pursuing strategic alternatives
> and was being marketed by CFSB.  The Trust objects to and disputes the characterization
> that "Maxus's advisers felt that Maxus was out of options" as baseless and unsupported

by record evidence.

141.    On February 28, 1995, YPF, YPF Acquisition Corp. ("YPFA"), a wholly-owned subsidiary of YPF, and Maxus entered into a merger agreement (the "Merger Agreement"), Propps Decl. Ex. 114, pursuant to which YPFA commenced a tender offer to purchase all of the outstanding shares of Maxus (the "Acquisition") for approximately $762 million. Propps Decl. Ex. 2 at 76; Propps Decl. Ex. 16 at 2. Through that Merger Agreement, Maxus agreed to the financing structure set forth above. *See* Propps Decl. Ex. 114 at MAXUS3059126 (§ 3.7).  The financing was also approved by Maxus's new board (including three pre-YPF legacy members). *See* Propps Decl. Ex. 111 at -619-20, -639-44. The $5.50 cash per share tender offer resulted in YPF acquiring approximately 88% of the outstanding common stock of Maxus in April 1995. *See* Propps Decl. Ex. 2 at 76. The remaining outstanding common stock of Maxus was redeemed for cash in June 1995 after a special meeting of Maxus shareholders approved the merger of YPFA with Maxus. *Id.* The "Maxus shareholders not accepting the tender offer received the same amount of $5.50 per share paid under the tender offer." *Id.* at 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

142.    The tender offer was financed by a capital contribution of $250 million from YPF to YPFA, and YPFA's drawdown of approximately $442 million from a $500 million credit facility obtained from Chase Manhattan Bank ("Chase") and other lenders. *See* Propps Decl. Ex. 2 at 76. Following the merger, as anticipated by YPF and Maxus, Chase provided credit facilities totaling $425 million (the "Acquisition Facilities") to two Maxus subsidiaries, which were guaranteed by Maxus and by YPF; a $250.0 million credit facility extended to Midgard Energy

Company (the "Midgard Facility"), and a $175.0 million credit facility extended to Maxus Indonesia, Inc. (the "Chase Indonesia Facility"). *Id.* at 76-77; Propps Decl. Ex. 115 at 10; Propps Decl. Ex. 100 at F-42. Maxus used $94 million in cash and the proceeds from the $425 million loan to repay, in part, (i) the facility entered into by YPFA to acquire Maxus's shares, and (ii) the payment to holders of the outstanding shares of common stock that did not accept the tender offer. *See* Propps Decl. Ex. 115 at 10. These shares were converted into the right to receive cash in connection with the tender offer and merger with YPFA. Propps Decl. Ex. 2 at 76.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

143.   The Merger Agreement included a covenant pursuant to which YPF agreed to provide capital contributions to Maxus up to the amount of the Acquisition Facilities (of $425 million) if necessary over a period of nine (9) years following the effective date of the merger in an amount necessary to permit Maxus to meet its obligations, whether upon maturity or otherwise (the "Keepwell Covenant"). Propps Decl. Ex. 2 at 77. Those obligations included preferred stock dividends and redemption payments. *Id.* The Keepwell Covenant was:

> [L]imited to the amount paid by Maxus to service the acquisition loans, including any loans refinancing such loans and will be reduced by the amount of any capital contribution by YPF to Maxus after the date of the merger, and by the amount of the net proceeds from any sale by Maxus of common or nonredeemable preferred stock after the merger. *Id.*

Propps Decl. Ex. 116 at § 5.15; Propps Decl. Ex. 117 at 75 ("YPF committed to contribute capital to CLH up to an amount that will enable CLH to satisfy its obligations."). YPF also agreed to provide a parental guarantee on Maxus's obligations for future preferred stock dividends and redemption payments. Propps Decl. Ex. 2 at 77.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

144.    As of March 31, 1995, Maxus had 1,250,000 shares of $9.75 redeemable preferred stock outstanding ("$9.75 Preferred Stock") with a liquidation value of $101 per share; 3,500,000 shares of $2.50 preferred stock outstanding ("$2.50 Preferred Stock") with a liquidation value of $25 per share; 4,356,958 shares of $4.00 convertible preferred stock with voting rights outstanding ("$4.00 Preferred Stock") with a liquidation value of $50 per share; and long-term debt obligations of $975.6 million. Propps Decl. Ex. 16 at F-2, F-16, F-18 and F-19. The $9.75 Preferred Stock was subject to mandatory redemptions of 625,000 shares per year, with the next redemption scheduled for early 1996. *See Id.* at 1, 20, 25, 27, 28, F-17, Note Seventeen.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

145.    ████████████████████████████████████████
███████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

146.    Solvency experts, Houlihan, Lokey, Howard & Zukin ("Houlihan"), retained by YPF, opined that with the Keepwell in place, Maxus would be solvent even after absorbing $425 million in acquisition debt. *See* Propps Decl. Ex. 109 at -096. Houlihan opined that Maxus would pass the cash-flow and reasonable capital tests with this in place, and would be balance-sheet solvent with or without it, even after absorbing the acquisition debt. Id. at -096.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

147.    All of the material terms of the acquisition were included in public SEC filings by Maxus and YPF – Maxus even sent a copy of its SEC filings to Oxy – and neither Oxy nor any other creditors objected to the transaction. *See* Propps Decl. Ex. 88 at 162:14-166:19 and Propps Decl. Ex. 89, Propps Decl. Ex. 90, Propps Decl. Ex. 91, Propps Decl. Ex. 92, Propps Decl. Ex. 93; Propps Decl. Ex. 94; Propps Decl. Ex. 95 at 95:20-25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

148.

63

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust objects that the witnesses whose testimonies are cited are not percipient witnesses and further objects that these statements █████████████████████████████████████████.

149.  Without the YPF acquisition, Maxus would have sold off its major assets, or it would have filed for bankruptcy. Propps Decl. Ex. 101 at -511-512, -531, -548. In a presentation prepared by CSFB at the time, CSFB noted that Maxus had few options remaining and that it would "run of out excess cash by the 1st quarter of 1996." *Id.* at -512. CSFB presented Maxus's options as limited to a merger, equity carve out, JV, or asset sale, all of which presented significant disadvantages. *Id.* Maxus also never would have had any ability to satisfy its contractual obligation to pay Oxy's share of massive environmental liabilities relating to the Passaic River that only emerged years later, or anything more to EPA either. *See* Propps Decl. Ex. 101 at CS001512 (noting Maxus' funding gap, and that Maxus would run out of excess cash by 1996).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust objects to this statement of fact as pure speculation as to what Maxus "would have" done. The YPF Defendants have provided no evidence of what Maxus would have done and citing to presentations listing out options is not indicative of what Maxus would have done (or its ability to satisfy its contractual obligations) in a hypothetical world where YPF did not acquire Maxus.

D.  **YPF'S DILIGENCE WAS APPROPRIATE AS MAXUS AND YPF REASONABLY BELIEVED MAXUS COULD MANAGE ITS OXY INDEMNITY OBLIGATIONS**

1.  <u>**Historical Background**</u>

150.  In 1983, EPA discovered dioxin at the Lister Site, and in 1983, the New Jersey Department of Environmental Protection ("NJDEP") issued an order requiring DSCC to take

actions to prevent run-off pollution. *See* Propps Decl. Ex. 42.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

151.    In 1985, as part of the investigation of the DASS, Maxus retained the consultants at International Technology Corp. to conduct a comprehensive study of the Passaic River to determine, among other things, whether the dioxin in the river's sediment posed an immediate risk to human health or the environment; a report on that study was submitted to the NJDEP. Propps Decl. Ex. 124 (the "IT Report").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

152.    Among other things, the IT Report concluded:

      i.    "Dioxin occurs throughout the entire length of the lower Passaic River although strong fresh water discharge conditions tend to limit the extent of site-area reach-associated sediment mobility to approximately 6.5 miles upstream." Propps Decl. Ex. 124 at -90606.

      ii.    "The occurrence of dioxin at some locations could not be attributed to the site-areareach as a source [and] was relatively confined to pockets rather than distributed over a wide area."*Id.*

      iii.    There was no immediate and substantial risk to public health or the environment associated with the present distribution of dioxin in the site-area reach associated sediment in the Lower Passaic River below Dundee Dam. *Id.* at -90607.

      iv.    Higher concentrations of dioxin were generally found below the top 2

feet of sediment, which may pose an additional risk to humans the environment if the sediments were disturbed. *Id.* at -90607.

      v.    In fact, the highest concentration of dioxin found was at a location 8 to 10 feet below the surface of the riverbed outside of the Lister Site. *Id.* at -90605.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

153.    In 1987, the NJDEP and EPA issued a ROD for OU-1, the Lister Site itself.  ("1987 Lister Site ROD") Propps Decl. Ex. 125. NJDEP and EPA considered seven different alternatives, ranging from No Action to removal, treatment (via incineration) and disposal of dioxin-contaminated waste. *Id.* at -127. Estimates of the capital costs ranged from $422,000 to $247,808,000. *Id.* at -128. Alternative 3 was selected, which involved containment of dioxin waste above 1 ppb for storage in drums that would be buried and capped at the Lister Site itself, rather than being removed. *Id.* at -132, -146. Alternative 3's estimated cost was just over $8 million. *Id.* at -128. EPA selected Alternative 3 notwithstanding it did "not fully satisfy the preference for treatment expressed in Section 121(b) of CERCLA." *Id.* at -132.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

154.    The 1987 Lister Site ROD selected an interim remedy, with a requirement that the remedy be revisited every two years. Propps Decl. Ex.125 at -195.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

155.    To date, no large-scale sediment removal has occurred, and no interim remedy has been implemented, in the Passaic River. Propps Decl. Ex. 126 at 5. Only two limited removal actions have been carried out – one of 40,000 cubic yards of contaminated sediment adjacent to the Lister Site completed in 2012, and the other at river mile 10.9 in Lyndhurst, which was substantially completed in 2014. Propps Decl. Ex. 13 at 5-6.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The state of dredging at relevant times is disputed by the parties' experts and is not an issue of fact that can be determined absent the resolution of expert testimony.

156.    ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ Of the 54 largest remedial dredging projects before 2000, the aggregate cost of them was $552 million *combined*. Propps Decl. Ex. 127 at -842. EPA and NRC also issued guidance documents at that time observing that remedies for such large-scale contaminated sediment projects could be "prohibitively expensive and involve such extensive areas that disposal of contaminated sediment in a safe manner may not be technologically or economically feasible" given the millions of cubic yards that would have to be removed, treated and disposed of after it was dredged. Propps Decl. Ex. 128 at 8-10, 20, Propps Decl.Ex. 129 at p. 89 of 189. EPA stated at a May 1996 Newark community meeting that "*it's unlikely that all of the contamination could be dredged because there is no place large enough to dispose of the material,*" and that "*there would be few options for remediating the river.*" Propps Decl. Ex. 130. Similarly, ██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the statement of fact highlighted in yellow in this paragraph is not material and/or irrelevant to this adversary proceeding. The Trust disputes as unsupported by the cited document the statement that "of the 54 largest remedial dredging projects before 2000, the aggregate cost of them was $552 million combined." The cited document does not specify that these were the largest sites or contain any cost figures at all.

157.    In the 1990s, environmental remedial dredging was employed for sites that were either pilot study dredging operations or small-scale sites with respect to the volumes dredged. *See* Propps Decl. Ex. 131 at 12, 27, 51, 162. *See also* Propps Decl. Ex. 127 at -842 (confirming that no large scale dredging involving large-scale dredging of high volumes of contaminated sediment was ordered by EPA before 2000).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as incorrect and as mischaracterizations of the cited documents. The Trust notes that the term "small-scale" is entirely undefined and submits that there were several sites in the 1990s with dredging projects in the tens of thousands of cy. *See* Soto Decl. Ex. 168 at Appendix C ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The Trust also objects to the statement that EPA did not order "large-scale dredging of high volumes of contaminated sediment" before 2000 as entirely unsupported by the cited document which speaks for itself.

158.    Particular aspects of the Passaic River also presented challenges for selecting a large-scale dredging and removal remedy. For example, the Lower Passaic River is located in a densely populated and highly industrialized area, in contrast to other rivers like the Hudson River and the Fox River, which are in areas with relatively low population density. Propps Decl. Ex. 13 at 1-2; Propps Decl. Ex. 132 at 8; Propps Decl. Ex. 133 at 2, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Responses and Objections:*  Subject to its General Objections, the Trust disputes the statements highlighted in red in this paragraph as stating Maxus's own self-serving opinions and advocacy positions with respect to the likelihood of dredging, which are not facts.  *See* Propps Decl. Ex. 134 at -514-515 ███████████████████████████████ ████████████████████████████████████████ (emphasis added).  While the Trust does not dispute that resuspension was a known problem, the Trust submits that it is not, and was not during the 1990s, a technically unmanageable or insurmountable problem.

159.    Maxus records reflected that in July 1986, Diamond Shamrock Chemicals Company prepared cost estimates for remediation of various contaminated sites in preparation for negotiations with its insurance carriers prepared for counsel. *See* Propps Decl. Ex. 135. These potential cost estimates were summarized in a memo dated July 15, 1986 from R.C. Halden to W.C. Hutton, including potential Passaic River and Lister Site remediation costs. *See id.* The memo contained a Low-Cost option and a High-Cost option for the remediation of the Passaic River, which were $5 million and $50 million, respectively for the Passaic River, and $40 million and $90 million, respectively, for the Lister Site. *Id.* at -628.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

160.    The Low-Cost option was based on the assumption that only additional studies of the dioxin occurrence in the Passaic River would be necessary, with the least risk being realized by leaving the sediments in place. *Id.* The High-Cost option was based on the assumption that dredging would be required for those limited areas of the Lower Passaic River where sediments with high levels of dioxin were found (resulting in 47,250 cubic yards of sediment dredged and shipped for incineration). *Id.* at -531.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

161.    In 1991, ███████████████████████████████████████ ██████████████████████████ There is no evidence that ██████████████████████

69

███████████████████████████████

███████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statements highlighted in red as argumentative and unsupported by evidence in the record.

162.    In early 1993, one of the consultants Maxus used for toxicology and risk assessments for its work on analyzing data from the Passaic River was ChemRisk. *See* Propps Decl. Ex. 137.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

163.    The people working at ChemRisk at this time were toxicologists, not remediation engineers. In fact, ChemRisk was the toxicology/risk assessment arm of McClaren/Hart Environmental Engineering, a large firm that had a separate remediation engineering group that did not work on the Passaic River for Maxus. *See* Propps Decl. Ex. 138; Propps Decl. Ex. 139; Propps Decl. Ex. 140.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. It is undisputed that McLaren/Hart is a large firm, with significant experience in robust remediation engineering. The YPF Defendants' inappropriate separation of ChemRisk and McClaren/Hart is an attempt to mislead this Court. First, as demonstrated in the Memorandum cited by YPF, the proposed project team was referred to as "McLaren/Hart-ChemRisk's Project Team" and the team "include[d] scientists, engineers and technicians from McLaren/Hart as well as environmental and human health scientists from ChemRisk." Propps Decl. Ex. 140 at -111. Moreover, the individual members of the team were selected because they have "a proven track record working with Maxus." *Id.* The team's Project Director, Project Manager, and Field Team Leader all had significant experience in CERCLA related projects and RI/FS studies. *Id.* at -112.

164.    In its presentation made to Maxus, ChemRisk ██████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the characterization ██████████████████████  This characterization is not based on any cited evidence.  Propps. Decl. Ex. 137 at -643.  To the extent the YPF Defendants cite ████

████████████████████████████████
████████████████████
████████████████████████
██████████
█████████████████████████

165.    Significantly, ███████████████████████████

██████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph as a mischaracterization of the cited document. ███████████████████████████

The Trust objects to this mischaracterization as the document speaks for itself.

166. ███████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust objects to the YPF Defendants' characterization of deposition testimony.  To the extent the YPF Defendants intend to rely on deposition testimony elicited twenty years later, the testimony speaks for itself.

167. ████████████████████████████████████

████████████████████████████████████

██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust objects to the YPF Defendants' characterization of deposition testimony and further objects that the testimony is incomplete.

████████████████████████████████████
████████████████████████████████████
███████████████████████████

████████████████████████████████████
████████████████████████████████████



*Id.* at 355:11-22.

168.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the statement highlighted in red as a mischaracterization of the cited document. The Trust objects to this mischaracterization as the document speaks for itself.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the statements highlighted in red.

170.

███████████████████████████████████

███████████████████████████████████

███████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph.  The quoted testimony ████████████████████████████████████████████████████████████ The Trust objects to this mischaracterization as the document speaks for itself.

171. ██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████ Indeed, before 1996, capping was rarely selected as a remedy for contaminated sediment. *See* Propps Decl. Ex. 26 at 6 (noting that only 3 of 44 sediment remediation projects included capping).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

25

████████████████████████████████████████  The Trust objects to these mischaracterizations as the document speaks for itself.

172.   The 1994 AOC relied on the IT Report, which had concluded that the dioxin traceable to the Lister Site was primarily located within that six-mile area. Propps Decl. Ex. 45 at -313-319; Propps Decl. Ex. 124 at -606. The 1994 AOC required Oxy to conduct an RI/FS for the Passaic River Study Area, including a human and ecological risk assessment. Propps Decl. Ex. 45 at -313-319. The Statement of Work in the AOC required that Oxy assess in the feasibility study, at a minimum, the following alternatives: (1) treatment for source control of river sediments that would eliminate the need for long-term management (including monitoring); (2) treatment as principal element (presumably after dredging) to reduce the toxicity, mobility or volume of waste; (3) containment with little or no treatment; and (4) No Action. Propps Decl. Ex. 45 at -349.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the statement highlighted in red as a mischaracterization of the cited document.  The cited page in the IT Report says, "Dioxin occurs throughout the entire length of the lower Passaic River, although strong fresh water discharge conditions tend to limit the extent of site area reach-associated sediment mobility to approximately 6.5 miles upstream."  Propps Decl. Ex. 124 at -606.  This does not support the statement that dioxin was "primarily" located in the six-mile area.  The Trust objects to this mischaracterization as the document speaks for itself.

173.   During this time, the EPA and other state environmental regulators had selected monitored natural recovery at other sites, such as James River and Lake Hartwell. *See* Propps Decl. Ex. 36 at 296; Propps Decl. Ex. 147 at 102.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph insofar as it is suggested that there were additional sites other than the James River and Lake Hartwell at which monitored natural recovery was used, when

these were in fact the only known examples.  The Trust also notes that the James River remedy was selected in 1978, prior to the promulgation of CERCLA and prior to the discovery of dioxin contamination at the DASS.

174. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as misleading in the absence of necessary context. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████

████     The Lake Hartwell site is another example of a successful natural recovery remedy selected by EPA in 1994 over a more expensive remedy that would have involved dredging, removal and treatment of contaminated sediment. Propps Decl. Ex. 147 at 4, 102. ████

███████████████████████████████████████

███████████████████████████████████████

███████████    ███████████████████████████

████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the

statements in this paragraph as misleading in the absence of necessary context. ████████

████████████████████████████
████████████████████████████
████████████████

███

176. ████████████████
████████████████████
████████████████████
████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

177. ████████████████
████████████████████
████████████████████
████████████████████
████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

178. ████████████████
████████████████████
████████████████████
████████████████████
████████████████████
████████████████████

**Formatted:** Indent: Left: 0.75", No bullets or numbering

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. ████

██████████████████████████████████
████████████████████████████

179.    Maxus set forth the reasons for its conclusion that a no action remedy was appropriate for the Passaic River in a briefing memo in August 1994. *See* Propps Decl. Ex. 150. The memo reflects information based on IT Report data, river characteristics and natural sedimentation, that the most concentrated dioxin was buried under the riverbed such that it was not exposed to biota, and there were no viable, cost effective options for removing and treating the contaminated sediment, or for a capping remedy, which Maxus had studied in 1993. *See id.*; *see supra* at ¶ 171. Data also showed cleaner sediment was burying contaminated sediment at a reasonably rapid rate, further mitigating risks of dioxin exposure. *Id.*

*Responses and Objections:*  Subject to its General Objections, The Trust disputes as misleading the characterization of Propps Decl. Ex. 150 as a "briefing memo" or "a memo" and disputes the presentation of its contents as neutral facts.  The YPF Defendants' own expert ██████████████████████████████ Propps Decl. Ex. 25 at 26.  Its own contents make clear that this document was drafted as advocacy and not as neutral or complete scientific analysis.  *See*, e.g., Propps Decl. Ex. 150 at 6 ("The Project Team would be pleased to brief the Governor's Dredged Material Management Team…The Project Team would appreciate a copy of the Dredged Materials Team draft

report to aid in its collection of information in the Remedial Investigation and Feasibility Studies."). The Trust objects to these mischaracterizations as the document speaks for itself.

**2.    The Diligence of the Environmental Liabilities Prior to the YPF Acquisition**

180. ███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes as imprecise and argumentative the characterization ████████████████████ ████████████ The Trust does not dispute he had prior experience.

181. ███████████████████████████████████████████████

███████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact in this paragraph.

182. ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ Mr. Skaggs presented various slides explaining the status of different sites, including the Lister Site and Passaic River, indicating that the Passaic River was still in the RI/FS stage. Propps Decl. Ex. 154 at -53102. ████████

████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statement that ████████████████

███████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as irrelevant, and disputes that this is an accurate statement of liabilities.

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and

Second,

Likewise,

185.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Rabbe's personal recollections and opinions as undisputed facts.

186.

██████████████████████████████

██████████████████████████████

██████████████████████████████

████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Skaggs' personal recollections and opinions as undisputed facts.

187. ██████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Bohannon's personal recollections and opinions as undisputed facts.

188. ██████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Bohannon's personal recollections and opinions as undisputed facts.

189.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

190.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  However, the Trust notes that this characterization of Propps Decl. Ex. 155 is incomplete, given that the same memo also discusses ████████ ████████████████████████████████████████████████████████ ██████

191. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

192. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as argumentative and objects to the presentation of Mr. Skaggs' and Mr. Rabbe's personal recollections and opinions as undisputed facts.

193. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

194. █████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ Maxus disclosed in its SEC filings the possibility that its environmental liabilities could be in excess of Maxus's reserves for them. Propps Decl. Ex. 118 at 13.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

195. ████████████████████████████████████████

██████████████████████████████████████████████

████████████████ The requested increase in reserves related to analysis of the Kearny plant site, not the Passaic River. Propps Decl. Ex. 17 at 16.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph

196. █████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts.   The Trust further notes that

197.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts.   The Trust further notes that

198.

**Formatted:** Highlight

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute disputes the facts set forth statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts. The Trust further notes that

**Formatted:** Highlight

199. ████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust ~~does not dispute~~disputes the ~~facts set forth~~statements in this paragraph and objects to the presentation of Mr. Peacock's personal recollections and opinions as undisputed facts. The Trust further notes that ████████████████████████

████████████████████████████

**3.     Post-Acquisition**

200.    Studies of the Passaic River were continuing after the YPF acquisition closed, and in the summer of 1995, Maxus received ██████ from ChemRisk, the toxicologists performing the risk assessment for Maxus. *See* Propps Decl. Ex. 47.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

201.    In July 1995, Chemrisk drafted a Screening Level Human and Ecological Risk Assessment ("SLHERA"). *Id.* ████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

202.    After the YPF acquisition closed in June 1995. ████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the claim ████████████████████████████████████

████████████████████████████████████

203. ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the facts set forth in this paragraph.

204.    Nonetheless, Maxus █████████████████████████████████

███ and on October 26, 1995 authorized its environmental consultant, EA Engineering, to

conduct an Engineering Evaluation / Cost Analysis ("EE/CA"), which was commonly deployed in

assessing potential alternative remedies for a CERCLA site, (Propps Decl. Ex. 160), during the

RI/FS stage. ███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute
the statements of fact highlighted in green in this paragraph.  The Trust disputes the claim
that the authorization to EA was ████████████████████████
█████████████████████████ The YPF Defendants cite no evidence for
this claim.  The Trust also objects to the characterization of the EE/CA as "commonly
deployed in assessing potential alternative remedies for a CERCLA site" as unsupported
by any language in the document cited and as factually incorrect.  EE/CAs are used
specifically in the context of non-time critical removal actions, of which they are a
required step.  *See* Propps Decl. Ex. 29 at 9-10.

205.  ██████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute
the facts set forth in this paragraph.  The Trust submits, however, that in April 1996 the
██████████████████████████████████████████████
████████████████████████

206.  ████████████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements highlighted in green in this paragraph.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the facts set forth in this paragraph.

208. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as stating the opinions of YPF's expert which are not facts, and are subject to material dispute.

209. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited document and the quotations as incomplete and misleading. ██████████████
████████████████████████████████████████
███████████████████████████████

210. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited document and the quotations as incomplete and misleading. █

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

211.    ChemRisk also published these results under the name of its corresponding author Steven Huntley. The 1995 Huntley Report described how ChemRisk analyzed radiochemical data to conclude natural sedimentation likely was occurring, and that "the high rate of sediment deposition in the lower Passaic River and previously reported hydrodynamic data suggest that the lower Passaic River is not likely to be a major contributor of sediments to Newark Bay." *See* Propps Decl. Ex. 165 at -494.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. The YPF Defendants do not establish as a fact or cite any evidence to show that the "results" described in Propps Decl. Ex. 165 were the same as the data discussed in Propps Decl. Ex. 163.

212.    An interim draft of the EE/CA was delivered to Maxus in late November and early December 1995. ████████████████████████████

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the statements of fact highlighted in green in this paragraph.  The Trust disputes the claim
that ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████
██████████

213.    <mark>EA did not issue another draft EE/CA until June 1996.</mark> ████████████

███████████████████████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute
the statements of fact highlighted in green in this paragraph. ████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████

<mark>214.</mark> ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes the statements highlighted in red as stating the opinions of YPF's expert, which are not facts, and are subject to material dispute.

215.    At the time, EPA publicly stated a remedy for the Lister Site of $250 million was too expensive such that EPA "scotch[ed] the idea" of such an expensive remedy. *See* Propps Decl. Ex. 173 at -423.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as a mischaracterization of the cited document and the quotation as incomplete and misleading. The EPA stated that it "ventured a cost estimate -- $241 million plus transportation costs – that it said would scotch the idea." Propps Decl. Ex. 173 at -423. The EPA project manager further stated, however, that "Moreover . . .the agency does not have the authority to dump the contaminants elsewhere, or to compel Occidental to undertake a totally new plan." *Id.* The Trust also notes that the phrase "Lister Site" designates the factory buildings and surrounding land (OU-1), not the sediments in the river, and objects to this paragraph's attempted conflation of distinct segments of the DASS with distinct characteristics and distinct remediation histories. The Trust objects to these mischaracterization as the document speaks for itself.

216.    EPA and USACE ████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited documents, ████

████████████████████████████████████████

████████████████████████████████

217.    EPA also made a public statement in 1998 that "EPA is currently evaluating the feasibility of a hot spot-type removal, but the usefulness of such a removal is questionable at this time. EPA has not confirmed that the consumption of fish from the river poses a health threat to the population in the vicinity of the Passaic River Study Area. In addition, there appear to be other sources of contamination in the Passaic River (such as CSOs) that have to be identified before EPA can determine if a hot spot removal could be beneficial. If EPA performs a hot spot removal and the other sources re-contaminate the sediments, the money and effort spent on the hot spot removal would be futile, since there would not be an overall improvement in the river." Propps Decl. Ex. 168 at -065.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. For completeness, the Trust notes that, as the cited document makes clear, these remarks were limited to the appropriateness of hot-spot removal as an interim remedy in 1998 and not a statement about the larger RI/FS process, which was ongoing.

218.    EPA also cautioned in June 1996 that the recent data "[a]lone, this sediment characterization data cannot tell us who is responsible for dumping these contaminants into the river; effects these contaminants have on crabs, fish or humans; and whether or not contaminated sediments have moved up river or down into the Bay." Propps Decl. Ex. 12 at -121.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

219. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████

█ █ ██████████████████████████████
██████████████████████████████
████████████████

█ █ ██████████████████████████████
██████

█ █ ██████████████████████████████
████████████████████████████

██████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute
the facts set forth in this paragraph.

220.    In other words. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements highlighted in red as stating the opinions of YPF's expert, which are not facts, are subject to material dispute, are inadmissible hearsay and cannot constitute the basis for an undisputed fact.

4.    **Continued EPA Assessment of the Lister Site in the 1990s**

221.    In the mid- to late-1990s, EPA was attempting to revisit the interim remedy in the ROD to assess excavation of the waste at the Lister Avenue Site, and to potentially arrange for a mobile incinerator to be located on site to treat the dioxin waste, or potentially explore off-site treatment and disposal. *See, e.g.*, Propps Decl. Ex. 171 at -09-10; Propps Decl. Ex. 172 at -47-53.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements in this paragraph

222.    The realities of the situation were evident regarding the limitations on what could be practical for off-site treatment or disposal of any dioxin-contaminated sediments. *See, e.g.*, Propps Decl. Ex. 172 at -48-49 (describing difficulties connected with incinerating dioxin-contaminated waste from the Lister Site).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as argumentative and as a mischaracterization of the cited document. The cited document discusses waste from the Lister Site, which, as stated above, corresponded to a complex of buildings and the surrounding land area, and the waste under discussion corresponded to dioxin-contaminated soils and other wastes located on land, not to river sediments. The Trust disputes this mischaracterization as the document speaks for itself.

223.    In the 1990s, there was only a single facility (owned and operated by Aptus, Inc.) licensed to incinerate dioxin waste, and that facility was located in Coffeyville, Kansas. *See* MAXUS0793406-423, Propps Decl. Ex. 173 at -423. This facility had limited capacity or throughput to perform the incineration, resulting in timelines of many years to complete incineration of large volumes, which EPA recognized made such a treatment and disposal option

"extremely expensive." *See id.* ("The agency maintains that the only plant in the nation licensed to destroy dioxin by burning, which is in Coffeyville, Kan., could not handle the construction materials from the Diamond Alkali site…"); Propps Decl. Ex. 174 at -375 ("Question: Why can't you remove all of the material from the Site? Answer [by Lance Richman, project manager for the Diamond Alkali Superfund Site]: Because there is only one place in the U.S. that can take listed dioxin waste which makes it extremely expensive.").

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as a mischaracterization of the cited documents.   As the parenthetical quotation from Propps Decl. Ex. 174 makes clear, the Coffeyville facility was used to incinerate listed dioxin waste.  Neither document supports the claim that there were no other facilities available to handle non-listed dioxin waste such as sediment from the Passaic River.  The Trust again notes that this discussion referred to land waste from the Lister Site (OU-1) and not to contaminated river sediments.  The Trust objects to this mischaracterization as the documents speaks for themselves.

224.    An additional problem posed by large scale dredging was that dioxin waste could not simply be put in any landfill because it was considered a hazardous substance requiring special permitted landfill disposal. *Id.*

*Responses and Objections:*  Subject to its General Objections, the Trust disputes the statements in this paragraph as a mischaracterization of the cited document, which does not say or imply that the dioxin always was or needed to be treated as a listed waste subject to special handling.

225.    EPA also publicly stated in May 1996 that "the data shows widespread contamination of the river, and it's unlikely that all of the contamination could be dredged because there is no place large enough to dispose of the material. Mr. Frisco stated that there will be few options for remediating the river. Depending on the results of the next two parts of the study, EPA may consider limited movement of material, limited containment in place, or possibly a treatment alternative. The sediment contamination seems to be a large problem that may require a long-term solution." Propps Decl. Ex. 130 at -878 (emphasis added).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the facts set forth in this paragraph.

226.    By the end of 1997, Aptus publicly stated it was shutting down that facility, and ███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  For completeness, the Trust again notes that any discussion of the Coffeyville facility was in relation to the disposal of land wastes from OU-1, not river sediments.

227. ██████████████████████████████
████████████████████████
████████████████████████
████████████████████████
██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as mischaracterizations of the cited document and the quotations as incomplete.

228.    In the 1990s, Maxus continued to identify PRPs who also were responsible for polluting the Passaic River, who Maxus believed had to participate in paying for their fair share of cleanup costs, and by 1995 █████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████

200

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

229.    In addition, EPA had notified several other large corporations they were PRPs and continued identifying more. Propps Decl. Ex. 12 at -121; ██████████████████

████████████████████████████████████

████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

230. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph. ████████████████████████

████████████████████████████████████

██████████████████████████████████

231. ████████████████████████████████

██████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph and objects to the presentation of Mr. Rabbe's personal recollections and opinions as undisputed facts.

232.    In 2007, EPA decided to drop cleanup levels two orders of magnitude lower than what was originally set by EPA for dioxin in the 1990s for other sites (1 part per billion at the Lister Site and Love Canal) – to as low as 7.1 parts per trillion, before settling on 8.3 parts per trillion in 2016. Propps Decl. Ex. 125 at -266; Propps Decl. Ex. 166 at -2886; Propps Decl. Ex. 13 at 94. Cleanup levels that low required millions more of cubic yards of sediment to be removed, vastly increasing costs. Propps Decl. Ex. 13 at 149-150.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements in this paragraph as argumentative and as mischaracterizations of the cited documents.  The fact that different cleanup standards may have been ordered at different sites at different points in time does not support the claim that there was a single overall "cleanup level for dioxin" that "dropped" over time.  In addition, the assertion that "cleanup levels that low required millions more cubic yards of sediment to removed, vastly increasing costs" is entirely unsupported by any language appearing in the cited page range.  The Trust objects to these mischaracterizations as the documents speak for themselves.

## VI.    AFTER THE ACQUISITION BY YPF, MAXUS REMAINED A SEPARATE COMPANY NOT DOMINATED OR CONTROLLED BY YPF, WHILE BOTH COMPANIES AGREED TO THE GLOBAL RESTRUCTURING

### A.    MAXUS AND YPF MAINTAINED CORPORATE SEPARATENESS

233.    Following the acquisition by YPF, Maxus's corporate form was consistently honored and its separateness was consistently maintained. *See, e.g.*, Propps Decl. Ex. 179 at 56; Propps Decl. Ex. 100 at 31; Propps Decl. Ex. 180 at -061-63; Propps Decl. Ex. 217; Propps Decl.

Ex. 207 at 85.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust submits that whether or not Maxus and the YPF Defendants honored the corporate form is a genuine issue of material fact to be determined at trial by a factfinder. The Trust has submitted countless pieces of evidence demonstrating that Maxus and the YPF Defendants did not honor the corporate form. *See, e.g.,* Trust SOF at ¶¶ 55-72 (discussing YPF's transfer of Maxus's international assets to YPFI to render Maxus judgment-proof); ¶ 75 (discussing the "Maxus Management Group" whereby YPF had Maxus personnel continue to manage the assets that had been transferred to YPFI; ¶¶ 86-95 (discussing the subsequent transfer of the legacy Maxus assets from YPFI to Repsol); Smith Decl. Ex. 137 at 143-173 (discussing the ways Maxus and Defendants abused the corporate form including financial dependency, lack of corporate separateness, and domination and control).

234.    Following the acquisition, Maxus continued to have three independent and disinterested board members through 1999. Charles Blackburn, George Jackson, and R.A. Walker, although Mr. Blackburn resigned in 1997. Propps Decl. Ex. 98 at 13, 21–22; Propps Decl. Ex. 17 at 24–25, 38; Propps Decl. Ex. 100 at 32; Propps Decl. Ex. 16 at 35-36; Propps Decl. Ex. 208 at 56, 59); Propps Decl. Ex. 209 at 38, 41; Propps Decl. Ex. 210 at -76; Propps Decl. Ex. 211 at 1; Propps Decl. Ex. 212 at -693; Propps Decl. Ex. 214 at 14; Propps Decl. Ex. 215 at -942;YPF 0059118–9 Propps Decl. Ex. 216 at 9; Propps Decl. Ex. 217 at 9; Propps Decl. Ex. 218 at 20;Propps Decl. Ex. 219 at 51.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

235.    Mr. Blackburn was a Director of Lone Star Technologies, Inc. and Landmark Graphics Corporation. Propps Decl. Ex. 17 at 24. He received a B.S. from the University of Oklahoma. *Id.* He was a member of the Society of Petroleum Engineers, the American Association of Petroleum Geologists and the Executive and Budget Committees of the Mid-Continent Oil and Gas Association. *Id.*

██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

236.    Mr. Jackson was an oil field service consultant in Kerrville, Texas. Propps Decl. Ex. 17 at 24-25. He received a B.S. from Southern Methodist University. *Id.* ████████

██████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

237.    Mr. Walker was a managing director at Prudential Capital Group and vice president at The Prudential Insurance Company. Propps Decl. Ex. 17 at 24. He received his B.S./B.A. and MBA from the University of Tulsa. *Id.* ████████

████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

238.    Maxus directors were engaged in Maxus's governance in a manner entirely independent of YPF, and participated actively in Board discussions regarding oil and gas production, strategic planning, and the Company's annual financial results, among other topics. *See* Propps Decl. Ex. 220 at 55-60; Propps Decl. Ex. 100 at 32; Propps Decl. Ex. 221 at -585-94; Propps Decl. Ex.222 at 85.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  *See* response to ¶ 233.

