# **<u>Exhibit A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | ) |
| | ) Case No. 16-11501 (CTG) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |
| | ) |
| MAXUS LIQUIDATING TRUST, | ) |
| | ) **FILED UNDER SEAL** |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary Proceeding |
| | ) |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | ) Case No. 18-50489 (CTG) |
| HOLDINGS, INC., CLH HOLDINGS, INC., | ) |
| REPSOL, S.A., REPSOL EXPLORACIÓN, | ) |
| S.A., REPSOL USA HOLDINGS CORP., | ) |
| REPSOL E&P USA, INC., REPSOL | ) |
| OFFSHORE E&P USA, INC., REPSOL E&P | ) |
| T&T LIMITED, and REPSOL SERVICES CO., | ) |
| | ) |
| Defendants. | ) |

**REPSOL DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE EXPERT TESTIMONY OF TODD D. MENENBERG**

TABLE OF CONTENTS

Preliminary Statement ................................................................................................1

Procedural History ......................................................................................................5

Legal Standard ............................................................................................................5

Argument .....................................................................................................................6

I.      The Court Should Exclude Mr. Menenberg's Solvency Testimony As Unreliable ...........6

        A.      Mr. Menenberg Opines On Solvency Without Any Underlying Analysis .............6

        B.      Mr. Menenberg's Solvency Conclusion Is Facially Unreliable Because He
                Does Not And Cannot Ascribe Any Value To Liabilities .......................................8

        C.      Mr. Menenberg's "Cause to Believe" Standard Lacks "Fit" ...............................10

        D.      The Court Should Strike New Analysis In Rebuttal Under Rule 26 ....................11

II.     The Court Should Exclude All Of Mr. Menenberg's Opinions Regarding The
        Scope And Knowledge Of Maxus's Environmental Liabilities ........................................12

        A.      Mr. Menenberg Lacks The Qualifications To Assess Scope And
                Probability Of Contingent Environmental Liabilities Or Probabilities of
                Remedial Outcomes .............................................................................................13

        B.      Mr. Menenberg Does Not Bring Any Expertise To Bear And Instead
                Impermissibly Acts As An Advocate And Fact Witness ......................................13

III.    The Court Should Exclude Mr. Menenberg's Alter Ego Opinions For Lack Of
        Reliability And Qualification, And As Inappropriate Legal Conclusions .........................16

        A.      Mr. Menenberg Lacks The Qualifications To Provide Opinions On Alter
                Ego .......................................................................................................................17

        B.      Mr. Menenberg's Opinions On Alter Ego Issues Are Not Reliable .....................17

        C.      Mr. Menenberg's Opinions On Alter Ego Amount to Improper Legal
                Conclusions ..........................................................................................................19

IV.     The Court Should Exclude The Comparable Companies Analysis For Lack Of Fit
        And Unreliability ..............................................................................................................20

        A.      Mr. Menenberg's Comparable Companies Analysis Lacks The Requisite
                "Fit" To This Case And Is Unreliable Because Of The Litigation-Driven
                Timeframe ............................................................................................................20

        B.      Mr. Menenberg's Comparable Companies Analysis Is Unreliable As He
                Failed To Conduct Analysis, Instead Relying On Outdated Analysis By A
                Third-Party ...........................................................................................................22

V.      The Court Should Exclude The Fraudulent Transfer Analysis As Unreliable And
        Unhelpful To The Factfinder .............................................................................................24

VI.     Mr. Menenberg's Expert Opinions Are Merely Improper Fact Narration.........................26

Conclusion .................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Dairy Farmers of Am., Inc.,*
2014 WL 266290 (D. Vt. Jan. 23, 2014) .............................................................17

*Am. Diabetes Ass'n v. Friskney Family Tr., LLC,*
2015 WL 12826476 (E.D. Pa. July 21, 2015)........................................................11

*In re Armstrong World Indus., Inc.,*
285 B.R. 864 (Bankr. D. Del. 2002) .......................................................................6

*Auto Indus. Supplier ESOP v. SNAPP Sys.,*
2008 WL 5383372 (E.D. Mich. Dec. 23, 2008) ...................................................15

*Blair v. Infineon Techs. AG,*
720 F. Supp. 2d 462 (D. Del. 2010) .......................................................................19

*In re Blood Reagents Antitrust Litig.,*
2015 WL 6123211 (E.D. Pa. Oct. 19, 2015).........................................................23

*Burtch v. Opus, LLC (In re Opus East, LLC),*
528 B.R. 30 (Bankr. D. Del. 2015) .......................................................................17

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
350 F.3d 316 (3d Cir. 2003)................................................................................5, 6

*Caredx, Inc. v. Natera, Inc.,*
2021 WL 1840646 (S.D.N.Y. May 7, 2021) ........................................................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)....................................................................................... *passim*

*In Re Diet Drugs,*
2001 WL 454586 (E.D. Pa. Feb. 1, 2001) ............................................................29

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I),*
380 B.R. 348 (D. Del. 2008)...............................................................................7, 8

*Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.,*
213 F.3d 198 (5th Cir. 2000) ................................................................................23

*Forte v. Liquidnet Holdings, Inc.,*
675 F. App'x 21 (2d Cir. 2017) .............................................................................14

*Hausknecht v. John Hancock Life Ins. Co. of N.Y.*,
  2022 WL 1664362 (E.D. Penn. May 25, 2022) ........................................................20

*Illinois Mine Subsidence Ins. Fund v. Union Pac. R.R. Co.*,
  2019 WL 233219 (C.D. Ill. Jan. 16, 2019) ..............................................................19

*In re Joy Recovery Tech. Corp.*,
  286 B.R. 54 (Bankr. N.D. Ill. 2002) .......................................................................10

*King v. Fox Grocery Co.*,
  642 F. Supp. 288 (W.D. Pa. 1986) .........................................................................28

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................................6

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
  387 F. Supp. 2d 794 (N.D. Ill. 2005) .....................................................................24

*Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*,
  2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) .......................................................12

*In re Morse*,
  2018 WL 6721090 (Bkr. N.D.N.Y. Dec. 20, 2018) ...............................................21

*Muniz v. Rexnord Corp.*,
  2006 WL 5153078 (N.D. Ill. Nov. 2, 2006) ...........................................................18

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
  975 F. Supp. 2d 392 (S.D.N.Y. 2013).....................................................................19

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000)....................................................................................12

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital
  Mgmt., L.P. (In re Broadstripe, LLC)*,
  444 B.R. 51 (Bankr. D. Del. 2010) .........................................................................19

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994).....................................................................................5, 6

*Quadrant Structured Prods. Co. v. Vertin*,
  115 A.3d 535 (Del. Ch. 2015).................................................................................8

*In re Rezulin Prods. Liab. Litig.*,
  369 F.Supp.2d 398 (S.D.N.Y.2005).........................................................................22

*In re Rezulin Products Liability Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y 2004) ......................................................................14

*Schneider v. Fried*,
 320 F.3d 396 (3d Cir. 2003).............................................................................................5, 6

*Scott v. Chipotle Mexican Grill, Inc.*,
 315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................................14, 15

