## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*, | Case No. 16-11501 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50489 (CTG) |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE YPF DEFENDANTS' *DAUBERT* MOTION
## TO EXCLUDE EXPERT OPINION AND TESTIMONY OF BARRY PULLIAM

---

[1]      The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 5

I.      The Global Restructuring............................................................................. 5

    A.      The Oxy Indemnity And YPF's Acquisition Of Maxus ............................ 5

    B.      Post-Acquisition, Maxus Undertakes A Global
           Restructuring In Order To Realize Tax And Other Benefits ...................... 6

         a)      Bolivia And Venezuela Asset Sales.................................................. 8

         b)      Ecuador And Indonesia Asset Sales ................................................ 9

II.     The Evolution Of Mr. Pulliam's Opinions From The New Jersey Litigation
        To This Lawsuit ............................................................................................ 10

LEGAL STANDARD..................................................................................................... 11

ARGUMENT ............................................................................................................... 12

I.      The Court Should Exclude Mr. Pulliam's Independence Opinion ......................... 12

    A.      Mr. Pulliam's Independence Opinion Is Neither Relevant
           Nor Helpful ......................................................................................... 13

    B.      Mr. Pulliam Lacks The Expertise To Opine On Whether
           Maxus's Conduct Was Consistent With That Of An
           Independent Entity .............................................................................. 15

    C.      Mr. Pulliam's Independence Opinion Is Based On A
           Cherry-Picking Of The Record, Not A Reliable Analysis......................... 16

II.     The Court Should Exclude Mr. Pulliam's Valuation Opinion............................... 18

    A.      Mr. Pulliam Should Be Precluded From Giving An Opinion
           On REV............................................................................................... 18

    B.      Mr. Pulliam's Reliance On The MCM Renders His Entire
           Valuation Opinion Unreliable.............................................................. 19

**Page**

C.    Mr. Pulliam's Valuation Opinion Is Unhelpful Because It Consists Solely Of A Numerical Comparison That A Layperson Is Capable Of Making ................................................................. 24

D.    Mr. Pulliam's Attempts To "Corroborate" The MCM Values Are Themselves Unreliable ........................................................... 25

a)    Mr. Pulliam's Adjustment To Professor Williams's Discount Rates ................................................................. 25

b)    Mr. Pulliam's Adjustments To Cash Flows .................................... 27

III.    The Court Should Exclude Mr. Pulliam's "Background" Narrative Testimony .... 28

CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
No. CV 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022)...................................  25

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.*,
No. 13-cv-324 (RGA), 2017 WL 3528606 (D. Del. Aug. 16, 2017)................................  15, 29

*AstraZeneca LP v. TAP Pharm. Prods., Inc.*,
444 F. Supp. 2d 278 (D. Del. 2006)....................................................................  15

*BASF Corp. v. Johnson Matthey, Inc.*,
Civil Action No. 14-1204-RGA, 2018 WL 2729123 (D. Del. June 6, 2018)....................  13

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)......................................................................... 12, 13, 15

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*,
350 F. Supp. 2d 582 (D. Del. 2004)..................................................................  19

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)...........................................................................  25

*Faulkner v. Arista Recs.*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014).................................................................  17

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995)...........................................................................  14

*In re Ampal-Am. Israel Corp.*,
Case No. 12-13689 (SMB), 2020 WL 2529337 (S.D.N.Y. May 14, 2020) .....................  29

*In re Autobacs Strauss, Inc.*,
473 B.R. 525 (Bankr. D. Del. 2012) .................................................................  14

*In re Glaser*,
No. 01-10220-SSM, 2002 WL 32375007 (Bankr. E.D. Va. Oct. 25, 2002).....................  19

*In re Nickelson*,
Case No. 15-01271-NPO, 2016 WL 690954 (Bankr. S.D. Miss. Feb. 19, 2016)..............  19

*In re Opus East*,
528 B.R. 30 (Bankr. D. Del. 2015) ................................................... 16

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ............................................................... 19

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
26 F. Supp. 3d 449 (E.D. Pa. 2014) ................................................ 17

*Legendary Art LLC v. Godard*,
Civil Action No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ......................... 20

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991) ............................................................. 19

*MOSAID Techs. Inc. v. LSI Corp.*,
Civil Action No. 10-192-RGA, 2014 WL 807877 (D. Del. Feb. 28, 2014) ..................... 20

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000) ............................................................ 12

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
345 F. Supp. 2d 431 (D. Del. 2004) ................................................ 15

*Player v. Motiva Enters. LLC*,
No. Civ. 02-3216(RBK), 2006 WL 166452 (D.N.J. Jan. 20, 2006) ............................. 16

*Upjohn Co. v. Syntro Corp.*,
CIV. A. No. 89-107-JJF, 1990 WL 79232 (D. Del. Mar. 9, 1990) .............................. 14

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ............................................................ 21

## Rules and Statutes

Fed. R. Evid. 702 ........................................................................ *passim*

Fed. R. Evid. 703 ........................................................................ 19

Fed. R. Evid. 401 ........................................................................ 13

Defendants YPF S.A. ("YPF"), YPF International S.A. ("YPFI"), YPF Holdings, Inc. ("YPFH"), and CLH Holdings, Inc. ("CLHH," and, collectively, the "YPF Defendants") respectfully submit this memorandum of law in support of their motion to exclude the opinions and testimony of Barry Pulliam (collectively, the "Pulliam Report").

## INTRODUCTION

With respect to the years 1995 – 1999 (the "YPF Era"),[2] Mr. Pulliam principally addresses two questions:  (i) whether Maxus's sales of its international E&P assets (Bolivia, Venezuela, Ecuador, and Indonesia) to YPFI in 1996/1997 (the "Global Restructuring Transfers") were "consistent" with actions an "independent" entity would take, and (ii) whether Maxus received "fair market value" in connection with those transfers.  The first question is legally irrelevant, and Mr. Pulliam is not qualified to answer it even were it otherwise.  And his opinions on both issues are, in any event, based on utterly unreliable analysis (or no analysis at all).  Accordingly, both should be excluded.

Mr. Pulliam's first opinion – that the Global Restructuring Transfers were not consistent with conduct of a hypothetical independent company – addresses a straw man:  it is undisputed that at the time of the relevant transfers, Maxus was *not* an "independent" entity as Mr. Pulliam defines that term (effectively a company without a corporate parent or controlling shareholder).  Rather, Maxus was a wholly owned, indirect subsidiary of YPF.  Even if it were the case that Maxus did not act as if it were something it was not, that is simply not a "fact" relevant to any claim or defense in this case.  While a proper subject for expert testimony

---

[2]      This submission focuses on Mr. Pulliam's analysis for the YPF Era.  To the extent consistent with this submission, the YPF Defendants also adopt and incorporate the arguments raised in the *Daubert* motion to exclude the report and testimony of Mr. Pulliam submitted by Repsol, S.A. ("Repsol"), Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Co. (collectively, the "Repsol Defendants"), including with respect to the transfers occurring during the period from 1999 to 2012 in which Repsol was the ultimate parent company of both YPF and Maxus (the "Repsol Era").

would be whether the Global Restructuring Transfers were typical of transactions within corporate groups (on which the YPF Defendants' corporate governance expert, Yale Professor Jonathan R. Macey, opined), Mr. Pulliam disclaimed offering any such opinion.  *See infra* at Section I(A).

