## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Maxus Energy Corporation, *et al.*, | Case No. 16-11501 (CTG) |
| Debtors. | Jointly Administered |
| Maxus Liquidating Trust, | |
| Plaintiff, | Adv. Pro. No. 18-50489 (CTG) |
| v. | **Related Docket No. 753** |
| YPF S.A., YPF International, S.A., YPF Holdings, Inc., CLH Holdings, Inc., Repsol, S.A., Repsol Exploración, S.A, Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited and Repsol Services Co., | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

This lawsuit is brought by the Trust established out of the bankruptcy of Maxus Energy Corporation against two of the debtors' former owners and their affiliates.[1]   For decades, the debtors have faced the prospect of substantial environmental liabilities arising from the discharge of toxic chemicals into the Passaic River in Newark, New Jersey.   The theory of this lawsuit is that, when faced with those liabilities, the debtors, at the behest of their former owners, engaged in a

---

[1] Plaintiff Maxus Liquidating Trust is referred to as the "Trust."   The main bankruptcy case, *In re Maxus Energy Corporation, et al.,* is Bankr. D. Del. No. 16-11501.   YPF S.A. and its affiliates who are named as defendants are referred to as "YPF."   Repsol, S.A. and its affiliates who are named as defendants are referred to as "Repsol."

series of transactions intended to move value to its corporate affiliates where it would be outside the reach of the company's creditors. This action, filed in June 2018, asserts claims for fraudulent conveyance, alter ego liability, unjust enrichment, and civil conspiracy.

While the corporate histories and various transactions dating back to the 1970s (and earlier) are complex, for purposes of this motion, the critical facts are that Maxus and its affiliates, as well as Occidental Chemical Corporation, were subject to the environmental liabilities at issue.[2] Importantly, however, in connection with a 1986 transaction, Maxus had agreed to indemnify Occidental for those liabilities. As Judge Sontchi explained in a careful and thorough summary judgment opinion issued shortly before his retirement from this Court (upon which this case was transferred to the undersigned judge), YPF acquired Maxus in 1995. Repsol, in turn, acquired YPF (and thus Maxus) in 1999.[3]

The New Jersey Department of Environmental Protection filed suit in 2005 in the Superior Court of New Jersey, Essex County on the underlying environmental claims arising out of the contamination of the Passaic River. The defendants in that action included Maxus and Occidental. That lawsuit also included fraudulent conveyance and alter ego claims against Repsol and YPF that are similar to those asserted by the Trust in this lawsuit.

---

[2] Occidental Chemical Corporation is referred to as "Occidental."

[3] D.I. 738 at 11-12, 16-17.

In the New Jersey lawsuit, Occidental asserted crossclaims against Maxus, Repsol and YPF.  In connection with its crossclaims against Repsol, Occidental contended that Repsol had put "at issue" legal advice it had received from its counsel. Occidental thus argued that Repsol had waived the attorney-client privilege as to the subject-matter of that advice.  The New Jersey Superior Court agreed with Occidental and, after an *in-camera* review, required Repsol to produce some (but not all) of the documents as to which Repsol had asserted privilege.

Certain of those documents were in Maxus' possession upon the filing of the bankruptcy and were thus transferred to the Trust when the plan became effective. The Trust has trumpeted those documents in this litigation, including in its motion for summary judgment.  Repsol has responded by arguing that the Trust has taken portions of those documents out of context.  The question now before the Court is whether that is *all* Repsol has done.  The Trust says that Repsol has gone further than that, making affirmative use of the legal advice contained in those documents in a way that amounts to a new waiver of the attorney-client privilege.  Because that alleged waiver has taken place before this Court, the Trust argues that this Court should order the production of all of the documents otherwise claimed as privileged, including those that the New Jersey Superior Court did not require Repsol to produce.

Whether Repsol made affirmative use of the privileged communications, or simply sought to respond to and contextualize the Trust's use, is a close question.  If the Court were required to resolve that question, it would likely find that Repsol was merely responding to the Trust's statements and had not, in this Court, put the

privileged communications "at issue."  But in light of the procedural posture of this dispute, the Court does not believe it is required to resolve that close question.  The Trust never sought the production of those documents until after the resolution of summary judgment.  To the extent the affirmative reliance on otherwise privileged communications prejudiced the Trust in connection with this Court's summary judgment decision, the motion comes too late for any remedy in that respect.  The summary judgment ruling is in the rear-view mirror; this case is now proceeding to trial in March and April of 2023.

