**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al*., | Case No. 16-11501 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| MAXUS LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50489 (CTG) |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE YPF
DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE
CHEMRISK PRESENTATIONS, THE USACE ESTIMATE, AND
THE 1995 EA LETTER FROM EVIDENCE AT TRIAL**

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...........................................................................................3

    A.    The ChemRisk Presentations ................................................................3

    B.    The Court in the Passaic River Litigation Excluded the ChemRisk Presentations..9

    C.    The USACE Estimate .........................................................................10

    D.    The 1995 EA Letter ...........................................................................12

LEGAL STANDARD........................................................................................................14

ARGUMENT .....................................................................................................................15

    I.    The Challenged Figures Are So Inherently Unreliable That They Do Not Constitute Admissible Evidence .........................................................15

    II.    The Trust's Expert's Reliance on The Challenged Figures Violates Rule 703.......19

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bruno v. Bozzuto's, Inc.*,
    311 F.R.D. 124 (M.D. Pa. 2015)..............................................................................15

*Chemipal Ltd v. Slim-Fast Nutritional Foods Int'l*,
    350 F. Supp. 2d 582 (D. Del. 2004)........................................................................20

*Legendary Art, LLC v. Godard*,
    No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ...................................20

*LinkEpic Inc. v. Vyasil*,
    2019 WL 11717160 (N.D. Ill. Oct. 15, 2019)........................................................14

*Lott v. Tradesmen Int'l, Inc.*,
    2013 WL 245127 (E.D. Ky. Jan. 22, 2013) ...........................................................14

*Montgomery Cnty. v. Microvote Corp.*,
    320 F.3d 440 (3d Cir. 2003).....................................................................................14

*Mosaid Technologies Inc. v. LSI Corp.*,
    No. 10-192, 2014 WL 807877 (D. Del. Feb. 28, 2014)..........................................20

**Other Authorities**

Fed. R. Evid. 402 ..........................................................................................................14

Fed. R. Evid. 703 ..........................................................................................3, 14, 19, 20

Fed. R. Evid. 901 ....................................................................................................14, 15

Defendants YPF S.A. ("YPF"), YPF International S.A. ("YPFI"), YPF Holdings, Inc. ("YPFH"), and CLH Holdings, Inc. ("CLHH," and, collectively with YPF, YPFI, and YPFH, the "YPF Defendants") respectfully submit this memorandum of law in support of their motion *in limine* to exclude a set of documents containing unreliable estimates of environmental liabilities and any references to those documents:  (i) marketing materials prepared by third-party environmental consultant ChemRisk (the "ChemRisk Presentations"); (ii) passing references in three documents to a cost estimate prepared by the United States Army Corps of Engineers (the "USACE Estimate"); and (iii) a November 2, 1995 letter from J.H. Zarzycki at EA Engineering to Carol Dinkins from Vinson & Elkins (the "1995 EA Letter," and together with the ChemRisk Presentations and the USACE Estimate, the "Challenged Figures").[2]

## **INTRODUCTION**

The Court should preclude the Trust from introducing the Challenged Figures—three sets of documents containing passing estimates of environmental liabilities[3]—because they are so inherently unreliable that they have no evidentiary basis and/or foundation to constitute relevant evidence.

The ChemRisk Presentations were delivered by an environmental consulting firm to Maxus in December 1992 and January 1993 in an attempt to convince Maxus to significantly expand its work with respect to the Passaic River to include lucrative toxicological sampling services.  The ChemRisk Presentations ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ For example, ████████████████████████

---

[2] Even if the Court excludes the opinions of any of the Trust's experts, the Challenged Figures are still inadmissible for the reasons set forth herein.

[3] The YPF Defendants' Motion includes the Challenged Figures and all versions of the Challenged Figures that bear different Bates Numbers.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ The underlying assumptions and calculations behind this estimate (if any) are not provided, nor were the persons who prepared it deposed in this case.

