## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.*,<br><br><br>Debtors.[1] | Chapter 11<br><br>Case No. 16-11501 (CTG)<br>(Jointly Administered) |
| MAXUS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>YPF S.A., YPF INTERNATIONAL S.A.,<br>YPF HOLDINGS, INC., CLH HOLDINGS,<br>INC., REPSOL, S.A., REPSOL<br>EXPLORACION, S.A., REPSOL USA<br>HOLDINGS CORP., REPSOL E&P USA,<br>INC., REPSOL OFFSHORE E&P USA,<br>INC., REPSOL E&P T&T LIMITED, and<br>REPSOL SERVICES CO.,<br><br>Defendants. | Adv. Proc. No. 18-50489 (CTG)<br><br><br>**Hearing Date: TBD**<br>**Objection Date: TBD** |

## MOTION OF THE MAXUS LIQUIDATING TRUST
## FOR ENTRY OF AN ORDER (I) APPROVING THE SETTLEMENT BY
## AND AMONG THE MAXUS LIQUIDATING TRUST, THE YPF DEFENDANTS,
## AND THE REPSOL DEFENDANTS, AND (II) CLARIFYING THE PLAN INJUNCTION

The Maxus Liquidating Trust (the "Trust") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors (collectively, the "Debtors") by and through undersigned counsel, hereby files this motion (this "Motion"), pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Section 105 of the Bankruptcy Code

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

(11 U.S.C. §§ 101-1532), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) approving the settlement agreement attached hereto as **Exhibit B** (the "Settlement"),[2] by and among the Trust, YPF S.A. ("YPF"), YPF International S.A. ("YPFI"), YPF Holdings, Inc. ("YPFH"), and YCLH Holdings, Inc. (f/k/a CLH Holdings, Inc.) ("CLHH," and together with YPF, YPFI, and YPFH, the "YPF Defendants"), and Repsol, S.A. ("Repsol"), Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (f/k/a Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "Repsol Defendants," and together with the YPF Defendants, the "Defendants"), and (ii) pursuant to Sections 105(a) and 1141 of the Bankruptcy Code, clarifying that the Plan Injunction (as defined herein) enjoins all parties from asserting certain claims against any of the YPF Released Parties (as defined in the Settlement) or the Repsol Released Parties (as defined in the Settlement) as described more fully below and in the Settlement.  In support of this Motion, the Trust, by and through its undersigned counsel, states as follows:

## PRELIMINARY STATEMENT

1.      Following arms' length negotiations, and extensive discussions, the Trust and the Defendants have reached a settlement fully resolving the adversary proceeding filed in June 2018 as well as a number of other residual issues involving the Defendants.  The Settlement will provide the Trust with over $570 million for distribution to creditors pursuant to the Plan and will clear the path for the Trust to make such distributions and close the Chapter 11 Cases, which the Trust hopes

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement.  The summaries of the Settlement set forth in this Motion are qualified in their entirety by the provisions of the Settlement and to the extent there exists any inconsistency between this summary and the Settlement, the Settlement shall govern.

to accomplish by the end of this year.  The Trust estimates that, upon the conclusion of the claims allowance process, allowed Class 4 Claims will receive an approximate recovery of 69% and, with respect to the Class 5 Claims, approximately $25 million will be distributed to the environmental response and restoration trust established under the Plan to fund future remedial and restoration activities at the Diamond Alkali Site, $30.5 million will be distributed to EPA to be used in connection with remediation at the Diamond Alkali Site, and $30.5 million will be distributed to DOI and NOAA to be used in connection with restoration at the Diamond Alkali Site.[3]  This is in contrast to the plan of reorganization which was filed when these Chapter 11 Cases were commenced, which would have paid some creditors a small fraction of their allowed claims and others nothing at all; and thus represents perhaps the most significant event in these remarkable proceedings.

2.    The Settlement includes separate agreements among the YPF Defendants, Repsol Defendants, and certain creditors of the Debtors: Occidental Chemical Corporation ("OCC"), the United States of America (the "United States") on behalf of the U.S. Environmental Protection Agency ("EPA"), U.S. National Oceanic and Atmospheric Administration ("NOAA"), U.S. Department of the Interior ("DOI"), and the States of Ohio and Wisconsin, resolving issues relating to the Debtors' legacy liabilities, and in particular bringing to an end almost two decades of litigation involving the Debtors, the YPF Defendants, and the Repsol Defendants regarding, among other things, New Jersey's Passaic River and the Diamond Alkali Superfund Site.

---

[3] These estimates depend on, among other things, the amount of Class 4 claims that are ultimately allowed in the Chapter 11 Cases, the interest accrued on the settlement payment and the administrative costs of the Trust.  The Trust reserves all rights with respect to amounts of distributions, which will be made in accordance with the Liquidating Trust Waterfall under the Plan and the Liquidating Trust Agreement.

