**<u>Exhibit B</u>**

**Settlement Agreement**

**EXECUTION VERSION**

## SETTLEMENT AND RELEASE

This SETTLEMENT AND RELEASE (including all exhibits attached hereto, the "**Agreement**") is made and entered into as of April 6, 2023 (the "**Signing Date**"), by and among (i) the Maxus Liquidating Trust (the "**Trust**"); (ii) YPF S.A. ("**YPF**"), YPF International S.A. (f/k/a YPF International Ltd.) ("**YPFI**"), YPF Holdings, Inc. ("**YPFH**"), and YCLH Holdings, Inc. (f/k/a CLH Holdings, Inc.) ("**CLHH**," and together with YPF, YPFI, and YPFH, the "**YPF Defendants**"); and (iii) Repsol, S.A. ("**Repsol**"), Repsol Exploración, S.A., Repsol USA Holdings LLC, Repsol E&P USA LLC, Repsol Offshore E&P USA Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (f/k/a Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "**Repsol Defendants**," and together with the YPF Defendants, the "**Defendants**") (each of the foregoing, a "**Party**" and, collectively, the "**Parties**").

## RECITALS

**WHEREAS**, on or about June 17, 2016 (the "**Petition Date**"), Maxus Energy Corporation ("**Maxus**"), Tierra Solutions, Inc. ("**Tierra**"), Maxus International Energy Company ("**MIEC**"), Maxus (U.S.) Exploration Company ("**MUSE**"), and Gateway Coal Company (each, a "**Debtor**," and, collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing cases (the "**Chapter 11 Cases**"), which are jointly administered for procedural purposes and which were substantively consolidated pursuant to the Plan and Confirmation Order (each as defined below);

**WHEREAS**, the Debtors' filing of voluntary petitions resulted in an automatic stay of, *inter alia*, litigation against the Debtors concerning any Claims that arose prior to the Petition Date;

**WHEREAS**, Occidental Chemical Corporation ("**OCC**") filed Proofs of Claim Numbers 316 and 408 against Tierra and Proofs of Claim Numbers 320 and 413 against Maxus (collectively, the "**OCC Proofs of Claim**"), each alleging various Claims, as defined herein, under a Stock Purchase Agreement by and among Diamond Shamrock Corporation, Occidental Petroleum Corporation, Occidental Chemical Holding Corporation, and Oxy-Diamond Alkali Corporation, dated September 4, 1986 (the "**SPA**"), and in particular the indemnification provisions of the SPA (the "**OCC Indemnity**"), including in connection with the Diamond Alkali Superfund Site (as defined below);

**WHEREAS**, the United States, on behalf of the EPA, the DOI, and NOAA, each as defined herein, filed Proofs of Claim Numbers 473, 474, 2780, and 2782 against Maxus and Proofs of Claim Numbers 476, 2778, and 2781 against Tierra (collectively, the "**United States Proofs of Claim**"), each alleging various Claims in connection with each of the following:  (i) the four operable units of the Diamond Alkali Superfund Site, (ii) the Milwaukee Solvay Site, as defined herein, (iii) the Diamond Shamrock Kearny Plant Site at 1015 Belleville Turnpike, Kearny, New Jersey; (iv) the St. Johnsbury Trucking Site at Obrien St. and Sellers St. in Kearny, New Jersey; (v) certain real property related to the Painesville Works Site in Painesville, Ohio, including real property related to Operable Unit 2 (Cement Plant), Operable Unit 3 (Lake Erie Eastern Bluff Area), Operable Unit 4 (Brine Ponds), Operable Unit 6 (Coke Plant), Operable Unit 7 (Settling Basin #3), Operable Unit 10 (One Acre Site Landfill), Operable Unit 14 (Settling Basin #4),

1

Operable Unit 15 (Main Plant Area), Operable Unit 16 (Chrome Site), Operable Unit 18 (Internal Railroad Spur), Operable Unit 20 (Chrome Site Support Area); (vi) Painesville Parcel 7 A I; and (vii) the Maxus Agricultural Chemicals facility at 5421 Reichhold Rd., Tuscaloosa, Alabama;

**WHEREAS**, the Claims asserted in the United States Proofs of Claim (as most recently amended) total $7,138,239,976 to $11,906,239,976;

**WHEREAS**, the members of the Gibbons Group (as defined below) filed Proofs of Claim Numbers 233 (Harris Corporation), 324 (Mallinckrodt LLC), 339 (National-Standard LLC), 393 (Ashland LLC), 397 (Givaudan Fragrances Corporation), and 403 (ISP Chemicals LLC) against Tierra and Proofs of Claim Numbers 252 (National-Standard LLC), 307 (Harris Corporation), 394 (Ashland LLC), 395 (Mallinckrodt LLC), 398 (ISP Chemicals LLC), and 406 (Givaudan Fragrances Corporation) against Maxus (collectively, the "**Gibbons Group Proofs of Claim**"), each alleging various Claims in connection with the Diamond Alkali Superfund Site;

**WHEREAS**, the Lower Passaic River Study Area Cooperating Parties Group (the "**CPG**") filed Proofs of Claim Numbers 134 and 2617 against Maxus and Proofs of Claim Numbers 135 and 2629 against Tierra (collectively, the "**CPG Proofs of Claim**"), each alleging various Claims in connection with the Diamond Alkali Superfund Site;

**WHEREAS**, the State of Ohio ("**Ohio**") filed Proof of Claim Number 469 against Maxus and Proofs of Claim Numbers 470 and 471 against Tierra (collectively, the "**Ohio Proofs of Claim**"), each alleging various Claims in connection with the Painesville Ohio Site, as defined herein;

**WHEREAS**, the State of Wisconsin ("**Wisconsin**"), Department of Natural Resources filed Proof of Claim Number 80 against Maxus (the "**Wisconsin Proof of Claim**"), alleging various Claims in connection with a site referred to therein as the "Solvay Coke and Gas Site";

**WHEREAS**, on May 22, 2017, the Bankruptcy Court conducted an evidentiary hearing on confirmation (the "**Confirmation Hearing**") of the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (the "**Plan**") [Docket No. 1460], and various creditors appeared at the Confirmation Hearing, including the YPF Defendants, OCC, the Official Committee of Unsecured Creditors, and the United States Department of Justice on behalf of EPA, DOI, and NOAA;

**WHEREAS**, on May 22, 2017, the Bankruptcy Court entered an order (Case No. 16-11501, D.I. 1460) (the "**Confirmation Order**") confirming the Plan;

**WHEREAS**, on July 14, 2017, the effective date of the Plan occurred (the "**Plan Effective Date**");

**WHEREAS**, in the Confirmation Order, the Bankruptcy Court found and concluded that (i) known holders of claims entitled to vote on the Plan (those in Class 4 and Class 5), each were provided, among other things, copies of the Plan, the *Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (the "**Disclosure Statement**"), and notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**"); (ii) known holders of claims not

entitled to vote on the Plan were provided, among other things, copies of the Confirmation Hearing Notice and instructions on obtaining the Plan and the Disclosure Statement; (iii) the Debtors published the Confirmation Hearing Notice in the *New York Times*; and (iv) the Debtors' claims and noticing agent Prime Clerk LLC (now Kroll Restructuring Administration LLC) (the "**Claims and Noticing Agent**") published on its website, among other things, the Plan and the Disclosure Statement, which were available to the public free of charge (Confirmation Order at 7-8, ¶¶ G.1-5);

**WHEREAS**, in the Confirmation Order, the Bankruptcy Court ordered that "[g]ood and sufficient notice has been provided of (a) the Confirmation Hearing; (b) the deadline for filing and serving objections to the confirmation of the Plan; . . . and (d) the settlements, releases, exculpations, injunctions, and related provisions of the Plan.  No other or further notice is required" (Confirmation Order at 21, ¶ 9);

**WHEREAS**, in the Confirmation Order, the Bankruptcy Court found and concluded that the Plan had "been accepted by creditors holding in excess of two-thirds in amount and one-half in number of Claims that voted in each of Classes 4 and 5" (Confirmation Order at 12, ¶ N);

**WHEREAS**, pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement (as defined below), the Trust was created on the Plan Effective Date for the purpose of liquidating and distributing the Liquidating Trust Assets (as defined in the Plan) for the benefit of the Liquidating Trust Beneficiaries, and the Honorable Joseph J. Farnan, Jr. (Ret.) was appointed as the Trustee and Delaware Trustee of the Trust;

**WHEREAS**, the Plan provided that all Causes of Action (as defined in the Plan) that were not otherwise settled or released on or prior to the Plan Effective Date were transferred to the Trust on the Plan Effective Date;

**WHEREAS**, Section IV. H of the Plan provided that the Trust "shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court";

**WHEREAS**, Section XI. E of the Plan (the "**Plan Injunction**") provides:

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES, INCLUDING, BUT NOT LIMITED TO, THOSE THAT: (1) HAVE BEEN RELEASED PURSUANT TO ARTICLE XI. C HEREOF; (2) ARE AGAINST AN EXCULPATED PARTY; OR (3) ARE OTHERWISE STAYED, SETTLED, COMPROMISED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM (ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS,

EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES): (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY OTHER ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED); (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED OR EXCULPATED); (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED OR EXCULPATED); (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS WITH RESPECT TO ANY RETAINED PROPERTY, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED OR EXCULPATED) . . . ;

**WHEREAS**, in the Confirmation Order, the Bankruptcy Court found that "as described in greater detail below, the Plan's release, exculpation, and injunction provisions are warranted, necessary and appropriate, and are supported by sufficient consent and consideration under the circumstances of the Chapter 11 Cases as a whole and are consistent with sections 105, 1123(b)(6), and 1129 of the Bankruptcy Code and applicable law in this Circuit" (Confirmation Order at 10, ¶ I);

**WHEREAS**, in the Confirmation Order, the Bankruptcy Court found that

pursuant to section 1123(b) of the Bankruptcy Code, Bankruptcy Rule 3016, and applicable authority, the release, exculpation, and injunction provisions of the Plan

are warranted, necessary and appropriate and are supported by sufficient consent and consideration under the circumstances of the Plan and the Chapter 11 Cases as a whole. Proper, timely, adequate, and sufficient notice of the release, exculpation, and injunction provisions, including those contained in Article XI of the Plan, has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the orders of this Court, and due process. Interested parties have had a sufficient and adequate opportunity to object to such provisions and to be heard as to their objections, and no further notice of such provisions is required for entry of this Order. Each of the release, exculpation, and injunction provisions set forth in the Plan and this Order is: (a) within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) an integral element of the Plan; (c) conferring material benefit on, and is in the best interests of, the Debtors, their Estates, and Holders of Claims and Equity Interests; (d) important to the objective of the Plan to resolve all Claims and Equity Interests; and (e) consistent with sections 105, 1123, and 1129 and other applicable provisions of the Bankruptcy Code and any other applicable laws

(Confirmation Order at 17-18, ¶ CC);

**WHEREAS**, in the Confirmation Order, the Bankruptcy Court ordered that

upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Order shall be immediately effective and enforceable and deemed binding upon the Debtors, their Estates, the Liquidating Trustee, the PT Trustee, the ERRT Trustee, and any and all Holders of Claims or Equity Interests (regardless of whether such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Persons or Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Person or Entity acquiring property under the Plan or this Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors

(Confirmation Order at 23, ¶ 15);

**WHEREAS**, the Plan settled the OCC Proofs of Claim by providing OCC an allowed Class 4 Environmental Claim (as defined in the Plan) in the amount of $510,626,872.18 and a Class 5 Diamond Alkali Claim (as defined in the Plan);

**WHEREAS**, the Plan settled the United States Proofs of Claim by providing the United States an allowed Class 4 Environmental Claim in the amount of $145,696,361 (of which $145,000,000 relates to the United States Diamond Alkali Class 4 Claim (as defined in the Plan) for the Diamond Alkali Superfund Site and $696,361 relates to the United States Milwaukee Solvay Class 4 Claim (as defined in the Plan) for the Milwaukee Solvay Site (as defined herein)) and a Class 5 Diamond Alkali Claim in an amount of no less than $61 million;

**WHEREAS**, the Plan partially settled the Gibbons Group Proofs of Claim by providing Ashland LLC an allowed Class 4 Environmental Claim in the amount of $436,849.39, Mallinckrodt LLC an allowed Class 4 Environmental Claim in the amount of $279,549.13,

National-Standard LLC an allowed Class 4 Environmental Claim in the amount of $139,774.56, and Givaudan Fragrances Corporation an allowed Class 4 Environmental Claim in the amount of $349,508.24 (collectively, the "**Gibbons Group Allowed Class 4 RI/FS Claims**"), with portions of the Gibbons Group Proofs of Claim unresolved by the Plan;

**WHEREAS**, the Plan settled the CPG Proofs of Claim by providing the CPG an allowed Class 4 Environmental Claim in the amount of $14,365,320.14, reduced by the amount of the Gibbons Group Allowed Class 4 RI/FS Claims;

**WHEREAS**, the Plan settled the Ohio Proofs of Claim by providing the Ohio Environmental Protection Agency and the Ohio Department of Natural Resources an allowed Class 4 Environmental Claim in the amount of $25,000,000;

**WHEREAS**, the Plan settled the Wisconsin Proofs of Claim by providing the State of Wisconsin, Department of Natural Resources an allowed Class 4 Environmental Claim in the amount of $5,000,000;

**WHEREAS**, OCC and the Debtors' other creditors that submitted Proofs of Claim or otherwise have Claims that are Allowed, will receive a portion of the Settlement Payments, as defined herein, through the Liquidating Trust Waterfall, as defined in the Plan, in accordance with Article VI.D. of the Plan;

**WHEREAS**, the Plan and the Liquidating Trust Agreement provides that "[a]ll decisions concerning whether to prosecute or settle any Causes of Action (other than Preserved Contribution Claims (as defined in the Plan)) shall be made by the Liquidating Trust Oversight Committee (as defined in the Plan) in good faith and in the best interests of the Liquidating Trust";

**WHEREAS**, the Plan and the Liquidating Trust Agreement provide that if any settlement between the Trust and the YPF Defendants includes the YPF Contribution Release (as defined in the Liquidating Trust Agreement), then such settlement may be approved by the affirmative vote of a simple majority of the Liquidating Trust Oversight Committee;

**WHEREAS**, the distribution of the Liquidating Trust Assets (other than the Preserved Contribution Claims) (both as defined in the Plan) shall be made in accordance with the Liquidating Trust Waterfall as set forth in Article VI. D of the Plan;

**WHEREAS**, the Debtors are entitled to certain alternative minimum tax refunds with respect to tax returns filed in 2018 and 2019 (the "**AMT Refunds**") and on April 23, 2021, counsel to the YPF Defendants agreed that the YPF Defendants are not entitled to claim any of the AMT Refunds amount;

**WHEREAS**, in the Passaic River Litigation (as defined below), OCC, certain of the Debtors, and certain of the Defendants were named as defendants, and OCC filed cross-claims against such Debtors and Defendants;

**WHEREAS**, on December 12, 2013, the Superior Court of New Jersey Law Division-Essex County (the "**NJ Court**") approved a settlement between the State of New Jersey and

defendants Repsol, Maxus, Tierra, MIEC, YPF, YPFH, YPFI, and CLHH for $130 million (the "**RYM Settlement**"), to which Repsol funded $65 million;

WHEREAS, Repsol filed a counterclaim against OCC for contribution under the Spill Compensation and Control Act ("**Spill Act**"), N.J.S.A. 58:10-23.11 to -23.24 for the $65 million Repsol contributed to the RYM Settlement ("**Repsol Contribution Claim**");

WHEREAS, on January 29, 2015, the NJ Court dismissed OCC's cross-claims against Defendants that were asserted under fraudulent transfer, civil conspiracy, and unjust enrichment theories as time-barred;

WHEREAS, on April 6, 2016, the NJ Court granted summary judgment to Repsol on the OCC Cross-Claims (as defined below) against Repsol under its veil-piercing/alter ego theories;

WHEREAS, on June 14, 2016, the NJ Court's special master issued a recommendation that the NJ Court grant summary judgment in Repsol's favor on the Repsol Contribution Claim;

WHEREAS, on June 20, 2016, OCC removed its remaining cross-claims against Defendants (which asserted liability under a veil-piercing or alter ego theory) and Repsol's cross-claims against OCC to the United States Bankruptcy Court for the District of New Jersey (Adv. Pro. No. 16-51025, D.I. No. 1), which then transferred such claims to the Bankruptcy Court (Adv. Pro. No. 16-51025, D.I. No. 12), where such claims are captioned *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corporation, et al.*, Adv. Pro. No. 16-51025 (the "**Removed Action**");

WHEREAS, the Bankruptcy Court determined in its August 2, 2017 opinion (Case No. 16–11501, D.I. 1745-1) that the OCC Alter Ego Cross-Claims against Defendants were "general" claims that the Debtors could have asserted under state law pre-petition and therefore constituted property of the Debtors' estates such that the Debtors had exclusive standing to pursue them;

WHEREAS, the OCC Cross-Claims against Repsol and Repsol's cross-claims against OCC were nevertheless remanded to the NJ Court, but the remainder of the OCC Cross-Claims remain pending in the Bankruptcy Court as the Removed Action;

WHEREAS, on November 17, 2017, the NJ Court permitted the Trust to intervene in the Passaic River Litigation;

WHEREAS, on November 22, 2017, the NJ Court entered a final judgment dismissing all of the OCC Cross-Claims against Repsol and granting the Repsol Contribution Claim against OCC, finding that OCC was jointly and severally liable to Repsol for $65 million in Spill Act contribution;

WHEREAS, on January 8, 2018, the Trust appealed the NJ Court's judgment as to the dismissal of the OCC Alter Ego Cross-Claims and OCC's fraudulent transfer claims against Repsol, and OCC appealed the granting of the Repsol Contribution Claim;

**WHEREAS**, in its appellate briefs, the Trust sought, *inter alia*, to have the order dismissing the OCC Cross-Claims under fraudulent transfer theories vacated as moot, or the appeal of that order stayed;

**WHEREAS**, on December 27, 2021, the New Jersey Superior Court Appellate Division ("**NJ Appellate Division**") reversed the NJ Court's granting of summary judgment to Repsol on the OCC Alter Ego Cross-Claims, denied the Trust's request to vacate the order dismissing OCC's fraudulent transfer cross-claims or stay such order, and reversed the NJ Court's granting of summary judgment to Repsol on the Repsol Contribution Claim;

**WHEREAS**, on March 3, 2022, Repsol sought certiorari to appeal the NJ Appellate Division's December 27, 2021 order to the Supreme Court of New Jersey;

**WHEREAS**, on January 10, 2023, the Supreme Court of New Jersey denied Repsol's petition for certiorari;

**WHEREAS**, on or about June 14, 2018, the Trust filed a complaint (the "**Complaint**") against the Defendants with the Bankruptcy Court, captioned *Maxus Liquidating Trust v. YPF S.A. et al.*, Adv. Pro. No. 18-50489 (the "**Adversary Proceeding**");

**WHEREAS**, the Trust has alleged in the Adversary Proceeding certain generalized claims against the Defendants related to the corporate relationship between and among the Debtors and the Defendants, including with respect to certain prepetition transactions entered into between the Debtors and the Defendants;

**WHEREAS**, the claims alleged in the Adversary Proceeding include, without limitation, claims made under federal or state law based on theories of avoidance of fraudulent transfers, veil-piercing/alter ego liability, civil conspiracy, and unjust enrichment;

**WHEREAS**, in a Letter Opinion dated February 15, 2019, the Bankruptcy Court ruled that "under the Third Circuit's decision in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014) and this Court's ruling in [*In re Maxus Energy Corp.*, 571 B.R. 650, 660 (Bankr. D. Del. 2017)], which is the law of the case, the alter ego claims of the Debtor's creditors are property of the estate and may only be pursued by the Trust" (Adv. Pro. No. 18-50489, D.I. No. 107);

**WHEREAS**, in its claim based on a theory of veil-piercing/alter ego liability, the Trust alleges that Defendants' actions during the time they were affiliates of the Debtors and before the Petition Date resulted in the Debtors' inability to satisfy their obligations, including in connection with the proofs of claim filed against the Debtors in the Chapter 11 Cases, and therefore seeks to hold Defendants jointly and severally liable for (i) all Claims of the Debtors' creditors against the Debtors, including, without limitation, the Claims asserted in the proofs of claim filed in the Chapter 11 Cases, all of which represent liabilities that arose prior to the Petition Date, and (ii) other damages including expenses, attorneys' fees, and pre- and post-judgment interest;

**WHEREAS**, Defendants disagree with and dispute the Trust's allegations;

**WHEREAS**, on June 22, 2022, the Bankruptcy Court denied motions for partial summary judgment filed by the Trust and by the Repsol Defendants in the Adversary Proceeding and granted

in part and denied in part a motion for partial summary judgment filed by the YPF Defendants (Adv. Pro. No. 18-50489, D.I. Nos. 738, 739);

**WHEREAS**, the Trust and the Defendants have engaged in mediation before Hon. William B. Chandler III (Ret., Delaware Chancellor) (the "**Mediator**"), and in further good faith and arms' length negotiations with each other and have agreed to a settlement of any claims the Trust may hold against Defendants, claims that Defendants may have against the Trust and the Debtors, and claims that each of the YPF Defendants and Repsol Defendants may have against one another, on the terms set forth herein;

**WHEREAS**, the Parties seek to forever resolve any and all claims by or among them, and any of their Affiliates which were or could have been raised in any action relating to or arising out of any acts or omissions occurring on or before the Effective Date;

**WHEREAS**, as of the date hereof, the YPF Defendants, the Repsol Defendants, OCC, and certain of OCC's affiliates (namely, Occidental Petroleum Corporation, Occidental Chemical Holding Corporation, Glenn Springs Holdings, Inc., Miller Springs Remediation Management, Inc., and Mariana Properties, Inc.) have entered into a *Settlement and Release* attached hereto as Exhibit 1 (the "**OCC Agreement**"); and

**WHEREAS**, the YPF Defendants, the Repsol Defendants, the United States (on behalf of the EPA, DOI, and NOAA), Ohio, and Wisconsin will enter into a *Settlement and Covenant Not to Sue Agreement* attached hereto as Exhibit 2 (the "**Government Agreement**");

**NOW, THEREFORE**, without any final adjudication of any issue of fact or law, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Article I**

**<u>DEFINITIONS</u>**

**Section 1.1    Capitalized Terms Not Defined Herein Are Defined in the Plan.** Capitalized terms used but not otherwise defined herein, including in the Preamble and Recitals, shall have the meanings ascribed to such terms in the Plan.

**Section 1.2    Other Defined Terms**. The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"2014 *Convenio de Finiquito*" means that certain Settlement Agreement ("*Convenio de Finiquito*") by and between YPF, YPF Gas, S.A., and Repsol, dated February 27, 2014.

"2014 Maxus Excluded Matters" means claims that any YPF Released Party, on the one hand, and any Repsol Released Party, on the other, may have between them in relation to: (i) the activities, operations, assets, liabilities, rights and obligations of YPFH, Tierra, Maxus, MIEC, MUSE, CLHH, Gateway Coal Company and/or companies prior to April 16, 2012 that were controlled - directly or indirectly - by YPFH, Tierra, Maxus, MIEC,

MUSE, CLHH and Gateway Coal Company, except for potential claims between any Repsol Released Party, on the one hand, and any YPF Released Party, on the other, with respect to the one hundred thirty million dollars (USD $130,000,000.00) that such companies have paid under the RYM Settlement, the amount of which claims are included in the waivers and releases provided in the 2014 *Convenio de Finiquito*; and (ii) the transfer of assets of YPFI and/or companies that prior to April 16, 2012 were controlled - directly or indirectly - by YPFI, to any Repsol Affiliate.  Item (ii) applies only if the assets were first acquired by YPFI or its subsidiaries from any of the following companies: YPFH; Maxus; MIEC; MUSE and/or companies that were controlled - directly or indirectly - by YPFH, Tierra, Maxus, MIEC, MUSE, CLHH and/or Gateway Coal Company.

"Adversary Proceeding Stipulation of Dismissal" means such term as defined in Section 2.2 hereof.

"Affiliate" means (a) an Entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of a Party, other than an entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (b) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by a Party, or by an Entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of a Party, other than an Entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (c) a person whose business is operated under a lease or operating agreement by a Party, or person substantially all of whose property is operated under an operating agreement with a Party; or (d) an Entity that operates the business or substantially all of the property of a Party under a lease or operating agreement; *provided that* no individual or Governmental Authority shall be an Affiliate.

"Apportioned Final Judgment" means such term as defined in Section 9.6 hereof.

"Bankruptcy Court Order" means an order of the Bankruptcy Court or, upon a report and recommendation of the Bankruptcy Court, an order of the District Court adopting such report and recommendation in relevant part.

"Business Day" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are required or authorized by law or governmental action to close.

"Causes of Action" shall have the meaning set forth in the Plan.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*).

"Citibank LOC" means such term as defined in Section 6.4 hereof.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

10

"Contribution Claims" means Causes of Action held by the Debtors and/or the Trust against any non-Debtor for contribution or cost recovery under any Environmental Law for actual expenses paid by or on behalf of the Debtors prior to the Petition Date.

"Diamond Alkali Superfund Site" means the site designated by EPA inclusive of its four operable units, and encompassing the former manufacturing facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study Area, the Newark Bay Study Area and the areal extent of contamination. The Lower Passaic River Study Area includes the 17-mile tidal stretch of the Passaic River from Dundee Dam to Newark Bay, and tributaries. The Newark Bay Study Area includes Newark Bay and portions of the Hackensack River, Arthur Kill, and Kill van Kull.

"District Court" means a United States District Court.

"District Court Order" means an order of the District Court.

"DOI" means the United States Department of the Interior acting through the Fish and Wildlife Service.

"Dropdead Date" means such term as defined in Section 9.3 hereof.

"Effective Date" means, subject to Section 8.1, Section 8.2, and Section 8.3, the date following the Final Order Date, on which the Trust has received in its bank account in the United States, without offset, deduction or withholding, (i) the full amount of the Repsol Defendants' Settlement Amount and the Repsol Defendants' Accrued Interest Amount from the Escrow Agent or, solely in an Escrow Failure Event, from Repsol in accordance with the provisions of Section 3.3 and Section 4.1, and (ii) the full amount of the YPF Defendants' Settlement Payment and the YPF Defendants' Accrued Interest Amount, in accordance with the provisions of Section 4.2. To the extent that either the Repsol Defendants or the YPF Defendants become Non-Settling Defendants prior to the Effective Date, only the funds being received by the Trust in respect of the Settling Defendants shall be considered in determining whether the Effective Date has occurred.

"Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"Environmental Costs, Claims and Liabilities" means any and all Claims (or any portion thereof) against any of the Debtors or any other Person arising under or in connection with any Environmental Law or the OCC Indemnity.

"Environmental Law" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law, and all judicial and administrative orders and determinations and all common law, in each case concerning in any way the pollution of the environment or the protection of human health, the environment, or natural resources, including, but not limited to, CERCLA, RCRA, and the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a to -23.11z.

"EPA" means the United States Environmental Protection Agency.

"<u>Escrow Account</u>" has the meaning set forth in the Escrow Agreement.

"<u>Escrow Agent</u>" has the meaning set forth in the Escrow Agreement.

"<u>Escrow Agent Fees and Costs</u>" means such term as defined in Section 4.3 herein.

"<u>Escrow Agreement</u>" means the agreement, attached hereto as <u>Exhibit 3</u>, entered into between the Repsol Defendants, the Trust, and the Escrow Agent on the same date as this Agreement governing the terms of the escrow whereby, (i) the Repsol Defendants' Settlement Amount, and (ii) the Repsol Defendants' Interest Amount will be held and released consistent with the terms therein.

"<u>Escrow and LC Deadline</u>" means the date that is the earlier of (i) thirty (30) days after the Signing Date or, if such thirtieth (30th) day is not a Business Day, the following Business Day, and (ii) two (2) Business Days before the hearing date for the Settlement Motion.

"<u>Escrow Failure Event</u>" means such term as defined in Section 3.3 herein.

"<u>Escrow Funding and LC Posting Notice</u>" means such term as defined in Section 2.4 herein.

"<u>Extended Trust Termination Date</u>" means such term as defined in Section 9.3 hereof.

"<u>Extension Request</u>" means such term as defined in Section 9.3 hereof.

"<u>Final Order</u>" means an order or judgment of any court of competent jurisdiction, including the Bankruptcy Court, that has not been modified, amended, reversed, vacated, or stayed, is in full force and effect, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of a court of competent jurisdiction (including the Bankruptcy Court) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with all applicable law and rules, including Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided that* the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"<u>Final Order Date</u>" means the date that the Settlement Order becomes a Final Order or the date on which the Government Agreement Approval Order becomes a Final Order, whichever date is later, *provided that* both the Settlement Order and Government Agreement Approval Order have been entered; *provided further however*, that if either the Repsol Defendants or the YPF Defendants waive entry of the Government Agreement

Approval Order, the Final Order Date shall be deemed to occur in respect of such waiving party on the date of such waiver or the date on which the Settlement Order becomes a Final Order, whichever date is later, it being understood, for the avoidance of doubt, that the Final Order Date shall not be deemed to have occurred in respect of any non-waiving party.

"Gibbons Group" means, collectively, Ashland LLC, f/k/a Ashland Inc., ISP Chemicals LLC, Mallinckrodt LLC, f/k/a Mallinckrodt Inc., National-Standard LLC, Harris Corporation, and Givaudan Fragrances Corporation.