239.    The Maxus Board regularly took corporate action, voting on over 100 separate board resolutions. *See, e.g.,* Propps Decl. Ex. 223 at 209-10; *See, e.g.,* Propps Decl. Ex. 231 at 197-

98; Propps Decl. Ex. 214 at -530; Propps Decl. Ex. 225 at 398-99. The Maxus board approved dividendpayments to preferred shareholders, elected corporate officers, approved changes to employee compensation plans, approved contracts with third parties, approved sales of assets after reasonably determining that the consideration received for such sales was fair to Maxus. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

240.  ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 240.

241.    Maxus had its own substantial workforce separate from any of the YPF Defendants. *See* Propps Decl. Ex. 230 at 2. As of March 31, 1996, Maxus had 2,303 employees, the vast majority of whom were never separately employed by YPF. *See id.* at 4.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The total number of Maxus employees, and the nature and extent of their affiliation with any of the YPF Defendants, is a genuine issue of material fact to be determined at trial. For example, by the end of 2005, Maxus had only 69 employees. Trust SOF ¶ 98. Further, from approximately 2010 to at least 2016,

Maxus and the other Debtors and YPF had "shared" employees that held positions at Debtor and non-Debtor entities YPFH and CLHH such that they wore "two hats"; these shared employees included the Debtors' management.  Trust SOF ¶ 149.



242. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

243. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph,

of

█████████████████████████████████████████████

*See, e.g.*, Trust SOF ¶¶ 48-76.

244. ███████████████████████████████████

███████████████████████████████████████████

███████████████████ *See* Propps Decl. Ex. 237 at 593, 599, 604, 609. According to a 1995 report from the Maxus Audit Department, Maxus had an Audit Plan that included Treasury and Marketing audits, an audit of internal controls at Maxus Southeast Sumatra Inc., vendor audits, and IV audits. *Id.* at 593.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its responses to ¶ 243.

245. Further, at least one Maxus subsidiary had its own accounting policies for part of the Relevant Period. Propps Decl. Ex. 238 at 38-42. Maxus Bolivia had its own accounting procedures for at least accounts payable, general accounting, joint interest billing, banking, and management reporting and government reporting. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its responses to ¶ 243.

246. Maxus used its own letterhead, and Maxus had its own corporate email address (@MAXUSA), as did its separately incorporated subsidiaries (@MAXECU). *See e.g.*, Propps Decl. Ex. 239; Propps Decl. Ex. 230 at 10.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its responses to ¶ 243.

247.    Maxus maintained banking relationships separate from YPF, as evidenced by Maxus's separate accounts at Chase Bank. *See* Propps Decl. Ex. 241.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust incorporates its responses to ¶ 243.

248.    In addition, the record indicates that Maxus's accounting personnel communicated directly with its auditor, Arthur Andersen. Propps Decl. Ex. 242 at 08–12,& Propps Decl. Ex. 243.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust incorporates its responses to ¶ 243.

## B.    THE GLOBAL RESTRUCTURING

249. 

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

1.    **YPF and Maxus Plan the Tax and Debt Restructuring**

250.    Prior to the Acquisition, Maxus filed a U.S. consolidated income tax return ("Maxus Consolidated Tax Group") that included the activities of its Indonesian and South American subsidiaries. Propps Decl. Ex. 248. Maxus was the sole shareholder of Maxus International Energy Company ("MIEC"), which, in turn, owned the Indonesian and South American subsidiaries. Propps Decl. Ex. 98.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

251.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph

252.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes that the cited testimony

209



253.    On April 3, 1995, prior to the YPF acquisition closed in June 1995, YPF's tax consultants at Arthur Andersen advised YPF that it should explore restructuring options in its new corporate family to address tax inefficiencies. *See* Propps Decl. Ex. 250 at -137-141 (observing "it is not generally tax efficient for a foreign corporation (YPF) to own the stock of a U.S. corporation (Maxus) that, in turn, has foreign operations (i.e., Indonesia, Ecuador, Bolivia.)").

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249 by reference. The Trust further objects on the grounds that the cited document speaks for itself. Further, YPF's intent in carrying out the restructuring of Maxus is a triable issue of fact as, inter alia, YPF's legal counsel Andrews & Kurth, advised YPF that Maxus should undertake a restructuring in order to isolate Maxus's potentially extremely high environmental liabilities. Trust MOL at 12-13.

254.    The April 3rd Letter explained how the repatriation of Maxus profits to YPF was potentially costly, noting "[t]he U.S. and Argentina do not currently have an income tax treaty in force. Accordingly, the withholding rate for dividends and interest paid by a U.S. company is 30%." *Id.* at YPF0030133.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense. The Trust incorporates its responses to ¶ 249.

255. ██████████████████████████

██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
███████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense.  The Trust incorporates its responses to ¶ 249.  The Trust further objects on the ground that the cited testimony speaks for itself.

256.    Exacerbating this issue was the fact that such profits would have been already subject to taxes in foreign jurisdictions as well as in the U.S. Propps Decl. Ex. 246 at YPF0030136.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense.  The Trust incorporates its responses to ¶ 249.  The Trust further objects on the ground that the cited document speaks for itself.

257.    Tax efficiencies are reached for U.S. corporations only if their foreign source income is at least 80% of the gross income. *See* 26 U.S.C. § 871 (a)(1)(A). If a corporation reaches the 80% threshold, that portion of the distribution is exempt from U.S. withholding tax. *See* Propps Decl. Ex. 246 at YPF0030133. Prior to the Acquisition, the 80%-20% status was not a relevant issue to Maxus for tax planning purposes as a domestic, independent public company because it is a rule that comes into play following an acquisition. *See id.* at YPF0030136. After the acquisition, due to the nature of Maxus's international assets (*i.e.* for certain international assets Maxus served

as the operator, whereas for other international assets Maxus held non-working interests), AA concluded that the satisfaction of the active component of the 80% threshold may prove problematic. Propps Decl. Ex. 246 at YPF0030135-137.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense.  The Trust incorporates its responses to ¶ 249.  The Trust further objects on the ground that the cited document speaks for itself.  To the extent this paragraph purports to describe any tax attribute of Maxus at any given time, the Trust submits that such a description entails a legal argument to which no factual response is needed.

258.    Moreover, in the April 3rd Letter, AA identified other significant tax inefficiencies associated with the then existing corporate structure, leading AA to conclude that "it is not generally tax efficient for a foreign corporation (YPF) to own the stock of a U.S. corporation (Maxus) that, in turn, has foreign operations (i.e., Indonesia, Ecuador, Bolivia)." *Id.* at -137. To address these inefficiencies, AA advised YPF to transfer Maxus's non-U.S. operations to a foreign corporation inside of the YPF group. Propps Decl. Ex. 246 at YPF0030138- YPF0030139.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense.  The Trust incorporates its responses to ¶ 249.  The Trust further objects on the ground that the cited document speaks for itself.  To the extent this paragraph purports to describe any tax attribute of Maxus or YPF at any given time, the Trust submits that such a description entails a legal argument to which no factual response is needed.

259.    AA also identified one way in which the tax inefficiencies could be addressed was by the sale of the international assets by Maxus to a foreign subsidiary of YPF for fair market value. Propps Decl. Ex. 246 at -137.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph, even if accurate, have any relevance to any claim or defense.  The Trust incorporates its responses to ¶ 249.  The Trust further objects on the ground that the cited document speaks for itself.  To the extent this paragraph purports to

describe any tax attribute of Maxus at any given time, the Trust submits that such a description entails a legal argument to which no factual response is needed.

260. ███████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust further objects on the grounds that this paragraph mischaracterizes the cited documents, which speak for themselves.  The Trust incorporates its responses to ¶ 249.

261. ███████████████████████████████████████

█████████████████████████

**Figure 1.     Pre-Reorganization U.S. Tax Structure**[2]



---

[2] *See* Propps Decl. Ex. 251; Propps Decl. Ex. 252; Propps Decl. Ex. 250.



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust submits that expert testimony is self-serving hearsay, and whether or not the post-Acquisition structure was "tax efficient" is, if relevant to any claim or defense, a genuine issue of material fact to be resolved at trial. The Trust incorporates its responses to ¶ 249.

262.    The Maxus Tax Department led efforts to come up with an appropriate restructuring that would provide the most benefit to the YPF corporate group. In an October 7, 1995 memo, Maxus's Tax Director, David Smith, noted that movement of profits from Maxus's international assets to Maxus in the U.S., and then on to YPF as dividends, was "not efficient" from a tax perspective. Propps Decl. Ex. 244 at -269-70. He explained that (a) Maxus had significant debt, but could not take full advantage of the deductibility of its interest payments because the international operations already had foreign tax credits; (b) YPF could save $25-$28 million per year in Argentine taxes if the company was restructured; (c) under the companies' projections, YPF would run out of net operating losses ("NOLs") to shelter its income years before Maxus would (1996 vs. 1999). Propps Decl. Ex. 244 at -269.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Specifically, the Trust objects that the paragraph mischaracterizes the documents cited, which speak for themselves. The Trust disputes the characterization of Maxus' restructuring as appropriate for the reasons set forth in its responses to ¶ 249.

263.    Mr. Smith then explained one option for Maxus and YPF was "a sale of properties by Maxus to YPF at fair market value," and that Maxus "should use the sale proceeds to pay down its debt, immediately reducing its interest cost" while creating tax efficiencies in the process. *Id.* at YPF0069270.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

264.    Maxus had not reported taxable income for years before the YPF acquisition in part because of the interest expense on Maxus's debt, and the preferred shareholder dividends it was required to pay, which together cost Maxus $135 million annually. Propps Decl. Ex. 100 at F-1, F-35.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

86

the facts set forth in this paragraph.  The Trust clarifies, however, that preferred dividends, which are paid from taxable income, could not have caused Maxus not to earn taxable income.

265.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

266.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

267.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. ████



268.    In a letter to the leadership of Maxus, including Maxus's Chief Executive Officer, Roberto Monti, on October 23, 1995, the Maxus Tax Director, David Smith, discussed the business purposes of the proposed restructuring: to address "two problems presented by the present organizational structure," which were that "Maxus has a large debt and will be paying $137 million in interest during 1996," and the tax inefficiencies with that structure. Mr. Smith outlined the tax inefficiencies as follows:

Currently Maxus Energy has direct or indirect subsidiaries which operate all of its properties outside the U.S. When YPF desires to transfer cash earned in international operations to Argentina, moving the cash through the U.S. tax return is not efficient. There will be two opportunities for the U.S. to tax international profits, once when the cash is brought into the U.S. and again when the cash leaves the U.S. Taxing the income coming into the U.S. will be at a minimum 2%, which is the Alternative Minimum Tax (AMT) rate of 20% times 10% taxable portion of foreign source income sheltered by foreign credits. Since there is no tax treaty between the U.S. and Argentina, any dividend of foreign sourced income paid out of the U.S. to an Argentine shareholder is subject to a 30% withholding tax, unless the 80-20 rule applies.

Propps Decl. Ex. 256 at -551. ████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust disputes the statements highlighted in red as being unsupported by the evidence cited.

269.    Under "Long Term Actions," Mr. Smith further explained that the Maxus Tax Department would analyze "the savings of moving the interest expense from Maxus to YPF," noting that the tax cost of moving the international operations under YPF will be included in the models." The memo further stated Carlos Olivieri, YPF's vice president and controller, "will begin discussions at YPF regarding restructuring issues." Propps Decl. Ex. 256 at -552.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the factual allegations in this paragraph are relevant to any claim or defense as to which summary judgment is sought, and objects on the grounds that the cited document speaks for itself.

270.    There was no mention of any purpose other than addressing Maxus's debt problems and the tax inefficiencies of the new YPF corporate group were discussed with respect to the proposed restructuring to move Maxus's international assets to a new YPF subsidiary. In fact, environmental issues were never even mentioned. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. Specifically, the cited document speaks for itself, and what the document does not say cannot establish the absence or existence of a triable issue of fact. The Trust incorporate its response to ¶267.

271.    Although the option of selling Maxus's Midgard assets was discussed, the Tax

Group did not consider selling *both* the Midgard *and* international assets. Propps Decl. Ex. 258 at -274.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust further objects on the grounds that the memorandum cited by YPF Defendants (which speaks for itself) does not demonstrate that the group did not consider selling both the assets.

272. ████████████████████████████

████████████████████████████████

████████ Memorandum from A&K to YPF Board dated May 28, 1996 Propps Decl. Ex. 251 at 456.                                              Propps Decl. Ex. 259 ███████

████████████████████████████████

████████████ Propps Decl. Ex. 261 at -4053 ("For legal and tax purposes Maxus has hired an outside appraiser to determine the fair market value of any properties sold by Maxus to YPF. This is for the purpose of insuring that the preferred stock holders are protected and to document the values in preparation of an IRS challenge to the transactions.").

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust further disputes that the cited documents (which speak for themselves), establish that ██████████ The Trust incorporates its responses to ¶ 249.

273. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████

█████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust further objects on the grounds that the quoted text, from the expert report of YPF's expert witness, Mr. Jack Williams, is inadmissible hearsay that does not establish the existence or absence of any triable issue of fact.  The Trust incorporates its responses to ¶ 249.

274.    It was repeatedly emphasized by Maxus's management and advisors that any transfers of Maxus's international assets to a YPF entity would have to be done at Fair Market Value, given that the intercompany transfers would be facing IRS scrutiny. ██████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited in this paragraph, which speak for themselves, support the statements of fact therein.  The Trust incorporates its responses to ¶ 249.

275. ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited in this paragraph, which speak for themselves, support the statements of fact therein.  The Trust incorporates its responses to ¶ 249.

276.    At the time both YPF and Maxus recognized that the Global Restructuring could not be implemented without the disinterested directors' approval. Maxus's Articles of Incorporation precluded transactions of more than $25 million between Maxus and any shareholder owning more than 25% of its shares without the approval of a majority of Maxus's disinterested directors. Propps Decl. Ex. 267 at Sec. 2 ; Propps Decl. Ex. 268.

*Responses and Objections:* The Trust disputes that that the cited documents, which speak for themselves, are accurately cited as supporting the stated proposition.

277.

██████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

278.    On October 7, 1995, David Smith, Director of Tax and Chief Tax Counsel of Maxus, sent an interoffice memorandum stating, "If these sales are accomplished over a period of years, Maxus can use NOL [Net Operating Losses] and excess foreign tax credits to offset much of the resulting tax liability. The transactions need to be carefully scheduled to minimize U.S. taxes." Propps Decl. Ex. 258 at YPF 0069273.

*Responses and Objections:* The Trust notes that the proper citation for this paragraph is YPF006972, not YPF0069273. Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

279. ████████████████████████████████

████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statement of fact set forth in this paragraph on the grounds that it mischaracterizes the cited document, which speaks for itself.

280. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Formatted: Highlight

Formatted: Highlight

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green.  The Trust disputes that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

#### 2. **The Environmental Restructuring Did Not Include Any "Strategy" to hinder,delay or defraud creditors.**

281. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  For the reasons set forth above, the Trust disputes that the tax and debt issues were the purpose behind the Global Restructuring planning.  The Trust further objects that the cited document speaks for itself.

282. ▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

283. ██████████████████████████████
██████████████████████████████
██████████████████████████████
██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

284. ██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects that the cited document speaks for itself.

285. █████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects that the cited document speaks for itself.

286. █████████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects that the cited document speaks for itself.

**287.** ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statements of fact in this paragraph are relevant to any claim or defense.  Specifically, what the cited document does *not* say cannot establish the existence or absence of a triable issue of fact.  The Trust incorporates its responses from ¶ 267.  The Trust further objects that the cited document speaks for itself.

**288.** ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

**289.** ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

290. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

291. ███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████ █

██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document speaks for itself.

292. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects that the cited document speaks for itself.

293. ████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph and highlighted in green. The Trust objects that the cited document speaks for itself.
████████████████████████████████
█████████████

294. ████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████

P29

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects that the cited document (which the Trust submits constitutes a business record of YPF) speaks for itself.

295. ███████████████████████████████████████

**Formatted:** Highlight

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. ██████

████████████████████████████████ The Trust incorporates its responses from ¶ 267.

296. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects that the document cited speaks for itself,

████████████████████████████████████████████

297.  <mark>In February 1996, CSFB provided a presentation recommending how to execute the debt restructuring. Among the recommendations was for YPF to assume $863 million in Maxus's debt obligations, including redemption of part of Maxus's preferred shareholders. Propps Decl. Ex. 275.</mark> ████████████████████████████████

████████████████ *See* Propps Decl. Ex. 276 at 81:8-82:1. *See also* Propps Decl. Ex. 180 at -73, -75 (Maxus GC noting $17 million per year in savings of redemption of $4.00 preferreds, and Maxus Comptroller telling Maxus Board Maxus had sufficient surplus to effectuate dividend). The purpose of doing so was to effectuate the tax and debt restructurings. Propps Decl. Ex. 275. Moreover, YPF could borrow at lower rates than Maxus. Propps Decl. Ex. 277 at -006.

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph highlighted in red. The Trust does not dispute that CFSB provided a presentation recommending how to execute the debt restructuring, or that the presentation contained the recommendations and numbers relied upon by the YPF Defendants in the above paragraph. ████████████████████████████████████████████████████████████████. The Trust does not dispute the facts highlighted in green.

298. ██████████████████████████████████
████████████████████████████████████████
███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes
statements of fact in this paragraph. ████████
████████████████████████████████████
███████████████████████████████

299.    Following an "analysis of the taxability of these proposed transactions," Maxus
found that a sale of the foreign operations of Maxus be made to YPF because the tax credits would
benefit Maxus, with the sales allowing Maxus to "use NOL [Net Operating Losses] and excess
foreign tax credits to offset much of the resulting tax liability." Propps Decl. Ex. 281 at -264; Propps
Decl. Ex. 244 at -272.

*Responses and Objections:* Subject to its General Objections, the Trust disputes
statements of fact in this paragraph.

300. ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph. As described above, the Trust has cited numerous pieces of evidence demonstrating that the reorganization was intended to primarily confer a benefit to the YPF Defendants, not Maxus.

301.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████

*Responses and Objections:* Subject to its General Objections, the Trust disputes statements of fact in this paragraph highlighted in red. As described above, the Trust has cited numerous pieces of evidence demonstrating that the reorganization was intended to protect valuable assets from Maxus' creditors. *See, e.g.,* Trust MOL at 12-13 ████

████████████████████████████████████

302.    In addition to Arthur Andersen, international tax lawyers provided advice on the Global Restructuring including A&K, Marval O'Farrell & Marial, a prominent law firm with tax expertise in Argentina ("Marval"), and Alan Klein. Propps Decl. Ex. 280.

*Responses and Objections:* Subject to its General Objections, the Trust disputes

statements of fact in this paragraph.  There is no record in the evidence that Marval or Alan Klein provided Maxus or the YPF Defendants advice relating to the Global Restructuring.  The Trust objects to the YPF Defendants' withholding of relevant material and submits that the YPF Defendants' have waived privilege regarding this advice by affirmatively requesting this Court to make factual findings regarding the receipt of legal advice.