*Smith v. Wyeth-Ayerst Labs. Co.*,
 278 F. Supp. 2d 684 (W.D.N.C. 2003) ............................................................................30

*Spizz v. Eluz (In re Ampal-American Israel Corp.)*,
 2020 WL 2529337 (S.D.N.Y. May 14, 2020) ..................................................................20

*Tchatat v. City of New York*,
 315 F.R.D. 441 (S.D.N.Y. 2016) .....................................................................................28

*Tindall v. H & S Homes, LLC*,
 2012 WL 3242128 (M.D. Ga. Aug. 7, 2012)...............................................................17, 19

*United States. v. Downing*,
 753 F.2d 1224 (3d Cir. 1985)..............................................................................................6

*United States v. Perez*,
 280 F.3d 318 (3d Cir. 2002)................................................................................................6

*Wreal, LLC v. Amazon.com, Inc.*,
 2016 WL 8793317 (S.D. Fla. Jan. 7, 2016) .....................................................................11

*ZF Meritor LLC v. Eaton Corp.*,
 646 F. Supp. 2d 663 (D. Del. 2009)..................................................................................14

*ZF Meritor, LLC v. Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012)..............................................................................................24

**Statutes**

11 U.S.C.A. § 101(32) ............................................................................................................10

Uniform Voidable Transactions Act ..................................................................................10, 24

**Other Authorities**

Fed. R. Civ. P 26 ................................................................................................................2, 11

Fed. R. Evid. 702 ............................................................................................................1, 5, 6

## PRELIMINARY STATEMENT

The testimony of the Trust's accounting expert, Todd D. Menenberg, does not meet the *Daubert* standard of admissibility and should be excluded under Federal Rule of Evidence 702. That is true even though this is a bench trial, where the Court's gatekeeping role is more limited. Mr. Menenberg's opinions are so lacking in qualification, reliability, and fit, that they serve no purpose in this trial and will only confuse issues and waste time. Mr. Menenberg does not bring accounting expertise to bear, and merely parrots the Trust's pre-packaged narrative—which the Trust's attorneys laid out in documents that they drafted and sent to Mr. Menenberg as he was preparing his Report. Rather than serve as an expert, Mr. Menenberg acts as an advocate, narrator, and fact witness, and even offers legal conclusions. All of his testimony should be excluded.

***There Is No Solvency Test, Much Less A Reliable One***. Mr. Menenberg opines that █████ ████████████████████████████████████████████████████████████████████████ █████ Oct. 29, 2021, Expert Report of Todd. D Menenberg ¶ 14 (attached as **Ex. A**) (the "Menenberg Rep."). But he arrives at this conclusion without any analysis and without conducting any of the solvency tests recognized by courts and accountants. By his own admission, he did not conduct a balance sheet or cash flow test. Instead, █████████████████████████████████ █████████████████████████████████████████████████████. *See* Feb. 17, 2022, Deposition of Todd. D Menenberg at 345:25-346:10 (attached as **Ex. B**) ("Menenberg Dep.").

The Court will not find anything resembling a capital adequacy test in the Report. Mr. Menenberg does not expound upon the test or its parameters; does not explain what evidence would be relevant and why; and does not "show his work." There is no analysis. At his deposition, Mr. Menenberg claimed the analysis was buried in a single paragraph, 138 pages into the Report. That paragraph, excerpted below, plainly does not constitute a capital adequacy test; or at least not

an adequate one. Mr. Menenberg even admits ████████████████████████████ *Id.*
at 395:13-20. Rather, he claims he ██████████████████████████. The
Court should strike the new opinion in rebuttal as untimely under Rule 26.

Even if he were ██████ on the test in rebuttal (he is not), Mr. Menenberg's solvency
conclusion is unreliable. For one, he claims ██████████████████████████

████████████████████████████████████

██████████████████ Second, he concedes he did not even quantify the liabilities
and lacks the ability to do so. He thus only speculates that ████████████████████

██████████ Menenberg Rep. ¶ 16. At his deposition, he at first refused to answer whether
it is even possible to evaluate insolvency based on liabilities without calculating them; although
he later acknowledged that ████████████████████ Menenberg Dep. 207:20-
208:12, thereby conceding the unreliability of his own test. Further, while he declared that ████

██████████████████████████████████ Mr. Menenberg did
not grapple with the undisputed fact that Maxus paid *all* of its debts (including about $577 million
in environmental-related debts), from 1995 to 2014—including the period of Repsol's indirect
ownership of Maxus from 1999 to 2012.

Thus, in the one area he may have been qualified to testify—solvency—Mr. Menenberg
did not attempt to offer any expert analysis. Courts routinely exclude the testimony of accountants,
who do not aid the trier-of-fact with accounting expertise, but instead purport to opine about other
matters, like corporate governance, for which they lack expertise or experience. That alone suffices
to exclude Mr. Menenberg's testimony here. Mr. Menenberg opined on a wide variety of topics,
having nothing to do with accounting or finance—environmental liabilities, alter ego "domination
and control," and fraudulent intent. Each opinion is fatally unreliable.

*Mr. Menenberg Fabricates Environmental Liabilities*. As noted, Mr. Menenberg admitted at his deposition that he did not and cannot calculate Maxus's contingent environmental liabilities because he lacks the expertise. But that is precisely what he purported to do throughout his Report—surmise the relative size of those liabilities. Worse, to make it appear as though Maxus's contingent environmental liabilities were ███ Mr. Menenberg simply cherry-picked high-end figures in various documents, without assessing the reliability of those documents (which he admittedly could not do anyway) and while ignoring the low-end figures in the same documents and others in the record. Lacking expertise, Mr. Menenberg confessed that he ████████████ ████████████████████████████████████████████████ ████████. *See* Menenberg Dep. 272:2-10. That is advocacy, and inadmissible.

*Alter Ego Legal Conclusions Must Be Excluded*. Mr. Menenberg is not a corporate governance expert. Nor is he the factfinder in this case. Yet he opines that ████████ ████████████████—thus purporting to resolve one of the key elements of the Trust's alter ego claim. Aside from offering an inadmissible legal conclusion, Mr. Menenberg does not bring any expertise to bear in this analysis nor help the factfinder in any way, simply marching through facts and ████████████████████████████████████ ████████████████ which he did not assess to be reliable.

*The Comparable Companies Test Is Rigged*. Mr. Menenberg did not conduct a comparable companies analysis because he did not choose the comparable companies himself or assess whether they were comparable along industry metrics and characteristics. Instead, he ████████████████████████████████████████████, without evaluating the reliability of those selections. To the contrary, while he ████████ ████████████████████████████████████████████

Menenberg Dep. 99:8-100:11. Moreover, although the relevant period of examination would be 1995 to 2016 (and, for Repsol, 1999 to 2012), Mr. Menenberg curiously ended his "analysis" in 2007—right before a Great Recession sent many other oil and gas companies into bankruptcy. Mr. Menenberg's litigation-driven timeframe is quite obviously intended to eliminate a key variable that tends to show Maxus's solvency, in contravention of his and the Trust's narrative.