In any event, unlike Professor Macey, Mr. Pulliam conceded that he is not a corporate governance expert, nor does he have any experience advising (or serving on) boards or companies undergoing corporate restructurings.  *See infra* at Section I(B).  His lack of relevant qualifications (which is itself disqualifying) shows in the quality of his "analysis" – if one can call it that.  Mr. Pulliam's independence opinion is based on nothing more than citation to cherry-picked snippets of documents and deposition testimony supporting his pre-determined conclusion (which the Court is perfectly capable of understanding without Mr. Pulliam's lay views), while simply ignoring mountains of contrary evidence.  Since this is neither helpful to the Court as trier of fact, nor reliable, Mr. Pulliam's independence opinion should be excluded. *See infra* at Section I(C).

Mr. Pulliam's valuation opinion should also be excluded.  For starters, Mr. Pulliam conceded at his deposition that he has no opinion to offer the Court as to whether reasonably equivalent value ("REV") was paid in connection with the Global Restructuring Transfers, despite claiming he was asked to answer that question.  *See infra* at Section II(A).  Instead, Mr. Pulliam concludes only that the fair market value ("FMV") – a different standard – of four of the Maxus assets that were transferred to a subsidiary of YPF in connection with the Global Restructuring (defined below) exceeded the $1,026.9 billion consideration paid for those assets by ████████ in aggregate.

The foundation for Mr. Pulliam's opinion is a black box called the "Maxus Corporate

2

Model" (or "MCM"), which Mr. Pulliam describes as ██████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 65:21-66:11 █████████████

████████████████████████████████████████████████████. Mr.

Pulliam's opinions instead rest solely on his second-hand interpretation of two single-page

documents containing ████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ While

Mr. Pulliam conceded that it is critical for a valuation expert to understand – and adjust if

necessary – the assumptions underlying management projections before relying on them, he

did not do that here.  Instead, he simply speculated about what the assumptions *might* be.  But

guesswork is not proper expert testimony.  Nor can Mr. Pulliam save his opinions by relying

on Maxus management – to the extent the views of Maxus management are relevant, the

record shows that Maxus management believed that the consideration received by Maxus in

connection with the Global Restructuring Transfers (which Mr. Pulliam derides as inadequate)

*equaled or exceeded* FMV.  *See infra* at Section II(B).  And regardless, to the extent Mr.

Pulliam's "analysis" consists simply of a comparison of the (unexplained) MCM outputs with

the prices paid by YPF, the Court is perfectly capable of making that comparison for itself.

*See infra* at Section II(C).

    While Mr. Pulliam tries to shore up his opinions by performing "analyses" to

"corroborate" the MCM outputs, these "analyses" themselves lack a reliable foundation.
Despite the fact that it is the Trust's burden to demonstrate that transfers were not made for
REV, Mr. Pulliam never constructs his own valuation model – instead, he makes
"adjustments" to the discounted cash flow models of others, including Maxus's independent
financial advisors and the YPF Defendants' and Repsol Defendants' valuation experts, both in
terms of discount rate and cash flows.

Mr. Pulliam's discount rates, however, rest on a conceded error.  In particular, Mr.
Pulliam uses discount rates that he calculated in his rebuttal report in the prior New Jersey
litigation, where he was retained by Occidental Chemical Corporation ("Oxy") – the very
entity that controls the Trust and is funding this action.  Mr. Pulliam borrowed those discount
rates almost entirely from the Weighted Average Cost of Capital model constructed by the
YPF Defendants' valuation expert, Professor Jack Williams, except for one "adjustment"
which involved a method of calculating country risk that Mr. Pulliam had never used before
this litigation.  But Mr. Pulliam conceded at his deposition that this adjustment was
inconsistent with the methodology he erroneously believed he was applying.  Mr. Pulliam's
so-called corroborating analyses therefore lack a reliable foundation for this reason alone.  *See
infra* at Section II(D)(a).

Mr. Pulliam's cash-flow adjustments also lack a reliable foundation.  *See infra* at
Section II(D)(b).  For example, Mr. Pulliam adjusted the discounted cash flow ("DCF") model
for Maxus's Venezuela subsidiary created by Maxus's independent valuation expert Credit
Suisse First Boston ("CSFB") at the time that asset was transferred to a subsidiary of YPF in
order to add output from a well that was not producing at that time.  At his deposition,
however, Mr. Pulliam admitted he had no idea how to value that asset as of the transfer date

4

and was simply speculating.  *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 141:5-23, 142-2:7

(Mr. Pulliam conceding that "███████████████████████████████████

████  as of the valuation date).

In the end, there is nothing to redeem Mr. Pulliam's fatally flawed reliance on the

unavailable MCM to conclude that, notwithstanding all of the independent valuation advice

Maxus received at the time of the transfers that the assets were being sold for FMV, those

experts were all wrong.  His valuation opinion is not reliable and should be excluded.

Finally, even if any of these opinions are not excluded, Mr. Pulliam should still be

precluded from testifying about the background facts in the Pulliam Report because they are

unnecessary to understand his opinions.  Instead, he simply parrots the Trust's and Oxy's one-

sided version of events, without applying any expert analysis and ignoring contrary facts.

## BACKGROUND

### I.    The Global Restructuring

#### A.    The Oxy Indemnity And YPF's Acquisition Of Maxus

In 1986 – nearly a decade before YPF acquired Maxus – an affiliate of Oxy acquired

and later merged with Diamond Shamrock Corporation's ("Diamond Shamrock") chemicals

business, Diamond Shamrock Chemicals Company ("DSCC").  D.I. 692 Ex. E ¶ 92.[3]  By that

transaction,█████████████████████████████████████████████████

████████  and thus required that Diamond Shamrock retain ownership of the Lister Site located

on the Passaic River in New Jersey (which had been used by DSCC's chemicals business) and

indemnify Oxy for certain environmental liabilities relating to DSCC.  *See id.* ¶ 98.  Diamond

Shamrock was later renamed Maxus Energy Corporation ("Maxus").  *Id.* ¶ 99.

---

[3]    D.I. 692 Ex. E is the Statement of Undisputed Facts in Support of the YPF Defendants' Motion for Partial Summary Judgment, dated April 27, 2022 and as corrected on May 5, 2022.

Following the sale of its chemicals business to Oxy, Maxus engaged in a series of asset sales and dividends. *See, e.g.*, *id.* ¶ 106. By 1995, Maxus was in dire financial straits for reasons unrelated to any environmental liabilities, having incurred losses each year from 1987 to 1994 (with the exception of 1990 and 1992). *See id.* ¶¶ 114, 123. Maxus began actively seeking a buyer. *See id.* ¶ 121.