The Trust is entitled, however, to be protected against the affirmative use of otherwise privileged communications at trial (at least without having access to the underlying material necessary to test such a claim).  In that regard, though, it is noteworthy that Repsol, in addition to arguing that it did not put any legal advice at issue in connection with summary judgment, has also made clear that it does not intend to put any such advice at issue during trial.[4]

As a result of that suggestion, there is a fairly obvious way to protect the Trust against Repsol's potential use of the privilege as a sword rather than a shield without deploying the draconian remedy of compelling the production of otherwise privileged communications.  This Court can and will enforce Repsol's promise.  The Court will not permit Repsol to weaponize the privilege by introducing otherwise privileged communications into evidence at trial, other than to the extent necessary to permit

---

[4] Nov. 8, 2022 Hr'g Tr. at 51.

Repsol to contextualize the Trust's use of the documents it already has. The Court will accordingly deny the Trust's motion to compel.

## Factual and Procedural Background

As the parties indicated at argument on the Motion, while this lawsuit has a long and complex history, the resolution of the dispute now before this Court requires an understanding of only a handful of facts.

1.    **Environmental liabilities.**    Maxus has environmental liabilities dating back to the early 1950s when, in connection with the production of Agent Orange, its predecessors discharged dioxins into the Passaic River from a former manufacturing facility located on Lister Avenue in Newark, New Jersey.[5] The U.S. Environmental Protection Agency identified contamination at the Lister Site in 1982 and required Maxus to start clean-up immediately to prevent the spread of contamination.[6] Occidental acquired Maxus' chemical business in 1986, and Maxus contractually agreed to defend and indemnify Occidental for environmental liabilities arising from the contaminated sites, including the Lister Site.[7]

2.    **New Jersey lawsuit.**    In December 2005, the New Jersey Department of Environmental Protection sued Maxus, Repsol, YPF, Occidental, and their affiliates in the Superior Court of New Jersey, Essex County.[8] The New Jersey

---

[5] D.I. 738 at 5.

[6] *Id.* at 8.

[7] *Id.* at 6.

[8] D.I. 738 at 18-19. The New Jersey Department of Environmental Protection is referred to as the "Department of Environmental Protection." The New Jersey state court lawsuit is captioned *N.J. Dep't of Env't Prot. v. Occidental Chem. Corp., et al.*, No. ESX-L9868-05 (N.J. Super. Ct. Mar. 13, 2012).

lawsuit sought to recover against Maxus on its environmental claims arising out of the Lister Site under the New Jersey Spill Act and the Water Pollution Control Act.[9] In addition to seeking to recover against Maxus on the underlying environmental claims, the Department of Environmental Protection also argued that Maxus had transferred, to its former owners YPF and Repsol (and their affiliates), assets that would otherwise be available to satisfy the underlying environmental liabilities. It thus asserted fraudulent conveyance and alter ego claims against those defendants. Occidental (in addition to denying liability) filed crossclaims against Maxus for indemnification and against Repsol and YPF for alter ego liability (on the theory that they were liable for Maxus' conduct), fraudulent conveyance, civil conspiracy, tortious interference with contract, unjust enrichment, contribution, and breach of fiduciary duty.[10]

3. **Rulings on waiver of privilege.** In the New Jersey litigation, Repsol asserted attorney-client privilege over documents, sought by Occidental in discovery, that contained legal advice it had received from its outside counsel.[11] The New Jersey Department of Environmental Protection had contended that certain transactions between Maxus and YPF, which took place in the late 1990s, were fraudulent conveyances that were made with the intent to hinder, delay or defraud Maxus' creditors, including the Department of Environmental Protection. Repsol and YPF,

---

[9] Compl., at 2-3, Dec. 13, 2005, *N.J. Dep't of Env't Prot. v. Occidental Chem. Corp. et al.*, No. ESX-L9868-05 (N.J. Super. Ct. Mar. 13, 2012).