The USACE Estimate and the 1995 EA Letter are similarly unreliable.  The USACE Estimate is ████████████████████████████████████ ██████, which no party has produced.  And in the 1995 EA Letter, a letter prepared by EA Engineering ("EA"), a Maxus environmental consultant, ██████████████████ ████████████████ However, that estimate was put together with little work and ██████████████████████████ Tellingly, when that work was done, EA ██████████████████████ That letter was the very beginning of an engineering evaluation and cost assessment study which by the very design of that kind of study requires consideration of several alternative remedial approaches.  ██████████████ ██████████████████████████████████████

The Trust's summary judgment filings and expert materials make clear that it intends to use the Challenged Figures both to prove that environmental liabilities could be estimated in the 1990s and could be in the billions of dollars.  However, each of the Challenged Figures is so unreliable that they can be excluded as irrelevant.  The ChemRisk Presentations are irrelevant to the actual extent of any liabilities because they lack any analytical framework or support and were prepared by unqualified people.  Moreover, the Trust lacks a foundation to authenticate the ChemRisk Presentations as what they claim they are (a considered estimate of liabilities).  They are also irrelevant to show what Maxus knew or should have known, because, as the

testimony cited below makes clear, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████   Not one witness testified to the contrary.  Indeed, the New Jersey trial

court in the Passaic River Litigation precluded the ChemRisk Presentations.[4]  Given that the

ChemRisk Presentations were merely marketing materials, they were never raised with Maxus

management or with YPF at any time before the Global Restructuring occurred.  Similarly,

because no YPF witness testified to awareness of either the USACE Estimate nor the EA Letter,

neither can be used as relevant to show YPF's awareness of any such potential estimates.

Finally, as described in the YPF Defendants' *Daubert* motions, the Trust's expert's use

of the Challenged Figures violates Federal Rule of Evidence 703.

## **FACTUAL BACKGROUND**

A.    **The ChemRisk Presentations**

The ChemRisk Presentations ███████████████████████████████████

████████████████████████████████████████████████████   Both

were produced in the Passaic River Action.   ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

---

[4] The "Passaic River Action" is *New Jersey Dep't of Environmental Protection, et al. v. Occidental Chemical Corp., et al.*, No. L9868-05 (N.J. Super. Ct).  There, the New Jersey Department of Environmental Protection sued Occidental Chemical Corporation (Oxy), Maxus, Tierra, YPF, Repsol, and certain of their affiliates, seeking recovery under various New Jersey environmental laws.

ChemRisk was a toxicology firm that conducted environmental sampling and assessment work for Maxus during the 1980s and 1990s. ███████████████████████

███████████████████████████████████████████

███████████████████████████████ ███████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ ChemRisk lacked expertise in designing, costing or conducting actual remedial work. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

None of the ChemRisk personnel involved with the ChemRisk Presentations were engineers or contaminated sediment remediation specialists with the necessary experience to evaluate the implementability or feasibility of any particular sediment remediation options. ███

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

██████

To the contrary, the ChemRisk Presentations were marketing pitches. ████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ The

ChemRisk Presentations included, among other things, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ █████████████████████████████

████████████████████████████████████████████████████

██████████████████████

For example, █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ On the very next slide, ████████████

████████████████████████████████████████████████████

██████████████████████████████ █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Neither the Trust in this action nor Occidental Chemical Corporation in the Passaic River Action deposed any of the ChemRisk presenters.

The Maxus personnel who attended these presentations confirmed, both in the Passaic River Action and in this action, that ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Maxus personnel also viewed the ChemRisk Presentations' figures as an unreliable scare tactic. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

What's more, environmental-expert testimony confirms that



**B.**     **The Court in the Passaic River Litigation Excluded the ChemRisk Presentations.**

The YPF Defendants moved to exclude these ChemRisk Presentations before trial in the Passaic River Action, and the Special Master granted the motion.  *See* Propps Decl. Ex. 16.  The New Jersey Court held that the ChemRisk Presentations were hearsay and were not evidence of knowledge of the risk of environmental liabilities.