3.      As more fully described herein and in the Settlement, the Settlement provides for, among other things, (a) $573 million in net cash consideration plus any interest accrued on that amount from May 1, 2023, (b) dismissal with prejudice of all pending litigation between the Trust and the Defendants, (c) mutual releases among the Trust, the Defendants, and their Related Parties (as defined in the Settlement), (d) resolution of various residual issues, and (e) related agreements between (1) the Defendants and OCC resulting in the dismissal with prejudice of all pending litigation among them and execution of mutual releases and (2) the Defendants and the United States and the States of Ohio and Wisconsin, resulting in covenants not to sue and contribution protection under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (known as "CERCLA"), which is subject to public comment after which the United States will decide whether to seek court approval.  The Settlement represents an arms'-length package deal combining heavily negotiated and interconnected agreements into a global resolution of decades of litigation.  In clear terms, the Settlement avoids the uncertainty, cost, and time of prolonged litigation over such issues.

4.      Accordingly, the Trust respectfully requests that the Court enter the Order and grant the relief requested in this Motion.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Trust consents pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      As provided for under the Confirmation Order and Article XIV(p), (r) of the Plan, this Court retains jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases, the Debtors, and the Trust.

7.      Venue of the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The basis for the relief requested herein is Bankruptcy Rule 9019(a) and Section 105(a) of the Bankruptcy Code.

## BACKGROUND

9.      On June 17, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

10.     On April 19, 2017, the Debtors filed the *Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* [Docket No. 1232].

11.     On May 20, 2017, the Debtors filed the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* [Docket No. 1451] (as the same may have been amended, modified, and/or supplemented from time to time, the "Plan").

12.     On May 22, 2017, the Court entered the *Order Confirming Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and The Official Committee of Unsecured Creditors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1460] confirming the Plan (the "Confirmation Order").

13.     On July 17, 2017, the Debtors filed the *Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III) Related Bar Dates* [Docket No. 1701] (the "Plan Effective Date Notice") informing parties in interest that the Plan became effective on July 14, 2017 (the "Plan Effective Date").

14.     In the Confirmation Order, the Court found:

> [P]ursuant to section 1123(b) of the Bankruptcy Code, Bankruptcy Rule 3016, and applicable authority, the release, exculpation, and injunction provisions of the Plan are warranted, necessary and appropriate and are supported by sufficient consent and consideration under the circumstances of the Plan and the Chapter 11 Cases as a whole.  Proper, timely, adequate, and sufficient notice of the release, exculpation, and injunction provisions, including those contained in Article XI of the Plan, has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the orders of this Court, and due process.  Interested parties have had a sufficient and adequate opportunity to object to such provisions and to be heard as to their objections, and no further notice of such provisions is required for entry of this Order.  Each of the release, exculpation, and injunction provisions set forth in the Plan and this Order is: (a) within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) an integral element of the Plan; (c) conferring material benefit on, and is in the best interests of, the Debtors, their Estates, and Holders of Claims and Equity Interests; (d) important to the objective of the Plan to resolve all Claims and Equity Interests; and (e) consistent with sections 105, 1123, and 1129 and other applicable provisions of the Bankruptcy Code and any other applicable laws.

Confirmation Order at 17-18, ¶ CC.

15.     Further, in the Confirmation Order, the Court ordered:

> [U]pon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Order shall be immediately effective and enforceable and deemed binding upon the Debtors, their Estates, the Liquidating Trustee, the PT Trustee, the ERRT Trustee, and any and all Holders of Claims or Equity Interests (regardless of whether such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Persons or Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Person or Entity acquiring property under the Plan or this Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

Confirmation Order at 23, ¶ 15.

16.    Pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement, dated July 5, 2017 [Docket No. 1436-1] (the "Liquidating Trust Agreement"), the form of which was included as Exhibit A to the Notice of Amendment to Plan Supplement [Docket No. 1436], the Trust was created on the Plan Effective Date for the purpose of liquidating and distributing the Trust Assets for the benefit of the Trust Beneficiaries, and the Honorable Joseph J. Farnan, Jr. (Ret.) was appointed as the Trustee and Delaware Trustee of the Trust.

17.    The Plan provided that all Causes of Action (as defined in the Plan), including the Repsol Causes of Action and YPF Causes of Action that were not otherwise settled or released on or prior to the Plan Effective Date, were transferred to the Trust on the Plan Effective Date.  Section IV.H of the Plan provided that the Trust "shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court."  Plan Art. IV.H.

18.    The Plan further provided:

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES, INCLUDING, BUT NOT LIMITED TO, THOSE THAT: (1) HAVE BEEN RELEASED PURSUANT TO ARTICLE XI.C HEREOF; (2) ARE AGAINST AN EXCULPATED PARTY; OR (3) ARE OTHERWISE STAYED, SETTLED, COMPROMISED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM (ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES): (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL

RESPONSE/RESTORATION TRUST, OR ANY OTHER ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED); (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED OR EXCULPATED); (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED OR EXCULPATED); (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED OR EXCULPATED) . . . .