"Government Agreement Approval Motion" means the motion for approval of the Government Agreement.

"Government Agreement Approval Order" means the District Court Order approving the Government Agreement that (i) conforms to Section 3.4 of the Government Agreement and (ii) does not affect, in any manner, the payment rights and obligations under this Agreement.

"Governmental Authority" means, with respect to any Person, the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government to the extent such entity or body has jurisdiction over such Person.  For the avoidance of doubt, no Party shall be considered a Governmental Authority for purposes of this Agreement.

"Governmental Parties" means the United States (on behalf of EPA, DOI, and NOAA), Ohio, and Wisconsin.

"Hazardous Material" means any substance, material, vapor, gas, or waste that is, has been, or will be regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, chromate, dioxin, DDT, polychlorinated biphenyls, radon, mold, mercury and urea formaldehyde insulation and similar.

"Joint Draw Instruction" means such term as defined in Section 4.2 hereof.

"Joint Release Instruction" means such term as defined in Section 4.1 hereof.

"Law" means the common law and all federal, state, local, and foreign laws, rules and regulations, orders, injunctions, judgments, decrees, rulings, writs, assessments or awards and other determinations of the United States, any foreign country, or any domestic or foreign Governmental Authority.

"LC" means such term as defined in Section 3.2 hereof.

"LC Bank" means such creditworthy financial institution that is reasonably acceptable to the Trust.

"<u>Liberty Mutual Bond</u>" means such term as defined in Section 6.4 hereof.

"<u>Liquidating Trust Agreement</u>" means that certain trust agreement dated July 5, 2017, the form of which was included as Exhibit A to the Plan Supplement (as defined in the Plan), which, among other things: (a) establishes and governs the Trust and (b) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

"<u>Liquidating Trust Beneficiaries</u>" has the meaning set forth in the Plan.

"<u>Liquidating Trust Oversight Committee</u>" has the meaning set forth in the Plan.

"<u>Liquidating Trust Oversight Committee Approval</u>" means the Liquidating Trust Oversight Committee's resolution approving this Agreement, duly adopted as prescribed by the Liquidating Trust Agreement and the Plan.

"<u>Milwaukee Solvay Site</u>" has the meaning set forth in the Plan.

"<u>Natural Resources</u>" has the meaning set forth in CERCLA Section 101(16), 42 U.S.C. § 9601.

"<u>Neptune Sale Order</u>" means the Stipulation Regarding Neptune Sale Proceeds and YPF Claims dated as of March 1, 2018, by and between (i) YPFI, YPFH, YPF, YPF Services, and CLHH and (ii) the Trust, as granted by the Bankruptcy Court on March 6, 2018, in the *Order Approving Stipulation of Neptune Sale Proceeds and YPF Claims* (Case No. 16-11501, D.I. 2001).

"<u>NOAA</u>" has the meaning set forth in the Plan.

"<u>Non-Settling Defendant</u>" means such term as defined in Section 9.4 hereof.

"<u>OCC Alter Ego Cross-Claims</u>" means the Second Count ("Declaratory Judgment – Alter Ego Liability") of the OCC Cross-Claims as well as such portions of the Third Count ("Breach of Contract") and the Seventh Count ("Contractual Indemnification") of the OCC Cross-Claims that sought to impose liability on any of the Repsol Released Parties or any of the YPF Released Parties.

"<u>OCC Cross-Claims</u>" means Occidental Chemical Corporation's Second Amended Cross-Claims in the Passaic River Litigation, dated September 26, 2012.

"<u>Organization Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority

in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Painesville Ohio Site" has the meaning set forth in the Plan.

"Passaic River Litigation" means the civil action pending before the Superior Court of New Jersey Law Division-Essex County, bearing the caption *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corp.*, Docket No. ESX-L0968-05 (PASR), along with all appeals therefrom.

"Passaic River Litigation Dismissal" means such term as defined in Section 2.3 hereof.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PBGC Settlement Offset" means $2,000,000, which amount reflects a negotiated offset to the YPF Defendants' Settlement Amount, which shall be in full satisfaction of any and all rights to payment, offset or reduction of claims that YPF or any of the YPF Released Parties may have under the PBGC Stipulation and Consent Order.

"PBGC Stipulation and Consent Order" means the Stipulation and Consent Order dated as of December 15, 2017, by and among (i) the PBGC, (ii) YPF, YPFI, YPF Services, CLHH, and YPFH, and (iii) the Trust, as granted by the Bankruptcy Court on December 18, 2017, in the *Order Granting Stipulation and Consent Order Between the Pension Benefit Guaranty Corporation, the YPF Entities and the Liquidating Trust Regarding Certain Pension Claims* (Case No. 16-11501, D.I. 1940).

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Preserved Contribution Claims" has the meaning set forth in the Plan.

"PRP" means any Entity (including, without limitation, generators, transporters, operators and owners under Environmental Law) that may be responsible for causing or contributing to contamination at any site where the Debtors or their corporate predecessors or former subsidiaries, including, without limitation, Diamond Shamrock Chemicals Company and Diamond Alkali Company, had operations.

"Related Parties" means, with respect to (i) the Repsol Defendants, the Repsol Defendants and any Entity that Repsol directly or indirectly owns, controls, or holds with power to vote, more than 50% of the outstanding voting securities of, and, solely in their capacity as such, each of such Entity's current and former employees, officers, directors, members, managers, representatives, agents, successors, assignees, attorneys, financial advisors, and other professionals and agents, (ii) the YPF Defendants, the YPF Defendants and each of their respective subsidiaries and Affiliates but only to the extent that such subsidiary or Affiliate is a direct or indirect subsidiary of, and under the control of YPF, and, solely in their capacity as such, each of their current and former employees, officers, directors, members, managers, representatives, agents, successors, assignees, attorneys, financial advisors, and other professionals and agents, and (iii) the Trust and, solely in their capacity as such, (a) the Liquidating Trustee, the members of the Liquidating Trust Oversight

Committee, and (b) each of the Trust's attorneys, financial advisors, and other professionals and agents.

"Released Parties" means the Repsol Released Parties, the Trust Released Parties, and the YPF Released Parties.

"Repsol Causes of Action" has the meaning set forth in the Plan.

"Repsol Defendants' Accrued Interest Amount" shall mean the interest that accrues in the Escrow Account in accordance with the terms of the Escrow Agreement.

"Repsol Defendants' Settlement Amount" means Two Hundred Eighty-Seven Million Five Hundred Thousand Dollars ($287,500,000).  As is detailed in Section 3.4, the YPF Defendants shall have no obligation to pay any portion of the Repsol Defendants' Settlement Amount.

"Repsol Defendants' Settlement Payment" means such term as defined in Section 3.3 hereof.  As is detailed in Section 3.4, the YPF Defendants shall have no obligation to pay any portion of the Repsol Defendants' Settlement Payment.

"Repsol Executive Committee Approval" means the approval of this Agreement by unanimous vote of all members of Repsol's Executive Committee.

"Repsol Released Parties" means the Repsol Defendants and each of their respective Related Parties.  For the avoidance of doubt, any YPF Released Party which fits within the definition of Repsol Released Party solely by virtue of having been an Affiliate of the Repsol Defendants shall be covered by the provisions of this Agreement addressing the YPF Released Parties rather than those addressing the Repsol Released Parties.

"Settlement Motion" means a motion filed by the Trust with the Bankruptcy Court that is substantially in the form attached as Exhibit 5 or otherwise acceptable to each of the Parties.

"Settlement Order" means the Bankruptcy Court Order approving the Settlement Motion that is substantially in the form attached as Exhibit 6 hereto, or is otherwise (i) acceptable to the YPF Defendants and the Repsol Defendants in their sole discretion and (ii) either (a) is acceptable to the Trust in its sole discretion or (b) does not affect, in any manner, the payment rights and obligations under this Agreement.

"Settlement Payments" means the YPF Defendants' Settlement Payment, the Repsol Defendants' Settlement Payment, the Repsol Defendants' Accrued Interest Amount, and the YPF Defendants' Accrued Interest Amount.

"Settling Defendant" means such term as defined in Section 9.4 hereof.

"Signing Date" means such term as defined in the Preamble hereof.

"Stipulations of Dismissal" means the Passaic River Litigation Dismissal and the Adversary Proceeding Stipulation of Dismissal.

"<u>Terminating Defendant</u>" means such term as defined in Section 9.4 hereof.

"<u>Trust Derivative Claims</u>" means any and all Causes of Action that were or could have been asserted by the Debtors and/or the Trust against any of the YPF Released Parties or the Repsol Released Parties, seeking relief or recovery arising from harm to any Debtor or any Debtor's estate based on, inter alia, any legal theory (i) that such Released Party was the corporate alter ego of any Debtor, (ii) that the corporate veil between any Debtor and such Released Party should be pierced, (iii) that such Released Party is liable under any theory of successor liability as a successor to any Debtor, (iv) that such Released Party wrongfully took or otherwise appropriated assets of any Debtor, or (v) that such Released Party otherwise interfered with any Debtor's ability to meet its legal obligations. For the avoidance of doubt, Trust Derivative Claims include (x) the Causes of Action that have been brought by the Trust in the Adversary Proceeding and (y) all Causes of Action that are similar or analogous to the Causes of Action set forth in (i)-(v) above and that arise from the same or substantially similar facts and allegations.

"<u>Trust Released Parties</u>" means the Trust, the Debtors, and each of their respective Related Parties. Except as otherwise provided in this Agreement, the members of the Liquidating Trust Oversight Committee shall be released only in their capacity as members of the Liquidating Trust Oversight Committee.

"<u>Trust Termination Date</u>" means such term as defined in Section 9.3 hereof.

"<u>Trust Termination Intent Notice</u>" means a written notice (which may be provided via email) provided to each Defendant as provided herein or, if not so provided, no less than four (4) calendar days prior to the Trust Termination Date or any Extended Trust Termination Date stating that the Trust intends to exercise its right to terminate this Agreement on such date.

"<u>Tuscaloosa Site</u>" means the 16.66 acre site spanning 5 parcels, located at 5421 Reichhold Road, Tuscaloosa, Alabama, and the areal extent of contamination therefrom.

"<u>United States</u>" means the United States of America, on behalf of EPA, DOI, and NOAA.

"<u>YPF Board of Director Approval</u>" means the YPF Board of Directors' resolution approving this Agreement, duly adopted by unanimous vote of all Directors (including, in any case, the affirmative vote of the director representing the class A shares).

"<u>YPF Causes of Action</u>" has the meaning set forth in the Plan.

"<u>YPF Defendants' Accrued Interest Amount</u>" means an amount equal to (i) the YPF Defendants' Per Diem Accrued Interest, multiplied by (ii) the number of days between May 1, 2023 and the Effective Date.

"<u>YPF Defendants' Per Diem Accrued Interest</u>" means $33,243.15 per diem.

"<u>YPF Defendants' Settlement Amount</u>" means Two Hundred Eighty-Seven Million Five Hundred Thousand Dollars ($287,500,000). As is detailed in Section 3.4, the Repsol

Defendants shall have no obligation to pay any portion of the YPF Defendants' Settlement Amount.

"<u>YPF Defendants' Settlement Payment</u>" means such term as defined in Section 3.2 hereof. As is detailed in Section 3.4, the Repsol Defendants shall have no obligation to pay any portion of the YPF Defendants' Settlement Payment.

"<u>YPF Released Parties</u>" means the YPF Defendants and each of their respective Related Parties.  For the avoidance of doubt, any Repsol Released Party which fits within the definition of YPF Released Party solely by virtue of having been an Affiliate of the YPF Defendants shall be covered by the provisions of this Agreement addressing the Repsol Released Parties rather than those addressing the YPF Released Parties.

"<u>YPF Services</u>" means YPF Services USA Corp.

**Section 1.3    Exhibits Incorporated by Reference**.  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  Subject to Section 5.3 and Section 5.5, in the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

## Article II

## <u>THE TRUST'S OBLIGATIONS</u>

**Section 2.1    Stay of Adversary Proceeding**.  Upon execution of this Agreement by each Party, the Trust shall request, jointly with the Defendants, that the Bankruptcy Court formally stay the Adversary Proceeding until the Adversary Proceeding is dismissed pursuant to Section 2.2 or the Agreement is terminated pursuant to Article IX.

**Section 2.2    Dismissal of Adversary Proceeding**.  The Trust shall execute a stipulation, in the form of <u>Exhibit 7</u> annexed hereto, dismissing the Adversary Proceeding with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) (made applicable to the Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7041) (the "**Adversary Proceeding Stipulation of Dismissal**"), a copy of which shall be provided to counsel to each Party by the Escrow and LC Deadline to hold in escrow and released on the Effective Date, such copy to be executed by the Trust in such a form that it can be filed on behalf of the Trust without any further action by the Trust.  The Trust shall file the Adversary Proceeding Stipulation of Dismissal on the Effective Date; if the Trust fails to do so, any of the Defendants may file the Adversary Proceeding Stipulation of Dismissal at any time after the day following the Effective Date without further notice or demand.

**Section 2.3    Passaic River Litigation**.  The Trust, the Repsol Defendants, the YPF Defendants, and, as required by the OCC Agreement, OCC, shall execute a stipulation, in the form of <u>Exhibit 8</u> annexed hereto, dismissing all of their claims and appeals in the Passaic River Litigation to be dismissed with prejudice (the "**Passaic River Litigation Dismissal**"), a copy of which shall be provided to counsel to each Party by the Escrow and LC Deadline to hold in escrow and released on the Effective Date, such copy to be executed by the Trust in such a form that it

can be filed on behalf of the Trust without any further action by the Trust. The Passaic River Litigation Dismissal shall be filed on the Effective Date; if the Trust or OCC, as required by the OCC Agreement, fails to do so, any of the Repsol Defendants may file the Passaic River Litigation Dismissal at any time after the day following the Effective Date without further notice or demand. As necessary, the Trust shall cooperate with OCC in connection with the dismissal of the Passaic River Litigation pursuant to the terms of this Agreement and the OCC Agreement.

**Section 2.4    Notice of Funding or Posting of Defendants' Settlement Payments**. No later than two (2) Business Days after the Repsol Defendants' Settlement Payment has been deposited in the Escrow Account in full and the YPF Defendants have posted the LC in full, the Trust shall file a notice of the receipt of such deposit and posting (the "**Escrow Funding and LC Posting Notice**") in the Adversary Proceeding and in the Chapter 11 Cases, and shall provide a copy of such Escrow Funding and LC Posting Notice to each Party.

**Section 2.5    Settlement Motion**.

(a)    No later than two (2) Business Days after the Signing Date, the Trust shall file the Settlement Motion and the proposed Settlement Order. The Trust shall use its reasonable best efforts to obtain entry of the Settlement Order, and shall not withdraw the Settlement Motion except if the Trust terminates this Agreement lawfully and validly in accordance with and pursuant to Section 9.2; *provided, however*, that the Trust shall have the option, in its sole discretion, to postpone a hearing on the Settlement Motion in the event that (i) the Repsol Defendants' Settlement Payment has not been deposited into the Escrow Account by the Escrow and LC Deadline, or (ii) the LC in the amount of the YPF Defendants' Settlement Payment has not been posted by the Escrow and LC Deadline for the benefit of the Trust.

(b)    The Trust shall provide notice of the Settlement Motion and Settlement Order to the Entities listed on the "Core/2002 Service List" available on the Claims and Noticing Agent's website. Defendants may (i) provide notice to additional Entities through the Claims and Noticing Agent and (ii) publish notice of the hearing on the Settlement Motion; *provided that* such additional notices shall be paid for (and split evenly) by the Defendants, and the Trust shall have no obligation or responsibility for the cost of such additional notices.

(c)    To the extent any formal or informal objections to the Settlement Motion are received by any Party from any Entity, or to the extent any Entity contacts any Party regarding the Settlement Motion, such Party shall notify the other Parties of such objections or contacts. The Trust, the YPF Defendants, and the Repsol Defendants shall use reasonable best efforts to include the other Parties in such communications with any such Entity.

**Section 2.6    Government Agreement**.

(a)    The Trust shall act in good faith and reasonably cooperate with the Defendants in prosecuting the Government Agreement Approval Motion. To the extent any formal or informal objections to the Government Agreement Approval Motion are received by the Trust from any Entity, or to the extent any Entity contacts the Trust regarding the Government Agreement Approval Motion, the Trust shall notify the YPF Defendants, the Repsol Defendants, OCC, and the Governmental Parties of such objections or contacts. The Trust shall include the

YPF Defendants, the Repsol Defendants, OCC, and the Governmental Parties in such communications with any such Entity as is reasonably necessary.

(b)     The Trust shall take no action that seeks to impose the contribution protection contemplated by the Government Agreement on OCC.  The Trust shall refrain from joining any motion by the United States that seeks to do so in any circumstance.  OCC is intended to be, and shall be, an express third-party beneficiary with regard to this Section 2.6(b), and no other provision of this Agreement, and may pursue any remedies provided hereby, *provided that* OCC shall not have the right to consent to any amendment, modification, or waiver that is agreed to by the Parties.

Section 2.7     [Intentionally Omitted].

Section 2.8     **Notice of Effective Date**.  On the Effective Date, the Trust shall file a notice of the Effective Date (the "**Effective Date Notice**") in the Adversary Proceeding and in the Chapter 11 Cases, and shall provide a copy of such Effective Date Notice to each Party.

Section 2.9     **Distribution of Settlement Proceeds**.  The Trust shall not distribute the proceeds of the Settlement Payments until all of the Trust's obligations in Section 2.2, Section 2.3, and Section 2.8 hereof are satisfied, whether by the Trust, or by the Defendants pursuant to Section 2.2 and Section 2.3. The Trust shall have the sole responsibility and obligation to cause the proceeds of the Settlement Payments to be allocated and distributed to the Liquidating Trust Beneficiaries consistent with the Liquidating Trust Agreement, the Plan, the Confirmation Order, and any applicable Laws.

Section 2.10     **No Assignment of Claims**.  Other than with respect to its existing funding obligations with OCC, the Trust shall not sell, assign, transfer, encumber, hypothecate, abandon, convey, or otherwise dispose of any of the Claims and Causes of Action which are being settled, compromised, and released herein pursuant to Article V hereof, which include, without limitation, any and all Causes of Action against any and all Repsol Released Parties and YPF Released Parties. For the avoidance of doubt, the liens securing such funding obligations will be released by OCC pursuant to the OCC Agreement as of the Effective Date.

**Article III**

**DEFENDANTS' OBLIGATIONS**

Section 3.1     **Stay of Adversary Proceeding**.  Upon execution of this Agreement by each Party, each Defendant shall request, jointly with the Trust, that the Bankruptcy Court formally stay the Adversary Proceeding until the Adversary Proceeding is dismissed pursuant to Section 2.2 or the Agreement is terminated pursuant to Article IX.

Section 3.2     **The YPF Defendants' Payment Obligations**.  In consideration for the releases, covenants not to sue, and dismissal of the Adversary Proceeding and Passaic River Litigation provided herein, the YPF Defendants shall indefeasibly pay the Trust an amount equal to the sum of (i) the YPF Defendants' Settlement Amount, less the PBGC Settlement Offset, for a total of $285,500,000 (the "**YPF Defendants' Settlement Payment**") and (ii) the YPF Defendants' Accrued Interest Amount.  For the avoidance of doubt, as to the YPF Defendants and

the YPF Related Parties, the Effective Date shall not occur (and the releases, covenants not to sue and dismissal of the Adversary Proceeding and Passaic River Litigation in favor of the YPF Related Parties shall not be effective) until the Trust has indefeasibly received the full payment of the YPF Defendants' Settlement Payment and the YPF Accrued Interest Amount in the Trust's bank account located in the United States without any setoff, deduction, or withholding.  As security for such payment obligation for the benefit of the Trust, the YPF Defendants shall, by no later than the Escrow and LC Deadline, cause the LC Bank to issue one or more letters of credit, substantially in the form attached as Exhibit 4 hereto (collectively, the "**LC**"), in an aggregate amount equal to (a) the YPF Defendants' Settlement Payment and (b) an amount equal to (x) the YPF Defendants' Per Diem Accrued Interest multiplied by (y) 245.

Section 3.3     **The Repsol Defendants' Payment Obligations**. In consideration for the releases, covenants not to sue, and dismissal of the Adversary Proceeding and Passaic River Litigation provided herein, the Repsol Defendants shall indefeasibly pay the Trust an amount equal to the sum of (i) the Repsol Defendants' Settlement Amount and (ii) the Repsol Defendants' Accrued Interest Amount.  As security for such payment obligation for the benefit of the Trust, the Repsol Defendants shall cause the payment of the Repsol Defendants' Settlement Amount to the Escrow Agent (the "**Repsol Defendants' Settlement Payment**") by the Escrow and LC Deadline. The Repsol Defendants' Settlement Payment may be made in more than one installment, in the Repsol Defendants' sole and absolute discretion, so long as all installments have been made by the Escrow and LC Deadline. The Repsol Defendants' Settlement Payment and the Repsol Defendants' Accrued Interest Amount will remain in the Escrow Account until release thereof is permitted by the Escrow Agreement, consistent with the terms therein. For the avoidance of doubt, as to the Repsol Defendants and the Repsol Related Parties, the Effective Date shall not occur (and the releases, covenants not to sue and dismissal of the Adversary Proceeding and Passaic River Litigation in favor of the Repsol Related Parties shall not be effective) until the Trust has indefeasibly received the full payment of $287,500,000 and the Repsol Accrued Interest Amount in the Trust's bank account located in the United States from the Escrow Agent, or, solely in the event the Escrow Agent (i) files any petition for bankruptcy, (ii) is adjudicated insolvent, (iii) makes a general assignment for the benefit of its creditors, or (iv) has a receiver or trustee appointed for it or for the administration of its assets (each of the foregoing an "**Escrow Failure Event**"), from Repsol, without any setoff, deduction, or withholding.

Section 3.4     **Independent Obligations**.  The Settlement Payments are not joint and several.  The YPF Defendants shall have no obligation whatsoever to pay the Repsol Defendants' Settlement Payment or the Repsol Defendants' Settlement Amount and the Repsol Defendants shall have no obligation whatsoever to pay the YPF Defendants' Settlement Payment or the YPF Defendants' Settlement Amount.

Section 3.5     **Settlement Motion**.  The Defendants shall reasonably cooperate with the Trust in prosecuting the Settlement Motion, and shall use reasonable best efforts to obtain entry of the Settlement Order.

Section 3.6     **Government Agreement**.  The Defendants shall act in good faith and reasonably cooperate with the United States in prosecuting the Government Agreement Approval Motion and shall use reasonable best efforts to obtain entry of the Government Agreement Approval Order, consistent with the terms of the Government Agreement as quickly as reasonably

possible.  To the extent any formal or informal objections to the Government Agreement Approval Motion are received by the Defendants from any Entity, or to the extent any Entity contacts the Defendants regarding the Government Agreement Approval Motion, such Party shall notify the Trust, OCC, and the Governmental Parties of such objections or contacts.  The YPF Defendants and the Repsol Defendants shall include the Trust, OCC, and the Governmental Parties in such communications with any such Entity as is reasonably necessary.

**Section 3.7     Dismissal of Actions**.  The Defendants shall execute, as appropriate, the Stipulations of Dismissal.

**Section 3.8     No Assignment of Claims**.  The Defendants shall not sell, assign, transfer, encumber, hypothecate, abandon, convey, or otherwise dispose of any of the Claims and Causes of Action which are being settled, compromised, and released herein pursuant to Article V hereof.

**Article IV**

**SPECIFIC MATTERS RELATING TO ESCROW AND LC**

**Section 4.1     Disbursements to the Trust from the Escrow Account**.[1]  The Repsol Defendants and the Trust shall act in accordance with, and the Escrow Agent shall hold and release the Repsol Defendants' Settlement Payment and the Repsol Defendants' Accrued Interest Amount as provided in this Section 4.1 as follows:

(a)     No later than one (1) Business Day after the Final Order Date, and subject to the satisfaction or waiver of the conditions precedent in Section 8.1, Section 8.2, and Section 8.4, each of the Trust and the Repsol Defendants shall execute joint written instructions to the Escrow Agent that is executed by an Authorized Person of each Interested Party, as each term is defined in the Escrow Agreement, (a "**Joint Release Instruction**") directing the Escrow Agent to disburse the Escrow Property to the Trust.

(b)     No later than one (1) Business Day after either (i) a valid termination of the Agreement by the Trust or Repsol, or (ii) an automatic termination of this Agreement has occurred as a result of the failure to consummate the Agreement by the Dropdead Date, each of the Trust and the Repsol Defendants shall execute a Joint Release Instruction directing the Escrow Agent to disburse the Escrow Property to the Repsol Defendants.

(c)     Upon receipt of any Joint Release Instruction, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse the Escrow Property in accordance with such Joint Release Instruction.

(d)     In the event of a dispute between Repsol and the Trust regarding disbursement of the Escrow Property, and upon receipt by the Escrow Agent of (i) a copy of an order from the Bankruptcy Court confirming (x) that all conditions precedent set forth in Article VIII of this Agreement have been satisfied or waived and (y) that the Agreement has not been validly terminated in accordance with Article IX (the "**Bankruptcy Court CP Determination**")

---

[1] For the avoidance of doubt and as it pertains to Section 4.1 of this Agreement, any term not defined herein or that does not appear in this Agreement shall have the meaning assigned to in the Escrow Agreement.

and (ii) written payment instructions of the Trust, the Escrow Agent shall on the fifth (5th) Business Day following receipt of such Bankruptcy Court CP Determination, disburse the Escrow Property as directed by the Trust. The Escrow Agent shall be entitled to act on such Bankruptcy Court CP Determination without further inquiry.

(e)     In the event of a dispute between Repsol and the Trust regarding disbursement of the Escrow Property, and upon receipt by the Escrow Agent of (i) a copy of an order from the Bankruptcy Court confirming that either a Repsol Defendant or the Trust has validly terminated this Agreement (the "**Bankruptcy Court Repsol Termination Determination**") and (ii) written payment instructions of Repsol, the Escrow Agent shall on the fifth (5th) Business Day following receipt of such Bankruptcy Court Repsol Termination Determination, disburse the Escrow Property as directed by Repsol. The Escrow Agent shall be entitled to act on such Bankruptcy Court Repsol Termination Determination without further inquiry.

(f)     For the avoidance of doubt, in the event that Trust receives payment of the Repsol Defendants' Settlement Payment and the Repsol Defendants' Accrued Interest Amount directly from Repsol, the Trust shall not be entitled to payment from the Escrow Agent and shall not have any right to recover any portion of the Escrow Property.

**Section 4.2     Disbursements to the Trust from the LC**.  The YPF Defendants and the Trust shall act in accordance with, and the LC Bank shall disburse the YPF Defendants' Settlement Payment and the YPF Defendants' Accrued Interest Amount as provided in this Section 4.2 as follows:

(a)     No later than one (1) Business Day after the Final Order Date, and subject to the satisfaction or waiver of the conditions precedent in Section 8.1, Section 8.3, and Section 8.4, each of the Trust and the applicable YPF Defendant shall execute a joint certificate in the form attached as Exhibit A to the LC (a "**Joint Draw Instruction**") directing the LC Bank to disburse the amount of the YPF Defendants' Settlement Payment and the YPF Defendants' Accrued Interest Amount, and the LC Bank shall disburse the amount of the YPF Defendants' Settlement Payment and the YPF Defendants' Accrued Interest Amount in accordance with the terms of the LC.

(b)     No later than one (1) Business Day after either (x) the valid termination of the Agreement by the Trust or the YPF Defendants or (y) an automatic termination of this Agreement has occurred as a result of the failure to consummate the Agreement by the Dropdead Date, the Trust will comply with the notice and return or destruction of the LC documents as set forth in Section 9.4(b).

(c)     In the event of a dispute between the YPF Defendants and the Trust regarding a draw on the LC, and upon receipt by the Trust of an order from the Bankruptcy Court confirming (x) that all conditions precedent set forth in Article VIII of this Agreement have been satisfied or waived, (y) that the Trust is entitled to draw on the LC in accordance with the terms of this Agreement, and (z) that the Agreement has not been validly terminated in accordance with Article IX, the Trust shall (i) notify in writing the YPF Defendants that it intends to exercise its rights to draw on the LC pursuant to this paragraph (c) and (ii) no earlier than one (1) Business Day following such written notice, execute and deliver to the LC Bank a certificate in the form of Exhibit B to the LC (which shall attach a copy of such Bankruptcy Court order) directing the LC

Bank to disburse the amount of the YPF Defendants' Settlement Payment and the YPF Defendants' Accrued Interest Amount, and the LC Bank shall disburse the YPF Defendants' Settlement Payment and the YPF Defendants' Accrued Interest Amount in accordance with the terms of the LC.

(d)    The Trust may only make one drawing under the LC.  Any undrawn portion of the LC shall automatically be cancelled after such drawing.

**Section 4.3    Escrow Agent Fees and Costs**.  The reasonable fees or costs of the Escrow Agent incurred in furtherance of its obligations under the Escrow Agreement (the "**Escrow Agent Fees and Costs**") shall be paid in accordance with the Escrow Agreement.