303.    Marval created a presentation on the restructuring process that also provided tax and legal advice to YPF and Maxus in connection with the Global Restructuring. Propps Decl. Ex. 280. In their analysis, Marval confirmed the same objectives as in the memos discussed above: address tax inefficiencies of the YPF corporate group, addressed its debt, and remove the environmental liabilities from Maxus's financial statements to CLH "that will administer the environmental problems." Propps Decl. Ex. 280. There is no mention of a strategy to isolate Maxus's assets, or to otherwise hinder or delay creditors in some fashion.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the statement of facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust incorporate its responses and objections to ¶ 302. Further, as described above, the Trust has cited numerous pieces of evidence demonstrating that the reorganization was intended to protect valuable assets from Maxus' creditors.  *See, e.g.,* Trust MOL at 12-13 ████████████████████████████ ████████████████████.

304.    In February 1996, CSFB created a presentation for YPF regarding the proposed debt restructuring. It noted that YPF could address $863 million worth of Maxus's third party debt and preferred shares. It recommended that YPF raise capital and use it to pay off the $4.00 preferred shareholders and replace expensive debt with new, cheaper debt more affordable to Maxus. *See* Propps Decl. Ex. 277 at -16; Propps Decl. Ex. 251 at 456 ("the price must be set at fair market value" for Maxus's international assets).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute

the facts set forth in this paragraph.

305.    In a May 16, 1996, email, David Smith wrote that "Pursuant to the meeting held in Maxus's offices. . .the portion of the Tax Restructure that would be proposed to the YPF and Maxus Board of Directors would be the sale of Maxus's Bolivian properties and Venezuelan properties to YPF. Based upon analysis of the taxability of these proposed transactions and subject to comments and suggestions from you, the Tax Department recommends that these transactions take place in the following manner . . ." Propps Decl. Ex. 281

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

306.    On May 22, 1996, Mr. Peacock sent a memo to the YPF Board of Directors.  Propps Decl. Ex. 251 at 456. Mr. Peacock explained █████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ (*Id.* at

-159). ███████████████████████████████████. (*Id.* -161).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

307.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

308. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

309. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the cited testimony establishes the proposition for which it is cited. ████████
████████████████████████████

310.    In any event, in his April 10, 1996 Memo, Mr. Peacock also informed the YPF Board about YPF's "indirect liability" for Maxus' environmental problems, via its equity and other support of Maxus, which totaled $1.1 billion (and another $1.2 billion if guaranteed debt was included). Propps Decl. Ex. 283.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

311. 

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green accurately paraphrase portions of the memorandum cited (i.e., Propps Decl. Ex. 270), which speaks for itself.  The Trust disputes that the statement highlighted in yellow is relevant to any claim or defense as to which summary judgment is sought, as what a document does *not* say cannot establish the existence or absence of a triable issue of fact.

312. 

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph in green are accurately quoted, with the exception that YPF omits the text highlighted in yellow in the above.

313.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

3. **The Maxus Board, Including the Disinterested Directors, Approved the 1996 Global Restructuring Transactions**

314.    The Maxus Board held a meeting on June 18, 1996, at which the sale of the Bolivian and Venezuelan assets to YPF, the redemption of the $4.00 preferred stock, and the environmental restructuring would be debated and voted on. Propps Decl. Ex. 180 at -63-64. In addition to the Board, the meeting was attended by certain members of management and representatives of A&K and CSFB. *Id.* at -61. Disinterested Directors Charles Blackburn, George Jackson, and R.A. Walker attended the Board meeting. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

315.    Maxus's Disinterested Directors met with, and were debriefed by, Maxus management, including Maxus General Counsel and Vice President, Legal, David Wadsworth, with respect to the Global Restructuring before the Board meeting. Propps Decl. Ex. 180 at 65.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

316.    At the Board meeting, Mr. Wadsworth reminded the board that fair market value

was required and noted that "it is proposed that the consideration for the transfer equal the higher of the fair market value of the subsidiaries and the carrying value of the assets held by such subsidiaries on the consolidated books and accounts of the Corporation as of the time of transfer." Propps Decl. Ex. 180 at -64. This carrying value was estimated at approximately "$260 million which is believed by management to exceed substantially the sum of the respective fair market values of the subsidiaries." *Id.*

       *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

       317.    William M. Wicker and Alex Sundich, of CSFB, addressed the Board regarding the valuations. Propps Decl. Ex. 180 at -65. Mr. Wicker stated CSFB had conducted a discounted cash flow ("DCF") analysis and a comparable acquisitions analysis, *id.*, and that Maxus Bolivia, Inc., was valued at $35 million to $55 million under the DCF method and $30 million to $54 million under the comparable acquisitions method, while Maxus Venezuela (C.I.) Ltd. was valued at $100 million to $140 million under the DCF method (and the comparable acquisitions method was inapplicable). *Id.* at -68.

       *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

       318.    Mr. Wicker also stated that Maxus Guarapiche – one of the subsidiaries in Venezuela – was properly valued at approximately $27 million, the recent acquisition cost of its only asset. *Id.* at -67.

       *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

319.    Mr. Wadsworth noted that Maxus Venezuela S.A., "which had been formed to pursue business opportunities in Venezuela and which held no substantial assets," was not valued by CSFB. Propps Decl. Ex. 180 at -68. Under these circumstances, the transfer of either Maxus Guarapiche or Maxus Venezuela S.A., was not anticipated to result in a gain or loss to Maxus or YPF. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

320.    After the presentations, "[a] general discussion ensued and a consensus developed among members of the Board that the proposed transfer of the Corporation's Bolivian and Venezuelan subsidiaries is in the best interests of the Corporation . . .   Each of the Independent Directors....... indicated that he was entirely comfortable with the proposed transactions." *Id.* at -69. The sale of those subsidiaries was approved unanimously by the Disinterested Directors, *id.* at -69-70, and the full Board. *Id.* at 70-72.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

321.    Mr. Peacock later testified ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Propps Decl. Ex. 157 182:8-22.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

322.    At that meeting, the Board, was informed that YPF had committed to fund the cost of redeeming the $4.00 Preferred Stock (at a cost of approximately $220 million), that the

redemption would save approximately $17.4 million in dividend payments, and that Maxus had a sufficient surplus for paying the dividends. Propps Decl. Ex. 180 at -73.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

323.    The Disinterested Directors unanimously approved the redemption, *id.* at -74, followed by a unanimous approval by the full Board. *Id.* at -74-77.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, but notes that there is no evidence that the Disinterested Directors were ever provided material information regarding the environmental liabilities.

324.    Mr. Wadsworth explained the environmental restructuring to the Board, including the contribution of CLH to a newly created subsidiary of CLH and the entry into the Assumption Agreement and the Contribution Agreement. *Id.* at -77. By the terms of the Contribution Agreement, YPF agreed to provide Tierra up to $108.1 million (later amended to $111.5 million) for environmental expenses and to cover general and administrative expenses (including legal feels). He also explained the cap on contributions under the Contribution Agreement and that it was tied to the environmental reserve as of June 30, 1996, that contributions would also include CLH's G&A expenses, and that Maxus would remain primarily liable. *Id.* at -77-78.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust does not dispute that Mr. Wadsworth explained certain aspects of the environmental restructuring to the Board. However, the Trust submits that there is no evidence that the disinterested directors were given a full briefing on the consequences of the restructuring on Maxus's solvency and therefore were not adequately informed. The trust objects that the document cited speaks for itself.

325.    The    Disinterested    Directors    unanimously    approved    the    environmental restructuring, *id.* at -78-79, followed by a unanimous approval by the full Board. *Id.* at -79-80.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact highlighted in this paragraph.  The Trust does not dispute that the disinterested directors unanimously approved the environmental restructuring.  However, the Trust submits that there is no evidence that the disinterested directors were given a full briefing on the consequences of the restructuring on Maxus's solvency and therefore were not adequately informed.  The trust objects that the document cited speaks for itself.

326.    Other business was discussed at the June 18, 1996, Board meeting, including the approval of a loan by YPF to Maxus, *id.* at -80-81, the approval of a Services Agreement between YPF and Maxus, *id.* at -81-82, approval of the issuance of additional stock to YPF in relation to capital contributions of approximately $64 million to Maxus through May 1996, *id.* at -82-84, and discussions about efforts to develop a JV between Midgard Energy Company and Amoco Corporation. *Id.* at -84. Roberto Monti reported that "Midgard's profits continue to improve." *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

**4.    The Sale of the Bolivian and Venezuelan Assets**

327.    On June 28, 1996, MIEC contributed 100% of the common stock of Maxus Bolivia, Inc., Maxus Venezuela (C.I.) Ltd. and Maxus Venezuela S.A. to its newly created wholly owned subsidiary, YPFI. Propps Decl. Ex. 283.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

328. ███████████████████████████

████ United States-based corporations often create subsidiaries in the Cayman Islands for the tax benefits. According to a recent study, at the end of 2016, Goldman Sachs had 511 subsidiaries registered in the Cayman Islands, Morgan Stanley had 251, Wells Fargo 48, and J.P. Morgan had 25. Propps Decl. Ex. 240; Propps Decl. Ex. 245; Propps Decl. Ex. 253; Propps Decl. Ex. 268.

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Likewise, ██████████████████████████
████████████████████
████████████

329.    On July 1, 1996, MIEC sold all of the issued and outstanding shares of capital stock of YPFI to YPF, pursuant to a Stock Purchase and Sale Agreement by and between YPF and MIEC. Propps Decl. Ex. 283 at MAXUS3258579. MIEC had previously received a $101 million advance against the purchase price from YPF. Propps Decl. Ex. 285 at 24-25. At closing, the remainder of the estimated purchase price was paid in the form of a promissory note payable by YPF to MIEC in the principal amount of $165.2 million. *Id.*; Propps Decl. Ex. 16 at 3 and F-40.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

330.    The total purchase price for the outstanding shares of capital stock of YPFI was approximately $266.4 million, which represented the book value of YPFI on the financial reporting books of MIEC as of June 30, 1996. Propps Decl. Ex. 285 at 24-25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

331.    On July 30, 1996, CSFB issued a Fair Market Value opinion with regard to YPFI (based on the values of its subsidiaries) with a range of $149 to $214 million. *See* Propps Decl. Ex. 284 at MAXUS1212200.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

332.    On August 13, 1996, Maxus used the proceeds from this transaction, along with a $56 million advance from YPF, for the redemption of all of its outstanding shares of $4.00 Preferred Stock at a price of $50 per share plus accrued and unpaid dividends (approximately $221 million in the aggregate). Propps Decl. Ex. 285 at 24-25.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph and highlighted in green. The Trust notes that the cited document does not appear to refer to the $56 million advance.

5.    **Environmental Restructuring**

333.    YPFH was incorporated on July 31, 1996 as a subsidiary of YPFI. Thereafter, on August 13, 1996, YPF contributed Maxus to YPFH. *See* Maxus Energy Corp., SEC Form 10-Q filed November 12, 1996, Propps Decl. Ex. 115 at 9-10.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

334.    On August 14, 1996, CLHH, a newly formed subsidiary of YPFH, and Maxus Corporate Company ("MCC"), a Maxus subsidiary, entered into a Stock Purchase and Sale

Agreement (the "CLH SPA"), which transferred ownership of CLH (n/k/a Tierra) from MCC to CLHH. *See* Propps Decl. Ex. 287.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

335.    Concurrently with the execution of the CLH SPA, Tierra and Maxus executed an assumption agreement (the "Assumption Agreement"), under which Tierra agreed to assume certain environmental obligations, as well as contractual indemnification obligations related to environmental liabilities, from Maxus. *See* Propps Decl. Ex. 288.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

336.    YPF, YPFI, YPFH, Maxus, and CLHH entered into an agreement (the "Contribution Agreement") under which the parties agreed to provide Tierra with certain financial support upon Tierra's request in conjunction with its obligations under the Assumption Agreement. Propps Decl. Ex. 289 at -152.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

337.    As originally executed, the Contribution Agreement provided support for up to $108.4 million, plus up to 110% of approved expenses. Propps Decl. Ex. 289 at -152. On February 5, 1997, the parties amended the Contribution Agreement, adding an additional $3.1 million, in potential support. Propps Decl. Ex. 290. The total of potential support under the Contribution Agreement was therefore $111.5 million.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

338.    By its terms, the Contribution Agreement provides that funding made by YPF to CLH for environmental remediation expenses are not counted toward the Keepwell Covenant, but that operating expenses of CLH are counted toward the Keepwell Covenant. Propps Decl. Ex. 289.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

339.    After execution, and prior to Repsol's hostile takeover (*see infra* ¶ 435), YPF contributed a documented $25.5 million under the Contribution Agreement. Propps Decl. Ex. 291.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

340.    ████████████████████████████████████
████████████████████████████████
████████████████████████████
███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

341.    As of June 30, 1996, Maxus's reserves for the environmental contingencies totaled $109 million. Propps Decl. Ex. 285 at 16. As of December 31, 1996, reserves for environmental contingencies totaled roughly $101 million. *See* Propps Decl. Ex. 16 at 17.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

342. 

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding.

6. **The 1996 Transactions in Connection with the Global Restructuring Were Extensively Disclosed**

343.    Extensive SEC filings also evidence that Maxus and YPF contemporaneously and robustly disclosed the transfer of the Bolivian and Venezuelan assets and the environmental restructuring, and the details were widely available to the public. *See, e.g.,* Propps Decl. Ex. 285 at 22-23; Propps Decl. Ex. 298 at 1; Propps Decl. Ex. 115 at 11; Propps Decl. Ex. 16 at 24-25,

Propps Decl. Ex. 299 at 9-10; Propps Decl. Ex. 117 at 75; Propps Decl. Ex. 226 at 80. The disclosures provided detail on every aspect of the transfers, including details about each of the international assets being transferred and the amount of consideration paid for each. *See id.*

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Specifically, the Trust disputes the characterization of the SEC filings as "extensive" and "robust."  Maxus and YPF Defendants may have disclosed in SEC filings certain aspects regarding the transfer of the assets; the cited documents speak for themselves in this respect.  However, the disclosures did not adequately disclose, among other things, the impact of these transfers on Maxus' liquidity and its ability to pay its creditors potential environmental liability claims and other claims as they come due.  Accordingly, the disclosures were inadequate to inform potential creditors, shareholders of Maxus, and the public of necessary information.

344.    These disclosures also had detailed financial information concerning the relative contribution each of the international assets (and Maxus' remaining domestic assets) were generating for the company. *See* Propps Decl. Ex. 16 at 24-25; Propps Decl. Ex. 299 at 15-17; Propps Decl. Ex. 380 at 2-5; Propps Decl. Ex. 228 at 16-20; Propps Decl. Ex. 498 at 16-21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust also references and incorporates its responses and objections to ¶ 233 herein.  The Trust disputes the accuracy of the term "detailed," but the cited document speaks for itself.

345.    These public disclosures further included that the Contribution Agreement "cut off" YPF's obligations to fund CLH above $108 million "based on the Company's reserves" plus certain operating expenses. Propps Decl. Ex. 289; Propps Decl. Ex. 290; Propps Decl. Ex. 285 at 16.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the cited documents establish that public disclosures stated that the Contribution Agreement "cut off" YPF's obligations.  The Trust also references and incorporates its responses and objections to ¶ 233 herein.

346.    Maxus further disclosed that it could not predict whether regulators would require "more vigorous enforcement policies" which could require material expenditures by the Company, and that changes in circumstances—including specifically at the Passaic River—could result in additions to the company's environmental liability reserves in the future as well. *See* Propps Decl. Ex. 100 at 12-14; Propps Decl. Ex. 16 at 11-12; Propps Decl. Ex. 299 at 9-10.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust also references and incorporates its responses and objections to ¶ 233 herein.

347.    Moreover, detailed descriptions of remedial efforts at the major Oxy sites for which Maxus was responsible under the Oxy Indemnity were all publicly disclosed. *Id.* 12-16. Maxus also disclosed the limits of when environmental expenditures are recorded. *See, e.g.,* Propps Decl. Ex. 16 at F-6 ("Environmental liabilities are recorded when environmental assessments and/or remediation are probable and material such that costs to the Company can be reasonably estimated," which is based on either "1) detailed feasibility studies of remediation approach and costs for individual sites or 2) the Company' estimate of costs to be incurred based on historical experience and publicly available information, based on the state of assessment and/or remediation of each site.").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust also references and incorporates its responses and objections to ¶ 233 herein. The Trust disputes the accuracy of the term "detailed," but the cited document speaks for itself.

348.    The New Jersey Court previously ruled that these disclosures were robust such that Oxy knew or should have known about them when disclosed in the 1996 and 1997 SEC filings. As such, in 2015 the New Jersey Court granted the YPF and Repsol Defendants' motion to dismiss

those claims as time-barred. Propps Decl. Ex. 300 at * 21 ("OCC did not act as a reasonable creditor would have. If it acted as a (sic) reasonably, it would have learned about the transfers at issue when they were announced in SEC filings, and it would have brought its claims within one year. It did not."), *aff'd in relevant part*, 2021 WL 6109820 (N.J. App. Div. Dec. 27, 2021) Propps Decl. Ex. 301.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that dismissal of claims brought by OCC does not establish the existence or absence of a triable issue of fact in this litigation. The Trust objects that the opinion cited speaks for itself. To the extent this paragraph sets forth a legal contention, no additional response is warranted.

**7.    The Maxus Board, Including the Disinterested Directors, Approved the 1997 Global Restructuring Transactions**

349.    The Maxus Board held a meeting on December 19, 1997, at which the sale of the Indonesian and Ecuadorian assets to YPFI and certain unrelated matters would be debated and voted on. Propps Decl. Ex. 302. In addition to the Board, the meeting was attended by certain members of management, Fernando Nardini and Francis Fernie of YPF, and representatives of Gaffney, Cline & Associates Inc. *Id.* Disinterested Directors George Jackson and R.A. Walker attended the Board meeting. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself.

350.    Mr. Rosso, Maxus's CEO, stated that the proposed combined consideration for the Indonesian and Ecuadorian assets was $689,278,768. *Id.*, at -14. This consisted of $241,336,869 for the stock of Maxus Southeast Sumatra Inc., $263,975,810 for the stock of YPF Java Baratlaut B.V., ("YPF Java") and $183,966,089 for the stock of YPF Ecuador, Inc. ("YPF Ecuador") *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document

speaks for itself.