*Fraudulent Transfer Legal Conclusions Must Be Excluded*. Mr. Menenberg's "analysis" of fraudulent transfer amounts to nothing more than presenting favorable facts in narrative form and jumping to legal conclusions without support. He does not even purport to offer expert analysis in this area (nor could he—except for possibly with respect to solvency, on which he offered no such opinion). For example, in two sentences on ███████████████████████████████ ███████████████████████████████████████████████████████████████ ▌ ████ ██████████████ Putting aside the lack of expert analysis in his slanted recitation of facts, Mr. Menenberg's insinuation that the assets still belonged to Maxus is unsupported, incorrect, and based on legal conclusions he has no basis to offer. Similarly, Mr. Menenberg purports to offer an opinion on ████████████████████████ without any attempt to value assets at all—his analysis is nothing more than a few sentences. His opinions are unreliable and unhelpful, as he simply provides a factual narrative, often misstating the facts and conflating the parties.

*Mr. Menenberg Admits Advocacy Not Expertise.* Mr. Menenberg's advocacy rather than expertise is pervasive, and requires exclusion of all his testimony. Mr. Menenberg repeatedly claimed that his goal was to collect record documents and put them into ████████ for the Court. But that is the role of the attorney, not the expert. And, here, Mr. Menenberg does not bring any accounting expertise to bear.

---

[1] Here, again, Mr. Menenberg is parroting the Trust's theories. *See, e.g.*, Compl. ¶ 97 [A.D.I. 1].

## PROCEDURAL HISTORY

The Maxus Liquidating Trust commenced this adversary proceeding against Defendants[2] on June 14, 2018. Discovery is complete, and the Court has ruled on the parties' summary judgment motions. A.D.I. 739. Trial is set for March 2023. A.D.I. 762. Repsol submits this motion to exclude the testimony of the Trust's expert Todd D. Menenberg for the reasons set forth below.[3]

## LEGAL STANDARD

Under Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In analyzing Rule 702, courts in the Third Circuit focus on the "trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

*First*, an expert must be qualified to testify on the subject matter. *See Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). Qualification refers to the requirement that the witness possess specialized expertise. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli II*"). While the qualification requirement is construed liberally, the level of an expert's qualifications "may affect the reliability of the expert's opinion." *Id.*

*Second*, the expert's testimony must be reliable. *Calhoun*, 350 F.3d at 321. To determine

---

[2] YPF S.A., YPF International S.A., YPF Holdings, Inc., and CLH Holdings, Inc. (collectively, "**YPF**"), and REPSOL, S.A., REPSOL Exploración, S.A., REPSOL USA Holdings Corp., REPSOL E&P USA, INC., REPSOL Offshore E&P USA, Inc., REPSOL E&P T&T Limited, and REPSOL Services Co. (collectively, "**Repsol**").

[3] Repsol also adopts and incorporates the arguments raised in the *Daubert* motion to exclude the Report and testimony of Mr. Menenberg submitted by the YPF Defendants.

whether an expert's testimony is reliable, courts in the Third Circuit have looked to not only the

factors contained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but also

those laid out in the earlier Third Circuit case, *United States v. Downing*, 753 F.2d 1224 (3d Cir.

1985). *See Paoli II*, 35 F.3d at 742; *In re Armstrong World Indus., Inc.*, 285 B.R. 864, 870 (Bankr.

D. Del. 2002). These factors are not exhaustive, and a court "may take into account any other

relevant factors" it deems appropriate. *See Calhoun*, 350 F.3d at 321; *see also Kumho Tire Co. v.

Carmichael*, 526 U.S. 137, 151 (1999).

  ***Third***, the expert's testimony must "fit": it must "help the trier of fact to understand the

evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also United States v. Perez*, 280

F.3d 318, 341 (3d Cir. 2002). "'Fit' is not always obvious, and scientific validity for one purpose

is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591.

**ARGUMENT**

**I. The Court Should Exclude Mr. Menenberg's Solvency Testimony As Unreliable**

  Mr. Menenberg purports to offer an opinion about ███████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ Menenberg

Rep. ¶ 14; *see also id.* ¶¶ 238, 265. But Mr. Menenberg did not conduct any solvency test and

simply assumed insolvency without underlying analysis. His *ipse dixit* is unhelpful to the factfinder

and unreliable, and should be excluded. *Schneider*, 320 F.3d at 404.

**A. Mr. Menenberg Opines On Solvency Without Any Underlying Analysis**

  At the outset, Mr. Menenberg identified three standard solvency tests, and admitted ████

████████████████████████████████████████████████ Menenberg Dep. 28:22-

29:5 ████████████████████████████████. Instead, he claimed to have ████████

████████████████████████████████████████████████████ *Id.* at 28:22-29:5.

This is demonstrably false. In his Report, Mr. Menenberg did not explain the capital adequacy test or its parameters, did not discuss what type of evidence would be relevant to the analysis, did not cite case law or treatises expounding on the test or its factors, did not apply any evidence to the test or "show his work" in doing so, and did not explain how he reached his "conclusion" using the test. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Menenberg Rep. ¶¶ 78, 249.

When pressed on the capital adequacy test he had supposedly conducted, Mr. Menenberg pointed to a single paragraph in the entire Report. Menenberg Dep. 29:12-22 (citing Menenberg Rep. ¶ 238). That paragraph does not use the term capital adequacy, much less apply the test— which requires looking at ████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████ Menenberg Rep. ¶ 78; *EBC I, Inc. v. Am. Online, Inc. (In re EBC I)*, 380 B.R. 348, 355-59 (Bankr. D. Del. 2008) (capital adequacy looks at whether "at the time of the transfer the company had insufficient capital, including access to credit, for operations"). None of that analysis appears in the paragraph to which Mr. Menenberg referred:



At the end of this paragraph, Mr. Menenberg also listed a handful of facts from the record in bullet

point. *Id.* At his deposition, he described that list as ███████████████████████████

Menenberg Dep. 26:13-15 (emphasis added), but also claimed the list ███████████████

███████████████████, *id.* at 392:4-23 ███████████████████████████

███████████████████████. That being the extent of Mr. Menenberg's

solvency inquiry—regurgitating facts from the record—his opinion is unreliable and

inadmissible.[4]

### B. Mr. Menenberg's Solvency Conclusion Is Facially Unreliable Because He Does Not And Cannot Ascribe Any Value To Liabilities

Even without any underlying analysis, it is clear Mr. Menenberg's conclusion suffers from

two fundamental methodological flaws. First, Mr. Menenberg clearly opines that ███████████

███████████████████████████████████████. *Compare*

Menenberg Rep. ¶ 238 █████████████████████████████████████

███████████████████████████████████████████████

██████, *with, e.g., Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 556 (Del. Ch. 2015)

(the "balance sheet test" for insolvency is defined as "when the entity has liabilities in excess of a

reasonable market value of assets") (citation and internal quotation marks omitted).