YPF – operating solely in Argentina at the time – decided to make a bid for Maxus in order to help YPF become an international player in the oil and gas exploration and production industry. *Id.* ¶¶ 128-29. After an arm's-length process that involved multiple bidders and third-party legal and financial advisors, YPF completed its acquisition of Maxus in 1995 for a total of $5.50 per share, contingent on Maxus absorbing a portion of the acquisition financing. *See id.* ¶¶ 133, 136-38. Before the acquisition, ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ *See, e.g.*, *id.* ¶ 193. This estimated total was less than Maxus's shareholder equity following the transaction, *id.* ¶ 434; there is no evidence that Maxus, or even Oxy, believed at that time that the environmental liabilities subject to indemnification would run into the billions of dollars.

B.     Post-Acquisition, Maxus Undertakes A Global Restructuring In Order To Realize Tax And Other Benefits

In April 1995, before YPF's acquisition of Maxus was complete, Arthur Andersen advised YPF that YPF and Maxus should explore restructuring options. In particular, Arthur Andersen explained that a foreign parent to holding international subsidiaries under Maxus, a U.S. company, would not be tax efficient and would instead expose the income from these subsidiaries to an additional, costly layer of taxation in the United States. *See id.* ¶ 253

6

(Arthur Andersen stating that "it is not generally tax efficient for a foreign corporation (YPF) to own the stock of a U.S. corporation (Maxus) that, in turn, has foreign operations (*i.e.*, Indonesia, Ecuador, Bolivia.)"). *See, e.g.*, *id.* ¶ 255 (Legacy Maxus Tax Director David Smith explaining that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████. This consistent internal and external advice is, frankly, Tax 101, and the Trust has not offered an expert to dispute it.

In the months that followed, the Maxus Tax Department led efforts to devise an appropriate restructuring that would make the group more tax efficient, while also reducing the costs of servicing Maxus's expensive third-party debt. *See id.* ¶¶ 249, 263 (Legacy Maxus Tax Director David Smith explaining that one option for Maxus was "█████████████████ ██████████████████████████████ after which Maxus could ██████████████ ████████████████████████████████). *See* July 7, 2021 L. Engelbrecht Dep. Tr. [D.I. 692 Ex. 121] at 202:21-25 ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████); D.I. 692 Ex. E ¶ 300 ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████). A Maxus Tax Department memo calculated that the total tax savings of the restructuring could be $████████████ *See id.* ¶ 298.

This tax and debt restructuring ultimately was accomplished via the sale of Maxus's international assets in Bolivia, Venezuela, Ecuador, and Indonesia to a subsidiary of YPF (the

"Global Restructuring").[4]  It was repeatedly emphasized by Maxus's management (and agreed to by YPF) that any transfers of Maxus's international assets to a YPF entity would have to be done on a fair market value basis for multiple reasons, including the IRS scrutiny that the transactions would receive and potential penalties that could be assessed for any shortfall.  *See, e.g.*, *id.* ¶ 272 ██████████████████████████████████████████

██████████████████

       a)     *Bolivia And Venezuela Asset Sales*

In 1996, Maxus obtained an independent valuation of its Bolivian and Venezuelan subsidiaries from well-regarded experts at CSFB, which valued them at $149 million to $214 million, with a midpoint of $181.5 million.  *Id.* ¶ 331.  At a June 18, 1996 Maxus Board meeting to discuss the sales, Maxus General Counsel David Wadsworth reminded the Board that fair market value was required and noted that "it is proposed that the consideration for the transfer equal the higher of the fair market value of the subsidiaries and the carrying value of the assets held by such subsidiaries on the consolidated books and accounts of the Corporation as of the time of transfer."  *Id.* ¶ 316.[5]  Following a presentation by CSFB regarding the fair market valuations provided and a "general discussion" among Board members regarding "the best interests of the Corporation" with respect to the assets, the Maxus Board – including the disinterested directors whose votes were required to effectuate the transfers – unanimously approved the sale of Maxus's Bolivian and Venezuelan assets to YPFI, a newly-created wholly-owned subsidiary of YPF, for the book value of $266 million, $52 million higher than

---

[4]     In addition to addressing the tax and debt issues that were the drivers of the Global Restructuring, Maxus also underwent a separate corporate reorganization concerning Maxus's indemnity obligation to Oxy for Oxy's environmental liabilities, which is not germane to the opinions expressed in Mr. Pulliam's expert reports, and so is not further addressed here.

[5]     At the time, the book value of these subsidiaries reflected goodwill from the YPF acquisition just one year earlier.  *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 91:8-20.

the upper end of CSFB's valuation range.  *Id.* ¶¶ 279, 320.

        b)      *Ecuador And Indonesia Asset Sales*

On December 3, 1997, Maxus obtained an independent valuation from leading industry experts, Gaffney Cline & Associates ("Gaffney Cline"), which valued the Ecuadorian assets at $165 million.  *Id.* ¶ 360.  On December 22, 1997, CSFB provided a valuation of approximately $205 – 245 million.  *Id.*

Also in December 1997, Maxus obtained valuations from Gaffney Cline for its Indonesian subsidiaries, Southeast Sumatra and Northwest Java, of $286 million and $278 million, respectively.  *Id.* ¶ 356.  However, there was significant economic turmoil in Indonesia, and YPF and others were bidding on similar Indonesian assets then being marketed by Repsol, S.A.  Therefore, Maxus and YPF agreed to a provisional price of approximately $505 million for both Southeast Sumatra and Northwest Java based on YPF's bid for those similar Repsol assets, subject to upward adjustment based on the actual sales price of that similar interest if such sales price implied a higher valuation (there was no provision for a downward price adjustment in the event of a lower third party transaction).  *Id.* ¶ 351.

The Maxus Board – including its disinterested directors – unanimously approved the sale of Maxus's Indonesian and Ecuadorian assets to YPFI at its December 19, 1997 Board meeting.  *Id.* ¶ 355.  During this meeting, Maxus's CEO Mario Rosso emphasized the need to obtain fair market value and stated that Maxus management believed the prices offered for the Indonesian and Ecuadorian assets to be fair.  *Id.* ¶ 353.  William Cline of Gaffney Cline, who had performed the valuation of the Ecuadorian and Indonesian assets, was present and answered questions posed by the Maxus Board.  *Id.* ¶ 354.  The Maxus Board ultimately approved a sales price of $185.2 million for the Ecuadorian assets (exceeding the Gaffney

Cline valuation of $165 million), and $505.3 million for the Indonesian assets, which was subsequently adjusted upwards based on another third-party transaction that occurred after the sale by Maxus to YPF, for a total price of $575.3 million for the Indonesian assets. *Id.* ¶¶ 361, 357.[6]

Members of Maxus's management attended the board meetings where the Global Restructuring Transfers were discussed and approved, and as to each one expressed the opinion that the sale price equaled or exceeded FMV. *Id.* ¶¶ 314-25, 349-55.