[10] D.I. 766-1 at 2.

[11] D.I. 753 at 2.

however, had filed a "trial plan" in the state court arguing that the YPF-Maxus transactions between 1996 and 1998 occurred "for legitimate business reasons having nothing to do with any alleged obligations to the State of New Jersey or Occidental."[12] In fact, Repsol and YPF asserted, the "sales turned on the tax and debt restructuring advice of outside advisors such as Arthur Andersen, CS First Boston and Andrews & Kurth."[13] Occidental argued that this statement put the legal advice that Repsol and YPF had received "at issue," thus waiving attorney-client privilege.

The New Jersey Superior Court examined whether these statements had put the legal advice Repsol had received "at issue," and thus amounted to a waiver of attorney-client privilege. Repsol argued that it did not waive attorney-client privilege because it had not referenced counsel's advice in an affirmative defense, claim, or pleading.[14] Further, Repsol argued that even if its statement in the trial plan could be a waiver of privilege relating to transactions from 1996 to 1998, it could not extend to legal advice received in 2004.

The judge presiding over the New Jersey lawsuit, as well as an appointed special master, conducted an *in-camera* review of hundreds of documents to resolve the dispute over the existence and scope of the privilege waiver. The court found that the privilege had been waived and directed the production of some but not all of the documents over which Repsol had previously asserted privilege. Among the

---

[12] *See* D.I. 766 at 3 (citing D.I. 766-1 at 11 (Brief of Defendant/Appellant Repsol in Support of Its Motion for Leave to File Interlocutory Appeal of Superior Court's December 4, 2014 Privilege Order)).

[13] *Id.*

[14] D.I. 766-1 at 4-5 (Brief of Defendant/Appellant Repsol in Support of Its Motion for Leave to File Interlocutory Appeal of Superior Court's December 4, 2014 Privilege Order).

documents Repsol was required to produce was a memorandum provided by King & Spalding, though certain of the exhibits to that memorandum were excluded from the documents whose production was ordered. After an unsuccessful effort to obtain appellate review of the Superior Court's ruling, Repsol complied with the discovery order.[15] As a result, Maxus obtained certain otherwise privileged documents.

4.    **The Trust obtains the documents as successor to Maxus.**  On the eve of the New Jersey trial, Maxus filed for bankruptcy.  In May 2017, this Court confirmed a chapter 11 plan of reorganization that provided for the creation of the Trust, which succeeded to Maxus' rights to pursue estate causes of action.[16]  The Trust thus obtained whatever documents were then in Maxus' possession, including the otherwise privileged documents whose production was ordered in the New Jersey lawsuit.[17]

The Trust filed this lawsuit in 2018.  The parties agreed that they could use (without the need to produce again in this action) documents previously produced in the New Jersey litigation.

5.    **The Trust trumpets the documents.**  The Trust made extensive use of the otherwise privileged documents in the complaint, during discovery, and in connection with summary judgment.  For example, the complaint quotes a 2004 King

---

[15] D.I. 766-1 at 3 & n.2.

[16] *See In re Maxus Energy Corp., et al.*, No. 16-11501 (Bankr. D. Del. May 20, 2017), D.I. 1460 (Order Confirming Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation*, et al.* and the Official Committee of Unsecured Creditors).

[17] D.I. 766 at 3, 5 ("As discussed, the Produced K&S Documents were produced to Maxus under court order, and the Trust obtained them as Maxus's successor.").

& Spalding report that, the Trust argues, concludes that Maxus was insolvent at the time of certain of the challenged transactions.[18]  The complaint further contends that King & Spalding advised Repsol that while it would ultimately need to file a bankruptcy case for Maxus, it should wait until the statute of limitations on a fraudulent conveyance claim had run before doing so.[19]

Repsol also contends that, during discovery, the Trust asked witnesses about the privileged documents in depositions and that the Trust's expert reports refer extensively to the privileged documents.[20]  At the same time, Repsol continued to assert privilege over materials that had not previously been produced.  Ultimately, Repsol produced 10,632 pages of non-privileged material and a categorial privilege log of documents as to which it continued to assert privilege.  Importantly, Repsol continued to assert privilege as to documents that were reviewed *in camera* in the New Jersey litigation, but that it was not ordered to produce.[21]

6.    **References to privilege in connection with summary judgment.** The Trust's summary judgment motion similarly relied on the otherwise privileged King & Spalding documents.  The version of the summary judgment motion that was publicly filed redacts the specific quotations from the otherwise privileged documents. In broad strokes, however, the motion points to the advice Repsol had received from

---

[18] D.I. 1 ¶ 129.