The Court explained: "[I]t appears to this court that those kind of projections by people who were not, you know, in the business or didn't do what was necessary as an engineer or environmental engineer as to talk about what would be the costs of cleanup."  *See* Propps Decl. Ex. 17 at 45:19-46:4.  The ChemRisk Presentations "admittedly" were offered "just . . . to say that you might end up with" a bad result without ChemRisk's help, which—given ChemRisk's lack of expertise—was like "go[ing] to your dentist and he would tell you, 'You know, you ought to invest in the market because you could make a billion dollars by next year.'"  *Id.*  This was all just "a marketing ploy."  *Id.*  The Court reasoned: "[T]hey [ChemRisk] were just a consultant who they [Maxus] were perhaps going to hire not for risk assessment as to the cost of cleanup, but to do toxicology studies to perhaps then come up with because of the particular matters that would be

above certain levels or whatever in soil samples or something, then you could discuss what would be the real cost to clean." *Id.* at 47:22-48:3.   Ultimately, the Court did not see "a basis to allow [the exhibit] in as relevant evidence as to knowledge of the risk," and "it's hearsay." *Id.* at 48:4-9.

### C.   The USACE Estimate

The Trust also relies on ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████ The documents that refer to the USACE Estimate do not provide the data or assumptions that resulted in the USACE Estimate.   For example, ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████

The record does show that ██████████████████████████████████████████

██████████████████████████████████████████████████ But according to the EPA, the incinerator in Coffeyville, Kansas—"the only plant in the nation licensed to destroy dioxin by burning"—" could not handle the construction materials from the Diamond Alkali Site." Propps Decl. Ex. 21 at MAXUS0793423).   As of June 1998, the Coffeyville incinerator was idle, and "[w]hen the incinerator [would] be fully operational [was] unknown." Propps Decl. Ex. 22 at NJDEP00169488.

All other key information about the USACE Estimate is entirely missing, and therefore untestable. The context in which the USACE prepared the USACE Estimate is unknown as well. Because nobody has the actual USACE Estimate, it is unknown whether it was prepared for navigational dredging where the volume of dredged sediment would be necessary to allow the passage of ships (i.e., more and different dredging than would be necessary to remediate environmental concerns), or whether it was prepared to address contaminated sediment, in which case the depth and volume of sediment to be dredged would be tailored to reduce harm to human health and the environment.

As with the ChemRisk Presentations, no expert witness has testified that the USACE Estimate is reliable.[5] ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

Ultimately, ██████████████████████████████████████

████████████████████████████████████  As of 1998, the EPA stated that it "would scotch the idea" of processing dredged material at the Coffeyville incinerator even if it cost $241 million plus transportations costs. Propps Decl. Ex. 21 at MAXUS0793423). Even the documents cited by the Trust referencing the USACE Estimate explicitly state ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] No lay witness has testified about the USACE Estimate, but ████████████████████████████████
████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████ Moreover, before 2000, ████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

The Trust and its expert rely in part on the USACE Estimate to ████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

**D.      The 1995 EA Letter**

In the November 2, 1995 EA Letter, EA Engineering, a Maxus contractor, noted that ████

█████████████████████████████████████████████

███████████████████████████████    ███████████████

██████████████████    █████████████████████████

████████████████    ███████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████    ███████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████    ██████████████████████

█████████████████████████████████████████████

████████████████████████████

EA issued the 1995 EA Letter in connection with performing a more extensive Engineering Evaluation/Cost Analysis ("EE/CA"). █████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████   ███████████████████████████████

███████████████████████████████████████████████

████████████████████

Moreover, ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████   ████████████████