Plan, Art. XI.E (the "Plan Injunction").

19. The Plan and the Liquidating Trust Agreement provide that "[a]ll decisions concerning whether to prosecute or settle any Causes of Action (other than Preserved Contribution Claims (as defined in the Plan)) shall be made by the Liquidating Trust Oversight Committee (as defined in the Plan) in good faith and in the best interests of the Trust," with any settlement of Causes of Action by the Trust subject to the prior written consent of the Liquidating Trust Oversight Committee.  Plan Art. VI.G.

20.     While the Trust has obtained such consent, as a condition precedent to the effectiveness of the Settlement and the payment of more than half a billion dollars, the Defendants have also required approval of the Settlement by this Court pursuant to Bankruptcy Rule 9019, as well as a clarification that the Plan Injunction enjoins third parties from pursuing certain causes of action against the Defendants or their Related Parties.  Without this Court's approval, therefore, creditors will not receive the substantial and recoveries offered by the Settlement and any recoveries will remain dependent on the uncertainties of litigation.

## ADVERSARY PROCEEDING

21.     On June 14, 2018, the Trust filed its Complaint in the above-captioned adversary proceeding with the Court, captioned *Maxus Liquidating Trust v. YPF S.A. et al.*, Adv. Pro. No. 18-50489 (the "Adversary Proceeding"), against the Defendants.

22.     The Trust has alleged claims in the Adversary Proceeding including, without limitation, claims made under federal or state law based on theories of veil-piercing/alter ego liability (count 1), avoidance of fraudulent transfers (counts 2–21), unjust enrichment (count 22), and civil conspiracy (count 23).

23.     In a Letter Opinion dated February 15, 2019, on the Defendants' motions to dismiss, the Court ruled that "under the Third Circuit's decision in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014) and this Court's ruling in [*In re Maxus Energy Corp.*, 571 B.R. 650, 660 (Bankr. D. Del. 2017)], which is the law of the case, *the alter ego claims of the Debtor's creditors are property of the estate and may only be pursued by the Trust*."  [Docket No. 107] (emphasis added).

24.     In its claims based on theories of avoidance of fraudulent transfers, veil-piercing/alter ego liability, civil conspiracy, and unjust enrichment, the Trust alleges that the Defendants' actions during the time they were affiliates of the Debtors and before the Petition Date resulted in harm to the Debtors, including the Debtors' inability to satisfy certain of their

obligations, including in connection with the proofs of claim filed against the Debtors in the Chapter 11 Cases, and therefore sought to hold the Defendants jointly and severally liable for (i) all claims of the Debtors' creditors against the Debtors, and (ii) other damages including expenses, attorneys' fees, and pre- and post-judgment interest. The Complaint asserted the damages it sought could be as much as US$14 billion. The Defendants disagree with and vigorously dispute the Trust's allegations.

25.    On June 22, 2022, the Court denied motions for partial summary judgment filed by the Trust and by the Repsol Defendants and granted in part and denied in part a motion for partial summary judgment filed by the YPF Defendants, holding, among other things, that the "all liabilities" theory was inapplicable to the Trust's alter ego claim, but denying all other requests for relief made by the YPF Defendants in their motion. *See Maxus Liquidating Trust v. YPF S.A.*, 641 B.R. 467 (Bankr. D. Del. 2022).

26.    In the middle of 2021, the Trust and the Defendants engaged in mediation before the Hon. William B. Chandler III (Ret., Delaware Chancellor) (the "Mediator"). In December 2022 further good faith and arms' length negotiations occurred with the Mediator, which resulted in an agreement to settle any claims the Trust may hold against the Defendants in exchange for more than a half a billion dollars, as embodied in the Settlement.

## THE SETTLEMENT

27.    In an effort to resolve all of the disputes and issues outstanding in these Chapter 11 Cases between them, the Trust and Defendants engaged in extensive arms' length and good faith negotiations, which ultimately resulted in the agreement set forth in the Settlement. Through the

Settlement, the Trust and the Defendants agreed to the key terms as follows:[4]

a.  <u>Defendants' Obligations</u>:  The Repsol Defendants shall pay the Trust the Repsol Defendants' Settlement Payment in an amount equal to $287,500,000.00 to be held in escrow pending satisfaction of the other conditions, with the Trust receiving all interest accruing on such escrow account.  The YPF Defendants shall pay the Trust the YPF Defendants' Settlement Payment, payable by either a direct transfer from the YPF Defendants or by the Trust's drawing of a Letter of Credit provided by the YPF Defendants to the Trust in an amount of $285,500,000.00[5] plus interest.

b.  <u>Trust's Obligations</u>:  The Trust shall execute a stipulation dismissing with prejudice the Adversary Proceeding and the Passaic River Litigation. Additionally, the Trust shall file this Motion and the Proposed Order and use reasonable best efforts to obtain entry of the Proposed Order.