**Article V**

**RELEASES**

**Section 5.1    Trust Release**.  Subject to Section 5.7, on and as of the Effective Date and without further action by any Party, Person, or Entity, for the good and valuable consideration provided by each of the YPF Defendants and Repsol Defendants, the Trust hereby does forever release and discharge and shall be deemed to have released and discharged each of the YPF Released Parties and the Repsol Released Parties and their respective assets and properties of and from all of the Repsol Causes of Action, YPF Causes of Action, Trust Derivative Claims, and Contribution Claims, and any and all manner of action or actions, cause or causes of action, counterclaims, cross-claims, damages, demands, in law or equity, suits, debts, liens, contracts, agreements, promises, liabilities, Claims (however denominated) including, but not limited to, Environmental Costs, Claims and Liabilities and all other Claims arising under or in connection with constitution, statute, regulation, ordinance, contract, common law, or otherwise, direct, derivative or indirect, whether known or unknown, foreseen or unforeseen, currently existing or arising in the future, based in whole or in any part on acts or omissions occurring on or before the Effective Date, suspected or unsuspected, fixed or contingent, concealed or hidden, latent or patent, asserted or unasserted, for any injury, damage or loss of any kind whatsoever, including, but not limited to, compensatory damages, consequential damages, treble damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, interest, and attorneys' fees, including, but not limited to, any and all Claims that may be asserted under Chapter 5 of the Bankruptcy Code and Claims arising under similar statutes, rules or theories, any and all Claims under or related to veil-piercing or alter ego theories of liability (including without limitation to the fullest extent of any such liability alleged in the First Cause of Action in the Trust's Complaint by which the Trust seeks to impose veil-piercing or alter ego liability on Defendants for all liabilities and obligations of the Debtors, including, but not limited to, all Environmental Costs, Claims and Liabilities associated with the Diamond Alkali Superfund Site, including, but not limited to, those alleged in the United States Proofs of Claim), any and all Claims under or related to fraudulent conveyance theories, any and all Claims under or related to civil conspiracy theories, any and all Claims under or related to unjust enrichment theories, any and all Claims under or related to successor liability theories, a theory of debt recharacterization, or equitable subordination liability, and any and all Claims which any of the Debtors, their estates, and the Trust ever had or now have or may have against the YPF Released Parties and/or Repsol Released Parties arising from or related in any way to the Debtors,

24

their estates, and the Trust, the Liquidating Trust Assets, or the Diamond Alkali Superfund Site, including those that any of the Debtors or their estates would have been legally entitled to assert against any of the YPF Released Parties and Repsol Released Parties in their own right (whether individually or collectively).

**Section 5.2    YPF Release**.  Subject to Section 5.7 and the satisfaction of the Trust's obligations in Section 2.2 and Section 2.3, and, solely with respect to the Repsol Released Parties, subject to Section 5.6, on and as of the Effective Date and without further action by any Party, Person, or Entity, for the good and valuable consideration provided by the Trust and the Repsol Defendants, each of the YPF Defendants, on behalf of itself and its Related Parties, does hereby forever release and discharge and shall be deemed to have released and discharged each of the Trust Released Parties and the Repsol Released Parties and their respective assets and properties of and from any and all manner of action or actions, cause or causes of action, counterclaims, cross-claims, damages, demands, in law or equity, suits, debts, liens, contracts, agreements, promises, liabilities, Claims (however denominated), including, but not limited to, Environmental Costs, Claims and Liabilities and all other Claims, arising under or in connection with constitution, statute, regulation, ordinance, contract, common law, or otherwise, direct, derivative or indirect, whether known or unknown, foreseen or unforeseen, currently existing or arising in the future, based in whole or in any part on acts or omissions occurring on or before the Effective Date, suspected or unsuspected, fixed or contingent, concealed or hidden, latent or patent, asserted or unasserted, for any injury, damage or loss of any kind whatsoever, including, but not limited to, compensatory damages, consequential damages, treble damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, interest, and attorneys' fees, including, but not limited to, any and all Claims which any of the YPF Defendants or their Related Parties ever had or now have or may have against the Trust Released Parties, or the Repsol Released Parties, including but not limited to, the 2014 Maxus Excluded Matters or those arising from or related in any way to the Diamond Alkali Superfund Site, the Passaic River Litigation, the Adversary Proceeding, the Removed Action, Environmental Law, Hazardous Material, or the Chapter 11 Cases.  Upon the effectiveness of the foregoing release, (i) all Proofs of Claim that each of the YPF Defendants or any YPF Released Party filed in the Chapter 11 Cases shall be deemed withdrawn and shall be expunged and (ii) all rights of each YPF Defendant and each YPF Released Party to any payment or setoff under all stipulations or orders entered in the Chapter 11 Cases, including without limitation the PBGC Stipulation and Consent Order and Neptune Sale Order, shall be deemed released.

**Section 5.3    YPF Contribution Covenant Not to Sue for Settlement Amounts**.  The YPF Defendants, on behalf of themselves and the YPF Related Parties, as of the Effective Date, hereby covenant not to sue any PRP, including the members of the Gibbons Group and the current and former members of the CPG (but for the avoidance of doubt excluding OCC, the United States, and the states of New Jersey, Ohio, and Wisconsin who are parties to separate agreements with the YPF Defendants) for contribution or cost recovery under or in connection with any Environmental Law with respect to the Diamond Alkali Superfund Site, the Passaic River Litigation, the Adversary Proceeding, the Milwaukee Solvay Site, or the Painesville Ohio Site or for reimbursement or contribution of amounts paid in connection with this Agreement and/or actual out of pocket costs and expenses related thereto; *provided, however*, that if a PRP covered by this Section 5.3 sues any YPF Released Party for contribution or cost recovery under or in connection with any Environmental Law with respect to the Diamond Alkali Superfund Site, the Passaic River

Litigation, the Adversary Proceeding, the Milwaukee Solvay Site, or the Painesville Ohio Site, then the covenant not to sue contained in this Section 5.3 shall not apply solely as to such suing PRP and all of the YPF Defendants' and the YPF Related Parties' rights, remedies, and Causes of Action against such suing PRP are preserved. In the event of any conflict or inconsistency between this Section 5.3 and the provisions of the OCC Agreement or the Government Agreement, the terms of the OCC Agreement or the Government Agreement (other than Section 4.5 of the Government Agreement and Section 7.10 of the OCC Agreement), as applicable, shall prevail.

**Section 5.4      Repsol Release**. Subject to Section 5.7 and the satisfaction of the Trust's obligations in Section 2.2 and Section 2.3, and solely with respect to the YPF Released Parties, subject to Section 5.6 on and as of the Effective Date and without further action by any Party, Person, or Entity, for the good and valuable consideration provided by the Trust and the YPF Defendants, each of the Repsol Defendants, on behalf of itself and its Related Parties, does hereby forever release and discharge and shall be deemed to have released and discharged each of the Trust Released Parties and the YPF Released Parties and their respective assets and properties of and from any and all manner of action or actions, cause or causes of action, counterclaims, cross-claims, damages, demands, in law or equity, suits, debts, liens, contracts, agreements, promises, liabilities, Claims (however denominated), including, but not limited to, Environmental Costs, Claims and Liabilities and all other Claims, arising under or in connection with constitution, statute, regulation, ordinance, contract, common law, or otherwise, direct, derivative or indirect, whether known or unknown, foreseen or unforeseen, currently existing or arising in the future, based in whole or in any part on acts or omissions occurring on or before the Effective Date, suspected or unsuspected, fixed or contingent, concealed or hidden, latent or patent, asserted or unasserted, for any injury, damage or loss of any kind whatsoever, including, but not limited to, compensatory damages, consequential damages, treble damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, interest, and attorneys' fees, including, but not limited to, any and all Claims which any of the Repsol Defendants or any of their Related Parties ever had or now have or may have against the Trust Released Parties or the YPF Released Parties, including but not limited to, the 2014 Maxus Excluded Matters or those arising from or related in any way to the Diamond Alkali Superfund Site, the Passaic River Litigation, the Adversary Proceeding, the Removed Action, Environmental Law, Hazardous Material, or the Chapter 11 Cases.

**Section 5.5      Repsol Contribution Covenant Not to Sue for Settlement Amounts**. The Repsol Defendants, on behalf of themselves and the Repsol Related Parties, as of the Effective Date, hereby covenant not to sue any PRP, including the members of the Gibbons Group and the current and former members of the CPG (but for the avoidance of doubt excluding OCC, the United States, and the states of New Jersey, Ohio, and Wisconsin who are parties to separate agreements with the Repsol Defendants), for contribution or cost recovery under or in connection with any Environmental Law with respect to the Diamond Alkali Superfund Site, the Passaic River Litigation, the Adversary Proceeding, the Milwaukee Solvay Site, or the Painesville Ohio Site or for reimbursement or contribution of amounts paid in connection with this Agreement and/or actual out of pocket costs and expenses related thereto; *provided, however*, that if a PRP covered by this Section 5.5 sues any Repsol Released Party for contribution or cost recovery under or in connection with any Environmental Law with respect to the Diamond Alkali Superfund Site, the Passaic River Litigation, the Adversary Proceeding, the Milwaukee Solvay Site, or the Painesville Ohio Site, then the covenant not to sue contained in this Section 5.5 shall not apply solely as to

26

such suing PRP and all of the Repsol Defendants' and the Repsol Related Parties' rights, remedies, and Causes of Action against such suing PRP are preserved.  In the event of any conflict or inconsistency between this Section 5.5 and the provisions of the OCC Agreement or the Government Agreement, the terms of the OCC Agreement or the Government Agreement (other than Section 4.5 of the Government Agreement and Section 7.10 of the OCC Agreement), as applicable, shall prevail.

Section 5.6     **Releases between Repsol and YPF**.  Notwithstanding anything to the contrary in Section 5.2 or Section 5.4, the releases by (i) the YPF Defendants, on behalf of themselves and their Related Parties, of the Repsol Released Parties and their respective assets and properties and (ii) the Repsol Defendants, on behalf of themselves and their Related Parties, of the YPF Released Parties and their respective assets and properties, release and discharge only actions, causes of action, counterclaims, cross-claims, damages, demands, suits, debts, liens, contracts, agreements, promises, liabilities, and Claims (however denominated) that relate to, are connected to, or arise from (a) the Debtors, CLHH, YPFH, or YPFI, or  (b) the 2014 Maxus Excluded Matters, including but not limited to those related to CLHH, YPFH, or YPFI, to the extent not otherwise covered by (a).

Section 5.7     **General Release**.  EACH OF THE TRUST, AND THE DEFENDANTS EXPRESSLY ACKNOWLEDGE THAT IT HAS READ AND UNDERSTANDS SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH STATES:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

THE RELEASES CONTAINED IN THIS SECTION ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED, UNSUSPECTED, FORESEEN, OR UNFORESEEN.  IT IS THE INTENTION OF THE PARTIES THAT, NOTWITHSTANDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 OR ANY SIMILAR PROVISION, RIGHTS AND BENEFITS CONFERRED BY ANY LAW IN ANY OTHER STATE, AND NOTWITHSTANDING THE POSSIBILITY THAT THE PARTIES OR THEIR COUNSEL MAY DISCOVER OR GAIN A MORE COMPLETE UNDERSTANDING OF THE FACTS, EVENTS OR LAW THAT, IF PRESENTLY KNOWN OR FULLY UNDERSTOOD, WOULD HAVE AFFECTED THE DECISION TO ENTER INTO THIS AGREEMENT, ANY AND ALL RELEASE OF CLAIMS, INCLUDING UNKNOWN CLAIMS, SHALL BE FULLY, FINALLY, AND FOREVER SETTLED.  EACH OF THE PARTIES PROVIDING RELEASES ACKNOWLEDGES THAT THE INCLUSION OF UNKNOWN CLAIMS HEREIN WAS SEPARATELY BARGAINED FOR AND WAS A KEY AND MATERIAL ELEMENT OF THIS AGREEMENT.

Section 5.8     **Covenant Not to Sue.**  Subject to the obligations in this Agreement, and effective on and as of the Effective Date, each of the Parties agrees and covenants, on behalf of

itself and each of its Related Parties, not to (a) sue any of the Released Parties on the basis of any matter released in this Article V or (b) assist, support, fund, or encourage any Entity in commencing or maintaining any lawsuit or administrative proceeding against any of the Released Parties on the basis of any matter released in this Article V.

      **Section 5.9    Non-Waiver.**  Nothing herein shall be construed as a release or waiver by any Party of another Party's obligations or agreements under this Agreement, or of any claims arising out of, resulting from or related to a breach of this Agreement by any Party, and shall not bar any action on any claim for the enforcement of this Agreement.

**Article VI**

**<u>SPECIFIC MATTERS RELATING TO YPF DEFENDANTS</u>**

      **Section 6.1    Proofs of Claim.**  Consistent with the YPF Release in Article IV hereof, all proofs of claim filed in the Chapter 11 Cases by the YPF Defendants or any of their respective subsidiaries, including YPF Services, shall be deemed withdrawn.  For avoidance of doubt, the YPF proofs of claim are Claim Numbers 257, 282, 291, 292, 293, 294, 296, 321, 326, 327, 328, 2656, 2657, 2658, 2660 (which is separately addressed in Section 6.4 below), 2661, 2662, 2663, 2664, 2665, 2666, and 2667.  The Trust may provide a copy of this Agreement to the Claims and Noticing Agent, to effectuate this Section.

      **Section 6.2    DIP Claims.**  Consistent with the YPF Release in Article V hereof, the YPF Defendants shall waive and release their Claims pursuant to the *Final Order Pursuant to Sections 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Postpetition Financing and (B) Granting Related Relief* entered by the Bankruptcy Court on August 19, 2016 (Case No. 16-11501, D.I. 268), as amended, supplemented, or modified.  The Trust may provide a copy of this Agreement to the Claims and Noticing Agent, to effectuate this Section.

      **Section 6.3    Tax Issues.**  The Trust and the YPF Defendants shall reasonably cooperate in resolving any issues regarding the historical practice by the Debtors, YPFH, and CLHH, of filing consolidated income tax returns in certain jurisdictions, including pursuant to the United States Internal Revenue Code, 26 U.S.C. § 1 *et seq.*  The Parties' guiding principle shall be that (i) any tax liabilities attributable to any of the Debtors shall remain the Debtors' liabilities to the extent of such attribution, while any tax liabilities attributable to YPFH or CLHH shall remain the YPF Defendants' liabilities to the extent of such attribution, and (ii) any tax benefits attributable to any of the Debtors shall remain the Debtors' property to the extent of such attribution, while any tax benefits attributable to YPFH or CLHH shall remain the YPF Defendants' property to the extent of such attribution.  The Trust and YPF Defendants confirm that the Defendants shall have no entitlement to the AMT Refunds.

      **Section 6.4    Liberty Mutual Bond.**  The Trust shall use reasonable best efforts to procure the permission of the United States Bureau of Ocean Energy Management to release, as of April 25, 2023, the bond issued by Liberty Mutual Insurance Company (the "**<u>Liberty Mutual Bond</u>**") for decommissioning expenses in connection with certain wells in the Neptune oil field in the Gulf of Mexico pursuant to 30 C.F.R. Part 556, which bond is secured by a $1 million letter of

28

credit issued by Citibank, N.A., and procured and guaranteed by YPF (the "**Citibank LOC**"). Nothing in this Section 6.4 shall obligate the Trust to incur any financial obligations in connection with the release of the Liberty Mutual Bond or prevent the Trust's timely dissolution.  YPF agrees that any claim based on the Liberty Mutual Bond (including Claim Number 2660) will be withdrawn or expunged.

## Article VII

## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

**Section 7.1**   The Parties, solely and on behalf of themselves and their respective subsidiaries, represent and warrant that:

(a)   **Due Organization, Standing, and Authority**.   Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation.

(b)   **Authorization and Validity of the Agreement**.   The execution, delivery, and performance of this Agreement (i) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect, and (ii) do not violate any of the terms and conditions of such Party's Organization Documents. Such Party has expressly authorized its undersigned representative to execute this Agreement on such Party's behalf as its duly authorized agent.

(c)   **Enforceability**.   This Agreement has been duly executed and delivered on behalf of such Party and constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms, and shall be binding upon and will inure to the benefit of each of the Parties and its successor in interest, heirs, executors and/or administrators.

(d)   **Releases**.   Such Party has the power and authority to provide covenants not to sue and to grant the releases provided in Article V hereof.

(e)   **Acknowledgment of Party**.   Each Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (a) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any other Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (b) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; (c) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement; (d) this Agreement has been thoroughly negotiated and analyzed by each Party and/or its counsel and has been executed and delivered in good faith, pursuant to arms'-length negotiations, and for good and valuable consideration; (e) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Agreement (including all of its exhibits and schedules); (f) it has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, which Agreement it makes voluntarily and of its own choice and not under coercion or duress; (g)

it knowingly waives any and all claims that this Agreement was induced by any misrepresentation or non-disclosure.

**Section 7.2    Encumbrance of Claims**.    The Trust (other than existing funding arrangements with OCC) and the Defendants represent and warrant that each have not sold, assigned, transferred, encumbered, hypothecated, abandoned, conveyed or otherwise disposed of any of the Claims which are being settled, compromised, and released herein pursuant to Article V hereof, which include, without limitation, any and all Causes of Action against any and all Trust Released Parties, Repsol Released Parties, and YPF Released Parties.

**Section 7.3    Preserved Contribution Claims**.    Effective as of the Effective Date, the Trust covenants not to sue and shall not otherwise pursue any Preserved Contribution Claims against any Entity; *provided, however*, that the Trust may bring such a Preserved Contribution Claim solely as a defense or counterclaim against a creditor as a means to reduce, offset or recoup any Claim or portion of any Claim filed by that creditor against the Debtors' estates or the Trust, including any Administrative Claim (as defined in the Plan), that has not been Allowed (as defined in the Plan) as of the Signing Date; *provided further however*, in no event shall any Entity owe the Trust damages with respect to a Preserved Contribution Claim that are in excess of the amount of such Entity's Claims in the Chapter 11 Cases.

**Section 7.4    Reliance**.    The Parties agree and stipulate that each Party is relying upon these representations and warranties in entering into this Agreement.    Furthermore, the Parties agree that these representations and warranties are a material inducement to entering into this Agreement.

**Section 7.5    2014 Maxus Excluded Matters**.    The Repsol Defendants and the YPF Defendants further represent and warrant that as of the Effective Date, they will have no claims related to the 2014 Maxus Excluded Matters contained in the 2014 *Convenio de Finiquito*.    For the avoidance of doubt, the Repsol Defendants and the YPF Defendants expressly declare that the 2014 *Convenio de Finiquito* remains in full force and effect except with respect to the 2014 Maxus Excluded Matters.

**Section 7.6    Survival**.    None of the representations and warranties set forth in this Article VII, except in the case of Section 7.2, Section 7.3, Section 7.4, and Section 7.5, shall survive after the Effective Date.

**Article VIII**

**<u>CONDITIONS PRECEDENT</u>**

**Section 8.1    Conditions to Effective Date with Respect to Defendants**.    For any Defendant as to which the Agreement has not been terminated pursuant to Article IX below, the occurrence of the Effective Date with respect to each Defendant shall be subject to the satisfaction (or express waiver in writing by the Defendant as to itself and its Related Parties, as the case may be) of each of the following conditions:

(a)    The Settlement Order shall have become a Final Order.

(b)     The Government Agreement Approval Order shall have become a Final Order.

(c)     The OCC Agreement shall continue to be in effect, and OCC shall be in compliance with its obligations under the OCC Agreement.

(d)     The Liquidating Trust Oversight Committee Approval shall be obtained prior to the Trust's execution of this Agreement, and shall not be rescinded or modified at any time.

(e)     The Trust has complied with and performed in all material respects with each of the covenants required to be complied with or performed by it.

**Section 8.2     Other Conditions to Effective Date with Respect to the Repsol Defendants**.  The occurrence of the Effective Date with respect to the Repsol Defendants shall be subject to the satisfaction (or express waiver in writing by the Repsol Defendants as to itself and its Related Parties) of each of the following additional conditions:

(a)     The YPF Board of Director Approval shall be obtained prior to the YPF Defendants' execution of this Agreement, and shall not be rescinded or modified at any time.

(b)     The representations and warranties of the Trust and the YPF Defendants set forth in Article VII of this Agreement shall continue to be true and correct in all material respects.

**Section 8.3     Other Conditions to Effective Date with Respect to the YPF Defendants**.  The occurrence of the Effective Date with respect to the YPF Defendants shall be subject to the satisfaction (or express waiver in writing by the YPF Defendants as to itself and its Related Parties) of the following additional conditions:

(a)     The Repsol Executive Committee Approval shall be obtained prior to the Repsol Defendants' execution of this Agreement and shall not be rescinded or modified at any time.

(b)     The representations and warranties of the Trust and the Repsol Defendants set forth in Article VII of this Agreement shall continue to be true and correct in all material respects.

**Section 8.4     Conditions to Effective Date with Respect to the Trust**.  The occurrence of the Effective Date with respect to the Trust shall be subject to the satisfaction (or express waiver in writing by the Trust) of the following conditions:

(a)     A Bankruptcy Court Order denying the Settlement Motion on the basis that this Agreement is unreasonable shall not have been entered.

(b)     The representations and warranties of the YPF Defendants and the Repsol Defendants set forth in Article VII of this Agreement shall continue to be true and correct in all material respects.

**Section 8.5      Efforts to Consummate**.  Each Party shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with each other Party in doing, all things reasonably necessary under applicable Law or otherwise to consummate and make effective the settlement and any related transactions contemplated by this Agreement in the most expeditious manner practicable prior to or as of the Effective Date, including using reasonable best efforts to obtain all actions or non-actions, waivers, consents, approvals, orders and authorizations from any Governmental Authority and make all registrations, declarations and filings with any Governmental Authority, in each case, that are necessary to consummate the transactions contemplated by this Agreement.  Neither any Party nor any of its Affiliates shall take any action that could reasonably be expected to have the effect of delaying, impairing or impeding the consummation of the transactions contemplated by this Agreement.

**Article IX**

**TERMINATION OF THE AGREEMENT**

**Section 9.1      Termination of the Agreement by the Defendants**.  Any Defendant may elect to terminate this Agreement as to itself and its Related Parties by written notice (which may be by email) sent to all Parties: no earlier than ten (10) Business Days following notice of (a) the Trust's or any other Defendants' material failure to comply with, or breach of, any of its obligations or representations under this Agreement, unless the Trust or the breaching Defendant cures such material non-compliance or breach or obtains a written waiver or deferral from the YPF Defendants and/or Repsol Defendants, as the case may be, within such ten (10) Business Day period, or (b) a Final Order denying the Government Agreement Approval Motion.

**Section 9.2      Termination of the Agreement by the Trust**.  The Trust may terminate this Agreement by written notice (which may be sent by email) sent to all Parties (i) if the Repsol Defendants fail to fund the Escrow Account by the Escrow and LC Deadline, unless such failure to fund the Escrow Account has been cured within ten (10) Business Days following receipt of notice of such failure, (ii) if the YPF Defendants fail to post the LC for the benefit of the Trust by the Escrow and LC Deadline, unless such failure to post the LC has been cured within ten (10) Business Days following receipt of notice of such failure, (iii) notwithstanding anything to the contrary in this Agreement, in the event of a denial of the Settlement Motion on the basis that the settlement is not reasonable, or (iv) on any Extended Trust Termination Date as defined in and established *pursuant* to Section 9.3 hereof; *provided that* the Trust may not terminate this Agreement (a) as to the Repsol Defendants, if the Effective Date has occurred with respect the Repsol Defendants; (b) as to the YPF Defendants, if the Effective Date has occurred with respect to the YPF Defendants; or (c) during the period of five (5) Business Days following the Final Order Date.

**Section 9.3      Termination of the Agreement for Failure to Close**.

(a)      In addition to its termination rights pursuant to Section 9.2 hereof, if the Effective Date has not occurred by August 1, 2023, the Trust shall have the right to terminate the Agreement on August 1, 2023 (the "**Trust Termination Date**") by providing a Trust Termination Intent Notice on July 21, 2023 if, following such notice, any unsatisfied condition precedent listed in Section 8.1(a)-(b) shall not have been waived by the Trust Termination Date by either the YPF

Defendants or the Repsol Defendants or all Defendants (if all such unsatisfied conditions precedent have been waived by either but not both of the YPF Defendants and the Repsol Defendants, the Agreement shall only terminate pursuant to this Section 9.3 as to the non-waiving Defendants); *provided, however,* that the Trust Termination Date may be extended by the Mediator for cause shown only if:

(i)　　the Government Agreement Approval Motion has been filed by June 30, 2023 or the Mediator determines there is good cause shown for it not having been filed by such date;

(ii)　　as of July 20, 2023, one or more of the following is true:  (A) the Government Agreement Approval Motion remains pending, (B) the Settlement Motion remains pending, (C) a District Court Order approving, denying, or otherwise dismissing the Government Agreement Approval Motion has not become a Final Order, or (D) a Bankruptcy Court Order approving, denying, or otherwise dismissing the Settlement Motion has not become a Final Order;

(iii)　　by July 25, 2023 the YPF Defendants and/or the Repsol Defendants have sent a letter to the Mediator (with copy to all other Parties) seeking to extend the Trust Termination Date for cause (an "**Extension Request**");

(iv)　　each other Party has had the opportunity to object by letter to the Mediator (with copy to all other Parties) to the Extension Request by July 28, 2023; and

(v)　　the Mediator issues a letter determination approving the Extension Request and explaining the cause shown by July 31, 2023 (and for the avoidance of doubt, the Mediator may deny the Extension Request explaining the lack of cause).  The decision of the Mediator regarding an Extension Request shall be final.

(b)　　The Mediator may consider any grounds cited by Defendants for granting the Extension Request.  So long as the Mediator considers such grounds to be reasonable, what constitutes "good cause" is in the Mediator's sole discretion.  The Mediator also may consider any grounds cited by the Trust for contending that the requested Extension Request lacks a reasonable, good cause, such that the Mediator should decline to grant any Extension Requested by the Defendants in his sole discretion, including, among other things: (i) an unreasonable delay in filing the Government Agreement Approval Motion or scheduling a hearing thereon that is materially attributable to the actions or inactions of any of the Repsol Defendants or YPF Defendants; (ii) an unreasonable request by Defendants for the District Court to reconsider a ruling on the Government Agreement Approval Motion; (iii) an unreasonable request by the Defendants to bring an appeal of an order approving the Government Agreement Approval Motion; (iv) an unreasonable request by the Defendants for an adjournment of any hearing with respect to the Government Agreement Approval Motion, it being expressly understood significant personal or professional issues of a Defendant attorney (e.g., death of a family member, contending with an emergency on another matter) may be considered reasonable; (v) an inexcusable failure by the Defendants to file an emergency motion seeking an expedited appeal of a denial of the Government Agreement Approval Motion; or (vi) where an attempt to obtain a Final Order by the Dropdead Date would be futile.

(c)     Notwithstanding anything set forth herein, the Trust shall not be permitted to terminate this Agreement while a timely Extension Request remains unresolved due to the unavailability of the Mediator.

(d)     In the Mediator's letter determination, if any, approving the Extension Request, the Mediator may set conditions for any extension and may, at his discretion, provide for a similar process with regard to the date to which the Mediator extends the Trust Termination Date (any such date, an "**Extended Trust Termination Date**"), which process must include a Trust Termination Intent Notice.

(e)     Notwithstanding anything set forth herein, under no circumstance shall any extension to the Trust Termination Date granted by the Meditator run beyond the earlier of (i) the date that is five (5) Business Days after the Final Order Date and (ii) December 31, 2023.

(f)     The Agreement shall automatically terminate on the "**Dropdead Date**" unless the Effective Date has occurred.  The Dropdead Date shall be December 31, 2023 at 11:59 p.m. prevailing Eastern Time, unless by December 20, 2023 it has been extended in writing by the Trust and either the YPF Defendants or the Repsol Defendants or all Defendants; *provided that* if the Trust and only one of the YPF Defendants (as a whole) or the Repsol Defendants (as a whole) extends the Dropdead Date as set forth above, the Agreement will terminate on December 31, 2023 at 11:59 p.m. prevailing Eastern Time as to the non-extending Defendant and its Related Parties unless the Effective Date has previously occurred.

**Section 9.4     Effect of Termination of the Agreement**.  To the extent that this agreement is terminated as to either the YPF Defendants (and their Related Parties) or the Repsol Defendants (and their Related Parties) in accordance with and pursuant to Article IX hereof (the "**Terminating Defendant**" or "**Non-Settling Defendant**"), the remaining non-terminating Defendant (and its Related Parties) (the "**Settling Defendant**") has the right to terminate the Agreement or to waive termination at that time.  To the extent the Settling Defendant elects to waive termination, the terms of the Agreement shall continue and have full effect as to the Settling Defendant and the Trust, consistent with Article IX hereof.

(a)     To the extent this Agreement is terminated pursuant to the terms hereof with respect to the Repsol Defendants (and their Related Parties), the Repsol Defendants' Settlement Payment and the Repsol Defendants' Accrued Interest Amount will be released to Repsol, in accordance with the terms of the Escrow Agreement.

(b)     To the extent this Agreement is terminated pursuant to the terms hereof with respect to the YPF Defendants (and their Related Parties), the Trust shall immediately provide written notice to the LC Bank, with a copy to the YPF Defendants, that the LC is cancelled and return and/or destroy all originals and copies of the LC in its possession, it being understood, for the avoidance of doubt, that the Trust shall not be entitled to draw on the LC, in whole or in part, upon termination of this Agreement with respect to the YPF Defendants.