351.    Mr. Rosso stated that management believed this price to be fair. *Id.* The purchase price for the Indonesian subsidiaries had "been determined by comparison to the equivalent value being offered in a contemporaneous third party transaction," the sale of stock in Repsol entities that held interests in the same properties in which Maxus's Indonesian subsidiaries owned interests. *Id.* at 14-15. Notably, Mr. Rosso informed the Board that the price to be paid to Maxus for the Indonesian subsidiaries would increase if the Repsol sale were to indicate a fair market value greater than $505,312,679. *Id.* In the event of an implied fair market value in excess of $1 billion, YPFI would have the right to cancel the sale. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.    The Trust objects on the ground the cited document speaks for itself.

352.    Mr. Rosso informed the board that the proposed sale price for YPF Ecuador Inc. was "the appraised fair market value as determined by an independent expert, Gaffney, Cline & Associates Inc., an engineering and management advisory firm having expertise in the petroleum industry." *Id.* Further, all prices were based on November 30, 1997, balance sheets and would be adjusted after year-end. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects on the ground the cited document speaks for itself.

353.    Mr. Rosso emphasized the need to obtain fair value and for Maxus to continue to meet certain debt covenants, including maintaining a net tangible assets-to-liabilities ratio of over 1:1. *Id.* at -16. Maxus's Controller, Linda Engelbrecht, advised that after the sale, that ratio would

remain greater than 1:1. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself.

354.    The Board discussed the sales, and asked William Cline of Gaffney, Cline, about the basis of the appraisal of YPF Ecuador; "Mr. Cline responded that the determination of the fair value of such subsidiary is based on the appraised value of the underlying assets owned by the subsidiary and represents Gaffney Cline's best judgment of the sales price that a willing buyer would pay and that a willing seller would accept in a purchase and sale transaction arrived at pursuant to an arms-length negotiation." *Id.* at -17.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself. The Trust does not dispute that William Cline made the statement above, but submits that the question of whether the Ecuador Assets were exchanged for fair market value is a genuine issue of material fact to be resolved at trial.

355.    After the Board's discussions concluded, the Board (including the Disinterested Directors) unanimously approved the sales. *Id.* at -17-22.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust notes for completeness that there is no evidence the Board was advised of the full nature and scope of the environmental liabilities.

8.    **The Sale of the Indonesian Assets**

356.    On December 3, 1997, Gaffney Cline provided opinion letters stating that "the represented net property interests of [YPF Java encompassed] a financial value of US$286,000,000

(two hundred eighty six million United States dollars) at 1st December 1997," and "the represented net property interests of [Maxus Sumatra LLC ("Maxus Sumatra") encompassed] a financial value of US$278,000,000 (two hundred seventy eight million United States dollars) at 1st December 1997." Propps Decl. Ex. 303 at MAXUS3050255-56; Propps Decl. Ex. 304 at MAXUS3058105.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

357.    On December 31, 1997, Maxus Indonesia sold all the issued and outstanding capital stock of YPF Java, all its interest in Maxus Sumatra, and a right to repayment under a $41 million June 1, 1992 Promissory Note (the "Indonesian Promissory Note") between Maxus Java and Maxus Indonesia (as successor in interest of MIEC) to YPFI for $505.3 million. Propps Decl. Ex. 305. Maxus recorded total consideration of $511.7 million, which retired intercompany debt. Propps Decl. Ex. 306; Propps Decl. Ex. 502 at MAXUS0091796.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

358.    The potentially comparable sale of the Repsol Indonesian entities did not close. Propps Decl. Ex. 308 at -35.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

359.    However, on June 22, 1998, another participant in the Sumatra-PSC, Novus Petroleum Ltd. ("Novus") sold its 3.72% interest for $20 million. *See* Propps Decl. Ex. 309. This transaction was then used, in accordance with the purchase agreement, as a basis to increase the consideration for the sale of Maxus Sumatra LLC from $241.3 million to $292.5 million. Propps Decl. Ex. 308; Propps Decl. Ex. 310, and for the sale of YPF Java and the promissory note from

$264.0 to $282.8 million, Propps Decl. Ex. 305 at YPF0055849-850, for a total price for the Indonesian Assets of $575.3 million.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green. The Trust disputes the accuracy of the statement highlighted in red, on the grounds that the post-closing adjustment of the YPF Java purchase price was based on a valuation prepared by Gaffney Cline, not on the Novus sale. *See* YPF0055719 at 37, Maxus Board Meeting Minutes, August 4, 1998. The Trust objects on the ground the cited documents speak for themselves.

**9.    The Sale of the Ecuadorian Assets**

360.    On December 3, 1997, Gaffney Cline provided an opinion of the valuation of YPF Ecuador (previously Maxus Ecuador, Inc. (Propps Decl. Ex. 311), valuing YPF Ecuador at $165 million. Propps Decl. Ex. 312 at 12. Later in the month, on December 22, 1997, CSFB provided a valuation of about $205 million to $245 million. Propps Decl. Ex. 313.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust does not dispute the opinion letters are correctly quoted above, but objects to the extent the statements are being offered as expert evidence. The Trust objects on the ground the cited document speaks for itself.

361.    On December 31, 1997, MIEC sold its shares of YPF Ecuador to YPFI for $185,246,734.85, as adjusted after year-end. Propps Decl. Ex. 314.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust objects on the ground the cited document speaks for itself.

**10.    The 1997 Transactions in Connection with the Global Restructuring Were Extensively Disclosed**

362.    Extensive SEC filings also evidence that Maxus and YPF contemporaneously and

355

robustly disclosed the transfer of the Indonesian and Ecuadorian assets, and the details were widely available to the public. *See, e.g.*, Propps Decl. Ex. 117 at 75; Propps Decl. Ex. 226 at 80. The disclosures provided detail on every aspect of the transfers, including details about each of the international assets being transferred and the amount of consideration paid for each. *See id.*

   *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes the characterization of the SEC filings as "extensive" and "robust."  Maxus and YPF Defendants may have disclosed in SEC filings the transfer of the assets.  However, the disclosures did not adequately disclose the impact of these transfers on Maxus' liquidity and its ability to pay its creditors potential environmental liability claims and other claims as they come due.  Accordingly, the Trust disputes that the disclosures were adequate to inform potential creditors and the public of necessary information.  The Trust objects on the ground the cited documents speak for themselves.

   363.   These disclosures also had detailed financial information concerning the relative contribution each of the international assets (and Maxus' remaining domestic assets) were generating for the company. *See* Propps Decl. Ex. 16 at 4.; Propps Decl. Ex. 16 at 24-25; Propps Decl. Ex. 299 at 7-8; Propps Decl. Ex. 228 at 16-20.

   *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

   364.   Maxus further disclosed that it could not predict whether regulators would require "more vigorous enforcement policies" which could require material expenditures by the Company, and that changes in circumstances – including specifically at the Passaic River -- could result in additions to the company's environmental liability reserves in the future as well. *See* Propps Decl. Ex. 16 at 12-14; Propps Decl. Ex. 16 at 24-25; Propps Decl. Ex. 299 at 9-10; Propps Decl. Ex. 228 at 35, 42.

   *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

365.    Moreover, detailed descriptions of remedial efforts at the major Oxy site for which Maxus was responsible under the Oxy Indemnity were all publicly disclosed. *Id.* 12-16; Propps Decl. Ex. 228 at 35-39. Maxus also disclosed the limits of when environmental expenditures are recorded. *See, e.g.,* Propps Decl. Ex. 16 at F-6; Propps Decl. Ex. 299 at 8 ("Environmental liabilities are recorded when environmental assessments and/or remediation are probably and material such that costs to the Company can be reasonably estimated," which is based on either "1) detailed feasibility studies of remediation approach and costs for individual sites or 2) the Company' estimate of costs to be incurred based on historical experience and publicly available information, based on the state of assessment and/or remediation of each site."); Propps Decl. Ex. 299 at 7-8.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

366.    The New Jersey Court previously ruled that these disclosures were robust such that Oxy knew or should have known about them when disclosed in the 1998 and 1999 SEC filings. As such, in 2015 the New Jersey Court granted the YPF and Repsol Defendants' motion to dismiss those claims as time-barred. Propps Decl. Ex. 300 at * 21 ("OCC did not act as a reasonable creditor would have. If it acted as a (sic) reasonably, it would have learned about the transfers at issue when they were announced in SEC filings, and it would have brought its claims within one year. It did not."), Propps Decl. Ex. 301.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that dismissal of claims brought by OCC does not establish the existence or absence of a triable issue of fact in this litigation. The Trust objects that the opinion cited speaks for itself. To the extent this paragraph sets forth a legal contention, no additional response is warranted.

11.    **The Maxus Corporate Model**

367. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute that ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

368. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements to the extent it characterizes or ascribes meaning to Mr. Pulliam's expert report and testimony.  Mr. Pulliam's testimony and expert reports speak for themselves.

369. ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph to the extent they imply that ████████████████████████████████████████ The Trust objects that the documents cited speak for themselves.

370. ███████████████████████████████████████████

███████████████████████████████████████████

█████████ Moreover, CSFB, Maxus's valuation consultant *did* discuss its valuations of the assets with Maxus's management who were using their internal model. Propps Decl. Ex. 321 at YPF0039405-6; Propps Decl. Ex. 321 at YPF0039403 (CSFB representative describing to Maxus board whether CSFB valuation of international transfers included information from Maxus's

recent Viboral well in the Quiriquire unit); Propps Decl. Ex. 277, at CS 000007 (noting the Maxus

Corporate Planning Model as a source for a CSFB assumption regarding future cash flows).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that
> the factual statements in this paragraph are relevant to any claims or defenses as to
> which summary judgment is sought.  The Trust objects that the cited documents
> speak for themselves.

**12.    IRS Scrutiny of the Asset Sales**

371.   ███████████████████████████████████████████████

████████████████████████████████████████

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that
> the facts in this paragraph are relevant to any claim or defense as to which summary
> judgment is sought.  The Trust objects on the grounds that the documents cited speak for
> themselves.

372.    There is no evidence in the record that the IRS challenged the sale prices for the

Bolivian, Venezuelan, or Indonesian Assets. However, the IRS did challenge Maxus's valuation

of YPF Ecuador Inc. On Maxus's consolidated 1996 federal tax return, because of the involuntary

termination of a risk service contract, Maxus Ecuador reported a loss in the amount of

$101,470,583, which reduced the adjusted tax basis of $221,470,583, to amount shown on "a

Property Valuation Report of Maxus Ecuador prepared by Gaffney, Cline and Associates" of

$120,000,000. Propps Decl. Ex. 322 at -59; Propps Decl. Ex. 323 at -36.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the
> facts in this paragraph are relevant to any claim or defense as to which summary
> judgment is sought.  The Trust objects on the grounds that the documents cited speak for
> themselves.

373.    On Maxus's 1997 return, after redomiciling Maxus Ecuador to Cayman, Maxus

recognized a tax *gain* of $26,006,665. Propps Decl. Ex. 322 at -58 & -67, Propps Decl. Ex. 324 at -67 (line 9), -71 (line 24). This was based on a Gaffney Cline valuation. Propps Decl. Ex. 322 at -60.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects on the grounds that the documents cited speak for themselves.

374.    The IRS challenged the $101 million loss for 1996, Propps Decl. Ex. 323 at -935, and recalculated the 1997 effect on income of the redomiciliation from a $26 million tax gain to a $135,854 tax loss. Propps Decl. Ex. 322 at -457. Based on the IRS calculation of the tax basis as $225,135,854 as of December 31, 1996, this resulted in a valuation of $225,000,000 to match the midpoint of the CSFB valuation. Propps Decl. Ex. 322 at -462. *See also generally* Propps Decl. Ex. 325 (combining these explanations).

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects on the grounds that the documents cited speak for themselves.

375.    In July 2003, Maxus protested the IRS's positions on this and a number of other issues. *See* Propps Decl. Ex. 326 at -62 & Propps Decl. Ex. 327. The protest argues that the $101 million loss should be allowed for 1996 and that the gain in 1997 should be reinstated – but if the $101 million loss were not fully restored, the reduction in gain for 1997 would be appropriate. Propps Decl. Ex. 327 at -67-68.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects on the grounds that the documents cited speak for

themselves.

376.    By March 2006, Maxus and the IRS had reached a settlement. For 1996, the IRS agreed to a loss of $42,820,290. Propps Decl. Ex. 328 at -262. For 1997, the tax gain ($26,006,665) was fully eliminated. Propps Decl. Ex. 329 at -202. This resulted in a value of $182,315,564 ($225,135,854 (the tax basis previously determined by IRS) - $42,820,290). As stated above, the final sale price of YPF Ecuador Inc., as adjusted for the year-end balance sheet, was $185,246,735, almost $3 million above the value determined by the IRS.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the documents cited speak for themselves.  The Trust further objects that the allegations in this paragraph not supported by citations to record evidence do not establish the existence or absence of a triable issue of fact.

377.    In August 2006, the Congressional Joint Committee on Taxation approved the settlement of Maxus's audits for 1994-1997. Propps Decl. Ex. 330. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the document and testimony cited speak for themselves.  The Trust further objects on the ground that the cited testimony constitutes hearsay to the extent offered for the truth of the matter asserted.

**13.    No negative effects on creditors of Global Restructuring**

378.    There is no evidence in the record of *any* creditor ever raising a concern with Maxus or YPF about the Global Restructuring, whether Oxy, an environmental regulator, or any other person or entity.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Among other things, the Trust submits that the cross-claims brought by OCC in the New Jersey Litigation constitute "concerns about the Global Restructuring."

379.    In fact, from the environmental restructuring until after the bankruptcy filing, environmental regulators consistently corresponded with the entity known in the 1990s as CLH in connection with the remediation of the Lister Site, the Passaic River, and other sites. Propps Decl. Ex. 332 at -3389; Propps Decl. Ex. 46 at -194; Propps Decl. Ex. 45; Propps Decl. Ex. 52.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought.  The Trust objects on the grounds that the document and testimony cited speak for themselves.  .

380.    As shown above, nothing in any of the planning documents, memoranda, minutes, or transcripts suggests that these transfers were being done to hinder, delay or defraud creditors.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  As explained above, the Trust has cited numerous pieces of evidence in the record demonstrating that a primary reason for the transfers at issue was to protect assets and segregate them away from Maxus in an attempt to prevent environmental liability creditors from reaching said assets.

381.

**Formatted:** Highlight

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought..  The Trust does not dispute that Prof. Williams will provide the testimony indicated; however, ████████████████████████████████ ████████████████████████

382. ████████████████████████████████

**Formatted:** Highlight

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the facts in this paragraph are relevant to any claim or defense as to which summary judgment is sought. The Trust objects on the grounds that the purported factual allegations in this paragraph are, in actuality, descriptions of conclusions reached by YPF's expert on matters of live dispute. The Trust further objects that the cited document speaks for itself. Further, whether Maxus was ██████████████████ ████████████

14.    **Maxus Guarapiche and Greenstone**

383.    Maxus sold two other entities to YPFI in the 1990s, neither of which is specifically challenged by the Trust.

*Responses and Objections:* On the understanding that the sales referred to in this paragraph are the sales of Maxus Guarapiche and Greenstone (as described in paragraphs 384 and 385), the Trust does not dispute this factual allegation.

384.    On September 1, 1996, MIEC sold all of the capital stock of Maxus Guarapiche to YPFI for $26.4 million, which represented the book value of Maxus Guarapiche on its underlying financial statements as of August 31, 1996. Propps Decl. Ex. 299 at 9. As discussed above, during the June 18, 1996, Board meeting, CSFB informed the Board that the acquisition cost (approximately $27 million) was the proper valuation for Maxus Guarapiche, and Maxus Guarapiche was one of the entities the sale of which was authorized by the Maxus Board on June 18, 1996. Propps Decl. Ex. 180 at -69-72.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

385.    ████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.



386.    This transaction was considered by the Maxus Board of Directors at a meeting on December 14, 1998. Propps Decl. Ex. 335. The Maxus Board of Directors accepted the recommendation of Maxus management that the sale of Greenstone was justified from a business point of view in light of the fact that Maxus's "continued ownership of Greenstone is of questionable benefit given the Corporation's current organization and operation" and unanimously approved the sale. *Id.* at 57-58.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

387.    An additional business justification for the sale of Greenstone was that Greenstone was classified as a controlled foreign corporation for U.S. tax purposes. This classification meant that Greenstone's passive investment income, which it earned on insurance, was considered taxable income for Maxus, and the transfer to YPFI was expected to reduce the tax burden of the overall entity. Propps Decl. Ex. 336 at 69. As such, it was determined that the transfer of Greenstone to YPFI would be efficient because Greenstone was "more valuable to YPFI than to

Maxus." *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

388.    Maxus relied on an independent valuation performed by Arthur Andersen to determine the fair value of Greenstone. *Id.* The independent valuation that Arthur Andersen prepared was distributed to the Maxus Directors in advance of the December 14, 1998 meeting. Gus Krause of Arthur Andersen was available to the Maxus Board of Directors meeting at which the sale to Greenstone was considered and approved to answer any questions concerning the Arthur Andersen valuation. *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust disputes the fact that Maxus "relied on" the Arthur Andersen evaluation.  The Trust does not dispute that Maxus was provided with the evaluation, but disputes that the evaluation was "relied on" to the extent it is unsupported by the evidence.

### 15.    **YPFI—Post Global Restructuring**

389.    ██████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the allegation in this paragraph ████████████████████
████████████████████████████████████████

390.    The figure below sets forth a simplified organizational chart for YPF and Maxus after the Global Restructuring, which demonstrates, that consistent with the objectives of the tax restructuring, only Maxus's international assets were moved to YPFI, while all of its substantial domestic assets remained with Maxus (Propps Decl. Ex. 338; Propps Decl. Ex. 337 at -674).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the implication created by this paragraph that Maxus's domestic assets were "substantial" as compared to the international assets sold to YPFI.   As explained above, the Trust has also provided evidence to demonstrate that one of the objectives of the tax restructuring was to avoid exposing Maxus's most valuable assets to its lingering environmental liability.

**Figure 2.     Post Reorganization U.S. Tax Structure**



391.     Prior to its acquisition by YPF, Maxus was highly leveraged and not able to access the capital markets. ██████████████████████████

████████████████████████████████████████████████

█████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.