Second, even though he purported to █████████████████████████████

███████████████████████, *id.*, Mr. Menenberg admitted that he was unable to,

unqualified to, and did not try to quantify Maxus's environmental liabilities. *See infra* § II. At the

---

[4] His unsupported conclusions are even still irrelevant to the Trust's claims against Repsol, as Mr. Menenberg only purports to assess Maxus's reasonable capital immediately after the 1996-97 transactions, two years before Repsol had purchased YPF in 1999. Menenberg Rep. ¶ 238. In that lone paragraph, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

time of his analysis, moreover, neither the testimony of the Trust's expert Stephen A. Johnson nor

of any other environmental expert had been produced.[5] Thus, Mr. Menenberg admitted he opined

that Maxus was insolvent based on *unquantified* liabilities. Menenberg Rep. ¶ 238 ███████

█████████████████████████████████████████████████████████████

███████████████████████████████ (emphasis added)).

At his deposition, Mr. Menenberg at first tried to avoid conceding that it is impossible to

determine insolvency based on liabilities without also quantifying those liabilities:



Menenberg Dep. 98:17-101:19. But Mr. Menenberg later acknowledged it is █████████████

*id.* at 207:20-208:12, thereby admitting the unreliability of his own test, which did not quantify

liabilities.

In addition to rendering a solvency opinion without calculating liabilities, Mr. Menenberg

blinded himself to one of the most important factors in determining solvency under the capital

---

[5] Menenberg Dep. 237:7-17 ███████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████ ); *id.* at 50:6-11

█████████████████████████████████████████████████████████ .

adequacy test: the fact that Maxus continued to pay *all* of its debts on time for the entire 13-year period that Repsol had an indirect stake in the company, and continued to do so even after the expropriation in 2012. Repsol Defendants' Affirm. Stmt. of Undisputed Mat. Facts ¶ 184 [A.D.I. 639]. Remarkably, Mr. Menenberg did not mention, much less grapple with that critical fact, even as he deemed Maxus insolvent for an entire 21-year period. *See Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) (noting that "courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction," and collecting cases in which companies were found to have reasonable capital when they survived for only eight to twelve months after a challenged transaction).

### C.  Mr. Menenberg's "Cause to Believe" Standard Lacks "Fit"

Having no basis to find insolvency, and failing to analyze it, Mr. Menenberg tried to redefine the concept to encompass knowledge of potential insolvency. In his words, ████████ ████████████████████████████████████████████████████ Menenberg Rep. ¶ 265 (emphasis added). But, at his deposition, Mr. Menenberg changed course, claiming █ ██████████████████████████████████████████████████ ████████████. Menenberg Dep. 386:18-24 ████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████.

Putting aside Mr. Menenberg's about-face, there is no ████████████ standard that is legally or financially relevant, or helpful to the factfinder (here, the Court) in this case. *See* Menenberg Dep. 373:9-374:13; 380:4-10 (testifying he does not recall financial literature or the UVTA applying his standard); *see also* 11 U.S.C.A. § 101(32) (defining solvency as a "financial condition"). In any event, Maxus's ████████████ insolvency would have depended on the still-unsupported premise that Maxus was, in fact, insolvent based on the reasonably knowable

size and scope of environmental liabilities, which Mr. Menenberg could not and did not quantify.

### D.  The Court Should Strike New Analysis In Rebuttal Under Rule 26

Because several experts in their rebuttal reports highlighted that Mr. Menenberg did not conduct a solvency analysis, he attempted to spin up the analysis in his rebuttal. *See* Jan. 14, 2022, Rebuttal Expert Report of Todd. D Menenberg ¶¶ 58-93 (attached as **Ex. C**) ("Menenberg Rebuttal Rep."). When asked why he waited until rebuttal to do so, he offered meandering excuses and evasive responses, stating: ███████████████████████████████████████

███████████████████████████████ Menenberg Dep. 350:8-18, and that ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████ *Id.* at 351:6-14; *but see id.* at 353:19-354:14 ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████.

In any event, Mr. Menenberg cannot ██████ on a test that did not exist in the initial Report; the initial Report never disclosed a solvency test, much less one that was ██████ At his deposition, Mr. Menenberg admitted ████████████████████████████████████

██████████████ *Id.* at 394:13-395:22. If Mr. Menenberg—an accountant ████████████

██████████ Menenberg Rep. ¶ 208—was purporting to conduct a solvency test, it would not be ████████████ In reality, Mr. Menenberg did not conduct a solvency test in his Report, and only purported to do so in rebuttal. Any opinion he offered is thus inadmissible. Fed. R. Civ. P 26(a)(2)(B) (expert report must contain a "*complete* statement of all opinions the witness will express" (emphasis added)); *Wreal, LLC v. Amazon.com, Inc.*, 2016 WL 8793317, at *3 (S.D. Fla. Jan. 7, 2016) (excluding expert testimony that introduced analysis in rebuttal report); *Am. Diabetes*

*Ass'n v. Friskney Family Tr., LLC*, 2015 WL 12826476, at *2 (E.D. Pa. July 21, 2015).[6]

\*\*\*

Mr. Menenberg's solvency analysis—and his entire Report—can be summed up by his answer to the question ███████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████ Menenberg Dep. 345:20-346:10. His willingness to bypass the primary accounting tests and simply ███████████—and then assume ██████████ ████████ without analysis—shows a lack of expertise and desire to reach a correct result. His opinion is the type of *ipse dixit* conclusion that the *Daubert* standard precludes. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000). That he has some accounting experience "does not mean that the Court's concerns with *ipse dixit* disappear." *Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *8 (S.D.N.Y. Sept. 16, 2015).

## II. The Court Should Exclude All Of Mr. Menenberg's Opinions Regarding The Scope And Knowledge Of Maxus's Environmental Liabilities

As noted, one of the hotly-disputed issues in this case is the value of Maxus's contingent environmental liabilities and whether YPF and Repsol believed those liabilities were ██████████ ██████████ at relevant times. *See* Menenberg Rep. ¶ 241 ████████████ ████████████████████████████████████████████████████████ ████████████████████. Mr. Menenberg's discussion about these issues is pervasive. ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[6] Even if his rebuttal ██████████ were admissible, it still suffers from the fundamental flaws that require exclusion of the Report—the failure to quantify environmental liabilities. *See* Menenberg Rebuttal Rep. ¶¶ 58-93 ███████████████████████████████; *but cf. id.* ¶ 59 ██████████████ ████████████████████████████████.

████████. And Mr. Menenberg purports to offer sweeping conclusions about them, including that:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* ¶¶ 14, 16, 19.

Mr. Menenberg did not perform any analysis to render these opinions. Nor could he, as he admittedly lacks expertise to do so. His conclusions are thus imprecise speculation ████████ ████████████████████████████, which does not assist the factfinder. To the extent Mr. Menenberg purports to opine about ████████████████████████ he offers inappropriate fact-witness testimony. His environmental opinions should be excluded.