## II.    The Evolution Of Mr. Pulliam's Opinions From The New Jersey Litigation To This Lawsuit

Almost a decade later, in late 2005, the New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund filed a complaint in New Jersey Superior Court against Oxy, Maxus, YPF, and Repsol, among others (the "New Jersey Litigation"), alleging that hazardous substances were discharged from the Lister Plant which contaminated the plant area and the lower 17-mile portion of the Passaic River. *Id.* ¶¶ 59, 65.  A few years later, in 2007, Oxy filed cross-claims against YPF and Repsol for, *inter alia*, alter ego and fraudulent transfer liability. *Id.* ¶ 458.  In these proceedings, Mr. Pulliam was designated by Oxy to opine (as relates to the YPF Era) that (1) Maxus's conduct in connection with the Global Restructuring Transfers was not consistent with an independent economic entity, and (2) the Ecuador and Indonesia asset sales prices were lower than projections made in the MCM and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Gonzalez Decl. Ex. 4, Pulliam NJ ER ¶¶ 7-8.  Mr. Pulliam's opening report in the New Jersey Litigation did not opine that any of the Global Restructuring Transfers were for less than

---

[6]       Although the IRS challenged Maxus's valuation of YPF Ecuador, Inc. in connection with the sale of the Ecuador assets, D.I. 692 Ex. E ¶ 372, Mr. Pulliam conceded that he had no basis to dispute that the IRS's challenge was later withdrawn. *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 94:17-24; D.I. 692 Ex. E ¶¶ 371-76.

FMV.

It was not until Mr. Pulliam's New Jersey rebuttal report – submitted in response to YPF's valuation expert, Professor Jack Williams – that Mr. Pulliam first purported to opine on the FMV for these transfers.  In his rebuttal report, Mr. Pulliam conceded that Maxus received FMV for the Bolivian and Venezuelan assets (an opinion he then backtracked on in this case, as described below).  *See* Gonzalez Decl. Ex. 1, Pulliam ER, Attachment 3, ¶¶ 113-17 & Table 24.  However, Mr. Pulliam opined that ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████  *Id.* ¶¶ 36, 60.

Not surprisingly given that Oxy is funding this lawsuit, controls the Trust, and has the largest economic stake in the outcome, in November 2021, the Trust engaged Oxy's expert here and submitted a new report from Mr. Pulliam in this action.  In his opening report, Mr. Pulliam once again addressed two limited questions:  (1) whether Maxus's conduct in completing the assets sales were consistent with the actions of an "independent economic entity," and (2) whether Maxus's assets were sold for fair market value.  Gonzalez Decl. Ex. 1, Pulliam ER ¶ 9.  Unlike his initial report in the New Jersey Litigation, Mr. Pulliam addressed FMV (but not reasonably equivalent value) in his opening report, including by attaching and incorporating the rebuttal report – but, oddly, not his opening report – that he submitted in the New Jersey Litigation.  *See* Gonzalez Decl. Ex. 1, Pulliam ER, Attachment 3.  The reasons will become obvious upon review of the details below.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 ("Rule 702"), made applicable here through Rule 9017 of

the Federal Rules of Bankruptcy Procedure, provides a "trilogy of restrictions on expert testimony: qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (internal citation omitted); *see* Fed. R. Evid. 702. Courts determining whether expert testimony is admissible in this Circuit thus require (1) that the expert be qualified through "specialized expertise;" and that the testimony be (2) reliable, meaning that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation,'" and (3) "relevant for the purposes of the case and must assist the trier of fact." *Id.* (internal citation omitted). The party putting forward the expert testimony must establish each of Rule 702's requirements by a preponderance of the evidence. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).

## **ARGUMENT**

### I.    **The Court Should Exclude Mr. Pulliam's Independence Opinion**

Mr. Pulliam purports to opine that ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ (the "Independence Opinion"). Gonzalez Decl. Ex. 1, Pulliam ER ¶ 9. But it is indisputable that Maxus was not an independent E&P company; it was a member of a corporate group and therefore, Mr. Pulliam's opinion that ████████████ ████████████████████████████ is completely irrelevant. Moreover, his Independence Opinion is based solely on cherry-picked facts, none of which are particularly complex and none of which he opines would ordinarily apply to intra-group transactions, including that (1) Maxus did not market to third parties the assets it intended to sell to YPFI as part of the Global Restructuring; and (2) some (but not all) members of the Maxus Board of

Directors who approved the Global Restructuring Transfers were YPF employees. *See, e.g.*, *id.* ¶¶ 49-50, 59, 71-73. As explained below, the Independence Opinion fails at each step of the Rule 702 "trilogy": it is not relevant or helpful to the trier of fact, Mr. Pulliam is not qualified to offer it, and it is not reliable.

A.    <u>Mr. Pulliam's Independence Opinion Is Neither Relevant Nor Helpful</u>

Rule 702 provides that an expert's opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Calhoun*, 350 F.3d at 321 (characterizing this prong as requiring "fit"). To be "helpful," the expert testimony must – at minimum – meet the relevance requirement of Rule 401. Fed. R. Evid 702(a); *see* Fed. R. Evid. 401 (evidence is relevant if it has any tendency to make a fact more or less probable than it would be without evidence, and if the fact in issue is of consequence in determining the action). But even more, expert testimony must help the trier of fact by applying specialized knowledge; an expert may not simply act as a mouthpiece for counsel in spinning a one-sided narrative of the facts. *See BASF Corp. v. Johnson Matthey, Inc.*, Civil Action No. 14-1204-RGA, 2018 WL 2729123, at *1 (D. Del. June 6, 2018) (court should exclude "expert" testimony that "outlines the closing argument one might expect [a] lawyer to make" based on "the underlying documents" instead of applying specialized knowledge). The Independence Opinion flunks this standard.

*First*, Mr. Pulliam's opinion that  is not relevant. By his own admission, Mr. Pulliam's definition of an "independent" company for purposes of his Independence Opinion is a company that either lacks a parent or controlling shareholder, or that transacts

with an unrelated third party.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 46:4-48:8.  But as Mr.

Pulliam conceded, at the time of the Global Restructuring Transfers, Maxus did not meet this

definition because it was a wholly-owned, indirect subsidiary of its ultimate parent company,

YPF, *see* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 48:9-16, and one of the key purposes of

the Global Restructuring Transfers – to minimize income tax expense for the YPF corporate

group – by definition involved a subsidiary (Maxus) transacting with its parent (YPF).

Whether Maxus functioned as if it were an "independent entity," as defined by Mr.

Pulliam in connection with the Global Restructuring, is not relevant to any claim or defense in

this case – even the Trust does not claim it is.  On its alter ego claim, the Trust must show (i)

that the companies operated as a "single economic unit;" and (ii) the presence of an overall

element of "injustice or unfairness." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 555 (Bankr.