[19] *Id.* ¶ 130.  *See also id.* ¶ 196.

[20] D.I. 766 at 5.

[21] D.I. 753 at 3.

counsel to support its contention that Repsol had engaged in a scheme to separate itself from Maxus' environmental liabilities.[22]

In opposing summary judgment, Repsol disputed the Trust's characterization of the legal advice it had received. Repsol argued that, in context, none of the advice supports the claim that Repsol had engaged in an inappropriate "strategy" to separate itself from Maxus' environmental liabilities.[23] Additionally, in the statement of undisputed facts filed in support of its own motion for summary judgment, Repsol provided further context regarding the engagement of King & Spalding. Without disclosing the substance of counsel's advice, Repsol stated that King & Spalding's engagement did not contemplate having counsel conduct a solvency analysis but was instead intended to provide general strategic advice premised on the assumption that Maxus' environmental liabilities rendered it insolvent.[24]

7.    **The instant motion.** The Trust noted in its summary judgment reply that it believed that Repsol, by making the statements described above in connection with the summary judgment briefing, had waived the privilege. The Trust did not, however, seek to compel the production of the underlying documents in connection with its response to Repsol's assertions. Rather, it decided to proceed to respond to the summary judgment briefs based on the then-existing summary judgment record,

---

[22] *See generally* D.I. 622 (summary judgment brief); D.I. 623 ¶¶ 107-112 (statement of undisputed facts).

[23] D.I. 638 at 50-52.

[24] D.I. 639 ¶¶ 137-142.

while "reserving" its right to seek them later.[25]  The Court noted that reservation in its summary judgment opinion.[26]

The Court denied the parties' cross-motions for summary judgment (except for the one issue on which it granted summary judgment) and the matter is now set for trial in March and April of 2023.[27]  The Trust now takes the position that what Repsol did in connection with the summary judgment briefing operates as a subject-matter waiver and seeks to compel Repsol to produce all otherwise privileged communications it received.[28]

## Jurisdiction

This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

## Analysis

Parties to civil litigation are generally permitted to take discovery of relevant, non-privileged information.[29]  "Privileges forbid the admission of otherwise relevant evidence when certain interests the privileges are thought to protect are regarded as more important than the interests served by the resolution of litigation based on full disclosure of all relevant facts."[30]  Encouraging "full and frank communication between attorneys and their clients" in order to "promote broader public interests in

---

[25] D.I. 701 at 74-75 n.46.

[26] D.I. 738 at 46 n.117.

[27] *See generally* D.I. 738.

[28] *See generally* D.I. 753.

[29] Fed. R. Civ. P. 26(b)(1).

[30] *Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994).

observance of law and administration of justice" is such an interest.[31] Communications between attorney and client, made in confidence, for the purpose of obtaining or providing legal advice are thus typically outside the scope of discovery.[32] In view of the important interests served by the attorney-client privilege, the Third Circuit has explained that a court should not lightly order the production of otherwise privileged materials.  Rather, the court explained in *Haines v. Liggett Group Inc.*, "the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously."[33]

The attorney-client privilege may, however, be waived.[34]  A party that is in possession of a privileged communication is permitted to keep attorney-client communications out of the case and thus protect its privileged communications from disclosure.  But a party may not voluntarily put those communications "at issue" by affirmatively relying on otherwise privileged communications as a basis for a claim or defense without permitting its opponent a fair opportunity to test the assertion. The principle, often described through the metaphor of "medieval battle," is that the privilege "may not be used as both a sword and a shield."[35]  This doctrine reflects a commonsense principle of fairness.   You cannot claim, for example, that your

---

[31] *In re Bevill, Bresler & Shulman Asset Management Corp.*, 805 F.2d 120, 124 (3d Cir. 1986) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[32] *See generally In re Teleglobe Communications Corp.*, 493 F.3d 345, 359 (3d Cir. 2007).