███████████████████████████████████████████████

██████████████████████████████   Nonetheless, the Trust's summary judgment filings ███████████████████████████ repeatedly cited only the ████████████ ███████ in the 1995 EA Letter.  Adv. D.I. 622 at 11, 62; ██████████████████ ████

As with both the ChemRisk Presentation and the USACE Estimate, █████████ ███████████████████████████████████████████████ ████████   It clearly was not a reliable one, as evidenced by ███████████ ███████████████████████████████████████████████ ██████████████████████████████

The Trust specifically relies on ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████

## **LEGAL STANDARD**

Evidence that is so unreliable and utterly lacks foundation cannot be admissible.  Fed. R. Evid. 402.  Unreliable estimates that lack any probative value warrant exclusion under Rules 401 and 402.  *See Lott v. Tradesmen Int'l, Inc.*, 2013 WL 245127, at *1 (E.D. Ky. Jan. 22, 2013) (holding that given witness's "lack of knowledge and lack of specifics, the testimony has almost no probative value" and excluding such evidence before a bench trial); *LinkEpic Inc. v. Vyasil*, 2019 WL 11717160, at *3 (N.D. Ill. Oct. 15, 2019) (excluding irrelevant and inadmissible evidence prior to bench trial).  Under Rule 901, the proponent of evidence is required to "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901.

Similar rules prevent the use of unreliable documents by experts.  Under Rule 703, an expert may base an opinion on existing data "of a type reasonably relied on by experts in the field"; the court must also "assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert."  *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003).  Therefore, to rely on such materials, the expert must show that (1) he or she conducted

some sort of independent investigation or verification to ensure the data is both accurate and helpful to the court, and (2) the investigation is thorough enough that the expert gained a working familiarity with the underlying information. *Bruno v. Bozzuto's, Inc*., 311 F.R.D. 124, 144 (M.D. Pa. 2015); *see id.* at 137–40 (collecting cases).

## **ARGUMENT**

I.      **The Challenged Figures Are So Inherently Unreliable That They Do Not Constitute Admissible Evidence.**

**The ChemRisk Presentations.**  The ChemRisk Presentations are inadmissible because they are so inherently unreliable.  The Trust entirely lacks a foundation to authenticate the ChemRisk Presentations as what they claim they are (a considered estimate of liabilities).  The Trust made clear in its summary judgment papers that it plans to use the ChemRisk Presentations to prove that ███████████████████████████████████████████████████

████████████████████████████████  ████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████  *See* Adv. D.I. 622 at 7.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████  *See* Adv. D.I. 701 at 52-53.

But the ChemRisk Presentations are not relevant to either the actual extent of possible remedial costs or anyone's knowledge of those costs, because everyone involved recognized that they were baseless and unreliable.  To that end, the Trust has not put forth any evidence under Rule 901 to support a finding that the ChemRisk Presentations amount to what the Trust claims they are—*reliable* estimates that show an awareness of realistic potential remedial costs.

First, ChemRisk was a firm of environmental toxicologists who lacked the qualifications to make the remedial cost estimates.  As toxicologists, ChemRisk's experience was limited to evaluating contaminants located in a particular site and assessing the attendant risks they pose to human or animal welfare.  ChemRisk was not equipped to assess, design, cost, or conduct remediation work.  Indeed, there is no evidence that ChemRisk's assertions about the potential exposure at the Passaic River or Newark Bay were the product of any substantial study or remedial design analysis.  ██████████████████████████████ and as noted above, no ChemRisk representative was deposed in this case.

Second, ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████   ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

This was a key reason why the New Jersey Court excluded these same materials. The court did not see "a basis to allow [the exhibit] in as relevant evidence as to knowledge of the risk": The Presentations are just "a marketing ploy." *See* Propps Decl. Ex. 17 at 45:19-46:4, 48:5-7.