c.  <u>Releases</u>:  The Trust and the Defendants agree to the Releases set forth in Article V of the Settlement.  Such releases include the release of all claims asserted by YPF and its Affiliates in the Chapter 11 Cases.

d.  <u>Government Agreement</u>:  The Settlement's effectiveness is conditioned on an agreement between the Defendants and the United States (on behalf of EPA, NOAA, and DOI) and the States of Ohio and Wisconsin, which will provide covenants not to sue and contribution protection in connection with various sites, including the Diamond Alkali Superfund Site, the Painesville Ohio Site, and the Milwaukee Solvay Site in exchange for the significant recoveries they will receive from the settlement proceeds and covenants not to sue by the Defendants.  The Government Agreement is subject to public comment, after which the United States will either file a motion seeking court approval or, in its sole discretion, terminate the Government Agreement if the public comments disclose facts or considerations that indicate the Government Agreement is inappropriate, improper, or inadequate.  Separate approval of the Government Agreement is *not* being sought by this Motion, but will be subject to separate motion practice in the Bankruptcy Court and/or the District Court for the District of Delaware; however, if this Motion is not granted, the Government Agreement will not become effective.

e.  <u>OCC Agreement</u>:  The Settlement's effectiveness is also conditioned on the effectiveness of an agreement between the Defendants and OCC in which the parties will exchange certain releases and covenants not to sue, along with the agreed-to dismissal with prejudice of all Maxus-related litigation still pending, in exchange for the significant recovery OCC will receive from the settlement

---

[4] These terms are summarized for illustrative purposes only.  The terms of the Settlement are governed by the language in the Settlement.

[5] This reflects the PBGC Reduction (as defined below).

proceeds.    Approval of the OCC Agreement is *not* being sought by this Motion; however, if this Motion is not granted, the OCC Agreement will not become effective.

f.  <u>Covenants Not to Sue</u>:   The Settlement contains covenants by the Defendants not to sue any PRPs (*i.e.*, potentially responsible persons, including the current and former members of the CPG and the members of the Gibbons Group) for contribution or cost recovery for amounts arising out of the Defendants' settlement payment; provided however, that such covenants not to sue will not apply to any PRP that sues the Defendants.

g.  <u>Trust Covenant Not to Sue</u>:   The Settlement also contains a covenant by the Trust not to sue any PRP for contribution or cost recovery; provided however, that the Trust will be permitted to assert such claims as a defense or offset with respect to any Claim that has not been allowed as of the date of the Settlement.

h.  <u>Miscellaneous YPF and Trust Agreements</u>:  The Trust and YPF Defendants have agreed that in exchange for the Trust's commitment to use reasonable best efforts to procure the release of the Liberty Mutual Bond which is secured by a $1 million letter of credit issued by Citibank, N.A. and guaranteed by YPF, YPF's claim on the Liberty Bond (including Claim number 2660) will be disallowed and the related escrow reserved under the Neptune Sale Order would be released to the Trust.  The Trust and the YPF Defendants have also agreed to a $2.0 million reduction of the YPF Defendants' Settlement Amount in connection with the offset reserved for YPF in the *Order Granting Stipulation and Consent Order Between the Pension Benefit Guaranty Corporation, the YPF Entities and the Liquidating Trust Regarding Certain Pension Claims* [Docket No. 1940] (the "<u>PBGC Reduction</u>").

i.  <u>Termination</u>:  The Settlement provides for circumstances in which one or more of the parties may terminate it.  These include a denial of this Motion on the grounds that the Settlement is not reasonable and that the motion for approval of the Government Agreement is denied.  The Settlement also is subject to termination by the Trust if it has not become effective by August 1, 2023, subject to procedures whereby the Mediator may decide to grant an extension, which decision is final.

28.    As part of the Settlement, the Parties have agreed to seek clarification of the Plan Injunction, as further described below, to make crystal clear what actions can and cannot be brought by any person holding a claim against the Debtors:

The Plan, including Articles IV.H and XI, enjoins and precludes all parties from prosecuting any and all Trust Derivative Claims and Trust Contribution Claims which were or could have been asserted by the Trust or other parties (but which

became Trust Derivative Claims on the Petition Date) against any of the YPF Released Parties or the Repsol Released Parties.

29.      In an effort to provide broad notice of the Settlement and requested injunction, the Trust is serving this Motion within three (3) calendar days of the filing of this Motion and Defendants will publish notice of the hearing on this Motion in a widely available national newspaper.  The Trust and/or Defendants may supplement this service with such additional service or publication they deem appropriate.

## RELIEF REQUESTED

30.      By this Motion, the Trust respectfully requests that this Court enter an Order substantially in the form of the Proposed Order annexed hereto as **Exhibit A** (i) approving the Settlement pursuant to Bankruptcy Rule 9019 and Section 105 of the Bankruptcy Code, (ii) clarifying that the Plan Injunction enjoins all parties from asserting certain claims against any of the YPF Released Parties or the Repsol Released Parties as described more fully below and in the Settlement, and (iii) granting related relief.