**Section 9.5     No Liability in Connection with Termination**.  In the event of a valid termination of this Agreement by any Party, neither such Party nor any of its Related Parties shall have any liability to any other Party or its Related Parties in connection with the termination or the

events providing cause for the termination.  No non-terminating Party or Parties (or any such Party's Related Parties) shall have any liability in connection with the termination or the events providing cause for the termination.

Section 9.6    **Judgment Reduction**.  Solely in the event that the Effective Date occurs after termination of this Agreement by and as to any Non-Settling Defendants, (i) the Trust and the Non-Settling Defendants as part of any pre-trial order shall jointly request that, in any final money judgment entered against the Non-Settling Defendants, the Bankruptcy Court determine (x) the amount of damages for each cause of action as to which liability is established, (y) whether any such cause of action for which damages are apportioned gives rise to a non-contractual right of contribution by the Non-Settling Defendants against the Settling Defendants, and (z) the respective proportion of liability as between the Settling Defendants and Non-Settling Defendants for each cause of action as to which a non-contractual right of contribution exists, (ii) the Trust will provide notice of this agreement to the court entering a final money judgment, and (iii) the Trust agrees that the amount of any sum awarded to the Trust as a judgment against the Non-Settling Defendants shall be reduced on account of the consummation of the Trust's settlement with the Settling Defendants as and to the extent available under applicable law (an "**Apportioned Final Judgment**").

Section 9.7    **Mutual Defendant Releases After Partial Termination**.    Without limiting the releases provided in Section 5.2, Section 5.4, and Section 5.6, and regardless of any termination by a Non-Settling Defendant, each Defendant hereby releases any and all rights to seek or obtain any contribution, indemnification, or any other recovery from a Settling Defendant or its Related Parties in connection with any Apportioned Final Judgment or any Claims released by the Trust pursuant to Section 5.1.

## Article X

## MISCELLANEOUS

Section 10.1    **Notices.**  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

> (a)    if to the Trust, to:
>
>    J. Christopher Shore
>    Brett L. Bakemeyer
>    White & Case LLP
>    1221 Avenue of the Americas
>    New York, New York 10020
>    cshore@whitecase.com
>    brett.bakemeyer@whitecase.com
>
>    – and –

Michael J. Farnan
Farnan LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
mfarnan@farnanlaw.com


(b)      if to the YPF Defendants, to:

Servicios Jurídicos
YPF S.A.
Macacha Güemes 515 – Piso 42
C1106BKK – Ciudad Autónoma de Buenos Aires
Argentina
SSJJInternacional@ypf.com

with copies, which shall not constitute notice, to:

John J. Kuster
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
jkuster@sidley.com

– and –

Jeffrey A. Rosenthal
Juan Giráldez
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
jrosenthal@cgsh.com
jgiraldez@cgsh.com

(c)      if to the Repsol Defendants, to:

Pablo Blanco Perez
Ignacio del Cuvillo Bañuelos
Calle Méndez Álvaro, 44,
28045 Madrid, Spain
pblancop@repsol.com
icuvillo@repsol.com

with copies, which shall not constitute notice, to:

Ed Soto
Pravin Patel
Daniel Guernsey
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Edward.Soto@weil.com
Pravin.Patel@weil.com
Daniel.Guernsey@weil.com

– and –

Curtis Miller
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
CMiller@morrisnichols.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail, email, or courier shall be effective when received.

   **Section 10.2   Specific Performance**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and that each non-breaching Party shall be entitled to specific performance of the terms hereof and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages), including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, in addition to any other remedy at law or equity; *provided*, *however*, that no Party shall be liable for special, indirect, consequential, or punitive damages arising out of, in connection with, or relating to this Agreement or any agreement or instrument contemplated hereby.

   **Section 10.3   GOVERNING   LAW;   SUBMISSION   TO   JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY**.

   (a)   **GOVERNING LAW**.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

   (b)   **SUBMISSION TO JURISDICTION AND SELECTION OF FORUM**. EACH PARTY HERETO AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, TO THE EXTENT POSSIBLE, IN THE BANKRUPTCY COURT, AND SOLELY IN CONNECTION WITH CLAIMS ARISING UNDER THIS AGREEMENT: (A)

**EXECUTION VERSION**

IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT; (B) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT; AND (C) WAIVES ANY OBJECTION THAT THE BANKRUPTCY COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY HERETO.

(c)     **WAIVER OF TRIAL BY JURY**.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, AND ANY TRANSACTION CONTEMPLATED HEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

**Section 10.4   Taxes**.  Each Party shall bear the burden of its own respective taxes, if any, in connection with this Agreement.

**Section 10.5   Complete Agreement**.  This Agreement (including, for the avoidance of doubt, all exhibits attached hereto) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

**Section 10.6   Amendment and Waiver**.  This Agreement may not be amended and, except as specified herein, no right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

**Section 10.7   Severability**.  Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby (including, without limitation, the releases provided in Article V hereof) is not affected in any manner materially adverse to the Parties.  Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.8   Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns and is intended to be binding upon any successor trustee, the Debtors, and the estates of any or all of the Debtors. Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any claims or causes of action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until (i) each other Party hereto provides its written consent and (ii) such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

**Section 10.9    Cooperation**.  The Parties shall reasonably cooperate with one another with regard to any actions to be taken in the Chapter 11 Cases, the Adversary Proceeding, the Removed Action, the Passaic River Litigation, or that are otherwise necessary for the performance of this Agreement in a manner that is consistent with this Agreement.  The Trust agrees and covenants that it will, as soon as practicable, and in any event within five (5) Business Days of any request by the YPF Defendants or Repsol Defendants, take any necessary actions to enforce the Settlement Order or this Agreement, including but not limited to any such request for the Trust to seek a Bankruptcy Court Order enforcing the Settlement Order, this Agreement, or the Plan Injunction or any such request for cooperation and support in seeking to have a court determine whether a claim brought against the YPF Defendants and/or the Repsol Defendants is derivative or duplicative of the Claims released by the Trust in Article V hereof, or that is otherwise enjoined by the Settlement Order, except for such requests the Trust reasonably and in good faith believes lacks a good faith basis as to such characterization.  This obligation of cooperation and support shall continue as long as the Trust continues to exist as a legal entity.

**Section 10.10  No    Admission    of    Liability;    Confidentiality    of    Settlement Communications**.  This Agreement does not constitute, and shall not be construed as, an admission of any violation of any Law, breach of any contract, wrongdoing or liability of any kind whatsoever, but is a compromise and settlement.  All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives relating to, concerning, or in connection with this Agreement, or the matters covered hereby and thereby, are confidential and shall be governed and protected in accordance with the Federal Rule of Evidence 408 and any similar local rules and state law provisions, as well as being subject to all applicable protections provided by statutes or laws relating to the confidentiality, exemption from discovery, and inadmissibility into evidence in any legal, court, regulatory, or administrative proceedings of statements, communications, and documents relating to the mediation of the Adversary Proceeding.  Except as necessary in the Trust's, the YPF Defendants', or the Repsol Defendants' discretion in connection with the prosecution of the Settlement Motion or any appeals from entry or denial of the Settlement Order, negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except in an action or proceeding to enforce or for breach of the terms of this Agreement, or pursuant to an order of any court of competent jurisdiction.

**Section 10.11  Reservation of Rights**.  Nothing in this Agreement is meant to prejudice any of the Parties' Claims, defenses, or rights against any Entity that is not party to this Agreement, except to the extent such Entity is a Released Party.  Each Released Party that is not Party hereto is intended to be, and shall be, an express third-party beneficiary with regard to Article V hereof and may pursue any remedies provided hereby, *provided that* any third-party beneficiary of this Agreement shall not have the right to consent to any amendment, modification, or waiver that is agreed to by the Parties.  Except as specified in Article V hereof, the Parties expressly reserve any and all Claims, defenses, and rights, at law and equity, that they may have against any Entity that is not party to, or released by, this agreement without prejudice whatsoever.

**Section 10.12  Interpretation and Rules of Construction**.  This Agreement is the product of negotiations among the Trust and the Defendants, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation

for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Trust and the Defendants were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. The following rules of construction shall apply to this Agreement: (a) "includes" and "including" are not limiting; (b) "may not" is prohibitive, and not permissive; (c) "or" is not exclusive; and (d) the singular includes the plural.

**Section 10.13 Expenses**. Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including attorneys' fees) in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement.

**Section 10.14 Headings**. The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**Section 10.15 Execution of Agreement**. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**Section 10.16 Survival**. Except as expressly provided herein, Section 10.1, Section 10.3, Section 10.4, Section 10.5, Section 10.7, Section 10.8, Section 10.10, Section 10.11, Section 10.12, Section 10.13, Section 10.14 shall survive any termination of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*

MAXUS LIQUIDATING TRUST

By: Joseph J. Farnan, Jr.
Title: Liquidating Trustee of the Maxus Liquidating Trust

YPF S.A.

By:    Pablo González
Title:  Director and Chairman, YPF S.A.

YPF INTERNATIONAL S.A.

By:    Pablo González
Title:  Attorney-in-Fact

YPF HOLDINGS, INC.

By:    Pablo González
Title:  Attorney-in-Fact

YCLH HOLDINGS, INC.

By:    Pablo González
Title:  Attorney-in-Fact

Ari J. Papahronis
Notary Public, State of New York
No.01PA6430868
Qualified in New York County
Commission Expires March 21, 2026

[Signature Page - YPF Defendants]

REPSOL, S.A.

_____
By:  Miguel Klingenberg
Title: General Counsel


REPSOL EXPLORACIÓN, S.A.


_____
By:
Title:


REPSOL USA HOLDINGS LLC


_____
By:
Title:


REPSOL E&P USA LLC


_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.


_____
By:
Title:


REPSOL SERVICES COMPANY


_____
By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____
By: Francisco Gea
Title: EMD E&P


REPSOL USA HOLDINGS LLC

_____
By:
Title:


REPSOL E&P USA LLC

_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.

_____
By:
Title:


REPSOL SERVICES COMPANY

_____
By:
Title:

REPSOL, S.A.

_____
By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:


REPSOL USA HOLDINGS LLC

_____
By: Ferdinando Rigardo
Title: President


REPSOL E&P USA LLC

_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.

_____
By:
Title:


REPSOL SERVICES COMPANY

_____
By:
Title:


[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:


REPSOL USA HOLDINGS LLC

_____
By:
Title:


REPSOL E&P USA LLC

*Forrest W Pace*
Forrest W Pace (Apr 4, 2023 10:16 CDT)
_____
By: Forrest W. Pace
Title: President


REPSOL OFFSHORE E&P USA INC.

_____
By:
Title:


REPSOL SERVICES COMPANY

_____
By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:

REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:

REPSOL USA HOLDINGS LLC

_____
By:
Title:

REPSOL E&P USA LLC

_____
By:
Title:

REPSOL OFFSHORE E&P USA INC.

*Forrest W Pace*
Forrest W Pace (Apr 4, 2023 10:15 CDT)
_____
By: Forrest W. Pace
Title: President

REPSOL SERVICES COMPANY

_____
By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____

By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____

By:
Title:


REPSOL USA HOLDINGS LLC

_____

By:
Title:


REPSOL E&P USA LLC

_____

By:
Title:


REPSOL OFFSHORE E&P USA INC.

_____

By:
Title:


REPSOL SERVICES COMPANY

_____
By: Ferdinando Rigardo
Title: President


[Signature Page - Repsol Defendants I]

PERENCO TRINIDAD & TOBAGO (HOLDINGS) ETVE SLU
(F/K/A REPSOL E&P T&T LIMITED)

By:     Emmanuel Colombel
Title:    Director

[Signature Page - Repsol Defendants II]

**<u>EXHIBIT 1</u>**

**OCC AGREEMENT**

EXECUTION VERSION

## SETTLEMENT AND RELEASE

This SETTLEMENT AND RELEASE (including all exhibits attached hereto, the "**Agreement**") is made and entered into as of April 6, 2023, by and among (i) Occidental Chemical Corporation ("**OCC**"), Occidental Petroleum Corporation ("**OPC**"), Occidental Chemical Holding Corporation ("**OCHC**"), Glenn Springs Holdings, Inc. ("**Glenn Springs**"), Miller Springs Remediation Management, Inc. ("**Miller Springs**"), Mariana Properties, Inc. ("**Mariana Properties**," and, together with OCC, OPC, OCHC, Glenn Springs, and Miller Springs, the "**OCC Parties**"); (ii) YPF S.A. ("**YPF**"), YPF International S.A. ("**YPFI**"), YPF Holdings, Inc. ("**YPFH**"), and YCLH Holdings, Inc. (f/k/a CLH Holdings, Inc.) ("**CLHH**," and together with YPF, YPFI, and YPFH, the "**YPF Parties**"); and (iii) Repsol, S.A. ("**Repsol**"), Repsol Exploración, S.A., Repsol USA Holdings LLC, Repsol E&P USA LLC, Repsol Offshore E&P USA Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (f/k/a Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "**Repsol Parties**") (each of the foregoing, a "**Party**" and, collectively, the "**Parties**").

## RECITALS

**WHEREAS**, on or about June 17, 2016 (the "**Petition Date**") Maxus Energy Corporation ("**Maxus**"), Tierra Solutions, Inc. ("**Tierra**"), Maxus International Energy Company ("**MIEC**"), Maxus (U.S.) Exploration Company ("**MUSE**"), and Gateway Coal Company (each, a "**Debtor**," and, collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing cases (the "**Chapter 11 Cases**"), which are jointly administered for procedural purposes and which were substantively consolidated pursuant to the Plan and Confirmation Order (each as defined below);

**WHEREAS**, the YPF Parties and the Repsol Parties are former Affiliates, as defined herein, of each of the Debtors;

**WHEREAS**, the United States, on behalf of the EPA, DOI, and NOAA (each as defined below), filed Proofs of Claim Numbers 473, 474, 2780, and 2782 against Maxus and Proofs of Claim Numbers 476, 2778, and 2781 against Tierra (collectively, the "**United States Proofs of Claim**"), each alleging that the United States has various Claims, as defined herein, in connection with each of the following: (i) the four operable units of the Diamond Alkali Superfund Site, as defined herein; (ii) the Milwaukee Solvay Site, as defined herein; and (iii) Claims that the United States has or may have in connection with other Debtor owned real properties that are part of the bankruptcy estates, including (a) the Diamond Shamrock Kearny Plant Site at 1015 Belleville Turnpike, Kearny, New Jersey, as defined herein; (b) the St. Johnsbury Trucking Site at Obrien St. and Sellers St. in Kearny, New Jersey; (c) certain real property related to the Painesville Ohio Site in Painesville, Ohio, including real property related to Operable Unit 2 (Cement Plant), Operable Unit 3 (Lake Erie Eastern Bluff Area), Operable Unit 4 (Brine Ponds), Operable Unit 6 (Coke Plant), Operable Unit 7 (Settling Basin #3), Operable Unit 10 (One Acre Site Landfill), Operable Unit 14 (Settling Basin #4), Operable Unit 15 (Main Plant Area), Operable Unit 16 (Chrome Site), Operable Unit 18 (Internal Railroad Spur), Operable Unit 20 (Chrome Site Support Area), and Painesville Parcel 7 A I; and (d) the Maxus Agricultural Chemicals facility at 5421 Reichhold Rd., Tuscaloosa, Alabama;

**WHEREAS**, OCC filed Proofs of Claim Numbers 316 and 408 against Tierra and Proofs of Claim Numbers 320 and 413 against Maxus (collectively, the "**OCC Proofs of Claim**"), each alleging various Claims under a Stock Purchase Agreement by and among Diamond Shamrock Corporation, OPC, OCHC, and Oxy-Diamond Alkali Corporation, dated September 4, 1986 (the "**SPA**"), and in particular the indemnification provisions of the SPA (the "**OCC Indemnity**"), including in connection with the Diamond Alkali Superfund Site (as defined below);

**WHEREAS**, on May 22, 2017, the Bankruptcy Court conducted an evidentiary hearing on confirmation (the "**Confirmation Hearing**") of the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (the "**Plan**") [Docket No. 1460-1], and various creditors appeared at the Confirmation Hearing, including the YPF Parties, OCC, the Official Committee of Unsecured Creditors, and the United States Department of Justice on behalf of EPA, DOI, and NOAA;

**WHEREAS**, on May 22, 2017, the Bankruptcy Court entered an order (Case No. 16-11501, D.I. 1460) (the "**Confirmation Order**") confirming the Plan;

**WHEREAS**, on July 14, 2017, the effective date of the Plan occurred (the "**Plan Effective Date**");

**WHEREAS**, pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement (as defined below), the Maxus Liquidating Trust (the "**Trust**") was created on the Plan Effective Date for the purpose of liquidating and distributing the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, and the Honorable Joseph J. Farnan, Jr. (Ret.) was appointed as the Trustee and Delaware Trustee of the Trust;

**WHEREAS**, the Plan provided that all Causes of Action of the Debtors or their estates that were not otherwise settled or released on or prior to the Plan Effective Date were transferred to the Trust on the Plan Effective Date;

**WHEREAS**, Section IV.H of the Plan provided that the Trust "shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court";

**WHEREAS**, the Plan settled the OCC Proofs of Claim by providing OCC an allowed Class 4 Environmental Claim in the amount of $510,626,872.18 and a Class 5 Diamond Alkali Claim that will benefit solely from distributions made to the Environmental Response/Restoration Trust;

**WHEREAS**, OCC and the Debtors' other creditors that submitted Proofs of Claim or otherwise have Claims that are Allowed, will receive a portion of the Settlement Payments, as defined below, through the Liquidating Trust Waterfall in accordance with Article VI.D. of the Plan;

**WHEREAS**, the distribution of the Liquidating Trust Assets (other than the Preserved Contribution Claims (as defined in the Plan)) shall be made in accordance with the Liquidating Trust Waterfall as set forth in Article VI.D of the Plan;

**WHEREAS**, in the Passaic River Litigation (as defined below), OCC, certain of the Debtors, certain of the YPF Parties, and certain of the Repsol Parties were named as defendants, and OCC filed cross-claims against such Debtors and the YPF Parties and Repsol Parties;

**WHEREAS**, on December 12, 2013, the Superior Court of New Jersey Law Division-Essex County (the "**NJ Court**") in the Passaic River Litigation approved a settlement between the State of New Jersey and Repsol, Maxus, Tierra, MIEC, YPF, YPFH, YPFI, and CLHH for $130 million (the "**RYM Settlement**"), to which Repsol funded $65 million;

**WHEREAS**, Repsol filed a counterclaim against OCC for contribution under the Spill Act (as defined below) for the $65 million Repsol contributed to the RYM Settlement ("**Repsol Contribution Claim**");

**WHEREAS**, on January 29, 2015, the NJ Court dismissed the OCC Cross-Claims (as defined below) against the YPF Parties and the Repsol Parties that were asserted under fraudulent transfer, civil conspiracy, and unjust enrichment theories as time-barred;

**WHEREAS**, on April 5, 2016, the NJ Court granted summary judgment to Repsol on the OCC Cross-Claims against Repsol under its veil-piercing/alter ego theories;

**WHEREAS**, on June 14, 2016, the NJ Court's special master issued a recommendation that the NJ Court grant summary judgment in Repsol's favor on the Repsol Contribution Claim;

**WHEREAS**, on June 20, 2016, OCC removed the remaining OCC Cross-Claims against the YPF Parties and the Repsol Parties (which asserted liability under a veil-piercing or alter ego theory) and the Repsol Contribution Claim against OCC to the United States Bankruptcy Court for the District of New Jersey (Adv. Pro. No. 16-51025, D.I. No. 1), which then transferred such claims to the Bankruptcy Court (Adv. Pro. No. 16-51025, D.I. No. 12), where such claims are captioned *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corporation, et al.*, Adv. Pro. No. 16-51025 (the "**Removed Action**");

**WHEREAS**, the Bankruptcy Court determined in its August 2, 2017, opinion (Case No. 16-11501, D.I. 1745-1) that OCC's veil-piercing or alter ego cross-claims against the YPF Parties and the Repsol Parties were "general" claims that the Debtors could have asserted under state law pre-petition and therefore constituted property of the Debtors' estates such that the Debtors had exclusive standing to pursue them;

**WHEREAS**, the OCC Cross-Claims against Repsol and the Repsol Contribution Claim against OCC were nevertheless remanded to the NJ Court because the court found that all six requirements for abstention pursuant to 28 U.S.C. § 1334(c)(2) were met, including a finding that such claims were non-core, but the remainder of the OCC Cross-Claims remain pending in the Bankruptcy Court as the Removed Action;

**WHEREAS**, on November 17, 2017, the NJ Court permitted the Trust to intervene in the Passaic River Litigation;

**WHEREAS**, on November 22, 2017, the NJ Court entered a final judgment dismissing all of the OCC Cross-Claims against Repsol and granting the Repsol Contribution Claim against OCC, finding that OCC was jointly and severally liable to Repsol for $65 million in Spill Act contribution;

**WHEREAS**, on January 8, 2018, the Trust appealed the NJ Court's judgment as to the dismissal of OCC's fraudulent transfer and veil-piercing/alter ego cross-claims against Repsol, and OCC appealed the granting of the Repsol Contribution Claim;

**WHEREAS**, in its appellate briefs, the Trust sought, *inter alia*, to have the order dismissing the OCC Cross-Claims under fraudulent transfer theories vacated as moot, or the appeal of that order stayed;

**WHEREAS**, on December 27, 2021, the New Jersey Superior Court Appellate Division ("**NJ Appellate Division**") reversed the NJ Court's granting of summary judgment to Repsol on the OCC Alter Ego Cross-Claims, denied the Trust's request to vacate the order dismissing OCC's fraudulent transfer cross-claims or stay such order, and reversed the NJ Court's granting of summary judgment to Repsol on the Repsol Contribution Claim;

**WHEREAS**, on March 3, 2022, Repsol sought certiorari to appeal the NJ Appellate Division's December 27, 2021 order to the Supreme Court of New Jersey;

**WHEREAS**, on January 10, 2023, the Supreme Court of New Jersey denied Repsol's petition for certiorari;

**WHEREAS**, on or about June 14, 2018, the Trust filed a complaint against the YPF Parties and the Repsol Parties with the Bankruptcy Court, captioned *Maxus Liquidating Trust v. YPF S.A. et al.*, Adv. Pro. No. 18-50489 (the "**Adversary Proceeding**");

**WHEREAS**, the claims alleged in the Adversary Proceeding include, without limitation, claims made under federal or state law based on theories of avoidance of fraudulent transfers, veil-piercing/alter ego liability, civil conspiracy, and unjust enrichment;

**WHEREAS**, in a Letter Opinion dated February 15, 2019, the Bankruptcy Court ruled that "under the Third Circuit's decision in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014) and this Court's ruling in [*In re Maxus Energy Corp.*, 571 B.R. 650, 660 (Bankr. D. Del. 2017)], which is the law of the case, the alter ego claims of the Debtor's creditors are property of the estate and may only be pursued by the Trust" (Adv. Pro. No. 18-50489, D.I. No. 107);

**WHEREAS**, the Trust, the YPF Parties, and the Repsol Parties have engaged in mediation before Hon. William B. Chandler III (Ret., Delaware Chancellor), and in further good faith and arms' length negotiations with each other and have agreed to a settlement of any Claims the Trust may hold against the YPF Parties and the Repsol Parties, Claims that the YPF Parties and the Repsol Parties may have against the Trust and the Debtors, and Claims that each of the YPF Parties

**EXECUTION VERSION**

and Repsol Parties may have against one another, on the terms set forth in a *Settlement and Release* dated April 6, 2023, (the "**Settlement and Release**");

WHEREAS, in connection with the Settlement and Release, the YPF Parties have agreed to pay Two Hundred Eighty-Five Million Five Hundred Thousand Dollars ($285,500,000) (the "**YPF Parties' Settlement Payment**") and the Repsol Parties have agreed to pay Two Hundred Eighty-Seven Million Five Hundred Thousand Dollars ($287,500,000) (the "**Repsol Parties' Settlement Payment**," and together with the YPF Parties' Settlement Payment, the "**Settlement Payments**") for a total of Five Hundred Seventy-Three Million Dollars ($573,000,000);

WHEREAS, OCC will receive a substantial portion of the Settlement Payments through the Liquidating Trust Waterfall in accordance with Article VI.D. of the Plan;

WHEREAS, the Effective Date of the Settlement and Release and therefore the Trust's receipt of the proceeds of the Settlement Payments is expressly conditioned on this Agreement being in effect on the Effective Date, such that the failure of this Agreement to be in effect would create substantial uncertainty with regard to OCC's and other creditors' potential recoveries from the Trust, as they will be dependent on the uncertainties of litigation;

WHEREAS, in return for the benefits provided in connection with the Settlement and Release, OCC, on the one hand, and the YPF Parties and the Repsol Parties, on the other hand, are prepared to mutually release one another and their respective Related Parties from any Claims and Causes of Action on the Released Matters (as defined below);

WHEREAS, the YPF Parties, the Repsol Parties, the United States (on behalf of the EPA, DOI, and NOAA), the State of Ohio, and the State of Wisconsin will enter into a *Settlement and Covenant Not to Sue Agreement* attached hereto as Exhibit 1 (the "**Government Agreement**");

WHEREAS, Section 3.4 of the Government Agreement provides the Repsol Released Parties and the YPF Released Parties with contribution protection pursuant to Section 113(f)(2) of CERCLA for the Matters Addressed therein, as defined therein, against all Entities *except* for OCC;

WHEREAS, Section 3.4 of the Government Agreement provides that the Matters Addressed therein do not apply to any direct Claims brought by OCC itself against any of the Repsol Released Parties or YPF Released Parties, which are being resolved separately in this Agreement;

NOW, THEREFORE, without any final adjudication of any issue of fact or law, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**EXECUTION VERSION**

## Article I

## DEFINITIONS

**Section 1.1    Capitalized Terms Not Defined Herein Are Defined in the Plan or the Settlement and Release.**  Capitalized terms used but not otherwise defined herein, including in the Preamble and Recitals, shall have the meanings ascribed to such terms in the Plan or the Settlement and Release.

**Section 1.2    Other Defined Terms**.  The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"Affiliate" means (a) an Entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of a Party, other than an Entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (b) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by a Party, or by an Entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of a Party, other than an Entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (c) a person whose business is operated under a lease or operating agreement by a Party, or person substantially all of whose property is operated under an operating agreement with a Party; or (d) an Entity that operates the business or substantially all of the property of a Party under a lease or operating agreement; *provided that* no individual or Governmental Authority shall be an Affiliate.

"Approval Order" has the meaning set forth in the Government Agreement.

"Bankruptcy Court Order" means an order of the Bankruptcy Court or, upon a report and recommendation of the Bankruptcy Court, an order of the United States District Court for the District of Delaware adopting such report and recommendation in relevant part.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are required or authorized by law or governmental action to close.

"Causes of Action" shall have the meaning set forth in the Plan.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*).

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Contribution Claims" means Causes of Action held by each of the Parties against any other Party for contribution or cost recovery under any Environmental Law for actual expenses paid or to be paid in the future by or on behalf of such Party.

"Diamond Alkali Superfund Site" means the site designated by EPA as such (including as such designation may be supplemented or expanded in the future), inclusive of its four operable units designated as of the date hereof, and encompassing the former manufacturing facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study Area, the Newark Bay Study Area and the areal extent of contamination. The Lower Passaic River Study Area includes the 17-mile tidal stretch of the Passaic River from Dundee Dam to Newark Bay, and tributaries. The Newark Bay Study Area includes Newark Bay and portions of the Hackensack River, Arthur Kill, and Kill van Kull.

"DOI" means the United States Department of the Interior acting through the Fish and Wildlife Service.

"Draft Filings" means such term as defined in Section 2.3 hereof.

"Effective Date" means the Effective Date of the Settlement and Release, as defined therein.

"Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"Environmental Costs, Claims and Liabilities" means any and all Claims (or any portion thereof) against any of the Parties or any of their respective Related Parties in any way related to, arising out of, or in connection with any of the Debtors or in any way related to, arising out of, in connection with, or otherwise subject to the OCC Indemnity, including, but not limited to, claims for the costs of Response Actions, Natural Resource Damages, compensatory damages, consequential damages, treble damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, debts, interest, and attorneys' fees.

"Environmental Law" means, whenever in effect, all federal, tribal, state and local statutes, regulations, rules, ordinances and similar provisions having the force or effect of law, and all judicial and administrative orders and determinations and all common law, in each case concerning in any way the release of a hazardous substance (as defined in CERCLA), the pollution of the environment, or the protection of human health, safety, the environment, or natural resources, including, but not limited to, CERCLA, RCRA, and the Spill Act.

"EPA" means the United States Environmental Protection Agency.

"Escrow and LC Deadline" means such term as defined in the Settlement and Release.

"Governmental Authority" means, with respect to any Person, the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government to the extent such entity or body has jurisdiction over such Person. For the avoidance of doubt, no Party shall be considered a Governmental Authority for purposes of this Agreement.

"<u>Hazardous Material</u>" means any substance, material, vapor, gas, or waste that is, has been, or will be regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, chromate, dioxin, DDT, polychlorinated biphenyls, radon, mold, mercury and urea formaldehyde insulation and similar.

"<u>Law</u>" means the common law and all federal, state, local, and foreign laws, rules and regulations, orders, injunctions, judgments, decrees, rulings, writs, assessments or awards and other determinations of the United States, any foreign country, or any domestic or foreign Governmental Authority.