392. ██████████████████████████████████████

█████████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

393.     The Global Restructuring enabled Maxus to reduce its debt load by approximately $1 billion in debt and preferred stock, reducing future projected interest and preferred stock dividends. *See* Propps Decl. Ex. 100 at F-50; Propps Decl. Ex. 285 at 5, 13-15 and 25; Propps Decl. Ex. 16 at F-49; Propps Decl. Ex. 340; Propps Decl. Ex. 341; Propps Decl. Ex. 342 at AA-YPF-0011760, AA-YPF-0011769 & AA-YPF-0011770; Propps Decl. Ex. 343; Propps Decl. Ex. 344; Propps Decl. Ex. 345 at AA-YPF-0011828, AA-YPF-0011837, AA-YPF-0011838; Propps Decl. Ex. 346; Propps Decl. Ex. 307, at MAXUS0091799 & MAXUS0091807, MAXUS0091808; Propps Decl. Ex. 347; Propps Decl. Ex. 348; Propps Decl. Ex. 349 at AA- YPF-0033426, AA-YPF-0033435 and AA-YPF-0033436; Propps Decl. Ex. 350 at tabs $430.2mm Note, $232.5mm Note, $200mm Note; Propps Decl. Ex. 351.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

394. ███████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████████
███████████████████████████████
███████████████████████████████
██████████████████████████████████
███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

16.    **The Maxus Management Group**

395. ████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
█████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

396.    According to Maxus Audit Committee Minutes, the Maxus Management Group was defined as "...the Corporation [Maxus] and certain affiliated companies whose operations are managed by the Corporation under a Services Agreement..."; Minutes of the Meeting of the Audit Review Committee of the Board of Directors of Maxus Energy Corporation held on August 18, 1996. Propps Decl. Ex. 358.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph.  The Trust disputes that the minutes cited in Propps Decl. Ex. 358 are dated August 18, 1996 to the extent the evidence shows they are dated August 18, 1997.

397. ██████████████████████████████████████████
████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

398. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the assertion in this paragraph that ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

399. ██████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

400.    YPFI also had its own, separate board of directors and officers. *See* Propps Decl. Ex. 363; Propps Decl. Ex. 364. At all times after each of the international asset sales were completed, YPFI had legal control over those assets. *See* Propps Decl. Ex. 365; Propps Decl. Ex. 366; Propps Decl. Ex. 305; Propps Decl. Ex. 367; Propps Decl. Ex. 368; Propps Decl. Ex. 369; Propps Decl. Ex. 370; Propps Decl. Ex. 371; Propps Decl. Ex. 372.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

401.    ████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Whether YPF█████████████████████████████

402. ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts in this paragraph.

VII.    **AFTER THE GLOBAL RESTRUCTURING MAXUS HAD $1 BILLION IN DOMESTIC ASSETS WITH ESTIMATED FUTURE REVENUES OF $200 MILLION ANNUALLY**

403.    In the period leading up to the acquisition by Repsol, Maxus continued as an oil and gas exploration and production company. Propps Decl. Ex. 16 at 2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

404. ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green.  The Trust disputes the accuracy of the phrase ███████████████████████████████████████  The Trust objects that the cited documents speak for themselves.

*Crescendo*

405.    Specifically, Maxus focused its domestic exploration and production efforts in the mid-continent region through its wholly-owned subsidiary, Midgard. *See* Propps Decl. Ex. 380 at AA_MAXUS001417172. At the time of the YPF acquisition, Maxus saw improving results from Midgard. *See* Propps Decl. Ex. 16 at 5 ("In 1996, Midgard continued an aggressive drilling program on its Midcontinent properties, drilling and completing 109 wells compared to 81 wells in 1995. Production for 1996 rose 12% over 1995 rates to an average of 145 mmcfpd and year-end reserves increased 22% from December 31, 1995 to 724 bcf equivalent. Midgard replaced 330%

of production during the year at a cost of $0.34 per thousand cubic feet ("mcf" equivalent and, as compared to 1995, reduced unit production costs by 12% and unit gathering costs by 6%").

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

406.    The Midgard Assets were located in the Midcontinent region of the United States, specifically in the Texas Panhandle and western Oklahoma. *Id.* at 3. Midgard was the second largest producer in the area. Propps Decl. Ex. 381 at -653.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

407.    

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

408.    Midgard also owned 2,400 miles of natural gas gathering systems and two processing plants with a total capacity of 250 million cubic feet per day. Propps Decl. Ex. 381 at 651; Propps Decl. Ex. 497.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

409.    In 1995, YPF's financial consultant, Salomon Brothers, valued Midgard between $643 million and $705 million. Propps Decl. Ex. 385 at YPF0001000. CSFB, Maxus's consultant at that time, had estimated Midgard's value if sold to be $675 million. Propps Decl. Ex. 497 at CS000425; Propps Decl. Ex. 387 at CS 001446 ;

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

410.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

411.    While YPF supported Maxus in this because it had hopes of turning Maxus around and wanted to support Maxus's financial growth, Maxus was making its own decisions with respect to strategy for Midgard. *Id.*; Propps Decl. Ex. 392; Propps Decl. Ex. 393 at MAXUS3223014; Propps Decl. Ex. 16 at 5; Propps Decl. Ex. 394 at MAXUS321786.

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited support the assertion that YPF supported Maxus's development of its Midgard assets "because it had hopes of turning Maxus around," or that "Maxus was making its own decisions with respect to strategy for Midgard." The Trust has cited to demonstrable evidence showing that the YPF group prevented Maxus from making its own decisions with respect to strategy for its assets, including Midgard. *See* Trust MOL at 17-18.

412.    For example, in November 1995, Maxus's President and CEO, Roberto Monti, presented a plan to the Maxus Board of Directors to form a JV with Amoco involving the Midgard assets (the "Crescendo JV"). Propps Decl. Ex. 390 at YPF0000176-7; Propps Decl. Ex. 391 at YPF0012198). He explained that Maxus wanted to retain significant interests in the strategic U.S. gas market and that increased gas volumes through the Crescendo JV would allow for enhanced marketing capabilities as well as reduced operating costs of $10 million annually. *Id.* Around April 1996, Mr. Monti presented that Maxus had been in discussions with Amoco and exchanging technical data. *See* Propps Decl. Ex. 180 at -84.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust notes that Mr. Monti actually presented about Maxus's discussions with Amoco in June 1996, although the negotiations had begun in April.  *See* Propps Decl. Ex. 180 at -84.

413.    Maxus began negotiating with Amoco regarding the formation of the Crescendo JV in April 1996. Propps Decl. Ex. 395 at YPF 0039420.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

414.    In June 1996, Mr. Monti updated the Maxus Board on the progress towards developing the Crescendo JV. *Id.* ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████ Maxus also retained exploratory interests in the Gulf of Mexico, including working interests ranging from

16.67 percent to 100 percent in 23 blocks, and overriding royalty interests in two other blocks. Propps Decl. Ex. 227 at 27.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the mischaracterization of Mr. Menenberg's exert report.  Crescendo was an asset owned by Maxus's subsidiary, Midgard. ████████████████████████████████████████████████████████████████████████████████████████████████ Importantly, Crescendo was not developed and instead was siphoned by Repsol.  Trust Mot. at 17-18..

415.    In October 1996, Maxus and Amoco directly negotiated the value of the assets each would contribute to the Crescendo JV. Propps Decl. Ex. 396. Maxus and Amoco signed a Letter of Intent regarding this JV in January 1997. Propps Decl. Ex. 393.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph.  The Trust disputes the mischaracterization of the text highlighted in red because Maxus was an alter ego of the YPF Defendants and was dominated by the YPF.  *See* Omnibus Reply Section II.E.

416.    There is nothing in the record to suggest that YPF opposed, or tried to prevent Midgard from entering into, the JV.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, the Trust states that it is not aware of record evidence demonstrating that YPF opposed, or tried to prevent, Midgard from entering the Crescendo JV, but submits that the absence of such record evidence does not establish the existence or absence of a triable issue of fact regarding any claim or defense as to which summary judgment is sought.

417.    The Maxus Board meeting on June 20, 1997 indicates that the formation and

participation of the Crescendo JV was a product of Maxus/Midgard board decision-making rather than YPF. *See* Propps Decl. Ex. 397 at 46. Specifically, William M. Wicker and Karim Rashid of CFSB attended the June 20, 1997 meeting and made a presentation about the proposed JV. *Id.* at 46. The minutes indicated that the due diligence was done by CSFB at Maxus's direction. *Id.* at 47-48. The Maxus board was involved in planning the details of the transaction, such as the technical issues of partnership accounting for the financial results of the JV. *Id.* at 48.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes that the participation in Crescendo JV was not a product of YPF decision-making. Among other things, the board minutes on which YPF relies for this assertion reflect that YPF-affiliated directors (Messrs. Rosso, Bridger, Lesch, Monti and Peacock – see Menenberg Report at ¶ 256) were present at the meeting at which entry into the JV was deliberated, and one such director, Mr. Rosso, was one of two directors appointed to an Ad Hoc Committee to consider the Crescendo prospect. *See* Propps Decl. 397.

418. In August 1997, Maxus and Amoco formed the Crescendo JV. Propps Decl. Ex. 392; Propps Decl. Ex. 399 ¶ 98. Maxus contributed $700 million in exploration and production and midstream assets including its Midgard operations to the Crescendo JV on August 20, 1997. *Id.*; Propps Decl. Ex. 392 at -611; Propps Decl. Ex. 393 at MAXUS3223014. Amoco contributed E&P interests in the partnership area and agreed to install a gas processing plant. Propps Decl. Ex. 393 at MAXUS3223014; Propps Decl. Ex. 398 at YPF3645 ).

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

419. Based on its contributed assets, Maxus received a 59% interest in Crescendo.

Propps Decl. Ex. 339 ¶ 21.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

420.    YPF supported Maxus's efforts with regards to the Crescendo JV in the hopes of helping Maxus develop further profits. *See* Propps Decl. Ex. 400 at YPF-E-0000144549. "Before the Repsol acquisition of YPF, BP Amoco[3] and YPF were strongly aligned to create a business yielding a 16% ROCE [Return on Capital Employed] on the core of the Crescendo assets." *Id.*

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

421.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

422.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

---

[3] In 1998, Amoco and BP merged combining their operations into a single operation.

423.    [RESERVED]


424.    In its 1999 business plan (dated June 1998), Maxus projected annual net cash flows from Midgard to average approximately $80 million per year between 2000 and 2002 even with the low natural gas prices at that time. Propps Decl. Ex. 405 (average of cells F113:H113).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust disputes natural gas prices were low at the time as being unsupported by the evidence.


425.    Moreover, Crescendo's production was expected to remain at or above 1998 levels for the next decade, even with no significant new investment. Propps Decl. Ex. 406 at MAXUS3205818. As BP Amoco described it, "Crescendo is viewed as a low risk business, with a high degree of predictability around net income (normalized for price)." Propps Decl. Ex. 403 at MAXUS3209039.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.


426.    ████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████



*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

427.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph to the extent they

428.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, subject to the qualification that

429.    By the time of the Crescendo Board meeting on April 22, 1999, the company was on track toward its goals and had made significant improvements. Propps Decl. Ex. 410. The first quarter of 1999 had gone well. Maxus (with YPF's support) and BP Amoco made plans to work together on building their 3 and 10 year plans. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

430. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

431. ████████████████████████████████████████████

███████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

***Gulf of Mexico***

432.    At the same time, Maxus also held assets in the Gulf of Mexico and other assets

that Maxus was developing (having sold its original Gulf of Mexico assets in 1994 for $325 million as part of Maxus's pre-YPF acquisition attempts to address its diminishing financial condition, *supra* ¶ 116). Propps Decl. Ex. 380 at 30. ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████

> *Responses and Objections:* The Trust cannot confirm █████████████████████████ ████████████████████████ Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

433.    As of June 1999 (the quarter-end immediately following Repsol's acquisition of a controlling interest in YPF), Maxus's assets were valued at a book value of $942.6 million, and consisted of Maxus's indirect interests in Crescendo and certain Gulf of Mexico fields. *See* Propps Decl. Ex. 413 at TAB BS-YPFFORMAT. Those assets were never the subject of being transferred to any YPF entity or sold as part of YPF's restructurings – instead, Maxus was actively involved in monetizing and developing these assets. *See* Propps Decl. Ex. 414; *see also* Propps Decl. Ex. 402 at YPF0126684, at -86-88.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes that Maxus "valued" the assets at a book value, but concurs that the recorded book value of the assets were $942.6 million. The Trust also disputes the accuracy of the assertion that "Maxus was actively involved in monetizing and developing the[] assets" in question. The documents cited do not support this assertion: Propps Decl. Ex. 414 is the Master Agreement governing the joint venture, which at most establishes that Maxus was formally involved, while Propps Decl. Ex. 402, a management summary and five-year plan regarding certain Gulf of Mexico Assets indicates that well blocks apparently belonging to Maxus would provide an "opportunity to position YPF as an offshore Producer with significant reserves at acceptable F&D costs."

VIII.    **THE REPSOL ACQUISITION MAKES CLEAR THAT THERE WAS NO DECADES LONG CONSPIRACY**

434.    In 1999, prior to the Repsol acquisition, YPF and Maxus were actively working to turn around Maxus's finances and they were seeing results. *See* Propps Decl. Ex. 415 at -793.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

435. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

436. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ Indeed, press outlets were reporting that Repsol was "circumventing YPF's board and its chairman, Robert Monti… who… made no secret of his desire to seek a dialogue of equals with Repsol, if not to remain independent." Propps Decl. Ex. 416 at 2. There was also "strong opposition in the management of YPF to Repsol taking charge." Propps Decl. Ex. 7 at 2. After its acquisition of YPF, the Spanish parent entity changed its name from "Repsol" to "Repsol YPF." Propps Decl. Ex. 183 at v; Propps Decl. Ex. 184 at v.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

## IX.    MAXUS FOLLOWING THE REPSOL ACQUISITION

437.    Following the Repsol acquisition, major decisions of the corporate family were directed by Repsol. Under Repsol's leadership, Maxus was free to pursue a strategy to develop assets in the Gulf of Mexico, and it decided which assets to sell and which to keep, with a few exceptions discussed below. Propps Decl. Ex. 419 at -194.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes that Maxus was free to pursue a strategy to develop assets in the Gulf of Mexico as it was dominated by Repsol.  *See* Trust SOF ¶¶ 96-104.  Repsol and Maxus were alter egos with at many times, shared employees and management.  Trust SOF ¶¶ 97-98.  Further, the document cited in support (minutes of the Board of Directors of YPFH on May 3, 2006, presided over by YPFH director and then-CFO of YPF, Carlos Olivieri), merely reflects that director M.G. Smith provided an update on Stormy Monday, North Bronto and Neptune.  This document does not establish the existence or absence of a triable issue of fact regarding Maxus's "freedom" to pursue a development strategy.

438.    Maxus never tried to evade any of its contractually assumed environmental obligations during Repsol's ownership of YPF either. *See* Propps Decl. Ex. 13 at 3-9; Propps Decl. Ex. 420. It entered into consent arrangements with EPA and NJDEP, and it continued to engage in massive cleanup efforts of the Passaic River and other sites.  Propps Decl. Ex. 13 at 3-9.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Maxus litigated its indemnification obligations with OCC for years, including in the New Jersey Litigation.

**Crescendo JV Ends**

439. ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Maxus ultimately sold its share in Crescendo to Apache Resources and BP Amoco for $625 million. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

*Responses and Objections:* ████████████████████████ ████████████████████████████████████████ Subject to its General Objections, the Trust does not dispute the other facts set forth in this paragraph.

440.    Thus, in 1999-2000, the Crescendo partnership terminated. Propps Decl. Ex. 421 at

-318. Neither partner could liquidate the partnership before 2002, absent a change in control. Propps Decl. Ex. 392 at AA-YPF-0029601-02. But in 1999, both parties had changes in control (Amoco having been acquired by BP, and Maxus by Repsol). Propps Decl. Ex. 422 at 11; Propps Decl. Ex. 5 at REP14154.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

441.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.



442.

███████████████████████████████████

███████████████████████████████████

██

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

443. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes that the documents cited support the assertion highlighted in red. Among other things, ██ ████████████████████████████████ ████████████████████

444.    Including Neptune and its other Gulf of Mexico prospects, Maxus was estimated to have $429 million in assets in 2006. *See* Propps Decl. Ex. 430 at MAXUS5829746 – MAXUS5829766.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the accuracy of this assertion of fact. Among other things, the document cited for support establishes that Maxus's GOM assets could be valued from $309 to $429 million (depending on discount rate), and concludes by stating the actual valuation range from $300 to $365 million.

*YPFI Transfers*

445.    From 2000-01, Repsol engaged in a tax restructuring of its international assets. *See*

Propps Decl. Ex. 431; Propps Decl. Ex. 202; *see also* Propps Decl. Ex. 432; Propps Decl. Ex. 433; Propps Decl. Ex. 434; Propps Decl. Ex. 435; Propps Decl. Ex. 436; Propps Decl. Ex. 437 at YPF-E-0000238023; Propps Decl. Ex. 438.

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph as irrelevant. Repsol restructuring of its international assets was not relevant to why they made transfers with YPFI assets. The Trust also notes that Repsol's restructuring of its international assets were not primarily for tax reasons, but to siphon Maxus's valuable assets and protect their investment in acquiring the company.

446.    Repsol caused YPFI to transfer the former Maxus international assets (Bolivia, Ecuador, Indonesia and Venezuela, discussed *supra* 327-32) to Repsol entities, and/or sell them to third parties, with the Indonesian assets sold to the China Offshore Cooperation Southeast Asia Limited ("CNOOC"). *See* Propps Decl. Ex. 376 at 462-63; Propps Decl. Ex. 369; Propps Decl. Ex. 439; Propps Decl. Ex. 440; Propps Decl. Ex. 441; Propps Decl. Ex. 442 at 50-53

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in paragraph 446.

447.    The YPFI assets were no longer Maxus assets, as they had been sold to YPFI for more than $1 billon several years earlier. *Id.*

> *Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. Specifically, the factual record supporting the Trust's summary judgment submissions create a triable issue of fact regarding whether YPFI and Maxus were alter egos and the assets of one are the assets of the other.

448.    Certain of these assets (in particular the Bolivian assets) sold included a combination of both former Maxus assets as well as legacy or later-acquired *YPF* assets. Propps

Decl. Ex. 374 at- 629 and -637; Propps Decl. Ex. 443 at 863; Propps Decl. Ex. 375 at -681; Propps Decl. Ex. 376 at 463; Propps Decl. Ex. 377; Propps Decl. Ex. 378 at 166; Propps Decl. Ex. 379.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

449.    Repsol asserts that it transferred the assets in order to pay down debt in connection with its acquisition of YPF, to rationalize taxes, and to divest non-core assets (like Indonesia) outside Spain or Latin America. Propps Decl. Ex. 376 at -462-63, at 462-63; Propps Decl. Ex. 439; Propps Decl. Ex. 441; Propps Decl. Ex. 442 at 50-53; Propps Decl. Ex. 5 at REP 14207 (describing the asset divestment plan that permitted Repsol YPF to progressively reduce its debt levels following the acquisition of YPF in 1999); Propps Decl. Ex. 444 (discussing asset disposals including its interest in Crescendo Resources will help Repsol YPF exceed its target debt reduction amount).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, with the qualification that the Trust does dispute that the documents cited establish that Repsol's divestment initiative was motivated by tax concerns.