### A. Mr. Menenberg Lacks The Qualifications To Assess Scope And Probability Of Contingent Environmental Liabilities Or Probabilities of Remedial Outcomes

At the outset, Mr. Menenberg lacks qualification to assess the scope of Maxus's contingent environmental liabilities, or the probabilities that any environmental remedies would have been implemented. Menenberg Dep. 17:13-18:16, 59:18-24. Mr. Menenberg admitted in his deposition that he has not previously served as an expert witness to value environmental liabilities, is not an environmental engineer, is not a licensed environmental professional, and has no education or experience estimating environmental remediation projects. *Id.* at 17:13-18:16. He further admitted that he was not qualified to evaluate Defendants' environmental experts. *Id.* at 49:16-50:5. Instead, he explained that he relied only on estimates in various documents. *Id.* at 56:12-57:17.

### B. Mr. Menenberg Does Not Bring Any Expertise To Bear And Instead Impermissibly Acts As An Advocate And Fact Witness

Without expertise, Mr. Menenberg does nothing more than cherry-pick figures from those documents, without applying any technical scrutiny to them. By simply ████████ various figures

from the record, he impermissibly acts as an advocate. *See In re Rezulin Prods. Liability Litig.*,
309 F. Supp. 2d 531, 563 (S.D.N.Y 2004) (an expert "may not pick and [choose]" such that they
"present the Court with what he believes the final picture looks like") (citations omitted). In his
own words, he intended to ██████████████████████████ Menenberg Dep. 236:19-237:4
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ ; *id.*
at 259:19-260:4 ██████████████████████████████████████████ .

Putting documents and figures in ████████ does not assist the trier of fact and is not expert
testimony if the ████████████ does not assess the reliability of the figures presented. *See*
Menenberg Dep. 73:14-22 ████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████ . When asked about the bases for various environmental
estimates or reports that he had relied on, he refused to answer, taking refuge in his lack of
expertise. *See Id*. 59:18-24 ████████████████████████████████████
██████████████████████ .[7] In other words, Mr. Menenberg does what the Trust's lawyers
can do. And many courts have held that an expert relying on documents, without verification or
independent analysis, as here, warrants exclusion. *See, e.g.*, *ZF Meritor LLC v. Eaton Corp.*, 646
F. Supp. 2d 663, 667 (D. Del. 2009); *CareDx, Inc. v. Natera, Inc.*, 2021 WL 1840646, at *3 (D.
Del. May 7, 2021); *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 23-24 (2d Cir. 2017); *Scott*

---

[7] *See also* Menenberg Dep. 61:15-62:5 ████████████████████████████████████ ;
*id*. at 73:5-12 ████████████████████████████████████████████████████████████
████████████████████████████ .

*v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 54-55 (S.D.N.Y. 2016); *Auto Indus. Supplier ESOP v. SNAPP Sys.*, Inc., 2008 WL 5383372, at *5 (E.D. Mich. Dec. 23, 2008).

Mr. Menenberg's environmental opinions are thus clearly unreliable. But they are also prejudicial and would muddle the presentation of evidence at trial. Not only did Mr. Menenberg not ascribe any value or probability to the environmental liabilities (because he could not), he admitted ███████████████████████████████████████. Menenberg Dep. 271:11-272:10 ██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████; *id.* at 232:23-233:14 ███████████

████████████████████████████████████████████

████████████████████████████████████████. Mr. Menenberg's opinion thus serves no use in this case, other than to introduce figures that appear to fit the Trust's narrative, but without any consideration of the reliability of those figures as to the central question of this case: what were Maxus's known or knowable environmental liabilities at the time of the various challenged transactions.

Worse still, Mr. Menenberg intentionally disregarded evidence of unreliability, which tended to show Maxus's contingent liabilities were *not* known to be substantial. As a prime example, Mr. Menenberg placed great weight on the ChemRisk document in reaching his conclusion about the size of Maxus's contingent environmental liabilities. Menenberg Rep. ¶ 33. But he did not (and could not) assess whether it was reliable, and even ignored the fundamental limitations of the ChemRisk document that several witnesses had explained—namely that it was a marketing device, without *any* underlying support or evidence, drafted by chemical engineers without expertise in environmental remediation. *See* Menenberg Dep. 51:5-57:21; *but see*

Menenberg Rebuttal Rep. ¶ 18 ████████████████████████████

████████████████████████████████ .

Moreover, Mr. Menenberg purported to testify about the Defendants' contemporaneous *knowledge* of these documents and what they believed about the figures therein. *See* Menenberg Dep. 51:18-53:7 ████████████████████████████

████████████████████████████████████

████████████████████████████████████

His opinions are thus inadmissible: what the Defendants knew and when are questions of fact. In any event, Mr. Menenberg is simply wrong as to *Repsol's* awareness of this document from 1993 in Maxus's files, as there is no evidence in the record Repsol ever saw it after purchasing YPF in 1999. Indeed, as Judge Sontchi acknowledged at summary judgment, "there is no assertion that Repsol knew the environmental liabilities would be substantial (i.e., in the billions of dollars) at the time Repsol made any of the transfers." A.D.I. 738 at 58.

## III.    The Court Should Exclude Mr. Menenberg's Alter Ego Opinions For Lack Of Reliability And Qualification, And As Inappropriate Legal Conclusions

In the ████████ section of his Report, Mr. Menenberg listed various ████████

████████████████████████████████████

Menenberg Rep. ¶ 246. He then marched through each factor, like a legal brief, compiling facts from the record and ultimately concluding that ████████████████████

████████████████████████████████████

████████████████████████████████ *Id.* ¶¶ 269-70.

These opinions regarding alter ego should be excluded. First, Mr. Menenberg is unqualified to testify whether Maxus, Repsol, and YPF were ████████████████ as he is not an expert on corporate separateness or alter ego. Second, his opinions are unreliable because his

methodology is flawed, he does not apply expertise, and he simply provides factual narrative, often opining on ultimate legal issues improperly. Last, his opinions do not "fit" because, even if he were qualified to testify as to whether Maxus and Repsol and YPF were ███████████████ ████ he does not do so within any appropriate or recognized legal framework.

### A.  Mr. Menenberg Lacks The Qualifications To Provide Opinions On Alter Ego

Mr. Menenberg, a forensic accountant, lacks qualifications to assess almost any issue relevant to the law of alter ego—except potentially solvency, a topic on which he offered no reliable opinion or analysis at all. *Supra* § I. Mr. Menenberg admits he is not a corporate lawyer or expert on corporate governance. Menenberg Dep. 18:18-23. Still, he purports to offer opinions on corporate governance, and claims his role is to ██████████████████████████ ███████████████████████████████████████████ ███████████████████████████ Menenberg Dep. 21:5-20. It is the lawyer's job—not the expert's—to "compile" relevant facts. *See infra* § VI.

Courts have excluded testimony on corporate affairs issues in strikingly similar situations. *See Burtch v. Opus, LLC (In re Opus East, LLC),* 528 B.R. 30, 58-59 (Bankr. D. Del. 2015) (excluding corporate governance testimony of economist, despite service on multiple corporate boards); *Tindall v. H & S Homes, LLC,* 2012 WL 3242128, at * 6 (M.D. Ga. Aug. 7, 2012) (excluding an accounting and finance expert with "no prior experience as an expert on the issues of corporate separateness, alter ego, or piercing the corporate veil"); *Allen v. Dairy Farmers of Am., Inc.,* 2014 WL 266290, at *9-10 (D. Vt. Jan. 23, 2014) (finding an economist was unqualified "to opine regarding true 'cooperative governance'"). As such, Mr. Menenberg's background as a forensic accountant does not make him qualified to testify on corporate governance.