D. Del. 2012).  But no part of that test depends on whether a subsidiary's conduct is

"consistent" with the conduct of a hypothetical company without a parent or controlling

shareholder or that transacts with an unrelated third party.  Gonzalez Decl. Ex. 1, Pulliam ER ¶

5.  On the contrary, even a lack of independence under Mr. Pulliam's definition – *e.g.*, the fact

that the parent-subsidiary relationship reflects the "type of conduct [that] is typical of a

majority shareholder or parent corporation" – is not sufficient to establish an alter ego

relationship as a matter of law. *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1460 (2d Cir. 1995)

(applying Delaware law).  Indeed, "[e]ven the exercise of a significant degree of control by a

parent over a subsidiary will not suffice to warrant the disregard of separate corporate entities."

*Upjohn Co. v. Syntro Corp.*, CIV. A. No. 89-107-JJF, 1990 WL 79232, at *4 (D. Del. Mar. 9,

1990).[7]

---

[7]    While these cases show that it might be relevant if the parent's domination and control of its subsidiary
exceeded that of a typical parent, Mr. Pulliam expressly disclaimed offering any such opinion.  Gonzalez Decl. Ex. 3,

*Second*, even if relevant, Mr. Pulliam's Independence Opinion relies on speculation as

to the intent or state of mind of others.  For example, Mr. Pulliam opines that the

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████        Gonzalez Decl. Ex. 1, Pulliam ER ¶ 9.  This kind of speculation to the intent or

state of mind of others is impermissible.  *See Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F.

Supp. 2d 431, 443 (D. Del. 2004) (finding that expert witnesses cannot testify regarding a

defendant's "intent, motive, or state of mind, or evidence by which such state of mind may be

inferred"); *AstraZeneca LP v. TAP Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del.

2006) (precluding expert opinion of what party recognized, felt, concluded, or was concerned

about, as expert witnesses cannot testify about the subjective state of mind of a party); *see also*

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.*, No. 13-cv-324 (RGA), 2017 WL

3528606, at *5 (D. Del. Aug. 16, 2017) (intent is not a proper topic for expert testimony).

> B.    <u>Mr. Pulliam Lacks The Expertise To Opine On Whether Maxus's Conduct Was
> Consistent With That Of An Independent Entity</u>

Even if some part of the Independence Opinion were both relevant and helpful to the

trier of fact, Mr. Pulliam lacks the "scientific, technical, or other specialized knowledge"

required to testify about it.  Fed. R. Evid. 702; *Calhoun*, 350 F.3d at 320.  Mr. Pulliam

describes himself as an economist specializing on "valuation matters."  Gonzalez Decl. Ex.

1, Pulliam ER ¶¶ 1-2.  But that does not make him qualified to testify as to corporate

governance, because expertise in one area is not sufficient to qualify as an expert even on an

---

Pulliam Dep. Tr. at 48:17-23 (testifying he was not offering any opinion as to whether the Global Restructuring

Transfers were ████████████████████████████████████████████).

*adjacent* topic – and valuation and corporate governance are wholly different disciplines.

*See Player v. Motiva Enters. LLC*, No. Civ. 02–3216(RBK), 2006 WL 166452, at *5-6

(D.N.J. Jan. 20, 2006) (expert experienced in appraising property could not testify on

devaluation of plaintiff's property resulting from contamination, because expert lacked

knowledge regarding contamination issues specifically); *In re Opus East*, 528 B.R. 30, 58-59

(Bankr. D. Del. 2015) (rejecting expert as unqualified where his opinion that companies had

operated as a single entity was based only on his personal experiencing serving on corporate

boards, he had never testified on the issue of a subsidiary's independence, and he was not an

attorney).

    While Mr. Pulliam opines that ████████████████████████████ he in fact

acknowledged that he lacks any qualifications or relevant expertise in the topic of corporate

governance. Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 37:15-17. Moreover, Mr. Pulliam is

particularly unqualified to opine on corporate governance in the context of a corporate

restructuring. He has never advised a board considering a transfer among affiliates,

Gonzalez Decl. Ex. 5, Pulliam NJ Dep. Tr. at 48:12-19, and he has never sat on any board of

directors, other than that of his own consulting firm, Econ One. Gonzalez Decl. Ex. 5,

Pulliam NJ Dep. Tr. at 48:20-49:1. *See also* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at

35:15-36:16 (testifying that Mr. Pulliam truthfully and accurately testified in his New Jersey

deposition, including with respect to questions about his professional experience).

    C.    <u>Mr. Pulliam's Independence Opinion Is Based On A Cherry-Picking Of The Record, Not A Reliable Analysis</u>

    Finally, the Court should also exclude Mr. Pulliam's Independence Opinion because it is

not based on a reliable analysis, but rather is nothing more than an exercise in cherry-picking

the factual record to support a pre-ordained conclusion. For an expert's testimony to be reliable

under Rule 702, an expert cannot selectively choose his support and disregard relevant records.
*See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 461-62 (E.D.
Pa. 2014); *see also Faulkner v. Arista Recs.*, 46 F. Supp. 3d 365, 281 (S.D.N.Y. 2014).

That is exactly what Mr. Pulliam has done here. His Independence Opinion is nothing
more than a summary review of factual evidence which Mr. Pulliam then concludes supports the
Trust's position that the Global Restructuring Transfers ███████████████████████████
███████████████████████ " but instead allegedly reflect an effort to benefit YPF ████████
██████ for environmental creditors. Gonzalez Decl. Ex. 1, Pulliam ER ¶ 9.

As noted above, the stated rationales for the Global Restructuring Transfers (repeated
again and again in documents Mr. Pulliam simply ignores) were to minimize income tax expense
for the entire YPF corporate group while reducing Maxus's debt burden, not to obtain cash from
a third party for Maxus's assets. *See supra* at 6-8. Maxus's management repeatedly emphasized
(as agreed to by YPF) that any transfer of Maxus's international assets to a YPF entity would
have to be done on a fair market basis, and it received third party expert opinions that the sale
prices did reflect fair market value. *See id.* at 8. In any event, each of the Global Restructuring
Transfers was unanimously approved by the Maxus Board's disinterested directors – indeed, this
was a requirement to effectuate the sale of the Bolivia and Venezuela assets. *See id.* at 8-10.

Remarkably, Mr. Pulliam ignores every one of these facts (and many others). Indeed, the
only acknowledgement of the factual context for the Global Restructuring Transfers in his report
is to refer to a "restructuring" (in scare quotes) as if to imply he has concluded that the
restructuring was a sham (even though he does not discuss the issue at all). *See, e.g.*, Gonzalez
Decl. Ex. 1, Pulliam ER ¶ 44. He thus views the cherry-picked facts he selected through the
wrong lens, as if these transfers were sales to third parties whose sole purpose was to obtain the

17

highest possible price. *See, e.g.*, *id.* ¶ 74 ██████████████████████████

██████████████████████████████████████[8] But the fact that Maxus did not

market its assets is wholly unremarkable in the context of a corporate restructuring. Mr. Pulliam

never contends otherwise. At minimum, he never explains why the Court should disregard

contrary explanations or provides a reliable basis for his conclusions.