[33] 975 F.2d 81, 90 (3d Cir.1992) (internal citation omitted).

[34] *Rhone-Poulenc Rorer*, 32 F.3d at 863; *In re ML-Lee Acquisition Fund II, L.P.*, 859 F. Supp. 765, 766 (D. Del. 1994); *see also North River Ins. Co. v. Phila. Reinsurance Corp.*, 797 F. Supp. 363, 370 (D.N.J. 1992); *Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66, 71 (D.N.J. 1992).

[35] 1 Edna Selan Epstein, The Attorney–Client Privilege and the Work Product Doctrine 666 (6th ed. 2017) ("Epstein").

infringement of a patent was not "willful" because you were relying on the advice you received from your lawyer, and then withhold the lawyer's opinion letter from your opponent.[36]

This same concern for protecting a litigant from improper prejudice also governs the scope of the waiver once a court concludes that a party has put its privileged communications at issue. The waiver extends to any communication on the same "subject matter" that has been placed at issue. Consistent with the concern for avoiding improper prejudice, a litigant may not voluntarily waive the privilege for communications that support its claims or defenses, while at the same time withholding from its opponent other communications, on the same subject-matter, that may undermine those claims or defenses.[37]

This case, of course, is complicated by the fact that the Trust had obtained Repsol's otherwise privileged communications, before this adversary proceeding was even filed, as a result of what transpired in the New Jersey litigation. The court there conducted an *in-camera* review and decided about the scope of the waiver. The decisions made in New Jersey, both as to the fact of the waiver and as to its scope, are not subject to collateral attack here. The issue this Court confronts, however, is that to the extent the Trust were to mischaracterize or take out of context a statement in an otherwise privileged communication that is now in the Trust's possession,

---

[36] *Id.* at 672.

[37] Epstein at 674 ("The waiver extends to all advice that the client received on that subject matter and not just [to] advice the client claims to have relied on. Clearly any other outcome would allow the client to pick and choose what he purports to have relied on.").

Repsol is entitled to respond or seek to contextualize the statement.  Repsol must be permitted to do so by using documents already in the Trust's possession without further putting the privileged communication "at issue."  But line-drawing exercises can sometimes be difficult.  And the task of distinguishing between a "defensive" effort to contextualize the Trust's use of otherwise privileged communications and an "offensive" use of those communications in a manner that would amount to a fresh waiver of the privilege is an example of that difficulty.

As the question is presented to this Court by the parties, the current dispute accordingly requires consideration of three questions: (1) whether the motion to compel the production of otherwise privileged communications has been timely filed; (2) whether Repsol's references to otherwise privileged communications in connection with the summary judgment proceeding were, on the one hand, merely "defensive" references or, on the other, amounted to a fresh waiver of the attorney-client privilege; and (3) to the extent the Court were to conclude that there had been a waiver, the Court would then need to address the scope of such a subject-matter waiver.

## I.    The motion is untimely to the extent it seeks to compel production for use at summary judgment; timely to the extent it seeks to guard against the misuse of otherwise privileged communications at trial.

Repsol argues that the Trust's request is untimely because fact discovery has long been closed.[38]  The determination of timeliness is left to the Court's discretion.[39]

---

[38] D.I. 766 at 2.

[39] *See* CHARLES ALAN WRIGHT & ARTHUR MILLER, 8B FEDERAL PRACTICE & PROCEDURE § 2285 (3d ed. Apr. 2022 update).

The rules only require that the movant demonstrate in good faith that they have conferred or attempted to confer with the party failing to produce documents without court involvement.[40]  Here, there is no dispute that the parties appropriately exhausted their efforts to reach a consensual resolution of this matter.