Similarly, the Trust cannot use the ChemRisk Presentations as relevant evidence to show that YPF was aware of Maxus's environmental liabilities, because ███████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████ *See supra* 7-8.  Even then, █████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████ *See supra* 7-8.  █████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

**The USACE Estimate.** No party has been able to locate the USACE document, so many of its key underlying assumptions remain unknown, such as whether it was created in the context of navigational dredging or sediment remediation, the length or depth of the Passaic River to be dredged, or the dioxin cleanup goals it contained.

Moreover, ████████████████████████████████████████████

██████████ ███████████████████████████████████████ YPF had no relationship with the USACE such that it would have received an underlying document showing the estimate.

Tellingly, ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

**The 1995 EA Letter.** The 1995 EA Letter fares no better. ████████████████████

██████████████████████████████████████████████████████ █

███████████████████████████████████████████████████████

████████████████████ ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Nonetheless, the Trust relies on the information in the 1995 EA Letter, which is clearly unreliable.

In addition, ████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

## II.     The Trust's Expert's Reliance on The Challenged Figures Violates Rule 703.

As the YPF Defendants set forth in the *Daubert* motion and memorandum of law in support

to partially exclude the opinion and testimony of Stephen Johnson (Adv. D.I. 788 at 22-26), Mr.

Johnson's reliance on the Challenged Figures violates Federal Rule of Evidence 703.  Mr. Johnson

relies on the Challenged Figures to opine on likely remedies and accompanying costs, but he never

analyzed the Challenged Figures' reliability, and all the evidence discussed above shows that no

reasonable expert would rely on these materials.  Thus, if the Court does not address whether Mr.

Johnson's use of the Challenged Figures violates Rule 703 in deciding the *Daubert* motion, it

should do so here.

As noted, ChemRisk had no remediation experience.  None of ChemRisk's professional

staff members were even licensed as engineers—

Similarly, the USACE Estimate has never been

produced and therefore is unavailable for Mr. Johnson to rely on without any foundation or

underlying assumptions.  The 1995 EA Letter is equally unreliable given the circumstances of its preparation.

Mr. Johnson's unquestioning reliance on the Challenged Figures violates Rule 703's command that experts can rely on data only if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  The Court should thus follow other decisions in this circuit excluding expert testimony that relied on similar marketing pieces or that involved no independent verification.  One court excluded expert damages testimony that relied on a presentation prepared by the defendant setting forth a marketing estimate because the expert conducted no independent analysis, used no expertise to evaluate the estimate's source materials, and did not know what the data represented, how it was compiled, or how it was evaluated or chosen.  *Chemipal Ltd v. Slim-Fast Nutritional Foods Int'l*, 350 F. Supp. 2d 582, 589–92 (D. Del. 2004).  Another excluded expert testimony on lost profits that relied on a business plan prepared by the plaintiff, which included several central assumptions the expert did not verify.  *Mosaid Technologies Inc. v. LSI Corp.*, No. 10-192, 2014 WL 807877, at *2–3 (D. Del. Feb. 28, 2014).  And another excluded expert damages testimony that relied on profit-and-loss projections supplied by the plaintiff, where the expert did nothing to verify the projections and had no familiarity with the methods or reasoning used to create them.  *Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012).  The same reasoning and result apply here.

## **CONCLUSION**

For these reasons, the Court should exclude the ChemRisk Presentations, the USACE Estimate, and the 1995 EA Letter from evidence at trial.  The Court should also preclude the Trust's expert, Stephen Johnson, from relying on the documents or testifying about them at trial.

Date:   December 21, 2022
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ *Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
E-mail: landis@lrclaw.com
            mcguire@lrclaw.com
            jenner@lrclaw.com

-and-

**SIDLEY AUSTIN LLP**

John J. Kuster (*pro hac vice*)
Andrew P. Propps (*pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

**CLEARY GOTTLIEB STEEN
& HAMILTON LLP**

Jeffrey A. Rosenthal (*pro hac vice*)
Ari D. MacKinnon (*pro hac vice*)
Mark E. McDonald (*pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000

*Counsel for the YPF Defendants*