## BASIS FOR RELIEF

**I.      The Settlement Satisfies the Standards of Bankruptcy Rule 9019 and Should Be Approved.**

31.      Under the Plan, the decision whether to settle the Adversary Proceeding lies in the sole discretion of the Trust, and approval of this Count under Rule 9019 is not required. Defendants, however, have requested that the Trust seek this Court's approval as an integral part of the Settlement.  Rule 9019(a) provides, in relevant part:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).  In addition, Section 105(a) of the Bankruptcy Code allows a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

32.     Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 428 (1968). It is well settled that in order to "minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)); *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that "[s]ettlements are favored [in bankruptcy]"); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same). Accordingly, when required, "courts are able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, affect the result the [Bankruptcy] Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

33.     Pursuant to Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997) ("The decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (citation omitted)); *In re Nw. Corp.*, No. 03-12872 (KJC), 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("[T]he bankruptcy court must determine whether the compromise is fair,

reasonable, and in the best interests of the estate.") (citation omitted); *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr D. Del. 2005) ("[T]he bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable."). "Ultimately, the decision whether or not to approve a settlement agreement lies within the sound discretion of the Court." *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014).[6]

34.     In *Martin*, the United States Court of Appeals for the Third Circuit set forth a four-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors the Court must consider are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393.  *See also In re Nutraquest*, 434 F.3d at 644–45 (applying *Martin's* four-factor test to affirm district court's order approving settlement); *Nebo Ventures, LLC v. Stanziale (In re Novapro Holdings, LLC)*, No. 18-766-RGA, 2019 U.S. Dist. LEXIS 49047

---

[6] Courts in this district and elsewhere routinely approve settlements pursuant to Bankruptcy Rule 9019(a) even where a confirmed plan, as here, provides the reorganized debtor, plan administrator, or liquidating trust the authority to enter into settlements without court approval.  *See, e.g.*, *In re SS Body Armor I, Inc.*, 2021 WL 2315177, at *1 & *9  (Bankr. D. Del. June 7, 2021) (approving a Rule 9019 motion brought by a recovery trustee when the plan gave the trustee the authority to settle claims without court approval); *In re Syntax-Brillian Corp.*, 2016 WL 7177615, at *3 (D. Del. Dec. 9, 2016) (involving a plan that gave a liquidating trust the sole authority to settle claims, and noting that the trustee of a liquidation trust entered into a settlement under Rule 9019); *Strong v. Prince, Yeates & Geldzahler*, 416 F. Supp. 3d 1300, 1305-1306 (D. Utah 2019) ) (discussing procedural history including court approval of settlement brought by liquidating trustee pursuant to Rule 9019, and plan included a provision allowing the liquidating trustee to settlement without further order of the bankruptcy court); *In re Health Diagnostic Lab'y, Inc.*, 588 B.R. 154 (Bankr. E.D. Va. 2018) (approving settlement negotiated by liquidating trustee under Rule 9019 and confirming liquidating trustee's authority to settle claims when trust was formed pursuant to the plan, which empowered the trustee to prosecute and/or settle such claims without approval from the bankruptcy court); *Whyte v. Kivisto (In re SemCrude, L.P.)*, Bankruptcy No. 08-11525 (BLS), Adversary No. 09-50189 (BLS), 2010 WL 4814377 (Bankr. D. Del. Nov. 19, 2010); *In re Fred's Inc.*, Case No. 19-11984 (CTG), D.I. 1776 (Bankr. D. Del. Jan. 17, 2023); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (SCC), D.I. 59921 (Bankr. S.D.N.Y. Sept. 5, 2019).

(D. Del., Mar. 5, 2019) (applying *Martin's* four-factor test to affirm bankruptcy court's order approving settlement); *Key3Media*, 336 B.R. at 93 (holding that, when determining whether a compromise is in the best interests of the estate, courts must "assess and balance the value of the claim that is being compromised against the value of the estate of the acceptance of the compromise proposal").

35.     Importantly, it is well-established that a settlement proponent need not convince the Court that a settlement is the best possible compromise, but only that the settlement falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 77–78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."); *Nortel*, 522 B.R. at 510 (same).

36.     The Trust respectfully submits that the Settlement is fair and reasonable, is in the best interests of the Debtors' estates and creditors, and should be approved pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code. Indeed, the Settlement is the product of extensive, good-faith discussions and arms' length bargaining among the Trust and the Defendants, with the oversight of the Hon. William B. Chandler III (Ret., Delaware Chancellor) as mediator, for over a period of more than 18 months. The Trust believes that the Settlement represents a very favorable result for the Debtors' estates and falls well within the range of reasonableness under the *Martin* factors.