"<u>Liquidating Trust Agreement</u>" means that certain trust agreement dated July 5, 2017, the form of which was included as Exhibit A to the Plan Supplement (as defined in the Plan), which, among other things: (a) establishes and governs the Trust and (b) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

"<u>Liquidating Trust Beneficiaries</u>" has the meaning set forth in the Plan.

"<u>Natural Resources</u>" has the meaning set forth in CERCLA Section 101(16), 42 U.S.C. § 9601.

"<u>Natural Resource Damages</u>" means damages for injury or loss of Natural Resources as set forth in CERCLA Section 107(a), 42 U.S.C. § 9607(a), or CERCLA Section 111(b), 42 U.S.C. § 9611(b).

"<u>NOAA</u>" has the meaning set forth in the Plan.

"<u>OCC Alter Ego Cross-Claims</u>" means the Second Count ("Declaratory Judgment – Alter Ego Liability") of the OCC Cross-Claims as well as such portions of the Third Count ("Breach of Contract") and the Seventh Count ("Contractual Indemnification") of the OCC Cross-Claims that sought to impose liability on any of the Repsol Released Parties or any of the YPF Released Parties.

"<u>OCC Cross-Claims</u>" means Defendant Occidental Chemical Corporation's Second Amended Cross-Claims in the Passaic River Litigation, dated September 26, 2012.

"<u>OCC Released Parties</u>" means the OCC Parties and each of their respective Related Parties.

"<u>Organization Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority

in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Subject Sites" means all sites listed on any of SPA Schedule 2.07(g) (Superfund Sites), SPA Schedule 9.03(a)(iv) (Inactive Sites), SPA Schedule 10.01 (Active Sites), the OCC Proofs of Claim, and in the Site Transition Agreement.

"Passaic River Litigation" means the civil action pending before the Superior Court of New Jersey Law Division-Essex County, bearing the caption *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corp.*, Docket No. ESX-L0968-05 (PASR), along with all appeals therefrom.

"Passaic River Litigation Dismissal" means such term as defined in Section 2.2 hereof.

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"PRP" means any Entity (including, without limitation, generators, transporters, operators and owners under Environmental Law) that is or may become liable pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the release or threatened release of hazardous substances or Hazardous Material at any site where the Debtors or their corporate predecessors or former subsidiaries, including, without limitation, Diamond Shamrock Chemicals Company and Diamond Alkali Company, had operations.

"Related Parties" means, (i) with respect to the Repsol Parties, the Repsol Parties and any Entity that Repsol directly or indirectly owns, controls, or holds with power to vote, more than 50% of the outstanding voting securities of, and, solely in their capacity as such, each of such Entity's current and former employees, officers, directors, members, managers, representatives, agents, successors, assignees, attorneys, financial advisors, and other professionals and agents, (ii) with respect to the YPF Parties, the YPF Parties and each of their respective subsidiaries and Affiliates but only to the extent that such subsidiary or Affiliate is a direct or indirect subsidiary of, and under the control of YPF, and, solely in their capacity as such, each of their current and former employees, officers, directors, members, managers, representatives, agents, successors, assignees, attorneys, financial advisors, and other professionals and agents, and (iii) with respect to the OCC Parties, the OCC Parties and as of the date hereof, each of their respective predecessors, successors, and, solely in their capacity as such, each of their current and former employees, officers, directors, members, managers, representatives, agents, owners, successors, assignees, attorneys, financial advisors, and other professionals and agents.

"Released Matters" means (i) OCC's acquisition of Diamond Shamrock Chemicals Corporation, (ii) the acquisition and ownership of the Debtors by YPF, Repsol, and/or their Related Parties, (iii) the operations and activities of the Debtors, (iv) the Diamond Alkali Superfund Site or any Other Subject Site, (v) the OCC Indemnity, (vi) the Passaic River Litigation, (vii) the Removed Action, (viii) the Chapter 11 Cases, (ix) the Adversary Proceeding, (x) Subject Site Contribution Claims, (xi) OCC Alter Ego Cross-Claims, (xii) OCC Cross-Claims, or (xiii) any Environmental Costs, Claims and Liabilities in connection with any sites with regard to which the Debtors have or had any connection,

through the OCC Indemnity or otherwise, including, but not limited to, the Diamond Alkali Superfund Site and the Other Subject Sites, including, without limitation, claims for any injury, damage or loss, cost, fee, or expense of any kind whatsoever that is related to or arises out of any of the foregoing.  For the avoidance of doubt, the term "Released Matters" (i) does not include OCC's or any of its Related Parties' Claims under Environmental Law against parties other than the YPF Released Parties or the Repsol Released Parties and (ii) includes only Claims or Causes of Action that relate to, are connected to, or arise from the Debtors or any site at which the Debtors had liability pursuant to Environmental Law or the OCC Indemnity.

"Released Parties" means the Repsol Released Parties, the OCC Released Parties, and the YPF Released Parties.

"Repsol Released Parties" means the Repsol Parties and each of their respective Related Parties.  For the avoidance of doubt, any YPF Released Party which fits within the definition of Repsol Released Party solely by virtue of having been an Affiliate of the Repsol Parties shall be covered by the provisions of this Agreement addressing the YPF Released Parties rather than those addressing the Repsol Released Parties.

"Removed Action Stipulation of Dismissal" means such term as defined in Section 2.1 hereof.

"Response Action" has the same meaning set forth in CERCLA Section 101(25), 42 U.S.C. § 9601(25), and shall include all actions to (i) clean up, remove, treat, or in any other way address any Hazardous Material, (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (iii) perform pre-remedial or concurrent studies and investigations or post-remedial studies, monitoring and care, or (iv) correct, otherwise address or compensate for any condition of noncompliance with Environmental Laws or related harms.

"Spill Act" means the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to 23.11z.

"Subject Site Contribution Claims" shall mean any Contribution Claim any Party may have with regard to the Diamond Alkali Superfund Site or any Other Subject Site.

"Trust Settlement Motion" means the Settlement Motion, as defined in the Settlement and Release.

"Trust Settlement Order" means the Settlement Order, as defined in the Settlement and Release.

"United States" means the United States of America, on behalf of EPA, DOI, and NOAA.

"YPF Released Parties" means the YPF Parties and each of their respective Related Parties. For the avoidance of doubt, any Repsol Released Party which fits within the definition of YPF Released Party solely by virtue of having been an Affiliate of the YPF Parties shall

be covered by the provisions of this Agreement addressing the Repsol Released Parties rather than those addressing the YPF Released Parties.

**Section 1.3    Exhibits Incorporated by Reference**.  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

## Article II

## JOINT OBLIGATIONS

**Section 2.1    Removed Action**. The YPF Parties and OCC shall execute a stipulation, in the form of Exhibit 2 annexed hereto, dismissing the Removed Action with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) (made applicable to the Removed Action by Federal Rule of Bankruptcy Procedure 7041) (the "**Removed Action Stipulation of Dismissal**"), a copy of which (in such form that it can be filed on behalf of OCC without any further act by OCC) shall be provided to the YPF Parties and the Repsol Parties within three (3) Business Days of the date hereof.  OCC shall file the Removed Action Stipulation of Dismissal no later than the Effective Date; if OCC fails to do so, any of the YPF Parties or the Repsol Parties may file the Removed Action Stipulation of Dismissal at any time after the day following the Effective Date without further notice or demand.

**Section 2.2    Passaic River Litigation**.  OCC, the YPF Parties, the Repsol Parties, and, as required by the Settlement and Release, the Trust shall execute a stipulation of dismissal with prejudice, in the form of Exhibit 3 annexed hereto, of the Passaic River Litigation (the "**Passaic River Litigation Dismissal**"), a copy of which shall be provided to counsel to each Party by the Escrow and LC Deadline to hold in escrow and released on the Effective Date, such copy to be executed by OCC in such a form that it can be filed on behalf of OCC without any further action by OCC.  OCC shall file the Passaic River Litigation Dismissal on the Effective Date; if OCC or the Trust fails to do so, any of the YPF Parties or the Repsol Parties may file the Passaic River Litigation Dismissal at any time after the day following the Effective Date without further notice or demand. As necessary, the Parties shall mutually cooperate to effectuate the dismissal of all pending appeal(s) in the Passaic River Litigation and shall cooperate in good faith to obtain the release of OCC's pending supersedeas bond.

**Section 2.3    Draft of Trust Settlement Motion and the Approval Order**. Not later than five (5) Business Days prior to the date they are to be filed, the YPF Parties and the Repsol Parties shall provide to counsel to OCC a draft of the Trust Settlement Motion and, to the extent in their possession or reasonably obtainable by them, the draft Approval Order contemplated by the Government Agreement (the "**Draft Filings**").

(a)    On OCC's reasonable request, the YPF Parties and the Repsol Parties shall in good faith consider, and shall encourage the Trust and the United States to consider, any reasonable edits to the Draft Filings before they are filed to ensure that each conforms to the terms of this Agreement and the Government Agreement, as applicable.

**EXECUTION VERSION**

(b)     So long as the relief sought by a Draft Filing is not inconsistent with this Agreement or the Government Agreement, as applicable, OCC shall remain bound to the covenant pursuant to Section 2.4 to take no action to oppose, or any action that could reasonably be construed as supporting any other Entity's opposition to, the entry of the Trust Settlement Order or the Approval Order.

(c)     The YPF Parties and the Repsol Parties agree they shall take no action that seeks to impose the contribution protection contemplated by the Government Agreement on OCC. The YPF Parties and the Repsol Parties shall refrain from joining any motion by the United States that seeks to do so in any circumstance.

**Section 2.4    Non-Opposition to Trust Settlement Order and Approval Order.** Subject to compliance by the Repsol Parties and the YPF Parties with Section 2.3 of this Agreement and the conformity of each filing with Section 3.4 of the Government Agreement, the OCC Parties shall take no action to oppose, or any action that could reasonably be construed as supporting any other Entity's opposition to, either the entry of the Trust Settlement Order or the Approval Order, or any efforts by any of the Trust, the YPF Parties, or the Repsol Parties to enforce the Trust Settlement Order, the Approval Order, the Settlement and Release, the Government Agreement, this Agreement, or the RYM Settlement.  OCC shall not be in breach of this provision if it appears in any proceeding to argue that Section 3.4 of the Government Agreement does not and cannot affect OCC's rights to seek contribution under Section 113(f)(2) of CERCLA (42 U.S.C. § 9613(f)(2)); *provided*, *however*, that nothing herein relieves the OCC Parties of their obligations pursuant to Article IV hereof.

**Section 2.5    Non-Opposition to Release of OCC Bond.** The Repsol Parties and the YPF Parties shall take no action to oppose, or any action that could reasonably be construed as supporting any other Entity's opposition to, entry of an order authorizing the release of OCC's supersedeas bond in the Passaic River Litigation.

**Section 2.6    No Assignment of Claims**.  The OCC Parties, the YPF Parties and their Related Parties, and the Repsol Parties and their Related Parties shall not sell, assign, transfer, encumber, hypothecate, abandon, convey, or otherwise dispose of any of the Claims or Causes of Action which are being settled, compromised, and released herein pursuant to Article IV hereof.

**Article III**

**THE YPF PARTIES' AND THE REPSOL PARTIES' OBLIGATIONS**

**Section 3.1    The YPF Parties' Settlement Payment**.  The YPF Parties shall comply with their obligations contained in Article III of the Settlement and Release, in accordance with the terms thereof.

**Section 3.2    The Repsol Parties' Settlement Payment**.  The Repsol Parties shall comply with their obligations contained in Article III of the Settlement and Release, in accordance with the terms thereof.

**EXECUTION VERSION**

**Article IV**

**RELEASES**

**Section 4.1    Mutual Releases**.  Subject to Section 4.4, on and as of the Effective Date and without further action by any Party, Person, or Entity, for the good and valuable consideration provided by each of the other Parties, (i) each of the OCC Parties does hereby forever release and discharge and shall be deemed to have released and discharged each of the YPF Released Parties and the Repsol Released Parties and their respective assets and properties and (ii) each of the YPF Parties, on behalf of itself and its Related Parties (together with the YPF Parties, the "**YPF Releasing Parties**") and each of the Repsol Parties, on behalf of itself and its Related Parties (together with the Repsol Parties, the "**Repsol Releasing Parties**," and together with the OCC Parties and the YPF Releasing Parties, the "**Releasing Parties**," and any one of such Releasing Parties, a "**Releasing Party**"), does hereby forever release and discharge and shall be deemed to have released and discharged each of the OCC Released Parties and their respective assets and properties: of and from any and all Claims or Causes of Action that such Releasing Party have or could have asserted, whether known or unknown, against any of the Released Parties (including, but not limited to, any Environmental Law), in any way related to, arising out of, or in connection with the Released Matters, including, but not limited to, any and all manner of action or actions, Cause or Causes of Action, counterclaims (including, but not limited to, the Repsol Contribution Claim), cross-claims, damages, demands, in law or equity, suits, debts, liens, contracts, agreements, promises, liabilities, Claims (however denominated), including, but not limited to, Environmental Costs, Claims and Liabilities and all other Claims, arising under or in connection with constitution, statute, regulation, ordinance, contract, common law, or otherwise, direct, derivative or indirect, whether known or unknown, foreseen or unforeseen, currently existing or arising in the future, based in whole or in any part on acts or omissions occurring on or before the Effective Date, suspected or unsuspected, fixed or contingent, concealed or hidden, latent or patent, asserted or unasserted, for any injury, damage or loss of any kind whatsoever, including, but not limited to, compensatory damages, consequential damages, treble damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, interest, and attorneys' fees, including, but not limited to, any and all Claims that may be asserted under Chapter 5 of the Bankruptcy Code and Claims arising under similar statutes, rules or theories, any and all Claims under or related to veil-piercing or alter ego theories of liability (including without limitation to the fullest extent of any such liability alleged in the OCC Alter Ego Cross-Claims), any and all Claims under or related to fraudulent conveyance theories, any and all Claims under or related to civil conspiracy theories, any and all Claims under or related to unjust enrichment theories, any and all Claims under or related to successor liability theories, tortious interference with contract, a theory of debt recharacterization, or equitable subordination liability.

**Section 4.2    Repsol Supersedeas Bond Consent**.  Repsol, S.A. will not challenge and consents to the release of the supersedeas bond posted in support of OCC's appeal in the Passaic River Litigation in full and its return by the Clerk of all security for it to OCC.

**Section 4.3    Liquidating Trust Facility Liens Consent**.  As of the Effective Date, and subject to the occurrence thereof,  OCC consents to and authorizes the release of its liens on the Trust's Causes of Actions against the Repsol Parties and the YPF Parties; provided that no release

shall have occurred with respect to the Settlement Payments received by the Trust, which shall be deemed to be proceeds of those Causes of Action.

      **Section 4.4    General Release**.  EACH OF THE OCC PARTIES, THE YPF PARTIES (ON BEHALF OF ITSELF AND EACH OF ITS RELATED PARTIES), AND THE REPSOL PARTIES  (ON BEHALF OF ITSELF AND EACH OF ITS RELATED PARTIES) EXPRESSLY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH STATES:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

THE RELEASES CONTAINED IN THIS SECTION ARE EFFECTIVE REGARDLESS OF WHETHER THOSE CLAIMS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED, UNSUSPECTED, FORESEEN, OR UNFORESEEN.  IT IS THE INTENTION OF THE PARTIES THAT, NOTWITHSTANDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 OR ANY SIMILAR PROVISION, RIGHTS AND BENEFITS CONFERRED BY ANY LAW IN ANY OTHER STATE, AND NOTWITHSTANDING THE POSSIBILITY THAT THE PARTIES OR THEIR COUNSEL MAY DISCOVER OR GAIN A MORE COMPLETE UNDERSTANDING OF THE FACTS, EVENTS OR LAW THAT, IF PRESENTLY KNOWN OR FULLY UNDERSTOOD, WOULD HAVE AFFECTED THE DECISION TO ENTER INTO THIS AGREEMENT, ANY AND ALL RELEASE OF CLAIMS, INCLUDING UNKNOWN CLAIMS, SHALL BE FULLY, FINALLY, AND FOREVER SETTLED.  EACH OF THE PARTIES PROVIDING RELEASES ACKNOWLEDGES THAT THE INCLUSION OF UNKNOWN CLAIMS HEREIN WAS SEPARATELY BARGAINED FOR AND WAS A KEY AND MATERIAL ELEMENT OF THIS AGREEMENT.

      **Section 4.5    Covenant Not to Sue.**  Each of the YPF Parties (on behalf of itself and its Related Parties), the Repsol Parties (on behalf of itself and its Related Parties), and the OCC Parties agrees and covenants effective on and as of the  Effective Date not to: (a) sue or assert any administrative or judicial Claims or Causes of Action against any of the Released Parties on any of the Released Matters, subject to the scope of Section 4.1 hereof; or (b) assist, support, fund, or encourage any Entity in commencing or maintaining, or permit any Entity under its direct or indirect control to commence or maintain, any lawsuit or administrative proceeding against any of the Released Parties on the basis of or related to any of the Released Matters, including, but not limited to, in connection with amounts that have not yet been expended, to the extent that such Party or its Related Parties would themselves be precluded from doing so pursuant to the releases granted in Section 4.1 hereof.

      **Section 4.6    Non-Waiver.**  Nothing herein shall be construed as a release or waiver by any Party of another Party's obligations or agreements under this Agreement, or of any Claims

arising out of, resulting from or related to a breach of this Agreement by any Party, and shall not bar any action on any claim for the enforcement of this Agreement.

**Article V**

**REPRESENTATIONS AND WARRANTIES OF THE PARTIES**

**Section 5.1**    The Parties, solely and on behalf of themselves and their respective subsidiaries, represent and warrant that:

(a)    **Due Organization, Standing, and Authority**.    Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation.

(b)    **Authorization and Validity of the Agreement**.    The execution, delivery, and performance of this Agreement (i) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect and (ii) do not violate any of the terms and conditions of such Party's Organization Documents. Such Party has the requisite power and authority, without limitation, to provide the covenants and releases provided in Article II and Article IV of this Agreement.    Such Party has expressly authorized its undersigned representative to execute this Agreement on such Party's behalf as its duly authorized agent.

(c)    **Enforceability**.    This Agreement has been duly executed and delivered on behalf of such Party and constitutes a legal, valid, and binding obligation of such Party enforceable against it and, with respect to each Repsol Party and each YPF Party, its Related Parties in accordance with its terms, and shall be binding upon and will inure to the benefit of each of the Parties, their Related Parties, and each of their successors in interest, heirs, executors and/or administrators.

(d)    **Releases**.    Such Party has the power and authority to provide the covenants not to sue and grant the releases provided in Article IV hereof.

(e)    **Acknowledgment of Party**.    Each Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (i) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any other Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (ii) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; (iii) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement; (iv) this Agreement has been thoroughly negotiated and analyzed by each Party and/or its counsel and has been executed and delivered in good faith, pursuant to arms'-length negotiations, and for good and valuable consideration; (v) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Agreement (including all of its exhibits and schedules); (vi) it has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, which Agreement it makes voluntarily and of its own choice and not under coercion or duress;

(vii) it knowingly waives any and all Claims that this Agreement was induced by any misrepresentation or non-disclosure.

Section 5.2    **Encumbrance of Claims**.  The OCC Parties, the YPF Parties and their Related Parties, and the Repsol Parties and their Related Parties each represent and warrant that they have not sold, assigned, transferred, encumbered, hypothecated, abandoned, conveyed or otherwise disposed of, in whole or in part, either directly or indirectly, any of the Claims or Causes of Action which are being settled, compromised, and released herein pursuant to Article IV hereof, which include, without limitation, Claims or Causes of Action based on or related to any of the Released Matters.

Section 5.3    **Claims or Causes of Action by Occidental Family Companies Regarding the Released Matters**.  The OCC Parties represent and warrant that no Entity under the direct or indirect control of OPC, other than the other OCC Parties, holds any Claim or Cause of Action against any of the YPF Released Parties or the Repsol Released Parties that relates to, is connected to, or arises from the Released Matters.

Section 5.4    **Reliance**.  The Parties agree and stipulate that each Party is relying upon these representations and warranties in entering into this Agreement.  Furthermore, the Parties agree that these representations and warranties are a material inducement to entering into this Agreement.  These representations and warranties shall survive the execution of this Agreement indefinitely without regard to statutes of limitations.

## Article VI

## TERMINATION OF THE AGREEMENT

Section 6.1    **Termination of the Agreement if the Settlement and Release is Terminated**.  If the Settlement and Release is terminated as to both the Repsol Parties and the YPF Parties, this Agreement shall terminate as to all Parties. If the Settlement and Release is terminated by either the Repsol Parties or the YPF Parties, this Agreement shall terminate as to the non-settling Parties only.

Section 6.2    **No Termination After the Effective Date**.  Upon the occurrence of the Effective Date, no Party may terminate this Agreement.

## Article VII

## MISCELLANEOUS

Section 7.1    **Notices.**  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)      if to OCC or OCHC, to:

            Neil Ackerman
            President, Occidental Chemical Corporation and
            Dan Almaguer, Chief Legal Officer
            14555 Dallas Parkway Suite 400
            Dallas TX 75254

            - and -

            Kathy Patrick
            Anthony Kaim
            Gibbs & Bruns LLP
            1100 Louisiana St.
            Suite 5300
            Houston TX 77002
            kpatrick@gibbsbruns.com
            akaim@gibbsbruns.com

    (b)      If to Glenn Springs Holdings, Inc., Miller Springs Remediation Management, Inc., or Mariana Properties, Inc., to:

            Juan Somoano, President
            Dan Almaguer, Chief Legal Officer
            14555 Dallas Parkway Suite 400
            Dallas TX 75254

            - and -

            Kathy Patrick
            Anthony Kaim
            Gibbs & Bruns LLP
            1100 Louisiana St.
            Suite 5300
            Houston TX 77002
            kpatrick@gibbsbruns.com
            akaim@gibbsbruns.com

(c)    if to Occidental Petroleum Corp., to:

Sylvia Kerrigan, General Counsel
5 Greenway Plaza Suite 110
Houston TX 77046

- and -

Melissa Hunt, Deputy General Counsel
14555 Dallas Parkway Suite 400
Dallas TX 75254

- and -

Kathy Patrick
Anthony Kaim
Gibbs & Bruns LLP
1100 Louisiana St.
Suite 5300
Houston TX 77002
kpatrick@gibbsbruns.com
akaim@gibbsbruns.com

(d)    the YPF Parties, to:

Servicios Jurídicos
YPF S.A.
Macacha Güemes 515 – Piso 42
C1106BKK – Ciudad Autónoma de Buenos Aires
Argentina
SSJJInternacional@ypf.com

with copies, which shall not constitute notice, to:

John J. Kuster
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
jkuster@sidley.com

- and -

Jeffrey A. Rosenthal
Juan Giráldez
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
jrosenthal@cgsh.com
jgiraldez@cgsh.com

(e)     if to the Repsol Parties, to:

Pablo Blanco Perez
Ignacio del Cuvillo Bañuelos
Calle Méndez Álvaro, 44,
28045 Madrid, Spain
pblancop@repsol.com
icuvillo@repsol.com

with copies, which shall not constitute notice, to:

Ed Soto
Pravin Patel
Daniel Guernsey
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Edward.Soto@weil.com
Pravin.Patel@weil.com
Daniel.Guernsey@weil.com

- and -

Curtis Miller
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
CMiller@morrisnichols.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail, or courier shall be effective when received.

    **Section 7.2    Specific Performance**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and that each non-breaching Party shall be entitled to the remedy of specific performance of the terms hereof and injunctive or other equitable relief, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, as well as an award of any costs and expenses (including reasonable

attorneys' fees) incurred in connection with the enforcement of this Agreement to any Party who prevails on its claim for specific performance of this Agreement. The remedy of specific performance is not exclusive and all remedies at law or equity shall remain available to any Party seeking to enforce this agreement against a breaching Party.

**Section 7.3    GOVERNING    LAW;    SUBMISSION    TO    JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY**.

(a)    **GOVERNING LAW**.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

(b)    **SUBMISSION TO JURISDICTION AND SELECTION OF FORUM**. EACH PARTY HERETO AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, TO THE EXTENT POSSIBLE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, AND SOLELY IN CONNECTION WITH CLAIMS ARISING UNDER THIS AGREEMENT: (A) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR, IF SUCH COURT IS WITHOUT SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF DELAWARE (COLLECTIVELY, THE "**DELAWARE COURTS**"); (B) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE DELAWARE COURTS; AND (C) WAIVES ANY OBJECTION THAT ANY DELAWARE COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY HERETO.

(c)    **WAIVER OF TRIAL BY JURY**. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, AND ANY TRANSACTION CONTEMPLATED HEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

**Section 7.4    Complete Agreement**.  This Agreement (including, for the avoidance of doubt, all exhibits attached hereto) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

**Section 7.5    Amendment and Waiver**.  This Agreement may not be amended and, except as specified herein, no right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

**Section 7.6    Severability**.  Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this

Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby (including, without limitation, the Trust's receipt of the Settlement Payment and the releases provided in Article IV hereof) are not affected in any manner materially adverse to the Parties. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 7.7     Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and to the extent specified, their respective Related Parties, and each of their respective successors and assigns. Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any Claims or Causes of Action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until (i) each other Party hereto provides its written consent and (ii) such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

**Section 7.8     Cooperation**.  The Parties shall reasonably cooperate with one another with regard to any actions to be taken in the Chapter 11 Cases, the Adversary Proceeding, the Removed Action, the Passaic River Litigation, or that are otherwise necessary for the performance of this Agreement in a manner that is consistent with this Agreement.

**Section 7.9     No    Admission    of    Liability;    Inadmissibility    of    Settlement Communications**.  This Agreement does not constitute, and shall not be construed as, an admission of any violation of any Law, breach of any contract, wrongdoing or liability of any kind whatsoever, but is a compromise and settlement.  All negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except in an action or proceeding to enforce or for breach of the terms of this Agreement, or pursuant to an order of any court of competent jurisdiction.

**Section 7.10     Reservation of Rights**.  Nothing in this Agreement is meant to prejudice any of the Parties' Claims, defenses, or rights against any Entity that is not party to this Agreement, except to the extent such Entity is a Released Party.  Each Released Party that is not Party hereto is intended to be, and shall be, an express third-party beneficiary with regard to Article IV hereof and may pursue any remedies provided hereby.  Except as specified in Article IV hereof, the Parties expressly reserve any and all Claims, defenses, and rights, at law and equity, that they may have against any Entity that is not party to, or released by, this Agreement without prejudice whatsoever. Notwithstanding anything to the contrary in this Agreement, nothing in the releases in Article IV relieves any party from the obligations under this Agreement or waives the right of any Party to enforce this Agreement.

**Section 7.11     Interpretation and Rules of Construction**.  This Agreement is the product of negotiations among the OCC Parties, the YPF Parties, and the Repsol Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption

with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The OCC Parties, the YPF Parties, and the Repsol Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  For the avoidance of doubt, no interpretation shall be adopted that affects, compromises, or releases the terms of existing commercial relationships related to the exploration for or exploitation of hydrocarbons whether by any Party or its Affiliates.

**Section 7.12   Expenses**.  Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including attorneys' fees) in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement.

**Section 7.13   Headings**.  The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**Section 7.14   Execution of Agreement**.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*

**EXECUTION VERSION**

OCCIDENTAL CHEMICAL CORPORATION

By: NEIL R. ACKERMAN
Title: PRESIDENT

OCCIDENTAL PETROLEUM CORPORATION

By:
Title:

OCCIDENTAL CHEMICAL HOLDINGS CORPORATION

By: NEIL R. ACKERMAN
Title: PRESIDENT

GLENN SPRINGS HOLDINGS, INC.

By:
Title:

MILLER SPRINGS REMEDIATION MANAGEMENT, INC.

By:
Title:

MARIANA PROPERTIES, INC.

By:
Title:

[Signature Page - OCC Parties]

**EXECUTION VERSION**

OCCIDENTAL CHEMICAL CORPORATION

By: _____
Title:

OCCIDENTAL PETROLEUM CORPORATION

By: *Z. Melissa Hunt*
Title: *Deputy General Counsel*

OCCIDENTAL CHEMICAL HOLDINGS CORPORATION

By: _____
Title:

GLENN SPRINGS HOLDINGS, INC.

By: *Laura L. Whiting*
Title: *Vice President & General Counsel*

MILLER SPRINGS REMEDIATION MANAGEMENT, INC.

By: *Laura L. Whiting*
Title: *Vice President & General Counsel*

MARIANA PROPERTIES, INC.

By: *Laura L. Whiting*
Title: *Vice President & General Counsel*

[Signature Page - OCC Parties]

YPF S.A.


By:    Pablo González
Title: Director and Chairman, YPF S.A.


YPF INTERNATIONAL S.A.


By:    Pablo González
Title: Attorney-in-Fact


YPF HOLDINGS, INC.


By:    Pablo González
Title:    Attorney-in-Fact


YCLH HOLDINGS, INC.


By:    Pablo González
Title:    Attorney-in-Fact


Ari J. Papahronis
Notary Public, State of New York
No.01PA6430868
Qualified in New York County
Commission Expires March 21, 2026

[Signature Page - YPF Parties]

REPSOL, S.A.

_____
By: Miguel Klingenberg
Title: General Counsel


REPSOL EXPLORACIÓN, S.A.


_____
By:
Title:


REPSOL USA HOLDINGS LLC


_____
By:
Title:


REPSOL E&P USA LLC


_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.


_____
By:
Title:


REPSOL SERVICES COMPANY


_____
By:
Title:


[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____
By:  Francisco Gea
Title:EMD E&P


REPSOL USA HOLDINGS LLC

_____
By:
Title:


REPSOL E&P USA LLC

_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.