450.  ██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes that ████ ████████████████████████████ YPF received the proceeds of the sale (as admitted by the YPF Defendants) and was required to consent to the transaction. Trust SOF ¶¶ 86-95.

*King & Spalding Memo*

451. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes ███ ████████████████████████████████████ The Trust further objects on the reliance of any documents withheld for privilege or legal advice by the YPF Defendants. To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding. Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

452. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust incorporates its responses and objections from ¶ 451. The Trust further objects on the reliance of any documents withheld for privilege or legal advice by the YPF Defendants. To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding

environmental liabilities from King & Spalding.  Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

The Trust disputes that the memorandum is ██████████████████████. The first discussions of a potential bankruptcy occurred much earlier, including in the context of a global restructuring.

453. ████████████████████████████████████████████

████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust to any reliance by YPF reliance on any documents that YPF withheld or sought to withhold for privilege or legal advice by the YPF Defendants.  To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding.  Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

454. ████████████████████████████████████ █

████████████████████████████████████████

████████████████████████████████████████

██████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

455. ████████████████████████████████████████████

████████████████████████████████████████

994

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

456. ████████████████████████████████

███████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes ███████ the documents that would prove or refute that fact have been categorically withheld by the YPF Defendants and Repsol.  Further, the memorandum advised Repsol on filing for bankruptcy in the future and no further analysis was necessary as the time for Maxus' bankruptcy was not ripe.  To the extent the YPF Defendants seek findings of fact that Repsol (or the YPF Defendants) sought advice from its lawyers at King & Spalding, the Trust submits that the YPF Defendants have effectuated a subject-matter waiver and request that the YPF Defendants either be directed to produce all documents and communications relating to legal advice regarding environmental liabilities from King & Spalding.  Alternatively, the Trust requests that the Court draw an adverse inference against the YPF Defendants concerning the withheld documents.

457.    Maxus never tried to evade any of its environmental obligations from 1999 through the date the bankruptcy petition was filed in June 2016. It entered into consent arrangements with

895

EPA and NJDEP, and it continued to engage in massive cleanup efforts of the Passaic River and other sites. *See* Propps Decl. Ex. 13 at 3-9; Propps Decl. Ex. 84. During this time, among other things, Maxus and Tierra were conducting investigations of the Lower Passaic River, and agreed to a removal action in which hot spots immediately adjacent to the Lister Site were dredged. Propps Decl. Ex. 13 at 3-9.  During the New Jersey Litigation, when NJDEP was settling with Maxus, Tierra, YPF, and Repsol, NJDEP recognized that Tierra was taking actions to facilitate the remediation efforts. Propps Decl. Ex. 22 at 14.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Among other instances of trying to evade its obligations, Maxus (under the direction of Repsol and YPF) litigated its indemnification obligations with OCC for years, despite having no good faith legal basis for their dispute. Further, Maxus continued to litigate in the NJ litigation from until 2016, where the core of the dispute involved its environmental obligations.  For example, Maxus disputed that it was not an alter ego of Tierra (the vehicle used to maintain the environmental obligations).

458.    At the end of 2005, NJDEP sued Oxy, Maxus, Tierra, and some of the YPF and Repsol Defendants. Propps Decl. Ex. 28. As of 2007, NJDEP had asserted claims against the YPF and Repsol Defendants on alter ego and fraudulent transfer theories based on many of the same transfers at issue here. *See* Propps Decl. Ex. 449 ¶¶ 33-53, 118-124. Oxy asserted cross claims for alter-ego and fraudulent transfer claims against the YPF Defendants in 2007. *See* Propps Decl. Ex. 450 at 4.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

*2007/08 Settlement Agreement Between YPF and Maxus*

459.

███████████████████████████████

███████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

460.  ███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

461.    The settlement amount offered by YPF – $378.2 million – *exceeded* SRR's highest estimated value for the Contribution Agreement by over $18 million. Propps Decl. Ex. 453 at -935. After SRR's backup was prepared, the parties to the Settlement Agreement entered into a Third Amendment, which added $43 million in contributions to Maxus ultimately from YPF to fund Maxus's pension plan, bringing the total consideration to $421.2 million. *See* Propps Decl. Ex. 454 at -296-300.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

462.    Accordingly, SRR concluded that Maxus was fully compensated by the Settlement

Agreement and that "the terms and conditions of the 2007/2008 Settlement Agreements were fair, from a financial point of view, to Tierra and Maxus." Propps Decl. Ex. 452 at -330.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph, but refers the court to the document which sets forth certain of SRR's assumptions with respect to their conclusions.

463. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████

*Maxus's Gulf of Mexico Assets & Project Neptune*

464. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
This included $125 million in credit made newly available in connection with the closing of the 2007/2008 Settlement Agreement. Propps Decl. Ex. 454 at YPF 0030246 (§ 8). ██████████

████████████████████████████████

████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust incorporates its response and objections to ¶ 463 herein. As explained above, ████████████████████████████ ██████████████

465.    Project Neptune relates to Maxus's 2003 acquisition of Neptune assets in the Gulf of Mexico using part of the proceeds from the Crescendo sale. *See* Propps Decl. Ex. 455 at -943-44("Subsequently, in 2003 Maxus US entered into an agreement whereby it participated in drilling the fifth (5th) well and thereby earned a fifteen percent (15%) interest in the five (5) lease blocks comprising the Neptune Unit."). This was part of a larger Gulf of Mexico portfolio, which included right to the Stormy Monday Tiger/North Bronto, Guppy Wake, Ra, Coronado, and Ouachita prospects. *See* Propps Decl. Ex. 456 at REPSOL-E-0000005637; Propps Decl. Ex. 460 at -436; Propps Decl. Ex. 262 at 81:20-84:12; Propps Decl. Ex. 229 at -507.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

466.    In 2006, outside consultants at Scotia Waterous determined that Maxus should focus on Neptune rather than other more speculative prospects in Maxus's portfolio; Maxus's decision to do so was made based on the recommendation of these consultants, not YPF. *See* Propps Decl. Ex. 457 at REPSOL-E-0000006666.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust disputes that the document cited establishes that Maxus's purported decision to focus on Neptune rather than more speculative assets was not influenced or directed by YPF (or Repsol). As described above, Repsol and YPF wholly dominated Maxus during this time period. Moreover, the YPF Defendants provide no evidence, and their cited evidence does not

demonstrate, that this decision was based solely on the recommendation of the consultants.

467.    Scotia Waterous estimated Maxus's Gulf of Mexico exploratory well portfolio to be worth between $309 million and $429 million as of August 8, 2006 (with most of the value assigned to Neptune and North Neptune). *See* Propps Decl. Ex. 430 at MAXUS5829758; *see also* Propps Decl. Ex. 458 at MAXUS3226979.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  *See* Response 444, *supra*.

468.  ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust that ███████████ ████████████████ cannot establish the existence or absence of a triable issue of fact as to any issue on which summary judgment is sought.

469.    On August 8, 2006, YPFH's board of directors authorized the sale of two exploratory wells in the Gulf of Mexico, Stormy Monday and Tiger/North Bronto, in exchange for certain ORRIs that outside financial advisor found to be at a fair market value. *See* Propps Decl. Ex. 459 at 934-35.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph highlighted in green, but notes that the document cited in support reflects that YPFH's board authorized the sale of interests in leases, not exploratory wells themselves.

470. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

471.    In 2007, adverse weather conditions and a succession of technical problems stalled Neptune's development. Propps Decl. Ex. 463 at -931; Propps Decl. Ex. 460 at -436; Propps Decl. Ex. 464 at -205.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

472.    Initial production finally began in mid-2008, but shortly thereafter the global financial crises led to a crash in oil prices and demand for oil. *See* Propps Decl. Ex. 465 at -723.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

473. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████

██████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the assertions highlighted in red as not supported by the cited document.  See Response 443, *supra*.

<mark>474.</mark> ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the chronology of the factual assertion in the above paragraph.  Specifically, ██████████████████████ ████

<mark>475.</mark> ███████████████████████████████████

████████████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes that ██████████████████████████████████████ ████████████████████

## X.    THE ARGENTINE GOVERNMENT'S TEMPORARY OCCUPATION AND EXPROPRIATION PROCESS FURTHER MAKES CLEAR THAT THERE WAS NO DECADES LONG CONSPIRACY

476.    On May 3, 2012, Argentina's Congress passed the Public Interest Law, making 51% of the share capital of YPF held by Repsol "subject to expropriation" and under "temporary

202

occupation" by the Republic. *See* Propps Decl. Ex. 236. The Republic's temporary occupation of Repsol's 51% share capital continued through 2014, when the expropriation was completed.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

477. ███████████████████████████████████████████████
█████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. It is undisputed that YPF and Repsol were in a joint defense agreement in the NJ action after the expropriation and prior to Maxus filing its bankruptcy petition.

478.    On June 4, 2012, a shareholders' meeting convened pursuant to the Public Interest Law resolved to replace virtually all of YPF's Board members. *See* Ex. Propps Decl. Ex. 158. YPF thereafter developed a brand-new business plan—which notably did not mention Maxus—focused on boosting oil and gas production in Argentina to reverse its decline and achieve "sufficient supply to meet growing demand." Propps Decl. Ex. 204.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. The Trust does not dispute that a meeting occurred. The Trust disputes the characterization of a "brand-new business plan" and submits that the document cited by YPF speaks for itself.

479. ████████████████████████████████████
███████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. It is undisputed that during this time, YPF had requested memoranda from Chadbourne concerning strategies involving Maxus.

480.    Following the arrival of new management, YPF and its subsidiaries conscientiously

observed corporate formalities (as they had done pre-Repsol)., Propps Decl. Ex. 442 at 72-75

[REDACTED] Propps

Decl. Ex. 468; Propps Decl. Ex. 469; Propps Decl. Ex. 470.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

481. [REDACTED]

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.

482.    Maxus made no material transfers to the YPF Defendants during this time and EPA's remediation plans remained unresolved. Propps Decl. Ex. 442 at 72-75 ( [REDACTED] ); Propps Decl. Ex. 13 at 3-6.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements contained in this paragraph.

## XI.    "PROJECT JAZZ" AND MAXUS'S BANKRUPTCY[4]

483.    After Argentina began the process of expropriating the controlling shares of YPF, in August 2012, the YPF Defendants retained Chadbourne & Parke LLP ("Chadbourne") as conflicts counsel in the NJ Action. Propps Decl. Ex. 501 ¶ 6.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust objects to the YPF Defendants requesting this Court to determine facts based upon documents that they continue to maintain are

---

[4] Many of the facts in this section are derived from documents over which the YPF Defendants have asserted privilege, which assertions were overruled by the Court in its orders dated August 16, 2021 (Adv. Proc. D.I. 482); August 19, 2021 (Adv. Proc. D.I. 490); September 16, 2021 (Adv. Proc. D.I. 518). The YPF Defendants continue to believe the Court's privilege decisions were erroneous and reserve all rights.

204

privileged.

484.    In late September 2012, NJDEP filed its Fourth Amended Complaint, alleging actions taken by Repsol contrary to YPF's interests, Kirkland & Ellis LLP, which had been representing both YPF and Repsol in the NJ Action since 2008, determined that continuing to represent either YPF or Repsol would present ethical issues. Propps Decl. Ex. 501 ¶¶ 10-11.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

485.    Chadbourne then became lead counsel for the YPF Defendants, and Weil, Gotshal & Manges LLP became lead counsel for Repsol. *See generally* Propps Decl. Ex. 501 ¶¶ 3, 12, 15, and 17.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

486. ████████████████████████
████████████████████████
████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

487. ████████████████████████
████████████████████████
████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

488.     ███████████████████     Propps Decl. Ex. 472 at 165:5-25 ███████

████████████████████████████████████████████████████

Remediation costs were increasing Propps Decl. Ex. 84. ████████████████

███████████████████ Propps Decl. Ex. 472 at 57:23-58:18, 164:17-165:165.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

489.     In May 2012, Javier Gonzalez sent an email to Eduardo Pigretti, John Enloe, Teodoro Marco, and Sebastian Sanchez stating that he was "certain the Judge will rule against us" on alter ego. Propps Decl. Ex. 473. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust objects to and disputes the YPF Defendants'

████████████████████████████████████████████

████████████████████████

490. ███ ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the ████████████████████████████  As described above, the key elements of the strategy were presented much earlier including, as admitted by the YPF Defendants, in 2005 by King & Spading.

491.    In its September 2012 memo, Chadbourne ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████ Propps Decl. Ex. 205, App'x A at 780-814. ████████████████████████████████

████████████████████████████████████████

██████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph are.  The Trust disputes that ████████████  ███████████████ The Trust incorporates its responses to ¶ 490 herein.

492.    Many companies doing business in the United States, including through subsidiaries, avail themselves (or their subsidiaries) of the United States Bankruptcy Code when facing catastrophic litigation. Examples include Takata, faced with mounting consumer lawsuits and recalls over faulty air bags, Propps Decl. Ex. 427, Owens Corning, besieged by asbestos litigation, Propps Decl. Ex. 407, and Texaco, hit with a judgment it could not appeal without posting a multi-billion dollar bond, Propps Decl. Ex. 401.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  Companies do not avail themselves for bankruptcy as part of a near two-decade strategy to siphon assets and hinder creditors.

493.    In 2013, the *Tronox* decision was rendered. ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.  The Trust disputes the characterization of the advice presented in the memorandum and refer the Court to the documents.  The Trust further objects to the statements of fact to the extent they are being submitted for the truth of the matters asserted as inadmissible hearsay and based on evidence that the YPF Defendants seek to withhold as privileged.

494.  ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in this paragraph.

495.    On or about July 13, 2015, Maxus amended its bylaws (the "2015 Amended Bylaws") to add two directors to its three-member Board. Propps Decl. Ex. 480 at -011, -026] At least two of the members of the Board were to be Special Independent Directors (as defined therein) (*id.* at -011), who would form a Special Independent Committee ("SIC"). (*Id.* at -014). As

208

laid out in the 2015 Amended Bylaws, the SIC was empowered to:

> (i)    design and implement a process and procedure for the review and assessment of (A) all material transactions entered into between the Corporation and any affiliate involving aggregate consideration of $10 million or more in any instance that occurred after April 8, 1995, and prior to the date of creation of the Special Independent Committee, (B) the historic course of dealing and interrelationships between the Corporation and its affiliates over the same time period, and (C) potential claims and defenses arising in relation to these transactions and interrelationships (collectively, the "Special Independent Committee Investigative Responsibilities");

> (ii)    negotiate a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities, which settlement, discharge or agreement shall be subject to the prior approval of the Board;

> (iii)    engage, at the expense of the Corporation, such financial and other experts and consultants, including legal counsel, in respect of the Special Independent Committee Investigative Responsibilities as the Special Independent Committee in it sole discretion believes to be necessary or advisable for the Special Independent Committee to properly assess any of such transactions and interrelationships; and

> (iv)    communicate and make proposals and recommendations to the Board regarding (A) the potential prosecution of claims identified in connection with execution of the Special [sic] Committee Investigative Responsibilities, and (B) a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities.

(*Id.* at -015, Section 2(a)). The SIC could not delegate any of these powers to any other person. (*Id.*, Section 2(b)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

496.    Bradley I. Dietz and Theodore P. Nikolis were selected as the Special Independent Directors. Main. Proc. D.I. 3 ¶¶ 2, 7; Propps Decl. Ex. 386. In November 2015, the SIC engaged former Bankruptcy Judge Peck of Morrison & Foerster LLP ("MoFo") as its legal advisor; in April 2016, the SIC engaged Scott Winn of Zolfo Cooper, LLC ("Zolfo"), as its financial advisor. Main

Proc. D.I. 3 ¶¶ 10, 11. ███████████████████████████

████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.  The Trust notes that at this point, ██████████ ██████████████████████████████████████████████

497.    After being hired, the Special Independent Directors, MoFo, and Zolfo spent eight months and at least $1.7 million assisting in its investigation. ██████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph. ███████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

498. ███████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████ There

were limited (i.e., 1-2) occasions when MoFo/Zolfo spoke with the full Maxus board to explain in general terms the work being performed for the independent directors; however, the professionals' communications to Maxus were done through the independent board members. Neither firm dealt directly with the Maxus management team while conducting the investigation for the Special Committee.")

*Responses and Objections:* Subject to its General Objections, the Trust disputes the statements of fact in this paragraph.   The Trust incorporates its responses to ¶ 497 herein. The Trust disputes that ███████████████████████████████ ████████████████████████████

241

499.    At the conclusion of the investigation, MoFo issued a 196-page report, concluding that Maxus had potentially viable, albeit uncertain, claims against the YPF Defendants. Compl. ¶ 204; Ex. 488 at 8; Main Proc. D.I. 3 ¶ 13. With MoFo's report in hand, the SIC engaged in negotiations with YPF regarding a potential settlement.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 499.

500.

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts set forth in paragraph 500.

501.    The settlement included two primary components: YPF would pay $130 million in cash after approval of the settlement, and YPFH would provide a DIP Facility to the Debtors. Main Proc. D.I. 3 ¶ 15; Main Proc. D.I. 3, Ex. A §§ 2.1, 2.2. The DIP Facility proposed at the time of filing included a Tranche A Facility, a senior secured, superpriority $31.9 million facility Main Proc. D.I. 10 ¶ 3(a), and a Tranche B Facility, a subordinated unsecured $31.2 million facility. Main Proc. D.I. 10 ¶ 3(b). As ultimately approved by the Court, the Tranche A Facility was reduced to $28.75 million(Main Proc. D.I. 268-1 at 14 (Definition of "Tranche A Commitment")), and the Tranche B Facility was increased to $34.35 million. Main Proc. D.I. 268-1 at 14 (Definition of "Tranche B Commitment"). The Tranche B Facility was "subordinate to all general unsecured claims" and would "most likely never be repaid." Main Proc. D.I. 300-3] ¶ 20.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. the Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

502. ██████████████████████████████

██████████████████████████████████

███████████████████████████████ Later that day, Maxus and the other Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in this Court. Main Proc. D.I. 3 at ¶ 4. In support of their petitions and other first-day filings, the Debtors filed a declaration from Mr. Dietz, in which he described the process leading up to the bankruptcy filing and the Settlement Agreement. Main Proc. D.I. 3. The Settlement Agreement was attached to Mr. Dietz's declaration. Main Proc. D.I. 3, Ex. A.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. the Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

503.    On August 29, 2016, the Debtors filed a motion for approval of the Settlement Agreement. Main Proc. D.I. 300. In connection with the prosecution of the settlement motion, Zolfo's Scott Winn submitted an excerpt report regarding potential liability on the part of the YPF Defendants. Propps Decl. Ex. 488. In that report, he concluded that "the potential, estimated, reasonable range of damages recoverable on account of the Debtors' alter ego claims against YPF is between zero and $253.0 million when assuming, as directed by Counsel, that there is between a 10% and 49% chance that the Debtors would prevail on such claims." *Id*. at 9 (emphasis added). He also concluded that "the potential, estimated, reasonable range of damages related to the

Debtors' fraudulent conveyance claims against YPF are between zero and $57.7 million with a Midpoint of $21.7 million, when assuming, as directed by Counsel, that there is a 5% to 10% chance that the Debtors will prevail on such claims." *Id.* at 19. Overall, Mr. Winn's assessment was that "the potential, estimated, reasonable range of damages recoverable on account of the Debtors' alter ego and fraudulent conveyance claims against YPF is between zero and $274.6 million." *Id.* at 8. He noted that "[e]ven if a judgment was awarded against YPF, based upon assumptions provided to me by Counsel, potential collection risk may exist as YPF's operations and assets are primarily located outside the United States." *Id.* He also noted that Judge Peck and/or his colleagues had asked Mr. Winn "to assume that, under an alter ego theory of liability, an unlimited recovery against YPF would be extremely unlikely." *Id.* at 7 (emphasis added). The bankruptcy filing triggered the automatic stay in section 362(a) of the Bankruptcy Code, which stayed Oxy's claims against Maxus and Oxy's alter ego cross-claim against YPF and Repsol pending in the NJ Action. Main Proc. D.I. 1258-1 at 37.