### B.  Mr. Menenberg's Opinions On Alter Ego Issues Are Not Reliable

Recognizing his inability to opine on matters relating to alter ego, Mr. Menenberg plays

"heads I win, tails you lose." For dozens of pages in his Report, he points to supposed ███

███████████████████████████████████████████████████████████████████████████

███ Menenberg Rep. ¶¶ 247, 248, 256-58, 266, 269, 270. At his deposition, however, when

questioned about his alter ego assumptions and conclusions, he declined to answer, taking refuge

in his lack of expertise. As Mr. Menenberg said over and over again, █████████████ and thus

could not answer the questions posed to him. Menenberg Dep. 124:21-23.[8]

Mr. Menenberg's lack of expertise manifests in the substance of his ████████ which is

unreliable. For one, Mr. Menenberg relies on and purports to apply only the "Litigation Services

Handbook" as a guide to determine whether Maxus was acting as an independent corporate actor

behaving in its own self-interest. Menenberg Rep. ¶¶ 242-244, 246; Menenberg Dep. 181:22-

182:7. That is a document that Mr. Menenberg did not (and could not) assess to determine whether

it was even reliable for that purpose. Menenberg Dep. 182:8-12[9]; *Muniz v. Rexnord Corp.*, 2006

WL 5153078, at *2 (N.D. Ill. Nov. 2, 2006) ("In addition, there is no evidence that Bialecki's

primary resource, Chapter 38 of the Litigation Services Handbook, has been subjected to peer

review and/or that it has been generally accepted to support the expert's alter-ego analysis."). Mr.

Menenberg failed to do any type of reliability determination and his opinions should be excluded.

Second, Mr. Menenberg does not purport to offer any analysis about corporate behavior—

comparing the facts to principles in treatises or typical corporate behaviors. Menenberg Rep. ¶¶

242-244, 246. Rather, he narrates underlying facts and applies them, like an advocate, to the

---

[8] Menenberg Dep. 124:15-23 ██████████████████████████████████████

███████████████; *id.* at 125:12-20

███████████████████████████████████████████████████; *see also id.* at 126:11-16, 128:9-129:10, 179:10-19; 180:4-181:5.

[9] Indeed, Mr. Menenberg was not even sure whether the supposed standard he applied in his Report
came from the Handbook. Menenberg Dep. 183:4-9.

Litigation Handbook factors. He thus brings no expertise to bear, and does not aid the trier-of-fact.

Third, Mr. Menenberg purports to assess whether ████████████████████████ ████████████████████████████████████████████ Menenberg Rep. ¶¶ 269-270. That is not the standard for examining the relationship between a corporate grandparent and an indirect, wholly-owned subsidiary with respect to alter ego claims. *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 404 (S.D.N.Y. 2013) (under Delaware law, "shared management, shared corporate principles, or a parent's ownership and operation of a subsidiary—even exclusively for the parent's gain—do not merit piercing the corporate veil").

### C.  Mr. Menenberg's Opinions On Alter Ego Amount to Improper Legal Conclusions

Mr. Menenberg also explicitly claims that ████████████████████████████████ ██████████████████ Menenberg Rep. ¶ 270 (emphasis added). That is plainly an ultimate question for the factfinder. *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470 (D. Del. 2010) (alter ego may exist where a corporate parent exercises "domination and control over its subsidiary") (citation omitted); *see also Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 102 (Bankr. D. Del. 2010).

It is improper for Mr. Menenberg to testify to these ultimate legal issues because it invades on the province of the factfinder. *Illinois Mine Subsidence Ins. Fund v. Union Pac. R.R. Co.*, 2019 WL 233219, at *5 (C.D. Ill. Jan. 16, 2019) (excluding expert testimony that "contain[s] essentially legal argument and legal conclusions on each element of the Alter Ego Claim as framed by Presser"); *Tindall*, 2012 WL 3242128, at *6 (excluding expert report on "issues of corporate separateness, alter ego, or piercing the corporate veil," as the expert is not "permitted to articulate and apply the relevant law and, thereby, circumvent the jury's decision-making function by telling it how to decide [this] case.") (citations omitted).

Thus, in *Pereira v. Cogan*, the court struck an expert's opinion that "[u]pon examination,

it appears that all such decisions were actually consistent with the controlling shareholder's interests, without regard to the corporation's paramount interests," because it was an "ultimate legal conclusion[ ]." 281 B.R. 194, 198 (S.D.N.Y. 2002); *see also Spizz v. Eluz (In re Ampal-American Israel Corp.)*, 2020 WL 2529337, at *4 (Bankr. S.D.N.Y. May 14, 2020) ("The jury does not require Solomon's opinion to decide whether Eluz was so under Maiman's thumb that she placed his interests ahead of Ampal's."). Here, too, the Court does not need Mr. Menenberg to review the documents in this case and determine whether Repsol and YPF "dominated and controlled" Maxus. To the extent solvency would be relevant to that inquiry, Mr. Menenberg may have been able to assist the trier-of-fact. As noted above, however, he did not do even that.

## IV.   The Court Should Exclude The Comparable Companies Analysis For Lack Of Fit And Unreliability

Mr. Menenberg reached various conclusions ████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████. Menenberg Rep. ¶ 210. The opinion is unreliable and conspicuously manufactured to fit the Trust's litigation-driven narrative.

### A.   Mr. Menenberg's Comparable Companies Analysis Lacks The Requisite "Fit" To This Case And Is Unreliable Because Of The Litigation-Driven Timeframe

Mr. Menenberg admits that he conducted a comparable companies analysis, not for any particular purpose relevant to the case, but only to ████████████████████████████ Menenberg Rep. ¶ 209. Because "context" and "color commentary" do not assist the trier of fact, Mr. Menenberg's comparable company analysis should be excluded. *Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 2022 WL 1664362, at *10 (E.D. Penn. May 25, 2022) (granting *Daubert* motion for a challenged portion of an expert report that was "not admissible as an expert opinion"

in that it was a summary or "'color commentary' of the record"). Elsewhere, Mr. Menenberg implied that he intended to assess whether ████████████████████████████████.

Menenberg Rep. ¶ 24. To the extent that is the purpose of the comparable companies analysis, however, Mr. Menenberg does not purport to quantify damages. *See generally* Menenberg Rep.

Whatever the purpose of the analysis, Mr. Menenberg's testimony is both unreliable and does not "fit" the case because he plainly rigged the parameters to fit a predetermined narrative about Maxus's performance, and not to aid the factfinder with objective analysis of the underlying facts. Specifically, Mr. Menenberg cabined his examination of Maxus from 1995 to 2006, Menenberg Rep. ¶ 12—even though he knew that Repsol owned Maxus (indirectly through YPF) from 1999 to 2012, and YPF owned Maxus from 1995 to 2016. *Id*. ¶¶ 45, 50, 61, 65.