## II.    The Court Should Exclude Mr. Pulliam's Valuation Opinion

Mr. Pulliam's second opinion is that Maxus did not receive FMV for ██████████████

██████████████████████████████████████ (the "Valuation

Opinion"). Gonzalez Decl. Ex. 1, Pulliam ER ¶ 9. This Valuation Opinion is based on an utterly

unreliable foundation – the unavailable MCM – which Mr. Pulliam cannot save through his also

unreliable "corroboration." For the reasons explained below, it should also be excluded.

### A.    Mr. Pulliam Should Be Precluded From Giving An Opinion On REV

At the threshold, despite purporting to ████████████████████████████

██████████████████████ Gonzalez Decl. Ex. 1, Pulliam ER ¶ 10, Mr.

Pulliam disclaimed offering any such opinion in his deposition. Gonzalez Decl. Ex. 3, Pulliam

Dep. Tr. at 48:24-49:25. Instead, Mr. Pulliam simply compares the consideration Maxus

received to his FMV conclusions (discussed below). *Id.* But FMV is *not* the same as REV.

FMV is a valuation standard that measures "value-in-exchange" and assumes a hypothetical

buyer and a hypothetical seller, neither under compulsion to act. However, REV not only

includes direct benefits determined by the FMV standard (*i.e.*, the funds paid), but also indirect

---

[8]    As Professor Macey observed, ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Expert Report of Prof. Jonathan R. Macey, dated Dec. 17,
2021 [D.I. 692 Ex. 119] ¶ 172.

benefits (*i.e.*, lower taxes, lower financing cost, etc.).  *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) ("However, in evaluating whether reasonably equivalent value has been given the debtor under section 548, indirect benefits may also be evaluated.").  Indeed, selling for less than FMV is often found to be consistent with REV.  *See In re Nickelson*, Case No. 15-01271-NPO, 2016 WL 690954, at *10 (Bankr. S.D. Miss. Feb. 19, 2016) (70% of the value was considered REV in the sale of a mobile home); *In re Glaser*, No. 01-10220-SSM, 2002 WL 32375007, at *7 (Bankr. E.D. Va. Oct. 25, 2002) (66-68% of market value was "reasonably equivalent").[9]  Because Mr. Pulliam disclaimed offering any REV opinion at his deposition, he should be precluded from testifying on this issue at trial.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 49:18-25.

>   B.   Mr. Pulliam's Reliance On The MCM Renders His Entire Valuation Opinion Unreliable

While FMV may be relevant to the ultimate determination of REV, Mr. Pulliam's opinions on FMV should nonetheless be excluded because they are fundamentally unreliable. Rule 702 requires that expert testimony be "the product of reliable principles and methods." Fed. R. Evid. 702(c).  *See also* Fed. R. Evid. 702(d) (requiring an expert to also reliably apply the principles and methods to the facts of the case).  *Every* step in the analysis must be reliable, such that *any* step that renders the analysis unreliable renders the expert's testimony inadmissible.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).  Federal Rule of Evidence 703 ("Rule 703") similarly allows experts to rely on data only if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703; *see, e.g., Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*,

---

[9]   According to Mr. Pulliam's flawed calculations, Maxus received 73.7% of FMV for the assets transferred as part of the Global Restructuring, which the Court could find constitutes REV.  *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 54:25-55:6.

350 F. Supp. 2d 582, 589-92 (D. Del. 2004) (excluding damages testimony because expert used no expertise to evaluate marketing estimate's source materials and did not know what data represented or how it was compiled).

The centerpiece of Mr. Pulliam's Valuation Opinion is the MCM.  Rather than construct his own independent valuation model, Mr. Pulliam concludes, for each of the Global Restructuring Transfers, that the MCM's output is FMV.  *See* Gonzalez Decl. Ex. 1, Pulliam ER ¶ 46, Figure 1 (equating MCM values with FMV for Bolivia and Venezuela assets); *id.* ¶¶ 101-02, Figure 3 (equating MCM values with FMV for Ecuador and Indonesia assets).

Before deeming FMV to equal the output of this "model" (notwithstanding the contemporaneous views of third party experts), an expert such as Mr. Pulliam was required to have – at a minimum – performed the necessary due diligence to confirm that this "model" is accurate and reliable.  Indeed, Mr. Pulliam conceded that this is part of the job of a valuation expert, and something he routinely does in other cases.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 64:3-21.  Yet not only did he indisputably not do that here, but Mr. Pulliam acknowledged that he has never seen (let alone tested) the MCM itself.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 66:3-11.[10]  This renders Mr. Pulliam's valuation opinion unreliable.  *See Legendary Art LLC v. Godard*, Civil Action No. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) (excluding expert damages testimony where expert had no familiarity with methods used to create projections); *MOSAID Techs. Inc. v. LSI Corp.*, Civil Action No. 10-192-RGA, 2014 WL

---

[10]    This is not because there are no cash flow projections with detailed explanations of their underlying assumptions in the record and therefore the MCM was the only evidence available to Mr. Pulliam; to the contrary, there *are* detailed contemporaneous projections prepared by Maxus management in the record, but Mr. Pulliam just chose to ignore them.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 63:20-64:2; Gonzalez Decl. Ex. 6, International Upstream Operations (Maxus Energy Corporation) Five Year Outlook.  Mr. Pulliam guessed that these detailed projections (which he referred to as "F&O projections") "fed into" the MCM, but he conceded that was just speculation, Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 84:19-86:4, and has no document or testimony supporting his speculation.

807877, at *2-3 (D. Del. Feb. 28, 2014) (excluding expert testimony where expert did not verify several central assumptions in a business plan); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (excluding expert's damages testimony based on business plan because expert did not know the assumptions upon which the business plan estimates were based).

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████,

*see* Gonzalez Decl. Ex. 7, Memo from Monty Kehl, dated Feb. 9, 1996 at YPF-AK-0054956, which is reproduced in its entirety below:



The lone assumptions that can be gleaned from this one-page document are (1) the reference date of ████████████ six months before these assets were ultimately sold to YPFI; (2) the discount rate of ██% (with no explanation of how that was derived); and (3) the use of

"███████████" (again, with no explanation of what that even means).  Gonzalez Decl. Ex. 7, Memo from Monty Kehl, dated Feb. 9, 1996 at YPF-AK-0054956.  Mr. Pulliam concedes that no other inputs or assumptions are reflected in this document.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 68:24-69:4.