As Judge Sontchi's summary judgment opinion explains, after Repsol made reference to the privileged communications in connection with its opposition to the Trust's summary judgment motion, the Trust argued in its reply brief that those references amounted to a subject-matter waiver.[41]  The Trust did not, however, seek the immediate production of those documents so that it could avoid being prejudiced by the "offensive" use of otherwise privileged communications in connection with the Court's disposition of the summary judgment motion.  Instead, as Judge Sontchi observed, the Trust "reserved the right to properly present this issue before the Court at a later time."[42]

The Trust was certainly entitled to proceed in that fashion.  And the Trust is very likely correct to say, as it argued at the hearing on this Motion, that it had no practical ability to ask Judge Sontchi to postpone the hearing on summary judgment to permit the Trust to bring a motion to compel.[43]

---

[40] F.R.C.P. 37(a)(1).

[41] D.I. 738 at 46 n. 117 ("Repsol has never produced a full and final memorandum with the attachments listed in the indices. The Trust asserts that this is a case of using privilege as a sword and a shield, and seeks a ruling from the Court either: (i) denying Repsol the relief it seeks or (ii) finding a general subject matter waiver with respect to, at the very least, all the King & Spalding communications and advice.").

[42] *Id.*

[43] At argument on the current motion, counsel for the Trust made the point that seeking to delay the summary judgment proceeding so that they could seek to compel the production of further documents would have undoubtedly been a futile gesture.  *See* Nov. 8, 2022 Hr'g Tr. at 16 ("[T]he notion that we

But the consequence of waiting until now is that the Trust cannot now be heard to argue (and in fairness, it is not at all clear that the Trust intends to so argue) that it is entitled to the production of otherwise privileged documents for the purpose of seeking reconsideration of the Court's summary judgment decision.

Accordingly, to the extent the Trust might now ask for the production of the otherwise privileged communications for the purpose of seeking reconsideration of the Court's summary judgment decision, the Motion comes too late. But to the extent the Motion seeks the production of the otherwise privileged documents to protect against being prejudiced by Repsol's potential "offensive" use of attorney-client communications at trial, the Motion is timely. Indeed, the briefing now before this Court is precisely the "proper presentation" contemplated by Judge Sontchi when he left this issue to be considered by the trial court.[44]

## II.    Whether Repsol put the advice of counsel "at issue" in connection with the summary judgment briefing presents a close question of judgment.

As described above, the Trust has made active use, throughout the litigation, of otherwise-privileged documents that were in its possession, either as a result of the rulings in the New Jersey litigation or otherwise. The question now before the Court is whether Repsol's responses, in connection with the summary judgment briefing, were simply "defensive," or amounted to affirmatively putting "at issue" the legal advice it had received.

---

were going to delay the summary judgment hearings to allow this issue to play out in discovery would have countermanded probably no fewer than ten express edicts from Judge Sontchi.").

[44] D.I. 738 at 46 n. 117.

The Trust contends that Repsol put the advice of counsel "at issue" in two different submissions to the Court in connection with summary judgment – its brief in opposition to the Trust's motion for summary judgment, and in the undisputed statement of material facts filed in connection with Repsol's motion for summary judgment.

The Court does not find that the statements that Repsol made in connection with its opposition to summary judgment put legal advice at issue. To be sure, Repsol did discuss the privileged documents in its opposition to summary judgment.[45] But as described above, the Court finds that Repsol's discussion of otherwise privileged communications in its summary judgment opposition sought to provide context for considering the arguments the Trust made about those documents. The Court finds these uses to be "defensive," rather than an affirmative act to put the privileged communications "at issue" in the lawsuit.

Whether the statements Repsol made in its undisputed statement of material fact affirmatively put legal advice "at issue" is a closer question. There, while Repsol did not disclose the substance of the legal advice it received, it did describe the contours of the issues Repsol had asked its counsel to examine. Repsol stated that the scope of counsel's engagement did not include undertaking an analysis into solvency. Those statements at least raise challenging questions about whether Repsol might have voluntarily disclosed information otherwise protected by the privilege.

---

[45] D.I. 638 at 52.