37.     Although the Trust is confident in their legal and factual positions, litigation is inherently uncertain.  With respect to the first and third *Martin* factors—the probability of success

in litigation and complexity of the litigation involved—in the absence of the Settlement, any potential recovery on account of the Trust's claims against the Defendants would require the Trust to continue to engage in lengthy and costly litigation.  To date, nearly 100 depositions have been conducted,[7] millions of pages of documents have been produced, and the parties have generated approximately 3,500 pages of expert reports, as well as countless other pleadings, conferences, and negotiations related to over thirty years of history concerning the events giving rise to this dispute.  While the Trust believes that this voluminous record provides the Trust with evidence and expert testimony to support its case, the Trust is faced with a risk that this Court does not agree.

38.    Moreover, following this Court's decision on the Trust's motion for summary judgment and the Defendants' cross motions for summary judgment (*see Maxus Liquidating Trust v. YPF S.A., et al. (In re Maxus Energy Corp.)*, 641 B.R. 467 (Bankr. D. Del. 2022)), the parties have continued to incur legal fees and expenses in preparation for trial, including in connection with motions pending before the Court, and would otherwise expect to spend months preparing for a six-week trial before this Court, with post-trial submissions likely (and almost inevitably multiple appeals no matter which party prevails at trial).  The inherent uncertainty with respect to litigation of the Trust's claims weighs in favor of compromise under these circumstances.  *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) (finding uncertainty weighs in favor of settlement); *see also Moren v. Ray & Bergman, et al.*, 2007 WL 953115 (9th Cir. Jan. 29, 2007) ("Given the tremendous uncertainty of success at trial, this factor weighs heavily in favor of approval of the compromise").  Furthermore, any judgment obtained may be subject to appeal,

---

[7] These include fact and expert witness depositions in both the Passaic River Litigation and in the Adversary Proceeding.

which could entail a significant and additional delay in distributions to creditors in these Chapter 11 Cases (that have already been pending for over 6 years). On the contrary, the Settlement allows the Trust and the Defendants to reach a just, reasonable, and consensual outcome, and avoids the uncertainty of protracted and expensive litigation.

39.     In addition, while the Trust does not believe that difficulty in collection is a significant factor in the *Martin* analysis as applied to these facts, it is cognizant that there may be impediments to collecting on any judgment. By contrast, the Settlement provides for a consensual payment of $573 million to the Debtors' estates by the Defendants.

40.     Finally, with respect to the paramount interest of creditors, the Trust believes that the Settlement inures to the benefit of, and is in the paramount interests of, its creditors. The Settlement will facilitate the YPF Defendants' Settlement Payment and the Repsol Defendants' Settlement Payment, which together provide over half a billion dollars to the Debtors' estates for distribution to creditors, including OCC (Maxus's indemnitee and largest private creditor) and the United States,  on account of funds expended or to be expended in connection with the cleanup and restoration of the Diamond Alkali Superfund Site. In addition, both OCC and the United States have agreed to release claims or covenant not to sue in exchange for the money they will receive as part of the Settlement, highlighting that the Debtors' largest creditors view the Settlement, at the very least, as reasonable (though the Government Agreement remains subject to public review and comment). The Settlement will also end almost two decades of litigation involving YPF, Repsol, and the Debtors regarding New Jersey's Passaic River and the Diamond Alkali Superfund Site. Finally, in an effort to achieve global peace, each of the Defendants have covenanted not to sue any PRP for contribution or cleanup costs (including for any contribution

claims arising out of the Defendants' settlement payment) so long as those PRPs do not assert contribution claims against the Defendants or the Related Parties.[8]

## II.    The Plan Injunction Enjoins the Pursuit of the Trust's Causes of Action.

41.    Pursuant to the Plan Injunction (Plan Art. XI), the Plan provision regarding Preservation of Causes of Action (Plan Art. IV.H), and this Court's prior order in this proceeding, *see* Letter Opinion dated February 15, 2019 (D.I. 2186) ("under the Third Circuit's decision in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014) and this Court's ruling in *Maxus*, 571 B.R. at 660, which is law of the case, the alter ego claims of the Debtor's creditors are property of the estate and may only be pursued by the Trust") ("Letter Opinion"), all entities and individuals are enjoined and precluded from prosecuting any of the "Liquidating Trust Causes of Action."[9]    Tracing through the definition and linking them to the Plan Injunction, it is clear that, in tandem, they enjoin any creditor of the Debtors from ever pursuing the Repsol Defendants or the YPF Defendants for the defined claims, which would include any and all alter ego and fraudulent conveyance claims, among others.    *See, e.g.*, *Grossman v. Belridge Grp. (In re Lothian Oil, Inc.)*, 531 Fed. App'x. 428, 436–37 (5th Cir. 2013) (interpreting a similar plan injunction provision and finding parties were enjoined from acting upon derivative causes of action belonging to the estate).    However, a party reviewing the Plan must trace through the Plan's numerous defined terms and reference back to

---

[8] The covenants not to sue provided by the Defendants will not apply as to any PRP that sues such Defendant or its Affiliates.  Similarly, the Trust's covenant not to sue for contribution will not prevent the Trust from asserting such claims in defense to the allowance of any Claim that has not yet been allowed as of the date of the settlement.