_____
By:
Title:


REPSOL SERVICES COMPANY

_____
By:
Title:

REPSOL, S.A.

_____
By:
Title:

REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:

REPSOL USA HOLDINGS LLC

_____
By: Ferdinando Rigardo
Title: President

REPSOL E&P USA LLC

_____
By:
Title:

REPSOL OFFSHORE E&P USA INC.

_____
By:
Title:

REPSOL SERVICES COMPANY

_____
By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____

By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____

By:
Title:


REPSOL USA HOLDINGS LLC

_____

By:
Title:


REPSOL E&P USA LLC

*Forrest W Pace*
Forrest W Pace (Apr 4, 2023 10:16 CDT)
_____

By: Forrest W. Pace
Title: President


REPSOL OFFSHORE E&P USA INC.

_____

By:
Title:


REPSOL SERVICES COMPANY

_____

By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:

REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:

REPSOL USA HOLDINGS LLC

_____
By:
Title:

REPSOL E&P USA LLC

_____
By:
Title:

REPSOL OFFSHORE E&P USA INC.

*Forrest W Pace*
Forrest W Pace (Apr 4, 2023 10:15 CDT)
_____
By: Forrest W. Pace
Title: President

REPSOL SERVICES COMPANY

_____
By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:

REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:

REPSOL USA HOLDINGS LLC

_____
By:
Title:

REPSOL E&P USA LLC

_____
By:
Title:

REPSOL OFFSHORE E&P USA INC.

_____
By:
Title:

REPSOL SERVICES COMPANY

_____
By: Ferdinando Rigardo
Title: President

[Signature Page - Repsol Defendants I]

PERENCO TRINIDAD & TOBAGO (HOLDINGS) ETVE SLU
(F/K/A REPSOL E&P T&T LIMITED)

By:      Emmanuel Colombel
Title:     Director

[Signature Page - Repsol Defendants II]

**<u>EXHIBIT 1</u>**

**GOVERNMENT AGREEMENT**

[OMITTED AS ATTACHED AS EXHIBIT 2]

## EXHIBIT 2

**REMOVED ACTION STIPULATION OF DISMISSAL**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAXUS ENERGY CORPORATION, | Case No. 16-11501 (CTG) |
| Debtor. | (Jointly Administered) |
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, *et al.,* Plaintiffs, | Adv. Proc. No. 16-51025 (CTG) |
| -against- | |
| OCCIDENTAL CHEMICAL CORPORATION, *et al.,* | |
| Defendants. | |

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7041 of the Federal Rules of Bankruptcy Procedure, the parties (collectively, the "Parties") to the above-captioned adversary proceeding (the "Adversary Proceeding") filed in the United States Bankruptcy Court for the District of Delaware, by and through their respective

*[Remainder of Page Intentionally Left Blank]*

1

counsel, stipulate and agree that the Adversary Proceeding shall be, and hereby is, dismissed with

prejudice, with each Party to bear its own costs and attorneys' fees.

Dated: _____ __, 2023
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A**.

*/s/ Draft*_____
Russell C. Silberglied (No. 3462)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
E-mail: silberglied@rlf.com
          schlauch@rlf.com

- and –

**GIBBS & BRUNS LLP**
Kathy D. Patrick (admitted *pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 650-0903
kpatrick@gibbsbruns.com

*Counsel for Occidental Chemical
Corporation*

**LANDIS RATH & COBB LLP**

*/s/ Draft*_____
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
          mcguire@lrclaw.com
          jenner@lrclaw.com

– and –

**CLEARY GOTTLIEB STEEN & HAMILTON
LLP**
Jeffrey A. Rosenthal (*pro hac vice*)
Ari D. MacKinnon (*pro hac vice*)
Mark E. McDonald (*pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

– and –

**SIDLEY AUSTIN LLP**
John J. Kuster (*pro hac vice*)
Andrew P. Propps (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel for the YPF Defendants*

**<u>EXHIBIT 3</u>**

**PASSAIC RIVER LITIGATION DISMISSAL**

PASHMAN STEIN WALDER HAYDEN
A Professional Corporation
MICHAEL S. STEIN, ESQUIRE/037351989
Court Plaza South
21 Main Street, Suite 200
Hacksensack, New Jersey 07601
(201) 488-8200
*Attorneys for Intervenor Joseph J. Farnan, Jr.,*
*As Liquidating Trustee of the Maxus Liquidating Trust*

LANGSAM STEVENS SILVER & HOLLAENDER LLP
JOHN J. MCDERMOTT, ESQUIRE/039042006
65 South Main Street, Suite B102
Pennington, New Jersey 08534

GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
BY: KATHY D. PATRICK, ESQUIRE
(admitted *pro hac vice*)
ANTHONY N. KAIM, ESQUIRE
(admitted *pro hac vice*)
*Attorneys for Defendant/Cross-Claimant Occidental Chemical Corporation*

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>   Plaintiffs,<br><br>v.<br><br>OCCIDENTAL CHEMICAL CORPORATION, TIERRA SOLUTIONS, INC., MAXUS ENERGY CORPORATION, MAXUS INTERNATIONAL ENERGY COMPANY, REPSOL YPF, S.A., YPF, S.A., YPF HOLDINGS, INC., YPF INTERNATIONAL S.A. (*f/k/a* YPF INTERNATIONAL LTD.) and CLH HOLDINGS,<br><br>   Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - ESSEX COUNTY<br><br>DOCKET NO. L-9868-05 (PASR)<br><br>CIVIL ACTION<br><br>**JOINT STIPULATION OF DISMISSAL** |

The matter in difference in the above entitled action having been amicably adjusted by and between Intervenor Maxus Liquidating Trust, Defendant and Cross-Claimant Occidental Chemical Corporation, and Defendant YPF S.A., YPF International S.A., YPF Holdings, Inc., and YCLH Holdings, Inc. (*f/k/a* CLH Holdings, Inc.) (collectively, the "**YPF Defendants**"), and Defendant Repsol, S.A. (*f/k/a* Repsol YPF, S.A.), Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (*f/k/a* Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "**Repsol Defendants**"), it is hereby stipulated and agreed that all claims, counterclaims, appeal rights, and causes of action that were asserted or could have been asserted in this action between intervenor Maxus Liquidating Trust or cross-claimant Occidental Chemical Corporation against the YPF Defendants or the Repsol Defendants be and are hereby dismissed with prejudice and without costs. It is further stipulated and agreed that all appeals and rights to appeal on behalf of intervenor Maxus Liquidating Trust and cross-claimant Occidental Chemical Corporation against the YPF Defendants or the Repsol Defendants are hereby released and dismissed with prejudice, without costs.

**Dated: _____ __, 2023**

By: /s/ *Draft* _____
Michael S. Stein
**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
*Attorneys for Intervenor*
*Joseph J. Farnan, Jr. as*
*Liquidating Trustee for the Maxus*
*Liquidating Trust*

By: /s/ *Draft* _____
John J. McDermott
**LANGSAM STEVENS SILVER &
HOLLAENDER LLP**
65 South Main Street, Suite B102
Pennington, New Jersey 08534
T: 856-727-0057
F: 856-727-0315
*Attorneys for Defendant/Cross-Claimant
Occidental Chemical Corporation*


By: /s/ *Draft* _____
Diane P. Sullivan
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
T: 609-986-1120
F: 609-986-1199
*Attorneys   for   Defendant/Cross-Claimant
Repsol, S.A.*

**<u>EXHIBIT 2</u>**

**GOVERNMENT AGREEMENT**

## SETTLEMENT AND COVENANT NOT TO SUE

This SETTLEMENT AND COVENANT NOT TO SUE (including all exhibits attached hereto, the "**Agreement**") is made and entered into by and among (i) YPF S.A. ("**YPF**"), YPF International S.A. (f/k/a YPF International Ltd.) ("**YPFI**"), YPF Holdings, Inc. ("**YPFH**"), and YCLH Holdings, Inc. (f/k/a CLH Holdings, Inc.) ("**CLHH**," and together with YPF, YPFI, and YPFH, the "**YPF Parties**"); (ii) Repsol, S.A. ("**Repsol**"), Repsol Exploración, S.A., Repsol USA Holdings LLC, Repsol E&P USA LLC, Repsol Offshore E&P USA Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (f/k/a Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "**Repsol Parties**") (together with the YPF Parties, the "**Private Parties**"); (iii) the United States of America (the "**United States**"), on behalf of the U.S. Environmental Protection Agency ("**EPA**"), U.S. Department of the Interior ("**DOI**"), and U.S. National Oceanic and Atmospheric Administration ("**NOAA**"); (iv) the State of Ohio ("**Ohio**"); and (v) the State of Wisconsin ("**Wisconsin**" and, together with the United States and Ohio, the "**Governmental Parties**") (the foregoing, collectively, the "**Parties**," and each a "**Party**").

## RECITALS

**WHEREAS**, on or about June 17, 2016 (the "**Petition Date**"), Maxus Energy Corporation ("**Maxus**"), Tierra Solutions, Inc. ("**Tierra**"), Maxus International Energy Company ("**MIEC**"), Maxus (U.S.) Exploration Company, and Gateway Coal Company (each, a "**Debtor**," and, collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing cases (the "**Chapter 11 Cases**"), which are jointly administered for procedural purposes and which were substantively consolidated pursuant to the Plan and Confirmation Order (each as defined below);

**WHEREAS**, the Private Parties are former parents or Affiliates, as defined herein, of each of the Debtors;

**WHEREAS**, the Debtors' filing of voluntary petitions resulted in an automatic stay of, *inter alia*, litigation against the Debtors concerning any claims that arose prior to the Petition Date;

**WHEREAS**, the United States, on behalf of EPA, DOI, and NOAA, filed Proofs of Claim Numbers 473, 474, 2780, and 2782 against Maxus and Proofs of Claim Numbers 476, 2778, and 2781 against Tierra (collectively, the "**United States Proofs of Claim**"), each alleging that the United States has, or may have, various Claims, as defined herein, in connection with each of the following: (i) the four operable units of the Diamond Alkali Superfund Site, as defined herein; (ii) the Milwaukee Solvay Site, as defined herein; and (iii) Debtor owned real properties that are part of the bankruptcy estates, including (a) the Diamond Shamrock Kearny Plant Site at 1015 Belleville Turnpike, Kearny, New Jersey, as defined herein; (b) the St. Johnsbury Trucking Site at Obrien St. and Sellers St. in Kearny, New Jersey; (c) certain real property related to the Painesville Ohio Site in Painesville, Ohio, including real property related to Operable Unit 2 (Cement Plant), Operable Unit 3 (Lake Erie Eastern Bluff Area), Operable Unit 4 (Brine Ponds), Operable Unit 6 (Coke Plant), Operable Unit 7 (Settling Basin #3), Operable Unit 10 (One Acre Site Landfill), Operable Unit 14 (Settling Basin #4), Operable Unit 15 (Main Plant Area), Operable Unit 16 (Chrome Site), Operable Unit 18 (Internal Railroad Spur), Operable Unit 20 (Chrome Site Support

Area), and Painesville Parcel 7 A I; and (d) the Maxus Agricultural Chemicals facility at 5421 Reichhold Rd., Tuscaloosa, Alabama (each of the foregoing, together with the areal extent of contamination therefrom, a "**Covered Site**," and collectively, the "**Covered Sites**");

WHEREAS, Ohio filed Proof of Claim Number 469 against Maxus and Proofs of Claim Numbers 470 and 471 against Tierra (collectively, the "**Ohio Proofs of Claim**"), each alleging various Claims in connection with the Painesville Ohio Site, as defined herein;

WHEREAS, the State of Wisconsin, Department of Natural Resources filed Proof of Claim Number 80 against Maxus (the "**Wisconsin Proof of Claim**" and, together with the United States Proofs of Claim and the Ohio Proofs of Claim, the "**Governmental Proofs of Claim**"), alleging various Claims in connection with the Milwaukee Solvay Site, as defined herein;

WHEREAS, on or about September 4, 1986, Maxus (then known as Diamond Shamrock Corporation) sold all of the stock of Diamond Shamrock Chemicals Company ("**DSCC**") to an affiliate of Occidental Chemical Corporation ("**OCC**"), and subsequently DSCC merged into such affiliate, which in turn merged into OCC;

WHEREAS, in connection with the sale of DSCC, Maxus and certain of OCC's affiliates executed a Stock Purchase Agreement dated September 4, 1986, which provided indemnification by Maxus to certain of OCC's affiliates that subsequently merged into OCC, including in connection with the Diamond Alkali Superfund Site;

WHEREAS, on May 22, 2017, the Bankruptcy Court conducted an evidentiary hearing on confirmation (the "**Confirmation Hearing**") of the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (the "**Plan**"), and various creditors appeared at the Confirmation Hearing, including the Official Committee of Unsecured Creditors and the United States Department of Justice on behalf of EPA, DOI, and NOAA;

WHEREAS, on May 22, 2017, the Bankruptcy Court entered an order (Case No. 16-11501, D.I. 1460) (the "**Confirmation Order**") confirming the Plan;

WHEREAS, the Plan, as confirmed by the Bankruptcy Court, provided that all Causes of Action (as defined below) (which include without limitation all avoidance actions, claims seeking to impose veil-piercing or alter ego liability, claims for civil conspiracy, and claims for unjust enrichment) were transferred to the Maxus Liquidating Trust (the "**Trust**"), and Section IV.H of the Plan provided that the Trust "shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court";

WHEREAS, the Plan settled the United States Proofs of Claim by providing the United States an allowed Class 4 Environmental Claim in the amount of $145,696,361 (of which $145,000,000 relates to the United States Diamond Alkali Class 4 Claim (as defined in the Plan) for the Diamond Alkali Superfund Site and $696,361 relates to the United States Milwaukee Solvay Class 4 Claim (as defined in the Plan) for the Milwaukee Solvay Coke & Gas Superfund

Site) and a Class 5 Diamond Alkali Claim (as defined in the Plan) in an amount of no less than $61 million;

WHEREAS, the Plan settled the Ohio Proofs of Claim by providing the Ohio Environmental Protection Agency and the Ohio Department of Natural Resources an allowed Class 4 Environmental Claim in the amount of $25,000,000;

WHEREAS, the Plan settled the Wisconsin Proofs of Claim by providing the State of Wisconsin, Department of Natural Resources an allowed Class 4 Environmental Claim in the amount of $5,000,000;

WHEREAS, on July 14, 2017, the effective date of the Plan occurred;

WHEREAS, the Bankruptcy Court determined in its August 2, 2017, opinion (Case No. 16–11501, D.I. 1745-1) that another creditor's veil-piercing or alter ego cross-claims against the Private Parties were "general" claims that the Debtors could have asserted under state law pre-petition and therefore constituted property of the Debtors' estates such that the Debtors had exclusive standing to pursue them;

WHEREAS, pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement (as defined below), the Trust was created on the effective date of the Plan to liquidate the Debtors' assets and prosecute the Debtors' Claims and Causes of Action, as defined herein, on behalf and for the benefit of the Debtors' creditors, and the Honorable Joseph J. Farnan, Jr. (Ret.) was appointed as the Trustee and Delaware Trustee of the Trust;

WHEREAS, on or about June 14, 2018, the Trust filed a complaint against the Private Parties with the Bankruptcy Court, captioned *Maxus Liquidating Trust v. YPF S.A. et al.*, Adv. Pro. No. 18-50489 (the "**Adversary Proceeding**");

WHEREAS, the Trust has alleged in the Adversary Proceeding certain generalized claims against the Private Parties related to the corporate relationship between and among the Debtors and the Private Parties, including with respect to certain prepetition transactions entered into between the Debtors and the Private Parties;

WHEREAS, the claims alleged in the Adversary Proceeding include, without limitation, claims made under federal or state law based on theories of avoidance of fraudulent transfers, veil-piercing/alter ego liability, civil conspiracy, and unjust enrichment;

WHEREAS, in a Letter Opinion dated February 15, 2019, the Bankruptcy Court ruled that "under the Third Circuit's decision in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014) and this Court's ruling in [*In re Maxus Energy Corp.*, 571 B.R. 650, 660 (Bankr. D. Del. 2017)], which is the law of the case, the alter ego claims of the Debtor's creditors are property of the estate and may only be pursued by the Trust." (Adv. Pro. No. 18-50489, D.I. No. 107);

WHEREAS, in its claim based on a theory of veil-piercing/alter ego liability, the Trust alleges that Private Parties' actions during the time they were affiliates of the Debtors and before the Petition Date resulted in the Debtors' inability to satisfy their obligations, including in connection with the proofs of claim filed against the Debtors in the Chapter 11 Cases, and therefore

seeks to hold Private Parties jointly and severally liable for (i) all Claims of the Debtors' creditors against the Debtors, including, without limitation, the Claims asserted in proofs of claim filed against the Debtors in the Chapter 11 Cases, and (ii) other damages including expenses, attorneys' fees, and pre- and post-judgment interest, under an "all liabilities" theory of alter ego damages;

**WHEREAS**, the Private Parties disagree with and dispute the Trust's allegations;

**WHEREAS**, on June 22, 2022, the Bankruptcy Court denied motions for partial summary judgment filed by the Trust and by the Repsol Parties in the Adversary Proceeding and granted in part and denied in part a motion for partial summary judgment filed by the YPF Parties, holding, among other things, that the Trust's "all liabilities" theory of alter ego damages was invalid as a matter of law and that the damages, if any, to which the Trust will be entitled on its claim based on a theory of veil-piercing/alter ego liability should be limited to those caused by the Private Parties' alleged alter ego conduct (Adv. Pro. No. 18-50489, D.I. No. 738);

**WHEREAS**, the Trust and the Private Parties have engaged in mediation before Hon. William B. Chandler III (Ret., Delaware Chancellor), and in further good faith and arms' length negotiations with each other have agreed to a settlement of any claims the Trust may hold against the Private Parties, claims that the Private Parties may have against the Trust and the Debtors, and claims that each of the YPF Parties and Repsol Parties may have against one another, on the terms set forth herein;

**WHEREAS**, the Trust, the YPF Parties, and the Repsol Parties have entered into a *Settlement and Release* (the "**Settlement and Release**");

**WHEREAS**, the YPF Parties, the Repsol Parties and OCC have entered into a bilateral contractual agreement and mutual release (the "**OCC Agreement**");

**WHEREAS**, the Governmental Parties are not parties to the OCC Agreement, which is separate and apart from this Agreement, and by entering into this Agreement the Governmental Parties do not indicate their agreement with or acceptance or endorsement of any statement or assertion in the OCC Agreement;

**WHEREAS**, in connection with the Settlement and Release, and subject to any applicable offsets for amounts previously paid by such Private Parties, the YPF Parties have agreed to pay Two Hundred Eighty-Seven Million Five Hundred Thousand Dollars ($287,500,000) and the Repsol Parties have agreed to pay Two Hundred Eighty-Seven Million Five Hundred Thousand Dollars ($287,500,000) for a total of Five Hundred Seventy-Five Million Dollars ($575,000,000) (the "**Settlement Payments**");

**WHEREAS**, the United States, on behalf of EPA, DOI, and NOAA, will (directly, and through the Environmental Response/Restoration Trust ("**ERRT**"), established pursuant to Article IX of the Plan) receive a portion of the Settlement Payments through the Liquidating Trust Waterfall, as the term is defined in the Plan, in accordance with Article VI.D. of the Plan, with the Parties having been informed by counsel to the Trust that such portion is expected to be approximately $160 million;

**WHEREAS,** the ERRT, established to fund remedial and restoration activities at the Diamond Alkali Superfund Site, will additionally receive an amount to be managed by the ERRT and used for remediation and restoration at the Diamond Alkali Superfund Site as provided in the Plan, with the Parties having been informed by counsel to the Trust that such amount is expected to be approximately $25 million;

**WHEREAS**, as provided in the Plan, only the amount of cash received by EPA, DOI or NOAA pursuant to the Plan for their allowed claims in connection with the Diamond Alkali Superfund Site and the Milwaukee Solvay Site, and not the total amount of such allowed claims, shall be credited as a recovery by EPA, DOI or NOAA for such sites, which credit shall reduce the liability of non-settling potentially responsible parties for such sites by the amount of the credits;

**WHEREAS**, Ohio will receive a substantial portion of the Settlement Payments through the Liquidating Trust Waterfall, as the term is defined in the Plan, in accordance with Article VI.D. of the Plan, with the Parties having been informed by counsel to the Trust that such portion is expected to be approximately $17 million, of which 10 percent shall be allocated to the Ohio Attorney General's Office for collection costs authorized under Ohio law, and of the remaining amount, 97.5 percent shall be allocated to an appropriate account of the Ohio Environmental Protection Agency to be spent in accordance with Ohio law, and 2.5 percent shall be allocated to an appropriate account of the Ohio Department of Natural Resources to be spent in accordance with Ohio law;

**WHEREAS**, Wisconsin will receive a substantial portion of the Settlement Payments through the Liquidating Trust Waterfall, as the term is defined in the Plan, in accordance with Article VI.D. of the Plan, with the Parties having been informed by counsel to the Trust that such portion is expected to be approximately $3 million;

**WHEREAS**, the YPF Parties and the Repsol Parties have expressly reserved the right to terminate the Settlement and Release if this Agreement is not approved in a Final Order, as defined therein, which would void their obligations to make the Settlement Payments and instead create substantial uncertainty with regard to the Governmental Parties' and other creditors' potential recoveries from the Trust, as they will be dependent on the uncertainties of litigation;

**NOW, THEREFORE**, without any final adjudication of any issue of fact or law, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**

**<u>DEFINITIONS</u>**

**Section 1.1    Capitalized Terms Not Defined Herein**.  Capitalized terms used but not otherwise defined herein, including in the Preamble and Recitals, shall have the meanings ascribed to such terms in the Plan or in the Settlement and Release.

**Section 1.2    Other Defined Terms**.  The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"<u>Affiliate</u>" means: (a) an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of a Private Party, other than an entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (b) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by a Private Party, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of a Private Party, other than an entity that holds such securities— (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (c) a person whose business is operated under a lease or operating agreement by a Private Party, or person substantially all of whose property is operated under an operating agreement with a Private Party; or (d) an entity that operates the business or substantially all of the property of a Private Party under a lease or operating agreement.  No individual or Governmental Authority shall be an Affiliate.

"<u>Approval Order</u>" means the District Court order granting the Environmental Motion and approving this Agreement.

"<u>Business Day</u>" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are required or authorized by law or governmental action to close.

"<u>Causes of Action</u>" has the meaning set forth in the Plan and includes any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors and/or their bankruptcy estates), including, without limitation, any claims, causes of action, objections, rights, remedies arising under Chapter 5 of the Bankruptcy Code pursuant to, among others, sections 502, 510, 542 through 545 and 547 through 553 or 558 thereof, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, and whether held in a personal or representative capacity, that are or may be pending as of the date of the Plan or instituted thereafter against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of the Plan.

"<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*).

"<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Diamond Alkali Superfund Site" means the site designated by EPA as such, inclusive of its four operable units, and encompassing the former manufacturing facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study Area, the Newark Bay Study Area and the areal extent of contamination therefrom. The Lower Passaic River Study Area includes the 17-mile tidal stretch of the Passaic River from Dundee Dam to Newark Bay, and tributaries. The Newark Bay Study Area includes Newark Bay and portions of the Hackensack River, Arthur Kill, and Kill van Kull.

"Diamond Shamrock Kearny Plant Site" means the property located at 1015 Belleville Turnpike, Town of Kearny, Hudson County, New Jersey comprised of several parcels located on the tax map of the Township of Kearny as Block 287, Lots 32.02, 46, 47, and 47.01, and the areal extent of contamination therefrom.

"Effective Date," subject to Section 7.1, means the date that the Trust Settlement Order becomes a Final Order or the date on which the Approval Order becomes a Final Order, whichever date is later, provided that both the Trust Settlement Order and the Approval Order have been entered.

"Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"Environmental Law" means, whenever in effect, all federal, tribal, state and local statutes, regulations, rules, ordinances and similar provisions having the force or effect of law, and all judicial and administrative orders and determinations and all common law, in each case concerning in any way the Environmental Release of a hazardous substance, pollution of the environment or the protection of human health, safety, the environment, or natural resources, including, but not limited to, CERCLA; RCRA; the Clean Water Act (33 U.S.C. § 1251 *et seq.*); the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*); the Rivers and Harbors Act of 1899 (33 U.S.C. § 401 *et seq.*); the Oil Pollution Act of 1990 (33 U.S.C. § 2701 *et seq.*); the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a to -23.11z; Ohio Revised Code Chapters 1501, 1504, 1506, 3734, 3767, and 6111; the Wisconsin Hazardous Substances Spills and Environmental Repair laws, Wis. Stat. Chp. 292; and Chapters NR 500-799, Wis. Admin. Code, as each has been or may be amended.

"Environmental Motion" has the meaning set forth in Section 5.1(c).

"Environmental Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, migration or leaching into the indoor or outdoor environment, or into or out of or through any property.

"FDCPA" means Subchapter D of the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3301-3308, as hereinafter amended.

"Final Order" means an order or judgment of any court of competent jurisdiction, including the Bankruptcy Court, that has not been modified, amended, reversed, vacated, or stayed, is in full force and effect, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing

thereof has been sought, such order or judgment of a court of competent jurisdiction (including the Bankruptcy Court) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with all applicable law and rules, including Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Final Order Date" means the date that the Trust Settlement Order becomes a Final Order or the date on which the Approval Order becomes a Final Order, whichever date is later, provided that both the Settlement Order and the Approval Order have been entered.

"Governmental Authority" means, with respect to any Person, the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government to the extent such entity or body has jurisdiction over such Person.  For the avoidance of doubt, no Private Party shall be considered a Governmental Authority for purposes of this Agreement.

"Law" means the common law and all federal, state, local, and foreign laws, rules and regulations, orders, injunctions, judgments, decrees, rulings, writs, assessments or awards and other determinations of the United States, any foreign country, or any domestic or foreign Governmental Authority.

"Liquidating Trust Agreement" means that certain trust agreement dated July 5, 2017, the form of which was included as Exhibit A to the Plan Supplement (as defined in the Plan), which, among other things: (a) establishes and governs the Trust and (b) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

"Matters Addressed" has the meaning set forth in Section 3.4(b).

"Milwaukee Solvay Site" means the Milwaukee Solvay Coke & Gas Superfund Site located at 311 East Greenfield Avenue, Milwaukee, Wisconsin, consisting of approximately 46 acres in a primarily industrial and commercial area and associated contaminated sediment in the Kinnickinnic River, and the areal extent of contamination therefrom.

"Natural Resource Damages" means damages for injury or loss of Natural Resources as set forth in CERCLA Section 107(a), 42 U.S.C. § 9607(a), or CERCLA Section 111(b), 42 U.S.C. § 9611(b).

"Natural Resources" has the meaning set forth in CERCLA Section 101(16), 42 U.S.C. § 9601.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Painesville Ohio Site" means the former Diamond Shamrock Painesville Works Site located partly in the Village of Fairport Harbor, Ohio, partly in the city of Painesville, Ohio, and partly in Painesville Township, Lake County, Ohio, and the areal extent of contamination therefrom, including all Operable Units of said site.

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Private Parties" has the meaning set forth in the introductory paragraph of this Agreement.

"Property Trust" has the meaning set forth in the Plan, and also includes any trust established to hold and/or remediate the Tuscaloosa Site.

"RCRA" means the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*).

"Related Private Parties" means the Repsol Related Private Parties and the YPF Related Private Parties.  Each of the Related Private Parties is a "Related Private Party."

"Report and Recommendation" has the meaning set forth in Section 5.1(c).

"Repsol Related Private Parties" means (a) the Repsol Parties and (b) the Affiliates of the Repsol Parties listed in Exhibit 1 and the current and former directors, officers, managers, members and employees of the Repsol Parties, but only to the extent that the alleged liability of such Affiliate, director, officer, manager, member, or employee is based on its status as and in its capacity as an Affiliate, director, officer manager, or employee of a Repsol Party.  For the avoidance of doubt, any YPF Related Private Party that fits within the definition of Repsol Related Private Parties solely by virtue of having been an Affiliate of the Repsol Parties shall be covered by the provisions of this Agreement addressing the YPF Related Private Parties rather than those addressing the Repsol Related Private Parties.

"Response Action" has the same meaning set forth in CERCLA Section 101(25), 42 U.S.C. § 9601(25).

"RYM Settlement" means that certain Settlement Agreement by and between the State of New Jersey and defendants Repsol, Maxus, Tierra, MIEC, YPF, YPFH, YPFI, and CLHH, approved by the Superior Court of New Jersey Law Division-Essex County December 12, 2013.

"Trust Derivative Claims" means any and all Causes of Action that were or could have been asserted by the Debtors and/or the Trust against any of the YPF Released Parties or the Repsol Released Parties, as those terms are defined in the Settlement and Release, seeking relief or recovery arising from harm to any Debtor or any Debtor's estate based on, *inter alia*, any legal theory (i) that such Released Party was the corporate alter ego of any Debtor, (ii) that the corporate veil between any Debtor and such Released Party should be pierced, (iii) that such Released Party is liable under any theory of successor liability as a successor to any Debtor, (iv) that such Released Party wrongfully took or otherwise appropriated assets of any Debtor, or (v) that such Released Party otherwise interfered with any Debtor's ability to meet its legal obligations to creditors. For the avoidance of doubt, Trust Derivative Claims include (x) the Causes of Action that have been brought by the Trust in the Adversary Proceeding and (y) all Causes of Action that are similar or analogous to the Causes of Action set forth in (i)-(v) above and that arise from the same or substantially similar facts and allegations.