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph. The Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding. Details of an expert report filed in connection with the bankruptcy proceeding is inadmissible hearsay is not material to any claims or defenses presented in this case.

504.    On June 16, 2016, the Debtors filed a motion seeking approval of the DIP facility referred to in the Settlement Agreement. Main Proc. D.I. 10. The proposed Tranche A Facility would "be used for the Debtors' general bankruptcy and restructuring expenses," while the proposed Tranche B Facility would "be used to fund the Debtors' corporate overhead expenses, such as salaries and administrative fees, the E&P operations and related overhead, and the operations of [Tierra], including all current and active remediation projections [sic] being

undertaken by Tierra." Main Proc. D.I. 10, ¶¶ 4-5. On August 19, 2016, the Court approved the DIP Facility, which had been modified from the original proposal, including as to the amounts of the two sub-facilities described above. Main Proc. D.I. 268. The DIP Credit Agreement, as approved, provided it would be an event of default if a Debtor were to "file any Chapter 11 plan of reorganization or liquidation that is not approved by the Lender unless such Chapter 11 plan of reorganization or liquidation provides for (A) the repayment in full in cash of the Tranche A Obligations and termination in full of all Revolving Credit Commitments, (B) subject to Section 2.06, the payment of Tranche B Obligations in accordance with Section 8.03 hereof and (C) the implementation of the Settlement Agreement and the transactions contemplated therein." Main Proc. D.I. 268-2, § 8.01(t). The occurrence of a default would permit the lender (YPFH) to terminate its commitments under the DIP Facility, declare all amounts immediately due and payable (except that the outstanding obligations under the Tranche B Facility would not be payable until, among other things, all general unsecured claims were paid in full), and exercise its remedies. Main Proc. D.I. 268-2, § 8.02.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

505.    On November 8, 2016, each of the Debtors amended their bylaws (as amended, the "2016 Amended Bylaws") to concentrate authority over the bankruptcy cases in the SIC. The Debtors filed the 2016 Amended Bylaws with this Court on November 9, 2016. Main Proc. D.I. 533. Pursuant to the 2016 Amended Bylaws, among other things:

- any settlement arising from its investigation would no longer be subject to the full board's approval (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(ii));

- the SIC would be able to prosecute or settle any claims revealed by its investigation on its own authority (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(iv));

- the SIC would have decision making authority as to the Settlement Agreement, the DIP

Facility or any other debtor-in-possession financing, and the commencement, prosecution, or settlement of claims against affiliates (except as limited by the Settlement Agreement) (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(vii));

- the SIC would be responsible for any dealings with the YPF Entities and any dealings in which the Debtors and the YPF Entities were not fully aligned (e.g., Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(viii)); and

- on certain matters, including as to a Chapter 11 Plan, the SIC would make recommendations to the full Board. (*e.g.*, Main Proc. D.I. 533, Ex. 1, Ex. A, § V.2(a)(x)).

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

506.    Even before these amendments, Judge Peck had previously represented to the Court and parties in interest that he had "taken the position with the company that I'm only listening to the independent directors." Propps Decl. Ex. 11 at 42:5-7.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust disputes the phrase "Judge Peck" as misleading – at this point, Mr. Peck was no longer serving as a Judge and is operating in his capacity as a partner of MoFo.

507.    On December 29, 2016, the Debtors filed a proposed plan (the "December 2016 Plan") (Main Proc. D.I. 697) and disclosure statement. Main Proc. D.I. 698. The December 2016 Plan anticipated the Court's approval of the Settlement Agreement, but provided that if the Settlement Agreement were not approved, the causes of action that would have been settled thereby would become assets of a liquidating trust. Main Proc. D.I. 697, § IV.A.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

508.    On March 1, 2017, the Creditors' Committee wrote to the SIC to express continued dismay that the SIC was going forward with the December 2016 Plan, as to which a hearing on the disclosure statement had been scheduled for March 7. Propps Decl. Ex. 489. The letter attached three term sheets: one for replacement debtor-in-possession financing and one for exit financing, both to be provided by Oxy. The third was for a plan of liquidation "formally supported by the Committee." *Id.* at 2. The Creditors' Committee's proposed plan would "(i) preserve the causes of action against YPF and the Debtors' other claims against third parties, (ii) transfer all of the Debtors' assets to a liquidating trust (the 'Liquidating Trust') to liquidate those in the creditors' best interests, ... and (iv) provide for a recovery waterfall of the Liquidating Trust prioritizing liquidated claims over future remediation costs, while ensuring that a reasonable portion of the recoveries from the Liquidating Trust will be apportioned towards current and future remediation efforts and utilized in the most efficient way possible." *Id.* at 2-3. The Creditors' Committee asked that the March 7, 2017, disclosure statement hearing be adjourned. *Id.* at 3.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

509.    The disclosure statement hearing was adjourned to April 7, 2017, with the Court holding a status conference on March 7 instead. Main Proc. D.I. 1005. At that status conference, Debtors' counsel stated that the SIC "concluded that it was appropriate and consistent with the fiduciary duties of the independent directors . . . for a period of time to be dedicated to a further evaluation of the proposal." Propps Decl. Ex. 490 at 5:10-20.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

510.    After the Creditors' Committee provided its term sheet, YPF presented the SIC with a revised settlement proposal. Main Proc. D.I. 1258-1 at 54.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

511.    ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████    On March 28, 2017, the Debtors filed an amended plan (Main Proc. D.I. 1056) and disclosure statement (Main Proc. D.I. 1058) and a motion for approval of replacement debtor-in-possession financing provided by Oxy (Main Proc. D.I. 1063). The plan and disclosure statement were also proposed by the Creditor's Committee. On April 10, 2017, YPFH sent a notice of default. Main Proc. D.I. 1258-1 at 144.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts highlighted in green in this paragraph. The Trust submits that the facts in this paragraph highlighted in yellow are not material and/or irrelevant to this adversary proceeding.

512.    On April 17, 2017, the Debtors and the Creditors' Committee filed an amended disclosure statement, in which the plan proponents recounted the history of the proposal of the Settlement Agreement and related plan, the Creditors' Committee's term sheets, YPF's enhanced settlement offer, and the SIC's decision to pursue confirmation of the plan supported by the Creditors' Committee. Main Proc. D.I. 1210, at 51-55. The plan proponents – the Debtors and the Creditors' Committee – included that "[t]he decision to enter into the YPF Settlement Agreement

was an unbiased and fair-minded one made in good faith with the support of professional advisors."
*Id.* at 55. On April 19, 2017, the Court approved the disclosure statement Main Proc. D.I. 1237, and the plan proponents thereafter distributed the solicitation version of the disclosure statement Main Proc. D.I. 1258-1, seeking creditor approval of the Plan.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

513.    As of April 19, 2017, the Plan included settlements of several claims, including those of Oxy (which would receive a Class 4 Claim allowed in the amount of $510,626,872.18), the CPG (which would receive a Class 4 Claim allowed in the amount of $14,365,320.14, "reduced to the extent of any duplication between the Claim asserted by the CPG and any Claim asserted by any member of the Gibbons Parties," allowed by agreement or court order), and the United States (on behalf of EPA, NOAA, and DOI-FWS). Main Proc. D.I. 1258-1, Ex. A, at 12-13, 62, and the payment of all allowed claims pursuant to waterfalls. Main Proc. D.I. 1258-1, Ex. A, at 69.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

514.    The Plan also provided in Article X.C that "[o]n or after the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests; (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim or Cause of Action without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court." Main Proc. D.I. 1258-1, Ex. A, at 55 (page 62 of 335). The Liquidating

==Trust would be subject to oversight by the Liquidating Trust Oversight Committee==, which would

have five members, three of whom were to be appointed by Oxy and two by the CPG. ==Main Proc.==

==D.I. 1258-1, Ex. A, at 42 (page 49 of 335).==

> *Responses and Objections:* Subject to its General Objections, the Trust does not dispute
> the facts highlighted in green in this paragraph.  The Trust submits that the facts in this
> paragraph highlighted in yellow are not material and/or irrelevant to this adversary
> proceeding.

==515.    YPF, Debtors, and the Creditors' Committee (which included Oxy – represented by==

==White & Case) engaged in negotiations regarding the Plan; on May 3, 2017, YPF's counsel emailed==

==counsel to the Debtors and to the Creditors' Committee about various concerns, including Article==

==X.C, with regard to which YPF's proposal was to==

> ==[m]odify the procedures for resolving disputed claims so that (i) the==
> ==Liquidating Trust does not have the "exclusive" authority to object to claims==
> ==after the Effective Date (other parties would also have the ability to dispute==
> ==claims), (ii) any the [sic] allowance of any creditor's claim under the plan==
> ==would not be binding on YPF and (iii) YPF's right to challenge such claims==
> ==would be preserved post-confirmation."==

==Propps Decl. Ex. 182 at 4-5.==

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the
> facts in this paragraph are not material and/or irrelevant to this adversary proceeding.
> Negotiations concerning specific provisions of the Plan are not material to any claims or
> defenses upon which summary judgment is sought and constitute inadmissible parol
> evidence.

==516.    After speaking with counsel to the Debtors and to the Committee on May 4, 2017,==

==YPF's counsel emailed proposed language to address this issue:==

> ==Below please find suggested language to address several of the points we==
> ==discussed this morning[.] Please let us know if you have any questions or==

==would like to discuss.. . .==

==New Article XV.P. [Renumber "Conflicts" as XV.O]==

**==O [sic]. No Impact on Other Litigation.==**

==Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any Person in any litigation, including in any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action and the Preserved Contribution Claims).==

==*Id.* at 1-2.==

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

==517.    On May 7, 2017, counsel to the Creditors' Committee responded that the "Committee directed us to try and move forward to resolve your client's concerns as set forth in your email. We are reviewing the language suggestions you sent and are looking at the other changes requested. Will hopefully be in a position to respond later tomorrow." *See* Propps Decl. Ex. 493.==

*Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

==518.    On May 12, 2017, the YPF Entities filed a limited objection to confirmation of the==

Plan on May 12, 2017. Main Proc. D.I. 1411. The objection noted that settlement discussions had been productive, and had resulted in an agreement on the above language. Main Proc. D.I. 1411 at 8-9. However, the parties had not resolved one final concern of YPF, which was the basis of YPF's objection – that Oxy should not appoint three members of the Liquidating Trust Oversight Committee, but rather the third Oxy appointee should have been independent. *Id.* at 10. On the same date, the YPF Entities also objected to Oxy's claims. Main Proc. D.I. 1418.

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

519.    The next version of the Plan that was filed, as an attachment to the plan proponents' confirmation brief on May 14, 2017. Main Proc. D.I. 1433-1, included the agreed language, with a minor change of "against any Person in any litigation" to "against any person or entity in any litigation." Otherwise, the language was as the YPF Entities had proposed.

Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action and the Preserved Contribution Claims).
Main Proc. D.I. 1433-1, Ex. C at 85 (page 140 of 144).

> *Responses and Objections:* Subject to its General Objections, the Trust submits that the facts in this paragraph are not material and/or irrelevant to this adversary proceeding. Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

520.    On May 17, 2017, Debtors' claims and noticing agent filed a certification of the ballots cast on the Plan, Main Proc. D.I. 1429; 1429-1, showing that over 90% of creditors (both in number and in amount) entitled to vote on the Plan had voted in its favor. In light of these results and the resolution of most of their issues (including the alter ego damages issue), "and in the interest of avoiding unnecessary use of judicial resources," the YPF Entities withdrew their limited objection to the Plan and their objection to Oxy's claims. *See* Main Proc. D.I. 1431.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the statements of fact highlighted in green in this paragraph.  The Trust does not dispute that the YPF Entities withdrew their limited objection to the Plan and Oxy's claims, however, the Trust disputes (and the YPF Defendants provide no evidence in support) that this was due to a resolution of any alter ego damages issue.  Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and constitute inadmissible parol evidence.

521.    The Court held a confirmation hearing on the Plan on May 22, 2017. At the hearing, Judge Peck informed the Court that YPF had withdrawn its objections, "sav[ing] the estate and the planned [sic] proponents some time and energy and, hopefully, will save the court some time as well," Propps Decl. Ex. 494 at 13:6-25, and his colleague Ms. Marines noted that the Plan had been amended to help YPF settle or withdraw its objection. Propps Decl. Ex. 494 at 20:8-14. Mr. Zumbro, on behalf of YPF and its affiliates, highlighted for the Court that among these amendments was that "neither the allowance or the disallowance of any claim nor the allowed amount of any claim will have any precedential, preclusive or other effect on any litigation including the YPF causes of action " Propps Decl. Ex. 494 at 84:18-85:2.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph. The Trust submits that the facts highlighted in yellow in this paragraph are immaterial and/or irrelevant to this adversary proceeding. Amendments and negotiations to the Plan are not material to any claims or defenses presented in this case.  Negotiations concerning specific provisions of the Plan are not material to any claims or defenses upon which summary judgment is sought and

constitute inadmissible parol evidence.

522.    The Court confirmed the Plan, entering the Confirmation Order on May 22, 2017. Main Proc. D.I. 1460. The confirmed Plan included the text of Article XV.P. from the May 12, 2017, version. Main Proc. D.I. 1460-1 at 77 (page 84 of 89). The confirmed Plan also included the settlements with Oxy, the United States, and the CPG as described above (*supra* ¶ 513 (Main Proc. D.I. 1460-1 at 12-13, 62)), as well as settlements with the State of Ohio (which received an allowed claim of $25 million, described above (*supra* ¶ 91)) and the State of Wisconsin (which received an allowed claim of $5 million, described above (*supra* ¶ 91)). The definition of the "CPG Class 4 Claim" was modified to specify it was allowed in the amount of $14,365,320.14, "provided that the Allowed Amount of the CPG Class 4 Claim shall be reduced by an amount equal to the Gibbons Group Allowed Class 4 RI/FS Claims." Main Proc. D.I. 1460-1 at 6. The Gibbons Group Allowed Class 4 RI/FS Claims totaled $1,205,681.32. Main Proc. D.I. 1460-1 at 11.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

523.    The Plan included provisions for "Class 5 Diamond Alkali Claims," which included a partially liquidated amount for the United States and any amounts consisting of Environmental Remediation Expenses or Environmental Restoration Expenses, as defined in the ERRT Agreement (as defined in the Plan), reimbursed by the Environmental Response/Restoration Trust (as defined in the Plan). Main Proc. D.I. 1460-1, Art. I.A.30. Pursuant to the terms of the ERRT Agreement, "Environmental Remediation Expenses" are the "reasonable and necessary fees, costs and expenses paid by a PRP for Response Work after the Effective Date of the Plan" (with certain exclusions) and "Environmental Restoration Expenses" are the "reasonable and necessary costs

and expenses paid by a PRP or NRD Trustees for Restoration Work after the Effective Date of the Plan" (with certain exclusions). Main Proc. D.I. 1453-1, Ex. B-1, at 2. Section 3.03 of the ERRT Agreement provides for the reimbursement of such expenses to the extent a PRP or NRD Trustee expends them in connection with the DASS and submits invoices "accompanied by reasonable documentation" according to a specified waterfall. *Id.* § 3.03. There is no requirement that any such PRP pay its equitable share of the costs of remediation or restoration of the DASS.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

524.    The provisions of the Plan providing for the settlements with Oxy, the CPG, and the United States (Art. XI.F.1), the State of Wisconsin and the State of Ohio (Art. XI.F.2), and the Gibbons Group (Art. XI.F.3) each explicitly provide "that this settlement shall not constitute an admission of the Debtors' actual liability " Main Proc. D.I. 1460-1, at 64-66 (pages 71-73 of 89).

*Responses and Objections:* Subject to its General Objections, the Trust disputes the facts in this paragraph as being irrelevant.

525.    The Effective Date of the Plan occurred on July 17, 2017. Main Proc. D.I. 1701.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

526.    The Plan is governed by New York law. Main Proc. D.I. 1460-1, at 24 Art. I.D.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

527.    "Liquidating Trust Causes of Action" is defined as including "the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims." Main Proc. D.I.

1460-1, at 13 Art. I.A.120. "Preserved Contribution Claims' is defined as "certain Contribution Claims, which shall be transferred to the Liquidating Trust on the Effective Date," all of which were "Filed on April 11, 2017" under Main Proc. D.I. 1147. Main Proc. D.I. 1460-1, at 17, Art. I.A. 164. "Contribution Claims" is defined as "Causes of Action held by the Debtors against any non-Debtor for contribution or cost recovery under any Environmental Law for actual expenses paid by or on behalf of the Debtor prior to the Petition Date." Main Proc. D.I. 1460-1, at 6, Art. I.A.36. The Trustee is "vested with full authority to make all decisions regarding whether to prosecute any Preserved Contribution Claim, in furtherance of his or her fiduciary duty to the Liquidating Trust Beneficiaries." Main Proc. D.I. 1460-1, at 45, Art. VI.G.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

528.    Almost a year later, and just before the two-year anniversary of the bankruptcy filing, on June 14, 2018, the Trust commenced this action by filing the Complaint. Adv. Proc. D.I. 1.

*Responses and Objections:* Subject to its General Objections, the Trust does not dispute the facts set forth in this paragraph.

Date:  May 18, 2022

Respectfully submitted,

FARNAN LLP

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

J. Christopher Shore (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

Jason Zakia (admitted *pro hac vice*)
WHITE & CASE LLP
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

*Attorneys for the Liquidating Trust*

# EXHIBIT G

# Exhibit 8
# Filed Under Seal

# EXHIBIT H

# Exhibit 8
# Filed Under Seal