Accordingly, with respect to Repsol, Mr. Menenberg's timeframe is meaningless. Assuming for argument purposes only that Maxus's total assets were ████████████████ ████, as Mr. Menenberg claims, *see* Menenberg Rep. ¶ 197, then it would have been incumbent upon Mr. Menenberg to compare Maxus to similarly-situated oil and gas companies in 1999, to determine any additional effect that Repsol's indirect ownership could have possibly had on Maxus's performance from 1999 onward. Mr. Menenberg testified ████████████████ ███████████████████████████████████████████████████████████ ██████ Menenberg Dep. 120:2-12; *In re Morse*, 2018 WL 6721090, at *7 (Bkr. N.D.N.Y. Dec. 20, 2018) ███████████████████████████████████████ ████████████████████████████████████████████████.

Mr. Menenberg's timeframe also conveniently ended in 2007, right before a global Great Recession that put several oil and gas companies into bankruptcy. But the fact that Maxus continued to pay all of its debts on time through 2014—a full two years after Repsol had any

ownership interest in the company and seven years after the Great Recession—would show *success* as compared to similarly-situated companies that halted debt payments. Mr. Menenberg deemed that ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████ Menenberg Dep. 114:6-14.

Mr. Menenberg's suggestion that ████████████████████████████████████

███████████████ is antithetical to the approach an expert would take to a legitimate comparable companies analysis. That a company survives the recession is highly probative of whether it was financially stable *as compared to* similarly situated companies. An objective expert does not ignore such critical variables. *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (rejecting expert testimony that "ignored a large amount of information that calls many aspects of the [expert's theory] into question" and explaining that "any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect"). When questioned about the artificial endpoint of his analysis, Mr. Menenberg then claimed t███████

███████████████████████████████████████████. Menenberg Dep. 112:25-113:6 ██████████████████████████████████████████████████████████

███████████████████████████. It is thus apparent that even if comparable companies "fit" this case, Mr. Menenberg's analysis is fatally flawed—and not only flawed but specifically designed to serve the Trust's narrative.

**B.  Mr. Menenberg's Comparable Companies Analysis Is Unreliable As He Failed To Conduct Analysis, Instead Relying On Outdated Analysis By A Third-Party**

If that were not enough, Mr. Menenberg's analysis is also unreliable because he did not select any of the ████████████████████ in his own analysis. Rather, he used ████████████

███████████████████████████████████████. Menenberg Rep. ¶ 209. Even

if that were an acceptable starting point for selecting companies, Mr. Menenberg did not then independently evaluate whether the companies were comparable to Maxus in 1995, and whether those companies remained comparable at all of the inflection points thereafter (*e.g.*, after the YPF acquisition in 1999). He decided, without explanation, to ████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████ *Id.*[10]

     At his deposition, Mr. Menenberg refused to answer whether ████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████. Menenberg Dep. 103:11-106:18; *id.* at 107:7-22 ██████████████████████████████████████████████████████████ ██████████████████████████████████████████; *id.* at 108:8-12 ██████████████ ████████████████████████████████████. That renders his testimony inexpert and unreliable. *See supra* pp.14-15 (collecting cases in which courts exclude expert that borrows from documents without verifying reliability). Indeed, the main role of the expert in a comparable companies analysis is to determine the vectors of comparison in the given industry and then explain *why* companies are comparable along those vectors—the opposite of what Mr. Menenberg did here. *See Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 205-09 (5th Cir. 2000) (rejecting comparable company analysis where there was no evidence as to characteristics of the businesses: location, market served, costs of operation, amounts charged, etc.); *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *21-22 (E.D. Pa. Oct. 19, 2015) (rejecting analysis

---

[10] Notably, while Mr. Menenberg relied on ████████████████████████████████████ ████████████████████████ *See* Menenberg Dep. 99:8-100:11 ████████████████████; *see also* Menenberg Rep. ¶¶ 80-81 (criticizing Houlihan's solvency analysis); Menenberg Rebuttal Rep. ¶ 61 ████████████████████████████████████████████.

where the "expert has failed to perform any substantive analysis of those factors most relevant to comparability"); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 813 (N.D. Ill. 2005) (rejecting testimony where expert "admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability"); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) ("In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable.").

Notably, Mr. Menenberg was not even able to explain ███████████████████ ███████████████████████████████. Menenberg Dep. 107:7-17 ████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████.

## V.    The Court Should Exclude The Fraudulent Transfer Analysis As Unreliable And Unhelpful To The Factfinder

In his section on fraudulent transfers, Mr. Menenberg listed the Uniform Voidable Transactions Act ("UVTA") factors, and then marched through each factor purporting to render final legal conclusions on each. For example, Mr. Menenberg concluded, without support, that ███████████████████████████████████████████████ ██████████ Menenberg Rep. ¶ 231. He also rendered conclusions about the debtor (Maxus) retaining possession of property transferred, concealment, reasonably equivalent value, and so forth for each of the factors. *Id.* ¶¶ 231-41.

Mr. Menenberg's opinions on fraudulent transfer must be excluded for the same reasons

his alter ego opinion must be excluded: on the only topic on which he may have been qualified to testify about—*i.e.*, solvency—he did not offer an admissible opinion. *Id.* ¶ 238. And Mr. Menenberg lacks expertise to testify about any of the other fraudulent transfer factors he purported to analyze, ███████████████████████████████████████████ *Id.* ¶¶ 236, 237; *supra* § I.

Even so, his opinions are plainly unreliable and unhelpful, as he does not even purport to offer expert analysis. He simply provides a factual narrative—as an advocate would do in writing a brief—walking through the various legal factors and citing evidence in support. Indeed, for each of the eight factors, Mr. Menenberg provides *only* facts, and does not try to explain how he is bringing expertise to bear or otherwise assisting the trier of fact. *Id.* ¶¶ 231-241. For example, in one short paragraph, Mr. Menenberg claims—without any support or analysis—████████████ ████████████████████████████████████████████████████ *Id.* ¶ 235. Recall, of course, that Mr. Menenberg *disclaimed* he had conducted any cash flow test. Menenberg Dep. 28:22-29:5. Similarly, in two short sentences, he insinuated Maxus concealed assets in the 1996-97 transfers to YPFI. Menenberg Rep. ¶ 236. He did not even purport to explain how those transactions were concealed given they were publicly reported in SEC filings, a fact he conveniently does not mention. *See, e.g.*, Maxus Energy Form 10-K, dated Dec. 31, 1996, at 2.

Similarly, Mr. Menenberg disclaimed at his deposition that he was conducting a fair value analysis. Menenberg Dep. 49:5-11 ████████████████████████████████████████ ██████████████████████████████████████████. Yet that is exactly what he purported to do in his Report. Menenberg Rep. ¶ 237 ████████████████████████ █████████████████████████.[11] Finally, he concluded that ████████████████████

---

[11] Although Mr. Menenberg claimed ███████████████████████████████████████████ ██████████████. Menenberg Dep. 427:22-428:11.

████████████████████████████████████████████████████████████

████████████████████████████████████ Menenberg Rep. ¶ 241. As noted, Mr. Menenberg

did not and could not quantify the scope of contingent environmental liabilities, so his opinion is

unreliable and improper. *Supra* § II. This is true throughout his fraudulent transfer testimony, for

each factor, where he fails to conduct expert analysis. Menenberg Rep. ¶¶ 231-41.