Mr. Pulliam admitted that he has not seen the cash flow projections that he assumes were part of the MCM used to arrive at these values for the Bolivia and Venezuela (and other) assets. *Id.* at 78:1-3.  Mr. Pulliam was also unable to determine the assumptions underlying the cash flow projections, *id.* at 79:21-80:3, including as to operating expenses, *id.* at 81:19-24, or reserve risking factors.  *Id.* at 82:6-13.  As to even the assumptions that are apparent from the document, Mr. Pulliam does not know why they were selected.[11]  For example, Mr. Pulliam could not explain – other than to speculate – why Maxus chose to use a ██% discount rate, *id.* at 108:25-109:16, or what "pricing" the "███████████" assumption reflects.  *Id.* at 69:23-71:5.

The MCM outputs on which Mr. Pulliam relies for the FMV of the Ecuador and Indonesia assets are even more limited, again consisting of ██████████████████████ ████████████████████████████████████ ████████████████.

---

[11] Maxus Tax Director David Smith testified that different inputs may have been used for different reasons. *See, e.g.*, Oct. 21, 2020 D. Smith Dep. Tr. [D.I. 692 Ex. 103] at 112:11-21 ████████████ ████████████████████████████



Gonzalez Decl. Ex. 8, Maxus Energy Corporation Asset Evaluation Review, dated Sept. 23, 1997 at AA-YPF-0033109.  For the Ecuador valuation, the only assumptions or inputs reflected in the document are the assumption of the ████████████████████████████ ███████████████████████████████████████ *See id.*; Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 72:19-73:3.  For the Indonesia valuation, as Mr. Pulliam conceded, no input information or assumptions are provided *at all*.  *Id.* at 74:12-14.[12]

Mr. Pulliam testified that he believed the discount rate used to generate these outputs was ██%.  *Id.* at 157:22-24.  But he admitted that was mere speculation.  *Id.* at 111:23-112:9.  In fact, Mr. Pulliam conceded that Maxus generally used a higher ██% discount rate.  *Id.* at 110:4-111:13.

---

[12]    The date of the document is September 23, 1997 – months before the Ecuadorian and Indonesian assets were sold in December 1997.  *See* Gonzalez Decl. Ex. 8, Maxus Energy Corporation Asset Evaluation Review, dated Sept. 23, 1997 at AA-YPF-0033109.  However, it is unclear whether September 1997 provides the reference point for the MCM calculations, or was simply when this document (consisting solely of this comparison chart) was prepared.  If the latter, the record offers no clue as to the reference date.

At bottom, in order to justify his blind reliance on the MCM, Mr. Pulliam can only cite the truism that a company's management arguably may be better placed than others to predict the company's financial future and thus its FMV.  *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 88:24-90:14.  To the extent Mr. Pulliam tries to substitute the Maxus management team's expertise for his own analysis, however, that not only does it not save his fatal reliance on the MCM but it dooms it.  Maxus's management attended the Maxus Board meetings during which valuations of the assets sold in the Global Restructuring were discussed and approved, without a single one of them ever raising a concern that the MCM was not being used or that Maxus's independent valuation experts got it wrong.  *See* D.I. 692 Ex. E ¶ 369.  And as Mr. Pulliam remarkably omitted from his reports but conceded at his deposition, the minutes of these meetings reflect that Maxus management advised the Board that they believed the transfer prices for each of the Global Restructuring Transfers *equaled or exceeded FMV*.  *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 136:14-19, 138:6-19; *see also id.* at 155:4-16.

At the end of the day, internal valuation models are used for a variety of purposes, some of which have nothing to do with what management anticipates a willing buyer will pay for a company's assets.  Here, the evidence that those responsible for the MCM considered the opinions of third parties hired for this purpose to be a more reliable estimate of FMV is uncontroverted, and Mr. Pulliam's exclusive reliance on the two pages of MCM output without any information about them renders his entire Valuation Opinion unreliable.

C.    <u>Mr. Pulliam's Valuation Opinion Is Unhelpful Because It Consists Solely Of A Numerical Comparison That A Layperson Is Capable Of Making</u>

Even were it acceptable for Mr. Pulliam to simply accept the MCM values as FMV, his opinion is nothing more than a comparison of two sets of numbers (the MCM values against the sale prices).  In this respect, Mr. Pulliam's Valuation Opinion is not only unreliable but also

unhelpful to the trier of fact.  At a minimum, a proffered expert witness "must possess skill or knowledge greater than the average layman."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  It does not take an expert to determine, as between two numbers, which one is higher. *See Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704-MAK, 2022 WL 3021560, at *19 (D. Del. July 29, 2022) (excluding an expert's testimony which added and multiplied numbers provided by the plaintiff because addition and multiplication are "not a specialized form of knowledge" for which expert is required).

> D.  Mr. Pulliam's Attempts To "Corroborate" The MCM Values Are Themselves Unreliable

Rather than attempt to perform his own valuation, Mr. Pulliam instead purports to make certain "adjustments" to *other* parties' valuation estimates for the sole purpose of corroborating the MCM.  *See, e.g.*, Gonzalez Decl. Ex. 1, Pulliam ER ¶¶ 41-42.  But Mr. Pulliam's adjustments, which he makes to (a) discount rates and (b) cash flows, are (as he conceded) based either on error or sheer speculation, making those adjustments themselves unreliable.

> a)  *Mr. Pulliam's Adjustment To Professor Williams's Discount Rates*

Most of Mr. Pulliam's discount rate methodology is generally accepted – the part he borrows from YPF's valuation expert, Professor Jack Williams.  But Mr. Pulliam purports to make "adjustments" to that generally-accepted analysis that have no basis in the methodology he purports to apply, with the effect of artificially increasing the estimated value of the assets being assessed in every situation.

In his deposition, Mr. Pulliam acknowledged that he relies on his own modifications to Professor Williams's analysis to inform his Valuation Opinion in this case.  Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 29:22-30:9.  In his New Jersey Litigation rebuttal report (which forms the

basis of Mr. Pulliam's discount-rate opinions in the present case), Mr. Pulliam used the discount

rate models proposed by Professor Williams with what he called "corrections." *Id.* at 97:11-19.

Mr. Pulliam claims the disagreements between the discount rate methodology used by

Mr. Pulliam and Professor Williams are ████████████████████████████████

████████████████████████ – the relative risk-based premium associated with

investing in a particular country. *See* Gonzalez Decl. Ex. 2, Pulliam Reply ER ¶ 33; *see also*

Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 99:2-5. Asserting that Professor Williams has ████

████████████ Mr. Pulliam ████████████" to Professor Williams's valuation

model by using the "Godfrey-Espinosa" model. Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at

100:4-15. Although Mr. Pulliam acknowledged that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ *See generally id.* at 115:1-117:10; 175:9-177:11; *see also* Gonzalez

Decl. Ex. 9, S. Godfrey and R. Espinosa, A Practical Approach to Calculating Costs of Equity

for Investments in Emerging Markets, JOURNAL OF APPLIED CORPORATE FINANCE, Vol.

9.3, Fall 1996.