It is well-established, of course, that the disclosure of the subject matter, but not the content, of an attorney client communication does not constitute a waiver.[46] Indeed, since even a privilege log is required to provide the general subject of the communication as to which privilege is claimed,[47] it must necessarily follow that the disclosure of the subject of an attorney-client communication does not itself waive the privilege. To that end, a case can at least be made that the disclosures Repsol made in its statement of undisputed facts about the contours of counsel's engagement is analogous to the testimony offered by a university administrator in *Doe v. St. Joseph's University*.[48] There, the administrator testified about an otherwise privileged discussion between the university's in-house counsel and school administrators about the school's compliance with guidance from the Department of Education on sexual assault. Because the testimony was "essentially limited to stating the meeting's purpose and the conclusion reached (i.e., that [the university's] then-current policies conformed to the new guidance)," the Third Circuit did not find a subject-matter waiver of the attorney-client privilege.[49]

In the end, however, the Court concludes that it need not resolve that question today. Perhaps a case can be made that Repsol's statements went beyond disclosure

---

[46] *See generally Polyvision v. Smart Techs, Inc.*, 2006 U.S. Dist. LEXIS 12688 at * 17-18 (W.D. Mich. Mar. 7, 2006) (disclosure of the subject of privileged communications, but not the content, do not waive the privilege).

[47] *See* Fed. R. Civ. P. 26(b)(5)(A)(ii) (party claiming privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.").

[48] 832 Fed. App'x 770 (3d Cir. 2020).

[49] *Id.* at 775.

of the subject of the legal advice, such that it should be considered an "offensive" use of a privileged communication. The timing of the motion, however, means that no remedy is available for any prejudice the Trust may have suffered in the past. And as described below, the Trust can be protected from any prejudice at trial by the exclusion of any evidence that Repsol may seek to offer that would make affirmative use of the legal advice it received.

### III. Repsol can use attorney-client privilege as a shield, but the Court will not allow Repsol to use it as a sword during trial and will strike from the record any offensive use of the privileged documents.

To the extent the Court were required to reach a conclusion on the question whether Repsol's statements in connection with the summary judgment briefing put legal advice "at issue," it would likely conclude that they did not. Indeed, the Third Circuit has explained that when "a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary."[50] It is only when "partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court" that a court should find the privileged to be "waived as to all communications on the same subject."[51]

---

[50] *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1426 n.12 (3d Cir. 1991).

[51] *Id. See also* F.R.E. 502(a) ("When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together.").

In arguing that Repsol's statements amount to a subject-matter waiver requiring at least the entire King & Spalding report with its exhibits, the Trust relies heavily on the district court's decision in *Kickflip, Inc. v. Facebook, Inc.*[52] There, the plaintiff asserted antitrust claims against Facebook relating to its virtual-currency service and its social-gaming network. Facebook argued that the plaintiff lacked standing to sue on the ground that the plaintiff had sold the assets that would have formed the basis for its claim of injury to another entity, Gambit Labs.

Kickflip opposed Facebook's summary judgment (based on the lack of standing) by submitting a declaration that purported to explain the nature of Kickflip's relationship with Gambit Labs, and how that relationship left Kickflip with a concrete stake in the dispute with Facebook. At an earlier Rule 30(b)(6) deposition, however, Kickflip had denied Facebook the opportunity to take discovery into those issues, claiming that testimony regarding the parties' agreements called for the disclosure of privileged communications.

Judge Stark found that Kickflip could not, at the same time, put forward the testimony about the nature of the relationship with Gambit Labs while depriving Facebook of the ability to take discovery into that relationship on the ground that it invaded the attorney-client privilege.[53]

---

[52] 2015 U.S. Dist. LEXIS 9162 (D. Del. Jan. 21, 2015).

[53] *Id.* at * 9 (finding the privilege to be waived because "the substantive disclosures in the Declaration regarding the November and December Agreements provide information it appears Facebook was attempting to elicit in the deposition, which Facebook was unable to do as a consequence of Kickflip's invocation of the attorney-client privilege.").