[9] The Plan, attached hereto as **Exhibit C**, defines "Liquidating Trust Causes of Action" to mean "all Claims and Causes of Action of the Estates . . .  that will be transferred to the Liquidating Trust on the Effective Date . . . . For the avoidance of doubt, Liquidating Trust Causes of Action shall include the YPF Causes of Action, the Repsol Causes of Action . . . .").  Plan at 13; *see also* Plan at 23, 19 (defining (i) YPF Causes of Action as "any and all Causes of Action held by the Debtors and their estates against any of the YPF Entities" and (ii) Repsol Causes of Action as "any and all Causes of Action held by the Debtors and the Estates against any of the Repsol Entities.").

the Plan Injunction, as well as previous orders in this case, to reach that same conclusion.  As such,

the Defendants desire to make it crystal clear to all parties through the Settlement that they can

never take any action with respect to the Trust Derivative Causes of Action and Trust Contribution

Claims, all of which are being released by the Trust, the only party with standing to pursue them.

42.    To explain, in the Confirmation Order, the Court found that "as described in greater

detail below, the Plan's release, exculpation, and injunction provisions are warranted, necessary

and appropriate, and are supported by sufficient consent and consideration under the circumstances

of the Chapter 11 Cases as a whole and are consistent with sections 105, 1123(b)(6), and 1129 of

the Bankruptcy Code and applicable law in this Circuit."  Confirmation Order at 10, ¶ I.

43.    Section 1141 of the Bankruptcy Code provides:

> Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions
> of a confirmed plan bind the debtor, any entity issuing securities under the plan,
> any entity acquiring property under the plan, and any creditor, equity security
> holder, or general partner in the debtor, whether or not the claim or interest of such
> creditor, equity security holder, or general partner is impaired under the plan and
> whether or not such creditor, equity security holder, or general partner has accepted
> the plan.

11 U.S.C. § 1141(a).

44.    "A confirmation order is a binding, final order, accorded full res judicata effect and

precludes the raising of issues which could or should have been raised during the pendency of the

case."  *In re Worldwide Direct, Inc.*, 280 B.R. 819, 821–22 (Bankr. D. Del. 2002) (Walrath, J.)

(internal citations and quotations omitted).  "Because a confirmation order must be accorded res

judicata effect, courts have held that unless a plan expressly reserves the right to litigate a specific

cause of action, confirmation of the plan will bar its assertion thereafter."  *Id.* at 822 (collecting

cases).

45.    The Plan (Art. IV.H) expressly provides that all Causes of Action (including the Repsol Causes of Action and YPF Causes of Action) of the Debtors or their estates that were not otherwise settled or released on or prior to the Plan Effective Date were transferred to the Trust on the Plan Effective Date.[10]

46.    The Liquidating Trust Agreement states that the Liquidating Trustee, subject to the prior written approval of the Liquidating Trust Committee, shall have the right to prosecute or settle any Causes of Action.  Liquidating Trust Agreement at Sections 3.02(b) and 4.09(a).  The Plan and prior orders of this Court enjoin and preclude any and all entities and individuals from prosecuting any of the Trust's Causes of Action, which include the Trust Derivative Claims and the Trust Contribution Claims.  *See e.g.,* Plan, Art. IV.H, Art. XI.E, Letter Opinion at 3.[11]

47.    The Trust, in the interest of providing the Defendants with the certainty and global resolution they seek in executing the Settlement, seeks the Court's clarification that, upon the effective date of the Settlement as set forth in the terms therein, any and all parties are enjoined

---

[10] *See* Plan at Art. IV. H providing:

> the [] Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Estates, whether arising before or after the Petition Date . . . . The [] Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing . . . . For the avoidance of doubt and without limiting the breadth and generality of the foregoing, the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims shall be preserved for prosecution by the [] Trust.

[11] The Confirmation Order also provides that "[a]ll injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any Order of the Court then existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Order) shall remain in full force and effect to the maximum extent permitted by law." Confirmation Order at 23, ¶ 14.

and precluded by the Plan Injunction from prosecuting any Trust Derivative Claims, which are

defined in the Settlement as:

> any and all Causes of Action that were or could have been asserted by the Debtors
> and/or the Trust against any of the YPF Released Parties or the Repsol Released
> Parties, seeking relief or recovery arising from harm to any Debtor or any Debtor's
> estate based on, inter alia, any legal theory (i) that such Released Party was the
> corporate alter ego of any Debtor, (ii) that the corporate veil between any Debtor
> and such Released Party should be pierced, (iii) that such Released Party is liable
> under any theory of successor liability as a successor to any Debtor, (iv) that such
> Released Party wrongfully took or otherwise appropriated assets of any Debtor, or
> (v) that such Released Party otherwise interfered with any Debtor's ability to meet
> its legal obligations.  For the avoidance of doubt, Trust Derivative Claims include
> (x) the Causes of Action that have been brought by the Trust in the Adversary
> Proceeding and (y) all Causes of Action that are similar or analogous to the Causes
> of Action set forth in (i)-(v) above and that arise from the same or substantially
> similar facts and allegations.

48.    Providing clarification of the terms and provisions of a plan is within the powers of

the bankruptcy court, and such clarifying "interpretation is governed by the same principles as

contract interpretation." *In re NorthEast Gas Generation, LLC*, 2022 WL 828263 (Bankr. D. Del.

Mar. 18, 2022) (citing *In re Shenago Grp. Inc.*, 501 F.3d 388, 344 (3d Cir. 2007)).[12]

49.    Courts—including this Court, in these Chapter 11 Cases—have held that claims

based on theories of successor liability, alter ego liability, or fraudulent transfer are within the

injunctive power of the bankruptcy court as, importantly, such derivative claims are property of

the bankruptcy estate and the estate (here, the Trust) has "exclusive standing" to assert such claims.

*See In re Maxus Energy Corp*., 571 B.R. 650, 656 (Bankr. D. Del. 2017) (finding claims predicated

on alter ego liability are property of the bankruptcy estate and creditors lack standing to assert such

claims); *see also In re Emoral, Inc*., 740 F.3d at 879 (affirming the district court's decision that

---

[12] "[A] bankruptcy court may clarify a plan where it is silent or ambiguous.  Bankruptcy courts
can also use this authority to 'interpret' plan provisions to further equitable concerns." *Beal Bank,
S.S.B. v. Jack's Marine, Inc.*, 201 B.R. 376, 380 (E.D. Pa. 1996) (internal citations omitted).

plaintiffs' successor liability claims were property of the bankruptcy estate and, thus, creditors lacked standing to assert such claims); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 430 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014); *cf. In re Tronox Inc*., 855 F.3d 84, 112 (2d Cir. 2017) (where state court plaintiffs sought to use trial court's findings "involv[ing] generalized claims for fraudulent conveyance" and "those generalized findings would benefit their individual-creditors case, then their claims are no less generalized than the fraudulent-conveyance claims in the Adversary Proceeding" and the district court's injunction against pursuing such claims was proper).

50.    Indeed, the Second and Third Circuits have enforced injunctions of duplicative or derivative claims by a bankruptcy court (or a district court exercising bankruptcy jurisdiction) similar to the one subject to this Motion.  *See In re Tronox Inc.*, 855 F.3d 84 (2d Cir. 2017); *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014); *In re Bernard L. Madoff Inv. Securities LLC*, 740 F.3d 81 at 89 (2d. Cir. 2014) ("Insofar as such claims are truly duplicative or derivative, they undoubtedly have an effect on the bankruptcy estate and, thus, are subject to the Bankruptcy Court's jurisdiction.").

51.    Clarification and enforcement of the Plan Injunction is appropriate here to provide certainty to the parties that there shall be no re-litigation of claims asserted (or that could have been asserted) on behalf of all creditors of the Debtors that have been settled or otherwise resolved by the Trust, particularly where the Trustee has resolved those claims in a manner that provides creditors with over half a billion dollars, as provided in the Settlement.

52.    If Trust Derivative Claims, as defined in the Settlement, were allowed to be asserted, claimants would be permitted to side-step the jurisdiction of this Court, and the

mechanisms and compromises approved in the Plan, Confirmation Order, and Liquidating Trust Agreement.  Permitting parties with claims derivative or duplicative of those owned and settled by the Trust to prosecute such claims would also create the potential for double recovery.

## NOTICE

53.     The Trust will provide notice of this Motion to all parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and/or their respective counsel, as applicable.  The Defendants also will provide notice to all creditors of the Debtors, all government entities and PRPs at sites where the Debtors had operations, and publish notice of the hearing on this Motion in a widely available national newspaper in advance of such hearing. The Trust submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

54.     No prior request for the relief sought in this Motion has been made to this or any other court, except that the Debtors originally sought approval [Docket No. 300] for a settlement of all claims and causes of action they may have had against the YPF Defendants, but subsequently withdrew their motion prior to any hearing on the motion [Docket No. 1260].

*[Remainder of the page intentionally left blank]*

WHEREFORE, the Trust requests that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  April 7, 2023
      Wilmington, Delaware

Respectfully submitted,

**FARNAN LLP**

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*-and-*

**WHITE & CASE LLP**
J. Christopher Shore (admitted pro hac vice)
Thomas MacWright (admitted pro hac vice)
Brett Bakemeyer (admitted pro hac vice)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
cshore@whitecase.com
tmacwright@whitecase.com
brett.bakemeyer@whitecase.com

*Counsel for the Maxus Liquidating Trust*