"Trust Settlement Motion" means the Settlement Motion as defined in the Settlement and Release.

"Trust Settlement Order" means the Settlement Order as defined in the Settlement and Release.

"Tuscaloosa Site" means the 16.66 acre site spanning 5 parcels, located at 5421 Reichhold Road, Tuscaloosa, Alabama, and the areal extent of contamination therefrom.

"United States" means the United States of America and each department, agency, and instrumentality of the United States.

"YPF Related Private Parties" means (a) the YPF Parties and (b) the Affiliates of the YPF Parties listed at Exhibit 2 and the current and former directors, officers, managers, members and employees of the YPF Parties, but only to the extent that the alleged liability of such Affiliate, director, officer, manager, member, or employee is based on its status as and in its capacity as an Affiliate, director, officer manager, or employee of a YPF Party. For the avoidance of doubt, any YPF Related Private Party that fits within the definition of Repsol Related Private Parties solely by virtue of having been an Affiliate of the Repsol Parties shall be covered by the provisions of this Agreement addressing the YPF Related Private Parties rather than those addressing the Repsol Related Private Parties.

**Section 1.3    Exhibits Incorporated by Reference**.  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

## ARTICLE II

## PRIVATE PARTIES' OBLIGATIONS

**Section 2.1    The YPF Parties' Settlement Payment**.  The YPF Parties shall comply with their obligations contained in Article III of the Settlement and Release, in accordance with the terms thereof.

**Section 2.2    The Repsol Parties' Settlement Payment**.  The Repsol Parties shall comply with their obligations contained in Article III of the Settlement and Release, in accordance with the terms thereof.

## ARTICLE III

## GOVERNMENTAL PARTIES' ACKNOWLEDGMENT OF TRUST DERIVATIVE CLAIMS; COVENANT NOT TO SUE BY GOVERNMENTAL PARTIES; CONTRIBUTION PROTECTION; COVENANT NOT TO SUE BY PRIVATE PARTIES

**Section 3.1    United States**.

(a)    The United States, on behalf of EPA, DOI and NOAA, for purposes of this Agreement only, agrees, accepts, and recognizes that: (i) the Trust owns, controls and has the exclusive right to assert, settle, and compromise the Trust Derivative Claims; (ii) the United States on behalf of EPA, DOI and NOAA does not own, control or have the right to assert or settle the Trust Derivative Claims, including any such claims that stem from a cause of action under Environmental Law; and (iii) the United States has no right, standing, or ability to assert, prosecute, recover, or make any demand with respect to the Trust Derivative Claims.  For the purposes of this paragraph, the term Trust Derivative Claims shall not be construed to include claims asserted by the United States under the FDCPA.

(b)    Upon the payments required by Article III of the Settlement and Release as described in Section 2.1 and Section 2.2, and effective upon the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), the United States (on behalf of EPA, DOI and NOAA) covenants not to sue or assert any  common law civil claims or causes of action against the Related Private Parties for any claims that are Trust Derivative Claims relating to (1) the Covered Sites, including response actions and natural resource damages at the Covered Sites, (2) the United States' Proofs of Claim, (3) the Chapter 11 Cases, or (4) the Adversary Proceeding.  Additionally, upon the payments required by Article III of the Settlement and Release as described in Section 2.1 and Section 2.2, and effective on the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), the United States covenants not to sue or assert a claim or cause of action against the Related Private Parties under the FDCPA, to recover on a debt that is an environmental liability at a Covered Site where such claim or cause of action arises from the transactions at issue in the Adversary Proceeding.

11

(c)     Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective on the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), the United States on behalf of EPA, DOI and NOAA covenants not to sue or assert any civil claims or causes of action or to take administrative action against the Related Private Parties pursuant to Sections 106 or 107 of CERCLA (42 U.S.C. §§ 9606 and 9607) or Section 7003 of RCRA (42 U.S.C. § 6973) with respect to the Covered Sites, including, but not limited to, any such civil claims, causes of action or administrative actions relating to: (1) any and all response actions and natural resource damages, (2) the United States' Proofs of Claim, (3) the Chapter 11 Cases, and/or (4) the Adversary Proceeding.

**Section 3.2     Ohio**.

(a)     Ohio, for purposes of this Agreement only, agrees, accepts, and recognizes that: (i) the Trust owns, controls and has the exclusive right to assert, settle, and compromise the Trust Derivative Claims; (ii) Ohio does not own, control or have the right to assert or settle the Trust Derivative Claims, including any such claims that stem from a cause of action under Environmental Law; and (iii) Ohio has no right, standing, or ability to assert, prosecute, recover, or make any demand with respect to the Trust Derivative Claims.

(b)     Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective upon the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), Ohio covenants not to sue or assert any common law civil claims or causes of action against the Related Private Parties for any claims that are Trust Derivative Claims relating to (1) the Painesville Ohio Site, including response actions and natural resource damages, (2) the Ohio Proofs of Claim, (3) the Chapter 11 Cases, or (4) the Adversary Proceeding.

(c)     Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective on the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), with respect to the Painesville Ohio Site, Ohio covenants not to sue or assert any civil claims or causes of action whatsoever nor to take any administrative action against the Related Private Parties under CERCLA and Ohio Revised Code Chapters 1501, 1504, 1506, 3734, 3767, and 6111, including but not limited to, any such civil claims, causes of action or administrative actions relating to: (1) any and all response actions and natural resource damages, (2) the Ohio Proofs of Claim, (3) the Chapter 11 Cases, and/or (4) the Adversary Proceeding.

**Section 3.3     Wisconsin**.

(a)     Wisconsin, for purposes of this Agreement only, agrees, accepts, and recognizes that: (i) the Trust owns, controls and has the exclusive right to assert, settle, and compromise the Trust Derivative Claims; (ii) Wisconsin  does not own, control or have the right to assert or settle the Trust Derivative Claims, including any such claims that stem from a cause of action under Environmental Law; and (iii) Wisconsin has no right, standing, or ability to assert, prosecute, recover, or make any demand with respect to the Trust Derivative Claims.

(b)     Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective upon the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), Wisconsin covenants not to sue or assert any common law civil claims or causes of action against the Related Private Parties for any claims that are Trust Derivative Claims relating to (1) the Milwaukee Solvay Site, including response actions and natural resource damages, (2) the Wisconsin Proof of Claim, (3) the Chapter 11 Cases, or (4) the Adversary Proceeding.

(c)     Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective on the Effective Date without further action by any Party, and except as specifically provided in Article IV (Reservation of Rights), with respect to the Milwaukee Solvay Site, Wisconsin covenants not to sue or assert any civil claims or causes of action whatsoever nor to take any administrative action against the Related Private Parties under CERCLA and the Wisconsin Hazardous Substances Spills and Environmental Repair laws, Wis. Stat. Chp 292; and Chapters NR 500-799, Wis. Admin. Code including but not limited to, any such civil claims, causes of action or administrative actions relating to: (1) any and all response actions and natural resource damages, (2) the Wisconsin Proof of Claim, (3) the Chapter 11 Cases, and/or (4) the Adversary Proceeding.

### Section 3.4     Contribution Protection.

(a)     The Private Parties and each of the Governmental Parties agree that, upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and upon the Effective Date, this Agreement will constitute a judicially approved settlement for purposes of Section 113(f)(2) of CERCLA, and that each Private Party is entitled, as of the Effective Date and upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), or as otherwise provided by law for the Matters Addressed in this Agreement.

(b)     Except as provided in Subsections 3.4(c), for purposes of this Section 3.4, the Matters Addressed are as follows: (i) all response actions taken or to be taken and all response costs incurred or to be incurred by the United States, Ohio, Wisconsin or any other person, except for the State of New Jersey, at or in connection with the Diamond Alkali Superfund Site, the Milwaukee Solvay Site or the Painesville Ohio Site, and all areas affected by migration of hazardous substances from such sites; and (ii) claims for Natural Resource Damages, including but not limited to restoration and assessment costs, asserted by the United States on behalf of DOI or NOAA at the Diamond Alkali Superfund Site. Nothing herein is intended to diminish any contribution protection rights the Related Private Parties may have under the RYM Settlement.

(c)     The Matters Addressed in this Agreement do not include: (i) any matters that are the subject of the reservations of rights set forth in Article IV (Reservation of Rights); or (ii) any direct claims brought by OCC itself against any of the Related Private Parties, which are being resolved separately in the OCC Agreement.

**Section 3.5       Covenant Not to Sue by Private Parties**.

(a)       Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective upon the Effective Date without further action by any Party, the Private Parties covenant not to sue the Governmental Parties, the ERRT, and the Property Trust, established under Article VIII of the Plan, for any offset or reduction of the recovery in the Adversary Proceeding, including but not limited to any claim pursuant to § 502(h) of the Bankruptcy Code, and covenant not to sue and waive any claim for reimbursement of the Settlement Payments against the Governmental Parties, the ERRT, and Property Trust.

(b)       Upon the payments required by Article III of the Settlement and Release described in Section 2.1 and Section 2.2, and effective upon the Effective Date without further action by any Party, the Private Parties covenant not to sue or assert any Cause of Action against the Governmental Parties, including their departments, agencies or instrumentalities, the ERRT, and the Property Trust, (a) with respect to the Covered Sites, including but not limited to, any claims or causes of action under the Bankruptcy Code, any direct or indirect claim or cause of action for reimbursement from the Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507), through CERCLA Sections 106(b)(2), 107, 111, 112, 113, 42 U.S.C. §§ 9606(b), 9607, 9611, 9612, 9613, RCRA, or any other provision of law; any claims or causes of action pursuant to Sections 107 or 113 of CERCLA, 42 U.S.C. §§ 9607, 9613; any claims or causes of action for reimbursement of the Settlement Payments; or any claims or causes of action arising out of response actions at such Covered Sites, or (b) relating to (a) the United States Proofs of Claim, (b) the Ohio Proofs of Claim, (c) the Wisconsin Proof of Claim, (e) the Chapter 11 Cases, (f) the Adversary Proceeding, or (g) the Trust Derivative Claims.  Nothing in this Agreement shall be construed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611 or 40 C.F.R. § 300.700(d).

(c)       For the avoidance of doubt, Governmental Parties shall include for the purpose of this Section 3.5 all departments, agencies, and instrumentalities of the United States, including but not limited to EPA, DOI, and NOAA.

## ARTICLE IV

## RESERVATION OF RIGHTS

**Section 4.1       Contribution, Indemnity, and/or Insurance Claims**.  The settlement embodied in this Agreement shall not in any way prejudice the rights of the Related Private Parties to seek contribution, indemnity, and/or insurance against or from a Person not a Party.

**Section 4.2       Governmental Parties' Reservations**.  The mutual releases and covenants not to sue set forth in Article III do not pertain to any matters or Persons other than those expressly specified therein.  The Governmental Parties reserve, and this Agreement is without prejudice to, all rights against the Related Private Parties with respect to all matters other than those for which covenants are specifically provided in Section 3.1, Section 3.2, and Section 3.3.  Except as expressly provided herein, the Governmental Parties also specifically reserve and this Agreement is without prejudice to: (i) any criminal liability; (ii) any liability arising under Title 26 of the United States Code (Internal Revenue Code) or state tax laws; (iii) any liability arising under

federal or state securities laws; (iv) any action to enforce the terms of this Agreement; (v) any liability that the Related Private Parties might have that does not arise from or through a liability of a Debtor; or (vi) any liability of a Related Private Party due to its status or acts or omissions since May 22, 2017 as a/an (A) owner, (B) operator, (C) arranger for disposal or treatment, (D) transporter, or (E) person who generates, handles, transports, treats, stores or disposes of solid or hazardous waste.  For the avoidance of doubt, to the extent that a reserved liability of a Related Private Party referred to in subparts (i)-(vi) would be a liability for which such Related Private Party would be jointly and severally liable with others, including but not limited to one or more Debtors, under applicable law, nothing in this Agreement is intended to alter any such applicable principles of joint and several liability where otherwise provided by law.

Section 4.3    **Claims by Non-Signatory Related Parties**. In the event that a Related Private Party that is not a signatory hereto brings an action against a Governmental Party relating to the Covered Sites or any Trust Derivative Claim, any covenant with respect to such Covered Site or the subject matter of such Trust Derivative Claim provided by such Governmental Party to such Related Private Party shall be null and void and have no force or effect.

Section 4.4    **Private Parties' Reservations**. The Private Parties reserve, and this Agreement is without prejudice to, all rights against the Governmental Parties with respect to (a) all matters other than those set forth in Section 3.5, and (b) any action to enforce their rights under the terms of this Agreement.  In addition, the Private Parties' covenant not to sue under Section 3.5 shall not apply in the event that a Governmental Party brings a cause of action or issues an order pursuant to the reservations set forth in Article IV, but only to the extent that the Related Private Party's claims and causes of action arise from the same response action, response costs, damages or other relief that the Governmental Party is seeking pursuant to the applicable reservations.

Section 4.5    **Claims against Other Persons**. Except as expressly set forth herein, the Parties reserve all claims, demands, and causes of action, either judicial or administrative, past or future, in law or equity, which they may have against all other Persons for any matter arising from or relating in any manner to the Covered Sites, and/or claims addressed, released, or with respect to which covenants not to sue have been provided herein.

Section 4.6    **Claims Against OCC.** The Governmental Parties reserve all claims, demands and causes of action against OCC.

Section 4.7    **Non-Limitation under Environmental Law**. Nothing in this Agreement shall be deemed to limit the authority of the United States or any state to take response or natural resource assessment action under Section 104 of CERCLA, 42 U.S.C. § 9604, or any other applicable Environmental Law, or to alter the applicable legal principles governing judicial review of any action taken by the United States or a state pursuant to that authority.  Nothing in this Agreement shall be deemed to limit the information-gathering authority of the United States or a state under Sections 104 and 122 of CERCLA, 42 U.S.C. §§ 9604 and 9622, or any other applicable Environmental Law, or to excuse a Related Private Party from any disclosure or notification requirements imposed by CERCLA or any other applicable Environmental Law.

15

## ARTICLE V

## PUBLICATION IN FEDERAL REGISTER AND COURT
## APPROVAL OF AGREEMENT

**Section 5.1    Publication of Notice in Federal Register by the United States and Seeking Court Approval**.

(a)    As soon as practicable after the later of (a) the execution of this Agreement by all Parties hereto and (b) the filing of the Trust Settlement Motion, the United States shall submit for publication a notice for public comment for a period of thirty (30) days in the Federal Register regarding this Agreement.

(b)    The United States, in its discretion, may terminate this Agreement if the public comments regarding this Agreement, following notice in the Federal Register, disclose facts or considerations that indicate that this Agreement is inappropriate, improper or inadequate by written notice (which may be by email) to all Parties.

(c)    Promptly after the close of the public comment period, if the United States determines not to terminate this Agreement, the United States shall file in the District Court a motion seeking approval of this Agreement or file in the Bankruptcy Court a motion seeking a report and recommendation (the "**Report and Recommendation**") recommending approval of this Agreement to the District Court (the "**Environmental Motion**").

**Section 5.2    Combined Proceedings and Motions Permitted**.    Proceedings on the Environmental Motion may be combined with the proceedings on the Trust Settlement Motion as the Parties to this Agreement and the parties to the Settlement and Release and/or the Bankruptcy Court may deem appropriate.    The Environmental Motion and the Trust Settlement Motion may be combined such that the Trust and the United States are co-movants as the Parties to this Agreement and the parties to the Settlement and Release may deem appropriate.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE
## PARTIES

**Section 6.1**    Subject to Section 5.1(b) hereof, the Private Parties, solely and on behalf of themselves and their respective subsidiaries, represent and warrant that:

(a)    **Due Organization, Standing, and Authority**.    Such Private Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation.

(b)    **Authorization and Validity of the Agreement**.    The execution, delivery, and performance of this Agreement (a) are within such Private Party's powers and authority, (b) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect, and (c) do not violate any of the terms and conditions of such Private Party's Organization Documents. Such Private Party has the requisite power and authority to provide the acknowledgments it is providing pursuant to this

16

Agreement and to provide covenants not to sue and/or release the claims it is providing covenants for and/or releasing pursuant to this Agreement. Such Private Party has expressly authorized its undersigned representative to execute this Agreement on such Private Party's behalf as its duly authorized agent.

(c)    **Enforceability**. This Agreement has been duly executed and delivered on behalf of such Private Party and constitutes a legal, valid, and binding obligation of such Private Party enforceable against it in accordance with its terms, and shall be binding upon and will inure to the benefit of each of the Private Parties and its successor in interest, heirs, executors and/or administrators.

(d)    **Acknowledgment of Private Party**. Each Private Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (a) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (b) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; (c) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement; (d) this Agreement has been thoroughly negotiated and analyzed by each Party and/or its counsel and has been executed and delivered in good faith, pursuant to arms'-length negotiations, and for good and valuable consideration; (e) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Agreement (including all of its exhibits and schedules); (f) it has the opportunity to be represented and advised by legal counsel in connection with this Agreement, which Agreement it makes voluntarily and of its own choice and not under coercion or duress; (g) it knowingly waives any and all claims that this Agreement was induced by any misrepresentation or non-disclosure.

**Section 6.2    Governmental Parties.** Senior Counsel David L. Gordon in the Environment and Natural Resources Division of the Department of Justice, the Assistant Attorney General Michael E. Idzkowski for the State of Ohio, and the Assistant Attorney General Michael D. Morris for the State of Wisconsin, each certify that he or she is fully authorized to enter into the terms and conditions of this Agreement and to execute and legally bind such Party to this document, subject to the public comment process and the right of the United States to terminate this Agreement after the public comment period as provided in Section 5.1(b) hereof.

**Section 6.3    Reliance**. The Parties agree and stipulate that each Party is relying upon these representations and warranties in entering into this Agreement. Furthermore, the Parties agree that these representations and warranties are a material inducement to entering into this Agreement. These representations and warranties shall survive the execution of this Agreement indefinitely without regard to statutes of limitations.

# ARTICLE VII

## CONDITIONS PRECEDENT

**Section 7.1    Conditions to Effectiveness**. This Agreement shall not go into effect until the Effective Date of the Settlement and Release.

# ARTICLE VIII

## TERMINATION OF THE AGREEMENT

**Section 8.1**    In the event that an order denying the Environmental Motion becomes a Final Order, or in the event that the United States exercises its right to terminate this Agreement under Section 5.1, then this Agreement shall terminate and be null and void (except that Section 9.10 shall survive termination of this Agreement), and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice.

# ARTICLE IX

## MISCELLANEOUS

**Section 9.1    Notices.**  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

        (a)      if to the YPF Parties, to:

                Servicios Jurídicos
                YPF S.A.
                Macacha Güemes 515 – Piso 42
                C1106BKK – Ciudad Autónoma de Buenos Aires
                Argentina

                with copies, which shall not constitute notice, to:

                David T. Buente
                Sidley Austin LLP
                1501 K Street, N.W.
                Washington, D.C. 20005

                - and -

                John J. Kuster
                Sidley Austin LLP
                787 Seventh Avenue
                New York, New York 10019

- and -

Jeffrey A. Rosenthal
Juan Giráldez
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

(b)    if to the Repsol Parties, to:

Pablo Blanco Perez
Ignacio del Cuvillo Bañuelos
Calle Méndez Álvaro, 44,
28045 Madrid, Spain

with copies, which shall not constitute notice, to:

Ed Soto
Pravin Patel
Daniel Guernsey
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131

-    and -

Curtis Miller
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

(c)    if to the United States, to:

EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-11-3-07683/11

(d)      if to Ohio, to:

Michael Idzkowski, Assistant Attorney General
Environmental Enforcement
30 East Broad St., 25th floor
Columbus, OH  43215

(e)      if to Wisconsin, to:

Michael Morris
Assistant Attorney General
State of Wisconsin Department of Justice
Special Litigation and Appeals
17 W. Main Street
Madison, WI 53707

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

**Section 9.2     Remedies**.   The Parties agree that each Party's sole remedy for breach of this Agreement shall be the remedy of specific performance, including that the Government Parties shall have the right to enforce the payment obligations set forth in Article II of this Agreement.

**Section 9.3     Waiver of Trial by Jury**. The Parties hereto, to the extent permitted by law, waive all right to trial by jury in any action, suit, or proceeding arising out of, in connection with or relating to, this Agreement, and any transaction contemplated hereby. This waiver applies to any action, suit or proceeding whether sounding in tort, contract, or otherwise.

**Section 9.4     Complete Agreement**.  This constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto provided, however, that nothing herein shall be interpreted to alter the terms of the Plan or the Confirmation Order.

**Section 9.5     Amendment and Waiver**.  This Agreement may not be amended and, except as specified herein, no right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

**Section 9.6     Non-Severability**.   Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.

**Section 9.7     Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.  Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any claims or causes of action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until (i) each other Party hereto provides its written consent and (ii)

such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

**Section 9.8    Cooperation**.  The Parties shall reasonably cooperate with one another with regard to any actions to be taken necessary for the performance of this Agreement in a manner that is consistent with this Agreement.

**Section 9.9    No Admission of Liability.**  This Agreement does not constitute, and shall not be construed as, an admission of any violation of any Law, breach of any contract, wrongdoing or liability of any kind whatsoever, but is a compromise and settlement.

**Section 9.10    Settlement Communications**.  All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives in  connection with the negotiation of this Agreement, and the motions to be filed and orders to be sought pursuant to this Agreement, shall be governed and protected in accordance with Federal Rule of Evidence 408 and any similar local rules and state law provisions, as well as being subject to any applicable protections provided by statutes or laws relating to the confidentiality, exemption from discovery, and inadmissibility into evidence in any legal, court, regulatory, or administrative proceedings of statements, communications, and documents relating to the mediation of the Adversary Proceeding.  Except as necessary in the Governmental Parties', YPF Parties', or the Repsol Parties' discretion in connection with the prosecution of the Environmental Motion or any appeals from entry of the Report and Recommendation or Approval Order or in the YPF Parties' or the Repsol Parties' discretion in connection with the prosecution of the Trust Settlement Motion, negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except in an action or proceeding to enforce or for breach of the terms of this Agreement, or pursuant to an order of any court of competent jurisdiction.  Nothing in this Paragraph shall limit the right of the Governmental Parties to (a) use any communication in connection with the enforcement of any law including, without limitation, environmental or public health and safety laws, (b) seek or obtain any information or materials from any entity through subpoena, formal discovery or other process, (c) comply with the Freedom of Information Act,  5 U.S.C. § 552, and similar Ohio and Wisconsin freedom of information statutes, and the applicable rules and regulations implementing such statutes, or (d) comply with any court order.

**Section 9.11    Interpretation and Rules of Construction**.  This Agreement is the product of negotiations among the Private Parties and the Governmental Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Private Parties and the Governmental Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  The following rules of construction shall apply to this Agreement:  (a) "includes" and "including" are not limiting; (b) "may not" is prohibitive, and not permissive; (c) "or" is not exclusive; and (d) the singular includes the plural.

**Section 9.12    Expenses**.  Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including attorneys' fees)

in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement.

**Section 9.13   Headings**.   The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**Section 9.14   Execution of Agreement**.   This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.   Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement.

[*Remainder of page intentionally left blank*.]

YPF S.A.

_____

By:    Pablo González
Title:  Director and Chairman, YPF S.A.


YPF INTERNATIONAL S.A.

_____

By:    Pablo González
Title:  Attorney-in-Fact


YPF HOLDINGS, INC.

_____

By:    Pablo González
Title:  Attorney-in-Fact


YCLH HOLDINGS, INC.

_____

By:    Pablo González
Title:  Attorney-in-Fact


Ari J. Papahronis
Notary Public, State of New York
No.01PA6430868
Qualified in New York County
Commission Expires March 21, 2026

REPSOL, S.A.

_____
By: Miguel Klingenberg
Title: General Counsel


REPSOL EXPLORACIÓN, S.A.


_____
By:
Title:


REPSOL USA HOLDINGS LLC


_____
By:
Title:


REPSOL E&P USA LLC


_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.


_____
By:
Title:


REPSOL SERVICES COMPANY


_____
By:
Title:

REPSOL, S.A.

_____

By:
Title:

REPSOL EXPLORACIÓN, S.A.

_____

By: Francisco Gea
Title: EMD E&P

REPSOL USA HOLDINGS LLC

_____

By:
Title:

REPSOL E&P USA LLC

_____

By:
Title:

REPSOL OFFSHORE E&P USA INC.

_____

By:
Title:

REPSOL SERVICES COMPANY

_____

By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____

By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____

By:
Title:


REPSOL USA HOLDINGS LLC

_____
Ferdinando Rigardo (Apr 3, 2023 05:04 PDT)

By: Ferdinando Rigardo
Title: President


REPSOL E&P USA LLC

_____

By:
Title:


REPSOL OFFSHORE E&P USA INC.

_____

By:
Title:


REPSOL SERVICES COMPANY

_____

By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____

By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____

By:
Title:


REPSOL USA HOLDINGS LLC

_____

By:
Title:


REPSOL E&P USA LLC

*Forrest W Pace*
Forrest W Pace (Apr 4, 2023 10:16 CDT)
_____

By: Forrest W. Pace
Title: President


REPSOL OFFSHORE E&P USA INC.

_____

By:
Title:


REPSOL SERVICES COMPANY

_____

By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____
By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____
By:
Title:


REPSOL USA HOLDINGS LLC

_____
By:
Title:


REPSOL E&P USA LLC

_____
By:
Title:


REPSOL OFFSHORE E&P USA INC.

*Forrest W Pace*
Forrest W Pace (Apr 4, 2023 10:15 CDT)
_____
By: Forrest W. Pace
Title: President


REPSOL SERVICES COMPANY

_____
By:
Title:

[Signature Page - Repsol Defendants I]

REPSOL, S.A.

_____

By:
Title:


REPSOL EXPLORACIÓN, S.A.

_____

By:
Title:


REPSOL USA HOLDINGS LLC

_____

By:
Title:


REPSOL E&P USA LLC

_____

By:
Title:


REPSOL OFFSHORE E&P USA INC.

_____

By:
Title:


REPSOL SERVICES COMPANY

_____

By: Ferdinando Rigardo
Title: President


[Signature Page - Repsol Defendants I]

PERENCO TRINIDAD & TOBAGO (HOLDINGS) ETVE SLU
(F/K/A REPSOL E&P T&T LIMITED)

By: _____
       Emmanuel Colombel
Title: Director

[Signature Page - Repsol Defendants II]

FOR THE UNITED STATES OF AMERICA:

Todd Kim
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

4/5/23
Date

David L. Gordon
Donald G. Frankel
Senior Counsels
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC  20044-7611
617-947-9590

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3/31/23

Date

Lawrence E. Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

FOR THE UNITED STATES NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION:


3-30-2023
Date

Chauncey Kelly
Section Chief
Natural Resources Section
Office of General Counsel
National Oceanic and Atmospheric Administration
1315 East-West Highway
SSMC3, Suite 15107
Silver Spring, MD 20910

FOR THE STATE OF OHIO, OHIO ENVIRONMENTAL PROTECTION AGENCY AND
OHIO DEPARTMENT OF NATURAL RESOURCES:

**DAVE YOST**
**OHIO ATTORNEY GENERAL**

4/5/23
Date

By: Michael E. Idzkowski
Assistant Attorney General
Environmental Enforcement Section
30 East Broad St., 25th Floor
Columbus, OH 43215

FOR THE STATE OF WISCONSIN:

JOSHUA L. KAUL
Attorney General of Wisconsin

MICHAEL D. MORRIS
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3936
(608) 294-2907 (Fax)
morrismd@doj.state.wi.us

# EXHIBIT 1

## <u>REPSOL AFFILIATES</u>

1. 504744 Alberta, Ltd.
2. 7308051 Canada, Ltd.
3. 8441251 Canada, Ltd.
4. 8787352 Canada, Ltd.
5. Abastecimentos e Serviços de Aviaçao, Lda.
6. Acteco Productos y Servicios, S.L.
7. Agrovolt 01 S.r.l.
8. Air Miles España, S.A.
9. Akakus Oil Operations, B.V.
10. Alba Emission Free Energy, S.A.
11. Albatros, S.A.R.L.
12. Alectoris Energía Sostenible 1, S.L.
13. Alectoris Energía Sostenible 3, S.L.
14. Aneto, SAS
15. Aragonesa de Infraestructuras Energéticas Renovables, S.L.U
16. Araste SPV 2021, S.L.U.
17. Arco Energía 1, S.L.U.
18. Arco Energía 2, S.L.U.
19. Arco Energía 3, S.L.U.
20. Arco Energía 4, S.L.U.
21. Arco Energía 5, S.L.U.
22. Arcos 400 Renovables, A.I.E.
23. Arteche y García, S.L.
24. Asfaltos Españoles, S.A.
25. Asterion Energies Italia S.r.l.
26. Asterion Energies, S.L.U.
27. Asterion Renewables France Limited
28. Asterion Sunproject Uno S.r.l.

29. Autoservicio Sargento, S.A. de C.V.

30. Bardahl de México, S.A. de C.V.

31. Baschenis S.r.l.

32. Basque Hydrogen, S.L

33. Bay of Biscay Hydrogen, S.L.

34. Benzirep - Vall, S.L.

35. Boalar Energías, S.L.U

36. Boethia, SAS

37. BP Trinidad & Tobago, Llc.

38. BPC Energy S.r.l.

39. BPRY Caribbean Ventures, Llc.

40. Cal II, SAS

41. Cal III, SAS

42. Cal IV, SAS

43. Cal V, SAS

44. Cal VI, SAS

45. Cal VII, SAS

46. Cal VIII, SAS

47. Cal, SAS

48. Campsa Estaciones de Servicio, S.A.

49. Carburants i Derivats, S.A.

50. Cardón IV, S.A.

51. Cartagena Hydrogen Network, S.L.

52. Cefiro Holdco 1, S.L.U.

53. Cefiro Holdco 10, S.L.U.

54. Cefiro Holdco 11, S.L.U.

55. Cefiro Holdco 12, S.L.U.

56. Cefiro Holdco 2, S.L.U.

57. Cefiro Holdco 3, S.L.U.

58. Cefiro Holdco 4, S.L.U.

59. Cefiro Holdco 5, S.L.U.

60. Cefiro Holdco 6, S.L.U.

61. Cefiro Holdco 7, S.L.U.

62. Cefiro Holdco 8, S.L.U.

63. Cefiro Holdco 9, S.L.U.

64. Cefiro Holdco, S.L.U.

65. Cefiro Holdco, S.L.U.

66. CI Repsol Aviación Colombia, S.A.S.

67. Cinto, SAS

68. Clemer S.r.l.

69. Cogeneración Gequisa, S.A.

70. Combustibles Sureños, S.A. de C.V.

71. Compañía Anónima de Revisiones y Servicios, S.A.

72. Compañía Auxiliar de Remolcadores y Buques Especiales, S.A.

73. Corsica Optimum 2, SAS

74. Cyrasol Energia I S.r.l.

75. Cyrasol Energia III S.r.l.

76. Cyrasol Energia IV S.r.l.

77. Damien S.r.l.

78. Desarrollo Eólico Las Majas VII, S.L.U

79. Desarrollo Eólico Las Majas VIII, S.L.U

80. Desarrollo Eólico Las Majas XIV, S.L.U

81. Desarrollo Eólico Las Majas XV, S.L.U

82. Desarrollo Eólico Las Majas XXVII, S.L.U

83. Desarrollo Eólico Las Majas XXXI, S.L.U

84. Desarrollos Eólicos El Saladar, S.L.U

85. Distribuidora Andalucía Oriental, S.A.

86. Distribuidora de Petróleos, S.A.

87. Dynasol China, S.A. de C.V.

88. Dynasol Elastómeros, S.A. de C.V.

89. Dynasol Elastómeros, S.A.U.

90. Dynasol Gestión México, S.A.P.I. de C.V.

91. Dynasol Gestión, S.L.

92. Dynasol, Llc.

93. Ecoplanta Molecular Recycling Solutions, SL

94. Edwards Gas Services, Llc.

95. Ekiola Construcción, M&O, S.L.

96. Ekiola Energía Comercializadora, S.L.

97. Ekiola Promoción, SL

98. Energía Distribuida del Norte, S.A.

99. Energías Renovables de Cilene, S.L.U

100. Energías Renovables de Dione, S.L.U

101. Energías Renovables de Gladiateur 18, S.L.U

102. Energías Renovables de Hidra, S.L.U

103. Energías Renovables de Kore, S.L.U

104. Energías Renovables de Lisitea, S.L.U

105. Energías Renovables de Polux, S.L.U,

106. Energy Express, S.L.

107. Eólica Montesinos, S.L.U.

108. Eólica Montesinos, S.L.U.

109. Equion Energía, Ltd.

110. ERNC LOA, SpA

111. Estación de Servicio Bahía Asunción, S.A. de C.V.

112. Estación de Servicio Barajas, S.A.

113. Estación de Servicio Montsia, S.L.

114. Ezzing Renewable Energies S.L.

115. FEHI Holding, S.a.r.l.

116. Fortuna International (Barbados), Inc.

117. Fortuna Resources (Sunda), Ltd.

118. Four Winds Investco, S.L.

119. Four Winds Investco, S.L.

120. Fuerzas Energéticas del Sur de Europa V, S.L.U

121. Fuerzas Energéticas del Sur de Europa VI, S.L.U

122. Fuerzas Energéticas del Sur de Europa XI, S.L.U

123. Fuerzas Energéticas del Sur de Europa XII, S.L.U

124. Fuerzas Energéticas del Sur de Europa XIII, S.L.U

125. Fuerzas Energéticas del Sur de Europa XIV, S.L.U

126. Fuerzas Energéticas del Sur de Europa XIX S.L.U

127. Fuerzas Energéticas del Sur de Europa XVIII, S.L.U

128.   Gaolania Servicios, S.L.

129.   Gaviota RE, S.A.

130.   Gemini Wind S.r.l.

131.   Generación Eólica El Vedado, S.L.

132.   Generación y Suministro de Energía, S.L.U

133.   General Química, S.A.U.

134.   Georges S.r.l.

135.   Gestao e Administraçao de Postos de Abastecimiento Unipessoal, Lda.

136.   Gestión de Puntos de Venta, Gespevesa, S.A.

137.   Gimsan SPV 2021, S.L.U.

138.   Giovanni S.r.l.

139.   Greenstone Assurance, Ltd.

140.   Grupo Repsol del Perú, S.A.C.

141.   Gruppo Visconti Turi S.r.l.

142.   Guará, B.V.

143.   Gustave S.r.l.

144.   Gutsa Servicios, S.A. de C.V.

145.   Hecate Energy Frye Solar LLC

146.   Hecate Energy Group, LLC

147.   Hecate Energy Longhorn Solar LLC

148.   Hecate Energy Outpost Solar LLC

149.   Hispánica de Desarrollos Energéticos Sostenibles, S.L.U

150.   Iberen Renovables, S.A.

151.   Iberian Lube Base Oils Company, S.A.

152.   Ibil, Gestor de Carga de Vehículo Eléctrico, S.A.

153.   Industrias Negromex, S.A. de C.V.

154.   Innea Projet 2, SARL

155.   Insa Gpro (Nanjing), Synthetic Rubber Co. Ltd.

156.   ISC Greenfield 1, S.L.U.

157.   ISC Greenfield 10, S.L.U.

158.   ISC Greenfield 11, S.L.U.

159.   ISC Greenfield 13, S.L.U.

160.   ISC Greenfield 17, S.L.U.

161.  ISC Greenfield 18, S.L.U.

162.  ISC Greenfield 19, S.L.U.

163.  ISC Greenfield 2, S.L.U.

164.  ISC Greenfield 20, S.L.U.

165.  ISC Greenfield 24, S.L.U.

166.  ISC Greenfield 25, S.L.U.

167.  ISC Greenfield 3, S.L.U.

168.  ISC Greenfield 4, S.L.U.

169.  ISC Greenfield 5, S.L.U.

170.  ISC Greenfield 6, S.L.U.

171.  ISC Greenfield 8, S.L.U.

172.  ISC Greenfield 9, S.L.U.

173.  Jackson S.r.l.

174.  Jackson S.r.l.

175.  Jasper S.r.l.

176.  Jicarilla Solar 1 Bond Purchaser LLC

177.  Jicarilla Solar 1 LLC

178.  Jicarilla Solar 2 Bond Purchaser LLC

179.  Jicarilla Solar 2 Class B LLC

180.  Jicarilla Solar 2 Holdings LLC

181.  Jicarilla Solar 2 LLC

182.  Jicarilla Storage 1 LLC

183.  Jicarilla Storage Bond Purchaser LLC

184.  Keith S.r.l.

185.  KI 1, SAS

186.  Klikin Deals Spain, S.L.

187.  Lapa Oil & Gas, B.V.

188.  LGA Logística Global de Aviação, Lda.

189.  Liaoning North Dynasol Synthetic Rubber Co. Ltd.

190.  Lorenzo S.r.l.

191.  Mafra Solar S.r.l.

192.  Medusa Alternativas Suministro Eléctrico, S.L.

193.  Michelangelo S.r.l.

194.    Natural Power Development, S.L.U

195.    Nesa Vento Galego 1, S.L.

196.    Nesa Vento Galego 2, S.L.

197.    Nesa Vento Galego 3, S.L.

198.    Net Zero Ventures, S.L.

199.    New Energy Viven S.r.l.

200.    Nudo Manzanares 220 KV, A.I.E.

201.    Oleoducto de Crudos Pesados, Ltd.

202.    Paladin Resources, Ltd.

203.    Palmira Market, S.A. de C.V.

204.    Paolo S.r.l.

205.    Parque Eólico Antofagasta, SpA

206.    Parque Eólico Atacama SPA

207.    Parque FV Centauro, S.L.U.

208.    Parque FV Hércules, S.L.U.

209.    Parque FV Orión, S.L.U.

210.    Parque FV Taurus, S.L.U.

211.    Paul S.r.l.

212.    PE Cabo Leones III SpA

213.    PE Levante 4W, S.L.U.

214.    PE Mistral 4W, S.L.U.

215.    PE Tramontana 4W, S.L.U.

216.    Perseo Biotechnology S.L.U.

217.    Petrocarabobo, S.A.

218.    Petróleos del Norte, S.A.

219.    Petronor Innovación, S.L.

220.    Petroquiriqué, S.A. - Empresa Mixta

221.    PI 1, SAS

222.    PI Italy 2 S.r.l.

223.    PI Italy S.r.l.

224.    Pieter S.r.l.

225.    Polidux, S.A.

226.    Prejeance Industrial, SAS

227. PT Pacific Lubritama Indonesia

228. PV Aries S.r.l.

229. PV El Tomillar, S.L.U.

230. PV Italy 008 S.r.l.

231. PV Sagittarius S.r.l.

232. PV Scorpio S.r.l.

233. PV Taurus S.r.l.

234. PV Virgo S.r.l.

235. Quiriquiré Gas, S.A.

236. Radira SPV 2021, S.L.U.

237. Refinería La Pampilla, S.A.A.

238. Régsiti Comercializadora Regulada, S.L.U.

239. Relkia Distribuidora de Electricidad, S.L

240. Remolcadores Portuarios de Tarragona,S.L.

241. Renovacyl, S.A.

242. Repsol Alberta Shale Partnership

243. Repsol Andaman B.V.

244. Repsol Angostura, Ltd.

245. Repsol Bolivia, S.A.

246. Repsol Bulgaria Khan Kubrat, S.A.

247. Repsol Butano, S.A.

248. Repsol Canada Energy Partnership

249. Repsol Canadá, Ltd.

250. Repsol Chemie Deutschland, GmbH

251. Repsol Chile SpA

252. Repsol Colombia Oil & Gas Limited

253. Repsol Comercial de Productos Petrolíferos, S.A.

254. Repsol Comercial, S.A.C.

255. Repsol Comercializadora de Electricidad y Gas, S.L.U.

256. Repsol Corridor, S.A.

257. Repsol Customer Centric, S.L.

258. Repsol Directo, Lda.

259. Repsol Directo, S.A.

260.   Repsol Downstream Internacional, S.A.

261.   Repsol Downstream México, S.A. de C.V

262.   Repsol Ductos Colombia, S.A.S.

263.   Repsol E&P Bolivia, S.A.

264.   Repsol E&P S.a.r.l.

265.   Repsol E&P USA Holdings, Inc.

266.   Repsol E&P USA, Llc.

267.   Repsol Energy North América Canada Partnership

268.   Repsol Energy North América Corporation

269.   Repsol Energy Perú, S.A.C.

270.   Repsol Energy Ventures, S.A.

271.   Repsol Europe Finance S.A.R.L.

272.   Repsol Exploração Brasil, Ltda.

273.   Repsol Exploración 405A, S.A.

274.   Repsol Exploración Aitoloakarnania, S.A.

275.   Repsol Exploración Argelia, S.A.

276.   Repsol Exploración Aru, S.L

277.   Repsol Exploración Atlas, S.A.

278.   Repsol Exploración Colombia, S.A.

279.   Repsol Exploración Gharb, S.A.

280.   Repsol Exploración Guinea, S.A.

281.   Repsol Exploración Guyana, S.A.

282.   Repsol Exploración Ioannina, S.A.

283.   Repsol Exploración Irlanda, S.A.

284.   Repsol Exploración Karabashsky, B.V.

285.   Repsol Exploración México, S.A. de C.V.

286.   Repsol Exploración Murzuq, S.A.

287.   Repsol Exploración Perú, S.A.

288.   Repsol Exploracion South East Jambi B.V.

289.   Repsol Exploración South Sakakemang, S.L.

290.   Repsol Exploración Tanfit, S.L.

291.   Repsol Exploración Tobago, S.A.

292.   Repsol Exploración West Papúa IV, S.L.

293.    Repsol Exploración, S.A.

294.    Repsol Exploration Advanced Services, A.G.

295.    Repsol Finance Brasil B.V.

296.    Repsol Finance Brasil S.A.R.L.

297.    Repsol Financiera Renovables, S.A.

298.    Repsol Gas Portugal, Unipessoal, Lda.

299.    Repsol Generación de Ciclos Combinados, S.L.U.

300.    Repsol Generación Eléctrica, S.A.

301.    Repsol Gestión de Divisa, S.L.

302.    Repsol Greece Ionian, S.L.

303.    Repsol Ibereólica Renovables Chile SpA

304.    Repsol Industrial Transformation, S.L

305.    Repsol International Finance, B.V.

306.    Repsol Investigaciones Petrolíferas, S.A.

307.    Repsol LNG Holding, S.A.

308.    Repsol Lubricantes y Especialidades, S.A.

309.    Repsol Lubrificantes e Especialidades Brasil Participaçoes, Ltda.

310.    Repsol Mar de Cortés Estaciones de Servicio, S.A. de C.V.

311.    Repsol Mar de Cortés, S.A. de C.V.

312.    Repsol Marketing France, S.A.S.U.

313.    Repsol Marketing, S.A.C.

314.    Repsol Norge, AS

315.    Repsol Nughedu S.R.L.

316.    Repsol OCP de Ecuador, S.A.

317.    Repsol Offshore E&P USA, Inc.

318.    Repsol Oil & Gas Australasia Pty, Ltd.

319.    Repsol Oil & Gas Australia (JPDA 06-105) Pty Ltd.

320.    Repsol Oil & Gas Canada, Inc.

321.    Repsol Oil & Gas Gulf of Mexico, LLC

322.    Repsol Oil & Gas Holdings USA, Inc.

323.    Repsol Oil & Gas RTS Sdn, Bhd.

324.    Repsol Oil & Gas USA, LLC.

325.    Repsol Oil &Gas Vietnam 07/03 Pty Ltd.

326.    Repsol Oriente Medio, S.A.

327.    Repsol Perpetual Norge, A.S.

328.    Repsol Perú, B.V.

329.    Repsol Petróleo, S.A.

330.    Repsol Polímeros, Unipessoal, Lda.

331.    Repsol Portuguesa, Lda.

332.    Repsol Química, S.A.

333.    Repsol Renewable and Circular Solutions,S.A

334.    Repsol Renewables Development Company LLC

335.    Repsol Renewables Development Holdings Corp

336.    Repsol Renewables Italia S.R.L.

337.    Repsol Renewables North America, Inc

338.    Repsol Renovables, S.A.

339.    Repsol Sakakemang, B.V.

340.    Repsol Salamanca Midstream, LLC

341.    Repsol San Mauro S.R.L.

342.    Repsol Services Company

343.    Repsol Services México, S.A. de C.V.

344.    Repsol Servicios Colombia, S.A.

345.    Repsol Servicios Renovables, S.A.

346.    Repsol Shale Oil & Gas LLC.

347.    Repsol Sinopec Brasil, B.V.

348.    Repsol Sinopec Brasil, S.A.

349.    Repsol Sinopec Resources UK, Ltd.

350.    Repsol St. John LNG, S.L

351.    Repsol Technology and Ventures, S.L.U

352.    Repsol Tesorería y Gestión Financiera, S.A.

353.    Repsol Trading Perú, S.A.C.

354.    Repsol Trading Singapore Pte, Ltd.

355.    Repsol Trading USA LLC.

356.    Repsol Trading, S.A.

357.    Repsol Transgasindo S.à r.l.

358.    Repsol U.K., Ltd.

359.    Repsol Upstream B.V.

360.    Repsol Upstream Inversiones, S.A.

361.    Repsol USA Holdings LLC.

362.    Repsol Uta S.R.L.

363.    Repsol Venezuela, S.A.

364.    Repsol Venosa S.R.L.

365.    Saint John LNG Development Company Ltd.

366.    Saint John LNG Limited Partnership

367.    Salamanca Infrastructure, LLC

368.    Servicios de Seguridad Mancomunados, S.A.

369.    Servicios Logísticos de Combustibles de Aviación, S.L

370.    Sidney S.r.l.

371.    Sierracol Energy Arauca, LLC

372.    Smarkia Energy, S.L.

373.    Sociedade Abastecedora de Aeronaves, Ltda.

374.    Società Agricola Edward S.r.l.

375.    Societat Catalana de Petrolis, S.A.

376.    Solar 360 de Repsol y Movistar, S.L.

377.    Solar 360 Soluciones de Instalación y Mantenimiento, S.L.

378.    Solar Antofagasta SpA

379.    Solar Elena SpA

380.    Solar Fotovoltaica Villena, S.L.

381.    Solgas Distribuidora de Gas, S.L.

382.    Solred, S.A.

383.    Soluciones Tecnológicas de Energías Verdes, S.L.U

384.    SPV Lanas-Servas, SAS

385.    Sunnprod, SAS

386.    Sunrgyze, S.L.

387.    Talisman (Asia), Ltd.

388.    Talisman (Block K 39), B.V.

389.    Talisman (Jambi Merang), Ltd.

390.    Talisman (Sageri), Ltd.

391.    Talisman (Vietnam 133 & 134), Ltd.

392. Talisman Colombia Holdco, Ltd.

393. Talisman East Jabung, B.V.

394. Talisman International (Luxembourg), S.a.r.l.

395. Talisman International Holdings, B.V.

396. Talisman Perpetual (Norway), Ltd.

397. Talisman Resources (Bahamas), Ltd.

398. Talisman Resources (North West Java), Ltd.

399. Talisman South Sageri, B.V.

400. Talisman UK (South East Sumatra), Ltd.

401. Talisman Vietnam 07/03-CRD Corporation, Llc.

402. Talisman Vietnam 146-147, B.V.

403. Tarragona Hydrogen Network, S.L.

404. Terminales Canarios, S.L.

405. Tramperase, S.L.

406. Transportadora Sulbrasileira del Gas, S.A.

407. Transworld Petroleum (U.K.) Ltd.

408. Triad Oil Manitoba, Ltd.

409. Tucan LNG S.à r.l.

410. United Oil Company Pte Ltd

411. Valdesolar Hive, S.L.

412. Vento Continuo Galego, S.L.U.

413. Vincent S.r.l.

414. Viveiro PE Galicia, S.L.U.

415. VOLT B, SAS

416. Volt B, SAS

417. Volt II, SAS

418. Volt III, SAS

419. Volt, SAS

420. Vung May 156 - 159 Vietnam, B.V.

421. WIB Advance Mobility, S.L.

422. YPFB Andina, S.A.

423. YPFB Transierra, S.A.

# EXHIBIT 2

## <u>YPF AFFILIATES</u>

1.  A&C Pipeline Holding Company
2.  AESA – Construcciones y Servicios Ltd.
3.  AESA Ingeniería y Construcciones Bolivia S.A.
4.  AESA Perú S.A.C.
5.  A-Evangelista S.A.
6.  Bajo del Toro I S.R.L.
7.  Bajo del Toro II S.R.L.
8.  Bioceres S.A.
9.  Bizoy S.A.
10. Central Dock Sud S.A.
11. Civeny S.A.
12. Compañía de Desarrollo No convencional S.R.L.
13. Compañía de Hidrocarburo No Convencional S.R.L.
14. Compañía Mega S.A.
15. CT Barragán S.A.
16. Eleran Inversiones S.A.U.
17. Empresa de Perforaciones Argentina S.A.
18. Energía Andina S.A.
19. Gas Austral S.A.
20. Gasoducto del Pacífico Argentina S.A.
21. Gasoducto Oriental S.A.
22. Inversora Dock Sud S.A.
23. Lestery S.A.
24. Luz del León S.A.
25. Luz del Río S.A.
26. Luz del Valle S.A.U.
27. Metrogas S.A.
28. Metronergía S.A.

29. Miwen S.A.

30. Oiltanking Ebytem S.A.

31. Oleoducto Loma Campana – Lago Pellegrini S.A.

32. Oleoducto Trasandino Argentina S.A.

33. Oleoducto Trasandino Chile S.A.

34. Oleoductos del Valle S.A.

35. Operadora de Estaciones de Servicios S.A.

36. Petrofaro S.A.

37. Profertil S.A.

38. Refinería del Norte S.A.

39. Subdistribuidora Bahía Blanca S.A.

40. Sustentator S.A.

41. Terminales Marítimas Patagónicas S.A.

42. Wokler Investment S.A.

43. YCLH Holdings Inc. (CLH Holdings Inc.)

44. Y-GEN Eléctrica II S.A.U.

45. Y-GEN Eléctrica S.A.U.

46. Y-LUZ Inversora S.A.U.

47. YPF Brasil Comercio de Derivados de Petróleo Ltda.

48. YPF Chile S.A.

49. YPF Colombia S.A.

50. YPF E&P Perú S.A.C.

51. YPF EE Comercializadora S.A.U.

52. YPF Energía Eléctrica S.A.

53. YPF Exploración y Producción de Hidrocarburos de Bolivia S.A.

54. YPF GAS S.A.

55. YPF Holdings Inc.

56. YPF International S.A.

57. YPF Litio S.A.U.

58. YPF Services USA Corp.

59. YPF Shale Oil Holding II Ltd.

60. YPF Shale Oil Holding Ltd.

61. YPF Shale Oil Investment I LLC

62. YPF Shale Oil Investment II LLC

63. YPF Shale Oil Investment III LLC

64. YPF Shale Oil Investment IV LLC

65. YPF Tecnología S.A.

66. YPF Ventures Investment LLC

67. YPF Ventures Management LLC

68. YPF Ventures S.A.U.

**<u>EXHIBIT 3</u>**

**ESCROW AGREEMENT**

[*Intentionally Omitted*]

**<u>EXHIBIT 4</u>**

**LC**

[*Intentionally Omitted*]

**EXHIBIT 5**

**SETTLEMENT MOTION**

[*Intentionally Omitted*]

**EXHIBIT 6**

**SETTLEMENT ORDER**

[*Intentionally Omitted*]

**<u>EXHIBIT 7</u>**

**ADVERSARY PROCEEDING STIPULATION OF DISMISSAL**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11501 (CTG)<br>(Jointly Administered) |
| MAXUS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACION, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO.,<br><br>Defendants. | Adv. Proc. No. 18-50489 (CTG) |

## STIPULATION AND PROPOSED ORDER OF DISMISSAL

Plaintiff Maxus Liquidating Trust (the "**Trust**"); YPF S.A., YPF International S.A., YPF Holdings, Inc., and YCLH Holdings, Inc. (f/k/a CLH Holdings, Inc.) (collectively, the "**YPF Defendants**"); Repsol, S.A., Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (f/k/a Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "**Repsol Defendants**"), by and through its undersigned counsel, submit this Stipulation of Dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(ii) (made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7041). The Trust, the YPF Defendants,

and the Repsol Defendants (each a "**<u>Party</u>**" and, collectively, the "**<u>Parties</u>**") stipulate that all of the Trust's claims brought in this adversary proceeding are fully resolved and hereby dismissed with prejudice.  Each Party shall bear its own attorneys' fees and costs.

Dated: _____ __, 2023

Respectfully submitted,

MAXUS LIQUIDATING TRUST

THE YPF DEFENDANTS

By: */s/ DRAFT* _____

By: */s/ DRAFT* _____

FARNAN LLP
Brian E. Farnan (Bar No. 4098)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

LANDIS RATH & COBB LLP
Adam G. Landis (Bar No. 3407)
Matthew B. McGuire (Bar No. 4366)
Nicolas E. Jenner (Bar No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
(302) 467-4400
landis@lrclaw.com
mcguire@lrclaw.com
jenner@lrclaw.com

WHITE & CASE LLP
J. Christopher Shore (admitted *pro hac vice*)
Colin West (admitted *pro hac vice*)
Erin M. Smith (admitted *pro hac vice*)
Matthew L. Nicholson (admitted *pro hac vice*)
Brett L. Bakemeyer admitted (*pro hac vice*)
Jade H. Yoo (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
cshore@whitecase.com
cwest@whitecase.com
erin.smith@whitecase.com
matthew.nicholson@whitecase.com
brett.bakemeyer@whitecase.com
jade.yoo@whitecase.com

SIDLEY AUSTIN LLP
John J. Kuster (admitted *pro hac vice*)
Andrew P. Propps (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

CLEARY GOTTLIEB STEEN
& HAMILTON LLP
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Ari D. MacKinnon (admitted *pro hac vice*)
Mark E. McDonald (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
(212) 225-2000

WHITE & CASE LLP
Jason Zakia (admitted *pro hac vice*)
111 S Wacker Dr. Suite 5100
Chicago, IL 60606
(312) 881-5400
jzakia@whitecase.com

THE REPSOL DEFENDANTS

By: */s/ DRAFT*_____

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
Robert J. Dehney (Bar No. 3578)
Curtis S. Miller (Bar No. 4583)
Daniel B. Butz (Bar No. 4227)
Sophie Rogers Churchill (Bar No. 6905)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

WEIL, GOTSHAL & MANGES LLP
Edward Soto (admitted *pro hac vice*)
Pravin Patel (admitted *pro hac vice*)
Brian Liegel (admitted *pro hac vice*)
Mark Pinkert (admitted *pro hac vice*)
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
(305) 577-3100

      IT IS SO ORDERED this _____ day of _____, 2023.

                               _____
                                 The Honorable Craig T. Goldblatt
                                 United States Bankruptcy Judge

4

<u>**EXHIBIT 8**</u>

**PASSAIC RIVER LITIGATION DISMISSAL**

PASHMAN STEIN WALDER HAYDEN
A Professional Corporation
MICHAEL S. STEIN, ESQUIRE/037351989
Court Plaza South
21 Main Street, Suite 200
Hacksensack, New Jersey 07601
(201) 488-8200
*Attorneys for Intervenor Joseph J. Farnan, Jr.,*
*As Liquidating Trustee of the Maxus Liquidating Trust*

LANGSAM STEVENS SILVER & HOLLAENDER LLP
JOHN J. MCDERMOTT, ESQUIRE/039042006
65 South Main Street, Suite B102
Pennington, New Jersey 08534

GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
BY: KATHY D. PATRICK, ESQUIRE
(admitted *pro hac vice*)
ANTHONY N. KAIM, ESQUIRE
(admitted *pro hac vice*)
*Attorneys for Defendant/Cross-Claimant Occidental Chemical Corporation*

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>                    Plaintiffs,<br><br>v.<br><br>OCCIDENTAL CHEMICAL CORPORATION, TIERRA SOLUTIONS, INC., MAXUS ENERGY CORPORATION, MAXUS INTERNATIONAL ENERGY COMPANY, REPSOL YPF, S.A., YPF, S.A.,  YPF HOLDINGS, INC., YPF INTERNATIONAL S.A. (*f/k/a* YPF INTERNATIONAL LTD.) and CLH HOLDINGS,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION -  ESSEX COUNTY<br><br>DOCKET NO. L-9868-05 (PASR)<br><br>CIVIL ACTION<br><br><br>**JOINT STIPULATION OF DISMISSAL** |

The matter in difference in the above entitled action having been amicably adjusted by and between Intervenor Maxus Liquidating Trust, Defendant and Cross-Claimant Occidental Chemical Corporation, and Defendant YPF S.A., YPF International S.A., YPF Holdings, Inc., and YCLH Holdings, Inc. (*f/k/a* CLH Holdings, Inc.) (collectively, the "**YPF Defendants**"), and Defendant Repsol, S.A. (*f/k/a* Repsol YPF, S.A.), Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Perenco Trinidad & Tobago (Holdings) ETVE SLU (*f/k/a* Repsol E&P T&T Limited), and Repsol Services Company (collectively, the "**Repsol Defendants**"), it is hereby stipulated and agreed that all claims, counterclaims, appeal rights, and causes of action that were asserted or could have been asserted in this action between intervenor Maxus Liquidating Trust or cross-claimant Occidental Chemical Corporation against the YPF Defendants or the Repsol Defendants be and are hereby dismissed with prejudice and without costs. It is further stipulated and agreed that all appeals and rights to appeal on behalf of intervenor Maxus Liquidating Trust and cross-claimant Occidental Chemical Corporation against the YPF Defendants or the Repsol Defendants are hereby released and dismissed with prejudice, without costs.

**Dated: _____ __, 2023**

By: /s/ *Draft* _____
Michael S. Stein
**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
*Attorneys for Intervenor*
*Joseph J. Farnan, Jr. as*
*Liquidating Trustee for the Maxus*
*Liquidating Trust*

By: /s/ *Draft*_____
John J. McDermott
**LANGSAM STEVENS SILVER &**
**HOLLAENDER LLP**
65 South Main Street, Suite B102
Pennington, New Jersey 08534
T: 856-727-0057
F: 856-727-0315
*Attorneys for Defendant/Cross-Claimant*
*Occidental Chemical Corporation*


By: /s/ *Draft*_____
Diane P. Sullivan
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
T: 609-986-1120
F: 609-986-1199
*Attorneys for Defendant/Cross-Claimant*
*Repsol, S.A.*