Finally, while Mr. Menenberg's mere narration is non-expert and unreliable, some of his

conclusions are improper and unreliable, as based on unsupported factual and legal premises.

Namely, in describing sales of the debtor's assets, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████. Menenberg Dep. 122:12-125:6 ████████████████████

████████████████████████. Still, Mr. Menenberg claims that ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Menenberg Rep. ¶ 236 (emphasis added).

Because Maxus no longer owned these assets, they are entirely irrelevant to the fraudulent transfer

analysis. Nonetheless, Mr. Menenberg deems them relevant, rendering a legal conclusion that they

would be relevant, were the court to find Maxus, YPF, and YPFI alter egos in 1996-97. *See*

Menenberg Dep. 122:18-124:5.[12]

## VI.    Mr. Menenberg's Expert Opinions Are Merely Improper Fact Narration

While each of the foregoing opinions are inexpert and unreliable, and should be struck for

the reasons above, Mr. Menenberg's entire line of opinions is inadmissible. Mr. Menenberg is a

forensic accountant, and yet offers no accounting expertise. On solvency, for example, he simply

---

[12] Even if Mr. Menenberg's legal premises were correct—that non-debtor assets were somehow relevant to the fraudulent transfer analysis in this case—he still did not conduct any solvency analysis of the actual seller, YPFI, which at that point owned and sold the "Legacy" assets.

assumed a conclusion without applying any of the standard tests: he did not evaluate Maxus's balance sheets, its cash flows, or its capital adequacy. By his own admission, ███████████████ ██████████████████████████████████. Menenberg Dep. 345:25-346:12.

Providing no admissible opinions in the area of forensic accounting, where he was potentially qualified to testify, Mr. Menenberg simply tells a story that might sound favorable to the Trust, and thereby tries to give the Trust's litigation-driven narrative an air of expertise. Indeed, the Trust provided Mr. Menenberg a blueprint of its theory, which he then reproduced in his Report. *See* MLT00276885-MLT00276929 (attached as **Ex. D**); MLT00276878-MLT00276884 (attached as **Ex. E**); MLT00276930-MLT00276944 (attached as **Ex. F**) (documents drafted by White & Case and sent to Mr. Menenberg); *see also* Menenberg Dep. 221:6-232:18 (describing having received these documents before his report). For example, Mr. Menenberg assumes that Maxus was insolvent from 1995 to 2016, conveniently during all of the challenged transactions in this case. Menenberg Rep. ¶ 238. But, Mr. Menenberg's conclusion and supporting "evidence" is markedly similar to that in ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████. *See* Ex. E at 1-2; *see also* Menenberg Rep. ¶ 72 (discussing Houlihan Lokey Report dated April 5, 1995), ¶ 153 (discussing May 2005 K&S Memo).

Mr. Menenberg's euphemism for his advocacy is ██████—in his view, ████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ Menenberg Dep. 216:23-217:20; *id.* at 219:9-220:3 ██████████████████████████████; *id.* at 260:6-20 ████████



; *id.* at 303:19-304:4

; *id.* at 312:14-20

.[13]

That is not valid expert testimony. It is the job of the lawyers, as advocates, to "contextualize" or "highlight" evidence. *See Tchatat v. City of New York*, 315 F.R.D. 441, 444-45 (S.D.N.Y. 2016) ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert*'s most basic requirements.") (citations omitted); *King v. Fox Grocery Co.*, 642 F. Supp. 288, 291 (W.D. Pa. 1986) (striking expert report because it "includes a two page recitation of facts, which merely summarizes facts already in the record").

Indeed, Mr. Menenberg's testimony is only advocacy and narration, and includes no testable expert opinions. As noted above, he lacked expertise to evaluate Maxus's contingent environmental liabilities, yet he

Menenberg Rep. ¶¶ 16, 19. Likewise, he conducted an

---

[13] *See also* Menenberg Dep. 23:24-24:15

; *id.* at 192:12-21. 218:20-219:8, 240:2-7, 244:8-13, 260:2-4, 304:14-18.

egregiously unreliable "comparable companies analysis" that spanned from 1995-2007, such that it would eliminate a key variable that contravened his narrative.

In parroting the Trust's narrative, Mr. Menenberg also distorts record evidence. As explained in Repsol's October 17, 2022 Discovery Letter [A.D.I. 766], for example, the Trust has sought to establish ██████████ by mischaracterizing the contents of ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████. Like the Trust, Mr. Menenberg falsely claimed ██████████████████, despite the explicit language in the memo to the contrary. *Compare* Menenberg Rep. ¶ 154 ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████ *with* May 24, 2005 Executive Summary to King & Spalding Report, REP000869-REP000914, at REP000895 (attached as Ex. G) ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████.[14]

Moreover, Mr. Menenberg frequently purports to testify about the parties' intent and state of mind. *See, e.g.*, Menenberg Rep. ¶ 17 ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████. But, an accountant cannot testify to corporate intent, which is a question of ultimate fact. *In Re Diet Drugs Prods. Liability Litig.*, 2001 WL 454586, *2

---

[14] Remarkably, Mr. Menenberg quoted *half* of the sentence, while leaving out the first clause of that same sentence that ████████████████████████████████████████████████ ██████.

(E.D. Pa. Feb. 1, 2001) (excluding testimony of expert regarding "what the corporate intent of [defendant] and/or what beliefs of FDA officials were on matters upon which they spoke or acted."); *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 700 (W.D.N.C. 2003) (finding corporate intent testimony is inadmissible as "the jury should hear and / or see first-hand any relevant evidence pertaining to the Defendant's intent. Then the jury, not the witnesses, should consider the facts and make its own determination regarding Defendant's intent."). Whether the transactions and restructuring were undertaken for legitimate corporate purposes is for the fact-finder to decide after reviewing those documents and deposition excerpts, and does not require expert analysis.

## CONCLUSION

Mr. Menenberg's opinions relating to solvency, environmental liabilities, alter ego, fraudulent transfer, and comparable companies should be excluded. Mr. Menenberg's minimal qualifications, narration rather than analysis, and the obvious unreliability of his opinions all warrant the exclusion of his opinions. Once these opinions are excluded, there is no permissible testimony that remains—as such, the Report should be excluded in its entirety.

Dated: October 27, 2022
       Wilmington, Delaware

*/s/ Curtis S. Miller*
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Sophie Rogers Churchill (No. 6905)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*- and -*

**WEIL, GOTSHAL & MANGES LLP**
Edward Soto
Corey Berman
Brian Liegel
Mark Pinkert
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

*Attorneys for Repsol Defendants*

# EXHIBIT A

## FULLY REDACTED

# EXHIBIT B

## FULLY REDACTED

# EXHIBIT C

## FULLY REDACTED

# Exhibit D

## Fully Redacted

# EXHIBIT E

## FULLY REDACTED

# EXHIBIT F

## FULLY REDACTED

# EXHIBIT G

## FULLY REDACTED