As Mr. Pulliam acknowledged in his deposition, ████████████████████████

████████████████████████████████████████████████████

████████████████ *Id.* at 87-88; Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 177:4-11. But in

implementing the Godfrey-Espinosa model, Mr. Pulliam did *not* make this model-mandated

comparison between the local equity market and the U.S. market. *Id.* at 115:20-116:4; Gonzalez

Decl. Ex. 1, Pulliam ER, Attachment 3 ¶¶ 106-108; Gonzalez Decl. Ex. 2, Pulliam Reply ER ¶

37. Mr. Pulliam instead admitted that he used the relative volatility calculations of Professor

Williams, who did *not* apply the Godfrey-Espinosa model but instead used a different methodology comparing the local market's relative volatility to that of developed markets generally (which is higher than that of the U.S.). *See* Expert Report of Prof. Jack Williams, dated Dec. 17, 2021 [D.I. 692 Ex. 257] Appendix E-13. By making this error, Mr. Pulliam under-calculated the relative volatility input into the Godfrey Espinosa model that he purported to apply, *id.*, which resulted in under-stating the cost of equity and over-stating FMV. Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 119:4-120:17.[13] Each of Mr. Pulliam's attempts to "corroborate" the MCM are infected by this conceded error. Those opinions lack a reliable foundation for this reason alone.

b)    *Mr. Pulliam's Adjustments To Cash Flows*

In any event, Mr. Pulliam also makes adjustments to the cash flows used in others' valuation models that only serve to make these corroboration opinions more unreliable.



For example, Mr. Pulliam ████████████████████████████████ ████████████████████████████ which began production after the June 1996 transfer to YPFI. Gonzalez Decl. Ex. 1, Pulliam ER ¶¶ 62, 66-68. But Mr. Pulliam conceded that ██ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████ Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 140:15-23. And Mr. Pulliam also conceded that "████████████████████████████████ ████████████ as of the valuation date. *Id.* at 141:5-23, 142-2:7. So he just made it up.

---

[13]    The errors in Mr. Pulliam's analysis may be attributable to his lack of expertise in valuing oil and gas businesses in emerging market countries. *See* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 102:12-23, 103:8-12. Mr. Pulliam admitted that he has never used the Godfrey-Espinosa model in any matter outside of this case. *Id.* at 113:21-24] (██████████████████████████████████████████ ").

As another example, Mr. Pulliam claimed that ████████████████████████ ████████████████████████ Gonzalez Decl. Ex. 2, Pulliam Reply ER ¶¶ 77-78.  But he was forced to concede at his deposition that ████████████████████████ ████ Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 161:15-25.  Mr. Pulliam tried to save this aspect of his opinion by saying that ████████████████████████████ ████████████████ *Id.* at 162:21-163:5.

Finally, with respect to the Ecuadorian assets, Mr. Pulliam's adjustments reflect his confusion about a fundamental difference between the Gaffney Cline and the CSFB valuations, and this confusion leads Mr. Pulliam to mix apples and oranges.  Specifically, as Mr. Pulliam ignores, Gaffney Cline valued Maxus's reserves in Ecuador, Gonzalez Decl. Ex. 1, Pulliam ER ¶¶ 100, 105, whereas CSFB valued the Ecuador businesses as a going concern (the latter is what was sold in the Global Restructuring).  *Id.* ¶ 100.  Mr. Pulliam thus erred when he "adjusted" the Gaffney Cline valuation by adding the $████████ in non-property, plant, and equipment ("PP&E") reflected in CSFB's analysis.  *Id.*, Attachment 3 ¶¶ 34-35.  This is so because what Mr. Pulliam fails to do is add back the corporate overhead cost, which would not be a part of an estimation of Ecuador's PP&E asset value by Gaffney Cline – because it focused solely on valuing reserves – but was accounted for in CSFB's valuation.  In essence, Mr. Pulliam added non-operating enterprise values to an asset level valuation without adding in the corporate overhead expenses necessary to derive an enterprise level value.

## III.    The Court Should Exclude Mr. Pulliam's "Background" Narrative Testimony

Even if the Court does not exclude Mr. Pulliam's Independence and Valuation Opinions in their entirety, Mr. Pulliam's factual recitation of the Global Restructuring Transfers remains inappropriate and should be excluded.  In providing factual background for the Global

Restructuring Transfers, Mr. Pulliam ignores large portions of the record and instead highlights what he views as facts that are unhelpful to the YPF Defendants – all while applying no analysis. To provide just one example, Mr. Pulliam asserts without any analysis (and apropos of no opinion he offers) that prior to the YPF acquisition, Maxus was one of the largest independent oil and gas E&P companies, ███████████████████████████████████████████████

███████ Gonzalez Decl. Ex. 1, Pulliam ER ¶ 11.  In implying from that that Maxus was in a robust financial condition before the Global Restructuring (which is the opposite of what the Trust's other expert Todd Menenberg asserts for that period), Mr. Pulliam ignores large swaths of evidence of Maxus's financial and operating difficulties before it was acquired by YPF.  *See* D.I. 692 Ex. E ¶¶ 113-14; *see also* Gonzalez Decl. Ex. 3, Pulliam Dep. Tr. at 58:20-59:7 (Mr. Pulliam admitting that ████████████████████████████████████████████████████

██████████████████████████████████████████

Not only do these cherry-picked facts contradict other evidence in the record, but all of this information can be gleaned from the documents themselves – therefore requiring no expert analysis whatsoever.  An expert is not permitted to simply recite facts and pair them with bare assertions.  *See Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC,* No. 13-CV-324 (RGA), 2017 WL 3528606, at *4 (D. Del. Aug. 16, 2017) (finding that jury is capable of assessing the facts narrated by an expert in his report where expert offered no additional analysis); *In re Ampal-Am. Israel Corp.*, Case No. 12-13689 (SMB), 2020 WL 2529337, at *4 (S.D.N.Y. May 14, 2020) (stating that an expert should not testify about the factual background of the case because such material is properly presented through percipient witnesses and documentary evidence).  The "facts" cited by Mr. Pulliam are not used in any of the "analysis" he purports to do – he accepts the MCM blindly, he makes incorrect adjustments to Professor

Williams's model not based on the record, and Mr. Pulliam's adjustments to the CSFB and Gaffney Cline valuations are likewise not rooted in his cherry-picked facts.

## CONCLUSION

For the forgoing reasons, the YPF Defendants respectfully request that the Pulliam Report be excluded in its entirety.

Date:   October 27, 2022
Wilmington, Delaware

<div style="margin-left: 45%;">

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        jenner@lrclaw.com

-and-

</div>

**SIDLEY AUSTIN LLP**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

John J. Kuster (*pro hac vice*)
Andrew P. Propps (*pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

Jeffrey A. Rosenthal (*pro hac vice*)
Ari D. MacKinnon (*pro hac vice*)
Mark E. McDonald (*pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000

*Counsel for the YPF Defendants*