Significantly, however, Judge Stark also rejected Kickflip's suggestion that the appropriate remedy would be to strike certain portions of the declaration. The Trust argues, and by no means unreasonably, that Kickflip's proposed remedy to the alleged waiver is analogous to this Court's determination to prevent Repsol from making affirmative use, at trial, of the advice it received from counsel. The Court, however, understands Judge Stark's decision in *Kickflip* to rest on his conclusion that Kickflip had tried to have it both ways. "Kickflip failed to disclose relevant information during the deposition of its corporate representative, then later chose to disclose some of that information as a basis for opposing Facebook's motion for summary judgment. Thereafter, Kickflip incorrectly insisted it never waived privilege, and opposed discovery that would permit Facebook (and the Court) to be sure Kickflip's waiver was not selective (i.e., resulting in a skewed and inaccurate recitation of the facts…). Consequently, Facebook has been prejudiced, and this case has been substantially delayed."[54]

This case is different. Here, for the reasons described above, this case is infused with otherwise privileged communications because the Trust has chosen to put those communications front and center in its case. It is free to do that. But as described above, Repsol is certainly entitled to respond to those arguments by providing context based on the communications that have already been disclosed without effecting a further waiver of privilege. Might Repsol have gone a step further than that in its statement of undisputed facts? Maybe. But even if the Court were

---

[54] *Id.*

to conclude that Repsol's toe edged across the line, the circumstances are nothing like the overt gamesmanship that animated Judge Stark's decision in *Kickflip*.

The Trust further points to the decision of the District Court for the District of New Jersey in *In re Human Tissue Products Liability Litigation* as supporting the proposition that even an implicit reliance on the advice of counsel could operate as a waiver of privilege.[55] There, in support of their contention that it lacked knowledge that documents had been falsified, defendants explained that, in response to concerns about the character of the individual alleged to have falsified the documents, it had retained counsel to conduct an investigation of the individual in question.[56] The court found that this reliance amounted to a waiver. "Having chosen to go beyond mere denial of Plaintiffs' claims, Defendant [could not] on the one hand implicitly rely on the fruits of this background investigation as evidence that [the party] exercised its diligence and thus had no reasonable basis of knowing that the consent forms submitted by [the individual] were fabricated, while at the same time depriving Plaintiffs of access to this information on the basis of privilege."[57]

Nothing in *Human Tissue*, however, is inconsistent with this Court's determination that, under the circumstances present here, the Trust's interests will be appropriately protected by the exclusion, at trial, of any evidence that Repsol may seek to introduce that would make affirmative use of otherwise privileged communications. Indeed, the Court in *Human Tissue* emphasized that the

---

[55] 255 F.R.D. 151 (D.N.J. 2008).

[56] *Id.* at 157.

[57] *Id.* at 161.

"overriding" concern is one of "fairness," and that whether "fairness requires disclosure is decided on a case-by-case basis," and "depends primarily on the specific context" of the case.[58]  Here, for the reasons described above, the Court's judgment is that the overriding concerns of fairness are more appropriately served by the exclusion of evidence at trial.

    Finally, the Trust argued at the hearing on this Motion that a ruling that required the Court, at trial, to police the line between Repsol's "defensive" versus "affirmative" use of attorney-client communications would unfairly burden the Trust. The parties have agreed to a joint pretrial order that allocates trial time between the parties, and the Trust expressed the concern that deferring the issue to trial would require the Trust to object to the introduction of evidence in a way that will count against the Trust's trial time.

    The tools available to the Court to manage the trial, however, are more than sufficient to protect the Trust's interest in this regard.  Repsol is on clear notice that it may not make affirmative use of attorney-client communications in support of its position.  To the extent, at trial, Repsol seeks to run up against that line, the Court may certainly adjust the parties' trial time to ensure that the Trust is not unfairly prejudiced.  Indeed, if circumstances at trial were to require it, the Court could always stop the trial and order the production of the documents the Trust now seeks.  In view of the exceptional professionalism displayed by all counsel in this matter, the Court would certainly be surprised if such relief were warranted.  The point for current

---

[58] *Id.* at 159 (internal citations omitted).

purposes is only that the Court is sensitive to the concerns expressed by the Trust and is prepared to ensure that it have a fair opportunity to present its case.  Having chosen to invoke privilege as a shield (including "defensive" responses to the Trust's use of previously disclosed communications), Repsol will not be permitted to unsheathe it as sword.

## Conclusion

For the reasons set forth above, the Trust's Motion to compel Repsol to produce otherwise privileged documents is denied.

Dated: November 22, 2022

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE